# EXHIBIT B-008

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| IN RE: ) | | |
| SPECIAL PURPOSE GRAND JURY ) | 2022-EX-000024 | |
| ) | | |
| ) | Judge Robert C. I. McBurney | |
| ) | | |

FILED IN OFFICE
JUN 30 2022
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## STATE'S RESPONSE TO MOTION TO QUASH

**COMES NOW** the State of Georgia, by and through Fani T. Willis, District Attorney, Atlanta Judicial Circuit, Fulton County, Georgia, acting in her capacity as the legal advisor to Fulton County's special purpose grand jury, and responds to the Motion to Quash filed by "Members of the General Assembly (William Ligon; Lt. Governor Duncan; and others)." In order to ensure the proper execution of the special purpose grand jury's function and to prevent the unwarranted extension of legislative immunity or privilege to actions which are entirely outside the General Assembly's jurisdiction or legitimate activities, the District Attorney opposes the motion on behalf of the special purpose grand jury.

The Georgia Constitution states, at art. III, § 4, ¶ 9:

> The members of both houses shall be free from arrest during sessions of the General Assembly, or committee meetings thereof, and in going thereto or returning therefrom, except for treason, felony, or breach of the peace. No member shall be liable to answer in any other place for anything spoken in either house or in any committee meeting of either house."

As a result of their concern about the "scope of the grand jury's inquiry and the questions that will be posed to them," the movants ask this Court to prohibit the special purpose grand jury from questioning "any Member of the General Assembly" about three broad subjects: (1) matters that occurred within their legislative capacity, (2) the Members' "motivations" for legislative

activities, and (3) any research they conducted, "including interviewing constituents, lobbyists, or other sources of information that relates to the legislative process." The movants suggest this Court apply the broadest possible brush to limit the scope of the special purpose grand jury's inquiry, preventing questioning regarding "all other activities that are part of the legislative responsibility of the legislator and staff." On behalf of the special purpose grand jury, the District Attorney urges this Court not to do so.

As a preliminary matter, the movants have not yet comprehensively identified themselves. As noted above, the motion refers only to William Ligon, a former state senator; Geoff Duncan, the lieutenant governor of Georgia; and "others." While the District Attorney understands that additional Members served with a grand jury subpoena may choose to join in the motion, the motion requests relief that would apply to *any* Member of the General Assembly, whether they join in the motion or not. Because the right of the legislative immunity and privilege lies with the individual Member, a single motion cannot request a universal ruling outlining their application to each and every Member. *See* ACORN v. Cnty. of Nassau, 2007 U.S. Dist. LEXIS 71058, 2007 WL 2815810, at *2 (E.D.N.Y. Sept. 25, 2007). A legislator cannot assert or waive the privilege on behalf of another legislator. *See* A Helping Hand, LLC v. Baltimore Cnty., Md., 295 F. Supp. 2d 585, 590 (D. Md. 2003). However, as two movants (Mr. Ligon and Lieutenant Governor Duncan) have been identified, the District Attorney will address the scope and nature of legislative immunity and privilege as it may apply to those movants.

I. **The General Assembly cannot, either in 2020 or today, "rectify" election results by changing the outcome of a certified election that has already taken place, and it is never, and can never be, considered a legitimate "legislative duty" to attempt to do so.**

It has long been established that members of a legislature are not immune to a grand jury subpoena. The Speech and Debate Clause of the United States Constitution does not "immunize

Senator or aide from testifying at trial or grand jury proceedings involving third-party crimes where the questions do not require testimony about or impugn a legislative act." Gravel v. United States, 408 U.S. 606, 622 (1972).[1] The special purpose grand jury's investigation, which is authorized to examine any facts and circumstances relating directly or indirectly to possible criminal disruptions of the 2020 elections in Georgia, certainly qualifies as a "grand jury proceeding involving third-party crimes."

The question, then, is what constitutes a "legislative act." The movants seek to prevent inquiry into "matters that occurred in the witness's legislative capacity," as well as their "motivations" for legislative activities. With regard to immunity, "[a]bsolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376 (1951)). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." Id. "A party claiming legislative immunity must demonstrate that its actions, when stripped of all considerations of intent and motive, were legislative rather than administrative or executive in nature." LHR Farms, Inc. v. White City, 2010 U.S. Dist. LEXIS 149917 at *27 (N.D.Ga.) (citing Bogan, 523 U.S. at 55). In Bogan, the Supreme Court considered "whether the application of legislative immunity required a court to 'look beyond [defendants'] formal actions to consider whether the ordinance was legislative in substance.'" Ahearn v. City of Palos Verdes Estates, 2007 U.S. Dist. LEXIS 104513 at *27 (C.D.Cal.) (quoting Bogan, 523 U.S. at 55). The Court first assessed the "formally legislative nature" of the activity (the passing of an ordinance), concluding that the act of voting for the ordinance was "quintessentially legislative."

---

[1] The Georgia Supreme Court has held that the legislative immunity and privilege clause of the Georgia Constitution is similar to the Speech and Debate Clause of the United States Constitution. See N. Atlanta v. Cook, 219 Ga. 316, 318 (1963).

3

Bogan, 523 U.S. at 55. But the Court "expressly declined to decide whether the mere *form* of legislative action was sufficient, ruling instead that the particular vote was legislative in *substance* because it was a 'discretionary, policymaking decision.'" Dyas v. City of Fairhope, 2009 U.S. Dist. LEXIS 92001, *14 (citing Bogan, 523 U.S. at 56) (emphasis original).

With regard to privilege, the Supreme Court's assessment of the Speech and Debate Clause and its application to Members of Congress provides another two-part test. While the Clause on its face protects only speech and debate on the floor of Congress, "the Supreme Court has given the clause a practical meaning, extending the subject matter protected to cover activity that is within the 'legitimate legislative sphere.'" Miller v. Transamerican Press, Inc., 709 F.2d 524, 529 (9th Cir. 1983).

> However, "legislative acts are not all-encompassing"; the privilege extends beyond pure speech and debate only when necessary to prevent indirect impairment of Congressional deliberations. Gravel, 408 U.S. at 625. Activity other than speech or debate must meet what may be characterized as a two-part test to qualify for the privilege. First, it must be "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." Id. The privilege applies "to things generally done in a session of the House by one of its members in relation to the business before it." Kilbourn v. Thompson, 103 U.S. 168, 204, 26 L. Ed. 377 (1881). Second, the activity must address proposed legislation *or some other subject within Congress' constitutional jurisdiction.* Gravel, 408 U.S. at 625. The scope of Congressional inquiry is broad, see, e.g., id. at 610 n.6, though not unlimited. Watkins v. United States, 354 U.S. 178, 187, 1 L. Ed. 2d 1273, 77 S. Ct. 1173 (1957).

Miller, 709 F.2d at 529 (emphasis added). Thus, for privilege to apply, it is not enough that the activity involved is typical of the legislative process; it must address a subject that is *actually within the legislature's jurisdiction.*

In their motion, the movants ask this Court to perform only half of each of these evaluations, assessing only the form of various activities while ignoring their substance, and assessing the forum or presentation of an activity while ignoring whether it lay within the legislature's jurisdiction. A specific example of "legislative activity" provided in the motion is

4

"committee hearings or other meetings."[2] Clearly, committee hearings are traditionally understood as examples of "legislative acts"; they are specifically mentioned in the legislative privilege and immunity clause of the Georgia Constitution, *supra*. However, some facts and circumstances involving a movant, Mr. Ligon, and relevant to the special purpose grand jury's investigation, require greater scrutiny in order to determine whether a hearing is *always* within the "legitimate legislative sphere."

While it is clear that committee hearings or "committee meetings" are legislative in form, their substance is another matter. It is a matter of public record that on December 3, 2020, Mr. Ligon chaired a Senate subcommittee hearing at which Rudy Giuliani and others were given the floor for several hours in order to present claims and public comment relating to purported election fraud. This fact is unquestionably "directly or indirectly related" to the subject of the special purpose grand jury's investigation.[3] Many of the comments and materials offered by Giuliani and others at this hearing have been demonstrated to be utterly false. In 2021, Giuliani was suspended from the practice of law in the state of New York for a pattern of making and publicizing false and misleading statements, including, specifically, his presentations before the Georgia legislature.[4] Following the hearing at which Giuliani appeared, Mr. Ligon authored and publicized a report[5] summarizing the public comments offered at the hearing, presenting the assertions made by

---

[2] Motion p. 3.
[3] *See* O.C.G.A. § 15-12-100(c).
[4] Giuliani "repeated to lawmakers and the public at large numerous false and misleading statements regarding the Georgia presidential election results." *See* Matter of Giuliani, 146 N.Y.S.3d 266, 275-79 (2021).
[5] The report, entitled "Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee," was released first by Mr. Ligon as an individual Member "for informational purposes." On December 30, 2020, the subcommittee adopted the report in a 3-1 vote. *See* http://www.senatorligon.com/THE_SENATE%20JUDICIARY%20SUBCOMMITTEE_FINAL%20REPORT.PDF .

Giuliani and others as true "findings" even when they had been publicly (and repeatedly) debunked by state officials for weeks.[6] At the conclusion of the report, Mr. Ligon made several "recommendations," concluding with the following paragraph:

> H. For Rectifying the 2020 General Election Results
> The Legislature should carefully consider its obligations under the U.S. Constitution. If a majority of the General Assembly concurs with the findings of this report, the certification of the Election should be rescinded and the General Assembly should act to determine the proper Electors to be certified to the Electoral College in the 2020 presidential race. Since time is of the essence, the Chairman and Senators who concur with this report recommend that the leadership of the General Assembly and the Governor immediately convene to allow further consideration by the entire General Assembly.

The General Assembly cannot, either in 2020 or today, "rectify" election results by changing the outcome of a certified election that has already taken place, and it is never, and can *never* be, considered a legitimate "legislative duty" to attempt to do so.[7] Holding hearings and generating a report intended to propose "rescinding" an election certification is *entirely outside* of the General Assembly's jurisdiction. Additionally, presenting demonstrable falsehoods as "findings" in a committee report should never be considered conduct protected by legislative immunity or privilege, and to suggest otherwise makes a mockery of the "integrity of the legislative process" the movants supposedly seek to preserve by shielding themselves from legitimate inquiry from Georgia citizens. It is those citizens, after all, whose votes would have been invalidated by

---

[6] *See* "Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee," Section V, paragraph 7. *Compare* https://apnews.com/article/election-2020-donald-trump-georgia-media-social-media-e9a73462e39e7aa39683f0f582a6659e .

[7] While the Constitution gives states, through their legislatures, the power to choose the manner for appointing electors, it delegates to Congress the power "to determine the time of chusing Electors." U.S. Const. art II, § I, cl. 4. Congress, in turn, has provided that all states must appoint their electors on the "Tuesday after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1. That particular day is better known as Election Day. The manner of appointment of electors in Georgia is a general presidential election, *see* O.C.G.A. § 21-2-130 et seq., O.C.G.A. § 21-2-10 et seq., O.C.G.A. 21-2-499, just as it is in every other state. As a result, a state legislature's post-Election Day appointment of its own slate of electors would directly violate federal law, in addition to fundamental tenets of democracy.

the "rectifying" activity proposed by Mr. Ligon. Despite this, he has moved to quash his subpoena on the basis of protections whose purpose, he suggests, is not "protecting the members against prosecutions for their own benefit, but to support the rights of the people." It is outrageous to claim a mantle of protection for legitimate legislative duties when one's own actions sought to reduce the legislature to a laundry for falsehoods and illegalities. It is a matter of public record that this is exactly what occurred in Mr. Ligon's report.

Even actions resulting from "committee meetings" must meet a threshold determination: "once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference." Eastland v. United States Servicemen's Fund, 421 U.S. 491, 503 (1975). In circumstances such as these, the report created by Mr. Ligon cannot *possibly* exist within the "legitimate legislative sphere." Including within the same report some recommendations for future legislation, a legitimate legislative duty, does not confer legitimacy upon false "findings" or advocacy for illegal legislative actions such as the "rescinding" of a certified election.[8] To find otherwise would be the ultimate elevation of *form* above *substance*. Even if the Ligon Report was the product of a "hearing," "meeting," or "investigation," the power of a legislature "is not unlimited." Watkins v. United States, 354 U.S. 178, 187 (1957). In Watkins, a case involving the actions of the House Un-American Activities Committee, the Supreme Court held that "[n]o inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of Congress." Id. If Congress could exceed the scope of its powers as described in Watkins

---

[8] Even in United States v. Johnson, 383 U.S. 169, 180 (1966), where the Supreme Court stated "[t]he claim of an unworthy purpose does not destroy the privilege," the legislator's actions were more clearly within the "legitimate legislative sphere" than the actions contemplated herein. The legislator in Johnson had given a speech for an allegedly improper reason, but it was inarguably within his authority as a legislator to give the speech. Here, Mr. Ligon wrote a report recommending the overturn of a certified election, an activity which, as has been stated, neither he nor the General Assembly *ever* had the authority to pursue, much less to accomplish.

7

by pursuing "[i]nvestigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated," activity which the Supreme Court found "indefensible," then the Members of the General Assembly can exceed their powers in pursuing activities designed to advocate for *ultra vires* actions entirely outside of their jurisdiction such as "rescinding" or "rectifying" a certified election.

Finally, it is not an "inhibition" of the legislative process or legislative legitimacy and independence to expect a legislator to verify the truth of his statements or the legality of his recommendations before they are placed into a report and released to the public. This is particularly true where legislative immunity and privilege exist in part because, as the movants insist, "[b]ad ideas need to be discussed and rejected; good ideas should be promoted."[9] The Supreme Court has observed that the Speech or Debate Clause "protects Members against prosecutions that directly impinge upon or threaten the legislative process." Gravel, 408 U.S. at 616.[10] Questioning members as to these matters could not possibly impinge upon the legislative process with regard to proposals for "rescinding" votes because such a proposal falls outside the "legitimate legislative sphere" and outside of the legislature's jurisdiction. Where dishonesty or misinformation was the result, Members should be subject to questioning by the special purpose grand jury. If "the need to encourage frank and honest discussion among lawmakers favors nondisclosure,"[11] then the need to inquire into dishonesty favors the opposite. The movant is free, of course, to argue otherwise.

## II. Members' communications with third parties are not protected by legislative privilege in criminal investigations.

---

[9] Motion p. 6.

[10] While the language of Gravel mentions "prosecutions," the movants have argued that legislative immunity precludes them from being called to testify at all regarding any legislative act whatsoever. The special purpose grand jury cannot issue indictments, and no Members have been formally accused of a crime.

[11] Comm. for a Fair & Balanced Map, 2011 U.S. Dist. LEXIS 117656, *8.

8

The third form of relief requested by the movants is that this Court prohibit the special purpose grand jury from asking a Member "to reveal any research the Member conducted (or staff conducted) including interviewing constituents, lobbyists, or other sources of information that relates to the legislative process." While movants again would paint legislative privilege and immunity with as broad a brush as possible, the Supreme Court has made clear that constitutional protections do not extend to activities or communications with parties outside the legislature.

In Gravel, the Supreme Court evaluated whether a grand jury could subpoena a Senator's aide for questioning in an investigation of third-party criminal conduct, ultimately concluding that the Speech and Debate Clause does not protect a Congressman from testifying before a grand jury about sources of information used in preparation for legislative acts. The Court held that the grand jury could not question the Senator's aide "*except as it proves relevant to investigating possible third-party crime*, concerning any act, in itself not criminal,[12] performed by the Senator, or by his aides in the course of their employment, *in preparation for the subcommittee hearing*." 408 U.S. at 629 (emphasis added). The holding applied equally to the Senator and to his aide; the Court "refus[ed] to distinguish between Senator and aide in applying the Speech or Debate Clause." Id. at 622. It is thus well settled that, in a criminal investigation such as the one conducted by the special purpose grand jury, third-party communications are not protected by legislative privilege.

The movants cite Miller, 709 F.2d at 530, in support of their claim that "the privilege applies to a legislator's source of information if the information relates to a legislative investigation

---

[12] The Court had earlier held that immunity did not bar prosecution into criminal acts committed in preparation for legislative acts. "While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law *in preparing for or implementing* legislative acts." Id. at 626 (emphasis added).

9

or the formulation of legislation."[13] However, Miller is a civil case and thus inapposite. Additionally, while the Ninth Circuit in Miller expressed concern that failing to extend legislative privilege to conversations between legislators and third parties would "deter constituents from candid communication" and otherwise "chill speech and debate on the floor," id., this concern is not shared by all federal courts. Numerous federal authorities have refused to extend legislative privilege beyond legislators and their staffers, even in civil cases. *See* La Union del Pueblo Entero v. Abbott, 2022 U.S. Dist. LEXIS 93601 at *20 (W.D.Tex.) ("To the extent . . . that any legislator, legislative aide, or staff member had conversations or communications with any outsider (e.g. party representatives, non-legislators, or non-legislative staff), any privilege is waived as to the contents of those specific communications."); N.C. State Conf. of the NAACP v. McCrory, 2014 U.S. Dist. LEXIS 185130 at *22-23 (third party communication is "not ordinarily the type of legislative acts that the privilege is designed to protect" and "was waived when the communications were shared with non-legislative outside parties"). Finally, even when federal courts do recognize legislative privilege regarding third-party communications, they also acknowledge that the "seriousness" of a particular case can mitigate in favor of limiting the privilege. Courts have observed that voting rights cases can involve sufficiently serious matters in order to abrogate the privilege, and "[i]n this respect, they are akin to criminal prosecutions." League of Women Voters of Fla. v. Lee, 340 F.R.D. 446, 457 (N.D.Fla. 2021).

Because the special purpose grand jury is conducting an investigation into possible criminal activity, under Gravel this Court cannot extend Georgia's legislative privilege to third-party communications, even if they were undertaken in preparation for a hearing or legitimate legislative activity. This Court also cannot extend the privilege to actions, such as research,

---

[13] Motion at 7.

undertaken in preparation for a hearing or legitimate legislative activity. As a result, the movants' third claim must fail.

### III. The District Attorney welcomes the general guidance of this Court, but the scope of questioning will likely require individual determinations.

The movants also suggest that this Court provide "general guidelines" in advance of the questioning of any Member. Otherwise, this Court would have to "evaluate all questions to all Members who have been subpoenaed throughout the course of each Members' testimony over the following weeks or months." The District Attorney agrees that, to the extent possible, this Court should clarify the scope of permissible questioning by the special purpose grand jury. However, individual issues will likely necessitate at least some evaluation of scope for each Member who appears before the grand jury. For example, Lieutenant Governor Duncan has joined in the motion, which states that its arguments apply equally to him. While it is true that "legislative immunity extends to officials outside the legislative branch... when they perform legislative functions," Kensington Volunteer Fire Dept., Inc. V. Montgomery County, 684 F.3d 462, 470 (4th Cir. 2012), there will still have to be a determination of precisely which of the Lieutenant Governor's activities require legislative functions as opposed to executive ones. *See also* Bogan, supra. Other Members will similarly require individual determinations of privilege in order to determine the boundary between protected activities and those subject to proper questioning.

Additionally, these determinations are not required to take place *in camera*, as legislative privilege is not based upon confidentiality concerns. "[C]onfidentiality does not lie at the root of the concerns motivating a privilege for all legislative speech or debate. The speech or debate privilege is at its core a 'use privilege' not a privilege of nondisclosure." In re Grand Jury, 821 F.2d 946, 958 (3rd Cir. 1987). *See also* Pulte Home Corp. v. Montgomery County, 2017 U.S. Dist. LEXIS 82935 at *22 (D.Md.) ("[T]he maintenance of confidentiality is not the fundamental

11

concern of the legislative privilege."). The Court in its discretion may of course determine that some determinations must be made *in camera*, but, unlike determinations of attorney-client privilege, confidentiality concerns are not of primary concern.

**WHEREFORE**, the State of Georgia, by and through Fani T. Willis, District Attorney, Atlanta Judicial Circuit, Fulton County, Georgia, prays that this Honorable Court deny the instant Motion to Quash and allow for the questioning of the movants before the special purpose grand jury.

Respectfully submitted this the 30th day of June, 2022,

Fani T. Willis, Bar. No. 223955
District Attorney
Atlanta Judicial Circuit
136 Pryor Street Southwest
Third Floor
Atlanta, Georgia 30303

F. McDonald Wakeford, Bar. No. 414898
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit

Nathan J. Wade, Bar. No. 390947
Special Prosecutor
Atlanta Judicial Circuit

## Certificate of Service

I hereby certify that on this 30th day of June 2022, a true copy of this Response was delivered to the following persons by electronic mail: Donald F. Samuel and Amanda Clark Palmer, attorneys for the movants.

*[signature]*

FANI T. WILLIS   223955

District Attorney