# EXHIBIT B-028



IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| IN RE 2 MAY 2022 SPECIAL PURPOSE GRAND JURY | 2022-EX-000024 |
|---|---|

## ORDER DENYING MOTION TO QUASH

On 20 January 2022, the District Attorney of Fulton County petitioned the Chief Judge of the Superior Court of Fulton County to convene the entire Superior Court bench to consider the District Attorney's request for a special purpose grand jury. That grand jury's charter, if approved, would be to investigate "the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia" and to prepare a report and recommendation for the District Attorney advising her whether she should seek to prosecute anyone for such potential offenses. On 24 January 2022, the Chief Judge, having received a majority of the twenty judges' assent, issued an Order authorizing the convening of a special purpose grand jury for the aforementioned purpose.

On 2 May 2022, the special purpose grand jury was selected and sworn in; in June 2022 it began receiving evidence. The District Attorney has since subpoenaed several members of the Georgia Legislature to appear before the grand jury. Two of these "member" witnesses -- Lieutenant Governor Geoff Duncan[1] and former State Senator William Ligon -- have retained counsel who, on their[2] behalf, has filed a motion

---

[1] The Lieutenant Governor serves as the President of the Senate and is thus effectively a member of the legislature. Ga. Const. art V, § 1, ¶ 3.

[2] The witnesses' counsel has indicated that he and his colleague will likely represent additional members of the Legislature for purposes of navigating the issues addressed in this Order.

1

challenging their subpoenas. The witnesses contend that the legislative privilege protects them from such process and that their subpoenas should be quashed. The State filed a responsive pleading on 30 June 2022 and on 1 July 2022, the Court heard from the witnesses' counsel as well as the District Attorney. Based on the briefs, oral argument, and relevant law, the Court DENIES the witnesses' motion to quash but does establish certain limits to the District Attorney's ability to question these two "legislative" witnesses (and any future similarly situated witnesses).

The legislative privilege, codified in the Georgia Constitution in article III, section four, paragraph nine, reads in pertinent part, "No member shall be liable to answer in any other place for anything spoken in either house or in any committee meeting of either house." This protection serves the laudable purpose of ensuring that our state legislators can speak freely to each other while conducting legitimate legislative activity in the house and senate without worrying that their words, written or spoken, will result in either executive or judicial branch inquiry.

The District Attorney has made plain in her responsive pleading that she intends to question the witnesses about matters she believes fall outside the scope of the privilege, making quashal improper. And she is correct, insofar as the questioning of the witnesses indeed stays away from legitimate[3] legislative activity. However, because the District

---

[3] One prong of the District Attorney's argument against quashal to which the Court does not subscribe is her claim that legislators associated with any legislative activity (floor debates, committee meetings, etc.) to decertify or otherwise challenge the results of the November 2020 general election enjoy no legislative immunity because their actions were not "legitimate" legislative actions. It is decidedly not the province of the judicial branch (or the executive) to assess the wisdom or merits of legislative activity. If the deed was done, the word was spoken, or the vote was taken in connection with debating and enacting legislation, it is protected: "The claim of an unworthy purpose does not destroy the privilege." *Village of N. Atlanta v. Cook*, 219 Ga. 316, 319 (1963), quoting *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). And while the District Attorney has identified certain topics addressed during the 3 December 2020 subcommittee hearing that appear to fall outside the jurisdiction of the State legislature, other items discussed during that session and in the subcommittee's final report clearly are within the purview of the legislature.

Attorney has indicated that one topic of interest for the grand jury is the 3 December 2020 "Election Law Study" subcommittee hearing that former Senator Ligon chaired, counsel for the witnesses understandably has requested that, if quashal is not occurring (and it is not), guidelines for inquiry be established so that (1) the District Attorney will avoid certain patently improper lines of questioning and (2) the witnesses know when they might persuasively invoke the legislative privilege while being questioned.

Each witness will be different and investigative questioning is inherently difficult to cabin, especially when the grand jurors are empowered to ask questions of their own. Nonetheless, some fairly clear lines can be drawn to help guide the questioning of legislative witnesses, including the Lieutenant Governor and former Senator Ligon.

**First, neither the District Attorney nor the grand jurors may ask either witness about anything he said while participating in any session of the legislature, be that on the floor of the body or in a subcommittee.** This is the essence of the immunity provided by the legislative privilege. It includes spoken words, memos, draft bills, and any other written documents prepared by a legislator or her staff for the session, as well as any official reports generated during or as a result of the session.[4] This prohibition bars inquiries not only into what was said (or written) but also, perhaps more importantly, into why it was said (or written). The motivations of the elected officials for the actions they took (or failed to take) during legislative sessions are not subject to scrutiny by this grand jury (or any other). *United States v. Brewster*, 408 U.S. 501, 525 (1972).

---

[4] There is one exception, discussed in n.6 below, for the re-publication of speeches or reports.

3

**Second, neither witness may be asked about direct communications (face-to-face conversations, calls, e-mails, texts, etc.) he had with any other legislator in preparing for any session or drafting any legislation or official report.** This ban extends to any direct communications with staff members, either the witness's own or those of another legislator, made in connection with preparing for a session or drafting official documents.[5]

Where the legislative privilege ends and the grand jury's authority to question the witnesses about possible criminal electoral interference by others[6] begins is when a witness (or his staff) has engaged with private citizens on topics relevant to the grand jury's investigative charter. This is so for at least four reasons. First, there is nothing inherently confidential in such exchanges, unlike the traditional protected communications between a lawyer and her client, a doctor and his patient, or a priest and his parishioner. Put differently, there is no "senator-constituent" privilege[7] -- in particular when those communications are relevant to possible third-party crimes (*i.e.*, the legislator (or her aide) is not the target of the investigation). A concerned citizen or interested lobbyist has no reasonable basis for expecting that his communications with a

---

[5] Courts have regularly held that both the member and his staff enjoy the protections of the legislative privilege when engaged in legitimate legislative activity. *Code Revision Comm'n for Gen. Assembly of Georgia v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1245 (11th Cir. 2018), *aff'd sub nom. Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 206 L. Ed. 2d 732 (2020) ("legislative immunity applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself").

[6] Obviously if the questioning turns towards a *witness's* possible involvement in such activity, a different privilege becomes available for assertion.

[7] Certainly the "constituent" could not invoke the privilege: imagine the foreign agent spotted leaving a legislator's office resisting a subpoena on the grounds that her communications with the legislator were "privileged." And if it does not exist for the third party, how does it exist for the legislator? Would only what the legislator said in the conversation with the third party be off limits?

4

legislator won't be shared by the legislator, either with colleagues or the press;[8] similarly, the legislator knows full well that the third party with whom she spoke is not bound to secrecy and can reveal to anyone what was shared in their exchange. Second, public disclosure of who meets with our legislative decision-makers yields a social benefit, as it enables voters to understand who is influencing -- or at least seeking to influence -- those who theoretically represent them in our legislature. Third, lobbyists (and other private citizens and organizations) do not create legislation; they are not our elected representatives. They may -- and very often do -- submit draft proposals, offer research, and contribute generously to re-election campaigns. But what they may *not* do is actually conduct the business of the legislature: the speaking, the debating, and, ultimately, the voting. The legislative privilege, both in its actual text[9] as well as in its application through the courts, protects *that* process of law-making, not the extra-legislative lobbying, persuading, and cajoling that occurs *outside* the corps of legislators and their staff and involves non-privileged communications with non-legislative stakeholders.

Fourth, and binding upon the undersigned, the United States Supreme Court has held that such third party communications fall outside the legislative privilege in the context of criminal investigations. Specifically, the Supreme Court concluded that the Speech or Debate Clause -- the federal constitution's version of the legislative privilege -- does not "immunize Senator or aide from testifying at trials or grand jury proceedings

---

[8] Indeed, the U.S. Supreme Court has held that even a plainly privileged communication, such as a speech on the legislative floor or a committee report, can lose its protection if the member himself republishes it, as that re-publication is not a legislative act and so does not enjoy immunity. *Hutchinson v. Proxmire*, 443 U.S. 111, 127–28 (1979). This principle may come into play with Mr. Ligon, who, according to the District Attorney, personally republished both the subcommittee's report and a video of the hearing.

[9] The language of the State Constitution protects legislators from answering for what is "spoken in either house or in any committee meeting of either house." Had the drafters of this constitutional provision wanted to extend the privilege to what is spoken outside the legislative chambers to non-legislators, they could have. But they did not.

5

involving third-party crimes where the questions do not require testimony about or impugn a legislative act." *Gravel v. U. S.*, 408 U.S. 606, 622 (1972). Put differently, a legislator may, consistent with legislative immunity, be compelled to testify before a grand jury concerning communications he (or his staff) had with third parties -- even if arguably in connection with the performance of his legislative duties -- if such an inquiry proves relevant to investigating possible third-party crime.[10]

In the end, this balance makes sense. If, as the District Attorney alleges, outside individuals sought to influence Georgia legislators and other elected state officials as part of a possibly illegal scheme to interfere with the lawful administration of the electoral process in our State, the grand jury should be able to investigate such activity. The legislative privilege, designed to protect the legitimate -- as in lawful -- legislative process, ought not to be a shield that benefits those outside individuals or otherwise obscures from the grand jury's view the full scope of the alleged efforts to subvert Georgia's elections.

This is not, however, a boundless exception to the privilege. Inquiries remain limited to who and what, not why. For example, the District Attorney may ask former Senator Ligon to identify any non-legislators (and non-staffers) with whom he met to discuss ideas such as "rescinding" the certification of the general election and substituting "proper" electors for those already selected -- if those topics are relevant to the grand jury's investigation of possible electoral crimes. And the grand jury may explore with the former senator what such individual(s) who promoted these ideas shared with him. What

---

[10] The Court appreciates counsel for the witnesses' reliance on the dissents in *Gravel*. They contain passionate language about the need to extend the legislative privilege to a legislator's private communications with the citizenry and the importance of the legislative "informing function." *See, e.g., Gravel* at 649-50 (Brennan, J., dissenting). However, to restate what seems to have become a forgotten axiom of American democracy, a lesser vote count -- be it in a judicial opinion or a general election -- does not carry the day.

the grand jury may *not* pursue is any line of questioning about what the former senator thought of such proposals or what, if anything, he decided to do based on having received such input.

Undoubtedly, issues will arise that do not fall neatly into any of these categories. These witnesses (and others) may invoke the legislative privilege in response to questions the District Attorney deems proper. The District Attorney may ask questions the witnesses contend are prohibited by this Order (and/or the legislative privilege). Such instances should be brought to the Court's attention and, as soon as the Court can disentangle itself from its other judicial responsibilities, it will mediate the dispute.

SO ORDERED this 6th day of July 2022.

*[signature]*
Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit