# EXHIBIT B-034

FILED IN OFFICE

JUL 19 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

**IN THE FULTON COUNTY SUPERIOR COURT**
**STATE OF GEORGIA**

IN RE SUBPOENAS FROM MAY 2022    )          Case No. 2022-EX-000024
SPECIAL PURPOSE GRAND JURY        )

**SUBPOENAS ISSUED TO:** Presidential Nominee Electors Mark Amick, Joseph Brannan, Brad Carver, Vikki Consiglio, John Downey, Carolyn Fish, Kay Godwin, Cathy Latham, David Shafer, Shawn Still, CB Yadav

## <u>MOTION TO QUASH AND DISQUALIFY[1]</u>

NOW COME the above-referenced subpoena recipients, pursuant to O.C.G.A. § 23-13-23 and this Court's inherent authority over the Special Purpose Grand Jury ("Grand Jury"), and move this Court to quash their Grand Jury subpoenas <u>for appearances beginning July 25, 2022</u> as unreasonable and oppressive, showing this Court as follows:[2]

### I.    <u>Introduction</u>

From April 19, 2022 until June 28, 2022, the Fulton County District Attorney's ("DA") Office correctly and appropriately represented that the above-referenced eleven individuals, who are eleven of the sixteen Georgia Republican nominee presidential electors ("nominee electors") in the 2020 election, were witnesses, not subjects or targets, of the DA Office's and the Grand Jury's investigation into the 2020 election. In reliance on this representation, all of these nominee electors agreed to voluntary interviews with the DA's Investigative Team.[3] Those interviews began on April 25, 2022, with David Shafer. Vikki Consiglio's interview took place April 26, 2022. Mark Amick was scheduled to be interviewed on April 28, 2022, but that interview was

---

[1] These nominee electors also join in Senator Jones' Motion to Disqualify filed July 15, 2022 for the reasons set forth there and herein.

[2] If this Court believes that oral argument would be useful in resolving this Motion, we request oral argument.

[3] The team is Nathan Wade, Don Wakeford, Will Wooten, Adam Ney, and Investigators Mike Hill and Trina Lucas.

1

canceled by the Investigative Team. The team said that they would reschedule Mr. Amick's interview and schedule the remaining eight nominee electors' interviews, but that never happened.[4]

Instead, on June 1, 2022, the Investigative Team sent Grand Jury Subpoenas for all eleven nominee electors. We raised concerns with members of the Investigative Team about these subpoenas, including that the nominee electors had agreed to voluntary interviews, that coming to Atlanta for a Grand Jury appearance for many of them would be difficult, and that it seemed unnecessarily cumulative for them all to testify. We also noted the potential danger attendant in a Grand Jury appearance in this case and the abuse and harassment that the nominee electors have already experienced, and would inevitably experience again, as a result. We asked that these concerns be raised with the rest of their team and requested that they either continue the voluntary interviews or, at least, limit the number of the nominee electors to testify in the Grand Jury. We never received any response to these requests. *At no time in our communications with the DA's Office before June 28 did anyone ever suggest that the nominee electors' status had changed or that they were no longer considered witnesses, including when they were subpoenaed.*

On June 28, 2022, we contacted the Investigative Team to discuss logistics regarding the nominee electors' grand jury appearances. Immediately upon learning that the nominee electors were, in fact, planning to testify substantively to the Grand Jury, Special Prosecutor Nathan Wade informed us for the first time that all of these eleven nominee electors were suddenly targets,

---

[4] On May 1, 2022, the Investigative Team requested that we provide the documents that Mr. Shafer had previously supplied to the House of Representatives' January 6 Committee, and we did so on May 2, 2022. We also provided additional documents and information showing that the nominee electors' actions in December 2020 were proper, even necessary, under the governing law. This exculpatory information is discussed in greater detail herein. On May 5, 2022, having heard nothing further from the Investigative Team about the schedule for the voluntary interviews of the remaining 9 nominee electors whom we represent, we contacted the team to discuss schedules and inform the team of upcoming conflicts that we had to facilitate setting interview dates. That same day, Mr. Wade responded to that email, stating "Thank you Holly, as of now our investigation has us tied up with other components so no worries."

stating that "as our investigation has matured and new evidence has come to light, in a spirit of integrity we feel it only fitting to inform you that your clients' status has changed to 'Target.'"

As discussed herein, it is virtually impossible on these facts for that representation to be accurate.[5]  First, the unchanged law governing the actions and duties of presidential electors and nominee electors makes plain that the actions they took on December 14, 2020 -- executing a *contingent* slate of elector ballots that would only spring into validity *if* the then-pending judicial contest in the Fulton County Superior Court were successful -- were lawful and done upon the advice of counsel. *See infra.*

Second, the nominee electors' actions and their reasons taking them were public and transparent – indeed, they broadcast on the news on December 14, 2020.  *See* https://www.fox5atlanta.com/video/880535.  Georgia GOP Chairman Shafer made the point explicitly in social media posts he published that day, which specifically reference "the *Republican nominees* for Presidential Elector" and discuss the need for them to act provisionally, as follows:

> Because the President's lawsuit contesting the Georgia election is still pending, the Republican nominees for Presidential Elector met today at noon at the State Capitol today and cast their votes for President and Vice President.
>
> Had we not meet [*sic.*] today and cast our votes, the President's pending election contest would have been effectively mooted. Our action today preserves his rights under Georgia law.

Importantly, these facts have been known to the DA's Office *since the beginning of its investigation*.  Based upon these known facts, the DA's Office properly labeled these nominee electors as *witnesses,* which induced the nominee electors' voluntary cooperation. With *no* change in the law or the facts, however, the eleven nominee electors were *all* suddenly transformed into

---

[5] In our July 12 Letter, we asked the DA to share with us this supposed new evidence, if it exists, so that we could respond to it and debunk it.  We have received no response.

*targets* of the Grand Jury when the DA learned that they were planning to continue their cooperation and provide substantive testimony to the Grand Jury.

The abrupt, unsupportable, and public elevation of all eleven nominee electors' status wrongfully converted them from witnesses who were cooperating voluntarily and prepared to testify in the Grand Jury to persecuted targets of it. In light of the escalation, counsel advised the elector nominees to invoke their federal and state constitutional and statutory rights not to provide substantive testimony to the Grand Jury, advice they have reluctantly accepted.[6] The unavoidable conclusion is that the nominee electors' change of status was not precipitated by new evidence or an honestly-held belief that the they have criminal exposure but instead an improper desire to force them to publicly invoke their rights as, at best, a publicity stunt.[7]

On July 12, 2022, we outlined these concerns to the DA, objecting to the target label, explaining in detail the exculpatory documents and information that we had already provided to her Investigative Team on behalf of the nominee electors, and informing her that the sudden change of their status from witness to target would deprive the Grand Jury of testimony that they were

---

[6] *"[N]o implication of guilt"* can be drawn from an individual's invocation of her Fifth Amendment privilege before the grand jury. *Grunewald v. United States,* 353 U.S. 391, 421 (1957) (emphasis added). "Recent re-examination of the history and meaning of the Fifth Amendment has emphasized anew *that one of the basic functions of the privilege is to protect innocent men." Id.* (citation omitted). "*Too many,* even those who should be better advised, *view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.' Id.* (quoting *Ullmann v. United States,* 350 U.S. 422, 426 (1956) (emphasis added)). '"*The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances*." *Id.* (quoting *Slochower v. Board of Higher Education,* 350 U.S. 551, 557-558 (1956) ) (emphasis added). The Supreme Court has consistently reaffirmed these principles. *See, e.g., Baxter v. Palmigiano,* 425 U.S. 308. 327 (1976) ("And *it is not necessary that a person be guilty of criminal misconduct to invoke the privilege; an innocent person, perhaps fearing that revelation of information would tend to connect him with a crime he did not commit, also has its protection.*") (internal citations and quotations omitted) (emphasis added); *Ohio v. Reiner,* 532 U.S. 17 (2001) (witness could assert Fifth Amendment privilege despite claim of innocence because she had reasonable cause to apprehend danger from her answers).

[7] Bolstering this conclusion is the fact that the Grand Jury has subpoenaed no documents from the nominee electors or, upon information and belief, from other witnesses it has subpoenaed. Also, as set forth in Section II, federal and state law protect the right of the nominee electors to execute contingent presidential ballots, and they, therefore, cannot have committed a crime by so doing, a fact presumably known to the DA's Office. *See also* FN 8.

prepared to give. *See* July 12, 2022 Letter to DA Willis (attached hereto as **Exhibit A**). We also informed her that, because of these changed circumstances, we had advised the nominee electors to invoke their state and federal rights, that they had grudgingly agreed, and that customary practice and ethical rules dictate that they should be excused from their Grand Jury appearances, citing ABA STANDARDS OF PROSECUTION FUNCTION 3-4.6(f) (prosecutor should not force targets into grand jury without immunity) (emphasis added); *see also* Ga. R. Prof. Resp. 3.8, Special Responsibilities of a Prosecutor, Comment 1 (citing favorably the ABA Standards of Prosecution); United States Attorney Manual ("USAM") 9-11.150 (subpoenaing targets of grand jury investigation "may carry the appearance of unfairness"); and USAM 9-11.154 (when target of grand recount jury investigation informs government that they plan to invoke their 5th Amendment privilege in grand jury, they should ordinarily be excused from appearing). We asked DA Willis to confirm by Thursday, July 14 that she would excuse the nominee electors. We received no response from the DA's Office.

On July 15, 2022, the AJC quoted DA Willis as saying that "[The DA's Office has] informed some [of the nominee electors] that they are being looked at as a target — or let me say more clearly, we've told people's lawyers that." (available at https://www.ajc.com/politics/top-ga-republicans-informed-theyre-targets-of-fulton-da-probe/3CZJHEYOD5ADFDCVP3372HROFQ/). This public (mis)branding of  the nominee electors is an improper abuse of this investigatory process.[8] The substance and timing of all of these events, especially in light of the known facts and governing law, and the attempt to force the

---

[8] These comments by the DA also appear to run afoul of Ga. R. Prof. Resp. 3.8(g), Special Responsibilities of a Prosecutor: "[E]xcept for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, [*a prosecutor must] refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused.")* (emphasis added).

nominee electors to be publicly marched into the Grand Jury only to invoke their rights is political theater and gamesmanship, not a good faith use of the Grand Jury.[9]

The subpoenas are unreasonable and oppressive for other reasons. The nominee electors' personal appearance to invoke their rights can have little to no value to the Grand Jury's investigation, and the disruption, potential danger, and inconvenience them outweighs any alleged slight value. Additionally, the DA knows (or should know), and therefore the Grand Jury knows or should know, that under the governing law, the nominee electors' actions were legal. Despite this fact, the DA's office persists in publicly claiming otherwise and misusing the Grand Jury process to harass, embarrass, and attempt to intimidate the nominee electors, not to investigate their conduct. For these reasons and as set forth herein, we ask that this Court quash the subpoenas for the nominee electors' scheduled appearances for the week of July 25, 2022.

## II.     The Grand Jury Subpoenas Should Be Quashed As Unreasonable and Oppressive.

Subpoenas, including grand jury subpoenas, may be quashed by this Court when they are unreasonable or oppressive. *See* O.C.G.A. § 24-13-23(b)(1). Additionally, in the context of a special purpose grand jury, this Court has inherent powers of oversight. Here, the subpoenas are

---

[9] Other facts suggest that political, not legal, considerations are improperly infecting this investigatory process. As explained in the disqualification motion filed on Friday, July 15, 2022 by Senator Burt Jones, DA Willis and Nathan Wade appear to have serious and direct conflicts of interest in this investigation. Additionally, as pointed out in that motion, the Grand Jury is authorized to be empaneled through at least April 2023, but the DA has made known her intention to have the Grand Jury release its report in October 2022, *one month before the November elections*. Despite the year-long authorization of the Grand Jury, the DA refused our requests for any extension of the time for the nominee electors to appear in the Grand Jury, and upon information and belief, the DA has refused requests to move Grand Jury appearances for other elected officials until after the election so that she can maintain the October pre-election deadline for the release of the report. Also, the manner in which the DA's Office has pursued certain of the nominee electors as targets while ignoring other nominee electors speaks to a political motivation. Specifically, many, but not all, of the nominee electors are prominent figures in the Georgia GOP: David Shafer is its volunteer chairman, Vikki Consiglio is its Assistant Treasurer, Shawn Still is a Republican candidate for State Senate, many of our eleven clients are on the Republican State Executive Board or hold or have held other positions within the Party. Although all of the nominee electors performed the same functions on December 14, 2020, the ones with these more prominent roles in Georgia GOP have been actively pursued while, on information and belief, other nominee electors without such political roles have not been subpoenaed or even contacted by the DA or the Grand Jury.

unreasonable and oppressive under the circumstances, and this Court should excuse the eleven presidential nominee electors from their appearances in front of the Grand Jury <u>next week</u>.

### A. Targets of a Grand Jury Investigation Should Be Excused From Appearing Before the Grand Jury.

As set forth herein, there is no legal or factual basis to label the nominee electors as targets of this or any Grand Jury. Nonetheless, the DA has rashly elevated them from witnesses to targets, and the nominee electors have informed her of their intention to follow our legal counsel to invoke their state and federal constitutional and statutory rights not to provide substantive testimony. *See* Exhibit A. Under these circumstances, customary practice and ethical rules countenance that they be excused from their appearances. *See, e.g.,* ABA STANDARDS OF PROSECUTION FUNCTION 3-4.6(f) ("If the prosecutor concludes that a *witness is a target of a criminal investigation, the prosecutor should not seek to compel the witness's testimony before the grand jury absent immunity.*") (emphasis added); *see also* Ga. R. Prof. Resp. 3.8, Special Responsibilities of a Prosecutor, Comment 1 (citing favorably the ABA Standards of Prosecution); United States Attorney Manual ("USAM") 9-11.150 (subpoenaing targets of grand jury investigation "may carry the appearance of unfairness"); USAM 9-11.154 (when target of grand jury investigation informs government that they plan to invoke their 5th Amendment privilege in the grand jury, they should ordinarily be excused from having to appear in front of the grand jury). Because the DA has not, we ask that this Court excuse their appearances.

### B. The Fulton County DA and the Grand Jury Lack Jurisdiction.

Under the Supremacy Clause, a State has *no* jurisdiction to criminalize actions (such as the casting of or determination of the validity of presidential electoral ballots) that are taken pursuant to federal constitutional and statutory authority and are inseparably connected to the functioning of the National Government. When a State attempts to meddle in such areas in which they have

no jurisdiction, federal courts are empowered to prevent such abuses.  *See, e.g., In re Loney*, 134

U.S. 372, 375 (1890);[10] *see also Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 507–08

(1973) ("The situations in which pretrial or preconviction federal interference by way of habeas

corpus with state criminal processes is justified involve *the lack of jurisdiction, under the*

*Supremacy Clause, for the State to bring any criminal charges against the petitioner*.") (citing

*Wildenhus's Case*, 120 U.S. 1 (1887); *In re Loney*, 134 U.S. 372 (1890); and *In re Neagle*, 135

U.S. 1 (1890)[11]) (emphasis added).

"While presidential electors are not officers or agents of the federal government, *they*

*exercise federal functions under, and discharge duties in virtue of authority conferred by, the*

*Constitution of the United States."  Burroughs v. United States*, 290 U.S. 534, 545 (1934)

(emphasis added).  Indeed, presidential electors are created by the U.S. Constitution, not by state

authority.  *See* U.S. CONST. art. II, cl. 2; Amendment 12.[12]  Further, the Twelfth Amendment

---

[10] Loney was arrested and held in custody by the state authorities under a charge of perjury committed in giving his deposition as a witness before a notary public Virginia, in the case of a contested election of a member of Congress. The intended effect of Loney's arrest by the State of Virginia was to embarrass one of the parties in the contested Congressional election, to impede him in obtaining evidence on his behalf, to intimidate witnesses he might wish to present, and to delay or disrupt the preparation of the case for final determination by Congress. The Supreme Court affirmed the issuance of the writ releasing him from state custody, stating as follows:

> It is essential to the impartial and efficient administration of justice in the tribunals  of the nation that witnesses should be able to testify freely before them, unrestrained by legislation of the state, or by fear of punishment in the state courts. *The administration of justice in the national tribunals would be greatly embarrassed and impeded if a witness testifying* before a court of the United States, *or upon a contested election* of a member of congress, *were liable to prosecution and punishment in the courts of the state upon a charge of perjury, preferred by a disappointed suitor or contestant, or instigated by local passion or prejudice.*

*In re Loney*, 134 U.S. at 375.  The Court concluded that "[t]he courts of Virginia having no jurisdiction of the matter of the charge on which the prisoner was arrested, and he being in custody, *in violation of the constitution and laws of the United States, for an act done in pursuance of those laws, by testifying in the case of a contested election of a member of congress,* law and justice required that he should be discharged from such custody . . . .." *Id.* at 376–77.

[11] In *In re Neagle*, a deputy U.S. Marshal assigned to protect a federal judge killed an individual attempting to assassinate that judge.  He was arrested by the State for homicide, and the federal district court issued a writ of habeas corpus requiring his release because the State had no jurisdiction

[12] That section provides

commits exclusive authority to Congress to adjudicate and count electoral votes.  The Electoral

Count Act ("ECA") specifies that, when States fail to resolve disputes before January 6 (as the

Georgia court here did), Congress is the sole body authorized to resolve remaining disputes about

presidential electors, *including* when two slates of electors are submitted by a single state. *See* 3

U.S.C. §§ 5, 6, and 15.

Here, the dispute in the Georgia 2020 election about which slate of presidential electors

were the proper ones was committed in the first instance to the state judiciary, who failed to timely

act to resolve the dispute.  By operation of Constitutional authority and federal law, the

responsibility at that point to receive, adjudicate, and count all presidential electoral ballots

devolved entirely and solely to Congress, and only Congress had authority at that point to

determine whether any submitted electoral slate or ballot from any State was valid or invalid.[13]

State and local courts have no jurisdiction to interfere or attempt to interfere with the submission

of these electoral ballots to Congress or Congress' right and duty to adjudicate their validity and

count the valid ballots, especially by attempting to criminalize actions taken in furtherance of these

exclusive federal duties.  In other words, the States have no jurisdiction to determine which elector

slates are "fake" or valid; the Constitution is clear that only Congress may do that.  As such, States

---

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

U.S. CONST. art. II, cl. 2.  State legislatures are directed to create the manner of appointment of such electors, but Congress has the *exclusive* authority to count and determine the validity of the presidential electoral ballots, including choosing between two "dueling" slates of electoral ballots from one state when the state has not resolved that dispute through its judicial process.  *See* Amendment XII and Electoral Count Act, 3 U.S.C. §§ 5, 6, and 15.

[13] Indeed, several court opinions and decisions have concluded that this power vested in Congress divests even federal courts from interfering with its exercise.  *See, e.g. Bush v. Gore*, 531 U.S. 98 (2000) (Breyer, J., dissenting) ("Given this detailed, comprehensive scheme [in the 12th Amendment and the Electoral Count Act] for counting electoral votes, *there is no reason to believe that federal law either foresees or requires resolution of such a political issue by this Court*."); *cf. Hutchinson v. Miller*, 797 F.2d 1279, 1284 (4th Cir. 1986) ("Had the framers wished the federal judiciary to umpire election contests, they could have so provided.  Instead, they reposed primary trust in popular representatives and in political correctives.").

(and their local governments) have no authority to interfere (through attempted criminalization or otherwise) with the process of sending potential elector slates to Congress for it to adjudicate.

### C. Federal Law Protects The Nominee Electors' Right to Cast Contingent Ballots.

Even if the DA and the Grand Jury had jurisdiction here, federal law specifically anticipates and permits the submission of more than one slate of presidential electors from a State and, as noted, gives Congress exclusive jurisdiction to adjudicate the validity of those slates within the parameters set in the Electoral Count Act ("ECA") and through their own internal procedures. *See* 3 U.S.C.A. § 15.[14] Obviously, an action specifically permitted by federal law cannot be a crime.

Indeed, two slates of presidential elector ballots were previously submitted to Congress by the State of Hawaii in the close, judicially contested presidential election between Nixon and Kennedy in 1960. There, the contingent, provisional electoral ballots cast by the Kennedy presidential electors were ultimately the ones counted by Congress as Hawaii's electoral votes.

---

[14] That statute states, in pertinent part, as follows:

> If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate*, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law*; and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State*, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*

3 U.S.C. § 15 (emphasis added); *see also* COUNTING ELECTORAL VOTES: AN OVERVIEW OF PROCEDURES AT THE JOINT SESSION, INCLUDING OBJECTIONS BY MEMBERS OF CONGRESS, Congressional Research Service at pp. 8-9 (explaining Congress' process to adjudicate between two slates of presidential elector ballots from the same state).

*See, e.g.,* Todd Zywicki, THE LAW OF PRESIDENTIAL ELECTIONS AND THE 2000 ELECTION at pp. 27-28 (March 8 2001) (discussing the 1960 Hawaii contested election), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=262338.

Specifically, in the 1960 Hawaii Presidential election, the original vote count was for Nixon, not Kennedy, but the margin was small. Hawaii's Governor certified the votes for Nixon in November 1960. Democrats sued to contest the election results, and a court-ordered recount ensued in December 1960. That recount was still ongoing on the mandatory federal date for presidential electors to cast their ballots,[15] which that year was December 19. While the recount continued, both the sets of presidential electors separately met on December 19, and each cast an electoral slate for their respective candidates that was transmitted to Congress. *Id.*

When the recount was complete, Kennedy won, and the state court entered judgment for Kennedy. *Only because* the Democrat *nominee* electors had taken the necessary step of casting their contingent presidential electoral ballots by the federally mandated date of December 19 was Hawaii able to certify the Kennedy elector slate to Congress on January 4, 1961. Congress then ultimately counted that electoral slate for Kennedy, discounting the previously certified one for Nixon, even though the Kennedy slate was not certified until January 1961 (after the ECA's purported deadline) and conflicted with the previously timely certification for Nixon. *Id.* The Democratic Hawaii nominee electors' contingent slate had, in essence, saved Hawaii's ability to have its electoral votes counted. Appropriately, no one suggested that they were criminals.

The Georgia nominee electors took the same steps for the same reasons on December 14, 2020. In the Georgia 2020 presidential election, Biden was the apparent winner, and he was so

---

[15] The Constitution and the ECA require that the presidential electors meet on the first Monday after the second Wednesday in December (which was December 14 in 2020) to cast their votes for President and Vice President of the United States. *See* U.S. CONST. art. II, § 1, cl. 4; U.S. CONST, Amendment 12; 3 U.S.C. §§ 7-8).

certified by Georgia in November 2020. But, as in Hawaii in 1960, there was a pending judicial challenge to the validity of the election results that had not been decided by the mandatory federal deadline for presidential electors to execute electoral ballots (December 14, 2020).[16] As in Hawaii, both slates of nominated Georgia presidential electors met on the required day and executed electoral votes for their party's candidates and transmitted them to Congress as required, thus ensuring that no matter the resolution of the judicial contest to the election, Georgia would have a valid slate of electoral votes for Congress to count on January 6, 2021.

*Unlike* in Hawaii, the Georgia judicial contest did not change the election results, and so the contingent Republican presidential electoral votes appropriately were not certified by the State or counted by Congress. [17] But, had the nominee electors *failed* to execute their contingent slate on December 14, 2020 and the legal challenge to the election *had* been successful (a result that

---

[16] The judicial challenge pending in Fulton County contesting the election's validity and, therefore, ultimately who the correct presidential electors were, was *Trump et al., v. Raffensperger et al.,* Case No. 2020CV343255 (Fulton County Superior Court Dec. 2020), filed on December 4, 2020. Georgia law such lawsuits to be heard within 20 days, but this lawsuit was not scheduled for a hearing until January 8, 2021 - more than two weeks after the statutory deadline and two days *after* Congress met on January 6, 2021 to count and certify the votes of the Electoral College - effectively mooting the lawsuit. No Georgia court ever held an evidentiary hearing or ruled on the merits of the lawsuit.

[17] Much has been made in the press about an email from Robert Sinners of the Trump campaign that was apparently sent to some or all of the nominee electors advising them to, in essence, conduct their work in secret. While we are aware of no law that would have prevented the nominee electors from adhering to this request, it is obvious from the news coverage and the public tweets cited to herein that they did not follow it. Instead, they acted publicly and transparently. It has also been reported in the media that certain high level members of the Trump team (Mr. Eastman, Mr. Giuliani, et al.) developed a *different* plan in late December 2020 (after Christmas) to, among other things, attempt to convince Vice President Pence to count these contingent presidential electoral slates as the valid elector slates despite the lack of any successful judicial ruling. To the extent these reports are accurate (which we have no way of knowing), the nominee electors did not and could not have had any involvement in or knowledge of any such plan, as it was not even *conceived* until several weeks *after* the GOP electors had completed their contingent electoral slates on December 14, 2020, and, in any event, it was never disclosed to or discussed with the nominee electors at any time. Indeed, John Eastman himself publicly confirmed on December 16, 2020 that the limited and legitimate purpose of the provisional Republican electoral slates was to preserve a remedy for pending judicial contests: "We have historical precedent here, and in each of these states, there is pending litigation challenging the results of the election. *If that litigation proved successful, then the Trump electors, having met and voted, would be able to have those votes certified* and be the ones properly counted in the joint session of Congress on January 6", available at https://www.ntd.com/john-eastman-explains-the-historical-precedents-on-dueling-electors_540953.html (December 16, 2020) (emphasis added). Additionally, as Vice President Pence and his team determined, such a plan is unprecedented and unlawful under both the Constitution and the provisions of the ECA. As such, none of the nominee electors could have anticipated on December 14, 2020 that there could or would be any attempt to misuse their lawfully cast contingent electoral slate in such a manner, nor did they or could they have participated in the same.

was not and could not have been known on December 14, 2020), the State of Georgia would have had *no valid presidential electoral votes* to be counted in Congress on January 6, 2021, and citizens of Georgia could have had their voice in the 2020 presidential election silenced.

No law countenances, much less commands, such a result. Instead, federal law specifically provides for these very actions, and no state law does or can criminalize these actions of presidential nominee electors acting under Constitutional and federal authority to preserve their legal challenge and the electoral votes of the State of Georgia in a contested election.

Rather than suggesting that such actions are improper or illegal, legal and political luminaries have lauded the execution of two presidential elector slates as the gold standard in a contested presidential election that has not been resolved by the mandatory federal deadline to execute presidential electoral ballots. In the hotly contested Presidential election of 2000, for example, Justice Stevens cited with approval the 1960 Hawaii precedent in his dissent in *Bush v. Gore,* stating as follows:

> In the interest of finality, however, the majority effectively orders the disenfranchisement of an unknown number of voters whose ballots reveal their intent—and are therefore legal votes under state law—but were for some reason rejected by ballot-counting machines. It does so on the basis of the deadlines set forth in Title 3 of the United States Code. *Ante,* at 532. *But, as I have already noted, those provisions merely provide rules of decision for Congress to follow when selecting among conflicting slates of electors. Supra,* at 540. They do not prohibit a State from counting what the majority concedes to be legal votes until a bona fide winner is determined. *Indeed, in 1960, Hawaii appointed two slates of electors and Congress chose to count the one appointed on January 4, 1961, well after the Title 3 deadlines.* See Josephson & Ross, Repairing the Electoral College, 22 J. Legis. 145, 166, n. 154 (1996).

*Bush v. Gore*, 531 U.S. 98, 127 (2000) (Stevens, J., dissenting) (emphasis added). Democrat Congresswoman Patsy Mink of Hawaii, the first woman of color to serve in the House of Representatives, specifically referenced the Hawaii precedent in advocating for the provision of two elector slates to Congress from Florida in the 2000 Bush v. Gore election as follows:

13

The [Hawaii] precedent of 40 years ago *suggests the means for resolving the electoral dispute in Florida*: count the votes under the supervision of the court pursuant to Florida law, *both slates of electors meet on December 18 and send their certificates to Congress;* the Governor of Florida send a subsequent certificate of election based on the decision of the count supervised by the court accompanied by the decision of the court; *and Congress accepts the slate of electors named by the Governor in his final certification.*

Under this procedure Florida need not rush to complete its recount in an attempt to meet unrealistic deadlines set by the court or the legislature. *The key date is not December 12 or December 18. It is January 6, the date on which the electoral votes are counted.* As the 1960 experience of Hawaii shows, the Florida recount does not have to be completed until just before the electoral votes are counted.

Statement of Rep. Patsy Mink, CONGRESSIONAL RECORD, December 13, 2000 (emphasis added), available at https://www.govinfo.gov/content/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26609-2.htm. Electoral college scholars have echoed these sentiments, arguing that executing two slates of electoral ballots and submitting both to Congress is "the model" for how to decide a close presidential election. *See, e.g.,* Michael L. Rosin and Jason Harrow, *How to Decide a Very Close Election for Presidential Electors: Part 2*, available at https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-2.

Because federal law controls[18] and it permits, even anticipates, the actions taken by the presidential nominee electors, they cannot have committed and did not commit any criminal

---

[18] Much has been made in the press about an email from Robert Sinners of the Trump campaign that was apparently sent to some or all of the nominee electors advising them to, in essence, conduct their work in secret. While we are aware of no law that would have prevented the nominee electors from adhering to this request, it is obvious from the news coverage and the public tweets cited to herein that they did not follow it. Instead, they acted publicly and transparently. It has also been reported in the media that certain high level members of the Trump team (Mr. Eastman, Mr. Giuliani, et al.) developed a *different* plan in late December 2020 (after Christmas) to, among other things, attempt to convince Vice President Pence to count these contingent presidential electoral slates as the valid elector slates despite the lack of any successful judicial ruling. To the extent these reports are accurate (which we have no way of knowing), the nominee electors did not and could not have had any involvement in or knowledge of any such plan, as it was not even *conceived* until several weeks *after* the GOP electors had completed their contingent electoral slates on December 14, 2020, and, in any event, it was never disclosed to or discussed with the nominee electors at any time. Indeed, John Eastman himself publicly confirmed on December 16, 2020 that the limited and legitimate purpose of the provisional Republican electoral slates was to preserve a remedy for pending judicial contests: "We have historical precedent here, and in each of these states, there is pending litigation challenging the results of the election. *If that litigation proved successful, then the Trump electors, having met and voted, would be able to have those votes certified*

offense.  In the light of this fact, the DA's labeling the presidential nominee electors as targets of

the Grand Jury's investigation is inaccurate and improper.  But having done so, the injury and

disruption to the nominee electors should not be compounded.  Forcing them to publicly march

into the Grand Jury only to harass and embarrass them is both unreasonable and oppressive.

### D. Georgia Law Protects The Nominee Electors' Right to Cast Contingent Ballots.

Georgia law governing the resolution of contested elections is entirely consistent with

these principles and with the provisional actions taken by the nominee electors.  As an initial

matter, O.C.G.A. § 21-2-502(e) governs the certification of the election of presidential electors as

follows:

> (e) *Presidential electors.* The Secretary of State, on receiving and computing the
> returns of presidential electors, shall lay them before the Governor, who shall
> enumerate and ascertain the number of votes for each person so voted for and shall
> cause a certificate of election to be delivered to each person so chosen.

In turn, O.C.G.A. § 21-2-521 allows any candidate for elected office or any aggrieved elector who

was entitled to vote for such a person to contest the election results in the Georgia courts.  After

hearing the allegations and the evidence in such a contest, O.C.G.A. § 21-2-527 empowers the

relevant court to "declare as elected" the qualified candidate who received the requisite number of

votes and "pronounce judgment accordingly."

When election results have been certified by the State, but a judicial contest is still

pending (as it was in the 2020 election), Georgia law provides that any necessary commission shall

be issued to the initial apparent winner and that the initial victors can be sworn into office.

---

and be the ones properly counted in the joint session of Congress on January 6", available at
https://www.ntd.com/john-eastman-explains-the-historical-precedents-on-dueling-electors_540953.html  (December
16, 2020) (emphasis added).  Additionally, as Vice President Pence and his team determined, such a plan is
unprecedented and unlawful under both the Constitution and the provisions of the ECA.  As such, none of the nominee
electors could have anticipated on December 14, 2020 that there could or would be any attempt to misuse their lawfully
cast contingent electoral slate in such a manner, nor did they or could they have participated in the same.

O.C.G.A. § 21-2-503(a) and (c)   But, importantly, if the court in the judicial contest determines that the person so commissioned or sworn in was not the actual winner, then commissions are issued to the actual winner and that ultimate winner is sworn into office.   The issuance of these commissions and swearing in of the ultimate winner nullifies the prior commissions and the authority of the initial winner.   O.C.G.A. § 21-2-503(a) and (c) (emphasis added).

Applying those provisions here, the nominee electors' actions on December 14, 2020 are expressly provided for and protected by Georgia law.   A contest to the presidential election was filed in Fulton County Superior Court on December 4, 2020, *Trump et al., v. Raffensperger et al.,* Case No. 2020CV343255 (Fulton County Superior Court Dec. 2020), which contest would decide who the rightful presidential electors for Georgia were.   Federal law mandates that presidential elector ballots *must* be executed on the first Monday after the second Wednesday in December, which was December 14, 2020.   The court case, however, was still pending on that date.   To preserve their right and ability to serve as presidential electors in the event that the pending judicial contest were successful and to keep the judicial contest from being mooted, the nominee electors took the obvious and required procedural step of executing provisional electoral ballots.   These provisional ballots would only become the operative Georgia electoral votes if the judicial election contest were decided in favor of the Republican presidential electors.   Here, the judicial contest remained was unresolved and ultimately mooted.

To label that these actions as criminal is plainly contrary to Georgia law.   It is the equivalent of suggesting that when a candidate for political office in Georgia exercises his or her rights under express Georgia law to contest the results of an election, taking the necessary procedural steps to preserve and continue that challenge until it is adjudicated by the Georgia courts, it is a crime.   To the contrary, it is a specifically given and articulated right under Georgia law.

The mere suggestion that this lawfully permitted activity is or could be criminal is not just patently incorrect – it is exceedingly dangerous.  If this were the law, state or local law enforcement officials of an opposing political party could threaten to *criminalize* necessary actions taken in furtherance of a legitimate legal challenge to an election, allowing these partisan, elected local officials to inject themselves into state and federal elections in potentially outcome determinative ways.  It would also permit such officials to effectively cut off access to the judicial remedy that Georgia law expressly provides to contest elections.  State and local law enforcement officials could, in effect, shut down judicial election contests in close elections by criminalizing (or threatening to criminalize) the actions necessary to preserve such contests, forcing political candidates to concede or moot their judicial challenges before any court has heard the first bit of evidence, much less been able render a final decision.

Indeed, what the DA is actually saying when she labels the nominee electors as targets is that she believes that she has the right to prohibit them, upon pain of criminal prosecution and imprisonment, from exercising their right to preserve a judicial challenge to the results of their own election as presidential electors, even when Georgia law expressly permits such a challenge. That notion is antithetical to both federal and Georgia law and would be a terrifying intrusion by a local law enforcement official into a consequential national election.  This type of political interference in federal elections and tribunals born of local passion and prejudice is the very harm against which the Supreme Court cautioned in *In re Loney* and other such cases, *supra*.  In short, this is most decidedly not the law, and may it never be.

The DA's Office lacks the jurisdiction or authority to attempt to criminalize that which federal and state law specifically permit and protect.  On December 14, 2020, the nominee electors took the same contingent, provisional actions that the Kennedy electors took in Hawaii in 1960,

actions specifically provided for by federal law and protected by state law, actions that Justice Stevens, Representative Mink, and noted electoral college scholars have identified as the model to be followed in close, contested presidential elections.  The nominee electors contemporaneously made explicit the contingent nature of their electoral ballot dependent upon the outcome of a pending judicial challenge that would have, had it been heard on its merits, determined the question of who the lawful presidential electors for Georgia were.[19]

The actions of the Georgia presidential nominee electors simply are not and cannot be criminal under either federal or state law.  Instead, they are specifically contemplated by federal law and expressly protected by State law.  So, for the DA to improperly label it criminal and then misuse the power of the Grand Jury to force these wrongfully labeled "targets" of her investigation into the Grand Jury for personal appearances just to invoke their rights serves no other than their attempted public humiliation and harassment.  This is the epitome of unreasonable and oppressive.

### E.   Personal Appearance in Front of the Grand Jury Is Unnecessary, Unreasonable and Oppressive.

In the light of the facts and circumstances outlined herein, the personal appearance of the nominee electors before the Grand Jury is unnecessary, and it would prove extremely burdensome and costly to them.  Especially because guilt cannot be inferred from any invocation of an individual's state and federal 5th Amendment rights, *see* FN 5, forcing the nominee electors to personally appear before the Grand Jury has limited, if any, value, and the Grand Jury, acting through the DA's Office, has not and cannot meet their burden of establishing that it does.  *See, e.g., Morris v. State,* 246 Ga. 510, 512 (1980) (individual(s) moving to quash a grand jury subpoena

---

[19] Even if their activities were not protected by federal and state authority, which they are, the elector nominee's public statements and actions negate any claim that they were improper or illegal:  they cannot be and were not knowingly or willfully false or fraudulent, nor were the nominee electors attempting to deceive or trick anyone, much less Congress, which is the body to whom the contingent elector slate would have been presented had the pending litigation been successful.

as unreasonable has the general burden of persuasion, but grand jury has burden to make *prima facie* case that the actions commanded by the grand jury subpoena are relevant to investigation).

In contrast, the cost and burden for the nominee electors is considerable.  Virtually all of them have been subjected to significant, abusive threats -- both personally and through social media -- for serving as presidential nominee electors, and the public spectacle of forcing them to personally appear will re-enliven and invigorate these threats and harassment, just as the DA's public announcement of their target status has done.  As has been publicly reported, the DA's Office has been forced to increase its own security because of this investigation, and the nominee electors do not have law enforcement resources to protect them during and after such an event.

Also, traveling to Atlanta to personally invoke their rights before the Grand Jury is especially burdensome for several of the nominee electors.  For example, two of the electors are their 70s and live 4 and 5 hours away from Atlanta, respectively, and one has medical conditions that prevent her from driving, and she would have to secure some other mode of transportation to the Grand Jury.  Another elector nominee lives almost 6 hours away.

In short, the actual substantive benefit of the nominee electors' personal appearances under these circumstances is low to nonexistent and the cost and burden to them is high.  Because there is little to no value in their personal appearances under these circumstances, they should be excused from appearing, as customary practice and the ethics rules specify.

### III.   <u>Conclusion and Prayer for Relief</u>

For the reasons set forth herein, the Grand Jury subpoenas to these eleven nominee electors are unreasonable and oppressive, and we respectfully request the following relief:

1)   that the nominee electors be excused from personally appearing before the Grand Jury;

2) that this Court inquire into the District Attorney's actions outlined herein indicating the improper politicization of this investigatory process, including but not limited to the alleged new evidence upon which the District Attorney supposedly relied to change the nominee electors' status in light of the legal and factual authorities provided herein;

3) that this Court ensure that the exculpatory information that the nominee electors have provided to the District Attorney's Office be provided to the Grand Jury as outlined herein and in Exhibit A;

4) that this Court grant Senator Jones' Motion to Disqualify for the reasons set forth therein;

5) that this Court grant Senator Jones' request that the Grand Jury report be embargoed or placed under seal until after the November elections for the reasons set forth therein and in this Motion;

6) that this Court grant all other appropriate relief.

Respectfully submitted,


Holly A. Pierson
Georgia Bar No. 579655
PIERSON LAW LLC
2951 Piedmont Road NE
Suite 200
Atlanta, GA 30305
hpierson@piersonlawllc.com
404-353-2316

Kimberly Bourroughs Debrow
Georgia Bar No. 231480
STRICK:AND & DEBROW
246 Bullsboro Drive, Suite A
Newnan, GA 30263
kimberly@debrowlaw.com
678-350-1095


*Counsel for Nominee Electors*

20

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing *Motion to Quash and Disqualify* with the Clerk of Court of the Fulton County Superior Court and that date-stamped copy will be hand-delivered to the Fulton County District Attorney's Office today.

Respectfully submitted this the 19th day of July, 2022.


Holly A. Pierson
Georgia Bar No. 579655

# EXHIBIT A



**Holly A. Pierson**
404-353-2316
hpierson@piersonlawllc.com
www.piersonlawllc.com

July 12, 2022

**VIA EMAIL (**fani.willis@fultoncountyga.gov)

District Attorney Fani Willis
Fulton County District Attorney's Office
136 Pryor St SW 3rd Floor
Atlanta, GA 30303

Re:   *Target Status of Georgia GOP Nominee Electors and the Fulton
County Special Purpose Grand Jury*

Dear District Attorney Willis:[1]

As you know, Kim Debrow and I represent 11 of the 16 Georgia GOP nominee electors (the "GOP electors") from the 2020 Election,[2] all of whom have been subpoenaed to appear before the Fulton County Special Purpose Grand Jury (the "Grand Jury") at the end of July.  For all of the factual and legal reasons outlined in this letter, including your team's abrupt and seemingly arbitrary post-subpoena change in our clients' status from witness to target, our clients have all accepted our advice to exercise their applicable state and federal constitutional and statutory rights not to give testimony. Customary practice and ethical rules dictate that they should, therefore, be excused from their appearance before the Grand Jury. We request that they be so excused.

**I.     Background**

Before the Grand Jury was empaneled, we were informed by your investigative team[3] that each of our 11 clients were witnesses, not subjects or targets, of your investigation into the 2020 election.  On the basis of those representations, we worked cooperatively with your office in its investigation and agreed to present our clients for voluntary interviews with your team overseeing

---

[1] This letter is an attorney proffer and constitutes negotiations and settlement discussions regarding this matter with your office.  It is protected under all applicable state and federal laws and rules of procedure and/or evidence, including but not limited to O.C.G.A. § 24-4-408, Fed. R. Evid. 408, and Fed. R. Evid. 410. Additionally, this letter does not purport to outline or address every potential factual or legal argument of our clients, and they do not waive any such argument or defense by virtue of this letter.

[2] We represent David Shafer, Vikki Consiglio, Shawn Still, Brad Carver, Carolyn Fish, Cathy Latham, Kay Godwin, Mark Amick, Joseph Brannan, CB Yadav, and John Downey.

[3] The team consists of Nathan Wade, Don Wakeford, Will Wooten, Adam Ney, Investigator Mike Hill, and Investigator Trina Lucas.

the investigation relating to the electors. Specifically, on April 25, 2022, David Shafer presented himself to your team for a voluntary interview, and Vikki Consiglio did so on April 26, 2022. The status of all of our clients as witnesses was reaffirmed at these interviews. Mark Amick was scheduled to meet with your team on April 28, 2022, but that interview was canceled because a scheduling conflict for your team had arisen. They informed us at that time that they would be back in touch to reschedule Mr. Amick's interview and to schedule the remaining 8 GOP electors' interviews.

On May 1, 2022, Investigator Mike Hill contacted us to request that we provide the documents that Mr. Shafer had previously supplied to the House of Representatives' January 6 Committee, and we voluntarily supplied that information to your team on May 2, 2022. We also provided to your team at that same time additional documents and information definitively showing that the GOP electors' actions in December 2020 were proper, even necessary, under the governing federal law and demonstrating that there could be no legitimate question about their lawful intent in taking the contingent, provisional actions upon advice of legal counsel at that time.

## II.     Exculpatory Document and Information Presented to the District Attorney's Office.

Specifically, we provided your team with a link to a news outlet's coverage of the GOP electors on December 14, 2020. That clip is available here: https://www.fox5atlanta.com/video/880535 (relevant coverage starts around 40-45 seconds and at 1 minute and 40 seconds into the clip). As reported in that clip, the GOP electors made clear at the time that they met on December 14, 2020 that the elector slate they executed was contingent, provisional, and would only spring into validity if the then-pending legal challenge to Georgia's election were successful.[4]  Georgia GOP Chairman Shafer made this same point explicitly in tweets he published on December 14, 2020, which refer to the GOP electors as "the Republican nominees for Presidential Elector" and discuss the need for them to act provisionally to preserve then-President Trump's remedies in pending litigation. Those tweets were also provided to your office on May 2, 2022, and they state as follows:

Because the President's lawsuit contesting the Georgia election is still pending, the Republican nominees for Presidential Elector met today

---

[4] Although there was significant litigation in various forums contesting the election, the one pending in Fulton County challenging its validity was *Trump et al., v. Raffensperger et al.,* Case No. 2020CV343255 (Fulton County Superior Court Dec. 2020). Georgia law requires lawsuits contesting elections to be heard within 20 days, but this lawsuit was not even scheduled for a hearing until January 8, 2021 - more than two weeks after the statutory deadline for it to be heard and two days after Congress met on January 6, 2021 to count and certify the votes of the Electoral College - effectively mooting it. No Georgia court ever held an evidentiary hearing or ruled on the merits of the lawsuit.

at noon at the State Capitol today and cast their votes for President and Vice President.

Had we not meet [*sic.*] today and cast our votes, the President's pending election contest would have been effectively mooted. Our action today preserves his rights under Georgia law.

The news coverage and Chairman Shafer's tweets make plain that the GOP electors cast contingent, provisional votes to preserve a legal remedy and the ability of Georgia to have presidential electors in the event of a judicial ruling in President Trump's favor in a then-undecided legal contest.[5]

We also sent to your team on May 2, 2022, an annotated copy of 3 U.S.C. § 15, part of the Electoral Count Act ("ECA"), which is the federal law (in conjunction with U.S. CONST. art. II, § 1 and the Twelfth Amendment) giving Congress the

---

[5] Much has been made in the press about an email from Robert Sinners of the Trump campaign that was apparently sent to some or all of the nominee electors advising them to, in essence, conduct their work in secret. While we are aware of no law that would have prevented the GOP electors from adhering to this request, it is obvious from the news coverage and the public tweets about what the Georgia GOP electors did on December 14, 2020 that, to the extent any of them received and read this advice, they did not follow it. Instead, the GOP electors acted and spoke publicly so as to be transparent about what they were doing and why. Chairman Shafer invited members of the news media, including TV cameras, into the room to observe and record the meeting. Additionally, the documents that we have voluntarily provided to you from Mr. Shafer (based upon his status as a witness) confirm that the representatives of the Trump campaign involved with the contingent presidential elector slates were clear at that time that the sole purpose of the contingent elector slates was to preserve a remedy in the event of a successful legal challenge.

It has also been reported in the media that certain high level members of the Trump team (Mr. Eastman, Mr. Giuliani, et al.) developed a *different* plan in late December 2020 (after Christmas) to, among other things, attempt to force Vice President Pence to count these contingent presidential electoral slates as the valid elector slates despite the lack of any successful judicial ruling. To the extent these reports are accurate (which we have no way of knowing), the Georgia GOP electors did not and could not have had any involvement in or knowledge of any such plan, as it was not even conceived until several weeks *after* the GOP electors had completed their contingent electoral slates on December 14, 2020, and it was never disclosed to or discussed with the Georgia GOP electors. Indeed, at the relevant time, John Eastman himself publicly confirmed on December 16, 2020 that the limited and legitimate purpose of the provisional Republican electoral slates was to preserve a remedy for pending judicial contests to the election: "We have historical precedent here, and in each of these states, there is pending litigation challenging the results of the election. *If that litigation proved successful, then the Trump electors, having met and voted, would be able to have those votes certified* and be the ones properly counted in the joint session of Congress on January 6", available at https://www.ntd.com/john-eastman-explains-the-historical-precedents-on-dueling-electors_540953.html (December 16, 2020) (emphasis added). Additionally, as Vice President Pence and his team determined, the alleged later plan -- to have VP Pence, as President of the Senate, determine the validity between competing elector slates and to count the uncertified provisional slates as valid in the absence of a successful judicial challenge in that State -- is unprecedented and unlawful under both the Constitution and the provisions of the ECA (which Mr. Eastman himself at one point apparently conceded). As such, none of the Georgia GOP electors could have possibly known or anticipated on December 14, 2020 that there could or would be any attempt to misuse their lawfully and appropriately cast contingent electoral slate in such a manner, nor did they or could they have participated in the same.

exclusive right to count electoral votes and to decide objections to those votes, including determinations between competing slates of electors from the same state.  That statute specifically anticipates that in cases like the 2020 election, where the results in certain States are close and contested, Congress may well receive two competing elector slates from a State.  The federal statute is plain that there is nothing improper about the submission of two slates and that the decision of which of these two competing slates is to be counted must be resolved solely by Congress:

> If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate*, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law*; and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State,* unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*

*See* 3 U.S.C.A. § 15 (emphasis added).  In other words, federal law specifically anticipates and permits the submission of more than one slate of electors from a State and gives Congress the exclusive jurisdiction to adjudicate the validity of those slates within the parameters set in the ECA.  These principles are further set forth, among other places, in an article from the Congressional Research Service (CRS) addressing this issue.  *See* COUNTING ELECTORAL VOTES: AN OVERVIEW OF PROCEDURES AT THE JOINT SESSION, INCLUDING OBJECTIONS BY MEMBERS OF CONGRESS, Congressional Research Service at pp. 8-9 (also provided to your team on May 2, 2022).

We also provided your team with articles and information illustrating on point precedent for a contingent elector slate such as that executed by the Georgia GOP electors. In particular, in Hawaii in the 1960 Presidential election, the original vote count was for Nixon, the Republican, not Kennedy, the Democrat, but the margin of victory was small. Hawaii, through its Governor, certified the votes for Nixon in November 1960. Democrats sued to contest the election results, and a court-ordered recount ensued in December 1960. That recount was still ongoing on the required date under the Constitution and the ECA for the presidential electors to cast their ballots,[6] which that year was December 19. While Hawaii continued its recount, both the Republican and Democrat presidential electors (or, more specifically, the putative Republican presidential electors and the Democrat nominees for presidential elector) separately met on December 19, and each cast an electoral slate for their respective candidates that was transmitted to Congress. When the recount was completed, Kennedy was the actual winner, and the state court declared that Kennedy had won Hawaii by 113 votes. Because the Democrat nominee electors had taken the necessary step of casting their contingent presidential electoral ballots by the federally mandated date of December 19, 1960, the new Governor of Hawaii was able to certify the Kennedy Certificate of Ascertainment to Congress on January 4, 1961. Congress then ultimately counted that electoral slate for Kennedy, discounting the previously certified one for Nixon, even though the Kennedy slate was not certified until January 1961 (after the ECA's purported deadline) and conflicted with the previously timely certified Certificate of Ascertainment for Nixon from Hawaii.[7]

---

[6] The Constitution and the ECA require that the presidential electors meet on the first Monday after the second Wednesday in December (which was December 14 in 2020) to cast their votes for President and Vice President of the United States. *See* U.S. CONST. art. II, § 1, cl. 4; U.S. CONST, Amendment 12; 3 U.S.C. §§ 7-8).

[7] In the hotly contested Presidential election of 2000, this same Hawaii precedent and the concept of two elector slates again received significant attention. Justice Stevens cited with approval the 1960 Hawaii precedent of providing two slates of electors when a contested election was still undecided at the time electors are required by the Constitution and federal law to execute their electoral ballots in his dissent in *Bush v. Gore,* stating as follows:

> In the interest of finality, however, the majority effectively orders the disenfranchisement of an unknown number of voters whose ballots reveal their intent—and are therefore legal votes under state law—but were for some reason rejected by ballot-counting machines. It does so on the basis of the deadlines set forth in Title 3 of the United States Code. *Ante,* at 532. *But, as I have already noted, those provisions merely provide rules of decision for Congress to follow when selecting among conflicting slates of electors. Supra,* at 540. They do not prohibit a State from counting what the majority concedes to be legal votes until a bona fide winner is determined. **Indeed, in 1960, Hawaii appointed two slates of electors and Congress chose to count the one appointed on January 4, 1961, well after the Title 3 deadlines.** See Josephson & Ross, Repairing the Electoral College, 22 J. Legis. 145, 166, n. 154 (1996).[5] *Thus, nothing prevents the majority, even if it properly found an equal protection violation, from ordering relief appropriate to remedy that violation without depriving Florida voters of their right to have their votes counted.* As the majority notes, "[a]

The Hawaii precedent is instructive here. As in the 2020 election in Georgia, the presidential election in Hawaii was contested through litigation and a determination of the final results had not been made by the date upon which federal law mandates that presidential electors must execute their electoral votes. As in Georgia in the 2020 election, the presidential election in Hawaii had been certified by the State for the apparent winner (Nixon) despite the ongoing election disputes and contests. But because the federal deadline for presidential electors to vote is set in stone (the first Monday after the second Wednesday in December) and because the election dispute had not been finally resolved by that time, the presidential electors for *both* the putative winner (Nixon) and for the candidate contesting the election results (Kennedy) met on the date required by the Constitution and federal law (Dec. 19, 1960) to execute electoral votes for their respective candidates to preserve the electoral votes for whomever the ultimate winner of the election contests was. In Hawaii, the ultimate winner turned out to be Kennedy, and *only because* the elector nominees for Kennedy had taken the federally required step of executing an electoral slate for Kennedy (even when Hawaii had already certified its election for Nixon) did Congress have electoral votes for Kennedy that it could then count. Had the Kennedy elector nominees *not* executed their provisional electoral votes on December 19, 1961 and transmitted them to Congress, Kennedy would have won the State of Hawaii but still been *deprived of its electoral votes*, and the citizens of Hawaii would have had their voice in the 1960 presidential election silenced.

---

desire for speed is not a general excuse for ignoring equal protection guarantees." *Ante,* at 532.

*Bush v. Gore,* 531 U.S. 98, 127 (2000) (Justice Stevens, dissenting) (emphasis added). Around this same time, Democrat Congresswoman Patsy Mink of Hawaii, the first woman of color to serve in the House of Representatives, specifically referenced the Hawaii precedent and advocated for the provision of two elector slates from Florida to Congress as follows:

The [Hawaii] precedent of 40 years ago suggests the means for resolving the electoral dispute in Florida: count the votes under the supervision of the court pursuant to Florida law, *both slates of electors meet on December 18 and send their certificates to Congress;* the Governor of Florida send a subsequent certificate of election based on the decision of the count supervised by the court accompanied by the decision of the court; and Congress accepts the slate of electors named by the Governor in his final certification.

Under this procedure Florida need not rush to complete its recount in an attempt to meet unrealistic deadlines set by the court or the legislature. *The key date is not December 12 or December 18. It is January 6, the date on which the electoral votes are counted.* As the 1960 experience of Hawaii shows, the Florida recount does not have to be completed until just before the electoral votes are counted.

Statement of Representative Patsy Mink, CONGRESSIONAL RECORD, December 13, 2000 (emphasis added), available at https://www.govinfo.gov/content/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26609-2.htm. Suffice to say that neither esteemed Supreme Court Justice Stevens nor Representative Mink found anything improper or illegal with two slates of competing presidential electors being presented to Congress in a contested presidential election; indeed, both *endorsed* that path as the *correct one.*

So too in the 2020 presidential election in Georgia. As in Hawaii in 1960, in the Georgia 2020 presidential election, Biden was the apparent winner and the results in his favor were certified by the State. But, as in Hawaii, there was a pending judicial contest to the validity of the election results that had not been decided by the mandatory federal deadline for electors to execute their electoral ballots (December 14, 2020). As occurred in Hawaii, both slates of nominated Georgia presidential electors met on the required day and executed electoral votes for their political party's chosen candidates and transmitted them to Congress as required by law, thus ensuring that no matter how the judicial contest to the election turned out, the State of Georgia would have a slate of electoral votes for Congress to count on January 6, 2021.

Unlike the 1960 Hawaii election, the judicial contest in Georgia did not change the election results, and so the contingent presidential electoral votes executed by the Republican nominee electors appropriately were not certified by the Governor of Georgia nor were they presented to or counted by Congress as the final, certified vote for the State. But, had the GOP elector nominees *failed* to execute their contingent slate on December 14, 2020 and the legal challenge to the election *had* been successful (a result that was not and could not have been known on December 14, 2020), the State of Georgia would have had *no presidential electoral votes* to be counted in Congress on January 6, 2021, and citizens of Georgia would have had their voice in the 2020 presidential election silenced. No law countenances, much less commands, such a result, and no state law or law enforcement body can or should attempt to criminalize actions of presidential electors acting under Constitutional and federal authority to preserve the electoral votes of the State of Georgia in a contested election.[8]

In sum, on May 2, 2022, we voluntarily and proactively provided your team with ample evidence that the Georgia GOP nominee electors acted in a proper, legal, precedented – even necessary -- manner, and that they were transparent in their actions and the legitimate intent for the same at the time that these actions occurred on December 14, 2020.[9]

---

[8] Indeed, well-known and highly credentialed electoral college scholars contend that executing the two slates of electoral ballots and submitting both to Congress is "the model" for how a close presidential election should be decided. *See, e.g.,* Michael L. Rosin and Jason Harrow, *How to Decide a Very Close Election for Presidential Electors: Part 2* (explaining that both sets of presidential elector nominees casting votes for their candidates as occurred in the 1960 Hawaii presidential election is the model that should be followed in a close election), available at https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-2.

[9] The fact that the GOP electors publicly and contemporaneously made explicit the contingent nature of their electoral slate pending the outcome of ongoing litigation that would, when heard on its merits, determine the question of who the lawful presidential electors for Georgia were, obviously negates any claim that such actions taken by the GOP electors were knowingly or willfully false or fraudulent or that the GOP electors were attempting to deceive or trick anyone, much less Congress, which is the body to whom the contingent elector slate would have been presented had

### III.   Post-Subpoena Change of Status from Witness to Target.

On May 5, 2022, having heard nothing further from your team about the schedule for the voluntary interviews of the remaining 9 GOP elector nominees whom we represent, we reached out to your team to discuss schedules and inform the team of some upcoming conflicts that we had to facilitate setting interview dates.  That same day, Mr. Wade responded to that email, stating "Thank you Holly,  as of now our investigation has us tied up with other components so no worries."  For approximately another month, we heard nothing further from your team.  On June 1, 2022, Investigator Lucas sent – out of the blue – an email attaching Grand Jury subpoenas for each of our 11 clients.[10]

Understandably, we were surprised by the service of these subpoenas:  we had been waiting since May 5 for your team to reach back out to us to schedule the remaining voluntary interviews to which we had agreed, and which had begun in April.  In a subsequent call that Ms. Debrow and I had with Investigators Lucas and Hill to discuss this development, we raised our objections and concerns about these subpoenas, including the fact that it was not the path to which we had all previously agreed and that coming to Atlanta for a Grand Jury appearance for many of our clients would be extremely laborious, inconvenient, and difficult given their remote locations and age.  We also noted the unnecessarily cumulative nature of the testimony of most of our clients, the potential danger attendant in a Grand Jury appearance in this case, and asked Investigators Lucas and Hill to raise these concerns with the rest of your team and to see if we could either revert to voluntary interviews or, at least, limit the number of our clients who would be needed to provide testimony to the Grand Jury.  While we were assured that these concerns would be raised with Mr. Wade and the team, we never received any feedback or response to these requests.

On June 28, 2022, Ms. Debrow contacted Mr. Wade and his team in an attempt to resolve some scheduling conflicts that both counsel and some of our clients had with the assigned Grand Jury appearance dates at the end of July.  Despite having previously agreed to work with us and our clients on dates and conflicts, Mr. Wade responded that same day declining to make any changes to the Grand Jury schedule.  Mr. Wade also took that opportunity to inform us that "as our investigation has matured and new evidence has come to light, in a spirit of integrity we feel it only fitting to inform you that your clients' status has changed

---

the then-unknown contingencies come to fruition.  Additionally, to the extent that any of the GOP electors had a genuinely held belief at that time that irregularities in the Georgia election rendered or could render them the actual presidential electors of Georgia, any contingent attestation to that effect to preserve their right to claim their rightful status cannot be false or deceitful, and certainly not knowingly or intentionally so.  And, of course, the GOP electors, like all citizens, have a right to assemble and petition their government – in this case, Congress – for grievances under the First Amendment and, here, the specific provisions of the Constitution and the ECA.

[10] We were also sent in this same email a Grand Jury subpoena for Mark Hennessy, a GOP elector whom we do not represent, and we informed your team by return email that we could not accept service on his behalf for that reason.

to 'Target.'  Madam DA has continually made certain that her office operate [*sic.*] with transparency and integrity and as such, your clients will receive target letters soon."  On July 5, 2022, Investigator Hill sent an email attaching target letters for each of our clients.

In light of all of these facts and the governing law, this series of events - particularly the precipitous change from of our clients being properly characterized as witnesses to them being abruptly and inaccurately labeled as targets -- is concerning on a number of fronts.  First, we question the existence of jurisdiction for either the Fulton County District Attorney's Office or any of its grand juries to interfere with, much less prosecute, presidential electors or elector nominees executing electoral ballots (including *contingent* electoral ballots) for their party's candidates for President and Vice President, especially where a legal contest to the election is then pending and federal law explicitly recognizes the right of such electors and elector nominees to do expressly that, setting Congress as the sole arbiter of which of the competing slates is the valid one.  Our clients cannot properly be called "targets" of your or the Grand Jury's investigation when there is no state jurisdiction over the actions that they performed, and our legal research indicates that jurisdiction over these actions and functions is exclusively federal.

Setting aside the jurisdictional issue here for purposes of discussion, the existing facts and legal authority -- much of which has already been presented to your investigative team and herein -- make it plain that the GOP electors acted in an entirely proper and legal manner.  *See infra.*  Additionally, the actions that our clients took in their capacities as GOP electors has been a matter of public record and media coverage since December 14, 2020.  All of the actions taken by our clients and the purpose for which they were taken were known to you and your investigative team before your team labeled our clients witnesses, disavowing that they were subjects or targets, and induced us to participate in voluntary interviews with your team.  Those facts are fixed – they cannot and have not matured or evolved.  Additionally, to our knowledge, the Grand Jury has subpoenaed no documents from any of the GOP electors (and perhaps not from any other witness it has subpoenaed for appearance), and the documents that we voluntarily provided when our clients were labeled as witnesses are exculpatory.  Thus, it is difficult to accept at face value the assertion that your team has or could have uncovered any credible evidence that incriminates our clients.  We request that you share this supposed new evidence with us so that we can respond to/explain/correct/debunk it.

The timing of our clients' change in status adds to our concern:  your team consistently represented that all of our clients were witnesses to, not subjects or targets of, your office's or the Grand Jury's investigation from our initial contact, through our voluntary interviews in April and service of the Grand Jury subpoenas in early June, and up until we notified your team in late June, through our email requesting scheduling changes, that our clients were planning to testify in the Grand Jury.  Only upon learning that our clients were actually planning to testify

did their status suddenly change from "witness" to "target." The timing of these events, especially in light of the known facts and governing law, leaves the impression of gamesmanship rather than good faith.

## IV.   Excusing Individuals Labeled As Targets From Appearing Before the Grand Jury.

As set forth herein, we believe that labeling our clients as targets is factually and legally unjustifiable. But because your office has invoked that label, each of our clients has accepted our advice to invoke their state and federal statutory and 5th Amendment rights and will not be providing substantive testimony to the Grand Jury.[11] We request, therefore, that you release our clients from their Grand Jury appearances. *See, e.g.,* ABA STANDARDS OF PROSECUTION FUNCTION 3-4.6(f) ("If the prosecutor concludes that a *witness is a target of a criminal investigation, the prosecutor should not seek to compel the witness's testimony before the grand jury absent immunity.*") (emphasis added); *see also* Ga. R. Prof. Resp. 3.8, Special Responsibilities of a Prosecutor, Comment 1 (citing favorably the ABA Standards of Prosecution); United States Attorney Manual ("USAM") 9-11.150 (subpoenaing targets of grand jury investigation "may carry the appearance of unfairness"); USAM 9-11.154 (when target of grand jury investigation informs government that they plan to invoke their 5th Amendment privilege in the grand jury, they should ordinarily be excused from having to appear in front of the grand jury).

In addition to these material fairness and ethical considerations that counsel strongly against forcing a target into a grand jury, our clients have very real and practical challenges in appearing for this limited purpose that cannot be of much, if any, value to the Grand Jury's investigation. As we have previously discussed with your team, there are significant and heightened safety concerns

---

[11] *"[N]o implication of guilt"* can be drawn from an individual's invocation of her Fifth Amendment privilege before the grand jury. *Grunewald v. United States,* 353 U.S. 391, 421 (1957) (emphasis added). Expanding on this principle, the Supreme Court noted that "[r]ecent re-examination of the history and meaning of the Fifth Amendment has emphasized anew *that one of the basic functions of the privilege is to protect innocent men." Id.* (citation omitted). Further elaborating, the Court noted that *"[t]oo many,* even those who should be better advised, *view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.' Id.* (quoting *Ullmann v. United States,* 350 U.S. 422, 426 (1956) (emphasis added)). "'The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Id.* (quoting *Slochower v. Board of Higher Education,* 350 U.S. 551, 557-558 (1956)). Since *Grunewald,* the Supreme Court has consistently reaffirmed these principles. *See, e.g., Baxter v. Palmigiano,* 425 U.S. 308. 327 (1976) ("And *it is not necessary that a person be guilty of criminal misconduct to invoke the privilege; an innocent person, perhaps fearing that revelation of information would tend to connect him with a crime he did not commit, also has its protection.* The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.") (internal citations and quotations omitted) (emphasis added); *Ohio v. Reiner,* 532 U.S. 17 (2001) (witness could assert Fifth Amendment privilege despite claim of innocence because she had reasonable cause to apprehend danger from her answers).

surrounding this Grand Jury in particular. Your office has been forced to increase its own security measures in light of this investigation, and it is fair to say that things are fraught, unpredictable, and uncertain for both the government and the subpoenaed individuals in this investigation. The inevitable news coverage of each of our clients being forced into the Grand Jury to follow their counsel's advice to invoke their rights will undoubtedly re-enliven and invigorate the significant and abusive threats that many of our clients have already received. And, quite obviously, they do not have the law enforcement resources of your office to protect them during and after such an event. Also, traveling all the way to Atlanta to have to personally invoke their state and federal 5th Amendment rights before the Grand Jury is extremely burdensome for several of our clients and of little if any value to the Grand Jury's investigation. For example, Ms. Godwin and Ms. Fisher are both in their 70s and live 4 and 5 hours away from Atlanta in Blackshear and Saint Simons, respectively. Ms. Godwin has medical conditions that prevent her from driving and would, therefore, have to secure a driver or some other mode of transportation to the Grand Jury. Mr. Yadav lives almost 6 hours away in St. Marys, Georgia. So for all of these reasons, we ask that our clients be excused from appearing before the Grand Jury.

## V.     Presentation of Exculpatory Information to the Grand Jury.

We also request that you and your team provide to the Grand Jury the significant exculpatory information that we have already provided to your team and that is set forth in more detail in this letter. Our clients wanted to and were prepared to testify, but the abrupt change in their status has made that impossible. Even still, if the goal of the Grand Jury is to receive the facts and get to the truth, they should be given this important, relevant, exonerating information, including the news coverage and Shafer tweets from December 14, 2020, a copy and accurate explanation of 3 U.S.C. § 15, a copy of the CRS article with attention drawn to the section on competing elector slates, a  full and accurate description of the 1960 Hawaii precedent, a copy of Justice Stevens' dissent in *Bush v. Gore* with the favorable reference to the Hawaii precedent highlighted, a copy of Representative Mink's statement in the Congressional Record, and the Supreme Court precedent provided in Footnote 11.

## VI.    Conclusion.

Please confirm by close of business this <u>Thursday, July 14, 2022</u> that the Grand Jury will excuse our 11 clients from their Grand Jury appearances. Please also advise us at your earliest convenience if you are willing to share with us the evidence that your team believes justifies the elevation of our clients from witnesses to targets so that we might have the opportunity to respond to it.

[*Signatures on Following Page*]

Page **11** of **12**

Very truly yours,

*/s/ Holly A. Pierson*

Holly A. Pierson

*/s/ Kimberly Bourroughs Debrow*

Kimberly Bourroughs Debrow

cc:   Nathan Wade
      Don Wakeford
      Will Wooten
      Adam Ney
      Trina Lucas
      Mike Hill

**IN THE FULTON COUNTY SUPERIOR COURT**
**STATE OF GEORGIA**

IN RE SUBPOENAS FROM MAY 2022   )          Case No. 2022-EX-000024
SPECIAL PURPOSE GRAND JURY       )

**ISSUED TO:** Presidential Nominee Electors Mark Amick, Joseph Brannan, Brad Carver, Vikki Consiglio, John Downey, Carolyn Fish, Kay Godwin, Cathy Latham, David Shafer, Shawn Still, CB Yadav

## (PROPOSED) ORDER

The above-named recipients of subpoenas from the Fulton County Special Purpose Grand Jury ("Grand Jury") have moved this Court to excuse their personal appearances before the Grand Jury, arguing that such appearances are unreasonable and oppressive under O.C.G.A. § 23-13-23. The movants have also joined in Senator Burt Jones' Motion to Disqualify, filed in this Court on July 15, 2022,[1] and requested additional relief in their motion.  Having considered the motion, and for good cause shown, the Court hereby ORDERS as follows:

1. Each of the eleven movants are excused from having to personally appear before the Grand Jury;

2. The District Attorney is directed to provide to the Grand Jury the information that movants describe as exculpatory in Exhibit A to their motion; and

3. The District Attorney will provide to this Court, *ex parte* and *in camera*, no later than _____ the evidence or testimony upon which it is relying to claim that the movants status in this investigation was properly changed from that of witnesses to targets of the investigation.

---

[1] The Court's ruling on Senator Jones' motion will be made by separate order.

SO ORDERED this ___ day of July, 2022.


_____

Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit