# EXHIBIT B-147

FILED IN OFFICE

APR 13 2023

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

)
IN RE 2 MAY 2022 SPECIAL PURPOSE    )    No. 2022-EX-000024
GRAND JURY                          )
                                    )

## MEDIA INTERVENORS' NOTICE OF FILING

The Atlanta Journal-Constitution; The Associated Press; Bloomberg L.P.; Cable News

Network, Inc.; CMG Media Corporation and its television station WSB-TV; Dow Jones &

Company, publisher of The Wall Street Journal; The E.W. Scripps Company on behalf of

Scripps News and its local media station group; Gray Media Group, Inc. and its television station

WANF; The New York Times Company; and Tegna Inc. and its television station WXIA-TV

(collectively, "Media Intervenors"), respectfully submit this Notice of Filing.

Attached hereto as Exhibit A is a true and correct copy of the transcript of the hearing

held by this Court on January 24, 2023.

Attached hereto as Exhibit B is a true and correct copy of the October 22, 2010 Report

and Special Presentments of the Special Purpose Grand Jury in the Superior Court of Gwinnett

County, as published by the legal organ for Gwinnett County, *The Gwinnett Daily Post* (the

"Gwinnett SPGJ Report").  The October 22, 2010 Report was presented to the Court and State

during the Court's January 24, 2023 hearing in this matter.

Dated this the 13th day of April, 2023

Respectfully submitted,

FOR:   KILPATRICK TOWNSEND & STOCKTON LLP

Thomas M. Clyde
    Georgia State Bar No.: 170955
    tclyde@kilpatricktownsend.com
Lesli N. Gaither
    Georgia State Bar No.: 621501
    lgaither@kilpatricktownsend.com
Suite 2800, 1100 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: (404) 815-6500

Attorneys for Media Intervenors

2

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served a true and correct copy of the

above via Electronic and United States Mail upon:


Fani T. Willis
Will Wooten
District Attorney's Office
136 Pryor Street SW, 3rd Floor
Atlanta, Georgia 30303
Fani.willisda@fultoncountyga.gov
Will.wooten@fultoncountyga.gov


DATED this the 13th day of April, 2023

Thomas M. Clyde

# EXHIBIT "A"

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

IN RE: 2 MAY SPECIAL          )

PURPOSE GRAND JURY            )

                             )

                             )    2022-EX-000024


TRANSCRIPT OF SPECIAL PURPOSE GRAND JURY HEARING
BEFORE THE HONORABLE ROBERT C.I. MCBURNEY
ON JANUARY 24, 2023, ATLANTA, GEORGIA

APPEARANCES:

    ON BEHALF OF THE STATE:

      *FANI WILLIAMS, ESQ.
      ELECTED DISTRICT ATTORNEY

      ADA FMCDONALD WAKEFORD, ESQ.

      ADA WILL WOOTEN, ESQ.

      ADA ADAM NEY, ESQ.

      ADA NATHAN WADE, ESQ.

    ON BEHALF OF THE MEDIA INTERVENORS':

      THOMAS M. CLYDE, ESQ.

      LESLI GAITHER, ESQ.

---

KAREN RIVERS, RMR, RPR, CCR-2575
OFFICIAL COURT REPORTER
FULTON COUNTY JUSTICE CENTER TOWER
185 CENTRAL AVENUE, S.W.
ATLANTA, GEORGIA  30303

THE COURT:  So, Mr. Ney, if I could have the appearance for the State.

MR. NEY: Adam Ney, your Honor.

THE COURT:  And on behalf of the media interveners?

MR. CLYDE: Your Honor, Tom Clyde and Lesli Gaither.

THE COURT:  Welcome both of you.

Mr. Clyde, will you be doing the primary speaking for the Media Intervenors'.  I'm happy to have it spread out wherever, but if I have questions for your side, should I just pose them and you guys will flip a coin?

MR. CLYDE: I welcome just posing them, and we'll flip a coin, but I anticipate I will be doing the bulk of the argument.

THE COURT: Great.  Mr. Ney just breathed a side of relief.

Mr. Wade, who will be answering questions if I've got any for the District Attorney's Office.

MR. WADE:  So, Judge, here for the State is myself, Nathan Wade.  Donald Wakeford is here as well as well as Adam Ney and Will Wooten.  Madam District Attorney will be making an appearance as well, Judge.  But, for the bulk of the argument we

anticipate it will be Donald Wakeford.

THE COURT:  Great.  Well, welcome all of you.

So, we're here to discuss whether the final report that the special purpose grand jury that was created, if you will, by Chief Judge Brasher's order from January 24th of last year and that was empaneled in May of last year.  Whether their final report should be made public, in part, in whole or if it should remain where it is, which right now is solely in the District Attorney's custody.  So everyone is clear, I hand delivered to the District Attorney the copy of the final report soon after it was available, and my colleagues have voted that the special purpose grand jury had completed its work and should be dissolved.,  And that's the one copy I'm aware of that is in circulation within the District Attorney's span of control.  But the question has come up as to whether it should be shared more broadly.  The special purpose grand jury voted pursuant to O.C.G.A. 15-12-80 to have the report made public. We need to work through the consequences, if any, of that vote.  We need to talk about whether this final report is the equivalent of a general

presentment, if those terms really even make a
difference, and we need to talk a little bit about
how the final report might be viewed as what the
courts have referred to as court records, which
enjoy a presumption of public access, or if this
final report is somehow something different.  And
I'll note going in that there are precious and few
cases in Georgia dealing with special purpose grand
jury's because they are few and far between.  But
there are some, and they provide some guidance as
to what can happen with a final report from a
special purpose grand jury.  I think there is
precedent for their final reports being disclosed.
I'm holding one in my hand.  It was one of the
exhibits to the media intervenors' brief, so it's
been done before.  That doesn't mean that that was
the right thing to do.  It also doesn't mean that
that special purpose grand jury was sufficiently
similar to this one.  That this one's report ought
to be treated the same way.  I just want to be
thoughtful about it because there's clearly great
interest in the work that the special purpose grand
jury completed, and we need to be responsive to
what may be competing concerns of the investigative
interests of the District Attorney's Office and the

4

public's interest in understanding what its

colleagues, the members of the special purpose

grand jury did after they heard the evidence that

was presented to them.

So, Mr. Wakeford, I'm happy, if there's

something you want to say up front, but otherwise,

I've got questions that I'd love to get a DA's

Office prospective on to help me frame this, and

then I have similarly for Mr. Clyde and Ms. Gaither

some questions.

MS. WILLIS:  May I address the Court?

THE COURT: You may.

MS. WILLIS: Fani Willis, the Elected

District Attorney for Fulton County, on behalf of

the citizens and the state.

I believe that Mr. Wakeford will give you

some of the answers that you have required.  But

just as an overview -- first of all, the thought

that this is a presentment grand jury, you and I

both know it's really kind of a nonsensical

question.

THE COURT:  So, be thoughtful as you work

through this.  Because don't lump me with you as to

who thinks what is nonsensical and what's not.  So

you tell me what you think, and then I will let you

know later on what I think.

MS. WILLIS: Fair enough.

THE COURT: Excellent.

MS. WILLIS:  Back in May of last year, the Honorable Chief Brasher swore in 26 members of the public to create a special purpose grand jury. Their entire function was to be an investigative tool.  And we are very very thankful to those citizens.  As you and I both know, they gave up a great deal of their time.  Hopefully, you and I can agree on that.

THE COURT:  We do.

MS. WILLIS: And heard from 75 witnesses, saw countless exhibits, but all for the purpose of investigation.  At this point, reaching back to prior experience of both myself and I'm going to say you again, because I know your history is that you've been a prosecutor.  Often when a prosecutor is in a trial courtroom they find themselves in this position of not only protecting the rights of the victims, witness and the community, but making sure that Defendant's rights are protected, too. Rights sometimes is a very selfish interest; you don't want the case overturned.  And so as the prosecutor we stand in that position of protecting

everyone in the courtroom's rights.  Having been
one of very few people that have had the
opportunity to read that report, you being the
other one, I think we can assume that fact is also
true.  In this case, the State's understands the
media inquiry and the world interests.  But we have
to be mindful of protecting future defendant's
rights.  And so what the State does not want to see
happen, and don't think that there's anyway the
Court would be able to guarantee, is that if that
report was released there somehow could be
arguments made that it impacts the right for later
individuals, (multiple) to get a fair trial, to
have a fair hearing, to be able to be tried in this
jurisdiction.  The list can go on and on.  And so
representing the state of Georgia and these
citizens, I know we have this common interest, we
want to make sure everyone is treated fairly, and
we think for future defendants to be treated fairly
it's not appropriate at this time to have this
report released.  I, as the elected District
Attorney, have made several commitments to the
public understanding, the public interest around
this case.  The first was before you were assigned
to this case.  I said by June of that year I would

make a decision as to whether we would ask for a
special purpose grand jury.  In fact, I did so in
May, which is why they were ruled on in May.  I
then asked for a special purpose grand jury to last
for a year, but made certain commitments by the end
of such year, meaning last year 2022, the special
purpose Grand Jury's work would end.  At this time,
in the interest of justice and the rights of not
the state but others, we are asking that the report
not be released.  Because you haven't seen that
report, decisions are imminent.

THE COURT:  All right.  Thank you.  And I
didn't mean to skip over you DA Willis.  Mr. Wade
had mentioned that you would be appearing at some
point, but that Mr. Wakeford would be primary
spokesperson.  So, I wasn't sure if the way in
which you all were going to present, but thank you
for sharing those overview comments.

Mr. Wakeford?

MR. WAKEFORD: Good morning, Judge.

THE COURT:  Or afternoon.  How are you
doing?

MR. WAKEFORD: I'm just fine, Judge.

THE COURT: Good.

MR. WAKEFORD: So I understand, your Honor

-- I have a question for your Honor first, and then
I understand that your Honor has questions for me.
If you'll indulge me?

THE COURT:  I will.  Maybe.

MR. WAKEFORD:  Sure.  That's your
prerogative, Judge.

Your order actually calling for this
hearing made mention of a certification from the
grand jury that they asked that their report be
published under O.C.G.A. 15-12-80.  To my knowledge
standing here, I also -- I don't want to make
comments about the contents of a report whose
confidentiality is the subject of this hearing.

THE COURT:  Sure.

MR. WAKEFORD:  But I'm prepared to say
that a mention of 15-12-80 is not in the report.

THE COURT: Sure.

MR. WAKEFORD: So I'm asking your Honor
what the source of the certification mentioned in
your order is.

THE COURT:  The grand jurors.  So, it's
not -- you're correct, it's not in the report.  It
is something that they did after they completed
their work.

MR. WAKEFORD:  Okay. All right.  Thank

you, your Honor.  That was not one thing I was not able to ascertain.

THE COURT:  Sure.  You didn't miss anything nor was I reading between the lines or there's a footnote that was omitted.

MR. WAKEFORD:  Okay.  And I understand your Honor has questions for me.  I'm fully prepared to engage in a dialogue if that's the way you would prefer to proceed.

THE COURT:  Well, let me ask some threshold questions because that may help focus the dialogue and also focus the dialogue with Mr. Clyde and Ms. Gaither.  I'm trying to understand the basis for the request for nondisclosure, and I'm approaching it from a number of angles.  One is the fairly limited scope of secrecy of grand jury work in Georgia, and with that I'm particularly influenced by the Olsen case where the Supreme Court made plain that their view of the statutory framework for grand jury's is that really only deliberations are secret.  Secret isn't the only touchstone here, but that's what's in the oath, is that deliberations are kept secret.  You, had you been present for anything that happened in front of the grand jury are not bound by any statute or oath

to maintain secrecy about anything that happened.
None of the witnesses who appeared are bound by any
oath.  Their oath is simply to provide truthful
testimony.  Not to then not disclose their
testimony to the media, their uncle or anything
like that.  And grand jurors are bound by their
oath only not to discuss deliberations.  So unless
we -- and I believe it's a stretch.  Unless we
somehow stretch to say their final report is their
deliberations then, I think, we're already outside
the statutory realm of what's secret.  That doesn't
mean something should be disclosed just because
it's not secret as part of the grand jury.  But
going into this my thinking was everything with the
grand jury is secret and there had to be an
exception.  And in Georgia it seems like it's
almost the reverse.  It's very different from
federal grand jury.  And I know I asked you to
share some thoughts about how we're going to work
with the special grand jurors going forward.  And
there are lessons to be drawn from federal practice
but are not driving our decisions.  So talk me
through just first this question of secrecy and why
if that's one of the arguments you think that -- it
really doesn't matter what you want to do, Judge,

11

it's secret statutorily the final report.  And then
we'll evolve to a court record or not or this
notion that in someways may be nonsensical that a
final report is equivalent to a presentment of the
special purpose grand jury.

        MR. WAKEFORD:  Okay. Yes, your Honor.
And let me say also, if there are questions -- I
would ask your Honor if there are questions at the
end of the hearing today that I feel that I can
request us to provide a written response or more
research on, I would simply ask for the opportunity
to do that.

        THE COURT: Sure.

        MR. WAKEFORD:  So, in other words, that
the report is not -- a decision is not rendered and
the report is not released at 12:59 pm on today.

        THE COURT:  That's not how it will
happen. They'll be notice in case there's decisions
that want to be made after you understand what the
decision is.

        MR. WAKEFORD:  Understood.  I also will
-- sorry for all the prefaces.  I have to be a
little bit circumspect because I have to talk about
this report while attempting not to divulge the
contents of the report.

THE COURT:  And I intend to do the same.
So none of my questions will be about -- well, what
about page six, if there's even a page six, if the
pages are numbered.  That's not --I promise I won't
be trying to drag you into -- oh, but wait this
part here or tell me what part you think ought to
be redacted.  That assumes that I would have
decided some part ought to be made public.  I
haven't. We can keep it at the very high level, and
in why is it a secret.

MR. WAKEFORD:  I'm glad to here that your
Honor.  I just didn't want to try your patience if
I keep talking about the report could be rather
than what the report is.  But, I'm glad you
understand the position that we're in.

THE COURT:  And I think it helps Mr.
Clyde and Ms. Gaither are necessarily going to have
to approach it that way.  They don't know what
color paper it was printed on.  Is it double
spaced, and what's in it.  By you and me having
exchanges at that level as well will make it easier
for the different prospective's to share their
views.

MR. WAKEFORD:  Right.  Okay.  So, then
the question of secrecy, your Honor -- I would say

13

that the special purpose grand jury's report in
these circumstances -- well, actually in all
circumstances.  Special grand jury's are special.
We have learned that over the course of the past
year.  As your Honor referred to at the outset of
this hearing, there is precious little litigation
on this topic.

        THE COURT:  They are special.  I'm going
to pause you from time to time because If I don't
write my question down I need to ask it.  There are
only two statutes about special purpose grand jury.
And one of them says, use all the other statutes
about grand jury's unless they somehow conflict.  I
don't know how they conflict because there's so
little in 101 and 102.  So, there are many things
we know because we look at all the statutory
framework for regular grand jury's.  Same oath.
And that oath says your deliberations are secret.
Your oath wasn't different, if you took one.  It
doesn't bind you in anyway.  The witness's take the
same oath and they're not bound in any way by any
sense of secrecy.  Yes, special purpose grand
jury's are different.  They last longer.  They
investigate in a different way.  They cannot hand
down a bill of indictment or anything like that.

14

But, in lots of ways their grand jury's. And so I think that needs to guide our discussion. And a regular grand jury per Olsen this is the pretty narrow parameters of what's secret. Their deliberations. You can't be in there for them. Grand jurors can't discuss their deliberations. But when they're done, here's our indictment, our presentment, whatever it may be. And so I'm analogizing, perhaps, mistakenly, and you can help me work through that. When we slide over here it's a special purpose grand jury. Those grand jurors ought not talk about their deliberation, but when we're done what pops out of the toaster. Instead of an indictment is a final report. I don't see how that's secret based on the statutory framework in which we're working. Again, not dispositive. But, you may be able to convince me it is secret because of this case or that case. I know you don't have a case, you would have sent it to me long before, but I'm interested in your analysis.

MR. WAKEFORD:  Thank you, Judge. I guess, let's start up here then. And the first point to be made is that special purpose grand jury's can be empaneled at the explicit request of the District Attorney, the prosecutor, which is, in fact, what

happened in this case.  It was empaneled with the request that they investigate certain matters and also be in power to provide charging recommendations, if any, to the District Attorney' who would then not be bound by those recommendations but could be advised by them moving forward.

THE COURT:  Right.  The special purpose grand jury whose report is Exhibit C of the media intervenors' filing, which was Dekalb, presided over by Judge Scott, do you know -- I don't, that's why I'm asking.  Was that special purpose grand Jury convened at the request of Robert James, who would be Ms. Willis's counterpart at that time in Dekalb County.

MR. WAKEFORD:  I actually do not know the answer to that question.

THE COURT:  That would be an interesting question to answer.

MR. WAKEFORD: But I will endeavor to find out, of course.

THE COURT:  Me, too.

MR. WAKEFORD:  But in this case specifically, I think the specialness of special purpose grand jury's in someways point to how

16

individual they are.  So, in that case that's a
fine example.  The ambit of the authority for the
special purpose grand jury in that case was to look
into a civil investigation.  That is not what this
case is about.  This case, as we have litigated it
constantly, and as your Honor had purpose to look
into constantly, has been a criminal investigation
at the request of the District Attorney.  And the
report --

THE COURT:  I'm going to pause you for a
second.  Page six, pursuant to the relevant
statutes.  On September 7, 2011, the District
Attorney -- so Robert James --requested that a
special purpose grand jury be empaneled.  Dekalb
Stone Mountain Judicial Circuit voted to approve.
Entered an order, and thus, was created that
special purpose grand jury.  So structurally, it's
the same or similar.  DA James said, I need a
special purpose grand jury to investigate
something.  And as a result of their investigation
there was a report and it was published.

MR. WAKEFORD:  Yes, your Honor.  What I'm
saying is then in this case it was requested by the
District Attorney for the sole purpose of
conducting an investigation into possible criminal

activity.  And that the report, therefore, could
consist of several different types of information.
There could be a summary of what the grand jury
came to find out in the course of its
investigation.  There could be a list of statutes
that the grand jury thinks might have been violated
by someone.  There could be a list of individuals
with accompanying activities that the grand jury
believes could be-- could have broken the law.  It
could even get more detailed than that.  And so the
actual content of the report I think gives us some
guidance here as to how secret to perceive-- how
much respect to provide the secrecy of this report.
Because as your Honor knows ongoing criminal
investigations having different --a different
understanding as far as court records are concerned
in this case.  And in fact, records that are part
of an ongoing investigation are not subject to
public scrutiny.  When the District Attorney
requested that the special purpose grand jury
engage in this investigation and provide
recommendations if they saw fit, it was as part of
-- at that time and at this time ongoing criminal
investigation.  If that report contains information
it is for the use of the District Attorney per the

empaneling order.  If that report contains charging
recommendations that is certainly solely for the
use of the District Attorney, and I would argue
that under the law what the law tells us under
15-12-101, I believe, is that the only required
recipient of the special purpose grand jury's final
report is you as the supervising judge except in
this case where it was also the district attorney.
Because if -- whether there are recommendations or
not the District Attorney has to ascertain that.
So has to see the report.  So I think that's a
lesson right there, in that the content of the
report and the nature of the empaneling order in a
specific special purpose grand jury can affect how
we view it under the law.  And of course, I will
speak to court records and presentment versus
reports in greater detail.  But I think that is an
indication of what we are operating under with
regard to the statutory language.  The content of
the report should be the guide for this court as to
exercising its discretion and how to move forward
with respect to secrecy and publication.

       THE COURT:  But what -- I follow.  But
what about the process makes it secret?  I'm trying
to understand.  We need to be guided by the

statutes that are not there for optional

consideration and the deliberations are secret.

Are you saying this is deliberations or you're

saying you know what, judge, let's table the whole

secrecy thing.  Because I don't think you can

stretch the statutes to say the report is secret,

but maybe this is where you want to go next.  The

report is not a court record, so we don't get to

Uniform Superior Court Rule 21 analysis.

MR. WAKEFORD:  That's exactly where I

would head next.

THE COURT:  Okay.  Let's go there.

MR. WAKEFORD:  I would flip the question.

I would say in what respects is it secret is one

way in looking at it.  And certainly, I'm sure that

my colleagues from the intervenors' would look at

it from that prospective.  I think I have looked at

this question as what makes it subject to

publication.  And there's nothing in 15-12-100 or

101 that indicates that there is any contemplation

of publication.  Any special contemplation of

publication.  And I know where your Honor's going.

Because 15-12-102 says that part one of the grand

jury code sections applies unless otherwise

indicated.  But 15-12-80 which is with regard to

publication applies only to general presentments.
And again, the content of a special purpose grand
jury report can contain elements of both a general
and a special presentment.  Making it a third kind
of thing.  A special purpose grand jury report it's
an isolated instance under the law.

THE COURT:  But I want to --I think we
may be able to dispose of one term so we don't get
too confused. My understanding is that this concept
of special presentment has gone away.  That
basically indictments and special presentments, one
in the same.  We don't do special presentments
anymore.  A grand jury can indict someone if they
are presented --first, if it's not a special
purpose grand jury.  But in reviewing case law that
you've provided and that I'd received from the
media intervenors', I got the sense that we really
don't even use that term "special presentment"
anymore.  You're welcome to.  I dont know that--I
think it's going to cloud things a little bit.  I
think in one corner you've got charging documents
which this body had no authority to present.  And
we have a history.  There's at least one Supreme
Court case dealing with a rogue special purpose
grand jury that this said not only do we think you

should do this DA, but we've indicted him for you.
Thank you. That's a step you can't take. That's
the District Attorney's decision to make and then
ultimately a regular grand jury hearing the
evidence deciding whether there ought to be a true
bill.

        MR. WAKEFORD: That was an court of
appeals decision.

        THE COURT: Court of appeals. Either
way, it was out of Gwinnett County. That is not
what we're dealing with here. So I don't know that
we get into special presentment. Why is the final
report so distinct that it ought not to be treated
as a general presentment, and 15-12-80 ought to be
so narrowly read that it's only a general
presentment, whatever the heck a general
presentment is.

        MR. WAKEFORD: That's sort of the problem
right there, your Honor. Is that -- first of all,
special presentments just to put that to bed, I
think the distinction is not only that they are
charging, but they make specific allegations of
wrong doing under the law. So there is a
possibility that the report can contain what is
essentially a special presentment within it because

they were empowered to do precisely that.  So I'm
coming back to this thing again.  The content of
the report should guide their analysis.  The
special purpose grand jury was authorized to return
a report that was in all but name took the form
after of a special presentment.  That's something
they had been authorized to do.  They were also
authorized -- I mean, it just says report.  They
could have come back and just provided a summary of
what they heard everyday.  Or they could have
provided a two page summary of what overall they
thought the picture -- the picture painted for them
was.  That they are authorized to do any number of
these things.  And the report can take any of those
forms.  So a special purpose grand jury report as
we'll see can take the form of something akin to a
special presentment or to a general presentment or
have elements of either.  And where 15-12-80
specifically says general presentments I don't
think that we can say it applies without question
to a report issued by a special purpose grand jury.
Additionally, I would point your Honor to 15-12-71.
That is the duties of the grand jury statute.
There's something interesting within this statute
in a couple of instances.  It was actually pointed

out by the intervenors' in their submission to the
court.  Which is that 15-12-80 is specifically
mentioned in 15-12-71 with regards to presentments.
What's interesting is that when it appears the
legislature has taken pains to point out that a
report or presentment provided as a result of a
civil investigation conducted by a regular grand
jury is subject to 15-12-80 also.  They also later
say a decision by a grand jury not to pursue
charges or recommend charges against a peace
officer who has been accused of an unlawful use of
force is also subject to 15-12-80.  That report or
presentment is.  If they recommend that charges are
pursued, they can recommend it by either requesting
an indictment or special presentment.  So, in these
other places the legislature has not assumed that
15-12-80 applies to any report that a grand jury is
empowered to produce.  When they have to produce
these two reports as they are required to under the
law they have taken pains to say, oh, and 15-12-80
applies, and that is within part one of the grand
jury code sections.  Part two, which says that
unless contradicted everything in part one applies.
There's just no mention of 15-12-80 in the special
purpose grand jury statutes.

THE COURT:  There's not.  They don't
mention any other statute from that first part.
They simply say all of the first part is
incorporated insofar as it's not specifically in
conflict.

MR. WAKEFORD:  And the other term --Well,
it's specifically in conflict, I would say the term
they use is report, it is not general presentment.
Now, I understand the position of the intervenors'.
We're not closing our eyes to their position that
come on, there's no distinction between a report
and a general presentment.  I would refer you,
though, to where I began, which is that in this
situation the law has created a situation where
special purpose grand jury can return something
that is either special presentment, a general
presentment or has elements of both.  And so it
just cannot be considered to not be in conflict
with 15-12-80, which says general only.

THE COURT:  If it has elements of both
then are the general presentment elements
publishable at the special purpose grand jury's
direction but not the special presentment parts.  I
want to move away from labels.  They called that a
report.  They could have written on there general

25

presentment.  I think you would still be arguing

what you're arguing.  Even though they called it

general presentment, and thus literally under

15-12-80, the Court shall publish other than ultra

vires stuff that I am empowered to take out.  They

called it a final report.  I told them to call it a

final report.  You asked for a final report so

that's why it says final report.  But what if there

are -- as you said, it can contain components of

both if there are things that call out at you as

general presentment then what do we do with

15-12-80?

        MR. WAKEFORD:  Right.  And at that point

if it's not something that could be considered

solely a general presentment then it's not a

general presentment under the law.

        THE COURT:  A hybrid presentment?

        MR. WAKEFORD:  Hybrid --it's a special

purpose grand jury report.  We have a special

purpose grand jury statute that makes a special

grand jury that produces a report.  These are

isolated under the law and therefore fall outside

of the general understanding in certain instances.

One thing that's also not in 15-12-100 or 101 is

that a special purpose grand jury cannot indict.

So 15-12-102 says all the rest of the first part
applies.  That doesn't say they can indict.  So the
court of appeals in its wisdom has decided well
that means they can't indict.  So just because
these two statutes are brief and you have the catch
all statute does not mean we are incorporating a
single component of part 1 unless there is
something glaringly obvious.  It actually takes a
little bit of -- a lot of analysis to look into
this.  And I think were the choice of words is
report and where the report can take on this sort
of strange hybrid form that you cannot assume that
the general presentment as used in 15-12-80 applies
to a special purpose grand jury report.  I think
the content of that report again is going to guide
this court's analysis as to how really to look at
that.  And that ultimately if there is something
that isn't clearly a general presentment 15-12-80 I
cannot apply.

THE COURT:  Okay.

MR. WAKEFORD: I also think that we can
reach to the conclusion there is a discretionary
aspect here, and that is something Madam DA was
actually speaking to.  If there are recommendations
the District Attorney requested those.  And if

there are any in there or if there are not any in
there the District Attorney in its ongoing
investigation has to assess what has been provided
by the special purpose grand jury.  This report was
issued 10 days ago.  I'm not even --

THE COURT:  I don't remember when we had
our hand off, but it's recent.

MR. WAKEFORD:  It's extremely recent.
There has been no opportunity whatsoever for this
office to incorporate anything in the document into
an ongoing investigation in a meaningful way, and
to make the ultimate decision that only the
District Attorney is empowered to make, which is
either there will be -- the investigation's over
and no charges will be pursued or the investigation
is over and charges will be pursued.  And where the
express purpose of the report is to investigate a
set of circumstances and provide or not provide
recommendations to the District Attorney, we think
immediately releasing before the District Attorney
has even had an opportunity to address publicly
whether there will be charges or not, because there
has not been a meaningful enough amount of time to
assess it, is dangerous.  It's dangerous to the
people who may or may not be named in the report

for various reasons.  It's also a disservice to the witnesses who came to the grand jury and spoke the truth to the grand jury.

THE COURT:  So, how do  -- how does one reconcile this prospective with the parallel highly public proceedings with the January 6th commission? Many of the same witnesses hopefully saying similar things if they were asked the same question, but that's not my business, and the commission actually referring to the Department of Justice, you need to look at these people for these things.  Dangerous. Pressure on the Department of Justice.  They seem to withstand that, and they're doing what they're doing.  Maybe they'll bring charges, maybe they won't.  Those were recommendations.  I think they were called referrals.  But clearly congress, one branch, doesn't tell the executive DOJ, another branch, what to do.  But there was nothing clandestine, secret, tucked into a report that the public didn't get to see about that process.  And that's different.  That was not a special purpose grand jury.  But that is another situation that has been ongoing that I think I need to assess and reconcile with how it's happening here.  Our legislature didn't choose to have hearings like

that, and so the way the District Attorney explored it was through the one means she had, a special purpose grand jury. Parts of it secret. Some of it, maybe not. But this danger and impact balance it against the fact that the January 6th commission seem to do what it did and DOJ didn't have to shut down after those referrals came.

MR. WAKEFORD: Well, first of all they were looking at issues in a different light than the special purpose grand jury was asked to look at them. Obviously, Congress addresses the entire nation. Special purpose grand jury is focusing on Georgia and possible criminal activity within the state of Georgia or the touches upon the state of Georgia. Additionally, Congress doesn't have to contend with 15-12-101 and 102. I'm not making fun. We are traveling under the law here. So Congress -- if there's danger created because they are not bound similarly by concerns of grand jury secrecy or traditional secrecy here or the -- I'll put it this way. Congress was going to conduct this investigation because Congress can conduct investigations. That's something it is empowered to do. It was not conducting an investigation at the request of the Department of Justice to provide

recommendations which would inform it's ongoing investigation.  That's what happened here.  So to --

THE COURT:  But I guess the point I'm making through that observation is --it's 21.  I don't know that you pointed to any law that says the final report must not be disclosed.  Reasons for it.  Policy reasons.  But it may not, must not, I don't think that's what statute or case law says. So I think it's going to be a balancing  -- and I don't mean the balancing of Rule 21.  We may get there.  I'm not saying that's where we are.  But I see nothing that says thou shalt not disclose.  And so many some of the very powerful policy arguments that I've been hearing from you and from the District Attorney we need to be thoughtful about lots of stakeholders.  And you and I both heard the District Attorney whisper "dangerous," and then you said "dangerous." And I was merely observing a parallel process occurred in Washington DC and the world kept spinning and referrals were made and DOJ processed that and they're going to do what they're doing.  And clearly they didn't feel like, well, we better do something right now because very publicly the January 6th Commission referred certain charges

against certain people.  So, if an argument you're
making, the District Attorney's Office is making
whomever the person is.  But that your office is
making is look it may be post indictment.  It makes
all the sense in the world to disclose the report.
But before then you're hamstringing an
investigation.  Maybe putting inordinate pressure
on someone.  I get these things, but that doesn't
seem to have caused the wheels to fall off the DOJ
bus.

                    MR. WAKEFORD:  Well, we don't know, your
Honor.  We don't know because the DOJ operates in
such complete secrecy and their grand jury
proceedings are subject to much more powerful
secretive requirements.  So we don't quite know the
answer to that question.  Additionally, Congress's
proceedings happened in public.  They were
nationally televised.  They had witnesses come and
testify to the entire nation.  And then so when
they made recommendations it was based on
information that they were publicly releasing.
Sometimes live and in living color.

                    THE COURT:  Understood.  But if Fred
Jones was testifying up there and Fred Jones came
down here --I mean, that's the only point I'm

making.  Is that some of this  -- well, we don't
know what happened in the grand jury insofar as
there's overlap.  Maybe people do and things -- we
don't need to get into that.  You've shared with me
your prospective on how-- I understand it.  How
January 6th Commission was different and the fact
that they very publicly referred certain charges
against certain people to the Department of Justice
is sufficiently different that you don't think that
there should be a parallel drawn with the concerns
here.

      MR. WAKEFORD: I would also add, your
Honor, that while by the necessity of the laws
governing serving subpoenas in different states
some of the witnesses have been made public.  But
the public does not know who the witnesses were for
the special purpose grand jury.

      THE COURT:  That wasn't my point.  I
agree.  That wasn't my point at all.  We heard 75.
We heard a number but not names.  I was merely
observing that the public actually does know a fair
number, and some of those names overlapped with the
very public presentations to or refusal to share
thoughts and ideas and testimony with the January
6th Commission.  We can move pass that.

Talk to me about court record and Rule 21. Why is this not -- you may have already answered it because you were analogizing it, I think, aptly to it's an investigative report. And if a detective wrote a final report saying I recommend this person be prosecuted for this homicide, that is not something that the public has traditionally enjoyed right of access unless and until it's part of discovery or it's introduced as an exhibit at trial.

MR. WAKEFORD:  I think that is exactly how to conceptualize the report at this time, your Honor.  I also want to highlight a point that you sort of alluded to a couple of minutes ago, which is that the time for this conversation really should be after the District Attorney -- what to do with the report.  What is the nature of the public or secret nature of the report should come after the District Attorney has had an opportunity to state I am not pursuing charges or I am pursuing charges or even I have sought charges and here is the indictment that has been true billed.  At that point, the relative stance, the status of everyone involved will be much clearer, and we will have a much better road map for how to handle secrecy or

publication.   So, I actually think that this entire

conversation would be better handled after that

decision is made, which the District Attorney began

by stating that when she has made assurances as to

time frame she has held up or exceeded those

assurances.   But I will also want to point to

another thing.   The statute regarding court records

is very specific in that ongoing criminal

investigations are not subject to public scrutiny.

There is no presumption of public access to those.

This we think commonsensically falls within those.

THE COURT:   When you say the statute,

you're not referring to Rule 21?

MR. WAKEFORD:   I mean, Rule 21.   In re:

Gwinnett County Grand Jury, which is cited, I

believe, by intervenors' in their submission

actually clarifies that with regard to the kinds of

civil investigations which regular grand jury's are

empowered to pursue, and which they can produce

reports or presentments as a result of, in which

the statute says specifically 15-12-80 applies to.

They say that the term court records as used in

USCR 21 encompasses only the presentments made by

the grand jury in open court at the conclusions of

the grand jury's investigation.   There is a

longstanding requirement for which documents must
be presented in open court, including special
presentments and indictments.  Here, the report
under 15-12-71 had to be presented in open court
and actually already had been.  That is not a
requirement under 15-12-100 or 101.  The only
requirement for the final report is that it go to
you as the supervising judge, and then in this case
go to the jury District Attorney as recipient of
either a recommendation for charges or no
recommendation for charges.  So, there is no open
court requirement for special purpose grand jury
reports.  It's just not there.  And the Gwinnett
County case points to the fact that the
presentments-- it's not that they're presentments,
it's that they're made in open court that makes
them a court record.  You couple that with the
presumption that documents attached to an ongoing
criminal investigation are not subject to a
presumption of public scrutiny or access.  And I
think it's clear that the report in this case is
not a court record as contemplated by Rule 21.  I
think it's another indication that discretion and
the wise choice at this time is -- cannot be that
it's released at this time.  And everything about

the nature of this report indicates that it is
premature to make the report public at this time.
That I think is the strongest stance I will take
before your Honor today.

THE COURT: Okay. Let me throw a little
bit of a wrinkle at you. What would prevent a
special purpose grand juror from reaching out to
the media saying I'll tell you what's in the report
other than me telling them? But what would be the
basis for me telling them because it's not
deliberation. So we can step back from
presentments and Rule 21 and all these things.
It's not deliberations. Maybe it's investigative.
It is investigative. Maybe it's disclosable, maybe
it's not. Maybe it's disclosable after the
investigation is done. That's the reason rule
you're proposing. But now I'm special purpose
grand jury member McBurney and I disagree with that
approach. I'm not going to tell you our
deliberation. I'm going to tell you how we came up
with what we came up with; why we did. I'm going
to tell you what several witnesses said because I
didn't like what they said or I really liked what
they said. Because their testimony isn't protected
in any way. Why could that not happen, or on what

basis could I forbid it from happening so that
there could be contempt if it did happen?

MR. WAKEFORD:  Because the report is the
necessary result of the deliberations of the grand
jury.

THE COURT:  So is a jury verdict.  So is
an indictment.  So is a general presentment or a
special presentment.  It's the synthesis of.  It's
the end product of.  But it's not the
deliberations.  And that's where if we end where we
began our part of the conversation that's what
Olsen is all about.  It's just the deliberation.
You can't be in there.  I can't be in there while
they're deliberating.  What goes into it, witness
testimony.  You actually could have had five
assistant district attorneys in there even if only
one of them was asking a question.  No harm, no
foul.  Once they're done -- again, why is it not
something that is disclosable?  And if they can
disclose it, why wouldn't it then just generally be
disclosable.  And that's sort of the end of the
curve ball.

MR. WAKEFORD: Right.

THE COURT:  You either hit it or miss it.

MR. WAKEFORD:  All of the results that

you've mentioned like an indictment or verdict,
there is a requirement under the law that those be
made public which we're sort of  --we're going
around in circles.  There is no requirement that
the special purpose grand jury be made public.
There is not a requirement.  And again, we're going
to come -- we're going to see that the intervenors'
will likely come from the angle there's nothing
that says it has to be secret.  Well, we're saying
there's nothing that requires it to be public.
It's its own document.  And your Honor could forbid
them from speaking about its contents because right
now it hasn't been published in open court.  It's
not in the possession of anyone in the state of
Georgia or in the United States of America other
than briefly your Honor and the District Attorney,
who is engaging in an on going criminal
investigation.  And so it hasn't been publicized.
It hasn't been released.  There's nothing that
indicates a requirement that it be released, and
the only result of a grand juror talking about it
would be to shed light on the deliberations and
also in the bargain interfere with the ongoing
criminal investigation which their report was meant
to be a part of.

THE COURT:  So what odds do you give an appeal of an order that I would enter forbidding them from talking about the contents of the final report?  It gets appealed.  Restrain of speech, first amendment violation and special purpose grand juror X just sends the Supreme Court or Court of Appeals (Olsen).  So how's that going to play out?  I appreciate I could do things to help maintain the investigation and not get it prematurely derailed by things that it ought not to have to deal with until the time is right, and that's a decision that the District Attorney and her team would make as to when the time is right.  That's an important interest to uphold.  You've got my full support of that interest.  But, I don't know. I need to think through how that plays out.  And if we have a grand juror who says that's fascinating, you're not going to release the report, but I'm going to talk.  I muzzle you.  I suspect there'd be an appeal.  I'm not interested entering an order that we know is DOA (dead on appeal).

MR. WAKEFORD:  So, (1) your Honor, respectfully.  One thing I refuse to do is ever handicaps odds of what the court of appeals will and will not do.

THE COURT:  We do that all the time, and we're always wrong.

MR. WAKEFORD:  You're right, your Honor. What I'm saying is that the -- can I actually confer with the District Attorney for one second?

THE COURT: Sure. Please.  And you're almost done.

(Pause in record for counsel to confer.)

(Record resumed.)

MR. WAKEFORD:  So, there's two things I wanted to highlight.  And I appreciate you letting me confer with Madam District Attorney.

THE COURT:  Not a problem.

MR. WAKEFORD:  The first is that our position should not be understood to be a blanket opposition to release of the report forever and until the end of time.

THE COURT:  I have not, not heard that once.  I have heard, I think, a reasoned approach of not now and here's why.  Likely later and here's why. I haven't heard forever, bottle it up.  So, that's not my take away from what you've been saying.

MR. WAKEFORD:  But to your question what will a future appellate court do?  I think that's

an extremely relevant fact is that this is not

opposition that is intended to go to March to the

end of time and prevent public disclosure of what's

in this report forever.  That's not the position.

It is simply saying that now is not the time, and

that your Honor has the power to pursue that.

THE COURT:  It's like a temporary

sealing.  We're going to seal this to include seal

the mouths of some the people until --and that may

put some additional pressure onto reach a finish

line sooner, but it's not the same pressure that

what's actually in the report.  And if it says

certain things that complicates and maybe

compromises a more thoughtful approach to charging

decisions.

MR. WAKEFORD:  I think that there is a

clear time to have this conversation when we have a

much better idea of how to proceed, and it is after

the District Attorney has announced either we will

not be pursuing charges or we will or  --and here

they are.  That I think is really what I'm saying.

But additionally, there are other constitutional

rights that are impacted.  And those are the rights

of anyone who is possibly named in the report.

THE COURT:  So I'm going to ask the media

intervenors' about that.  But I guess we can end
with that.  So let's say that your special purpose
grand juror X says, you know what, Oscar the Grouch
should be indicted.  And we talked about it.  And
my gosh, Oscar the Grouch should be indicted for
treason-- if that's a state crime-- for inciting a
riot based on what happened here in Georgia.
What's Oscar the Grouch --who's he suing?  What
constitutional rights is he going to be invoking to
say, wait a minute, I can't believe someone said
that.  And of course the someone isn't the District
Attorney.  It's not you.  It's either in the report
because it's published or it's coming from someone
who is not bound by any oath of secrecy to not talk
about witness testimony or the final decision of
the special purpose grand jury.  Because the DA
brought this up as well.  I get it in part, but I'm
-- crystalize it for me.  So what does Oscar the
Grouch do?  He hires a lawyer and that lawyer has
conference -- a press conference to say we're
outraged.  We'll prove our innocence even though we
don't have to prove anything because we're innocent
until proven guilty.

         MR. WAKEFORD:  Well, we know that the
cases exist which your Honor actually refer to in

your order where there were discussions of public

officials seeking expungement of statements made by

grand jury's that were different in color than a

special presentment or an indictment.  So, I guess

the simplest answer to this question is I'm not

totally sure, but we can avoid that question

entirely by not publicizing the report until after

the District Attorney has made --

THE COURT:  Why tangle with it if you

don't have to.

MR. WAKEFORD:  Exactly.  There's just no

reason when the report is sure to be eventually

disclosed because the District Attorney is not

going to forever oppose it.  There is no reason to

contemplate the release until there has been a

public decision made by the District Attorney of

the three options I have mentioned many times.

We're not pursuing anything.  We plan to pursue

something or we have pursued it and here is a bill

of indictment.  At that point we have a much better

idea of -- we don't have to worry about statements

made about individuals because they will either not

be any and we have a better idea of what to do or

there are and they are contained in a bill of

indictment.

THE COURT:  Right.  If Oscar gets
indicted and it's released and it says Oscar should
have been indicted, sort of I told you so.  And if
Oscar's not indicted and the report said he should
be then someone could choose to explain from the
District Attorney's Office why Oscar the Grouch
wasn't indicted, but there isn't that cloud hanging
over Oscar's head in the interim.

MR. WAKEFORD: That's precisely right,
your Honor.

THE COURT: I'm not sure that it
necessarily invokes constitutional rights, but I
get the policy concern.

MR. WAKEFORD:  Well, it also marches in
lock step with the concerns about an ongoing
criminal investigation.  It's sidesteps all of
those problems.  It also solves the issue of is
this a general or is this a special or is it -- it
sort of everything becomes clearer at a later date.
And we can come back and discuss in the clear light
of day as opposed to a lot of me standing here and
going well it could be this or it could be that and
you agreeing it could be that or this.  And I think
the main point is today is not the time.  Now is
not the time.  But eventually, we will have a

better idea of when the time will be.  And the
District Attorney's Office is not opposed to the
eventual release.  It's opposed to it right now,
and it's opposed to releasing it without very
careful consideration in light of all the other
factors that are in play.  I just ask your Honor
once again to consider the contents of what the
actual report ends up being.  Because the law has
set up a situation where it could be little of
this, a little of that or something completely
different.  And I think that's part of the reason
why we're here to sort of get an idea of what are
we even dealing with.  And I would ask again if
there are further points of law, points of policy
or any other position that the District Attorney
should illuminate, that you will allow us a chance
to dig in on that and provide a written submission.
And otherwise, I remain available to answer any
other questions.  Thank you.

          THE COURT: Okay.  Thank you so much.
Appreciate it.

          So, Mr. Clyde, you're client's are going
to get the report eventually; can we go home?

          MR. CLYDE:  No, your Honor.  Obviously,
we believe the report should be released now and in

its entirety.  And that approach is consistent with the way the american judicial system operates.  In other words, it is not unusual for a District Attorney or a prosecuting authority to be generally uncomfortable with having to release information during the progress of a case.  That occurs all the time.  But the judicial system time and time again has said when matters are brought to the court system we are going to be -- require them to be made public because the faith of the public and the court system is much improved by operating in a public way.  And so it's only in the most extraordinary situations where our appellate courts and where United States Supreme Court has allowed the sealing of records or and including, as you articulated, the outcome of grand jury activity. We acknowledge the operations of the grand jury while it was ongoing were subject to a veil of secrecy.  But that, as the Court has explained, that has come to an end, and they have issued a final report, and that final report is the outcome of the judicial process, not an executive branch, criminal investigation.  They invoked the judicial process of the special purpose grand jury statutes and now that's special purpose grand jury has

issued a report and the jurors themselves have

asked for it to be published.  There's enormous

public interest in what they have said, and that

exist in this state.  It exist the across nation.

It exist beyond the nation.  And we believe the

statutory law supports its public release right

now.  We believe the case law supports its public

release right now.  And we believe constitutional

law, including our own state constitution, requires

its release right now.

         THE COURT:  So why isn't this one of

those extraordinary circumstances where disclosure

wouldn't be the standard?  I appreciate that you're

characterizing it as a judicial proceeding.

Because, of course, a judge had to be appointed to

supervise and ultimately received the report.  But

I don't think Mr. Wakeford was misdescribing it all

that much.  He didn't use the word "conduit," but

it basically was here, Judge, here's our report

that we prepared ultimately at the request of the

District Attorney to answer the questions that the

District Attorney had, not the Court had.  The

Court didn't sua sponte-- could have-- but it

didn't, to be clear in this case.  We want to know

more about what went on with the general election

in 2020.  That was something that the District
Attorney asked for.  Had to pull some levers to do
that, judicial levers.  But it was executive branch
saying we want to investigate this.  The mechanism
by which we investigate it is a grand jury, okay.
That means the courts have to be procedurally, not
substantively, but procedurally involved.  And then
we get our report.  We, the District Attorney's
Office, so we can figure out what we're going to do
next.  How is that -- that's how things flowed.
And it did pass through a court proceeding because
I had to swear the jurors in and what not.  But it
wasn't a trial.  It wasn't a hearing.  I didn't
issue any ruling.  So I'm pulling it out of that
framework.  I'm wondering how you say no, no, no,
it needs to stay in, in that framework.  Or at
least why is it not one of these extraordinary
uncommon situations where it's really not a court
record that came out.  I haven't filed it.  There's
nothing that says I need to file it, which is
usually -- when you are invoking -- I asked you a
bunch of questions.  So you'll get to answer.  Rule
21 kicks in usually because there's something in
the docket that your clients can't get their hands
on.  There's nothing in the docket and there's not

going to be anything in the docket unless I decided
that something needs to be published, and it
probably will be published by putting it in the
docket.  There is no requirement it go in the
docket.  So there isn't even a court filing that
we're talking about.

    MR. CLYDE: Okay.  Your Honor --

    THE COURT:  I'm done.

    MR. CLYDE:  I see that as three questions
and I'm going to answer them in order.  Number (1)
I understand your analogy that this is a conduit
situation and I'm going to speak to that.  And then
I'm going to speak to why there's really no
circumstances.  There's none of the extraordinary
circumstances that would justify sealing, and why
in the end this is a Rule 21 document.  And so let
me start first with this is a judicial process.  I
understand your Honor's point that it was requested
by the grand jury.  But it's actually an
extraordinary judicial process.  In other words,
that request is made to this court and this court's
-- this -- not just Judge Robert McBurney's
courtroom, but the Superior Court of Fulton
County's power is invoked.  Grand jurors are
required to come to this courthouse.  Those -- and

that can't happen until a majority of the Superior
Court judges agree that this is a worthy thing to
undertake.  So, it's actually an extraordinary
exercise of judicial power.  And so I don't think
it can be characterized as just a we helped out the
executive branch.  It is fully invoking the
judicial branch's power and requiring jurors to
come and devote their time and their energy to
carry out a purpose for this court system.  And
that is the kind of environment where the case law
says that's judicial.

So the next question you asked is, all
right, isn't this one of those extraordinary
circumstances.  And respectfully, I don't think the
State has made any showing of any substance that
this is -- that's one of those extraordinary
circumstances, and let me explain that.  I respect
the District Attorney's statement about the
protection of other people, and that is an admiral
statement for a - for any District Attorney to
make.  But other people, particularly the other
people that were involved in this grand jury are
represented by their own counsel.  This hearing
took place, was widely published.  Their counsel
aren't here.  The risk of prejudice to them is

actually much less than it is with many many
documents that are disclosed during the judicial
process.   Indictments get entered as the Court is
very well -- indictments get entered by the State
or by the federal government with a great deal of
detail.   Sometimes press conferences that drive
defense counsel crazy.   But there's never been any
suggestion, and there couldn't be that that process
should be closed.   Hearings take place about the
exclusion of evidence or the exclusion of
witnesses.   All those hearings take place publicly.
The documents related to them have to be disclosed
as court records.   Those are much more --much
closer in time to a trial, so there's a much
greater risk involved in those documents.   Here
we're -- if we're talking about risk to potential
defendants facing a trial years into the future
that this document is reeling, doesn't rise to the
level of the routine kind of documents that are
disclosed publicly during the judicial process.   So
I don't think there's a compelling case for
protecting other people's rights.

          The Court asked about, well, who does
somebody sue? The Court's exactly right; they can't
sue anybody.   Long ago, the United States Supreme

Court in 1976, in Paul vs. Davis said no.
Government institutions are going to make
statements that have negative impact on people's
reputation.  That alone will not ever create a
cause of action.  You have to show something called
stigma plus.  It has to be a deprivation of other
kind of rights.  Simply reputational interest
aren't enough.  So what the State is pointing to is
simply not the kind of information that justifies
sealing.  And there hasn't been any suggestion, any
evidence, any presentation that really makes a
compelling demonstration that there should be a
sealing in this case.  Ongoing investigation
--investigations obviously when people are indicted
they don't necessarily close.  They continue
throughout a case.  And so ongoing investigations
frequently continue after there is significant
disclosures of information about an investigation.
That's exactly what would occur here.  As the Court
has pointed out, the House of Representatives
January 6th committee also has disclosed enormous
amounts of information.  There's really no precise
showing that can support the kind of sealing that
they're asking for.

        And finally, the Court asked, all right,

Rule 21.  Really, why is this triggering Rule 21;
it's not filed.  And your Honor, it is filed for
purposes of Rule 21.  Let me explain what that is
for purposes of Rule 21.  The question is not
whether it's submitted to the clerk.  The question
is whether it is submitted to a judicial officer
that needs to take action on it.  And that's what
triggers Rule 21.  The -- I will give you a case
cite to that.

THE COURT:  Please.

MR. CLYDE:  And we're happy to provide
more authority on this issue.  This is -- I'm going
to give you Forsyth vs. Hale.  It is at *166 Ga.*
*App. 340*.  I'm quoting a part of it here.  "A paper
is said to be filed when it is delivered to the
proper officer and by him received to be kept on
file."  In this case that special report was by law
submitted to you as the supervising judge.  Based
on that, immediately you had responsibilities.  You
had to provide it to other judges and everybody to
reach a decision about whether this grand jury
could be dissolved.  There were decisions that had
to be made.  The power of this Court was invoked.
The decisions by you as the supervising judge had
to be made.  And so overall it falls exactly within

the category of Rule 21.  Now, I acknowledge that there is a secrecy with respect-- that the Gwinnett County grand jury decision recognize there's a line.  That Court -- the records that the grand jury looked at during its ongoing process are not accessible as court records.  Because historically they haven't been.  But then the Gwinnett County Supreme Court or the Court of Appeals in the Gwinnett -- the Supreme Court in the Gwinnett County decision emphasized the -- in that case that general presentment had to be made public because it was the outcome of this process.  And so it was subject to Rule 21, and essentially the same process would apply here.

THE COURT:  Was that grand jury a special purpose grand jury or a regular grand jury?  Because regular grand jury's can do general presentments as well.  They're empowered to investigate the Clerk's office.  They could -- they're not going to indict the Clerk, but they could say, hey, we noticed that they use too much paper in the copy machines and we should be more environmentally conscious.

MR. CLYDE: Exactly.

THE COURT:  So if the case you're

referring to -- there are lots of Gwinnett cases.
So I'm not necessarily seizing upon the same one.
Was that a special purpose grand jury in which the
Supreme Court said that -- I know they use the term
general presentment, and we'll talk about report
versus presentment.  But, setting that aside they
were saying that special purpose grand jury's,
general presentment must be made public because it
is effectively a filing.

          MR. CLYDE:   Correct.  And it was a
general presentment from a grand jury, and in a
civil context.  And I'm talking about 2008 In re:
Gwinnett County grand jury case.  Justice Benham
held that that document was subject to Rule 21.
And we would submit the same thing would be --with
the same conclusion would be reached with respect
to the final report.

          Your Honor has, and I  understand the
questions relating to 15-12-80, and we're eager to
address that.  But one of the things I want to
emphasize, I think, from the Court's questions, you
fully understand this, but those are two
independent basis for the disclosure of the report.

          THE COURT:   No, they are.  And I pressed
Mr. Wakeford on them because it's sort of mounting

pressure, if you will.  The grand jury itself said
you need to publish it.  And if one travels to
15-12-80 -- actually, it's a "shall." There aren't
a lot of statutes that say the Court "shall."  And
I've learned what that means.  If it applies, if 80
applies.  But I appreciate that that is a separate
basis.  If I were to find that the final report is
effectively a Rule 21 filing, then Rule 21.  And
all the case law that you and Ms. Gaither cited
that talk about the competing interest, and it
really is extraordinary and exceptional not to
disclose something that would fall under or within
Rule 21's gambit.  So that would be a second and
compelling reason if I were to find the final
report is a Rule 21 filing.

      MR. CLYDE:  Exactly, your Honor.  If I
may add one item to your desk is  -- today we're
also going to provide the Court with another
example of a special report that was published.
This -- and this is a -- I'm going to provide a
copy to you in just a moment.  It involves the
Gwinnett County Grand Jury, and it is from 2009.
It was then looking at land transactions, and Judge
Clark at the end where I put that -- may I
approach?

THE COURT:  You may.

MR. CLYDE:  Where I put the blue tab is where Judge Clark has ordered this special purpose grand jury report to be published in the legal orbit.  It is an example -- and I would say that just as -- in a sense I would think that the two special purpose grand jury reports that are before the Court are in a sense examples of the two ends of the spectrum.  Obviously, in the Dekalb special purpose grand jury they recommended prosecutions of a named individual.  And that was disclosed and published by Judge Adams in the Dekalb situation. In the Gwinnett situation, this is a grand jury that found a great deal of discomfort and criticized various aspects of the land purchasing decisions made by Gwinnett, but generally is not recommend prosecution, is moving in the other direction.  But in both cases they were published in their entirety at the direction of the supervising court judges in both cases. These are special purpose grand jury's.

THE COURT:  So these would be then examples that it is possible to do it, and I assumed it had been legally challenged, and -- and a higher court had said the trial judge was in

error to do that, then Mr. Wakeford would have
shown me those opinions.  So those are out there.
But what about his argument that if -- and I know
you don't know the content of the final report for
lots of good reasons.  But what about the argument
that the contents should drive the decision making
process?

MR. CLYDE:  So, your Honor, I'm going to
address--

THE COURT:  Did I interrupt you before
you got all the--

MR. CLYDE:  No, no, no.  You raised
another issue that I'd like to cover, and I will
directly answer that question.

THE COURT:  Okay.

MR. CLYDE:  With respect to the Dekalb
special purpose grand jury -- and the Court may
already be aware of this.

THE COURT:  Full disclosure.  I was a
brand new judge and all of a sudden Mark Scott
Defendant was in front of me.  There was a whole
lawsuit that came out of Dekalb about not handing
over that report to the rest of the bench.  And it
-- so I'm a little familiar with that.  Nothing
about publication.  It was news --  I wasn't

interested in whether it was made public.  I was
interested in getting Judge Scott out of my
courtroom.

          MR. CLYDE:  And the only thing I want to
point out is Burrell Ellis is ultimately prosecuted
for perjury in the aftermath of that special
purpose grand jury based on his testimony that was
presented at that special purpose grand jury.  He's
prosecuted.  He is --there's a verdict.  He was
convicted at trial.  And he ultimately on appeal --
parts of his conviction are affirmed.  Parts of it
are reversed.  But there's nowhere in that opinion,
and that opinion does recount the history of
special purpose grand jury, that it is anyway
critical of the release of the report nor did
Burrell Ellis and his counsel ever make any
argument that the release of the report somehow put
him in an impossible position at his trial.  It was
-- it obviously as the Court has pointed out there
hasn't been a decision directly on point with the
issue that we're taking on today.  But it is an
example of somebody who is prosecuted in the
aftermath of the release of a report, and it never
rose to the level of an issue worthy of appeal.

          Then, your Honor, I'm going to address --

I apologize, I'm having trouble remembering --

THE COURT:  It's all right.  Mr. Wakeford was making the argument that we could -- when I was exploring reports, special presentment, general presentment, that really depends on the content of the document.  And the more it is like a special presentment, the more it is something that is an investigative tool for the District Attorney as opposed to a general report on here's the things we learned and saw and what not.  That would militate towards not disclosing now because it's much more like a detective's homicide report.  That's not a court filing.  That doesn't get filed with the Court.  But that's someone thinking long and hard about should the District Attorney bring charges against someone for killing someone.

MR. CLYDE:  And your Honor, in terms of suggesting to the Court that it has discretion to make independent judgments about what should be public and what shouldn't be public, I do not believe that that discretion exist in anything other than the law of Rule 21 and the law of essentially expungement of ultra vires activity.  In other words, what do we believe the case law supports.  We believe the Court is within its

rights to read the report.  If this grand jury and
occasionally that happens -- and if this grand
jury has gotten outside the ambit of its mandate
and made statements that have nothing to do with
what its actual role was, that is appropriate for
expungement, we aren't disputing that.  We only
note that that by implication suggest everything
within the scope of their mandate they're suppose
to be made public.

THE COURT:  I fully understand it.  I
The second part is does the Court have
the authority to seal under Rule 21? Absolutely, it
does.  But, it has to meet the Rule 21 standards.
And there is the -- there is -- the argument that
has generally come from the State today is, it is
uncomfortable this report being released until
we've made these decisions.  And I don't fault the
expression of discomfort or --

THE COURT:  I fully understand it.  I
think it is a reasonable concern to raise.  But if
I find that we're within the realm of Rule 21, it's
just not one that weighs really heavily in the
scale that I understand the analysis that higher
courts have performed.  One doesn't ignore it, but
it's a lighter weight than the public's interest
and the general presumption that court filings are

to be made public.

MR. CLYDE:  And your Honor, I guess we would say it's not just a lighter presumption; it doesn't meet the standard.  In other words, the discomfort of the prosecuting authority in disclosing court records isn't enough to make them sealed.  It has to be significant identifiable evidence that's going to cause a problem.  And your Honor, I don't think that submission has been made.

THE COURT:  I have a question about that standard.  In your brief, page 18, you use the phrase "clear and convincing proof."  And clear and convincing evidence, that is a standard out there which is different from a preponderance.  Much more than that.  It's not well-defined.  It's less than a reasonable doubt.  It's actually what the JQC has to use for judges.  "Clear and convincing," and that's the phrase you used.  It's a whole lot more than a preponderance.  And I'm wondering if you have case law for that or it was just a colorful phrase trying to show that there is a burden that the parties seeking to seal something has to meet.  And there is.  But I'm not familiar with it being clear and convincing evidence.  That is a higher burden than I weigh it and find in which way do the

scales lean.  Where is the preponderance?  Sealing
and not sealing.  And that's why I was saying the
District Attorney's concern about timing and not
having the investigation unnecessarily rushed.  I
think that is a factor that I can weigh.  Your
point was -- my point was how heavily do I weigh
it.  You said, oh, it doesn't weigh as much as
public interest.  It might not, but there are other
concerns that the District Attorney raised.  The
rights of folks who may be named in an unfavorable
report if that's how it works.  So I envision the
process, the Rule 21 process to be stacking weights
on a scale just like a jury would in a civil trial.
I think that's a fair way to think about it.  There
are heavier and lighter weights, but in the end I
need to decide are the scales leaning in the
direction of sealing or in the direction of having
this be an open record.  I think I just need to see
that it is leaning in a direction.  I don't think
it has to be leaning in a particularly strong way,
and clear convincing is that it has to be leaning
in a particularly strong way.  So that was a long
way of saying where do you get clear and convincing
evidence as the standard?

     MR. CLYDE:  Your Honor, I believe clear

and convincing is the standard for closing the

courtroom.  I would say the way you've described

the sealing of records is correct with this caveat.

The items that you are putting on the scale have to

be constitutionally cognizable issues.  So, in

other words, a general statement that people's

reputations might get hurt has repeatedly been

identified by our appellate courts as not enough.

Not even beginning the discussion.

THE COURT:  Okay.  Because there's two

different things.  Not enough is what you keep

saying, and I'm saying, okay, it's not enough

standing alone, but maybe there's more, other

factors.  But then you shifted towards the end

saying actually that's not a factor at all.  It

would be improper to put that on the scale because

it's not constitutionally cognizable.  I'm not

disagreeing with you.  I'm asking you to educate

me.  Can I put whatever ought to be deemed

reasonable factors or there are cases out there

that say these kinds of thing might be someone's

concern but you may not put them on that scale to

decide which way the scales are leaning.

MR. CLYDE:  I would say it's the latter.

In other words, that's simply -- that kind of

general articulation of potential injury to
reputation simply doesn't get -- make the scale.

THE COURT:  It's not a factor to be
considered.  Whether one considers it lightly or
greatly, it's not a factor.

MR. CLYDE:  And if there is a detailed
showing about an individual made by their counsel
and the  -- it was an extraordinary situation --

THE COURT:  Stigma plus.

MR. CLYDE:  Well, extraordinary typically
involves juveniles.  Typically involves highly
private information.  It doesn't involve public
officials who are involved in activities following
a national election.  And so that's the part where
the fit is just not very tight.  And so that's --
so -- but your Honor also brings up a good point
that I would like to react to.  The only
organization that filed a brief in advance of this
hearing is us.  The State has articulated their
argument today.  We will plan to respond to that
argument with more detail so the Court has some of
the case law that has rejected sort of generic
concerns about reputation as a basis for sealing.
But I do think that is well established.  And so
what we would submit is when it comes to that

weighing process, and Rule 21 itself requires that
it significantly outweigh that presumption of
openness.  That when it comes to that weighing
process, I'd let the weight that you can put on the
closure side are really not compelling in the
situation that's before us here.  And then on our
side we're talking about really one of the most
compelling situations for legitimate public
interest that I can think of in this courthouse.
In other words, there is genuine public interest in
what these grand jurors found after they sifted the
evidence.  After they heard from all the witnesses
and its interest not just because of the role they
played on the grand jury but also because they are
community citizens.  And speaking to these issues
from that vantage point as well.  And so that's
also important and part of the public interest.

THE COURT:  What is your response if I'm
the special purpose grand juror whose been told by
this judge you can't talk about your final report
to anyone, it's secret or at least I'm telling you
can't do it.  And they look in the online person
and the lawyer Tom Clyde pops up.  And you get a
call from the special purpose grand juror saying,
judge is telling me I can't talk about

deliberations, but I also can't talk about what any witness testified about.  In particular, I want to tell people about this special purpose --our final report because the judge isn't publishing it, but I want to talk to folks about it.  Can the judge tell me I can't?  I mean, yes, he can, because he did.  Can we challenge this judge, and what's our strategy?

MR. CLYDE:  Your Honor, I think they could challenge that.  In other words, as the Olsen case makes clear they are now required to take a oath and that oath was narrowed by the general assembly.  And so they are bound by that oath.  Could this court in extraordinary circumstances impose what would be a prior restraint on their speech? Yes, in extraordinary circumstances.  But as the court knows the extraordinary circumstances to warrant a prior restraint are typically situations, they're putting the national security of the nation at risk.  In other words, the examples that have been used by the United State's Supreme Court are the location of warships and time of war, things like that.  That can justify a prior restraint.  But here, as long as that grand juror abided by the oath they were required to take and

the general assembly approved I think they're
within their rights speaking about the experience.
And this is specifically what the Supreme Court
case, USC Supreme Court case that says witnesses
that appear before the grand jury are allowed to
speak about their experience before the grand jury.

THE COURT:  I think that the Olsen case
makes that clear.  I'm not talking about witnesses,
they're going to do what they do.  So you contend
that that would constitute a prior restraint saying
you can't talk about this.  Well, what about the
notion that the final report is really just an
extension of their deliberations?  It's not a
presentment.  It's not the kind of thing that grand
jury's --it is specifically what this grand jury
came up with at the end, but it's not a general
presentment.  It's not a special presentment.  So
really they shouldn't talk about the final report
because it is just an extension of those
deliberations.

MR. CLYDE: Your Honor --

THE COURT: I'm not really compelled by
that question.

MR. CLYDE:  It's a step too far.  In
other words, as the Court has indicated the outcome

69

of grand jury process, the outcome of those
deliberations is a public document and
historically.  And so that process of the
deliberations and an outcome gets rendered to the
court system is a significant and important step in
the process, but I don't think you could seal the
final report as being part of their deliberations.
And candidly, I think the statement by the special
purpose grand jurors that they wanted their report
published speaks to that.  I don't think they see
it as an exposure of their deliberations. They see
it as this is the judgment -- I read it as they see
it.  This is the judgment that we've reached, and
that's what the court system historically said that
document becomes public.

Your Honor, unless you have other
questions, I will not take any further of your
time, but what we would propose is that just as
Judge Adams did in Dekalb, that you order that the
report be filed with the Clerk's office, and I
think the expression you used was spread among the
minutes of the Court.  And that it be published
pursuant to 15-12-80.

THE COURT:  All right.  Ms. Gaither,
anything you want to add?  Did he cover it?

MS. GATHER: No, your Honor, he did a
pretty good job.

THE COURT: Mr. Wakeford, I have seen the
Post it notes flying in your direction, so why
don't you come on up here and let me hear any brief
rebuttal you may have.

MR. WAKEFORD: Brief, right, your Honor?

THE COURT: That's what the lawyer always
say and 30 minutes later we're still hearing. I'm
interested in what you've got to say in response.
And in particular, touch upon  -- I'm not familiar
with the Forsyth case, *166 Ga. App. 340.* I'll read
it, and I'll look for other cases like it. But I
was intrigued by this notion that there's case law
out there that one could use to characterize the
final report as a filing. Certainly not in the
clerk's possession right now and won't be anytime
soon. But because it came into the Court's
possession then it's a filing. And we are within
the realm of Rule 21 and not some place you'd
rather be.

MR. WAKEFORD: Right, your Honor. And I
think opposing counsel or counsel for the
intervenors' used an interesting phrase just a
moment ago. We progressed away from filing in open

court to just maybe sort of filing to render to the court system, which is now we're so far from the language that is contained in the case they cited, In Re: Gwinnett County jury, that we're no longer talking about a presentment made by the grand jury in open court, which is what the language that the Court chose, the Supreme Court chose in that case. Additionally, they cite to a portion of the language of that case in their brief at page 11. A block quote from the Supreme Court's language where they talk about Rule 21. And it's at the top of page 11. They say "Rule 21 embodies the right of access to court records which the public and press in Georgia have traditionally enjoyed." And as opposing counsel also pointed out there's no law on point as to what to do here because there's actually nothing traditional about special purpose grand jury.

THE COURT: That's not the strong argument for disclosure is that this report falls into that category of traditional act. There's nothing traditional about this report or this process. I get that. That doesn't mean; however, that it falls outside of Rule 21. It's just --it's not a simple one, which is why we're having to have

this hearing.  If this were an indictment, it's a
simple one and we don't have this discussion.  And
it may be that there is the name of a critical
witness that the State is seeking to redact from
the indictment until it's appropriate to unseal
that piece because people haven't been arrested yet
or something.  That happens all the time.  That's
not this.  This is different.

MR. WAKEFORD:  Well, I would say that the
question of whether Rule 21 is applied in this
specific way -- going to your Honor's point, that
may be something that requires additional argument
from the District Attorney's Office because I
really think that demonstrates ably that we are not
within the realm court Rule 21, and that we are
much -- if we are this is a document that is much
more akin to a piece of an ongoing criminal
investigation, but you've heard me a lot on that.
I also want to point out that we got to take what
guidance we have, and 15-12-101 refers to a final
report not a general presentment.  In other places
where reports are mentioned like 15-12-71 they say
report or presentment.  That is not the choice that
was made in 15-12-101.  Additionally, there is no
open court requirement there.  There is only that

it goes to the supervising judge, and as we said in this case to the District Attorney.  That would -- that seems to indicate something to me that is significant, but mainly that we are not in the realm of a general presentment and certainly my comments about the content guiding the analysis remain.  But let's go all the way to saying, okay, fine, it is a general presentment.  Even then 15-12-80 just says that the Court shall order publication.  But it also empower's the grand jury to direct the manner.  And there is no indication from your Honor that the manner was prescribed by the grand jury indicating to me that says once again the district attorney is not opposing the eternal oppression of the report.  That your Honor has discretion about the manner of publication.

THE COURT:  Which here would be timing as opposed to --

MR. WAKEFORD: Precisely.

THE COURT:  No one's fussing about is it put on a website or is it in a docket.  It's really all about the clock.  When does it go to whatever place that would be.

MR. WAKEFORD:  Precisely, your Honor.  There could be conversations about specific

portions depending again on what the content of the

report is.  But really going back to where we began

this is about timing.  Yes, your Honor.  That is

exactly correct.  And since the grand jury's

preference has been afforded great weight as it

should be.  And I'll take this opportunity to say

the District Attorney's Office, as I'm sure your

Honor is, are enormously grateful to these citizens

for the really above and beyond contribution of

their time, energy and efforts to this process.  We

want to act with respect to their wishes, but we

also have to act in as stewards of an ongoing

criminal investigation of which they were a vital

part.  And so with regard to the timing aspect we

think that that -- since they did not speak to

manner, your Honor has a discretion there, if this

is a general presentment.  And so no matter which

route we take to get -- where we end up is it's a

question of timing and now it's just not the time.

The time will come and the District Attorney

committed to that idea, it's just not immediate.

            THE COURT:  Got it.

            MR. WAKEFORD:  Thank you, your Honor.

            THE COURT:  Thank you.  Well, I want to

thank both sides for being prepared and having

these thoughtful presentations.  This is not
simple.  I think the fact that we had to discuss
this for 90 minutes shows that it is somewhat
extraordinary, Mr. Clyde.  Partly what's
extraordinary is what's at issue here, the alleged
interference with a presidential election.  But
it's also extraordinary in the plain meaning of
that word.  Is that it's not ordinary to have
special purpose grand jury doing things.  That
doesn't mean, however, that there hasn't been
course of conduct developed over time as to what
happens with special purpose grand jury reports or
presentments.  It also doesn't mean that we can't
-- I can't figure out a way to assess the final
report through the lens of grand jury secrecy and
the statutory scheme for grand jury's as well as
viewing it through the lens of Rule 21 to decide if
it falls within the reach and scope of Rule 21, and
that's what I'll need to do.  My proposal is that I
think about this a little bit and then contact both
groups, the District Attorney's Office and the
intervenors' if I've got specific questions for
which I'd like more input.  And then you're welcome
to file something or provide an email that these
are the cases you should look at.  I won't dictate

the format in which you respond.  I will be sure if
I have questions, even though they may be for one
group and not the other --I won't say side.  One
group and not the other -- they go out to both
groups because I may have a question for Mr. Clyde
and Ms. Gather, but Ms. Willis, your team may want
to be heard on that question even though it is
poking more at the media's position.  As I said
early on they'll be no rash decisions.  There's not
going to be an order that pops out with no notice
and attached to it is the report.  There will be an
order if there's going to be disclosure that
perhaps says this is when it happens so that both
sides have a chance to react and take whatever
steps they want to take in light of an order that
says this is going to happen a little ways down the
line.  So no one is going to wake up with the Court
having disclosed the report on the front page of a
newspaper.  The report, of course, exist in the
District Attorney's control.  So if it does show up
folks will need to work through that.  But I will
circle back, and we'll figure out the best way to
move forward with this.

        Ms. Willis, anything else from the
District Attorney's side?

MS. WILLIS: No. Thank you for allowing us to be heard today.

THE COURT:  Thank you for being here, all your team.

THE COURT:  Mr. Clyde, anything else on behalf of the interveners?

MR. CLYDE: Your Honor, could I speak just very briefly to one of the last things that you mentioned?

We understand the Court will give the opportunity for either side to take whatever action they want in terms of appellate issues.  We believe the proper court -- if there's an appeal in this case, we believe the proper court should be the Georgia Supreme Court.  And we believe the Georgia Supreme Court would be interested if that's the direction it takes.  But I will point out to your Honor that the constitutional argument we are making would have to be reached by your Honor in order for that to be the clear choice and the clearly appropriate court for resolution of the issue.  So that is an area we hope the Court will reach.

THE COURT:  I appreciate your concern. And I think if there is a ruling of nondisclosure

1    it would need to address the different basis and

2    each of the basis that you raised.  That it's not

3    secret.  That it does fall within Rule 21.  And so

4    I think you'd find the tell holds you need to do

5    what you need to do if you feel that's appropriate

6    what you need to do it.  That's the end result.

7          MR. CLYDE: Thank you, your Honor.

8          THE COURT:  That's it.  Thank you

9    everyone.

10          (Whereupon, the proceedings are

11    concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

STATE OF GEORGIA:

COUNTY OF FULTON:

      I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A TRUE, COMPLETE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY ME IN THE CASE AFORESAID. (<u>AND EXHIBITS ADMITTED, IF APPLICABLE</u>).

      THIS CERTIFICATION  IS EXPRESSLY WITHDRAWN AND DENIED UPON THE DISASSEMBLY OR PHOTOCOPYING OF THE FOREGOING TRANSCRIPT, OR ANY PART THEREOF, INCLUDING EXHIBITS, UNLESS SAID DISASSEMBLY OR PHOTOCOPYING IS DONE BY THE UNDERSIGNED OFFICIAL COURT REPORTER AND ELECTRONIC SIGNATURE ARE ATTACHED THERETO.

      THIS, THE 13TH DAY FEBRUARY, 2023

       <u>/s/ *Karen Rivers*</u>
       ***(KAREN RIVERS), CCR-***2575
       RPR, OFFICIAL COURT REPORTER
       SUPERIOR COURT OF FULTON COUNTY

# EXHIBIT "B"

# Grand Jury Presentments

- Staff

- Nov 3, 2010 Updated Jan 25, 2016

- _0

- Facebook
- Twitter
- Email

- Facebook
- Twitter
- Email
- Print
- Copy article link
- Save

REPORT AND SPECIAL

PRESENTMENTS

OF THE

SPECIAL PURPOSE

GRAND JURY -

2009-2010

IN THE SUPERIOR COURT

GWINNETT COUNTY,

GEORGIA

MAYDEL MASSELLI-MONTERO,

FOREPERSON

WILL C. WARRICK, III,

VICE FOREPERSON

JANICE N. MCCLOSKEY,

CLERK

OLIVER BOJARSKI,

DEPUTY CLERK

Report and Presentments of the Special Purpose Grand Jury

The 2009 - 2010 Session of the Gwinnett County Special Purpose Grand Jury consisted of the following members:

Maydel Masselli-Montero, Foreperson

Will C. Warrick, III, Vice-Foreperson

Janice N. McCloskey, Clerk

Oliver Bojarski, Deputy Clerk

Emily D. Chesser

William K. Conklin, Jr.

Randall Cunico

Art Cuthbert

Tamara (Tammy) L. Delk

Dawn Fischer

Sandra Franklin

Kenneth Gauthier

Joseph Gentry

Brian Green

Sally Gustafson

Latonya .Holt

Robert Johnston (excused)

Carole de la Cruz Jones

Ronald (Ron) D. Miller

Holly Shelnutt

Randy Sneed

David Charles Steffes

Joseph Yeager

INTRODUCTION

The Special Purpose Grand Jury was empanelled by a vote of the Superior Court judges on November 9th, 2009. We have been hearing evidence essentially every other Friday since December, 2009. During that time we have followed the order which empanelled the Grand Jury and inquired into the acquisition of land by the Gwinnett County Board of Commissioners from 2004 until 2009. Utilizing a methodology which will be described later, the Grand Jury made a detailed inquiry into five land acquisitions which were ostensibly purchased for parks. It should be noted at the outset that none of the properties, three of which were purchased in 2007, are currently being utilized as parks.

The Grand Jury has diligently inquired into the standard county practices for land acquisitions, and the results of deviations from these practices. The information that we were required to review was so voluminous that the District Attorney was forced to establish a secure website to produce the documents in an electronic format to make these documents available for review. We heard the testimony of over 70 witnesses both from county government and the private sector. It is this evidence which allows us to reach our conclusions and make our recommendations.

From the beginning, each individual Grand Jury member believed that we were engaged in important work. It was our goal to determine whether or not the elected officials and county employees were making decisions that were proper, legal, and wise in the expenditure of taxpayer money. This task was undertaken at no small price, both personally and financially, by each Grand Jury member. The Grand Jury wishes to express our appreciation to member Robert Johnston who stayed with us as long as he could until financial and work issues forced him to seek an excusal. It is unfortunate that the individual elected county Commissioners did not take our task as seriously. In fact, one was heard to say in the Grand Jury waiting room that we were "a pain in the ass." The Grand Jury regrets that an elected official would make such a remark. It is particularly worrisome that this remark was made about a group of citizens who were

summoned to be grand jurors and have been performing their civic obligation for the last ten months.

The Grand Jury wishes to thank and commend many of the witnesses who appeared before us, including members of the county staff, who brought records for our review, prepared for their testimony by looking at notes and documents and in several cases prepared presentations and charts to assist us in understanding their testimony. In particular the Grand Jury wishes to thank and commend former Commissioner Lorraine Green for her willingness to appear on numerous occasions. The Grand Jury also appreciates her prepared and knowledgeable testimony as well as her familiarity with the community.

By contrast, under oath, every single sitting County Commissioner testified that they had not reviewed any of the readily available documents prior to their testimony. This failure to prepare in even the most basic way for their appearance resulted in a lack of recall about most important facts of each transaction. It is the Grand Jury's opinion that this failure to prepare for their appearance in any meaningful way is not only an insult to the Grand Jury but is consistent with the way in which decisions are made involving millions of taxpayer dollars.

That being said, it is our purpose that the citizens of Gwinnett County know the results of our investigation, hear our recommendations and that the judges of the Superior Court consider our work complete.

HISTORICAL CONTEXT

The Grand Jury heard testimony that prior to late 2007, the County was actually in competition with developers in its efforts to acquire land for various government purposes such as parks, water treatment, and roads. Prior to 2007, in order to be competitive, county government often paid more than the appraised price of land. In fact, this was so common that oftentimes the first offer to buy made by the County was

appraised value plus ten percent. The Grand Jury heard examples of purchases prior to 2007 where even this offer was insufficient to induce sellers to sell.

In late 2007 and certainly by 2008, the real estate market collapsed. Prices for raw land plummeted and proposed developments were foreclosed on. Yet, the Grand Jury heard testimony from the Director of Support Services and from the current elected County Commissioners that county government continued its practice of offering, and paying, at least the appraised price plus ten percent.

Neither the Director of Support Services, nor the commissioners could provide the Grand Jury with a plausible explanation for continuing the practice.

STANDARD PRACTICES

IN LAND ACQUISITION

In our first 3 meetings the Grand Jury was presented evidence about how land is acquired by county government in the normal course of business. In general, we found that several departments are involved in land acquisition depending on the purpose for which the property is being acquired.

Department of Support

Services

The Grand Jury heard testimony from Steve North, the Director of Support Services. He testified that the role of his department in land acquisition was two-fold. In the case of park acquisition, once a need had been established for a park or a particular tract had been identified, he was notified by the Director of Community Services, Phil Hoskins. He would then direct his staff to either locate a suitable parcel or parcels to meet the need or to conduct an evaluation of an identified parcel.

The evaluation process consisted of several steps. First, employees of Support Services would research the property using available county resources to determine the apparent suitability of the property for the proposed purpose. The owner of the property may also be contacted to determine if there is an interest in selling and at what price. The second step was to receive Board of Commissioners' approval to obtain an appraisal of the property. If approval was denied, the process would end.

After the appraisal was approved, North would request bids from a list of approved appraisers, select the lowest qualifying bidder and have the appraisal done. Once the appraisal was done, the results of the work of Support Services would be presented to the Board of Commissioners in an executive session. Since 2006, the commission has adopted a rule that there can be no vote on land purchases in executive session, these votes must be made in an open public meeting. Based upon this rule, Mr. North testified that if he receives a "consensus" from the Board and "direction" from the Board he moves forward to the next step.

Mr. North could not, nor could any present or former county employee, describe how he determined that there was a "consensus." It was variously described as "no one said anything," "no one disagreed, everyone nodded." The consensus or directions to Mr. North are not recorded in any county document and as we learned later, no elected commissioner had a clear recollection of the meetings. In fact, on at least one of the transactions reviewed in detail, there was a strenuous disagreement about the purchase price between Chairman Bannister and Commissioner Beaudreau, but this was described by county staff that they left the meeting believing there was a "consensus" to purchase the property at a higher price. This is a common practice which ended up costing taxpayers $1,152,662.00. To date, the Grand Jury has not been provided with an explanation of this "consensus"

concept but does note that Webster's Dictionary defines consensus as:

a) general agreement; unanimity

b) the judgment arrived at by most concerned

Mr. North then testified that once a consensus had been arrived at, he was authorized to negotiate a purchase price within the limits set by the Board. If an agreement could be reached with the seller, the documents were delivered to the Law Department for the preparation of a formal offer which was then submitted to the Board of Commissioners for approval to purchase. No purchase or offer was final until approved by the Board.

Mr. North also testified that his department was responsible for the purchase of land for other facilities such as fire stations, police precincts and libraries but that the process was the same.

Since the Grand Jury did not select any acquisitions by this department for further review, we have no comment on the operation of the Department of Support Services. The Grand Jury does note that Director Steve North provided us with documents which supported his testimony and answered our questions.

DEPARTMENT OF

COMMUNITY SERVICES

The Grand Jury heard testimony from Phil Hoskins regarding the role of his department in land acquisitions. Mr. Hoskins testified that land needs for his department were identified from two primary sources. First was the Master Plan developed by county staff and approved by the Board of Commissioners in 2004 and 2007. The second was the traditional practice of placing a large "active" park near high schools so that the park athletic program would support the athletic program at the high school. Mr. Hoskins testified that there was no formal process in place between the county government and the Gwinnett County Public Schools to coordinate this process.

Once a need had been identified, the process of acquisition was turned over to the Department of Support Services to handle the acquisition. Mr. Hoskins testified that he

was present at executive sessions when properties related to his department were presented to the Board. He also attempted to describe to the Grand Jury the "consensus" concept.

Since the Grand Jury did not select any acquisitions by this department for further review, we have no comment on the operation of the Department of Community Services. The Grand Jury does note that Director Phil Hoskins provided us with documents which supported his testimony and answered our questions.

LAW DEPARTMENT

Karen Thomas, the County Attorney testified that the role of her department fell into two general categories. First, her department is responsible for the preparation of all legal documents related to the purchase in the "standard acquisition." Second, her department is responsible for litigating or overseeing the litigation of re-zoning cases, condemnations and all other cases which may arise out of land acquisition. In the course of preparing for litigation, county attorneys are authorized to hire appraisers of their own choosing as expert witnesses without the necessity of Board approval.

Since the Grand Jury did not select any acquisitions by this department for further review, we have no comment on the operation of the Law Department. The Grand Jury does note that Karen Thomas provided us with documents which supported her testimony and answered our questions.

DEPARTMENT OF

WATER RESOURCES

Lynn Smarr, the Director of Water Resources testified that her department acquired land for sewer and water lines, pump stations and treatment facilities. These acquisitions were handled within the department and no property could be purchased without Board approval.

Since the Grand Jury did not select any acquisitions by this department for further review, we have no comment on the operation of the Department of Water Resources as it relates to land acquisition. The Grand Jury does note that Director Lynn Smarr provided us with documents which supported her testimony and answered our questions.

DEPARTMENT OF

TRANSPORTATION

The Grand Jury heard testimony from Brian Allen regarding land acquisition by his department. Mr. Allen described that his department was responsible for acquiring land for roads including intersections and rights of way. He described that his department acquired land in accordance with the Transportation Master Plan through either purchase or condemnation. Land acquisition was done within the department.

Since the Grand Jury did not select any acquisitions by this department for further review, we have no comment on the operation of the Department of Transportation. The Grand Jury does note that Director Brian Allen provided us with documents which supported his testimony and answered our questions.

GENERAL FINDINGS

• It should be noted that none of the acquisitions reviewed by the Grand Jury followed the procedures outlined by these witnesses.

• The procedures described above are not in any comprehensive document or procedure manual that the Grand Jury could find.

• No present or past commissioner who testified before the Grand Jury displayed any familiarity or understanding of this process.

• Land parcels in which the county may be interested in purchasing are identified from a variety of sources including inquiries from sellers, contacts with individual commissioners, and investigation by county employees.

• No parcel would be put on an executive session agenda for review by the Board unless staff received the approval of the District Commissioner for the district in which the land was located or the approval of the Chairman.

METHODOLOGY

The Grand Jury was presented evidence that as of November 13, 2009 the county government owned approximately 4,682 discrete parcels of land. These parcels ranged in size from several hundred acres to parcels which could be measured in square feet. We were then presented evidence that during the time period from 2005 to 2009 the county acquired 1,156 parcels of varying sizes.

We quickly realized that to examine each transaction during the relevant time period would be impossible for a group of twenty-three citizens had been asked to "put aside the press of their everyday lives" and serve as Grand Jurors. At the suggestion of the District Attorney, we developed a set of criteria to evaluate the purchases to determine which transactions would be reviewed.

We applied these criteria to all of the land acquisitions and arrived at seventeen (17) potential properties. Of those seventeen (17) we selected five (5). After ten months of evidence and after hearing testimony twice a month for those ten months we are confident that we have enough information to draw our conclusions and issue this report.

The criteria which the Grand Jury used to filter the transactions were as follows:

• Was the transaction initiated by an individual commissioner? (As opposed to initiated by staff as part of a Master Plan)

• Was the transaction to settle litigation?

• Was there a relationship between the seller and the commissioner who initiated the purchase?

• Was there a significant difference between the county's appraisal and the purchase price?

• How long had the seller owned the property before it was sold to the county?

• Was the parcel suitable for the proposed use?

The information to answer these questions was provided from public records, the testimony of investigators from the District Attorney's Office and from the testimony of the previously mentioned county employees.

The properties which were initially selected for review were identified by the Grand Jury as follows and each transaction will be described in detail in this report.

RABBIT HILL PARK

EXPANSION

Summary of the Transaction

The Rabbit Hill Park expansion was actually made up of three separate transactions spanning several years and involving a number of parcels. The stated purpose for the acquisition was to provide an expansion of the existing Rabbit Hill Park and/or to settle pending litigation.

According to the evidence that was presented, these tracts of land are located along Rabbit Hill Road in Dacula and are across from and adjacent to the existing Rabbit Hill

Soccer Park. The three transactions resulted in the acquisition of 124.3 acres by the Gwinnett County Board of Commissioners in 2005 and 2007.

Transaction 1

According to the testimony of James Braden, he purchased a tract of land on Rabbit Hill Road in 2003 primarily to reinvest funds from another transaction primarily for tax reasons. The tract was a roughly triangular piece of property consisting of approximately 19.5 acres. When Braden purchased the property, it was zoned as part of a Light Industry District (M-I) and was physically located in the district represented by Commissioner Kevin Kenerly.

In February 2003 Braden applied to have the property re-zoned for multi-famlly residences at a density of 8 units per acre (RM-8). A vote by the Planning Commission on November 2003 denied the zoning as requested but allowed for detached single family dwellings (R-ZT Detached). The Board of Commissioners upon motion of Commissioner Kenerly, voted to modify the original zoning request to R-ZT Detached.

After the re-zoning was approved, as modified, Braden and the Gwinnett County Board of Commissioners were sued by Publix Supermarkets who operated a large distribution facility on an adjacent tract. Publix contended that placing residences so close to the distribution center would lead to a disruption of their business.

In order to settle the lawsuit, the Board of Commissioners purchased the tract for $1,903,163.00 and entered into certain agreements regarding future development of the property.

Transaction 2

The second transaction in the Rabbit Hill expansion involved several tracts with an aggregate of 90.58 acres. The evidence before the Grand Jury showed that D.G. Jenkins Development Corp., a corporation owned and operated by David Jenkins

purchased the property in November of 2005 for $7,981.400.00. When Jenkins purchased the property there was a pending re-zoning application filed by the seller C.E. Smith to zone the property from R-100 (Single Family Residence) to R-ZT (Residential Zero Lot Line/Townhouse). Jenkins, represented by the law firm of Mahaffey, Pickens and Tucker amended the application to include some commercial development on two of the included tracts.

In July of 2006, the Board of Commissioners denied the applications and left the property zoned R-100 for the commercial application. The residential application was approved as R-100 modified and R-ZT. In light of the re-zoning decision and its effect on his planned development, Jenkins instructed his attorneys to file suit against Gwinnett County.

In April of 2007 Jenkins transferred ownership of the property from D.G. Jenkins Development Corporation to Sydney Investments for a stated purchase price of $10,390,554.00. This transaction was described by Jenkins as a "cash out" transaction that did not change the real ownership of the property or his plans for developing the property.

In May of 2007 based upon a motion by Commissioner Kenerly, the County agreed to purchase the property for $16,260,000.00 as an active park and to settle the lawsuit.

Transaction 3

The third transaction was the acquisition of 14.2 acres located adjacent to Rabbit Hill Park. The testimony disclosed that the property was purchased in May of 2006 by Charles Ashworth d/b/a/ Cidpro, Inc. This purchase was made to acquire a full interest in the property from a partnership in which Mr. Ashworth was a partner. The

purchase price in 2006 for 14.22 acres was $370,865.00.

Mr. Ashworth applied in August of 2007 to change the zoning to R-ZT. This application was denied by both the Planning Commission and by a vote of the Board of Commissioners. The zoning was modified from RA-200 to R-60 with the stipulation that the owner donate approximately 4 acres to the County.

Based upon the vote of the Board, Mr. Ashworth instructed his attorney Lee Thompson to file suit against the County. In October 2007 Ashworth sold the property to the County for $1,000,000.00 partially based upon the purchase price paid to Jenkins and Braden. This payment was made in settlement of the litigation and as an expansion of Rabbit Hill Park.

TESTIMONY OF WITNESSES

Based upon our findings and recommendation, the Grand Jury believes that a presentment or report is not the appropriate forum to report our findings.

FINDINGS OF THE GRAND JURY

Based upon a review of all the evidence and testimony of witnesses, the District Attorney is directed to prepare a Bill of Indictment which charges Kevin Kenerly with one count of Bribery and two counts of Failure to Disclose Financial Interest. The Bill of Indictment is to be served upon Kevin Kenerly in accordance with law and brought before us for our consideration on October 8, 2010.

PEACHTREE INDUSTRIAL

BOULEVARD PROPERTY

Summary of the Transaction

The Grand Jury heard testimony and received evidence regarding a tract of land located on Peachtree Industrial Boulevard which consisted of 66.635 acres.

In the Spring of 2006, this parcel of land was identified as a possible site for an active park for the new Lanier High School cluster. Pursuant to procedure, the Department of Support Services contacted the owner, Mr. Wendell Starke to determine his interest in selling. Mr. Starke indicated that he would be willing to sell for the price listed in an appraisal he had obtained which was approximately $10.5 million dollars. The Department of Support Services obtained an independent appraisal which placed the value at $10.89 million dollars. Mr. Starke indicated that he would be willing to sell at his original price.

Former County Administrator Jock Connell testified that on six different occasions between September 2006 and March 2007, he requested permission from the district commissioner, Kevin Kenerly, to place the purchase on an executive session agenda to get Board approval to move forward with the purchase. On each occasion, permission was denied.

By April of 2007, Mr. Starke was frustrated by the lack of action by the County and accepted an offer from Brickton Commercial Partners, LLC to buy 58 acres of the parcel for $9.995 million dollars. The property was placed under contract during the first week of April, 2007.

Brickton Commercial Partners is a company owned by David Bowen, Thomas Michael Phelps, Jr. and Eric Cape. They testified that they

purchased the property for development but that after they put the property under contract, they were informed by Mr. Starke's agent that the County had been interested in the property. The partners instructed their attorney to inquire about the County's interest and set an asking price of 13.95 million dollars. The attorney, Lee Tucker of Mahaffey, Pickens & Tucker confirmed the interest and communicated the asking price.

Brickton closed on their contract and purchased the property on August 6, 2007. The Gwinnett County Board of Commissioners, upon motion by Kevin Kenerly, voted to

purchase Brickton's 58 acres on August 7, 2007. The County closed with Brickton on August 14, 2007 paying the asking price of $13,950,000.00.

TESTIMONY OF WITNESSES

The Grand Jury acknowledges that when we first applied the criteria for review to this transaction, there were several areas of concern. However, after a complete review of the evidence only one question remains

unanswered.

Mr. Wendell Starke testified that in the Spring of 2006 he was prepared to sell the entire tract of land to Gwinnett County and entered into good-faith negotiations with the County.

The county staff, including Steve North and Jock Connell, testified that they were ready to move forward with the purchase as early as September, 2006.

The principals of Brickton Commercial Partners, LLC testified that they had been interested in the property and had made prior offers since 2001. They testified that Mr. Starke's agent approached them in March of 2007 and that they put the property under contract during the first week of April, 2007. Their stated intention was to build a development similar to the Suwanee Town Center. They particularly believed this development would be successful since the proposed Sugarloaf Extension was slated to end right in front of the property. The timing of the closing date was adequately explained by both the principal and their bankers as having to do with financing considerations. The Grand Jury finds nothing improper regarding the purchase of the tract by Brickton.

The principals of Brickton testified that they learned of the County's interest in the property after placing the property under contract. This was confirmed by Mr. Starke

and his agent. The principals then testified that because they wanted to resolve the issue with the County they set a "take it or leave it" purchase price: The County took it.

Commissioner Kevin Kenerly did not testify and asserted, through counsel, his Fifth Amendment right against self-incrimination. The delay from September 2006 until April 2007 was never explained.

FINDINGS OF THE GRAND JURY

The Grand Jury had been unable to ascertain the reason why Commissioner Kenerly would not allow the land purchase to be placed on the Executive Session agenda for review by the entire Board. This transaction is a prime example of the custom of district courtesy gone wildly out of control. No Commissioner should be allowed by rule or custom to control the agenda of the entire Board. Staff should be allowed to take it upon themselves to bring a matter of this magnitude to the entire Board or, at the very least, to the Chairman for action. This example of blind adherence to custom cost the taxpayers three point four million dollars.

LAKES PARKWAY

PROPERTY

Summary of the Transaction

The Grand Jury heard testimony and received evidence that this is an 8.27 acre parcel located on Lakes Parkway outside of Lawrenceville. The property is located in District 1 which was represented by former Commissioner Lorraine Green until January 1, 2009 when Commissioner Shirley Lasseter took office. The property was acquired by Elite Land Development, Inc. in April 2005 for $300,000.00. The principle owner of Elite, Joe Dixon, testified that the original purpose of the purchase was to build office condos and that in fact he had begun development of the project with the installation of

infrastructure. However, because of financial issues and the failing economy, he was unable to complete the project.

In 2007, Elite through its agent initially approached the County to purchase the land for a park or as a headquarters for a central library.

On February 17, 2009 the Gwinnett County Board of Commissioners voted to purchase the 8.27 acres for $1,161,500.00 from Elite. The purchase was placed on the consent agenda and approved by consent. The proposed use was for a trailhead of 35 acres already owned by the County.

TESTIMONY OF WITNESSES

Mr. Phil Hoskins, the Director of Community Services first became aware of the property when it was proposed as a possible site for a central library. He did not recall who brought it to his attention but he rejected the site because of its location. When asked to consider alternate uses, Mr. Hoskins stated that the property provided entry to approximately 25 acres already owned by the County but that it would require access across the Yellow River. He stated that he had a feasibility study done which indicated that a twelve foot wide pedestrian bridge would cost approximately one million dollars. The cost of the bridge was included in the PowerPoint presentation which was made to the Board of Commissioners in Executive Session.

Mr. Steve North testified that as Director of Support Services he was assigned by the Board of Commissioners to negotiate the purchase of the Lakes Parkway property on behalf of Gwinnett County. He stated that on January 6, 2009 the Board was first presented the property in Executive Session and requested a cost estimate on the bridge. On January 20, 2010 the tract was brought up again including the cost of the bridge and Mr. North was authorized to negotiate a purchase price of appraisal plus up to fifteen percent ($1,000,000,00 + up to 15%).

Mr. North stated that by January 20, 2010 he knew that sitting Senior Judge James Oxendine was acting as an agent for the seller. On or about January 20, 2010 he contacted James Oxendine at his office in the courthouse to deliver the preliminary offer letter with the offer of appraised value. Oxendine told him that rather than mail the letter, North could just bring it over to his office. That is exactly what North did.

North testified that James Oxendine, upon receipt of the letter in his office, made a counter offer of appraised value plus 10 percent. North agreed and the purchase price was set at one million one hundred and eleven dollars. North testified that on January 30, 2010 he received a call from James Oxendine and again met in Oxendine's office in the courthouse. Oxendine told North that he knew North's authority to negotiate was appraised value plus 15 percent and that he needed to change the purchase price to reflect that amount. Mr. North testified that he was surprised that Oxendine was aware of the limits of his authority. Based upon that knowledge and the position of James Oxendine as Senior Judge he felt further negotiations would not be feasible.

Former County Administrator Jock Connell testified that he first became aware of the property when it was brought to his attention by former Senior Judge James Oxendine. Mr. Connell testified that Mr. Oxendine indicated that he was representing the sellers, that they needed to sell, and proposed that the County purchase the property for a library site. Mr. Connell stated that Mr. Oxendine met with him four to six times to press the sale since Connell was not inclined to recommend the purchase of the property. He stated that the property could possibly be used to "fill a qap" in that area of the county but its acquisition was not a staff priority. Mr. Connell stated that he was convinced that a member of the Board of Commissioners disclosed the limits of the negotiating authority granted by the Board.

Commissioner Kevin Kenerly, Bert Nasuti and Mike Beaudreau all testified that they deferred to Commissioner Shirley Lasseter in this land acquisition because of district courtesy and therefore had very little knowledge of the transaction. They denied knowing about the cost of the bridge when they voted to purchase. They denied knowing that James Oxendine represented the seller.

Commissioner Shirley Lasseter testified that she took office in January, 2009 as District 1 Commissioner. She stated that she first learned of the proposal to purchase the property in Executive Session. She did not recall the specific authorization given to Mr. North. She stated that she did not know James Oxendine was the seller's agent. She stated that she had looked at the property. Mrs. Lasseter denied that she initiated the purchase and then she relied on staff to work out the details and bring the purchase forward when they were ready. She acknowledged that it was logical that she would have initiated the process, and that she should have been the one to put the matter on the Executive Session agenda but denied doing so. She testified that she did not know about the change in purchase price and the negotiation with James Oxendine.

Former Judge James Oxendine testified that he did not consider his actions to be engaging in the practice of law. He stated that he was doing a favor for the son of his old friend Randall Dixon and took no fee. He stated that it was common knowledge that Gwinnett County paid 15 percent over the appraised value and he had just made a mistake when he agreed to 10 percent. He denied that he had received any information from any County Commissioner about the negotiation authority granted to Mr. North.

FINDINGS OF THE GRAND JURY

First, it was a stunning revelation to the Grand Jury that no member of the county staff expressed any reservations about being involved in a real estate transaction where a sitting Senior Superior Court Judge is acting as the seller's agent. If the Commissioners who testified are to be believed, it is inconceivable that this information was not disclosed prior to any vote to purchase. Leaving aside questions of fees and negotiating a land deal in a judge's office in the courthouse, the sheer impropriety of this representation should have been a warning sign.

Second, despite testimony to the contrary by County Commissioners, they were presented with information regarding the cost of the pedestrian bridge prior to the vote to purchase. The evidence is clear on that fact. They weren't paying attention.

Third, it is the conclusion of the Grand Jury that the information regarding the negotiation authorization was given to James Oxendine after he signed the initial purchase price agreement. Also it was common practice for the Board of Commissioners to authorize 10 percent over appraisal not 15 percent. An examination of all of the evidence, including the relationships of the parties, can only lead to the conclusion that it was a member of the Board of Commissioners who disclosed this information. While this conduct may not constitute a crime, it is certainly a bad business practice which led to an unfair benefit to the land seller in this case.

The Grand Jury believes that the conduct of former Senior Judge James Oxendine was inappropriate if not unethical. However since he has left the bench there seems to be no sanction available for us to recommend.

Commissioner Shirley Lasseter testified about her recollection of the events which led up to this property acquisition. After observing her demeanor and hearing her testimony the Grand Jury specifically recommends the following:

1. That Commissioner Lasseter develop at least a basic understanding of the land acquisition process;

2. That Commissioner Lasseter become more engaged in issues which affect her district and the entire county;

3. That Commissioner Lasseter must understand her role as a policy maker and decision maker rather than relying on the county staff to do her work for her.

In conclusion, the Grand Jury can find no rational, reasonable basis for the acquisition of this property other than to bail out the son of an old friend of several members of the Board of Commissioners. The Grand Jury can find no evidence of a crime in this transaction but that doesn't make it right.

GIVENS ROAD PROPERTY

Summary of the Transaction

The Grand Jury heard testimony and received evidence regarding this 33.198 parcel of land which adjoins Palm Creek Park in District 3 represented by Commissioner Mike Beaudreau. The Grand Jury learned that the property was placed under contract by Falcon Investments, LLC, a company owned by Marvin Hewatt and Larry Fleeman, in October of 2007. Once the property was placed under contract, Mr. Hewatt instructed his attorney Lee Tucker of Mahaffey, Pickens & Tucker to file a re-zoning application to change the zoning from RA-200 to R75 Modified. Both the Planning Commission and the Board of Commissioners voted to deny the application. Hewatt then instructed Tucker to file suit against the County.

During the pendency of the suit in preparation for litigation, the county law department commissioned an appraisal which valued the property at $1,138,000.00.

During the pendency of the litigation Mr. Hewatt met with Chairman Charles Bannister in Bannister's office in the courthouse and had delivered his own appraisal which valued the property at $2,423,000.00. This meeting occurred in February, 2009.

On May 5, 2009, the Board of Commissioners voted to approve the purchase of the property for $2,290,662.00.

TESTIMONY OF WITNESSES

Mr. Marvin Hewatt testified that in addition to other business interests, he and his partner had made several land purchase investments. The business plan he described was that a parcel of land would be located, the property would be purchased, and the property would be re-zoned for high density residential purchases then sold on a per lot basis to a developer.

He testified that in 2007, Falcon Investments purchased approximately 33 acres of land located on Givens Road for forty-eight thousand five hundred dollars per acre. Once the

purchase was made, Mr. Hewatt instructed his attorney, Lee Tucker to file a re-zoning application to change the zoning from RA-200 (Residential/Agricultural) to RA-75 (High Density). The application was filed and eventually denied. Mr. Hewatt testified that during the pendency of the re-zoning application, he met with Commissioner Mike Beaudreau but was not encouraged by the commissioner's response to his application. His exact words were, "he didn't say what I wanted to hear."

After the denial, Mr. Hewatt authorized his attorney to file a lawsuit which was served on Gwinnett County on December 2, 2008. While the lawsuit was pending, Mr. Hewatt testified that he had received a phone call from his attorney instructing him to get an appraisal of the property because the county appraisal had valued the land at approximately thirty-four thousand dollars per acre. Based upon this conversation, Mr. Hewatt hired James Clower to appraise the property.

Mr. Hewatt testified that Mr. Clower appraised the property at approximately seventy-three thousand dollars per acre.

Mr. Hewatt testified that on February 24, 2009 he met Mr. Clower in the office of Chairman Charles Bannister and Mr. Clower delivered the appraisal directly to the Chairman. He then stated that he received a call from his attorney who told him that the county had made an offer of approximately sixty-eight thousand dollars per acre. Mr. Hewatt testified he was not happy with the offer but acting on advice of counsel he accepted it.

Mr. Hewatt described his relationship with Chairman Bannister as a friend and political supporter. He stated that he allowed Bannister to use a billboard for political advertising without charge and the use of a van for political purposes without a charge. The Grand Jury has been unable to locate these contributions on Mr. Bannister's disclosure filings. Mr. Larry Fleeman testified that the van was later purchased with Bannister campaign funds.

Mr. James Clower testified that he did an appraisal of the Givens Road property at the request of Lee Tucker on behalf of Tucker's client Falcon Investments. He stated that his opinion of value of the property was seventy-three thousand dollars per acre and that the highest and best use was for a RA-200 subdivision. He stated that his value per acre was based on the amount paid per acre for comparable tracts adjusted for an economic decline.

Mr. Clower then testified that he personally delivered his appraisal to Chairman Charles Bannister and Marvin Hewatt in the Chairman's office in the Justice and Administration Center. He stated that he believed it was on February 23, 2009. He remembered because Mr. Hewatt and Chairman Bannister pointed out an error in the appraisal where the appraisal was directed to Marvin Hewatt rather than Lee Tucker. He said he left, returned to his office, made the correction and returned to the chairman's office. When he returned, Mr. Hewatt was still in the office so he delivered the appraisal and left.

Commission Chairman Charles Bannister testified that he had known Marvin Hewatt for years and considered him a friend. Bannister said that Hewatt had sent him a plat of the Givens Road property expressing an

interest in selling the property to the County. Chairman Bannister testified that he had a recollection of the re-zoning application, its denial and the subsequent lawsuit. He was also aware of the County appraisal of the property. He stated he believed the County appraisal was too low based on prior County purchases. Chairman Bannister remembered becoming aware that the County had received an appraisal from a third party which valued the land at approximately seventy thousand dollars per acre but was unclear about where that appraisal originated.

Chairman Bannister on the 23rd of July, 2010 denied that he met with Marvin Hewatt in his office and denied that he received the appraisal from James Clower or Marvin Hewatt. On August 20, 2010, after the Grand Jury had subpoenaed his calendar, Mr. Bannister acknowledged that the meeting

may have taken place since it was on his calendar but again denied receiving the appraisal from Hewatt or Clower.

Chairman Bannister stated that he decided to "take the lead" on this particular purchase because of "so many no votes" coming from Commissioner Mike Beaudreau. He stated that getting this land transaction passed was to get Mr. Beaudreau's attention. To quote his testimony, "It was pure politics." He testified that this purchase was an object lesson to Commissioner Beaudreau.

Commissioner Kevin Kenerly testified that after the lawsuit was filed, he spoke to Marvin Hewatt's attorney who attempted to settle the lawsuit with the purchase of the land by the County. He said that he voted to deny the re-zoning request out of district courtesy. Mr. Kenerly testified that after the lawsuit was initiated he was in favor of the land acquisition because of his perception that the Law Department lost most re-zoning suits and the

zoning decisions of the Board of Commissioners were not upheld. He also stated that he believed that the County appraisal of the property w.as incorrect and not in line with previous purchases in the same area.

Kenerly testified that Chairman Bannister produced an appraisal at an Executive Session but that he didn't know where the appraisal came from. However, he stated that based on a lack of information from county staff, he believed that the sellers appraisal was a more accurate assessment of the value of the property. Kenerly stated he witnessed a heated discussion between Chairman Bannister and Commissioner Beaudreau and therefore he stated that he believed that Chairman Bannister was pushing the acquisition to "stick it to Mike". He stated that he disregarded district courtesy in his vote because Commissioner Beaudreau had benefitted from previous Board actions but then publicly criticized these actions. He cited the 2008 millage rate vote as an example.

Commissioner Bert Nasuti basically testified to the same facts and perceptions as Kenerly.

FINDINGS OF THE GRAND JURY

The Grand Jury could not find any evidence of any direct payment to any public official to induce any performance of an official duty. However, it is clear that in this land acquisition the regular process was subverted to benefit a long-time friend and political supporter of Charles Bannister. Just as disturbingly, over one million dollars of taxpayer money was used to make a political point. The Grand Jury believes that all of the district commissioners who voted in favor of the Givens Road property acquisition made choices that were financially unsound, motivated by petty politics and generally wrong for the citizens of Gwinnett County.

Furthermore, this particular acquisition is an example of what appears to be a complete disconnect between county staff and the current Board of Commissioners. Business decisions are being made without seeking input from staff, without staff volunteering information or without any real knowledge of the likelihood of success of any particular lawsuit.

The Grand Jury heard testimony in this case that the tract in question was not part of the Parks Master Plan nor did the park that adjoined the property need to be expanded. Despite that information the Board pursued acquiring the land.

The Grand Jury also heard testimony that the perception of Commissioners Kenerly, Nasuti and Beaudreau was that the lawyers for the County were unable to prevail in zoning lawsuits so settlement was their only option. The testimony from the Law Department was that the County prevails in most zoning lawsuits and in any event the result of a loss would be a remand for a new zoning decision not the payment of monetary damages.

This particular case, in the opinion of the Grand Jury, was not one which cried out for settlement unless the agenda was to allow the landowner to make a profit on the sale. If settlement was not mandated, the question of varying appraisals would never have come up. The only conclusion that can be reached is that the Board of Commissioners made a decision based on faulty information or perception or there was an agenda other than the best interests of the public at work in this case.

Based upon the contradiction between the testimony of Charles Bannister and Marvin Hewatt, the Grand Jury directed the District Attorney to prepare and present an indictment charging Charles Bannister with Perjury.

On October 8, 2010 Mr. Bannister asked the Grand Jury not to indict him and to allow him to resign effective immediately. After a consideration of the evidence in the case, the proposed charge, and in the interest of limiting costs to taxpayers and expediting a resolution of this matter, the Grand Jury decided that it was in the best interest of the citizens of Gwinnett County to allow Bannister to resign and for the Grand Jury to return a "No Bill" of Indictment. The Grand Jury in making this decision also considered the following factors:

• In our investigation which included a review of financial records, we did not uncover any evidence of an illegal payment or bribe in this transaction. The proposed charge was based upon contradictions in testimony before us, not upon the transaction itself.

• The Grand Jury weighed the possible outcomes. If we had returned an indictment then removal from office would have depended upon the outcome of the criminal trial. The Grand Jury decided that assured, permanent removal from office was the appropriate solution to one of the problems we uncovered in our investigation.

1-85 AT BEAVER RUIN

PROPERTY

Summary of Transaction

The Grand Jury heard testimony regarding these two parcels containing 36.79 acres (Tract A) and 21.12 acres (Tract B). In 2005 these two tracts were owned by Retail Development Partners, LLC, a company which is owned by Wayne Mason and others. In 2005, Retail Development applied for a re-zoning of Tract A from Commercial (C-2) to Multi-Family Residential (RZM). The Planning Commission voted to recommend approval of the re-zoning however, the Board of Commissioners upon motion of former Commissioner, Lorraine Green voted to deny the re-zoning. Retail Partners filed suit to challenge the denial.

During the litigation Tract A was appraised at a value of $4,650,000.00. On February 15, 2007, the County purchased Tract A for $4,650,000.00 and Mr. Mason donated Tract B which consisted of a stream and wetlands. The purpose of the purchase was for a public park and settlement of litigation.

TESTIMONY OF WITNESSES

Mr. Wayne Mason testified that he and other partners originally acquired a tract of land which he called the Rich's site in 1980 or 1981 and that the tract originally was made up of over one hundred acres. Actually, the Grand Jury learned that the tract contained one hundred thirty-three acres. He testified that after two or three years, he wanted to sell the property based on an offer but that his partners didn't want to sell so his partners bought him out for 5.7 million dollars.

Mr. Mason testified that he reacquired the entire piece of property back in "the 1990's" for 5.5 million dollars. He stated that one of the reasons he reacquired the tract was he needed stream buffer credits to develop another property at the now intersection of Pleasant Hill Road and North Berkley Lake Road. He also stated that since he knew the property was zoned for commercial development, he could use the property in his business.

Mr. Mason then testified that he sold part of the property which has frontage on Satellite Boulevard for commercial development and used his approved stream crossings to subdivide the remaining property. He stated that he applied for a zoning which would allow for the construction of apartments, was granted the re-zonings and sold each of the parcels for in excess of 5 million dollars. By 2007, the only parcel that had not been sold was the parcel in question in this inquiry and the property surrounding the

stream. This was a total of approximately 57 acres.

Mr. Mason told the Grand Jury that he received an offer to sell 30 acres for the purpose of building apartments contingent upon a re-zoning of the property. He applied for the re-zoning, received a positive recommendation from the Planning Commissioner but when the matter went to a vote before the Board of Commissioners, his application was denied. When the application was denied, Mr. Mason instructed his attorneys to file suit against Gwinnett County.

Mr. Mason testified that while the re-zoning process was ongoing he had no official conversations with any county commissioner but acknowledged that he may have spoken to one or more informally. After the filing of the lawsuit, Mr. Mason acknowledged that he spoke to Lorraine Green urging her to buy the property because he was confident he would win the lawsuit.

Significantly, Mr. Mason also testified that as early as 2001 the Gwinnett County Commission voted to condemn the entire 133 acres for green space acquisition. He testified that his understanding was that the condemnation effort was dropped because of problems with title to the property and because Commissioner Nasuti wanted an aquatic center on Peachtree Industrial Boulevard.

Mr. Mason finally agreed to settle the lawsuit for less than the contract price he had been offered and agreed to donate the wetlands (Tract B) to the County. He stated that he agreed to settle because when he considered the tax ramifications, the court costs and the value of the wetlands if he kept them, it made no business sense.

Lorraine Green, former District 1 Commissioner testified about her involvement in this transaction. She began by saying that from the outset she was opposed to Mason's re-zoning application. She stated that it was her belief that the last thing that Satellite Boulevard needed was more apartments. However, she testified that she was contacted by representatives of the neighborhoods adjoining the tract who were willing to negotiate with the re-zoning applicant if they could not stop the re-zoning. Mrs. Green testified that she remained opposed to additional apartments and so despite the recommendation of the Planning Commission, after consultations with the Law Department, she made the motion to deny the re-zoning. She said that, with the exception of Chairman Charles Bannister, it was not difficult to persuade the other commissioners to support her motion.

Mrs. Green testified that the idea to purchase the property for green space came from her. She testified that she was aware of the events of 2001 and believed the purchase was appropriate. She testified that although the litigation was only about Tract A, she insisted on the donation of Tract B as part of the settlement. Mrs. Green also testified that she asked for an engineering study to be done to assure herself that the proposed development by Mr. Mason was in fact feasible. Once this had been done, despite opposition from Bannister and some hesitancy from Nasuti, she made the motion to purchase the land to settle the lawsuit and as an acquisition of green space. The motion passed by a vote of 4 to 1.

Chairman Charles Bannister testified that his opposition to the land purchase began with the vote to deny the re-zoning application. He stated that he was opposed to the purchase of the property because of the development costs to the County. He also testified that he was opposed to the re-zoning application because he had made a campaign promise not to allow any more apartments. Chairman Bannister abstained from the vote to deny Mason's zoning application.

Mr. Bannister testified that after the filing of the lawsuit, he believes he inquired about the County's chances to prevail and was assured that zoning votes were rarely over turned. He then stated that when the subject of purchasing the land came up, he was

surprised because he had spoken to Community Services Director Phil Hoskins and had been informed about the high costs of developing the property. He stated based on his prior knowledge of the property and the other factors he mentioned he was opposed to the purchase of the property.

FINDINGS OF THE GRAND JURY

The Grand Jury finds no evidence of wrongdoing in the acquisition of this parcel of property. This is no evidence of any improper payment made to, or solicited by, Lorraine Green in her role as a public official.

In essence, this acquisition came down to a question of priorities. If Gwinnett County had won the lawsuit, Mr. Mason would have been left with a tract of land which was already zoned for commercial development. If the County had lost the lawsuit, apartments would have been built. This District Commissioner was faced with a difficult choice. Whether she made the correct choice depends on one's point of view. On one hand, green space and wetlands were preserved, while on the other hand, valuable property was removed from the tax digest.

RECOMMENDATIONS

OF THE GRAND JURY

The Special Purpose Grand Jury would like to thank District Attorney, Danny Porter, Stan Hall and the entire staff of the District Attorney's office for the professional and capable assistance they have provided this Grand Jury. We also want to express our appreciation to the court reporters Holly Brown and Tara Johnson. We also wish to commend the bailiffs Bob Hettesheimer and Mark Henderson for their professionalism and support as the bailiffs to the Special Purpose Grand Jury.

After the conclusion of ten months of testimony and evidence, the Special Purpose Grand Jury makes the following recommendations:

1. DISTRICT COURTESY

We understand that district commissioners work on a part-time basis for Gwinnett County in addition to their full-time employment. Therefore, due to the sheer volume of transactions and the amount of information involved in each transaction, commissioners often end up deferring to the commissioner of the district in which the transaction is proposed. This practice is known as district courtesy. It is the opinion of the Grand Jury that this concept of district courtesy, while useful in some ways, is at the root of the problems with each land transaction we examined. District courtesy has allowed commissioners to avoid responsibility and accountability for their votes. We heard on numerous occasions a commissioner testify that, unless there was something unusual about the transaction, they always voted with the district commissioner. This in effect allowed one commissioner to totally control a decision which affects all citizens of Gwinnett County. An example of this control is the Peachtree Industrial Boulevard property. The completely arbitrary and unexplained delay by Commissioner Kenerly in keeping the transaction from the agenda essentially ended up costing the taxpayers approximately four (4) million

dollars. No individual commissioner should have this kind of power.

The Grand Jury is strongly of the opinion that certain transactions such as parks transcend the concept of district courtesy. These are transactions which involve millions of dollars and affect all citizens of Gwinnett County. All commissioners should be involved and held responsible for all phases of

these types of projects.

II. REORGANIZATION OF COUNTY GOVERNMENT

The Grand Jury recommends that the basic structure of Gwinnett County government be changed. The current system with one full-time chairman and four part-time district commissioners does not provide adequate representation to the citizens of the County.

The current system with its reliance on district courtesy and its over-reliance on county staff provides too many opportunities for conflicts of interest and fosters a culture of inappropriate business relationships which have been the common thread running through our investigation.

The majority of the Grand Jury is in favor of making all current county commission seats, including the Chairman, a full-time position. Essential to this concept would be that these new commissioners would be adequately compensated and would be prevented from having any outside business interests which could potentially conflict with their responsibilities to govern. The expectation of these full-time commissioners would be that they would have the opportunity to be better informed and make better decisions. This system would also eliminate potential conflicts between their private life and

public responsibility.

In considering this recommendation, the Grand Jury recognized that it is unrealistic to expect the current part-time commissioners to be able to balance their private lives and occupations with the immense amount of

work needed to make intelligent decisions on county matters. Full-time commissioners, who would not be allowed to have outside employment, could devote the necessary time to each decision.

The Grand Jury also considered the cost of this system. Full-time commissioners would have to be adequately compensated to attract the type of candidate who could do the job. The Grand Jury recognizes that at first glance, this appears to be an additional cost to taxpayers. But, if just one of the land transactions we investigated could have been prevented by a wiser decision, that would more than pay for the salaries of full-time commissioners.

On the other hand, many members believe that moving to full-time commissioners may not be the answer. These members believe that the concept of a part-time Citizen/Commissioner is still valid. The members who support the idea of part-time commissioners do agree that the current system does not provide adequate representation and provides too many opportunities for misconduct. These members agree that the current workload is too burdensome and the current commission districts are too large for one person to adequately do the job on a part-time basis.

The alternate recommendation of the Special Purpose Grand Jury is to re-structure the current system to include more County Commissioners representing smaller districts. This would have multiple benefits to the citizens of the County.

• It would decrease the pervasive influence of district courtesy.

• It would reduce the workload on individual commissioners to allow and require them to make decisions based on all the facts.

• More districts would allow for better representation of each district.

• More districts would dilute the ability of one commissioner to totally control any given transaction.

Given these advantages and the Grand Jury's ultimate demand for more accountability, the proposal to add commissioners has significant merit.

III. BUSINESS PLAN

It is the opinion of the Grand Jury that the current business plan utilized by Gwinnett County government needs significant improvement. During the course of our investigation we observed serious pervasive lack of communication, information sharing, and even trust between the County Commissioners and the heads of the major departments of county government. On numerous occasions department heads testified

that they were not asked to offer an opinion about a particular land transaction. There was no inquiry by the Board of Commissioners about how the purchase would fit into the Parks Master Plan or the best use of the property was. Members of the staff, including the current and past County Administrator consistently testified that they were not asked and did not give an opinion whether a particular transaction was in the best interest of the citizens. One department head testified "that wasn't his job."

County Commissioners on the whole testified that department heads did not provide them with the information to make informed decisions. One current Commissioner described the staff as "note takers." It was clear from the testimony that the decisions are being made by commissioners based on a PowerPoint presentation made in Executive Session. Sometimes these sessions occur fifteen minutes before a vote is taken. Although the evidence shows that each commissioner is provided with a large packet of information, either because of time limitations or for other reasons, the packets are not being looked at.

The Grand Jury is of the opinion that there should be better communication between the County Staff and the Board of Commissioners. This communication should be clearly documented so that staff is clear on the intentions of the Board of Commissioners and the Board is clear about its intentions. Because of this lack of documentation, the Grand Jury was forced to dissect each transaction in order to determine the truth behind each purchase. The goal of the business process should be that every citizen should be able to examine any transaction conducted by Gwinnett County government and evaluate that transaction objectively. The county government should be able, and willing, to explain on each transaction who proposed it, who recommended it, why the Board voted for it, and why it benefitted the citizens. Citizens should expect no less and the Grand Jury finds that Gwinnett County government has failed to deliver on this expectation.

IV. LAND ACQUISITION

Commissioner Kenerly testified that he believed that the citizens of Gwinnett County had given him a mandate to acquire land to build parks and preserve green space. The Grand Jury does not disagree but we found a process that is ruled more by custom and by the whims of individual commissioners than it is by sound business decisions and economic considerations. The Grand Jury believes that the entire land acquisition process should be restructured to increase efficiency and, most importantly, accountability.

• First and foremost the acquisition should be based upon a philosophy of obtaining best value for the taxpayer's dollar. Instead of the current philosophy of buy it and make it work, each transaction should be critically examined to determine its current or future use and value. The presumption should be that unless a transaction can be justified under stringent standards known to all involved, the Gwinnett County Board of Commissioners should decline the purchase.

• Decisions to purchase land are important to all citizens and should transcend all notions of district courtesy. All information on all land transactions along with staff recommendations should be given to all County Commissioners as soon as the transaction is ready to be considered. No single commissioner should have the power to singlehandedly delay consideration of a purchase for political or other reasons.

• No Limited Liability Company should be permitted to apply for a rezoning, acquire property from the county or sell property to the county without a full disclosure of the individual identities of the shareholders. The Grand Jury recognizes that an LLC is a legitimate type of company formed for a variety of legitimate reasons but it should not be a vehicle to conceal the identity of individuals who are doing business with the government.

• The Grand Jury found that the minutes of Executive Sessions as they now exist are not useful to determine what actually happened in the meetings. They are cursory at best and only reflect the final action taken. The Grand Jury recommends that Executive

Sessions be audiotaped or videotaped to insure that later review will reveal what actually happened in the meetings.

• As stated earlier, the concept of consensus in Executive Session leaves all parties involved confused and unsure about the decision that was actually made. The Grand Jury recognizes that this procedure was instituted to ensure that all votes were made at public meetings. The Grand Jury also recognizes there are many topics, such as land pricing and negotiation strategy that should not be discussed at a public meeting. The current process should be re-evaluated since it clearly is not working.

• The Grand Jury became concerned about the apparent difference of opinion between commissioners and staff about the appraisal process and results. It appears that staff trusts the process and results implicitly while the current Board of Commissioners does not trust it at all. Provisions should be made and procedures put in place for those situations in which the seller's appraisal and the County appraisal vary. The decisions made by the Board of Commissioners, especially in settlement of litigation, must be made based on appraisals that the Board trusts and which are legally defensible.

• The Grand Jury found a profound lack of communication between the County Law Department and the members of the Board of Commissioners. The attorneys from the Law Department who testified told us that the county prevailed in the majority of cases in which a rezoning decision had been made. Several members of the Board of Commissioners testified that most of those cases were remanded for a different decision. In other words, the county lost the case. When pressed for specifics, neither the County Attorneys nor the

Commissioners could provide the Grand Jury with detailed information. It would seem that one of the fundamental pieces of information needed by the Board of Commissioners in deciding whether to settle a lawsuit would be an evaluation of the likelihood of success, including success in past cases. Members of the current Board testified that they were not provided this information. The County Attorneys testified that the Board was provided the information. Without the documentation procedures

mentioned earlier, the Grand Jury is unable to determine what happened. The Grand Jury is of the opinion that this type of information is critical to making informed decisions. The Grand Jury recommends that Gwinnett County government take whatever steps are necessary to restore confidence in the Law Department and to make sure that information is available to make sound decisions.

• The practice of offering appraisal price plus ten percent for land acquisition should be abolished. County government should have trained

real estate negotiators on staff to obtain the best value for taxpayer dollars. These negotiators should be experienced, aware of market conditions and have sufficient authority to conduct aggressive negotiations on behalf of taxpayers without undue influences from outside forces.

• The Grand Jury has found that SPLOST funds have been used for a variety of purposes from land acquisitions outside the Parks Master Plan to settlement of litigation. The Grand Jury is of the opinion that these actions have placed the passage of future SPLOST votes in jeopardy. SPLOST funds should be used for clearly delineated purposes approved by the voters, not as a general pot of money to be used for various purposes based upon a commissioner's desire.

• Finally, land acquisition should follow a clearly defined and set system of policies and procedures. These procedures should be public and designed to make the property acquisition decision as objective as possible and based upon a valid business reason. Deviation from these procedures should be the exception rather than the norm and each deviation should be adequately documented.

V. ETHICS REFORM

The Grand Jury was surprised to learn that the ethics ordinance passed by the Gwinnett County Board of Commissioners has not been significantly reviewed or changed since its passage in 1993. This is simply unacceptable. The Grand Jury recommends that the

ethics ordinance be reviewed and updated as necessary every two years. This should be a priority of the elected Board of Commissioners.

The Grand Jury has heard sufficient testimony to conclude that comprehensive enforceable ethics ordinance should be a priority for' Gwinnett County Government. The only way that any semblance of trust can be re-established is for citizens to believe that their elected officials and county employees are acting ethically and on their behalf. The basics of

such an ethics ordinance would have to include full disclosure of business interests and prohibitions against receiving gifts or other things of value. Without these basics, trust cannot exist.

CONCLUSION

Based upon the evidence gathered during the course of our investigation, the Grand Jury, as a group of citizens, has been increasingly concerned about the path that Gwinnett County government is on. We have seen decisions involving millions of dollars made with little or no information or for the most venal reasons.

As interested citizens we have carefully considered our decisions and recommendations. It is now up to the elected leaders of Gwinnett County to carefully consider these recommendations and implement those they believe would best serve the public interest.

In many ways, Gwinnett County is still a great place to live, work and raise our children but in order to remain great, changes must be made.

In addition to the publication of presentments, we recommend that a copy of these presentments be delivered to:

Mr. Charles Bannister, Former Chairman, Gwinnett County Board of Commissioners

Ms. Shirley Lasseter, Gwinnett County Board of Commissioners

Mr. Bert Nasuti, Gwinnett County Board of Commissioners

Mr. Mike Beaudreau, Gwinnett County Board of Commissioners

Mr. Kevin Kenerly, Gwinnett County Board of Commissioners

Mr. Daniel J. Porter, Gwinnett County District Attorney

Honorable Dawson Jackson, Chief Superior Court Judge, Gwinnett Judicial Circuit

Honorable Michael C. Clark, Superior Court Judge, Gwinnett Judicial Circuit

Honorable William M. Ray, II, Superior Court Judge, Gwinnett Judicial Circuit

Honorable Karen E. Beyers, Superior Court Judge, Gwinnett Judicial Circuit

Honorable Ronnie K. Batchelor, Superior Court Judge, Gwinnett Judicial Circuit

Honorable Melodie Snell Conner, Superior Court Judge, Gwinnett Judicial Circuit

Honorable Debra K. Turner, Superior Court Judge, Gwinnett Judicial Circuit

Honorable R. Timothy Hamil, Superior Court Judge, Gwinnett Judicial Circuit

Honorable Tom Davis, Superior Court Judge, Gwinnett Judicial Circuit

Honorable Warren Davis, Superior Court Judge, Gwinnett Judicial Circuit

Karen Thomas, County Attorney

Steve North, Department of Support Services

Phil Hoskins, Department of Community Services

Lynn Smarr, Department of Water Resources

Brian Allen, Department of Transportation

Glenn Stephens, County Administration

Done this 22nd day of October, 2010.

By the Grand Jury

-s- MAYDEL MASSELLI-MONTERO, FOREPERSON

-s- JANICE N. MCCLOSKEY, CLERK

ORDER

The within and foregoing Report and Presentments of the Special Purpose Grand Jury, having been presented, it is ordered that the same be filed with the Clerk of this Court and spread upon the minutes thereof.

It is ordered that the Report and Presentment of the Special Purpose Grand Jury be published in the Officiai County news media, The Gwinnett Daily Post, as a legal notice, at least one time with costs to be paid from the general funds of Gwinnett County.

This 22nd day of October, 2010.

-s- Michael C. Clark

HONORABLE

MICHAEL C. CLARK

SUPERVISING JUDGE

GWINNETI COUNTY

SUPERIOR COURT

GWINNETI JUDICIAL

CIRCUIT

912-06615189,11/4@