# EXHIBIT B-154



FILED IN OFFICE

MAY 05 2023

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## IN THE FULTON COUNTY SUPERIOR COURT
## STATE OF GEORGIA

IN RE                                    )      **Case No.**
SPECIAL PURPOSE GRAND JURY               )      **2022-EX-000024**

### EIGHT ELECTOR NOMINEES' OPPOSITION TO THE DISTRICT ATTORNEY'S
### SECOND MOTION TO DISQUALIFY COUNSEL AND
### MOTION FOR SANCTIONS

NOW COME the eight currently represented Republican elector nominees[1] ("elector

nominees" or "electors") and oppose the Fulton County District Attorney's (the "District

Attorney") Second Motion to Disqualify Counsel, showing this Court as follows:

### INTRODUCTION

Despite the fact that disqualification motions filed by opposing counsel are strongly

disfavored and automatically deemed suspicious as improper tactical moves by the courts, the

District Attorney has recklessly filed their *second pre-indictment* disqualification motion without

any factual or legal basis. This second motion is an attempted re-tread of the first such motion

already decided by this Court, supposedly propped up by new and salacious facts. In reality, these

new "factual" allegations are complete fiction, as the indisputable evidence proves, and the DA

election team knew their claims could not possibly be true when they filed their Motion.

---

[1] Defense counsel currently represents eight of the ten previously jointly represented Republican elector nominees. When the DA's election team made actual, written offers of immunity to these eight electors in April 2023 but not to the remaining two elector nominees previously represented by defense counsel, the decision was made, in consultation with the non-immunized clients and an outside ethics expert hired after the first disqualification attempt to advise defense counsel, for those two individuals to obtain individual counsel. Although defense counsel and the outside ethics expert agreed that, for the reasons set forth in defense counsel's original opposition to the District Attorney's first disqualification motion, there was no ethical impediment to Ms. Debrow's continued representation of all ten of the electors, all of whom remain united in their innocence, all affected parties agreed that this new arrangement was likely the most prudent and conservative course given the practicalities of the representation and the positions being taken by the District Attorney's office. To protect the individual identities of the electors in this context and in the context of the discussions of various events relevant to and discussed in this opposition, the Court and the District Attorney's office have been provided with a legend or "key" that identifies the eight currently represented clients and the two former clients who have obtained individual counsel. Pursuant to that key, Electors A, B, C, D, E, F, G and J are currently represented by Ms. Debrow.

The District Attorney's Motion is reckless, frivolous, offensive, and completely without merit. This Court should recognize this second motion as the improper tactic that it is, deny the Motion, and order the District Attorney to bear the costs of defense counsel's response in opposition as sanction.

## FACTUAL SUMMARY AND BACKGROUND

### A.  April 2022 – March 2023

Beginning in April of 2022 and before the Special Purpose Grand Jury ("SPGJ") was sworn in on May 2, 2022, certain Republican elector nominees from the 2020 presidential election were approached by the Fulton County District Attorney's Office (the "FCDA") to provide information related to its investigation into the 2020 Georgia general election.  Each of those elector nominees—and all others jointly represented—were told by the Fulton County District Attorney's election team (the "DA's election team") that they were solely witnesses in the investigation, and each voluntarily agreed, after consulting with counsel, to provide interviews to the FCDA.  On April 25 and April 26, 2022, the DA's election team—led by a private attorney contracted by the FCDA to serve as a special prosecutor, Nathan Wade—interviewed two elector nominees; but the DA's election team canceled the third scheduled interview, telling counsel that it and the other voluntary interviews would be rescheduled.

On June 1, 2022, while the remaining elector nominees were still waiting to hear from the DA's election team about their voluntary interviews, the FCDA unexpectedly served SPGJ subpoenas to appear and testify before the SPGJ in July 2022.  Counsel for the jointly represented elector nominees raised questions about these subpoenas in a letter addressed to the District Attorney, but she never replied.  Instead, the next communication the elector nominees received

was a notification on June 28th from Mr. Wade that all eleven elector nominees were now identified as targets of the FCDA investigation.

Between April 25, 2022 and June 28, 2022, the elector nominees were transformed by the FCDA from cooperative witnesses voluntarily agreeing to provide information for their investigation to being publicly portrayed and treated by the District Attorney as putative criminals. In light of this abrupt change and for other reasons, the jointly represented electors filed a Motion to Quash and Disqualify on June 27, 2022, which this Court denied. As a result, three of the then-jointly represented electors dutifully presented themselves pursuant to their subpoenas on July 26, 2022 to appear before the SPGJ. Before any of these three electors were actually called into the SPGJ, however, a legal impasse regarding the proper scope of Fifth Amendment invocations developed between the DA election team and defense counsel. After a brief telephone conference with the lawyers and this Court, this Court determined that, at defense counsel's request, the Court would set the matter for a formal hearing at a future date. As a result, the FCDA excused the three electors present from their SPGJ appearances and canceled the appearances for the other jointly represented electors before the SPGJ until after the Court's hearing on the legal issue.

The very next day, on July 27, 2023, Mr. Wade sent the following email to the Court and Ms. Pierson:

> Our office has received information prompting us to offer immunity to one or more of Ms [sic.] Pierson's clients in exchange for full and truthful testimony. This issue unfortunately gives rise to potential legal conflicts with Ms [sic.] Pierson's representation, and we wanted to work through the best way of executing the offer seamlessly prior to the scheduling of any hearing. (*See* Exhibit 1).

This email from Mr. Wade was especially odd, as the DA election team had announced in open court during a hearing just a few days prior that the FCDA had no intention of immunizing any of the jointly represented electors. In any event, it was *this email communication* regarding potential

3

immunity offers to some (unidentified) but not all of the jointly represented elector nominees that was the genesis of the FCDA's *first* disqualification motion.

In light of this email, the parties conferenced with the Court, and the Court instructed the DA election team to send defense counsel an email outlining the type of immunity that it was potentially offering. The Court declined the request by defense counsel that the DA election team identify the individual electors to whom they intended to offer immunity. On Friday, July 28, 2022, the District Attorney's election team sent their email to defense counsel, and it stated, in pertinent part, as follows:

> [O]ur office is prepared to offer one or more of your clients full immunity from prosecution for any acts taken related to the December 14, 2020, meeting at the Georgia State Capitol to execute purported electoral college votes in favor of former President Donald J. Trump and former Vice President Michael R. Pence.
>
> This immunity would be offered only on the condition that those clients identified must fully cooperate with our office's investigation related to the Special Purpose Grand Jury authorized by Chief Judge Christopher S. Brasher on January 24, 2022. This would include full and complete testimony before the Special Purpose Grand Jury and any other court proceedings that may be related to or result from the Special Purpose Grand Jury's investigation.
>
> Upon reaching an agreement, a formal proffer letter would be drafted and approved by the parties to memorialize all aspects of the agreement."

In this email, the DA election team again declined to identify a single elector client to whom it intended to or was willing to offer immunity. Instead, they indicated that they had internally divided the 11 jointly represented clients into 3 categories: (1) individuals to whom they are likely to offer immunity; (2) individuals to whom there is a possibility that they would offer immunity; and (3) individuals to whom they are not offering immunity. The only category in which they were willing to identify any specific individuals, however, was the category of whom they were *not* interested in immunizing at that time. At *no time* during the joint representation of the eleven

4

electors did the DA election team identify a single elector to whom it wished to offer immunity or offer actual immunity to *any* jointly represented elector.

In response to the FCDA's email, then-joint defense counsel Holly Pierson sent an email to the DA election team requesting clarification of the type and scope of immunity that was being considered, and she asked for a blank draft immunity agreement for review. The DA election team never replied. Instead, on August 1, 2022, they filed a motion for leave to file their first disqualification motion under seal.

In its teleconference with the parties on or about July 29, 2022, the Court had also agreed to give counsel for the jointly represented elector nominees a week to consult with their eleven clients about the FCDA's potential immunity offers and all other potential conflict of interest issues raised and to report back to the Court and the FCDA on the outcome of those discussions. Despite the FCDA's unwillingness to provide the basic information requested about the potential immunity it might offer, joint counsel nonetheless promptly proceeded to advise *all* their clients consistent with Georgia's Rules of Professional Responsibility regarding all matters relevant to actual or potential conflicts of interest, including the potential implications of an as-yet hypothetical immunity offer (or lack of the same) as follows:

- In separate, individual, written communications sent to each client on August 1, 2022, counsel explained: (1) the existence and possible implications of the FCDA's potential immunity offer(s), (2) whether such an offer would raise a potential or actual conflict under Georgia law, specifically Georgia Rules of Professional Responsibility Rule 1.7, (3) if such a conflict existed, then whether it is one that could be waived, and (4), after consulting with independent counsel if they so

choose, each client's decision of whether to waive any such conflicts.  (*See* Exhibit 2) (submitted *in camera)*.

- On August 3, 2022, counsel provided each client a thirteen-page, single-spaced memo consisting of original attorney work product that comprehensively outlined and explained all conflict of interest issues, the requirements for informed consent to joint representation (including their right to consult with independent counsel on these matters, which some did), and their respective rights from their attorneys and from other jointly represented clients under Georgia law.  (*See* Exhibit 3) (submitted *in camera*).

- Immediately thereafter, counsel scheduled and held individual teleconference meetings (usually lasting at least an hour) with each client between August 3 and August 5 to explain the written communications and to address any questions or concerns.

- After each individual meeting, the client was provided a detailed Informed Consent to Continued Joint Representation waiver form to complete and return if they so chose after any consultation with independent legal counsel.  (*See* Exhibit 4) (submitted *in camera*).

After reviewing the written information, consulting with counsel, and, in a few instances, considering the input of independent legal counsel, the 11 jointly represented clients unequivocally chose to remain in the joint representation, and they each executed an informed consent form.  (*See* Exhibit 5) (submitted *in camera*).

As agreed in the July 29, 2022 teleconference, joint counsel notified the Court and the FCDA on August 5, 2022, that, after having been thoroughly advised by counsel and, for some,

6

having sought the advice of independent legal counsel, all elector nominees elected to remain in

the joint representation.  They also continued to maintain that they committed no wrongdoing or

criminal offenses and that they were unified in their innocence and common defenses.  Defense

counsel further notified the Court and the FCDA that, after also having been thoroughly advised

by their counsel, and for some, having sought the advice of independent legal counsel, all elector

nominees declined the FCDA's offer of potential immunity *"as presented at this time."* (emphasis

added).  The email explained this decision in detail as follows:

> Regarding the DA's potential offer of immunity to one or more of our clients, none of our clients are interested in that offer *as presented at this time.*  While an offer of immunity from prosecution is enticing at first blush, [the elector nominees] all fundamentally distrust the motives and intentions of the DA and the investigative team in this case, due in part to the abrupt and unexplained change in each of their statuses in the investigation from witness to target, in part to the abrupt decision to potentially offer immunity to some of them after having stated in open court only days before that the DA had no intention of immunizing any of them, and in part to their perception that this investigation into their lawful conduct is not based on (or even interested in) the facts or the law but instead is politically motivated.
>
> Our clients, therefore, have grave concerns that if they were to be offered immunity from prosecution, accepted that offer, and then told your team and/or the grand jury the truth -- which is that neither they nor the other electors committed any illegal act or engaged in any sort of conspiracy with regard to the 2020 election -- the DA and your team would not accept that truth, especially because you have represented that you have evidence to the contrary.  In such a scenario, our clients believe that the DA's Office is likely to threaten to or actually charge them with perjury or false statements to law enforcement officials or similar after their truthful, immunized testimony merely because the immunized witness is not in a position to tell the DA's Office or the grand jury the story they want to hear.  Our clients also believe that other similar risks of wrongful prosecution are rife under the facts of this investigation, *and the proffered potential immunity does not address or insulate them from these risks.*  At this time, our clients are unwilling to expose themselves to the serious risks inherent in the potential immunity *as proffered.*
>
> Additionally, our clients believe (as do we) that they are already immune from any successful prosecution because they did not and could not have committed any crime in relation to the 2020 election and for the other reasons outlined above.

(Emphasis added).

On October 3, 2022, the District Attorney filed their first Motion to Disqualify Counsel. Joint defense counsel filed their response in opposition on November 10, 2022, and provided to the Court *in camera* copies of several attorney-client privileged documents, including the August 3, 2022 thirteen-page memo. Both the Court and the FCDA were provided copies of the extensive Informed Consent Waivers executed by each of the elector nominees. Each of those eleven Informed Consents affirmatively verified that each client had been fully informed about the alleged conflict of interest concerns raised by the District Attorney, which, of course started with and included the potential immunity offers.

This Court ruled on the District Attorney's first Motion to Disqualify on November 30, 2022. In that Order, this Court determined that the August 3 memo and the Informed Consent Waivers signed by each client satisfied the requirements of Rule 1.7(b) with respect to all potential conflicts at the pre-indictment investigation phase of this matter, with the exception of Chairman David Shafer, whom the Court ordered severed from the other ten electors. (Order at p 5-7). The Court also expressly stated in that Order that it had reviewed *in camera* "the thirteen-page, single-spaced memorandum Pierson and Debrow provided each client *addressing the concerns raised by the District Attorney* about persisting with joint representation and the risks and benefits of doing so." (Order at 4, n. 4) (emphasis added).

After consulting with each client, as well as a number of experienced practitioners, Pierson and Debrow, who are in separate law firms, dissolved their previous co-counsel relationship, with Ms. Pierson representing Mr. Shafer going forward and Ms. Debrow staying on as counsel for the remaining ten elector nominees. Through email communication, the DA election team strongly objected to this arrangement, but on December 6, 2022, this Court agreed that Pierson and Debrow's proposed arrangement was not prohibited by the Georgia Rules of Professional

Responsibility or the law.  In denying the FCDA's objection, the Court instructed the parties in their reply to notify the Court if any problems arose in the future to which any "good faith legal objections" could be made.

On December 14, 2022, Ms. Debrow, as defense counsel for the ten jointly represented electors, contacted DA election team via email to again gauge any interest in continuing conversations regarding immunity and the next steps for the remaining ten elector nominees (*See* Exhibit 6).  The DA election team did not respond until four months later.

### B.  April 23, 2023 Immunity Offers

On April 4, 2023, defense counsel received a phone call from Mr. Wade "in response to" the December 14th email.  Mr. Wade stated that the FCDA now wanted to convey actual immunity offers to eight of the ten jointly represented elector nominees.  Defense counsel notified all ten clients about the State's offer.  Per defense counsel's request, the FCDA sent draft immunity letters to defense counsel on April 7, 2023, and those letters were shared with the clients to whom they were directed.  Additionally, defense counsel individually followed up with each client via telephone to advise about the risks and benefits of accepting the offer.  Based on the details in the actual immunity offers that addressed some of counsel's previous concerns and counsel's current assessment of the risks and benefits of the immunity offers, all eight of the electors who were offered immunity accepted.

Interviews pursuant to the accepted immunity offers occurred as follows:

| Date and Time | Elector Nominee | Exhibit (*in camera*) |
|---|---|---|
| April 11, 2023 at 3:00 p.m. | A | (none) |
| April 12, 2023 at 9:30 a.m. | B | 10 |
| April 12, 2023 at 1:00 p.m. | C | 11 |
| April 12, 2023 at 4:00 p.m. | D | 12 |
| April 14, 2023 at 9:00 a.m. | E | 13 |
| April 14, 2023 at 11:00 a.m. | F | 14 |
| April 14, 2023 at 1:00 p.m. | G | 15 |
| To be scheduled [2] | J | (none) |

Each of these interviews were conducted and completed as scheduled.  At *no time during or after any of these interviews* did the DA election team state that they believed an elector was incriminating another jointly represented elector or that they believed a conflict of interest had arisen.  Furthermore, at no time during or after any of these interviews did the DA election team inform this Court that they believed they had a new, good faith objection to the joint representation or that they believed defense counsel had made a misrepresentation to this Court.  Instead, the DA election team proceeded with a week-long interview schedule and filed their motion without a word to defense counsel or this Court.  These interviews were recorded by both the FCDA and defense counsel, and defense counsel has had six of the seven interviews transcribed.[3]  Those transcripts are being submitted to the Court *in camera* for its review.

With respect to Elector Nominees H and I, defense counsel immediately acted upon learning that they were not being offered immunity to determine whether it was either necessary

---

[2] Elector J also accepted the offered immunity but was out of the country during this time.  As such, the FCDA has agreed to keep the offer open and schedule his interview at a later time.

[3] Defense counsel's recording of Elector A's interview is corrupted, and it is unclear whether the computer experts will be able to restore it.  The DA election team, however, has their own recording of this interview should any portion of it become relevant.  Additionally, defense counsel has extensive and comprehensive notes taken during the interview, and there is nothing that interview that is relevant in any way to the District Attorney's claims in their Motion.  Elector A was not asked about prior potential immunity, and she did not incriminate herself or any other elector.

of a "minister of justice." *See* Nat'l Prosecution Stds., Nat'l Dist. Atty. Assoc. 3d ed, available at: https://ndaa.org/resource/national-prosecution-standards-third-edition-updated-2009/ (stating that the dignity and honor of the [prosecutorial] profession call for compliance with a higher standard of conduct, and when a prosecutor's conduct falls below this national standard, he or she may expect sanctions impacting a particular case or the individual prosecutor.)

### B.   No Elector Nominee Ever Indicated That They Had Not Been Informed of Any Potential Offer of Immunity During the Joint Representation.

In April 2023, the DA election team approached defense counsel for the first time with actual immunity offers for eight of the remaining ten represented electors. After reviewing the actual, written offers of immunity, each of those eight electors accepted their immunity offer. Pursuant to those immunity agreements, the DA election team sought interviews with those eight electors, and seven of those interviews were accomplished between April 11 to April 14, 2023.[5] The recordings and transcripts of those interviews conclusively disprove the District Attorney's contention that some of the immunized electors "told members of the investigation team that no potential offer of immunity was ever brought to them in 2022." *See* District Attorney's Motion at 4. Specifically, Mr. Wade of the DA's election team questioned only three of the electors about supposed prior offers of immunity,[6] and the transcripts of those interviews have been submitted to the Court *in camera*. As the transcripts reveal, Mr. Wade *never* asked a single elector in their interview whether they were ever told in 2022 that they could *potentially* be offered immunity by the District Attorney, as the District Attorney misrepresents in their Motion, *id.*; instead, Mr. Wade asked them if they knew or had heard before April 2023 that they specifically were offered immunity.

---

[5] The interview of the eighth immunized elector could not occur in this timeframe as the elector was out of the country, but an agreement was reached to schedule that interview either by Zoom or upon the elector's return.

[6] Electors D, E, and F.

or prudent for them to obtain their own independent counsel.  Defense counsel consulted with Clients H and I and with the outside legal ethics expert hired to advise defense counsel after the first disqualification dispute.  Although defense counsel and the outside expert concluded that, for the reasons set forth in defense counsel's original opposition to the District Attorney's first disqualification motion, there was no ethical impediment to defense counsel's continued representation of the electors (all of whom remain united in their innocence), all affected parties agreed that the most conservative and practical course was for Electors H and I to obtain independent counsel.  Electors H and I immediately began the process of securing new counsel, and they have each now obtained their own independent counsel.

## ARGUMENT AND CITATION OF AUTHORITY

I.   **The District Attorney's Accusations that Counsel for the Eleven Then-Jointly Represented Elector Nominees Failed to Share Information Regarding Unspecified Potential Offers of Immunity with Every Client in August 2022 Are Entirely and Provably False.**

The District Attorney's accusations that then-defense counsel either failed to apprise the jointly represented clients of the District Attorney's potential offers of immunity in 2022 or that Ms. Pierson misrepresented that fact to the Court are demonstrably and entirely false, and they knew these claims were false when they filed their second disqualification motion.  As discussed in greater detail above, the only actual offers of immunity from the District Attorney were made on April 4, 2023.  Any immunity discussion prior to that date were highly generalized, non-individualized "offers to offer" *potential* immunity to undisclosed recipients.

Yet, despite the DA election team's repeated refusal to identify *any* elector to whom they were willing to actually *offer* immunity, and despite their refusal to engage with counsel or answer basic questions regarding the scope and other logistics of even a potential immunity offer, defense

11

counsel for the jointly represented electors thoroughly and repeatedly discussed every known aspect of the potential immunity with the elector nominees in writing and in follow-up, individual teleconferences.  Indeed, as set forth above, on August 1, 2022, Ms. Pierson sent each client a written communication citing verbatim the email language from the DA's election team about the generalized potential offers of immunity, as well as the verbatim email language of the questions Ms. Pierson sent to the DA's election team in response.  Counsel then provided a separate thirteen-page, single-spaced memo to each client on August 3, 2022, almost three single-spaced pages of which were devoted to the potential immunity issue itself.  Finally, counsel had follow-up conference calls, usually lasting about an hour, with each client, to discuss again all the potential conflict of interest issues raised between August 3rd and August 5th, including a full discussion of potential offers of immunity and the implications for that client if such immunity were eventually offered to them.  In its November 30, 2022 Order, this Court acknowledged that Ms. Pierson and Ms. Debrow's disclosures fully satisfied the Georgia Rules of Professional Responsibility.

**A.** **The District Attorney Knew Before They Filed Their Motion That Their Potential Offers of Immunity Had Been Disclosed to and Discussed With The Electors.**

The potential offers of immunity are the very issue that ignited the District Attorney's *first* disqualification motion.  *See* July 27, 2022 Email from FCDA to Judge McBurney and Holly Pierson, *supra* (claiming that potential offers of immunity raised conflict of interest concerns). The District Attorney raised the potential immunity issue directly in their first attempt to disqualify counsel, and it was addressed by both parties in their briefing.

This Court's November 30, 2022 Order ruling on the first disqualification motion noted that defense counsel had addressed all of the issues raised by the District Attorney, which necessarily included the potential immunity issue:  this Court specifically stated that it had

12

reviewed *in camera* "the thirteen-page single-spaced memorandum Pierson and Debrow provided each client *addressing the concerns raised by the District Attorney about persisting with joint representation and the risks and benefits of doing so*." *See* November 30, 2022 Order at 4, n. 4 (emphasis added).[4]

The District Attorney knew from the first disqualification litigation that the potential immunity issue had been disclosed to and discussed with the jointly represented electors and that defense counsel had presented sufficient evidence to satisfy this Court that they had discharged their ethical responsibilities on this very issue. Unless the District Attorney is suggesting that this Court failed to do what it explicitly said it had done, the District Attorney cannot in good faith believe or truthfully assert that their potential offers of immunity had not been discussed with the jointly represented electors.

The District Attorney also knows, as the interview transcripts and recordings definitively prove, that no elector ever told any member of the DA election team that potential offers of immunity were not brought to them in 2022, as discussed in greater detail below. Knowing all of that, however, they have the audacity to publicly accuse Ms. Pierson and Ms. Debrow of making misrepresentations to the Court about these matters *knowing* that accusation is false, while they themselves are misrepresenting to this Court that "some of the electors represented by Ms. Debrow told members of the investigation team that no potential offer of immunity was ever brought to them in 2022" (FCDA's Motion at p. 4) This conduct is well beneath the ethical standards for any lawyer, and it certainly is not the heightened duty of candor to the court and integrity demanded

---

[4] At the time, the District Attorney's Office was insistent that discussions regarding potential immunity remain confidential, and this Court granted that request. As such, this Court's Order did not identify all of the specific issues, including potential immunity, that were addressed in the thirteen-page memo. But the District Attorney's Office certainly knew that potential immunity was the very first concern that it had raised in their July 27, 2022 email to the Court and again in their first disqualification motion. And this Court's order plainly stated that all of the District Attorney's concerns were addressed in the client memo, which, of course, they were.

of a "minister of justice." *See* Nat'l Prosecution Stds., Nat'l Dist. Atty. Assoc. 3d ed, available at: https://ndaa.org/resource/national-prosecution-standards-third-edition-updated-2009/ (stating that the dignity and honor of the [prosecutorial] profession call for compliance with a higher standard of conduct, and when a prosecutor's conduct falls below this national standard, he or she may expect sanctions impacting a particular case or the individual prosecutor.)

**B.     No Elector Nominee Ever Indicated That They Had Not Been Informed of Any Potential Offer of Immunity During the Joint Representation.**

In April 2023, the DA election team approached defense counsel for the first time with actual immunity offers for eight of the remaining ten represented electors.  After reviewing the actual, written offers of immunity, each of those eight electors accepted their immunity offer. Pursuant to those immunity agreements, the DA election team sought interviews with those eight electors, and seven of those interviews were accomplished between April 11 to April 14, 2023.[5] The recordings and transcripts of those interviews conclusively disprove the District Attorney's contention that some of the immunized electors "told members of the investigation team that no potential offer of immunity was ever brought to them in 2022." *See* District Attorney's Motion at 4.  Specifically, Mr. Wade of the DA's election team questioned only three of the electors about supposed prior offers of immunity,[6] and the transcripts of those interviews have been submitted to the Court *in camera*.  As the transcripts reveal, Mr. Wade *never* asked a single elector in their interview whether they were ever told in 2022 that they could *potentially* be offered immunity by the District Attorney, as the District Attorney misrepresents in their Motion, *id.*; instead, Mr. Wade asked them if they knew or had heard before April 2023 that they specifically were offered immunity.

---

[5] The interview of the eighth immunized elector could not occur in this timeframe as the elector was out of the country, but an agreement was reached to schedule that interview either by Zoom or upon the elector's return.

[6] Electors D, E, and F.

The transcripts further reveal that Mr. Wade was deliberately trying to manufacture this narrative about the immunity issue by intentionally misleading and confusing these electors, suggesting in his questions that these electors were *specifically* or *individually* offered *actual* immunity last year (during the joint representation), despite his knowledge that no such actual offers of immunity were made before April 2023.  When defense counsel attempted to correct and clarify the confusion, she was actively resisted by Mr. Wade each time.  In one case, discussed in more detail below, Mr. Wade made outrageous threats and engaged in intimidation tactics in front of the elector being interviewed when Mr. Wade believed the recording had stopped, threatening to revoke their immunity and indict them (which he has no authority to do), all to try to silence defense counsel and prevent the truth from coming out.

### 1.   *April 14, 2023 Interview with Elector E.*

By far the most egregious and aggressive attempt by Mr. Wade to mislead an elector with regard to the potential immunity/actual immunity issue occurred during the interview of Elector E.  This interview occurred immediately after Elector D's interview, discussed below, in which defense counsel had been forced to step in to clarify the misleading questions Mr. Wade asked about immunity.  Despite his knowledge that no actual offers of immunity were made to any elector and defense counsel's earlier clarification of Mr. Wade's misleading questions, Mr. Wade asked Elector E a series of questions designed to deliberately confuse and mislead them.  Worse, when defense counsel again attempted to make the same necessary clarification she made in Elector D's interview, Mr. Wade threatened and attempted to intimidate both defense counsel and Elector E.

In particular, Mr. Wade first asked Elector E, "When did you first hear that you would get offered immunity?"  *See* April 14, 2022 Transcript of Interview of Elector E, p. 35, lines 19-20.  Reasonably understanding that Mr. Wade was referring to the recent, actual, written offer of

immunity, Elector E answered that he did not know, that defense counsel had told him about it, he thought he had also seen it in the news, and that he thought it was in the last month or two months. *Id.* at p. 35, lines 21-25. Elector E subsequently clarified that he was offered this current written immunity approximately a week before his interview. *Id.* at p. 35, lines 20-24.

Knowing that the District Attorney's recent, actual, written offer of immunity was the immunity Elector had accepted and to which Elector E had been referring in his answer, Mr. Wade nonetheless then asked Elector E "And you -- you declined? You didn't want immunity?" *Id.* at p. 36, lines 6-7. Although he gave no indication of this fact, Mr. Wade's question clearly referred *not* to the actual written offer of immunity that Elector E had just been discussing but, instead, to the jointly represented electors' earlier declination of undefined and unspecified potential immunity in November 2022. Obviously confused, Elector E answered, "I didn't decline." *Id.* at p. 36, line 8.

At that point, defense counsel was compelled to interject a clarification once again on the record because of Mr. Wade's misleading questions. Unlike the interview of Elector D two days previously, however, in which defense counsel was able to make the necessary clarification uninterrupted, this time Mr. Wade aggressively resisted defense counsel's efforts, attempted to silence her, and—after ordering his investigator to stop the recording—resorted to overt threats and attempted intimidation against both counsel and client. *Id.* at pp. 26, line 12- 22; pp. 36-47; p. 42, line 3. Defense counsel's own recording continued to capture the exchange, however, and it is fully and accurately reflected in the transcript of this interview submitted to the Court.

While he thought the recording had stopped, Mr. Wade threatened that if defense counsel persisted in trying to make this simple and truthful clarification, he would terminate Elector E's interview, "tear up" his immunity agreement (which was already binding and in force) and indict

him. *Id.* at pp. 43, lines 16-19; p. 44, lines 2-5 (MR. WADE: "Here's the deal. Here's the deal. Either [Elector E] is going to get this immunity, and he's going to answer the questions -- and talk (inaudible) wants to talk -- or -- or we're going to leave. *And if we leave, we're ripping up his immunity agreement, and he can be on the indictment.* That's what can happen.") (emphasis added). Even more outrageous, Mr. Wade insisted on making these inflammatory (and baseless) threats in the presence of Elector E, despite defense counsel's repeated requests that counsel discuss the matter outside of Elector E's presence. *Id.* at p. 43, lines 11-12 (MS. DEBROW: "Mr. Wade, can I talk to you outside please?"); p. 43, lines 20-22, 25; p. 44, line 1 (MS. DEBROW: "I'd like to speak to you outside the presence of [Elector E] . . . because what you what you are doing is intimidating").

Despite Mr. Wade's intentionally misleading questions about immunity, the heated exchange between Mr. Wade and defense counsel, and Mr. Wade's threats to "tear up" Elector E's immunity and indict him, Elector E nonetheless confirmed in their interview (during the segment of the interview that Mr. Wade had instructed his investigator not to record) and again in their Declaration (Exhibit 8) that potential immunity had been discussed with him by defense counsel back in 2022 when the first conflict of interest issues were raised by the District Attorney. *Id.* at p. 42, lines 9-23. Elector E's interview, therefore, refutes the DA election team's claims.

2. *April 12, 2023 Interview of Elector D.*

Knowing that his question was untrue, Mr. Wade first asks Elector D, "You were *at least on two occasions offered immunity*, yes?" *See* Transcript of April 12, 2023 Interview with Elector D at p. 26, lines 16-17 (emphasis added). When Elector D expressed surprise and confusion in response to that question, Mr. Wade then asked, "You just signed a document that gives you immunity. We're not prosecuting you. The document says you have immunity; you signed it.

*Was that the first time that you had ever been offered immunity?*" *Id.* at p. 27, lines 1-14 (emphasis added). When Elector D responded that they did not recall that they had ever personally been offered immunity until this present opportunity, *id.* at p. 27, lines 16-19, Mr. Wade doubles down on his attempt to mislead, stating, "Yeah. *It would have been a few months back, you would have got everything offered [to] you.*" *Id.* at p. 27, lines 20-22 (emphasis added).

At that point in the interview, defense counsel stepped in, made the necessary clarification between the generalized discussions of potential immunity in 2022 where the District Attorney declined to make any actual offers of immunity to any elector and the current specific written immunity offer to this elector. She further indicated that she did not want her client to be misled by Mr. Wade's questions. *Id.* at p. 27, line 27-28; p. 28, lines 1-12. Even with Mr. Wade's misleading questions, however, Elector D testified affirmatively that they knew there had been previous discussions regarding potential immunity with the District Attorney, but that to their knowledge, no actual or specific offer of immunity had been made to them. *Id.* at p. 28, lines 16-22, 24-25; p. 29, lines 4-10. (Elector D further confirms these accurate facts in their Declaration, attached as Exhibit 7). In short, Elector D's interview also refutes rather than supports the District Attorney's false allegations.

      *3.*    *April 14, 2023 Interview with Elector F.*

Two days later, in an interview with Elector F, Mr. Wade again failed to ask about any prior discussion of *potential* immunity offers but instead only asked whether Elector F had heard about any actual *offers* of immunity:

| MR. WADE: | When did you first hear about *this* immunity? |
|---|---|
| ELECTOR F: | Last week. |
| MR. WADE: | Okay. And any time before that? |

| ELECTOR F: | Nope. |
|---|---|
| MR. WADE: | Never heard about any immunity *offer* at all? |
| ELECTOR F: | No. |

*See* Transcript of April 14, 2023 Interview of Elector F, p. 71, lines 8-16 (emphasis added).

Nowhere in this exchange or elsewhere in Elector F's interview were they asked whether they had earlier heard of or discussed the District Attorney's prior *non-specified, non-individualized, potential* offers of immunity; instead, Elector F was only asked whether they had heard of an actual immunity offer before the previous week, and they truthfully and accurately testified that they had not. (Elector F further confirms these facts in their Declaration, attached hereto as Exhibit 9). Elector F's interview, therefore, provides no support for the allegations in the District Attorney's Motion.

> 4. *Elector Declarations confirming defense counsel's disclosure and discussion of the District Attorney's "non-offers" of potential immunity in 2022.*

Although the transcripts of the interviews themselves unequivocally prove the falsity of the District Attorney's allegation that "some of the electors represented by Ms. Debrow told members of the investigation team that no potential offer of immunity was ever brought to them in 2022," each of the electors who were asked such questions about immunity by Mr. Wade are disturbed by the District Attorney's Motion mischaracterizing their interviews and attacking their current and former counsel with false accusations. They have, in an abundance of caution, confirmed in written declarations the obvious and known truth – that they were fully briefed in writing and verbally by then co-counsel during the joint representation in August 2022 about the DA election team's non-specified, *potential offer to offer* immunity and that they were never personally offered any actual immunity from the District Attorney until April 2023. *(See* Exhibits 7, 8, and 9) (unredacted versions submitted *in camera*).

19

In sum, as the documents previously submitted to this Court during the first disqualification dispute and this Court's November 30, 2022 Order definitively establish, then co-counsel repeatedly and thoroughly covered all aspects of the DA election team's potential offer of immunity to unspecified electors with each of their jointly represented clients in 2022.[7]  The DA election team knew these facts at least as of November 30, 2022.  No elector stated otherwise to the DA election team in their recent interviews, as the transcripts of those interviews confirm, and the electors to whom the DA election team posed any questions about prior alleged "offers" of immunity in their interviews have submitted declarations re-affirming these facts.

On behalf of the DA's election team, Mr. Wade repeatedly attempted to create, through intentionally misleading and confusing questions, a false narrative on the immunity issue in these interviews.  Worse, Mr. Wade aggressively resisted attempts to clarify the record on that issue in one interview, resorting to egregious intimidation and threats directed to both defense counsel and Elector E.  Despite knowing this, the District Attorney still filed their motion accusing defense counsel of having made misrepresentations upon the Court when the evidence proves it is they who are simply not telling this Court the truth.  Their allegations about the immunity issue are plainly false, and their own interview recordings prove that fact.  The District Attorney has falsely but publicly maligned the integrity of two well-respected and fellow members of the Bar based on fictional claims known to be untrue when made.  Such reckless and unprofessional conduct is simply untenable and unacceptable.

---

[7] While those documents and this Court's November 30, 2022 order are more than sufficient on their own to establish these facts, defense counsel has submitted to the Court *in camera* its August 1, 2022 Email to each of the then-jointly represented clients as even further, additional confirmation of additional discussions on the potential immunity issue at that time.  *See* Exhibit 2.

## II.   The District Attorney's Conclusory Allegations That Certain Represented Electors Are Supposedly Incriminating Other Represented Electors Is False.

In their motion, the District Attorney makes only the barest conclusory allegation that during the recent interviews, "some of the electors stated that another elector represented by Ms. Debrow committed acts that are violations of Georgia law and that they were not party to these additional acts." *See* District Attorney Motion at 4. This statement is categorically false, and provably so.[8] First, defense counsel, who previously served as an Assistant District Attorney in Clayton, Dekalb, and Fulton Counties before reentering private practice, was present for every interview and would have alerted to any statements made by her clients even remotely resembling the alleged statements claimed by the District Attorney to have been made. Nothing even similar to any such statements were made by any of the interviewed electors:  none of the interviewed electors said anything in any of their interviews that was incriminating to themselves or anyone else, and certainly not to any other elector represented by defense counsel.[9]

---

[8] Because this allegation is false, the authority cited by the District Attorney in their motion is inapposite. *See* District Attorney Motion at 5-8 (citing *Heidt v. State*, 292 Ga. 343 (2013) and *Edwards v. State*, 336 Ga. App. 595 (2016)). Additionally, the inapplicability of these specific cases to this pre-indictment context was previously addressed at length in defense counsel's opposition to the District Attorney's first motion to disqualify counsel. *See* Response in Opposition to State's Motion to Disqualify Counsel at 7; 11, n. 6; 31 n. 17; 35 and 35 n. 18, as was the Georgia appellate court's post-*Heidt* rejection of the "serious potential for conflict" ground advocated by the District Attorney as a basis for disqualification. *Id.* at p. 11, n. 6. Defense counsel incorporates as fully set forth herein the legal and factual points and analysis in that first opposition, including its discussion of informed consent.

[9] As noted, none of the interviewed electors made statements that *anyone* else had "committed acts that are violations of Georgia law." And because the District Attorney has not provided even the slightest factual basis for their assertions otherwise, it is impossible to determine whether the supposed statements to which they are referring even supposedly apply to any of the eight electors currently represented by defense counsel. It is entirely possible – but impossible to discern from the District Attorney's motion – that whatever statements the District Attorney is (wrongly) asserting are incriminating pertain to electors that defense counsel does not even represent, which would eliminate the entire premise of the District Attorney's motion.

Indeed, several of the electors pointed out in their interviews that they had done nothing wrong,[10] that they had acted on advice of counsel[11] and in conformity with prior legal precedent (the dual slate of electoral ballots executed and sent to Congress in the contested 1960 Hawaii presidential election)[12], and that they had only contingently or provisionally executed their electoral ballot as a precaution to preserve the remedies in the pending judicial contest to the presidential election and to protect the ability of Georgia to have electoral votes in the event that the then-pending judicial challenge in Georgia was successful.[13]

This Court need not take defense counsel's word for the fact that none of the electors incriminated themselves or each other – these interviews were recorded, six of the seven interviews have been transcribed and submitted to the Court, and the District Attorney can (and should) provide any statements it believes to be incriminating to defense counsel and to the Court so that the Court can verify for itself whether such statements or supposed incrimination is anywhere to be found in the actual interviews.

In reality, the transcripts collectively show that no elector nominees incriminated another elector. First, as noted, the recordings and the transcripts on their face are devoid of any such

---

[10] *See, e.g.,* April 12, 2023 Transcript of Interview of Elector D, p. 24, lines 5-16 and p. 26, lines 8-16; April 12, 2023 Transcript of Interview of Elector G, p. 16, lines 22-23; April 14, 2023 Transcript of Elector E, p. 35, lines 8-12 and p. 61, lines 5-10; April 14, 2023 Transcript of Interview of Elector F, p. 34, lines 24-25.

[11] *See, e.g.,* April 12, 2023 Transcript of Elector D, p. 11, lines 18-23; p. 14, lines 11-25; p. 33, lines 12-17; p. 36, lines 11-14; p. 61, lines 22-23; p. 62, lines 7-12; *see also* Transcript of Elector C, p. 33, lines 5-8.

[12] *See, e.g.,* April 14, 2023 Transcript of Interview of Elector G, p. 16, lines 23-25; April 12, 2023 Transcript of Elector D, p. 10, lines 4-11; p. 34, lines 24-25; p. 35, lines 1-13; p. 36, lines 5-14; p. 57, lines 14-25; April 14, 2023 Transcript of Elector E, p. 26, lines 5-17; April 12, 2023 Transcript of Elector C, p. 33, lines 10-15; April 14, 2023 Transcript of Elector F, p. 26, lines 2-7 and p. 29, lines 17-20; April 12, 2023 Transcript of Interview of Elector B, p. 31, line 25 and p. 32, lines 1-2.

[13] *See, e.g.,* April 12, 2023 Transcript of Elector D, p. 10, lines 1-11; p.22, lines 22-25; p. 23, lines 1, 3-10; April 14, 2023 Transcript of Elector E, p. 14, lines 11-18; p. 15, lines 4-12; April 14, 2023 Transcript of Elector F, p. 31, lines 6-11; p. 39, lines 7-12; p. 60, line 25; p. 61, lines 1-6; April 12, 2023 Transcript of Elector C, p. 37, lines 21-25; p. 38, lines 1, 22-25; p. 39, lines 1-3; April 14, 2023 Transcript of Elector G, p. 13, lines 7-25; p. 14, lines 1-6; p. 15, lines 2-4 and 16-25; p. 16, lines 1, 3-4, and 17-25; April 12, 2023 Transcript of Elector B, p. 29, lines 23-25; p. 30, lines 1-15.

statements.  Second, the District Attorney has provided *no* information – either in their publicly filed motion or in their private conversations with the Court and defense counsel about the motion – identifying any of the alleged specifics of this supposed incrimination or any other information that would permit either the Court or defense counsel to identify to whom or what they are referring:  they have refused to identify which elector(s) supposedly made such statements, which statements they believe contain this supposed incrimination, which other elector was allegedly incriminated, what the alleged "criminal activity" they are alluding to supposedly is, and so on.

The simplest explanation for the District Attorney's refusal to provide this information either publicly or privately to defense counsel and this Court is that they cannot – because it does not exist.  All of the electors remain united in their collective innocence and defenses, and none testified or believe that they or any other elector committed any wrongdoing, much less "criminal acts."  And, even if Georgia law permitted such blanket, conclusory assertions as a basis for disqualification, neither defense counsel nor this Court can or should simply take the DA election team's word on this explosive but unsupported claim.

Georgia law, in fact, requires much more than such conclusory and speculative statements for the District Attorney to have standing to file and to adequately support a motion to disqualify counsel.  "For an attorney to have standing to raise the issue of an opposing lawyer having a conflict of interest in simultaneously representing multiple plaintiffs or defendants, *there must be a violation of the rules which is sufficiently severe to call in question the fair and efficient administration of justice*" and the party seeking disqualification "*must provide substantiation.*" *Bernocchi v. Forcucci*, 279 Ga. 460, 463 (2005), (citations omitted) (emphasis added); *see also Life Care Centers of America v. Smith*, 298 Ga. App. 739, 745(3) (2019) (absence of evidence of wrongdoing by counsel, *"[b]eyond conclusory allegations,"* does not justify disqualification)

(emphasis added); *Lewis v. State*, 312 Ga. App. 275, 289–90 (2011) (overruling disqualification as an abuse of discretion when "the case for disqualification consist[ed] of one conjecture piled upon another"); *see also Schaff v. State,* 304 Ga. App. 639, 642(1) (2010) (speculation cannot support disqualification); *Clough v. Richelo,* 274 Ga. App. 129, 135-136(1)(b) (2005) (mere speculation is no basis for disqualification).

In their motion, however, the District Attorney has provided only conclusory, speculative, and unsupported allegations that electors are incriminating another represented elector. Not only are these allegations affirmatively disproved by the interviews themselves, but they are facially insufficient for the District Attorney to even file their motion, much less to justify disqualification, as a matter of law.

The DA election team's behavior in conducting the interviews at issue further indicates that they do not actually believe that any of the electors incriminated another represented elector. Specifically, as noted, this Court had expressly told the District Attorney's office in its December 6, 2023 email that if any perceived problems arose from defense counsel's continued joint representation, the DA election team should reach out to the Court, and the Court would address the matter. If the DA election team had truly believed during one or more of the recent elector interviews that one of defense counsel's clients was incriminating another one of her clients, the natural (and arguably only appropriate) response would have been to stop the interview, alert defense counsel to the conflict that it perceived had then arisen, and then seek the Court's guidance on how to resolve the matter, as the Court had explicitly instructed and invited the DA election team to do.

The DA election team took none of those steps. They completed all of the scheduled interviews over the course of several days, they did not raise any supposed incrimination or conflict

concerns with defense counsel *at any time during or after* those interviews, and they did not reach out to the Court (as they had when they first raised the disqualification issue on July 27, 2022, and as they had done on innumerable occasions throughout this investigation) for assistance in resolving this perceived issue. Instead, the DA election team completed all the interviews and then blindsided defense counsel and this Court with a public filing filled with unparticularized and provably false assertions. This behavior is not that of attorneys behaving professionally and ethically who harbor a genuine concern that opposing counsel is laboring under an actual conflict.

In short, there is no merit to the District Attorney's claim that any elector incriminated another in their recent interview, and the recordings and transcripts prove it. In the absence of such supposed incrimination, there is no basis for the District Attorney's motion and, thus, it should be denied.

### III. Even if the District Attorney's Allegations Were True, Which They Are Not, There Is Not and Cannot Be a Disqualifying Conflict When the Elector Nominees Are Immune from Prosecution.

As noted throughout this opposition brief and supported by the interview transcripts, none of defense counsel's clients have incriminated themselves or any other elector. They remain united in their collective defenses and in their lack of knowledge of any wrongdoing, much less criminal activity, by any other elector. But even if this were not the case, frankly, what prosecution could come from it? Each of the clients represented by defense counsel has accepted the District Attorney's offer of immunity from prosecution and have upheld their end of the bargain to keep said protection. Whether they incriminate each other or not at this point (which they have not), none can be prosecuted by the District Attorney.

The only involvement that defense counsel can possibly have at this point is to attend additional interviews (if the DA election team requests them) of one or more of her immunized

clients, produce requested documents on their behalf, and/or to assist one or more such immunized clients to testify before a grand jury or at a non-client's trial. There simply is no actual conflict and no real likelihood of any potential conflict. Indeed, the District Attorney has not even made (and cannot truthfully make) an argument that there is or can be one under these circumstances.[14]

Because defense counsel's clients all have immunity, the likelihood that any scenario involving a conflict either could or will arise is virtually nil. But if that unforeseeable circumstance should come to pass in the context of some future proceeding, there is no evidence to suggest that defense counsel would not or could not dutifully identify and resolve such a conflict. Regardless, the District Attorney will again have the opportunity to attempt to seek redress from the then-presiding judicial officer or court.

Given the near impossible chance of any conflict existing between any of the jointly represented, immunized clients even if they were incriminating each other (which they are not), the District Attorney's motion and attempt to disqualify counsel begs the question of what relief can they properly even ask of this Court? In their motion, the District Attorney requests that defense counsel be disqualified and "prevented from any further participation in *this matter*." *See* District Attorney Motion at 7 and 8 (emphasis added). The only current "matter" before this Court is its service as the supervising judicial body to the Special Purpose Grand Jury, which is now

---

[14] As noted, the District Attorney's motion is devoid of any actual factual information regarding these alleged incriminating statements from which defense counsel or the Court can discern the supposed basis for these allegations or which electors have supposedly been "incriminated." In their motion, however, the District Attorney has proceeded and relied upon their assumptions that defense counsel continues to represent all ten of the previously jointly represented electors when, as noted above, defense counsel only currently represents the eight immunized electors. To the extent that the elector whom the District Attorney believes has been "incriminated" is no longer represented by defense counsel (information which cannot be discerned or known from the solely conclusory statements made by the District Attorney in their motion), then none of the District Attorney's allegations are even relevant, even if they were true (which they are not). Had the DA election team bothered to extend the most basic of professional courtesies by raising this issue and the other issues addressed herein with defense counsel before they recklessly and publicly made these false allegations in their motion, this entire unnecessary debacle could easily have been avoided.

dissolved. *See, e.g.,* January 24, 2022 Order Impaneling Special Purpose Grand Jury. This case still remains unindicted and defense counsel's clients now have full immunity from prosecution by the Fulton County District Attorney. Whatever the District Attorney is doing in this case at this time, it is not pursuant to, on behalf of, or for the purpose of the dissolved Special Purpose Grand Jury. Thus, to the extent that the District Attorney is seeking to disqualify defense counsel in any context outside of and beyond the Special Purpose Grand Jury, is improper.

## CONCLUSION AND PRAYER FOR RELIEF

The District Attorney's Second Motion to Disqualify is factually and legally baseless, and it should be denied. Additionally, although it will not begin to undo the damage that the District Attorney's Motion has so recklessly caused, for the reasons set forth herein, the District Attorney should be ordered by this Court to bear the cost of defense counsel having to respond to their Motion and any other relief this Court deems reasonable.

This 5th day of May, 2023.

Respectfully submitted,

Kimberly Borroughs Debrow
Georgia Bar No. 231480
Strickland Debrow LLP
246 Bullsboro Drive, Suite A
Newnan, GA 30263
(404) 683-4402
kbdebrow@stricklanddebrow.com

27

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing *Opposition to State's Second Motion to Disqualify Counsel* with the Clerk of Court of the Fulton County Superior Court and that date-stamped copy will be hand-delivered to the Fulton County District Attorney's Office today.

Respectfully submitted this the 5th day of May, 2023.


Kimberly Bourroughs Debrow
Georgia Bar No. 231480

# Exhibit 1

**From:** Nathan Wade ████████████████████
**Sent:** Wednesday, July 27, 2022 2:03 PM
**To:** Holly Pierson ███████████ ██████████████████████ ████████████
████████ ████████
**Cc:** Willis, Fani ████████████████████████████
**Subject:** ██

Judge McBurney and Attorney Pierson:

We understand the Court is currently in the process of scheduling a hearing at the request of Ms Pierson to address issues concerning the testimony of her clients, 11 of the 16 "alternate slate of electors." Our office has recieved information prompting us to offer immunity to one or more of Ms Pierson's clients in exchange for full and truthful testimony. This issue unfortunately gives rise to potential legal conflicts with Ms Pierson's representation, and we wanted to work through the best way of executing the offer seamlessly prior to the scheduling of any hearing. Please advise

Nathan J. Wade

# Exhibit 2

[Filed *in camera*]

# Exhibit 3

[Filed *in camera*]

# Exhibit 4

**INFORMED CONSENT TO CONTINUED JOINT REPRESENTATION**

I, _____, am one of eleven Georgia Republican presidential elector nominees jointly represented by Holly A. Pierson of Pierson Law LLC and Kimberly Debrow of Strickland Debrow LLP ("my lawyers"). At the beginning of this joint representation, the risks and advantages of this joint representation were explained to me, including but not limited to potential and actual conflicts of interest, and I knowingly and voluntarily decided to accept those risks and participate in the joint representation.

Because the Fulton County District Attorney's Office has raised the issue of conflicts of interest and has signaled its intention to attempt to disqualify my attorneys from continuing to jointly represent some or all of the jointly represented clients, my attorneys have provided me with a comprehensive written memorandum outlining in detail my right to conflict-free representation, the applicable provisions of the Georgia Rules of Professional Responsibility relating to the duty of loyalty, to conflicts of interest with current and former clients, the advantages and disadvantages of joint representation, the alternatives to the joint representation, and the requirements for waiver of a potential or actual conflict and continuing in the joint representation, including my right to consult with independent counsel about these matters before deciding whether to continue with the joint representation.   In short, I have been provided the information required by the Georgia Rules of Professional Responsibility, including Rule 1.7 and Rule 1.9, necessary for me to decide whether to continue with the joint representation and, if so, to provide informed consent to do so.

Additionally, I have discussed this memorandum and the joint representation in detail with my lawyers, and they have answered all questions or concerns that I have about it to my satisfaction. I understand the information that has been provided to me, including the risks involved in joint representation. Having carefully considered all of the information provided by my attorneys in writing and verbally, including the disadvantages of joint representation and the alternatives to joint representation, and having had the opportunity to consult with independent counsel, I wish to continue in the joint representation, and I oppose and object to any effort to disqualify my attorneys from representing me or my ability to continue in this joint representation.

In doing so, I knowingly and intelligently consent to the continued joint representation, waive to the fullest extent possible under the law all potential and actual conflicts of interest that currently exist or could arise among or between the jointly represented individuals. I further knowingly and intelligently consent to and waive any objection to the fullest extent possible under the law to any potential or actual conflict of interest that could arise if my lawyers decided to or were forced to withdraw from representing me but decided to and were allowed to continue to represent other clients in the joint representation. I have agreed and do agree to waive to the fullest extent possible under the law any later claim that my lawyers' prior joint representation of me disqualifies them from continuing to represent other clients in this matter or in any other proceedings.

I further represent that I am unaware of any information that I possess that can or would create a potential or actual conflict between me and any of the other 10 Georgia Republican presidential nominee electors relating to the 2020 election. Specifically, I did not commit any unlawful act in relation to the 2020 presidential election, including but not limited to my acts as a Georgia Republican nominee presidential elector, and I have

no knowledge or evidence that any other elector, including the 10 other Georgia Republican presidential nominee electors jointly represented by my lawyers, committed any unlawful act in relation to the 2020 presidential election, including but not limited to their acts as Republican nominee presidential electors.

_____
Signature

_____
Printed Name

_____
Date

# Exhibit 5

# [Filed *in camera*]

# Exhibit 6

[Filed *in camera*]

# Exhibit 7

# IN THE FULTON COUNTY SUPERIOR COURT
## STATE OF GEORGIA

IN RE                   )     Case No.
SPECIAL PURPOSE GRAND JURY     )     2022-EX-000024

### DECLARATION OF █████████

1. My name is ████████. I am over 21 years of age and otherwise competent to make this declaration.

2. In December 2020, I served as a Republican presidential elector nominee in the State of Georgia.

3. From approximately early April 2022 through late November or early December 2022, I was represented by Kimberly Bourroughs Debrow and Holly Pierson in connection with the Fulton County District Attorney's and the Special Purpose Grand Jury's investigation into the 2020 presidential election.

4. On August 1, 2022, I received an email from my lawyers that, among other things, notified me that the District Attorney's office had raised the issue of potential immunity offers to some, but not all, of the jointly represented electors. Specifically, the email stated in relevant part:

> **Potential Immunity Offers.** Later in the week last week, Nathan Wade (the "lead" prosecutor on this part of the investigation), reached out to Judge McBurney to say that the DA Team had "received information" prompting them to offer immunity to one or more of you in exchange for "full and truthful testimony." In the DA's view, offering some but not all of you this "immunity" could create a conflict of interest for Kim and me in continuing to represent all of you.

5. The August 1, 2022 email continued, and it quoted the specific email that the District Attorney's office had sent to my lawyers and the one my lawyers sent in response to the District Attorney's office requesting additional information about these potential immunity offers.

6. The August 1, 2022 email then let me know that additional, detailed discussions about the potential immunity offers and any other conflict of interest concerns

1

would be necessary and forthcoming:

> **Next Steps.** So, where do we go from here? In addition to the conflict vetting that we performed at the beginning of this representation, we will need to speak with each of you about that matter and see whether, based upon these developments, you now perceive or foresee any conflicts with the other electors whom we represent, including whether you perceive conflicts if another elector/client is offered and/or accepts immunity when you are not. Additionally, we will need to discuss the DA Team's view on the conflict issue, as well as any potential or actual conflicts that could be raised by the DA Team and/or the Court, as well as the legitimacy or lack of legitimacy of these conflict concerns and any others that we can posit based on the current facts.

> Once we have discussed all of that, if we do identify any potential or actual conflicts, we will discuss the ramifications of those with you, pro and con. Finally, if there are any such conflicts, we will discuss with you whether they are waivable and, if so, whether you want to waive them. You also have the right under the Georgia law to consult with independent counsel about these matters.

> After we have had this conflict discussion again in light of the DA's potential offer of immunity and them raising potential conflict issues, we will decide with you either (1) there are no potential or actual conflicts, or (2) there are potential or actual conflicts that can be waived. If the latter, and you believe it is in your best interests to waive such conflicts (after consultation with independent counsel if you so choose), then we will need to document all of this information and process in writing with you to comply with Georgia law and ethics rules.

7. On August 3, 2022, I received from my lawyers a thirteen page, single-space memorandum addressing all of the matters highlighted in the August 1 email. Almost three pages of that memorandum specifically addressed in detail the District Attorney's potential offers of immunity and all the possible implications from those potential offers.

8. On August 4, 2022, at 4 p.m. while I was in ███████████ I participated in a Zoom meeting with my lawyers in which we discussed all of the information in

2

their August 3, 2022 memo, including the District Attorney's potential offers of immunity.

9. Any claim that the District Attorney has made that I was not informed about their potential offer of immunity in 2022 is untrue. My lawyers told me about it in at least two written communications, and it was discussed in those documents and in our follow up teleconference in detail.

10. The first actual offer of immunity that I received from the District Attorney's office was the offer I received in April 2023, which I accepted.

11. In my interview with the District Attorney's team on April 12, 2023 pursuant to my immunity agreement, Mr. Wade asked me questions that appeared to suggest that the District Attorney's office had previously offered me actual immunity in 2022, but I understood that this was not true. I knew there were discussions of potential immunity in 2022, but I understood that the District Attorney's office would not at that time identify any elector to whom they wished to offer immunity or provide necessary details about the scope and consequences of those potential offers to my lawyers.

12. In the April 12, 2023 interview, I truthfully testified that I was aware that there were earlier discussions about immunity with the District Attorney's office and my lawyers, but that the only actual offer of immunity that had been made to me was the one in April 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 4th day of May, 2023.



# Exhibit 8

# IN THE FULTON COUNTY SUPERIOR COURT
## STATE OF GEORGIA

IN RE                                    )      Case No.
SPECIAL PURPOSE GRAND JURY               )      2022-EX-000024

### DECLARATION OF ████████████████

1. My name is ████████████████. I am over 21 years of age and competent to make this Declaration.

2. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

3. According to my records, I received an email on August 1, 2022, from one of the attorneys representing me at that time notifying me that the District Attorney's office had indicated that there was a possibility that offers of immunity from prosecution may be made available to some, but not all, of the jointly represented electors. Specifically, the email I received stated in relevant part:

   > **"Potential Immunity Offers.** Later in the week last week, Nathan Wade (the "lead" prosecutor on this part of the investigation), reached out to Judge McBurney to say that the DA Team had "received information" prompting them to offer immunity to one or more of you in exchange for "full and truthful testimony." In the DA's view, offering some but not all of you this "immunity" could create a conflict of interest for Kim and me in continuing to represent all of you."

4. The August 1, 2022, email from my attorneys quoted the email that the District Attorney's office had sent them and the one my lawyers sent in response to the District Attorney's office requesting additional information about these potential immunity offers.

5. The August 1, 2022, email also informed me that additional detailed discussions about the potential immunity offers, and the conflict of interest concerns, would

be necessary and forthcoming; the email stated as follows:

> **"Next Steps.** So, where do we go from here? In addition to the conflict vetting that we performed at the beginning of this representation, we will need to speak with each of you about that matter and see whether, based upon these developments, you now perceive or foresee any conflicts with the other electors whom we represent, including whether you perceive conflicts if another elector/client is offered and/or accepts immunity when you are not. Additionally, we will need to discuss the DA Team's view on the conflict issue, as well as any potential or actual conflicts that could be raised by the DA Team and/or the Court, as well as the legitimacy or lack of legitimacy of these conflict concerns and any others that we can posit based on the current facts.

> "Once we have discussed all of that, if we do identify any potential or actual conflicts, we will discuss the ramifications of those with you, pro and con. Finally, if there are any such conflicts, we will discuss with you whether they are waivable and, if so, whether you want to waive them. You also have the right under the Georgia law to consult with independent counsel about these matters.

> "After we have had this conflict discussion again in light of the DA's potential offer of immunity and them raising potential conflict issues, we will decide with you either (1) there are no potential or actual conflicts, or (2) there are potential or actual conflicts that can be waived. If the latter, and you believe it is in your best interests to waive such conflicts (after consultation with independent counsel if you so choose), then we will need to document all of this information and process in writing with you to comply with Georgia law and ethics rules."

6. According to my records, on August 3, 2022, I also received from my lawyers a thirteen-page, single-spaced memorandum addressing the matters in their August 1, 2022, email. Almost three pages of that memorandum specifically addressed in detail the District Attorney's potential offers of immunity and possible implications from those potential offers.

7. Soon after receiving the August 3, 2022, memorandum (I do not recall the exact date), I had a telephone conference with my lawyers in which they reviewed the

information in their August 3, 2022, memorandum, including the District Attorney's potential offers of immunity to some of the electors and the possibility of conflicts of interest among the electors if one or more accepted an offer of immunity and agreed to provide testimony in the investigation but other electors declined an offer of immunity. I told my lawyers that I would do what they advised; they prepared and I signed an "Informed Consent to Continued Joint Representation" on August 8, 2022, waiving any conflicts of interest.

8. As my records show, and I do recall, I was informed about a potential offer of immunity in August of 2022: my lawyers told me about it in the August 1, 2022, email and the August 3, 2022, memorandum, and it was also discussed in our follow up telephone conference.

9. The August 1, 2022, email and the August 3, 2022, memorandum also told me that I could hire independent counsel to review all of the information and analysis provided and to advise me about it. I hired Attorney █████████ to perform these functions, and ██ advised me that I was well represented and that I should do what Ms. Debrow and Ms. Pierson advised me to do, which I did.

10. I received the offer of immunity from the District Attorney's office in April 2023, which I accepted, and in which I agreed to answer questions. On April 14, 2023, in the presence of my attorney Ms. Debrow and an investigator from the District Attorney's office, I was interviewed by Mr. Nathan Wade of the District Attorney's office and I provided truthful answers to all of the questions I was asked by Mr. Wade, to the very best of my ability. ████████████████

11. In my interview on April 14, 2023, some of the questions that I was asked about immunity were confusing. I have reviewed the transcript of the interview and it appears that when I thought we were discussing the date of the actual offer of immunity made to me in April 2023, Mr. Wade was actually asking about the first time I ever heard about the potential offers of immunity – and that was last August, 2022, when I received the email and memo from my attorneys and had the telephone conversation with them, as stated above. As the transcript shows, I truthfully testified that my lawyers had discussed potential immunity offers with me "in the past also" (Tr.p.46).

I declare under penalty of perjury that the foregoing is true and correct.

3

Executed this the __5th__ day of May, 2023.

# Exhibit 9

**IN THE FULTON COUNTY SUPERIOR COURT**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| IN RE | ) | Case No. |
| SPECIAL PURPOSE GRAND JURY | ) | 2022-EX-000024 |

<u>**DECLARATION OF**</u> ███████████

1. My name is ████████████   I am over 21 years of age and otherwise competent to make this declaration.

2. From approximately March through December 2020, I served as a Republican presidential elector nominee in the State of Georgia.

3. From approximately early April 2022 through late November or early December 2022, I was represented by Kimberly Bourroughs Debrow and Holly Pierson in connection with the Fulton County District Attorney's and the Special Purpose Grand Jury's investigation into the 2020 presidential election.

4. On August 1, 2022, I received an email from my lawyers that, among other things, notified me that the District Attorney's office had raised the issue of potential immunity offers to some, but not all, of the jointly represented electors. Specifically, the email stated in relevant part

> **Potential Immunity Offers.** Later in the week last week, Nathan Wade (the "lead" prosecutor on this part of the investigation), reached out to Judge McBurney to say that the DA Team had "received information" prompting them to offer immunity to one or more of you in exchange for "full and truthful testimony." In the DA's view, offering some but not all of you this "immunity" could create a conflict of interest for Kim and me in continuing to represent all of you.

5. The August 1, 2022 email continued, and it quoted the specific email that the District Attorney's office had sent to my lawyers and the one my lawyers' sent in response to the District Attorney's office requesting additional information about these potential immunity offers.

6. The August 1, 2022 email then let me know that additional, detailed discussions about the potential immunity offers and any other conflict of

2

interest concerns would be necessary and forthcoming:

> **Next Steps.** So, where do we go from here? In addition to the conflict vetting that we performed at the beginning of this representation, we will need to speak with each of you about that matter and see whether, based upon these developments, you now perceive or foresee any conflicts with the other electors whom we represent, including whether you perceive conflicts if another elector/client is offered and/or accepts immunity when you are not. Additionally, we will need to discuss the DA Team's view on the conflict issue, as well as any potential or actual conflicts that could be raised by the DA Team and/or the Court, as well as the legitimacy or lack of legitimacy of these conflict concerns and any others that we can posit based on the current facts.
>
> Once we have discussed all of that, if we do identify any potential or actual conflicts, we will discuss the ramifications of those with you, pro and con. Finally, if there are any such conflicts, we will discuss with you whether they are waivable and, if so, whether you want to waive them. You also have the right under the Georgia law to consult with independent counsel about these matters.
>
> After we have had this conflict discussion again in light of the DA's potential offer of immunity and them raising potential conflict issues, we will decide with you either (1) there are no potential or actual conflicts, or (2) there are potential or actual conflicts that can be waived. If the latter, and you believe it is in your best interests to waive such conflicts (after consultation with independent counsel if you so choose), then we will need to document all of this information and process in writing with you to comply with Georgia law and ethics rules.

7. On August 3, 2022, I received from my lawyers a thirteen page, single-space memorandum addressing all of the matters highlighted in the August 1 email. Almost three pages of that memorandum specifically addressed in detail the District Attorney's potential offers of immunity and all of the possible implications from those potential offers.

8. Between August 3 and August 5, 2022, I participated in an individual

teleconference with my lawyers in which we discussed all of the information in their August 3, 2022 memo, including the District Attorney's potential offers of immunity.

9. Any claim that the District Attorney has made that I was not informed about their potential offer of immunity in 2022 is untrue. My lawyers told me about it in at least two written communications, and it was discussed in those documents and in our follow up teleconference in detail.

10. The first actual offer of immunity that I received from the District Attorney's office was the offer I received in April 2023, which I accepted.

11. In my interview with the District Attorney's team on April 14, 2023 pursuant to my immunity agreement, I was not asked whether I knew that the District Attorney's office had raised potential immunity to some of the electors in 2022. I was only asked about actual offers of immunity, and I truthfully testified that the only actual offer of immunity that had been made to me was the one in April 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 4ᵗʰ day of May, 2023.

2

# Exhibit 10

[Filed *in camera*]

# Exhibit 11

[Filed *in camera*]

# Exhibit 12

[Filed *in camera*]

# Exhibit 13

[Filed *in camera*]

# Exhibit 14

[Filed *in camera*]

# Exhibit 15

[Filed *in camera*]