# EXHIBIT B-173

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

STATE OF GEORGIA           )        **CASE NO.:** 2022-EX-000024

                           )

        VS.                )

                           )                **ORIGINAL**

BRIAN B. KEMP              )

**FILED IN OFFICE**

SPECIAL PURPOSE GRAND JURY          AUG 1 0 2023

TRANSCRIPT OF MOTION HEARING       CHÉ ALEXANDER
                                   Clerk of Superior Court

BEFORE THE HONORABLE ROBERT C.I. MCBURNEY Fulton County, Georgia

ON AUGUST 25, 2022, ATLANTA, GEORGIA

APPEARANCES:

    FOR THE STATE:              NATHAN WADE, ESQ.
                                FM MCDONALD, ESQ.
                                ADAM NEY, ESQ.
                                WILL WOOTEN, ESQ.
                                ATTORNEYS AT LAW

    FOR THE DEFENDANT:          S. DEREK BAUER, ESQ.
                                BRIAN F. MCEVOY
                                ATTORNEYS AT LAW

_____

KAREN RIVERS, RMR, RPR, CCR-2575
OFFICIAL COURT REPORTER
FULTON COUNTY JUSTICE CENTER TOWER
185 CENTRAL AVENUE, S.W.
ATLANTA, GEORGIA  30303

1          THE COURT:  This is 2022-EX-000024, and

2     we are here having a hearing this morning

3     concerning a motion that has been filed on behalf

4     of Governor Kemp by his lawyers seeking to quash a

5     subpoena that has been issued for his appearance

6     before the special purpose grand jury that is

7     investigating alleged electorial interference in

8     Georgia's 2020 general election.  Why don't we

9     start -- because I think there may have been some

10    last minute additions to the ranks of lawyers here

11    -- by having counsel for the governor introduce

12    themselves, get themselves on the record and we'll

13    figure out who from the State, meaning the district

14    attorneys, will be confusing with the State here,

15    who from district attorney's office will be talking

16    as well?

17          MR. MCEVOY:  Good morning, your Honor.

18    Brian McEvoy on behalf of the Office of the

19    Governor.

20          MR. BAUER:  Good morning, your Honor.

21    Eric Bauer, also for the office of the governor.

22          MR. MCEVOY: We are also joined by David

23    Dove, Executive Counsel for office of the Governor.

24          THE COURT:  Welcome all three of you.

25          Mr. McEvoy, you are free to divide up the

speaking anyway you want.  All I ask is that only
one person at a time make a point.  But if Mr.
Bauer's is going to be handling  --I'm making it up
--executive privilege and Mr. Dove's going to be
talking about electoral cycles, fine.  But let's
try to keep the one person for topic, if that
works.

MR. MCEVOY: Yes, your Honor.  Just for
your Honor's understanding, Mr. Bauer will be
handling the immunity, sovereign immunity.  Mr.
Dove is just here as a client representative.  He
can answer any questions that your Honor may have,
and I will likely be handling the other components.

THE COURT:  Sounds good.  Good morning.

MR. WADE:  Good morning.  Nathan Wade
here for the State, along with Donald Wakeford here
for the State.  And with us will be Will Wooten and
Adam Ney, District Attorney for the State as well.
The arguments will be handled by Mr. Wakeford and
myself if that's okay with the Court.

THE COURT:  It is okay.  Same rules, just
try to keep one person per topic or at least have a
clear dividing line so that Ms. Rivers can more
readily follow along.

MR. WADE:  Yes, sir.

3

THE COURT:  So Mr. McEvoy, I'm going to
hand it over to you in a minute.  Just so you know
I've read the motion and the response.  I can't say
I've read all the e-mails.  I don't particularly
hear a lot about the e-mails, but it may be
germane, and so I don't mean don't talk about them,
but we don't need to get down into, well, that's
when he called me a name in an e-mail from August
14th.  I get the drift with what the e-mails were
about, those that were included and those that
weren't, etc.  But in terms of the thrust of the
arguments made by the office of the governor in
order of appearance sovereign immunity, executive
privilege, attorney/client privilege, and then
interference with the electoral cycle.  You can
handle them in any order you want.  The way I
process them was the way they were in the brief,
and the basic argument is that the governor hasn't
waived his immunity from, I guess, what we'll be
discussing how a subpoena in connection with a
criminal investigation is a lawsuit.  But that's
why you handed that one to Mr. Bauer.  Then we can
talk about executive privilege, it's existence and
application in the state of Georgia.  And then
we'll manage attorney/client whatever way you want.

4

The same with the concerns about scheduling, okay.

MR. MCEVOY:  Thank you, your Honor.  I had some introductory remarks that I don't think really are necessary.  I think Mr. Bauer could probably go into the sovereign immunity argument.

THE COURT:  Great.  And I guess what I'll do, while Mr. Bauer strides to the podium, is if we get deep enough in the sovereign immunity I may turn to the district attorney's office to get their response to that topic rather than have the governor's office cover all four, and then I'm trying to remember what was said about sovereign immunity.  So, Mr. Wakeford, Mr. Wade, just be ready.  It may be you're bouncing up four times rather than once.

MR. MCEVOY:  Your Honor, just one housekeeping item.  We do have a -- sort of a Power Point and some exhibits that we may or may not go through.  I've got a complete set for the State and a complete set for your Honor.

THE COURT:  To that end, the best way to share things would be to join the Zoom session and I think you've got that link.  And if you did, then you can share your screen.  I currently have you in the Zoom call, but maybe your law firm has a way

that's penetrating our Zoom system from a satellite
somewhere and it's going to come that way.

MR. MCEVOY: We'll figure that out.

Can I approach just to give your Honor
hard copies?

THE COURT: But please like don't plug
things into things because that may disconnect
something. So the best way is to join the Zoom and
then share screen.

MR. BAUER: Good morning, your Honor.
It's a pleasure to be here. As you know, the
governor's motion to quash the subpoena is on three
grounds: Lack of jurisdiction, that's sovereign
immunity, improper purpose, and failure to
accommodate important privileges. As Mr. McEvoy
just reported to you, I'm going to address the
jurisdiction issue, and he is going to speak to the
other issues.

As the Court knows from the papers, we
believe the century old doctrine of sovereign
immunity precludes the county district attorney
from using the superior court's impulsory process
to subject a sitting governor to an inquiry
regarding the performance of his official duty
absent some expressed waiver does not exist. I

know that the Court is deeply familiar with the

doctrine of sovereign immunity.  I know you just

issued a detailed order in which you had to emerse

yourself in it.

THE COURT: Had a recent crash course.

MR. BAUER: That's right.  In another

matter.

THE COURT: Thank you, solicitor general.

MR. BAUER:  I do not intend to bark at

the Court about things the Court already knows well

because I do think this issue may be destined for

additional review at some point one way or the

other.  I hope you will indulge a little bit of

exposition on that issue.  I do feel like to start

off, and I think Mr. McEvoy may have been intending

to do this in his opening remarks, but you

indicated in response to the motion that was filed

it's a bafflement as to why we're in the position

we're in.  Why you were getting a motion to quash

on sovereign immunity at this point in this

investigation, and --

THE COURT:  And by point I meant on the

eve of the appearance date that had been carefully

negotiated with input from the governor's office at

governor's counsel request.

7

MR. BAUER: Correct.

THE COURT:  Just so everyone understands

--

MR. BAUER:  Absolutely.  Stuff could
change and that was an issuance of a subpoena, and
Mr. McEvoy will speak to the relevant details of
those communications and what the governor's
agreement or agreement he thought he had with the
district attorney's office was on that.  But we're
equally frustrated.  When we got that subpoena we
were equally baffled because there are some serious
limits to the authority of a special purpose grand
jury.  And I think more relevant here the authority
of a local county prosecutor when you're talking
about using the court's process to compel the
sitting governor to do anything in relation to his
official duties.  And so once that subpoena was
issued, and we believe it was ultra vires, the
motion became necessary.  And I just want the Court
to know that its frustration is shared.

THE COURT:  So the subpoena flowed from
the scheduling discussions we had that yielded the
date that was suppose to work for both the governor
and his lawyer.  It was after that discussion that
the subpoena -- I was under the impression that

there had been a subpoena but people just agreed

we're going to change the date because there was

conflict X, conflict Y, conflict Z.

        MR. BAUER:  That's not what happened.

        THE COURT:  So there's only been one

evidence subpoena.

        MR. BAUER: There was a document subpoena.

        MR. MCEVOY: Your understanding is

correct, your Honor, and I can address those

logistical issues which were there in part

exacerbated by my own personal travel.  I'm happy

to talk about it now or later.

        THE COURT: No, no, no.  I  -- Mr.

Bauer's helping me understand why the motion came

when it did, and there was something that changed,

and that was a subpoena.  So was it -- I may be

asking questions.  I'm not trying to do this to you

that are Mr. McEvoy's questions, but was it the

plan that the governor was going to appear on that

date which I think was last week without a

subpoena?  In other words, he wasn't asking for one

and then -- and the District Attorney's Office can

explain its own actions-- belt and suspenders-- hey

we got this understanding, but let's send a

subpoena anyway just to memorialize.  You don't

need to answer for the DA's Office, but I guess

more bafflement.  If everyone had agreed that this

is the date that the governor is going to come in

and testify before the special purpose grand jury

as did his secretary of state as -- but the

secretary of state, other people.  If the only

thing that changed was well, let's make it

official.  Here's an invitation.  It's a subpoena,

but it's an invitation.  What -- I guess, I'm

confused if there was an understanding that he was

coming anyway, the subpoena  -- he could say I

don't need that subpoena.  But now that it's a

subpoena he doesn't want to come.  I guess I need

to understand that.

MR. BAUER:  Mr. McEvoy's going to explain

that to you in crystal clear detail, but there

wasn't firm understanding.  There had not been an

agreement on that date or the terms of appearance.

The subpoena was new.  It was not by agreement.  It

was not invited, and it was not welcomed, nor do we

think it's necessary.  But more important for legal

issue in front of you today, it's not legally

proper.  So, the governor's position is very

straight forward.  Sovereign immunity is

jurisdictional.  No court can exercise jurisdiction

over state or it's chief executive without consent

in the form of constitutional waiver or statutory

waiver that meets the criteria that the Court is

familiar with for such a statutory waiver.

THE COURT:  So, true with lawsuits.

Maybe you're getting there.  I know you're getting

there.  Let's get there.  Because to me the real

issue here is how does sovereign immunity apply if

at all in the criminal context.  I want to be very

clear.  No suggestion that the governor or his

office is connected to criminal activity.  I think

if one were to summarize the theory of the

investigation the governor was almost the target of

the targets.  And so it would be lower case

v-victim of pressure to do things that one theory

is working proper post election.  But it's in the

criminal context, and so I did look long and hard

at all the cases that were cited and they all

involve someone trying to sue governor, the state,

whatever it is, lawsuits, civil action.  And apart

from the email exchanges there's not a whole lot

civil about what's going on with the grand jury

right now.

MR. BAUER:  I'm going to address that

particular point, the specific language suit,

lawsuit action where that shows up.

        THE COURT: Okay.

        MR. BAUER: Why that's not the limitation.
I think it would be crystal clear when I'm done.
But I think given the DA's opposition what they
filed late Tuesday  -- I think I need to take a
step further back.  And while, as you know, our
motion was based on jurisdictional issues arising
from sovereign immunity, the opposition that the
District Attorney's Office filed I think has raised
another issue that we have to educate the Court
about today, which is the fundamental statutory
limits of a special purpose grand jury and it's
authority and by extension the DA.  So, their
opposition appears to be based on two things.  One,
a fundamental misunderstanding of the grand jury
and the county DA's authority.  And to a narrow
reading of the word "suit" the issue you just
raised, that's neither legally, historically,
contextually, logically historic.  And I have a few
of those in that order to educate the court.

        THE COURT: Sure.

        MR. BAUER:  I read the special
prosecutor's brief Tuesday night, and read it again
last night.  And what jumps out at me is they think

their authority is unlimited if what they're doing

is (a) a criminal investigation, and (b) their

investigation.  And there are no constitutional

separation of powers or sovereign immunity or

statutory limits on that jurisdiction and authority

if what they're doing is a criminal investigation.

THE COURT:  Well, I think that overstates

it a bit.  We've been navigating.  There are all

sorts of limitations.  There's attorney/client

privilege.  There's legislative privilege, etc. And

the district attorney's office has pushed against

that, but ultimately acknowledged that there are

certain things that even in the 5th amendment

privilege that stand in the way of unfettered

inquiry with the witnesses who do appear in front

of the grand jury.

MR. BAUER:  You only get that far.  You

only get to analyze whether they have to respect

the privileges if they had  -- or more importantly

the special purpose grand jury has the authority to

do whatever it's doing anyway.

THE COURT:  Agreed.

MR. BAUER:  And we've got to go back now

and look at what that authority is because their

position is that as long as what they're doing in a

13

criminal investigation there are no limits on that
and they could haul in the governor and they don't
have to pay attention to these other jurisdictional
constitutional issues.  It's wrong on every level.
Starting with, this is actually not a criminal
investigation.  So, slide one I put up here for
you, this is a civil investigation.  And in civil
investigations a special purpose grand jury and the
district attorney's that's aiding it have no
authority under established Georgia law to
investigate state offices.  They simply don't.  I
said civil, and I saw the Court's reaction to it,
but that is what a special purpose grand jury does.
And I think the Court has actually recognized this,
albeit indirectly, it's one of your other orders in
this matter.  They keep saying it's a criminal
investigation and it's their investigation and it's
neither.  The investigation -- and understanding
why those are both wrong is crucial to
understanding what the special purpose grand jury
is authorized to do and what it's not.  And we got
to look at that before we even get to can they use
it to haul the sitting governor into testify about
its duties.  So, we're lucky the Georgia appellate
courts have actually answered this question for us.

14

So, number (1), it's a grand jury investigation.
It's not a DA investigation.  While the DA aids it,
it's the grand jury that investigates.  I know the
Court is very familiar with that construct.  And
because it is a special purpose grand jury
investigation, it's by definition is civil and it's
not criminal no matter how they want to dress it
up.  This is because the special purpose grand jury
is a civil investigative body only.  It has no
power to indict.  And this is what I think your
Honor has noted in some of your orders in this
case.  It doesn't have any power to indict.  It has
limited power to interview witnesses, and it can
only issue a report.  There is simply nothing
criminal about its process of investigation.  And
whatever it does in that process, in that ultimate
report, they belong to the grand jury.  They don't
belong to the district attorney. So, this slide
tells you what the Georgia Court of Appeals has
said about the nature of the special purpose grand
jury, and there is a number of cases about them.
The first one was the State vs. Bartell case from
1996, in which the Court of Appeals was trying to
figure out does it matter whether this grand jury
came under the special purpose statute or the

regular grand jury statute.  And they said, no, it doesn't matter.  Because what this particular grand jury, the regular grand jury's doing was civil, not criminal in this particular case.  Either way, we don't have to add to that question, but special purpose grand jury's only do civil investigations because they can't indict.  That was reinforced Kennerly vs State in 2011.

THE COURT:  Why does the lack of power to indict -- I agree with you that the special purpose grand jury cannot bring charges, and we've had to explain that to  -- through witnesses, to all sorts of folks.  Why does that mean it's not a criminal investigation or criminal investigative body as opposed to civil?  Wouldn't one look to  -- I'll call it the charter.  So, the chief judge signed an order authorizing the creation of the special purpose grand jury and its purpose was not to investigate civil matters; it was to investigate alleged criminal interference with the 2020 general election.  So criminal, criminal, criminal, not civil, civil, civil.  What  -- why is simply the lack of the ability to -- a police officer cannot indict anyone.  But if a police officer is asking you questions that's not civil investigation, it's

a criminal investigation.

MR. BAUER: Sure. And it would trigger different constitutional concerns obviously. And you know, the court of appeals cases that have answered this, and they are the only cases in the State that have actually looked at the nature of the special purpose grand jury on this question. They haven't expanded, you know, particularly helpfully on that distinction. But I think the reason is because particularly when you're investigating state or even local government actors who have special immunities that ordinary citizens may not have, then criminal versus civil, the nature of the investigation in the grand jury does become a structural issue with respect to, you know, are you subject to jurisdiction. And if it's civil, if you're talking about government officials acting in the course of their official duties in a civil investigation, particularly when you're talking about the state, sovereign immunity is a bar. And so, I think this rule is recognizing that when you are investigating a criminal act and you have probable cause to believe there's been a crime committed, by definition that's outside the scope of an official state duty. And so, I think that's

where the court's are drawing that distinction and answers your question. But we don't have clarity from the appellate courts about your specific question, is it indictment or no. But in these cases, and I'll urge the Court to read them, they say if the grand jury can't indict, if it can't make a presentment, and all it can do is issue a report, then it's civil, it's not criminal. And they view that distinction as important. But here's why it's particularly important in this case.

THE COURT: What about on the federal level? Because I know this isn't your space, but this executive privilege is being imported from a lot of federal cases. So, federal grand jury's they can investigate civil. They can investigate criminal. If it is a criminal investigation at the federal level, but it's merely designed -- I guess it's tricky because that -- there are no special purpose grand jury's. That grand jury is a multipurpose tool. It may be used at that point only to investigate. And the U.S. Attorney's gathers enough information and says we choose not to present an indictment to that grand jury. But what do you know about what federal case law says

about sovereign immunity and a federal grand jury

if the focus is criminal activity?  Not, hey,

should we have remunerated people's whose land we

took more, but it's focused on a RICO allegations?

MR. BAUER:  I know enough to be

dangerous.

THE COURT:  For your side or the other

side.

MR. BAUER:  For everybody.  I don't want

to tell you, you know, with certainty that I'm

about to tell you an issue of law that I'm correct

on, particularly with respect to a federal criminal

investigation of a sitting executive office of the

president.  I think the Supreme Court has said you

can't do that while the president is in office.

THE COURT:  But this is not an

investigation of the governor.  It's not an

investigation of the governor.  Again, the  -- as I

understand the theory of the investigation, if the

governor were to fall into a category, it would be

victim, in his official capacity.  So, that's not

the right framework.  Because I understand that

there might be limits to say you can't  --

executive and executive.  But Department of Justice

you cannot use a grand jury against a sitting

19

executive president to investigate that individual.

But that's not this situation.

MR. BAUER:  It's not.  And I think the

federal cases that are applying sovereign immunity

through to subpoenas give you that road map.  They

are telling you that unless the State has said one

of our people can be a witness in your proceeding,

without sovereign immunity being waived you can't

do that.  But, you know, the Federal Court -- the

Supreme Court has looked  -- is interesting to see

they've cited the Paula Jones case against Clinton.

We can haul in a sitting judge if we want to, and

the Supreme Court has said that conduct has nothing

to do with the discharge of his official duties.

You can call him in for a deposition, but I think

they said that case aint going to trial until he's

out of office.  Because you cannot interfere with

the performance of his official duties.  I don't

think this is any different, and Mr. McEvoy could

talk about the ethical guidelines that go to

prosecutions and why they are separate and apart

from whether there's a Supreme Court case that says

federal grand jury's can't haul in the president to

be a witness in the investigation of some other

person's crime.  DOJ guidelines say you don't do

that during election season.  Even if you got a

really good reason to talk to somebody, if they're

in an election and you have authority to talk to

them, you still don't do it.

THE COURT: We're getting off topic.

We'll get to that.

MR. BAUER:  So, here's the problem.

You've got these cases.

You can go to slide two, please.

You've got these two cases that come out

of the Georgia Court of Appeals.  It's a Floyd

County case.  They're related to a grand jury that

Floyd County had.  There are two different grand

jury's, two different cases.  But what the court of

appeals said in these two cases -- and one you can

look at in particular is: In Re Floyd County Grand

Jury presentments for May term 1996. 245 Ga. App

705.  At the bottom of the screen.  Court of

appeals said, look, you're a county grand jury.

You do not have any statutory authority to

investigate state offices or state officers.

Particularly -- that the one I just quoted you was

a special purpose -- was not a special purpose

grand jury, but it was conducting a civil

investigation just like this special purpose grand

21

jury has to do.  And says you can't use a civil

investigation, local grand jury to write a report

that is derogatory to a state officer.  That is

beyond the scope of your authority.  You can't do

it.

THE COURT:  You keep calling it a local

grand jury.  What is the local part other than to

make it sound like we're out in the sticks.

MR. BAUER:  Well, I think because there's

a distinction and a hierarchy of sovereignty of the

state.  And state and subordinate political bodies,

and a county grand jury, which is authorized by a

county superior court judge, who by all means whose

authority we respect greatly --

THE COURT:  But that wasn't my point.  But

there's no other grand jury in Georgia. There's

federal.

MR. BAUER: That's right.

THE COURT:  And there's a state grand

jury.  It doesn't have statewide authority

necessarily, but I just want to make sure I wasn't

missing something that the attorney general

believes -- well, I actually could convene a

special, special grand jury that has statewide --

MR. BAUER: It's a grand jury that is

required to be convened by a county superior court
judge who's elected by a local county electorate,
not statewide, in overseeing generally  -- unless
there's an attorney general involved -- by a local
county prosecutor.  And so I think what this case
is saying is look, these two cases.  You can't --
the State has not suborned its sovereignty to these
local bodies in this way.  If you're going to
investigate the State in this state that authority
rests with the attorney general, the governor,
ironically, and the general assembly.  And each of
them have been given that authority by statute or
constitution or both.  So, you can look at them.
O.C.G.A. 45-15-17 is the statutory authority that
says attorney general you can investigate state
offices.  And then 19 is general assembly, you can
do it, too.  What you won't find and what these
cases say you can't do is have a county grand jury
doing a civil investigation of state officers or
state offices.  So, I point this out just because,
you know, reading their position, which is as long
as we think it's criminal we can do what we want
and we're not bound by any limitations.  Then we
have to go back and look at this and say, well,
wait a minute, is this a criminal investigation.

23

And the courts say special grand jury can't do that. And do they have the authority to go beyond their local jurisdiction and haul in state officers. And all of these statutes and these court of appeals cases say you can't do that. You cannot usurp the authority of the AG and the general assembly or the governor for yourself as a state prosecutor.

THE COURT: Because in Floyd County they were investigating DFACS, which is a state agency, and it was an investigation into the operations of the state agency, etc. which that grand jury thought, hey, we're able to inspect our clerk's office. And I don't know what gave them the wild hair to go after DFACS. Again, not this situation.

MR. BAUER: So  -- but what they were doing -- they could still subpoena records from DFACS. It's interesting that the grand jury's authority does allow them. Specifically, it trust you to get documents from state departments. But what it can't do, and what this court says was quashed in that case was, you can't subpoena DFACS employees. We weren't even talking about head of DFACS. We're talking about low level people.

THE COURT: Right. Investigation into

the operation of DFACS as opposed to an
investigation into maybe there was a hacking attack
on DFACS.  And so they're just trying to figure
out, hey, you were a victim of hacking.  Tell me
what you saw on your computer screen when the
ransom ware appeared.  That's different.

    MR. BAUER:  Okay.

    THE COURT:  But who knows.

    MR. BAUER:  I'm sure the grand jury could
have articulated a narrower way to phrase what they
were trying to investigate that made it less direct
on DFACS.  But either way, the Court of Appeals
says if you want to take it to state officials,
that's the AG's purview, that's the general
assembly's purview.  That's not something you can
do here.  But that's just the statutory limits that
the courts have put on grand jury authority.  And
there's no recognition of it at all or the fact
that the special purpose grand jury is civil by
definition.  Can't be anything else in --

    THE COURT:  And you say that because of
Bartell?

    MR. BAUER:  Bartell and Kennerly, yes.

    THE COURT:  Yes.  Kennerly just said you
can't indict, but you'd marry the two because it

1    can't indict it must be civil.

2          MR. BAUER:  I think that's a clear

3    implication of those cases.  We don't even need to

4    go there.  We need to make our record.  They

5    attacked or demonstrated that they do have

6    statutory authority to do it.  We don't even have

7    to wade through that thicket to dispose of this

8    subpoena because sovereign immunity is not

9    structural.  It's not based on suit or lawsuit or

10   action or claim or any of those, you know, words

11   that you can interchange and are interchanged in

12   law.  It is jurisdictional.

13          So, could you go to slide three, please.

14          . I know the Court's aware of the

15   common-law jurisdictional doctrine.  It actually

16   predates the charter of the state of Georgia in our

17   first constitution.  But it was constitutionalize

18   in 1974.  So we don't have to worry about is it

19   common-law or is it constitutional.  It is

20   constitutional.  And it is jurisdictional.  The

21   McConnell case from 2017.   And Conway case makes

22   it very clear that it's not structural, it is

23   jurisdictional as do half a dozen other cases in

24   the state that have reviewed it.

25          Now, the special prosecutor argues that

sovereign immunity is tethered to the nature of the

legal process at issue as if it matters what forum

of legal process is being asserted against the

State.   And I'm going to show you that's not the

case.   The entire argument appears rooted in the

issue that you've raised, which is they believe the

word "suit" appearing in certain provisions in the

Georgia constitution that provide for express

waivers of the jurisdictional immunity means that

sovereign immunity only applies in the context of

an actual complaint filed naming the State or its

officers as a nominal defendant.   But when you look

at how that word "suit" or "lawsuit"or "action,"

those words are actually used in the Georgia

constitution with respect to the application of the

jurisdictional bar, it's clear that there is no

such limitation.   Because the provisions in the

constitution that say we, the State, are immune

from jurisdiction, they don't have that language

there.   I'm going to show you why and where that

is.   And there's no other defined mechanism or

process at all that limits that jurisdiction.   So,

you know, even if you accept his argument that suit

or lawsuit means a complaint or petition or some

defined cause of action, which according to Black's

27

Law Dictionary  -- by the way that's not what those
words mean.  It doesn't.  So, let's look at the
constitution.  So, this is Georgia Constitution
Article 1 Section 2 paragraph 9.  This is the
primary provision in the constitution that provides
for sovereign immunity.  And up until the amendment
a few years ago that constitution was the sole
location in the constitution where you would find
any waiver.  So, the key provisions in here that
actually provide for the -- they incorporate the
common-law sovereign immunity are subsections (e)
and to a lesser extent (f).  So, let's look
primarily (e) here.  (E) is the actual expression
of immunity in the state of Georgia.  This is the
source language.  "Except as specifically provided
this paragraph, sovereign immunity, no limitation,
no suit, no action, no law suit. It extends to the
state and all of its departments and agencies, the
sovereign immunity of the State and its departments
and agencies can only be waived by act of the
general assembly, which specifically provides
sovereign immunity is thereby waived to the extent
of such waiver."  That is not limited to any
specific cause of action.  As you know, you very
articulately laid out the history of the Supreme

28

Court's look at these provisions over the last 10 years, last week.  They are issuing opinions that expand the scope of that and clarify, making sure that people who are concerned that they don't know what it applies to know it applies to everything.  But if you look at this source language it is not limited.  It doesn't say sovereign immunity the State enjoys it only for suits, lawsuits, actions, claims.  That's just simply not what it says.  So where does that language come from.  You can find it in the exemptions, express waivers, and only there.

THE COURT:  And they're all for civil actions.

MR. BAUER:  And they are specifically identified.  So, the only place those limiting descriptors show up is when they are in the constitution explaining the limits of those express waivers.  So, you got the constitution saying we are immune unless we tell you otherwise.

THE COURT:  But immune from what?

MR. BAUER:  Jurisdiction.  You can't bring me into court for any reason.  It is jurisdictional bar.  The State is above the reach.

THE COURT:  Where is there a case ever

that says that includes criminal proceedings?

          MR. BAUER:  It doesn't have to unless
there is an expressed waiver for it.  Now --

          THE COURT:  But then there'd be a case
that says, oh, you actually can't haul this person
into court for criminal proceedings because of
sovereign immunity.  One of these local prosecutors
with a local judge would have tried it, and if
sovereign immunity prevented a state actor from
being hauled into court in connection with a
criminal investigation you know there'd be a case
about that.  Your brief says nothing about that.
So, I guess, that's what I -- we don't need to
quibble about what "suit" means.  Pick your words:
Suit, action, complaint, etc. The dividing line as
I understood it, civil and criminal.  And there
were no cases in your brief.  You have mentioned no
cases yet is what I would have led with.  Oh, look
at this case from the Georgia Supreme Court.
Georgia Court of Appeals, wherever that says, hey,
sovereign immunity also applies to criminal
actions.  Because, of course, the State is an actor
in a criminal action.  So, this notion of importing
sovereign immunity gets kind of sticky because it's
State vs. State.  And I appreciate you've used the

                                                    30

word "local" in front of everything.  If there were
an indictment from the grand jury that processes
the special grand jury report, that indictment
wouldn't say local Fulton County.  It would say
state of Georgia vs. -- there's is two people.
Some of them might be state actors.  And I don't
believe those state actors could say, oh, sovereign
immunity, you can't indict me.  But I could be
entirely wrong.  I'm just waiting to see that case
that says if you're in the criminal realm sovereign
immunity doesn't apply.  Isn't that the argument of
the District Attorney's Office?

          MR. BAUER:  Okay.  So, that appears to be
their argument.

          THE COURT:  So pretend it's my argument
now. Say why that doesn't work.

          MR. BAUER:  Just because you label it
criminal doesn't make it a criminal proceeding.

          THE COURT:  And that's your argument
that, look, this special purpose grand jury is
actually a civil thing.  And if you're right,
civil, I agree, sovereign immunity.  I don't see
any waiver anywhere.  But indulge me for a moment.
You know what, it's a criminal investigation.  The
only discussion is criminal statutes.  The only

concern is was there criminal interference with a
2020 general election in Georgia.  So, it's a
criminal investigation.  No jurisdiction.

          MR. BAUER:  It's an investigation into
whether a crime was committed, but it's not a
criminal investigation because it cannot result in
any criminal indictment or presentment being made.
That was the choice of the District Attorney when
they opened this investigation.  They chose to go
to the route of a special purpose grand jury that
can just write a report.  That's all they can do.
And that doesn't convert this into a criminal
inquiry.  And I don't think it's settled by any
stretch that even if this were a criminal grand
jury proceeding that the DA could summon the
governor to it as a witness only to talk about the
performance of his official duties while he sits in
office.

          THE COURT:  I don't know if it's settled,
but you haven't shown me anything that says that
couldn't.  I guess I'm curious if it were a GBI
investigation.  So, they can't indict anything
either and they're trying to interact with folks,
and they try to get legal process to do something.
Sovereign immunity?  No, you can't do it because we

                                                      32

haven't waived it.  It's not -- I think what you're

bumping up against is the fact that even though it

doesn't say civil in Article 1 Section 2 Paragraph

9, sovereign immunity applies to civil action suits

against the State.  But if it's criminal it is the

State.  The State is the actor.

MR. BAUER:  Justice Blackwell gave us the

history lesson a few years ago.

THE COURT:  And Peterson.  We got a lot

of history lesson.

MR. BAUER: We got a lot of lengthy

decision, but they're not really complicated.  And

what they're saying is, and the reason we had this

constitutional amendment a few years ago is that

Lakeford vs. [Hugh] Case came out and basically

said, sorry guys, you got nobody to sue.

THE COURT: Sue to bring a civil lawsuit

against?

MR. BAUER: In that particular case, yes.

But what they said was the sovereign immunity is a

jurisdictional bar that is virtually absolute,

broad sweep is the language they used, and dates

back to the sovereignty of the King.  It's not

about the nature of the process or the nature of

the tribunal.  It's about whether the State like

the King of Old has consented to jurisdiction.
Now, the King of Old couldn't be compelled into any
court he didn't want to go to.  We're a little more
sophisticated than that.  You're the King, state of
Georgia, which include its chief executive, the
governor.  But we're going to carve a little bit
out of that, and we're going to say unless the
State has put it in the constitution or the general
assembly has done it, and the governor ironically
signs it, you're above the law as far as process
and tribunal's concerned for your official duties.
And this is really the keep point here.  They are
not trying to summon the governor to talk to him
about things that were outside the scope of his
official duties.  They want to talk to him about
what he was doing in office performing his duties.
He is the King for purposes of sovereign immunity
jurisdictional bar unless the constitution or the
general assembly has said otherwise, and they
haven't.  Now, I'm --you know -- you're not going
to agree with me.  I don't think that the special
purpose grand jury isn't criminal, it's civil.  And
I think that answers the question.  But the
governor is not above the law.  He's never
contended he's above the law.

34

THE COURT:  He's just the King.

MR. BAUER:  Subject to -- he's the State,
right.  He is not the King; he's the State.  But
that immunity of the State which his office has to
enjoy and protect, not just for the performance of
his duties but for the next governors, and the next
governors.  Yes, the State enjoys in the Supreme
Court's words absolute immunity, unless it is
consented otherwise, through these processes.
General assembly or constitution, it doesn't exist.
And I don't think we or the governor have the
luxury of pretending that immunity doesn't exist,
and it is a jurisdictional bar because it's
politically convenient for him to do so.  Mr.
McEvoy is going to talk to you about all the
efforts that the governor has made to try to engage
with this investigation, but once that subpoena
issue he was put in a position where he had to
either enforce the law of the state of Georgia,
which includes making sure that there is no
inadvertent waiver or derogation of this important
immunity the State enjoys and he is duty bound to
protect.

THE COURT:  Is there a particular reason
we're having this discussion now and not when -- I

think this is how it played.  I may be mistaken.
The secretary of state fall under this definition.
Received a subpoena.  Attorney General, the chief
law officer of the state received a subpoena.  Why
is it the King rather than his chief counsel or the
secretary of state?

MR. BAUER:  It's a fair question.  Mr.
McEvoy and I would have very much liked to have
been --

THE COURT: Engaged in --

MR. BAUER:  Counsel to those gentlemen
before they made their decision, but they do enjoy
the same sovereign immunity.

THE COURT:  It could be the same
argument.  And they could chose to enforce it or
say I'll honor the subpoena and let this grand jury
hear what I have to say.

MR. BAUER:  The Court is sophisticated
enough to know that both of those state officers,
they have had independent reasons.  One primary one
being the timing of the outreach.

THE COURT:  Months ago.

MR. BAUER:  For  -- and scope.  We don't
know what kind of discussions their legal team had
with the District Attorney before they agreed to

36

come talk.  We don't know if they were reassured

that their executive privileges, their

attorney/client privileges, the scope of the

questions would be limited and appropriate.  We

just don't know.  That's questions that I think

they would have to answer.  But sovereign immunity

is not there's to waive.  And while the attorney

general is one of the law enforcement officers who

has a duty to uphold the law in the state of

Georgia, the governor is the chief executive.  And

the constitution is very clear that he doesn't have

the luxury of ignoring something as important to

the State's continuing operations as this

jurisdictional principle merely because he was

going to be put in this awkward and uncomfortable

situation where he's, you know, being disparaged on

a daily basis for the way this process has

unfolded.  He did not choose to have the subpoena

implicate this important jurisdictional doctrine,

but it did. As soon as it was issued he was left

without a choice if he was going to fulfill his

constitutional duty to make sure that that immunity

is upheld and protected.   The Court --

THE COURT:  So, I want to follow.  I

follow most of that.  He was left without a choice.

37

Are you saying he, the governor, didn't have the

same liberty that the secretary of state or the

attorney general and could have elected -- it would

have set a precedent that governor in his wisdom

would have made, but could have said, all right,

you know what, I'm going to showup anyway.  I don't

necessarily think this is something that has

jurisdiction over me.  It's a piece of paper that I

could choose to ignore, or as you said, he had no

choice but to.  And I assume that was to defend --

MR. BAUER:  And it's rhetorically because

honestly these proceedings are suppose to be

secret, the grand jury investigation.  Yet, somehow

this stuff plays out on the front page of the paper

seemingly multiple times a week.  I don't actually

know whether the attorney general and secretary of

state were subpoenaed or whether they were

appearing voluntarily.

THE COURT: Me neither.

MR. BAUER:  Mr. McEvoy is going to tell

you at length what efforts the governor made to

engage voluntarily with the District Attorney's

Office.  So, the change, the duty to make sure that

he is not complicit in an unauthorized

investigation exceeded its authority came when that

subpoena issued.  So, you know, we kind of talked

jokingly about the State being the King, and I'm

not trying to suggest that the governor views

himself in that way.  I have to clarify because

we've got lots of people watching.

THE COURT:  Understood.  Me neither.  You

were simply going historical, and the term is

sovereign immunity.  There is no sovereign in

America, but there is a head of the government and

head of the executive branch, and our duly elected

governor.  And that would be where sovereignty

starts.

MR. BAUER:  That's right.  And the

principal derives from the King.  And so you have

to understand that context to properly apply the

principal here.  But the governor doesn't think

that he is beyond any reach of law; he is just

beyond the reach of this particular subpoena

because there are other mechanisms.  If the State

needs or wants to investigate the official

activities of the governor, that legal authority

does exist.  It just doesn't exist with this

special purpose grand jury.  It exists with the

attorney general, with the general assembly on

multiple levels.  And constitutionally, there are

proceedings.  We've seen them at the national level
where the legislatures can hold the chief executive
accountable for violations of law or other
misconduct related to the official performance of
his duties.  They get to do --

THE COURT:  Sure.  With a slightly
different setting again.  Again, my understanding
is not that the purpose of the subpoena was to hold
anyone accountable, but to gather information,
investigate.  It's a body that can't hold anyone
accountable.

MR. BAUER:  That's right.  So, I'm going
to wrap up, I think, with that point.  You know,
the governor wasn't looking for an unnecessary
fight with an important branch of his
administration.  But he does need to defend the
important constitutional and statutory limits of
the grand jury's authority to protect the next
sitting governor from what I'm not suggesting its
misuse here.  Some might.  But the next governor
needs to know that his office is protected from,
perhaps, an over zealous administrator of a special
purpose grand jury.  So, we're here asking the
Court to follow the clear law, what we think is the
clear law of the state and hold the special purpose

grand jury to that law, to its statutory limits and
to its jurisdictional limits.  We think the
subpoena is ultra vires.  It's due to be quashed
for lack of jurisdiction. And I will leave the
Court with this.  You know, it's kind of where I
started.  If there's any doubt in the Court's mind
about where these lines are drawn, we're going to
need appellate clarity on this.  And proper avenue
here is to defer to the protection of the
constitutional principles and the State's
sovereignty defer to the jurisdictional bar until
the appellate courts tell us that's not the right
way to do this to answer the questions that you've
asked.  So, we would urge the Court if you have
questions or concerns about the reach of sovereign
immunity here, that you give us the quash order and
let the State take it up if they want, and we'll
get the clarity from the appropriate appellate
court.

    THE COURT:  All right.

    MR. BAUER: Thank you.

    THE COURT:  Mr. Wakeford.

    MR. WAKEFORD:  What opposing counsel just
said, if your Honor has questions just quash the
subpoena.  But your Honor asked several questions

41

and I didn't hear from opposing counsel answers to
those questions.  So, this proceeding, which is
clearly criminal, why is it civil?  This proceeding
which is not a lawsuit, but instead a subpoena, why
does sovereign immunity apply to that?  There has
still not been a direct answer to those questions.
And finally, where is the authority for this
position?  Where is the case that states that the
governor can have his subpoenaed quashed on these
circumstances?  Well, there were not answers to
those questions.  So, I'm at your Honor's disposal.
If you have questions for me, but our position is
that this is a criminal proceeding.  Sovereign
immunity applies to immunity from suit.

THE COURT:  What makes it a criminal
proceeding?  I guess what I'd like you to focus on
is, it's not quite exactly where Mr. Bauer started,
but page two.  Bartell  -- I understand what
Kennerly says.  Different sides have invoked
Kennerly. I've invoked Kennerly.  Just to let
everyone know this grand jury is issuing a report,
not an indictment.  That's the extent of their end
game authority.  To me it's less clear they've
extended their authority to summons people before
them.  What makes this special purpose grand jury a

42

criminal proceeding as opposed to a special grand
jury.  That special grand jury that was
investigating something plainly civil.

MR. WAKEFORD:  I think DFACS -- if you
were investigating the administration of DFACS, if
it declared itself a civil investigation  -- first
of all, the Kennerly case is --when it says the
language that opposing counsel relies upon.  It is
interpreting Bartell.  It says, Bartell says
special purpose grand jury's are only civil.
That's not what Bartell says.  That grand jury was
civil and declared itself as such.

THE COURT:  Do you know what the special
purpose grand jury in Bartell was tasked to do?

MR. WAKEFORD:  The grand jury in Bartell
actually wasn't clear which statute that grand jury
was impaneled under.  And the Court in Bartell
ultimately says, you know, it doesn't matter
because it says it's a civil grand jury.  It could
have been under the regular grand jury statute.

THE COURT:  Does that have to do with the
oaths that were administered?

MR. WAKEFORD: Yes.

THE COURT:  And gosh, which provision
should they have used.

43

MR. WAKEFORD:  Right.

THE COURT: Not to dive deeper into
Bartell, but what would distinguish Bartell for me
is if its charter was to determine if there had
been a violation of the city code in a non-criminal
way with the way something has developed.  It had
nothing to do with alleged criminal activity.

MR. WAKEFORD: And the part of the
decision in Bartell is they say we don't know which
statute this grand jury was chartered under, so
there is no charter.  But what the oath is Bartell
said is, do you swear to tell the truth in this
civil investigation into the Department of Family
and Child Services.  It's clear.  So, the Court of
Appeals says, it doesn't matter.  It could be under
either because 15-12-100, the special purpose grand
jury statute says that you can be impaneled for
either.  You can impanel one to investigate
anything that a normal grand jury can investigate.
A normal grand jury can investigate civil or
criminal proceedings.  So, then we look -- I mean,
the language of the statute says that a special
purpose grand jury can be convened to investigate
any violation of the laws of this state.  The
impaneling order which was issued by the chief

44

judge of this circuit said that any violation of
the laws of this state can be investigated within
the subject matter that is relevant for this
special purpose grand jury.  And in the request
from the District Attorney for a special purpose
grand jury it was said over and over that there
could be possible criminal disruptions to the laws
of this state, and that is what it is
investigating.  Over and over again this has been
emphasized.

Finally, you have the authority of a
special purpose grand jury who is investigating
criminal matters to make recommendations in its
report that certain criminal charges be pursued.
So to say that because of a line in Kennerly that
misinterprets the holding in Bartell that this is
somehow civil, and there is no amount of other
authority or specific information in this case can
say otherwise is -- well, it's just not true.

THE COURT:  Well, let's say for a moment
that it's fair to characterize the special purpose
grand jury here as one that's engaged solely in
criminal investigation.  Why does sovereign
immunity then not apply to the subpoena to the
governor?

45

MR. WAKEFORD:  Well, sovereign immunity
-- if I could look to the constitution.  This was
cited by opposing counsel.  Article 1 Section 2
Paragraph 9.  "It may waive the State sovereign
immunity from suit by enacting a state tort claims
act."  I mean, we are talking about items and
matters that have absolutely nothing to do with the
criminal investigation.

Additionally, this is not a suit.  This
is if they had meant any legal proceeding
conceivable they could have said so.  But this is
talking about tort claims.  This is talking about
proceedings against the State where the State is a
party.  This is a subpoena to the governor as an
individual about his activities as a witness to the
actions of other people.

THE COURT:  Well, yes.  But to Mr.
Bauer's point it wasn't a witness where he happens
to be driving from home to work and there was an
accident or he saw people in a fight.  It would
have -- the only reason he is connected to this is
because of his official capacity.  And as I
understand the theory of the investigation
intreaties that he exercise his authority in
certain ways to benefit folks who thought that the

electoral outcome wasn't what it seem to be.  So,
yes, witness.  And I've seen nothing that suggests
the governor's anything but a witness, as in we're
interested in learning from you -- subject, not
target -- to get into that messy nomenclature that
raises pulse rates.  But it is still in connection
with his official duties, which is why I think we
then need to explore the concept of sovereign
immunity.  Because I don't think  -- I think Mr.
Bauer acknowledged this.  If the governor had been
driving home from work and had been going 90 in a
35 zone and hit someone and there was a lawsuit
over that accident I -- that would be victim of
accident versus the name of the governor.  Not
governor in his official capacity.  And I don't
think sovereign immunity would help him a lot
there, but it certainly  -- if this were a civil
investigation this is the governor in his official
capacity responding how ever he did to people from
the outside of Georgia and inside of Georgia saying
why not take this course of conduct.  Why not do
this.  We ought to do that.  So, it's -- to call as
an individual unless I am --you're much closer to
where this special purpose grand jury has gone, but
on the surface the lay person understands it to be

the governor as governor and not as I happen to
live in Georgia and these things happened.

MR. WAKEFORD: That analysis of whether
acts or official acts or acts in official capacity
is always undertaking when there is a lawsuit. So,
to put that analysis ahead of the determination of
whether this is a lawsuit or not puts the cart
before the horse. It inverts the analysis, and
it's just not relevant because this is not a
lawsuit. This is a subpoena to ask the governor to
be a witness in a criminal investigation. So, it
just doesn't apply. And if it did, I'm not sure if
the implications of their position have been fully
thought out and explored. Because police officers
are arms of the state, and they're subpoenaed to
appear in court proceedings all the time. I have
yet to hear that a police officer or state trooper
who is an employee of state government cannot be
subpoenaed to come in and provide testimony in
criminal matters.

THE COURT: GBI agent.

MR. WAKEFORD: If this position is
validated, the power of this court is entirely
destroyed with regard to a whole host of actors.
And it simply doesn't flow from logic or the way

48

the law is suppose to fit together.  This grand
jury has asked the governor to come forward in the
same way that his legal advisor, under the laws of
this state, the attorney general was asked to come
forward.  And as your Honor pointed out this is the
first we are hearing of this argument.  And yet,
the legal advisor to the governor has come forward.
At no point was there a motion before this court
from the attorney general saying sovereign immunity
applies to me.

          THE COURT:  But that doesn't make the
argument a stronger or weaker argument.  The timing
is peculiar, but we have explored that, and Mr.
Bauer, I think, helpfully reminded me there are a
bunch of different reasons why different state
actors would make different choices upon receiving
an invitation from the special purpose grand jury.
We're confronted with this motion at this point and
time and the merits of the sovereign immunity
argument I don't think hinge on when in the course
of the investigation or even more so when in the
course of the interactions in trying to get some
communication between your investigation and the
governor's office.  It's come up and we need to
engage, all of us, both sides and myself, the

merits of the argument and not so much the timing.

MR. WAKEFORD: Aside from that, your Honor, the application of the Floyd County cases which specifically speak to the regular grand jury statutes authorizing specifically civil investigations in the State offices simply do not apply under these circumstances for reasons that should be obvious. This is not a regular grand jury authorized to investigate a civil matter. It's a special purpose grand jury specifically authorized to investigate criminal matters. So, I believe our position is clear and was clear in the briefing and has been clear here today. This -- simply there is no application of sovereign immunity in these circumstances, and this is not a lawsuit. Sovereign immunity would be -- the application here would be in contravention of decades or centuries of practice in this state. They've presented no authority to indicate to this court that this court shouldn't grant quashal on this case. And unless your Honor has additional questions, I believe our position on this matter is clear.

THE COURT: I have one last, and I'm importing from the federal side. But this notion

that summoning in an active executive, sitting
president, sitting governor, sitting mayor.  The
executive of whatever level of government you're
looking at.  That's the issue.  So, yes, maybe
there's immunity, but there's also just the policy
practicality of we don't do that because we need to
let that individual perform his or her important
function and when the sunsets on that
administration then let's have that conversation
with a person who occupied that office.

MR. WAKEFORD:  Well, there is no
authority again for that position in the state of
Georgia.  There is no gubernatorial immunity from
process.  Whether he is the King of the state or
anything else, there is no basis in the law for a
position like that.  The governor is not the
equivalent of the president.  Additionally, I
believe that they're sort of a -- they're sort of
two considerations.  They sort of say that he is
the sitting governor and therefore, he can't be
pulled in.  But there is no basis for that.  And
there's also a citation to cases under federal law
that invoked the touhy doctrine, which is
specifically promulgated in federal courts to say
that federal bureaucrats cannot be forced to

testify over the -- without the authorization of
their superiors.  That is a wholly [indiscernible]
of federal law.  Has absolutely no advocation of
the Georgia law and doesn't impact --shouldn't
impact this court's analysis at all.

THE COURT:  I think the word is agents
and not bureaucrats.  But, yes.

MR. WAKEFORD: Pardon me.

THE COURT:  That is what Touhy does.
That's definitely what Touhy does.  Okay.  I
appreciate that.

Mr. Bauer, was there anything you heard
that you just can't let go by or can we transition
to the next topic?

MR. BAUER:  I get paid by the hour, your
Honor.  I have two points.

THE COURT:  Okay.  Not by the word, by
the hour?

MR. BAUER:  Right. So, I'll try to be
brief.

It is not our burden to show there is a
waiver of sovereign immunity, right.  Constitution
says we have it.  It's jurisdictional.  The only
way the governor in his official duty can be hauled
into court for any reason if there's something and

maybe you've seized on something that I haven't
found that says, if it's criminal and he is a
witness, he could do it.  You have the authority to
do it.  But under the construct of our constitution
we don't have to give you that authority that says
you don't have the authority.  They've got to show
you the authority for the waiver, and they haven't
done that.  They've said we haven't done it, but
that's flipping the burden on its head.  The
default is the State is immune from process absent
a waiver.  They've got to show you the waiver.
This --

THE COURT:  That is, indeed, what the law
says if sovereign immunity applies to that
situation.  So, what I heard the State, meaning the
District Attorney's Office argument to be is we
don't need to point you to a waiver because
sovereign immunity applies to suits, actions, etc.
And you've responded. I get that.  But I think the
two sides are talking passed each other a little
bit and definitely passed me because you don't have
the burden to show that immunity applies.  They
need to show there's a waiver.  Someone has the
opportunity to show me a case that says, oh, by the
way, that applies in a criminal context.

1          MR. BAUER: Sure.

2          THE COURT:  I just have never seen that

3     case.

4          MR. BAUER:  Well, this is a civil

5     proceeding so we haven't looked for that case for

6     you, but we will.  But the only limitations to

7     lawsuits, claims, actions is when the general

8     assembly -- and in that language that he pointed

9     you to I think answers the question.  I pointed you

10    to subsection (a) of Article 1 Section 2 paragraph

11    9.  It says "the general assembly may waive the

12    State sovereign immunity from suit by enacting a

13    state claims act."  That doesn't say the State only

14    has sovereign immunity for suits.  It says, we're

15    immune.  That's what subsection (e) says unless the

16    general assembly does something to reduce that.

17    And what (a) says is we're giving you general

18    assembly direction that one of the things you are

19    authorized to limit our jurisdictional bar on is a

20    state for claims act.  So, general assembly, you

21    don't have to worry about this sovereign immunity

22    being a proper tort claims against the State

23    because we are telling you in the constitution you

24    can do that.  You can say immune from suit by

25    enacting a state claims act.  It doesn't say these

54

are the only things that we're waiving immunity

from or we need a waiver of immunity from.

The only other point I want to make is --

I think you sort of highlighted the slippery slope

of authorizing grand jury's to subpoena a sitting

governor during his term, during election -- I'll

let Mr. McEvoy talk about that  -- to discuss the

conduct of his duties in office.  You've

distinguished the cases I cited for you by saying

those -- maybe they're investigating DFACS and that

is the scope of their authority.  But what if the

grand jury is investigating the mayor's office, not

beyond the historical realm of possibility in this

city.  And what if the mayor who in past times

might have been in regular communication with the

governor as one would expect with two important

chief executives in the same state.  Does that give

every grand jury that's investigating a city --

potential city crime the ability  -- during that

governor's term -- to say you're going to come in

here and be a witness in our investigation to talk

about your performance of your duties in office.  I

think sovereign immunity says you can't do that.

You have to find another way, State, to prove your

case without infringing on the chief executive's

immunities and privileges and separation of power's

protections unless we've said specifically you can

do it.  Now --

THE COURT:  Of course, the separation of

powers is executive, legislative and judicial.

MR. BAUER:  Correct.

THE COURT:  That's the third one.

Prosecution, governor, they're all in the same

branch so we're not separating a whole lot when

you're pitting a criminal investigation against

your theory that sovereign immunity actually

includes criminal investigations.

MR. BAUER:  No, the reason is the

separation of powers constitutional concerns.  I

know that Justice Blackwell would have agreed with

this.  Because this is not the DA issuing a

subpoena to the governor.

THE COURT: It's the grand jury.

MR. BAUER: It's the grand jury in this

court.  And that raises a problem that Justice

Blackwell has written about that I don't even know

if the courts of this state could enjoin the

governor in a claim in which sovereign immunity

theoretically doesn't apply.  So that's what I

think the problem is here.  We appreciate the

Court's time and attention to it.

       THE COURT:  You're welcome.

       What's next, Mr. McEvoy?

       MR. MCEVOY:  Your Honor, before we turn
our attention to executive privilege, if I could
just respond to one issue regarding criminality of
special purpose grand jury.

       THE COURT:  Okay.

       MR. MCEVOY:  I think an important
distinction that you've raised, and if you look at
rule 6 of the federal rules of criminal procedure
and what federal criminal grand jury's are
authorized to do, that's return indictments.  And
in our view that's the distinction between a
criminal procedure and civil procedure.  Even in
the federal context you impanel a grand jury.  You
want to look at some civil FDA issue, that grand
jury still has the power to return an indictment
even if it starts off as a civil inquiry.  I liken
it to law enforcement.  Did somebody have arrest
powers.  If they have arrest powers, it's criminal
in nature.  If you don't have arrest powers, it's
civil in nature.  And I think that applies here.
And if you look at Chief Judge Brasher's order you
know the only thing that they're empowered to do is

make recommendations.  In this country making a
recommendation about a criminal matter does not
empower to become a criminal matter.

THE COURT:  Does the GBI ultimately make
a recommendation to the attorney general's office
about whether to seek an indictment of a statewide
gang matter that they've been doing?

MR. MCEVOY:  So, that's a little bit
different, right.  I mean, there is dual
jurisdiction.  You know, now the FBI has dual
jurisdiction.  The FBI can investigate something
criminally but make a civil recommendation.  And we
see that false claims act context all the time.
It's frightening for somebody like me, but it --
but you can't have it the other way around.  You
can't a civil investigator have arrest powers or
indictment powers just as a special purpose grand
jury has no power to bring charges against anybody.

THE COURT:  Okay.  But my question was
the fact that the GBI can't indict but they could
recommend to the attorney general that he pursue an
indictment following their investigation doesn't
make their investigation non-criminal.

MR. MCEVOY:  But, your Honor, that's not
the province of a law enforcement officer.  The

province of a grand jury is to return a true bill

or not return a true bill. That is the entire --

as you well know, that's the forum of the grand

jury. Forum of a police officer or detective,

they're not empowered to bring indictments. They

are --

THE COURT: Understood. But the fact that

they cannot bring an indictment doesn't make their

investigation non-criminal. That's all I'm getting

at. And this grand jury -- this special purpose

grand jury much like a GBI agent investigating

something, they don't have the power to indict, but

they have the power to gather information and

ultimately make recommendation to the District

Attorney. Hey, based on what we've got here, we

think you should indict, and I think -- I'm

analogizing here. I want you to distinguish it.

The way that a homicide detective might say, you

know what, we think you should bring this case or

FBI agents would bring to an assistant U.S.

attorney. We think you should bring this case.

That's not a civil investigation until it's

indicted.

MR. MCEVOY: Your Honor, that's not   --

the role of grand jury, historically, is to either

59

bring criminal charges or not.  This is a unique
body.  They're not authorized to bring criminal
charges.  I understand that it's related to some
potential criminal case that may or may not be made
down the road, but they don't have the power to
bring criminal charges, and we're just trying to
make distinction between criminal and civil.  If
you have the ability to bring criminal charges it's
a criminal matter.  If you don't, it's not.

THE COURT:  Okay.

MR. MCEVOY:  Your Honor, I was going to
address the executive privilege issue.  You know,
some of the other issues that we're going to
discuss are kind of interwoven between one another,
and I just wanted to provide a little bit of
context, you know, historically as to why we're
here and how we're here.  And, you know, one thing
Mr. Wakeford said is that Governor Kemp was asked
in the same way to be here as secretary of state
and attorney general.  I think that's not really
true, and we sort of walked through that.  But it's
important to note by way of background that your
Honor has it, Governor Kemp is just a witness in a
matter.  Governor Kemp is someone that's ardently
defended the rule of law. He took appropriate steps

to protect the integrity of Georgia's election
process.  He certified the presidential election
November 20, 2020, just as the constitution and
state law provide.  He's now been identified as a
witness in this investigation.  And the most
important point, your Honor, he has been willing to
engage in this investigation since April of 2021,
despite the fact that we have the belief as Mr.
Bauer explained that the Court and district
attorney's office and special purpose grand jury
lacked the jurisdiction to bring him in.  We've
been engaging voluntarily.  Now we're in the middle
of an election cycle for really the most closely
followed gubernatorial race in the country.  There
may be one or two others that are close, but this
is certainly up there.  This is happening,
coincidentally or otherwise, as this high profile
and politically charged investigation of Governor
Kemp's role in it are reaching a crescendo.  The
intersection of law and politics in this way we
believe shouldn't be happening on the eve of an
election.  And despite our willingness to engage
we're just asking that the rule of law be closely
followed in this matter.  And we're going to talk a
little bit about, you know, the political impact

that this is all having later, but just to observe

while we're talking about the special purpose grand

jury that it's impaneled until May of 2023.  And

the District Attorney's Office has publicly stated

repeatedly that it is in no rush to complete this

investigation.  It's likely to last through the end

of this year.

THE COURT:  So that I can put what you

want to share in context, because the politics of

this aren't my domain.  You're sharing this because

it goes to the oppressive nature of the subpoena if

I find that it is not to be quashed because of

sovereign immunity, no jurisdiction or executive

privilege.  I will have to hear that argument

because I want to make sure there's a point.  You

have aired very publicly through your pleadings,

and the District Attorney has provided her

prospective in pleadings about some of the back and

forth and tit for tat and the politics.  That's not

my space.  So I don't want to open this proceeding

up to here's how we think the race is going for the

governor, and we think it has this political spin

or that.  I don't think this is the right forum for

that, and you may not have been going there.  I

want to make sure there's a good purpose for you to

explore what you want to explore since the slide in

front of everyone says "political impact of the

subpoena."

MR. MCEVOY:   I'm sorry.   I will get to

that, your Honor.   And we're asking for a quashal

and modification.   Quashal and/or modification on

several basis.   One is executive privilege.   The

other is attorney/client privilege, and the other

is the improper purpose of the subpoena, which is

sort of what this overview is meant to sort of tee

up.   And later in the presentation we'll be showing

your Honor as your Honor has seen what the relevant

policy statements are around conducting an

investigation like this during an election cycle.

So our position, your Honor, may disagree.   Our

position is within your Honor's province to take

some action if your Honor sees fit.   Listen, I

don't want to repeat everything we've said in our

brief, and I do want to be very respectful of the

Court's time, but given the importance of this

matter to Governor Kemp, I do want to be thorough.

THE COURT:   We'll strike the right

balance.

MR. MCEVOY: I'm working on it.   The one

thing that is a little bit unusual, and there are a

63

lot of things that have been unusual in how this
has been handled.  Just in my experience, it's our
effort to engage for whatever reason, you know,
this interview that was suppose to happen by
September of 2021, didn't happen.  It didn't happen
in the beginning of 2022.  It matriculates into the
spring pass the primary.  At that point we asked
that it be pushed and the district attorney's
response was that it's unable to agree to push the
date of a future voluntary interview pass the date
of the general election.  That's curious to us.
I'm not sure why that is, and I'm sure that the
district attorney will talk about that.  But in
that time frame it only serves to increase the risk
of an unfavorable political impact which we'll get
to.  And so, you know, I just say that as to kind
of tee up the discussion around executive privilege
which is one of the things that we have been trying
to discuss with the district attorney's office as
this court hasn't encouraged with other witnesses
since April of '21.

         So, I want to talk about the application
executive privilege generally, and then also
specifically to this case.  And the latter is a
little bit more complicated because we learned

about what they wanted to talk about for the first
time on Tuesday evening.  But I want to address the
application of it generally, and I think, your
Honor, in our papers we made it pretty clear that
courts in other states have applied executive
privilege to governor's.

THE COURT: And so just as a starting
point you acknowledge that there is no codified
either in statute or case law executive privilege
in Georgia.  You're seeking to import that concept
to this situation?

MR. MCEVOY: That's right.  In the State's
response  -- I mean, this was a little bit unusual
for me that the State said more notably having the
remaining 49 states rush to bestow such privilege
the executive -- upon their respective governor's.
By way of example, see State,  ex. Rel v Dunn,
which is an Ohio case.  And then they have this
quote.  And so, we looked at that case and low and
behold they cited a dissenting opinion.  So, the
only case that they cited that says executive
privilege does not apply to a governor.  Actually,
says it applies to that governor.

THE COURT:  In Ohio?

MR. MCEVOY:  In Ohio.  And that case says

65

the governor has an executive communication

privilege that applies to communications to or from

the governor when communications were made for the

purpose of fostering informed and sound

gubernatorial deliberations, policy making and

decision making.  The State then goes onto say  --

the DA's Office then goes onto say, special

prosecutor goes onto say, movant cites only two

cases to support the claim that several states have

found the existence of this executive communication

privilege.  I thought that the pleading being 121

pages was probably long enough, but you know, for

your Honor and the district attorney's review we've

got 10 other cases that I was going to make

reference to.  And rather than, you know, repeating

the cites out, if I could approach and provide

these to your Honor, and I've also included a copy

of the attached decision.

THE COURT:  Before you go further with

executive privilege, I may have misunderstood in

your original brief.  Are you arguing that

executive privilege precludes all testimony or it

like attorney/client privilege, legislative

privilege would cabin the governor's testimony

should he testify in certain ways.  Because if it's

66

the latter, I don't -- you do need to articulate why you think there is such a thing in Georgia. But beyond that, I think we would need to work through after we conclude today that threshold question of is the subpoena quashed or not.  If it's not, then I think the governor falls into the same broad category as many other witnesses who have come before the special purpose grand jury where you and your colleagues, the district attorney's representatives and I would sit down and say, here's a safe area, an allowable area or not. I don't think we'll do that here and now.

MR. MCEVOY:  Well, that is a great suggestion and one we have been trying to facilitate for 18 months.  I'm happy to go through a couple of analogous cases that have similar findings, and the cites are all in front of your Honor.  In the state of Washington in the Freedom Foundation case, the Court held that the executive communication privilege applies to communications, authored, solicited or received by the governor or aids for purposes of fostering informed and sound gubernatorial deliberations, policy making and decision making.  In New Jersey in the Nero case the governor has privilege to protect

67

confidentiality communications pertaining to the
executive function.   In California in the  --

            THE COURT:   I see they're all listed
here.

            MR. MCEVOY:   They all apply to the
governor, your Honor.   So, you know, just -- I
understand your Honor's point, this is not a case
directly on point in Georgia saying the executive
privilege applies to the governor in the same way
that it applies to the president.   But the attorney
general's position is that it does.   It's
consistent with 10 other states who have found the
same thing.   And there is not a single case that
we've been able to find or that's been identified
by the District Attorney that says it does not.   In
other words, no other state has come out and said
the executive privilege does not apply to the
governor.   I don't know what else really to say
about the potential theoretical general application
of the executive privilege to the governor.   I
think it's pretty clear.   But to your Honor's point
I'm happy to kind of move onto the specifics.

            THE COURT:   Okay.

            MR. MCEVOY:   And Judge, this does require
a little bit of context, if you will indulge.

You know, one of the things that since we first engaged with the district attorney's office in April of 2021, when we were dealing with the initial prosecutor Sonya Allen.  We spoke with her in April of '21, and they indicated they may want to speak with the governor.  We asked if we could come in and discuss areas of inquiry.  They didn't respond to that.  I wrote an e-mail to the District Attorney on June 16th, made the same request.  I said it may facilitate the process if we could have a conversation about the areas of inquiry.  That never happened.  And as your Honor is well aware, I think there are five or six other requests where we have asked to come in and sort of give a proffer of testimony so that we can facilitate these complicated evidentiary issues despite our belief that we have no obligation to do so.  And so, I thought that, you know, this issue of an attorney proffer has become kind of a controversial issue in this case.  And I think your Honor has a understanding of what an attorney proffer is, but I just wanted to go over my understanding and what we'd hoped to accomplish.  Because in my experience, both as a federal prosecutor and a defense attorney, an attorney proffer is one of the

69

most commonly used tools in any significant

investigation.  The purpose is to afford --

THE COURT:  So it is frequently used, but

it takes two.  And if the district attorney's

office isn't interested in doing that, and they

think that's the way to move forward is a subpoena,

we got to where we are.  So I'm going to ask you to

focus on the subpoena, why it applies, why it

doesn't.  If it does apply, how you think it ought

to be.

MR. MCEVOY:  I appreciate that, your

Honor.  But your Honor did ask why we're here and

how we got here.  We did agree -- the district

attorney's office did agree in writing to allow us

to conduct an attorney proffer.

THE COURT:  And then that didn't get to

happen.

MR. MCEVOY:  And then everything changed.

On June 13th it's unilaterally revoked.  We had a

date.  They asked for dates for attorney proffer. I

gave them dates.  June 24th to June 27th. This was

anticipation of a voluntary interview July 25th.

And on June 13th we get the rug pulled out from

under us.  There will be no attorney proffer.

Actually, we've given August dates, and then on

June 13th the special prosecutor said those dates
are no good.  You're not doing an attorney proffer.
Governor's got to come in sooner.  And, you know,
if you don't give me new dates within 48 hours
we're going to issue a grand jury subpoena.  This
is the first I've ever heard of a grand jury
subpoena because we've been operating in good faith
for over a year.  And I noted the change in tone
and said there is no reason to threaten a grand
jury subpoena. I got the it's not a threat, it's a
promise.  And I think the last time I heard that
line I was riding around in a big wheel.  But we
understood the position had changed.  So, we
provided those dates within 48 hours, but the hope
was that we could still facilitate some
conversation about the subject matter that would be
discussed with the sitting governor who is agreeing
to voluntarily come in.  Okay.  It didn't happen.
And so, you know, what is interesting is what has
happened since.  You know, it's somewhat -- you
know -- even when your Honor was conducting a
hearing on June 22nd regarding some similar issues,
and you know, Ms. Pearson asked at a minimum you
asked the State and DA's Office to provide buckets
to us before the people are brought in.  Your Honor

said that's a fair request and sort of worked

through it, and that's what we have been trying to

do.  And, you know, whether one is an experienced

prosecutor or leading an investigation like this

for the first time, I'm just troubled by the fact

that we weren't treated like --and we were not

given the ability to discuss these important

evidentiary issues.  And you know call me a wordy

word, but I don't think I would be doing any client

a service, let alone the sitting governor, if I

were to walk that client into a meeting unprepared,

not knowing the first thing what's going to be

talked about.  And all we were told is well, we

want to talk to him about some conversation between

the secretary of state and the president that he

wasn't on, and what he knows about it and what he

doesn't know about it.  Well, we have now learned

for the first time in a public filing on Tuesday

night that the areas of inquiry are much more

detailed and much more significant.  And so, you

know, talk about the politics of all this and

political impact regardless of whether it's

politically motivated or not the ABA and DOJ policy

focus on political impact.  This clearly has a

political impact.  It has a political impact when a

72

public filing for the first time you list all these
areas of inquiry. And so I don't know what purpose
that serves. In other words, I'm trying to figure
out why we were not able to have that conversation
with the district attorney's office that we've been
requesting for over a year. And as your Honor is
aware the tone changed things. You know, became
for some reason adversarial. And all that we were
asking in advance of what ultimately became July
25th, voluntary interview, were just standard
prophylactic measures that any prudent attorney
would take before bringing someone into
investigation. Particularly if, as the district
attorney's office says, it's a criminal
investigation. I take those things seriously,
Judge. And so to your Honor's question, the answer
is I don't know. You know, there is a lot of
information here on this page. They're talking
about phone calls between people that we were never
involved in. They go through this detailed, you
know, litany of information that's never been
discussed with me, and therefore, I've never had
the opportunity to discuss it with my client. And
they end by saying "the District Attorney submits
that the above clearly relevant information is just

73

the start of what may be revealed through the
movant's grand jury witness testimony."  So there's
a lot there to unpack, and we would just renew our
request that we be given the opportunity to discuss
that with the district attorney's office as your
Honor has suggested in other cases.  And by the
way, I think I have probably been involved in more
than a hundred attorney proffers as a prosecutor
and defense attorney.  I have never had the
experience of a prosecutor telling me that she
wouldn't let me come in and hear what I had to say.
And as a prosecutor I've never told someone you
can't come in and proffer evidence.  Because I know
how helpful it is to the process.  And I'm also not
familiar -- I have practiced all over the country,
and I have never had any state or federal
prosecuting agency tell me that there was a policy
against an attorney proffer.  So we have been
trying to come in voluntarily, facilitate the
dialogue to discuss executive privilege,
attorney/client privilege, those types of things.
They have rejected at every turn.  And then for the
first time they do what we were asking to do, but
they do it in a public filing.  So, I'm at a little
bit of a disadvantage to talk about the specific

application of the executive privilege without
knowing as your Honor has said what the questions
might be how they're asked, what the subject matter
is.  We've got to be given that opportunity to do
that, and certainly would not allow any client to
go into the grand jury separated by counsel and
have to parse through, you know, these very
complicated privileges, whether it's
attorney/client privilege or otherwise.  So, you
know, what we have proposed repeatedly and will
propose again-- I don't know if it's within your
Honor's power to do it now, but it's very simple,
Judge.  And as Mr. Bauer said we're a little
frustrated, too.  If the district attorney's office
agrees to address these outstanding evidentiary
privilege issues an attorney proffer in advance of
a voluntary interview that takes place after
November 8th, all of these issues will be resolved.
As Mr. Bauer said, we can't waive sovereign
immunity, but we'll do what we've said from day one
and come in voluntarily, and that's all we have
been trying to do, Judge.  I think that executive
privilege pretty clearly applies if we're talking
about it generally.  Whether it applies
specifically on subject matter they want to ask him

about, the answer is, I don't know, it depends.   We

have been able to identify certain things where we

don't think it applies.   Happy to talk to him about

it.   We just haven't had that conversation.

THE COURT:   When you say come in for a

voluntary interview, and from some of the exchanges

that I've had with you and the district attorney's

office always present together, there 's the notion

of an interview as in before the grand jury because

they're the body that will be issuing this

recommendation and so they might have questions

that the prosecutor didn't think of versus a

voluntary interview solely with the district

attorney's office?   So, it's a voluntary interview

before whom?   Assuming these other attorney proffer

happens, you work through concerns about privilege,

all three of them, etc., that's a voluntary

interview in front of the grand jury?   It's a

voluntary appearance, in other words?

MR. MCEVOY:   It's exactly what we had

agreed to.   A voluntary interview with the district

attorney's office.   That's what was scheduled and

what became publicized on July 25th in advance of

that after the attorney proffer was canceled by the

district attorney's office.   In last ditch efforts

in discussing these issues in advance we sent an

e-mail on July 20th that, you know, everybody's

seen, where we asked to discuss the topics in

advance -- some questions in advance to deal with

these issues.  In response to that July 20th e-mail

the interview was canceled, grand jury subpoena was

issued.  Here we are.

THE COURT:  So the conversations that you

and Mr. Wade and others and I had about finding a

date that works not just with the governor's

schedule but yours, I thought that was for an

appearance before the grand jury and not -- I don't

need to get in the middle of  -- I ought not to be

asked to get in the middle of setting up an

interview.  I was brought in because there were

concerns about the reasonableness of the district

attorney's office's insistence on a particular date

for an appearance before the grand jury which we

can call interview.  I don't really care what label

you put on it, but it's structurally different as,

you know, appearing in front of the grand jury

versus sitting down with representatives of the

DA's Office.  So, I don't want to misunderstand

what you're describing.  Not that I get to enforce

any of this other than I'm being asked to enforce

77

or quash the subpoena.  But what you can negotiate
with the DA's Office that's your powers of
persuasion and what not.  So, that's where I'm
confused.

MR. MCEVOY:  Well, your Honor, I'm just
trying to tell you what happened.  We had an
agreement for a voluntary interview.  We had an
agreement to conduct a proffer session on either
June 24th or June 27th.  That agreement was
unilaterally terminated on June 13th.  We were told
to give dates sooner than August for voluntary
interview or a grand jury subpoena would be issued.
We did do that with the hopes of continuing to have
a dialogue of previewing some of these topics in
advance to facilitate conversation and not having
to come before your Honor, which we would have
certainly have to have done multiple, multiple,
multiple times.  And then in an effort when I made
those requests in advance of a voluntary interview
on July 25th, that offer for voluntary interview
was revoked.  We were issued a grand jury subpoena
on July 29th.  It was at a time when I was planning
to be in the middle of the Grand Canyon going down
the Colorado River.  And your Honor and the
district attorney's office was kind of enough to

push it back one week.  It was during that period
of time we were trying to assess what our options
were put into this box where we then had to invoke
sovereign immunity because we still were not given
any clarity about what would be discussed.  And it
wouldn't be proper for any lawyer to take their
client in let alone the sitting governor of the
state of Georgia under those circumstances.  And
this has all been sort of highlighted and very well
reported in the media, and that will get to the
discussion that we have later about the political
impact.  But it -- we did not want to be here.

THE COURT:  So I'm clear, voluntary
interview is different from grand jury appearance?

MR. MCEVOY:  Right.

THE COURT:  Okay.  All right.  Thanks.
I guess I will hear from the district attorney's
office.  I guess we're talking about executive
privilege.  If you feel compelled to engage on the
back and forth with the e-mails and invitations, do
so.  Very, very briefly, I'm more interested at
this juncture hearing about executive privilege if
that's something you want to respond to.

MR. WADE Very briefly, Judge.

THE COURT:  Always makes me nervous.  Not

just from you.

MR. WADE:  It just has become abundantly clear to the State that Mr. McEvoy is going to respond in·a manner that he gets across a message that's not even relevant.  The Court has insistently, consistently stated to Mr. McEvoy and our side that the Court is not interested in hearing certain aspects of even the pleadings.  Mr. McEvoy has ignored that as he has done through this process.  He has ignored our communication.  He's ignored clear communication to him because he wants to drive the way that the State is proceeding with its investigation.  Mr. McEvoy clearly is not in favor of the State electing to not move forward with an interview outside of the grand jury process or the special purpose grand jury room.  The State has elected to do that.  That is not Mr. McEvoy's call.  That rests solely with the District Attorney and the District Attorney has made that decision through the power of the special purpose grand jury.  Mr. McEvoy starts to talk about an e-mail exchange between the two sides, which the Court has clearly stated it does not have an interest in, and we would not go there.  However, Mr. McEvoy made specific reference to his e-mail, and I'd like to

address that briefly here.  In Mr. McEvoy's e-mail
he outlines requirements.  He said these are the
requirements for our client to come and sit and
speak with you.  One of the requirements is we're
to get in advance --well, in advance each and every
question that's to be asked.  Well, that's his
call.  And that's not the State's position.  The
State's position was that his client would come in
and speak in front of the special purpose grand
jury just as a host of 30 plus other witnesses have
done.  That's all.  At that juncture, Judge, during
the course of the interview, what really broke down
the conversation was within the e-mail.  Mr. McEvoy
says that the only way that that interview would
take place, the only way that a voluntary interview
would take place is if we didn't record it.  Well,
our intent was to record it so that the special
purpose grand jury could see and hear for
themselves what the testimony was.  Accurately.
Well, that's an issue.  We can't record it to show
the special purpose grand jury accurately what is
reflected during the course of the questioning,
then it becomes too much of a control issue.  Mr.
McEvoy was attempting to control our efforts to
ascertain the information that we were seeking.

Now, I did say briefly, that's brief.  However, I

will allow Mr. Wakeford to come up and address the

other issue for the Court.

THE COURT:  Thank you for sharing that.

Mr. Wakeford?

MR. WAKEFORD:  Your Honor, each witness

who has come before the special purpose grand jury

and raised an issue of privilege, if the parties,

meaning members of the district attorney's office

and counsel for that witness cannot come to an

agreement about the application of that privilege,

it is elevated to your Honor and decided based on

the specifics of the situation at hand.  That is

still available.  And if the governor appears to

testify, that process will still be in place.

THE COURT: True.  What about the

threshold argument that executive privilege, if

applied in Georgia, would bar all testimony because

the inquiries are about what the governor did in

the exercise of his office?

MR. WAKEFORD:  I have -- I'm not sure if

I understand their argument to be that all inquiry

whatsoever into anything the governor did is barred

by a claim of executive privilege.  I believe it

would be the process of deliberation before a

decision is reached.  Anyway, any arguments about
executive privilege don't go to factual
determinations which privilege doesn't touch.
Whether something happened, whether something was
said is not reached by privilege.  And so the total
quashal, the absolute quashal of a subpoena which
they're seeking is just not appropriate.  This is
again something we could talk about again on a
question by question basis if your Honor is
participating in the process.

THE COURT:  So if it applies you'd
analogize it to legislative privilege which
precluded some area of questioning for certain
witnesses but allow others.  And you'd work through
that either as you've described it, the lawyers
sorted it out or as group we sorted it out?

MR. WAKEFORD:  That is just a reflection
of the sovereign immunity argument.  It's just the
same.  It's the same argument where I don't know
whether it was in jest or not, but the governor is
the King.  The governor is the State and body, and
therefore, this court has no authority to tell the
governor to do anything.  That's the same thing
with the executive privilege argument, and that is
not the case.  There's no recognized gubernatorial

privilege in Georgia, first of all.  And second, it would have to be tailored to actual questions which are being asked.

THE COURT:  Okay.  Thank you.

Mr. McEvoy, you're back up.  Not much of a rest for you.

MR. MCEVOY:  No.  And I'll be brief, your Honor.  I know that your Honor does not seem to be too receptive to this argument, but I would like just to be able to brief it.

THE COURT:  I'm open minded.  Expand my horizons.

MR. MCEVOY:  I will say on executive privilege it applies to document and other materials that reflect presidential decision making, and it applies pre-deliberative and post decisional material as well.  So our view it is pretty broad.  I agree with the DA's Office.  We may be able to carve some things out that he could talk about is what we've been trying to do.  I'm happy to do it under the right circumstances.  The problem and final ground that we believe is appropriate for quashal is because of the significant political impact that this investigation has had on Governor Kemp.  The timing

of the investigation, it's political impact have
reached a point we believe where it has been
violative of existing DOJ, ABA, the National
Prosecution Standards.  And they all direct that
any political impact should be avoided.  Quote.
"Such investigative action that could impact the
outcome of an election is greatly diminished once
voting has concluded."  The ABA's criminal justice
standards provide similar guidance.  These
standards which are quote "intended as a guide to
conduct for a prosecutor actively engaged in a
criminal investigation or performing a legally
mandated investigative responsibility state when
due to the nature of the investigation or the
identity of the investigative targets any decision
will have some impact on the political process such
as an impending election. The prosecutor should
make decisions and use discretions in principle
manner and a manner designed to limit the political
impact without regard to the prosecutor's personal
political beliefs or affiliation."  And finally,
the ABA, the Criminal Justice Standards 3.6 on
prosecutorial investigation says, "whether one
agrees that this investigation -- what I just read
was from the ABA.  And so there's been discussions

about whether this investigation is politically
motivated, whether it's not.  Whether one agrees
that it is politically motivated or not, I think
there's some evidence to suggest that no one can
deny that this investigation had and continues to
have political impact which is the standard under
the relevant policies.  I've got a couple of
exhibits.  Exhibit C and Exhibit A that I would
just like to publish, your Honor.  And these are
just represented examples of what happened out in
the world hours after we believe we were forced to
file our motion to quash.

THE COURT: Okay.

MR. MCEVOY: So look, I understand you've
got political candidates trying to gain traction
with some segment of voters, but as an attorney and
not a politician it doesn't sit with me, and
doesn't sit well with policies that I've just
enumerated.  Obviously, we've discussed and
debated, had very reasonable debate about a refusal
to testify.  I don't think it's because he'll do
anything to win an election, right.  So these
things happen, as I said hours -- that's 9pm on
April 18th.  I think we filed our motion that day.
It's having a political impact.

THE COURT:  What's having that impact was the decision to file the motion.  I will do my best to refrain from descending into the political chaos that I know some folks really really want to talk about, and the pundits can do that.  But is  -- was not setting aside the sovereign immunity concern -- and I'm not minimizing those in anyway.  Setting those aside, would not the path of least resistance, least attention, least political fire from any direction to have been we agreed on a date.  You were available.  You had confirmed the governor was available.  Appear.  Come in through a secure entrance.  Leave.  It's a non-event.  I may be missing it.  But because it's in your brief and because you argued, look, this is -- these political impacts, it's not fair and per all the policies that you correctly cite, DOJ, ABA, etc. Isn't the answer how about November 15th to come in for whatever coming in means.  Right now that's not the posture we're in.  But Z happened because what had originally been negotiated didn't happen.

MR. MCEVOY:  That's right.

THE COURT:  Okay.

MR. MCEVOY:  Is that where we are, Judge, in society in our legal system where I don't

believe anyone should be punished politically or
otherwise for invocation of a legal right or
privilege.  That's what happened here.  We didn't
want to be here.  We agreed to something.  They
disagreed.  They created a controversy.  We had to
respond.  Who benefits from that controversy?  Not
Governor Kemp.  He doesn't benefit from that.  And
I don't think it's fair to punish Governor Kemp
from invoking a legal right of privilege.  That, by
the way, he doesn't have the authority to waive
sovereign immunity.  And by raising it, was he
hiding?  Judge, we're still a society that's
governed by the rule of law. The District
Attorney's Office is free to pursue any type
investigation without fear, but it also must do so
without favor and without the threat of impacting
our election integrity.  That's something Governor
Kemp has fought very hard to protect and maintain.
And the district attorney's office has said they
don't want to have a political impact.  I
appreciate that.  So the easiest thing to do is
kick this down the road 75 days.  Your Honor is
well aware of where we are, what state we're in,
what race we're facing and, you know, the governor
ought not have to suffer political consequences for

invoking a legal right.  I think the district

attorney's office would agree with that.  And so,

in our -- it's our position there's a very simple

solution for that.  I don't understand why his

appearance has always been tied to coming before

the general election, but it has.  This

investigation is going on until the end of year

anyway.  Special grand jury is impaneled until May

of '23.  I don't see any significant investigative

harm to pushing it.  It's consistent with DOJ

policies.  It's consistent with ABA policies.  And

that's all we're asking for.

          MR. WADE:  Before we respond we got kind

of lost in the argument.  Two screens ago Mr.

McEvoy posted an opinion by the attorney general

that specifically referenced a criminal

investigation to criminal statute.  Well, not 20

minutes ago the argument was this wasn't criminal.

So we got kind of lost in the argument.  Is it

criminal or is it not? Was is their position?

Because if it's not criminal then that slide two

screens ago would not be applicable.  So, we're

just trying to figure out which side does the Court

want us to argue.

          THE COURT:  I want you to argue your

side, whatever that may be.  I noticed the

situation that you noticed.  You don't have to sigh

everytime you come up.

          MR. WAKEFORD:  So, refraining from

sighing, your Honor.  The District Attorney

publicly stated earlier in 2022, that although this

special purpose grand jury was impaneled in May it

would not begin conducting business until June,

specifically, to avoid public activity, in order to

avoid interference with the political primaries

which were decided in late May.  In those contest,

perhaps, no one was more visible for obvious

reasons than the governor's own contest against an

opponent whose involvement and opinions about the

matters relevant to this special purpose grand jury

could not have been more public, more vehement or

more vitriolic if you watch the debate between the

two individuals before the governor's primary.

That was a specific delay which the District

Attorney publicly stated she would take.  She would

decide to pursue.  After communications breakdown

there is a -- well, they breakdown because of a

July 2022 e-mail in which requirements for the

governor's voluntary interview are stated by Mr.

McEvoy and the word "requirements" is very

specifically used.   Another phrase that is used in

that July 20th e-mail is a politically motivated

investigation.   It has been their position since

before the voluntary interview was   -- could not

move forward before a subpoena was issued.   This

was their stated position that, well, this is a

politically motivated investigation.   They put it

in writing to us.   What is the District Attorney

suppose to do with that when she has already tried

to move the date of any involvement pass an

entirely contentious primary that the governor was

participating in.   When the District Attorney had

engaged in negotiations to have a voluntary

interview even after the special purpose grand jury

was seated and was subpoenaing other witnesses.   As

in deference to the respect afforded the office of

the governor, communications and negotiations about

voluntary interview continued until requirements

were stated by the governor's office.   Because in

their words this was clearly a politically

motivated investigation.   At that point what more

is there to discuss?   There was an agreement to a

date after a subpoena was issued.   There was an

original subpoena date, and then there was a

conversation which your Honor participated between

the parties where counsel for the governor pointed

out I can't do that date.  For personal reasons I

can't be there on that date.  So, there was an

agreement among the parties that another date eight

days later would be appropriate.  That was agreed

to.  Another subpoena was issued and accepted.  And

on the day before that agreed to day of the 18th

they filed this motion.  All of these issues

existed.  All of these positions they have didn't

arise in the eight days  -- seven days between when

they agreed to a date and they filed their motion.

        And finally, I think this is very

important to understand where they're saying

they're being persecuted for raising this position.

Or they decided to raise it on the eve of a date

that they agreed to specifically after requesting

that it be moved.

        Additionally, the media  -- as we point

out in our brief the media had already reported,

incorrectly as it turns out, that the governor had

appeared and provided testimony, whether it was a

voluntary interview or before the special purpose

grand jury.  This was reported in the media widely

that on July 25th the governor had appeared and

provided testimony.  No one from the district

attorney's office contradicted that.  No one from the governor's office contradicted that.  The story was over.  There were no statements by anybody else.  There was not a fire storm.  There was not an eruption of controversy; it was quiet.  If the governor had appeared on August 18th, driven into a secure location and brought into the building, appeared, provided testimony, left, there would have been no story.  There would have been no controversy.  There would be no political implications.  There would be nothing to talk about because the story for media purposes was over. There was no testimony to hear about because it had already happened.  But instead they waited until the day before the governor was suppose to appear, the date they agreed to, and then they filed this motion and made public statements about how they could not cooperate at this stage.  So, to continually insist that this is a situation engineered by the district attorney's office to the intentional detriment of the governor is just not true.  The facts before the judge make that clear, and to insist otherwise  -- well, your Honor can make your own determinations about the validity of those arguments.  That is the District Attorney's

93

position as to this.  If he'd just come in we had

talked about these issues even with you that day

there would have been no story because the story

was already over.  Instead the governor's counsel

created the story by not just choosing to file the

motion, but choosing to file it in this way after

getting the date that they requested.  Thank you.

THE COURT:  You're welcome.

MR. MCEVOY:  Your Honor --

THE COURT: So, I don't want to hear

anymore back and forth about who had what

agreement, about voluntary interview or not and

dates.  I'm now familiar with the timeline.

MR. MCEVOY:  Sure.

THE COURT:  And of course, none of this

impacts sovereign immunity and jurisdiction, but it

does go into if that argument fails how do we

structure things going forward.  And I feel very

comfortable now that I understand not every aspect

of the back and forth but enough to make some

informed decisions.  So, if there are other topics

you want to cover, Mr. McEvoy, in connection with

the motion you filed that brought us here in a

public setting, I'm happy to hear other topics.

MR. MCEVOY: Well, I want to reiterate its

impact.  It's not intentional.  It's political

impact.  No one has denied there is significant

political impact and that's the concern.  And

certainly would have been impactful had we gone in

voluntarily on July 25th and given a statement

which we're not fully prepared, and it was

recorded.  And one of the things we asked for was

to enter into a nondisclosure agreement so it

wouldn't -- they wouldn't do that, right. So then

we bring in the governor to a voluntary interview

that, you know, they put in a publicly available

documents so everybody would know about it.  And if

it didn't go well and there was no 6(e) grand jury

secrecy protection, what would have happened.   I

mean, we are damned if we do, damned if we don't.

We come in, it's going to be politicized.  If we

don't come in, it's going to be politicized. We

invoke legal rights, it's politicized.  And we are

just in a difficult position which underscores the

difficult balance of conducting a high profile

political investigation in the middle of an

election.

              MR. WADE:  Judge, if I might.

              THE COURT:  You mightn't. That's okay.

Unless it's a different topic.  If it's in response

to what Mr. McEvoy said, I think that was a good

re-summation of what he already said.  Good meaning

accurate.  I think it fit what he said before.

Nothing new.  So, if you are going to address that

same thing, we've covered that turf.  But if

there's another topic that you'd like to cover, by

all means.

MR. WADE:  Another topic, Judge, but it's

dealing with the issue at hand, which is we

proposed that if we treat this just as we've

treated other witnesses, which is that the day Mr.

McEvoy comes in with his client, the morning of,

we'd share with him our buckets.  After we get

through sharing with Mr. McEvoy the buckets he can

then speak with his client.  They can get their

plan of action, and we can start the examination

process.

THE COURT:  It's a tried and trued method

that has worked for many similarly situated

individuals.  So, I think if and when we go forward

that would be the model that we'd use.

MR. WADE:  Yes.

THE COURT:  Mr. McEvoy, Mr. Bauer, Mr.

Dove, anything else that you want to get before me

since we're all together right now in connection

with the motion to quash that you filed?

MR. MCEVOY:  No, your Honor.  We didn't discuss attorney/client privilege, but I think the same frames parameters apply.

THE COURT:  Definitely.  And insofar as the governor might have a reason to raise a legislative privilege because of some whoa he had with the legislature.  Preserve, protected and would be navigated if we get to that point of, oh, he's confronted with those kinds of questions.

Okay.  The Power Point that you put up, is it in here somewhere; is it one of those tabs or is this just all the e-mails again?

MR. MCEVOY:  I've have got an extra copy for your Honor.

THE COURT:  That would be great.  Before you leave if I could get that.  I kept trying to find some of your slides because they come off the screen.

MR. MCEVOY:  May I approach?

THE COURT:  Mr. Wade, Mr. Wakeford, anything else from the District Attorney's Office at this time?

MR. WADE:  Nothing else from the State, Judge.  Thank you.

THE COURT:   So, as I see the sequencing, I need to work through the sovereign immunity issue that the lawyers for the governor have raised that Mr. Bauer articulated here in court.  If I agree with Mr. Bauer's arguments then there is no jurisdiction that this Court enjoys to enforce any subpoena and then the two sides would need to discuss other ways in which to get information from the governor if that's how things would flow.  It just wouldn't be anything I have any role in.  It could include appearing before the special purpose grand jury, but that would be because everyone agreed to do that as opposed to anyone was compelled to do that.  If I end up agreeing with the District Attorney's/State's position on sovereign immunity or lack thereof in this context, then we'll need to have discussions about how to move forward, and I will spend sometime before we would have that discussion thinking through the concerns Mr. McEvoy raised about the political impact, not motivation, but the impact of having not just a sitting governor but a governor who is in the midst of a race for his office.  Whether that should occur, his appearance before or after the election is over.  So, I'll need to make both

those decisions before we would regroup.  And if
the decision is favorable to the district
attorney's office, I will need to let everyone know
my thoughts about the timing of an appearance, and
then we could discuss procedural next steps.

Is there anything, Mr. McEvoy, that you
think I should be working through or Mr. Bauer,
that I should be working through in addition?

MR. BAUER:  I just want to make sure that
it's on your radar that if you are inclined to deny
the motion to quash on jurisdictional grounds, that
issue should go up on a  --it is an interlocutory
issue.  It is a discretionary appeal.  If you look
at Turner v Giles, which is a 1994 case.  264 Ga.
812.  That kind of immunity question the Supreme
Court has said barring some exceptional
circumstances mandating a different outcome needs
to go up on an interlocutory basis.

THE COURT:  I'm hearing you say two
different things.  It's discretionary or not
discretionary.  Discretionary whether the Supreme
Court would hear it or discretionary as to whether
I would issue the certificate of immediate review?

MR. BAUER:  Both.  And --

THE COURT:  I guess it's always at the

99

top end whether they want to hear it or not.

Regardless of their -- I don't control what they

do.   I focus on what -- so, you're saying it's

discretionary, except under Turner it's not

discretionary?

MR. BAUER:  Well, the Supreme Court says

under our appellate statute it's not an automatic

right appeal.  It's not considered a collateral

order that you get a direct appeal without a

certificate from trial court.  But what Turner says

to the trial court is --

THE COURT:  You better issue a

certificate.

MR. BAUER:  So take a look at that

decision, your Honor, because we will ask you in

that circumstance to give us one.

THE COURT:  Can you give me that cite

again, please?

MR. BAUER:  Yes, sir.  Turner v Giles.

264 Ga. 812.

THE COURT:  That's a nondiscretionary

discretion.

MR. BAUER: Couldn't have said it better.

THE COURT:  Yeah.  The Supreme Court

could say it better apparently.  I will assume

there would be appellate ramifications to whatever
decision I make, but I'll read Turner and see what
I need to do.

Anything more from the district
attorney's office?

MR. WADE: Nothing, Judge.  Thank you.

THE COURT:  Well, everyone, thank you for
your time.  Appreciate it.  We are concluded here,
and I will be in touch.

MR. MCEVOY: Thank you, your Honor

(Whereupon, the proceedings are
concluded.)

101

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF FULTON:

      I DO HEREBY CERTIFY THAT THE FOREGOING

PAGES ARE A TRUE, COMPLETE AND CORRECT TRANSCRIPT

OF THE PROCEEDINGS TAKEN DOWN BY ME IN THE CASE

AFORESAID. (AND EXHIBITS ADMITTED, IF APPLICABLE).

      THIS CERTIFICATION  IS EXPRESSLY WITHDRAWN

AND DENIED UPON THE DISASSEMBLY OR PHOTOCOPYING OF

THE FOREGOING TRANSCRIPT, OR ANY PART THEREOF,

INCLUDING EXHIBITS, UNLESS SAID DISASSEMBLY OR

PHOTOCOPYING IS DONE BY THE UNDERSIGNED OFFICIAL

COURT REPORTER AND ELECTRONIC SIGNATURE ARE

ATTACHED THERETO.

      THIS, THE 6TH DAY OF MARCH, 2023

      /s/ Karen Rivers
      ***(KAREN RIVERS), CCR-***2575
      RPR, OFFICIAL COURT REPORTER
      SUPERIOR COURT OF FULTON COUNTY