**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | CIVIL ACTION NO. |
| | ) | 1:23-cv-03721-SCJ |
| | ) | |
| v. | ) | |
| | ) | RE: NOTICE OF REMOVAL |
| | ) | OF FULTON COUNTY |
| | ) | SUPERIOR COURT |
| JEFFREY BOSSERT CLARK | ) | INDICTMENT NO. |
| | ) | 23SC188947 |

<u>**STATE OF GEORGIA'S RESPONSE TO**</u>
<u>**DEFENDANT JEFFREY BOSSERT CLARK'S NOTICE OF REMOVAL**</u>

Defendant Jeffrey Bossert Clark has asked this Court to remove his criminal case from the Superior Court of Fulton County to the Northern District of Georgia. Because the defendant faces charges arising from conduct that he was specifically told was outside the color of his office, and because he can offer no plausible federal defense, the State of Georgia respectfully requests that this Court remand the case to the Superior Court of Fulton County.

The defendant is the former Acting Assistant Attorney General for the Civil Division of the Department of Justice (DOJ). He also served as the Assistant Attorney General for the Environmental and Natural Resources Division (ENRD). In these roles, the defendant had no role in or authority over elections or criminal

investigations relating to elections; he did not participate in any such DOJ prosecutions or investigations; and he did not possess any relevant experience or expertise applicable to such investigations.

Nevertheless, on December 28, 2020, the defendant chose to compose a letter falsely claiming that the DOJ had "identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia." *See* Exhibit A. The letter was intended to be on official DOJ letterhead and to be signed by Acting Attorney General Jeffrey Rosen, Acting Deputy Attorney General Richard Donoghue, and the defendant. The intended recipients were Georgia elected officials: Governor Brian Kemp, Speaker of the House David Ralston, and Senate President *Pro Tempore* Butch Miller. The letter's central claim, that the DOJ had "identified significant concerns that may have impacted the outcome" of Georgia's elections, was entirely untrue. The defendant knew the claim was false and was told as much. Undeterred, he attempted for days to acquire the authority to send the letter with its patently false claim intact, an act which, as Donoghue told the defendant, amounted to "nothing less than the Department meddling in the outcome of a presidential election." *See* Exhibit B at 103.

The defendant now asks this Court to remove the State of Georgia's prosecution of him for these unlawful acts to federal court, a request that entirely

inverts the purpose of removal jurisdiction for federal officers. Removal is designed to protect legitimate federal authority from state and local interference, not to afford a federal forum to individuals who blatantly sought to misuse the weight of federal authority to interfere with matters of state control. Yet that is precisely what the defendant intended to do with his letter, which purported to claim that *the Department of Justice itself* was exhorting Georgia officials to convene its General Assembly in a special session to examine the "irregularities" and "violations of Georgia election law" that the DOJ had "identified," determine the proper winner of the election, and "take whatever action is necessary" to appoint a valid slate of electors. Exhibit A.[1]

---

[1] The letter also cited the DOJ's purported "belief" that a slate of electors supporting the losing candidate in Georgia's election, co-defendant and then-President Donald J. Trump, had met, "cast their ballots," and sent them to the Vice President. It went on to state that the DOJ found it "troubling" that the Trump campaign's private litigation against Georgia's Secretary of State was not proceeding as quickly as the campaign would like; recommended precisely what the General Assembly should do once a special session was called; stated that while the DOJ "believed" that the Governor should call the special session himself, the DOJ also sought to "share with you our view" that the General Assembly could just call the session itself; and argued that the General Assembly unquestionably "must have inherent authority granted by the U.S. Constitution to come into session to appoint Electors, regardless of any purported limit imposed by the state constitution or state statute requiring the Governor's approval." Exhibit A.

In short, the defendant sought to peddle a lie and place the imprimatur of the Department of Justice upon that lie. He was told by the chief officers of the DOJ that his claim *was a lie*, that *he did not have authority to make the claim at all*, and that *it was not the DOJ's role to make such a claim*, but he persisted in attempting to send the letter containing his claim anyway. Although the defendant exceeded the scope of his own authority and the authority of the entire Department of Justice, he argues to this Court that he was somehow acting under color of office and taking actions that were necessary and proper to his duties. The defendant's claims, like the one central to his letter, are baseless, and the State of Georgia respectfully requests that this Court refuse to authorize the removal of this case.

## RELEVANT FACTS

Committees of both the Senate and the House[2] have investigated the defendant's activities during the relevant time period, and each has produced a report

---

[2] *See* Select Committee to Investigate the January 6th Attack on the United States Capitol, *Final Report*, 382-403, 117th Congress, 2d Session, H.R. Rep. 117-000 (Dec. 00, 2022) [date oddity "00" in original], *available at* https://www.documentcloud.org/documents/23514956-the-full-january-6-committee-report-text; Select Committee, *Deposition of Kenneth Klukowski*, December 15, 2021, *passim*, *available at* https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000034612/pdf/GPO-J6-TRANSCRIPT-CTRL0000034612.pdf; U.S. Senate Committee on the Judiciary, *Interview of Jeffrey Rosen*, Saturday, August 7, 2021, *passim*, *available at* https://www.judiciary.senate.gov/imo/media/doc/Rosen%20Transcript.pdf; U.S.

with supporting materials summarizing these events in great detail. Briefly summarized, the relevant facts are as follows.

On December 28, 2023, Acting Attorney General Rosen and Acting Deputy Attorney General Donoghue received an email from the defendant with the subject line "Two Urgent Action Items." Exhibit C. The email (1) requested that the defendant receive a security briefing because of his unsupported concerns about the possibility uncovered by "white hat hackers" that China had hacked a Dominion voting machine through a thermostat, and (2) suggested sending the draft letter described above to Georgia leaders. The draft letter was attached.

Donoghue's reaction to the email was immediate, forceful, and unambiguous. He responded, stating in no uncertain terms that the proposed letter was outside the role of the DOJ, that there was no basis for the central claim that the DOJ had "identified significant concerns that may have impacted the outcome of the election in multiple states," and that "there is no chance that I would sign this letter or anything remotely like this." Exhibit D. Despite Donoghue's response, the defendant still asked the two to sign the letter at a meeting shortly thereafter. Both refused,

---

Senate Committee on the Judiciary, *Interview of Richard Donoghue*, August 6, 2021, *passim*, *available at* https://www.judiciary.senate.gov/imo/media/doc/Donoghue%20Transcript.pdf.

reiterating points made in Donoghue's response. The two also recommended that if the defendant had any questions about election-related investigations in Georgia, he should reach out to the United States Attorney for the Northern District of Georgia, BJay Pak, who had supervised investigations that revealed no substance to claims of fraud in Georgia's elections. During the meeting, the defendant revealed that he had already spoken with then-President Trump; Rosen and Donoghue reprimanded him for violating established DOJ policy[3] by speaking with the president directly and ordered him not to do so again. Exhibit B at 104; Exhibit F at 85.

On January 2, 2021, the defendant met again with Donoghue and Rosen. He revealed that he had remained in contact with then-President Trump, again violating DOJ protocol as well as the direct orders of his superiors, and stated that he still intended to seek authority to send the letter. The defendant indicated that he had not contacted USA Pak but instead had reached out to a Georgia bail bondsman, co-defendant Scott Hall, who had recently testified at Georgia legislative meetings; Rosen summarized Hall's prior claims as "tales that didn't add up." Exhibit F at 131. The defendant revealed that then-President Trump was considering offering him the position of Acting Attorney General but that he had not made up his mind on whether

---

[3] *See* Exhibit E, *Communications with the White House and Congress*, Office of the Attorney General, May 11, 2009.

he would accept. At that point, the defendant again asked Rosen to sign the letter, and again, Rosen refused.

On January 3, 2021, the defendant told Rosen that he had decided to accept the offer to become Acting Attorney General. He asked Rosen to stay on as his deputy. Rosen, refusing to be "fired by his subordinate," requested a meeting with then-President Trump for that same day. At the subsequent meeting, Rosen, Donoghue, and several White House officials all advocated strenuously against both elevating the defendant and sending his baseless letter, while the defendant urged that it be sent. Then-President Trump ultimately declined to name the defendant as Acting Attorney General or authorize sending the letter after Rosen and Donoghue informed him that doing so would cause the entire leadership of the DOJ to resign.

## ARGUMENT

The defendant seeks to remove his pending criminal case under 28 U.S.C. § 1455, on the basis that at the time he engaged in the conduct described in the indictment, he was a "federal officer" under 28 U.S.C. § 1442(a)(1). As this Court is well aware, federal officer removal is available to any officer, agent, or agency of the United States (1) "for any act under color of such office" so long as they can (2) "raise a colorable defense arising out of its duty to enforce federal law." *Florida v. Cohen*, 887 F.2d 1451, 1454-55 (11th Cir. 1989). The removing party bears the

burden of demonstrating that removal is proper, and if the non-removing party "appropriately challenges" the facts presented in the notice of removal, the removing party "must support [its factual averments] by competent proof." *People v. Trump*, 2023 U.S. Dist. LEXIS 124733, *15 (S.D.N.Y. 19 July 2023) (citations omitted).

The defendant cannot satisfy either element here. Count 1 of the Indictment alleges that the defendant, while associated with a criminal enterprise, unlawfully conspired and endeavored to conduct and participate in the enterprise through a pattern of racketeering activity, both directly and indirectly. That conspiracy contained a common plan and purpose to unlawfully change the outcome of Georgia's presidential election in co-defendant Trump's favor. *See* Indictment at 13-14. Count 22 charges the defendant with attempting to make a false statement or writing by composing and attempting to send a letter falsely claiming the Department of Justice had "identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia." *Id.* at 83. Neither of these alleged acts falls within the scope of a federal officer's duties, and the defendant's proffered federal defenses cannot apply. This is another case where "the long-recognized purpose of federal-officer removal is the protection of federal *authority*. There is no federal authority to protect here." *State v. Meade*, 2022

U.S. Dist. LEXIS 28535, *18 (S.D. Ohio 17 Feb. 2022) (emphasis original) (citing *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)).

## I.      The defendant was not acting under color of office.

The defendant is accused of conspiring to participate in a criminal enterprise that sought to overturn an election and attempting to make a knowingly false statement to Georgia officials. The defendant offers no explanation of how such crimes could fall within the color of office of an Assistant Attorney General. In seeking removal of his case, the defendant must first make a showing that he is a federal officer subjected to criminal prosecution "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "The phrase 'relating to' is broad and requires only a 'connection' or 'association' between the act in question and the federal office." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (internal citations omitted). As the Court is aware, this is not typically a high bar to clear. However, "[n]ot every act of or on behalf of a federal officer is an act under color of office." *Trump*, 2023 U.S. Dist. LEXIS 124733 at *20. "[T]he person seeking the benefit of [federal officer removal] should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was *confined to his acts as an officer*." *Colorado v. Symes*, 286 U.S. 510, 520 (1932) (emphasis added).

In attempting to make such a showing, the significant problem faced by this defendant is that he was explicitly told by his immediate superiors in the Department of Justice (1) that what he was attempting to do was outside the scope of his authority within the DOJ, (2) that he was actually attempting to take actions outside the authority of the *DOJ as a whole*, (3) that it was "entirely unacceptable," "inappropriate," and "irresponsible," (4) that "what he was proposing was nothing less than the Department meddling in the outcome of a presidential election," and, perhaps most crucially, (5) that he was making a central claim that was *entirely untrue and "completely at odds" with the results of actual DOJ investigations*. The defendant was told these things more than once.

Both Rosen and Donoghue have spoken directly about the defendant's role within the DOJ, his authority, and its relationship to the matters discussed in his draft letter. Rosen observed that the defendant had no role in election issues, and there was no civil case that would authorize his involvement with any election matters. Exhibit F at 99. Donoghue also said that, while the head of the Civil Division had a "vast portfolio," it had "nothing having to do with elections."[4] Exhibit B at 97, 103.

---

[4] The defendant asked his subordinate within the Civil Division, Ken Klukowski, to assist him with composing the draft letter. Klukowski later stated that the assignment "shocked" him because "election-related matters are not part of the Civil portfolio." Exhibit G at 67.

Donoghue told the defendant "he had no business sticking his nose into this; that he should remain with the portfolio he's got." *Id.* at 103. Donoghue also told the defendant that he found his actions "entirely unacceptable" and obviously beyond the scope of his official duties, asking him, "[W]ho told you to reach out to witnesses and conduct investigations?" *Id.*

Both of the former top officials also agreed that Clark's attempt to send out his letter was beyond the scope of his own authority and, in fact, the role of the entire Department of Justice. Rosen said that the letter attempted to do something that was *explicitly not the DOJ's role*: "it's not the Justice Department's responsibility. We're not election officials. We're not the global Secretary of State or something…it's just not our role." Rosen said as much *directly to the defendant*. Exhibit F at 102. In addition to the thoughts expressed in his email, Donoghue also said the letter was outside the scope of what the DOJ actually does and that it was "not at all the Department's role to be dictating to states what they should or should not be doing with regard to their presidential elections." Exhibit B at 98. Donoghue told the defendant that his proposal was "wildly inappropriate and irresponsible" and that "what he was proposing was nothing less than the Department meddling in the outcome of a presidential election." *Id.* at 103.

Finally, of course, the defendant's central claim was patently untrue. The statement that the DOJ had ongoing investigations which had "identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia" has never been true, and the defendant knew that when he wrote it. In his email response, Donoghue immediately pointed this out, noting public statements Attorney General William Barr had made only days before indicating precisely the opposite of the defendant's claim. Donoghue later characterized the claim as "factually wrong" and "completely at odds with what we had determined in the investigations that we had conducted." *Id.* at 98. The defendant still attempted for days to send the letter and now claims to this Court that it was somehow his federal duty to do so.

In addition to the contemporaneous views of the defendant's superiors, the DOJ's Justice Manual clearly describes the role of the Assistant Attorney General for the Civil Division, demonstrating that the office has no authority over elections or criminal investigations related to elections. *See* Exhibit H. The office's authority is defined by connections to specific federal regulations, none of which involve elections. *Id.* And while the defendant suggests that the DOJ's general authority includes the "authority claimed under any Act of Congress for the apprehension or punishment of criminals" (Doc. [1] at 26, quoting 28 U.S.C. § 1442(a)(1)), he can

make no showing that any such authority actually belonged to him as head of the Civil Division. JM 4-1.200 shows as much with great specificity, and Donoghue specifically chastised the defendant for straying outside his "portfolio."

The Justice Manual and the statements of the defendant's DOJ superiors demonstrate that the defendant did not enjoy some sort of wide-ranging remit that empowered him to take any activity he chose under color of federal authority. Instead, they demonstrate that his roles were very specifically defined and, broad as they were, had absolutely nothing to do with either elections or election investigations. The defendant cannot claim that he wrote the letter under federal authority because his responsibilities were specifically defined and did not include any role related to elections at all. Certainly, there can be no source of authority for the defendant to advance claims *which he knows for a fact to be untrue* in the name of the entire Department of Justice, or for him to advocate for activities which are outside the role of the entire DOJ, such as directing state officials what to do or, in the words of his superiors, blatantly "meddling" with the results of a state's elections. The defendant's actions as charged were distinctly outside his responsibilities and outside the "color of his office."

Even in decisions emphasizing the permissive application of federal officer removal, courts have always acknowledged that there are limits to a federal officer's

authority. This is particularly true where, as here, the duties of the officer are specifically delineated. In *Georgia v. Heinze*, 2022 U.S. Dist. LEXIS 194515, *14-15 (N.D. Ga. Oct. 25, 2022), this District Court distinguished between deputy U.S. Marshal activities which it found to have been made under color of office and the activities described in *State v. Meade*, 2022 U.S. Dist. LEXIS 28535 (S.D. Ohio Feb. 17, 2022). *Meade* involved a special deputy marshal who was federally authorized to pursue fugitives with active arrest warrants. When Meade pursued, shot, and killed a suspect *without* an active warrant and was subsequently prosecuted, a court determined that removal was not appropriate because he was acting outside of his specifically defined federal authority. *Id.* at *17-18. The situation presented here is a much weaker case for removal even than *Meade*. Imagine that the defendant in *Meade* had told the Director and Deputy Director of the Marshals Service that he intended to shoot the victim, and they responded that in his role he had no authority to do so, that he was seeking to shoot the victim for reasons that they all knew to be untrue, and that it was not the role of the Marshals Service to take such actions in the first place. If Meade then attempted to shoot the victim anyway and had to be actively thwarted by the Director himself, he could not seriously claim that his actions were taken under the color of his office.

The defendant makes vague claims about his broad authority as a DOJ official within the "sanctums" of the DOJ or the White House, but he does not acknowledge that his own authority was quite specific and had nothing to do with the representations made in his draft letter. He mentions the sweeping authority of the DOJ as a whole without acknowledging that his own superiors immediately told him that his letter went dangerously outside of any actual role of the DOJ, or that his attempts to go around them and warp the DOJ's role immediately threw the entire Department into a crisis. And he makes no attempt to deny that the central claim of his draft letter was completely unfounded. Arguing that these actions were somehow taken under the color of his office is demonstrably untrue and, when placed in context of the defendant's participation in a conspiracy to "meddle" in Georgia's elections, perverse.

## II.     The defendant cannot assert a colorable federal defense.

To remove a case under § 1442, the defendant also must raise a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 136 (1989). In the context of removal, "colorable" means "plausible." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996). In his Notice, the defendant states that he intends to raise no fewer than eight separate defenses. Doc. [1] at 28. Despite a 45-page Notice

of Removal, the defendant does not develop any arguments or cite authority explaining how those defenses relate to any lawful federal activities.[5]

## A. Supremacy Clause immunity

The defendant indicates first that he intends to raise the defense of Supremacy Clause immunity. Supremacy Clause immunity requires the defendant to show both that he was performing "an act which he was authorized to do by the law of the United States" and that, in performing that authorized act, "he did no more than was necessary and proper for him to do." *In re Neagle*, 135 U.S. 1, 75 (1890). "For conduct to be 'necessary and proper,' an officer must subjectively believe that his actions were appropriate to carry out his federal duties, and that belief must be objectively reasonable." *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017). In the Eleventh Circuit, a defendant's claim of Supremacy Clause immunity is negated by evidence that they acted out of "personal interest, malice, actual criminal intent, or for any other reason than to do [their] duty as [they] saw it." *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

The defendant does not supply any argument or authority for how this defense could apply to his actions in this case, so it is not clear how he intends to explain that

---

[5] *See City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1110 (9th Cir. 2022) ("For some of these, as the district court put it, Defendants have 'simply asserted a defense and the word "colorable" in the same sentence.'").

offering blatant falsehoods in an area outside his defined scope of responsibilities is "an act which he was authorized to do by the law of the United States." It is exceedingly clear, however, no matter what he claims, that he cannot show how any "subjective belief" of his that his actions were appropriate to carry out his federal duties could be "objectively reasonable." Once the top brass of the DOJ told him his actions were "wildly inappropriate and irresponsible," outside the proper role of the entire DOJ, and involved claims that were obviously untrue, the defendant could not possibly have an objectively reasonable belief that his actions were either necessary or proper. Supremacy Clause immunity is implausible and simply does not apply.

### B. The Take Care Clause

The defendant also names the Take Care Clause among his intended defenses. Again, he does not articulate how he could plausibly employ the Take Care Clause as a defense. The Clause describes the authority of the President, not an official like the defendant. Article II, Section 3 of the Constitution vests in the President the authority to "take Care that the Laws be faithfully executed." While those are "sweeping words," *Myers v. United States*, 272 U.S. 52, 122, 47 S. Ct. 21, 71 L. Ed. 160 (1926), "they do not confer limitless presidential authority." *Thompson v. Trump*, 590 F.Supp.3d 46, 77 (D.D.C. 2022). Even if the defendant were to show that then-President Trump specifically directed him to write the draft letter, the letter

amounts to nothing more than a false representation designed to pressure Georgia state officials to take unlawful actions. The defendant here has not identified any authority "that would support his assertion that merely exhorting non-Executive Branch officials to act in a certain way is a responsibility within the scope of the Take Care Clause." *Id.* at 78. The defense is inapplicable and therefore implausible.

### C. The Opinion Clause

The defendant also names the "Opinion Clause," noting briefly that "as the President is entitled to ask Senate-confirmed officials in his Administration for their advice on legal questions and, when asked, they are obliged to respond." Doc. [1] at 28. The defendant apparently refers here to Article II, Section 2, Clause 1 of the Constitution, which states that the President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." The defendant does not explain how such a fact would apply to his attempts to send the letter to officials in Georgia, rather than to the President, or clarify whether he is actually a "principal Officer" of an "executive Department" as contemplated by the Clause. Additionally, he makes no mention of the fact that all of his contact with the White House was in blatant violation of both direct orders and DOJ protocol. Regardless, because the defendant is charged with attempting to knowingly send a letter containing a false statement (a

fact which he does not attempt to dispute), the necessary implication of any Opinions Clause defense is that the defendant was somehow constitutionally obligated to lie to, or on behalf of, the President of the United States. This is, to say the least, not a plausible defense.

### D. The First Amendment

The defendant also names the First Amendment among his intended federal defenses. He says that the Indictment fails to explain how "taking a phone call from a citizen could be anything other than protected conduct under the First Amendment of the U.S. Constitution's Petition Clause." Doc. [1] at 18. Here, the defendant refers to Act 110 of Count 1, found at page 50 of the Indictment, which notes that co-defendant Scott Hall spoke with the defendant for 63 minutes on January 2, 2021. It is again unclear how this is a plausible federal defense. First, as the State of Georgia has previously noted, a defense applicable to a single overt act is not a colorable defense at all. *See Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770, 778, 783 (E.D. Pa. 2010) ("Thus, the Court concludes that a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial."). Second, the defendant spoke with co-defendant Hall rather than speaking with United States Attorney BJay Pak, as Rosen

had instructed the defendant to do. So, rather than speak to the most knowledgeable source within the DOJ about Georgia's election, the defendant spoke with a private individual without any firsthand knowledge of actual DOJ investigations. Third, there is no apparent connection between any First Amendment right to have a phone conversation with co-defendant Hall and the defendant's federal duties. As noted above, the defendant's position had no authority to conduct election- or criminal-related investigations, a fact for which Donoghue specifically chastised the defendant ("[W]ho told you to reach out to witnesses and conduct investigations?"). To the extent that the defendant has articulated a basis for this defense, he has not shown that it is plausible or even applicable to this case.

### E. The remaining defenses

Finally, the defendant names four defenses that, without any argument or authority presented to support them, are either too vague to allow a substantive response or clearly inapplicable to the case. These defenses include "qualified immunity," "federalism," "the lack of Georgia jurisdiction over federal officer conduct inside the sanctums of the White House and Justice Department," and simply "immunity." Qualified immunity is, of course, a civil defense and therefore wholly inapplicable in this case. The purported absence of authority for the State of Georgia to prosecute federal officials in certain "sanctums," "federalism," and

"immunity," to the extent it is possible to identify any basis for them as defenses, all seem to rely solely on the defendant's *status* as a former federal official rather than the actual nature of his conduct. The defendant's status as a federal official at the time of the relevant conduct does not provide him a defense on its own because of the "functional approach" recommended by the Supreme Court: even immunities for acts clearly *within* an officer's official capacity are grounded in "the nature of the function performed, not the identity of the actor who performed it." *Clinton v. Jones*, 520 U.S. 681, 695 (1997) (citing *Forrester v. White*, 484 U.S. 219, 229 (1988)).

The defendant has named a great number of apparent defenses with a paucity of argument or support, but even the limited analysis possible at this stage demonstrates that none of them are actually plausible. Some are not plausible, and others are not defenses at all. Because he cannot raise a plausible, and therefore colorable, federal defense, removal cannot be authorized.

## III.   The SPGJ proceedings are not removable.

The defendant also attempts to commingle the proceedings of the Fulton County Special Purpose Grand Jury (SPGJ) with his criminal Indictment. This is improper and/or impossible for numerous reasons. First, a SPGJ is not an "action" capable of removal as contemplated within 28 U.S.C. § 1441. The defendant's claim that the SPGJ could seek and issue subpoenas transforms it into a removable

proceeding is incorrect because the SPGJ had none of the hallmarks of a civil case under section 1441. *See Wisconsin v. Pelican Ins. Co*., 127 U.S. 265, 299 (1888), overruled on other grounds by *Milwaukee v. M.E. White Co*., 296 U.S. 268 (1935); *see also* Action, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "civil action" as "[a]n action brought to enforce, redress, or protect a private or civil right").  As the District Court for the District of Columbia's remand of the defendant's bar disciplinary proceedings recently made clear, the Congressional history of the removal statute also does not support Clark's characterization of SPGJ proceedings (or any grand jury proceedings) as civil actions.

> The version of the removal statute in effect until 1948 provided for removal of "[a]ny suit of a civil nature, at law or in equity," over which U.S. district courts have original jurisdiction. Judicial Code of 1911, § 28, 36 Stat. 1087, 1094 (1911). In 1948, Congress codified Title 28, and in doing so revised the general removal statute to the formulation that endures in relevant part today permitting removal of "any civil action brought in a State court" over which U.S. district courts have original jurisdiction, "[e]xcept as otherwise expressly provided by Act of Congress." Pub. L. No. 773, 62 Stat. 937 (1948); *see* 28 U.S.C. § 1441.

*In re Clark*, No. 22-mc-0096, 2023 U.S. Dist. LEXIS 100128, at *22 (D.D.C. June 8, 2023). The District Court found the narrowing of the statute from "any suit of a civil nature" to "any civil action" significant when it found bar disciplinary proceedings to be outside the range of removable actions. *Id.* This same analysis

would preclude a grand jury proceeding from being susceptible of removal. The Eleventh Circuit, in the context of appealing interlocutory orders, has also found that a federal grand jury proceeding is not a civil action. *In re Grand Jury Proceedings*, 832 F.2d 554, 557 (11th Cir. 1987). Additionally, the Fulton County Superior Court has consistently considered the SPGJ as a criminal investigation, making the SPGJ neither "civil" nor an "action." Order Denying Motion to Quash, at 4, *In re 2 May 2022 Special Purpose Grand Jury – Subpoena for Gov. Kemp*, 2022-EX-000024 (Fulton Super. Ct. Aug. 29, 2022). As Judge Robert McBurney concluded, "Put simply, there is nothing about this special purpose grand jury that involves or implicates civil practice." *Id.*

Finally, the proceedings of the SPGJ have concluded and should not be considered "pending" under section 1442(a). The SPGJ has been dissolved in accordance with Georgia law because its investigation has concluded, and the final report has been released.  Order Dissolving Special Purpose Grand Jury and Setting Hearing on Question of Publication, at 2, *In re 2 May 2022 Special Purpose Grand Jury*,  2022-EX-000024 (Fulton Super. Ct. Jan. 9, 2023). The release of the report renders moot attendant appellate proceedings being pursued by intervenors from the news media and ends the matter entirely. There is no longer anything to remove.

## CONCLUSION

The defendant has been indicted for joining a common plan to overturn a lawful election and for attempting to knowingly make false statements to Georgia state officials. He was told repeatedly that he had exceeded every possible source of lawful authority and that his central claim was untrue. The defendant's actions were not taken under "color of his office" and do not support any plausible federal defense. Instead, they demonstrate his willful and persistent attempts to abuse immense sources of federal power in order to interfere with the State of Georgia's supervision of its own elections. For all of these reasons, the State of Georgia respectfully requests that this Court find that removal should not be permitted in this case.

Respectfully submitted, this 8th day of September 2023.

FANI T. WILLIS
DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT

By: s/ F. McDonald Wakeford
F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit
Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
fmcdonald.wakeford@fultoncountyga.gov

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this pleading complies with

the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.)

in that it is double-spaced and composed in 14-point Times New Roman font.

This 8th day of September 2023.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify the foregoing was served upon the following by email:

Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta GA 30346
(404) 843-1956
hmacdougald@ccedlaw.com

Dated this 8th day of September, 2023.

*s/ F. McDonald Wakeford*
F. McDonald Wakeford