# EXHIBIT B

1  things Scott said he had looked into it and that was not the
2  case.
3         In fact, that's how I came to the conclusion
4  that there was nothing to that particular allegation because
5  Scott looked into it, and he came back to me, and he said,
6  "No, the database they were looking at is short data on four
7  counties, and that's why you have a delta."
8         Ms. Zdeb.  My colleague asked you a little
9  bit about Mr. Clark's letter in the previous round. I'd like
10 to turn back to that now.  And if you could pull up what has
11 been designated as Majority 8.
12        Mr. Donoghue.  Yes.
13        Ms. Zdeb.  And we will mark that as Exhibit
14 Number 9.
15                    (Exhibit 9, email, was marked.)
16        BY MS. ZDEB.
17   Q.  This is an email from Mr. Clark to you and Mr. Rosen
18 at 4:48 p.m. on December 28, 2020.  The email subject line is
19 "Two urgent action items."
20        I know you've already explained what role Mr.
21 Clark had at the Department at this time.  I'm wondering if
22 you can just briefly characterize your professional
23 relationship with him.  Was he someone that you worked
24 closely with?
25   A.  It was fairly limited.  When I went down there, I

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   got to know all of the AAGs because they all reported up to

2   the DAG. And as the PADAG, his deputy, I worked closely with

3   him. There were many, many meetings. So I knew him first as

4   the AAG of ENRD, and then later as the Acting, because I think

5   Jody Hunt left right around the time I went down there.

6         So I saw him on a regular basis, mostly

7   briefing the Deputy AG on civil matters and litigation that

8   was underway and things like that. They have a vast portfolio

9   that they were responsible for. Nothing having to do with

10  elections, but a lot of other things that were important to

11  the Department at the time.

12        I think it's important to understand that Jeff

13  Rosen and Jeff Clark had a long professional and personal

14  relationship. They had known each other for, I think, 20

15  years or more, had worked together at a law firm, et cetera.

16  So Jeff Rosen knew Jeff Clark much better than I did, but I

17  did establish some sort of relationship with him when I went

18  down there.

19        Q.  I know you said that you were surprised to hear his

20  name raised both by the President and by Congressman Perry the

21  day before.

22        Prior to sending this email, had Clark

23  reached out to you directly in any way about allegations

24  regarding the 2020 election, or was this the first direct

25  outreach you received from him personally?

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1      A.   I'm pretty sure this was the first direct outreach.
2  There were discussions earlier in the day with Clark, but I
3  was not involved in those.
4      Q.   What was your reaction to this request?
5      A.   I was stunned.
6      Q.   And I know your email response that my colleague was
7  asking about earlier, in essence, speaks for itself.  But I'm
8  wondering if you can elaborate a bit on what about it stunned
9  you?
10     A.   Well, again, the email speaks for itself and
11 captured my views at the time.  But I had to read it several
12 times to make sure I understood what he was proposing.  It
13 just struck me as being wildly inappropriate for the
14 Department to do the things that he was proposing.  It's just
15 not what the Department does.  It's not our role, and in
16 addition to it being completely at odds with what we had
17 determined in the investigations that we had conducted.
18          So it was just factually wrong, and it was
19 not at all the Department's role to be dictating to states
20 what they should or should not be doing with regard to their
21 presidential elections.
22     Q.   Did you have a sense at this point -- I know that
23 his letter is drafted in a way that focuses on Georgia, but it
24 is titled "Proof of Concept," and I think he made it clear in
25 his transmittal that he was not intending it to be limited to

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   Georgia.

2              Did you have a sense of which other states he

3   was proposing to send a version of this letter to?

4       A.   As I understood at the time, it was some of the

5   other swing states.

6       Q.   And we've -- you've been talking about this sort of

7   generically, and I understand you to be talking about the

8   proof of concept letter, but I should step back and note that

9   his transmittal email also had another suggestion in there

10  that was unrelated to the letter.

11             So he starts out with the statement that he

12  would like to have your authorization and Mr. Rosen's to get a

13  classified briefing from the Office of the

14  Director of National Intelligence on Foreign Election

15  Interference.  He goes on to make some claims about Dominion,

16  including a claim that a Dominion machine accessed the

17  Internet through a smart thermostat with a net connection

18  trail leading back to China.  He then goes on to say, "ODNI

19  may have additional classified evidence."

20             Did you have a particular reaction to that

21  aspect of his email?

22      A.   Yes.  And without going into the details, I did not

23  think that ODNI or anyone in the intelligence community would

24  have such information.

25      Q.   How did you respond to that aspect of his request?  Did

1      you give him the go-ahead to reach out to
2 ODNI?  Did you tell him "You shouldn't do that"?
3      A.  I did not address it in my email.  But shortly after
4 my response at 5:50, he was summoned to the Deputy Attorney
5 General's conference room, and the three of us met.  So you're
6 talking at that point about Acting Attorney General Rosen,
7 myself and Jeff Clark. And we discussed both the letter and
8 his request for a briefing.
9          With regard to the briefing, he explained
10 that he felt the IC might have information that was relevant.
11 And I really didn't have any input because, before I said
12 anything, the Acting Attorney General said, "Well, look, if
13 you have the appropriate security clearances, you can get a
14 briefing.  But I think you're going to see that there's no
15 reason for us to believe that."
16     Q.  Were you aware that Mr. Clark contacted an
17 individual named Dustin Carmack, who was the DNI's chief of
18 staff on January 1, to arrange a call?
19     A.  Not until I saw the emails that were produced, I
20 guess, initially by the House committee in relation to this.
21 I was aware that there was some sort of briefing provided, but
22 I had nothing to do with approving it or arranging it or
23 anything.  I just knew from discussions on January 2 that, in
24 fact, Clark had received a briefing.
25     Q.  Back to the Georgia proof of concept letter aspect

1  of this email from Mr. Clark, before he sent the email to you,
2  Ken Klukowski, who I understand to have been a senior counsel
3  in the Civil Division, sent a copy of the letter to Clark.
4              And that's an email that you're not on, so I
5  wouldn't expect you to have seen it, but I'm curious whether
6  you know who Ken Klukowski is?
7      A.  I don't.
8      Q.  Did you have a sense at the time as to whether Clark
9  was sort of a solo operator on this or whether he was working
10 with others either within the Civil Division or elsewhere
11 within the Department?
12     A.  I had no reason to think anyone else in the
13 Department was working on this.  I thought that he drafted
14 this letter himself.
15     Q.  So you mentioned Clark being summoned to a meeting
16 in then-Acting Attorney General Rosen's office a bit later in
17 the afternoon, after you had sent the response that we've
18 already discussed.
19              Can you just give us a sense of how this
20 meeting unfolded?  I imagine that you and Mr. Rosen pushed
21 back on his suggestions.
22     A.  Yes.  Just so you understand the background,
23 obviously we got the calls the night before the 27th, both the
24 President and Congressman Perry mentioned Jeff Clark.  As I
25 said, Jeff Rosen and Jeff Clark had known each other for a

Trustpoint.One | Alderson          www.trustpoint.one
                                   www.aldersonreporting.com          800.FOR.DEPO
                                                                      (800.367.3376)

```
 1   long time.
 2                  We spoke both that night and I think the next
 3   morning, and Acting AG Rosen said, you know, "I'm going to
 4   talk to Jeff," meaning Jeff Clark, "and find out what this is
 5   all about, what's going on here."
 6                  So I believe there were one or more
 7   conversations earlier that day that were then followed by this
 8   email at 4:40.  I responded at 5:50.
 9                  As I recollect, the DAG, the Acting AG, Jeff
10   Rosen, was at some place; he was busy or something. But I
11   responded without showing him or anyone else my response.  I
12   simply drafted it and sent it.
13                  And then I went to his office, I think after I sent
14   it, and he was pretty upset with the proposal from Clark.  And
15   he said, "I told so and so," one of his administrative
16   assistants, "to get him up here.  I want him in my conference
17   room now."
18                  So I understood that the communication had
19   gone out.  Jeff Clark came up a few minutes later and the
20   three of us sat in the conference room and had a very
21   difficult discussion.
22        Q.    What was difficult about it?
23        A.    It appeared to me that Jeff Rosen was really floored
24   by the fact that someone he knew and whose professional
25   judgment he had trusted was proposing something like this.  I
```

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1  didn't know Jeff Clark well, and so I was not -- I was
2  certainly surprised.  That someone in the Department proposed
3  something like this, but I had no personal relationship to
4  base this on.
5                    It got a little heated.  I began telling Jeff
6  Clark that he had no business sticking his nose into this;
7  that he should remain with the portfolio he's got.  Why was he
8  involved in this in the first place? Why are we hearing your
9  name from the President?  Why are we hearing your name from
10 the Congressman?  So on and so forth.
11                   It got a little heated, particularly toward
12 the end.  I told him that I thought his proposal was,
13 essentially, wildly inappropriate and irresponsible.  I told
14 him that what he was proposing was nothing less than the
15 Department meddling in the outcome of a presidential election.
16           So it got fairly heated toward the end.  And
17 Acting AG Rosen said, "Well, look.  Let's just sort of move
18 forward here.  Get your briefing, if that's what you want.  I
19 think you'll see that there's nothing to be concerned about
20 from the intelligence community. And then, you know, we can
21 talk about this letter."
22            But he was very clear and I was very clear
23 that that letter was never going out.
24      Q.  Did Clark give you any sense during this meeting of
25 how he knew Congressman Perry?

Trustpoint.One | Alderson    www.trustpoint.one
                www.aldersonreporting.com    800.FOR.DEPO
                                             (800.367.3376)

1    A.   No.

2    Q.   And did he indicate -- I'm sorry.  Go ahead.

3    A.   He made some reference to being in communication
4  with the President.  I think at this
5  point, he told us that he had been in the Oval Office. He
6  didn't explain how he got there.  But I immediately said "You
7  violated the White House contact policy."

8    Q   Did he say when he had -- I'm sorry.  Go ahead.

9    A.   No.  It wasn't clear.  It wasn't clear how he got
10  there or exactly when he was in the Oval Office, but I'm sure
11  it was in this meeting where he told us he had actually
12  physically been in the Oval Office.

13    Q.   Did he say anything during this meeting about a
14  willingness on the part of the President to install him in Mr.
15  Rosen's place?

16    A.   He did make some reference to that.  I don't
17  remember as specifically as the subsequent meeting on
18  January 2nd.  But he did make reference to the President being
19  -- considering, I should say, a leadership change to the
20  Department.

21    Q.   Did he indicate whether the President was aware of
22  the proposed letter?

23    A.     I don't remember him saying that, no.

24    Q.     After the meeting, you reached out to
25  Assistant Attorney General for the Office of Legal

1   Counsel Steven Engel to read him in to the situation.

2             What was the purpose of doing that?

3       A.   If you follow the Department's internal chain

4   of succession, you'll see that the people who were in place at

5   that time, if you go through them, the next one in line to the

6   Acting Attorney General, absent some action to the contrary by

7   the President, would be Steve Engel.  There were other people

8   above the OLC AAG in the chain, but when you do that, you have

9   to remove everyone who is in an Acting position.

10            So, for instance, the Solicitor General was

11  above the OLC AAG, but there was an Acting Solicitor General,

12  so you had to remove him from the chain.  So if you follow the

13  chain, if Jeff Rosen got fired, the next person to become

14  Acting Attorney General would be Steve Engel.  And I was

15  concerned that Steve be fully aware of what's going on in case

16  Jeff Rosen was fired and Steve ended up in the seat.

17            And so Jeff Rosen and I discussed like how

18  far we should allow information relating to this to get out.

19  We decided that it would be prudent to keep a very, very close

20  hold.  But we agreed that Steve should know everything

21  because, if he's fired or we're fired and Steve ends up in the

22  seat, Steve needs to know that this is coming and how it came

23  about.

24      Q.   I know at some point a bit later on, you expand the

25  circle of Department officials who you read into the

1  situation.  Why did you want to keep it close hold at this

2  point?

3      A.   We didn't expand the circle until the late afternoon

4  of January 3rd, but we wanted to keep a close hold because,

5  frankly, I thought -- we thought it would create friction and

6  maybe even panic within the leadership of the Department.

7           Ms. Zdeb.  I'd like to turn to a meeting in

8  the White House that takes place the day after Clark sends

9  his letter.  This is reflected in Majority 11, which I will

10 mark as Exhibit Number 10. (Exhibit 10, notes, was marked.)

11           BY MS. ZDEB.

12     Q.    Are these your notes?

13     A.    I have it.  Yes, these are my notes.

14     Q.  And these are notes of a December 29, 2020, meeting

15 with the Chief of Staff, White House Counsel, PC and PP, who I

16 imagine are Pat Cipollone and Patrick Philbin, the Deputy

17 Attorney General, you and Steven Engel.  Is that correct?

18     A.    That's right.

19     Q.    Did anyone else participate?

20     A.    No.

21     Q.    And this took place at the White House?

22            Yes.  In the Chief of Staff's office.  That's

23 the only time I've been in his office.

24     Q.    What prompted this meeting?

25     A.   I don't remember exactly why we were called over