**EXHIBIT F**

1    long as he did on the 15th.  So I listened to that.  And I

2    said, in substance -- this is just the content I remember --

3    "I think we've been through that, but if there's new things,

4    you know, we function on the facts of the law.  If there's

5    more facts, then the Department can receive them, but you know

6    what we know, that we told you, we haven't seen any."

7              And so two other things that I remember about

8    that call; one is more in hindsight.  At the time, he was

9    saying to me, "I'd like you to make sure the Department is

10   really looking into these things that you may have missed."

11             And I said, "Well, sir, it's Christmas. Today is

12   Christmas Eve.  Maybe take a few days off, and we can talk on

13   Monday."

14             He sort of hesitated.  "Well, that's four

15   days from now."

16             And I said, "Well, let's start with that."

17             But I wondered if it was going to be Monday.

18   You know, Richard Donoghue's notes that show it wasn't

19   Monday.

20             But the other part that stuck with me was

21   kind of an odd reference.  Somewhere in the conversation, he

22   made a reference to Jeff Clark.  And, again, I think the way I

23   remember this is that he said, just out of the blue, sort of,

24   "Do you know a guy named

25   Jeff Clark?"

1        And I said, "Yeah, he's the head of Civil Division."

2   Then he moved on.

3        So that struck me as curious as how does the

4   President of the United States know, you know, an Assistant

5   Attorney General.  They are important jobs, but I wouldn't

6   expect the President to know all the Assistant Attorney

7   Generals.  There are several of them.  So it struck me as odd.

8        That's more in hindsight.  Now, at the time,

9   that's become more significant, obviously, but at the time, I

10  was just quizzical.

11       How does the President know who Jeff Clark is and

12  why was he asking me that?

13       So that's how that call was.  It was kind of,

14  as I've alluded to, basically said follow up on all of the

15  stuff referred to in the media; that it was no secret that the

16  President was unhappy about the election outcome and people

17  were, according to him, telling him that there had been

18  corruption.

19       But the parts that were peculiar is why I

20  made earlier reference to the 24th as an interesting call;

21  Jeff Clark.

22             I can tell you how I felt about the matter,

23  or -- you have questions.

24  Q.    About how long did this call last?

25  A.  I want to say 10 to 15 minutes, maybe.  If I was to

1  guess, to the extent I can remember, I would say probably in

2  the order of 10 or 15, give or take.  Slightly shorter;

3  slightly more.

4      Q.  So in terms of the Jeff Clark reference that struck

5  you as curious at the time, it sounds like you were saying the

6  curiousness of that reference, that became more significant

7  overtime as events unfolded.

8      A.   Yes.

9      Q.  Did you sort of not focus on the curiousness of it

10  per se, but -- well, you tell me.  Did you just sort of file

11  it away at the time and not focus on it until later?

12      A.   Well, I heard that on the -- I think it was the

13  afternoon of December 24th.  So I didn't think there was

14  immediate follow-up to do on Christmas day.

15  But the day after, I'm pretty sure it was, as I recall,

16  Saturday the 26th, I called Jeff Clark and inquired of him --

17  I don't remember exactly.  I remember I was trying to see if

18  he was going to tell me something.

19          So I called him and was asking him, you know,

20  something to the effect of "Is there something going on that I

21  don't know about?"

22          And we had a little bit of a back-and-forth.  But

23  then he, at some point in the conversation, acknowledged that

24  he had had a meeting with

25  President Trump.  And I was flabbergasted.

1          And I said, "Excuse me?  When was this?  How

2   did that happen?"

3          And he was very defensive and kind of

4   apologetic as I chastised him that you had a meeting with the

5   President.  You didn't tell me about it in advance.  You

6   didn't get authorization.  You didn't tell me about it after

7   the fact.  This can't happen.

8          And so he was somewhat apologetic.  And he

9   was saying that he had kind of got caught up in something that

10  he hadn't planned, that he had been -- according to what he

11  said -- that's all that I can recount, what he told me.

12  Obviously, I don't have access to documents --there could be

13  more to it.  But what he said was that he had been talking to

14  Congressman Perry of Pennsylvania, or I think he referenced

15  General Perry, but he's a Congressman.

16         And that somehow General Perry had asked him

17  to come to a meeting.  He didn't understand with who or what

18  it was about, and it turned out they went down to the Oval

19  Office talking to the President.

20             Well, as you might guess, that did not seem

21  normal to me.  And so I told him that shouldn't have happened,

22  can't happen again.  And he assured me it wouldn't, that if he

23  was contacted to do it, he would give me a notice.  He would

24  tell me about it.

25             And so I had known him for a long time in a

1    professional capacity.  We had both been in a prior

2    administration.  We both had been at the same law firm. We had

3    actually worked together at some point and worked together at

4    the Justice Department.  So he said he wouldn't do it again.

5    And, initially, I accepted that.

6            I also tried to check -- I think this is

7    actually a couple of days later -- did the White House

8    counsel know about the meeting.  The answer was no. Had not

9    been present; didn't know it had happened; hadn't authorized

10   it.

11           So that's my discussion with Jeff Clark, that

12   Saturday the 26th of December, as best I recall.  And that was

13   it until you handed me Exhibit 6, until Monday, January 28.

14   Q.       Did he tell you when the meeting that he

15   attended in the Oval Office was?

16   A.  I think so.  But I think it had been either the day

17   before Christmas or two days before.  So it was either the

18   Wednesday or Thursday, December 23 or 24.  I don't know who

19   else was there.  But the ones that I remember are him and

20   Congressman Perry, but I think there were others.  I just am

21   not sure who they were.

22   Q.  Did he give you a sense of how he came to be

23   connected with Congressman Perry?

24   A.   Not really.  I thought about that at some ensuing

25   time, and I haven't been able to sort that out.  This has all

1  sort of popped up again.

2          So from my vantage point, the open

3  question is did they seek to see the President, or did the

4  President seek them?  Sort of what was the direction of the

5  initiation of that process, both at the outset and as it

6  continued through the events of January 3rd, Sunday night, we

7  spoke about just before the break.

8          At least from my memory, that's an open

9  question that I don't know the answer to, because all I really

10  know is what Mr. Clark told me and, to a limited extent, what

11  the President told me.

12      Q.  When you had this initial call with Mr. Clark on the

13  26th, did he give you a sense of what had transpired at the

14  Oval Office meeting?

15      A.  He had minimized it.  When I look back, I'd like to

16  know more -- but at the time, I was focused on how did the

17  President know who Jeff Clark is.  The answer is he was at

18  some meeting and probably had attributed it to that.  It was

19  all innocent.

20          That's the initial stage though it becomes more

21  concerning as the events developed.  But at that early part,

22  I'm questioning, as I said, how does the President know who

23  Jeff Clark is.  And he's telling me, you know -- he's probably

24  asking who I am because he heard my name and met me.  I wonder

25  if it was more, but that's what he told me.

1          Q.   So Clark didn't say to you "I got swept into this

2    meeting and we had a discussion about was the election

3    stolen."  It was just more "I got swept into this meeting" --

4    and what?

5          A.   He may have told me and – I can't recall.  I don't

6    think he told me more, but we're talking about our discussion

7    seven months ago.  So I told you that the parts that I recall,

8    I think they are telling --

9          Q.     Fair enough.

10              So that was December 26th.  My colleague on Senator

11   Grassley's staff, started asking you a bit about a call on the

12   next day, the 27th, before the break.

13         A.     Yeah.

14          Q I have a couple of additional questions about that

15   call.

16         A.     Sure.

17         Q.       So if you have Exhibit Number 5, which is

18   Mr. Donoghue's notes --

19              MALE SPEAKER.  Excuse me, which exhibit?

20              Ms. Zdeb.  5.  It's Mr. Donoghue's notes from

21   the call on the 27th.

22              Mr. Rosen.  I have Exhibit 5.

23               BY MS. ZDEB.

24          Q.   So for the time being, those are just mostly for

25   your reference in case you wanted to consult them. And

1    recognizing that they're not your own notes, I want to ask

2    about the discussion of Jeffrey Clark that I understand took

3    place on that call.

4              So you had had this call with the President

5    on the 24th where you had this curious exchange in which he

6    mentioned Jeffrey Clark.  You spoke to Clark himself on the

7    26th.  And then the 27th, you had this call with the President

8    that you patched Mr. Donoghue into.

9              So at some point during that call, did the

10   President again mention Jeffrey Clark?

11        A.  Well, yes.  The notes suggest that he did.  Again,

12   they're not my notes, but I don't have any reason to question

13   them.

14              So here is how I remember this is, I think

15   there is another reference to Clark.  But at the time, it

16   doesn't really register much with me, because -- in hindsight,

17   in certainly does -- but at the time, Jeff Clark has said, you

18   know, this somewhat benign -- not totally acceptable, but

19   somewhat benign explanation of how the President knew him.

20              So when the President then makes some

21   reference to him again, I think how to try to -- how he and

22   the President met for the first time three days ago in some

23   kind of group meeting.  So it didn't register with me.  But

24   when I saw these notes, there was more detail than, let's say,

25   the significance I remember having at the time.  But I see

1    this in the notes.

2        Q.  So putting the notes aside, do you have any

3    independent recollection of the President saying something to

4    the effect of "People tell me Jeff Clark is great and that I

5    should put him in"?

6        A.  I remember at a slightly greater level of

7    abstraction that "People are really very mad with the Justice

8    Department.  They tell me that there's fraud and the Justice

9    Department hasn't been addressing it and is the Justice

10   Department doing its job."

11             And I think Rich Donoghue and I were both

12   saying to the President, "You can rest comfortably.

13   The Justice Department is doing its job."

14                  I think that there was some kind of reference

15   to Jeff Clark, but I don't think it was -- as I said, I think

16   it didn't have great significance at the time. In hindsight,

17   it's a little bit of a clue that, well, what comes next.

18                  But at the time, it was the President met

19   some guy three days ago, he asked me who he is or something

20   like that.  Shrugged, like -- if the President wants to

21   replace the Justice Department, and he can do whatever he

22   wants, but the Department is going to maintain its position.

23   Because, at this time, I don't know if Jeff Clark has a

24   different point of view.

25                  So to me it's -- we're all in the same place,

1    which, as you know, ultimately, is true except for Jeff Clark.

2    In the Department leadership, we worked very much together.

3    But at the time, I didn't register Jeff Clark when the

4    President says -- and, again, I don't know if the notes are

5    exactly the way I can remember it.  I don't dispute it.  So

6    that's -- in hindsight, that's a tipoff.  But after time, it's

7    more clear.

8         Q.  Did you recall some reference in this meeting to

9    replacing the Department's leadership, putting aside the

10   question of whether you recall a specific reference to Clark's

11   relation to that.

12        A.  Yes.  But in one of these, he accused, you know,

13   "Some people have suggested or some people say the Department

14   hasn't done his job."

15             And I think Mr. Donoghue and I are saying "The

16   Department has done its job.  It is doing its job."

17                  If I remember, I saw something in the notes

18   saying you should have the leadership you want.  It's not

19   going to change where the Department is.  And I think that --

20   again, I don't remember that as a quote, but I think that

21   point was one of that both

22   Mr. Donoghue and I had made.

23        Q.  Along similar lines and on the topic of the

24   suggestion it sounds like the President made that the

25   Department was not doing its job, there was some discussion

1  with my colleague on Senator Grassley's staff before the break

2  about a notation in the notes about the President making

3  reference to looking into "legitimate claims" of election

4  fraud.  And some discussion about, "Well, isn't it the role,

5  and indeed, is appropriate, or at least not inappropriate, for

6  the President to want to have legitimate claims looked into?"

7       I wanted to just put a finer point on your

8  response to some of those questions.  As I understood you, you

9  didn't agree at the time that the claims that were being

10  discussed in the course of that call were legitimate; is that

11  right?

12      A.  At least, in the big picture, in the sense that I

13  thought the position that AG Barr had publicly announced

14  continued to be corroborated.  An individual investigation

15  somewhere, that I cannot comment on -- is there a target, is

16  there an illegal voter, or something on an individual case.

17              But in terms of the big-picture evidence, and

18  as I think I alluded to to Senator Grassley's counsel, I think

19  the President had raised this thing with the website in

20  Pennsylvania, the registrations and the certified votes don't

21  match.  So that's an appropriate thing to just figure out, but

22  I think we still believed there's no indicia of widespread

23  fraud that would call into question the national election.

24      Q.  In fact, I think -- and this is on page -737 of the

25  notes.  There's a notation there that appears, at least based

Trustpoint.One  Alderson.          www.trustpoint.one
                                    www.aldersonreporting.com
                                                                800.FOR.DEPO
                                                                (800.367.3376)

1    on Mr. Donoghue's notes, it was a direct quote from the

2    President saying, "You guys are not following the Internet the

3    way I do."

4        A.    Yes.

5        Q.    So I guess I take that as consistent with your

6    description of the overall flow of this conversation, and

7    similar conversations with him, in the sense that the

8    President would raise claims that he had heard or he had seen

9    and that he would have a dialogue --

10        A.    I think actually -- so I mentioned when Senator

11    Grassley was here, there are some places in the notes where I

12    said, "I agree.  I remember that."

13            One of them was my saying, "We can't and

14    won't just flip a switch and change the election."

15            Another is I do remember when he said "You

16    guys are not following the Internet the way I do." That one

17    registered with me, because it reinforced some of what Rich

18    Donoghue was saying.

19            The Department of Justice needs evidence,

20    needs facts.  We rely on the facts and the law.  So I don't

21    know that the President necessarily got what we were doing,

22    what we actually did.  But telling me something is on the

23    Internet, if you are trying to persuade me, is not actually

24    very effective.

25        Q.      So, in other words, the fact that the

1 President may believe that something on the Internet is

2 legitimate does not mean that, in the Department's view, it is

3 legitimate?  It may be, but it may not be.

4      A.  The sad reality, we all know, is that the Internet

5 is full of -- some things are true.  Some things are totally

6 garbage.  Some things are patently false.  Some things there

7 are outrageous.  It doesn't tell you much to say something is

8 on the Internet.  We have to see the actual evidence.

9      Q.  So, for instance, the whole Italygate theory, which

10 we'll go into briefly in a little bit, that was a thing that

11 was on the Internet.

12           But the mere fact that that was on the Internet,

13 would not, in the Department's view, have meant that it was,

14 "legitimate"?

15      A.  Well, being on the Internet does not tell us that

16 something is accurate or valid or truthful. There's some real

17 trash.  There is really no quality control on what people can

18 post.

19      Q.  So along the same lines in terms of the President

20 expressing frustration, displeasure that the Department was,

21 in his view, not looking into things on the Internet, things

22 that he viewed as legitimate. There's this notation in the

23 notes that my colleague asked you about earlier.  It starts at

24 the bottom of -738 and it carries over to the top of -739.

25           And it's a -- the notation following the

1   exchange in which you indicated you said that "DOJ won't use

2   its authority to flip a switch and change the election."

3          And then there's this response from the President

4   to the effect of "I don't expect you to do that.  Just say the

5   election was corrupt and leave the rest to me and the

6   Republican Congressmen."

7          What did you take him to mean when he said, "Just

8   say the election was corrupt and leave the rest to me"?

9      A.  So at the risk of repeating what I said earlier,

10  they are not my notes.  It was a longer conversation than the

11  notes.  I don't have any reason to challenge what Rich wrote

12  down, but I have a more general recollection of the President

13  making the argument, "People are telling me that there is

14  fraud.  You say there isn't, but people say there is.  Why

15  aren't you finding it?

16  Shouldn't you be more energetic?"

17          I don't remember exactly what he said, but

18  more vigorous, in some sense, at finding the fraud.

19          And, "You should be out there finding it and

20  saying so."

21          And my point is, "Well, we have done our jobs

22  appropriately.  Any American who knows of any evidence can

23  walk into any FBI field office or a U.S. Attorney's Office or

24  Department of Justice, and we don't see that. So we are not in

25  a position to do it.  And so we're not going to just have a

1    press conference."

2          I think that's actually what he said, "Just

3    have a press conference."

4          "No, we can't have a press conference because

5    there isn't a factual foundation to justify that."

6          I think this now is clearer.  So we never had

7    any such press conference or any such public statements saying

8    there was election fraud, because that would not be consistent

9    with the facts.

10    Q.  So it sounds to me, based on your description, that

11    he was almost less concerned about whether the Department

12    actually took steps to and also did uncover election fraud,

13    and it was more that he wanted you to make some sort of public

14    statement indicating that you were looking into it.

15          Is that the consistent with your

16    recollection?

17    A.  Well, as I said to your colleague, I don't want to

18    get in the posture of trying to say what was in the

19    President's brain.  I can more explain what I remember him

20    saying to me.

21          In terms of what would have satisfied him or

22    not satisfied him, unless he communicated that, I don't think

23    I'm in a posture to claim that I can read his mind and tell

24    you what he's thinking.

25          I think at different junctures he suggested

1   public communications, but at other points he asked for a

2   Supreme Court filing.  He asked at some juncture about special

3   counsel.  So I think there were a mix of actions that he

4   referenced as wanting or at least suggested.  Sometimes there

5   were "Other people have said."

6                    But I don't remember him prioritizing, "the

7   thing I want most is this or that."  The one consistent theme

8   was there's "I am told and assert that there is fraud, and you

9   guys should have found it.  Why aren't you doing your job?"

10       Q.    Fair enough.

11                    Certainly, one of the things -- irrespective

12  of how he may have prioritized it in his own mind, but one of

13  the things that he asked the Department to do was make some

14  sort of public statement.

15       A.   I think that's right, that he said "You should be" -

16  - in substance, "You should have found this fraud, and you

17  should say so."

18       Q.   Was he any more specific about what he hoped the

19  Department would say in the press conference?

20       A.   The parts that I remember were just more his

21  emphasizing that he had been told or he heard or he thought or

22  some variation of there's fraud in Pennsylvania and there's

23  fraud in Georgia.  You should be looking at that and doing

24  something about it.  So doing something about it, as I alluded

25  to earlier, varied at different junctures.

1     Q.        I'd like to move on to the next day.

2               I think you have a portion of this document

3     already in one of the Minority exhibits, but we'll give you a

4     different copy.

5               This will be Exhibit Number 6.  This will be

6     Exhibit Number 6.  And it starts at Bates No. -6697 at the

7     bottom.

8                         (Exhibit 6, email, was marked.)

9          Mr. Rosen.  -697?

10             BY MS. ZDEB.

11    Q.      -697.  Do you have it?

12    A.      Yes.

13      Q.   This is the December 28, 2020, email that you and

14    Mr. Donoghue received from Jeff Clark.

15    A.            It's kind of remarkable, wouldn't you agree?

16    You don't need to answer that.

17    Q.      I'm not the witness.

18             But yes.  So he sends you this email.

19    Subject line is "Two Urgent Action Items."

20             I want to ask you about the first action item

21    before we get to the letter.  So he makes this request for a

22    classified briefing from the Director of National

23    Intelligence.

24             Did you have a sense of the context for that

25    request?  What was your reaction to that component of his

1   email?

2        A.   So as best I recall, this email came somewhat out of

3   the blue, as to its content.   I think what happened, the way I

4   remember it, was my assistant told me that Jeff Clark wanted

5   to have a meeting with me. That wasn't a total surprise, given

6   my weekend conversation.   But the content of that meeting

7   turned out to be a surprise.

8                    So I set up the meeting.   And I think I had a

9   busy day and couldn't do it until 6:00, or something like

10  that.   And it shows on the email, it says 4:40 p.m.

11            This email comes across and it's strange.   So Rich

12  Donoghue and I have a discussion about it.   And the gist is we

13  should not do these things, and then we had the meeting, which

14  I'll be happy to tell you about.

15            But on your specific question about the

16  meeting, the proposal regarding the director of ODNI. Because

17  he was head of the Civil Division, Jeff Clark he did have

18  security clearances, but he didn't have responsibility for

19  election issues.   And at least at that point, I was unaware if

20  there was any election-related litigation or something that

21  would justify him having a role in this.

22                    So I didn't -- at this juncture, my thought

23  was it was not appropriate, and that changed at the meeting we

24  subsequently had.

25                    But I think you were asking me what was my

1    reaction to this.

2         Q.   Yes.   For instance, there's a line in his email

3    alluding to information in the public domain from hackers that

4    a Dominion machine accessed the Internet through a smart

5    thermostat with a net-connecting trail leading back to China.

6    And I'm just curious as someone who, as you described earlier,

7    had known this guy for quite some time, how did that sort of

8    statement strike you?

9         A.   I was confused, as in, what's going on with Jeff

10   Clark?   That this is inconsistent with how I perceived him in

11   the past.   And there's a reference in that paragraph you were

12   talking about where it talks about the smart thermostat

13   controlling voting machines.   He says "white hat hackers have

14   evidence in the public domain."   White hat hackers?

15            This, again, sounds like Internet theories.   He says

16   thermostats; he said they had access to the Internet.

17                 And at the meeting, there were further things

18   he said that were a little off-kilter too.   One of them came

19   up.   He has some email that he wants his title changed.   Oddly

20   enough, he said that multiple times, that he wanted -- he was

21   -- he was actually

22   Senate-confirmed as the head of the Environment and National

23   Resource Division; but at the time, he acted as the Civil

24   Division, the head of the Civil Division in the Department.

25                 And he wanted the "Acting" taken off his title

1   of the Civil Division.  And he had this theory that there was

2   an old OLC opinion that empowered the Attorney General to do

3   that.  OLC's head was -- at the time, Steve Engel -- he was

4   very opposed to this idea.  And I was not an expert in the

5   underlying law. I had very high regard for Steve Engel's

6   capabilities, but I didn't really want to referee could it be

7   done or whatever.

8           We're at December 28.  There's less than a

9   month in the administration, and you want to change

10  your title.  This came up multiple times.  That's why it

11  stayed with me.

12          So I think we're getting to the point of

13  we're realizing there is something off-kilter at this time,

14  yes.  It's even more evident in hindsight, but at the time, I

15  did think he's meeting with the President and now he wants to

16  be briefed by the DNI on thermostats plus the title change.

17  Just what is going on here with Jeff Clark?

18      Q.  So to set the stage for this meeting, you had

19  mentioned a couple of times, of course, that the other thing

20  that he lays out in the email is his proposal to send a letter

21  to Georgia and potentially other states.

22          I think this is implicit in some of your --

23  the comments that you've made already, but what was your

24  reaction to that aspect of his proposal?

25      A.  So Rich Donoghue and I had discussed it ahead of

1   time.  We said generally we don't want to do this, but decided

2   to go ahead and have the meeting in part -what you're getting

3   at, is to figure out what's going on, and to try to figure out

4   with Jeff Clark, what's going on with this.

5                So we met with him.  He came to my conference

6   room, and he more or less repeated things that are in the

7   email.  He wanted to -- I think he also wanted me to have a

8   press conference and say there was corruption.  And both Rich

9   Donoghue and I -- I think this is after Rich and I had talked.

10  Rich sent an email back to Jeff that said that this is not

11  going to happen.

12      I remember Mr. Donoghue gave Mr. Clark a bit of a hard

13  time about the meeting he had with the President.  He was

14  still maintaining he had been sort of inadvertently conned

15  into it.  And I rejected, at that time, the request for the

16  DNI briefing.

17                On the letter, I think there were so many

18  problems with that, but part of it was it's not the Justice

19  Department's responsibility.  We're not election officials.

20  We're not the global Secretary of

21  State or something; "Georgia, you should be doing this.

22  And, Arizona, you have to do this."

23                It's almost independent from the legal

24  arguments, which was not -- it's just not our role.  So we had

25  some discussion about that.  So I remember I was trying to

Trustpoint.One | Alderson.          www.trustpoint.one
                              www.aldersonreporting.com          800.FOR.DEPO
                                                                (800.367.3376)

1   draw him out, "Why do you want to do this?

2   Why do you think this is a good idea?  Why?"

3                    And I think it was somewhat unproductive.  I

4   thought there was a chance that he might say that he was

5   working with other folks or tell me, but he basically said,

6   "These are my ideas.  I think these are good ideas."

7                    And so the meeting was a little bit -- not a

8   little bit, actually -- parts of it were contentious.  I had

9   given him a little bit -- I had given him my dissatisfaction

10  with the fact that he met with the President without my

11  knowledge and not even told me about it after that.  I think

12  Rich Donoghue reinforced that strongly.  And I think Jeff

13  Clark took that less well the second time.  But that's neither

14  here nor there.  It was ridiculous.

15                   We spent a fair amount of time on this.  He

16  wanted to do these things and we told him no.  But the one

17  thing in my mind that was consequential was when we told him

18  we didn't want to do this, he basically accepted it at that

19  time.

20       Q.    Did he seem --

21       A.    He seemed accepting.  Like, "Oh, these are my ideas.

22  I think they are good ideas.  You don't like them.  Okay.

23  Then, I guess we won't do it."

24                   So at this juncture -- separating what he did then

25  versus what he did later -- at the time, it still seemed as

1  though he was recognizing that there's a change of command,

2  that his suggestions would be rejected, and he should just do

3  his job in a proper way.  So he appeared to be accepting.  He

4  wasn't pushing back, saying "I have right to meet the

5  President," or something like that.  He was -- at that point,

6  he said, "You don't have to tell me six times. I don't want to

7  have a meeting."  And "Okay.  You don't want to do the

8  briefing.  I really think, you know, it would be useful, but

9  okay."

10        So it was kind of a first phase.  He was

11  suggesting that, you know, he heard the direction he was

12  receiving.

13              The next couple of days, he kind of did.  You

14  may remember -- it was during that week that Congressmen

15  Gohmert filed a lawsuit suggesting the Vice President would

16  overturn the election.  And we opposed that and filed a motion

17  to dismiss -- I referenced this in my preliminary remarks.

18  The Civil Division did actually file that brief. And my

19  recollection is that the acting head of the Civil Division is

20  on the brief.  So for a little bit, it looked like someone had

21  --

22        Q.  When you discussed the letter with him at this

23  meeting, did he indicate which other states he proposed

24  sending it to?  Was the letter styled as a proof of concept --

25        A.    Yes.

1      Q.   -- in reference to replicating it outside of Georgia?

2      A I think he did.  I think it was five other states.

3 Pennsylvania.  It was Georgia.  It was Pennsylvania,

4 Michigan, Wisconsin, Arizona, and then

5 Nevada, if I recall correctly.

6      Q.  Did he give any indication during this conversation

7 as to whether he had discussed the proposal with the

8 President?

9      A.     Not at this juncture.

10      Q.  And you mentioned trying to get a sense from him of

11 whether he was working with anyone else or just working as a

12 solo operator, essentially.

13          Do you know who Kenneth Klukowski is?

14      A.  I don't recognize that as somebody that I know.  I

15 have come to learn, through preparing for today, he was at the

16 Department of Justice.  At the time, I don't think that name

17 registered with me.

18      Q.  So you had no sense one way or the other as to

19 whether he is someone that may have been working with Clark on

20 this?

21      A.     Right.  I don't know.

22          As I alluded to earlier, at least from my

23 vantage point, there's some unknowns about both the direction

24 of causality and who else might have been involved.  But what

25 I know of it really just came from Jeff Clark and a couple

1  brief references from the President.

2            And then when I met with Jeff Clark, both

3  this Monday, December 28th, and the subsequent meeting, he

4  never referenced these people or how a meeting got brought up.

5  You know, "I got a team working on it," or something like

6  that.

7       Q How about Douglas Smith?  Is that a name that rings a

8  bell?

9       A.  It does.  That was Jeff Clark's Chief of Staff in

10  the Civil Division.  But I don't have any awareness of -- at

11  the time, he didn't come with Jeff Clark to the meetings, and

12  Jeff Clark did not reference Doug Smith.

13       Q.              I want to move on to the next day, the 29th.

14            Do you recall a meeting at the White House

15  that day?  This was the day after you got this letter from

16  Jeff Clark.

17       A.  Do I recall a meeting at the White House? Yes.  I

18  had lunch with Pat Cipollone, who was White House counsel, who

19  is a long-time social friend, as well as a one-time colleague.

20  So we met in December together during the holidays.

21            But at that time, I did fill him in on that

22  something odd was going on with Jeff Clark.  And I told him a

23  few of the things we talked about, that Jeff

24  Clark was apparently in some kind of meeting with the

25  President shortly before Christmas and these proposals that

1   he's making.

2           I said, you know, "This is odd."

3           And I think it's then that I asked Pat

4   Cipollone, "Are you aware that the head of the Civil

5   Division met with the President of the United States?"

6           He was not.

7       Q.  And just so I am clear, is this a one-on-one

8   conversation between you and Pat Cipollone, or was it part of

9   a meeting that also included Rich Donoghue, Steven Engel, Mark

10  Meadows?

11      A.  I think what happened was part of -- I think Pat

12  Cipollone and I had lunch.  It was either alone or possibly

13  Pat Philbin, his deputy chief, and who was someone I knew for

14  a long time.  But there was a meeting subsequently scheduled

15  for the same day that afternoon, because Mr. Meadows, Chief of

16  Staff Meadows, wanted to talk to us about some oversight

17  requests that Congress had been asking for.  And at least as

18  Mr. Meadows communicated it, AG Barr had said that the

19  accommodation he worked out was done, but members of Congress,

20  representatives -- were contacting Mr. Meadows and saying it's

21  not resolved.  And so he wanted to have a discussion about

22  what are you guys doing to address this with regard to -- I

23  think this specific subject isn't really the election-related

24  issue, but it was about an oversight request.

25      Q.  And so when you -- when you had this meeting, did

1    the topic of the election also come up?

2         A.   My recollection is that the meeting was primarily of

3    the oversight issues.  But in some manner, before we left, Mr.

4    Meadows raised a couple of election items.

5         Q.      Do you recall what those items were?

6         A.   I think one of them was the Pennsylvania -the idea

7    that the United States file a Supreme Court case.  And I think

8    Steve Engel and I, maybe Rich

9    Donoghue too, said "That's not viable."

10        Q.   And how did that come up?  Was the inquiry from the

11   Chief of Staff?

12        A.    I think so.

13        Q.   And what did that inquiry consist of?  Was it a

14   status update?  Was it suggesting that this is something that

15   the Department should do?

16        A.   So the specifics -- what I remember is the meeting

17   is about the oversight things.  I think at this juncture, the

18   draft brief, or whatever it was, had come over, had already

19   happened.  So I don't think it was a new thing.  I think he

20   was saying something like, "Well, what are you guys doing with

21   that?"

22             And the thing I remember is I was just saying

23   it's not viable.  I don't remember if we went into in that

24   great a detail or not.  So at least to my recollection, that

25   wasn't what the meeting was for.  It was something he had kind

1   of thrown in.

2           And I'm trying to remember it.   I think there

3   may have been something else that was in the same category of

4   "Are you guys following up on something, or are you assembling

5   a plan for this?"   There may be records or something that

6   would help me with that.

7           Because my recollection of that discussion

8   was so dominated by the oversight issue, which let's say, with

9   respect to the Senators present, it's not really my favorite

10  thing to spend time on.

11  It's important, and --

12      Q.      Don't tell Senator Whitehouse that.

13          Ms. Zdeb.  I see that I've reached the end of

14  my hour.  I've actually gone a little bit over, so why don't

15  we hit "pause" here and we can go off the record.

16          Mr. Rosen.  Before we break, let me just say

17  for the record, even though I'm no longer a public official, I

18  did believe that I was a government official, that being

19  responsive to Congress was a significant responsibility.  So I

20  mean no disrespect in that in any way.

21              I just mean that you hope that you tell your

22  staff, please be responsive and get these things done. So

23  having to spend some time with the White House Chief of Staff

24  on that wasn't my preferred use of time, but it's what we

25  needed to do, I think.

1          MALE SPEAKER.  Before we go off, I think

2    we were joined by another Senator; is that right?

3          Ms. Zdeb.  Yes, I'm sorry.  For the record,

4    Senator Sasse has entered the room.

5                         (Discussion off the record.)

6          Mr. Flynn-Brown.  We'll go back on the record

7    at 2:28.

8               BY MR. FLYNN-BROWN.

9         Q.   Mr. Rosen, I'm going to quickly go back to the

10   January 3rd meeting that we discussed.  So you've discussed

11   a lot of phone calls and emails and conversations leading up

12   to January 3rd.  So January 3, 2021, that meeting with the

13   President was the culmination of a lot of different

14   communications and, say, frustrations with respect to how

15   the Justice Department was handling election allegations, is

16   that correct?

17        A.    I think that's right.

18        Q.      Okay.  So when the President decided

19   ultimately to reject sending the draft Clark letter and

20   decided to keep you on as Acting Attorney General -you went

21   into this a little bit in the previous hour.

22   The meeting adjourns.  The decisions have been made. Everybody

23   knows what needs to be done.

24               Did you talk with Cipollone afterwards?

25   I don't just mean immediately; maybe a day or two later or

1  hours later?  Or was it simply literally understood, at that

2  point, the President made his decision and there was nothing

3  to talk about?

4       A.  So the meeting ended, and we were heading out.  Pat

5  Cipollone invited Pat Philbin and Rich Donoghue and me to just

6  walk up to his office for a couple minutes.  I remember seeing

7  Jeff Clark as we were leaving, and he said something odd, like

8  "Can I join you," or "Best wishes to all," or something like

9  that.  And we did not invite him to join us.  And he headed

10  out.

11           But then I spoke briefly afterwards to the

12  two from White House counsel, and Rich Donoghue and me.  And we

13  all had the same thought, which is "Well, this is now

14  resolved.  It's done."  And I think I did not get called by

15  the President in the next few days.

16       Q.  When you say "White House counsel," you mean

17  Cipollone and Philbin; right?

18       A.   Yes.

19       Q.  And there was a sense of relief among you that it

20  was finally decided?

21       A.   I'm sorry, say it again.

22       Q.  There was a sense of relief among the four of you

23  that it was finally decided?

24       A.  I suppose.  I mean, we were pleased that the

25  President had made what I regarded as the correct decision.

1   Even though, as I said, he opened the meeting by saying "One

2   thing we know is Jeff Rosen leading the Justice Department,

3   nothing is going to get done in trying to overturn the

4   election."

5        Q.    Sorry?

6        A.   I'm saying of course I was pleased because it's my

7   position -- I had acknowledged -- he had said early in that

8   meeting, "One thing we know is you, Rosen, aren't going to do

9   anything to overturn the election."

10                  I said, "That's true.  But sometimes that's

11  the best course because it's based on the law and the facts.

12  It's consistent with what's in the best interest of the

13  country."

14                  And so he had said initially -- it wasn't

15  necessarily a very encouraging moment earlier.  It's "One

16  thing we know you're not going to do this, and this other guy

17  might," but it didn't get to that point.

18                  So I think you were asking were we pleased. Well,

19  yeah, of course.  Because I thought it was the right outcome.

20  And as I told you, I think all six of the participants, other

21  than Mr. Clark, were in that posture.

22       Q.   Are you aware of the draft complaint, the United

23  States of America versus the states of Pennsylvania, Georgia,

24  Michigan, Wisconsin, Arizona, and Nevada?

25       A.    Say that again.

1       Q.   The draft complaint of the United States of America

2   versus the Commonwealth of Pennsylvania, State of Georgia --

3       A.   Yes, sir.  That's right.  I testified before the

4   break, yes, that this draft was prepared, I guess, by someone

5   outside, because it wasn't prepared by the Department of

6   Justice, yeah, there's a whole chapter about that, which I'm

7   happy to tell you about.

8       Q.   Please do.

9            So you talked to the President about this

10  draft; correct?

11      A.   Yes, but this mostly occurred about two days --

12  maybe a day or two before then, but it was sent over, I think

13  to several of us.  Maybe Jeff Wall, the Solicitor General.

14  And we thought, "What is this?"  Because we didn't write it.

15            And as I alluded to, we felt this is not

16  something we're going to do.  But I got an inquiry.  It was

17  this sort of passing reference at the meeting with Chief of

18  Staff Meadows.  "What do you guys think?  What are you doing

19  here?  Let's follow up.  What he said doesn't appear

20  believable."

21            And then the President, at one point, I think

22  that day, asked me "Have you seen any writing," or something,

23  maybe it was -- maybe that was Mr. Meadows.

24  I don't know exactly.

25            But then there was this odd piece, which is

1   an outside lawyer by the name of Kurt Olsen made these almost

2   all day-long efforts to get me in a meeting.  I had a general

3   practice that I wasn't just going to be meeting with anybody

4   who was in the campaign.  I didn't think that that was my

5   role.

6          So I had previously declined.  I think the

7   President asked me if I could talk to Mr. Giuliani and some

8   others, and I said no.  But this lawyer kept leaving me

9   messages with the Solicitor General, my chief of staff, with

10  others, that it's urgent.

11             And I basically said I'm not going to do it.

12  But at some point in the afternoon, I think this is

13  that Tuesday the 20th, my cell phone, my DOJ cell phone,

14  started ringing with a number I didn't recognize.  And when

15  that happens, like, three times in a row, it didn't occur to

16  me that's him.  Because he would call at my desk office and

17  was calling all around the Department.

18          So I picked up.  And it's Kurt Olsen saying, "Have

19  you seen the draft, the Pennsylvania brief?  It's extremely

20  important that this get done."

21             And initially, yes, I was annoyed that --

22  it's like I answered a phone solicitor or something.

23  But -- so I initially I had some small talk with him.

24  And then he was pushing that he claimed that the

25  President wanted this brief.

1          And I said, "How do you know the President wants

2    this?  Who are you?"

3          He said, "Oh, we're working very closely with

4    the states that have filed a somewhat similar case previously

5    that the Supreme Court had declined to take."

6          So I said, "Well, you know, in that case,

7    there was no standing.  So this doesn't work."

8          He said, "Well, I can show otherwise."

9          That it was, I recall, it was like a

10   polite brushoff.  That's how the first call ended.

11         The next day -- so in the meantime, knowing

12   that I was probably going to have to discuss that with the

13   President at some point, I asked the Solicitor General's

14   Office to prepare kind of a bullet list of various points on

15   this thing.  I knew we wouldn't do it, but I had a strong

16   feeling that it's better to be able to explain that.

17         So I asked them to do the list.  And they did

18   a good list for lawyers, but it wasn't in plain English.  So I

19   asked Steve Engel, who was head of OLC, who was generally at

20   my side since the day I became Attorney General, "Steve, can

21   you help me sort of put this in plain English?"

22         So he then prepared some brief points.  But while I

23   was waiting on those so I could deal with it, telling the

24   President not to do it, Kurt Olsen calls again.  I don't

25   remember how he got me.  It was kind of the same thing.  He

1    would leave messages.  But to my surprise, he's aggressive.

2           "The President wants you to file this brief

3    by noon today."

4           "Oh, yeah?  He didn't tell me that."

5           And "I had sent you some of the authorities that

6    show there is standing."

7           I said, "Well, I'm not discussing the

8    substance of this with you.  If the President has something he

9    wants, he and I will discuss it with him.

10   You're no longer in this conversation."

11          And he got sort of aggravated by that.  He

12   said, "You're going to force me to call the President and tell

13   him you're recalcitrant," or whatever it is. I said, "This

14   conversation is over."

15          And so that told me -- I think I challenged

16   him on that.  "How do I know you have ever even spoken with

17   the President?  Just because you are saying it?"

18          And he didn't like that.  He said, "I've told

19   you who I represent."

20          So I figured this needs to get called up to

21   the President.  I am not talking to outsiders.  I rejected

22   further discussion with him.  To the best of my recollection,

23   that episode was the only time, and it's the last time I spoke

24   to someone on the outside about these things.  I tried not to

25   engage, but I did make it -- even today, I think it's the

1  proper thing to do.  Although, I did tell him -- I told him "I

2  will tell the President DOJ's position, not you."

3            So at that point -- I'm trying to sort out did

4  the President call me or did I call him.  I think he called

5  me.  Or it may have been, if I called him, it was because I

6  got a message that he wanted to talk to me.

7       Q    And what is the exact date, for the record?

8       A.        This is Wednesday afternoon, the 30th of

9  December.

10           And I know I didn't initiate calls to the President

11 to talk about election stuff, but it's possible that I got

12 word "He wants to call you.  Or he wants to hear from you.

13 You know, he's in Mar-a-Lago.

14 Be at this number at 3:00," or something like that.

15           I don't think that's very material.  But I

16 just can't say who actually placed the call.

17           But I spoke to him that afternoon, and I told

18 him this idea of filing the Supreme Court case was a bad idea,

19 doesn't work.  The Department of Justice can't do it.

20           And I had taken the outline that Steve Engel

21 had given me.  I didn't use it literally.  I relied on it.

22 But I sort of said, "There's five different reasons."  I laid

23 those out for him.

24           And he went "Okay."

25           So then he accepted it.  And that was the

1   end.  That was kind of the end of that, which is why I think

2   in the earlier conversation I had with your colleague about

3   the December 31 meeting, I think the discussion about the

4   Supreme Court brief had already been resolved.  I can't say,

5   definitively, if it came back the next day, but I don't think

6   so.  I think it was resolved in that phone call.  Things came

7   up, and we just said we're not doing it.  And that was it.

8          Q.     So the President yet again took your advice?

9          A.  Well, he accepted the Department's position that we

10  weren't going to do that.  He didn't resist it or deliver an

11  ultimatum or try to overrule us.

12         Q.  So after you gave him the list of five reasons

13  against filing the complaint --

14         A.     Yes.

15         Q -- his literal response was "Okay," or did he say

16  anything else?  Did he challenge you on any of the five?

17         A.  No.  No.  He accepted that we were not going to file

18  that, and that was that.

19         Q.  Was that the last time that you discussed this draft

20  complaint with the President?

21         A.     To the best of my recollection, it was.

22             Again, I'm not trying to split hairs here,

23  it's possible that it briefly came up the next day, at this

24  point, in passing.  I don't think so.  My best recollection is

25  that was the last time.  I'm acknowledging the flaws of human

1    memory, I guess.

2              Mr. Flynn-Brown.  For the record, Senator

3    Blackburn is here.

4              Mr. Rosen.  Senator Blackburn, nice to see

5    you.

6              BY MR. FLYNN-BROWN.

7        Q.  Okay.  So we talked about the January 3 meeting.  We

8    talked about the draft complaint.  We talked about the Clark-

9    related matters.

10             I'd like to turn to the exhibit that I was

11   going to turn to in the first hour.  We started to talk about

12   the Public Integrity Unit at the DOJ and the Election

13   Crimes Branch.  So please go to Bates -751 to -754.

14       A.     All right.  I have the exhibit.

15             Mr. Flynn-Brown.  Just to keep track of the

16   Exhibits, let's check to make sure what number we're on.

17             Ms. McClain Walton.  I have the next exhibit

18   as Exhibit 7.  Yes, the next number is Exhibit 7.

19                         (Exhibit 7, email, was marked.)

20             BY MR. FLYNN-BROWN.

21       Q.  Sir, let me know if you need to review this or if

22   you're ready.

23       A.  Well, I'm ready, because I've looked at it and I've

24   spent time on it.

25             And so, I guess, we will see what your question is,

1    but I suspect I'm not -- the best one to address it.

2         Q.     Fair enough.

3              And one of the reasons why I want to

4    introduce it as an exhibit is the context with respect to some

5    of the tension in the Public Integrity Unit and the FBI and

6    Main Justice.

7              So this is a December 7, 2020, exchange between

8    Rich Donoghue and Dave Bowdich, who was the Deputy Director at

9    the FBI at that time.

10             Do you see in the email here Donoghue

11   references the State Farm Arena allegations?  Do you see that

12   in that first paragraph?

13        A.    Yes.

14        Q.     Do you recall what those were?

15        A.   I don't.  I don't remember.  State Farm Arena

16   allegations?  It's possible you could refresh me on that, but

17   right now I don't remember what that is.

18        Q.   So this email chain originated with a gentleman by

19   the name of Corey Amundson, who was the Chief of the Public

20   Integrity Section.

21             He says, in part, in this email "As explained

22   below, PIN," the Public Integrity Section, "does not concur in

23   any overt investigative activity, including the proposed

24   interviews."

25             We got into this a little bit in the first

1    hour, and I want to try get through it to the extent that we

2    can.

3              Are you aware of how many times the Public

4    Integrity Section provided a non-concurrence to potential

5    investigative activity related to the 2020 election prior to

6    the election certification?

7         A.   So this correspondence is from Rich Donoghue, as is

8    the one attached at the back.  I think it probably would be

9    better to ask Mr. Donoghue about it.

10             I'm not going to say, I don't specifically

11   recall the incident about State Farm Arena allegations. So I'm

12   not sure I'm the most helpful one to go through this.

13        Q.     Okay.  Well, let's move on.

14             So in the email -- excuse me, the document

15   states, "Unfortunately, this is a continuation of a policy

16   disagreement between the Election Crimes Branch, PIN," which

17   is the Public Integrity Unit, "and the AG," the Attorney

18   General.

19             I believe the reference to the AG may be Barr

20   because of his memo, the November memo that we had discussed

21   previously.

22        A.     That seems like a reasonable assumption.

23   And, again, that date, December 7, AG Barr is the AG and has

24   not announced his resignation at that point.

25        Q.   So what I'm interested in here is the word

1    "continuation."

2             So when Donoghue says -- at the time of this,

3    you're the deputy attorney general at that point?

4        A.    That's right.

5        Q.  So when Donoghue says "continuation," it seems to

6    imply repeated conduct with respect to the Public Integrity

7    Unit.

8             Is that something that you can comment on?

9        A.  I don't think so.  I think I alluded to earlier that

10   I have a situational awareness of some friction, but when you

11   start getting into who said what to who, or what position

12   Corey Amundson had or Dave Bowdich, I don't think -- I don't

13   think I have a degree of granularity to testify specifically

14   to that.

15       Q.  Other than this email exchange about the Public

16   Integrity Unit when Attorney General Barr altered the policy

17   with respect to taking investigative steps prior to

18   certification, are you aware of any Justice Department

19   personnel or units that did not comply with that directive?

20       A.  The -- again, I think I alluded to this earlier.

21   There are some processes where there are disputes that are

22   elevated to the Deputy Attorney General.  I don't have any

23   recollection of having this issue brought to me for some kind

24   of resolution.  So as I sit here, I don't have recollection of

25   people telling me the things you're getting at.

1             I was not part of the equation.  I think

2    the Department works these things out.  I don't think I'm in a

3    position to really create a record on that.

4        Q.  So aside from the State Farm Arena allegations, are

5    you aware of whether or not the Public Integrity Section and

6    the Election Crimes Branch opened any election crime cases

7    before the 2020 election was certified?

8        A.  I think that I may need to refer you to the DOJ

9    folks that are here as to the authorization for my appearance

10   today was very explicit about the topics we've covered.  It

11   was a reservation of talking about individual cases that

12   existed or are pending.  I try to stay within the confines of

13   the guidance, so I --

14       Q.  Since DOJ is here, do you want to offer any comment

15   on this issue?  My questions are based on the documents that

16   the Department provided.

17           Mr. Weinsheimer.  Yeah, they offered -- they

18   commented on many things.  As the witness has indicated, he's

19   limited with respect to the authorization.  He can't talk

20   about prosecutorial decisions in particular cases.  He doesn't

21   know anything about this particular case.  He cannot talk

22   about specific cases.

23           To the extent that there are allegations

24   pursuant to the authorization that are actually from the White

25   House, those are things that he's been authorized to talk

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   about.

2        Mr. Flynn-Brown.  I believe I had five objections

3   in the first interview and that's one today.  Four more to go.

4           BY MR. FLYNN-BROWN.

5    Q.   What FBI unit does the Public Integrity Unit

6   interface with regarding election crimes?

7        Mr. Rosen.  [To DOJ counsel:]  Internal DOJ

8   organization, do you have any problem with that?

9        Okay.  The FBI has a counterpart called the Public

10  Integrity Unit.  So, ordinarily, that would be the relation.

11  There can be variants to that because the information could

12  come into the FBI field office in a way that this needs --

13  someone might need to call that number or vice versa.  But the

14  FBI does have a Public Integrity Section.

15           BY MR. FLYNN-BROWN.

16   Q.   So I'd like better to understand the Department's

17  process to receive and vet these voter fraud and election-

18  related allegations.

19                Are you generally aware of the processes in

20  play in the 2020 election?

21   A.   In a big picture, maybe in a managerial way. I'm not

22  working individual cases with special agents in the field, but

23  in a managerial kind of way.

24   Q.   So what was the intake process at the Justice

25  Department?  What was the main method or mechanism by which

1   the Department received allegations?  Did it start from the

2   FBI field offices?  Did it come from

3   Main Justice?

4       A.    All the above.

5       Q.    Okay.

6       A.  There's multiple ways.  There's 55 FBI field

7   offices, and an American citizen who knows of wrongdoing can

8   certainly report it to the FBI at either a field office or

9   headquarters.  Sometimes wrongdoing is learned by state

10  authorities who decide that there's Fed issues at stake.  They

11  report it to the FBI, to the local police.  It could be

12  election officials.

13              There's not a single formula that says "This

14  is the only way that information about potential wrongdoing is

15  addressed."  There's multiple ways.

16      Q.  During the 2020 election, do you recall whether most

17  of the allegations came through the FBI first or whether they

18  went through the DOJ proper?

19      A.  I think that we're getting into a quantitative area

20  that, you know, something that would require more consultation

21  with staff and others to be able to answer your question in an

22  accurate manner.

23      Q.  So with respect to the Justice Department, and

24  specifically the Justice Department proper, how many personnel

25  were responsible for vetting voter fraud and election crime-

Trustpoint.One | Alderson.       www.trustpoint.one
                                         www.aldersonreporting.com       800.FOR.DEPO
                                                                         (800.367.3376)

1  related allegations?

2      A.  Well, "potentially" responsible makes it a pretty

3  sizeable number across the FBI investigator offices and the

4  Criminal Division.  And, of course, if it is someone else that

5  gets a report,they will work with the FBI and channel it to

6  the appropriate location.

7          So if you're in the Drug Enforcement

8  Administration, you would still have responsibility to pass on

9  information.  But I don't have an exact number, but it's a

10 considerable number of people that potentially are able to

11 address those issues.

12     Q.     Thanks, sir.

13             So the general process, though, with respect

14 to the FBI, an allegation is vetted at the Field Office level

15 and eventually, if it's good enough, for lack of a better

16 phrase, it moves up the leadership chain.  Then, the Justice

17 Department becomes involved at that point?

18     A.  I apologize, but I missed the beginning of the

19 question.

20     Q.  So the general process is the FBI does the intake

21 first.  They vet it and they investigate it, and then they

22 move it up the chain.  And eventually the Justice Department

23 is supposed to receive some sort of notification about the

24 allegation.

25             Is that the general process?

```
1           A.   It's one of the potential processes.  I do think, to

2      the extent you really want to understand those processes, I

3      would like to suggest that the FBI and the Criminal Division

4      could provide greater detail.  For me, I rely on them to brief

5      me as needed, and follow up if I need to ask.

6                But as I said, I'm not responsible for

7      individual cases, if I understand the big picture of the

8      process.  And the Department of Justice has 115,000 people.

9      I'm just the Acting Attorney General.  So it's a big

10     organization.

11               Mr. Flynn-Brown.  So let's turn to Bates

12     stamp -714.  I believe this is going to be Exhibit 8.

13                            (Exhibit 8, notes, was

14               marked.) Mr. Rosen.  Okay.

15               BY MR. FLYNN-BROWN.

16     Q.          The top says "Meeting with DAG + Jeff Clark -

17     6th floor."

18               "DAG" refers to you, sir; is that correct?

19          A.   That would be my interpretation.  These are not my

20     notes.  I think from the handwriting it's maybe Rich

21     Donoghue's notes.  I don't think I took notes of this meeting

22     or the other meeting.

23          Q.   So in the middle of the page, I believe it says,

24     "Thinks he saw trucks move ballots to shredding location."

25               It's not clear based on the notes who "he"
```

1    is, per se.

2              Next, the notes say, "Cobb County - woman who

3    worked at facility testified at the Georgia Senate Hearing

4    that she saw shred trucks at election location."

5              Are you aware of whether or not these

6    allegations were investigated by the Justice Department or

7    FBI?

8        A.       So my understanding is these are things

9    that's been previously investigated by both the Georgia

10   authorities and DOJ authorities.  I think this needs a half

11   step back.

12             So this is a Saturday, January 2, meeting

13   with Jeff Clark.  I don't think that the notes are

14   comprehensive.  I'm not saying they're inaccurate as to what

15   they say.  Again, they're not my notes, but I remember this

16   meeting.  And so we should take a half step back as to where

17   did this meeting come from.  We haven't talked about that.

18             But my recollection is that either Thursday

19   night, New Year's Eve, December 31, or Friday morning, New

20   Year's Day, I had either a meeting or a conversation with Jeff

21   Clark.  And at that time, he shared with me that he had had

22   another meeting with the President, and that -- which was

23   contrary to this assurance to me that that wouldn't happen

24   again.  And he had not told me in advance that he was going to

25   a meeting with him.

1          And he said at that time that the President

2   wanted him to consider whether he would be willing to take

3   over my job if the President wanted him to.  It wasn't to say

4   that it would happen, but if the President wanted -- according

5   to Jeff Clark -- and I did not hear that from the President.

6   But according to Jeff Clark, the President was targeting

7   Monday for Jeff Clark to let him know whether he would be

8   willing to entertain the possibility of replacing me and

9   implementing a different approach.

10          So to say that I was disappointed to hear

11   that he had another meeting with the President, without

12   telling me, was a significant understatement.  Guessing you

13   can probably gather how I felt about it and it wasn't

14   positive.

15          So at that point, he renewed his request to

16   have a DNI briefing.  And I had to consider, he says he is

17   meeting with the President, but he's telling me that he just

18   wants to do some due diligence because, if he agrees with me

19   and Donoghue that there isn't corruption, malfeasance, he may

20   just tell the President no.

21          So this is a challenging assessment.  He does

22   have the clearance.  And my thought is he's going to advise

23   the President, whether I like it or not.  I don't think that's

24   appropriate.  But maybe the best thing is for him to know

25   something, because maybe he'll come to his senses and join

1    what I believe is the overall department position -- that

2    there's no facts that create a proper foundation for saying

3    the election results should not be certified.

4              So I contacted the DNI Director and asked him

5    if he would be amenable to give Mr. Clark the briefing that I

6    had previously had.  He agreed.  And I'm not going to talk

7    about the substance of it for obvious reasons, but Clark had

8    that --

9         Q.  Are those reasons because they are classified?

10        A.     Yes.  Yes.

11             And so Clark had the briefing on New Year's Day,

12   and then in the meeting that Saturday, to get an understanding

13   of whether he would now say "I'm done with this."

14             So it was a second step.  I thought maybe he

15   just needs an illustration of why Donoghue and I and others

16   think that these stories that they told are debunked.  Maybe

17   that would help.

18             So I knew of one where there had been a

19   suggestion raised the ballots were being destroyed in Atlanta.

20   And it was being attributed to a State Senator, but it was

21   debunked.  And the U.S. Attorney in Atlanta knew of this, this

22   story.

23             So I told Jeff Clark, "You can call the U.S.

24   Attorney and ask about the ballots."

25             To my surprise, as I heard at this meeting,

1    he never called the U.S. Attorney.  He did his own inquiry

2    where he called someone who had testified at a Georgia

3    legislature hearing the week before and was telling these

4    tales, but they -- at least, as it was reported to me, they

5    were tales that didn't add up.

6               So he had this meeting.  It was Rich Donoghue

7    and I and Jeff Clark on that Saturday morning.  The real

8    purpose -- it was really twofold.  One is to see if having

9    done a little bit, you know, "Knock yourself out, see a little

10   bit of the facts."

11              To see if he now says, "I see where you guys are

12   coming from.  I'll get with the program," or what is his

13   posture.

14              And either way it was harkening back to, again,

15   say "this is not okay to be going behind my back and talking

16   to my boss."

17              So we had a session -- and by the way, I will

18   give this quick digression.  Because he was a Presidential

19   appointee with Senate confirmation, I could not fire him.

20   Only the President could fire him.

21              So sometimes I think the issue, why didn't I

22   just tell him, "You said you're not going to do this again.

23   You did it again.  You're fired," because that's what I might

24   do in the past with people.  But a

25   Presidential appointee with a Senate confirmation, even as

1    Attorney General, I don't have that authority.

2              So we had this Saturday morning discussion,

3    and I think Rich's notes partly captured the concept that --

4    yeah.  The notes indicate that he did not, let's say, come

5    around to the position that I had.

6              And he wanted -- I think he used the word "due

7    diligence" or some such.  So it was a very difficult,

8    challenging meeting.  I see the notes say a rather difficult

9    meeting.  Well, that was accurate, consistent with what I am

10   saying.  But it would have been understated.

11             And so I think at this point, we shift from,

12   as I was alluding to earlier in the week, this was somebody I

13   had known for a long time.  He says he won't do it again.  He

14   did it again.  And he seems to be on a very different course.

15             So that sets up what happens at another

16   meeting with him on Sunday.  And then that sets up the Sunday

17   night where you know the final piece of that.

18             But these notes relate to that Saturday

19   morning meeting.  And so when you asked me -- this is really -

20   - sorry.  Just trying to give your sense of how it developed.

21             I don't think you can just circle, like, a

22   section and say "What about these allegations or whatever?"

23   Because this was some rogue activity.

24        Q  I appreciate your explanation.  I appreciate the

25   detail.