# EXHIBIT G

1        Q    Okay.    So that leaves the 23rd as the possible face-to-face with Mr. Clark

2  about the residence remaining?

3        A    23rd or early on the 24th, if I was there.    Again, I don't know, but DOJ will

4  have those records.

5        Q    Okay.

6        A    Or -- and then the next date is the 28th.    It was definitely not 25th, 26th, or

7  27th.

8        Q    Okay.    All right.

9        So let's go to the 28th.    And I'm going to have you turn to exhibit No. 2 in the

10  binder.

11        A    Just one moment.

12        Q    Sure.

13        This is an email.

14        A    Yes, sir.

15        Q    From Kenneth A. Klukowski (CIV).    I assume that's you.

16        A    Yes.

17        Q    To Jeff -- Jeffrey Clark (ENRD).

18        A    Yes.

19        Q    I assume that's the Clark we've been talking about.

20        A    Yes.

21        Q    The subject:    "email to you."

22        A    Yes.

23        Q    Attachment:    "Draft letter JBC 12 28 2020."    And then just in the body a

24  single word, "Attached."

25        A    Yes.

1    Q    All right.    Why did you send this email?

2    A    The -- this is the letter -- I'm sure we're about to talk about the letter -- this is

3    the day that I was drafting the parts of the letter that I drafted.    And for several hours

4    during that time there were problems with the Civil Division's email system.

5         Evidently, Civil Division has actually a separate email system.    I don't know if

6    other components also have their own separate thing.    But it is not like one DOJ system

7    that's either up or down.

8         And so, it's -- so I was -- had been unable for several hours to communicate by

9    email.    And so, I sent it, but Mr. Clark's ENRD address -- because he was still the head of

10   that division simultaneously -- that was working fine.

11        And so I was trying to send a test email to see if I could now send the letter I

12   currently had, to say whether I -- to see whether I could successfully send it to him by

13   email.    So that was me emailing it to his non-Civil, but still official DOJ address to see

14   if -- to see if it would -- if it would go through.

15   Q    Did he ask you to send this draft letter to him?

16   A    We had -- there had been a couple times -- so yes, yes, it was -- I was

17   working on this, and then I was to send it -- send it to him.

18   Q    Did he say he needed it for a specific purpose?

19   A    Yes.    He said that -- he had referenced -- he had referenced in these various

20   meetings, but including when I -- when I -- my standard -- the standard format for my

21   work at DOJ was each morning I would go down to Mr. Clark's office to get what my

22   assignments were for the day.    And, again, this is a little out of sequence.    But at

23   the -- this was my work assignment for the day.

24        And so, he had said -- he had referenced previous to that day that I knew there

25   were ongoing conversations between him, Mr. Rosen, and Mr. Donoghue regarding the

1    whole topic of the 2020 election.    And he said that I would assist in drafting this letter.

2    It was going to be a letter that Mr. Rosen, Mr. Donoghue, and he were going to sign and

3    that the meeting would be that evening.

4         So it was -- my task for the day was to work with him to prepare this letter for

5    their joint signatures, their three signatures.

6         Q    Okay.    So when you're sending this at 4:20 p.m. to Mr. Clark, is that you just

7    finishing the task for the day and sending it off?

8         A    Yes.

9         Q    Okay.

10        A    Yes.    I don't know, unless there was a later email between that and the end

11   of the day.    This is the time of day, between 4 and 5, is typically when I would report out

12   my work product.

13        The work product would normally be a recommendation on a package where I

14   would go down, brief him in person, he would make a decision off that.    But in this case

15   it was a document.    It was something he needed the file to.    And so I emailed it.    This

16   would be the time of day when I did that.

17        So if the email log does not show any subsequent email, then, yes, that would

18   have been sending that.

19        Q    When was the first time you found out that you'd be writing a -- or drafting a

20   letter like this?

21        A    That morning, when he --

22        Q    So the 28th?

23        A    Correct.    The morning of the 28th.

24        Q    And did he give you any context other than, "I'm having these conversations

25   with Mr. Rosen and Mr. Donoghue"?

1          A     No, out of the blue.

2          Q     Did this surprise you given the fact that election-related stuff is not in the

3    Civil Department -- Civil Division wheelhouse?

4          A     I was -- I was --

5          Mr. Greim.    You can answer.

6          The Witness.    I was shocked for two reasons.

7                 BY MR. ████████:

8          Q     Okay.

9          A     First of all, because election-related matters are not part of the Civil

10   portfolio.    The second is it's December 28.    You've got New Year's Eve coming, you've

11   got New Year's Day coming.    We're talking about Georgia?    Georgia has a special

12   election on January 5.    And then Congress meets on January 6.    What could you

13   possibly hope to accomplish at this late hour?

14          Now, I don't know if I -- I wouldn't have known how to communicate that in a way

15   that doesn't sound insulting, maybe even insubordinate.    So I don't know if I verbalized

16   anything about how surprised I was.    But I was stunned.

17          Q     So you said you don't know.    Do you think you said something, even if not

18   in the words you just used?

19          A     I'm trying to constrain -- to control myself as much as possible.    I don't

20   know.    If I did, it would have been very short and with as calm of -- something like,

21   "Well, that sounds extraordinary," or something like that, but nothing to convey what

22   could possibly -- I used to work at a State legislature.    And I had never heard, when

23   Mr. Clark would talk about his background, I never heard that he had.

24          I used to work at the Arizona State Senate.    I know how the State legislative

25   process works.    This legislature is not even in session.    And this is during the holiday

1   season when I know from my own personal experience legislators are typically on travel

2   with their family at the time.    What could you possibly hope?    What's the end game?

3        Q    Let me ask you, did Mr. Clark say --

4        A    He --

5        Q    -- what he hoped to accomplish?

6        A    He -- sorry, ma'am.    I get animated about this revisiting it.

7             He did not.    And as I was working on this through the day, I kept wondering,

8   what in the world?    Because among other things, given the current electoral college

9   count, even if something could happen with Georgia, it's still the same outcome for the

10  election, you're just changing the number.

11            So I -- so, no, it was not explained to me.    And it's -- at some point during the

12  day, I don't recall if it was this initial meeting, at some point in the day he had said, you

13  know, "And a similar letter could be sent to other States as well."

14       Q    Did he say what those other States would be?

15       A    I don't recall if he did.    I don't recall if he did.    Of course I had worked on

16  the campaign.    And even though I didn't have much time, I did consider to see the -- I

17  did continue to see the news.    And, you know, and I would -- and I -- I was aware of

18  other lawsuits in other States.

19            And so it's -- he wouldn't have had to tell me what States.    If you were sending a

20  letter like this, and if you were to ask what States are similarly situated to Georgia, I could

21  have a guess as to what those States were.    I don't recall if he had said that.    But in my

22  mind, it was adding one level of impossibility after another, because I wasn't drafting

23  anything for any other State.

24            So it was, okay, this is the 28th, you've -- you can already almost --- you can count

25  on your hands the number of days between this and January 6th.    You're talking about

1    drafting.    I don't know if he was talking about drafting a similar letter on future days

2    when you would even have fewer days.    So I just -- he didn't.

3           Mr. Greim.    I just want to tell the witness, you know, in a deposition they'll ask a

4    question, you should fully answer it, but, you know, only ask the question -- answer the

5    question asked.

6           The Witness.    Understood.

7           Mr. Greim.    Because when you add in all these other comments, I mean, they

8    decline probably in usefulness to the committee and then you won't get done today.

9    I'm sure they appreciate it, but just try to answer that.    And if they have a follow-up,

10   they'll ask you that.

11          The Witness.    I will focus on that.    I'm trying to answer fully, but I certainly don't

12   mean to drag things on.

13          Mr. ████    And we appreciate that.

14              BY MR. ████

15          Q    So when Mr. Clark gives you this assignment, what does he tell you?    What

16   are his expectations?

17          A    Okay.    Could we turn to the letter?

18          Q    Sure.    And that's exhibit 3.

19          A    Right.

20   Okay, he said --

21          Q    Or, I'm sorry, it's the continuation of 2.

22          A    Okay.    He said we're going to be drafting a letter.    So I don't know if he

23   used the word memo, but it would essentially be a legal memo in letter form, though I

24   don't know if he formulated it that way or if that's just what I said to myself.

25              He said it would be addressed to the Governor, the Speaker of the House, and the

1    head of the Senate, that I was to research who those individuals were and get their -- and

2    look up what would be appropriate contact information.

3           And then he ran through the points that he wanted made -- the points that he

4    wanted made.    He said that the first paragraph was going to say that the Department is

5    investigating various irregularities in the 2020 election, that the Department -- I mean,

6    like the first -- the first sentence there, I mean, I just wrote on to a note pad and typed up

7    exactly what he said.

8           Q      Okay.

9           A      The second sentence, same thing, though he edited the document

10    afterwards.    I -- this -- I wrote something similar here.    I don't know if he modified the

11    wording, but the substance is the same, just the Department will -- will advise you or

12    update you or report to you regarding what we find here.

13           Now, the word like -- third sentence -- "no doubt," I didn't write that.    That was

14    inserted after the fact.

1

2          [12:49 p.m.]

3                    BY MR. ████████

4     Q     And --

5     A     Yes.

6     Q     -- we'll get into the very specifics.

7     A     Okay.    Yes, sir.    You want me to go more general?

8     Q     Yeah.    Like what he told you --

9     A     Gotcha.

10    Q     -- before you started drafting?

11    A     Gotcha.    He told me the contents of the beginning.    And then he said, Pull
12    up the statutes and relevant cases for the casting of ballots for the electoral college, the
13    authority and prerogatives of State legislatures, what power they have under the electors
14    clause of Article II.    And he said, Mention what happened in Hawaii in 1960, which I had
15    to look up after the fact.    I did not know when I was given the instruction what had
16    happened in Hawaii in 1960.

17           And -- and then he said -- he said -- he said, Reference what's going on with the
18    election litigation in Georgia.    He said, Get the docket number, confirm the procedural
19    posture of the case.    The -- get the relevant dates, find out what's going on with that
20    case.

21           He said, Then -- then unpack the authorities under Article II.    He said, You know,
22    go to Bush v. Gore, look at the cases cited there.

23           And then -- and then he virtually -- he essentially dictated the next paragraph
24    saying what the purpose of the special session would be, though it -- though I think that
25    wording has been modified, but the substance is there.

1      And then he said, And -- and then add that, if the Governor does not call them into

2  special session, lay out an argument as to how they have the authority to call themselves

3  into session if the Governor won't do it.    And I think -- and we talked about that for a

4  moment then.

5      And, see, what I wrote was much shorter than this.    He added a lot of stuff.

6  The -- let me see.    One moment.

7      And -- and that was it.    He said, And then -- and then he says, Write three

8  signature blocks for that, General Rosen, Mr. Donoghue, and me.

9      And he said, And let's have it ready before close of business, because I'm going to

10 have a meeting with Rosen and Donoghue.    It's at close of business, and I want the letter

11 ready for signature by that time.

12     Q      Okay.    So, to unpack some of that, it sounds like --

13     A      Yes.

14     Q      -- Mr. Clark laid out an outline --

15     A      Yes.

16     Q      -- of what actually became this letter?

17     A      Correct.

18     Q      Was there anything that he told you to do that didn't end up in this letter?

19     A      No, not that I recall.    Nothing.

20     Q      Did you add any other sections or arguments that he didn't recommend to

21 you?

22     A      No.

23     Q      Okay.

24     A      He told me what the arguments were.    The -- the bottom line -- the black

25 law argument.    I was to go find the case law authorities to substantiate and flesh out

1      that argument.

2            Q      So he gave you structure.    You filled it in?

3            A      Correct.

4            Q      Okay.    All right.    And, with respect to the people who would be signing

5      this, was it your understanding when you got this assignment that General Rosen, Deputy

6      Donoghue, and Mr. Clark had all agreed to this conceptually, and this was just putting pen

7      to paper, or did you understand this to be, I'm going to present this to them for their

8      consideration?

9            A      A version of the second, but -- but I didn't know until I read the Senate

10     Judiciary Committee report that there had been no groundwork laid for this.    So I didn't

11     know -- my guess coming off it was, okay, they were -- they were -- they were shooting

12     back and forth ideas, and now -- and now Mr. Clark was going to actually come up with

13     what he was proposing to say, okay, now here's -- to -- I mean, to characterize it, like,

14     okay, that I said we should do a letter.    Here.    This is what I've talked about.    We

15     should send this out.

16            I didn't know until I read the Senate Judiciary Committee report that -- that, when

17     they first saw this, that evidently there had been no previous conversation about even

18     contemplating something of this nature.

19            Q      Okay.    And I think one of the things that you said was that Mr. Clark went in

20     and filled in additional information --

21            A      Yes.

22            Q      -- that you didn't originally write.

23            Quickly, I'd like you to turn to exhibit 15.

24            A      1-5?

25            Q      Correct.    This is a document that you produced to the --

1      A    Yes.

2      Q    -- select committee.

3      A    Yes.

4      Q    Is this the version that you wrote?

5      A    No.

6      Q    No?

7      A    I know this is further modified from the one in version 2.

8      Q    Okay.    And we'll get back to that, then --

9      A    Yeah.

10      Q    -- in a little bit.

11      A    Shall I go back to 2?

12      Q    Yes, please.

13      Mr. █████     Before we get off the general idea of the letter, because that was

14  assigned to you, Mr. ██████?

15      Mr. █████     No.    I'm all right.    Thank you.

16      Mr. █████     Okay.

17      Mr. █████     No.

18         BY MR. ███████

19      Q    All right.    So, looking at the letter, did Mr. Clark, in assigning it to you, say

20  that anybody else had requested this, like this is a request from the boss, meaning the

21  White House?

22      A    No, he did not.    Not that I recall.

23      Q    None at all?

24      A    Correct.

25      Q    Okay.

1          A      It sounded like an idea that he had.    The only question I had is what -- is

2    how it -- whether it had came up, and, in fact, I thought -- I was assuming it had come up

3    in a previous conversation with Mr. Rosen and Mr. Donoghue, that he was proposing

4    something -- putting flesh on something that had just been perhaps a passing idea or

5    whatnot.

6          Q      And did you have any assistance writing this?

7          A      No.

8          Q      Okay.    Other than Mr. Clark, who knew that you were drafting this?

9          A      No one that I know of.

10         Mr. <u>Greim.</u>    Counsel, before we go further, I'll ask it now so we don't screw up

11    your next line, but -- so we've got exhibit 2 as a cover -- a covering email, and then

12    some -- it sounds like now some version of the letter.    Is the exhibit that's -- is the letter

13    that's attached to this the draft letter attached to the email?

14         Mr. ███████    As relayed to the committee, this is the attachment to the email.

15    The <u>Witness.</u>    This is my recollection.

16    Mr. ███████    Okay.

17              BY MR. ███████

18         Q      So this is the version that you sent to Mr. Clark, just to put a finer point on

19    that, of exhibit 20?

20         A      It is.    He had added stuff in during the day.    He had gotten an earlier

21    version, added stuff in, because, in -- and I'm happy to point out the items that I know I

22    did not write and didn't even know about.    And then -- and then I continued adding to

23    it --

24         Q      Okay.

25         A      -- and then sent it back.    So it was a work in process.    We met multiple

1    times through the day on it --

2        Q    All right.

3        A    -- between my morning meeting and the end-of-day report.

4        Q    Okay.    So, actually, you know, before we get to the substance, then, in

5    these multiple times you met with him -- maybe we can start with the first time you met

6    with him after the assignment comes in.

7        A    Sure.

8        Q    What were his comments?    What did he say?

9        A    Just along the lines of -- I don't recall specific.    It was, Good start, and

10   then -- and then just had a number of nits, with part of it being -- I don't even recall -- I

11   don't even recall if he had me make additional changes before -- before he made his

12   changes, or if it was -- or if he took it and then made the changes himself, and then -- and

13   then everything I did was on -- when I had -- when I had it back from him, and then a list

14   of additional things to flesh out.

15       Like I recall one of them was cite checking, but that being like towards -- towards

16   the end.

17       Q    Normal editing type stuff?

18       A    Correct.

19       Q    Okay.

20       A    Yes.    Yes.

21       Q    But he was very involved in how this letter was shaping?

22       A    Oh, very much so.

23       Q    Okay.    All right.    So, at the beginning -- and you already referenced this,

24   but you wrote -- and Mr. Clark may have edited it, but that DOJ is investigating

25   very -- various irregularities in the 2020 election for President of the United States.

1          Now, generally, DOJ doesn't talk about ongoing investigations.    Why start a letter

2    like this?

3          A     First of all, I didn't even know -- even though I could not recall DOJ saying

4    things like that, I didn't even know that that wasn't something that would normally be

5    said.    That's something I didn't even know.

6          Second, I had no knowledge of any investigation that was going on.    I was

7    surprised by it.

8          Q     So this was strictly something he, Mr. Clark, told you to include?

9          A     Yes.    He told me that that was going to be the first sentence.

10          Q     And you were not aware of any investigations at that point about election

11    irregularities?

12          A     I thought there were no investigations going on.

13          Q     Okay.

14          A     To the best of my -- I did not know of any.

15          Q     Okay.    And then the next couple lines down, it says, We have identified

16    significant concerns that may have impacted the outcome of the election in multiple

17    States, including the State of Georgia.

18          As you're drafting this letter, do you know what those concerns were in Georgia?

19          A     I did not.    I just kept telling myself, this -- I guess this shows that this is not

20    part of the Civil Division.    These investigations must be someone else, because I have

21    never heard anything about any of this.

22          Q     And you hadn't seen any actual evidence to that point about

23    these -- whatever these irregularities or issues are in Georgia when you were drafting

24    this?

25          A     I had seen no evidence.

1   Q Did Jeff Clark ever show you any evidence, or discuss specifically evidence

2 about the irregularities that are referenced here, or concerns?

3   A Not that I recall. I mean, it's -- not that I recall.

4   Q Okay. And then, later in that paragraph, it says, No doubt, many of

5 Georgia's State legislators are aware of irregularities sworn to by various witnesses, and

6 we've taken notice of their complaints. See, e.g., a standing -- a subcommittee of the

7 standing Senate Judiciary Committee of testimony from a State senate hearing, and then

8 a reference to the tennesseestar.com.

9   Did you find those references?

10   A Starting with the words no doubt, I didn't write any of that.

11   Q Okay.

12   A Now, I -- I don't know if I had any version of that first sentence, but I never

13 looked up any -- any hearings. I didn't put any URLs, any web addresses in there. But

14 the rest of that paragraph is -- that's not me.

15   Q Okay. And are you aware if Jeff Clark had any other evidence aside from

16 these two things that are referenced about irregularities in Georgia?

17   A I am not aware.

18   Q Okay. And you did not have any evidence --

19   A No.

20   Q -- beyond that?

21   A No.

22   Q Okay.

23   A It's -- and, to be clear, I'm talking about, like, within my context of my DOJ

24 employment. I mean, I would see news reports of people, you know, alleging things in

25 lawsuits and whatnot. But, no, within the scope of DOJ employment, I had no

1   knowledge of any investigation.    I had no evidence within -- within the scope of that,

2   et cetera.

3           Q       Okay.    Now, this is identified as a proof of concept letter at the -- or just

4   says Georgia proof of concept, and you had mentioned potentially sending this or that

5   Mr. Clark indicated he wanted to send this to other States as well.

6           Did you ever learn what those other States might be?

7           A       First, I did not type the words, Georgia proof of concept, so those words had

8   to be inserted by Mr. Rosen.    I -- I did type the rest of the header.    I typed the

9   predecisional, deliberative, attorney-client or work product, or legal work product.

10  That's what I wrote.    He inserted the line under that.

11          Could you repeat the question?

12          Q       Yeah.    Did you ever learn what the other States might be where a letter like

13  this would be directed?    And that was a bad asking of a question, but let me -- let me

14  start over.

15          This is -- this is a proof-of-concept letter that seems to suggest it might go to other

16  States as well.

17          Did you ever learn what those other States might be?

18          A       I don't recall if he told me or if it was just my background knowledge with

19  ongoing election challenges that I -- that -- it would be speculation.    I don't recall him

20  providing the list.    I had the sense of -- I had my own sense of what those other States

21  would be, but I don't recall whether he said them, or whether I asked about it, because I

22  kept thinking about what are you going to do with this?

23          Q       Okay.

24                  BY MR. ███████

25          Q       Just ask a clarifying question.    You mentioned you thought Mr. Rosen had

1 inserted Georgia proof of concept. Did you mean, Mr. Clark?

2   A Oh, I'm sorry. Did I say Mr. Rosen?

3   Q I think you said Rosen.

4   A I misspoke. I meant Mr. Clark. I apologize. Yeah. I want to be very

5 clear on that.

6   Mr. ██████ Thanks.

7   The <u>Witness.</u> I don't even know what that phrase means, necessarily.

8   Mr.██████. Okay.

9     BY MR.██████

10   Q Okay. And were you aware at this point -- and this may go back to a

11 question that Mr. ██████ asked you -- that, you know, by this point, Attorney

12 General -- then-Attorney General Barr had said they looked into election issues and found

13 no evidence of widespread fraud that would affect the election, and that the U.S.

14 attorney in Georgia, B.J. Pak at the time, had looked into election issues and had nothing

15 to report.

16   Mr. <u>Greim.</u> Objection. Compound question.

17   Mr.██████ Okay.

18     BY MR.██████

19   Q Were you aware --

20   Mr. ██████ Are you directing him not to answer that question?

21   Mr. <u>Greim.</u> No, no, no. I mean, at a deposition, if there are -- I mean, we're

22 trying to kind of keep it free-flowing here, but, if there are problems with the form of the

23 question, he's providing evidence, you know, sworn testimony. I'm going to raise those,

24 and it's up to you to either decide to change the form of the question or to stand on it.

25 But I'll -- I'll say if I tell him not to answer.

1          Mr. ███████   Okay.    Thank you for clarifying that.

2          The <u>Witness.</u>   Could you?

3          Mr. ███████   Yeah.    So let's go back.

4          The <u>Witness.</u>   Can you repeat the question?

5          Mr. ███████   Let's do it one by one.

6                    BY MR. ███████:

7          Q     At the time you drafted this, were you aware that the Attorney

8     General -- former Attorney General, had come out and said there is no evidence of

9     widespread fraud in the election that would change the outcome?

10         A     Yes, only from the news stories that -- that were publicly available that I had

11    seen, just as a consumer of the news.

12         Q     Okay.    And were you --

13         A     Nothing through official channels.

14         Q     Okay.    Were you aware that the U.S. attorney in Georgia had looked into

15    issues related to election irregularities and found nothing of significance?

16         A     I cannot recall whether I had seen a news story about that, so I -- so I -- I

17    don't recall whether I saw something specifically about the U.S. attorney for the Northern

18    District of Georgia.

19         Q     Okay.    All right.    So one of the things you also say is, the top of page 2, the

20    Department recommends that the Georgia General Assembly should convene in special

21    session so that its legislators are in a position to take additional testimony, receive new

22    evidence, and deliberate on the matter consistent with its duties under the U.S.

23    Constitution.

24              Who, to your knowledge, in the Department recommended that?

25         A     I had no idea.    I was -- I -- this was essentially -- I was just writing, I believe,

1    what I was told word for word to write.

2          Q    Okay.

3          A    So, once we got to the signature block portion, I'm like, well, I think it

4    is -- you know, it's -- it's -- I'm inferring from that that it's the acting AG, the acting deputy,

5    and Mr. Clark, as the leaders of the Department, the first two speaking for the

6    Department.

7          Q    Okay.   Are you, Mr. Klukowski, aware of any other time that the

8    Department of Justice recommended that a State legislature call itself into session?

9          A    No.

10         Q    And, with your background working in the Arizona Legislature, was that

11   unusual as you were drafting this?

12         A    I had never seen anything like it.    I -- I was -- that -- that's the third -- that is

13   a third thing about the first paragraph that I found very surprising.

14         Q    Okay.    Now, you also say time is of the essence because of the joint session

15   on January 6th when the Vice President would preside, consider objections, and then

16   decide between any competing slates of elector certificates.

17         Was it your understanding that timing is of the essence for that reason; it had to

18   be before January 6th?

19         A    Yes.

20         Q    Did Mr. Clark say anything specifically about January 6th?

21         A    I can't recall if he said anything specific about January 6, or if it was just -- for

22   that matter, I don't know if that would be January 6th or January 20th when you say that

23   time is of the essence, because it's all post December 14.

24         Q    Okay.    So, whether it's January 6 or January 20th, though, it had to do with

25   the likely end of the former President's administration?

1        A      Yes.

2        Q      And this --

3        A      That was my impression.

4        Q      Okay.    And this needed to be before then?

5        A      Yes.

6        Q      Okay.    Was it Mr. Clark's idea to say time is of the essence?

7        A      I think so.    It's -- it's -- I don't recall anything that I came up with in this

8    paragraph.

9        Q      Okay.

10        A      It was -- it was -- I don't know if everything was given to me word for word,

11    and then he just modified it from there.    But I -- I don't remember any of this being

12    original content from me.

13        Q      Fair enough.

14        A      I was merely just transcribing --

15        Q      Okay.

16        A      -- the content I was told to write.

17        Q      Okay.    And, in this paragraph, it also talks about the -- effectively the joint

18    session considering any objections to any electoral certificates on January 6th.

19        A      Are we on the second paragraph now, page 2, first paragraph?

20        Q      Page 2, first paragraph still.

21        A      Okay.

22        Q      So, as you're writing this, were you aware of any planned objections to

23    electoral votes during the joint session?

24        A      I can't remember the first time I saw a news story or otherwise heard that

25    there was -- that there were Members who were going to voice objections.

1       Q     But you only learned about that through the news, not through Mr. Clark or

2    somebody else at the Department?

3       A     Definitely not through Mr. Clark or through the -- the Department, yes.

4       Q     Okay.

5       A     Yes.   I'm just trying to separate out both my background knowledge and

6    the fact that, in many previous elections, I knew objections had been raised.   I mean, I

7    had worked on previous campaigns.   It's -- so I'm trying to separate that out.   But, no, it

8    definitely did not come from Mr. Clark.

9       Q     Okay.   I appreciate that distinction.

10      Had you discussed with any Members of Congress objections to the electoral

11   count?

12      A     Had I discussed with any Members of Congress objections they could make

13   on January 6?

14      Q     Correct.

15      A     Not that I recall.

16      Q     Or that they would be making objections on January 6th?

17      A     Not that I recall.

18      Q     You're hesitating.   Is there something --

19      A     Well, it's just I'm -- I'm trying to think through events I would go to, you

20   know, like -- like group events, like social events, Republican Party events,

21   conservative -- and then some of them speaking on air during interviews on cable news

22   networks.   You know, it's -- it's -- I was trying -- I was trying to sort through all the

23   remarks I had heard from any number of Members of Congress discussing the election,

24   and whether any of them said that specifically.

25      At some point, I just don't know if it was before the 28th, you started seeing

1    Members saying, I'm going to raise this in our joint -- but I don't know the first time I

2    heard that, so I don't know if I had heard one of those when I was drafting this.    So I'm

3    trying to be precise --

4          Q    Understood.

5          A    -- in my answer to you.

6          Q    Okay.    So, in that same paragraph -- I'm going to go into the next one as

7    well -- it says -- it talks about the need to decide between competing slates of elector

8    certificates.

9          And then the next paragraph on page 2, it says, "The Department believes that, in

10   Georgia and several other States, both the slate of electors supporting Joseph R. Biden,

11   Jr., and a separate slate of electors supporting Donald J. Trump gathered at the proper

12   location to cast their ballots and that both sets of those ballots had been transmitted to

13   Washington, D.C. to be opened by Vice President Trump" -- excuse me -- "Vice President

14   Pence."

15         So this, in particular, do you know whether that was true as of the date of this

16   letter, December 28th, that alternate slates of elector certificates had been sent to

17   Washington?    Or, actually, let me back up.

18         Do you know whether they had actually been cast?

19         A    I'm not sure I recall -- and let me explain.    That reference is the Hawaii

20   thing.    Until I looked at the Hawaii thing, the Hawaii anomaly, if I could call it that -- until

21   I actually looked that up after he had instructed me to talk about Hawaii, I'm like, okay,

22   what is Hawaii from 1960?

23         Until I -- I checked out that Law Review article, and then I did internet searches

24   looking for more information on that.    Until then, I was unaware that there had ever

25   been a historical instance where the proposed electors for the person who was not

1    thought to be the winner of the State had actually showed up on the electoral college

2    State and actually cast ballots that, at that moment, had no recognized force of law.   I

3    didn't even know that had ever been done.

4          So, at the time I was writing this, I didn't know that this was -- I didn't know what

5    this was.   I had thought that this was -- that what was being talked about here

6    was -- was historically unprecedented and was anything other than just pieces of paper

7    that people were signing.

8          Q    Okay.   So, just to be precise, did you know that Republican electors had

9    gathered on December 14th and voted an alternate set of electoral votes?

10         A    At some point, outside the scope of DOJ, just as I read the news and, you

11   know, get information that sort of way each day, I had seen references to Trump electors

12   casting alternative ballots.   But my thinking at the time was anyone can take a piece of

13   paper, sign their name on it, and say, This is my elector certificate for President of

14   the -- it's just a piece of paper.   It has no legal -- so -- so I had seen news accounts and

15   whatnot, but I didn't know that anyone had ever tried anything of this sort or that there

16   was -- it's -- so I'm trying --

17         Q    Sure.

18         A    Am I answering the question?   It's --

19         Q    Let me ask this, too.   So this is a statement of fact.   The Department

20   believes -- it's the Department's belief, that in these States, two sets of electors cast

21   electoral votes.

22         Did Mr. Clark tell you to include this?

23         A    It -- he told me to include -- I'm trying to remember what the exact word

24   choice was.   He told me to cite it, and then one of my internet searches when I got back

25   to my computer was doing searches with keywords to actually pull this up and see if this

1      was, in fact, the case, because there were things I hadn't even given much thought to

2      previously, because there was a lot of people saying a lot of stuff, it seems, you know, in

3      public, and I had a job, and it wasn't this.

4              Q      Okay.

5              A      And so it wasn't until I got to my computer and looked up that I found out

6      that, indeed, there -- in each -- in several contested States, that this had, in fact,

7      happened.

8              Q      Okay.   So you learned that as you're writing and --

9              A      Yes.

10             Q      -- drafting the letter?

11             A      Yes.

12             Q      Okay.

13             A      Yes, yes, yes.

14             Q      I think I know the answer to this, but I have to ask anyway.   So were you

15     involved in an effort to appoint alternate electors or have alternate electors vote?

16             A      No.   Not -- not that I -- not that I -- no.

17             Q      Did you discuss this strategy about having alternate electors vote with

18     anybody at the Department of Justice?

19             A      No.

20             Q      Did you discuss it with anybody in the White House?

21             A      Alternate electors?   No.   There was -- there was at some sort of

22     going-away party a reference to, you know, some people are like -- and my reaction at

23     the time was trying to -- I can't remember the words that I used, but it was the substance

24     of what I had just conveyed in terms of, what, some people just signed papers saying

25     I'm -- I'm an elector for President?

1       I'm like, that -- there is no legal force behind that.   That's absurd.   So it wasn't

2   like a serious substantive conversation.   It was just another idea that I saw no

3   foundation in in law, because, I mean, at the time, I didn't even know about Hawaii.

4       So, I mean -- so it had come up -- the fact that -- one of these news stories or

5   something of that sort had come up at, like, a happy hour or something.   I don't even

6   remember who I was talking with, but where I had brushed off the idea as, you know,

7   some people will try anything.

8       Q    Okay.

9       A    It's -- so I --

10      Q    Did you -- did you discuss with anybody in the campaign kind of

11  implementing this strategy of having alternate electors vote?

12      A    No.

13      Q    Okay.   Did you know that people working for the campaign, when you

14  wrote this or later, had been calling State legislators about this very issue, about having

15  alternate electors vote?

16      A    About alternate electors?   Not that I recall.   I know that there were -- I

17  know that there were efforts, which I would -- which I would characterize differently.   I

18  know that there were efforts about having State legislatures weigh in and take direct

19  legislative action under the electors' clause.

20      But I had -- but, with the information that I had, it would have been similar to

21  what -- it would have been identical to what was going on, what I read -- what Bush v.

22  Gore talks about in terms of what was happening in Florida, where they were talking

23  about legislative action, like a joint resolution or whatever the vehicle would be, declaring

24  that, in that -- in that election, that George W. Bush had won the State of Florida and was

25  entitled to the State's electors -- electoral votes.