1                    UNITED STATES SENATE

2               COMMITTEE ON THE JUDICIARY

3                    WASHINGTON, D.C.

4

5

6

7

8          INTERVIEW OF RICHARD DONOGHUE

9

10

11

12

13               FRIDAY, AUGUST 6, 2021

14

15

16

17      The interview was convened, pursuant to notice, at 9:05

18  a.m, and was conducted via Zoom.

19

20

21

22

23

24

25

1                        PROCEEDINGS

2                                            9:05 a.m.

3          Ms. Zdeb.  This is a transcribed interview of

4    Richard Donoghue.  Chair Durbin requested this interview in

5    connection with the Judiciary Committee's investigation of

6    efforts to involve the Justice Department in former President

7    Trump's attempts to overturn the 2020 presidential election.

8          Would the witness please state his name for

9    the record.

10         Mr. Donoghue.  My name is Richard Peter

11   Donoghue, D-o-n-o-g-h-u-e.

12         Ms. Zdeb.  On behalf of Chair Durbin, I'd

13   like to thank you, Mr. Donoghue, for appearing here today.  We

14   appreciate your willingness to appear voluntarily.

15         My name is Sara Zdeb.  I'm the majority

16   Chief Oversight Counsel for the Judiciary Committee. And I'll

17   now ask everyone else on the Zoom to go around and please

18   introduce themselves for the record, with the exception of Mr.

19   Donoghue's counsel, who we will get to in just a minute.  And

20   maybe for the ease of this, we can start with my colleagues on

21   the chair staff.

22         Mr. Charlet.  I'm Joe Charlet, Counsel for

23   the majority.

24         Ms. McClain Walton.  Good morning.  I'm

25   Nicole McClain Walton, Counsel for the majority.

1           Mr. Flynn-Brown.  Good morning, Mr. Donoghue.

2 My name is Josh Flynn-Brown.  I'm Deputy Chief Investigative

3 Counsel for Senator Grassley.  We want to thank you for your

4 time this morning and this afternoon.  And

5 I'll turn it over to DeLisa for her introduction.

6           Ms. Ragsdale.  I'm DeLisa Ragsdale.  I'm

7 Chief Investigative Counsel for Senator Grassley.

8           Ms. Zdeb.  Department counsel?

9           Mr. Weinsheimer.  Brad Weinsheimer,

10 Department of Justice.

11           Ms. Loeb.  Emily Loeb, Department of Justice.

12           Ms. Antell.  Kira Antell, Department of

13 Justice.

14           Ms. Zdeb.  Thank you.

15           The Federal Rules of Civil Procedure do not

16 apply to the committee's investigative activities, including

17 transcribed interviews.  That said, we do follow some

18 guidelines that I'll go over now.

19           Our questioning will proceed in rounds.  The

20 majority staff will ask questions for one hour, then the

21 minority staff will have the opportunity to ask questions for

22 an equal amount of time.  We will go back and forth in this

23 way until there are no more questions.

24           We typically take a short break at the end of

25 each hour, but if you need to take a break at any other time,

1    please just let us know.

2              As I noted earlier, you're appearing

3    voluntarily, and we very much appreciate that.  I want to note

4    that you have been authorized by the Department of Justice to

5    provide "unrestricted testimony, irrespective of potential

6    privilege" on topics within the scope of the committee's

7    investigation.

8              As such, we anticipate that our questions

9    will receive complete responses.  As you can see, we have a

10   stenographer taking down everything that we say to make a

11   written record.  And so we ask that you give verbal responses

12   to each question.

13             Do you understand?

14             Mr. Donoghue.  Yes.

15             Ms. Zdeb.  We encourage witnesses who appear

16   before the committee to consult freely with counsel if they

17   choose.  You're appearing here today with counsel.

18             Counsel, could you please introduce

19   yourselves for the record.

20             Mr. Andres.  Sure.  Good morning.  My name is

21   Greg Andres from Davis Polk.  And together with me here in New

22   York are my colleagues, Kate Swan and Charles Klug.  And on

23   the Zoom is Brook Jackling in Washington.

24   Thank you.

25             Ms. Zdeb.  Mr. Donoghue, we want you to

1  answer our questions in a complete and truthful manner. So if

2  you don't understand one of our questions, please just ask.

3  You should understand that, although this interview is not

4  under oath, by law, you are required to answer questions from

5  Congress truthfully.

6          Do you understand that?

7          Mr. Donoghue.  Yes, I do.

8          Ms. Zdeb.  And specifically, witnesses who

9  knowingly provide materially false statements during the

10  course of a congressional investigation could be subject to

11  criminal prosecution under 18 USC 1001.  And this statute

12  applies to your statements in this interview.

13          Do you understand that?

14          Mr. Donoghue.  Yes, I do.

15          Ms. Zdeb.  Is there any reason why you are

16  unable to provide truthful answers to today's questions?

17          Mr. Donoghue.  No.

18          Ms. Zdeb.  Finally, we ask that you please

19  not speak about what we discuss in this interview with anyone,

20  outside of those of us who are on the Zoom, in order to

21  preserve the integrity of our investigation.

22          Is there anything else that my colleagues

23  from Senator Grassley's staff would like to add at this point?

24          Mr. Flynn-Brown.  I have nothing to add at

25  this point.  Thank you.



1          Ms. Zdeb.  In that case, this is the end of

2    my preamble.

3          Mr. Donoghue, do you have any questions

4    before we begin?

5          Mr. Donoghue.  No.  I'd just like to thank

6    the Senate and Senate staff for your professionalism

7    throughout, as well as the Davis Polk team that's helped me

8    prepare for today.  Thank you.

9          Ms. Zdeb.  With that, it is 9:10 a.m., and we

10   can begin our first round of questioning.

11            BY MS. ZDEB.

12      Q.  Mr. Donoghue, what was your most recent role at the

13   Department of Justice?

14      A.  My last official position at DOJ was as the

15   Principal Associate Deputy Attorney General.  I served in that

16   position from mid-July 2020 through the transition.  My detail

17   from the Eastern District of New York to D.C. ended at the end

18   of January.  So I did remain on DOJ's roll because I was a

19   career employee. I officially retired from DOJ in early April

20   of this year.

21      Q.    Congratulations.

22          So working backward from your -- well,

23   actually, strike that.

24          So at some point during that tenure during

25   which you were Principal Associate Deputy Attorney General,

1  you were elevated to the position of Acting Deputy Attorney

2  General; is that right?

3       A.       Technically, I was not the Acting Deputy

4  Attorney General because, under federal personnel law, if

5  there is a Senate-confirmed individual who is still in the

6  Department, you should not use the term "Acting Deputy

7  Attorney General," or "Acting" in any capacity.

8  And since the Deputy Attorney General confirmed by the Senate

9  was still in the Department, I did not technically use that

10  term to describe my position, nor did others, but I was

11  playing that role.

12                 I had the responsibilities and authorities of

13  the Deputy Attorney General from December 23 of 2020 through

14  the transition.

15       Q.   And prior to -- prior to your appointment as

16  Principal Associate Deputy Attorney General, you were --

17  remind me, you were the U.S. Attorney in the Eastern District

18  starting when?

19       A.   I started as U.S. Attorney in the Eastern District

20  in January of 2018 and remained in that position until mid-

21  July of 2020 when I went down to D.C. as the

22  Principal Associate DAG.

23       Q.    Thank you.

24                 And can you give us just a brief overview of

25  your professional experience prior to the time when you became

1    U.S. Attorney in the Eastern District?

2        A.     Sure.

3               Briefly, I graduated law school in 1992.  I

4    was admitted to the bar in December of '92.  In January of

5    1993, I went on active duty in the U.S. Army Judge Advocate

6    General's Corps.  I spent seven years on active duty.

7               I served in a variety of places and

8    capacities.  Most importantly, I served in the

         nd
9    82  Airborne Division in the XVIII Airborne Corps.

10              I was a prosecutor, defense counsel, military

11   magistrate judge, contract litigator, and a few other things

12   along the way.  In January of 2000, I began serving as an

13   Assistant United States Attorney in the Eastern District of

14   New York.  I remained in that office almost 12 years, leaving

15   in November of 2011.

16              During my time in the EDNY, I was a line

17   assistant.  I was promoted to deputy chief of the section,

18   chief of the section, deputy chief of the criminal division.

19   And I was ultimately appointed chief of the criminal division

20   by Loretta Lynch while she was the U.S. Attorney.  And as I

21   said, I served there until November of 2011.

22                     I left at that point and went to work for a

23   Fortune 500 software company as chief of litigation.

24   And I remained in that role until I became the U.S.

25   Attorney in 2018.

1     Q.    Thank you.

2           Turning back to the more recent period during

3   which you were Principal Associate Deputy Attorney General,

4   and, in particular, during the period of time after the 2020

5   election through the conclusion of your tenure in that role,

6   without getting into the details of any particular

7   investigation, can you give us just a general overview of what

8   your role would have been with respect to any investigations

9   into allegations of election fraud?

10    A.   The allegations of election fraud were handled

11   primarily by the U.S. Attorney's Offices.  So each U.S.

12   Attorney obviously had authority over their jurisdiction and a

13   responsibility to carry out investigations that they deemed

14   appropriate.

15           I, sitting in the Office of Deputy Attorney

16   General, to some extent, supervised these investigations, but

17   it was more a coordination role; making sure that the U.S.

18   Attorneys were aware of certain things, or making sure that

19   they were not in conflict with one another because we had more

20   than one office investigating the same thing, that sort of

21   thing.

22           So I had frequent contact with the U.S. Attorneys.

23   I was generally aware of the investigations they were doing;

24   although, I was not deeply involved in individual

25   investigations.  I also made an effort to keep the Deputy

1  Attorney General, Jeff Rosen, up-to-date on what was going on,

2  as well as AG Barr. And also, we had officials within the

3  criminal division headquartered at Main Justice who were

4  involved in some of these investigations.

5          So sometimes there were issues between the U.S.

6  Attorney's Office and the criminal division that I became

7  aware of or got involved in.

8     Q.  Given the role that you just described, again,

9  during this period of time postelection through the conclusion

10 of your tenure in that role, is it fair to say that if the

11 Criminal Division, a U.S. Attorney's Office, or the FBI had

12 concluded that there was evidence of election fraud sufficient

13 to have impacted the outcome of the 2020 election, you would

14 have been made aware of it?

15    A.     Yes, I would have known that.

16    Q.     On December 1, 2020, then-Attorney

17 General Barr publicly announced that the Justice Department

18 had found no evidence of widespread election fraud on a scale

19 that could have affected the outcome of the 2020 election.  I

20 think he later reaffirmed that finding a couple of weeks later

21 on December 21.

22         Did you have any reason to doubt Attorney General

23 Barr's conclusion that the Department had found no evidence of

24 widespread election fraud sufficient to change the outcome of

25 the election?

1       A.      No, none at all.

2       Q.  At this point, I'd like to ask you a couple of

3   questions about a document that we have designated as Majority

4   1.  And we can mark this as Exhibit 1.

5                           (Exhibit  1,  email,  was

6                   marked.) BY MS. ZDEB.

7       Q.  It is an email.  The beginning Bates number at the

8   bottom of the page is -680.

9       A.      I have it.

10      Q.      Terrific.

11              So this is an email that you sent to

12  Assistant Attorney Generals, copying Mr. Rosen, on November

13  11, 2020, attaching a couple of policy documents.  I imagine

14  you're familiar with these policies?

15      A.      Yes.

16      Q.  And there's a -- the dual policies that the

17  Department and the White House each maintain, and have

18  historically maintained, that govern limitations on contacts

19  between those two entities; is that right?

20      A.      That's right.

21      Q.  And at the time you circulated these, what was your

22  general understanding of the limitations they imposed?

23      A.  The memos were designed to funnel communications in

24  a certain way, and I won't go through all the details of it,

25  obviously.  But the goal of each memo was to minimize contact

1    between the White House and DOJ personnel, and to make sure

2    that any communications went through the proper channels so

3    that we can have appropriate insight and supervision over

4    those communications.

5         Q.   So I think you've just described the component of

6    the policy that limits and prescribes who in the White House

7    and the Department can communicate with one another.

8              But as I read it, and tell me if you agree,

9    it seems like the policy also places limits not just on who

10   within the Department can communicate with the White House and

11   vice versa, but also when those sorts of communications can

12   occur.

13             So, for instance, at the bottom of the first

14   page of the document, Bates-numbered -681, there is some

15   language -- there's some language indicating that only when it

16   is important for the performance of the President's duties,

17   and important from a law enforcement perspective, is it

18   acceptable for there to be communications about pending or

19   contemplated investigations or prosecutions.

20             Is that consistent with your understanding?

21        A.   Yes, it is.

22        Q.   Why did you circulate these policies at the time,

23   which was about a week after the 2020 election?

24        A.   Right.  These are long-standing policies, but I

25   circulated them on that particular day pursuant to a

1   conversation I had with Will Levi, L-e-v-i.  Will was

2   AG Barr's chief of staff at that point.

3           And I don't remember all the specifics,

4   obviously, but I recall Will calling me -- or we were on the

5   phone, for whatever reason, and he asked me to circulate these

6   policies back around to the AG -- AAGs, sorry -- Assistant

7   Attorneys General, as sort of just a precautionary measure.  I

8   don't, again, remember exactly why he said to do this, but he

9   said something like, Let's just make sure nobody trips over a

10  line or anything to that effect.  Let's make sure people are

11  aware of the policies.

12          And so I sent it out pursuant to that

13  discussion.

14      Q.  Did you have some understanding of why that

15  precaution was needed at that time?

16      A.  Not really.  I don't remember him giving a specific

17  reason for it, but obviously we were in the post-election

18  period.  There were challenges all over with regard to the

19  election, and it was clearly going to be controversial for

20  some period of time.  It was a tumultuous period.

21          And I just generally remember Will saying

22  something like, Let's just remind our people of where the

23  lines are.

24                  I think he had sent this out to other people

25  in the AG's staff, and he thought it might be a good idea for

1   me to send it to the AAGs.  I agreed, and I sent it out.

2       Q.      Did you take notes of that call,

3   incidentally?  I know we've seen other notes of yours that

4   we'll get to a bit later, but I'm curious if you have any from

5   that conversation with Mr. Levi.

6       A.  No, there are no notes from that.  I spoke to him

7   often.  And it was a very routine thing.  I wouldn't have

8   taken notes on that.

9       Q.      Fair enough.

10          Just to be clear, because it sounds like

11   you're describing this largely as a prophylactic measure and,

12   perhaps, in anticipation of future communications.  But at the

13   time you sent this out -again, November 11, shortly after the

14   election -- were you aware at that point of any outreach from

15   the White House to the Departments that may have implicated

16   those policies?

17       A.      No.

18          Ms. Zdeb.  So I'd like to jump ahead about a

19   month or so, and ask you about a document that we have

20   designated as Majority 2, if you have that.  And we can mark

21   this as Exhibit 2.

22                          (Exhibit 2, email, was

23              marked.) BY MS. ZDEB.

24       Q.  So this is an email from Theresa Watson in the

25   Office of the Attorney General.  It has some documents

1   attached to it related to allegations of election fraud in

2   Antrim County, Michigan.  You're not on the email, but she

3   sends these two documents to the two U.S. Attorneys in

4   Michigan, in the Eastern and the

5   Western District, and she says, "See attachments per

6   Rich Donoghue."

7              Do you recall how the -- how the attachments

8   to this email, that it seems like you requested to be sent to

9   the two U.S. Attorneys, how those attachments first came to

10  your attention?

11      A.  Generally, yes.  It's been, obviously, quite a

12  number of months at this point.  But I do remember generally

13  how those documents were being discussed that day, and why

14  they went out to those U.S. Attorneys.

15      Q So can you describe that context that you're recalling?

16      A.    Sure.

17              So the Allied Security Operations Group

18  report that is attached there is dated December 13. These

19  communications took place on December 14.  I won't get into

20  all the details of that report, but amongst other things, it

21  claimed to be a forensic review of Dominion Voting machines

22  and Dominion Voting software used in Antrim, A-n-t-r-i-m,

23  County in

24  Michigan.  And the report claimed that this forensic review

25  indicated that there was a 68 percent error rate in the

1  machines used in Antrim County.  That made a lot of news that

2  day.

3          It was -- I think this was part of a civil

4  filing.  The forensic review, as I recall correctly, arose

5  from some state litigation.  There was some lawsuit filed, I

6  believe, by a private citizen. Pursuant to that action, the

7  state court had authorized its forensic review of the machines

8  and software in the county, and that's what this report

9  supposedly arose from.

10          December 14th was the day that Attorney General

11  Barr announced his resignation and submitted his resignation

12  letter to the President.  Later that afternoon, I was up at AG

13  Barr's office, and he said,

14  "Have you heard about or seen this report from Michigan?"

15          It was getting a lot of coverage in the

16  media.  And, obviously, if there really was a 68 percent

17  error rate in Dominion Voting machines and systems, we had a

18  huge problem on our hands.  Not that we believed that, but

19  obviously that's what the report was claiming.

20              So I don't know if I had seen the report at

21  that point or just seen headlines or whatever it was.

22  But we had a brief discussion, and he said something to the

23  effect of, We have to get on top of this; make sure the U.S.

24  Attorneys are aware of this report, since they would have

25  primary authority and jurisdiction and responsibility for

1  addressing these things, and let's find out what this is all

2  about.

3            I think at that point, he had said that he

4  wanted DHS, Department of Homeland Security, to take a look at

5  the report and to let him know what their views were.

6            And so various things were going on with

7  regard to this report.  And as I was leaving AG Barr's office,

8  I think he said Theresa -- who is Theresa Watson, his

9  secretary -- I think he said Theresa has the report.  She has

10  electronic copies.

11            And so as I passed her desk, I said, "Theresa, do

12  you have these reports about this Michigan thing?"

13            She said, "Yeah, I've got them right here."

14            And I said, "Just do me a favor.  Send them

15  out to the U.S. Attorneys in Michigan."

16            Which she obviously did pursuant -- as you

17  see in this email.

18            I think I also called the U.S. Attorneys

19  there.  My recollection on this is not great, but I believe I

20  called Matt Schneider first.  And I just said, hey, you know,

21  heads up.  This report is out there.

22            And he was already aware of it.  I don't

23  think he had seen the report.  I don't recall exactly, but he

24  was aware of it.

25                  And I said, all right, just, you know, get on

1  top of this.  We're going to find out whether there's anything

2  to this.

3            And then I believe Matt then told me that Antrim

4  County is actually Andrew Birge's district.  I called Andrew

5  and said, you know, basically the same thing.  Heads up.  This

6  thing's out there.  We're going to try to take a look at this

7  and figure out if there's anything to this report.

8            And subsequently what happened was DHS did

9  look at the report.  There were some communications back and

10  forth.  The AG asked them to provide what he termed a "white

11  paper" to provide their views on the report. Ultimately, a

12  couple days later they had provided, I think, a one-page

13  summary.  It was just sort of bullet points.

14                    And they also came over with their experts to

15  discuss the report with AG Barr, which we did.  We discussed

16  it with DHS as well as the FBI.

17  Director Wray was there.  I believe the deputy director was

18  there and one or two other FBI personnel.

19                    And the reason, just so you understand that

20  we were turning to DHS, is because DHS has the expertise with

21  regard to election hardware and software.  Their election

22  support efforts are designed to help local, state and other

23  entities conduct elections.  And so they had the expertise as

24  to these machines.

25                    They came over.  They briefed AG Barr.  They

1   provided their report.  And they were generally very critical

2   of this Allied Security Operations Group report.  They

3   explained why they felt it was defective.

4                    Ultimately, there was a hand recount ordered

5   in Antrim County that was pursuant to the state litigation

6   that was going on.  And from what I recollect, the hand

7   recount revealed that there was only a one-ballot difference

8   between what the Dominion systems had counted and what the

9   hand recount showed.

10  There were over 15,000 votes cast in Antrim County. And so I

11  just kind of myself did the error rate calculation, and I

12  believe it was .0063.

13            So the difference was the Allied report

14  claiming a 68 percent error rate and the hand recount showing

15  a .0063 error rate.

16        Q.    Thank you.

17              When the report first came in, did you have

18  any familiarity with Allied Security Operations Group?

19        A.    No.  I had never heard of them.

20        Q.  And if you flip to the very last page of the so-

21  called forensic audit, you'll see a signature from an

22  individual named Russell Ramsland, who presumably authored the

23  report.

24              Did you have any familiarity with

25  Mr. Ramsland at the time?

1        A.     No, none at all.

2        Q.   I'd like to go back to something that you said a

3   minute or two ago, because it seems to me that when you were

4   describing this report, you said it "claimed" to be a forensic

5   review.  You noted specifically the claimed 68 percent error

6   rate and said "not that we necessarily believed it," or

7   something to that effect.  But you also indicated that

8   Attorney

9   General Barr said, "We need to get on top of this."

10              Can you give me a sense of why he felt it was

11   important to get on top of this, if you weren't necessarily

12   certain that it was at all credible?

13        A.   So I think you have to understand the AG -by which I

14   mean AG Barr's -- general approach to this, which he had been

15   very consistent about for months.

16              Well before the election, I heard him say on

17   many occasions that we need to make sure the American people

18   can trust the outcome of this election.  He was very, very

19   concerned that the election, because it was being conducted in

20   the midst of a pandemic, and there were new procedures, and

21   there were questions to be raised about the security of the

22   election, he was very concerned that we would potentially end

23   up in the situation where a large number of the American

24   people would not trust the outcome of the election.  And, as a

25   result, we did various things.

1          One of which was he issued a memo shortly

2   after the election which authorized U.S. Attorney's Offices,

3   FBI and others to conduct real-time investigations, rather

4   than delay those investigations, which would have been the

5   more traditional department approach.  And I heard him speak

6   about this pretty passionately a number of times, like, We

7   need to do our job.  We need to be able to say to the American

8   people that they can trust this election.  And if there's a

9   problem, we need to know what it is and what the scope of it

10  is.

11          So this was all in keeping with his approach. So

12  when you have purportedly a forensic audit of a single county,

13  the implications of that go far beyond the county.  If, in

14  fact, there really was a 68 percent error rate in one county

15  in Michigan, because Dominion Voting machines and Dominion

16  Voting software was widely used across the United States, that

17  would mean that we had a huge problem across the country and

18  with the

19  Presidential election.

20              So he wanted to get on this quickly because,

21  if that was true, then we needed to understand what the

22  implications were.  And if it was not true, we need to be in a

23  position to say that, if appropriate.

24      Q.  So I'm just trying to understand his position a

25  little bit more.

Trustpoint.One | Alderson.          www.trustpoint.one
www.aldersonreporting.com          800.FOR.DEPO
(800.367.3376)

1           Was it your sense that his position was that

2     in order to provide some assurance of the accuracy of the

3     election to the American people that it was the role of the

4     Department to look into all allegations of election fraud

5     irrespective of how farfetched they were?

6           A.   I think each of these allegations had to be sort of

7     taken on its own facts, right.  And that's why we analyzed

8     them one at a time.  And so, obviously, hearing a 68 percent

9     error rate being reported, that seemed unlikely to us.  But if

10    it was true, we had a huge problem.

11          And so I think that his concern at that point

12    was understanding, one, how they came up with this; and, two,

13    what DHS said about the reliability of this conclusion.  So he

14    was very concerned about claims like this that people could

15    use to undermine the country's confidence in the election.

16          Q.   And to your knowledge, did he or did you personally,

17    as part of this thought process, consider whether the act of

18    the Department taking public actions to look into allegations

19    like these might have the inadvertent effect of legitimizing

20    them for the very -the very people that it sounds like he was

21    trying to provide assurances?

22          A.   Well, the appearance was always a concern, and it

23    was something that we took into consideration.

24          But, for instance, with regard to this,

25    right, we didn't do anything overtly.  It's not as if we

1   issued grand jury subpoenas or began interviewing witnesses or

2   anything like that.  At the time, we made a request to DHS.

3   DHS did their evaluations.  They provided the paper.  They

4   came over and briefed the AG, but no one outside the

5   government knew that.

6           And furthermore, we relied on the hand

7   recount, which we had nothing to do with.  That was ordered by

8   the State court.  We were not involved in that litigation.  We

9   made no public statements about it, to my knowledge, anyway.

10          And so at the end of the day, everything that

11  we did with regard to this Antrim report, I think, was

12  nonpublic, but it did inform the AG's comments when he later

13  said that we've looked at a lot of these allegations,

14  including the most significant ones, and this definitely was a

15  significant allegation.

16          And we at the Department have concluded that

17  there's no fraud on the scale that would call into question

18  the outcome of the election.  So all these things mattered.

19  We were very sensitive to the appearances, but you had to

20  balance the appearance against the ability of someone like the

21  Attorney General to say that we've looked at these things, and

22  we either have or have not found fraud that calls into

23  question the election.

24          But, thankfully, he was in the position,

25  because of the decisions he made earlier on, to be able to say

1   that.

2        Q.   Turning back to the two attachments that you

3   forwarded to the two U.S. Attorneys, do you recall discussing

4   with Mr. Rosen how he received those emails earlier that day?

5             And to be more specific, were you aware that

6   they had been sent to Mr. Rosen by Molly Michael, a White

7   House special assistant, who told him that the documents were

8   "from POTUS"?

9        A.   I believe I found it out later, but you should

10  understand that there's no way that I knew that before Theresa

11  Watson sent them out.

12            Just so the physical layout is clear, the

13  Attorney General's office is on the fifth floor.

14  DAG Rosen's office is on the fourth floor.  I think, if

15  I remember correctly, the line of these emails, DAG Rosen

16  received that email from the President's secretary about two

17  minutes before Theresa sent them out.  So that's

18  coincidental, and it's a result of the fact that this report

19  was all over the place that day. It was all over the

20  Internet.  It was being sent to various places.

21            So although it's the same report, the email

22  that went to DAG Rosen was not the source of this email that

23  went from AG Barr's secretary out to the U.S. Attorneys.  They

24  were overlapping, but there's no way that we got it in to DAG

25  Rosen's email box and, in less than two minutes, printed it

1  out, ran up to the fifth floor, ran down the hallway, had a

2  secretary scan it, and then sent it out to the U.S. Attorneys.

3  It didn't happen that way.

4       Q.       And just to close the loop on the process

5  that you described in which DHS was pulled in, and I think you

6  described a meeting with DHS, the FBI director, the deputy

7  director and the Department, is it fair to say that the

8  conclusion of the DHS report, I think, as you said was highly

9  critical, and that -well, you tell me.

10              How was the DHS report received by that group

11  of individuals who assembled to hear the conclusions of DHS's

12  work?

13      A.   Just as a general matter, DHS reported out that the

14  Allied report was unreliable; that it was riddled with errors

15  and that, amongst other things, they were looking at the wrong

16  version of the software.

17              So the software that Antrim County used was a

18  different version of the Dominion software than is described

19  in the report.  I think that the one-page summary gives a lot

20  more detail, and I'll just defer to that.  But I do recall

21  being up in the conference room on the sixth floor with the

22  Attorney General and the other assembled federal partners, and

23  sitting through that briefing and having DHS explain to the

24  AG, to Director Wray and to the others in the room why this

25  just did not support.

1          And I think it was within a day or two,

2    probably, that the hand recount was completed.  And then, you

3    know, obviously, a strong level of confidence that the Allied

4    report was not accurate.

5          Q.   So jumping ahead, we've been talking about -we've

6    been talking about, primarily, December 14, which is when that

7    report was first in the news and was the day when it was sent

8    out on your behalf to the two Michigan U.S. Attorneys.

9          Jumping ahead a day to December 15, do you

10   recall attending a meeting or meetings at the White House that

11   day, which, again, was the day after Attorney General Barr

12   announced that he would be resigning?

13         A.   Yes, I do.

14         Q.   And was it one meeting or two meetings?  It's been a

15   little bit unclear to us from the documents.

16         A.   There was one meeting in the Oval Office.  I don't

17   recall right now as I sit here whether we had a short meeting

18   with the White House counsel or anyone else before we went to

19   the Oval Office, but I do remember the Oval Office meeting.

20         Q.   So with respect to the Oval Office meeting, it

21   sounds like you attended, obviously.

22         Who else attended that meeting?

23         A.   From what I recall, in the Oval Office, there was

24   obviously the President, Chief of Staff, White House counsel

25   Pat Cipollone, I believe White House Deputy counsel Pat

1   Philbin, myself, DAG Rosen, and I believe there was an

2   individual from DHS named Chad Mizelle.

3                   After the meeting started, the Chief of Staff

4   excused himself and said he had to go work on something else.

5   And somewhere around that time, Ken Cuccinelli, who was the

6   number two at DHS, the acting number two at

7   DHS, came into the meeting.

8        Q.   Who called the meeting?  Was it a meeting that the

9   White House called?  Was it a meeting that the Department

10  called?

11       A.   The department did not call it.  We were called over

12  to the White House.

13       Q  Did you have a sense at the time of what the reason

14  for your being called over to the White House was?

15       A.   I don't remember specifically how it was

16  communicated to me that we had to go over to the White House,

17  but I do think we understood at the time it had to do with

18  election matters.

19       Q.   And given the proximity in time to the Antrim County

20  allegations that we were just discussing, I'm curious whether

21  those were a topic of discussion in this meeting?

22       A.     Yes, they were.  Yes.

23       Q.   And could you give us a sense of how that discussion

24  unfolded?  Who raised the allegations?  Was it the President?

25                   Just sort of elaborate a bit on what that

1   discussion involved.

2        A.   Right.   And with the caveat, obviously, I'm not a

3   human tape recorder, so I can't give you exact quotes in many

4   of these instances.   But, generally, the President raised the

5   Antrim County matter.   And he said something to the effect of,

6   you know, "Have you guys seen this report?   This is

7   unbelievable.   This is a disaster.   They've got a 68 percent

8   error rate.   They used these machines all over the country,"

9   and so on.

10             And so the conversation basically progressed

11   by us saying, Well, there is a hand count underway that should

12   be done shortly.   And I recall Ken Cuccinelli saying, "The

13   hand count will be the gold standard. That will tell us

14   whether that's true or not."   And we should know in a day or

15   two, or maybe three, at most, whether the hand recount

16   supports or undermines the Allied report.

17             And so there was nothing to be decided or to

18   be done.   It was just a matter of the President talking about

19   the possible implications of this, if, in fact, the report was

20   correct.   And we all agreed that if there's a 68 percent error

21   rate, then, yes, there's a huge problem for the country.   But

22   let's not get ahead of ourselves.   The hand recount is

23   underway and let's let that progress.   And we should know in a

24   day or two whether there's really anything to this.

25             He seemed satisfied with that response.

1      Q.   Did he give you the impression at the time that this

2    was something he would like the Department to look into?

3      A.   The way he generally framed and phrased these

4    things, not just in that meeting but in subsequent meetings,

5    was "I want to make sure you guys were aware of this."

6          And so we said -- well, you know, I think, DAG

7    Rosen said, "Mr. President, we're aware.  We're aware of the

8    report.  We don't know what to make of it yet."

9          I don't recall if he told him that AG Barr

10   had asked DHS to look at it or not.  I just don't remember.

11   But the way the President presented these things throughout

12   was, "I want to make sure you guys know about this, that

13   you're aware of it."

14               We would say, essentially, "Yes, sir, we're

15   aware of it," and leave it at that.

16               And like I said, because the hand recount was

17   already underway on the Antrim County matter, it was very easy

18   to just say, you know, "Let's wait on the hand recount and see

19   what that shows."

20     Q.   Did any of the other White House participants in the

21   meeting offer views on the Antrim County issue at the time?

22   For instance, did Mark Meadows chime in, if he was still

23   there?

24     A.   Not really.  I mean, everyone is aware of the

25   report, obviously.  I don't know that anyone in the room had

1  read it fully at that point, but everyone was aware, and

2  everyone was aware that if this was right, it had serious

3  implications for the election nationwide.  But, again, the

4  matter was very much up in the air.

5              I think everyone was just relieved that there

6  was a hand recount underway so that we can say, well, let's

7  just wait for a day or two and see how this thing really

8  shapes up.

9       Q.  Did the President raise the prospect of appointing

10  special counsels to investigate Dominion

11  Voting systems?

12      A.  I don't specifically recall if he did in that

13  meeting.  He may have.  He raised it in at least one

14  subsequent meeting.  And I don't know that it was specifically

15  to Dominion, but he raised the possibility of a special

16  counsel being appointed to look at election fraud overall.

17      Q.  And what was the subsequent meeting where you do

18  recall him raising that?

19      A.  I believe it was raised on December 31st, in the

20  meeting.  And the reason I recollect that is because the

21  President said something to the effect of, "I think Ken

22  Cuccinelli would be a great special counsel."

23              And Ken was not in the room when the President said

24  that.  I remember sort of taking note of the fact that Ken

25  wasn't there.  I think that was in a subsequent meeting.

Trustpoint.One | Alderson.          www.trustpoint.one
                                     www.aldersonreporting.com          800.FOR.DEPO
                                                                        (800.367.3376)

1    Q.   Putting aside the question of whether he

2  specifically invoked the idea of special counsels in the

3  December 15th meeting we've been talking about, did he make

4  other complaints about Dominion, generally speaking?  Did he

5  ask the Department to look into issues involving Dominion?

6    A.   I'm sure Dominion came up, obviously, in connection

7  with Antrim discussion, but I don't specifically recall him

8  either on the 15th or the 31st talking at any length about

9  Dominion.  It may have been there.  I just can't recall

10  specifically, as I sit here now.

11    Q.   Did the President raise the prospect of the

12  Department filing legal briefs in support of his campaigns,

13  lawsuits or lawsuits filed by his allies, with the aim of

14  challenging and overturning the election results?

15    A.   He did raise the prospect of the Department filing,

16  not so much on his behalf or the campaign's behalf -- but,

17  again, as he framed and phrased this throughout, it was that

18  the election has been stolen from the American people, and

19  doesn't the Department represent the American people and

20  shouldn't you guys be doing something.

21            So I do recall -- these conversations overlap

22  a little bit, so you'll forgive me.  But between the 15th and

23  the 31st, the President saying things like, "All these cases

24  are getting dismissed because the judges say we no have

25  standing."

1          And the President clearly believed that the

2    department would have standing.  And I can understand, as a

3    layman, why he would.

4          So he believed, well, if these elections were

5    not conducted properly in certain states, that means that the

6    American people have been harmed, and, therefore, the

7    Department should be filing things because the Department

8    would have standing.  It represents the American people.  And

9    then the judges wouldn't dismiss these cases on standing

10   grounds, and you can actually get to the merits.

11         We explained to the President a number of

12   times why that doesn't work and why the Department did not

13   have standing.  There was a particular brief that was

14   forwarded, I think, to Jeff Rosen, probably after AG Barr

15   left.  And we asked both the Office of the Solicitor General

16   and the Office of Legal Counsel to take a look at it and give

17   us their views as to whether the Department would have

18   standing to file such a brief, because that was the first

19   issue.  That didn't mean we would file the brief; it just

20   meant there was a question about standing.

21         And both OSG and OLC came back and opined

22   that the Department would not have standing to file such a

23   brief.

24   Q.   Thanks for the explanation.  And we'll get back to

25   that, that potential Supreme Court brief in a little bit.

1          I take your point that the President may have

2   viewed or may have conveyed that he viewed the notion of a

3   legal filing by the Department being more on behalf of the

4   American people as opposed to a filing on behalf of his

5   campaign or filing that would benefit him personally.

6          But you understood, obviously, that such a

7   filing would, in fact, have redounded to the benefit of him in

8   his capacity as a political candidate; right?

9      A.   Yeah.  I think as a practical matter, it would have

10  benefited his campaign, of course.  But throughout, the

11  President was very careful in how he worded these things.  And

12  he would say, "Well, you guys represent the American people,

13  and the American people are the victim here.  They are the

14  ones being harmed," that kind of thing.

15         So I just wanted to make it clear that his

16  wording was more along those lines.  He wasn't saying, "I want

17  you to file this on my behalf or on behalf of my campaign."

18  But, sure, we all understood the implications.

19     Q.   At some point a couple of days after this meeting on

20  December 21, which was, I think, two days before Attorney

21  General Barr formally stepped down as Attorney General, he

22  reiterated that the public statement he had made previously to

23  the effect of the Department has found no evidence of

24  widespread election fraud sufficient to alter the outcome of

25  the election.

1                    And I'm curious whether you have any sense as

2    to whether that later statement on December 21st was related

3    to pressure that he was feeling, that you or Mr. Rosen may

4    have been feeling, from the President to look into some of the

5    issues we just discussed.

6         A.   I don't know his motivations for making it that day.

7    As you said, he was leaving two days later. I just think he

8    wanted to make it very clear before he left that that was

9    still the situation, as far as the Department was concerned.

10        Q.   So, in other words, in the intervening period of

11   time between when he first made the statement and December

12   21st, none of the allegations that had been brought to the

13   Department, either by the President or that had appeared in

14   the public domain, had changed the conclusion that there was

15   no evidence of widespread election fraud?

16        A.     That's right.

17        Q.   I want to ask you real quickly about a document just

18   to make sure that I understand what it is and kind of where it

19   fits into the chronology.  So if you could pull up the

20   document that is designated

21   Majority 4.

22                    (Exhibit  3,  email,  was

23                    marked.) BY MS. ZDEB.

24        Q.         And this is an email exchange between you and

25   Ken Cuccinelli on December 18th.  On December 18th, he

1   forwards you a one-pager that appears to summarize the Antrim

2   County allegations we were just discussing.  And then later on

3   in the email chain -- and this is the document numbered -689

4   at the bottom -- you respond to Cuccinelli, and you say that

5   you understand the limited scope of the document he has

6   attached and will be sure the AG knows that.

7                    You then, I think, go on on the final page of

8   the exhibit to ask Theresa Watson to forward the attachment to

9   the AG.

10                   Just to put this in context, is the one-page

11  document attached to Ken Cuccinelli's email to you, which you

12  then went on to ask be forwarded to the Attorney General, is

13  that the DHS kind of summary analysis that you were talking

14  about earlier?

15       A.    Yes, it is.

16       Q.   And by "AG" in this series of emails, at the time,

17  you were referring to Attorney General Barr and not Mr. Rosen;

18  is that right?

19       A.    Correct.

20       Q.   So I'd like to ask you about another one of your

21  conversations with the President, and if you could pull up the

22  document labeled Majority 5.

23                   (Exhibit 4, notes, was

24                   marked.) BY

25                   MS. ZDEB.

1     Q.  And although you've said earlier something to the

2  effect of, I'm not a stenographer, this is one where there are

3  some pretty detailed notes.

4           So, for starters, I should ask are these

5  notes that you took?

6     A.     Yes, they are.

7     Q.  And at the top, there's a notation saying,

8  "12/27/20, DAG called, on with POTUS and wants to conference

9  me in."

10          So it sounds like the DAG, who was Mr. Rosen

11  at the time, was on the line with the President and wanted to

12  patch you in.  Is that an accurate description of what

13  happened?

14    A.  Yes, that's right.  And because of the date, you

15  should just be aware that DAG Rosen, who I referred to

16  typically as "the DAG," was the Acting Attorney General

17  because AG Barr had left on the 23rd.

18          Ms. Zdeb.  Okay.  And by the way, just so I

19  am not completely confusing exhibit numbers, I think

20  Majority 5 can be designated --

21          Actually, Barb, what exhibit number are we on

22  right now?  And if you don't know, we can come back and

23  clarify later.

24                         (Discussion off the record.)

25          BY MS. ZDEB.

1     Q.   So turning back to these notes, which are -which

2    have now been marked as Exhibit 4, do you recall roughly what

3    time of day this call was?

4     A.        It was sometime in the afternoon.

5     Q.   And did you have a sense as to why Mr. Rosen wanted

6    to patch you in?

7     A.   Yes.  He called me that afternoon.  It was on the

8    government cell phone, and I answered it.  And he said

9    something to the effect of, "Hey, I'm on the phone with the

10   President.  We've been on the phone for about 30 minutes.

11   He's talking a lot about some of these election allegations.

12   It would be very helpful if you were on the phone.  Do you

13   mind if I patch you in?" And I said, "Of course."

14        And he then three-wayed me into the call.

15    Q.   Did you have a sense of why he thought it would be

16   helpful?

17    A.   Generally, I knew more about the allegations and the

18   Department's work on the allegations than Acting Attorney

19   General Rosen did, because I was closer to U.S. Attorneys, I

20   was closer to the criminal division, I was very close to the

21   FBI deputy director. So I knew what we were looking at and not

22   looking at, for the most part.

23        And I knew that with regard to any major

24   allegations, I had a better sense of, you know, whether we had

25   dispelled them or where we were in the process, that sort of

1    thing.  Not that we were necessarily going to report any or

2    all of that to the President, but he just felt that I had a

3    better handle on it, so I was useful to have sort of at his

4    side in a conversation like this.

5        Q.   Was anyone else on the line, to your knowledge?

6        A.     Not that I know of.

7        Q.   You said he had been on the line with the President

8    for some period of time before you got patched in.  Did you

9    say three minutes or 30, 3-0, minutes?

10       A.   He told me 3-0.  So it wasn't like he immediately

11   rolled me in.  It seemed like he was trying to have the

12   conversation with the President.  And for whatever reason, at

13   that point, thought it would be better to have me on the line.

14       Q.          Once you joined, how long did the call last?

15       A.   It was a long call.  I'd say over an hour after I

16   joined.

17       Q.        Was this the first call of this nature, to

18   your knowledge, that the President had placed to

19   Mr. Rosen?

20       A.   I don't recall specifically.  He would be a better

21   position to say that.

22            We had the meeting on the 15th, obviously. But

23   between the 15th and the 27th, I don't remember without

24   looking at, you know, maybe emails or things that were

25   contemporaneous.

1     Q.   But certainly it sounds like this is the first one

2     that you would have been patched in to, whether there were

3     other intervening calls or meetings or not.

4     A.   Yes.

5     Q.   So in a second, I want to walk through aspects of

6     the notes.  But before I do that, I'm wondering if you can

7     just give us kind of a thumbnail sketch, if you will, of the

8     overall tenor of the call.

9     A.   The President was going on at length about some of

10    these allegations.  It was similar to some of things he said

11    on the 15th about "This election has been stolen out from

12    under the American people.  Are you guys aware of this or that

13    allegation?  Are you taking it seriously?"  That sort of

14    thing.

15               And the President did the vast majority of

16    the talking.  And we sort of were taking the approach of

17    saying, you know, "Yes, we're aware of it," or if we're not,

18    admitting that "Well, we haven't heard that one before."

19               And, basically, DAG Rosen and I had

20    conversations in advance of this, and even in advance of the

21    15th of, saying our approach is going to be to say to the

22    President we're doing our job.  "Yes, sir, we understand.

23    We're doing our job."  And try to leave it at that as much as

24    possible.

25               So the President was well-versed in these

1   various allegations.  It certainly seemed that people were

2   providing these allegations to him and he was then relaying

3   them to us.  There was at least one allegation in here that I

4   had not heard of before, and, frankly, that was the reason for

5   me taking notes, in case he came up with something that we had

6   not heard of before. We ultimately did check that out, but it

7   did not support any conclusion that there was a problem with

8   the election.

9        Q.  On the very first page of your notes, there's a

10  notation toward the top about Scott Perry, and then in

11  parenthesis, I think it says "PA."  And then it says, "Senator

12  from PA - Doug Mastriano."

13          What was the President's point in raising

14  these two individuals, if you recall?

15       A.  I don't remember exactly, but I generally remember

16  that the President said something to the effect of "there are

17  officials all over the country who are raising issues about

18  the elections."

19          This one obviously was Pennsylvania.

20             And he said, for instance, you know, you've

21  got Scott Perry in Pennsylvania and the State Senator

22  Mastriano.  I think the State had had some hearings, or

23  something to that effect, both Pennsylvania and I think

24  Georgia did something similar.

25             So the President was saying that these local

1  officials, or I guess in Scott Perry's case, a federal

2  official, had all kinds of information about all kinds of

3  fraud and problems and things that had impacted the election.

4       Q.   There's also a reference to Jim Jordan on this first

5  page.  Did the President raise him in a similar vein?   In

6  other words, as someone who said or was advancing claims of

7  election fraud?

8       A.       He made a passing reference to Jim Jordan.

9  You can see I wrote there, "Fighter."

10          And the President said something to the

11  effect of, you know, "People were trying to address this

12  problem, Scott Perry and Mastriano.  Jim Jordan, he's a big

13  fighter, but they can't do it in their own capacities," or

14  something to that effect.  You know, they all had this limited

15  authority and limited responsibility.

16              So he did mention him, but it was very much

17  in passing.

18       Q.          How did you interpret the rejoinder to that?

19              In other words, if Congressman Scott Perry or

20  Congressman Jim Jordan couldn't do as much as the President

21  wanted in their own limited capacity, was he suggesting that

22  the Department had a greater capacity?

23       A.   He didn't say that specifically, but, you know, he

24  would say again, similar to what he said on the 15th,

25  essentially, "My God, are you guys aware of this?  Have you

1    seen this?  Have you seen these reports?  Did you hear about

2    this hearing in

3    Pennsylvania?"

4                 And then he would go through various

5    allegations, like you can see I have 205,000 votes there.  He

6    said that, you know, according to what he's being told from

7    Pennsylvania, there were 205,000 more votes certified than

8    were actually cast.  That, in fact, was an allegation I had

9    not heard before.  And, frankly, it's why I started taking

10   notes because I realized the President was going to raise some

11   things that maybe I had not heard before.

12                 And so then he went through the 600,000 votes

13   added.  And you can see, you know, throughout the notes, he

14   raises various things.

15           So, again, sort of in keeping with his tone of "are

16   you guys aware of this," that's how he was discussing it in

17   this call.  But he was -- he was concerned, certainly.  And

18   starting to get -Q. But -- I'm sorry.  Finish your thought.

19           A.   No.  The President was pretty, you know, adamant

20   about there being a major problem, in his view, or a series of

21   problems with the election.

22           Q.   So it seems like, at some point, he then did go on,

23   at least according to your notes, to specifically invoke and

24   perhaps even complain about the Department and the FBI.  You

25   have a notation here saying, "People are angry - blaming DOJ

1    for inaction."

2                  Am I reading that correctly?

3         A.      No.   That's right.   He did say that.

4         Q.   And then later on down the page of your notes,

5    there's a notation about U.S. Attorney's Offices and FBI.   And

6    then on the third page of your notes, which is Bates numbered

7    -737 at the bottom, you have a notation here saying, "DOJ

8    failing to respond to legitimate complaints/reports of

9    crimes."

10                 Is that -- am I -- have I deciphered your

11   notes correctly there?

12        A.      Yes, he does say that.

13        Q.   So I hear what you're saying in terms of the way it

14   sounds like the President would typically present the various

15   allegations of election fraud.   But as you're sitting there

16   listening to this, and you hear the complaints about the

17   allegations, you then hear him say, "Jim Jordan and Scott

18   Perry are great, but they are limited in their capacity in

19   terms of what they can do."   And he then goes on to say, "DOJ

20   is failing to respond to legitimate complaints."

21                 So when you put all of those things together,

22   I'm curious how you interpreted it, right?

23   Irrespective of the specific words the President may have

24   used, how did you interpret that as a commentary on what the

25   Department should or should not be doing, in his view?

1     A.   He was certainly complaining about what he thought

2  to be the Department's lack of action.   His displeasure was

3  clear.   He felt that we should be doing things that, in his

4  mind, at least, we weren't doing.

5     Q.   I'm getting close to the end of my hour.   So let me

6  just ask one or two more quick questions in the vein of

7  deciphering some of your handwriting before we take a quick

8  break.

9          There's a notation again on the third page of

10  your notes about -- it seems to be about Georgia.   And it says

11  -- I think it says, "Tape" something "shows fraud."

12          Can you elaborate on what that -- what that

13  statement or allegation was?

14     A.     Sure.

15          This relates to Georgia.   He was going

16  through the different states and he was sort of rattling off

17  these various theories and allegations. With regard to

18  Georgia, he said, "the tape," meaning the videotape at the --

19  I believe it's the State Farm

20  Arena -- "shows fraud."

21          Here it says "Ruby Freeman."   And the word

22  next to that is "Huckster."   Then he says, "Closed the

23  facility and then came back with hidden ballots under the

24  table."   I have an ellipsis there to show that he kept talking

25  about that particular claim, and I heard him make that claim

Trustpoint.One | Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

1    on numerous occasions.

2            He said "The networks," meaning the

3    television networks, "magnified the tape and saw them running

4    them through repeatedly," which was -- the President seemed to

5    be of the view that the videotape in the State Farm Arena

6    showed that the ballot workers were taking the same ballots

7    and running them through the machine repeatedly, I suppose, to

8    rack up votes for one candidate versus the other.

9            Ms. Zdeb.  I've reached the end of my hour,

10   so why don't we go off the record and take a quick break.  And

11   then we can come back and my colleagues on Senator Grassley's

12   staff will have their turn.

13                        (Discussion off the record.) Ms.

14           Zdeb.  It is 10:24, and we can go back on

15   the record.  And, with that, I will turn it over to my

16   colleagues on Senator Grassley's staff.

17           BY MR. FLYNN-BROWN.

18      Q Thank you, Mr. Donoghue.  Thank you for your time

19   today.

20           Can you hear me okay, first of all?

21      A.    I can.

22      Q.    Great.

23           I'd just like to introduce Minority 7 as Exhibit 5,

24   I believe.  This is Bates-stamped -744 to

25   -750.

1                        (Exhibit 5, Description

2                    , was marked.)

3              BY MR. FLYNN-BROWN.

4      Q.      You can pull that up and let me know.

5      A.    I have it.

6       Q.  So with reference to the December 28, 2020, email on

7  Bates -745 from Jeffrey Clark to you and Jeffrey Rosen, it

8  says in part that the draft Clark letter would have been sent

9  to the "Governor, Speaker and president pro temp of each

10 relevant state to indicate that in light of time urgency and

11 sworn evidence of election irregularities presented to courts

12 and to legislative committees, the legislatures thereof should

13 each assemble and make a decision about Elector appointment in

14 light of their deliberations."

15              And then let's move back to Bates -744, the

16 first page in this exhibit.  And I'm going to reference to

17 your email dated December 28, 2020, in response to Clark's

18 email that I just referenced and where you rejected the

19 letter.  And with the following handwritten at the top right

20 corner, if you see that, it says, "This letter was opposed by

21 A/AG + OLC.  Discussed with POTUS on January 3, 2021, and he

22 rejected AAG Clark's idea to send it."

23              Sir, are these your handwritten notes at the

24 top right corner?

25      A.      No, I have no idea who wrote that.

1       Q.       Is it accurate to say that A/AG refers to

2   Acting Attorney General?

3       A.   If I didn't write it, I don't know, but I would

4   assume that's correct.

5       Q.       And would you assume that OLC refers to the

6   Office of Legal Counsel?

7       A.       Yes, I would assume that.

8        Q  Were you in this referenced January 3, 2021, meeting?

9       A.       Yes.

10      Q.       So is it accurate to say that along with

11  President Trump, the Acting Attorney General and the

12  Office of Legal Counsel rejected sending the draft

13  Clark letter?

14      A.       Yes, that's right.

15      Q.   And is it correct to say that you also opposed

16  sending the draft Clark letter, based on your email here?

17      A.       That's correct.

18      Q.   Now, with respect to the January 3 meeting, based on

19  your recollection, who was in that meeting?

20      A.   I entered the meeting after it was already underway.

21  But when I entered, in the Oval Office were the President;

22  White House Counsel Pat Cipollone;

23  Deputy White House Counsel Pat Philbin; the Acting

24  Attorney General Jeff Rosen; Jeffrey Clark, who was the

25  Acting Assistant Attorney General in charge of the

1   Civil Division; Steve Engel, who was the Assistant

2   Attorney General in charge of the Office of Legal Counsel; a

3   White House lawyer named Eric Herschmann; and myself.

4        Q.     Thank you.

5               So is it accurate that -- is it accurate to

6   say then that both you and Rosen provided advice and

7   recommendations relating to this draft Clark letter in that

8   meeting, and that you provided advice and recommendations to

9   the President?

10       A.     Yes, we did.

11       Q.   And President Trump -- is it accurate to say that

12   President Trump accepted your advice and recommendations as

13   well as those of the Office of Legal Counsel's?

14       A.     At the end of the meeting, yes, he did.

15       Q.     Now, Trump isn't a lawyer; correct?

16       A.     Right.

17       Q.   So he listened to the advice of the lawyers in the

18   room; is that right?

19       A Yes.  Yes, he got conflicting advice, and he made a

20   decision.

21       Q.     And where did that conflict exist?

22       A.   Basically, the only one -- the only one advocating

23   for this letter or for a change in department leadership was

24   Jeff Clark, and everyone else in the room was adamantly

25   opposed.  The President heard out both sides for several hours

1    and then made a decision.

2        Q.  And he made a decision on -- and correct me if I

3    misunderstood you.  He made a decision on two fronts, then; on

4    one front, it had to do with the draft Clark letter, and on

5    the second front, it had to do with replacing Rosen.

6            Did I hear you right?

7        A.  Correct.  That meeting was largely about the

8    leadership change or the potential for leadership change.  And

9    at that point, it was very difficult to separate that decision

10   and the leadership change from whether this letter would be

11   sent, because Jeff Clark was pretty clear that he wanted to

12   send this letter and he intended to send the letter, and he

13   would send the letter if he became the Acting Attorney

14   General.  So they sort of went hand in hand.

15       Q.  I see.  Okay.  So then the President, President

16   Trump, rejected not just the draft Clark letter, but he

17   rejected firing Jeff Rosen and replacing him with Jeff Clark?

18       A.    Yes, that's right.

19       Q.      So with respect to that advice that you and

20   Rosen rendered and the President's ultimate decision related

21   to that advice, did he ever instruct you or Rosen to engage in

22   illegal activity?

23       A.  I'll leave the legal conclusions to others. Since

24   I'm a fact witness, I'm happy to relate to the extent I recall

25   what was said and done, but I don't think it's appropriate for

1    me at this point to make legal conclusions about whether the

2    President's activities were in violation of any laws.

3         Q.  Well, that wasn't my question.  So let me restate it

4    to make sure I articulated it properly.

5              So I said, with respect to the advice that

6    you and Rosen rendered at that January 3rd meeting and the

7    President's ultimate decision related to that advice that you

8    rendered, did he ever instruct you or Rosen to engage in

9    illegal activity based on that advice?

10        A.  Again, with the caveat that others can decide

11   whether or not the instructions, if any, were legal or

12   illegal, I did not perceive it to be that, at the time,

13   certainly.

14        Q.  So the ultimate decisions that the President made

15   here is, one, he's rejecting sending the Clark letter, which

16   was your advice; and he's rejecting firing Rosen, which was

17   also your advice.

18        A.   Right.

19        Q.  So I don't see, frankly, anything illegal about

20   those two decisions.  And those were based on the

21   recommendations that were provided to him by the Department

22   lawyers in the room and, I guess, other folks in the room.

23              So is that a correct accounting of

24   January 3rd?

25        A.  That is a correct summary of the President's

1  ultimate decisions, yes.

2       Q.   I think in your testimony earlier with Sara you

3  mentioned a December 15th and a December 31st, 3-1 or 2-1,

4  meeting with the President?

5       A.       3-1.  It was New Years Eve.

6       Q.   Okay.  So we have a January 3rd, 2021, and a

7  December 15th, 2020, and a December 31st, 2020, meeting with

8  the President.

9                Did you meet with the President in person at

10 any other times relating to election fraud matters?

11      A.   No, those were the three times that we met at the

12 Oval Office in relation to election fraud.

13      Q.   Other than this December 27th phone call that Rosen

14 looped you in on, were there any other phone calls that you

15 had with the President?

16      A.       I've had a number of phone calls with the

17 President over the last few years --

18      Q.   Well, I should say relating to election fraud.  I

19 apologize for interrupting, but I should have been more

20 precise here.

21               But with respect to, you know, the election

22 fraud-related issues.

23      A.       Right.  He called me on a morning of

24 December 28th, which was essentially a follow-up to the

25 December 27th late afternoon call.  It was a very short call.

1    I was still in my apartment.  It was probably around 8:00 or

2    8:15.

3            The phone rang.  I answered it.  It was the

4    President.  And he said something to the effect of "I don't

5    know if I mentioned this last night."

6            And he said something, and I don't recall

7    specifically what it was, but whatever it was, he had

8    mentioned it the night before.

9            And I said, "Yes, sir.  You did raise that."

10           And he said.  "Okay.  I just wanted to make

11   sure I didn't forget that."  And he hung up.

12           So it might have been the Pennsylvania claim

13   that there were more ballots certified by the Secretary of

14   State than were actually cast.  I think that was it, but I'm

15   not a hundred percent certain.  But whatever it was, it was

16   something he had raised the night before.

17   We had a very brief phone call, and that was in

18   relation to the 28th.

19           Also, on the night of the 3rd, after the Oval

20   Office meeting, he called me around 10 p.m. or 11:00, or

21   somewhere around there.  And he related that he had just

22   received information that a DHS Special Agent had a truckful

23   of ballots, or shredded ballots, that he had in his custody

24   somewhere in Georgia outside of Atlanta.

25   And he wanted to make sure that we were aware of that.

1          And I basically said, "Sir, I haven't heard

2     that.  If it's a DHS agent, remember they don't belong to DOJ.

3     But if they have an issue that they need our assistance with,

4     they certainly know how to contact us.

5     I'm sure that will happen, if appropriate."

6          And he said, "Okay.  Can you just make sure

7     Ken Cuccinelli knows about it?"

8          So I followed up with Ken Cuccinelli that

9     night a few minutes later, and I said, "Just be aware. The

10    President called me and he said there is an agent" -- by a

11    specific name, the President actually had the agent's name --

12    "who had some custody of a truck with ballots in it in

13    Atlanta."

14         And Ken didn't know about this either.  And he

15    said, "Thanks.  I'll look into it."  And that was it.

16         We also had a call not specifically about

17    election fraud, but the President did call me on December

18    14th, the day that AG Barr submitted his resignation.

19    Q.  So with respect to the most recent allegation that

20    you mentioned, the DHS connection, the matter down in Georgia,

21    did the Justice Department and FBI interface with DHS to run

22    that allegation down?

23    A.     Eventually, yes.

24    Q.     And how did that turn out?

25    A.  Other people would be in a better position to give

1    you the specifics.  But as I recollect it as I sit here today,

2    there was a truck that had shredded ballots in it, but I

3    believe the answer was that the County Board of Elections was

4    shredding ballots in the course of their usual procedures,

5    their records retention procedures, and that these were

6    ballots from past elections.

7                     So to make room for the ballots for the 2020

8    election, which they stored in warehouses, et cetera, they

9    were clearing out old ballots.  And, yes, a truck picked up

10   ballots, and, yes, ballots were shredded, but these all

11   related to an old election.

12                    And I think that the FBI -- I know that the FBI and

13   DHS and the U.S. Attorney's Office in Atlanta worked on that,

14   so they would have better information and recollection about

15   it.  That's what I remember.

16        Q.  During the course of your conversations with the

17   President, it was -- was it apparent to you that he truly had

18   concerns with respect to the validity of the election, and he

19   did want to run these allegations down?

20                    One way or the other, he wanted to know

21   whether these allegations were true or not.  Is that accurate?

22        A.  I think that's a fair characterization of the way he

23   presented these things, yes.

24        Q.  So in these conversations, then, that you mentioned

25   -- I'm not going to go through each one.  I don't think we

1    have enough time today to go line by line with respect to

2    every sentence that was uttered, but did you offer the

3    President advice or recommendations, generally speaking,

4    during the course of these interactions, with respect to those

5    allegations?

6                    Is there a way that you can generally speak

7    to your role here?

8        A.  It wasn't so much advice or recommendations on

9    specific allegations, because the President, you know, wasn't

10   looking to make decisions about the specific allegations.  He

11   was presenting it as, "Are you guys aware of this, X, this

12   allegation?"

13                   And we would either say yes, sir, or no.  And

14   the vast majority of the time the answer was "Yes, we knew.

15   We're aware of that."

16                   And then, again, as I said earlier, we would

17   reiterate, "Sir, we're aware of it.  We know our job.

18   We're doing our job."

19                   And then he would go through, you know, other

20   allegations, and we would say, "Yes, sir.  We're aware of that

21   one as well.  Got it.  Thank you."  That kind of thing.

22                   So we weren't providing advice so much to the

23   President on the individual allegations, but we were informing

24   him throughout the course of these conversations that what we

25   had seen to date and what we were seeing did not change AG

1  Barr's assessment of the reliability of the election.

2      Q.  Mr. Donoghue, did you take any action to overturn

3  the 2020 election results?

4      A.     Absolutely not.

5      Q.  Did the Attorney General Rosen -- Acting Attorney

6  General Rosen take any action to overturn the

7  2020 election results?

8      A.    No.

9      Q.       Did President Trump fire Acting Attorney

10 General Rosen?

11     A.    No.

12     Q.       Did President Trump fire you?

13     A.    No.

14     Q.  Did President Trump fire anyone at the Justice

15 Department or FBI relating to his frustration that more wasn't

16 being done to investigate election-related allegations?

17     A.     No, not at all.

18      Q Does the President have the authority to fire any U.S.

19 Attorney?

20     A.    Yes.

21     Q.      Who is Patrick Hovakimian?

22     A.            Patrick Hovakimian was the chief of staff to

23 Deputy Attorney General Rosen when I first came to Washington

24 in July of 2020.  In the next few months, somewhere in there,

25 the fall, perhaps, he was no longer the chief of staff because

1    he was nominated to be the Inspector General for the

2    intelligence community.  And the hope, the expectation was

3    that he would get confirmed and he would leave the Department.

4                     And, as a result, AG Rosen brought in someone

5    else to be his chief of staff.  But Pat remained on the ODAG,

6    the Office of the Deputy Attorney General's staff throughout

7    the end of the term because his nomination never went forward.

8         Q.   Was Mr. Hovakimian ever in any meetings with you and

9    the President, or any phone calls with you and the President?

10        A.    No.

11        Q.   Was Mr. Hovakimian at the level within the Justice

12   Department, as far as titles are concerned, to ever meet with

13   the President?

14        A.    No.

15        Q.   Okay.  I'd like to turn to the majority 5 document.

16   I guess this was the exhibit -- it's already been used as an

17   exhibit.  Majority 5 was Exhibit 4.

18                  Some of the documents that the majority

19   labeled as "Majority," as Sara and I have already discussed,

20   they are also minority exhibits.  We just didn't want to

21   double them up.

22                  Let's go to Majority 5.  And let's turn to

23   specifically page -- excuse me, Bates -736.

24                  Sir, let me know when you're there.

25        A.    I'm there.

1    Q.      And these are your notes; correct?

2    A.      That's right.

3    Q.   If you look down at the bottom, I believe it says,

4    "People won't have confidence in the Georgia

5    Senate races."

6         Is that something the President said?

7    A.   I wrote that down.  It's actually not a quote, so

8    it's not the exact words.  But he did say that, yes, in sum

9    and substance.

10   Q.   So is it fair to say as part of his concerns with

11   respect to the election fraud and crime-related allegations,

12   that part of his concern was the sanctity of the Georgia

13   Senate races?

14   A.      Yes, he did say that.

15   Q.      Okay.  Let's turn to Bates -737.

16        Notes say -- I believe Sara referenced this

17   earlier in her first hour, "DOJ failing to respond to

18   legitimate complaints/reports of crimes."

19        So I note the President's apparent use of the

20   word "legitimate."  Are the notes accurate in that regard,

21   based upon your recollection?

22   A.   Yes.  Again, this is not a quote, but that is what

23   the President said.  And he reiterated that several times.

24   Q.   So the volume of voter fraud and election crime-

25   related allegations that the President had received at that

1   time and which were publicly reported on at that time, was it

2   unreasonable under the circumstances for the President to have

3   such concerns regarding potentially legitimate complaints and

4   reports of crimes?

5        A.  Well, there were a lot of allegations.  There were

6   many allegations relating to concerns about the election.  So

7   I'm sure the President was aware of those, as I think we all

8   were.  We, the Department, took them one at a time.

9                So I can't really opine as to whether or not

10  the President's view was well founded based on all of them,

11  but I understood it to be that he was concerned about these

12  allegations, and whether or not the election was somehow

13  tainted by fraud.

14       Q.  So in the same vein, then, was it unreasonable under

15  the circumstances for the President to question what the

16  Justice Department and its components were doing to

17  investigate legitimate complaints and reports of crimes?

18       A.  I don't think it was unreasonable for him to

19  question it.  But, again, we tried to allay his concerns by

20  saying, "Yes.  We're aware of it.  We're doing our job."

21       Q.  Would you agree with me -- or I shouldn't say "with

22  me," I don't want to imply here, but maybe the cat is out of

23  the bag already.  But would you agree that the President's job

24  is to keep -- part of his job is to keep executive agencies in

25  check and ensure that they are doing all that they need to do

1   on behalf of

2   the American taxpayer?

3        A.    Yes.   Absolutely.

4        Q.   Okay.   Let's go to the bottom of -737.   I might need

5   your assistance here in translating it, potentially.   At the

6   very bottom, does the sentence say, "FBI will always say

7   nothing there, leaders there oppose me, SAs support me"?

8        A.    That's what it says.   Again, it's not a quote, but

9   it's a summary of what the President was saying.

10       Q.    Right.   And for the record, I want to note that when

11  I'm using quotes, I'm literally citing directly from the

12  document.   And I understand these may not be direct quotes

13  from that conversation in question.

14       A.    Right.

15       Q.    Okay.   So this statement, then, does it indicate to

16  you that the President maintained a certain amount of distrust

17  with the FBI?

18       A.    Yes.   At least, the leadership.

19       Q.    Now, did that distrust contribute to the President's

20  concern about how legitimate complaints and reports of crimes

21  were being handled by the Justice Department and the FBI?

22       A.    It may have played into his view, but I

23  really can't speak for him on that.

24       Q.    Let's turn to Bates -738.   So towards the bottom, I

25  believe there's one sentence here that says the President

1  allegedly said, and I'm quoting directly from the notes here,

2  "statistically impossible for me to lose."

3         Is that a correct reading?

4     A.    Yes, that's what I wrote.

5     Q.  In the interactions you had with the President, did

6  he often refer to statistical analysis when discussing vote

7  results?

8     A.  I do recall him saying that several times in several

9  meetings.  Yes, it was statistically impossible given where he

10  stood on election night.

11    Q.  All right.  Let's stay on -738.  There's a

12  reference to DAG at the bottom -- delta, alpha, gamma --

13  and that was in reference to the Acting

14  Attorney General Rosen; correct?

15    A.    Right.

16    Q.    Thank you.

17         So Rosen allegedly said this to the

18  President:  "We'll look at whether have more ballots in PA,"

19  standing for Pennsylvania, I assume, "than registered voters -

20  should be able to check on that quickly, but understand that

21  the DOJ can't + won't snap its fingers + change the outcome of

22  the election, doesn't work that way."

23         And then underneath, it has the letter P.

24  "P" responded -- who I presume is the President.

25         Is that correct?

1       A.      Right.

2          Q.   I'm sorry, can you say that again?  The audio popped

3   out.

4       A.      That is correct.

5          Q.   Thank you.

6             Okay.  So the President's alleged response

7   then, if you go from -738 to -739, "Don't expect you to do

8   that.  Just say that the election was corrupt + leave the rest

9   to me and the R Congressmen."

10            Is that a correct reading?

11      A.   Yes, that's right.  And that's an exact quote from

12  the President.

13         Q.   So the President didn't expect the Justice

14  Department to change the outcome of the election, then, based

15  on these notes.  Is that your interpretation of these notes?

16      A.      Yes, that's right.

17         Q.   Did Mr. Rosen ever look at whether there were more

18  ballots in Pennsylvania than registered voters?

19      A.      Yes, we did.

20         Q.    And how did that turn out?

21      A.   The answer was that the delta between the number of

22  votes certified by the Secretary of State, which is

23  approximately 5.25 million, and the 5 million figure that was

24  being provided to the President, that difference arose from

25  the fact that the database that reflected 5 million votes cast

1   was incomplete.  It was missing, I believe, data from four

2   counties in

3   Pennsylvania.

4           So once those four counties rolled their

5   information into the database, the number of votes cast

6   matched the number of votes certified by the Secretary of

7   State.  So that's how that was resolved.

8       Q.     Okay.  Thank you.

9           So let's move to Bates -741.  Same

10  conversation, same notes.

11          According to the notes, the President said,

12  "You," as in Rosen, "Rich," as in you, Mr. Donoghue, "should

13  go to Fulton County + do a signature verification, and you'll

14  see how illegal it is.  You'll find tens of thousands."

15          Did you and Rosen ever go to Fulton County?

16      A.    We did not.

17          But just to be clear, he wasn't speaking to

18  AG Rosen at that point.  He was speaking to me.  He said,

19  "You, Rich, should go to Fulton County."

20          So he wanted me personally to go to Fulton County.

21  That didn't involve the Acting Attorney General.

22      Q.    Very good.  I appreciate that clarification.

23          Do you know if anyone from the Justice Department

24  or its components did a signature verification of Fulton

25  County?

1        A.   You'd have to check with the U.S. Attorney's Office

2   down there, and perhaps the FBI, but I know that the U.S.

3   Attorney's Office in the Northern District of Alabama looked

4   at a lot of the allegations relating to Fulton County.

5        Q.   And who would be the official in charge of that?

6        A.   At that time, it was BJay Pak, who was the U.S.

7   Attorney for the Northern District of Georgia.

8        Q.     Thank you, sir.

9               So with respect to the statement, then, why

10  do you think the President wanted his chief -- one of his

11  chief law enforcement officers to be boots on the ground in

12  that geographic area?

13       A.   I can only take him at his word that if you go down

14  there and look at this, as he said there, you'll find tens of

15  thousands of -- I think he meant illegal votes.

16       Q  I think I'm done with this exhibit, for the time being.

17              I'd like to better understand the Justice

18  Department and FBI in their vetting protocol and procedure and

19  the intake process, with respect to how these voter fraud

20  allegations and reports of crimes were handled.

21              So as a threshold matter, sir, which units

22  within the Justice Department handle election crime

23  allegations?

24       A.   Primarily, the U.S. Attorney's Offices are

25  responsible for any allegations that arise in their

1    jurisdictions, whether it be election fraud or other crimes.

2    Each U.S. Attorney's Office has what they call a DEO, a D-E-O,

3    District Election Officer.  They are sort of the lead for the

4    United States Attorney for election matters.  So each office

5    would have a DEO.

6             The FBI field office has a corresponding

7    agent.  I forget what they called them, but there's a lead

8    agent for election matters.

9             So these can come in in a variety of ways. It can

10   come directly to the FBI.  They could come directly to the

11   U.S. Attorney's Office, or they might arise in different

12   ways.  But primarily, the U.S.

13   Attorney's Office would work with the FBI to check these

14   things out.

15            Also, it's important to understand that

16   within Main Justice, we have the Public Integrity Section, and

17   within the Public Integrity Section is a unit called the

18   Election Crimes Branch.  So ECB is within PIN, and they also

19   get involved.  Their role is more consulting.  They don't

20   necessarily have approval authority, but they work in

21   conjunction with the U.S.

22   Attorney's Offices on these matters when they come in.

23       Q.    Thank you for that.

24            So with respect to the Public Integrity Section,

25   who was in charge of that section during the 2020 election?

1        A.                A DOJ employee attorney named Corey Amundson,

2    A-m-u-n-d-s-o-n.

3        Q.        Thank you.

4                  And with respect to the Election Crimes Branch that

5    you mentioned, who was in charge of that branch during the

6    2020 election?

7        A.   Initially, it was a DOJ attorney named Richard

8    Pilger, P-i-l-g-e-r.  As I recollect,

9    Mr. Pilger stepped down from that position after AG Barr

10   issued his November 9th memo relating to election

11   investigations.  I believe he remained in ECB, but that one of

12   his deputies was the acting chief of that section from that

13   point forward.

14       Q.        Do you recall why he resigned?

15       A.    Yes.

16       Q.        And what was that reason?

17       A.   Well, he said that he resigned because he was

18   opposed to AG Barr's 11/9/20 memo.  Again, he did not -- he

19   presented this as a resignation, but, in fact, he didn't

20   resign from the Department.  He simply stepped down from that

21   position.  It was very public. There were articles about it.

22   There were emails about it.

23                  I believe he submitted a letter of some sort

24   that was very quickly leaked to the press.  And it raised

25   concerns because it left the perception that the Department

1    was somehow doing something improper when, in fact, all along,

2    what AG Barr wanted to make sure was that we were in a

3    position to assess whether or not the election had been

4    affected by fraud.

5        Q.  Did Mr. Pilger's decision to resign and the

6    subsequent leak -- obviously, I don't know who leaked the

7    document -- but the subsequent leak of his resignation, did

8    that frustrate the Department's ability to properly operate

9    the Election Crimes Branch consistent with AG Barr's November

10   memo?

11       A.  Yes, it definitely did.  It put the AG in a poor

12   light publicly, which was totally unwarranted. People

13   misunderstood the memo.  They misunderstood what the AG was

14   trying to do.  And the immediate leak of the email, the memo

15   and the related documents was not helpful to what the

16   Department was trying to do at that time.

17       Q.  Now, generally speaking, just for the record, since

18   we're referencing the Barr memo, I'm going to paraphrase this.

19   I don't think that this is an exact recitation from the memo

20   itself, but, generally speaking, what Barr did is he

21   authorized department officials to pursue substantial

22   allegations of voting and vote tabulation irregularities prior

23   to the certification of elections in your jurisdictions, in

24   certain cases.

25                   So the difference, then -- correct me if I'm

1    wrong -- the difference here is that he wanted action to occur

2    prior to certification of elections.  And prior to this memo,

3    the standard operating procedure was to wait until after

4    certification of elections to then dig into these election-

5    related issues and, potentially, crimes.

6                   Is that correct, generally?

7         A.   That's generally right, yes.  Again, this is

8    all very fact-specific.  It was always guidance, so there were

9    always exceptions.

10                  But the general practice of the Department,

11   as per ECB, Election Crimes Branch, was to wait until the

12   certification was done because, in their view, what the

13   Department should be doing is prosecuting things after the

14   fact in an attempt to deter misconduct in future elections.

15                  AG Barr's focus was on the current election

16   and making sure that we, the Department, were doing what we

17   could in real time to ensure that the American people could

18   have confidence in the outcome.  So there was a disconnect

19   there, and it created issues.

20        Q.   So did Mr. Pilger, when he was in his position at

21   ECB, did he have the authority to green-light investigative

22   steps for election-related investigations?

23                  I'm trying to figure out the amount of

24   authority and power that he had in that position prior to

25   resignation.

1          A.   So pursuant to the justice manual, the ECB had

2     consultation roles.   So the U.S. Attorney's Office was

3     supposed to consult with ECB, and they both reported up to the

4     DAG's office.   So if was there a disconnect, either side could

5     report up and say, "Well, we don't think these guys should

6     proceed this way," or something to that effect.

7               The problem was that ECB routinely implied

8     that they had approval authority.   And so the DEOs, those

9     District Election Officers in the U.S. Attorney's Office, were

10    extremely reluctant to proceed without the approval of ECB.

11              Furthermore, ECB communicated directly with

12    the Public Corruption Branch at FBI.   And those FBI agents

13    were, again, extremely reluctant to proceed without ECB's

14    explicit approval.   And since ECB was not on the same page

15    with AG Barr and they clearly disagreed with AG Barr's

16    determination, they were, at best, dragging their feet and

17    maybe more to keep these investigations from going forward, in

18    my view.

19              Mr. Flynn-Brown.   Okay.   I want to pull up an

20    additional exhibit.   We got this exhibit late last night from

21    DOJ, and I believe it was sent to you guys late last night as

22    well.

23              Let me pull up the Majority -- I think this

24    is labeled Majority -- I think it's labeled Majority 25.

25    It's the December 7, 2020, email, sir.

1    It's between you and David Bowdich.

2              Mr. Donoghue.  Yes, I have it.

3              Mr. Flynn-Brown.  I believe we are at -- I

4    believe this is Exhibit 6.

5                        (Exhibit 6, email, marked.)

6              BY MR. FLYNN-BROWN.

7         Q.  So you -- I believe you began to explain some of the

8    State Farm-related allegations.  This email, this December 7,

9    2020, email between you and David Bowdich references a -- some

10   State Farm Arena allegations.  I think you referred to them

11   earlier in the first hour.

12              Can you just restate them here again for the

13   record, based on your recollection, as to what they were.

14        A.  Generally, my recollection was that there were

15   claims that at the State Farm Arena, election officials, Board

16   of Election officials, said or did something that caused the

17   observers to leave.  And after the observers departed, the

18   election officials then produced a suitcase full of ballots,

19   and that they began running those ballots through the

20   tabulation machines, and that they ran them through

21   repeatedly.

22              So there were a couple different pieces to

23   that allegation.  One was that there were these sort of false

24   or fake ballots that were produced.  And another was that it

25   was run through multiple times.  And then, of course, that the

1  observers were somehow lured away.  That's basically what that

2  allegation was.

3                And because there were video cameras in the

4  facility, we, the FBI and others, were able to go back and

5  look at exactly what had happened.

6      Q.  So how did this matter resolve, based upon your

7  recollection?

8      A.  So the U.S. Attorney's Office in the Northern

9  District of Georgia looked at this.  They worked with the FBI.

10  You can see from this email that there's some frustration

11  because of the Election Crimes Branch attitude that I

12  described earlier.

13                But, ultimately, the witnesses who were there

14  were interviewed.  I can't remember if FBI did the

15  interviews alone or they did them in conjunction with State

16  authorities.  But whatever it was, they reviewed -- I

17  believe it was about 15 hours of videotape.

18                The witnesses were all interviewed.  And the

19  conclusion was that the observers left because of an error on

20  the part of someone in the media who said, "It looks like

21  they're done for the night."

22                And I think that was reasonable because I

23  believe the intent was to finish their tabulations for the

24  night.  I think it was around 10 p.m. or something like that.

25  They thought they were done.  They began sort of wrapping

1    things up and closing up their equipment.

2            Someone in the media pool made this comment

3    that "It looks like they're done for the night."  The

4    observers left.  They were then contacted by other State

5    officials that said, "Hey, we got a lot of work to do.  Don't

6    shut down this early."

7            So they then went back to tabulating ballots.

8            The allegation about a suitcase being brought

9    in apparently stemmed from the fact that these ballots were

10   kept in wheeled bins.  Those wheeled bins were just used as a

11   matter of routine in that facility.  And I think if you go

12   back and watch the video from the beginning, you can see

13   during the day workers opening absentee ballots, taking them

14   out of the envelope and placing them in the bins.

15           So there was no suspicion from the fact that

16   these were ballots were contained in the wheeled bin. That's

17   just the way they moved them around the facility.

18           Also, the video, I'm told, showed that they

19   did not feed them through repeatedly, and that that would not

20   have worked anyway because of the barcoding on the individual

21   ballots.

22           So we looked at the allegation.  We had FBI

23   go through the videotape.  We had interviews done of all the

24   witnesses, and the U.S. Attorney in the Northern District

25   reported back to me that there was nothing on that video,

1  nothing to these allegations that should cause us to question

2  what happened in that facility or the outcome of the Georgia

3  election.

4       Q.   So this email thread begins with an email from Corey

5  Amundson on December 7, 2020, at 12:34 a.m. And he says in

6  part, "As explained below, PIN," the Public Integrity Section,

7  "does not concur in any overt investigative activity,

8  including the proposed interviews."

9            Based on your recollection, how many times

10 did the Public Integrity Section provide a nonconcurrence to

11 potential investigative activity relating to the 2020

12 election, prior to the election certification?

13      A.   There was several times it came up.  I can't

14 remember exactly, but this was not an isolated incident.

15      Q.            Now, when those nonconcurrences came up, did

16 Main Justice override them?

17      A.   In some instances, yes.  It wasn't really a matter

18 of overriding because they didn't have the authority to

19 disapprove.  Again, you know, the way they framed this

20 sometimes creates confusion.

21            U.S. Attorney doesn't need their concurrence.

22 They have to consult with them.  Certainly, PIN or the U.S.

23 Attorney's Office was free to raise it up the chain of command

24 if they had concerns.

25      Q.   So with respect to the nonconcurrences, did any

1   nonconcurrence halt investigative activity by FBI or other DOJ

2   units?

3        A.   I believe there was one time that I recollect as I

4   sit here now, that there was a dispute between PIN and the

5   U.S. Attorney's Office.  It was not in Georgia. And DAG Rosen,

6   who might have been the Acting AG at the time, decided that

7   while some limited action would be permitted, that generally

8   the U.S. Attorney's Office would not be permitted to go

9   forward at that point in time.

10       Q.    Which state was this?

11       A.    Florida.

12       Q.    Florida?

13            Do you recall the allegations?

14       A.   I do.  But, you know, with all due respect to the

15   questioning, it may be an ongoing matter, so I don't think I

16   can comment on that.

17        Q And who was the U.S. Attorney on this matter at this

18   time?

19       A.    Larry Keefe.

20       Q.   So Rosen provided him instructions to perform some

21   actions, but not other actions?

22             Mr. Weinsheimer.   On behalf of the

23   department, I'm indicating that at this point, we've gone

24   beyond the authorization, and the witness has already

25   indicated it may relate to an ongoing matter. He's just not

1    authorized to speak about ongoing matters.

2            BY MR. FLYNN-BROWN.

3        Q.   In your email to Bowdich, you stated,

4    "Unfortunately, this is a continuation of a policy

5    disagreement between the Election Crimes Branch of PIN," the

6    Public Integrity Unit, "and the AG," Attorney General.

7            So you noted earlier that there were a couple

8    examples, couple times where PIN and the Election Crimes

9    Branch did kind of frustrate investigative steps.  So this use

10   of the word "continuation" does imply repeated conduct.

11           I'm wondering if you can get into more

12   specific numbers as to how many times your efforts were

13   frustrated by the Election Crimes Branch and the Public

14   Integrity Unit to proceed with investigative activity prior to

15   certification.

16       A.   I can't put a number on it, but it was a small

17   handful of times.  And I think they were elevated in the way

18   that this one was.

19       Q.   Okay.  And then my same question would be for after

20   certification.  So after certification occurred, did you still

21   have this frustrating relationship with PIN and the ECB?

22       A.   I can't recall specifically as I sit here whether it

23   was all before or it split between pre and post-certification.

24   I don't remember, but this was an ongoing issue, really,

25   throughout the election cycle.

1        Q.   At the time you left the Department, had this

2    tension that we described here today, based upon these emails

3    in the record, did that tension still exist with the Public

4    Integrity Unit?

5        A.   Well, the issue was still there, but, obviously, the

6    election was over and certified and all that.   So the

7    immediate concern was just no longer relevant.

8        Q.   So specifically, sir, you know, as we focus here on

9    the Public Integrity Unit and Barr's November memo altering

10   this policy to be more aggressive and forward-leaning, are you

11   able to specifically mention or name any specific department

12   personnel that worked to frustrate the Barr memo, the November

13   Barr memo?

14            Mr. Weinsheimer.   On behalf of the

15   department, I object.   He shouldn't be getting into specific

16   individuals other than those that he's already mentioned.

17            Mr. Flynn-Brown.   Okay.   So he's mentioned

18   Richard Pilger.   Can he get into more detail in his actions

19   in potentially undermining the November Barr memo?

20            Mr. Weinsheimer.   Again, I would object.   I

21   think that's outside the scope of the authorization at this

22   point.

23            Mr. Flynn-Brown.   No, I do think it's in

24   scope, so we'll put a pin in that.

25            BY MR. FLYNN-BROWN.

1     Q.  So with respect to the Public Integrity Unit, you

2  had mentioned that there was a similar unit at the

3  FBI that they interfaced with.

4          Do you remember the FBI unit precisely?

5     A.      I believe it's called the PCB, the Public

6  Corruption Branch.  Could be wrong about that.

7     Q.  Do you recall who was in charge of that branch

8  during the 2020 election?

9     A.  I knew at the time, but I just don't remember as I

10  sit here today.

11     Q.  Did the Justice Department and FBI open any election

12         crime investigations after the 2020 election was

13         certified?

14     A.  I can't say with certainty as I sit here, because I

15  was gone shortly after the election was certified.  But I

16  would assume the answer is yes.

17     Q.  So with respect to the process where you guys --

18  "you guys" being the Justice Department and the FBI --

19  received voter fraud allegations and reports of crimes, was

20  there a general protocol and process as to how the intake went

21  and how it moved up the chain?  Or was it fairly an ad hoc

22  process?

23          You know, maybe, for example, generally

24  speaking, did an allegation go into the FBI, the FBI vets it

25  and then moves it up to DOJ?  Or was there an intake, you

1  know, process specifically for Justice

2  Department proper?

3       A.  It could come in in a variety of ways.  They could

4  come directly to the FBI, in which case the FBI election agent

5  would coordinate with DEO, and they would staff it as needed

6  depending on the allegation.

7            It could also come in directly to the U.S.

8  Attorney's Office.  One of the things that we do, as a routine

9  matter in preparation for elections, is we have U.S.

10  Attorney's Offices all issue a press release, and they

11  identify who the District Election Officer is for the U.S.

12  Attorney's Office; actually put their name out there publicly

13  and how they could be contacted.

14            So if someone had an allegation, say, on

15  Election Day, you can pretty easily find out who the DEO was

16  in your district and report it to that person directly, if

17  need be.

18       Q.     Understood.  Thank you.

19            So with respect to the Justice Department, do

20  you know how many personnel were responsible for vetting voter

21  fraud and election crime allegations during the 2020 election?

22       A.  Well, at a minimum, you'd have a DEO in each of the

23  94 U.S. Attorney's Office, so that's 94 AUSAs right there.

24  Obviously, they have supervisors, criminal chiefs, U.S.

25  Attorneys and that kind of thing, who would have

1   responsibility.

2            Then you would have the Election Crimes Branch,

3   which I would guess was probably somewhere between 15 and 20

4   trial lawyers at that time, and then their chain of command.

5   And then, of course, you'd have the FBI side of things with

6   investigators.  So you're talking a few hundred people, at

7   least.

8        Q.   And from a data standpoint for the 2020 election, do

9   you know how many voter fraud and election crime allegations

10  were received by the Justice Department and the FBI

11  respectively?

12       A.    I don't know.

13       Q.   So after -- at what point does the Public Integrity

14  Section get involved in a voter fraud allegation?  I mean, do

15  they reach down into the FBI? Does the FBI go to them as a

16  matter of course?  I mean, how does that relationship work?

17            Because it sounds like the Public Integrity

18  Section, and the ECB, specifically, are in the pipeline of

19  this process to approve investigative steps, whether or not

20  their nonconcurrence or concurrence is given weight.  They're

21  in the pipeline.

22            So I'm wondering are they basically the

23  buffer between the FBI and you and Rosen?  How do they fit in

24  the scheme?

25       A.   No.  They're not between the FBI and us, but they do

1   coordinate very closely with the FBI's public corruption

2   branch.  So what would typically happen is you'd have

3   something originate either in a FBI field office or U.S.

4   Attorney's Office, and then the appropriate people in those

5   offices would make notifications up their chain of command.

6               So on the FBI's side, a notification would go

7   up to the Public Corruption Branch.  On the U.S.

8   Attorney's Office side, a notification would go to ECB and

9   say, "Hey, we're looking at opening an investigation about an

10  allegation of X."

11              So they would be aware of it.  If I remember

12  correctly, they can do preliminary steps of some sort, perhaps

13  without a notification, but the typical way this developed was

14  those notifications would be made. And so you would have the

15  two components in Washington aware that something was actually

16  out there and being worked.

17      Q.  I see.  So when the FBI does the interfacing with

18  the Public Integrity Section and the ECB, in the process you

19  just described, if the FBI does not go around PIN and ECB to

20  apprise you, as was done here with Bowdich in the December 7,

21  2020, email, is there a chance that you, up the food chain,

22  the leadership chain at DOJ, are not going to be aware of some

23  of the FBI's frustrations downstream with the Public Integrity

24  Section?

25      A.  It's possible.  But I would say that Dave Bowdich,

1   as the deputy director, was very hands on. And Dave and I

2   worked very closely together.  We spoke probably every day,

3   often several times a day.  And he understood the AG's memo

4   and -- though, there was a lot of back-and-forth there, but

5   it's certainly possible that could be.

6        Q.  My time is running a little bit short here, and I'm

7   not going to move on to another exhibit.  I'm going to wait

8   for my second hour, but I do want to ask a couple more

9   questions about PIN and ECB.

10          So you got Corey Amundson, who is above

11  Richard Pilger, correct?

12       A.    Yes.

13       Q.  So how did those two interact?  Did those two get

14  along, or did they often have disagreements with respect to

15  how things should proceed forward?

16          And I see I'm going to get another

17  objection here from DOJ.

18          Mr. Weinsheimer.  I'm going to object.  I

19  think that is beyond the scope and talks about prosecutorial

20  deliberations.  Outside the scope.

21             BY MR. FLYNN-BROWN.

22       Q.  So I'll say it this way, then.  With respect to

23  Richard Pilger and the public complaints that are attributed

24  to him with respect to the Barr memo, were those complaints,

25  those feelings, those concerns that

1    Pilger had, did they permeate through the Public

2    Integrity Unit, or were they specific to Mr. Pilger?

3              Mr. Weinsheimer.  Again, same objection.  I

4    don't think it's within the scope of the opposition.

5              Mr. Flynn-Brown.  I think it might be within

6    the scope because the DOJ provided records relating to the

7    questions that I am asking.

8              Mr. Weinsheimer.  With respect to the

9    communications between Corey Amundson and then Dave Bowdich

10   and Mr. Donoghue.  So those are what's within the scope.

11             BY MR. FLYNN-BROWN.

12       Q.     So, Mr. Donoghue, with respect to Corey

13   Amundson, did Mr. Bowdich -- with respect to this December 7,

14   2020, email, did Mr. Bowdich send other emails like this to

15   you relating to his concerns about the Public Integrity

16   Section?

17       A I don't specifically recall other emails like this, but

18   we did have conversations about things like that.

19       Q.   Okay.  So you had some phone calls or maybe other

20   emails with Mr. Bowdich about his concerns relating to PIN?

21       A.   Yeah, I don't recall other emails.  But as I said, I

22   spoke to Dave Bowdich probably every day in this time period,

23   and this was not limited to this specific instance.

24             Mr. Flynn-Brown.  Okay.  So I have five

25   minutes left, but I don't want to move on to the next exhibit.

1    I'll wait for my second hour.

2              So, sir, thank you for your time.  I may

3    return to some of these issues that we just discussed later on

4    today.

5              But for now, Sara, I'll turn it over to you.

6              Ms. Zdeb.  Thanks, Josh.

7              Mr. Donoghue, Counsel, would you like to take

8    another quick break before I start my next hour?

9              Mr. Andres.  That would be great.  Thank you.

10                          (Recess)

11             Ms. Zdeb.  It is 11:37, and we can go back on

12   the record.

13                   BY MS. ZDEB.

14        Q.  Mr. Donoghue, I wanted to just ask a couple more

15   questions about the email and the issues that my colleague was

16   just exploring with you at the end of the last hour.  I think

17   this was Exhibit 6, which is the exchange involving you and

18   Dave Bowdich and Corey Amundson.

19             So you spoke a little bit about Richard Pilger.

20   Just so I'm clear, he is, and was at the time, a career

21   employee in PIN.  Is that correct?

22        A.    Yes, that.

23        Q.  Do you know about how long he had been in the

24   position as head of the Election Crimes Branch?

25        A.     I believe it was 10 years at that point.

1       Q.   And is it fair to say he is viewed as an expert on

2  election crimes within the Department?

3            Mr. Weinsheimer.   I think, once again, we're

4  going outside the scope of the authorization.   I'd object to

5  further questions about Mr. Pilger.

6            Ms. Zdeb.   Well, I'm sticking to the scope of

7  the questions that my colleagues in the minority just asked.

8  And I have a few -- I have a few questions pertaining to

9  questions to which you did not object.

10           Mr. Weinsheimer.   That one, I don't think is

11  within the scope in terms of whether or not he's an expert.

12           Ms. Zdeb.   We can move on.

13             BY MS. ZDEB.

14      Q.   Just so I'm clear, it seems like the dispute, Mr.

15  Donoghue, that you were describing in this email and

16  describing a little while ago essentially boiled down to a

17  difference of opinion between Mr. Pilger, the career head of

18  the Election Crimes Branch, and the Department's political

19  leadership, when it came to the appropriate way to conduct

20  these investigations.

21             Is that accurate?

22      A.   To some extent, yes.   But keep in mind that I was

23  the senior career person in the Department at that time, even

24  though I had previously been political as an

25  U.S. Attorney.   And certainly, I shared the AG's view that we

1    need to be more proactive at this time period, given this

2    unique election.  So it wasn't just career versus political.

3         Q.    Understood.

4         A.  There were legitimate differences of opinion, and

5    there were merits to both sides of the argument, I understood

6    that.  And I think I reflected that in my email.

7         Q.  Right.  And specifically, as I read your email, it

8    sounds like it boiled down to a policy dispute, to use your --

9    or policy disagreement, to use your words, between the

10   Election Crimes Branch's historic position that overt

11   investigative steps should be avoided, to the extent possible,

12   because they have the potential to inject the Department

13   itself into the election, on the one hand; and on the other

14   hand, the different view that Attorney General Barr, and it

15   sounds like others including yourself, were espousing at the

16   time.

17            Is that a fair assessment of the policy

18   disagreement?

19        A.    Yes, that's generally correct.

20        Q.  And I think you said in response to my colleague,

21   that at the end of the day, this dispute manifested itself in

22   a handful of instances.  And that at the end of the day, there

23   was only one in which Mr. Rosen -- and I'm paraphrasing you --

24   took the side of PIN.  Is that correct?

25        A.    Yes.

1          Q.   And, in any event, with respect to either that one

2     particular instance or the instances in which the FBI and the

3     Department were permitted to take overt investigative steps

4     consistent with Attorney General Barr's memo, I would imagine

5     that in none of those cases did the Department uncover

6     evidence that changed Mr. Barr's conclusion that there was no

7     widespread evidence of election fraud sufficient to change the

8     outcome of the election.   Is that correct?

9          A.     That's right.

10         Q.   Let's move back really quickly to Exhibit 4, which

11    is your notes from the December 27th conversation with the

12    President.   And I had just a couple additional questions.

13              On the third page of that document, which is

14    numbered -737, you have a line saying -- you have a line

15    saying "You guys are not following the Internet the way I do,"

16    and you've included quotation marks around that one.

17              Am I correct in thinking that that means that

18    that was a direct quote, as you transcribed it at the time?

19         A.     Yes, it was.

20         Q.   And I believe you also said, in response to my

21    colleague's question, that the language starting at the bottom

22    of the next page, which is Bates -738 and continuing on to the

23    next page, which said, "Don't expect you to do that, just say

24    the election was corrupt and leave the rest to me and the R

25    Congressmen" -- you also indicated that that also was a

1   direct quote.  Is that right?

2        A.     Yes, that's right.

3        Q.   What did you take the President to mean when he told

4   you and Mr. Rosen to "Just say the election was corrupt and

5   leave the rest to me"?

6        A.   So the last part of that, "leave the rest to me and

7   the Republican Congressman," I understood that to be that they

8   were pursuing a political process on the Hill, whereby the

9   allies of the President would be challenging some of the

10  electoral college votes.  That obviously has nothing

11  whatsoever to do with the Department.  And so that's what I

12  think he was referring to.  That's what I took it as at the

13  time.

14                 I think there was already a lot of discussion

15  about whether there would be challenges to the electoral

16  college votes of certain states.  That had happened in

17  previous elections.  I believe that happened in 2004 and

18  2000.  So that does happen. Again, that's got nothing

19  whatsoever to do with the Department.

20                 The earlier part was that the President

21  wanted us, the Department, to say that it was corrupt. And,

22  again, I wrote it down as a quote.  He said what he said.  So

23  you can read it for yourself.

24       Q.   Shortly after that -- let me just pull up the page -

25  - there is a -- there's a notation in here on the following

1   page toward the bottom of -740.  Again, it looks like a direct

2   quote because you've used quotations.

3           "We have an obligation to tell people that

4   this was an illegal corrupt election."

5           And then after that, not in quotes, you

6   wrote, "People tell me Jeff Clark is great.  I should put him

7   in."

8           Did -- well, first of all, am I reading that

9   correctly?

10      A.    Yes, you are.

11      Q.  Did the President indicate when he said this how he

12   knew Mr. Clark?

13      A.  No.  That was the first I ever heard of a reference

14   of Mr. Clark in relation with any election matters.

15      Q.  And did you have an understanding of what the

16   President was getting at when he said, "People tell me he's

17   great.  I should put him in"?

18      A.  I understood that the President was referring to

19   possibly putting him in a leadership position in DOJ;

20   obviously, above where he currently was.  I was surprised at

21   the reference to Jeff Clark, though.

22      Q.    Why were you surprised?

23      A.  Because I hadn't heard his name in connection with

24   this before.  And as the head of the Civil

25   Division, and then, earlier, the head of the

1  Environmental and Natural Resources Division, he simply didn't

2  have anything to do with the Department's election

3  responsibilities.

4      Q.  I'd like to ask you a couple of questions about some

5  subsequent documents involving

6  Congressman -- Pennsylvania Congressman Perry, who we briefly

7  mentioned before because he comes up at the start of the notes

8  from the December meeting that we were just discussing.

9              So if you could pull up -- and just for the

10  sake of time I'll do these together, Majority 6 and Majority

11  7.

12      A.     Yes, I have them.

13          Ms. Zdeb.  So we can mark Majority 6 as

14  Exhibit Number 7.

15                  (Exhibit 7, email, was marked.)

16          Ms. Zdeb.  And Majority 7, not to get

17  completely confusing, will be he Exhibit No. 8.

18                  (Exhibit  8,  notes,  was

19              marked.) BY MS. ZDEB.

20      Q.  So Exhibit Number 7 is an email, an email that you

21  sent to U.S. Attorney Brady, but you were forwarding an email

22  that you received from

23  Congressman Perry on December 27 at 8:42 p.m.

24          And then the other document, Exhibit 8, is

25  handwritten notes from a conversation dated

1    December 28, 2020.

2                    So let's start with the notes first.  Is this

3    your handwriting?

4         A.  It is.  And I should clarify, I apologize, but those

5    notes are misdated.  That would be the 27th.

6         Q.  That's what I thought.  Thank you for that

7    clarification.

8         A.      Yeah, I received this call from

9    Congressman Perry while I was in the vehicle traveling back to

10   Washington that night.  And it was before he sent me this

11   email.  So sometime before 8:42.

12        Q.  And I noticed in the set of handwritten notes that

13   we were just discussing from your call with Mr. Rosen and the

14   President, that there was a notation at the end where you were

15   asked to provide your cell phone number so the President could

16   direct people to call you, in essence.

17               So when you received this call from Congressman

18   Perry, did you take it as sort of the follow-up to that

19   exchange that you had had with the President?

20        A.  Yes, I assumed the President or someone else passed

21   my cell phone number to Congressman Perry, and he called me.

22        Q.      Was anyone else on the call?

23        A.      Not to my knowledge.

24        Q.  And had you ever spoken to Congressman Perry before

25   this call?

1        A.   No.   I had never heard of him before that day.

2        Q.   So you didn't have any awareness at this point of

3    his role in the Stop the Steal campaign?

4        A.             No.   I think the first time I had ever heard

5    of him was when the President mentioned him on the call

6    earlier that day.

7        Q.   So it says at the start of the notes, "POTUS asked

8    him to call."

9             And then a couple lines down from that your

10   notes say, "Likes Jeff Clark a lot.   Thinks he would do

11   something about this."

12           Is that a notation describing what Congressman

13   Perry was saying about Jeff Clark, or was it --

14       A.   Yes.

15       Q Okay.   And did he -- did he explain what he meant by

16   that?

17       A.   I don't remember exactly, and I didn't put this in

18   quotes, but I do remember, as reflected in the notes, that he

19   brought up Jeff Clark.   And he said, effectively, "I think,

20   Jeff Clark is great.   I like that guy a lot.   He's the kind of

21   guy who could really get in there and do something about

22   this," or something to that effect.

23       Q.   Did he -- did the Congressman give you an

24   understanding of how it was that he knew Jeff Clark?

25       A.      No, and I didn't ask.

1      Q.   Did it seem strange to you?  I mean, you had just --

2   you had just said a minute ago that it seemed strange to you

3   that the President would be mentioning Jeff Clark, who I think

4   you said had a role in the Department that would not

5   ordinarily be involved in the sorts of things you were

6   discussing.

7            Were you equally surprised to hear Scott

8   Perry mention him?

9      A.   Yes.

10     Q.   There's a notation immediately following the line

11   about how Scott Perry likes Jeff Clark a lot, that says "EG."

12   And then there's some text that is not completely clear to us.

13   And I'm wondering if you can just decipher that a little bit.

14     A.   Sure.  I apologize for the handwriting.  It's bad to

15   begin with, but I was he also in a moving vehicle at the time.

16            So Congressman Perry was complaining

17   generally about the FBI.  And he said, you know, for instance,

18   Awan Brothers, A-w-a-n is how I wrote it down.  And it says

19   "HofR IT scandal," House of

20   Representatives IT scandal.

21            And he said something about the IG being

22   fired.  He said, "We asked FBI to interview her and they," the

23   FBI, "told her not to bring anything.  She feels like she was

24   the one under investigation.  FBI doesn't do the right thing."

25            This had nothing to do with the

1   investigation, but he was citing this I guess prior experience

2   with an FBI investigation to say that, you know, sometimes the

3   FBI doesn't handle things correctly.  And that raised some

4   concern for him.

5        Q.      And did that have anything to do with Jeff

6   Clark, or was that a separate train of thought?

7        A.  No.  But I think it formed some of the background of

8   why he was telling me that he felt that we, the Department,

9   needed to be more involved in the investigation.

10       Q.  So after this call at, again, 8:42 in the evening on

11  what you have just explained is the same day, December 27th,

12  you received this email from Congressman Perry attaching a set

13  of materials pertaining to various election fraud allegations

14  in Pennsylvania.

15            Did you have a sense of why he was sending

16  this directly to you?

17       A.  At the end of his conversation, he asked for my

18  email and said, "Can I send you stuff?  We've got a lot of

19  evidence.  We've got a lot of information about things going

20  on in Pennsylvania.  Can I send it to you?"

21            And then my last notation there is "Told him

22  we would, of course be willing to look at that, but thus far

23  we haven't seen fraud on the scale that changed the outcome in

24  Pennsylvania."

25            So he said, "Well, I have stuff.  I'd like to

1    send it to you."

2             I said, "You're free to do that."

3             I gave him my email.  And then this

4    8:42 email from him is what followed.  Probably an hour or two

5    hours later.  I was still in the car.

6        Q.  Why did you then forward those materials to the U.S.

7    Attorney for the Western District of Pennsylvania?

8        A.      So as I said at the outset, the U.S.

9    Attorneys is the one primarily responsible for this.

10   I'm certainly not conducting investigations, right.

11            Scott Brady was the U.S. Attorney in Pittsburgh,

12   the Western District of Pennsylvania.  We had three U.S.

13   Attorneys there.  I didn't want to send it to all three of

14   them and have them sort of scrambling around.  I knew Scott

15   best out of the three U.S. Attorneys.  He'd been on the U.S.

16   Attorney General's Advisory Committee.  I knew that he was, as

17   they all were, very, very competent.

18            So I just forwarded it to Scott in part

19   because a U.S. Attorney had to be looking at this

20   thing, a U.S. Attorney in Pennsylvania.  And I had full

21   confidence in his ability to handle it.  So what I did was I

22   looked at it -- I couldn't read the whole thing because, as I

23   said, I was in the car.  I was reading it on an iPhone.  And

24   so I flipped through it quickly to get a feel for it, and then

25   I just forwarded it to

1   Scott with that notation that you see in the email.

2       Q.   And, to your knowledge, and without getting into the

3   details of any particular investigative steps that the U.S.

4   Attorney may or may not have taken, did the U.S. Attorney

5   determine that any of these allegations were substantiated and

6   allegations that were sufficient to have impacted the course

7   of the election?

8       A.   Scott and I talked about this over the following

9   days, and to the extent that these allegations related to the

10  things that would be properly within the Department's scope,

11  he felt that they were not well founded, and that they do not

12  call into question the outcome of the election in

13  Pennsylvania.

14          I would note, however, though, that there

15  were things in there that don't have anything to do with the

16  Department's scope, such as I think that there were complaints

17  that, for instance, the Governor and

18  the State Attorney General and perhaps the Secretary of State

19  changed voting procedures, and that that should have been done

20  by the State legislature.  Maybe there's merit to the

21  argument, maybe not, but that wasn't an issue for the

22  Department.  That was a legal issue for the campaign and the

23  candidates to pursue on their own.

24          But to the extent it said things like "there

25  were more votes certified than actually cast," those kinds of

1    things Scott said he had looked into it and that was not the

2    case.

3              In fact, that's how I came to the conclusion

4    that there was nothing to that particular allegation because

5    Scott looked into it, and he came back to me, and he said,

6    "No, the database they were looking at is short data on four

7    counties, and that's why you have a delta."

8              Ms. Zdeb.  My colleague asked you a little

9    bit about Mr. Clark's letter in the previous round. I'd like

10   to turn back to that now.  And if you could pull up what has

11   been designated as Majority 8.

12             Mr. Donoghue.  Yes.

13             Ms. Zdeb.  And we will mark that as Exhibit

14   Number 9.

15                       (Exhibit 9, email, was marked.)

16             BY MS. ZDEB.

17       Q.  This is an email from Mr. Clark to you and Mr. Rosen

18   at 4:48 p.m. on December 28, 2020.  The email subject line is

19   "Two urgent action items."

20             I know you've already explained what role Mr.

21   Clark had at the Department at this time.  I'm wondering if

22   you can just briefly characterize your professional

23   relationship with him.  Was he someone that you worked

24   closely with?

25       A.  It was fairly limited.  When I went down there, I

1    got to know all of the AAGs because they all reported up to

2    the DAG.  And as the PADAG, his deputy, I worked closely with

3    him.  There were many, many meetings.  So I knew him first as

4    the AAG of ENRD, and then later as the Acting, because I think

5    Jody Hunt left right around the time I went down there.

6            So I saw him on a regular basis, mostly

7    briefing the Deputy AG on civil matters and litigation that

8    was underway and things like that.  They have a vast portfolio

9    that they were responsible for.  Nothing having to do with

10   elections, but a lot of other things that were important to

11   the Department at the time.

12           I think it's important to understand that Jeff

13   Rosen and Jeff Clark had a long professional and personal

14   relationship.  They had known each other for, I think, 20

15   years or more, had worked together at a law firm, et cetera.

16   So Jeff Rosen knew Jeff Clark much better than I did, but I

17   did establish some sort of relationship with him when I went

18   down there.

19      Q.  I know you said that you were surprised to hear his

20   name raised both by the President and by Congressman Perry the

21   day before.

22           Prior to sending this email, had Clark

23   reached out to you directly in any way about allegations

24   regarding the 2020 election, or was this the first direct

25   outreach you received from him personally?

1      A.   I'm pretty sure this was the first direct outreach.

2   There were discussions earlier in the day with Clark, but I

3   was not involved in those.

4      Q.      What was your reaction to this request?

5      A.      I was stunned.

6      Q.   And I know your email response that my colleague was

7   asking about earlier, in essence, speaks for itself.  But I'm

8   wondering if you can elaborate a bit on what about it stunned

9   you?

10      A.   Well, again, the email speaks for itself and

11   captured my views at the time.  But I had to read it several

12   times to make sure I understood what he was proposing.  It

13   just struck me as being wildly inappropriate for the

14   Department to do the things that he was proposing.  It's just

15   not what the Department does.  It's not our role, and in

16   addition to it being completely at odds with what we had

17   determined in the investigations that we had conducted.

18          So it was just factually wrong, and it was

19   not at all the Department's role to be dictating to states

20   what they should or should not be doing with regard to their

21   presidential elections.

22      Q.   Did you have a sense at this point -- I know that

23   his letter is drafted in a way that focuses on Georgia, but it

24   is titled "Proof of Concept," and I think he made it clear in

25   his transmittal that he was not intending it to be limited to

1    Georgia.

2                        Did you have a sense of which other states he

3    was proposing to send a version of this letter to?

4         A.  As I understood at the time, it was some of the

5    other swing states.

6         Q.  And we've -- you've been talking about this sort of

7    generically, and I understand you to be talking about the

8    proof of concept letter, but I should step back and note that

9    his transmittal email also had another suggestion in there

10   that was unrelated to the letter.

11                       So he starts out with the statement that he

12   would like to have your authorization and Mr. Rosen's to get a

13   classified briefing from the Office of the

14   Director of National Intelligence on Foreign Election

15   Interference.  He goes on to make some claims about Dominion,

16   including a claim that a Dominion machine accessed the

17   Internet through a smart thermostat with a net connection

18   trail leading back to China.  He then goes on to say, "ODNI

19   may have additional classified evidence."

20                       Did you have a particular reaction to that

21   aspect of his email?

22        A.  Yes.  And without going into the details, I did not

23   think that ODNI or anyone in the intelligence community would

24   have such information.

25        Q.  How did you respond to that aspect of his request?  Did

1          you give him the go-ahead to reach out to

2     ODNI?  Did you tell him "You shouldn't do that"?

3          A.  I did not address it in my email.  But shortly after

4     my response at 5:50, he was summoned to the Deputy Attorney

5     General's conference room, and the three of us met.  So you're

6     talking at that point about Acting Attorney General Rosen,

7     myself and Jeff Clark. And we discussed both the letter and

8     his request for a briefing.

9          With regard to the briefing, he explained

10    that he felt the IC might have information that was relevant.

11    And I really didn't have any input because, before I said

12    anything, the Acting Attorney General said, "Well, look, if

13    you have the appropriate security clearances, you can get a

14    briefing.  But I think you're going to see that there's no

15    reason for us to believe that."

16         Q.  Were you aware that Mr. Clark contacted an

17    individual named Dustin Carmack, who was the DNI's chief of

18    staff on January 1, to arrange a call?

19         A.  Not until I saw the emails that were produced, I

20    guess, initially by the House committee in relation to this.

21    I was aware that there was some sort of briefing provided, but

22    I had nothing to do with approving it or arranging it or

23    anything.  I just knew from discussions on January 2 that, in

24    fact, Clark had received a briefing.

25         Q.  Back to the Georgia proof of concept letter aspect

Trustpoint.One   Alderson.          www.trustpoint.one
                                       www.aldersonreporting.com          800.FOR.DEPO
                                                                          (800.367.3376)

1    of this email from Mr. Clark, before he sent the email to you,

2    Ken Klukowski, who I understand to have been a senior counsel

3    in the Civil Division, sent a copy of the letter to Clark.

4                      And that's an email that you're not on, so I

5    wouldn't expect you to have seen it, but I'm curious whether

6    you know who Ken Klukowski is?

7        A.    I don't.

8        Q.    Did you have a sense at the time as to whether Clark

9    was sort of a solo operator on this or whether he was working

10    with others either within the Civil Division or elsewhere

11    within the Department?

12        A.    I had no reason to think anyone else in the

13    Department was working on this.  I thought that he drafted

14    this letter himself.

15        Q.    So you mentioned Clark being summoned to a meeting

16    in then-Acting Attorney General Rosen's office a bit later in

17    the afternoon, after you had sent the response that we've

18    already discussed.

19                      Can you just give us a sense of how this

20    meeting unfolded?  I imagine that you and Mr. Rosen pushed

21    back on his suggestions.

22        A.    Yes.  Just so you understand the background,

23    obviously we got the calls the night before the 27th, both the

24    President and Congressman Perry mentioned Jeff Clark.  As I

25    said, Jeff Rosen and Jeff Clark had known each other for a

1   long time.

2                   We spoke both that night and I think the next

3   morning, and Acting AG Rosen said, you know, "I'm going to

4   talk to Jeff," meaning Jeff Clark, "and find out what this is

5   all about, what's going on here."

6                   So I believe there were one or more

7   conversations earlier that day that were then followed by this

8   email at 4:40.  I responded at 5:50.

9                   As I recollect, the DAG, the Acting AG, Jeff

10  Rosen, was at some place; he was busy or something. But I

11  responded without showing him or anyone else my response.  I

12  simply drafted it and sent it.

13                  And then I went to his office, I think after I sent

14  it, and he was pretty upset with the proposal from Clark.  And

15  he said, "I told so and so," one of his administrative

16  assistants, "to get him up here.  I want him in my conference

17  room now."

18                  So I understood that the communication had

19  gone out.  Jeff Clark came up a few minutes later and the

20  three of us sat in the conference room and had a very

21  difficult discussion.

22       Q.      What was difficult about it?

23       A.  It appeared to me that Jeff Rosen was really floored

24  by the fact that someone he knew and whose professional

25  judgment he had trusted was proposing something like this.  I

1  didn't know Jeff Clark well, and so I was not -- I was

2  certainly surprised.  That someone in the Department proposed

3  something like this, but I had no personal relationship to

4  base this on.

5              It got a little heated.  I began telling Jeff

6  Clark that he had no business sticking his nose into this;

7  that he should remain with the portfolio he's got.  Why was he

8  involved in this in the first place? Why are we hearing your

9  name from the President?  Why are we hearing your name from

10  the Congressman?  So on and so forth.

11              It got a little heated, particularly toward

12  the end.  I told him that I thought his proposal was,

13  essentially, wildly inappropriate and irresponsible.  I told

14  him that what he was proposing was nothing less than the

15  Department meddling in the outcome of a presidential election.

16        So it got fairly heated toward the end.  And

17  Acting AG Rosen said, "Well, look.  Let's just sort of move

18  forward here.  Get your briefing, if that's what you want.  I

19  think you'll see that there's nothing to be concerned about

20  from the intelligence community. And then, you know, we can

21  talk about this letter."

22        But he was very clear and I was very clear

23  that that letter was never going out.

24     Q.  Did Clark give you any sense during this meeting of

25  how he knew Congressman Perry?

1      A.    No.

2      Q.    And did he indicate -- I'm sorry.  Go ahead.

3      A.    He made some reference to being in communication

4   with the President.  I think at this

5   point, he told us that he had been in the Oval Office. He

6   didn't explain how he got there.  But I immediately said "You

7   violated the White House contact policy."

8      Q    Did he say when he had -- I'm sorry.  Go ahead.

9      A.    No.  It wasn't clear.  It wasn't clear how he got

10  there or exactly when he was in the Oval Office, but I'm sure

11  it was in this meeting where he told us he had actually

12  physically been in the Oval Office.

13     Q.    Did he say anything during this meeting about a

14  willingness on the part of the President to install him in Mr.

15  Rosen's place?

16     A.    He did make some reference to that.  I don't

17  remember as specifically as the subsequent meeting on

18  January 2nd.  But he did make reference to the President being

19  -- considering, I should say, a leadership change to the

20  Department.

21     Q.    Did he indicate whether the President was aware of

22  the proposed letter?

23     A.    I don't remember him saying that, no.

24     Q.    After the meeting, you reached out to

25  Assistant Attorney General for the Office of Legal

1    Counsel Steven Engel to read him in to the situation.

2             What was the purpose of doing that?

3        A.   If you follow the Department's internal chain

4    of succession, you'll see that the people who were in place at

5    that time, if you go through them, the next one in line to the

6    Acting Attorney General, absent some action to the contrary by

7    the President, would be Steve Engel.  There were other people

8    above the OLC AAG in the chain, but when you do that, you have

9    to remove everyone who is in an Acting position.

10            So, for instance, the Solicitor General was

11   above the OLC AAG, but there was an Acting Solicitor General,

12   so you had to remove him from the chain.  So if you follow the

13   chain, if Jeff Rosen got fired, the next person to become

14   Acting Attorney General would be Steve Engel.  And I was

15   concerned that Steve be fully aware of what's going on in case

16   Jeff Rosen was fired and Steve ended up in the seat.

17            And so Jeff Rosen and I discussed like how

18   far we should allow information relating to this to get out.

19   We decided that it would be prudent to keep a very, very close

20   hold.  But we agreed that Steve should know everything

21   because, if he's fired or we're fired and Steve ends up in the

22   seat, Steve needs to know that this is coming and how it came

23   about.

24       Q.   I know at some point a bit later on, you expand the

25   circle of Department officials who you read into the

1    situation.   Why did you want to keep it close hold at this

2    point?

3          A.   We didn't expand the circle until the late afternoon

4    of January 3rd, but we wanted to keep a close hold because,

5    frankly, I thought -- we thought it would create friction and

6    maybe even panic within the leadership of the Department.

7               Ms. Zdeb.   I'd like to turn to a meeting in

8    the White House that takes place the day after Clark sends

9    his letter.   This is reflected in Majority 11, which I will

10   mark as Exhibit Number 10. (Exhibit 10, notes, was marked.)

11               BY MS. ZDEB.

12         Q.      Are these your notes?

13         A.      I have it.   Yes, these are my notes.

14         Q.   And these are notes of a December 29, 2020, meeting

15   with the Chief of Staff, White House Counsel, PC and PP, who I

16   imagine are Pat Cipollone and Patrick Philbin, the Deputy

17   Attorney General, you and Steven Engel.   Is that correct?

18         A.      That's right.

19         Q.      Did anyone else participate?

20         A.   No.

21         Q.      And this took place at the White House?

22               Yes.   In the Chief of Staff's office.   That's

23   the only time I've been in his office.

24         Q.      What prompted this meeting?

25         A.   I don't remember exactly why we were called over

1    there.  There were a number of things the Chief of Staff

2    wanted to discuss.  Some of which had nothing to do with the

3    election; they had to do more transition matters.  But we went

4    over there, I think it was sometime in the afternoon.

5         Q.  There's a reference to Mark Mathis [sic] and John

6    Eastman at the top of your notes along what a notation that "P

7    trusts," and then I can't read the rest out of it.

8              Could you clarify what that notation to those

9    two individuals signifies?

10        A.  I think it says "P trusts their view."  And the

11   first name is Mark Martin, M-a-r-t-i-n.

12        Q.  There are then some notes a little farther down the

13   page on Pennsylvania election issue, which we've already

14   discussed.  There's a notation about the original jurisdiction

15   complaint, which I'll have a couple more questions about in a

16   minute.

17              But it says here "U.S. does not have

18   standing.  DOJ should talk to the Olsens (who filed similar

19   case)."

20              So this is a reference to the proposal that

21   had just recently been sent to the Department to file an

22   original jurisdiction complaint in the Supreme Court akin to

23   the Texas versus Pennsylvania case.  Is that correct?

24        A.     Yes, that's right.

25        Q.  And so, at this point, which I believe is just

1   shortly after you received -- you, the Department, had

2   received that complaint, it sounds like the Department is

3   sharing its view that the U.S. doesn't have standing.

4            Is that a correct interpretation of your

5   notes here?

6        A.  Yes, that's right.  I don't know if we got the

7   written opinions from OLC and OSG at this point or not.  But

8   they had shared their views and they followed up with some

9   short written submissions.

10       Q.  And the reference to Pennsylvania just above that,

11  as I read your notes, it says, "Advised that we are looking at

12  the claim that there are more certifications than number of

13  voters."

14           And we've talked about that a bit before. I'm

15  curious how that came up in the context of this meeting.  Did

16  one of the White House participants ask you what you were

17  doing to look into that allegation?

18       A.   I don't recall exactly.  But I believe it was

19  raised by the Chief of Staff, and this is the issue I

20  mentioned earlier.  So at this point, we obviously didn't have

21  the answer.  So this is something he was working on.  And I

22  think we were just telling the Chief of Staff, "Yeah, we're

23  aware of that and we're looking into it."

24       Q.  Did the Chief of Staff ask you to take any

25  particular actions, or was it just more in the vein of a

1  question about whether you were looking into it?

2       A No.  I think it was more along the lines of, you know,

3  "You guys know about this Pennsylvania claim, right?"

4           And we said yes, because he wasn't on the

5  call with the President.  So it was more of an echo of what

6  the President had told us two nights before.

7       Q.  Then we get into a portion of your notes about

8  someone named Arturo D'Elia.

9           Had you heard of that individual at any point

10 before this meeting?

11      A.    No.

12      Q.  Were you aware that earlier in the day, Mark Meadows

13 had sent Mr. Rosen a letter from a company called USAerospace

14 Partners laying out the so-called Italygate theory?

15      A.        I know I became aware of that letter.  I just

16 don't if it was before this meeting or after.  If it went to

17 the DAG, we worked very closely together.  If he had it before

18 this meeting, likely I would have seen it, but I'm not sure.

19      Q.  And how did Italygate and Arturo D'Elia, who as I

20 understand it is an IT contractor who was a part of the

21 Italygate conspiracy theory, how did those things end up

22 coming up during the course of this meeting?

23      A.  Again, this is something that I believe the Chief of

24 Staff raised.  I had my notebook open right in front of me.

25 You can see I was taking notes, so I wrote down the name.  I

1    believe this is actually a misspelling of the name, but that's

2    what he provided.

3              And he provided some information you see

4    reflected in the notes.  The company is Leonardo, something in

5    relation to a facility in Pesaro, Italy.

6    "Under the protection of government agency in Italy. Sent

7    letter on his company stationery.  Claims involvement in vote

8    changing in U.S. 2020.  Claims in coordination with CIA

9    officers and Embassy."  I have where the embassy is located in

10   Rome.

11             Then something about a subsidiary, the USAerospace

12   Partners, that was a U.S. subsidiary of

13   Leonardo.

14             So this was a convoluted story to begin with,

15   and the Chief of Staff himself said, "Look, I'm not even sure

16   about this, or what I'm providing to you."

17             He just said, "This is what I understand it

18   is."

19             Because that name, Arturo D'Elia, I don't

20   think is even in the letter.  So he was relaying to us that he

21   had some information, it wasn't clear where it had come from,

22   but that he wasn't even sure what the story was supposed to

23   be.  But it was a claim that an Italian company with the

24   knowledge of CIA using military-grade satellites was involved

25   in changing vote tabulations in the U.S. presidential

1    election.

2         Q.   There's a notation here saying "RPD," which is you,

3    "to check his background with FBI."

4              Did somebody ask you to check his background

5    with the FBI?

6         A.   Yes, we discussed it there.  And the DAG told me to

7    do that.  He said, "Just find out if we know anything about

8    this guy, if he shows up anywhere on the radar," whatever it

9    is.  So I did do that.  I asked FBI to run his name.

10             But as I've said, the name is misspelled.  I

11   don't think we got anything back from the FBI.

12        Q.        And did Mark Meadows ask you and the DAG to

13   look into this?

14        A.   He provided the information.  I don't specifically

15   recall him asking me or anyone else to do something specific.

16   I don't think he asked me to run the guy's name.  That was,

17   I'm pretty sure, from the Acting Attorney General who said,

18   "Just check this guy out.  See what we know about him."

19        Q.   Did you have an impression of why he was sharing the

20   information with you?

21        A.        The Chief of Staff?

22        Q.    Yes.

23        A.   I think he was just trying to pass along whatever

24   ended up on his desk, frankly.  I think he was probably

25   getting a lot of these reports as well, and my impression was

1    he wanted to be able to say "I passed it along to the

2    Department."

3        Q.    There's a note on the side of the page.  Does that say --

4                        does that mean John Demers working on this?

5        A.    Right.  So after I got back to the office, I called

6    John, who was the AAG for the National Security Division.  I

7    gave him this name, "Arturo D'Elio," the way it's spelled

8    there.  And I said, "Can you just find out if we know anything

9    about this guy?  The DAG is asking us to looking into it."

10                  I don't remember what details I would have

11   given John about this allegation, but he said "Fine."

12   He took the name.

13       Q.  I imagine this didn't strike you as a credible

14   allegation, did it?

15       A.   It seemed pretty farfetched on its face. But,

16   again, we have to take each of these individually and try to

17   figure out what there is to support or refute it.  And so I

18   asked the FBI to look into it.

19                  I actually just googled the name myself, and I

20   googled it in conjunction with "Leonardo," and that's how I

21   realized that the name was actually misspelled. I believe it's

22   D'Elia, ending with an A.  And I found some public reporting

23   on the arrests of Arturo D'Elia, who was an employee or a

24   contractor of Leonardo, who was arrested in Italy in

25   conjunction with a scheme to exfiltrate data from the company.

1    I believe that scheme ran from, according to public reporting,

2    2015 to 2017.  So at this time, it appeared that Mr. D'Elia

3    was sitting in a prison in Italy.

4              Ms. Zdeb.  I want to jump ahead to the

5    original jurisdiction complaint for just a minute.  If you

6    could pull up Majority 12, and this will be Exhibit 11.

7                        (Exhibit 11, notes, was marked.)

8              BY MS. ZDEB.

9    Q.  So Kurt Olsen is -- or was a private attorney who

10   reached out to the Department purportedly on behalf of the

11   President in connection with this proposed Supreme Court

12   action.  And I'm just curious about a few aspects of these

13   notes.

14             For starters, are these your notes?

15   A.    Yes.

16   Q.  And it says "DAG call with Ken Kohl" at the top.

17             Is that actually Kurt Olsen, or is it

18   somebody else?

19   A.  Yes, I'm certain that should be Kurt Olsen, having

20   reviewed the emails and other things provided in advance to

21   this.  So I apologize for the misidentification.  There was a

22   great deal going on at that time.

23             But, yeah, I believe this is a call with Kurt

24   Olsen.  It took place in the DAG's office.  He had him on

25   speaker phone, and I was there for the entire conversation.

1        Q.  And why -- why did the DAG agree to this call in the

2   first place?  I think you had said earlier that the complaint

3   came in, at least the initial view by the time you had this

4   meeting in the White House where it was raised, the initial

5   view was, at the Solicitor

6   General's office, was that there was no merit to it.

7               Why entertain a call with Kurt Olsen to begin

8   with?

9        A.  Mr. Olsen kept contacting the Department throughout,

10  at least that day and maybe the day prior. He dealt a number

11  of times with the Acting Attorney General's then-Chief of

12  Staff, John Moran.  And I think he was looking for a meeting.

13              The Acting AG said, "I'm not giving this guy

14  a meeting," but ultimately decided to, you know, allow him to

15  call in, I suppose -- you know, I won't speculate too much,

16  but to say that, you know, we heard the guy out, something to

17  that effect.

18              Ms. Zdeb.  Let me jump to one quick aspect of

19  a related document, which is Majority 13, which will be

20  Exhibit 12.

21                        (Exhibit  12,  document,  was

22                        marked.)

23              BY MS. ZDEB.

24        Q.  And this is a one-pager from the Office of Solicitor

25  General that was sent to Mr. Rosen with a cc to you on

1   December 30.  The attached document, which is a one-pager,

2   contains a number of points, in essence, explaining why the

3   Department cannot bring this

4   original action.

5          And I want to just ask you about the third

6   bullet on that page, which says, "Prohibition on representing

7   interest of private parties."

8          When we were talking earlier about some of

9   the back-and-forth with the President during one of your early

10  meetings with him, you said, "Well, he would never say I want

11  you to take legal action on behalf of my campaign or me

12  specifically.  You would be doing it on behalf of the American

13  people."

14         This bullet in the OSG one-pager says, "A

15  sovereign" -- and this is by way of explaining, I take it,

16  that there would be no standing for this lawsuit. It says,

17  "The sovereign may not resort to the Supreme Court's original

18  jurisdiction in the name of the sovereign, but in reality for

19  the benefit of particular individuals, a suit for the benefit

20  of a particular candidate would violate that rule."

21         So it seems to me that irrespective of how

22  the President may have been characterizing these sorts of

23  potential legal actions, it was the view of the Department

24  that such an action would be for the benefit of a particular

25  candidate as opposed to for the benefit of the American public

1    at large.

2                Is that a fair interpretation of this

3    portion?

4        A.  I think it's fair to say it's one of the concerns

5    that the OSG raised.  I didn't discuss this particular bullet

6    point with him, and I don't believe the Acting AG did.  I

7    didn't do any research on this myself.  We relied entirely on

8    OSG and OLC.

9                    But, yeah, they raised that point.  It's one

10   of a variety of points.  It doesn't drive the outcome. But

11   there are a number of reasons why the United States would not

12   have standing in their view, and that's one issue that they

13   raised.

14       Q.    Let me jump --

15       A.  It's not necessarily the Department's view, but it's

16   an issue there.

17       Q.    It's the view of the Office of  Solicitor

18   General?

19       A.  Yeah.  Well, they identified as one of a number of

20   significant procedural hurdles.  So, yeah, they raised the

21   concern.

22       Q.  Let me jump ahead to December 31st when I believe

23   there were a couple of meetings.  And, again, this is back to

24   the issue with Jeffrey Clark.

25                Was there another meeting between you, the

1   DAG and Mr. Clark on December 31st?

2        A.          I know there was a meeting at the White House

3   that day.  I don't -- there probably was, but I don't

4   specifically recollect a meeting with Mr. Clark.

5               Between Monday the 28th and Sunday, January 3,

6   there were a number of discussions and meetings.  I certainly

7   remember the 28th in the conference room, and I remember

8   January 2nd as well as January 3rd.  There may be a meeting

9   or two in between there, I just don't specifically recollect.

10       Q.  So, I'm sorry, you don't specifically recall a

11  meeting in the Oval Office on the 31st?

12       A.          Oh, no, I definitely recall that, but Jeff

13  Clark was not at that meeting.

14       Q.  I see.  So the Oval Office meeting, there's a photo

15  that the Department has produced at that meeting. And it seems

16  to show that the participants, in addition to the President,

17  were Mark Meadows, Patrick Philbin,

18  Pat Cipollone, yourself and Mr. Rosen. Was

19               there anyone else there?

20       A.  No, that was everyone who was at that meeting.

21       Q.       And who initiated the meeting?

22       A.  Not us.  I don't remember exactly how it was

23  communicated to the DAG to come over to the White House.  I

24  think the President returned from Florida that afternoon.  And

25  shortly after his plane landed, the Acting Attorney General

1   was contacted and told to come over to the White House, with

2   me, specifically.

3        Q Did the Clark letter come up during the meeting?

4        A.  Certainly, Clark came up.  I don't know if we

5   specifically discussed the letter.  But we discussed various

6   election allegations and the more general issue of whether the

7   Department leadership should be changed.

8        Q.  And so this was one of the meetings where there was

9   a discussion about the possibility of installing Mr. Clark in

10  place of Mr. Rosen; is that right?

11       A.     It was part of the discussion, yes.

12       Q.  And was that discussion a discussion that involved

13  the President?  Did it involve Mark Meadows?

14       A.     It involved everyone in the room, yes.

15       Q.  What was the President specifically saying about

16  should the Department's leadership be changed and

17  Jeffrey Clark?

18       A.  The way I recollect it at that point, the

19  President's frustration was increasing.  The conversation was

20  becoming more contentious.  The

21  President said, as I reflected in the notes from the

22  27th, "People tell me I should get rid of both of you.

23  You're not doing your jobs.  People tell me I should

24  put Jeffrey Clark in."  That sort of response or statement.

25                    And we essentially said, "Mr. President, you

Trustpoint.One | Alderson        www.trustpoint.one
www.aldersonreporting.com            800.FOR.DEPO
                                     (800.367.3376)

1  should have whatever leadership you want, but we're going to

2  tell you the Department operates on facts and evidence.   It

3  doesn't matter who the leader is.   That's how the Department

4  is going to act, and it's not going to change the outcome."

5       Q.          Did the Supreme Court -- did the idea of the

6  Supreme Court action come up during this meeting?

7       A.   Yes.   The President was very frustrated that we told

8  him that, in our view, the United States Department of Justice

9  did not have standing to bring such an action.   Again, I can

10  understand the

11  President's frustration on this point.

12            He kept saying "How can that be?   How is that

13  possible?   You represent the American people.   The American

14  people don't want to be harmed by all this fraud, and you're

15  telling me you can't file an action to protect the rights and

16  interests of the American people."

17            And we repeatedly said no and DAG Rosen tried

18  to explain why, but the President was very frustrated on that

19  point.

20       Q.       In other words, he wanted you to bring that

21  action, and you were telling him you couldn't?

22       A.   Generally, yes.   I mean, that wasn't a point where

23  he said "I'm instructing you to bring this action," but he did

24  say, you know, "What's going on with this brief?"

25            He would reference other people, like Mr. Olsen,

1    you know.  "They tell me that this is a slam dunk.  They tell

2    me you guys can just walk this right into court, and you're

3    refusing to do it."

4              And we said, "No, we cannot walk it into

5    court.  We do not have standing.  We've asked the OSG to look

6    at this.  We've asked the OLC to look at this. And there are

7    very specific reasons why we don't believe we have standing to

8    bring such an action."

9              He responded by saying, "How is that

10   possible?  How can that be?"

11             It went on like that for some time.

12        Q.  I have just a little bit of time left in this round.

13   So instead of asking you to look at or authenticate a bunch

14   more documents, let me just short-circuit some of my questions

15   on Mark Meadows a bit, by referring to an email that you sent

16   in which you used the phrase "pure insanity."  I'm happy to

17   introduce that.

18             I think you probably know what I'm talking

19   about.  And maybe you can just sort of, generally, in my

20   remaining minute or two, kind of give a flavor for -- give a

21   flavor of the outreach that seemed like it was increasingly

22   coming Mr. Rosen's way, in particular, from Mark Meadows, with

23   emails about things like Italygate, various allegations in

24   Georgia.

25             How did you -- what was your reaction to

1  that?

2       A.  I'm familiar with the emails that you're talking

3  about.  My comment about "pure insanity" related specifically

4  to the video that had been forwarded.  I don't know if Mark

5  Meadows looked at that video.  I have no idea.  But that was

6  on New Year's day.

7               The referrals were continuing to come.  Some

8  of them were pretty farfetched, as this one was.  And when I

9  looked at the video, I think it was about a 20-minute YouTube

10 video or something like that, it struck me as being fairly off

11 the wall, in part because it was very conclusory and it did

12 not really offer evidence.

13              It basically told a story about how the CIA

14 and  British  intelligence  and  actors  in  Italy  were  using

15 military satellites to change votes in swing states and so on.

16 And it just seemed not only unbelievably improbable, but even

17 worse.  So my "pure insanity" response was specifically

18 directed at the video and the claims in the video as opposed

19 to say the Chief of Staff or the Chief of Staff passing it

20 along or anything like that.

21              With regard to the subsequent one relating to

22 Georgia, where the Acting AG said "Can you believe this," his

23 frustration, I think was at the fact that they, at least the

24 Chief of Staff, they in the White House believed that Jeff

25 Clark should be involved in any of this stuff.  It was

1    strange, especially at that point, for them to be saying "Have

2    Jeff Clark look into this, or can Jeff Clark look into this."

3                      That, I took as the real frustration point in

4    that email exchange.  It had to do with voter signature

5    verification, and I responded sort of meshing two things.

6    Voter signature verification is a more substantive concern

7    than Italian military satellites. So I suppose, in that

8    regard, it was better.

9                      But, again, this idea of sending Jeff Clark

10   down to Georgia to do some sort of firsthand investigation of

11   voter signatures, that's just not the way the Department

12   operates.

13                     Ms. Zdeb.  I see that my time for this round

14   is up.

15                     Mr. Donoghue, I know that you have a 2:00

16   hard stop, and that we are -- I see your counsel is shaking

17   his head.

18                     Mr. Andres.  We can talk about that after.

19                     Ms. Zdeb.  Okay.  I was just going to suggest

20   if we were strictly trying to adhere to that hard stop that we

21   can take a shorter break or just keep going. But if you would

22   prefer to take a break now, and then maybe talk off the record

23   about --

24                     Mr. Andres.  We can take a 15-minute break or

25   so.  I don't want to speak for Brad or anybody else. But if we

1   can just have 15 minutes, I don't think we need anything more.

2   There's a lot of people making a nasty face at me, but we

3   don't need a long time for lunch.

4          Ms. Zdeb.  Okay.  I apologize.  We can go off

5   the record now, if we haven't already.  It's 12:39.

6                          (Discussion off the record.)

7          Ms. Zdeb.  It is 1:03.  We can go back on

8   record.  And I will turn it over again to my colleagues on

9   Senator Grassley's staff.

10          Mr. Flynn-Brown.  Thank you, Sara.

11          And, Mr. Donoghue, thank you for your time

12   today.  I'm probably going to take up less than one hour in

13   this questioning and then hand it back over to Sara for her

14   time.

15          So what I'd like to do is move to Minority 5.

16   I believe this is Exhibit 13, Bates-stamped -714.

17                          (Exhibit 13, document, was

18          marked.) Mr. Donoghue.  Yes.

19          BY MR. FLYNN-BROWN.

20      Q.  Okay.  So I believe that you may have addressed this

21   earlier in your testimony.  So forgive me if we're retreading

22   right now, but I just want the record to be precise here.

23          In the middle of the page, I believe it says,

24   correct me if I'm wrong, "Thinks he saw trucks move ballots to

25   shredding location."

Trustpoint.One   Alderson.        www.trustpoint.one
                                   www.aldersonreporting.com        800.FOR.DEPO
                                                                    (800.367.3376)

1          It's not clear to me who "he" is.  But next

2     the notes say, "Cobb County-woman who worked at facility

3     testified at the Georgia Senate hearing that she saw shred

4     trucks at election location."

5          Were these allegations investigated by the

6     Justice Department and the FBI?

7     A.   So this was relayed to us by Jeff Clark.  And Jeff Clark

8               apparently talked to one or two individuals.

9     It's not entirely clear to me from this.  And so this may

10    relate -- I'm not entirely certain as I sit here. This may

11    relate to the shredded ballot truck in Georgia.  But I don't

12    know if there was more than one allegation about that.

13         But to the extent there were allegations in

14    Georgia, BJay Pak's office handled those.  So I believe that

15    they were aware of the testimony in the Georgia Senate hearing

16    as well as other allegations.  And they, along with the FBI,

17    were looking at those.

18    Q.      So you said BJay Pak handled these allegations?

19    A.      Yes.  BJay Pak was the U.S. Attorney there.

20         Mr. Flynn-Brown.  Okay.  Let's now turn to --

21    Exhibit 14, Minority 2, Bates-stamped -598 to -601.

22              (Exhibit 14, email, was marked.)

23         Mr. Donoghue.  Yes, I have it.

24         BY MR. FLYNN-BROWN.

25    Q.   So this is a December 30th, 2020, email from Cleta

1  Mitchell to Mark Meadows, in which she sent the petition filed

2  in Georgia and a press release, and Meadows then forwards that

3  email to Mr. Rosen.

4            And in that email, Meadows says, "Can you

5  have your team look into these allegations of wrongdoing?

6  Only the alleged fraudulent activity.  Thanks, Mark."

7            Are you aware of whether or not the Justice

8  Department and FBI reviewed and investigated these allegations

9  specific to this document?

10            And if you need time to review it, you can

11  have it, obviously.

12      A.   Yeah, I don't recall specifically, as I sit here

13  now, these allegations.  But, again, our general practice was

14  to pass these things along to the U.S.

15  Attorney's Office, if they didn't already have it.

16                 Mr. Flynn-Brown.  Okay.  All right.  Let's go

17  to Minority 4.  This would be Exhibit 15, Bates -675.

18                      (Exhibit 15, email, was marked.)

19            BY MR. FLYNN-BROWN.

20      Q.     Let me know when you're there.

21      A.     I'm there.

22      Q.   Okay.  So Mark Meadows emails Rosen on January 1,

23  2021, and says in part, "Can you forward this list to your

24  team to review the allegations contained herein?"

25            And the allegations related to New Mexico

1    ballot security issues, according to the subject line on this

2    email.

3                      Do you recall whether this was floated your

4    way?  You're not on this email, but do you remember this

5    ballot security issue in New Mexico and whether that was

6    investigated by the DOJ or FBI?

7         A.  I don't remember that as I sit here.  I don't

8    remember New Mexico being an issue.

9         Q.  Okay.  Was it common practice for Meadows to flip

10   DOJ these types of emails, in essence to say, "Hey, you guys,

11   you need to look into this," so on and so forth?

12        A.  I think so.  As I said earlier, my general

13   impression was to the extent that things ended up on the Chief

14   of Staff's desk, I think his desire was to get them, you know,

15   referred out.  So I suppose he could say "I referred it to

16   DOJ."

17        Q.    Understood.

18                      So was Meadows fairly deferential to DOJ in

19   that regard?  He's forwarding you things, and is he deferring

20   to your judgment and expertise after he sends this information

21   your way?

22        A.    I think that's a fair characterization.

23        Q.  You had mentioned earlier when Sara was questioning

24   you, you guys got into a little bit of a discussion with

25   respect to the White House contact policy and how Clark may

1   have violated that.

2           With respect to that policy, generally

3   speaking, White House contact policy for DOJ did not preclude

4   communications between DOJ and the White House.  It limited

5   who and the circumstances for those communications; is that

6   correct?

7       A.    That's right.

8       Q.  Now, did Trump's efforts to push the DOJ and FBI to

9   be more aggressive in investigating election fraud and related

10  crimes -- or, excuse me, and election crimes work to make them

11  more aggressive than they would have been absent those efforts

12  from the President?

13      A.     No.  I would say it had no impact --

14      Q.    No impact?

15      A.  -- on what we were going to do.  We did what we were

16  going to do, regardless.

17          Mr. Flynn-Brown.  I'd like to introduce into

18  the record -- you don't need to comment on this, I'm not going

19  to ask you about it, but I just want the record to reflect

20  this.

21          These are statements that Senator Grassley

22  made publicly regarding January 6, 2021.

23              And, Sara, these are all public.  And I'd ask

24  that these be included as not witness exhibits, per se, but in

25  the appendix, I'd like these two documents to be included in

Trustpoint.One | Alderson    www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    the final record.

2             The first one is a January 6, 2021, press

3    release from Senator Grassley titled "America Must Be

4    Better Than This."

5             And the second one is a January 6, 2021,

6    press release as well.  So he issued two on that day.

7    And this one is titled "Grassley's Statement on

8    Electoral College Certification."

9             I would like those two to be included into

10   the interview record.

11            Mr. Donoghue, at this point, I don't have any

12   further questions for you.  I may have some depending upon my

13   colleague's questioning, so I'll reserve the time that I have.

14            But I want to thank you for your time today. And I

15   understand you served in the United States military.  So on

16   behalf of Senator Grassley, DeLisa and I would like to thank

17   you for your service to the country.

18            Mr. Donoghue.   Thank you.

19            Mr. Flynn-Brown.  So for the time being, I

20   think we're done with our line of questioning, but we do

21   reserve our time if we need to jump in at the end of this

22   interview.

23            So, Sara, I'm going to hand it over to you. Ms.

24             Zdeb.   Sure.

25            And as the spouse of a fellow former JAG, I

1   suppose I will add my thanks to Josh's thanks.

2            Would you guys like another quick break, or

3   are you good to keep going?

4            Mr. Andres.  I think we're good.  Thank you.

5            Ms. Zdeb.  Terrific.  So it's 1:11, and we

6   will start our next round.

7            Now that I understand we are not quite as

8   pressed for time, for the sake of completeness and because I

9   don't think we have done so already, I'm going to go ahead and

10  officially introduce the document that was labeled Majority

11  18.  And we are now, I think, up to Exhibit 16, so we'll call

12  it Exhibit 16.

13                         (Exhibit 16, email, was marked.)

14           Ms. Zdeb.  This is the -- actually, I'm

15  sorry.  I'm going to back up a second.

16           Majority 17, which will be Exhibit 16.

17           BY MS. ZDEB.

18      Q.  This is the January 1st, 2021, exchange between you

19  and Mr. Rosen that you and I were talking about right before

20  our last break.  It's the "pure insanity" email.  We talked a

21  bit about your reaction to the video and why you viewed it as

22  pure insanity, but I want to ask you about another portion of

23  the exchange with Mr. Rosen.  And that's where he indicates to

24  you that after -- at some point after he received the video he

25  was, quote, "asked to have the FBI meet with Brad Johnson,"

1    who was the individual who made the YouTube video.

2            Do you know who asked Rosen, Mr. Rosen, to

3    have the FBI meet with Brad Johnson?

4        A.   I don't know.  He may have told me that day.

5    But if he did, I don't remember as I sit here.

6        Q.  Do you know -- is there anything further that you

7    can tell us about the circumstances of that request?

8        A.   Well, it was January 1st, and so I was at my

9    apartment in Washington.  The Acting AG, I believe, was at

10   home.  And so these emails flowed throughout the day, and

11   there were calls throughout the day.  So he was sort of

12   keeping me updated.

13               But aside from generally going back and forth

14   and him calling me and saying what was going on, I don't

15   remember the specifics beyond what's in the email here.

16       Q.  Mr. Rosen went on to indicate that he had learned

17   that Brad Johnson -- again, the individual in the YouTube

18   video -- was working with Rudy Giuliani and that he, Mr.

19   Rosen, "Reaffirmed yet, again, that he would not talk to

20   Giuliani about any of this."

21               Do you know to whom Mr. Rosen reaffirmed that

22   he wouldn't talk to Rudy Giuliani?

23       A.   Sorry, I don't specifically remember.  He would have

24   to say.

25       Q.  Were you aware at the time of some efforts to

1 encourage Mr. Rosen or others in the Department to meet with

2 Mr. Giuliani?

3         A.  I think in relation to this, yes.  I do remember

4 this comment about "it was taken as an insult."  His refusal

5 to meet with Giuliani was taken as an insult.  So I do

6 recollect that, but I can't remember the specifics beyond what

7 I see on the page here about Rudy Giuliani.

8         Q.  Is it possible that it was Mark Meadows who made the

9 request?

10        A.  I'd be speculating, but, sure, that's possible.

11        Q.  Do you have a sense of -- I mean, I think I can

12 imagine, but do you have a sense based on your discussions

13 with Mr. Rosen as to why he refused, apparently, to meet with

14 Mr. Giuliani?

15        A.  As I said earlier, there's sort of a standard way

16 that these things are handled, and the FBI field office does

17 intake -- U.S. Attorney's Office does intake so on and so

18 forth.  It didn't surprise me at all that he was refusing to

19 meet with Rudy Giuliani.  I don't imagine any scenario where

20 he would have agreed to do that.

21            So I think he was just saying, "Tell them

22 they can follow the regular course.  Rudy Giuliani certainly

23 knows how to bring these things to the Justice Department.  He

24 can go to the FBI field office.  He can go to the U.S.

25 Attorney's Office.  He knows how to do this.  He's not going

1    to get an audience with the Acting Attorney General."

2              That was all consistent with his approach

3    throughout this time period.

4        Q.   I'm curious, because you indicated, in response to a

5    question from Josh just a few minutes ago, that at the end of

6    the day, the Department didn't take any particular actions in

7    response to all of the outreach that we have been discussing

8    from the White House, that it would not have -- that it would

9    not have taken anyway.

10             I take your point, but I'm sort of curious,

11   just based on your lengthy experience as a career prosecutor

12   and a member of the Department's leadership, whether this sort

13   of course of conduct, the repeated outreach from Mark Meadows,

14   the repeated outreach from the President, changed the

15   Department's actions at the end of the day or not.

16             Would you characterize this as kind of ordinary

17   course, or was this somewhat unusual in your view?

18       A.   It was definitely unusual.  But, again, I had never

19   operated at that level in the Department in other

20   administrations.  So it would be difficult for me to compare

21   one to another.  But we certainly thought it was unusual.  But

22   at the same time, I can say with confidence that it didn't

23   change anything we did.

24             You know, they were free to raise things.  And to

25   the extent they raised things we were unaware of, such as the

1    five -- over 250,000 supposed difference in Pennsylvania

2    votes, you know, we looked at them, obviously.  But no matter

3    what these conversations were, no matter what the phone calls

4    were, no matter what the meetings were, we did our job.

5           And I don't think that them calling or

6    calling us in or anything else changed the way we did it.  It

7    just made it a difficult circumstance, obviously.

8      Q.     What was difficult about it?

9      A.  Obviously, the fact that you're getting pulled over

10   to the White House, you know, distracts from your day-to-day

11   work.  And so while, at the end of the day, it didn't change

12   what we did, the Acting Attorney General and I and others in

13   the Department had plenty of other things to focus on at that

14   time.

15          Ms. Zdeb.  Let me now jump to Majority 18,

16   which will be Exhibit 17, I think.  And this is the follow-up

17   to the email we were just discussing.

18                         (Exhibit  17,  email,  was

19                 marked.) BY MS. ZDEB.

20     Q.  It's the January 2021 email from Mr. Rosen to you

21   forwarding the email in which Mark Meadows alerts you to

22   supposed allegations of signature match anomalies in Georgia,

23   and says, "Can you get Jeff Clark to engage?"

24               And I think you were saying before the break

25   that that -- the invoking of Jeff Clark's name, in particular,

1    in this circumstance, was not viewed well by Mr. Rosen.   In

2    this instance, you know, we have talked on a number of

3    occasions at this point about the

4    DOJ White House contacts policy.

5             Would you agree that this request from

6    Meadows was not consistent with that policy?

7        A.   I'd have to look back in the policy to see who on

8    the White House side is authorized to have these types of

9    communications, but I believe the Chief of Staff is.   I know,

10   certainly, the White House counsel is.

11            So I'm not entirely certain, but I don't

12   think it's all that unusual to have the Chief of Staff

13   communicating to someone who, in effect, is a cabinet member

14   at that point, right.   But I think that the reference to Jeff

15   Clark specifically is what led to the

16   Acting AG's response.

17       Q.   And just for clarification, and you're obviously

18   free to pull up what I think is Exhibit Number 1, which is the

19   email you sent way back in November attaching copies of the

20   contacts policies, but the White House Chief of Staff is not

21   among the individuals who are authorized to have those sorts

22   of communications with the Department, which is why I asked.

23   You're correct that the White House counsel is, but the Chief

24   of Staff is not among that universe.

25            And can I just -- before getting back to the Jeff

1    Clark aspect of this, I did just want to return to the

2    contacts policies.  Again, just to make sure that -- just to

3    make sure that we're covering kind of both of the two aspects

4    of that policy, that I think you and I discussed at the very

5    beginning of the interview.

6                      So the first portion of it, and this is the

7    one that Josh was just asking you about a few minutes ago, is

8    the portion that places limitations on who can have

9    communications.  So, in other words, limitations on which

10   people in the White House, which people in the Department.

11                     But I think when you and I were initially

12   talking, you agreed that there's a second component to the

13   policy as well, which is that it operates to limit the

14   circumstances in which those sorts of communications can

15   happen at all.

16                     Do you remember that general concept?

17        A.        Right.  Yes, I do remember that.

18        Q.  And I have always understood the reason for that

19   second portion of the policy, in particular -- but the policy

20   in its entirety as well -- is really to minimize the prospect

21   of undue political influence in the Department's law

22   enforcement activities.

23                     Would you agree with that kind of assessment

24   of the purpose?

25        A.  Yes, I think that's one of the major considerations.

1      Q.   And so when the White House Chief of Staff or even

2    the President himself raises concerns about particular

3    allegations of election fraud, wouldn't you agree,

4    particularly if it's repeated outreach, as it seems to have

5    been the case here, wouldn't you agree that that starts to

6    implicate that second portion of the policy as well as the

7    overall purpose of trying to limit undue political influence?

8      A.   Yeah, I think those concerns are implicated,

9    absolutely.  I don't think that the President is bound to

10   either of these policies, but you're right.  It's a legitimate

11   concern, and I think those concerns are implicated.

12     Q.   And I know my colleague Josh, at some point earlier

13   during the interview, asked you a question to the effect of,

14   "Well, isn't it the President's responsibility as the head of

15   the executive branch to supervise the Department of Justice."

16   And you agreed with that concept.

17              But would you also agree that the President's

18   role as head of the executive branch and supervisor of

19   agencies, including DOJ, it exists in tandem with these

20   principles enshrined in the contacts policy?

21              So, in other words, he's responsible for

22   supervising DOJ, but there are also limitations designed to

23   ensure that he is not unduly influencing the conduct of law

24   enforcement operations in a way that politicizes them?

25     A.       Yes, I would agree with that get.

1          Ms. Zdeb.  Let's move on to the January 2nd

2   meeting that I understand you and Mr. Rosen had with

3   Mr. Clark.  This is Majority 19.

4                         (Exhibit 18, notes, was marked.)

5          Mr. Donoghue.  I have it.

6          BY MS. ZDEB.

7      Q.  And I think we are now up to Exhibit 18.  Are these

8   your handwritten notes?

9      A.  Yes.

10     Q.  There is a notation on -- well, actually, let me

11  take a step back.

12          Do you remember exactly when on January 2

13  this meeting took place?

14     A.  It was sometime in the afternoon.  This was

15  Saturday.  So I was home, "home" meaning my apartment in D.C.

16  And Acting AG Rosen called me and said that he was going to

17  meet with Jeff Clark, but he did not want to meet with him

18  alone and asked if I could come to the apartment.  So I said

19  of course, and I immediately left the Department.

20          I probably got there 15 minutes after the

21  call or something like that.  And then we went up and we had

22  this meeting on the sixth floor in the SCIF.

23     Q.     Do you know why he didn't want to meet with

24  Mr. Clark alone?

25     A.  I don't think he said specifically, but I think it

1    was fairly obvious that this is becoming a very unusual

2    situation, and it would be better to have everyone involved.

3                        I mean, we were the Department leadership at

4    this time, and this was becoming more of a concern about the

5    potential for a leadership change.  And this was sort of a

6    follow-up to the December 28th meeting.

7        Q.  We talked a bit earlier about Mr. Clark's request to

8    be briefed by ODNI on election-related issues.  And it seems

9    from your notes at the top that a meeting of that sort took

10   place.  There's this notation saying "DNI briefing, no

11   evidence of ballot tampering, influence only."

12                        Was that something that Clark was reporting

13   to you based on a briefing he had had from ODNI?

14       A.  He had a briefing from ODNI.  And one of the things

15   I wanted to nail down was that he had had the briefing that he

16   requested.  And that based on the information he was provided,

17   there was no reason in the

18   IC to question the outcome.

19       Q.     How did he react to this?

20       A.  He acknowledged that, but then sort of moved right

21   past it and said, "Fine, but there's all these other things

22   going on."  And he began to talk about Georgia and how he had

23   spoken to this individual in Georgia.  And then got back to

24   the letter and said, you know, "Based on a discussion with

25   this individual in

1   Georgia and the things that came up in the Georgia

2   Senate hearing, that we should send the letter."

3        Q.  And there are a couple of notations in here, if I'm

4   reading the notes correctly, to the United States Attorneys in

5   Georgia.  So on the left-hand side, there's a little notation

6   saying, "Acknowledges that he did not call BJay Pak as he was

7   told to."

8             If I'm reading that correctly, can you

9   explain why he had been told to reach out to U.S.

10  Attorney Pak?

11       A.  Right.  You are reading it correctly.  Keep in mind

12  there were communications between Jeff Rosen and Jeff Clark

13  that I was not a party to in this time frame.  But,

14  essentially, when he was complaining about Georgia and these

15  things that had supposedly gone on if Georgia, the Acting AG

16  was getting a little exasperated and said, "Jeff, we've looked

17  at these things.  BJay Pak looked at them.  You're acting like

18  they haven't been looked at.  Just call BJay.  Call him and

19  he'll tell you that we've looked into these things."

20            And at some point, he provided BJay Pak's

21  cell phone number to Jeff Clark and told him to call him.

22  And at the outset of this meeting, I said to him -- just to

23  make a record and make sure we understood the context in

24  which were having a conversation, "Did you get the briefing?

25  What was the result?  Did you call BJay Pak?"

1          And he said "No, I haven't called BJay Pak,"

2     which I just noted there because I felt it was relevant.

3          Q.     Did he say why he didn't call him?

4          A.     No.  He just said that he did not.

5          Q.      Then there's a notation saying "Then called

6     Bobby Christine, but nothing done."

7               Did you have an understanding about what that

8     outreach to U.S. Attorney Christine involved?

9          A.  I don't believe that was Jeff Clark calling Bobby

10    Christine.  I think this is a reference to the individual

11    described above.  It says, "Largest bail bondsman in Georgia

12    and owns phone company."

13              So this is the individual to whom Jeff Clark

14    spoke.  And he's saying that he, that individual, the bail

15    bondsman, called the head of GBI, which is the Georgia Bureau

16    of Investigations.  They were not interested in his reporting.

17              He, again, that individual, the bail

18    bondsman, then called Bobby Christine.  Nothing done.

19              And then the reference to the right of that

20    is "Conducted surveillance on warehouse, et cetera." This is

21    talking about that individual or maybe people who worked for

22    him.  It wasn't entirely clear to me.

23         Q.  So he was raising these points about Georgia, the

24    surveillance, the outreach to Bobby Christine by way of,

25    again, advocating for the Department to send his letter.  Is

1    that correct?

2        A.   Right.   He was focused on Georgia, I suppose,

3    because the letter was, at least, initially, directed to

4    Georgia.   And he said, "See, there's all these things going on

5    in Georgia.   There were still all these questions.   There were

6    still all these allegations.   We need to get that letter out."

7    Something to that effect.

8        Q.   Partly down the page, you have a notation "This is

9    entirely unacceptable," which I imagine is something that

10   either you or Mr. Rosen said in response.   Is that accurate?

11       A   I said it.   This conversation became very heated.

12       Q.   And what -- when you made clear that it was

13   unacceptable, and presumably that the Department would not be

14   moving forward with his letter, how did he react?

15       A.   He just sort of shrugged.   I said a number of

16   things, "entirely unacceptable" being one of them, but I

17   reminded him that I was his boss, that he was apparently

18   continuing to violate the White House contact policy, that

19   that letter was never going out while we were in charge of the

20   Department.   And I sort of orally reprimanded him on a number

21   of points, including reaching out to witness, and "Who told

22   you to conduct investigations and interview witnesses," and

23   things like that.

24            I was getting very heated.   And he then

25   turned to Acting AG Rosen, and he said, "Well, the President

1  has offered me the position of Acting Attorney General.  I

2  told him I would let him know my decision on Monday.  I need

3  to think about that a little bit more."

4       Q.   Did he say when he had received that offer from the

5  President?

6       A.    Not specifically, no.

7       Q.     How did you leave the meeting?

8       A.   So this was Saturday.  He said that he had been

9  offered the position by the President.  He was going to let

10  the President know on Monday, that he was going to continue to

11  think about it.  And that he would let Jeff Rosen know his

12  decision.

13               As I said, it was a very heated meeting, and

14  we all just left there with that being the situation, that we

15  were expecting to hear sometime between then and Monday as to

16  what Clark was going to do, whether that was really going to

17  happen, and so on and so forth.

18       Q.   At some point while this is all unfolding, and

19  particularly after he has informed you that he was been

20  offered the position of Acting AG by the President, did you

21  and Mr. Rosen begin to widen the circle beyond yourselves and

22  Mr. Engel, and read other department officials into the

23  prospect, or the likelihood, even, that Mr. Rosen would be

24  replaced by Mr. Clark?

25       A.   Well, after we left the sixth floor, we went down to

143

1    the Acting AG's office and we sat there for some time talking

2    about this.  We may have called Steve Engel, I'm not sure,

3    frankly.  I think Pat Hovakimian was also sort of in that

4    circle.

5              Again, the communications between Pat and Acting AG

6    Rosen, I was not always privy to because they had a personal

7    and professional relationship.  And I know there were

8    conversations going on there.  But we decided to keep a close

9    hold because it still wasn't clear what was going to happen.

10             And that changed the following day, of

11   course.  But at that point on the 2nd, you know, we discussed,

12   "Do we now call everyone in?  Do we tell them what's going

13   on?"

14             And we went back and forth a little bit, and I

15   think ultimately the Acting AG said, "Look, we don't know

16   what's going to happen.  Let's just ride out tonight and see

17   how this goes."

18             That's how we left it at that point.

19        Q.   So at the end of the 2nd, you were anticipating that

20   the following Monday, which was the 4th, you would learn what

21   Jeffrey Clark had decided to do.  But then as you just alluded

22   to, it seems that things changed the following day.  And on

23   Sunday, the 3rd, there was some sort of conversation or

24   meeting between Mr. Clark and Mr. Rosen.

25             Is that your recollection?

1       A.      Yes, that's right.

2       Q.  And were you a participant in that meeting, or was

3   it just the two of them?

4       A.  Not the first discussion.  I think there were

5   actually at least two discussions that I was not part of that

6   day.  Those both preceded the meeting at the

7   White House.

8       Q.  And presumably, you came to have some understanding,

9   though, of those discussions.

10      A.      I did.

11      Q.        And what was your understanding of them?

12      A.  We had a meeting scheduled, a call, for 1:00 that

13  Sunday afternoon.  The meeting was amongst various agencies --

14  DOD, DHS, Interior, DOJ and others -- in relation to

15  preparation for January 6th.  That was already on the

16  calendar.  I was going to come into the Department to do that

17  call from my office or the DAG's office.  So we were already

18  scheduled to be in the office that afternoon.

19         I came a little before the 1:00 meeting,

20  maybe 12:30 or so, quarter to 1:00, something like that.  I

21  came into the DAG's office.  Obviously, it was very quiet.  It

22  was a Sunday afternoon.  No one else was really around.  And

23  the DAG was pretty exasperated, and he said, "I spoke to Jeff

24  Clark."  It appeared to be just shortly before that.  And he

25  said that "Clark says that he decided to take the President up

1  on his offer, that he's going to be the Acting AG, but he

2  wants to have one last face-to-face conversation with me

3  before he tells the President."

4              It was then time to do the call.  We did the

5  call with DOD and the others, talked through some of

6  the preparations for January 6.  And when that was over, he

7  filled me in some more on their conversation. And so he said,

8  "So Clark wants a one-on-one conversation with me."  It was

9  clear to me at that point, Jeff Clark did not want me involved

10  in any of these conversations.

11              And I said, "Well, sir, do you really want to

12  meet with him alone?"

13              And he said something to that effect of, "Look,

14  I've known this guy for decades.  I'm going to meet with him

15  alone.  That's fine."

16              He then met with him.  I was in my office.  I

17  think they met somewhere in the building.  I did not see Jeff

18  Clark at all until the Oval Office meeting.

19              Jeff Rosen told me that in the discussion

20  they just had, Jeff Clark asked him to stay on as his Deputy

21  Attorney General.  And basically said, "Can you believe the

22  nerve of this guy?"  Something to that effect.

23              He was exasperated.  And we both just sort of

24  shook our heads.  And I kind of said, "Well, I guess that's

25  it.  Are we going to find out in a tweet?"

1   Like, how are we going to find out about it?

2              And he said, "Well, I think he's going to go

3   over to the White House or call him or something, and I guess

4   we'll find out this afternoon."

5              At that point, I went I back to my office and I

6   began taking things off the wall and put them in boxes,

7   because I told the Acting AG I would immediately resign.

8   There was no way I was going to serve under Jeff Clark.  Began

9   taking things off the wall, putting them in boxes.  I did that

10  for a short time.

11             He came over and he said "I talked to Pat,"

12  by which he meant Pat Cipollone, "I talked to Pat.  Pat said,

13  in his view, this is not a done deal, that we should go to the

14  White House and fight this thing out."

15             And we talked about that, and he said, "Look,

16  if there's any shot of us stopping this from happening,

17  I think we need to go to the White House."

18             And I said, "That's fine.  I agree with

19  that."

20             And then he had a series of conversations

21  with people, and he would come back and report to me on them.

22  He said that Jeff Clark had agreed to meet at the White House

23  with DAG Rosen, but only on the condition that only DAG Rosen

24  showed up from the Department and no one else.

25             And as we got closer to that time, there was

1   some discussion about timing and such, and it was decided that

2   the meeting would take place in the Oval Office at 6:15 that

3   evening.

4           As we got closer to that, I said, "What do

5   you need me to do?  What can I do to help," essentially.  And

6   I think he also called Pat Hovakimian in.

7           And he said, "Well, you know, I think it's

8   time to let everyone know what's going on.  So can you do a

9   call with the AAGs and let them know what's going on?  It

10  would be interesting to know if they would resign.  Because

11  that might help inform the conversation at the White House, if

12  that's going to be their reaction."

13              So Pat and I set up that call.  We got most

14  of the AAGs, not all of them.  We got them on the phone in

15  Pat's office.  I described for the AAGs what the situation

16  was, what had been going on over the last week.  They, of

17  course, didn't know this.

18          And I said to them at the outset, "I don't

19  need a decision right now, but I need a decision quickly.  I

20  don't want to put anyone on the spot.  What I'd like you to

21  do, I'm going to tell you what's happening here.  And if you

22  can make a decision in the next 15 minutes, call me, call Pat,

23  email us and tell us what you would do.  If you can't, I

24  understand that.

25  That's fine."

1          I also said to John Demers, "John, as the AAG

2     for the National Security Division, I hope you do not resign

3     because we need you to stay in place.  We need NSD to have

4     stability, especially if the entire department of leadership

5     disappears."

6          Before the call was over, the AAG for civil

7     rights, Eric Dreiband said, "Well, I don't need to think about

8     this.  I am telling you right now, I'm leaving.  There's no

9     way I am standing for this."

10          Then other people began to chime in.  I said,

11     "Again, I don't want to put anyone on the spot.  You guys can

12     let us know."

13          But, essentially, everyone responded either

14     during the call or immediately thereafter that they would

15     resign.  And so we then had that information.

16          I went back to -- Pat and I went back to the Acting

17     AG.  We explained to him what the reaction had been among the

18     AAGs.  He said fine.  He was getting ready to go to the White

19     House.

20          I said, "What do you want me to do?"

21          He said, "I want you to come to the White

22     House."

23          I said, "All right.  But didn't Clark say he

24     wouldn't participate if anyone else from the Department was

25     in?"

1          Rosen said, "I don't care what Jeff Clark

2    wants.  I want you to come to the White House.  You know these

3    issues better than I do in terms of the election

4    investigations."

5          I noted that I was not dressed for a visit to

6    the White House.  I was in jeans, boots, covered in mud

7    because I had been walking on the Mall earlier in the day.  I

8    had an Army T-shirt on.  I hadn't shaved in four days.  So I

9    said, "Should I go change?"

10         He said, "No, there's no time for that."

11         And he said, "Look, I'll have you sit outside

12   the Oval Office.  If a question comes up I can't answer, I'll

13   pull you in.  But, otherwise, you can just sit outside."

14         "Fine."

15         We then got into the vehicles and went over

16   to the White House.  We arrived there I think about 6 p.m.  We

17   went to the White House Counsel's Office and spoke very

18   briefly to Pat Cipollone and Pat Philbin, and then we headed

19   to the Oval Office where I sat outside on a couch.

20         As I was on the couch, the Acting Attorney

21   General went into the Oval Office.  I saw

22   General Milley walk by.  I think he had just left the

23   Oval Office.  And shortly after that, I saw the Chief

24   of Staff walk by, who just nodded at me and said "Good luck"

25   and walked on his way.

1          I sat there for about 25 minutes.  I was

2     watching the news.  They were talking about the Raffensperger

3     call.  I think that was breaking news that afternoon.

4          After about 25 minutes, one of the

5     administrative assistants walked by and said, "Are you

6     supposed to be in this meeting with the President?"

7          I said, "No, I'm just here to answer any

8     questions if a question comes up no one else can answer."

9          She then disappeared for a minute, turned

10    around and came right back and said, "The President want you

11    in this meeting."

12          And I walked back and went into the Oval

13    office.

14    Q.  I'm going to turn it over to my colleague, Mr.

15    Charlet, in just a minute.  I know he has some questions.  He

16    is going to ask about the Oval Office meeting.

17          But I first wanted to go back to just the

18    process of getting the AAGs together in the lead-up to that

19    meeting.  We have seen a draft of a resignation letter from

20    Mr. Hovakimian that mentions both of your names.

21          Is that something that you saw at the time?

22    A No.  I think I saw that for the first time yesterday.

23          Ms. Zdeb.  I'll turn it over to Joe to ask

24    some questions about the Oval Office meeting.

25          Mr. Charlet.  Thank you, Sara.

1          Can everyone hear me?  I just want to make

2     sure.

3               BY MR. CHARLET.

4          Q.  So after you were called into the meeting, can you

5     give us just a general overview of how the meeting took its

6     course?  And then we can go from there.

7          A.  The meeting lasted about two and a half hours after

8     I entered, so it was presumably three hours for the other

9     participants.  When I came in, seated in the Oval Office was,

10    of course, the President behind the desk.  Then there was Pat

11    Cipollone, White House counsel; Pat Philbin; Jeff Rosen; Jeff

12    Clark; Steve Engel and myself.

13              When I came in, I first apologized to the

14    President for the way I was dressed, and he said, "Yeah,

15    yeah, that's fine.  Just grab a seat." And I tried to sit

16    on the couch and they

17    joked, and they said, "No, no, no.  You have to sit up here

18    with the rest of us."

19              So they handed me a chair and I sat directly

20    in front of the President with Jeff Rosen to my right and Jeff

21    Clark in my left.  And they were, obviously, in a

22    conversation, and I sort of joined in the conversation from

23    there.

24              It was a wide-ranging conversation about the

25    department.  Focus of it was whether the President should

1    replace the leadership, whether he should remove Jeff Rosen

2    and put Jeff Clark in as the Acting Attorney General.  There

3    was some discussions about the letter, obviously.

4              At that point, it was difficult to separate

5    the issue of the letter and Jeff Clark being in the leadership

6    position, because it was very clear, and he stated it

7    repeatedly, that if the President made him the Acting Attorney

8    General, he would send that letter.

9              So it wasn't as if there was a third option

10   where Jeff Clark would become the Acting Attorney General and

11   the letter would not go.  They were sort of one and the same

12   at that point.

13             Essentially everyone in the room -- again,

14   the President was making the decision, was taking advice from

15   different sides here.  But Jeff Clark was advocating for Jeff

16   Clark becoming the Acting Attorney General.  Everyone else in

17   the room was adamantly opposed to the President taking that

18   step.  And we kind of went around the room for hours

19   discussing it and telling him why this was a terrible idea.

20        Q.  And was the nature of the flow of the conversation

21   more organic?  Would people chime in as they had a point to

22   make, or was it a little bit more structured between Rosen and

23   Clark?

24        A.  No.  It was more organic.  I mean, you know, for

25   whatever else you want to say, it's not difficult to talk

1    around the President.  You don't feel very stilted, right.  So

2    people speak their minds, sometimes loudly.  And so it just

3    sort of flowed around the room with Jeff Clark making a point

4    and other people would jump in and say, you know, either

5    that's not prudent or whatever.

6                    And so the conversation -- everyone just sort

7    of chimed in as we went around the room.  And the President

8    would, you know, make comments throughout about the election

9    and how it was stolen, and how the American people had been

10   harmed, and how he can't believe that the Department hasn't

11   done more.  And maybe if he put Jeff Clark in, the Department

12   would do more, and back and forth.

13                   And he would say things like, "Well, what do I have

14   to lose?  What would I lose at this point if I put Jeff Clark

15   in?"

16                   And I said, "Sir, you have a great deal to

17   lose."

18                   And then we kind of went around and discussed

19   about the downside of doing this.  And we discussed whether

20   Jeff Clark was even qualified to serve as the Acting Attorney

21   General.

22                   And we informed the President that he should

23   expect mass resignations within the Department if he did this.

24   And that -- but at one point, the President said to me "So

25   suppose I do this, suppose I take him out," meaning Jeff

1    Rosen, "and I put him in," Jeff

2    Clark, "what do you do?"

3              I said, "Sir, I'd resign immediately."

4              And then he turned to Steve Clark, and he

5    said, "Steve" -- I'm sorry, he turned to Steve Engel, and he

6    said, "Steve, you wouldn't resign, would you?"

7              And Steve said, "Absolutely, I would,

8    Mr. President.  You would leave me no choice."

9              And I said, "Well, and Steve is not the only

10   one, sir.  All your AAGs are going to resign.  You should

11   count on that.  They're going to resign, and these are your

12   people.  These aren't bureaucrats left over from another

13   administration.  These are your handpicked people; your

14   leadership in the Department. This is the team you sent to the

15   Senate, you got confirmed, and they are all going to walk away

16   on you at once.  What does that say about you as a leader?

17   What does that say about the Department and what's going on

18   here?  And you shouldn't think it's going to end there because

19   I have no idea what U.S. Attorneys will do.  The U.S.

20   Attorneys may resign en mass.  You may have other department

21   personnel resign.  You could have a situation here, within 24

22   hours, you have hundreds of people resigning from the Justice

23   Department.  Is that good for anyone?  Is it good for the

24   Department?  Is it good for the country?  Is it good for you?

25   It's not."

1               And so we had these discussions that went on

2    and on, along those lines, for quite sometime.

3       Q.   When you first brought to his attention the fact

4    that you would resign, that Engel would resign and presumably

5    other AAGs would resign, when in the conversation did that

6    first come up?

7               Was that relatively early on, or did it not

8    come up until further on?

9       A.        I would say it was toward the earlier half.

10   It wasn't later, because that was an important point, right.

11   And in terms of the President saying "Well, what do I have to

12   lose?  What's really the downside," I don't think he was he

13   understanding, or at least I wanted to make it clear to him

14   what the fallout would be.  The ramifications would be very

15   significant.

16              So we did not tell him we had a call.  We

17   didn't tell him we talked to them or anything like that.  I

18   simply said, as a matter of fact, "You should expect your

19   entire leadership time to resign.  And do you really want to

20   deal with that?"

21              And so I made that point earlier rather than

22   later because I thought it was important to his understanding

23   of the situation.

24      Q.   Okay.  And to take one step back really quickly, you

25   said at this point, it became hard to disentangle Jeff Clark

1  becoming Acting Attorney General and sending the letter.

2              But during the course of this conversation,

3  was the President also focused on other specific election

4  fraud allegations, or was it mostly focused on Clark and the

5  letter and Georgia, specifically, as it pertained to the

6  letter?

7      A.  He mentioned other election allegations as he had in

8  previous conversations.  But as in previous conversations, we

9  would say to him, you know, "We checked that out, and there's

10 nothing to it."

11             So we would repeatedly say "The things you're

12 being told are false," or "the things you're being told do not

13 pan out.  They're not supported by the evidence."  And we

14 would cite to certain allegations. And so -- like such as

15 Pennsylvania, right.  "No, there were not 250,000 more votes

16 reported than were actually cast.  That's not true."  So we

17 would say things like that.

18             But the conversation on the 3rd wasn't so

19 much about specific allegations or how we addressed the

20 allegations or anything like that.  It was focused much more

21 on the leadership change.

22             The earlier conversations were more about

23 these allegations "Are you guys really aware of them?"

24             "We're responding appropriately."

25             On the 3rd, it was down to "Should I replace

1    the acting AG or not," and that was sort of just background to

2    that conversation.

3        Q.   Okay.  And can you give us a sense of how the

4    conversation came to an end, how the President ultimately made

5    his decision?

6        A.   It didn't appear to us that the President's decision

7    was obvious until about the last 15 minutes of the

8    conversation.  I do recall Pat Cipollone earlier saying "That

9    letter," meaning the draft letter to Georgia, "is a murder-

10   suicide pact.  And it will damage anyone and anything that it

11   touches."

12               And I remember some other specific comments

13   along that line, but we kind of followed up on that saying,

14   you know, "Do you want to be part of that?"

15               And so very deep into the conversation, the

16   President, who was very frustrated, and he just shook his head

17   and he said, "All right.  We're not going to do this."

18               He looked at Jeff Clark and said, "I

19   appreciate you being willing to do this.  I appreciate you

20   being willing to step up and take all the abuse, but the

21   reality is it's not worth the breakage.  We're going to have

22   mass resignations.  It's going to be a disaster.  You're not

23   going to be able to get this stuff done anyway, and the

24   bureaucracy will eat you alive.  So we're not going to do

25   this."

1              At that point, Jeff Clark tried to get the

2    President to change his mind.  He kept saying,

3    "Mr. President, we can do this.  We can get it done.

4    History is calling."  Things like that.

5                         And the President just sort of doubled down

6    and said, "No.  No, we're not going to do it."

7              He then looked at me and said "So now what

8    happens to him," pointing at Jeff Clark.

9              And I didn't understand the question.  I

10   said, "Sir?"

11             And he said, "Are you going to fire him?"

12             And I said, "No.  I don't have the authority

13   to fire him.  He's a Presidentially nominated, Senate-

14   confirmed AAG.  I don't have the authority to fire him."

15             And he said, "Well, I'm not going to fire

16   him."

17             And I said, "Okay.  Then, I guess we should

18   all go back to work."

19             And we all stood up and walked out of the

20   Oval Office.

21       Q.  So you said that White House Counsel Cipollone made

22   somewhat of a strong statement about the nature of the letter,

23   that it was a murder-suicide pact.

24             I'm sorry, do you need a break?

25       A.    No.

1    Q.   Okay.  Since, at some point during the discussion,

2  you had intimated that you and Engel and several others of his

3  leadership at DOJ might leave or take some sort of action,

4  public action if Clark was installed, did anyone from the

5  White House staff make any indications similarly, maybe not

6  quite that far, but just anything along those lines?

7    A.      Yes, they did.  I think Pat Cipollone said,

8  "There's no way I'm going to be here if this happens."

9         I mean, there was no "might."  It was very

10  clear.  We will resign.  And I think Pat then jumped in and

11  said the same thing.  "I'm not going to stay around here for

12  this."

13         Steve Engel at one point said "Jeff Clark

14  will be leading a graveyard.  And what are you going to get

15  done with a graveyard," that there would be such an exodus of

16  the leadership.

17         So it was very strongly worded to the

18  President that that would happen.

19    Q.      And during this meeting, did U.S. Attorney

20  Pak come up in any way?

21    A.   Yes.

22    Q.   And who brought him up?  Was it the President

23  himself?

24    A.   I think someone else mentioned something about

25  Atlanta, something to the effect of,

1   "Mr. President, we've looked at all this stuff.  We've looked

2   at this.  We looked at that.  We looked at Atlanta.  And, you

3   know, these things are not supported by evidence."

4              And then he said, "Oh, right.  Atlanta.  Of

5   course."

6              And he had a piece of paper on his desk.  He

7   said, "Atlanta, Atlanta, no surprise there.  They didn't find

8   anything.  No surprise because we have a never-Trumper there

9   as U.S. Attorney."

10             And I had no idea what he's talking about,

11  and he looked at the piece of paper, and he said, "Oh, yeah,

12  BJay Pak is a never-Trumper.  How did this guy get in my

13  administration?  He never should have been here in the first

14  place."

15             And then he read out a quote from the piece

16  of paper that he was holding, which was purportedly a quote

17  from BJay Pak criticizing the President about his messaging

18  and how it impacted the Republican Party's ability to recruit

19  minorities and minority candidates, I believe.

20             I had never heard this quote before.  I had

21  no idea what he was talking about.  And I just said something

22  to the effect of, "Mr. President, I don't even know what that

23  is.  I have no idea what you're talking about.  But all your

24  U.S. Attorney's were vetted.  So whatever BJay is, I don't

25  think he's a never-Trumper, whatever that is."

1          And I said "Oh, no, no.  He is.  He is.

2  He's a never-Trumper."

3          He was fixated on that for a short period of

4  time.  And he looked up at me and he said, "I want you to fire

5  him."

6          I said, "Mr. President, I'm not going to fire

7  him.  There's no reason to fire him."

8          And he said "Then I'm firing him."

9          And I said, "Well, before you do that,

10  understand that I talked to BJay a couple of days ago, and he

11  is submitting his resignation tomorrow morning," which would

12  have been Monday morning.

13          Pat Cipollone stepped in and said, "We're not

14  firing someone who is resigning in a few hours."

15          And the President said, "That's fine.  I'm

16  not going to fire him, then.  But when his resignation comes

17  in, it's accepted.  Tomorrow is his last day as

18  U.S. Attorney."

19          And Pat Cipollone then said "Fine.  Set that

20  aside," and then we got back into the rest of the

21  conversation.

22          Then the President said, "What do you know

23  about Bobby Christine?"

24          Bobby Christine is a United States Attorney

25  in the Southern District of Georgia.

1          I said, "Bobby Christine is a great U.S.

2   Attorney."

3          I didn't understand where he was going with

4   this.  And he said, "I hear great things about him."

5          And I said, "Yes, he's a great U.S.

6   Attorney."

7          He said, "I want Bobby Christine to run the

8   Northern District of Georgia."

9          And I said, "Mr. President, Bobby Christine

10  is already running the Southern District of Georgia. BJay Pak

11  has a first assistant who will step in when BJay leaves."

12          And he said, "No, I think Bobby should run

13  this, because if he's good, he'll find out if there's

14  something there," something to that effect.

15          And then he yelled out to one of his

16  administrative assistants "Get Bobby Christine on the phone."

17          Within a few moments Bobby Christine was on

18  the phone.  He was clearly caught completely offguard by this

19  phone call.

20          The President said, "Bobby, it's

21  President Trump.  I'm sitting here with Jeff and Rich and

22  other people, and BJay Pak is leaving Northern

23  District.  Would you be willing to run the Northern

24  District for the next few weeks?"

25          And Bobby sounded confused and -- but he

1    said, "Mr. President, I'll do whatever is needed."

2              And he said, "Great, Rich will give you a

3    call later and explain everything."

4              And hung up.  That was it.  It was a very

5    short phone call.

6        Q.  I'll return to that subject in just a minute. But by

7    the end of this meeting, once President Trump had indicated

8    that he would not replace Acting Attorney General Rosen with

9    Clark, did he direct you or anyone else or did anyone else at

10   the White House such as the Chief of Staff direct you or

11   anyone at the Department to take any further actions in regard

12   to any election fraud allegations?

13       A.  No.  It was clear at that point that that was sort

14   of over.  You know, the President said repeatedly, pointing at

15   Acting AG Rosen and me, he said, "These two aren't going to do

16   anything.  We all know it.  I know it.  They're not going to

17   get anything done."

18                        But, nonetheless, that was his decision, and

19   that was kind of the end of it.

20       Q.  So following this meeting at the Oval Office, you

21   and Hovakimian convened a meeting of DOJ senior leaders.  What

22   was the purpose of this meeting?

23       A.             To inform them that Jeff Clark was not going

24   to be put in as the Acting AG.

25       Q.  And was this a particularly long meeting? Was there

1   a debriefing of some sort, or was it more conveying that

2   direct information?

3        A.   It was pretty much that.  I'm sure we gave a brief

4   description of the meeting in the Oval Office. It was probably

5   a 20-minute call or so.  The Acting AG was on that call, so it

6   was the three of us in his office.  We convened everyone on

7   the call and just said we just spent three hours in the Oval

8   Office, and this is the outcome.

9        Q.   Okay.  And did anyone in the group in particular

10  discuss any sort of follow-up actions?  And by "the group," I

11  mean the DOJ senior leadership.

12       A.   No, I think everyone was just relieved that it had

13  come out that way, and tomorrow is Monday morning and we're

14  going to get back to work.

15       Q.   Okay.  So I'd like to move on -- unless Sara has a

16  question she'd like to interject -- to shortly after that, you

17  emailed U.S. Attorney Pak to -- and asked him to call you

18  ASAP.

19            Why did you do that?

20       A.   So that I could inform him of the part of the

21  discussion that related to him.  And I told him, obviously,

22  not about the whole conversation, but I told him about the

23  "never-Trumper" claim by the President.

24  I told him about the quote.

25            And he said, "Yeah, I did say that.  That was

1  from before the election.  I said that back in 2016, when I

2  was serving in the legislature in Georgia, and I was

3  criticizing him.  And -- but I became U.S. Attorney anyway."

4             I said, "Well, all I can tell you is he was

5  going on and on about how you're a never-Trumper.  You should

6  have never been in the administration, that this was all news

7  to him.  And that he wanted to fire you, but he decided to

8  accept your resignation effective tomorrow when you put it

9  in."

10            Now, I also told him, pursuant to the

11  discussion that Jeff Rosen and I had after the Oval Office,

12  that he was free to stay in the Department.

13  Because what the President said was he was done being U.S.

14  Attorney tomorrow.  Jeff Rosen said you know, "If it's helpful

15  to BJay, we can keep him in the Department for like another

16  two weeks, give him time to clear out his office and say his

17  good-byes and all that stuff. He would not be the U.S.

18  Attorney, but we would keep him in the Department as a

19  Schedule C employee."

20            So I explained that to BJay.  I said,

21  "Listen, Jeff Rosen wants you to know that you can

22  stay.  You can't be U.S. Attorney after tomorrow.  You can

23  stay.  If it's more helpful, we will keep you on the payroll.

24  You can take your time cleaning out your office.  It would be

25  more graceful, et cetera."

1          He said, "All right.  I appreciate that.  Let

2    me think about it, and I'll let you know."

3          He called me at about, I think, 4:30 the next

4    morning.  He was on the road.  He said, "I'm on my way to the

5    office.  I'm going to clear out my office.  Tell Jeff I

6    appreciate the offer, but I'm going to go.  If the President

7    wants me out, I'm just going to go."

8          So he went and cleared out his office and

9    left.

10   Q.  And earlier when we were discussing the Oval Office

11   meeting, you had indicated that you and Pak had previously

12   discussed his resignation, that he had already planned to

13   resign.

14          About when did that take place, when did Pak

15   inform you of this?

16   A.       Probably Tuesday or Wednesday of that week.

17   That was routine because of the U.S. Attorneys were all

18   informing me as to their departure plans.  Some of them had

19   already left.  Some of them had stayed until the end, whatever

20   it was, but that was not unusual.

21          BJay said, "Hey, Monday morning, I'll send

22   you my resignation."

23          "Okay.  Fine."

24          That had nothing to do with investigations or

25   election or anything.  It was just a routine departure of U.S.

1    Attorneys.

2         Q.   Okay.  So there was no indication on Pak's part that

3    there was a specific impetus besides the end of the

4    administration that was leading him to resign earlier?

5         A.     Yeah, that's all it was.

6         Q.   Were you or Rosen personally dissatisfied with Pak

7    or his performance in Georgia as an U.S.

8    Attorney?

9         A.   No.  I certainly wasn't.  I don't think Jeff Rosen

10   was.  I think he was in a difficult position.  I think sort of

11   what I described earlier about the conflict between ECB, the

12   Election Crimes Branch, and others, some of that was going on

13   throughout the Department.  And I think that -- BJay would

14   have to explain this for himself, but I think his own people

15   were dragging their feet a little bit in investigating these

16   things.  And so -- but he got it done.

17                   When I asked him, he said, "Yeah, we looked

18   at the video.  We did the interviews."

19              So he got it done.  And I was confident he

20   was doing his job.

21              Mr. Charlet.  Thank you, Mr. Donoghue.  I

22   will turn this back over to my colleague, Sara.

23                   BY MS. ZDEB.

24        Q.   Can I just go back to the Oval Office discussions?

25              Mr. Flynn-Brown.  Sarah, I apologize for

1    interrupting.  But we're wondering, it was our -- it was

2    represented to us that there was a 2 p.m. hard break here.

3              Ms. Zdeb.  Yes.

4              Mr. Flynn-Brown.  What's the status here? Because

5    we're beyond 2:00, and we altered some of our questions to hit

6    the 2:00 p.m. deadline.

7              Ms. Zdeb.  So as I understood our discussion

8    shortly before the lunch break, Mr. Donoghue and his counsel

9    indicated they had a little bit more wiggle room.  So I

10   personally just had one or two more questions, and then we are

11   done for purposes of our side.  And then, obviously, you're

12   welcome to --

13             Mr. Flynn-Brown.  I appreciate that.  Thank

14   you.

15             Ms. Zdeb.  Sure.

16               BY MS. ZDEB.

17        Q.        So just back to the discussion about U.S.

18   Attorney Pak in the Oval Office and the characterization of

19   him being a never-Trumper.  You described that, and then you

20   went on to describe the discussion you had with the President

21   about how, ordinarily, the Acting U.S. Attorney would be the

22   first assistant, but he seemed insistent on, instead, putting

23   Bobby Christine into that role.

24             And I just wanted to make sure I heard one

25   thing you said correctly.  You said the President said

1    something to the effect of "I've heard great things about

2    Bobby Christine, and if I put him in, he'll do something about

3    it."

4              Is that what you said?

5        A.   Something to that effect.  Of course it's not a

6    quote, but he said something like, "Well, if this guy is good,

7    maybe something will actually get done."

8        Q.   And by "something getting done," what did you

9    interpret him to mean?

10       A.   That there would be some sort of investigation that

11   hadn't been done.  But as I had told him repeatedly, the

12   Department's looked at it.  They did their job in the Northern

13   District of Georgia.

14       Q.   Just one concluding question, and then I think we

15   are going to be done for our side unless we have any follow-up

16   after any additional questions by our colleagues on Senator

17   Grassley's staff.

18             So we've discussed today a number of

19   different examples, email communications, phone calls,

20   meetings in which various White House officials and outside

21   allies of the President, for lack of a better term, brought

22   election fraud allegations to your attention; in some

23   instances, asked the Department to look into them.

24             Other than the examples that we have

25   discussed today, were there any additional instances in which

1  you were personally approached either by someone in the White

2  House or an outside ally of the President with election fraud

3  allegations or a request that you look into something?

4      A.  There were so many other things that we looked into,

5  as I sit here now, I don't recollect anything offhand that

6  came from the White House.  But there were other matters, some

7  of which were public, some of which were not, that the

8  Department, obviously, was looking at.  And some of which came

9  up in the course of these discussions.

10          So, for instance, there was an allegation of

11  a truck driver who had driven a truckload of ballots from New

12  York to Pennsylvania and things like that.  We looked at it.

13  We did not find that to be supported by evidence.  And so that

14  was mentioned in passing, but as one of the examples of things

15  that we had done and had not been supported by the evidence

16  that was developed.

17          So there were things like that, but I don't,

18  as I sit here now, recollect off the top of my head specific

19  instances that were referred to us by the

20  White House.

21      Ms. Zdeb.  Thank you.  And with that, I think I am

22  right at an hour, and that will conclude this round of

23  questioning for our side.

24          Josh, I'm happy to turn it back to you if you

25  have an additional round.  And then we'll assess whether we

1   have anything else.  But if we do, I anticipate that it would

2   be very short.

3          Mr. Flynn-Brown.  Just a couple follow-up

4   questions here.

5          BY MR. FLYNN-BROWN.

6   Q.  So with respect to the January 3rd meeting, and I

7   appreciate the detail that you went into in your explanation,

8   it sounded like President Trump, given the length of the

9   meeting and the number of people in there, and based on your

10  description, that this was a very open and frank discussion

11  about the risks and pitfalls of some of these decisions that

12  could have been made.

13         Is that an accurate representation?

14  A.         Yes.  It was definitely very open and frank.

15  Q And you said it lasted approximately three hours?

16  A.  It lasted two and a half hours after I joined, and I

17  think they were in there for 25 minutes before I went in.

18  Q.  So during the course of those discussions, did you

19  feel like President Trump took your and your colleagues', with

20  the exception of Jeff Clark, took your concerns very seriously

21  and gave them the due weight that you would have wanted them

22  to be given?

23  A.  He did.  And in the end, he made the decision that

24  we felt was appropriate.

25  Q.  And when he made that decision -- you may have

1   answered this, so forgive me if this is retread. But what was

2   Jeff Clark's reaction when Trump rejected his letter and

3   rejected the idea of him being at the top of the Department of

4   Justice?

5        A.  He was extremely disappointed.  When we walked out

6   of the Oval Office, we all went over to the box to get our

7   phones out.  And he said something to the effect of, "I know

8   we were all in there just doing what we thought was best for

9   the country.  So no hard feelings," or something like that.

10  No one responded.

11  We all just looked at him.

12       Q.  So Jeff Clark then had a firmly held belief that

13  what he was doing was the right way, was the right approach?

14       A.     That's what he said.

15       Q.   So after that meeting then, what kind of

16  interactions and relationship did all of you have with Jeff

17  Clark at that time, or was he effectively iced out?

18       A.  I only saw him once after that.  I don't think I had

19  any discussions or any interaction with him other than that

20  one incident, and that was a brown-bag lunch where the AAGs

21  were invited to the DAG conference room for sort of a final

22  brown-bag lunch in the last days of the administration.  He

23  showed up, and he sat at the end of the table.

24                  And I said to Acting AG Rosen, after it was

25  over, I said, "I'm sure the only reason he came here was to

1  make sure we weren't talking about him."

2      Q.  Do you know if Jeff Clark continued to interact with

3  President Trump after this January 3rd meeting?

4      A.  I don't know.  I think I -- I didn't say a word to

5  him during the brown-bag lunch.  I don't think I said a word

6  to him or had any communications with him from the time we

7  walked out of the Oval Office.

8      Q.  After the January 3rd meeting, did you hear about

9  anything relating to that again?

10          In other words, basically, the question is

11  once the decision was made, it was made; there was no going

12  back.  Is that correct?

13      A.  There was no going back.  It appeared to me that

14  decision was done.  And, you know, in very short order, we

15  were dealing with January 6.

16      Q.      I see.  Yeah, so you guys moved on.

17      A.  Yeah, that and the inauguration were all consuming

18  from that point.

19      Q.  You mentioned that BJay Pak was going to resign on

20  January 4.  Is that the correct date?

21      A.  That's the day he was going to submit his

22  resignation letter.  I did not know, and he never told me,

23  when he intended it to be effective.

24      Q.  And the President said, "Okay.  Once he submits that

25  resignation letter, I want it accepted immediately"?

1       A.      Yes.

2          Q.   And then BJay Pak had an opportunity to walk back

3    that planned resignation, stay at the Department.  And he chose

4    not to walk that resignation back; is that correct?

5       A.              Not so much to walk the resignation back, but

6    to remain in the Department as something other than the U.S.

7    Attorney.

8          Q.   I see.  So he would have transitioned to a different

9    post.  He would still be within the Department?

10      A.      Right.

11         Q.   Okay.  I'm going to highlight for the record, Mr.

12   Donoghue -- you don't have to address this.  But there was

13   some discussion about communications between the President and

14   members of law enforcement within government.

15              I want to highlight a September 30th, 2020 --

16   and incorporate it by reference here, I guess, if you want to

17   call it that -- September 30th, 2020, Senate Judiciary

18   Committee hearing with Former Director Comey, where Comey

19   said, under questioning from Senator Grassley, that Comey

20   provided information to President Obama in the summer of 2016

21   with respect to the Russia investigation, which we all know is

22   Crossfire Hurricane.

23              And then, of course, you have the infamous

24   January 5th, 2017, meeting in the Oval Office with Obama,

25   Comey, Biden, Sally Yates and Susan Rice where they discussed

1    Lieutenant General Flynn and withholding information from the

2    Trump transition team, with respect to what at that time they

3    believed to be risks attendant to Lieutenant General Flynn.

4            Of course, the Obama administration refused

5    and failed to give any defensive briefing or heads-up to the

6    Trump campaign and transition team, and they proceeded to

7    investigate them.

8            So if we're going to be talking about

9    communications with the White House and DOJ and FBI officials,

10   the record with respect to Crossfire Hurricane ought to be

11   mentioned in the same breath when it comes to those types of

12   communications.  And we all know how Crossfire Hurricane ended

13   up.

14           So, with that, I'm going to reserve my time

15   in case we need to jump in again.

16           But, Sara, back to you.

17           Ms. Zdeb.  As much as I always enjoy

18   revisiting Crossfire Hurricane, I think we are complete in

19   terms of our questions on this side.  So, Mr. Donoghue, thank

20   you very much.

21           Mr. Andres.  Sara, excuse me.

22           We just wanted to clarify the record and

23   supplement it with one additional answer that I think wasn't

24   followed up on, but just wanted the record to be complete

25   about one other discussion that Mr. Donoghue had with the

1   President that wasn't asked about.

2          Ms. Zdeb.  Of course.

3          Mr. Donoghue.  Just to be completely clear, I

4   think I was asked about a conversation that I had with the

5   President.  I mentioned that the President called me on

6   December 14th, the day that Attorney General Barr submitted

7   his resignation.

8          The President called me late that afternoon

9   on my cell phone and -- well, let me back up a moment.

10          After AG Barr returned from the White House, I went

11   to his office and asked him essentially how it went, because I

12   had learned, while he was gone, that he was submitting his

13   resignation.  He essentially said it went as well as it could,

14   that he had delivered the letter to the President.  And he

15   said, "The President is thinking about who will be the Acting

16   Attorney

17   General."

18          And I said, "Presumably, Jeff Rosen will be

19   the Acting Attorney General."

20          And he said "Yes, maybe.  But your name came

21   up as well.  So you should be prepared to get a call from the

22   President.  You should be prepared to get called over to the

23   White House.  And you should think about, if that offer is

24   made, whether you'd want to do that."

25          He said "Think about it tonight because I

1    wouldn't be surprised if you get called over there tomorrow

2    morning."

3             I went back to my office, and very shortly

4    thereafter, my phone rang.  It was the White House operator.

5    They put the President on.  We had a very brief conversation

6    where he said, "Did you hear that

7    Bill is leaving?"

8             I said, "Yes, Mr. President.  I saw him when

9    he returned from the White House.  I understand you had a good

10   meeting."

11            He said, "Yes, yes, good meeting.  He gave me

12   this great letter.  So that means I need an Attorney General.

13   I think you would be great at that.  Would you want to serve

14   as the Attorney General?"

15            And I essentially said "Thank you, Mr. President.

16   I appreciate that, but I really think it would be in the

17   best interest of the country, the Department, and you to

18   follow the regular course."

19            And he said "Well, does that mean Jeff would

20   become the Acting Attorney General?  That's the regular

21   course."

22            And I said, "Yes, pursuant to the statute

23   when the Attorney General leaves, the Deputy Attorney

24   General steps into the position.  He's a great lawyer.

25   He'll do a great job."

1          And the President asked, "Will you stay until

2    the end?"

3          And I said, "I have no plans of leaving

4    before the administration is over.  I'll be here to the end."

5          And he said, "So you'll serve as his deputy?"

6          Jeff Rosen and I had already discussed that,

7    and I said, "That's my expectation."

8          And he said, "Great.  I'll call Jeff."

9          I then left.  I went up to AG Barr's office.  I told

10   AG Barr about that conversation.  I then went downstairs to

11   tell the DAG.  When I entered the DAG's conference room, his

12   phone was ringing.  He picked it up.  He said, "It's the White

13   House."  He went into his office.

14         Then he came out and he told me that the President

15   asked him to be the Acting Attorney General, I congratulated

16   him, and we went on from there.

17         So I just didn't want that to come up later

18   at some point, and have anyone say "Why didn't you tell the

19   staffers or the committee about this conversation?"

20            BY MS. ZDEB.

21   Q.      I appreciate that.  Thank you.

22         Just a couple of quick follow-ups.  I'm

23   curious if you were either given a sense by Attorney General

24   Barr, or had your own impression at the time, as to why the

25   President might be interested in having you serve as Acting

1  Attorney General as opposed to

2  Mr. Rosen?

3      A.  No, I didn't know.  I had no contact with the

4  President for a very long time before that.  That's -I had one

5  meeting at the Oval Office on December 4.  It had nothing to

6  do with elections.  It was one brief conversation.  But I had

7  no contact with the President throughout 2020, and I think

8  almost all of 2019.

9          So I didn't understand why he thought that

10  was a good idea.  And AG Barr didn't let me know why he

11  thought that might be an issue.

12      Q.  Did you have any sense that the President was

13  somehow unhappy with Jeff Rosen?

14      A.     No, not at all.

15          Ms. Zdeb.  Josh, anything else?

16          Mr. Flynn-Brown.  I do not.  And, again, I

17  want to thank you, sir, for your time today.  Much

18  appreciated.

19          Mr. Donoghue.  Thank you all.  I appreciate

20  your professionalism in this.

21          Ms. Zdeb.  And we thank you very much for

22  making yourself available on somewhat short notice and

23  voluntarily.

24      It is 2:23.  And unless there's anything else, we can go

25  off the record.

```
1              Certificate of Deponent/Interviewee

2    I have read the foregoing ____ pages, which contain the correct

3    transcript of the answers made by me to the questions therein

4    recorded.

5

6

7

8

9

10           _____

11                  Witness Name

12

13

14

15           _____

16                      Date

17

18

19

20

21

22

23

24

25
```

## WORD INDEX

**< 0 >**
**0063**  19:*12, 15*

**< 1 >**
**1**  10:16  11:*4, 5*
100:*18*  125:22
134:*18*
**1:00**  144:*12, 19, 20*
**1:03**  123:7
**1:11**  129:5
**10**  52:20  71:24
83:*25*  106:*10*
**10:24**  45:*14*
**1001**  5:*11*
**11**  11:*13*  14:*13*
106:*9*  113:6, 7
**11/9/20**  66:*18*
**11:00**  52:20
**11:37**  83:*11*
**12**  8:*14*  113:6
114:20, *21*
**12/27/20**  36:8
**12:30**  144:20
**12:34**  73:5
**12:39**  123:5
**13**  15:*18*  114:*19*
123:*16, 17*
**14**  15:*19*  26:6
124:*21, 22*
**14th**  16:*10*  53:*18*
176:6
**15**  26:9  71:*17*
79:*3*  123:*1*  125:*17,
18*  137:20  147:22
157:7
**15,000**  19:20
**15-minute**  122:*24*
**15th**  31:*3, 8, 22*
38:22, *23*  39:*11, 21*
41:24  51:*3, 7*
**16**  129:*11, 12, 13, 16*
**17**  129:*16*  133:*16,
18*
**18**  5:*11*  129:*11*
133:*15*  137:4, *7*
**18th**  34:25
**19**  137:*3*
**1992**  8:*3*
**1993**  8:5
**1st**  129:*18*  130:8

**< 2 >**
**2**  14:20, *21, 22*
100:*23*  124:*21*
137:*12*  168:2
**2:00**  122:*15*  168:5,
*6*
**2:23**  179:*24*

**20**  79:*3*  97:*14*
**2000**  8:*12*  87:*18*
**2004**  87:*17*
**2011**  8:*15, 21*
**2015**  113:2
**2016**  165:*1*  174:*20*
**2017**  113:2  174:*24*
**2018**  7:*20*  8:25
**2019**  179:8
**2020**  2:*7*  6:*16*
7:*13, 21*  9:*4*  10:*13,
16, 19*  11:*13*  12:*23*
46:*6, 17*  51:*7*  54:*7*
56:*3, 7, 24*  65:25
66:6  69:25  70:9
73:5, *11*  77:8, *12*
78:*21*  79:8  80:*21*
82:*14*  90:*1*  96:*18*
97:*24*  106:*14*
110:8  124:25
174:*15, 17*  179:7
**2021**  11:*13*  46:*21*
47:8  51:6  125:*23*
127:22  128:2, *5*
129:*18*  133:*20*
**205,000**  42:5, *7*
**20-minute**  121:*9*
164:*5*
**21**  10:*21*  33:*20*
**2-1**  51:*3*
**21st**  34:2, *12*
**23**  7:*13*
**23rd**  36:*17*
**24**  154:*21*
**25**  69:24  150:*1, 4*
171:*17*
**250,000**  133:*1*
156:*15*
**27**  89:*23*
**27th**  38:*23*  51:*13,
25*  86:*11*  90:5
93:*11*  101:*23*
118:22
**28**  46:*6, 17*  90:*1*
96:*18*
**28th**  51:24  52:*18*
117:5, *7*  138:6
**29**  106:*14*
**2nd**  104:*18*  117:8
137:*1*  143:*11, 19*

**< 3 >**
**3**  34:22  46:*21*
47:8, *18*  117:5
**30**  37:*10*  38:9
115:*1*
**3-0**  38:9, *10*
**30th**  124:25  174:*15,
17*
**3-1**  51:*3, 5*

**31st**  30:*19*  31:8, *23*
51:*3, 7*  116:22
117:*1, 11*
**3rd**  50:6, *24*  51:6
52:*19*  106:*4*  117:8
143:*23*  156:*18, 25*
171:6  173:*3, 8*

**< 4 >**
**4**  34:*21*  35:23
37:*2*  57:*17*  86:*10*
125:*17*  173:20
179:5
**4:30**  166:*3*
**4:40**  102:8
**4:48**  96:*18*
**4th**  143:20

**< 5 >**
**5**  35:22  36:20
45:*23*  46:*1*  57:*15,
17, 22*  62:23, *25*
123:*15*
**5.25**  62:*23*
**5:50**  100:*4*  102:8
**500**  8:*23*
**598**  124:*21*
**5th**  174:*24*

**< 6 >**
**6**  1:*13*  70:4, *5*
83:*17*  89:*10, 13*
127:22  128:2, *5*
145:6  149:*16*
173:*15*
**6:15**  147:2
**600,000**  42:*12*
**601**  124:*21*
**675**  125:*17*
**68**  15:25  16:*16*
19:*14*  20:5  21:*14*
22:8  28:7, *20*
**680**  11:8
**681**  12:*14*
**689**  35:*3*
**6th**  144:*15*

**< 7 >**
**7**  45:*23*  69:25
70:8  73:5  80:20
82:*13*  89:*11, 14, 15,
16, 20*
**714**  123:*16*
**736**  57:*23*
**737**  43:7  58:*15*
60:*4*  86:*14*
**738**  60:24  61:*11*
62:7  86:22
**739**  62:7
**740**  88:*1*

**741**  63:9
**744**  45:24  46:*15*
**745**  46:7
**750**  45:25

**< 8 >**
**8**  89:*17, 18, 24*
96:*11*
**8:00**  52:*1*
**8:15**  52:2
**8:42**  89:23  90:*11*
93:*10*  94:4
**82**  8:9

**< 9 >**
**9**  96:*14, 15*
**9:05**  1:*17*  2:2
**9:10**  6:9
**92**  8:*4*
**94**  78:23
**9th**  66:*10*

**< A >**
**a.m**  1:*18*  2:2  6:9
73:5
**A/AG**  46:*21*  47:*1*
**AAG**  46:22  97:4
105:8, *11*  112:6
148:*1, 6*  158:*14*
**AAGs**  13:6  14:*1*
97:*1*  147:9, *14, 15*
148:*18*  150:*18*
154:*10*  155:5
172:20
**ability**  23:20  67:8
94:*21*  160:*18*
**able**  21:7  23:25
61:20  71:*4*  76:*11*
112:*1*  157:*23*
**absent**  105:6
127:*11*
**absentee**  72:*13*
**Absolutely**  56:*4*
60:*3*  136:9  154:7
**abuse**  157:20
**accept**  165:8
**acceptable**  12:*18*
161:*17*  173:25
**accepted**  48:*12*
161:*17*  173:25
**accessed**  99:*16*
**accounting**  50:23
**accuracy**  22:2
**accurate**  26:4
36:*12*  47:*1, 10*
48:5, *11*  54:*21*
58:20  84:*21*
141:*10*  171:*13*
**acknowledged**
138:20
**Acknowledges**  139:6
**act**  22:*17*  119:4

**Acting**  7:*1, 3, 6, 7*
27:6  36:16  37:*18*
47:2, *11, 23, 25*
49:*13*  56:5, 9
61:*13*  63:*21*  66:*12*
74:6  97:4  100:6,
*12*  102:*3, 9*  103:*17*
105:6, 9, *11, 14*
111:*17*  114:*11, 13*
116:6  117:25
121:22  130:9
132:*1*  133:*12*
134:*16*  137:16
139:*15, 17*  141:25
142:*1, 20*  143:*1, 5,
15*  145:*1*  146:7
148:*16*  149:20
152:2, *7, 10, 16*
153:20  156:*1*
157:*1*  163:8, *15, 24*
164:5  168:*21*
172:24  176:*15, 19*
177:20  178:*15, 25*
**action**  16:6  44:2
56:2, *6*  68:*1*  74:7
96:*19*  105:6
113:*12*  115:*4, 11,
24*  119:6, *9, 15, 21,
23*  120:8  159:*3, 4*
**actions**  22:*18*
74:*21*  76:*18*
108:25  115:*23*
132:6, *15*  163:*11*
164:*10*
**active**  8:5, *6*
**activities**  3:*16*  50:2
135:22
**activity**  49:22  50:9
73:7, *11*  74:*1*
75:*14*  125:6
**actors**  121:*14*
**ad**  77:*21*
**adamant**  42:*19*
**adamantly**  48:*24*
152:*17*
**add**  5:*23, 24*  129:*1*
**added**  42:*13*
**addition**  98:*16*
117:*16*
**additional**  69:20
86:*12*  99:*19*
169:*16, 25*  170:25
175:*23*
**address**  41:*11*
100:*3*  174:*12*
**addressed**  123:20
156:*19*
**addressing**  17:*1*
**adhere**  122:20
**administration**
154:*13*  160:*13*

165:6  167:4
172:22  175:4  178:4
**administrations**
132:20
**administrative**
102:15  150:5
162:16
**admitted**  8:4
**admitting**  39:18
**advance**  39:20
113:20
**advancing**  41:6
**advice**  48:6, 8, 12,
17, 19  49:19, 21
50:5, 7, 9, 16, 17
55:3, 8, 22  152:14
**Advised**  108:11
**Advisory**  94:16
**Advocate**  8:5
**advocating**  48:22
140:25  152:15
**afternoon**  3:4
16:12  37:4, 7
51:25  101:17
106:3  107:4
117:24  137:14
144:13, 18, 22
146:4  150:3  176:8
**AG**  10:2  13:2, 6
16:12  17:7  18:10,
15, 25  20:13, 14
23:4  24:23  25:24
29:9  32:14  35:6, 9,
16  36:17  53:18
55:25  57:4  63:18
66:9, 18  67:2, 9, 11,
13  68:15  69:15
74:6  75:6  97:7
102:3, 9  103:17
114:13  116:6
121:22  130:9
137:16  139:15
141:25  142:20
143:5, 15  145:1
146:7  148:17
157:1  163:15, 24
164:5  172:24
176:10  178:9, 10
179:10
**agencies**  59:24
136:19  144:13
**agency**  110:6
**Agent**  52:22  53:2,
10  65:7, 8  78:4
**agents**  69:12
**agent's**  53:11
**aggressive**  76:10
127:9, 11
**ago**  20:3  84:16
92:2  132:5  135:7
161:10

**agree**  12:8  59:21,
23  114:1  134:5
135:23  136:3, 5, 17,
25  146:18
**agreed**  14:1  28:20
105:20  131:20
135:12  136:16
146:22
**AG's**  13:25  23:12
81:3  84:25  134:16
143:1
**ahead**  14:18  26:5,
9  28:22  104:2, 8
113:4  116:22  129:9
**aim**  31:13
**air**  30:4
**Airborne**  8:9
**akin**  107:22
**Alabama**  64:3
**alerts**  133:21
**alive**  157:24
**allay**  59:19
**allegation**  23:15
39:13  40:3  42:8
44:13  53:19, 22
55:12  70:23  71:2
72:8, 22  77:24
78:6, 14  79:14
80:10  96:4  108:17
112:11, 14  124:12
170:10
**allegations**  9:9, 10
15:1  22:4, 6, 18
23:13  27:20, 24
34:12  35:2  37:11,
17, 18, 24  39:10
40:1, 2  42:5  43:15,
17  44:17  54:19, 21
55:5, 9, 10, 20, 23
56:16  58:11, 25
59:5, 6, 12  64:4, 20,
23, 25  67:22  70:8,
10  73:1  74:13
77:19  78:21  79:9
93:13  95:5, 6, 9
97:23  118:6
120:23  124:5, 13,
16, 18  125:5, 8, 13,
24, 25  133:22
136:3  141:6  156:4,
7, 14, 19, 20, 23
163:12  169:22
170:3
**alleged**  62:6  125:6
**allegedly**  61:1, 17
**Allied**  15:17  19:2,
13, 18  25:14  26:3
28:16
**allies**  31:13  87:9
169:21

**allow**  105:18
114:14
**alluded**  143:21
**ally**  170:2
**alpha**  61:12
**alter**  33:24
**altered**  168:5
**altering**  76:9
**America**  128:3
**American**  20:17, 23
21:7  22:3  31:18,
19  32:6, 8  33:4, 12,
13  39:12  60:2
68:17  115:12, 25
119:13, 16  153:9
**amount**  3:22  60:16
68:23
**Amundson**  66:1
73:5  81:10  82:9,
13  83:18
**A-m-u-n-d-s-o-n**
66:2
**analysis**  35:13  61:6
**analyzed**  22:7
**Andres**  4:20, 21
83:9  122:18, 24
129:4  175:21
**Andrew**  18:4
**angry**  42:25
**announced**  10:17
16:11  26:12
**anomalies**  133:22
**answer**  5:1, 4  54:3
55:14  62:21  77:16
108:21  149:12
150:7, 8  175:23
**answered**  37:8
52:3  172:1
**answers**  5:16  180:3
**Antell**  3:12
**anticipate**  4:8
171:1
**anticipating**  143:19
**anticipation**  14:12
**Antrim**  15:2, 22
16:1  18:3  19:5, 10
23:11  25:17  27:19
28:5  29:17, 21
31:7  35:1
**A-n-t-r-i-m**  15:22
**anybody**  122:25
**anyway**  23:9  72:20
132:9  157:23  165:3
**apartment**  52:1
130:9  137:15, 18
**apologize**  51:19
90:4  92:14  113:21
123:4  167:25
**apologized**  151:13
**apparent**  54:17
58:19

**apparently**  72:9
124:8  131:13
141:17
**appear**  2:14  4:15
157:6
**appearance**  22:22
23:20
**appearances**  23:19
**appeared**  34:13
102:23  113:2
144:24  173:13
**appearing**  2:13  4:2,
17
**appears**  35:1
**appendix**  127:25
**applies**  5:12
**apply**  3:16
**appointed**  8:19
30:16
**appointing**  30:9
**appointment**  7:15
46:13
**appreciate**  2:14
4:3  63:22  157:19
166:1, 6  168:13
171:7  177:16
178:21  179:19
**appreciated**  179:18
**apprise**  80:20
**approach**  20:14
21:5, 11  39:16, 21
132:2  172:13
**approached**  170:1
**appropriate**  9:14
12:3  21:23  49:25
53:5  80:4  84:19
100:13  171:24
**appropriately**
156:24
**approval**  65:20
69:8, 10, 14
**approve**  79:19
**approving**  100:22
**approximately**
62:23  171:15
**April**  6:19
**area**  64:12
**Arena**  44:20  45:5
70:10, 15
**argument**  85:5
95:21
**Army**  8:5  149:8
**arose**  16:4, 9  62:24
**arrange**  100:18
**arranging**  100:22
**arrested**  112:24
**arrests**  112:23
**arrived**  149:16
**articles**  66:21
**articulated**  50:4

**Arturo**  109:8, 19
110:19  112:7, 23
**ASAP**  164:18
**aside**  31:1  130:13
161:20
**asked**  13:5  18:10
29:10  32:15  84:7
90:15  91:7  92:22
93:17  96:8  111:9,
16  112:18  120:5, 6
129:25  130:2
134:22  136:13
137:18  145:20
164:17  167:17
169:23  176:1, 4, 11
178:1, 15
**asking**  82:7  98:7
111:15  112:9
120:13  135:7
**aspect**  99:21, 25
100:25  114:18
135:1
**aspects**  39:5
113:12  135:3
**assemble**  46:13
**assembled**  25:11, 22
**assess**  67:3  170:25
**assessment**  56:1
85:17  135:23
**assistance**  53:3
60:5
**Assistant**  8:13, 17
11:12  13:6  24:7
47:25  48:1  104:25
162:11  168:22
**assistants**  102:16
150:5  162:16
**Associate**  6:15, 25
7:16, 22  9:3
**assume**  47:4, 5, 7
61:19  77:16
**assumed**  90:20
**assurance**  22:2
**assurances**  22:21
**Atlanta**  52:24
53:13  54:13
159:25  160:2, 4, 7
**attached**  15:1, 18
35:6, 11  115:1
**attaching**  11:13
93:12  134:19
**attachment**  35:8
**attachments**  15:5, 7,
9  24:2
**attempt**  68:14
**attempts**  2:7
**attendant**  175:3
**attended**  26:21, 22
**attending**  26:10
**attention**  15:10

155:3 169:22
**attitude** 71:11
**Attorney** 6:15, 25
7:1, 4, 7, 8, 13, 16,
17, 19 8:1, 13, 20,
25 9:3, 12, 15 10:1,
22 11:12 14:25
16:10 20:8 23:21
24:13 25:22 26:11
33:20, 21 35:12, 17
36:16 37:18 47:2,
11, 24, 25 48:2
49:13 56:5, 9, 19,
23 57:6 61:14
63:21 64:7 65:4
66:1, 7 72:24
73:21 74:17 75:6
84:25 85:14 86:4
89:21 94:7, 11, 16,
19, 20 95:4, 18
100:4, 6, 12 101:16
104:25 105:6, 14
106:17 111:17
113:9 114:11
117:25 124:19
132:1 133:12
139:10 140:8
142:1 145:21
149:20 152:2, 7, 10,
16 153:20 156:1
159:19 160:9
161:18, 24 162:2, 6
163:8 164:17
165:3, 14, 18, 22
167:8 168:18, 21
174:7 176:6, 16, 19
177:12, 14, 20, 23
178:15, 23 179:1
**Attorneys** 9:18, 22
13:7 15:3, 9, 14
16:24 17:15, 18
24:3, 23 25:2 26:8
37:19 78:25 94:9,
13, 15 139:4
154:19, 20 166:17
167:1
**Attorney's** 9:11
10:6, 11 21:2 43:5
54:13 64:1, 3, 24
65:2, 11, 13, 22
69:2, 9 71:8 73:23
74:5, 8 78:8, 10, 12,
23 80:4, 8 125:15
131:17, 25 160:24
**attributed** 81:23
**audience** 132:1
**audio** 62:2
**audit** 19:21 21:12
**AUGUST** 1:13
**AUSAs** 78:23

**authenticate** 120:13
**authored** 19:22
**authorities** 7:12
71:16
**authority** 9:12
16:25 41:15 56:18
65:20 68:21, 24
69:8 73:18 158:12,
14
**authorization** 74:24
76:21 84:4 99:12
**authorized** 4:4
16:7 21:2 67:21
75:1 134:8, 21
**available** 179:22
**avoided** 85:11
**Awan** 92:18
**A-w-a-n** 92:18
**aware** 9:18, 23
10:7, 14 13:11
14:14 16:24 17:22,
24 24:5 29:5, 7, 13,
15, 24 30:1, 2
36:15 39:12, 17
41:25 42:16 52:25
53:9 55:11, 15, 17,
20 59:7, 20 80:11,
15, 22 100:16, 21
104:21 105:15
108:23 109:12, 15
124:15 125:7
130:25 156:23
**awareness** 91:2

**< B >**
**back** 3:22 9:2
13:6 18:9 20:2
24:2 32:21, 24
36:22 37:1 44:23
45:11, 14 46:15
71:4 72:7, 12, 25
83:11 86:10 90:9
96:5, 10 99:8, 18
100:25 101:21
111:11 112:5
116:23 123:7, 13
129:15 130:13
134:7, 19, 25
137:11 138:23
143:14 146:5, 21
148:16 150:10, 12,
17 153:12 155:24
158:18 161:20
164:14 165:1
167:22, 24 168:17
170:24 173:12, 13
174:2, 4, 5 175:16
176:9 177:3
**back-and-forth**
81:4 115:9

**background** 93:7
101:22 111:3, 4
157:1
**backward** 6:22
**bad** 92:14
**bag** 59:23
**bail** 140:11, 14, 17
**balance** 23:20
**ballot** 45:6 124:11
126:1, 5 138:11
**ballots** 44:23 45:6
52:13, 23 53:12
54:2, 4, 6, 7, 9, 10
61:18 62:18 70:18,
19, 24 72:7, 9, 13,
16, 21 123:24
170:11
**bar** 8:4
**Barb** 36:21
**barcoding** 72:20
**Barr** 10:2, 17
16:11 18:15, 25
20:9 26:11 29:9
32:14 33:21 35:17
36:17 53:18 66:9
67:2, 18, 20 69:15
76:12, 13, 19 81:24
85:14 176:6, 10
178:10, 24 179:10
**Barr's** 10:23 13:2
16:13 17:7 20:14
24:23 56:1 66:18
67:9 68:15 69:15
76:9 86:4, 6 178:9
**base** 103:4
**based** 47:16, 18
50:9, 20 58:21
59:10 62:14 70:13
71:6 73:9 76:2
131:12 132:11
138:13, 16, 24 171:9
**basically** 18:5
28:10 39:19 48:22
53:1 71:1 79:22
121:13 145:21
173:10
**basis** 97:6
**Bates** 11:7 43:6
46:7, 15 57:23
58:15 60:24 63:9
86:22 125:17
**Bates-numbered**
12:14
**Bates-stamped**
45:24 123:16
124:21
**becoming** 118:20
138:1, 4 152:16
156:1
**began** 8:12 23:1
70:7, 19 71:25

103:5 138:22
146:6, 8 148:10
**beginning** 11:7
72:12 135:5
**begins** 73:4
**behalf** 2:12 26:8
31:16 33:3, 4, 17
60:1 74:22 76:14
113:10 115:11, 12
128:16
**belief** 172:12
**believe** 16:6 17:19
18:3, 17 19:12
24:9 26:25 27:1
30:19 44:19 45:24
54:3 58:3, 16
60:25 63:1 66:11,
23 69:21 70:3, 4, 7
71:17, 23 74:3
77:5 83:25 86:20
87:17 100:15
102:6 107:25
108:18 109:23
110:1 112:21
113:1, 23 116:6, 22
120:7 121:22
123:16, 20, 23
124:14 130:9
134:9 140:9
145:21 153:10
160:19
**believed** 16:18
20:6 32:1, 4
121:24 175:3
**belong** 53:2
**benefit** 33:5, 7
115:19, 24, 25
**benefited** 33:10
**best** 69:16 94:15
172:8 177:17
**better** 37:24 38:3,
13, 20 53:25 54:14
64:17 97:16 122:8
128:4 138:2 149:3
169:21
**beyond** 21:13
74:24 81:19
130:15 131:6
142:21 168:5
**Biden** 174:25
**big** 41:12
**Bill** 177:7
**bin** 72:16
**bins** 72:10, 14
**Birge's** 18:4
**bit** 14:4 21:25
26:15 27:25 31:22
32:25 81:6 83:19
92:13 96:9 98:8
101:16 105:24
108:14 120:12, 15

126:24 129:21
138:7 142:3
143:14 152:22
167:15 168:9
**BJay** 64:6 124:14,
18, 19 139:6, 17, 18,
20, 25 140:1
160:12, 17, 24
161:10 162:10, 11,
22 165:15, 20
166:21 167:13
173:19 174:2
**blaming** 42:25
**Board** 54:3 70:15
**Bobby** 140:6, 9, 18,
24 161:23, 24
162:1, 7, 9, 12, 16,
17, 20, 25 168:23
169:2
**boiled** 84:16 85:8
**bondsman** 140:11,
15, 18
**boots** 64:11 149:6
**boss** 141:17
**bottom** 11:8 12:13
35:4 43:7 58:3
60:4, 6, 24 61:12
86:21 88:1
**bound** 136:9
**Bowdich** 70:1, 9
75:3 80:20, 25
82:9, 13, 14, 20, 22
83:18
**box** 24:25 172:6
**boxes** 146:6, 9
**Brad** 3:9 122:25
129:25 130:3, 17
**Brady** 89:21 94:11
**Branch** 65:18 66:4,
5 67:9 68:11
69:12 71:11 75:5,
9, 13 77:6, 7 79:2
80:2, 7 83:24
84:18 136:15, 18
167:12
**Branch's** 85:10
**break** 3:24, 25
44:8 45:10 83:8
122:21, 22, 24
129:2, 20 133:24
158:24 168:2, 8
**breakage** 157:21
**breaking** 150:3
**breath** 175:11
**brief** 7:24 16:22
32:13, 18, 19, 23, 25
52:17 119:24
164:3 177:5 179:6
**briefed** 18:25 23:4
138:8

**briefing** 25:23 97:7
99:13 100:8, 9, 14,
21, 24 103:18
138:10, 13, 14, 15
139:24 175:5
**Briefly** 8:3 89:6
96:22 149:18
**briefs** 91:22
**bring** 92:23 115:3
119:9, 20, 23 120:8
131:23
**British** 121:14
**Brook** 4:23
**Brothers** 92:18
**brought** 34:12
57:4 72:8 91:19
155:3 159:22
169:21
**brown-bag** 172:20,
22 173:5
**buffer** 79:23
**building** 145:17
**bullet** 18:13 115:6,
14 116:5
**bunch** 120:13
**Bureau** 140:15
**bureaucracy** 157:24
**bureaucrats** 154:12
**business** 103:6
**busy** 102:10

< C >
**cabinet** 134:13
**calculation** 19:11
**calendar** 144:16
**call** 14:2 23:17
27:11 37:3, 14
38:14, 15, 17 39:8
42:17 51:13, 25
52:17 53:16, 17
65:2 90:8, 13, 16,
17, 22, 25 91:5, 8
93:10 95:12
100:18 109:5
113:16, 23 114:1, 7,
15 129:11 137:21
139:6, 18, 21, 25
140:3 143:12
144:12, 17 145:4, 5
146:3 147:9, 13, 22
148:6, 14 150:3
155:16 162:19
163:3, 5 164:5, 7,
17 174:17 176:21
178:8
**called** 17:18, 20
18:4 19:21 27:8, 9,
10, 11, 14 36:8
37:7 51:23 52:20
53:10 65:7, 17
77:5 90:21 106:25

109:13 112:5
137:16 140:1, 5, 15,
18 143:2 147:6
151:4 166:3 176:5,
8, 22 177:1
**calling** 13:4 130:14
133:5, 6 140:9
158:4
**calls** 23:22 39:3
51:14, 16 57:9
82:19 101:23
130:11 133:3
169:19
**cameras** 71:3
**campaign** 33:5, 10,
17 91:3 95:22
115:11 175:6
**campaigns** 31:12
**campaign's** 31:16
**candidate** 33:8
45:8 115:20, 25
**candidates** 95:23
160:19
**capacities** 8:8
41:13
**capacity** 7:7 33:8
41:21, 22 43:18
**captured** 98:11
**car** 94:5, 23
**care** 149:1
**career** 6:19 83:20
84:17, 23 85:2
132:11
**careful** 33:11
**Carmack** 100:17
**carry** 9:13
**case** 6:1 40:5 41:1
78:4 96:2 105:15
107:19, 23 136:5
175:15
**cases** 31:23 32:9
67:24 86:5
**cast** 19:10 42:8
52:14 62:25 63:5
95:25 156:16
**cat** 59:22
**caught** 162:18
**cause** 73:1
**caused** 70:16
**caveat** 28:2 50:10
**cc** 114:25
**cell** 37:8 90:15, 21
139:21 176:9
**certain** 9:18 11:24
20:12 32:5 52:15
60:16 67:24 87:16
113:19 124:10
134:11 156:14
**certainly** 39:1 40:1
42:17 44:1 50:13
53:4 73:22 81:5

84:25 94:10 103:2
117:6 118:4
131:22 132:21
134:10 167:9
**certainty** 77:14
**Certificate** 180:1
**certification** 67:23
68:2, 4, 12 73:12
75:15, 20 128:8
**certifications** 108:12
**certified** 42:7
52:13 62:22 63:6
76:6 77:13, 15
95:25
**cetera** 54:8 97:15
140:20 165:25
**Chad** 27:2
**chain** 35:3 73:23
77:21 79:4 80:5,
21, 22 105:3, 8, 12,
13
**Chair** 2:4, 12, 21
151:19
**challenges** 13:18
87:15
**challenging** 31:14
87:9
**chance** 80:21
**change** 10:24
48:23 49:8, 10
55:25 61:21 62:14
86:7 104:19 119:4
121:15 132:23
133:11 138:5
149:9 156:21 158:2
**changed** 34:14
86:6 93:23 95:19
118:7, 16 132:13
133:6 143:10, 22
**changing** 110:8, 25
**channels** 12:2
**characterization**
54:22 126:22
168:18
**characterize** 96:22
132:16
**characterizing**
115:22
**charge** 47:25 48:2
64:5 65:25 66:5
77:7 141:19
**Charles** 4:22
**Charlet** 2:22
150:15, 25 151:3
167:21
**check** 40:6 59:25
61:20 64:1 65:13
111:3, 4, 18
**checked** 156:9
**Chief** 2:16 3:2, 7
8:17, 18, 19, 23

13:2 26:24 27:3
56:22, 25 57:5
64:10, 11 66:12
100:17 106:15, 22
107:1 108:19, 22,
24 109:23 110:15
111:21 121:19, 24
126:13 134:9, 12,
20, 23 136:1
149:23 163:10
**chiefs** 78:24
**chime** 29:22
148:10 152:21
**chimed** 153:7
**China** 99:18
**choice** 154:8
**choose** 4:17
**chose** 174:3
**Christine** 140:6, 8,
10, 18, 24 161:23,
24 162:1, 7, 9, 16,
17 168:23 169:2
**chronology** 34:19
**CIA** 110:8, 24
121:13
**Cipollone** 26:25
47:22 106:16
117:18 146:12
149:18 151:11
157:8 158:21
159:7 161:13, 19
**circle** 105:25 106:3
142:21 143:4
**circulate** 12:22
13:5
**circulated** 11:21
12:25
**circumstance** 133:7
134:1
**circumstances** 59:2,
15 127:5 130:7
135:14
**cite** 156:14
**citing** 60:11 93:1
**citizen** 16:6
**Civil** 3:15 16:3
48:1 88:24 97:7
101:3, 10 148:6
**claim** 44:25 52:12
99:16 108:12
109:3 110:23
164:23
**claimed** 15:21, 24
20:4, 5
**claiming** 16:19
19:14
**claims** 22:14 41:6
70:15 99:15 110:7,
8 121:18
**clarification** 63:22
90:7 134:17

**clarify** 36:23 90:4
107:8 175:22
**Clark** 46:7, 8
47:13, 16, 24 48:7,
24 49:4, 11, 16, 17
50:15 88:6, 12, 14,
21 91:10, 13, 19, 20,
24 92:3, 11 93:6
96:17, 21 97:13, 16,
22 98:2 100:7, 16,
24 101:1, 3, 8, 15,
24, 25 102:4, 14, 19
103:1, 6, 24 106:8
116:24 117:1, 4, 13
118:3, 4, 9, 17, 24
121:25 122:2, 9
124:7 126:25
133:23 134:15
135:1 137:3, 17, 24
138:12 139:12, 21
140:9, 13 142:16,
24 143:21, 24
144:24, 25 145:8, 9,
18, 20 146:8, 22
148:23 149:1
151:12, 21 152:2, 5,
10, 15, 16, 23 153:3,
11, 14, 20 154:2, 4
155:25 156:4
157:18 158:1, 8
159:4, 13 163:9, 23
171:20 172:12, 17
173:2
**Clark's** 46:17, 22
96:9 133:25 138:7
172:2
**classified** 99:13, 19
**cleaning** 165:24
**clear** 14:10 24:12
33:15 34:8 44:3
49:11 63:17 83:20
84:14 92:12 98:24
103:22 104:9
110:21 124:1, 9
140:22 141:12
143:9 145:9 152:6
155:13 159:10
163:13 165:16
166:5 176:3
**clearances** 100:13
**cleared** 166:8
**clearing** 54:9
**clearly** 13:19 32:1
69:15 162:18
**Cleta** 124:25
**close** 25:4 37:20
44:5 105:19 106:1,
4 143:8
**Closed** 44:22
**closely** 80:1 81:2
96:24 97:2 109:17

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

**closer** 37:*19, 20*
146:*25* 147:*4*
**closing** 72:*1*
**Cobb** 124:*2*
**coincidental** 24:*18*
**colleague** 83:*15*
85:*20* 96:*8* 98:*6*
136:*12* 150:*14*
167:*22*
**colleagues** 2:*20*
4:*22* 5:*22* 45:*11,*
*16* 84:*7* 123:*8*
169:*16* 171:*19*
**colleague's** 86:*21*
128:*13*
**college** 87:*10, 16*
128:*8*
**come** 36:*22* 45:*11*
65:*9, 10, 22* 78:*3, 4,*
*7* 110:*21* 117:*23*
118:*1, 3* 119:*6*
121:*7* 137:*18*
144:*16* 146:*21*
148:*21* 149:*2*
155:*6, 8* 159:*20*
164:*13* 178:*17*
**comes** 89:*7* 149:*12*
150:*8* 161:*16*
175:*11*
**Comey** 174:*18, 19,*
*25*
**coming** 105:*22*
109:*22* 120:*22*
**command** 73:*23*
79:*4* 80:*5*
**comment** 72:*2*
74:*16* 121:*3*
127:*18* 131:*4*
**commentary** 43:*24*
**comments** 23:*12*
153:*8* 157:*12*
**COMMITTEE** 1:*2*
2:*16* 4:*16* 94:*16*
100:*20* 174:*18*
178:*19*
**committees** 46:*12*
**Committee's** 2:*5*
3:*16* 4:*6*
**common** 126:*9*
**communicate** 12:*7,*
*10*
**communicated**
27:*16* 69:*11* 117:*23*
**communicating**
134:*13*
**communication**
102:*18* 104:*3*
**communications**
11:*23* 12:*2, 4, 11,*
*18* 14:*12* 15:*19*
18:*9* 82:*9* 127:*4, 5*

134:*9, 22* 135:*9, 14*
139:*12* 143:*5*
169:*19* 173:*6*
174:*13* 175:*9, 12*
**community** 57:*2*
99:*23* 103:*20*
**company** 8:*23*
109:*13* 110:*4, 7, 23*
112:*25* 140:*12*
**compare** 132:*20*
**competent** 94:*17*
**complain** 42:*24*
**complaining** 44:*1*
92:*16* 139:*14*
**complaint** 107:*15,*
*22* 108:*2* 113:*5*
114:*2*
**complaints** 31:*4*
43:*16, 20* 59:*3, 17*
60:*20* 81:*23, 24*
95:*16*
**complaints/reports**
43:*8* 58:*18*
**complete** 4:*9* 5:*1*
175:*18, 24*
**completed** 26:*2*
**completely** 36:*19*
89:*17* 92:*12* 98:*16*
162:*18* 176:*3*
**completeness** 129:*8*
**component** 12:*5*
135:*12*
**components** 59:*16*
63:*24* 80:*15*
**Concept** 98:*24*
99:*8* 100:*25*
135:*16* 136:*16*
**concern** 22:*11, 22*
58:*12* 60:*20* 76:*7*
93:*4* 116:*21* 122:*6*
136:*11* 138:*4*
**concerned** 20:*19, 22*
22:*14* 34:*9* 42:*17*
57:*12* 59:*11*
103:*19* 105:*15*
**concerns** 54:*18*
58:*10* 59:*3, 6, 19*
66:*25* 73:*24* 81:*25*
82:*15, 20* 116:*4*
136:*2, 8, 11* 171:*20*
**conclude** 170:*22*
**concluded** 10:*12*
23:*16*
**concluding** 169:*14*
**conclusion** 9:*5*
10:*9, 23* 22:*13*
25:*8* 34:*14* 40:*7*
71:*19* 86:*6* 96:*3*
**conclusions** 25:*11*
49:*23* 50:*1*

**conclusory** 121:*11*
**concur** 73:*7*
**concurrence** 73:*21*
79:*20*
**condition** 146:*23*
**conduct** 18:*23* 21:*3*
75:*10* 84:*19*
132:*13* 136:*23*
141:*22*
**conducted** 1:*18*
20:*19* 32:*5* 98:*17*
140:*20*
**conducting** 94:*10*
**conference** 25:*21*
36:*8* 100:*5* 102:*16,*
*20* 117:*7* 172:*21*
178:*11*
**confidence** 22:*15*
26:*3* 58:*4* 68:*18*
94:*21* 132:*22*
**confident** 167:*19*
**confirmed** 7:*8* 57:*3*
154:*15* 158:*14*
**conflict** 9:*19* 48:*21*
167:*11*
**conflicting** 48:*19*
**confused** 162:*25*
**confusing** 36:*19*
89:*17*
**confusion** 73:*20*
**congratulated**
178:*15*
**Congratulations**
6:*21*
**Congress** 5:*5*
**congressional** 5:*10*
**Congressman** 41:*19,*
*20* 87:*7* 89:*6, 23*
90:*9, 17, 21, 24*
91:*12, 23* 92:*16*
93:*12* 97:*20*
101:*24* 103:*10, 25*
**Congressmen** 62:*9*
86:*25*
**conjunction** 65:*21*
71:*15* 112:*20, 25*
**connection** 2:*5*
31:*6* 53:*20* 88:*23*
99:*17* 113:*11*
**consider** 22:*17*
**consideration** 22:*23*
**considerations**
135:*25*
**considering** 104:*19*
**consistent** 12:*20*
20:*15* 67:*9* 86:*4*
132:*2* 134:*6*
**conspiracy** 109:*21*
**consult** 4:*16* 69:*3*
73:*22*

**consultation** 69:*2*
**consulting** 65:*19*
**consuming** 173:*17*
**contact** 9:*22* 11:*25*
53:*4* 104:*7* 126:*25*
127:*3* 141:*18*
179:*3, 7*
**contacted** 72:*4*
78:*13* 100:*16* 118:*1*
**contacting** 114:*9*
**contacts** 11:*18*
134:*4, 20* 135:*2*
136:*20*
**contain** 180:*2*
**contained** 72:*16*
125:*24*
**contains** 115:*2*
**contemplated** 12:*19*
**contemporaneous**
38:*25*
**contentious** 118:*20*
**context** 15:*15*
35:*10* 108:*15*
139:*23*
**continuation** 75:*4,*
*10*
**continue** 142:*10*
**continued** 173:*2*
**continuing** 86:*22*
121:*7* 141:*18*
**contract** 8:*11*
**contractor** 109:*20*
112:*24*
**contrary** 105:*6*
**contribute** 60:*19*
**controversial** 13:*19*
163:*21* 164:*6*
**conversation** 13:*1*
14:*5* 28:*10* 38:*4,*
*12* 60:*13* 63:*10*
86:*11* 89:*25* 93:*17*
113:*25* 118:*19*
139:*24* 141:*11*
143:*23* 145:*2, 7, 8*
147:*11* 151:*22, 24*
152:*20* 153:*6*
155:*5* 156:*2, 18*
157:*2, 4, 8, 15*
161:*21* 164:*22*
176:*4* 177:*5*
178:*10, 19* 179:*6*
**conversations** 31:*21*
35:*21* 39:*20* 54:*16,*
*24* 55:*24* 82:*18*
102:*7* 133:*3* 143:*8*
145:*10* 146:*20*
156:*8, 22*
**conveyed** 33:*2*
**conveying** 164:*1*
**convoluted** 110:*14*

**coordinate** 78:*5*
80:*1*
**coordination** 9:*17*
110:*8*
**copies** 17:*10* 134:*19*
**copy** 101:*3*
**copying** 11:*12*
**Corey** 66:*1* 73:*4*
81:*10* 82:*9, 12*
83:*18*
**corner** 46:*20, 24*
**Corps** 8:*6, 9*
**correct** 28:*20*
35:*19* 47:*4, 15, 17*
48:*15* 49:*2, 7*
50:*23, 25* 58:*1*
61:*3, 14, 25* 62:*4,*
*10* 67:*25* 68:*6*
81:*11* 83:*21* 85:*19,*
*24* 86:*8, 17* 106:*17*
107:*23* 108:*4*
123:*24* 127:*6*
134:*23* 141:*1*
173:*12, 20* 174:*4*
180:*2*
**correctly** 16:*4*
24:*15* 43:*2, 11*
80:*12* 88:*9* 93:*3*
139:*4, 8, 11* 168:*25*
**corresponding** 65:*6*
**corrupt** 62:*8* 86:*24*
87:*4, 21* 88:*4*
**Corruption** 69:*12*
77:*6* 80:*1, 7*
**couch** 149:*19, 20*
151:*16*
**Counsel** 2:*16, 19,*
*22, 25* 3:*3, 7, 8*
4:*16, 17, 18* 8:*10*
26:*18, 24, 25* 30:*16,*
*22* 32:*16* 47:*6, 12,*
*22, 23* 48:*2* 83:*7*
101:*2* 105:*1*
106:*15* 122:*16*
134:*10, 23* 151:*11*
158:*21* 168:*8*
**counsels** 30:*10* 31:*2*
**Counsel's** 48:*13*
149:*17*
**count** 28:*11, 13*
154:*11*
**counted** 19:*8*
**counties** 63:*2, 4*
96:*7*
**country** 21:*17* 28:*8,*
*21* 40:*17* 128:*17*
154:*24* 172:*9*
177:*17*
**country's** 22:*15*
**County** 15:*2, 23*
16:*1, 8* 18:*4* 19:*5,*

*10* 21:*12, 13, 14*
25:*17* 27:*19* 28:5
29:*17, 21* 35:2
54:3 63:*13, 15, 19,
20, 25* 64:4
**County-woman**
124:2
**couple** 10:*20* 11:2,
*13* 18:*12* 33:*19*
70:22 75:7, *8* 81:8
83:*14* 86:*12* 89:4
91:9 107:*15*
116:*23* 139:3
161:*10* 171:3
178:22
**course** 5:*10* 33:*10*
37:*13* 54:4, *16*
55:4, *24* 70:25
79:5, *16* 93:22
95:6 109:22
131:22 132:*13, 17*
137:*19* 143:*11*
147:*17* 151:6, *10*
156:2 160:5 169:5
170:9 171:*18*
174:*23* 175:4
176:2 177:*18, 21*
**court** 16:7 23:8
32:25 107:22
113:*11* 119:5, 6
120:2, *5*
**courts** 46:*11*
**Court's** 115:*17*
**coverage** 16:*15*
**covered** 149:6
**covering** 135:3
**create** 106:5
**created** 68:*19*
**creates** 73:20
**credible** 20:*12*
112:*13*
**crime** 58:*24* 64:22
77:*12* 78:*21* 79:9
**crime-related** 58:*11*
**crimes** 43:9 58:*18*
59:4, *17* 60:20
64:20 65:*1, 18*
66:4 67:9 68:5, *11*
71:*11* 75:5, *8, 13*
77:*19* 79:2 83:*24*
84:2, *18* 85:*10*
127:*10* 167:*12*
**criminal** 5:*11* 8:*18,
19* 10:3, *6, 11*
37:20 78:*24*
**critical** 19:*1* 25:9
**criticizing** 160:*17*
165:3
**Crossfire** 174:22
175:*10, 12, 18*

**Cuccinelli** 27:5
28:*12* 30:22 34:25
35:4 53:7, *8*
**Cuccinelli's** 35:*11*
**curious** 14:4 27:20
34:*1* 43:22 101:5
108:*15* 113:*12*
132:4, *10* 178:23
**current** 68:*15*
**currently** 88:20
**custody** 52:23
53:*12*
**cycle** 75:25

**< D >**
**D.C** 1:3 6:*17* 7:21
137:*15*
**DAG** 7:22 24:*14,
15, 22, 24* 27:*1*
29:6 36:8, *10, 15,
16* 39:*19* 61:*12*
74:5 97:2 102:9
109:*17* 111:6, *12*
112:9 113:*16*
114:*1* 117:*1, 23*
119:*17* 144:*23*
146:23 172:21
178:*11*
**DAG's** 69:4 113:*24*
144:*17, 21* 178:*11*
**damage** 157:*10*
**data** 63:*1* 79:8
96:6 112:25
**database** 62:25
63:5 96:6
**date** 36:*14* 55:25
173:20 180:*16*
**dated** 15:*18* 46:*17*
89:25
**Dave** 80:25 81:*1*
82:9, 22 83:*18*
**David** 70:*1, 9*
**Davis** 4:*21* 6:7
**day** 12:25 15:*13*
16:2, *10* 23:*10*
24:4, *19* 26:*1, 7, 9,
11* 28:*14, 24* 30:7
34:6 37:3 53:*18*
72:*13* 78:*15* 81:2,
*3* 82:22 85:*21, 22*
91:*1, 6* 93:*11*
97:*21* 98:2 102:7
106:8 109:*12*
114:*10* 117:3
121:6 128:6 130:4,
*10, 11* 132:6, *15*
133:*11* 143:*10, 22*
144:6 149:7
161:*17* 173:21
176:6

**days** 18:*12* 33:*19,
20* 34:7 95:9
149:8 161:*10*
172:22
**day-to-day** 133:*10*
**deadline** 168:6
**deal** 113:22 146:*13*
153:*16* 155:20
**dealing** 173:*15*
**dealt** 114:*10*
**debriefing** 164:*1*
**decades** 145:*14*
**December** 7:*13* 8:4
10:*16, 21* 15:*18, 19*
16:*10* 26:6, 9
30:*19* 31:3 33:20
34:2, *11, 25* 46:6,
*17* 51:3, *7, 13, 24,
25* 53:*17* 69:25
70:8 73:5 80:20
82:*13* 86:*11* 89:8,
*23* 90:*1* 93:*11*
96:*18* 106:*14*
115:*1* 116:22
117:*1* 124:25
138:6 176:6 179:5
**decide** 50:*10*
**decided** 28:*17* 74:6
105:*19* 114:*14*
143:8, *21* 144:25
147:*1* 165:7
**decipher** 92:*13*
**deciphered** 43:*10*
**deciphering** 44:7
**decision** 46:*13*
48:20 49:*1, 2, 3, 9,
20* 50:7 67:5
142:2, *12* 147:*19,
22* 152:*14* 157:5, 6
163:*18* 171:*23, 25*
173:*11, 14*
**decisions** 23:25
50:*14, 20* 51:*1*
55:*10* 171:*11*
**deemed** 9:*13*
**deep** 157:*15*
**deeply** 9:*24*
**defective** 19:*3*
**defense** 8:*10*
**defensive** 175:5
**defer** 25:*20*
**deferential** 126:*18*
**deferring** 126:*19*
**definitely** 23:*14*
67:*11* 117:*12*
132:*18* 171:*14*
**delay** 21:4
**D'Elia** 109:8, *19*
110:*19* 112:22, *23*
113:2

**deliberations** 46:*14*
81:20
**D'Elio** 112:7
**DeLisa** 3:5, 6
128:*16*
**delivered** 176:*14*
**delta** 61:*12* 62:*21*
96:7
**Demers** 112:4
148:*1*
**DEO** 65:2, 5 78:5,
*15, 22*
**D-E-O** 65:2
**DEOs** 69:8
**departed** 70:*17*
**Department** 2:6
3:8, *10, 11, 12* 4:4
6:*13* 7:6, 9 10:*17,
23* 11:*17* 12:7, *10*
17:4 21:5 22:4, *18*
23:*16* 25:7 27:9,
*11* 29:2 31:5, *12,
15, 19* 32:2, 7, *12,
17, 22* 33:3, *23*
34:9, *13* 41:22
42:*24* 43:25 48:*23*
50:*21* 53:*21* 56:*15*
57:3, *12* 59:8, *16*
60:*21* 62:*14* 63:*23*
64:*18, 22* 66:20, 25
67:*16, 21* 68:*10, 13,
16* 74:*23* 76:*1, 11,
15* 77:*11, 18* 78:2,
*19* 79:*10* 84:2, *23*
85:*12* 86:3, *5*
87:*11, 19, 21* 92:4
93:8 95:22 96:*21*
97:*11* 98:*14, 15*
101:*11, 13* 103:2,
*15* 104:20 105:25
106:6 107:*21*
108:*1, 2* 112:2
113:*10* 114:9
115:*3, 23* 117:*15*
118:7 119:2, *3, 8*
122:*11* 124:6
125:8 131:*1, 23*
132:6, *19* 133:*13*
134:22 135:*10*
136:*15* 137:*19*
138:*3* 140:25
141:*13, 20* 142:22
144:*16* 146:*24*
148:4, *24* 151:*25*
153:*10, 11, 23*
154:*14, 17, 20, 23,
24* 163:*11* 165:*12,
15, 18* 167:*13*
169:*23* 170:8
172:3 174:3, *6, 9*

*177:17*
**Departments** 14:*15*
**Department's** 37:*18*
44:2 67:8 84:*18*
89:2 95:*10, 16*
98:*19* 105:3
116:*15* 118:*16*
132:*12, 15* 135:*21*
169:*12*
**departure** 166:*18,
25*
**depending** 78:6
128:*12*
**Deponent/Interviewe
e** 180:*1*
**deputies** 66:*12*
**Deputy** 3:2 6:*15,
25* 7:*1, 3, 6, 8, 13,
16* 8:*17, 18* 9:3, *15,
25* 18:*17* 25:6
26:25 37:*21* 47:*23*
56:23 57:6 81:*1*
97:2, 7 100:4
106:*16* 145:20
177:*23* 178:5
**describe** 7:*10*
15:*15* 168:20
**described** 10:8
12:5 25:5, 6, *18*
71:*12* 76:2 80:*19*
140:*11* 147:*15*
167:*11* 168:*19*
**describing** 14:*11*
20:4 84:*15, 16*
91:*12*
**description** 36:*12*
46:*1* 164:4 171:*10*
**designated** 11:3
14:20 34:20 36:20
96:*11*
**designed** 11:*23*
18:22 136:22
**desire** 126:*14*
**desk** 17:*11* 111:*24*
126:*14* 151:*10*
160:6
**detail** 6:*16* 25:20
76:*18* 171:7
**detailed** 36:3
**details** 9:6 11:24
15:20 95:3 99:22
112:*10*
**deter** 68:*14*
**determination** 69:*16*
**determine** 95:5
**determined** 98:*17*
**developed** 80:*13*
170:*16*
**DHS** 17:4 18:8, *16,
20* 22:*13* 23:2, *3*
25:5, 6, 8, *10, 13, 23*

27:2, 6, 7  29:10
35:13  52:22  53:2,
20, 21  54:13  144:14
**DHS's**  25:11
**dictating**  98:19
**difference**  19:7, 13
62:24  67:25  68:1
84:17  133:1
**differences**  85:4
**different**  25:18
44:16  65:11  70:22
85:14  152:15
169:19  174:8
**difficult**  49:9
102:21, 22  132:20
133:7, 8  152:4, 25
167:10
**dig**  68:4
**direct**  60:12  86:18
87:1  88:1  90:16
97:24  98:1  163:9,
10  164:2
**directed**  121:18
141:3
**directly**  60:11  61:1
65:10  69:11  78:4,
7, 16  93:16  97:23
151:19
**Director**  18:17
25:6, 7, 24  37:21
81:1  99:14  174:18
**disagreed**  69:15
**disagreement**  75:5
85:9, 18
**disagreements**  81:14
**disappeared**  150:9
**disappears**  148:5
**disappointed**  172:5
**disapprove**  73:19
**disaster**  28:7
157:22
**disconnect**  68:18
69:4
**discuss**  5:19  18:15
107:2  116:5  164:10
**discussed**  15:13
18:15  34:5  46:21
57:19  83:3  100:7
101:18  105:17
107:14  111:6
118:5  135:4
143:11  153:18, 19
166:12  169:18, 25
174:25  178:6
**discussing**  24:3
27:20  35:2  42:16
61:6  89:8  90:13
92:6  132:7  133:17
152:19  166:10
**discussion**  13:13
16:22  27:21, 23

28:1  31:7  36:24
45:13  87:14
102:21  118:9, 11,
12  123:6  126:24
138:24  144:4
145:19  147:1
159:1  164:21
165:11  168:7, 17,
20  171:10  174:13
175:25
**discussions**  98:2
100:23  117:6
131:12  144:5, 9
152:3  155:1
167:24  170:9
171:18  172:19
**disentangle**  155:25
**dismiss**  32:9
**dismissed**  31:24
**dispelled**  37:25
**displeasure**  44:2
**dispute**  74:4  84:14
85:8, 21
**dissatisfied**  167:6
**distracts**  133:10
**District**  6:17  7:17,
19  8:1, 13  15:5
18:4  64:3, 7  65:3
69:9  71:9  72:24
78:11, 16  94:7, 12
161:25  162:8, 10,
23, 24  169:13
**distrust**  60:16, 19
**Division**  8:9, 18, 19
10:3, 6, 11  37:20
48:1  88:25  89:1
101:3, 10  112:6
148:2
**DNI**  100:17  138:10
**document**  11:3
12:14  14:19  34:17,
20  35:3, 5, 11, 22
57:15  60:12  67:7
86:13  89:24
114:19, 21  115:1
123:17  125:9
129:10
**documents**  11:13
14:25  15:3, 13
24:7  26:15  57:18
67:15  89:5  120:14
127:25
**DOD**  144:14  145:5
**doing**  9:23  31:20
39:22, 23  43:25
44:3, 4  55:18
59:16, 20, 25  67:1
68:13, 16  98:20
105:2  108:17
115:12  118:23

153:19  167:20
172:8, 13
**DOJ**  6:14, 19  12:1
42:25  43:7, 19
53:2  58:17  61:21
66:1, 7  69:21  74:1
77:25  80:22  81:17
82:6  88:19  107:18
126:6, 10, 16, 18
127:3, 4, 8  134:4
136:19, 22  144:14
159:3  163:21
164:11  175:9
**DOJ's**  6:18
**domain**  34:14
**Dominion**  15:21, 22
16:17  19:8  21:15
25:18  30:10, 15
31:4, 5, 6, 9  99:15,
16
**DONOGHUE**  1:8
2:4, 10, 11, 13  3:1
4:14, 25  5:7, 14, 17
6:3, 5, 12  15:6
45:18  56:2  63:12
70:2  82:10, 12
83:7, 14  84:15
96:12  122:15
123:11, 18  124:23
128:11, 18  137:5
167:21  168:8
174:12  175:19, 25
176:3  179:19
**D-o-n-o-g-h-u-e**  2:11
**Donoghue's**  2:19
**double**  57:21
**doubled**  158:5
**doubt**  10:22
**Doug**  40:12
**downside**  153:19
155:12
**downstairs**  178:10
**downstream**  80:23
**draft**  46:8  47:12,
16  48:7  49:4, 16
150:19  157:9
**drafted**  98:23
101:13  102:12
**dragging**  69:16
167:15
**Dreiband**  148:7
**dressed**  149:5
151:14
**drive**  116:10
**driven**  170:11
**driver**  170:11
**dual**  11:16
**due**  74:14  171:21
**dunk**  120:1
**Durbin**  2:4, 12

**Dustin**  100:17
**duties**  12:16
**duty**  8:5, 6

**< E >**

**earlier**  4:2  23:25
24:4  35:14  36:1
51:2  55:16  58:17
70:11  71:12  75:7
87:20  88:25  91:6
98:2, 7  102:7
108:20  109:12
114:2  115:8
123:21  126:12, 23
131:15  136:12
138:7  149:7  155:9,
21  156:22  157:8
166:10  167:4, 11
**early**  6:19  72:6
115:9  155:7
**ease**  2:20
**easily**  78:15
**Eastern**  6:17  7:17,
19  8:1, 13  15:4
**Eastman**  107:6
**easy**  29:17
**eat**  157:24
**ECB**  65:18  66:11
68:11, 21  69:1, 3, 7,
10, 11, 14  75:21
79:18  80:8, 18, 19
81:9  167:11
**ECB's**  69:13
**echo**  109:5
**EDNY**  8:16
**effect**  13:10  16:23
20:7  22:19  28:5
30:21  33:23  36:2
37:9  40:16, 23
41:11, 14  52:4
69:6  91:22  114:17
134:13  136:13
141:7  145:13, 22
159:25  160:22
162:14  169:1, 5
172:7
**effective**  165:8
173:23
**effectively**  91:19
172:17
**effort**  9:25
**efforts**  2:6  18:22
75:12  127:8, 11
130:25
**either**  23:22  31:8
34:13  53:14  55:13
69:4  80:3  86:1
101:10  136:10
141:10  148:13
153:4  170:1  178:23

**elaborate**  27:25
44:12  98:8
**election**  2:7  9:5, 9,
10  10:12, 13, 18, 19,
24, 25  12:23  13:19
14:14  15:1  18:21
20:16, 18, 19, 22, 24
21:2, 8, 19  22:3, 4,
15  23:18, 23  27:18
30:3, 16  31:14, 18
33:24, 25  34:15
37:11  39:11  40:8
41:3, 7  42:21
43:15  46:11  51:10,
12, 18, 21  53:17
54:8, 11, 18  56:1, 3,
7  58:11, 24  59:6,
12  61:10, 22  62:8,
14  64:22  65:1, 3, 4,
8, 18, 25  66:4, 6, 10
67:3, 9  68:4, 11, 15
69:9  70:15, 16, 18
71:11  73:3, 12
75:5, 8, 13, 25  76:6
77:8, 11, 12, 15
78:4, 11, 15, 21
79:2, 8, 9  83:24
84:2, 18  85:2, 10,
13  86:7, 8, 24  87:4
88:4, 14  89:2
93:13  95:7, 12
97:24  99:14
103:15  107:3, 13
111:1  118:6  124:4
127:9, 10  136:3
149:3  153:8  156:3,
7  163:12  165:1
166:25  167:12
169:22  170:2
**election-related**
56:16  68:22  138:8
**elections**  18:23
32:4  40:18  54:3, 6
67:23  68:2, 4, 14
78:9  87:17  97:10
98:21  179:6
**Elector**  46:13
**electoral**  87:10, 15
128:8
**electronic**  17:10
**elevated**  7:1  75:17
**ellipsis**  44:24
**email**  11:5, 7, 11
14:22, 24  15:2, 8
17:17  24:16, 21, 22,
25  34:22, 24  35:3,
11  46:6, 17, 18
47:16  67:14  69:25
70:5, 8, 9  71:10
73:4  75:3  80:21
82:14  83:15  84:15

85:6, 7  89:15, 20,
21  90:11  93:12, 18
94:3, 4  95:1  96:15,
17, 18  97:22  98:6,
10  99:9, 21  100:3
101:1, 4  102:8
120:15  122:4
124:22, 25  125:3, 4,
18  126:2, 4  129:13,
20  130:15  133:17,
18, 20, 21  134:19
147:23  169:19
emailed  164:17
emails  24:4, 15
35:16  38:24  66:22
76:2  82:14, 17, 20,
21  100:19  113:20
120:23  121:2
125:22  126:10
130:10
Embassy  110:9
Emily  3:11
employee  6:19
66:1  83:21  112:23
165:19
en  154:20
encourage  4:15
131:1
ended  6:17  105:16
111:24  126:13
175:12
ends  105:21
enforcement  12:17
64:11  135:22
136:24  174:14
engage  49:21  50:8
133:23
Engel  48:1  105:1,
7, 14  106:17
142:22  143:2
151:12  154:5
155:4  159:2, 13
enjoy  175:17
ENRD  97:4
enshrined  136:20
ensure  59:25  68:17
136:23
entered  47:20, 21
151:8  178:11
entertain  114:7
entire  113:25
148:4  155:19
entirely  116:7
124:9, 10  134:11
140:22  141:9, 16
entirety  135:20
entities  11:19  18:23
envelope  72:14
Environmental  89:1
equal  3:22

equally  92:7
equipment  72:1
Eric  48:3  148:7
error  15:25  16:17
19:11, 14, 15  20:5
21:14  22:9  28:8,
20  71:19
errors  25:14
especially  122:1
148:4
espousing  85:15
essence  90:16  98:7
115:2  126:10
essentially  29:14
41:25  51:24  84:16
103:13  118:25
139:14  147:5
148:13  152:13
176:11, 13  177:15
establish  97:17
et  54:8  97:15
140:20  165:25
evaluations  23:3
Eve  51:5
evening  93:10
147:3
event  86:1
Eventually  53:23
evidence  10:12, 18,
23  33:23  34:15
46:11  86:6, 7
93:19  99:19  119:2
121:12  138:11
156:13  160:3
170:13, 15
exact  28:3  58:8
62:11  67:19
exactly  13:8  17:23
40:15  71:5  73:14
91:17  104:10
106:25  108:18
117:22  137:12
example  77:23
examples  75:8
169:19, 24  170:14
exasperated  139:16
144:23  145:23
exception  2:18
171:20
exceptions  68:9
exchange  34:24
83:17  90:19  122:4
129:18, 23
excuse  57:23
127:10  175:21
excused  27:4
executive  59:24
136:15, 18
exfiltrate  112:25
Exhibit  11:4, 5
14:21, 22  34:22

35:8, 23  36:19, 21
37:2  45:23  46:1,
16  57:16, 17  64:16
69:20  70:4, 5  81:7
82:25  83:17  86:10
89:14, 15, 17, 18, 20,
24  96:13, 15
106:10  113:6, 7
114:20, 21  123:16,
17  124:21, 22
125:17, 18  129:11,
12, 13, 16  133:16,
18  134:18  137:4, 7
exhibits  57:20
127:24
exist  48:21  76:3
exists  136:19
exodus  159:15
expand  105:24
106:3
expect  62:7, 13
86:23  101:5
153:23  155:18
expectation  57:2
178:7
expecting  142:15
experience  7:25
93:1  132:11
expert  84:1, 11
expertise  18:20, 23
126:20
experts  18:14
explain  25:23  70:7
91:15  104:6
119:18  139:9
163:3  167:14
explained  19:3
32:11  73:6  93:11
96:20  100:9
148:17  165:20
explaining  115:2, 15
explanation  32:24
171:7
explicit  69:14
exploring  83:16
extent  9:16  49:24
84:22  85:11  95:9,
24  124:13  126:13
132:25
extremely  69:10, 13
172:5

< F >
face  112:15  123:2
face-to-face  145:2
facility  44:23  71:4
72:11, 17  73:2
110:5  124:2
fact  21:14  24:18
28:19  30:24  33:7
42:8  49:24  62:25

66:19  67:1  68:14
72:9, 15  96:3
100:24  102:24
121:23  133:9
155:3, 18
facts  22:7  119:2
fact-specific  68:8
factually  98:18
failed  175:5
failing  43:8, 20
58:17
fair  10:10  14:9
25:7  54:22  58:10
84:1  85:17  116:2,
4  126:22
fairly  77:21  96:25
103:16  121:10
126:18  138:1
fake  70:24
fall  56:25
fallout  155:14
false  5:9  70:23
156:12
familiar  11:14
121:2
familiarity  19:18, 24
far  21:13  34:9
57:12  93:22
105:18  159:6
farfetched  22:5
112:15  121:8
Farm  44:19  45:5
70:10, 15
Farm-related  70:8
farther  107:12
favor  17:14
FBI  10:11  18:16,
18  21:3  25:6
37:21  42:24  43:5
53:21  54:12  56:15
60:6, 17, 21  64:2,
18  65:6, 10, 13
69:12  71:4, 9, 14
72:22  74:1  77:3, 4,
11, 18, 24  78:4
79:5, 10, 15, 23, 25
80:3, 17, 19  86:2
92:17, 22, 23, 24
93:2, 3  111:3, 5, 9,
11  112:18  124:6,
16  125:8  126:6
127:8  129:25
130:3  131:16, 24
175:9
FBI's  80:1, 6, 23
Federal  3:15  7:4
25:22  41:1
feed  72:19
feel  94:24  153:1
171:19
feeling  34:3, 4

feelings  81:25
172:9
feels  92:23
feet  69:16  167:15
fellow  128:25
felt  19:3  20:10
38:2  44:3  93:8
95:11  100:10
140:2  171:24
field  65:6  80:3
131:16, 24
fifth  24:13  25:1
fight  146:14
Fighter  41:9, 13
figure  18:7  62:23
68:23  112:17
file  32:18, 19, 22
33:17  107:21
119:15
filed  16:5  31:13
107:18  125:1
filing  16:4  31:12,
15  32:7  33:3, 4, 5, 7
filled  145:7
final  35:7  128:1
172:21
Finally  5:18
find  17:1  18:1
63:14  64:14  78:15
102:4  111:7  112:8
145:25  146:1, 4
160:7  162:13
170:13
finding  10:20
Fine  112:11  138:21
145:15  146:18
147:25  148:18
149:14  151:15
161:15, 19  166:23
fingers  61:21
Finish  42:18  71:23
fire  56:9, 12, 14, 18
158:11, 13, 14, 15
161:4, 6, 7, 16  165:7
fired  92:22  105:13,
16, 21
firing  49:17  50:16
161:8, 14
firm  97:15
firmly  172:12
first  6:10  12:13
15:9  17:20  19:17
26:7  32:18  34:11
38:17  39:1  40:9
41:4  45:20  46:16
56:23  58:17  70:11
88:8, 13  90:2  91:4
97:3, 24  98:1
103:8  107:11
114:2  128:2  135:6
144:4  150:17, 22

151:*13*  155:*3, 6*
160:*13*  162:*11*
168:*22*
**firsthand**  122:*10*
**fit**  79:*23*
**fits**  34:*19*
**fixated**  161:*3*
**flavor**  120:*20, 21*
**flip**  19:*20*  126:*9*
**flipped**  94:*24*
**floated**  126:*3*
**floor**  24:*13, 14*
25:*1, 21*  137:*22*
142:*25*
**floored**  102:*23*
**Florida**  74:*11, 12*
117:*24*
**flow**  152:*20*
**flowed**  130:*10*
153:*3*
**Flynn**  175:*1, 3*
**Flynn-Brown**  3:*1, 2*
5:*24*  45:*17*  46:*3*
69:*19*  70:*3, 6*  75:*2*
76:*17, 23, 25*  81:*21*
82:*5, 11, 24*  123:*10,*
*19*  124:*20, 24*
125:*16, 19*  127:*17*
128:*19*  167:*25*
168:*4, 13*  171:*3, 5*
179:*16*
**focus**  68:*15*  76:*8*
133:*13*  151:*25*
**focused**  141:*2*
156:*3, 4, 20*
**focuses**  98:*23*
**folks**  50:*22*
**follow**  3:*17*  105:*3,*
*12*  131:*22*  177:*18*
**followed**  53:*8*  94:*4*
102:*7*  108:*8*
157:*13*  175:*24*
**following**  46:*19*
86:*15*  87:*25*  92:*10*
95:*8*  143:*10, 20, 22*
163:*20*
**follow-up**  51:*24*
90:*18*  133:*16*
138:*6*  164:*10*
169:*15*  171:*3*
**follow-ups**  178:*22*
**food**  80:*21*
**foregoing**  180:*2*
**Foreign**  99:*14*
**forensic**  15:*21, 24*
16:*4, 7*  19:*21*  20:*4*
21:*12*
**forget**  52:*11*  65:*7*
**forgive**  31:*22*

123:*21*  172:*1*
**formally**  33:*21*
**formed**  93:*7*
**former**  2:*6*  128:*25*
174:*18*
**forth**  3:*22*  18:*10*
103:*10*  126:*11*
130:*13*  131:*18*
142:*17*  143:*14*
153:*12*
**Fortune**  8:*23*
**forward**  35:*8*  57:*7*
66:*13*  69:*17*  74:*9*
81:*15*  94:*6*  103:*18*
125:*23*  141:*14*
**forwarded**  24:*3*
32:*14*  35:*12*  94:*18,*
*25*  121:*4*
**forwarding**  89:*21*
126:*19*  133:*21*
**forward-leaning**
76:*10*
**forwards**  35:*1*
125:*2*
**found**  10:*18, 23*
33:*22*  24:*9*  33:*23*
112:*22*
**founded**  59:*10*
95:*11*
**four**  63:*1, 4*  96:*6*
149:*8*
**fourth**  24:*14*
**frame**  139:*13*
**framed**  29:*3*  31:*17*
73:*19*
**frank**  171:*10, 14*
**frankly**  40:*4*  42:*9*
50:*19*  106:*5*
111:*24*  143:*3*
**fraud**  9:*9, 10*  10:*12,*
*18, 24*  15:*1*  22:*4*
23:*17, 22*  30:*16*
33:*24*  34:*15*  41:*3,*
*7*  43:*15*  44:*11, 20*
51:*10, 12, 18*  53:*17*
58:*11, 24*  59:*13*
64:*19*  65:*1*  67:*4*
77:*19*  78:*21*  79:*9,*
*14*  86:*7*  93:*13, 21*
119:*14*  127:*9*
136:*3*  156:*4*
163:*12*  169:*22*
170:*2*
**fraud-related**  51:*22*
**fraudulent**  125:*6*
**free**  73:*23*  94:*2*
132:*24*  134:*18*
165:*12*
**freely**  4:*16*
**Freeman**  44:*21*

**frequent**  9:*22*
**friction**  106:*5*
**FRIDAY**  1:*13*
**front**  49:*4, 5*
109:*24*  151:*20*
**fronts**  49:*3*
**frustrate**  67:*8*  75:*9*
76:*12*
**frustrated**  75:*13*
119:*7, 18*  157:*16*
**frustrating**  75:*21*
**frustration**  56:*15*
71:*10*  118:*19*
119:*11*  121:*23*
122:*3*
**frustrations**  80:*23*
**full**  70:*18*  94:*20*
**fully**  30:*1*  105:*15*
**Fulton**  63:*13, 15, 19,*
*20, 24*  64:*4*
**funnel**  11:*23*
**further**  84:*5*
128:*12*  130:*6*
155:*8*  163:*11*
**furthermore**  23:*6*
69:*11*
**future**  14:*12*  68:*14*

**< G >**
**gamma**  61:*12*
**GBI**  140:*15*
**General**  6:*15, 25*
7:*2, 4, 7, 8, 13, 16*
9:*3, 7, 16*  10:*1, 17,*
*22*  11:*22*  13:*7*
14:*25*  16:*10*  20:*9,*
*14*  23:*21*  25:*13, 22*
26:*11*  32:*15*  33:*21*
35:*12, 17*  36:*16*
37:*19*  47:*2, 11, 24,*
*25*  48:*2*  49:*14*
56:*5, 6, 10, 23*  57:*1*
61:*14*  63:*21*  68:*10*
75:*6*  77:*20*  85:*14*
86:*4*  95:*18*  100:*6,*
*12*  101:*16*  104:*25*
105:*6, 10, 11, 14*
106:*17*  111:*17*
114:*25*  116:*18*
117:*25*  118:*6*
125:*13*  126:*12*
132:*1*  133:*12*
135:*16*  142:*1*
145:*21*  149:*21, 22*
151:*5*  152:*2, 8, 10,*
*16*  153:*21*  156:*1*
163:*8*  175:*1, 3*
176:*6, 17, 19*
177:*12, 14, 20, 23,*
*24*  178:*15, 23*  179:*1*

**generally**  9:*23*
13:*21*  15:*11, 12*
19:*1*  28:*4*  29:*3*
31:*4*  37:*17*  40:*15*
55:*3, 6*  67:*17, 20*
68:*6, 7*  70:*14*  74:*7*
77:*23*  85:*19*  92:*17*
119:*22*  120:*19*
127:*2*  130:*13*
**Generals**  11:*12*
**General's**  8:*6*
24:*13*  57:*6*  94:*16*
100:*5*  114:*6, 11*
**generically**  99:*7*
**geographic**  64:*12*
**Georgia**  40:*24*
44:*10, 15, 18*  52:*24*
53:*20*  58:*4, 12*
64:*7*  71:*9*  73:*2*
74:*5*  98:*23*  99:*1*
100:*25*  120:*24*
121:*22*  122:*10*
124:*3, 11, 14, 15*
125:*2*  133:*22*
138:*22, 23*  139:*1, 5,*
*14, 15*  140:*11, 15,*
*23*  141:*2, 4, 5*
156:*5*  157:*9*
161:*25*  162:*8, 10*
165:*2*  167:*7*  169:*13*
**getting**  9:*6*  16:*15*
31:*24*  44:*5*  76:*15*
88:*16*  95:*2*  111:*25*
133:*9*  134:*25*
139:*16*  141:*24*
148:*18*  150:*18*
169:*8*
**Giuliani**  130:*18, 20,*
*22*  131:*2, 5, 7, 14,*
*19, 22*
**give**  4:*11*  7:*24*  9:*7*
20:*10*  27:*23*  28:*3*
29:*1*  32:*16*  39:*7*
53:*25*  91:*23*  100:*1*
101:*19*  103:*24*
120:*20*  151:*5*
157:*3*  163:*2*
165:*16*  175:*5*
**Given**  10:*8*  27:*19*
61:*9*  79:*20*  85:*1*
112:*11*  171:*8, 22*
178:*23*
**gives**  25:*19*
**giving**  13:*16*  114:*13*
**go**  2:*17*  3:*18, 22*
11:*24*  20:*2*  21:*13*
27:*4, 16*  35:*7*  42:*4,*
*22*  45:*10, 14*  54:*25*
55:*1, 19*  57:*22*
60:*4*  62:*7*  63:*13,*
*15, 19, 20*  64:*13*

71:*4*  72:*11, 23*
74:*8*  77:*24*  79:*15*
80:*6, 8, 19*  83:*11*
104:*2, 8*  105:*5*
123:*4, 7*  125:*16*
129:*9*  131:*24*
146:*2, 13, 17*
148:*18*  149:*9*
150:*17*  151:*6*
152:*11*  158:*18*
166:*6, 7*  167:*24*
179:*24*
**go-ahead**  100:*1*
**goal**  11:*25*
**God**  41:*25*
**goes**  43:*19*  99:*15,*
*18*  143:*17*
**going**  10:*1*  13:*19*
17:*6*  18:*1, 6*  19:*6*
38:*1*  39:*9, 21*
42:*10*  44:*15*  46:*16*
54:*25*  67:*18*  69:*17*
80:*22*  81:*7, 16, 18*
84:*4*  93:*19*  99:*22*
100:*14*  102:*3, 5*
103:*23*  105:*15*
113:*22*  119:*1, 4, 24*
122:*19, 21*  123:*12*
127:*15, 16, 18*
128:*23*  129:*3, 9, 15*
130:*13, 14*  131:*25*
137:*16*  138:*22*
141:*4, 19*  142:*9, 10,*
*16*  143:*8, 9, 12, 16*
144:*16*  145:*1, 14,*
*25*  146:*1, 2, 8*
147:*8, 9, 12, 16, 21*
150:*14, 16*  154:*10,*
*11, 15, 17, 18*
157:*17, 21, 22, 23,*
*24*  158:*6, 11, 15*
159:*8, 11, 14*  161:*6,*
*16*  162:*3*  163:*15,*
*16, 23*  164:*14*
165:*5*  166:*5, 6, 7*
167:*12*  169:*15*
173:*11, 13, 19, 21*
174:*11*  175:*8, 14*
**gold**  28:*13*
**Good**  2:*24*  3:*1*
4:*20*  13:*25*  63:*22*
129:*3, 4*  149:*24*
154:*23, 24*  162:*13*
169:*6*  177:*9, 11*
179:*10*
**good-byes**  165:*17*
**googled**  112:*19, 20*
**govern**  11:*18*
**government**  23:*5*
37:*8*  110:*6*  174:*14*

**Governor** 46:*9*
95:*17*
**grab** 151:*15*
**graceful** 165:*25*
**graduated** 8:*3*
**grand** 23:*1*
**Grassley** 3:*3, 7*
127:*21* 128:*3, 16*
174:*19*
**Grassley's** 5:*23*
45:*11, 16* 123:*9*
128:*7* 169:*17*
**graveyard** 159:*14,*
*15*
**great** 17:*19* 30:*22*
43:*18* 45:*22* 83:*9*
88:*6, 17* 91:*20*
113:*22* 153:*16*
162:*1, 4, 5* 163:*2*
169:*1* 177:*12, 13,*
*24, 25* 178:*8*
**greater** 41:*22*
**green-light** 68:*21*
**Greg** 4:*21*
**ground** 64:*11*
**grounds** 32:*10*
**Group** 15:*17* 19:*2,*
*18* 25:*10* 164:*9, 10*
**guess** 41:*1* 50:*22*
57:*16* 79:*3* 93:*1*
100:*20* 145:*24*
146:*3* 158:*17*
174:*16*
**guidance** 68:*8*
**guidelines** 3:*18*
**guy** 91:*20, 21*
111:*8, 18* 112:*9*
114:*13, 16* 145:*14,*
*22* 160:*12* 169:*6*
**guys** 28:*6* 29:*5, 12*
31:*20* 33:*12* 39:*12*
41:*25* 42:*16* 55:*11*
69:*5, 21* 77:*17, 18*
86:*15* 109:*3* 120:*2*
126:*10, 24* 129:*2*
148:*11* 156:*23*
173:*16*
**guy's** 111:*16*

**< H >**
**half** 151:*7* 155:*9*
171:*16*
**hallway** 25:*1*
**halt** 74:*1*
**hand** 19:*4, 6, 9, 14*
23:*6* 26:*2* 28:*11,*
*13, 15, 22* 29:*16, 18*
30:*6* 49:*14* 85:*13,*
*14* 123:*13* 128:*23*
**handed** 151:*19*

**handful** 75:*17*
85:*22*
**handle** 38:*3* 64:*22*
93:*3* 94:*21*
**handled** 9:*10*
60:*21* 64:*20*
124:*14, 18* 131:*16*
**handpicked** 154:*13*
**hands** 16:*18* 81:*1*
**handwriting** 44:*7*
90:*3* 92:*14*
**handwritten** 46:*19,*
*23* 89:*25* 90:*12*
137:*8*
**happen** 25:*3* 53:*5*
80:*2* 87:*18* 135:*15*
142:*17* 143:*9, 16*
159:*18*
**happened** 18:*8*
36:*13* 71:*5* 73:*2*
87:*16, 17*
**happening** 146:*16*
147:*21*
**happens** 158:*8*
159:*8*
**happy** 49:*24*
120:*16* 170:*24*
**hard** 122:*16, 20*
155:*25* 168:*2* 172:*9*
**hardware** 18:*21*
**harmed** 32:*6* 33:*14*
119:*14* 153:*10*
**head** 83:*24* 84:*17*
88:*24, 25* 122:*17*
136:*14, 18* 140:*15*
157:*16* 170:*18*
**headed** 149:*18*
**headlines** 16:*21*
**headquartered** 10:*3*
**heads** 17:*21* 18:*5*
145:*24*
**heads-up** 175:*5*
**hear** 25:*11* 42:*1*
43:*13, 16, 17* 45:*20*
49:*6* 92:*7* 97:*19*
142:*15* 151:*1*
162:*4* 173:*8* 177:*6*
**heard** 16:*14* 19:*19*
20:*16* 21:*5* 39:*18*
40:*4, 6* 42:*9, 11*
44:*25* 48:*25* 53:*1*
88:*13, 23* 91:*1, 4*
109:*9* 114:*16*
160:*20* 168:*24*
169:*1*
**hearing** 22:*8* 42:*2*
103:*8, 9* 124:*3, 15*
139:*2* 174:*18*
**hearings** 40:*22*
**heated** 103:*5, 11, 16*

141:*11, 24* 142:*13*
**He'd** 94:*15*
**held** 172:*12*
**he'll** 139:*19* 162:*13*
169:*2* 177:*25*
**help** 18:*22* 147:*5,*
*11*
**helped** 6:*7*
**helpful** 37:*12, 16*
67:*15* 165:*14, 23*
**Herschmann** 48:*3*
**hey** 17:*20* 37:*9*
72:*5* 80:*9* 126:*10*
166:*21*
**hidden** 44:*23*
**highlight** 174:*11, 15*
**highly** 25:*8*
**Hill** 87:*8*
**historic** 85:*10*
**historically** 11:*18*
**History** 158:*4*
**hit** 168:*5*
**hoc** 77:*21*
**HofR** 92:*19*
**hold** 105:*20* 106:*1,*
*4* 143:*9*
**holding** 160:*16*
**home** 130:*10*
137:*15*
**Homeland** 17:*4*
**hope** 57:*2* 148:*2*
**hour** 3:*20, 25*
38:*15* 44:*5* 45:*9*
58:*17* 70:*11* 81:*8*
83:*1, 8, 16* 94:*4*
123:*12* 170:*22*
**hours** 48:*25* 71:*17*
94:*5* 151:*7, 8*
152:*18* 154:*22*
161:*14* 164:*7*
171:*15, 16*
**House** 11:*17* 12:*1,*
*6, 10* 14:*15* 24:*7*
26:*10, 18, 24, 25*
27:*9, 12, 14, 16*
29:*20* 47:*22, 23*
48:*3* 92:*19* 100:*20*
104:*7* 106:*8, 15, 21*
108:*16* 114:*4*
117:*2, 23* 118:*1*
121:*24* 126:*25*
127:*3, 4* 132:*8*
133:*10* 134:*4, 8, 10,*
*20, 23* 135:*10*
136:*1* 141:*18*
144:*7* 146:*3, 14, 17,*
*22* 147:*11* 148:*19,*
*22* 149:*2, 6, 16, 17*
151:*11* 158:*21*
159:*5* 163:*10*
169:*20* 170:*2, 6, 20*

175:*9* 176:*10, 23*
177:*4, 9* 178:*13*
**Hovakimian** 56:*21,*
*22* 57:*8, 11* 143:*3*
147:*6* 150:*20*
163:*21*
**Huckster** 44:*22*
**huge** 16:*18* 21:*17*
22:*10* 28:*21*
**human** 28:*3*
**hundred** 52:*15*
79:*6*
**hundreds** 154:*22*
**hung** 52:*11* 163:*4*
**Hunt** 97:*5*
**hurdles** 116:*20*
**Hurricane** 174:*22*
175:*10, 12, 18*

**< I >**
**IC** 100:*10* 138:*18*
**iced** 172:*17*
**idea** 13:*25* 31:*2*
46:*22, 25* 119:*5*
121:*5* 122:*9*
152:*19* 154:*19*
160:*10, 21, 23*
172:*3* 179:*10*
**identified** 116:*19*
**identify** 78:*11*
**IG** 92:*21*
**illegal** 49:*22* 50:*9,*
*12, 19* 63:*14* 64:*15*
88:*4*
**imagine** 11:*13* 86:*4*
101:*20* 106:*16*
112:*13* 131:*12, 19*
141:*9*
**immediate** 67:*14*
76:*7*
**immediately** 38:*10*
92:*10* 104:*6*
137:*19* 146:*7*
148:*14* 154:*3*
173:*25*
**impact** 127:*13, 14*
**impacted** 10:*13*
41:*3* 95:*6* 160:*18*
**impetus** 167:*3*
**implicate** 136:*6*
**implicated** 14:*15*
136:*8, 11*
**implications** 21:*13,*
*22* 28:*19* 30:*3*
33:*18*
**implied** 69:*7*
**imply** 59:*22* 75:*10*
**important** 12:*16, 17*
20:*11* 65:*15* 97:*10,*
*12* 155:*10, 22*

**importantly** 8:*8*
**imposed** 11:*22*
**impossible** 61:*2, 9*
**impression** 29:*1*
111:*19, 25* 126:*13*
178:*24*
**improbable** 121:*16*
**improper** 67:*1*
**inaction** 43:*1*
**inadvertent** 22:*19*
**inappropriate**
98:*13* 103:*13*
**inauguration** 173:*17*
**incident** 73:*14*
172:*20*
**incidentally** 14:*3*
**included** 86:*16*
127:*24, 25* 128:*9*
**including** 3:*16*
23:*14* 73:*8* 85:*15*
99:*16* 136:*19*
141:*21*
**incomplete** 63:*1*
**incorporate** 174:*16*
**increasing** 118:*19*
**increasingly** 120:*21*
**indicate** 46:*10*
60:*15* 88:*11* 104:*2,*
*21* 130:*16*
**indicated** 15:*25*
20:*7* 74:*25* 86:*25*
132:*4* 163:*7*
166:*11* 168:*9*
**indicates** 129:*23*
**indicating** 12:*15*
74:*23*
**indication** 167:*2*
**indications** 159:*5*
**individual** 7:*5* 9:*24*
19:*22* 27:*2* 55:*23*
72:*20* 100:*17*
109:*9* 130:*1, 17*
138:*23, 25* 140:*10,*
*13, 14, 17, 21*
**individually** 112:*16*
**individuals** 25:*11*
40:*14* 76:*16* 107:*9*
115:*19* 124:*8*
134:*21*
**infamous** 174:*23*
**influence** 135:*21*
136:*7* 138:*11*
**influencing** 136:*23*
**inform** 23:*12*
147:*11* 163:*23*
164:*20* 166:*15*
**information** 41:*2*
52:*22* 54:*14* 63:*5*
93:*19* 99:*24*
100:*10* 105:*18*
110:*3, 21* 111:*14,*

20 126:20 138:16
148:15 164:2
174:20 175:1
informed 142:19
153:22
informing 55:23
166:18
initial 114:3, 4
Initially 66:7
100:20 135:11
141:3
initiated 117:21
inject 85:12
input 100:11
insanity 120:16
121:3, 17 129:20, 22
insight 12:3
insistent 168:22
Inspector 57:1
install 104:14
installed 159:4
installing 118:9
instance 12:13
22:24 29:22 40:20
82:23 86:2 92:17
95:17 105:10
134:2 170:10
instances 28:4
73:17 85:22 86:2
169:23, 25 170:19
instruct 49:21 50:8
instructing 119:23
instructions 50:11
74:20
insult 131:4, 5
intake 64:19 77:20,
25 131:17
integrity 5:21
65:16, 17, 24 73:6,
10 75:6, 14 76:4, 9
77:1 79:13, 17
80:18, 23 82:2, 15
intelligence 57:2
99:14, 23 103:20
121:14
intended 49:12
173:23
intending 98:25
intent 71:23
interact 81:13
173:2
interaction 172:19
interactions 55:4
61:5 172:16
interest 115:7
177:17
interested 140:16
178:25
interesting 147:10
interests 119:16

interface 53:21
interfaced 77:3
interfacing 80:17
Interference 99:15
Interior 144:14
interject 164:16
internal 105:3
Internet 24:20
86:15 99:17
interpret 41:18
43:24 169:9
interpretation
62:15 108:4 116:2
interpreted 43:22
interrupting 51:19
168:1
intervening 34:10
39:3
INTERVIEW 1:8,
17 2:3, 4 5:3, 12,
19 92:22 128:10,
22 135:5 136:13
141:22
interviewed 71:14,
18
interviewing 23:1
interviews 3:17
71:15 72:23 73:8
167:18
intimated 159:2
introduce 2:18
4:18 45:23 120:17
127:17 129:10
introduction 3:5
investigate 30:10
56:16 59:17 175:7
investigated 124:5
125:8 126:6
investigating 9:20
127:9 167:15
investigation 2:5
4:7 5:10, 21 9:7
80:9 92:24 93:1, 2,
9 122:10 169:10
174:21
investigations 9:8,
13, 16, 23, 25 10:4
12:19 21:3, 4
66:11 68:22 69:17
77:12 84:20 94:10
98:17 140:16
141:22 149:4
166:24
Investigative 3:2, 7,
16 68:21 73:7, 11
74:1 75:9, 14
79:19 85:11 86:3
95:3
investigators 79:6
invited 172:21

invoke 42:23
invoked 31:2
invoking 133:25
involve 2:6 63:21
118:13
involved 9:24 10:4,
7 23:8 28:1 65:19
79:14 92:5 93:9
98:3 103:8 110:24
118:12, 14 121:25
138:2 140:8 145:9
involvement 110:7
involving 31:5
83:17 89:5
iPhone 94:23
irregularities 46:11
67:22
irrespective 4:5
22:5 43:23 115:21
irresponsible 103:13
isolated 73:14
issue 29:21 32:19
53:3 75:24 76:5
78:10 95:21, 22
107:13 108:19
116:12, 16, 24
118:6 126:5, 8
152:5 179:11
issued 21:1 23:1
66:10 128:6
issues 10:5 31:5
34:5 40:17 51:22
68:5, 19 83:3, 15
126:1 138:8 149:3
Italian 110:23
122:7
Italy 110:5, 6
112:24 113:3
121:14
Italygate 109:14, 19,
21 120:23
items 96:19
its 16:7 22:7
59:16 61:21 63:24
108:3 112:15
135:20 151:5

< J >
Jackling 4:23
JAG 128:25
January 6:18 7:20
8:4, 12 46:21 47:8,
18 50:6, 24 51:6
100:18, 23 104:18
106:4 117:5, 8
125:22 127:22
128:2, 5 129:18
130:8 133:20
137:1, 12 144:15
145:6 171:6 173:3,

8, 15, 20 174:24
jeans 149:6
Jeff 10:1 32:14
47:24 48:24 49:11,
17 88:6, 21 91:10,
13, 19, 20, 24 92:3,
11 93:5 97:12, 13,
16 100:7 101:24,
25 102:4, 9, 19, 23
103:1, 5 105:13, 16,
17 117:12 121:24
122:2, 9 124:7
133:23, 25 134:14,
25 137:17 139:12,
16, 21 140:9, 13
142:11 144:23
145:9, 17, 19, 20
146:8, 22 149:1
151:11, 20 152:1, 2,
5, 10, 15 153:3, 11,
14, 20, 25 154:1
155:25 157:18
158:1, 8 159:13
162:21 163:23
165:11, 14, 21
166:5 167:9
171:20 172:2, 12,
16 173:2 176:18
177:19 178:6, 8
179:13
Jeffrey 46:7 47:24
116:24 118:17, 24
143:21
Jim 41:4, 8, 12, 20
43:17
job 21:7 39:22, 23
55:17, 18 59:20, 23,
24 133:4 167:20
169:12 177:25
jobs 118:23
Jody 97:5
Joe 2:22 150:23
John 107:5 112:4,
6, 11 114:12 148:1
Johnson 129:25
130:3, 17
joined 38:14, 16
151:22 171:16
joked 151:17
Jordan 41:4, 8, 12,
20 43:17
Josh 3:2 83:6
132:5 135:7
136:12 170:24
179:15
Josh's 129:1
Judge 8:5, 11
judges 31:24 32:9
judgment 102:25
126:20

JUDICIARY 1:2
2:5, 16 174:17
July 7:21 56:24
jump 14:18 113:4
114:18 116:14, 22
128:21 133:15
153:4 175:15
jumped 159:10
jumping 26:5, 9
jurisdiction 9:12
16:25 107:14, 22
113:5 115:18
jurisdictions 65:1
67:23
jury 23:1
Justice 2:6 3:10,
11, 13 4:4 6:13
10:3, 17 53:21
56:14 57:11 59:16
60:21 62:13 63:23
64:17, 22 65:16
69:1 73:16 77:11,
18 78:1, 19 79:10
119:8 124:6 125:7
131:23 136:15
154:22 172:4

< K >
Kate 4:22
Keefe 74:19
keep 9:25 59:24
69:17 84:22
105:19 106:1, 4
122:21 129:3
139:11 143:8
165:15, 18, 23
keeping 21:11
42:15 130:12
Ken 27:5 28:12
30:21, 23, 24 34:25
35:11 53:7, 8, 14
101:2, 6 113:16
kept 44:24 72:10
114:9 119:12 158:2
kind 19:11 33:14
34:18 35:13 39:7
55:21 75:9 78:25
91:20 120:20
132:16 135:3, 23
145:24 152:18
153:18 157:13
163:19 172:15
kinds 41:2 95:25
Kira 3:12
Klug 4:22
Klukowski 101:2, 6
knew 23:5 24:10
37:17, 21, 25 55:14
77:9 88:12 91:24
94:14, 16 97:3, 16

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

100:23  102:24
103:25
**know**  4:1  14:3
16:20  17:5, 20, 25
18:5  21:9  26:3
28:6, 14, 23  29:6, 8,
12, 18, 25  30:14
34:6  36:22  37:24
38:6, 24  39:17
40:20  41:11, 14, 23
42:6, 13, 19  46:4
47:3  51:21  52:5
53:4, 14  54:12, 20
55:9, 17, 19  57:24
63:23  64:2  67:6
73:19  74:14  76:8
77:23  78:1, 20
79:9, 12  83:23
92:17  93:2  96:20
97:1, 19  98:6, 22
101:6  102:3  103:1,
20  105:20, 22, 24
108:6  109:2, 3, 15
111:7, 18  112:8
114:14, 15, 16
117:2  118:4
119:24  120:1, 18
121:4  122:15
124:12  125:20
126:14  130:2, 4, 6,
21  132:24  133:2,
10  134:2, 9  136:12
137:23  138:24
142:2, 10, 11  143:7,
11, 15  147:7, 8, 9,
10, 17  148:12
149:2  150:15
152:24  153:4, 8
156:9  157:14
160:3, 22  161:22
163:14, 16  165:14,
21  166:2  172:7
173:2, 4, 14, 22
174:21  175:12
179:3, 10
**knowingly**  5:9
**knowledge**  22:16
23:9  38:5, 18
90:23  95:2  110:24
**known**  10:15  97:14
101:25  145:14
**knows**  35:6  53:7
131:23, 25
**Kohl**  113:16
**Kurt**  113:9, 17, 19,
23  114:7

**< L >**
**labeled**  35:22
57:19  69:24  129:10

**lack**  44:2  169:21
**landed**  117:25
**language**  12:15
86:21
**large**  20:23  116:1
**largely**  14:11  49:7
**Largest**  140:11
**Larry**  74:19
**lasted**  151:7
171:15, 16
**late**  51:25  69:20,
21  106:3  176:8
**law**  5:4  7:4  8:3
12:17  64:11  97:15
135:21  136:23
174:14
**laws**  50:2
**lawsuit**  16:5  115:16
**lawsuits**  31:13
**lawyer**  48:3, 15
177:24
**lawyers**  48:17
50:22  79:4
**laying**  109:14
**layman**  32:3
**layout**  24:12
**lead**  65:3, 7
**leader**  119:3
154:16
**leaders**  60:7  163:21
**leadership**  48:23
49:8, 10  60:18
80:22  84:19  88:19
104:19  106:6
118:7, 16  119:1
132:12  138:3, 5
148:4  152:1, 5
154:14  155:19
156:21  159:3, 16
164:11
**leading**  99:18
159:14  167:4
**lead-up**  150:18
**leak**  67:6, 7, 14
**leaked**  66:24  67:6
**learn**  143:20
**learned**  130:16
176:12
**leave**  29:15  39:23
49:23  57:3  62:8
70:17  86:24  87:5,
6  142:7  154:8
159:3
**leaves**  162:11
177:23
**leaving**  8:14  17:7
34:7  148:8  162:22
177:7  178:3
**led**  134:15
**left**  8:22  32:15
34:8  36:17  66:25

71:19  72:4  76:1
82:25  97:5  120:12
137:19  142:14, 25
143:18  149:22
151:21  154:12
166:9, 19  178:9
**left-hand**  139:5
**legal**  31:12  32:16
33:3  47:6, 12  48:2,
13  49:23  50:1, 11
95:22  104:25
115:11, 23
**legislative**  46:12
**legislature**  95:20
165:2
**legislatures**  46:12
**legitimate**  43:8, 20
58:18, 20  59:3, 17
60:20  85:4  136:10
**legitimizing**  22:19
**length**  31:8  39:9
171:8
**lengthy**  132:11
**Leonardo**  110:4, 13
112:20, 24
**letter**  16:12  46:8,
19, 20  47:13, 16
48:7, 23  49:4, 10,
12, 13, 16  50:15
61:23  66:23  96:9
98:23  99:3, 8, 10
100:7, 25  101:3, 14
103:21, 23  104:22
106:9  109:13, 15
110:7, 20  118:3, 5
138:24  139:2
140:25  141:3, 6, 14,
19  150:19  152:3, 5,
8, 11  156:1, 5, 6
157:9  158:22
172:2  173:22, 25
176:14  177:12
**level**  26:3  57:11
132:19
**Levi**  13:1  14:5
**L-e-v-i**  13:1
**Lieutenant**  175:1, 3
**light**  46:10, 14
67:12
**likelihood**  142:23
**Likes**  91:10  92:11
**limit**  135:13  136:7
**limitations**  11:18,
22  135:8, 9  136:22
**limited**  35:5  41:14,
15, 21  43:18  74:7
82:23  96:25  98:25
127:4
**limits**  12:6, 9
**line**  8:16  13:10
24:15  36:11  38:5,

7, 13  55:1  86:14
92:10  96:18  105:5
126:1  128:20
157:13
**lines**  13:23  33:16
91:9  109:2  155:2
159:6
**list**  125:23
**Listen**  165:21
**listened**  48:17
**listening**  43:16
**literally**  60:11
**litigation**  8:23  16:5
19:5  23:8  97:7
**litigator**  8:11
**little**  21:25  26:15
31:22  32:25  81:6
83:19  84:16  92:13
96:8  103:5, 11
107:12  120:12
126:24  139:5, 16
142:3  143:14
144:19  152:22
167:15  168:9
**local**  18:22  40:25
**located**  110:9
**location**  123:25
124:4
**Loeb**  3:11
**long**  38:14, 15
83:23  97:13  102:1
123:3  163:25  179:4
**longer**  56:25  76:7
**long-standing**  12:24
**look**  17:4  18:6, 9
22:4, 18  29:2, 10
30:16  31:5  32:16
34:4  53:15  58:3
61:18  62:17  64:14
71:5  93:22  100:12
103:17  108:17
110:15  111:13
112:18  120:5, 6, 13
122:2  125:5
126:11  134:7
143:15  145:13
146:15  149:11
169:23  170:3
**looked**  23:13, 21
64:3  71:9  72:22
94:22  96:1, 5
121:5, 9  133:2
139:16, 17, 18, 19
157:18  158:7
160:1, 2, 11  161:4
167:17  169:12
170:4, 12  172:11
**looking**  25:15
37:21, 22  38:24
55:10  80:9  94:19
96:6  108:11, 23

109:1  112:9
114:12  124:17
170:8
**looks**  71:20  72:3
88:1
**loop**  25:4
**looped**  51:14
**Loretta**  8:20
**lose**  61:2  153:14,
17  155:12
**lot**  16:1, 15  23:13
25:19  37:11  59:5
64:4  72:5  81:4
87:14  91:10, 20
92:11  93:18, 19
97:10  111:25  123:2
**loudly**  153:2
**luck**  149:24
**lunch**  123:3  168:8
172:20, 22  173:5
**lured**  71:1
**Lynch**  8:20

**< M >**
**machine**  45:7  99:16
**machines**  15:21
16:1, 7, 17  18:24
21:15  28:8  70:20
**magistrate**  8:11
**magnified**  45:3
**Main**  10:3  65:16
73:16
**maintain**  11:17
**maintained**  11:18
60:16
**major**  37:23  42:20
135:25
**majority**  2:15, 23,
25  3:20  11:3
14:20  34:21  35:22
36:20  39:15  55:14
57:15, 17, 18, 19, 22
69:23, 24  89:10, 13,
16  96:11  106:9
113:6  114:19
129:10, 16  133:15
137:3
**making**  9:17, 18
34:6  68:16  123:2
152:14  153:3
179:22
**Mall**  149:7
**manifested**  85:21
**manner**  5:1
**manual**  69:1
**mark**  11:4  14:20
29:22  89:13  96:13
106:10  107:5, 11
109:12  111:12
117:17  118:13
120:15, 22  121:4

125:*1*, *6*, *22*   131:*8*
132:*13*   133:*21*
**marked**   11:*6*   14:*23*
34:*23*   35:*24*   37:*2*
46:*2*   70:*5*   89:*15*,
*19*   96:*15*   106:*10*
113:*7*   114:*22*
123:*18*   124:*22*
125:*18*   129:*13*
133:*19*   137:*4*
**marks**   86:*16*
**Martin**   107:*11*
**M-a-r-t-i-n**   107:*11*
**mass**   153:*23*
154:*20*   157:*22*
**Mastriano**   40:*12*,
*22*   41:*12*
**match**   133:*22*
**matched**   63:*6*
**materially**   5:*9*
**materials**   93:*13*
94:*6*
**Mathis**   107:*5*
**Matt**   17:*20*   18:*3*
**matter**   25:*13*   28:*5*,
*18*   29:*17*   30:*4*
33:*9*   53:*20*   64:*21*
71:*6*   72:*11*   73:*17*
74:*15*, *17*, *25*   78:*9*
79:*16*   119:*3*   133:*2*,
*3*, *4*   155:*18*
**mattered**   23:*18*
**matters**   27:*18*
51:*10*   65:*4*, *8*, *22*
75:*1*   88:*14*   97:*7*
107:*3*   170:*6*
**McClain**   2:*24*, *25*
**Meadows**   29:*22*
109:*12*   111:*12*
117:*17*   118:*13*
120:*15*, *22*   121:*5*
125:*1*, *2*, *4*, *22*
126:*9*, *18*   131:*8*
132:*13*   133:*21*
134:*6*
**mean**   20:*14*   21:*17*
29:*24*   32:*19*   79:*14*,
*16*   87:*3*   92:*1*
112:*4*   119:*22*
131:*11*   138:*3*
152:*24*   159:*9*
164:*11*   169:*9*
177:*19*
**meaning**   44:*18*
45:*2*   102:*4*   137:*15*
153:*25*   157:*9*
**means**   32:*5*   86:*17*
177:*12*
**meant**   32:*20*   64:*15*
91:*15*   146:*12*

**measure**   13:*7*   14:*11*
**meddling**   103:*15*
**media**   16:*16*   71:*20*
72:*2*
**meet**   51:*9*   57:*12*
129:*25*   130:*3*
131:*1*, *5*, *13*, *19*
137:*17*, *23*   145:*12*,
*14*   146:*22*
**meeting**   25:*6*   26:*10*,
*14*, *16*, *17*, *19*, *20*, *22*
27:*3*, *7*, *8*, *9*, *21*
29:*4*, *21*   30:*13*, *14*,
*17*, *20*, *25*   31:*3*
33:*19*   38:*22*   47:*8*,
*18*, *19*, *20*   48:*8*, *14*
49:*7*   50:*6*   51:*4*, *7*
52:*20*   89:*8*   101:*15*,
*20*   103:*24*   104:*11*,
*13*, *17*, *24*   106:*7*, *14*,
*24*   108:*15*   109:*10*,
*16*, *18*, *22*   114:*4*, *12*,
*14*   116:*25*   117:*2*, *4*,
*8*, *11*, *13*, *14*, *15*, *20*,
*21*   118:*3*   119:*6*
137:*2*, *13*, *22*   138:*6*,
*9*   139:*22*   142:*7*, *13*
143:*24*   144:*2*, *6*, *12*,
*13*, *19*   145:*18*
147:*2*   150:*6*, *11*, *16*,
*19*, *24*   151:*4*, *5*, *7*
159:*19*   163:*7*, *20*,
*21*, *22*, *25*   164:*4*
166:*11*   171:*6*, *9*
172:*15*   173:*3*, *8*
174:*24*   177:*10*, *11*
179:*5*
**meetings**   26:*10*, *14*
29:*4*   39:*3*   57:*8*
61:*9*   97:*3*   115:*10*
116:*23*   117:*6*
118:*8*   133:*4*   169:*20*
**member**   132:*12*
134:*13*
**members**   174:*14*
**memo**   11:*25*   21:*1*
66:*10*, *18*   67:*10*, *13*,
*14*, *18*, *19*   68:*2*
76:*9*, *12*, *13*, *19*
81:*3*, *24*   86:*4*
**memos**   11:*23*
**mention**   41:*16*
76:*11*   92:*8*
**mentioned**   51:*3*
52:*5*, *8*   53:*20*
54:*24*   66:*5*   76:*16*,
*17*   77:*2*   89:*7*   91:*5*
101:*15*, *24*   108:*20*
126:*23*   156:*7*
159:*24*   170:*14*

173:*19*   175:*11*
176:*5*
**mentioning**   92:*3*
**mentions**   150:*20*
**merit**   95:*20*   114:*6*
**merits**   32:*10*   85:*5*
**meshing**   122:*5*
**messaging**   166:*21*
**met**   51:*11*   100:*5*
145:*16*, *17*
**Mexico**   125:*25*
126:*5*, *8*
**Michael**   24:*6*
**Michigan**   15:*2*, *4*,
*24*   16:*14*   17:*12*, *15*
21:*15*   26:*8*
**mid**   7:*20*
**middle**   123:*23*
**mid-July**   6:*16*
**midst**   20:*20*
**military**   8:*10*
121:*15*   122:*7*
128:*15*
**military-grade**
110:*24*
**Milley**   149:*22*
**million**   62:*23*, *25*
**mind**   37:*13*   44:*4*
84:*22*   139:*11*   158:*2*
**minds**   153:*2*
**minimize**   11:*25*
135:*20*
**minimum**   78:*22*
**minorities**   160:*19*
**minority**   3:*21*
45:*23*   57:*20*   84:*7*
123:*15*   124:*21*
125:*17*   160:*19*
**minute**   2:*19*   20:*3*
92:*2*   107:*16*   113:*5*
120:*20*   150:*9*, *15*
163:*6*
**minutes**   24:*17*, *25*
37:*10*   38:*9*   53:*9*
82:*25*   102:*19*
123:*1*   132:*5*   135:*7*
137:*20*   147:*22*
150:*1*, *4*   157:*7*
171:*17*
**misconduct**   68:*14*
**misdated**   90:*5*
**misidentification**
113:*21*
**missing**   63:*1*
**misspelled**   111:*10*
112:*21*
**misspelling**   110:*1*
**misunderstood**   49:*3*
67:*13*
**Mitchell**   125:*1*

**Mizelle**   27:*2*
**Molly**   24:*6*
**moment**   176:*9*
**moments**   162:*17*
**Monday**   117:*5*
142:*2*, *10*, *15*
143:*20*   161:*12*
164:*13*   166:*21*
**month**   14:*19*
**months**   15:*12*
20:*15*   56:*24*
**Moran**   114:*12*
**morning**   2:*24*   3:*1*,
*4*   4:*20*   51:*23*
102:*3*   161:*11*, *12*
164:*13*   166:*4*, *21*
177:*2*
**motivations**   34:*6*
**move**   46:*15*   63:*9*
81:*7*   82:*25*   84:*12*
86:*10*   103:*17*
123:*15*, *24*   137:*1*
164:*15*
**moved**   72:*17*   77:*21*
138:*20*   173:*16*
**moves**   77:*25*
**moving**   92:*15*
141:*14*
**mud**   149:*6*
**multiple**   70:*25*
**murder**   157:*9*
**murder-suicide**
158:*23*

**< N >**
**nail**   138:*15*
**name**   2:*8*, *10*, *15*
3:*2*   4:*20*   53:*11*
76:*11*   78:*12*   88:*23*
97:*20*   103:*9*
107:*11*   109:*25*
110:*1*, *19*   111:*9*, *10*,
*16*   112:*7*, *12*, *19*, *21*
115:*18*   133:*25*
176:*20*   180:*11*
**named**   19:*22*   27:*2*
48:*3*   66:*1*, *7*
100:*17*   109:*8*
**names**   150:*20*
**nasty**   123:*2*
**National**   99:*14*
112:*6*   148:*2*
**nationwide**   30:*3*
**Natural**   89:*1*
**nature**   38:*17*
152:*20*   158:*22*
**nd**   8:*8*
**necessarily**   20:*6*, *11*
38:*1*   65:*20*   116:*15*
**need**   3:*25*   20:*9*, *17*
21:*7*, *9*, *22*   53:*3*

59:*25*   60:*4*   73:*21*
78:*17*   85:*1*   123:*1*,
*3*   125:*10*   126:*11*
127:*18*   128:*21*
141:*6*   142:*2*
146:*17*   147:*5*, *19*
148:*3*, *7*   158:*24*
175:*15*   177:*12*
**needed**   13:*15*
21:*21*   78:*5*   93:*9*
163:*1*
**needs**   105:*22*
**nerve**   145:*22*
**net**   99:*17*
**networks**   45:*2*, *3*
**never**   19:*19*   57:*7*
91:*1*   103:*23*
115:*10*   132:*18*
141:*19*   160:*13*, *20*
165:*6*   173:*22*
**never-Trumper**
160:*8*, *12*, *25*   161:*2*
164:*23*   165:*5*
168:*19*
**New**   4:*21*   6:*17*
8:*14*   20:*20*   51:*5*
121:*6*   125:*25*
126:*5*, *8*   170:*11*
**news**   16:*1*   26:*7*
150:*2*, *3*   165:*6*
**Nicole**   2:*25*
**night**   52:*5*, *8*, *16*, *19*
53:*9*   61:*10*   69:*20*,
*21*   71:*21*, *24*   72:*3*
90:*10*   101:*23*   102:*2*
**nights**   109:*6*
**nodded**   149:*24*
**nominated**   57:*1*
158:*13*
**nomination**   57:*7*
**nonconcurrence**
73:*10*   74:*1*   79:*20*
**nonconcurrences**
73:*15*, *25*
**nonpublic**   23:*12*
**Northern**   64:*3*, *7*
71:*8*   72:*24*   162:*8*,
*22*, *23*   169:*12*
**nose**   103:*6*
**notation**   36:*7*
40:*10*   42:*25*   43:*5*,
*7*   44:*9*   87:*25*
90:*14*   91:*12*   92:*10*
93:*21*   95:*1*   107:*6*,
*8*, *14*   111:*2*   137:*10*
138:*10*   139:*5*
140:*5*   141:*8*
**notations**   139:*3*
**note**   4:*3*   30:*24*
58:*19*   60:*10*   95:*14*

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

99:8  112:3

**notebook** 109:24
**noted** 4:2  20:5
75:7  140:2  149:5
**notes** 14:2, 3, 6, 8
35:23  36:3, 5  37:1
39:6  40:5, 9  42:10,
13, 23  43:4, 6, 11
44:10  46:23  58:1,
16, 20  61:1  62:15
63:10, 11  86:11
89:7, 18, 25  90:2, 5,
12  91:7, 10, 18
106:10, 12, 13, 14
107:6, 12  108:5, 11
109:7, 25  110:4
113:7, 13, 14
118:21  124:2
137:4, 8  138:9
139:4
**notice** 1:17  179:22
**noticed** 90:12
**notification** 80:6, 8,
13
**notifications** 80:5,
14
**notion** 33:2
**November** 8:15, 21
11:12  14:13  66:10
67:9  76:9, 12, 19
134:19
**NSD** 148:3
**number** 11:7  15:12
20:23  21:6  27:6
32:11  36:21  51:16
62:21  63:5, 6
75:16  89:14, 20
90:15, 21  96:14
106:10  107:1
108:12  114:10
115:2  116:11, 19
117:6  134:2, 18
139:21  141:15, 20
169:18  171:9
**numbered** 35:3
43:6  86:14
**numbers** 36:19
75:12
**numerous** 45:1

**< O >**
**oath** 5:4
**Obama** 174:20, 24
175:4
**object** 76:15, 20
81:18  84:4, 9
**objection** 81:17
82:3
**obligation** 88:3
**observers** 70:17
71:1, 19  72:4

**obvious** 138:1
157:7
**obviously** 9:12
11:25  13:4, 17
15:11  16:16, 19
17:16  22:8  26:3,
21, 24  28:2  29:25
31:6  33:6  38:22
40:19  67:6  76:5
78:24  87:10  88:20
101:23  108:20
125:11  133:2, 7, 9
134:17  144:21
151:21  152:3
164:21  168:11
170:8
**occasions** 20:17
45:1  134:3
**occur** 12:12  68:1
**occurred** 75:20
**ODAG** 57:5
**odds** 98:16
**ODNI** 99:18, 23
100:2  138:8, 13, 14
**offer** 29:21  55:2
121:12  142:4
145:1  166:6  176:23
**offered** 142:1, 9, 20
**offguard** 162:18
**offhand** 170:5
**office** 8:14  9:15, 20
10:6, 11  14:25
16:13  17:7  24:13,
14  26:16, 19, 20, 23
32:15, 16  47:6, 12,
21  48:2, 13  51:12
52:20  54:13  57:6
64:1, 3  65:2, 4, 6,
11, 13  69:2, 4, 9
71:8  73:23  74:5, 8
78:8, 12, 23  80:3, 4,
8  99:13  101:16
102:13  104:5, 10,
12, 25  106:22, 23
112:5  113:24
114:6, 24  116:17
117:11, 14  124:14
125:15  131:16, 17,
24, 25  143:1
144:17, 18, 21
145:16, 18  146:5
147:2, 15  149:12,
17, 19, 21, 23
150:13, 16, 24
151:9  158:20
163:20  164:4, 6, 8
165:11, 16, 24
166:5, 8, 10  167:24
168:18  172:6
173:7  174:24

176:11  177:3
178:9, 13  179:5
**Officer** 65:3  78:11
**officers** 64:11  69:9
110:9
**Offices** 9:11  21:2
43:5  64:24  65:22
78:10  80:5
**official** 6:14  41:2
64:5
**officially** 6:19
129:10
**officials** 10:2  40:17
41:1  67:21  70:15,
16, 18  72:5  105:25
142:22  169:20
175:9
**Oh** 117:12  160:4,
11  161:1
**Okay** 36:18  45:20
49:15  51:6  52:10
53:6  57:15  58:15
60:4, 15  62:6  63:8
69:19  75:19  76:17
82:19, 24  91:15
122:19  123:4, 20
124:20  125:16, 22
126:9  155:24
157:3  158:17
159:1  164:9, 15
166:23  167:2
173:24  174:11
**OLC** 32:21  46:21
47:5  105:8, 11
108:7  116:8  120:6
**old** 54:9, 11
**Olsen** 113:9, 17, 19,
24  114:7, 9  119:25
**Olsens** 107:18
**Once** 38:14  63:4
84:3  154:16  163:7
172:18  173:11, 24
**one-ballot** 19:7
**one-on-one** 145:8
**one-page** 18:12
25:19  35:10
**one-pager** 35:1
114:24  115:1, 14
**ones** 23:14  33:14
**ongoing** 74:15, 25
75:1, 24
**open** 77:11  109:24
171:10, 14
**opening** 72:13  80:9
**operate** 67:8
**operated** 132:19
**operates** 119:2
122:12  135:13
**operating** 68:3
**Operations** 15:17
19:2, 18  136:24

**operator** 101:9
177:4
**opine** 59:9
**opined** 32:21
**opinion** 84:17  85:4
**opinions** 108:7
**opportunity** 3:21
174:2
**oppose** 60:7
**opposed** 33:4
46:20  47:15  48:25
66:18  115:25
121:18  152:17
179:1
**opposition** 82:4
**option** 152:9
**orally** 141:20
**order** 5:20  22:2
173:14
**ordered** 19:4  23:7
**ordinarily** 92:5
168:21
**ordinary** 132:16
**organic** 152:21, 24
**original** 107:14, 22
113:5  115:4, 17
**originate** 80:3
**OSG** 32:21  108:7
115:14  116:5, 8
120:5
**ought** 175:10
**outcome** 10:13, 19,
24  20:18, 24  23:18
33:24  61:21  62:14
68:18  73:2  86:8
93:23  95:12
103:15  116:10
119:4  138:18  164:8
**outreach** 14:14
97:25  98:1  120:21
132:7, 13, 14  136:4
140:8, 24
**outset** 94:8  139:22
147:18
**outside** 5:20  23:4
52:24  76:21  81:20
84:4  149:11, 13, 19
169:20  170:2
**Oval** 26:16, 19, 20,
23  47:21  51:12
52:19  104:5, 10, 12
117:11, 14  145:18
147:2  149:12, 19,
21, 23  150:12, 16,
24  151:9  158:20
163:20  164:4, 7
165:11  166:10
167:24  168:18
172:6  173:7
174:24  179:5

**overall** 30:16  39:8
136:7
**overlap** 31:21
**overlapping** 24:24
**override** 73:16
**overriding** 73:18
**Oversight** 2:16
**overt** 73:7  85:10
86:3
**overtly** 22:25
**overturn** 2:7  56:2,
6
**overturning** 31:14
**overview** 7:24  9:7
151:5
**owns** 140:12

**< P >**
**p.m** 52:20  71:24
89:23  96:18
149:16  168:2, 6
**PA** 40:11, 12  61:18
**pact** 157:10  158:23
**PADAG** 97:2
**page** 11:8  12:14
19:20  35:7  40:9
41:5  43:4, 6  44:9
46:16  57:23  69:14
86:13, 22, 23  87:24
88:1  107:13  112:3
115:6  123:23
131:7  141:8
180:2
**pages** 180:2
**Pak** 64:6  124:18,
19  139:6, 10, 17, 25
140:1  159:20
160:12, 17  162:10,
22  164:17  166:11,
14  167:6  168:18
173:19  174:2
**Pak's** 124:14
139:20  167:2
**pan** 156:13
**pandemic** 20:20
**panic** 106:6
**paper** 18:11  23:3
160:6, 11, 16
**paraphrase** 67:18
**paraphrasing** 85:23
**parenthesis** 40:11
**part** 16:3  22:17
37:22  46:8  58:10,
12  59:24  71:20
73:6  87:6, 20
94:18  104:14
109:20  118:11
121:11  125:23
144:5  157:14
164:20  167:2
**participant** 144:2

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

participants 29:20
108:16 117:16
151:9
participate 106:19
148:24
particular 9:4, 6
12:25 32:13 44:25
86:2 95:3 96:4
99:20 108:25
115:19, 20, 24
116:5 120:22
132:6 133:25
135:19 136:2 164:9
particularly 103:11
136:4 142:19
163:25
parties 115:7
Partly 141:8
partners 25:22
109:14 110:12
party 139:13
Party's 160:18
pass 111:23 125:14
passed 17:11 90:20
112:1
passing 41:8, 17
121:19 170:14
passionately 21:6
Pat 26:25 47:22,
23 57:5 106:16
117:18 143:3, 5
146:11, 12 147:6,
13, 22 148:16
149:18 151:10, 11
157:8 159:7, 10
161:13, 19
patch 36:12 37:6,
13
patched 38:8 39:2
Patrick 56:21, 22
106:16 117:17
Pat's 147:15
payroll 165:23
PC 106:15
PCB 77:5
pending 12:18
Pennsylvania 40:19,
21, 23 42:3, 7
52:12 61:19 62:18
63:3 89:6 93:14,
20, 24 94:7, 12, 20
95:13 107:13, 23
108:10 109:3
133:1 156:15
170:12
people 13:10, 22, 24
20:17, 24 21:8
22:3, 14, 20 31:18,
19 32:6, 8 33:4, 12,
13 39:12 40:1
41:11 42:25 53:25

58:4 67:12 68:17
79:6 80:4 88:3, 6,
16 90:16 105:4, 7
115:13 118:22, 23
119:13, 14, 16, 25
123:2 135:10
140:21 146:21
148:10 152:21
153:2, 4, 9 154:12,
13, 22 162:22
167:14 171:9
perceive 50:12
percent 15:25
16:16 19:14 20:5
21:14 22:8 28:7,
20 52:15
perception 66:25
perform 74:20
performance 12:16
167:7
period 9:2, 4 10:9
13:18, 20 34:10
38:8 82:22 85:1
132:3 161:3
permeate 82:1
permitted 74:7, 8
86:3
Perry 40:10, 21
41:12, 19 43:18
89:6, 23 90:9, 18,
21, 24 91:13 92:8,
11, 16 93:12 97:20
101:24 103:25
Perry's 41:1
person 51:9 78:16
84:23 105:13
personal 97:13
103:3 143:6
personally 22:16
33:5 63:20 97:25
167:6 168:10 170:1
personnel 7:4 12:1
18:18 76:12 78:20
154:21
perspective 12:17
pertained 156:5
pertaining 84:8
93:13
Pesaro 110:5
Peter 2:10
petition 125:1
Philbin 27:1 47:23
106:16 117:17
149:18 151:11
phone 13:5 37:8, 9,
10, 12 51:13, 14, 16
52:3, 17 57:9
82:19 90:15, 21
113:25 133:3
139:21 140:12
147:14 162:16, 18,

19 163:5 169:19
176:9 177:4 178:12
phones 172:7
photo 117:14
phrase 120:16
phrased 29:3 31:17
physical 24:12
physically 104:12
picked 54:9 178:12
piece 160:6, 11, 15
pieces 70:22
Pilger 66:8, 9
68:20 76:18 81:11,
23 82:1, 2 83:19
84:5, 17
P-i-l-g-e-r 66:8
Pilger's 67:5
PIN 65:18 73:6, 22
74:4 75:5, 8, 21
76:24 80:19 81:9
82:20 83:21 85:24
pipeline 79:18, 21
pitfalls 171:11
Pittsburgh 94:11
place 15:19 24:19
102:10 103:8
104:15 105:4
106:8, 21 113:24
114:2 118:10
137:13 138:10
147:2 148:3
160:14 166:14
placed 38:18
places 8:7 12:9
24:20 135:8
placing 72:14
plane 117:25
planned 166:12
174:3
plans 166:18 178:3
played 60:22
playing 7:11
please 2:8, 17 4:1,
18 5:2, 18
plenty 133:13
point 5:23, 25 6:24
8:22 11:2 13:2
14:14 15:12 16:21
17:3 22:11 30:1
33:1, 19 38:13
40:13 42:22 49:9
50:1 63:18 66:13
74:9, 23 76:22
79:13 83:25 91:2
98:22 100:6 104:5
105:24 106:2
107:25 108:7, 20
109:9 116:6, 9
118:18 119:11, 19,
22 122:1, 3 128:11
129:24 132:10

134:3, 14 136:12
139:20 142:18
143:11, 18 145:9
146:5 152:4, 12, 21
153:3, 14, 24
155:10, 21, 25
158:1 159:1, 13
163:13 173:18
178:18
pointing 158:8
163:14
points 18:13 115:2
116:10 140:23
141:21
policies 11:14, 16
12:22, 24 13:6, 11
14:16 134:20
135:2 136:10
policy 11:13 12:6,
9 75:4 76:10 85:8,
9, 17 104:7 126:25
127:2, 3 134:4, 6, 7
135:4, 13, 19 136:6,
20 141:18
political 33:8
84:18, 24 85:2
87:8 135:21 136:7
politicizes 136:24
Polk 4:21 6:7
pool 72:2
poor 67:11
popped 62:2
portfolio 97:8
103:7
portion 109:7
116:3 129:22
135:6, 8, 19 136:6
position 6:14, 16
7:1, 10, 20 21:23,
24 22:1 23:24
38:21 53:25 66:9,
21 67:3 68:20, 24
83:24 85:10 88:19
105:9 142:1, 9, 20
152:6 167:10
177:24
possibility 30:15
118:9
possible 28:19
39:24 80:25 81:5
85:11 119:13
120:10 131:8, 10
possibly 88:19
post 174:9
post-certification
75:23
postelection 10:9
post-election 13:17
potential 4:5 32:25
49:8 73:11 85:12
115:23 138:5

potentially 20:22
59:3 60:5 68:5
76:19
POTUS 24:8 36:8
46:21 91:7
power 68:24
PP 106:15
practical 33:9
practice 68:10
125:13 126:9
pre 75:23
preamble 6:2
precaution 13:15
precautionary 13:7
preceded 144:6
precise 51:20
123:22
precisely 77:4
preclude 127:3
prefer 122:22
preliminary 80:12
preparation 78:9
144:15
preparations 145:6
prepare 6:8
prepared 176:21, 22
prescribes 12:6
present 43:14
presented 29:11
46:11 54:23 66:19
presenting 55:11
preserve 5:21
President 2:6
16:12 26:24 27:24
28:4, 18 29:7, 11
30:9, 21, 23 31:11,
23 32:1, 11 33:1,
11 34:4, 13 35:21
36:11 37:10 38:2,
7, 12, 18 39:9, 15,
22, 25 40:16, 25
41:5, 10, 20 42:10,
19 43:14, 23 45:4
46:9 47:11, 21
48:9, 11, 12, 25
49:15 50:14 51:4,
8, 9, 15, 17 52:4
53:10, 11, 17 54:17
55:3, 9, 23 56:9, 12,
14, 18 57:9, 13
58:6, 23, 25 59:2, 7,
15 60:9, 16, 25
61:5, 18, 24 62:12,
13, 24 63:11 64:10
86:12 87:3, 9, 20
88:11, 16, 18 90:14,
15, 19, 20 91:5
92:3 97:20 101:24
103:9 104:4, 14, 18,
21 105:7 109:5, 6
113:11 115:9, 22

117:*16, 24*  118:*13, 15, 21, 25*  119:*7, 18*  127:*12*  132:*14*  136:*2, 9*  141:*25*  142:*5, 9, 10, 20*  144:*25*  145:*3*  150:*6, 10*  151:*10, 14, 20, 25*  152:*7, 14, 17*  153:*1, 7, 22, 24*  154:*8*  155:*11*  156:*3*  157:*4, 16*  158:*2, 3, 5*  159:*18, 22*  160:*1, 17, 22*  161:*6, 15, 22*  162:*9, 20, 21*  163:*1, 7, 14*  164:*23*  165:*13*  166:*6*  168:*20, 25*  169:*21*  170:*2*  171:*8, 19*  173:*3, 24*  174:*13, 20*  176:*1, 5, 8, 14, 15, 22*  177:*5, 8, 15*  178:*1, 14, 25*  179:*4, 7, 12*

**presidential**  2:*7*  21:*19*  98:*21*  103:*15*  110:*25*

**Presidentially**  158:*13*

**President's**  12:*16*  24:*16*  40:*13*  49:*20*  50:*2, 7, 25*  58:*19*  59:*10, 23*  60:*19*  62:*6*  118:*19*  119:*11*  136:*14, 17*  157:*6*

**press**  66:*24*  78:*10*  125:*2*  128:*2, 6*

**pressed**  129:*8*

**pressure**  34:*3*

**presumably**  19:*22*  141:*13*  144:*8*  151:*8*  155:*4*  176:*18*

**presume**  61:*24*

**pretty**  21:*6*  36:*3*  42:*19*  49:*11*  78:*15*  98:*1*  102:*14*  111:*17*  112:*15*  121:*8*  144:*23*  164:*3*

**previous**  87:*17*  96:*9*  156:*8*

**previously**  33:*22*  84:*24*  166:*11*

**primarily**  9:*11*  26:*6*  64:*24*  65:*12*  94:*9*

**primary**  16:*25*

**Principal**  6:*15, 25*  7:*16, 22*  9:*3*

**principles**  136:*20*

**printed**  24:*25*

**prior**  7:*15, 25*  67:*22*  68:*2, 24*  73:*12*  75:*14*  93:*1*  97:*22*  114:*10*

**prison**  113:*3*

**private**  16:*6*  113:*9*  115:*7*

**privilege**  4:*6*

**privy**  143:*6*

**pro**  46:*9*

**proactive**  85:*1*

**probably**  26:*2*  32:*14*  52:*1*  79:*3*  81:*2*  82:*22*  94:*4*  111:*24*  117:*3*  120:*18*  123:*12*  137:*20*  164:*4*  166:*16*

**problem**  16:*18*  21:*9, 17*  22:*10*  28:*21*  40:*7*  41:*12*  42:*20*  69:*7*

**problems**  41:*3*  42:*21*

**procedural**  116:*20*

**Procedure**  3:*15*  64:*18*  68:*3*

**procedures**  20:*20*  54:*4, 5*  95:*19*

**proceed**  3:*19*  69:*6, 10, 13*  75:*14*  81:*15*

**proceeded**  175:*6*

**PROCEEDINGS**  2:*1*

**process**  22:*17*  25:*4*  37:*25*  64:*19*  77:*17, 20, 22*  78:*1*  79:*19*  80:*18*  87:*8*  150:*18*

**produced**  70:*18, 24*  100:*19*  117:*15*

**professional**  7:*25*  96:*22*  97:*13*  102:*24*  143:*7*

**professionalism**  6:*6*  179:*20*

**progress**  28:*23*

**progressed**  28:*10*

**Prohibition**  115:*6*

**promoted**  8:*17*

**prompted**  106:*24*

**Proof**  98:*24*  99:*8*  100:*25*

**proper**  12:*2*  78:*2*

**properly**  32:*5*  50:*4*  67:*8*  95:*10*

**prophylactic**  14:*11*

**proposal**  102:*14*  103:*12*  107:*20*

**proposed**  73:*8*  103:*2*  104:*22*  113:*11*

**proposing**  98:*12, 14*  99:*3*  102:*25*  103:*14*

**prosecuting**  68:*13*

**prosecution**  5:*11*

**prosecutions**  12:*19*

**prosecutor**  8:*10*  132:*11*

**prosecutorial**  81:*19*

**prospect**  30:*9*  31:*11, 15*  135:*20*  142:*23*

**protect**  119:*15*

**protection**  110:*6*

**protocol**  64:*18*  77:*20*

**provide**  4:*5*  5:*9, 16*  18:*10, 11*  22:*2, 21*  73:*10*  90:*15*

**provided**  18:*12*  19:*1*  23:*3*  48:*6, 8*  50:*21*  62:*24*  74:*20*  82:*6*  100:*21*  110:*2, 3*  111:*14*  113:*20*  138:*16*  139:*20*  174:*20*

**providing**  40:*2*  55:*22*  110:*6*

**proximity**  27:*19*

**prudent**  105:*19*  153:*5*

**public**  22:*18*  23:*9*  33:*22*  34:*14*  65:*16, 17, 24*  66:*21*  69:*12*  73:*6, 10*  75:*6, 13*  76:*3, 9*  77:*1, 5*  79:*13, 17*  80:*1, 7, 18, 23*  81:*23*  82:*1, 15*  112:*22*  113:*1*  115:*25*  127:*23*  159:*4*  170:*7*

**publicly**  10:*17*  59:*1*  67:*12*  78:*12*  127:*22*

**pull**  34:*19*  35:*21*  46:*4*  69:*19, 23*  87:*24*  89:*9*  96:*10*  113:*6*  134:*18*  149:*13*

**pulled**  25:*5*  133:*9*

**pure**  120:*16*  121:*3, 17*  129:*20, 22*

**purportedly**  21:*12*  113:*10*  160:*16*

**purpose**  105:*2*  135:*24*  136:*7*  163:*22*

**purposes**  168:*11*

**pursuant**  1:*17*  12:*25*  13:*12*  16:*6*  17:*16*  19:*5*  69:*1*

**pursue**  67:*21*  95:*23*

**pursuing**  87:*8*

**push**  127:*8*

**pushed**  101:*20*

**put**  35:*10*  43:*21*  67:*11*  75:*16*  76:*24*  78:*12*  88:*6, 17*  91:*17*  118:*24*  146:*6*  147:*20*  148:*11*  152:*2*  153:*11, 14*  154:*1*  163:*24*  165:*8*  169:*2*  177:*5*

**Putting**  31:*1*  88:*19*  146:*9*  168:*22*

**< Q >**

**qualified**  153:*20*

**quarter**  144:*20*

**question**  4:*12*  23:*17, 23*  31:*1*  32:*20*  50:*3*  59:*15, 19*  60:*13*  73:*1*  75:*19*  86:*21*  95:*12*  109:*1*  132:*5*  136:*13*  138:*18*  149:*12*  150:*8*  158:*9*  164:*16*  169:*14*  173:*10*

**questioning**  3:*19*  6:*10*  74:*15*  123:*13*  126:*23*  128:*13, 20*  170:*23*  174:*19*

**questions**  3:*20, 21, 23*  4:*8*  5:*1, 2, 4, 16*  6:*3*  11:*3*  20:*21*  44:*6*  81:*9*  82:*7*  83:*15*  84:*5, 7, 8, 9*  86:*12*  89:*4*  107:*15*  120:*14*  128:*12*  141:*5*  150:*8, 15, 24*  168:*5, 10*  169:*16*  171:*4*  175:*19*  180:*3*

**quick**  44:*6, 7*  45:*10*  83:*8*  114:*18*  129:*2*  178:*22*

**quickly**  21:*20*  34:*17*  61:*20*  66:*24*  86:*10*  94:*24*  147:*19*  155:*24*

**quiet**  144:*21*

**quite**  15:*11*  129:*7*  155:*2*  159:*6*

**quotation**  86:*16*

**quotations**  88:*2*

**quote**  58:*7, 22*  60:*8*  62:*11*  86:*18*  87:*1, 22*  88:*2*  129:*25*  160:*15, 16, 20*  164:*24*  169:*6*

**quotes**  28:*3*  60:*11, 12*  88:*5*  91:*18*

**quoting**  61:*1*

**< R >**

**races**  58:*5, 13*

**rack**  45:*8*

**radar**  111:*8*

**Raffensperger**  150:*2*

**Ragsdale**  3:*6*

**raise**  30:*9*  31:*11, 15*  41:*5*  42:*10*  52:*9*  73:*23*  132:*24*

**raised**  20:*21*  27:*24*  28:*4*  30:*13, 15, 19*  52:*16*  66:*24*  93:*3*  97:*20*  108:*19*  109:*24*  114:*4*  116:*5, 9, 13, 20*  132:*25*

**raises**  42:*14*  136:*2*

**raising**  30:*18*  40:*13, 17*  140:*23*

**ramifications**  155:*14*

**Ramsland**  19:*22, 25*

**ran**  25:*1*  70:*20*  113:*1*

**rang**  52:*3*  177:*4*

**rate**  15:*25*  16:*17*  19:*11, 14, 15*  20:*6*  21:*14*  22:*9*  28:*8, 21*

**rattling**  44:*16*

**reach**  79:*15*  100:*1*  139:*9*

**reached**  45:*9*  97:*23*  104:*24*  113:*10*

**reaching**  141:*21*

**react**  138:*19*  141:*14*

**reaction**  98:*4*  99:*20*  120:*25*  129:*21*  147:*12*  148:*17*  172:*2*

**read**  12:*8*  30:*1*  85:*7*  87:*23*  94:*22*  98:*11*  105:*1, 25*  107:*7*  108:*11*  142:*22*  160:*15*  180:*2*

**reading**  43:*2*  61:*3*  62:*10*  88:*8*  94:*23*  139:*4, 8, 11*

**ready**  148:*18*

**reaffirmed**  10:*20*  130:*19, 21*

**real**  34:*17*  68:*17*  122:*3*

**reality**  115:*18*  157:*21*

**realized**  42:*10*  112:*21*

**really** 13:16 16:16 21:14 28:24 29:24 30:7 59:9 60:23 73:17 75:24 86:10 91:21 100:11 102:23 121:12 135:20 142:16 144:22 145:11 155:12, 19, 24 156:23 177:16
**real-time** 21:3
**reason** 5:15 10:22 13:5, 17 18:19 27:13 30:20 38:12 40:4 66:16 100:15 101:12 135:18 138:17 161:7 172:25
**reasonable** 71:22
**reasons** 116:11 120:7
**recall** 13:4 15:7 16:4 17:23 24:3 25:20 26:10, 17, 23 28:12 29:9 30:12, 18 31:7, 9, 21 37:2 38:20 40:14 49:24 52:6 61:8 66:14 74:13 75:22 77:7 82:17, 21 108:18 111:15 117:10, 12 125:12 126:3 157:8
**recalling** 15:15
**receive** 4:9
**received** 24:4, 16 25:10 52:22 58:25 77:19 79:10 89:22 90:8, 17 93:12 97:25 100:24 108:1, 2 129:24 142:4
**Recess** 83:10
**recitation** 67:19
**recollect** 19:6 30:20 54:1 66:8 74:3 102:9 117:4, 9 118:18 131:6 170:5, 18
**recollection** 17:19 47:19 54:14 58:21 70:13, 14 71:7 73:9 143:25
**recommendations** 48:7, 8, 12 50:21 55:3, 8
**record** 2:9, 18 4:11, 19 36:24 45:10, 13, 15 60:10 67:17 70:13 76:3 83:12 122:22 123:5, 6, 8, 22 127:18, 19

**128:**1, 10 **139:**23 **174:**11 175:10, 22, 24 179:25
**recorded** 180:4
**recorder** 28:3
**records** 54:5 82:6
**recount** 19:4, 7, 9, 14 23:7 26:2 28:15, 22 29:16, 18 30:6
**recruit** 160:18
**redounded** 33:7
**refer** 61:6
**reference** 41:4, 8 46:6, 16 61:12, 13 88:13, 21 104:3, 16, 18 107:5, 20 108:10 119:25 134:14 140:10, 19 174:16
**referenced** 46:18 47:8 58:16
**references** 70:9
**referencing** 67:18
**referrals** 121:7
**referred** 36:15 70:10 126:15 170:19
**referring** 35:17 87:12 88:18 120:15
**refers** 47:1, 5
**reflect** 127:19
**reflected** 62:25 85:6 91:18 106:9 110:4 118:21
**refusal** 131:4
**refused** 131:13 175:4
**refusing** 120:3 131:18
**refute** 112:17
**regard** 13:18 17:7 18:21 22:24 23:11 37:23 44:17 58:20 98:20 100:9 121:21 122:8 126:19 163:11
**regarding** 59:3 97:24 127:22
**regardless** 127:16
**registered** 61:19 62:18
**regular** 97:6 131:22 177:18, 20
**reiterate** 55:17
**reiterated** 33:22 58:23
**rejected** 46:18, 22 47:12 49:16, 17 172:2, 3

**rejecting** 50:15, 16
**rejoinder** 41:18
**relate** 49:24 74:25 124:10, 11
**related** 15:1 34:2 49:20 50:7 52:21 54:11 58:25 67:15 68:5 95:9 114:19 121:3 125:25 127:9 164:21
**relates** 44:15
**relating** 48:7 51:10, 18 56:15 59:6 64:4 66:10 73:11 82:6, 15, 20 105:18 121:21 173:9
**relation** 51:12 52:18 88:14 100:20 110:5 131:3 144:14
**relationship** 75:21 79:16 96:23 97:14, 17 103:3 143:7 172:16
**relatively** 155:7
**relayed** 124:7
**relaying** 40:2 110:20
**release** 78:10 125:2 128:3, 6
**relevant** 46:10 76:7 100:10 140:2
**reliability** 22:13 56:1
**relied** 23:6 116:7
**relieved** 30:5 164:12
**reluctant** 69:10, 13
**remain** 6:18 103:7 174:6
**remained** 7:20 8:14, 24 57:5 66:11
**remaining** 120:20
**remember** 13:3, 8, 16, 21 15:12 24:15 26:19 27:15 29:10 30:24 38:23 40:15 53:2 54:15 71:14 73:14 75:24 77:4, 9 80:11 91:17, 18 104:17, 23 106:25 112:10 117:7, 22 126:4, 7, 8 130:5, 15, 23 131:3, 6 135:16, 17 137:12 157:12
**remind** 7:17 13:22
**reminded** 141:17
**remove** 105:9, 12 152:1

**rendered** 49:20 50:6, 8
**repeated** 75:10 132:13, 14 136:4
**repeatedly** 45:4, 7 70:21 72:19 119:17 152:7 156:11 163:14 169:11
**replace** 152:1 156:25 163:8
**replaced** 142:24
**replacing** 49:5, 17
**report** 15:18, 20, 24 16:8, 14, 19, 20, 24 17:5, 7, 9, 21, 23 18:7, 9, 11, 15 19:1, 2, 13, 17, 23 20:4 23:11 24:18, 21 25:8, 10, 14, 19 26:4, 7 28:6, 16, 19 29:8, 25 38:1 69:5 78:16 146:21
**reported** 22:9 25:13 59:1 69:3 72:25 97:1 156:16
**reporting** 112:22 113:1 138:12 140:16
**reports** 17:12 42:1 59:4, 17 60:20 64:20 77:19 111:25
**represent** 31:19 33:12 119:13
**representation** 171:13
**Representatives** 92:20
**represented** 168:2
**representing** 115:6
**represents** 32:8
**reprimanded** 141:20
**Republican** 87:7 160:18
**request** 23:2 98:4 99:25 100:8 130:7 131:9 134:5 138:7 170:3
**requested** 2:4 15:8 138:16
**required** 5:4
**research** 116:7
**reserve** 128:13, 21 175:14
**resign** 66:20 67:5 146:7 147:10 148:2, 15 154:3, 6, 10, 11, 20, 21 155:4, 5, 19 159:10 166:13 167:4 173:19

**resignation** 16:11 53:18 66:19 67:7 68:25 150:19 161:11, 16 165:8 166:12, 22 173:22, 25 174:3, 4, 5 176:7, 13
**resignations** 153:23 157:22
**resigned** 66:14, 17
**resigning** 26:12 154:22 161:14
**resolve** 71:6
**resolved** 63:7
**resort** 115:17
**Resources** 89:1
**respect** 9:8 26:20 47:18 49:19 50:5 51:21 53:19 54:18 55:1, 4 58:11 64:9, 19 65:24 66:4 73:25 74:14 77:1, 17 78:19 81:14, 22, 24 82:8, 12, 13 86:1 126:25 127:2 171:6 174:21 175:2, 10
**respectively** 79:11
**respond** 35:4 43:8, 20 58:17 99:25
**responded** 61:24 102:8, 11 120:9 122:5 148:13 172:10
**responding** 156:24
**response** 28:25 46:17 62:6 85:20 86:20 98:6 100:4 101:17 102:11 118:24 121:17 132:4, 7 134:16 141:10
**responses** 4:9, 11
**responsibilities** 7:12 89:3
**responsibility** 9:13 16:25 41:15 79:1 136:14
**responsible** 64:25 78:20 94:9 97:9 136:21
**rest** 62:8 86:24 87:5, 6 107:7 151:18 161:20
**restate** 50:3 70:12
**result** 20:25 24:18 57:4 139:25
**results** 31:14 56:3, 7 61:7
**retention** 54:5

retired 6:*19*
retread 172:*1*
retreading 123:*21*
return 83:*3* 135:*1*
   163:*6*
returned 117:*24*
   176:*10* 177:*9*
revealed 19:*7*
review 15:*21, 24*
   16:*4, 7* 20:*5*
   125:*10, 24*
reviewed 71:*16*
   113:*20* 125:*8*
revisiting 175:*18*
Rice 174:*25*
Rich 15:*6* 63:*12,*
   *19* 162:*21* 163:*2*
RICHARD 1:*8* 2:*4,*
   *10* 66:*7* 76:*18*
   81:*11, 23* 83:*19*
rid 118:*22*
riddled 25:*14*
ride 143:*16*
right 7:*2* 11:*19, 20*
   12:*24* 17:*13, 25*
   22:*7, 25* 26:*17*
   28:*2* 30:*2* 33:*8*
   34:*16* 35:*18* 36:*14,*
   *22* 43:*3, 22* 46:*19,*
   *24* 47:*14* 48:*16, 18*
   49:*6, 18* 50:*18*
   51:*23* 58:*2* 60:*10,*
   *14* 61:*11, 15* 62:*1,*
   *11, 16* 68:*7* 78:*23*
   85:*7* 86:*9* 87:*1, 2*
   92:*24* 94:*10* 97:*5*
   106:*18* 107:*24*
   108:*6* 109:*3, 24*
   112:*5* 118:*10*
   120:*2* 123:*22*
   125:*16* 127:*7*
   129:*19* 134:*14*
   135:*17* 136:*10*
   138:*20* 139:*11*
   140:*19* 141:*2*
   144:*1* 147:*19*
   148:*8, 23* 150:*10*
   151:*20* 153:*1*
   155:*10* 156:*15*
   157:*17* 160:*4*
   166:*1* 170:*22*
   172:*13* 174:*10*
rights 119:*15* 148:*7*
ringing 178:*12*
risks 171:*11* 175:*3*
road 166:*4*
role 6:*12* 7:*11*
   8:*24* 9:*5, 8, 17*
   10:*8, 10* 22:*3* 55:*7*
   65:*19* 91:*3* 92:*4*

96:*20* 98:*15, 19*
   136:*18* 168:*23*
roles 69:*2*
roll 6:*18*
rolled 38:*11* 63:*4*
Rome 110:*10*
room 25:*21, 24*
   29:*25* 30:*23* 48:*18,*
   *24* 50:*22* 54:*7*
   100:*5* 102:*17, 20*
   117:*7* 118:*14*
   152:*13, 17, 18*
   153:*3, 7* 168:*9*
   172:*21* 178:*11*
Rosen 10:*1* 11:*12*
   24:*4, 6, 15, 22* 27:*1*
   29:*7* 32:*14* 34:*3*
   35:*17* 36:*10, 15*
   37:*5, 19* 38:*19*
   39:*19* 46:*7* 47:*24*
   48:*6* 49:*5, 17, 20,*
   *21* 50:*6, 8, 16*
   51:*13* 56:*5, 6, 10,*
   *23* 57:*4* 61:*14, 17*
   62:*17* 63:*12, 15, 18*
   74:*5, 20* 79:*23*
   85:*23* 87:*4* 90:*13*
   96:*17* 97:*13, 16*
   100:*6* 101:*20, 25*
   102:*3, 10, 23*
   103:*17* 105:*13, 16,*
   *17* 109:*13* 114:*25*
   117:*18* 118:*10*
   119:*17* 125:*3, 22*
   129:*19, 23* 130:*2,*
   *16, 19, 21* 131:*1, 13*
   133:*20* 134:*1*
   137:*2, 16* 139:*12*
   141:*10, 25* 142:*11,*
   *21, 23* 143:*6, 24*
   145:*19* 146:*23*
   149:*1* 151:*11, 20*
   152:*1, 22* 154:*1*
   163:*8, 15* 165:*11,*
   *14, 21* 167:*6, 9*
   172:*24* 176:*18*
   178:*6* 179:*2, 13*
Rosen's 24:*14, 25*
   99:*12* 101:*16*
   104:*15* 120:*22*
roughly 37:*2*
round 6:*10* 96:*9*
   120:*12* 122:*13*
   129:*6* 170:*22, 25*
rounds 3:*19*
routine 14:*7* 72:*11*
   78:*8* 166:*17, 25*
routinely 69:*7*
RPD 111:*2*
Ruby 44:*21*

Rudy 130:*18, 22*
   131:*7, 19, 22*
rule 115:*20*
Rules 3:*15*
run 53:*21* 54:*19*
   70:*25* 111:*9, 16*
   162:*7, 12, 23*
running 45:*3, 7*
   70:*19* 81:*6* 162:*10*
Russell 19:*22*
Russia 174:*21*

< S >
sake 89:*10* 129:*8*
Sally 174:*25*
sanctity 58:*12*
Sara 2:*15* 51:*2*
   57:*19* 58:*16* 83:*5*
   123:*10, 13* 126:*23*
   127:*23* 128:*23*
   150:*25* 164:*15*
   167:*22* 175:*16, 21*
Sarah 167:*25*
SAs 60:*7*
sat 102:*20* 143:*1*
   149:*19* 150:*1*
   151:*19* 172:*23*
satellites 110:*24*
   121:*15* 122:*7*
satisfied 28:*25*
Saturday 137:*15*
   142:*8*
saw 45:*3* 97:*6*
   100:*19* 123:*24*
   124:*3* 149:*21, 23*
   150:*21, 22* 172:*18*
   177:*8*
saying 13:*21* 28:*11,*
   *12* 31:*23* 33:*16*
   36:*7* 39:*17, 21*
   40:*25* 42:*25* 43:*7,*
   *13* 59:*20* 60:*9*
   61:*8* 86:*14, 15*
   91:*13* 104:*23*
   111:*2* 118:*15*
   119:*12* 120:*9*
   122:*1* 130:*14*
   131:*21* 133:*24*
   138:*10* 139:*6*
   140:*5, 14* 155:*11*
   157:*8, 13* 158:*2*
says 15:*5* 40:*11*
   44:*10, 11, 21, 22*
   46:*8, 20* 58:*3* 60:*8,*
   *25* 73:*5* 91:*7*
   92:*11, 18* 107:*10,*
   *17* 108:*11* 113:*16*
   115:*6, 14, 16*
   123:*23* 125:*4, 23*
   133:*23* 140:*11*
   144:*25*

scale 10:*18* 23:*17*
   93:*23*
scan 25:*2*
scandal 92:*19, 20*
scenario 131:*19*
Schedule 165:*19*
scheduled 144:*12,*
   *18*
scheme 79:*24*
   112:*25* 113:*1*
Schneider 17:*20*
school 8:*3*
SCIF 137:*22*
scope 4:*6* 21:*9*
   35:*5* 76:*21, 24*
   81:*19, 20* 82:*4, 6,*
   *10* 84:*4, 6, 11*
   95:*10, 16*
Scott 40:*10, 21*
   41:*1, 12, 19* 43:*17*
   92:*7, 11* 94:*11, 14,*
   *18* 95:*1, 8* 96:*1, 5*
scrambling 94:*14*
se 127:*24*
seat 105:*16, 22*
   151:*15*
seated 151:*9*
second 39:*5* 49:*5*
   81:*8* 83:*1* 128:*5*
   129:*15* 135:*12, 19*
   136:*6*
secretary 17:*9*
   24:*16, 23* 25:*2*
   52:*13* 62:*22* 63:*6*
   95:*18*
section 8:*17, 18*
   65:*16, 17, 24, 25*
   66:*12* 73:*6, 10*
   79:*14, 18* 80:*18, 24*
   82:*16*
Security 15:*17*
   17:*4* 19:*2, 18*
   20:*21* 100:*13*
   112:*6* 126:*1, 5*
   148:*2*
see 4:*9* 15:*5* 17:*17*
   19:*21* 29:*18* 30:*7*
   41:*9* 42:*5, 13*
   46:*20* 49:*15* 50:*19*
   63:*14* 71:*10* 72:*12*
   80:*17* 81:*16* 95:*1*
   100:*14* 103:*19*
   105:*4* 109:*25*
   110:*3* 111:*18*
   117:*14* 122:*13, 16*
   131:*7* 134:*7* 141:*4*
   143:*16* 145:*17*
   173:*16* 174:*8*
seeing 55:*25*
seen 14:*3* 16:*14, 20,*
   *21* 17:*23* 28:*6*

42:*1* 55:*25* 93:*23*
   101:*5* 109:*18*
   150:*19*
SENATE 1:*1* 6:*6*
   7:*8* 58:*5, 13* 124:*3,*
   *15* 139:*2* 154:*15*
   158:*13* 174:*17*
Senate-confirmed
   7:*5*
Senator 3:*3, 7* 5:*23*
   40:*11, 21* 45:*11, 16*
   123:*9* 127:*21*
   128:*3, 16* 169:*16*
   174:*19*
send 14:*1* 17:*14*
   46:*22* 49:*12, 13*
   82:*14* 93:*18, 20*
   94:*1, 13* 99:*3*
   139:*2* 140:*25*
   152:*8* 166:*21*
sending 47:*12, 16*
   50:*15* 93:*15* 97:*22*
   122:*9* 156:*1*
sends 15:*3* 106:*8*
   126:*20*
senior 84:*23* 101:*2*
   163:*21* 164:*11*
sense 20:*10* 22:*1*
   27:*13, 23* 34:*1*
   37:*5, 15, 24* 93:*15*
   98:*22* 99:*2* 101:*8,*
   *19* 103:*24* 131:*11,*
   *12* 157:*3* 178:*23*
   179:*12*
sensitive 23:*19*
sent 11:*11* 13:*12,*
   *24* 14:*1, 13* 15:*8*
   24:*6, 11, 17, 20*
   25:*2* 26:*7* 46:*8*
   49:*11* 69:*21* 89:*21*
   90:*10* 101:*1, 3, 17*
   102:*12, 13* 107:*21*
   109:*13* 110:*6*
   114:*25* 120:*15*
   125:*1* 134:*19*
   154:*14*
sentence 55:*2* 60:*6,*
   *25*
separate 49:*9* 93:*6*
   152:*4*
September 174:*15,*
   *17*
series 35:*16* 42:*20*
   146:*20*
serious 30:*2*
seriously 39:*13*
   171:*20*
serve 146:*8* 153:*20*
   177:*13* 178:*5, 25*
served 6:*15* 8:*7, 8,*

*21* 128:*15*
**service** 128:*17*
**serving** 8:*12* 165:2
**set** 90:*12* 93:*12*
147:*13* 161:*19*
**seven** 8:6
**shaking** 122:*16*
**shapes** 30:8
**shared** 84:25 108:8
**sharing** 108:*3*
111:*19*
**shaved** 149:8
**she'd** 164:*16*
**shook** 145:*24*
157:*16*
**short** 3:*24* 26:*17*
51:*25* 81:6 96:6
108:9 146:*10*
161:*3* 163:5 171:2
173:*14* 179:22
**short-circuit** 120:*14*
**shorter** 122:*21*
**shortly** 14:*13* 21:*1*
28:*12* 77:15 87:*24*
100:*3* 108:*1*
117:25 144:*24*
149:23 164:*16*
168:*8* 177:*3*
**shot** 146:*16*
**show** 44:*24* 117:*16*
**showed** 19:9 45:6
72:18 146:*24*
172:23
**showing** 19:*14*
102:*11*
**shows** 29:*19* 44:*11*,
*20* 111:8
**shred** 124:*3*
**shredded** 52:*23*
54:2, *10* 124:*11*
**shredding** 54:*4*
123:25
**shrugged** 141:*15*
**shut** 72:6
**sic** 107:5
**side** 38:*4* 69:*4*
79:*5* 80:6, *8* 85:*24*
112:*3* 134:8 139:5
168:*11* 169:*15*
170:23 175:*19*
**sides** 48:25 85:5
152:*15*
**signature** 19:*21*
63:*13*, *24* 122:*4*, 6
133:22
**signatures** 122:*11*
**significant** 23:*14*,
*15* 116:*20* 155:*15*
**signifies** 107:9

**similar** 39:*10*
40:*24* 41:*5*, *24*
77:2 107:*18*
**similarly** 159:*5*
**simply** 66:*20* 89:*1*
102:*12* 155:*18*
**single** 21:*12*
**sir** 29:*14* 39:22
46:*23* 52:9 53:*1*
55:*13*, *17*, *20* 57:*24*
64:8, *21* 69:25
76:8 83:2 145:*11*
153:*16* 154:*3*, *10*
158:*10* 179:*17*
**sit** 26:*17* 31:*10*
54:*1* 74:*4* 75:22
77:*10*, *14* 124:*10*
125:*12* 126:7
130:*5* 149:*11*, *13*
151:*15*, *17* 170:*5*, *18*
**sitting** 9:*15* 25:*23*
43:*15* 113:*3* 162:*21*
**situation** 20:*23*
34:9 105:*1* 106:*1*
138:*2* 142:*14*
147:*15* 154:*21*
155:*23*
**sixth** 25:*21* 137:22
142:*25*
**sketch** 39:7
**slam** 120:*1*
**small** 75:*16*
**smart** 99:*17*
**snap** 61:*21*
**so-called** 109:*14*
**software** 8:*23*
15:22 16:8 18:*21*
21:*16* 25:*16*, *17*, *18*
**Solicitor** 32:*15*
105:*10*, *11* 114:*5*,
*24* 116:*17*
**solo** 101:9
**somebody** 111:*4*
113:*18*
**somewhat** 132:*17*
158:22 179:22
**sorry** 13:6 42:*18*
62:2 104:2, *8*
117:*10* 129:*15*
130:23 154:*5*
158:*24*
**sort** 9:*20* 13:7
18:*13* 22:6 27:25
30:24 37:25 38:*3*
39:*13*, *16* 42:*15*
44:*16* 49:*14* 65:*3*
66:23 70:23 71:25
80:*12* 90:*18* 94:*14*
97:*17* 99:6 100:*21*
101:9 103:*17*
118:24 120:*19*

122:5, *10* 130:*11*
131:*15* 132:*10*, *12*
138:5, 9, *20* 141:*15*,
*20* 143:*3*, *23*
145:23 151:22
152:*11* 153:*3*, 6
157:*1* 158:5 159:*3*
163:*13* 164:*1*, *10*
167:*10* 169:*10*
172:*21*
**sorts** 12:*11* 92:5
115:22 134:*21*
135:*14*
**sounded** 162:*25*
171:8
**sounds** 14:*10*
22:*20* 26:*21* 36:*10*
39:*1* 43:*14* 79:*17*
85:8, *15* 108:2
**source** 24:22
**Southern** 161:*25*
162:*10*
**sovereign** 115:*15*,
*17*, *18*
**speak** 5:*19* 21:5
55:6 60:*23* 75:*1*
122:25 153:2
**Speaker** 46:9
113:*25*
**speaking** 31:*4* 55:*3*
63:*17*, *18* 67:*17*, *20*
77:*24* 127:*3*
**speaks** 98:7, *10*
**special** 24:7 30:*10*,
*15*, 22 31:2 52:22
**specific** 13:*16* 24:5
43:*23* 53:*11* 55:9,
*10* 75:*12* 76:*11*, *15*
82:2, *23* 111:*15*
120:7 125:9 156:*3*,
*19* 157:*12* 167:*3*
170:*18*
**specifically** 5:8
20:5 27:*15* 30:*12*,
*14* 31:2, 7, *10*
38:*20* 41:*23* 42:*23*
52:7 53:*16* 57:*23*
75:22 76:8, *11*
78:*1* 79:*18* 82:*17*
85:7 104:*17*
111:*14* 115:*12*
117:*4*, 9, *10* 118:2,
5, *15* 121:*3*, *17*
125:*12* 130:*23*
134:*15* 137:25
142:6 156:5
**specifics** 13:*3* 54:*1*
130:*15* 131:6
**speculate** 114:*15*
**speculating** 131:*10*

**spelled** 112:7
**spent** 8:6 164:7
**split** 75:*23*
**spoke** 14:6 81:2
82:22 83:*19* 102:2
140:*14* 144:*23*
149:*17*
**spoken** 90:*24*
138:*23*
**spot** 147:*20* 148:*11*
**spouse** 128:*25*
**stability** 148:*4*
**staff** 2:*21* 3:*20*, *21*
5:*23* 6:6 13:2, *25*
26:*24* 27:*3* 45:*12*,
*16* 56:22, *25* 57:5,
6 78:5 100:*18*
106:*15* 107:*1*
108:*19*, 22, *24*
109:*24* 110:*15*
111:*21* 114:*12*
121:*19*, *24* 123:9
134:9, *12*, *20*, *24*
136:*1* 149:*24*
159:5 163:*10*
169:*17*
**staffers** 178:*19*
**Staff's** 106:22
126:*14*
**standard** 28:*13*
68:*3* 131:*15*
**standing** 31:*25*
32:2, 8, 9, *13*, 18, *20*,
22 61:*19* 107:*18*
108:*3* 115:*16*
116:*12* 119:9
120:5, 7 148:9
**standpoint** 79:8
**start** 2:*20* 83:8
89:7 90:2 91:7
129:6
**started** 7:*19* 27:*3*
42:9
**starters** 36:*4*
113:*14*
**starting** 7:*18* 42:*18*
86:*21*
**starts** 99:*11* 136:5
**state** 2:8 16:5, 7
18:22 19:5 23:8
40:*21*, 22 44:*19*
45:5 46:*10* 52:*14*
62:22 63:7 70:8,
*10*, *15* 71:*15* 72:*4*
74:*10* 95:*18*, *20*
**stated** 75:*3* 152:6
**statement** 33:22
34:2, *11* 44:*13*
60:*15* 64:9 99:*11*
118:24 128:7
158:22

**statements** 5:9, *12*
23:9 127:*21*
**STATES** 1:*1* 8:*13*
21:*16* 32:5 44:*16*
65:*4* 87:*16* 98:*19*
99:2, 5 116:*11*
119:8 121:*15*
128:*15* 139:*4*
161:*24*
**stationery** 110:7
**statistical** 61:6
**statistically** 61:2, 9
**status** 168:*4*
**statute** 5:*11* 177:22
**stay** 61:*11* 145:*20*
148:*3* 159:*11*
165:*12*, 22, *23*
174:*3* 178:*1*
**stayed** 166:*19*
**Steal** 91:*3*
**stemmed** 72:9
**stenographer** 4:*10*
36:2
**step** 99:8 137:*11*
152:*18* 155:*24*
157:*20* 162:*11*
**stepped** 33:*21* 66:9,
*20* 161:*13*
**steps** 68:22 75:9
79:*19* 80:*12* 85:*11*
86:*3* 95:*3* 177:*24*
**Steve** 48:*1* 105:7,
*14*, *15*, *16*, *20*, *21*, 22
143:2 151:*12*
154:*4*, *5*, 6, 7, 9
159:*13*
**Steven** 105:*1*
106:*17*
**sticking** 84:6 103:6
**stilted** 153:*1*
**stolen** 31:*18* 39:*11*
153:9
**stood** 61:*10* 158:*19*
**Stop** 91:*3* 122:*16*,
*20*
**stopping** 146:*16*
**stored** 54:8
**story** 110:*14*, 22
121:*13*
**strange** 92:*1*, *2*
122:*1*
**strictly** 122:*20*
**strike** 6:*23* 112:*13*
**strong** 26:*3* 158:22
**strongly** 159:*7*
**struck** 98:*13*
121:*10*
**structured** 152:22
**stuff** 93:*18*, 25
121:25 157:*23*

160:*1*  165:*17*
**stunned**  98:*5, 8*
**subject**  5:*10*  96:*18*
126:*1*  163:*6*
**submissions**  108:*9*
**submit**  173:*21*
**submits**  173:*24*
**submitted**  16:*11*
53:*18*  66:*23*  176:*6*
**submitting**  161:*11*
176:*12*
**subpoenas**  23:*1*
**subsequent**  29:*4*
30:*14, 17, 25*  67:*6,
7*  89:*5*  104:*17*
121:*21*
**subsequently**  18:*8*
**subsidiary**  110:*11,
12*
**substance**  58:*9*
**substantial**  67:*21*
**substantiated**  95:*5*
**substantive**  122:*6*
**succession**  105:*4*
**sufficient**  10:*12, 24*
33:*24*  86:*7*  95:*6*
**suggest**  122:*19*
**suggesting**  41:*21*
**suggestion**  99:*9*
**suggestions**  101:*21*
**suicide**  157:*10*
**suit**  115:*19*
**suitcase**  70:*18*  72:*8*
**sum**  58:*8*
**summarize**  35:*1*
**summary**  18:*13*
25:*19*  35:*13*  50:*25*
60:*9*
**summer**  174:*20*
**summoned**  100:*4*
101:*15*
**Sunday**  117:*5*
143:*23*  144:*13, 22*
**supervise**  136:*15*
**supervised**  9:*16*
**supervising**  136:*22*
**supervision**  12:*3*
**supervisor**  136:*18*
**supervisors**  78:*24*
**supplement**  175:*23*
**support**  18:*22*
25:*25*  31:*12*  40:*7*
60:*7*  112:*17*
**supported**  156:*13*
160:*3*  170:*13, 15*
**supports**  28:*16*
**suppose**  45:*7*
114:*15*  122:*7*
126:*15*  129:*1*
141:*2*  153:*25*

**supposed**  69:*3*
110:*22*  133:*1, 22*
150:*6*
**supposedly**  16:*9*
139:*15*
**Supreme**  32:*25*
107:*22*  113:*11*
115:*17*  119:*5, 6*
**Sure**  4:*20*  8:*2*
9:*17, 18*  12:*1*  13:*9,
10*  15:*16*  16:*23*
20:*17*  29:*5, 12*
31:*6*  33:*18*  34:*18*
35:*6*  44:*14*  50:*4*
52:*11, 25*  53:*5, 6*
59:*7*  67:*2*  68:*16*
92:*14*  98:*1, 12*
104:*10*  109:*18*
110:*15, 22*  111:*17*
128:*24*  131:*10*
135:*2, 3*  139:*23*
143:*2*  151:*2*  164:*3*
168:*15, 24*  172:*25*
173:*1*
**surprise**  131:*18*
160:*7, 8*
**surprised**  88:*20, 22*
92:*7*  97:*19*  103:*2*
177:*1*
**surveillance**  140:*20,
24*
**Susan**  174:*25*
**suspicion**  72:*15*
**Swan**  4:*22*
**swing**  99:*5*  121:*15*
**sworn**  46:*11*
**systems**  16:*17*  19:*8*
30:*11*

**< T >**
**table**  14:*24*  172:*23*
**tabulating**  72:*7*
**tabulation**  67:*22*
70:*20*
**tabulations**  71:*23*
110:*25*
**tainted**  59:*13*
**take**  3:*24, 25*  14:*2*
17:*4*  18:*6*  32:*16*
33:*1*  44:*7*  45:*10*
56:*2, 6*  64:*13*  83:*7*
86:*3*  87:*3*  90:*18*
108:*24*  112:*16*
115:*11, 15*  122:*21,
22, 24*  123:*12*
132:*6, 10*  137:*11*
144:*25*  147:*2*
153:*25*  155:*24*
157:*20*  159:*3*
163:*11*  165:*24*
166:*14*

**taken**  14:*8*  22:*7*
95:*4*  131:*4, 5*  132:*9*
**takes**  106:*8*
**talk**  102:*4*  103:*21*
107:*18*  122:*18, 22*
130:*19, 22*  138:*22*
152:*25*
**talked**  95:*8*  108:*14*
124:*8*  129:*20*
134:*2*  138:*7*  145:*5*
146:*11, 12, 15*
155:*17*  161:*10*
**talking**  26:*5, 6*
28:*18*  31:*3, 8*
35:*13*  37:*11*  39:*16*
44:*24*  79:*6*  99:*6, 7*
100:*6*  115:*8*
120:*18*  121:*2*
129:*19*  135:*12*
140:*21*  143:*1*
150:*2*  160:*10, 21,
23*  173:*1*  175:*8*
**talks**  81:*19*
**tampering**  138:*11*
**tandem**  136:*19*
**tape**  28:*3*  44:*11, 18*
45:*3*
**taxpayer**  60:*2*
**team**  6:*7*  125:*5, 24*
154:*14*  175:*2, 6*
**Technically**  7:*3, 9*
**television**  45:*3*
**tell**  12:*8*  25:*9*
28:*13*  88:*3, 6, 16*
100:*2*  118:*22, 23*
119:*2*  120:*1*  130:*7*
131:*21*  139:*19*
143:*12*  147:*21, 23*
155:*16, 17*  165:*4*
166:*5*  178:*11, 18*
**telling**  93:*8*  103:*5*
108:*22*  119:*15, 21*
148:*8*  152:*19*
**tells**  145:*3*
**temp**  46:*9*
**tenor**  39:*8*
**tens**  63:*14*  64:*14*
**tension**  76:*2, 3*
**tenure**  6:*24*  9:*5*
10:*10*
**term**  7:*6, 10*  57:*7*
169:*21*
**termed**  18:*10*
**terms**  43:*13, 19*
84:*11*  149:*3*
155:*11*  175:*19*
**terrible**  152:*19*
**Terrific**  11:*10*
129:*5*
**testified**  124:*3*

**testimony**  4:*5*  51:*2*
123:*21*  124:*15*
**Texas**  107:*23*
**text**  92:*12*
**thank**  2:*13*  3:*3, 14*
4:*24*  5:*25*  6:*5, 8*
7:*23*  9:*1*  19:*16*
45:*18*  48:*4*  55:*21*
61:*16*  62:*5*  63:*8*
64:*8*  65:*23*  66:*3*
78:*18*  83:*2, 9*  90:*6*
123:*10, 11*  128:*14,
16, 18*  129:*4*
150:*25*  167:*21*
168:*13*  170:*21*
175:*19*  177:*15*
178:*21*  179:*17, 19,
21*
**thankfully**  23:*24*
**Thanks**  32:*24*
53:*15*  83:*6*  125:*6*
129:*1*
**then-Acting**  101:*6*
**then-Attorney**  10:*16*
**then-Chief**  114:*11*
**theories**  44:*17*
**theory**  109:*14, 21*
**thereof**  46:*12*
**Theresa**  14:*24*
17:*8, 9, 11*  24:*10,
17*  35:*8*
**thermostat**  99:*17*
**thing**  9:*20, 21*  14:*7*
17:*12*  18:*5*  30:*7*
33:*14*  38:*1*  39:*14*
55:*21*  78:*25*  92:*24*
94:*20, 22*  146:*14*
159:*11*  168:*25*
**things**  8:*11*  9:*18*
15:*20*  17:*1, 6*
20:*25*  23:*18, 21*
25:*15*  29:*4, 11*
31:*23*  32:*7*  33:*11*
38:*24*  39:*10*  41:*3*
42:*11, 14*  43:*21*
44:*3*  54:*23*  65:*14*
68:*13*  72:*1*  78:*8*
79:*5*  81:*15*  82:*18*
92:*5*  93:*3, 19*
95:*10, 15, 24*  96:*1*
97:*8, 10*  98:*14*
107:*1*  109:*21*
113:*20*  120:*23*
122:*5*  125:*14*
126:*13, 19*  131:*16,
23*  132:*24, 25*
133:*13*  138:*14, 21*
139:*1, 15, 17, 19*
141:*4, 16, 23*
143:*22*  146:*6, 9*
153:*13*  156:*11, 12,

*17*  158:*4*  160:*3*
162:*4*  167:*16*
169:*1*  170:*4, 12, 14,
17*
**thing's**  18:*6*
**think**  10:*20*  12:*5*
13:*24*  16:*3*  17:*3, 8,
9, 18, 23*  18:*12*
20:*13*  22:*6, 11*
23:*11*  24:*14*  25:*5,
8, 19*  26:*1*  27:*17*
29:*6*  30:*5, 21, 25*
32:*14*  33:*9, 20*
34:*7*  35:*7*  36:*19*
40:*11, 22, 23*  44:*11*
49:*25*  51:*2*  52:*14*
54:*12, 22, 25*  59:*7,
18*  64:*10, 15, 16*
67:*19*  69:*5, 23, 24*
70:*10*  71:*22, 24*
72:*11*  74:*15*  75:*17*
76:*21, 23*  81:*19*
82:*4, 5*  83:*16*  84:*3,
10*  85:*6, 20*  87:*12,
14*  91:*4, 19*  92:*3*
93:*7*  95:*16*  97:*4,
12, 14*  98:*24*  99:*23*
100:*14*  101:*12*
102:*2, 13*  103:*19*
104:*4*  107:*4, 10*
108:*22*  109:*2*
110:*20*  111:*11, 16,
23, 24*  114:*2, 12*
116:*4*  117:*24*
120:*18*  121:*9, 23*
123:*1*  126:*12, 14,
22*  128:*20*  129:*4, 9,
11*  131:*3, 11, 21*
133:*5, 16, 24*
134:*12, 14, 18*
135:*4, 11, 25*  136:*8,
9, 11*  137:*7, 25*
140:*10*  142:*3, 11*
143:*3, 15*  144:*4*
145:*17*  146:*2, 17*
147:*6, 7*  148:*7*
149:*16, 22*  150:*3,
22*  154:*18*  155:*12*
159:*7, 10, 24*
160:*25*  162:*12*
164:*12*  166:*2, 3*
167:*9, 10, 13, 14*
169:*14*  170:*21*
171:*17*  172:*18*
173:*4, 5*  175:*18, 23*
176:*4, 23, 25*
177:*13, 16*  179:*7*
**thinking**  86:*17*
176:*15*
**Thinks**  91:*10*
123:*24*

**third** 43:6 44:9
86:13 115:5 152:9
**thought** 13:25
22:17 37:15 38:13
42:18 44:1 71:25
90:6 93:6 101:13
103:12 106:5
132:21 155:22
172:8 179:9, 11
**thousands** 63:14
64:15
**thread** 73:4
**three** 28:15 38:9
51:11 94:12, 13, 15
100:5 102:20
151:8 164:6, 7
171:15
**three-wayed** 37:14
**threshold** 64:21
**thumbnail** 39:7
**time** 3:4, 22, 25
7:25 8:16 9:4
10:9 11:21 12:22
13:15, 20 14:13
19:25 22:8 23:2
27:5, 13, 17, 19
29:1, 21 34:11
35:16 36:11 37:3
38:8 45:18 46:10
50:12 55:1, 14
59:1, 8 64:6, 16
67:16 68:17 74:3,
6, 9, 18 76:1 77:9
79:4 81:6 82:22
83:2, 20 84:23
85:1, 16 86:18
87:13 89:10 91:4
92:15 96:21 97:5,
11 98:11 99:4
101:8 102:1 105:5
106:23 113:2, 22
114:3 120:11, 12
122:13 123:3, 11,
14 125:10 128:13,
14, 19, 21 129:8
130:25 132:3, 22
133:14 138:4
139:13 143:1
145:4 146:10, 25
147:8 149:10
150:21, 22 155:19
161:4 165:16, 24
172:17 173:6
175:2, 14 178:24
179:4, 17
**times** 21:6 32:12
51:10, 11 58:23
61:8 70:25 73:9,
13 75:8, 12, 17
81:3 98:12 114:11
**timing** 147:1

**titled** 98:24 128:3,
7
**titles** 57:12
**today** 2:13 4:17
6:8 45:19 54:1
55:1 76:2 77:10
83:4 123:12
128:14 169:18, 25
179:17
**today's** 5:16
**told** 18:3 24:7
29:9 38:10 42:6
72:18 87:3 92:23
93:21 102:15
103:12, 13 104:5,
11 109:6 111:6
118:1 119:7
121:13 130:4
139:7, 9, 21 141:21
142:2 145:19
146:7 156:12
164:21, 22, 24
165:10 169:11
173:22 178:9, 14
**tomorrow** 161:11,
17 164:13 165:8,
14, 22 177:1
**tone** 42:15
**tonight** 143:16
176:25
**top** 16:23 18:1
20:9, 11 36:7
40:10 46:19, 24
107:6 113:16
138:9 170:18 172:3
**topic** 27:21
**topics** 4:6
**totally** 67:12
**touches** 157:11
**traditional** 21:5
**trail** 99:18
**train** 93:6
**transcribed** 2:3
3:17 86:18
**transcript** 180:3
**transition** 6:16
7:14 107:3 175:2, 6
**transitioned** 174:8
**translating** 60:5
**transmittal** 98:25
99:9
**traveling** 90:9
**trial** 79:4
**tried** 59:19 119:17
151:15 158:1
**trips** 13:9
**truck** 53:12 54:2, 9
124:11 170:11
**truckful** 52:22
**truckload** 170:11

**trucks** 123:24
124:4
**true** 21:21, 22
22:10 28:14 54:21
156:16
**truly** 54:17
**Trump** 47:11
48:11, 12, 15 49:16
56:9, 12, 14 162:21
163:7 171:8, 19
172:2 173:3 175:2,
6
**Trump's** 2:7 127:8
**trust** 20:18, 24 21:8
**trusted** 102:25
**trusts** 107:7, 10
**truthful** 5:1, 16
**truthfully** 5:5
**try** 18:6 39:23
112:16
**trying** 21:24 22:21
38:11 41:11 67:14,
16 68:23 111:23
122:20 136:7
**T-shirt** 149:8
**Tuesday** 166:16
**tumultuous** 13:20
**turn** 3:5 45:12, 15
53:24 57:15, 22
58:15 60:24 62:20
83:5 96:10 106:7
123:8 124:20
150:14, 23 167:22
170:24
**turned** 141:25
150:9 154:4, 5
**Turning** 9:2 18:20
24:2 37:1
**tweet** 145:25
**two** 11:19 15:3, 9
18:18 20:3 22:12
24:2, 3, 16, 25 26:1,
8, 14 27:6 28:15,
24 30:7 33:20
34:7 40:14 44:6
49:3 50:20 80:15
81:13 94:4 96:19
107:9 109:6 117:9
120:20 122:5
124:8 127:25
128:6, 9 135:3
144:3, 5 151:7
163:15 165:16
168:10 171:16
**types** 126:10 134:8
175:11
**typical** 80:13
**typically** 3:24
36:16 43:14 80:2

**U.S** 7:17, 19 8:1, 5,
20, 24 9:11, 17, 22
10:5, 11 15:3, 9, 14
16:23 17:15, 18
21:2 24:3, 23 25:2
26:8 37:19 43:5
54:13 56:18 64:1,
2, 6, 24 65:2, 11, 12,
21 69:2, 9 71:8
72:24 73:21, 22
74:5, 8, 17 78:7, 9,
11, 23, 24 80:3, 7
84:25 89:21 94:6,
8, 11, 12, 15, 19, 20
95:3, 4 107:17
108:3 110:8, 12, 25
124:19 125:14
131:17, 24 139:9
140:8 154:19
159:19 160:9, 24
161:18 162:1, 5
164:17 165:3, 13,
17, 22 166:17, 25
167:7 168:17, 21
174:6
**ultimate** 49:20
50:7, 14 51:1
**ultimately** 8:19
18:11 19:4 40:6
71:13 114:14
143:15 157:4
**unable** 5:16
**unacceptable** 141:9,
13, 16
**unaware** 132:25
**unbelievable** 28:7
**unbelievably** 121:16
**unclear** 26:15
**uncover** 86:5
**undermine** 22:15
**undermines** 28:16
**undermining** 76:19
**underneath** 61:23
**understand** 4:13
5:2, 3, 6, 13 18:19
20:13 21:21, 24
24:10 32:2 34:18
35:5 39:22 60:12
61:20 64:17 65:15
97:12 99:7 101:2,
22 109:20 110:17
119:10 128:15
129:7 137:2
147:24 158:9
161:10 162:3
177:9 179:9
**understanding**
11:22 12:20 13:14
22:12 88:15 91:24
140:7 144:8, 11
155:13, 22

**understood** 27:17
33:6, 18 59:11
78:18 81:3 85:3, 5
87:7 88:18 98:12
99:4 102:18
126:17 135:18
139:23 168:7
**underway** 28:11, 23
29:17 30:6 47:20
97:8
**undue** 135:21
136:7
**unduly** 136:23
**unfolded** 27:24
101:20
**unfolding** 142:18
**Unfortunately** 75:4
**unhappy** 179:13
**unique** 85:2
**unit** 65:17 75:6, 14
76:4, 9 77:1, 2, 4
82:2
**UNITED** 1:1 8:13
21:16 65:4 116:11
119:8 128:15
139:4 161:24
**units** 64:21 74:2
**universe** 134:24
**unreasonable** 59:2,
14, 18
**unrelated** 99:10
**unreliable** 25:14
**unrestricted** 4:5
**unusual** 132:17, 18,
21 134:12 138:1
166:20
**unwarranted** 67:12
**updated** 130:12
**upset** 102:14
**up-to-date** 10:1
**urgency** 46:10
**urgent** 96:19
**USAerospace**
109:13 110:11
**USC** 5:11
**use** 7:6, 9 22:15
58:19 75:9 85:8, 9
**useful** 38:3
**usual** 54:4
**uttered** 55:2

**< V >**
**validity** 54:18
**variety** 8:7 65:9
78:3 116:10
**various** 17:6 20:25
24:20 40:1 42:4,
14 43:14 44:17
93:13 118:5
120:23 144:13
169:20

**< U >**

**vast** 39:15 55:14 97:8
**vehicle** 90:9 92:15
**vehicles** 149:15
**vein** 41:5 44:6 59:14 108:25
**verbal** 4:11
**verification** 63:13, 24 122:5, 6
**versa** 12:11
**version** 25:16, 18 99:3
**versus** 45:8 85:2 107:23
**vets** 77:24
**vetted** 160:24
**vetting** 64:18 78:20
**vice** 12:11
**victim** 33:13
**video** 71:3 72:12, 18, 25 121:4, 5, 9, 10, 18 129:21, 24 130:1, 18 167:18
**videotape** 44:18 45:5 71:17 72:23
**view** 42:20 43:25 45:5 59:10 60:22 68:12 69:18 84:25 85:14 107:10 108:3 114:3, 5 115:23 116:12, 15, 17 119:8 132:17 146:13
**viewed** 33:2 84:1 129:21 134:1
**views** 17:5 18:11 29:21 32:17 98:11 108:8
**violate** 115:20 141:18
**violated** 104:7 127:1
**violation** 50:2
**visit** 149:5
**volume** 58:24
**voluntarily** 2:14 4:3 179:23
**vote** 61:6 67:22 110:7, 25
**voter** 58:24 64:19 77:19 78:20 79:9, 14 122:4, 6, 11
**voters** 61:19 62:18 108:13
**votes** 19:10 42:5, 7, 12 45:8 62:22, 25 63:5, 6 64:15 87:10, 16 95:25 121:15 133:2 156:15

**Voting** 15:21, 22 16:17 21:15, 16 30:11 67:22 95:19

**< W >**
**wait** 29:18 30:7 68:3, 11 81:7 83:1
**walk** 39:5 120:2, 4 149:22, 24 154:15 174:2, 4, 5
**walked** 149:25 150:5, 12 158:19 172:5 173:7
**walking** 149:7
**wall** 121:11 146:6, 9
**Walton** 2:24, 25
**want** 3:3 4:3, 25 29:5, 12 33:16 34:17 39:5 54:19 57:20 59:22 60:10 69:19 81:8 82:25 94:13 102:16 103:18 106:1 113:4 115:5, 10 119:1, 14 122:25 123:22 127:19 128:14 129:22 135:1 137:17, 23 145:9, 11 147:20 148:11, 20, 21 149:2 150:10 151:1 152:25 155:19 157:14 161:4 162:7 173:25 174:15, 16 176:24 177:13 178:17 179:17
**wanted** 17:4 21:20 33:15 34:8 36:11 37:5 41:21 49:11 52:10, 25 54:20 63:20 64:10 67:2 68:1 83:14 87:21 106:4 107:2 112:1 119:20 138:15 150:17 155:13 165:7 168:24 171:21 175:22, 24
**wants** 36:8 145:2, 8 149:2 165:21 166:7
**warehouse** 140:20
**warehouses** 54:8
**WASHINGTON** 1:3 4:23 56:23 80:15 90:10 130:9
**wasn** 95:21
**watch** 72:12
**watching** 150:2

**Watson** 14:24 17:8 24:11 35:8
**way** 3:23 8:12 11:24 24:10, 24 25:3 29:3, 11 36:18 43:13 54:20, 22 55:6 61:22 69:6 72:17 73:19 75:17 80:13 81:22 84:19 86:15 97:23 98:23 112:7 115:15 118:18 120:22 122:11 126:4, 21 131:15 133:6 134:19 136:24 140:24 146:8 148:9 149:25 151:14 159:8, 20 164:13 166:4 172:13
**ways** 65:9, 12 78:3
**Wednesday** 166:16
**week** 12:23 147:16 166:16
**weeks** 10:20 162:24 165:16
**weight** 79:20 171:21
**Weinsheimer** 3:9 74:22 76:14, 20 81:18 82:3, 8 84:3, 10
**welcome** 168:12
**well** 6:7, 22 10:2 18:16 20:16 22:22 25:9 28:11 29:6 30:6 32:4 33:12 39:18 48:13 50:3 51:18 55:21 59:5, 10 66:17 69:5, 22 76:5 78:22 84:6 88:8 93:25 95:11 98:10 100:12 103:1, 17 111:25 115:10 116:19 117:8 124:16 128:6 130:8 134:1 135:13, 20 136:6, 14 137:10 141:25 142:25 145:11, 24 146:2 147:7 148:7 153:13 154:9 155:11 158:15 161:9 165:4 169:6 176:9, 13, 21 177:19
**well-versed** 39:25
**went** 7:21 8:5, 22 12:2 15:14 24:22, 23 26:18 35:12 42:12 49:14 57:7 72:7 77:20 96:25

**97:5, 17 102:13 107:3 109:16 120:11 130:16 137:21 142:25 143:14 146:5 148:16 149:15, 17, 21 150:12 152:18 153:7, 18 155:1 166:8 168:20 171:7, 17 172:6 176:10, 11, 13 177:3 178:9, 10, 13, 16**
**We're** 18:1, 6 29:7, 14 39:17, 22, 23 55:15, 17, 18, 20 59:20 67:18 80:9 84:3 105:21 108:22, 23 119:1 123:21 128:20 129:4 135:3 156:24 157:17, 21, 24 158:6 161:13 164:13 168:1, 5 175:8
**Western** 15:5 94:7, 12
**we've** 14:3 23:13, 21 26:5 31:3 37:10 74:23 93:18, 19 99:6 101:17 107:13 108:14 120:5, 6 139:16, 19 160:1 169:18
**whatsoever** 87:11, 19
**wheeled** 72:10, 16
**White** 11:17 12:1, 6, 10 14:15 18:10 24:6 26:10, 18, 24, 25 27:9, 12, 14, 16 29:20 47:22, 23 48:3 104:7 106:8, 15, 21 108:16 114:4 117:2, 23 118:1 121:24 126:25 127:3, 4 132:8 133:10 134:4, 8, 10, 20, 23 135:10 136:1 141:18 144:7 146:3, 14, 17, 22 147:11 148:18, 21 149:2, 6, 16, 17 151:11 158:21 159:5 163:10 169:20 170:1, 6, 20 175:9 176:10, 23 177:4, 9 178:12
**widely** 21:16

**widen** 142:21
**wide-ranging** 151:24
**widespread** 10:18, 24 33:24 34:15 86:7
**wiggle** 168:9
**wildly** 98:13 103:13
**willing** 93:22 157:19, 20 162:23
**willingness** 2:14 104:14
**withholding** 175:1
**witness** 2:8 49:24 74:24 127:24 141:21 180:11
**witnesses** 4:15 5:8 23:1 71:13, 18 72:24 141:22
**won** 11:24
**wondering** 39:6 75:11 79:22 92:13 96:21 98:8 168:1
**word** 44:21 58:20 64:13 75:10 173:4, 5
**worded** 33:11 159:17
**wording** 33:16
**words** 34:10 41:6, 19 43:23 58:8 85:9 119:20 135:9 136:21 173:10
**work** 8:22 25:12 27:4 32:12 37:18 61:22 65:13, 20 72:5 79:16 127:10 133:11 158:18 164:14
**worked** 54:13 71:9 72:20 76:12 80:16 81:2 96:23 97:2, 15 109:17 124:2 140:21
**workers** 45:6 72:13
**working** 6:22 101:9, 13 108:21 112:4 130:18
**worse** 121:17
**worth** 157:21
**wrapping** 71:25
**Wray** 18:17 25:24
**write** 47:3
**written** 4:11 108:7, 9
**wrong** 25:15 68:1 77:6 98:18 123:24
**wrongdoing** 125:5
**wrote** 41:9 46:25 58:7 61:4 87:22 88:6 92:18 109:25

< X >
XVIII  8:*9*

< Y >
Yates  174:*25*
Yeah  17:*13*  33:*9*
 82:*21*  90:*8*  108:*22*
 113:*23*  116:*9*, *19*,
 *20*  125:*12*  136:*8*
 151:*14*, *15*  160:*11*
 164:*25*  167:*5*, *17*
 173:*16*, *17*
year  6:*20*
years  8:*6*, *14*  51:*5*,
 *17*  83:*25*  97:*15*
Year's  121:*6*
yelled  162:*15*
yesterday  150:*22*
York  4:*22*  6:*17*
 8:*14*  170:*12*
YouTube  121:*9*
 130:*1*, *17*

< Z >
Zdeb  2:*3*, *12*, *15*
 3:*8*, *14*  4:*15*, *25*
 5:*8*, *15*, *18*  6:*1*, *9*,
 *11*  11:6  14:*18*, *23*
 34:*23*  35:*25*  36:*18*,
 *25*  45:*9*, *14*  83:*6*,
 *11*, *13*  84:*6*, *12*, *13*
 89:*13*, *16*, *19*  96:*8*,
 *13*, *16*  106:*7*, *11*
 113:*4*, *8*  114:*18*, *23*
 122:*13*, *19*  123:*4*, *7*
 128:*24*  129:*5*, *14*,
 *17*  133:*15*, *19*
 137:*1*, *6*  150:*23*
 167:*23*  168:*3*, *7*, *15*,
 *16*  170:*21*  175:*17*
 176:2  178:*20*
 179:*15*, *21*
Zoom  1:*18*  2:*17*
 4:*23*  5:*20*