1          UNITED STATES SENATE

2        COMMITTEE ON THE JUDICIARY

3           WASHINGTON, D.C.

4

5

6

7

8        INTERVIEW OF JEFFREY ROSEN

9

10

11

12

13        SATURDAY, AUGUST 7, 2021

14

15

16

17      The interview was convened, pursuant to notice, at 10:00

18   a.m., and was conducted at the Dirksen

19   Senate Office Building, Washington, D.C.

20

21

22

23

24

25

1                  P R O C E E D I N G S

2
                                         10:04 a.m.

3          Ms. Zdeb.  It is 10:04.  We can go on the

4    record.  Welcome, Mr. Rosen.

5          I have a short preamble to go over and then

6    we'll jump into questioning.

7          Mr. Rosen.  Sure.

8          Ms. Zdeb.  This is a transcribed interview of

9    Jeffrey Rosen.  Chair Durbin requested this interview as part

10   of the Senate Judiciary Committee's investigation into efforts

11   to involve the Justice Department in former President Trump's

12   attempts to overturn the 2020 presidential election.

13         Would the witness please state your name for

14   the record.

15         Mr. Rosen.  Yes, my name is Jeffrey Rosen.

16         Ms. Zdeb.  On behalf of the Chair, Mr. Rosen, I

17   thank you for appearing here today.  We appreciate your

18   willingness to appear voluntarily.

19         My name is Sara Zdeb.  I'm the Majority Chief

20   Oversight Counsel for the Judiciary Committee.  And I'll ask

21   everyone else in the room to introduce themselves for the

22   record, except for Mr. Rosen's counsel, who we'll get to in a

23   few minutes.

24         And we'll start with the Senators.

25         Mr. Blumenthal.  Richard Blumenthal, United

1    States Senator from Connecticut.

2              Mr. Whitehouse.   Sheldon Whitehouse, Rhode

3    Island.

4              Ms. Zdeb.   The Federal Rules of Civil Procedure do

5    not apply to the Committee's investigative activities,

6    including transcribed interviews.   That said, we do follow

7    some guidelines that I will go over now.

8              Our questioning will proceed in rounds.   The

9    Majority staff will ask questions for one hour, then Minority

10   staff will have the opportunity to ask questions for an equal

11   amount of time.   We'll go back and forth in this manner until

12   there are no more questions.

13             We typically take a short break at the end of

14   each hour.   And if you need to take a break at any point

15   before that, please just let us know.   And assuming we're

16   still going, we will take a lunch break at some point.

17             As I mentioned earlier, you are here

18   voluntarily.   You have been authorized by the Department of

19   Justice to provide "unrestricted testimony, irrespective of

20   potential privilege" on topics within the scope of the

21   Committee's investigation.   Accordingly, we anticipate that

22   our questions will receive complete responses.

23             As you can see, we have a stenographer taking

24   down everything that we say in order to make a written record,

25   so we ask that you use verbal responses to each question.

1              Do you understand?

2              Mr. Rosen.  Yes.

3              Ms. Zdeb.  We encourage witnesses who appear

4    before the Committee to consult freely with counsel if they

5    choose.  You are appearing here today with counsel.

6              Counsel, would you please introduce

7    yourselves for the record.

8              Mr. Brown.  Reginald Brown, counsel for Jeff

9    Rosen.  And I am accompanied by two colleagues.

10             Mr. Byrnes.  John Byrnes.

11             Mr. Gallagher.  Nicholas Gallagher.

12             Ms. Zdeb.  Thank you.

13             And I just realized that I neglected to give

14   the other counsel for the Committee an opportunity to

15   introduce themselves, as well as department counsel.

16   So we can do that now, and then I'll continue.

17             Ms. McClain Walton.  Good morning, Nicole

18   McClain Walton, Counsel, Oversight for Chair Durbin.

19             Mr. Flynn-Brown.  Good morning, Mr. Rosen. My name

20   is Josh Flynn-Brown.  I am Deputy Chief Investigative counsel

21   for Senator Grassley.

22              The minority was unaware that Democratic members

23   would be attending until this morning, about an hour before

24   today's interview.  I want to let you know, as a courtesy,

25   that in light of this recent development, Republican members

1  might attend during the course of today's interview.  And

2  Senator Tillis just arrived as I was speaking.  So, as a

3  courtesy we wanted to make sure you were aware of additional

4  members and their potential attendance.

5              Mr. Rosen.  Thank you.

6              Ms. Zdeb.  There are two counsels for the

7  Department of Justice.  Would you introduce yourselves as

8  well, please.

9              Mr. Weinsheimer.  Brad Weinsheimer,

10 Department of Justice.

11             Ms. Antell.  Kira Antell, Department of

12 Justice.

13             Ms. Zdeb.  Thank you.

14             Mr. Rosen, we want you to answer our

15 questions in a complete and truthful manner.  If you don't

16 understand one of our questions, please let us know.  You

17 should understand that, although this interview is not under

18 oath, by law, you are required to answer questions from

19 Congress truthfully.

20             Do you understand that?

21             Mr. Rosen.  Yes.

22             Ms. Zdeb.  Specifically, witnesses who

23 knowingly provide materially false statements during the

24 course of a Congressional investigation could be subject to

25 criminal prosecution under 18 USC 1001, and this statute

1    applies to your statement in this interview.

2              Do you understand that?

3              Mr. Rosen.  I will tell the truth, as always.

4              Ms. Zdeb.  Is there any reason why you are

5    unable to provide truthful testimony here today?

6              Mr. Rosen.  Not that I'm aware of.

7              Ms. Zdeb.  Finally, we ask that you not speak

8    about what we discussed in this interview with anyone outside

9    of the room in order to preserve the integrity of our

10   investigation.

11             Is there anything that my colleagues from the

12   Minority would like to add?

13             I will take that as a no.

14             This is the end of my preamble.  Do you have

15   any questions before we start?

16             Mr. Rosen.  I just want to make sure that

17   your colleagues had heard that.

18             Ms. Zdeb.  Did you have anything to add at

19   this point?

20             Mr. Flynn-Brown.  I do not.  Thank you.

21             Ms. Zdeb.  Mr. Rosen, I understand you have

22   a prepared statement.  If you wish to give it, now would be

23   the time.

24             Mr. Brown.  If I might, before he gives his

25   statement, I want to make sure we enter some items into the

1  record.

2          The letter of authorization from the Department of

3  Justice dated July 26, 2021; the prior authorization, which

4  remains in effect, which was May 9, 2021; and the letter of

5  nonobjection from Doug Collins on behalf of former President

6  Trump dated August 2, 2021.  These authorize testimony that

7  Mr. Rosen will give today.

8          Ms. Zdeb.  Thank you.  And those will be

9  entered into the record.

10          Mr. Rosen.  Okay.  Well, thank you.  I thought I'd

11  offer some preliminary observations to help frame the

12  discussion and facilitate some conversation.  So thank you for

13  the opportunity to make some preliminary observations as we

14  begin the voluntarily transcribed interview.  With both the

15  current President and the former President having confirmed

16  that they do not object to my responding to these questions,

17  I'm here today to share with you, and the American public,

18  information about events during the period that I served as

19  the Acting Attorney General.

20          So I want to affirm at the outset that during

21  my tenure at the Department of Justice, my priority was to

22  ensure that the Department would always proceed on the basis

23  of the facts and the legal merits to enforce the Constitution

24  and preserve the rule of law.  We did that.  And I was honored

25  to have led and have served alongside the extraordinary team

1  of public servants who always put the best interests of our

2  country first.

3         During my tenure as the Acting Attorney

4  General, which began on December 24 of last year, the

5  Department of Justice maintained the position, publicly

6  announced by former Attorney General William Barr, that the

7  Department had been presented with no evidence of widespread

8  voter fraud in a scale sufficient to change the outcome of the

9  2020 election.  We thus held firm to the position that the

10 Department would not participate in any campaign's or

11 political parties' legal challenges to the certification of

12 the Electoral College votes, and that there must be an orderly

13 and peaceful transfer under the Constitution.

14         In particular, then, during my tenure, we

15 appointed no special prosecutors.  We sent no letters to

16 states or state legislators disputing the election outcome.

17 We made no public comments saying the election was corrupt and

18 should be overturned.  We initiated no Supreme Court actions,

19 nor filed or joined any other lawsuits, calling into question

20 the legitimacy of the election and our institutions.

21         To the contrary, the only time the Department

22 of Justice filed a brief in court regarding the election, it

23 was to say that a Congressional member's lawsuit to overturn

24 the election should be dismissed.  And it was.

25         Back in April of 2019, when I appeared before

1   the Senate Judiciary Committee at my nomination hearing, I

2   testified, "If the appropriate answer is to say no to

3   somebody, then I will say no."  That's exactly what I did.

4           At the outset, I want to comment on the

5   actions of two people you will likely be interested in;

6   President Trump, and former Acting Assistant Attorney General

7   for the Civil Division, Jeffrey Clark.

8           President Trump's unwillingness to accept the

9   results of the election is public and well known.  I thought

10  that was misguided, and I disagreed with things that President

11  Trump suggested the Justice Department do with regard to the

12  election, so we did not do them.

13  But when I and others told the President he was misinformed or

14  wrong or that we would not take various actions to discredit

15  the election's validity, he acquiesced to the Department's

16  position.

17          The President was persistent with his inquiries.

18  And I would have strongly preferred if he had chosen a

19  different focus in the last month of his presidency. But as to

20  the actual issues put to the Justice Department, DOJ

21  consistently acted with integrity, and the rule of law held

22  fast.

23          It was unfortunate that I ultimately had to

24  seek a meeting with the President on the evening of January

25  3rd, 2021, to persuade the President not to pursue a different

1   path endorsed by Jeffrey Clark, which would have ended my

2   tenure.  But with the support of the entire DOJ's senior

3   leadership team, and the White House counsel as well, the

4   President himself decided not to do that, not to pursue that

5   alternative path.

6          To this day, I find Mr. Clark's actions

7   inexplicable.  I'll do my best to answer your questions today,

8   recognizing my memory is unlikely to be perfect, as the events

9   occurred many months ago during an extraordinary time for our

10  country, and additional access to documents or other things to

11  jog my memory could be useful.

12         But the key thing that I clearly remember,

13  and will underscore today, is that during my time as Acting

14  Attorney General, the Department of Justice maintained its

15  integrity and maintained the rule of law with regard to last

16  year's elections.

17         Having seen no widespread fraud sufficient to

18  change the election result, we resisted entreaties from any

19  source to take public actions or make public statements that

20  would negate the results of the election.

21         So if there any further questions, I'll be

22  happy to address them.

23         Ms. Zdeb.  Thank you, Mr. Rosen, for that

24  opening statement.  We're glad to have the opportunity to

25  speak with you.  And as you can imagine, we do have some

1    questions.  So it is 10:16, and we will start our first round

2    of questioning.

3                BY MS. ZDEB.

4        Q.  You alluded to Jeffrey Clark.  As you can imagine,

5    we have a number of questions about Mr. Clark. We'll get to

6    them shortly.  But before we do that, I wanted to start with a

7    couple of basic questions just to contextualize the discussion

8    we're going to have today.

9                So in terms of your role at the Department,

10   you were confirmed when?

11       A.     May 16 of 2019.

12       Q.  And you became Acting AG, I think you said earlier,

13   officially on December 23rd; is that right?

14       A.     I think technically the 24th, because

15   Attorney General Barr departed on the 23rd, so yes.

16       Q.  You alluded to Attorney General Barr's statements

17   before his resignation to the effect of the Department had not

18   found any evidence of widespread election fraud sufficient to

19   change the outcome of the election.

20       A.  Right.

21       Q.  He -- I believe he made one of those statements on

22   December 1.  And then, although he didn't actually resign

23   until the 23rd, he announced on the 14th that he would be

24   resigning.  When did you first learn that Attorney General

25   Barr would be stepping aside?

1      A.  Well, there's two parts to that.  I was aware that

2  he was considering whether he was going to stay to the end or

3  not.  But in terms of his actual decision, I learned of it the

4  day he resigned.

5      Q.  Did he share with you what prompted his decision to

6  resign or to announce his resignation on the 14th?

7      A.           Well, he wrote a letter that I saw.  I don't

8  think he and I had a discussion about it.

9           Ms. Zdeb.  Just for the record, I wanted to

10  note that Ranking Member Grassley is now present in the

11  interview.

12           Good morning, Senator Grassley.

13           BY MS. ZDEB.

14      Q.  Mr. Rosen, under the Department's line of

15  succession, the DAG, which is the position you held at the

16  time, is next in line to become Acting Attorney General as the

17  Attorney General position; is that right?

18      A.    I believe so.

19      Q.  Did you become aware at any point around the 14th

20  when Attorney General Barr announced that he would be

21  resigning, that President Trump was considering bypassing you

22  and asking Richard Donoghue, your deputy, to step in as the

23  Acting Attorney General?

24      A.  I don't think I had any specific discussions to that

25  effect.  I think -- when I was aware that Attorney General

1   Barr had not decided to stay until the end, I think it was an

2   obvious question as to would the President go with the normal

3   line of succession or something else.  But with regard to my

4   deputy, in particular, I don't think I had any conversation

5   about that.

6        Q.  Did you have an impression as to why the President

7   might not go with the ordinary line of succession?

8        A.  No, but he had departed from it in the past with

9   other departments.

10       Q So there was not some sense that he was unhappy with

11   you?

12       A.  At least not that I -- that he had communicated to

13   me.

14       Q.    Fair enough.

15            I want to show you a document, again, in the

16   vein of contextualizing some of the discussion that we're

17   going to have about Mr. Clark's activities.

18            My colleague, Nicole, is handing you a

19   document that we marked as Exhibit Number 1.  It begins in

20   Bates No. -680, at the bottom of the page.

21                        (Exhibit  1,  email,  was

22                    marked.) BY MS. ZDEB.

23       Q.  So this is an email that Mr. Donoghue, your deputy,

24   sent to the Department's leadership, copying you on November

25   11th, 2020.

1                    Do you recall receiving this document at the

2    time?

3        A.      Yes.  I think we had discussed this.

4        Q.   And the two attachments to this email are the

5    companion policies that the White House and the Department

6    maintained at the time, and still maintain, that govern

7    contacts between the Department and the White House; is that

8    right?

9                    If you need a minute to review.

10       A.   I remember that we had been operating at the time

11   under the contact policy that had been put in place originally

12   by Attorney General Mukasey, and then a revised version by

13   Attorney General Holder, a memorandum.  That was one of the

14   reasons -- is that what's attached?

15       Q.      Yes, that's right.

16                  So the first of these memos is the Holder

17   version of it.  And you're welcome to take as much time to

18   review it as you want, but I mostly just want to get a sense

19   from you of at the time Mr. Donoghue circulated these, what

20   was your understanding of the restrictions that they imposed?

21       A.   Well, the general idea was to channel the sensitive

22   communications -- in other words, there are certain things,

23   legislation is appropriate to have staff to staff discussions,

24   but the more sensitive communications, they should be at a top

25   level.  On the White House side, the President and the White

1   House Counsel, and on the Justice Department side, the

2   Attorney General, Deputy Attorney General, or, in some places,

3   the Associate Attorney General.  And they can deputize others,

4   but they typically should be aware of the communications.

5        Q.   So, in other words, it places sort of ministerial,

6   for lack of a better word, limits on who in each of the

7   Department and the White House can communicate with to the

8   other about pending civil, criminal investigations or cases.

9   Is that consistent with your understanding?

10       A.   That's trying to channel to the leadership at each

11  end of the street, let's say, who can have the communications

12  or have authorized them.

13       Q.   And there's another aspect to the policy that I

14  wanted to draw your attention to.  There's a little "a" at the

15  bottom of the very first page of the Holder memo.

16       A.   Right.

17       Q.   And it says, "In order to ensure the President's

18  ability to perform his constitutional obligation 'to take care

19  that the laws will be faithfully executed,' the Justice

20  Department will advise the White House concerning pending or

21  contemplated criminal or civil investigations or cases when --

22  but only when -- it is important for the performance of the

23  President's duties and appropriate from a law enforcement

24  perspective."

25            So when I read it, I understand the policy

1   not just to impose ministerial limitations on who can talk to

2   whom, but also it reflects limits on when the Department can

3   have these sorts of conversations in the first place.  In

4   other words, only when it is important for the performance of

5   the President's duties.

6                    Is that consistent with how you understood it

7   at the time?

8       A.  Some variation on that.  The President has the

9   overall obligation to faithfully execute the laws.  So you're

10  not going to have a situation where the Attorney General can't

11  take the President's phone calls, because you don't know what

12  the call is about.  So -- but then it's really calling for

13  some judgment and sensitivity to the balance that has to be

14  struck between things where it enables the President to

15  perform his functions and also the Department to have

16  direction from the President versus things where there's no

17  real reason for the discussion to happen.

18                    So it's common, I think, for a fairly sensitive

19  judgment to have to occur regarding those.

20      Q.  I can understand that as well, which is why I

21  imagine it has this language about ensuring the President's

22  ability to perform his constitutional obligations, on the one

23  hand; but then on the other hand, there is also language in

24  the very first -- the very first paragraph of that memo

25  emphasizing that the legal judgments of the Department of

1   Justice must be impartial and insulated from political

2   influence.

3        And so, as I read this document, it seems to be striking

4   a balance between enabling the President to do his job but

5   also the very important purpose of insulating the Department

6   from improper political influence.  Would you agree with

7   that?

8        A.  Well, as it says in the second paragraph of this

9   memorandum, it sets out the guidelines to govern the

10  communications.  So this is the thing.  Not to speak for

11  Attorney General Holder or his state of mind, the direction,

12  there are conventions that are designed to strike these

13  balances that the Department has had. And I think these

14  guidelines or conventions, if you will, are designed to ensure

15  that things are done on the merits.

16       As I said in my preliminary remarks, that I

17  think the Justice Department in the case of investigations has

18  to proceed on the basis of the facts and the law and not

19  extraneous considerations.

20       Q.  While we're on the topic of policies, I did want to

21  briefly ask you about a different policy, which is the

22  Department's policy of -- I forget the exact title, but it is

23  the one that has long been reflected in the Election Crimes

24  Branch's manual on election crimes.  I see you nodding your

25  head.  It has the policy of noninterference in elections.  And

1   it is the one that Attorney General Barr updated in November

2   of 2020.

3        Do you have a general understanding of what

4   I'm referring to?

5        A.   I remember that.  The general policy of

6   noninterference is very long-standing.  And, like a lot of

7   these things, the nuances of the policy can be addressed from

8   time to time.

9        But I remember Attorney General Barr did

10  update them on that.  I want to say after the election; maybe

11  before the election.  I don't remember exactly, as I sit here.

12           Ms. Zdeb.  And for the record,

13  Senator Klobuchar just walked in.

14              BY MS. ZDEB.

15       Q.   So, again, your recollection of these policies is

16  consistent with -- my understanding is, as I understood it,

17  the long-standing policy of the Department, at least before

18  Attorney General Barr's November update, was essentially to

19  avoid taking overt investigative steps in election fraud

20  matters in the period of time between when people started

21  casting ballots and when the vote was certified.

22           Does that ring a bell with your

23  understanding?

24       A.   Say that again.  I think I may have missed a word.

25       Q.   As I understand it, the prior policy before Attorney

1  General Barr's memo was that in the post-election period, so

2  essentially starting when voters began to cast ballots and

3  ending when the vote was certified, during that entire period

4  of time, the Department, at least pursuant to the old policy,

5  would avoid -- would generally avoid taking investigative

6  steps that were overt, in order to avoid interjecting the

7  Department into the process.

8       A.  It would help if I have that document, because I

9  remember there was a process of preliminary reporting.  So

10  some of this gets into terminology; what's an inquiry, what's

11  an investigation, what are the steps and the like.

12              Conceptually, I want to say I think AG Barr's

13  memo was changing the time frame with regard to the

14  certification date versus -- I think it was Election Day.  But

15  I need the document to make sure I have got that right.

16       Q.  Sure.  I'm happy to share a copy of the document

17  with you.  I apologize to other counsel that I don't have

18  extra copies of this.

19              So I've just handed you a document that we

20  can mark as Exhibit Number 2, which is Attorney General

21  Barr's November 9th, 2020, memo.  And you can take a minute

22  to go over it, if that would help.

23                     (Exhibit 2, memo, was marked.)

24              Mr. Rosen.  I'll look it over.  But so as to

25  not be inefficient with your time and mine, this is the --

1    Attorney General Barr's changed policy, announced on November

2    9th.

3              BY MS. ZDEB.

4        Q.    Yes.

5        A.    What I was alluding to is the prior policy. I

6    thought it had more descriptions of different stages of

7    things.  And I'm not really -- to be clear, I'm being

8    technical here.  I'm not sure it's even -- I'm not trying to

9    disagree with you.  I'm just trying to understand, sometimes

10   these policies, they speak for themselves.

11             So in my effort to summarize it, I'm trying

12   to be very accurate.  I'm not sure if that's the use of time

13   you want.

14       Q.    And I appreciate that.  I mostly want to ask you

15   about the document that you have in front of you so we can

16   move on from that one.

17       A.    Okay.

18       Q.    So that memo was issued by the Attorney General in

19   November of 2020, about a week or so following the election.

20   And you said earlier that you were in the Department in 2019.

21             And I'm curious whether, to your knowledge,

22   there was any consideration given by the Attorney General or

23   anyone else within the Department to making the policy changes

24   reflected in that memo at some point before the election.

25       A.    Well, that might be something that Attorney General

1    Barr would know about.  He is the most knowledgeable about it,

2    I suppose.  I think -- sorry, I was just trying to be a little

3    precise here.

4              Are you asking me whether this memo was

5    discussed and prepared before the election, or are you asking

6    me whether there had earlier been changes considered that

7    would move this date to pre-election?

8        Q.  The latter of the two.  So I'm curious about the

9    fact that it was not until a week after the election that the

10   Attorney General changed the policy, when it seems to me there

11   were four years in which to do that.

12             So I'm just asking if you had any awareness

13   of whether consideration was given to doing it previously, as

14   opposed to immediately after the election.

15       A.  I think -- I don't know the answer as to whether it

16   was in consideration of changing this in, say, a year before

17   or something like that.  I think this memo itself didn't just

18   turn up on November 9th, but the Attorney General had been

19   considering it earlier.

20       Q.  At some point, did a policy disagreement develop

21   between the Department's Public Integrity Section, or PIN, and

22   the Department's leadership about this memo and the

23   application of the memo in the post-election period?

24       A.  I'm trying to remember when this was announced.  And

25   I think that this was something AG Barr was overseeing

1    himself.  So I think that, as often happens when there's a new

2    policy like this, there's some friction in the early

3    administration of it.  But I don't know that -- I don't know

4    the details of that.

5        Q.  Did you have a sense that the friction, to use your

6    word, had to do with, perhaps, a desire by Public Integrity to

7    hew a bit more toward their preexisting approach to these

8    things, on one hand, and on the other hand, the Attorney

9    General's desire to be a little bit more forward-leaning in

10   terms of the types of investigative steps the Department would

11   take?

12       A.  I don't remember myself having discussions with the

13   Public Integrity Section leadership or staff. So I don't think

14   I have firsthand communications to share on that.

15                As I say, a new policy like this comes out,

16   there's implementation issues.  So I think the folks on my

17   staff and the AG staff were involved with that, but I don't

18   think I had discussions with Public

19   Integrity Section about that.

20       Q.        Do you recall the career head of the

21   Election Crimes Branch within Public Integrity stepping down

22   from his position, albeit not from the Department, in response

23   to this friction?

24       A.  Mr. Pilger, yes.  I remember him stepping down, but

25   I don't remember if he said that it was specifically this or

1   some follow-up to this.  But I do remember him stepping down.

2       Q.  And were you ever personally asked to step in and

3   essentially mediate disputes between Public Integrity and

4   others within the Department when it came to the application

5   of this policy?

6       A.  Not that I recall, as I sit here today.  As I said,

7   I think my deputy — my staff -- probably might have been,

8   would have been responsible for something like that, but I

9   don't remember the details.

10      Ms. Zdeb.  Okay.  So I want to ask you about

11  a communication you received on the same day that Attorney

12  General Barr announced that he would be resigning.  And we can

13  mark that as Exhibit Number 3 for the record.

14                      (Exhibit 3, document, was

15                      marked.)

16      Ms. McClain Walton.  Just for the record, we

17  are happy to have so many Senators in the room today. We did

18  not make a copy.  So I apologize in advance if I don't have a

19  copy for everyone.

20                      (Discussion off record.)

21      Ms. Zdeb.  So Exhibit Number 3 is a document

22  starting on page that is Bates-numbered -425 at the bottom,

23  and it's a December 14 email from Molly Michael, in the

24  Executive Office of the President, to you.

25  And it has a couple of other attachments.

   www.trustpoint.one
www.aldersonreporting.com     800.FOR.DEPO
(800.367.3376)

1                BY MS. ZDEB.

2        Q.    Do you recall receiving this email?

3        A.    Well, the email shows that I did.  I don't actually

4   specifically remember it showing up, but it is addressed to

5   me.

6        Q.    So we can continue to take this outside the context

7   of this particular email for a minute.  The attachments to the

8   email involved the allegations concerning Antrim County,

9   Michigan.

10              Do you have a general recollection of what

11  those allegations were?

12       A.    Yes.  Well, again -- well, let me sort of clarify

13  because I don't want to be overly precise.

14              Do I remember this popping up in my email,

15  no.  But do I remember the document, yes.

16                   So the 14th was the day that AG Barr resigned

17  and I was asked to become the Acting Attorney General, which I

18  agreed to do.

19                   So the next day -- well, two things.  One is,

20  at some point, probably the next day, I don't remember

21  precisely, I looked at this, you know, in an overview kind of

22  way because I think we had received a briefing from DHS of the

23  voting machines issues previously that was inconsistent with

24  this.  This did not seem accurate.

25                   And the next day, the 15th, Richard Donoghue

1   and I and others were asked to go to a meeting at the White

2   House, at which several things were covered, but one of which

3   was mentioned was this report.  And, you know, I'll be happy

4   to get into it more with your questions, but the gist of it

5   was we had shared with the President -- he had said that he

6   had asserted that other people were telling him there was

7   fraud, you know, corruption in the election.  The voting

8   machines were no good.

9               And we were telling him that is inconsistent,

10  by "we," I mean Richard Donoghue and myself, that that was not

11  what we were seeing.  It was inconsistent with the Justice

12  Department's assessment at that point.  So

13  I think this report came up.  That's why I remember it. It was

14  not because it hit my inbox, as such, but because it was

15  discussed the next day.

16      Q.  So -- and I'm sorry to interrupt, but I wanted to

17  just clarify that.  I take it you -- and you don't recall

18  seeing the email in your inbox and specifically noticing that

19  subject line that said from

20  POTUS; is that right?

21      A.  Not -- yeah, not specifically.  I'm not denying that

22  I got it and noticed it.  I mean, if you get an email that

23  says from POTUS, you probably notice that.  I'm just saying,

24  as I sit here today, did that register, I don't remember it

25  today.  I remember it because of the content just described.

1      Q.   You mentioned having received at some point an

2   updated or a briefing from DHS about the voting machine

3   allegations reflected in this document.

4           And just for the record, the document is a

5   so-called forensic report that has a number of assertions

6   about what happened in this county in Michigan.  One of them,

7   for instance, is that there was something like a 68 percent

8   error rate as a result of the voting machines.

9      A.      Yes.  That was totally wrong.

10      Q.   And so it sounds like you knew at the time that --

11   either that you received this or that you first started

12   focusing on it, which I understand may not have been until the

13   meeting the next day, whenever that time was, you knew that

14   the claims in the document were not accurate?

15      A.   So two aspects of this.  The document appeared to be

16   inconsistent with what we had heard from the folks at CISA,

17   from DHS -- Cybersecurity and Infrastructure Security Agency

18   is the acronym -- who had come over, I think at AG's Barr's

19   request, and briefed us with regards to some information about

20   voting machines.  And what we were seeing, this appeared to be

21   inconsistent with what we had seen.  In some aspects,

22   inconsistent with things that we picked up in our own

23   analyses.

24           But there was -- and I believe that Mr. Cuccinelli

25   had told us -- or maybe it was someone from CISA -- Mr.

Trustpoint.One   Alderson.        www.trustpoint.one
www.aldersonreporting.com        800.FOR.DEPO
(800.367.3376)

1    Cuccinelli just happened to be at this White House meeting.

2    So I was concerned about that inconsistency.

3                     But we had become aware there was going to be

4    a hand recount in this county.  That had not yet occurred but

5    was in the works.  I think we learned in short order -- from

6    memory, I can't say exactly, but I'm guestimating, say two or

7    three days, something like that.  And then in short order, we

8    were advised that a hand recount showed that there was not a

9    differential, or if there was, it was minuscule.  Even less

10   than the allowable rate, refuting this report.

11        Q.  Do you know why Attorney General Barr asked that DHS

12   or CISA come and brief the Department on the voting machine

13   issue?

14        A.  Well, I don't remember if he told me why he set up

15   the meeting.  But I know in a general sense, we were

16   investigating -- "investigating" may not be the correct word

17   -- we were addressing the reports or complaints of different

18   types of election fraud as they came to the U.S. Attorneys or

19   FBI, et cetera.  But we were not really expert in the voting

20   machines.  That was more of DHS.  So I think we had a need to

21   understand some of those machines.

22        Q.  Was it because the claims about the Dominion

23   machines seemed credible to the Department, or was it just

24   more a desire to understand?

25        A.  I think it was -- well, I'll speak for myself.  It

1    ,was the latter.

2         Q.  So let's talk about the meeting that you attended on

3    the 15th.  And you said, "you," meaning the Department, were

4    asked to go to the White House.

5              Did I hear that correctly?

6         A.  Well, in part.  I think that Richard Donoghue and I

7    received a request to come on over to the White House that

8    afternoon.  And then we told AG Barr.

9                   I don't think, the best I recall sitting here

10   today, that I knew exactly what it was going to be about or

11   who else was going to be there.  I think that was -- if I

12   remember correctly, I think that was the day the Electoral

13   College had met.  So I thought it might have something to do

14   with that's all over, or it might have been to get better

15   acquinted -- you know, the President announced the day before

16   we were in charge.

17                   The short answer is I didn't know initially

18   what the meeting was going to be about.  It turned out that it

19   was -- the President wanted to discuss the election.

20        Q.  And you said that you and Mr. Donoghue were

21   specifically requested to attend.  Did it seem strange to you

22   that Attorney General Barr also wasn't asked? Because this was

23   the day after he announced he would be leaving, but he still

24   had a couple weeks left before he actually stepped down.

25                   Did that seem strange to you?

1        A.   Well, I didn't really know the subject, so I didn't.

2    I, you know, we told AG Barr, and he was okay.   I was going to

3    be Acting Attorney General.

4        Q.   When you got to the meeting and realized that the

5    subject related to the 2020 election, at that point did it

6    seem strange to you that Mr. Barr had been excluded?

7        A.   No, because he had said he was leaving and he had

8    publicly said what the Department's posture was with regard to

9    that.   And we were maintaining that.   So it didn't seem that

10   unusual that the President -- when the President in effect has

11   said, "You guys will soon be doing this.   Have the AG send

12   over

13   the guys that currently work for him and soon will be in

14   charge."

15           And as I said, we made it very clear to the

16   President the things that AG Barr had said publicly, which

17   were, in fact, consistent with what we saw as well.

18       Q.      You mentioned that Ken Cuccinelli with the

19   Department of Homeland Security was at the meeting. You were

20   at the meeting.   Mr. Donoghue was there.   Who else

21   participated?

22       A The White House Counsel Pat Cipollone.   And I believe

23   the White House Chief of Staff, Mr. Meadows, was there.

24       Q.      Was Chad Mizelle there?

25       A Not at that one.   I think that's a subsequent meeting.

1      Q.   So it sounds like you didn't know what the purpose

2  of the meeting was as you headed over there.

3  And then at a certain point, it became clear that the

4  President wanted to talk about the election.

5      A.    Right.

6      Q.   Can you just give us a flavor of how the discussion

7  unfolded?

8      A.    Yes.

9           So I think it was -- I don't remember the

10 exact kickoff, so I am just going to give you the general

11 recollection of this, but that the President started

12 delivering remarks that, honestly, to me, seemed pretty

13 consistent with the kinds of things that he was putting in the

14 public domain; the election was unfair, there was fraud, bad

15 things happened in

16 Pennsylvania and Georgia.

17           And for a while, he did most of the talking. But

18 then when he sort of walked through "People are telling me

19 this, people are telling me that," we said, "Well, people are

20 telling you things that are not right.  This is not accurate."

21           And so he said, "Well, what about this?  I saw

22 it on the videotape, somebody delivering a suitcase of

23 ballots."

24           And we said, "It wasn't a suitcase.  It was a

25 bin.  That's what they use when they're counting ballots.

1   It's benign."

2              And, "Well, people told me, you know, this

3   other thing."

4              So, you know, in a fairly high-level way, we were

5   not walking through each piece of evidence, but in a way of

6   saying "They're telling you things that are incorrect."

7              I recall that at one point I said to the

8   President, "I really want to suggest to you, sir,

9   respectfully, that it would be a better thing for everyone to

10  use this last month to focus on some of the things that had

11  been accomplished in the last four years, a -- tax reform and

12  the vaccine, Operation Warp Speed, and not go into this 'the

13  election was corrupt.'"

14             He said, "Oh, people are telling me this is

15  what's happening."

16             So most of the discussion was just back and

17  forth about that.  There was this open issue as to the

18  Michigan report.  And -- I think it was

19  Mr. Cuccinelli, not certain, but had indicated that there was

20  a hand recount.

21             And I think he said, "That's the gold

22  standard."

23             So we just dropped that, and the hand recount

24  was going on.  It was not being done by either DOJ or DHS.  It

25  would be done, and that will be that.

1          So I think that -- we'll call that a loose

2   end.  But, otherwise, it was just an opportunity -- it turned

3   into an opportunity for us to reiterate what AG Barr had

4   said:  There was no evidence of widespread fraud on a

5   substantial scale.

6          And that's where it was left at that time,

7   other than this open item which was resolved a few days later

8   when it was reported the hand recount confirmed the result.

9   So at least, as I sit here right now, that's what I remember

10  about that meeting.

11       Q.  You mentioned in your opening, that at the end of

12  the day, following all of the events that we've talked about

13  and that we'll talk about later, the Department did not -- and

14  then you listed a number of actions that the Department did

15  not take part in.

16       A.  That's right.  No public actions, no public

17  statements that would contradict the factual assessment that

18  we had at that time that there had not been widespread fraud

19  on a scale that would change the election.

20       Q.  I think you also mentioned that you, among the

21  things the Department did not do, was that it did not appoint

22  special counsels.  Was there some discussion during this

23  December 15th meeting of prospect of appointing special

24  counsels?

25       A.  I'm trying to sort out in my mind whether it was at

1  that meeting or -- I think that that may have come up, because

2  it was -- a lot of what was said in this meeting is consistent

3  with what the President was saying publicly; or was in the

4  public domain and reported that the President said it.  And in

5  that time frame, my recollection is that he was publicly, I

6  think, tweeting or doing an interview or something, I don't

7  remember the details.  But I think he had called for a special

8  election counsel.

9          I've been trying to sort it out in my memory

10 if that was at the meeting, whether it was outside the

11 meeting; or both, and I'm not totally certain.  I think it may

12 have come up in the meeting.

13         And I do remember, whether it was at the

14 meeting or elsewhere, that my response on that was "That is

15 not something I want to discuss.  We have to leave that to the

16 Department of Justice to decide," and, of course, we decided

17 not to do it.

18         But that kind of highlights a little bit of

19 the approach that there are some things that my response is

20 just "That's not something that we should talk about.  That's

21 for the Department of Justice.  We'll figure it out."  There

22 were other things like that.  And when you get to it, I'll

23 explain which things could be discussed and which things

24 couldn't be.

25              BY MS. MCCLAIN WALTON.

1      Q.   Mr. Rosen, you said that you weren't sure if

2   President Trump at that meeting or at a subsequent time asked

3   that DOJ appoint a special counsel.

4          Did President Trump ask DOJ to take any other

5   action in response to the allegations that he was sharing with

6   you?

7      A.   Not in the sense of, you know, "You should do X."

8   More in this broad way, "People tell me there's fraud.  You

9   guys are saying there isn't.  Why isn't the Department, you

10  know, doing more to look at this?  All these people are

11  telling me that there's fraud in Pennsylvania and Georgia.

12  And why are they saying that?  Is the Department going to do

13  its job?"

14              And our response is "The Department is doing

15  its job.  And it will continue to do its job.  It's for us to

16  sort that out."

17          So he didn't have a specific ask that I

18  remember.  As I said, the special counsel, I'm fuzzy if that's

19  in the meeting or elsewhere, but you can put that one aside.

20              I don't remember a specific ask.  And, again,

21  I don't mean to be semantic, unless you want to say

22  "Let me know how that hand recount came out."  I mean, I

23  suppose that's a specific request.  But not -- I don't think

24  that's what he was referring to in the meeting.

25     Q.     Let me ask you a question.  When

1  President Trump said "Why isn't the Department doing its job,"

2  can you indicate or clarify further on what exactly he thought

3  the Department wasn't doing that it should be doing?

4      A.   No.   And it wasn't at that stage.   It wasn't --

5  his tone was not angry.   He wasn't raising his voice or

6  something.   It was "People are saying this, you know.   I

7  mean, is the Department going to do -- you know, it's your

8  job, isn't it?"

9           You know, it was not belligerent.   It was

10  "This is what people are saying."

11           Rich Donoghue and I said, "You know, maybe they're

12  wrong."

13           I'm just trying to be clear that this

14  conversation was about -- he's asserting that there's been

15  election fraud.   It's an even-keeled conversation. It's not an

16  attack.   But, as I say, it's things he's already saying

17  publically.

18              BY MS. ZDEB.

19      Q.   Recognizing, again, that the Department didn't do

20  anything that you listed at the start of your statement today,

21  does the President of the United States need to be

22  belligerent, to use your word, in order to convey that he is

23  unhappy and wishes that the Department would do more?

24      A   So I hope I didn't misspeak.   I said he was not

25  belligerent.

1    Q.      That's right.  And my question is is it

2    necessary for the President of the United States to be

3    belligerent in order for him to convey that people are saying

4    these things and he wishes that the Department would, to use

5    your words, to do its job?

6    A.  I don't think I understand your question.  Is it

7    necessary for him to be belligerent?  I am not -- I don't

8    think I'm getting what you're asking me.

9    Q.  So my colleague asked you "Did the President ask the

10   Department to do anything specific during that meeting," and

11   your response was to the effect of, he -you were saying that

12   he was raising these allegations and saying "people are

13   saying," and he wasn't belligerent.

14                   And my question is he's the President of the

15   United States --

16   A.    Oh, I --

17   Q.   -- is it necessary for him to be belligerent in

18   order for you to interpret what he is saying --

19   A.   No.  I think I'd say it in the other direction,

20   because I can't control what he says.  I can only control what

21   I do from my position.  The Department of Justice is going to

22   do its job, whether the President is happy, unhappy, measured,

23   belligerent, that the Department of Justice is going to do

24   what we think is right based on the facts and the law.  We're

25   going to be faithful to the rule of law, the Constitution, to

1   the system of government we have.  And that's independent of

2   anyone else, including the President of the United States.

3          So no, I didn't -- I certainly wouldn't

4   suggest that the tone would have affected how I would perceive

5   it.  We were firmly committed.  We had an obligation to do the

6   right thing.  And that's what we would do, based on the facts

7   and the law.

8       Q.    Understood.

9              I guess what I'm trying to get at is there's

10  a distinction between how you and the Department responded,

11  perhaps, and how you received what he was saying.  And I'm

12  trying to understand how you received it, recognizing that the

13  way you responded sounds like it may have been the completely

14  appropriate way to respond, but in terms of how it was

15  received.

16      A.   Oh, okay.  So maybe another way to get at this is

17  when the President is raising these things, just the fact that

18  he's the President and you wanted to pay special attention or

19  whatever, I think my sense of it was he wasn't presenting it

20  as an -- I'll call it parochial item.  He was saying the

21  public is concerned; this is an issue of concern.

22             And I think there was truth to that.  It's

23  just that the public didn't have all the facts that we at the

24  Justice Department had.  So AG Barr had shared -- his

25  assessment, and we were hearing from the President how he

1   felt about that.

2              Does that maybe get more at it?

3        Q.     It does.

4              It sounds like he was conveying that there

5    were all of these allegations out there that he was hearing

6    that people were talking about.  He would perhaps express some

7    frustration that the Department wasn't doing more, and then

8    you responded, as you said you responded, which was to make

9    clear that the Department was doing its job.

10              Is that sort of a fair summation?

11        A.     That's consistent with what I said.

12        Q.   One more question about this meeting before we move

13   on.  You talked about Georgia, Pennsylvania, and obviously,

14   the Antrim County issue.  We talked about special counsels.

15              Was there any discussion at this meeting

16   about the prospect of the Department filing some sort of legal

17   action in the Supreme Court or otherwise?

18        A.   Not at that meeting.  That did come up subsequently.

19        Q.   And just so I'm tracking, what do you recall

20     specifically, at what meeting or on what phone call that it

21                                             came up?

22        A.   So actually -- I'm sorry, I'm trying to listen and

23   make sure I understood.  Did you say lawsuit with the Supreme

24   Court about the election?

25        Q.     Just about the election.

1        A.        Okay.  Then, what I said was accurate.

2                  Okay.  So, then, what do I remember about

3    that?  At some point, the President had called and he had

4    wanted to talk again about his concern people are saying

5    there's fraud; you are saying there's not.  Is the Department

6    going to look into things?

7                  I think my general position was the

8    department will do its job.  If there's information presented

9    that fits the criteria, the people would look into it.  If it

10   doesn't fit the criteria -- I mean, there's different levels

11   of proof that it takes to be at different stages of inquiry --

12   then we won't.  But you do that on the merits, on the factual

13   and legal merits.

14   And everybody knows what we've seen up to that point. Just

15   days before, DOJ was talking publicly -- because on the 21st,

16   at a press conference, AG Barr had elaborated on what he said

17   previously.

18                  So I'm trying to remember the first time the

19   Supreme Court lawsuit thing came up, but I think it's

20   in a phone call.  There may be documents that would help me

21   remember the date, but I want to say Sunday, Monday of the

22   week after Christmas.  So the 27th, 28th, somewhere in there.

23                  At first, I don't know that I quite knew what he

24   was talking about, because I originally thought he was talking

25   about Texas, the state was filing a lawsuit. Their case had

1   been rejected by the Supreme Court, as I recall.

2           Later there was actually an odd set of

3   events.  The President had his assistant send me and some

4   others a draft brief that I did not think was appropriate for

5   the Department to file.  And -- I'll kind of give you the

6   bottom line, and you can ask me if you want more specifics.

7   The bottom line was we thought it was not well founded,

8   legally.  It wasn't something the Department should do.

9           So I wound up having a conversation with the

10  President where I told him that.  This is not something we're

11  going to do.  And he asked why.  And I explained. And he said

12  okay.  We didn't do it.

13              But there's definitely some more color to all

14  this.  I'd be happy to walk you through more, if you wanted,

15  but that's the kind of the beginning to the end aspect.

16      Q.  I appreciate that.  Let's put a pin this issue.  I'd

17  like to come back to it in a little bit. We had just been

18  talking about the December 15th meeting at the White House.  I

19  want to ask you about a call that you and Mr. Donoghue had

20  with the President, which I understand had taken place on

21  December 27th.

22              But before I do that, the 27th is almost two

23  weeks, I guess, after that meeting on the 15th that we were

24  just talking about.  And I'm curious whether, during that one-

25  and-a-half, two-week period, were there other instances during

1   that period where the President called you, perhaps where the

2   Chief of Staff called you, or you had a meeting related to

3   these issues, at the White House?

4        A.      My best recollection is that after that

5   December 15th meeting, I did not hear from the President again

6   until I became Acting Attorney General on the 24th.  I don't

7   remember, necessarily,

8   Mr. Meadows, but I don't think so.  At least not about the

9   election.  It's possible I had a conversation with someone

10  else.  But the day that AG Barr left, I got a call from the

11  President.

12       Q.      And what did he say on this call?

13       A.      The first call was more of small talk.  You

14  know, it was "I understand that AG Barr is gone and you're in

15  charge."

16               I don't even really remember the substance,

17  but I think it was more just a checking in with me and letting

18  me know that he might want to talk to me.  It's possible there

19  was more, but that's -- I don't remember a lot of specifics.

20  It was a short call.

21       Q.  You don't recall whether he mentioned the election

22  or not?

23       A.  I don't.  In light of subsequent events, it seems

24  possible that he did, but I just don't remember.

25  I remember the next day.

1    Q.    Okay.   So just to make sure I have the timeline

2    correct, you said that he called you the day that AG Barr

3    left.   Was that the 23rd or the 24th?

4    A.       The afternoon of the 23rd.

5    Q.   So this initial call from the President that you're

6    describing also was on the 23rd?

7    A.   I think it was kind of the same thing.   But I think

8    what I'm saying is the day that AG Barr departed from DOJ, my

9    recollection is he left that afternoon. It was that afternoon

10   that I got a call from the President.   That particular call, I

11   don't have good recollection of what was covered other than

12   small talk.

13        He – the President -- was basically saying -- it was

14   just a chat.   I'm not saying it wasn't discussed.   I don't

15   remember that.   But I did receive another call from the

16   President on the 24th.

17        Ms. Zdeb.  I see that I'm getting pretty

18   close to the end of our first hour, so I think this is

19   probably a good stopping point.   Why don't we go off the

20   record.   It's 11:14.

21                    (Discussion off the record.)

22        Mr. Flynn-Brown.   So we can go back on the

23   record.   It's 11:27.

24   Before I start with my questioning, I want to make sure

25   that the record reflects that Daniel Parker is in attendance.

1    He's an investigator for Senator Grassley and I don't believe

2    he was included in the initial introductions.

3              Sir, thank you, again, for your time today. Let me

4    first start off with -- I'm going to introduce this as Exhibit

5    4, a document that is Bates-stamped -744 to -750.  I am not

6    stating the entire number on the bottom of the page, just

7    stating the last three digits.

8                        (Exhibit 4, document, was

9                        marked.)

10             BY MR. FLYNN-BROWN.

11        Q.   If you can pull that document up and let me know.

12        A.    I have it.

13        Q.   Okay.  So in reference to the December 28th, 2020,

14   email on Bates stamp -745 from Jeffrey Clark.  Do you see

15   that?

16        A.    Yes.

17        Q.   -745?

18        A.    Yes.

19        Q.   And that email was sent to you and Mr. Donoghue?

20        A.     That's correct.

21        Q.   The email says in part, and this refers to the

22   draft letter from Clark, that it would have been sent to the

23   "Governor, Speaker, and President pro temp of each relevant

24   state to indicate that in light of time urgency and sworn

25   evidence of election irregularities presented to courts and

1    to legislative committees, the legislatures thereof should

2    each assemble and make a decision about elector appointment

3    in light of their deliberations."

4            Let's go back to -744, the first page.

5            In reference to the email from Mr. Donoghue,

6    dated December 28, 2020, there is a notation at the top of

7    this document.  And I am going to state for the record that,

8    although these pages don't include your email response, there

9    is an email response from you with respect to Jeff Clark's

10   draft letter that you rejected sending this letter.  And I

11   want to make sure that's stated here for the record.

12           But with respect to the notes up at the top

13   right corner of this document, it says, "This letter was

14   opposed by A/AG + OLC.  Discussed with POTUS on January 3,

15   2021, and he rejected AAG Clark's idea to send it."

16           Are these your handwritten notes?

17       A.  I don't think so.  I think they're accurate, but I'm

18   just trying to figure out is that Rich Donoghue's?  Is that

19   Pat Hovakimian's?  I don't know who that is, but I don't think

20   that's me.

21       Q.  So with respect to "A/AG," that refers to the Acting

22   Attorney General; is that correct?

23       A.  Again, I didn't -- I don't think I wrote this, but I

24   would construe it the same way as you.

25       Q.    And "OLC" refers to the Office of Legal

1   Counsel; is that correct?

2       A.   Yes.

3       Q.   Okay.   So along with President Trump, the Acting

4   Attorney General and the Office of Legal Counsel rejected

5   sending the draft letter?

6       A.   That's right.   And the reference to the January 3,

7   2021, is that Sunday night meeting that I requested with the

8   President, that I went through in my preliminary remarks, I

9   guess.

10      Q.       So let's get into that January 3rd meeting.

11               Were there any pre-meetings that day before

12  the January 3rd meeting?

13      A.   I'm pausing because I remember how that day

14  unfolded.   And the pre-meetings -- again, not trying to be

15  semantic, but I met with my own staff that afternoon.   I

16  talked to White House counsel shortly before the meeting

17  itself.   So the conversations, whether they're pre-meetings or

18  not, you know, I guess we can all size it up, and it'll

19  probably be easier for you if I just tell you what happened.

20      Q.   The evening that the January 3rd meeting took place

21  at the Oval, and we'll get to it, you knew of the substance,

22  what it was going to be about, before you walked in the door?

23      A.   Yes, because the way the meeting came about was,

24  among other things, Jeff Clark had told me that the President

25  was going to replace me so that he could pursue the plan that

1    Jeff Clark had.

2                      And I said "Well, I don't get to be fired by

3    someone who works for me," in the case of Mr. Clark.  I wanted

4    to discuss it with the President.

5                      So I called Chief of Staff Meadows.  This

6    was -- I think my conversation with Jeff Clark, the meeting he

7    and I had ended in the neighborhood of 4:00.

8    And I called Mr. Meadows and said, "I need to meet with the

9    President."

10                     And the best I recall, he didn't even ask me

11   why.  He said okay.  Called me back and said you're on for

12   6:15.

13                     So, yes, I knew that this was going to be

14   discussed, because that's really what the issue was. Jeff

15   Clark had a number of things set out in this email and

16   unrelated pieces, and I had a different approach that you all

17   heard about, that my view of the facts required or that the

18   Department not take these measures.  So I was in the position

19   of wanting to tell the President he shouldn't do this.

20        Q.  So set this up for us.  You walk into the Oval on

21   January 3rd, and President Trump is sitting there at the

22   Resolute desk; correct?

23        A.  Yes.  Mr. Meadows had walked a group of us in, and

24   he didn't stay.  So in the room are -- there was seven lawyers

25   and the President of the United

1   States.

2       Q.  So if you're sitting in his chair, the President's

3   chair, if you proceed from his left to his right, can you name

4   the individuals that were present for us?

5       A.  Yes.  So Rich Donoghue and I, my deputy, are in the

6   middle, I think facing the desk, so the opposite way of what

7   you're saying.  I'm on the left. Mr. Donoghue is to the right.

8   Then on depending how you look, on the President's left and my

9   right, is Pat Cipollone at the end, the White House Counsel;

10  and Pat Philbin, the Deputy White House Counsel.  And then

11  Eric Herschmann, who was also a lawyer; his title was Senior

12  Adviser to the President, or something to that effect.

13          Now that I just said that, I was sitting next

14  to Mr. Herschmann.  So Rich Donoghue was to my left, from the

15  President's view Dnoghue was seated to my right

16          And then on the other end and to my left

17  was -- Jeff Clark was to the left of Rich Donoghue. And then

18  Steve Engel was at the other end closest to the desk, but

19  it's like a horseshoe, a semicircle.

20      Q.  So those present were all the major players that

21  needed to discuss this matter?

22      A.    Yes.

23      Q.      Regarding this situation; correct?

24      A.    That is correct.

25      Q.      How long did this meeting last?

1        A.   It was long.   It was scheduled to start at 6:15.

2   And I think it didn't start on time.   So the best estimate is

3   -- to my recollection, I would say probably in the

4   neighborhood of 6:30, give or take, maybe.   And it went till,

5   I'm going to estimate, maybe 8:30, a little past 8:30.

6        Q.      So approximately two hours?

7        A.        Yeah, maybe even a little longer than that.

8   It was long.

9        Q.   So the discussion, then, related to voter fraud,

10  election fraud-related allegations?

11       A.    Yes.

12       Q.And the draft Jeff Clark letter was also discussed?

13       A.   Yes.   I mean, as I said, since the meeting was done

14  at my request, it was -- the President said something near the

15  very beginning, "One thing we know is you, Rosen, aren't going

16  to do anything.   And you don't even agree that I'm right about

17  these concerns that people are telling me.   This other guy has

18  a different plan, you know.   Tell me why that's not the better

19  way to go?   You've made it clear you're going to do nothing."

20       Q.   So the President brought everybody in, then, to

21  allow you, the principals, to debate for him the issues, your

22  positions, and your challenges on those positions?

23       A.   Substantively, yes.   I mean, there's some other

24  things too.   There were people that -- this wasn't me, but

25  other folks wanted to discuss Mr. Clark's qualifications.   It

1  was not just his proposals of what to do, but that it was

2  inappropriate for him to even be doing what he was doing.  I

3  think at one time or another, all seven of the folks in the

4  room had their say, that's why it went on so long.

5       Q.  So your discussion involved the draft Clark letter,

6  but did it also include explicitly President Trump potentially

7  terminating you as Acting Attorney General?

8       A.     Yes, because those were tied together.

9              However, I was the representative of -- the

10 department's position is that, based on the facts and the law,

11 we don't see widespread fraud, so we're not going to take any

12 public actions or litigation steps or press conferences or

13 letters.  We shouldn't do any of that.

14             And Jeff Clark was the representative, if you

15 will, of "No, let's take a different approach," and sending

16 that letter he was proposing and make some public statements.

17 And sort of -- you know, as I said in the opening remarks, he

18 had a very different path in mind.

19             So these things were bound together because

20 it wasn't the nature of "Well, one of you is a smarter lawyer

21 or something."  It was about what course of actions we were

22 taking.  But each of us represented a different pathway.

23      Q.  So Jeff Clark was the one person who was asking to

24 take this particular approach?

25      A.     That's right.

1      Q.      And --

2      A.       That's how it turned out, yes.

3      Q.       That's how it turned out?   Okay.

4      A.    Correct.   And the only reason I say that is I

5  generally knew that the White House counsel were supportive of

6  where I had been and was.   But you just never know until you

7  are in the room with everybody.   I knew -- I knew -- actually,

8  I don't even want to -- that's almost unfair to White House

9  counsel.

10              I did know that they did not think Jeff Clark

11  should be the Acting Attorney General.

12      Q.       Say that again, I'm sorry.

13      A.    I did know that Pat Cipollone and Pat Philbin were

14  strongly opposed to the idea of Jeff Clark being the Acting

15  Attorney General.

16      Q.    So what did Cipollone and Philbin say when Clark

17  advocated his position to the President and to the group?

18      A.    Well, they spoke -- at several junctures, but I

19  think their basic position was the Department of Justice was

20  handling this properly.   They should be allowed to continue

21  doing that.   I think

22  Mr. Cipollone felt strongly that Jeff Clark was out of line,

23  that he had -- he should not really be doing what he was

24  doing, that I think he made comments to the effect that Jeff

25  Clark wasn't suited to the job, and that the whole approach

1    would be harmful and shouldn't be pursued.

2          So combining that, there are a number of

3    different parts to it.  But I think what I said earlier was --

4    everybody in the room, except Jeff Clark, was in one place.

5    Some had different arguments, if you will, but everybody -- it

6    was -- it was six against one.

7       Q.  Jeffrey Clark made clear to the President and to the

8    group that if he is made Attorney General, that he would send

9    this draft letter?

10   A.    Yes.

11   Q.      And how did you respond to that?

12   A.      How did I respond to that?

13   Q.    Yes.

14   A.  I think -- I think I had set out early on, and

15   repeated, that I thought that would not be good -would not be

16   justified under the law and facts, but also it's not the role

17   of the Justice Department to be telling state legislatures

18   what to do.  And it would be bad for the country, that it

19   wasn't something we need

20   to do.

21          And I think others agreed with that.  I think Steve

22   Engel set out a considerable explanation of why that wasn't an

23   appropriate thing to do.  Again, I think it was six against

24   one, actually.

25       Q.  So it's fair to say that you provided advice and

1  recommendations to the President at that time?

2      A.  That, we did. Q.

3          That you did --

4      A.   Yes.

5      Q.          -- provide advice and recommendations to the

6  President regarding this matter in the discussion?

7      A.    I think that's accurate.

8      Q.     Mr. Donoghue did the same?

9      A.   Yes.

10     Q.   Cipollone, Philbin, Engel, they all did the same?

11     A.    Yes.

12     Q.   Herschmann?

13     A.  Yes.  He definitely spoke up.  He didn't think the

14  letter was a good idea and was very critical of Mr. Clark.

15     Q.  So President Trump takes in all these data points.

16  He's listening to all of you speak, or is he interjecting in

17  the course of your conversation, or is he letting you -- all

18  of you as principals, as staffers, hash it out and he is just

19  taking in the conversation?

20     A.  Both.  He -- some of what you just described.  There

21  were considerable parts where people are talking and he was

22  just listening to their points.  In some places where he says,

23  "I've heard this or that.  What do you guys say about that?"

24     Q.  So he explicitly asked for your advice on this matter

25  under discussion?

1        A.    Yes.

2        Q.   And then in response to the advice and the

3   recommendations from the group, he took your recommendations;

4   is that correct, in the sense of, one, he ultimately rejected

5   sending the Clark letter, the draft Clark letter?

6        A.       Ultimately that's correct.

7        Q.   In the sense of, number one, he rejected sending the

8   draft Clark letter, in agreement with his advisers, you, and

9   others; and two, he rejected terminating you as Acting

10  Attorney General.  That was the ultimate one and two decision

11  that was made with respect to this matter; is that correct?

12       A.   Yes.  At the conclusion of the discussion, yes.

13       Q.       So how did Jeff Clark take that decision?

14       A.       I mean, that's a very -- I think he just

15  accepted the President gets to make the call.  There were

16  other somewhat humorous moments along the way where, at one

17  point, Mr. Clark actually said to the President in the

18  discussion at one time, he said,

19  "Mr. Trump, I think it's time to call the question."

20       And the President looked at him, with a look that said,

21  "Don't I get to decide that?"

22           So in terms of how Mr. Clark took it, I don't

23  think it's what he had anticipated going into the meeting, but

24  I think he accepted that the President made a decision.

25       Q.   And his decisions were entirely legal; correct?  The

1  decision to reject sending the draft letter and the decision

2  to retain you as Attorney

3  General, those were entirely legal?

4       A.   Certainly within the President's authority to not do

5  those things, yes.

6       Q Did the President discuss BJay Pak at that meeting?

7       A.   So I think -- I'm trying to remember that issue.   I

8  think what happened is that after the meeting was over and it

9  kind of tailed off, it was -- the people were getting ready to

10  move on, the President brought up Mr. Pak's name.   And Mr. Pak

11  was a very good U.S. Attorney.

12              So when he came up, and I think the President

13  raised it in a critical way, I think Richard Donoghue and I

14  said, "This is not right.   He's a good U.S. Attorney."

15              But I think the President had raised that he

16  wanted to replace him.   And I think, every -- all seven of us,

17  as best I remember -- I don't remember whether Jeff Clark

18  spoke to it or not -- but there was certainly nobody who

19  thought -- who recommended to the President that BJay Pak

20  should be fired.   But I think the President had some -- you

21  know, had some commentary about that.

22              And at some point, I think we knew that Mr. Pak

23  had already told us he was resigning, so somebody told the

24  President that this would be ridiculous and unfair and that he

25  was already resigning.

1                          And I think that's where it was left.  Well,

2     he's resigning.

3          Q    So with respect to potentially terminating Mr. Pak,

4     the President again listened to the advice and recommendations

5     of his attorneys and did not fire BJay Pak?

6          A.   Well, on that one, as I say, my memory of how that

7     went -- that stuff is not as good as I would wish.

8          Q.        Did the President of the United States fire

9     BJay Pak?

10         A.   The way I remember it, BJay Pak had already told

11    Rich Donoghue that he was resigning a few days before that

12    meeting.  But I cannot recall the sequence after that.  You're

13    probably just going to have to --

14         Q.   So it's your recollection that -- with respect to

15    your recollection, the President didn't fire

16    BJay Pak?

17         A.        He accepted that BJay Pak was resigning.

18         Q.   So he was already resigning, he just let that

19    process play out, according to your recollection?

20         A.   Well, I don't -- as I say, I don't want to get too

21    much into the details because I don't remember well, but BJay

22    Pak did resign.

23         Q.And if Trump wanted to fire any U.S. Attorney, he could

24    under his authority; correct?

25         A.   The U.S. Attorneys are Presidential appointees with

1   Senate approval, like I was and many other folks.  The

2   President can remove Presidential appointees for any reason

3   and no reason.

4        Q.   Mr. Rosen, did you take any action to overturn the

5   2020 election?

6        A.   No.

7        Q.     Did President Trump fire you?

8        A.   He did not.

9        Q.     Did President Trump fire Rich Donoghue?

10       A.   He did not.

11       Q.   Did President Trump fire anyone in the Justice

12   Department or FBI related to his frustration that more wasn't

13   being done to investigate election-related allegations?

14       A.     Anyone?  Not that I recall.

15            Mr. Flynn-Brown.  Let's go to Bates -736.

16   Actually, it starts with -735.  It goes to -742.

17            Mr. Rosen.  Which page?

18            Mr. Flynn-Brown.  The Bates -- this document

19   begins -735 to -742, these are the handwritten notes.

20            Mr. Blumenthal.  I do not have a copy.

21            Mr. Flynn-Brown.  Exhibit 5.

22            Yes, thank you.  This would be Exhibit 5.

23                      (Exhibit 5, notes, was marked.)

24            BY MR. FLYNN-BROWN.

25       Q.   Sir, if you need time to review, let me know.

1      A.   I think -- I think I've recently looked at this, so

2  I might need to look at specific things, but I know what this

3  document is, having just recently seen it.  I don't think I

4  was aware of it at the time, the best I recall, but I've

5  recently seen this.

6      Q.   Okay.  So according to the top right corner of the

7  notes, these are notes from a call that you had with President

8  Trump and I believe Rich Donoghue on December 27, 2020.

9      A.    Right.

10     Q.              If you look down -- and you're on -736.  The

11  Bates start at -735.  Let's go to -736.

12     A  Do you want me to give you some context on this call?

13     Q.    Fire away.

14     A.   The way I remember this is that I had asked the

15  President on the 24th, "It's a Christmas holiday weekend

16  coming up.  How about we defer talking further until Monday?"

17              And he said, "Well, okay.  But I might need

18  to call you."

19              So on Sunday morning, he called me from Mar-a-Lago,

20  if I recall, just before he was playing golf.  And I remember

21  I took the call, and I started talking to him about golf and

22  sports.  And he got me into it a bit.  And I was talking to

23  him about when he owned the Tour de New York bike race in New

24  York some years back, and whether he had met Greg LeMond, who

25  was a Tour de France winner.

1                      And then -- because we had talked about all

2      that, he had run out of time.  And so he said, "I'm running

3      late to get out to the golf course."

4                      And I said, "Okay, Mr. President.  I

5      think that should be your priority today."  And he laughed.

6                      But then sometime in the mid to late

7      afternoon, the phone rang and the White House operator is on

8      the line.  And I said "Okay."

9                      "The President wants to talk to you."

10                     So that's what I remember.  See, the Sunday

11     afternoon, the context just sort of stuck with me.  That the

12     President called me back after golfing.  I don't remember how

13     he had gotten to it, but I do remember I heard from him before

14     and after his golf game.

15          Q.    Thank you for that.

16                     So let's go to -736, down at the bottom where

17     the notes say "People won't have confidence in the Georgia

18     Senate race."

19                     I don't know if this is a direct quote from

20     the conversation or if this -- when I say quote, I'm not

21     saying that this is word for word what was said in the call.

22     But do you recall whether this was something that the

23     President said?

24          A.   So here's the thing.  It was a somewhat longer call.

25     So this isn't -- as best I can discern, it's not a transcript.

1   These aren't my notes.  I think they're Rich Donoghue's.  But

2   -- so I don't have any reason to doubt that what Rich put down

3   is accurate.

4          I see some things in these notes that do

5   square with my memory.  I think I did say, for example, that

6   with Pennsylvania, you can't just go and just flip a switch

7   and change the election.

8          So I see things in here.  But on many of the

9   notes what I would say, is, you know, they ring a bell of the

10  kinds of things that were talked about.

11      Q.  Do you recall the President ever having other

12  conversations referencing his concern about the American

13  people's confidence in the Georgia Senate races with respect

14  to some of these allegations of voter fraud and crime-related

15  allegations of other elections that had taken place?

16          Did he say in those conversations that he was

17  concerned about people having confidence in the Georgia

18  Senate races?

19      A.  He raised that on more than one occasion. "Many

20  people around the United States think there's been fraud.

21  This undermines confidence in the elections."

22          I remember at that level of generality.  As I

23  say, with regard to this particular comment, I don't have any

24  reason to doubt Rich's notes, but I can't say that's the exact

25  words at that level of specificity.

1    Q.   The President, you said, did mention on several

2    occasions that he's concerned regarding -- with respect to the

3    American people's confidence in the electoral process?

4    A.     Yes.

5    Q.     Let's go to -737.

6         The notes say, "DOJ failing to respond to

7    legitimate complaints/reports of crimes."

8         I note the President's apparent use of the

9    word "legitimate."  Now, with the volume of voter fraud and

10   election crime allegations that the President had received at

11   that time and which were reported on publicly at that time,

12   was it unreasonable under the circumstances for the President

13   to have such concerns regarding potentially "legitimate

14   complaints" and

15   "reports of crimes"?

16   A.   So two things.  At about this same time generally,

17   it's consistent with actual things I remember him saying.  I

18   don't know if this is a quote.  I just remember he would say,

19   you know, "DOJ needs to do more to respond to this.  The

20   people are doubting you, you know."

21        But our response, and "ours" being the

22   department, and, in particular, the administration, "We are

23   and have done these things.  We have looked at this as a

24   department.  We're continuing to when anybody presents

25   something with the indicia of reliability, but it's just not

1    accurate that we haven't done that."

2              And I think the President was reporting that

3    people had told him this allegation was true, but I think we

4    felt that there were people giving him bad information.

5         Q.   So based on that, the question is, was it reasonable

6    for him, based on the data that he was receiving, to have

7    raised these concerns relating to the election?

8         A.   I'm pausing just because I don't know that it's

9    really for me to be the one to evaluate what's in someone

10   else's head.  That's really for asking for a person's mental

11   process.  I'm just saying I can't control what the President

12   is hearing from other people or what he's saying.  I can

13   control what I do about it.  And I think what I do about it is

14   I try to focus on the facts and I do what I think is right and

15   is consistent with the rule of law.

16             So I don't think it's for me to comment on

17   what's in the President's head.  I think it's more that I

18   would prefer, let me put it that way, that other people not

19   tell him things that I don't think were accurate.  And then I

20   would prefer for the President to accept that.

21             I suppose since we talked to Jeff Clark Sunday

22   night in the January 3rd meeting, that's where it comes to a

23   resolution.  And so, you know, the stuff along the way, it is

24   what it is.

25        Q.   So the Justice Department did review voter fraud

Trustpoint.One   Alderson.      www.trustpoint.one
                                        www.aldersonreporting.com      800.FOR.DEPO
                                                                       (800.367.3376)

1    allegations in the 2020 election?

2        A.    Yes.

3        Q.    And reviewing them was what should have been done.

4    That was a reasonable step.  That's the DOJ's job; right?

5        A.    Right.  And I think the caveat I'm just giving is

6    reviewing them is not inherently validating that they're

7    there.  There's a different kind of basis which investigators

8    and prosecutors -- I think -- would have.  So to use that in a

9    colloquial sense --

10       Q.    Everybody at the DOJ was doing their job, at least

11   in your view?

12       A.    Yeah.

13       Q.    If those are reasonable steps to take, is it

14   reasonable, then, for the President to use his authority and

15   responsibility to ensure that the Justice Department and the

16   FBI are doing their job?

17       A.    And what I'm saying is that I don't really want to

18   be commenting on the reasonableness or unreasonableness of the

19   President's actions.  I'm not here to defend him; I'm not here

20   to criticize him.  I'm just -- I think I'm just here to tell

21   you what happened.

22       Q.    Let me ask this on a constitutional level.  The

23   President of the United States is the head of the executive

24   branch.  It's his job -- he takes an oath, it's his job to

25   work on behalf of the American people and taxpayers to ensure

Trustpoint.One | Alderson.        www.trustpoint.one
www.aldersonreporting.com        800.FOR.DEPO
(800.367.3376)

1    that the Departments and agencies under his control are doing

2    what they need to do for the taxpayers.

3                Would you agree with that?

4        A.     For any President.

5        Q.     Sure.

6        A.    All Presidents have to uphold their responsibilities

7    to the Constitution.

8        Q.       Okay.  So the bottom of -737.

9                    I think it says -- and I know these are not

10   your notes -- "FBI will always say nothing there.

11   Leaders there oppose me, SAs support me."

12                Do you see that at the bottom, sir?

13       A.    Yes.

14       Q   Does  this  statement  indicate  to  you  that  the

15   President maintained a certain amount of distrust of the FBI?

16       A.   Well, as I said before, I don't have any reason to

17   doubt the accuracy of Rich's notes.  And it's generally

18   consistent with -- I don't know if it's this call or another

19   time, but the President had some skepticism with the FBI.

20       Q.   Do you believe that that mistrust, or skepticism as

21   you just noted, contributed to the President's concern about

22   how "legitimate complaints" and "reports of crimes" were being

23   handled by the Justice Department and the FBI?

24       A.   Again, I really don't mean to be quibbling over any

25   of this.  I just don't think it's my role to try to get in the

1  President's head.  I'm just trying to describe who said what

2  when, who did what.  So the reality of these type of things, I

3  don't know if they're my role as a factual witness today.

4       Q.  In the course of your conversations with the

5  President about election fraud and crimes-related issues that

6  had been reported and that people had told him, you mentioned

7  earlier, I believe, and correct me if I got it wrong, that the

8  President often was telling you that the DOJ, generally

9  speaking, and I'm paraphrasing, was not doing enough with

10  respect to these allegations?

11       A   I think the President said that both publicly and

12  privately.

13       Q.    He said it to you often?

14       A.     More than once.

15       Q.     Let's go to -738.

16            The bottom of the page here.  It looks like

17  the President allegedly said, "statistically impossible for me

18  to lose."

19            Do you see that, sir?

20            Do you remember that?

21       A.    Yes.

22       Q.  The interactions that you had with the President,

23  did he often refer to statistical analysis in discussing vote

24  results?

25       A.  You know what, I can't remember -- and, again, I'm

1    not challenging Rich's notes, but I don't remember -- to put

2    it that way.  I just remember it more as, you know, "Election

3    night, I was ahead at 10:00.  And once that happens, you know,

4    you're in good shape.  But this election by the next morning,

5    you know, you're getting a flood of votes that would be in the

6    other direction.  And that's unlikely."

7                    And I think we thought there was a rational

8    explanation for that.

9        Q.    What was that?

10       A.   Well, to simplify, that this election was unlike

11   some past ones in the number of ballots that were not done in

12   person the day of voting.  So if 90 percent of the votes were

13   in person and you count those and you're ahead with 90 percent

14   in, you have reason to think you're in pretty good shape if

15   you're a little ahead.

16           But if only 50 percent are in because a whole

17   lot remain to be counted because they weren't in person, the

18   fact that the other 50 percent changed that just is not remote

19   and impossible.

20       Q.      If you go down that page to the reference

21   "DAG," it seems to be a reference to you, sir.

22       A.   I would construe it that way too.  They're not my

23   notes, but that's what it looks like.

24       Q   So to say there -- I am not saying that this is

25   word for word what was said.  Just reading the notes.

1              "Will look at whether have more ballots in PA" --

2      Pennsylvania -- "than registered voters - should be able to

3      check on that quickly but understand that the DOJ can't +

4      won't snap its fingers + change the outcome of the election,

5      doesn't work that way."

6           And then "P" responded.  And I assume "P" is

7      the President here.

8           Do you read that the same way?  You see "P" --

9      A.  No, I see what you're reading.  This is another

10     example of what I was getting at, is these aren't my notes so

11     I don't know if this is purporting to be a quote or a summary,

12     et cetera.  But I don't have any reason to think that Rich's

13     notes aren't accurate.

14     Q.  So the President's alleged response is "Don't expect

15     you to do that.  Just say the election was corrupt + leave the

16     rest to me and the R Congressmen."

17          Do you see that, sir?

18     A.   I see that.

19     Q.  So then is it your recollection after viewing these

20     notes here that the President didn't expect the Justice

21     Department to change the outcome of the election based on

22     these notes?

23     A.  So I think -- again, I'm not going to challenge the

24     accuracy of the notes.  They're not mine, but I think what I

25     can say I do remember that the President raised this issue

1    that the -- there's a website in Pennsylvania, I think it was

2    the registered voters website, and then there was the

3    certified vote and there was a discrepancy.  He said to look

4    into that.  We responded that we would.  We kind of kept it at

5    a government-to-government level, nothing public.

6              There was a reconciliation that actually answered

7    this, but that came later.  I think at this time, I was making

8    the point that there's a factual question.  You know, we can

9    try to figure out the facts on it, because we can proceed on

10   the facts and the law.  As I said, it's the law.

11             But what we can't do, and I think I did say

12   something to this effect, is we can't just -- we can't and we

13   won't, and even if we could, it's not our role to say "Well,

14   we're going to overturn the election."

15             And I think the President in a number of

16   places, and probably here too, said "The people are telling me

17   there is fraud and that you're just not finding it and these

18   statistics show it."

19             And so I was amenable to figuring out why are

20   the websites inconsistent, but I was not amenable to doing

21   things that would criticize the integrity of the election

22   without a factual foundation.

23        Q.     So with respect to the reference of

24   Pennsylvania ballots, I want to ask you this question and make

25   sure the record is clear, sir:  Did you ever look at whether

1  there were more ballots in Pennsylvania versus registered

2  voters?

3       A.   I think we did.  I think -- I don't remember the

4  specifics of the steps other than that we had, as a general

5  objective, to make sure that we weren't doing things that were

6  non-governmental in a way that might be misconstrued as "Oh,

7  the Justice Department is looking into this," because that

8  itself gives it plausibility. But this was something I think

9  we sorted out.

10            Again, I don't remember the who did what and

11  what were the steps, but I think what happened was that the

12  Pennsylvania website for the number of registered voters had

13  not been updated.  It was out-of-date.  And they were in the

14  process of updating that with the correct information, and

15  they did it shortly after this.  And when they did, the

16  reconciled numbers did square, so it solved this issue.

17            But that was a factual point that there

18  should be an answer to.

19       Q.       Understood.  Thank you for that.

20            Do you recall who at the Justice Department

21  was lead on that particular investigation discussed here?

22       A I don't.  I'd have to ask someone on my staff.

23       Q Okay.  Move to -741.  Let me know when you're there,

24  sir.

25       A.   I'm there.

1    Q.   According to the notes at the top, the President

2  said something to the effect of "You, Rich," as in you, Rich

3  Donoghue, "should go to Fulton County + do a signature

4  verification and you'll see how illegal it is.  You will find

5  tens of thousands".

6         Do you know if Mr. Donoghue ever went to

7  Fulton County?

8    A.   I don't think he did.  You'd have to ask him to be

9  certain.  But I don't think so.

10   Q.   Did you?

11   A.   I did not.

12   Q.   Did anyone from the Justice Department or its

13  components seek signature verifications from Fulton County?

14   A.   I don't remember.  I don't know the answer to that.

15  If we did, I don't know about it.  I think we had some

16  familiarity with things that had gone on in Fulton County.  I

17  am construing "CTY" as county.  It could be a city, but --

18  it's not my notes, but I think that's Fulton County.  And so

19  that's Georgia.

20                    (Discussion off the record.)

21       Mr. Rosen.  So the point I'm trying to

22  clarify is I don't think either Rich Donoghue or I personally

23  went to Fulton County, Georgia.  This is a pretty busy time.

24  There were lots of other responsibilities besides these

25  issues.

1              However, the Department has personnel in Fulton

2    County.  There's two U.S. Attorneys in Georgia; one that was

3    responsible for Fulton County.  And the FBI had a field

4    office.

5              So I think what I was trying to get at is I

6    don't have, as I sit here, comprehensive knowledge of

7    everything that was done in Fulton City by either us or by the

8    state authorities -- because I think there's some information-

9    sharing with the state.  I think that these kind of issues got

10   addressed, but we're talking about a level of granularity more

11   than I recall as I sit here now.  I can't remember exactly

12   what that would be if I was told specifics.  I don't think it

13   was ignored, these considerations.  I'm just saying that I

14   don't think Rich Donoghue and I actually went there.

15             BY MR. FLYNN-BROWN.

16        Q.  And who was the U.S. Attorney at that time or in

17   that area with responsibility for Georgia?

18        A.  I think for that area, it was BJay Pak, and another

19   part of Georgia was Bobby Christine.  There was actually a

20   third U.S. Attorney in Georgia too.

21        Q.  Do you recall the President ever asking you at other

22   times, or Mr. Donoghue at other times, that he would like you

23   personally to go somewhere to vet these allegations?

24        A.  As I sit here right now, I don't recall any.  But I

25   actually don't recollect this; I'm just saying I don't dispute

 1   Rich's notes.

 2       Q.  So do you have any comments on why you think the

 3   President wanted one of his chief law enforcement officers to

 4   be boots on the ground, so to speak, and verify fraud

 5   allegations personally?

 6       A.  I couldn't speak for him.  I don't remember if he

 7   gave a rationale for that.

 8       Q.  To your recollection, did the President have a

 9   firmly held belief that some of these allegations that he

10   received included information that was potentially credible

11   and needed following up on?

12       A.  Well, as I alluded to, when he said multiple times

13   "people are telling me this, people are telling me."  Now, I

14   didn't talk to the people he was talking to, if they were with

15   the campaign, or if the only people that he had as visitors to

16   the White House, were like Mike, the pillow guy.

17              FEMALE MAJORITY SPEAKER.  Mike Lindell.

18              Mr. Rosen.  Yeah, sorry, I couldn't recollect his

19   name.

20              So I couldn't say who the people are, but

21   people were telling him this.  And so he said that with some

22   regularity.  "People are telling me this," or "People have

23   said this," or "I've read this," or "I've heard this."

24              And I would agree with you that that is

25   something that he said more than once, regardless of these

1    particular notes.

2                    BY MR. FLYNN-BROWN.

3         Q.      The President consistently asserted that?

4         A.       Well, he asserted them more than once.

5         Q.   And he made these assertions with respect to the

6    election system writ large in the United States, he wanted to

7    ensure the proper operation of it?

8         A.   I can tell you what he said.  I can't tell you what

9    is in his mind.  Someone else would have to do that.

10        Q.What did he say with regard to the election system in

11   the United States?

12        A.   He said, "The American people are paying great

13   attention to this.  You know, people are concerned.  I'm

14   hearing that there's fraud in

15   Pennsylvania."

16                    I mean, as I alluded to earlier, this was not

17   uncommon that he would say things to us that he also said

18   publicly on national TV or in some form.  I can give you a

19   summary, but you probably have a little bit of the flavor.

20        Q.   Right.  So the President constantly referred to the

21   American people in his context?

22        A.   Yeah.  I don't mean -- I try not to be semantic with

23   this, but I don't know if he constantly did that, but it was

24   more than once.  I mean, he did say that.

25        Q.   So, Mr. Rosen, I am coming up on my hour here.

1    We'll get started on another section, and return to it in my

2    second hour.

3                Which units within the Justice Department

4    handle election crime allegations?

5        A.   So with regard to fraud and illegality or criminal

6    -- the criminal election statutes, it's the FBI that has

7    responsibility for that, as does the criminal division of the

8    Justice Department, the criminal division's Public Integrity

9    Section.  And then also the U.S. Attorney's Offices, of which

10   there are 94 in the United States, each United States

11   Attorney's office has some people who investigate allegations

12   of fraud.

13       Q.      The Public Integrity Section contains the

14   Election Crimes Branch; correct?

15       A.    It does.

16       Q.      Who was in charge of that branch during the

17   2020 election?

18       A.   Well, Mr. Corey Amundson was the head of the Public

19   Integrity Section.  The folks under him -- I'd have to refresh

20   myself.

21       Q.      Richard Pilger?

22       A.      Before the election, it was Richard Pilger.

23   There came a point in November, I think it is, that Mr.

24   Pilger resigned from that position.  He didn't resign from

25   the Department, but he resigned from that position.

1          Q.          You said he resigned after the election?

2          A.   To the best of my recollection, as I sit here today.

3     If there's to something to refresh my memory, I would be happy

4     to look at it, but that's how I remember it, is it was after

5     the election. Q.    So tell me --

6          A.   I don't know the day, but at some point. Q.

7               Understood.

8               So how did this process work, then, with

9     respect to the Public Integrity Section and the Election

10    Crimes Branch?  Does the Election Crimes Branch need to fully

11    approve investigative steps for election-related

12    investigations before those steps can be taken?

13         A.   So there's a process in the Justice Manual for

14    coordinating these kinds of things.  And I think the Public

15    Integrity Section has election responsibility, because one of

16    the functions in enforcing of the law is there has to be some

17    consistency.  No two cases are alike.

18               And so I think with 94 different U.S. Attorney's

19    Offices, we don't want to get into a situation where the law

20    is looked at in one way in one state and different in the

21    other states.  But there's coordination through the Public

22    Integrity Section, but I have to look at the Justice Manual to

23    refresh myself on is it a consultation or is there need of an

24    approval?  As I sit here, I don't remember.

25         Q.   So prior to the Barr memo in November of 2020, it

1   was the Justice Department's policy to wait until after

2   certification to begin investigating election-related crimes;

3   is that correct?

4       A.   A little bit like the discussion we had earlier.

5   There's a document that sets out what the earlier policy is

6   and what the later one is.  So, for accuracy, we should just

7   look at this and characterize it based on the actual one.

8            But in the big picture, I'm not really

9   disagreeing with you.  I think I just want to qualify it by

10  the contents of the actual documents.

11      Q.           So I believe the November 9th memo from Barr

12  says, "I authorize you to pursue substantial allegations of

13  voting and vote tabulation irregularities prior to the

14  certification of elections in your jurisdictions in certain

15  cases."

16           When that memo came out, how was that

17  received by the Public Integrity Unit and the Election Crimes

18  Branch, based on your recollection?

19      A.   Well, as I said earlier today, I did not, to the

20  best of my recollection, at least, have a meeting or have a

21  discussion about this.  And it didn't get to the point where

22  somebody asked to come see me to evaluate the issues, but I

23  think I had a little bit of a general awareness that there was

24  some friction about getting the DOJ to look into this.

25      Q.   When you say "friction," do you -- can you describe

1    the people involved at DOJ?

2         A.  Not really, because -- again, as I alluded to

3    earlier today, I wasn't -- AG Barr was pretty hands on with

4    regards to this memo that he had put out.  And I don't

5    remember -- as I said, I don't think I met with the Public

6    Integrity Section, so I think the things I know about this are

7    kind of a couple of steps removed.

8         Q.  The situations that you did know about, you said

9    "friction."  So what do you mean by "friction"?

10   Can you explain that?

11        A.  That's what I'm saying.  So I had some situational

12   awareness.  When you change your policy, that if there are any

13   questions about how to do this or how to implement it, and --

14        Q.      Well, let me put it this way --

15        A.  -- the issues that came into that, I'm probably just

16   not the best person to get into that.  Because, as I said, I

17   wasn't day-to-day having these conversations.  Sometimes the

18   way the Department works is there's previous issues that need

19   closure, something can be elevated to the Deputy Attorney

20   General for consideration and resolution.  But at least to the

21   best of my recollection, as I sit here today, I don't remember

22   that happening.

23        Q.  Do you recall anyone or any units in PIN or ECB that

24   expressed a position where they did not necessarily want to

25   comply with this Barr memo?

1    A.   I'd have to consult with some others or with the

2    records.   As I said, I remember in a situational way there was

3    some friction about this, and I think there were some folks on

4    my staff and on the AG's staff that had access to it, but I

5    think that would take more work than I'm in a position to

6    partake in today.

7         Mr. Flynn-Brown.   I have under one minute left.   We

8    don't have enough time to turn to the next exhibit.   So, I'm

9    going to wait for my second hour for those questions.   Before

10   my time is up, I want to quickly go through that January 3rd

11   meeting and the aftermath.

12        So once the decision was made by the

13   President, by President Trump, to reject the draft Clark

14   letter and to reject the notion that you were to be

15   terminated, in other words, he decided to keep you as Attorney

16   General, once that decision was made, that was a done deal;

17   correct?   There was no going back.

18   Trump made his decision and everybody proceeded.

19        Mr. Rosen.   That's how I perceived it.

20        Mr. Flynn-Brown.   So that's going to wrap up

21   my first hour.   And thank you for your time, sir.

22        Mr. Rosen.   Thank you.

23        Ms. Zdeb.   We can go off the record.

24                    (Discussion off the record.)

25        Ms. Zdeb.   It is 1:13 p.m., and we can go

1   back on the record.  And for the record, Senator Lee has

2   joined us as well.

3                    BY MS. ZDEB.

4        Q.  Mr. Rosen, I wanted to just follow up very briefly

5   on a conversation that you referenced in passing that you had

6   with Attorney General Barr during our initial hour.

7                    So we had talked about that meeting at the

8   White House on December 15th, the one where you and

9   Mr. Donoghue were requested to attend, and Attorney General

10  Barr was not requested.  You indicated, I think, that you did

11  not find it particularly surprising when you were asked to

12  that meeting -- you and Mr. Donoghue, but not the Attorney

13  General, were invited.  And I think you mentioned returning to

14  the Department following that meeting, during which, of

15  course, you described having discussions with the President

16  about the election.  I think you mentioned speaking with

17  Attorney General Barr at some point after you came back.

18                    Could you give us a sense of what that

19  discussion involved?

20       A.  What I remember is that when Mr. Donoghue and I went

21  back to the Department, I think it was an event at the AG's

22  conference room, maybe an awards ceremony or something --

23       Q.              Excuse me, Mr. Rosen, is your microphone on?

24       A.        I'm sorry, I will turn my microphone on.

25                    So I recall that when we got back from the

1   meeting with the President, Mr. Donoghue and I, I think we

2   needed to be at -- it was some kind of ceremonial event in the

3   Attorney General's conference room.  And we went to that.

4                     And I said to the Attorney General at sort of

5   a reception-like activity after he made some remarks, and I

6   think Mr. Donoghue and I, either right after the event or

7   maybe it was a little after, we pulled him aside for ten

8   minutes outside of it, we left the conference room.  And we

9   said that we had this discussion with the President, we told

10  him about it.

11                    He said, basically, you know, "Thanks for the

12  update."

13       Q.     Did he have any reaction beyond that?

14       A.   I think what I just said is the reaction that I

15  remember.

16       Q.   And, of course, it was just a couple of days after

17  that, I think December 20th, when he made another public

18  statement essentially reiterating his prior statement to the

19  effect of the Department has not identified evidence of

20  widespread election fraud.

21                    Did you have a sense at the time of whether

22  he felt some need to reiterate that statement because of the

23  meeting that you had informed him about?

24       A.   If it was cause and effect, he didn't tell me that.

25  So I don't know that that's the case.  I just remember he

1  stated it again at the news conference that he did on the

2  21st, which was about the Lockerbie plane crash, the

3  perpetrators being extradited after all these years. And at

4  least the way I remember it, he made this big announcement,

5  and none of the questions were about the Lockerbie case.

6                One of the questions was about the election

7  fraud issue.  And he gave a very blunt and expansive answer

8  about the Department of Justice had not found evidence of

9  substantial fraud, at least sufficient to overturn the results

10  of the election.  And that was, I think, the early afternoon

11  of Monday the 21st of

12  December.

13      Q.  So jumping forward a couple of days -- and I should

14  say I apologize.  We've been jumping a little bit back and

15  forth in time.  It's just the nature of the question rounds.

16                But I think right before -- right before my

17  last hour ended, you described the call from the President on

18  December 23rd, roughly coinciding with the official departure

19  of Attorney General Barr.  And you said it wasn't particularly

20  consequential, you talked about sports, but then you alluded

21  to another phone call from the President the next day on

22  December 24th, and that's where we left off.

23                Could you tell me a bit about the

24  circumstances of that call?

25      A.    Yeah.  Yes.



1          I think that's the 24th, the day before Christmas.

2    So it was a Thursday, late December.  And many people at the

3    Department of Justice are getting ready for their holiday

4    plans or going places and so forth.  I was staying around at

5    holiday season, so I was in the D.C. area.

6              And I got a -- he called, but I think it was

7    not scheduled.  So I don't think it was on my calendar.  I

8    think I just got a call from the White House operator, from

9    POTUS, and the President came on the line and said,  did I

10   have a few minutes to chat about something that was on his

11   mind.

12         So, "Okay, what's on your mind?"

13         And he then brought up the same kinds of

14   issues he brought up back on December 15.  He said, you know,

15   "You, at the Justice Department, you need to be aware lots of

16   people are saying that there's election fraud.  And I've heard

17   this about Pennsylvania, and

18   I've heard that about Arizona."

19              And he did most of the initial talking.  But

20   he was laying out, again, that -- I think his formulation was

21   not exclusive, but usually "people are saying" or "people are

22   telling me" or "I have heard that there's election fraud.

23   You're saying there's not, but have you looked?  Because this

24   is what I'm being told.  This is what I've heard."

25              And he did it at some length; not as

1   long as he did on the 15th.  So I listened to that. And I

2   said, in substance -- this is just the content I remember --

3   "I think we've been through that, but if there's new things,

4   you know, we function on the facts of the law.  If there's

5   more facts, then the Department can receive them, but you know

6   what we know, that we told you, we haven't seen any."

7            And so two other things that I remember about

8   that call; one is more in hindsight.  At the time, he was

9   saying to me, "I'd like you to make sure the Department is

10  really looking into these things that you may have missed."

11           And I said, "Well, sir, it's Christmas. Today is

12  Christmas Eve.  Maybe take a few days off, and we can talk on

13  Monday."

14           He sort of hesitated.  "Well, that's four

15  days from now."

16           And I said, "Well, let's start with that."

17           But I wondered if it was going to be Monday.

18  You know, Richard Donoghue's notes that show it wasn't

19  Monday.

20           But the other part that stuck with me was

21  kind of an odd reference.  Somewhere in the conversation, he

22  made a reference to Jeff Clark.  And, again, I think the way I

23  remember this is that he said, just out of the blue, sort of,

24  "Do you know a guy named

25  Jeff Clark?"

1          And I said, "Yeah, he's the head of Civil Division."

2   Then he moved on.

3          So that struck me as curious as how does the

4   President of the United States know, you know, an Assistant

5   Attorney General.  They are important jobs, but I wouldn't

6   expect the President to know all the Assistant Attorney

7   Generals.  There are several of them.  So it struck me as odd.

8          That's more in hindsight.  Now, at the time,

9   that's become more significant, obviously, but at the time, I

10  was just quizzical.

11         How does the President know who Jeff Clark is and

12  why was he asking me that?

13         So that's how that call was.  It was kind of,

14  as I've alluded to, basically said follow up on all of the

15  stuff referred to in the media; that it was no secret that the

16  President was unhappy about the election outcome and people

17  were, according to him, telling him that there had been

18  corruption.

19         But the parts that were peculiar is why I

20  made earlier reference to the 24th as an interesting call;

21  Jeff Clark.

22             I can tell you how I felt about the matter,

23  or -- you have questions.

24   Q.    About how long did this call last?

25   A.  I want to say 10 to 15 minutes, maybe.  If I was to

1  guess, to the extent I can remember, I would say probably in

2  the order of 10 or 15, give or take.  Slightly shorter;

3  slightly more.

4      Q.  So in terms of the Jeff Clark reference that struck

5  you as curious at the time, it sounds like you were saying the

6  curiousness of that reference, that became more significant

7  overtime as events unfolded.

8      A.  Yes.

9      Q.  Did you sort of not focus on the curiousness of it

10  per se, but -- well, you tell me.  Did you just sort of file

11  it away at the time and not focus on it until later?

12      A.  Well, I heard that on the -- I think it was the

13  afternoon of December 24th.  So I didn't think there was

14  immediate follow-up to do on Christmas day.

15  But the day after, I'm pretty sure it was, as I recall,

16  Saturday the 26th, I called Jeff Clark and inquired of him --

17  I don't remember exactly.  I remember I was trying to see if

18  he was going to tell me something.

19          So I called him and was asking him, you know,

20  something to the effect of "Is there something going on that I

21  don't know about?"

22          And we had a little bit of a back-and-forth. But

23  then he, at some point in the conversation, acknowledged that

24  he had had a meeting with

25  President Trump.  And I was flabbergasted.

1          And I said, "Excuse me?  When was this?  How

2   did that happen?"

3          And he was very defensive and kind of

4   apologetic as I chastised him that you had a meeting with the

5   President.  You didn't tell me about it in advance.  You

6   didn't get authorization.  You didn't tell me about it after

7   the fact.  This can't happen.

8          And so he was somewhat apologetic.  And he

9   was saying that he had kind of got caught up in something that

10  he hadn't planned, that he had been -- according to what he

11  said -- that's all that I can recount, what he told me.

12  Obviously, I don't have access to documents --there could be

13  more to it.  But what he said was that he had been talking to

14  Congressman Perry of Pennsylvania, or I think he referenced

15  General Perry, but he's a Congressman.

16         And that somehow General Perry had asked him

17  to come to a meeting.  He didn't understand with who or what

18  it was about, and it turned out they went down to the Oval

19  Office talking to the President.

20             Well, as you might guess, that did not seem

21  normal to me.  And so I told him that shouldn't have happened,

22  can't happen again.  And he assured me it wouldn't, that if he

23  was contacted to do it, he would give me a notice.  He would

24  tell me about it.

25             And so I had known him for a long time in a

1    professional capacity.  We had both been in a prior

2    administration.  We both had been at the same law firm. We had

3    actually worked together at some point and worked together at

4    the Justice Department.  So he said he wouldn't do it again.

5    And, initially, I accepted that.

6            I also tried to check -- I think this is

7    actually a couple of days later -- did the White House

8    counsel know about the meeting.  The answer was no. Had not

9    been present; didn't know it had happened; hadn't authorized

10   it.

11           So that's my discussion with Jeff Clark, that

12   Saturday the 26th of December, as best I recall.  And that was

13   it until you handed me Exhibit 6, until Monday, January 28.

14   Q.       Did he tell you when the meeting that he

15   attended in the Oval Office was?

16   A.  I think so.  But I think it had been either the day

17   before Christmas or two days before.  So it was either the

18   Wednesday or Thursday, December 23 or 24.  I don't know who

19   else was there.  But the ones that I remember are him and

20   Congressman Perry, but I think there were others.  I just am

21   not sure who they were.

22   Q.  Did he give you a sense of how he came to be

23   connected with Congressman Perry?

24   A.   Not really.  I thought about that at some ensuing

25   time, and I haven't been able to sort that out.  This has all

1   sort of popped up again.

2           So from my vantage point, the open

3   question is did they seek to see the President, or did the

4   President seek them?  Sort of what was the direction of the

5   initiation of that process, both at the outset and as it

6   continued through the events of January 3rd, Sunday night, we

7   spoke about just before the break.

8           At least from my memory, that's an open

9   question that I don't know the answer to, because all I really

10  know is what Mr. Clark told me and, to a limited extent, what

11  the President told me.

12      Q.   When you had this initial call with Mr. Clark on the

13  26th, did he give you a sense of what had transpired at the

14  Oval Office meeting?

15      A.   He had minimized it.  When I look back, I'd like to

16  know more -- but at the time, I was focused on how did the

17  President know who Jeff Clark is.  The answer is he was at

18  some meeting and probably had attributed it to that.  It was

19  all innocent.

20          That's the initial stage though it becomes more

21  concerning as the events developed.  But at that early part,

22  I'm questioning, as I said, how does the President know who

23  Jeff Clark is.  And he's telling me, you know -- he's probably

24  asking who I am because he heard my name and met me.  I wonder

25  if it was more, but that's what he told me.

1        Q.   So Clark didn't say to you "I got swept into this

2   meeting and we had a discussion about was the election

3   stolen."   It was just more "I got swept into this meeting" --

4   and what?

5        A.   He may have told me and – I can't recall.   I don't

6   think he told me more, but we're talking about our discussion

7   seven months ago.   So I told you that the parts that I recall,

8   I think they are telling --

9        Q.     Fair enough.

10             So that was December 26th.   My colleague on Senator

11  Grassley's staff, started asking you a bit about a call on the

12  next day, the 27th, before the break.

13       A.     Yeah.

14        Q I have a couple of additional questions about that

15  call.

16       A.     Sure.

17       Q.       So if you have Exhibit Number 5, which is

18  Mr. Donoghue's notes --

19             MALE SPEAKER.   Excuse me, which exhibit?

20             Ms. Zdeb.   5.   It's Mr. Donoghue's notes from

21  the call on the 27th.

22             Mr. Rosen.   I have Exhibit 5.

23              BY MS. ZDEB.

24        Q.   So for the time being, those are just mostly for

25  your reference in case you wanted to consult them. And

1    recognizing that they're not your own notes, I want to ask

2    about the discussion of Jeffrey Clark that I understand took

3    place on that call.

4              So you had had this call with the President

5    on the 24th where you had this curious exchange in which he

6    mentioned Jeffrey Clark.  You spoke to Clark himself on the

7    26th.  And then the 27th, you had this call with the President

8    that you patched Mr. Donoghue into.

9              So at some point during that call, did the

10   President again mention Jeffrey Clark?

11        A.  Well, yes.  The notes suggest that he did.  Again,

12   they're not my notes, but I don't have any reason to question

13   them.

14             So here is how I remember this is, I think

15   there is another reference to Clark.  But at the time, it

16   doesn't really register much with me, because -- in hindsight,

17   in certainly does -- but at the time, Jeff Clark has said, you

18   know, this somewhat benign -- not totally acceptable, but

19   somewhat benign explanation of how the President knew him.

20             So when the President then makes some

21   reference to him again, I think how to try to -- how he and

22   the President met for the first time three days ago in some

23   kind of group meeting.  So it didn't register with me.  But

24   when I saw these notes, there was more detail than, let's say,

25   the significance I remember having at the time.  But I see

1    this in the notes.

2        Q.  So putting the notes aside, do you have any

3    independent recollection of the President saying something to

4    the effect of "People tell me Jeff Clark is great and that I

5    should put him in"?

6        A.  I remember at a slightly greater level of

7    abstraction that "People are really very mad with the Justice

8    Department.  They tell me that there's fraud and the Justice

9    Department hasn't been addressing it and is the Justice

10   Department doing its job."

11              And I think Rich Donoghue and I were both

12   saying to the President, "You can rest comfortably.

13   The Justice Department is doing its job."

14                   I think that there was some kind of reference

15   to Jeff Clark, but I don't think it was -- as I said, I think

16   it didn't have great significance at the time. In hindsight,

17   it's a little bit of a clue that, well, what comes next.

18                   But at the time, it was the President met

19   some guy three days ago, he asked me who he is or something

20   like that.  Shrugged, like -- if the President wants to

21   replace the Justice Department, and he can do whatever he

22   wants, but the Department is going to maintain its position.

23   Because, at this time, I don't know if Jeff Clark has a

24   different point of view.

25                   So to me it's -- we're all in the same place,

1  which, as you know, ultimately, is true except for Jeff Clark.

2  In the Department leadership, we worked very much together.

3  But at the time, I didn't register Jeff Clark when the

4  President says -- and, again, I don't know if the notes are

5  exactly the way I can remember it.  I don't dispute it.  So

6  that's -- in hindsight, that's a tipoff.  But after time, it's

7  more clear.

8       Q.  Did you recall some reference in this meeting to

9  replacing the Department's leadership, putting aside the

10  question of whether you recall a specific reference to Clark's

11  relation to that.

12       A.  Yes.  But in one of these, he accused, you know,

13  "Some people have suggested or some people say the Department

14  hasn't done his job."

15            And I think Mr. Donoghue and I are saying "The

16  Department has done its job.  It is doing its job."

17                 If I remember, I saw something in the notes

18  saying you should have the leadership you want.  It's not

19  going to change where the Department is.  And I think that --

20  again, I don't remember that as a quote, but I think that

21  point was one of that both

22  Mr. Donoghue and I had made.

23       Q.  Along similar lines and on the topic of the

24  suggestion it sounds like the President made that the

25  Department was not doing its job, there was some discussion

1  with my colleague on Senator Grassley's staff before the break

2  about a notation in the notes about the President making

3  reference to looking into "legitimate claims" of election

4  fraud.  And some discussion about, "Well, isn't it the role,

5  and indeed, is appropriate, or at least not inappropriate, for

6  the President to want to have legitimate claims looked into?"

7       I wanted to just put a finer point on your

8  response to some of those questions.  As I understood you, you

9  didn't agree at the time that the claims that were being

10 discussed in the course of that call were legitimate; is that

11 right?

12      A.  At least, in the big picture, in the sense that I

13 thought the position that AG Barr had publicly announced

14 continued to be corroborated.  An individual investigation

15 somewhere, that I cannot comment on -- is there a target, is

16 there an illegal voter, or something on an individual case.

17           But in terms of the big-picture evidence, and

18 as I think I alluded to to Senator Grassley's counsel, I think

19 the President had raised this thing with the website in

20 Pennsylvania, the registrations and the certified votes don't

21 match.  So that's an appropriate thing to just figure out, but

22 I think we still believed there's no indicia of widespread

23 fraud that would call into question the national election.

24      Q.  In fact, I think -- and this is on page -737 of the

25 notes.  There's a notation there that appears, at least based

1    on Mr. Donoghue's notes, it was a direct quote from the

2    President saying, "You guys are not following the Internet the

3    way I do."

4        A.    Yes.

5        Q.    So I guess I take that as consistent with your

6    description of the overall flow of this conversation, and

7    similar conversations with him, in the sense that the

8    President would raise claims that he had heard or he had seen

9    and that he would have a dialogue --

10       A.    I think actually -- so I mentioned when Senator

11   Grassley was here, there are some places in the notes where I

12   said, "I agree.  I remember that."

13            One of them was my saying, "We can't and

14   won't just flip a switch and change the election."

15            Another is I do remember when he said "You

16   guys are not following the Internet the way I do." That one

17   registered with me, because it reinforced some of what Rich

18   Donoghue was saying.

19            The Department of Justice needs evidence,

20   needs facts.  We rely on the facts and the law.  So I don't

21   know that the President necessarily got what we were doing,

22   what we actually did.  But telling me something is on the

23   Internet, if you are trying to persuade me, is not actually

24   very effective.

25       Q.    So, in other words, the fact that the

1  President may believe that something on the Internet is

2  legitimate does not mean that, in the Department's view, it is

3  legitimate?  It may be, but it may not be.

4       A.  The sad reality, we all know, is that the Internet

5  is full of -- some things are true.  Some things are totally

6  garbage.  Some things are patently false.  Some things there

7  are outrageous.  It doesn't tell you much to say something is

8  on the Internet.  We have to see the actual evidence.

9       Q.  So, for instance, the whole Italygate theory, which

10 we'll go into briefly in a little bit, that was a thing that

11 was on the Internet.

12           But the mere fact that that was on the Internet,

13 would not, in the Department's view, have meant that it was,

14 "legitimate"?

15      A.  Well, being on the Internet does not tell us that

16 something is accurate or valid or truthful. There's some real

17 trash.  There is really no quality control on what people can

18 post.

19      Q.  So along the same lines in terms of the President

20 expressing frustration, displeasure that the Department was,

21 in his view, not looking into things on the Internet, things

22 that he viewed as legitimate. There's this notation in the

23 notes that my colleague asked you about earlier.  It starts at

24 the bottom of -738 and it carries over to the top of -739.

25           And it's a -- the notation following the

1   exchange in which you indicated you said that "DOJ won't use

2   its authority to flip a switch and change the election."

3           And then there's this response from the President

4   to the effect of "I don't expect you to do that.  Just say the

5   election was corrupt and leave the rest to me and the

6   Republican Congressmen."

7           What did you take him to mean when he said, "Just

8   say the election was corrupt and leave the rest to me"?

9       A.  So at the risk of repeating what I said earlier,

10  they are not my notes.  It was a longer conversation than the

11  notes.  I don't have any reason to challenge what Rich wrote

12  down, but I have a more general recollection of the President

13  making the argument, "People are telling me that there is

14  fraud.  You say there isn't, but people say there is.  Why

15  aren't you finding it?

16  Shouldn't you be more energetic?"

17          I don't remember exactly what he said, but

18  more vigorous, in some sense, at finding the fraud.

19          And, "You should be out there finding it and

20  saying so."

21          And my point is, "Well, we have done our jobs

22  appropriately.  Any American who knows of any evidence can

23  walk into any FBI field office or a U.S. Attorney's Office or

24  Department of Justice, and we don't see that. So we are not in

25  a position to do it.  And so we're not going to just have a

1   press conference."

2            I think that's actually what he said, "Just

3   have a press conference."

4            "No, we can't have a press conference because

5   there isn't a factual foundation to justify that."

6            I think this now is clearer.  So we never had

7   any such press conference or any such public statements saying

8   there was election fraud, because that would not be consistent

9   with the facts.

10      Q.  So it sounds to me, based on your description, that

11  he was almost less concerned about whether the Department

12  actually took steps to and also did uncover election fraud,

13  and it was more that he wanted you to make some sort of public

14  statement indicating that you were looking into it.

15           Is that the consistent with your

16  recollection?

17      A.  Well, as I said to your colleague, I don't want to

18  get in the posture of trying to say what was in the

19  President's brain.  I can more explain what I remember him

20  saying to me.

21           In terms of what would have satisfied him or

22  not satisfied him, unless he communicated that, I don't think

23  I'm in a posture to claim that I can read his mind and tell

24  you what he's thinking.

25           I think at different junctures he suggested

1    public communications, but at other points he asked for a

2    Supreme Court filing.  He asked at some juncture about special

3    counsel.  So I think there were a mix of actions that he

4    referenced as wanting or at least suggested.  Sometimes there

5    were "Other people have said."

6              But I don't remember him prioritizing, "the

7    thing I want most is this or that."  The one consistent theme

8    was there's "I am told and assert that there is fraud, and you

9    guys should have found it.  Why aren't you doing your job?"

10       Q.    Fair enough.

11             Certainly, one of the things -- irrespective

12   of how he may have prioritized it in his own mind, but one of

13   the things that he asked the Department to do was make some

14   sort of public statement.

15       A.  I think that's right, that he said "You should be" -

16   - in substance, "You should have found this fraud, and you

17   should say so."

18       Q.  Was he any more specific about what he hoped the

19   Department would say in the press conference?

20       A.  The parts that I remember were just more his

21   emphasizing that he had been told or he heard or he thought or

22   some variation of there's fraud in Pennsylvania and there's

23   fraud in Georgia.  You should be looking at that and doing

24   something about it.  So doing something about it, as I alluded

25   to earlier, varied at different junctures.

1       Q.      I'd like to move on to the next day.

2               I think you have a portion of this document

3       already in one of the Minority exhibits, but we'll give you a

4       different copy.

5               This will be Exhibit Number 6.  This will be

6       Exhibit Number 6.  And it starts at Bates No. -6697 at the

7       bottom.

8                        (Exhibit 6, email, was marked.)

9               Mr. Rosen.  -697?

10              BY MS. ZDEB.

11      Q.      -697.  Do you have it?

12      A.      Yes.

13       Q.  This is the December 28, 2020, email that you and

14      Mr. Donoghue received from Jeff Clark.

15      A.              It's kind of remarkable, wouldn't you agree?

16      You don't need to answer that.

17      Q.      I'm not the witness.

18              But yes.  So he sends you this email.

19      Subject line is "Two Urgent Action Items."

20              I want to ask you about the first action item

21      before we get to the letter.  So he makes this request for a

22      classified briefing from the Director of National

23      Intelligence.

24              Did you have a sense of the context for that

25      request?  What was your reaction to that component of his

1    email?

2        A.   So as best I recall, this email came somewhat out of

3    the blue, as to its content.  I think what happened, the way I

4    remember it, was my assistant told me that Jeff Clark wanted

5    to have a meeting with me. That wasn't a total surprise, given

6    my weekend conversation.  But the content of that meeting

7    turned out to be a surprise.

8             So I set up the meeting.  And I think I had a

9    busy day and couldn't do it until 6:00, or something like

10   that.  And it shows on the email, it says 4:40 p.m.

11            This email comes across and it's strange.  So Rich

12   Donoghue and I have a discussion about it.  And the gist is we

13   should not do these things, and then we had the meeting, which

14   I'll be happy to tell you about.

15            But on your specific question about the

16   meeting, the proposal regarding the director of ODNI. Because

17   he was head of the Civil Division, Jeff Clark he did have

18   security clearances, but he didn't have responsibility for

19   election issues.  And at least at that point, I was unaware if

20   there was any election-related litigation or something that

21   would justify him having a role in this.

22            So I didn't -- at this juncture, my thought

23   was it was not appropriate, and that changed at the meeting we

24   subsequently had.

25            But I think you were asking me what was my

1    reaction to this.

2         Q.   Yes.   For instance, there's a line in his email

3    alluding to information in the public domain from hackers that

4    a Dominion machine accessed the Internet through a smart

5    thermostat with a net-connecting trail leading back to China.

6    And I'm just curious as someone who, as you described earlier,

7    had known this guy for quite some time, how did that sort of

8    statement strike you?

9         A.   I was confused, as in, what's going on with Jeff

10   Clark?   That this is inconsistent with how I perceived him in

11   the past.   And there's a reference in that paragraph you were

12   talking about where it talks about the smart thermostat

13   controlling voting machines.   He says "white hat hackers have

14   evidence in the public domain."   White hat hackers?

15             This, again, sounds like Internet theories.   He says

16   thermostats; he said they had access to the Internet.

17                  And at the meeting, there were further things

18   he said that were a little off-kilter too.   One of them came

19   up.   He has some email that he wants his title changed.   Oddly

20   enough, he said that multiple times, that he wanted -- he was

21   -- he was actually

22   Senate-confirmed as the head of the Environment and National

23   Resource Division; but at the time, he acted as the Civil

24   Division, the head of the Civil Division in the Department.

25                  And he wanted the "Acting" taken off his title

1   of the Civil Division.  And he had this theory that there was

2   an old OLC opinion that empowered the Attorney General to do

3   that.  OLC's head was -- at the time, Steve Engel -- he was

4   very opposed to this idea.  And I was not an expert in the

5   underlying law. I had very high regard for Steve Engel's

6   capabilities, but I didn't really want to referee could it be

7   done or whatever.

8           We're at December 28.  There's less than a

9   month in the administration, and you want to change

10  your title.  This came up multiple times.  That's why it

11  stayed with me.

12          So I think we're getting to the point of

13  we're realizing there is something off-kilter at this time,

14  yes.  It's even more evident in hindsight, but at the time, I

15  did think he's meeting with the President and now he wants to

16  be briefed by the DNI on thermostats plus the title change.

17  Just what is going on here with Jeff Clark?

18      Q.  So to set the stage for this meeting, you had

19  mentioned a couple of times, of course, that the other thing

20  that he lays out in the email is his proposal to send a letter

21  to Georgia and potentially other states.

22          I think this is implicit in some of your --

23  the comments that you've made already, but what was your

24  reaction to that aspect of his proposal?

25      A.  So Rich Donoghue and I had discussed it ahead of

1    time.  We said generally we don't want to do this, but decided

2    to go ahead and have the meeting in part -what you're getting

3    at, is to figure out what's going on, and to try to figure out

4    with Jeff Clark, what's going on with this.

5                    So we met with him.  He came to my conference

6    room, and he more or less repeated things that are in the

7    email.  He wanted to -- I think he also wanted me to have a

8    press conference and say there was corruption.  And both Rich

9    Donoghue and I -- I think this is after Rich and I had talked.

10   Rich sent an email back to Jeff that said that this is not

11   going to happen.

12       I remember Mr. Donoghue gave Mr. Clark a bit of a hard

13   time about the meeting he had with the President.  He was

14   still maintaining he had been sort of inadvertently conned

15   into it.  And I rejected, at that time, the request for the

16   DNI briefing.

17                   On the letter, I think there were so many

18   problems with that, but part of it was it's not the Justice

19   Department's responsibility.  We're not election officials.

20   We're not the global Secretary of

21   State or something; "Georgia, you should be doing this.

22   And, Arizona, you have to do this."

23                   It's almost independent from the legal

24   arguments, which was not -- it's just not our role.  So we had

25   some discussion about that.  So I remember I was trying to

1  draw him out, "Why do you want to do this?

2  Why do you think this is a good idea?  Why?"

3                     And I think it was somewhat unproductive.  I

4  thought there was a chance that he might say that he was

5  working with other folks or tell me, but he basically said,

6  "These are my ideas.  I think these are good ideas."

7                     And so the meeting was a little bit -- not a

8  little bit, actually -- parts of it were contentious.  I had

9  given him a little bit -- I had given him my dissatisfaction

10  with the fact that he met with the President without my

11  knowledge and not even told me about it after that.  I think

12  Rich Donoghue reinforced that strongly.  And I think Jeff

13  Clark took that less well the second time.  But that's neither

14  here nor there.  It was ridiculous.

15                     We spent a fair amount of time on this.  He

16  wanted to do these things and we told him no.  But the one

17  thing in my mind that was consequential was when we told him

18  we didn't want to do this, he basically accepted it at that

19  time.

20        Q.    Did he seem --

21        A.  He seemed accepting.  Like, "Oh, these are my ideas.

22  I think they are good ideas.  You don't like them.  Okay.

23  Then, I guess we won't do it."

24                     So at this juncture -- separating what he did then

25  versus what he did later -- at the time, it still seemed as

1   though he was recognizing that there's a change of command,

2   that his suggestions would be rejected, and he should just do

3   his job in a proper way.  So he appeared to be accepting.  He

4   wasn't pushing back, saying "I have right to meet the

5   President," or something like that.  He was -- at that point,

6   he said, "You don't have to tell me six times. I don't want to

7   have a meeting."  And "Okay.  You don't want to do the

8   briefing.  I really think, you know, it would be useful, but

9   okay."

10          So it was kind of a first phase.  He was

11   suggesting that, you know, he heard the direction he was

12   receiving.

13                The next couple of days, he kind of did.  You

14   may remember -- it was during that week that Congressmen

15   Gohmert filed a lawsuit suggesting the Vice President would

16   overturn the election.  And we opposed that and filed a motion

17   to dismiss -- I referenced this in my preliminary remarks.

18   The Civil Division did actually file that brief. And my

19   recollection is that the acting head of the Civil Division is

20   on the brief.  So for a little bit, it looked like someone had

21   --

22          Q.  When you discussed the letter with him at this

23   meeting, did he indicate which other states he proposed

24   sending it to?  Was the letter styled as a proof of concept --

25          A.   Yes.

1      Q.   -- in reference to replicating it outside of Georgia?

2      A I think he did.  I think it was five other states.

3 Pennsylvania.  It was Georgia.  It was Pennsylvania,

4 Michigan, Wisconsin, Arizona, and then

5 Nevada, if I recall correctly.

6      Q.  Did he give any indication during this conversation

7 as to whether he had discussed the proposal with the

8 President?

9      A.     Not at this juncture.

10      Q.  And you mentioned trying to get a sense from him of

11 whether he was working with anyone else or just working as a

12 solo operator, essentially.

13         Do you know who Kenneth Klukowski is?

14      A.  I don't recognize that as somebody that I know.  I

15 have come to learn, through preparing for today, he was at the

16 Department of Justice.  At the time, I don't think that name

17 registered with me.

18      Q.  So you had no sense one way or the other as to

19 whether he is someone that may have been working with Clark on

20 this?

21      A.     Right.  I don't know.

22         As I alluded to earlier, at least from my

23 vantage point, there's some unknowns about both the direction

24 of causality and who else might have been involved.  But what

25 I know of it really just came from Jeff Clark and a couple

1   brief references from the President.

2            And then when I met with Jeff Clark, both

3   this Monday, December 28th, and the subsequent meeting, he

4   never referenced these people or how a meeting got brought up.

5   You know, "I got a team working on it," or something like

6   that.

7        Q How about Douglas Smith?  Is that a name that rings a

8   bell?

9        A.  It does.  That was Jeff Clark's Chief of Staff in

10  the Civil Division.  But I don't have any awareness of -- at

11  the time, he didn't come with Jeff Clark to the meetings, and

12  Jeff Clark did not reference Doug Smith.

13       Q.            I want to move on to the next day, the 29th.

14            Do you recall a meeting at the White House

15  that day?  This was the day after you got this letter from

16  Jeff Clark.

17       A.  Do I recall a meeting at the White House? Yes.  I

18  had lunch with Pat Cipollone, who was White House counsel, who

19  is a long-time social friend, as well as a one-time colleague.

20  So we met in December together during the holidays.

21            But at that time, I did fill him in on that

22  something odd was going on with Jeff Clark.  And I told him a

23  few of the things we talked about, that Jeff

24  Clark was apparently in some kind of meeting with the

25  President shortly before Christmas and these proposals that

1    he's making.

2              I said, you know, "This is odd."

3              And I think it's then that I asked Pat

4    Cipollone, "Are you aware that the head of the Civil

5    Division met with the President of the United States?"

6              He was not.

7        Q.  And just so I am clear, is this a one-on-one

8    conversation between you and Pat Cipollone, or was it part of

9    a meeting that also included Rich Donoghue, Steven Engel, Mark

10   Meadows?

11       A.  I think what happened was part of -- I think Pat

12   Cipollone and I had lunch.  It was either alone or possibly

13   Pat Philbin, his deputy chief, and who was someone I knew for

14   a long time.  But there was a meeting subsequently scheduled

15   for the same day that afternoon, because Mr. Meadows, Chief of

16   Staff Meadows, wanted to talk to us about some oversight

17   requests that Congress had been asking for.  And at least as

18   Mr. Meadows communicated it, AG Barr had said that the

19   accommodation he worked out was done, but members of Congress,

20   representatives -- were contacting Mr. Meadows and saying it's

21   not resolved.  And so he wanted to have a discussion about

22   what are you guys doing to address this with regard to -- I

23   think this specific subject isn't really the election-related

24   issue, but it was about an oversight request.

25       Q.  And so when you -- when you had this meeting, did

1    the topic of the election also come up?

2         A.  My recollection is that the meeting was primarily of

3    the oversight issues.  But in some manner, before we left, Mr.

4    Meadows raised a couple of election items.

5         Q.      Do you recall what those items were?

6         A.  I think one of them was the Pennsylvania -the idea

7    that the United States file a Supreme Court case.  And I think

8    Steve Engel and I, maybe Rich

9    Donoghue too, said "That's not viable."

10        Q.  And how did that come up?  Was the inquiry from the

11   Chief of Staff?

12        A.    I think so.

13        Q.  And what did that inquiry consist of?  Was it a

14   status update?  Was it suggesting that this is something that

15   the Department should do?

16        A.  So the specifics -- what I remember is the meeting

17   is about the oversight things.  I think at this juncture, the

18   draft brief, or whatever it was, had come over, had already

19   happened.  So I don't think it was a new thing.  I think he

20   was saying something like, "Well, what are you guys doing with

21   that?"

22             And the thing I remember is I was just saying

23   it's not viable.  I don't remember if we went into in that

24   great a detail or not.  So at least to my recollection, that

25   wasn't what the meeting was for.  It was something he had kind

1    of thrown in.

2              And I'm trying to remember it.  I think there

3    may have been something else that was in the same category of

4    "Are you guys following up on something, or are you assembling

5    a plan for this?"  There may be records or something that

6    would help me with that.

7              Because my recollection of that discussion

8    was so dominated by the oversight issue, which let's say, with

9    respect to the Senators present, it's not really my favorite

10   thing to spend time on.

11   It's important, and --

12        Q.     Don't tell Senator Whitehouse that.

13             Ms. Zdeb.  I see that I've reached the end of

14   my hour.  I've actually gone a little bit over, so why don't

15   we hit "pause" here and we can go off the record.

16             Mr. Rosen.  Before we break, let me just say

17   for the record, even though I'm no longer a public official, I

18   did believe that I was a government official, that being

19   responsive to Congress was a significant responsibility.  So I

20   mean no disrespect in that in any way.

21                  I just mean that you hope that you tell your

22   staff, please be responsive and get these things done. So

23   having to spend some time with the White House Chief of Staff

24   on that wasn't my preferred use of time, but it's what we

25   needed to do, I think.

1          MALE SPEAKER.  Before we go off, I think

2  we were joined by another Senator; is that right?

3          Ms. Zdeb.  Yes, I'm sorry.  For the record,

4  Senator Sasse has entered the room.

5                    (Discussion off the record.)

6          Mr. Flynn-Brown.  We'll go back on the record

7  at 2:28.

8          BY MR. FLYNN-BROWN.

9     Q.  Mr. Rosen, I'm going to quickly go back to the

10 January 3rd meeting that we discussed.  So you've discussed

11 a lot of phone calls and emails and conversations leading up

12 to January 3rd.  So January 3, 2021, that meeting with the

13 President was the culmination of a lot of different

14 communications and, say, frustrations with respect to how

15 the Justice Department was handling election allegations, is

16 that correct?

17    A.     I think that's right.

18    Q.       Okay.  So when the President decided

19 ultimately to reject sending the draft Clark letter and

20 decided to keep you on as Acting Attorney General -you went

21 into this a little bit in the previous hour.

22 The meeting adjourns.  The decisions have been made. Everybody

23 knows what needs to be done.

24          Did you talk with Cipollone afterwards?

25 I don't just mean immediately; maybe a day or two later or

1  hours later?  Or was it simply literally understood, at that

2  point, the President made his decision and there was nothing

3  to talk about?

4      A.  So the meeting ended, and we were heading out.  Pat

5  Cipollone invited Pat Philbin and Rich Donoghue and me to just

6  walk up to his office for a couple minutes.  I remember seeing

7  Jeff Clark as we were leaving, and he said something odd, like

8  "Can I join you," or "Best wishes to all," or something like

9  that.  And we did not invite him to join us.  And he headed

10  out.

11          But then I spoke briefly afterwards to the

12  two from White House counsel, and Rich Donoghue and me. And we

13  all had the same thought, which is "Well, this is now

14  resolved.  It's done."  And I think I did not get called by

15  the President in the next few days.

16      Q.  When you say "White House counsel," you mean

17  Cipollone and Philbin; right?

18      A.    Yes.

19      Q.  And there was a sense of relief among you that it

20  was finally decided?

21      A.    I'm sorry, say it again.

22      Q.  There was a sense of relief among the four of you

23  that it was finally decided?

24      A.  I suppose.  I mean, we were pleased that the

25  President had made what I regarded as the correct decision.

1    Even though, as I said, he opened the meeting by saying "One

2    thing we know is Jeff Rosen leading the Justice Department,

3    nothing is going to get done in trying to overturn the

4    election."

5        Q.    Sorry?

6        A.   I'm saying of course I was pleased because it's my

7    position -- I had acknowledged -- he had said early in that

8    meeting, "One thing we know is you, Rosen, aren't going to do

9    anything to overturn the election."

10               I said, "That's true.  But sometimes that's

11   the best course because it's based on the law and the facts.

12   It's consistent with what's in the best interest of the

13   country."

14               And so he had said initially -- it wasn't

15   necessarily a very encouraging moment earlier.  It's "One

16   thing we know you're not going to do this, and this other guy

17   might," but it didn't get to that point.

18               So I think you were asking were we pleased. Well,

19   yeah, of course.  Because I thought it was the right outcome.

20   And as I told you, I think all six of the participants, other

21   than Mr. Clark, were in that posture.

22       Q.   Are you aware of the draft complaint, the United

23   States of America versus the states of Pennsylvania, Georgia,

24   Michigan, Wisconsin, Arizona, and Nevada?

25       A.    Say that again.

1    Q.   The draft complaint of the United States of America

2    versus the Commonwealth of Pennsylvania, State of Georgia --

3    A.   Yes, sir.   That's right.   I testified before the

4    break, yes, that this draft was prepared, I guess, by someone

5    outside, because it wasn't prepared by the Department of

6    Justice, yeah, there's a whole chapter about that, which I'm

7    happy to tell you about.

8    Q.    Please do.

9    So you talked to the President about this

10   draft; correct?

11   A.   Yes, but this mostly occurred about two days --

12   maybe a day or two before then, but it was sent over, I think

13   to several of us.   Maybe Jeff Wall, the Solicitor General.

14   And we thought, "What is this?"   Because we didn't write it.

15   And as I alluded to, we felt this is not

16   something we're going to do.   But I got an inquiry.   It was

17   this sort of passing reference at the meeting with Chief of

18   Staff Meadows.   "What do you guys think?   What are you doing

19   here?   Let's follow up.   What he said doesn't appear

20   believable."

21   And then the President, at one point, I think

22   that day, asked me "Have you seen any writing," or something,

23   maybe it was -- maybe that was Mr. Meadows.

24   I don't know exactly.

25   But then there was this odd piece, which is

1    an outside lawyer by the name of Kurt Olsen made these almost

2    all day-long efforts to get me in a meeting.  I had a general

3    practice that I wasn't just going to be meeting with anybody

4    who was in the campaign.  I didn't think that that was my

5    role.

6              So I had previously declined.  I think the

7    President asked me if I could talk to Mr. Giuliani and some

8    others, and I said no.  But this lawyer kept leaving me

9    messages with the Solicitor General, my chief of staff, with

10   others, that it's urgent.

11              And I basically said I'm not going to do it.

12   But at some point in the afternoon, I think this is

13   that Tuesday the 20th, my cell phone, my DOJ cell phone,

14   started ringing with a number I didn't recognize.  And when

15   that happens, like, three times in a row, it didn't occur to

16   me that's him.  Because he would call at my desk office and

17   was calling all around the Department.

18              So I picked up.  And it's Kurt Olsen saying, "Have

19   you seen the draft, the Pennsylvania brief?  It's extremely

20   important that this get done."

21              And initially, yes, I was annoyed that --

22   it's like I answered a phone solicitor or something.

23   But -- so I initially I had some small talk with him.

24   And then he was pushing that he claimed that the

25   President wanted this brief.

1          And I said, "How do you know the President wants

2    this?  Who are you?"

3          He said, "Oh, we're working very closely with

4    the states that have filed a somewhat similar case previously

5    that the Supreme Court had declined to take."

6          So I said, "Well, you know, in that case,

7    there was no standing.  So this doesn't work."

8          He said, "Well, I can show otherwise."

9          That it was, I recall, it was like a

10   polite brushoff.  That's how the first call ended.

11         The next day -- so in the meantime, knowing

12   that I was probably going to have to discuss that with the

13   President at some point, I asked the Solicitor General's

14   Office to prepare kind of a bullet list of various points on

15   this thing.  I knew we wouldn't do it, but I had a strong

16   feeling that it's better to be able to explain that.

17         So I asked them to do the list.  And they did

18   a good list for lawyers, but it wasn't in plain English.  So I

19   asked Steve Engel, who was head of OLC, who was generally at

20   my side since the day I became Attorney General, "Steve, can

21   you help me sort of put this in plain English?"

22         So he then prepared some brief points.  But while I

23   was waiting on those so I could deal with it, telling the

24   President not to do it, Kurt Olsen calls again.  I don't

25   remember how he got me.  It was kind of the same thing.  He

1    would leave messages.  But to my surprise, he's aggressive.

2              "The President wants you to file this brief

3    by noon today."

4              "Oh, yeah?  He didn't tell me that."

5              And "I had sent you some of the authorities that

6    show there is standing."

7              I said, "Well, I'm not discussing the

8    substance of this with you.  If the President has something he

9    wants, he and I will discuss it with him.

10   You're no longer in this conversation."

11             And he got sort of aggravated by that.  He

12   said, "You're going to force me to call the President and tell

13   him you're recalcitrant," or whatever it is. I said, "This

14   conversation is over."

15             And so that told me -- I think I challenged

16   him on that.  "How do I know you have ever even spoken with

17   the President?  Just because you are saying it?"

18             And he didn't like that.  He said, "I've told

19   you who I represent."

20             So I figured this needs to get called up to

21   the President.  I am not talking to outsiders.  I rejected

22   further discussion with him.  To the best of my recollection,

23   that episode was the only time, and it's the last time I spoke

24   to someone on the outside about these things.  I tried not to

25   engage, but I did make it -- even today, I think it's the

1    proper thing to do.  Although, I did tell him -- I told him "I

2    will tell the President DOJ's position, not you."

3            So at that point -- I'm trying to sort out did

4    the President call me or did I call him.  I think he called

5    me.  Or it may have been, if I called him, it was because I

6    got a message that he wanted to talk to me.

7        Q    And what is the exact date, for the record?

8        A.        This is Wednesday afternoon, the 30th of

9    December.

10           And I know I didn't initiate calls to the President

11   to talk about election stuff, but it's possible that I got

12   word "He wants to call you.  Or he wants to hear from you.

13   You know, he's in Mar-a-Lago.

14   Be at this number at 3:00," or something like that.

15           I don't think that's very material.  But I

16   just can't say who actually placed the call.

17           But I spoke to him that afternoon, and I told

18   him this idea of filing the Supreme Court case was a bad idea,

19   doesn't work.  The Department of Justice can't do it.

20           And I had taken the outline that Steve Engel

21   had given me.  I didn't use it literally.  I relied on it.

22   But I sort of said, "There's five different reasons."  I laid

23   those out for him.

24           And he went "Okay."

25           So then he accepted it.  And that was the

1   end.  That was kind of the end of that, which is why I think

2   in the earlier conversation I had with your colleague about

3   the December 31 meeting, I think the discussion about the

4   Supreme Court brief had already been resolved.  I can't say,

5   definitively, if it came back the next day, but I don't think

6   so.  I think it was resolved in that phone call.  Things came

7   up, and we just said we're not doing it.  And that was it.

8        Q.     So the President yet again took your advice?

9        A.   Well, he accepted the Department's position that we

10   weren't going to do that.  He didn't resist it or deliver an

11   ultimatum or try to overrule us.

12        Q.  So after you gave him the list of five reasons

13   against filing the complaint --

14        A.     Yes.

15        Q -- his literal response was "Okay," or did he say

16   anything else?  Did he challenge you on any of the five?

17        A.   No.  No.  He accepted that we were not going to file

18   that, and that was that.

19        Q.  Was that the last time that you discussed this draft

20   complaint with the President?

21        A.       To the best of my recollection, it was.

22            Again, I'm not trying to split hairs here,

23   it's possible that it briefly came up the next day, at this

24   point, in passing.  I don't think so.  My best recollection is

25   that was the last time.  I'm acknowledging the flaws of human

1   memory, I guess.

2          Mr. Flynn-Brown.  For the record, Senator

3   Blackburn is here.

4          Mr. Rosen.  Senator Blackburn, nice to see

5   you.

6          BY MR. FLYNN-BROWN.

7   Q.  Okay.  So we talked about the January 3 meeting.  We

8   talked about the draft complaint.  We talked about the Clark-

9   related matters.

10         I'd like to turn to the exhibit that I was

11  going to turn to in the first hour.  We started to talk about

12  the Public Integrity Unit at the DOJ and the Election

13  Crimes Branch.  So please go to Bates -751 to -754.

14  A.      All right.  I have the exhibit.

15         Mr. Flynn-Brown.  Just to keep track of the

16  Exhibits, let's check to make sure what number we're on.

17         Ms. McClain Walton.  I have the next exhibit

18  as Exhibit 7.  Yes, the next number is Exhibit 7.

19                        (Exhibit 7, email, was marked.)

20         BY MR. FLYNN-BROWN.

21  Q.  Sir, let me know if you need to review this or if

22  you're ready.

23  A.  Well, I'm ready, because I've looked at it and I've

24  spent time on it.

25         And so, I guess, we will see what your question is,

1    but I suspect I'm not -- the best one to address it.

2        Q.      Fair enough.

3             And one of the reasons why I want to

4    introduce it as an exhibit is the context with respect to some

5    of the tension in the Public Integrity Unit and the FBI and

6    Main Justice.

7             So this is a December 7, 2020, exchange between

8    Rich Donoghue and Dave Bowdich, who was the Deputy Director at

9    the FBI at that time.

10            Do you see in the email here Donoghue

11   references the State Farm Arena allegations?  Do you see that

12   in that first paragraph?

13       A.    Yes.

14       Q.      Do you recall what those were?

15       A.   I don't.  I don't remember.  State Farm Arena

16   allegations?  It's possible you could refresh me on that, but

17   right now I don't remember what that is.

18       Q.   So this email chain originated with a gentleman by

19   the name of Corey Amundson, who was the Chief of the Public

20   Integrity Section.

21            He says, in part, in this email "As explained

22   below, PIN," the Public Integrity Section, "does not concur in

23   any overt investigative activity, including the proposed

24   interviews."

25            We got into this a little bit in the first

1    hour, and I want to try get through it to the extent that we

2    can.

3              Are you aware of how many times the Public

4    Integrity Section provided a non-concurrence to potential

5    investigative activity related to the 2020 election prior to

6    the election certification?

7         A.  So this correspondence is from Rich Donoghue, as is

8    the one attached at the back.  I think it probably would be

9    better to ask Mr. Donoghue about it.

10             I'm not going to say, I don't specifically

11   recall the incident about State Farm Arena allegations. So I'm

12   not sure I'm the most helpful one to go through this.

13        Q.     Okay.  Well, let's move on.

14             So in the email -- excuse me, the document

15   states, "Unfortunately, this is a continuation of a policy

16   disagreement between the Election Crimes Branch, PIN," which

17   is the Public Integrity Unit, "and the AG," the Attorney

18   General.

19             I believe the reference to the AG may be Barr

20   because of his memo, the November memo that we had discussed

21   previously.

22        A.      That seems like a reasonable assumption.

23   And, again, that date, December 7, AG Barr is the AG and has

24   not announced his resignation at that point.

25        Q.  So what I'm interested in here is the word

1    "continuation."

2            So when Donoghue says -- at the time of this,

3    you're the deputy attorney general at that point?

4        A.    That's right.

5        Q.    So when Donoghue says "continuation," it seems to

6    imply repeated conduct with respect to the Public Integrity

7    Unit.

8            Is that something that you can comment on?

9        A.    I don't think so.    I think I alluded to earlier that

10   I have a situational awareness of some friction, but when you

11   start getting into who said what to who, or what position

12   Corey Amundson had or Dave Bowdich, I don't think -- I don't

13   think I have a degree of granularity to testify specifically

14   to that.

15       Q.    Other than this email exchange about the Public

16   Integrity Unit when Attorney General Barr altered the policy

17   with respect to taking investigative steps prior to

18   certification, are you aware of any Justice Department

19   personnel or units that did not comply with that directive?

20       A.    The -- again, I think I alluded to this earlier.

21   There are some processes where there are disputes that are

22   elevated to the Deputy Attorney General.    I don't have any

23   recollection of having this issue brought to me for some kind

24   of resolution.    So as I sit here, I don't have recollection of

25   people telling me the things you're getting at.

1        I was not part of the equation.  I think

2    the Department works these things out.  I don't think I'm in a

3    position to really create a record on that.

4        Q.  So aside from the State Farm Arena allegations, are

5    you aware of whether or not the Public Integrity Section and

6    the Election Crimes Branch opened any election crime cases

7    before the 2020 election was certified?

8        A.  I think that I may need to refer you to the DOJ

9    folks that are here as to the authorization for my appearance

10   today was very explicit about the topics we've covered.  It

11   was a reservation of talking about individual cases that

12   existed or are pending.  I try to stay within the confines of

13   the guidance, so I --

14       Q.  Since DOJ is here, do you want to offer any comment

15   on this issue?  My questions are based on the documents that

16   the Department provided.

17            Mr. Weinsheimer.  Yeah, they offered -- they

18   commented on many things.  As the witness has indicated, he's

19   limited with respect to the authorization.  He can't talk

20   about prosecutorial decisions in particular cases.  He doesn't

21   know anything about this particular case.  He cannot talk

22   about specific cases.

23            To the extent that there are allegations

24   pursuant to the authorization that are actually from the White

25   House, those are things that he's been authorized to talk

1   about.

2          Mr. Flynn-Brown.  I believe I had five objections

3   in the first interview and that's one today.  Four more to go.

4          BY MR. FLYNN-BROWN.

5   Q.   What FBI unit does the Public Integrity Unit

6   interface with regarding election crimes?

7          Mr. Rosen.  [To DOJ counsel:]  Internal DOJ

8   organization, do you have any problem with that?

9          Okay.  The FBI has a counterpart called the Public

10  Integrity Unit.  So, ordinarily, that would be the relation.

11  There can be variants to that because the information could

12  come into the FBI field office in a way that this needs --

13  someone might need to call that number or vice versa.  But the

14  FBI does have a Public Integrity Section.

15          BY MR. FLYNN-BROWN.

16  Q.   So I'd like better to understand the Department's

17  process to receive and vet these voter fraud and election-

18  related allegations.

19              Are you generally aware of the processes in

20  play in the 2020 election?

21  A.   In a big picture, maybe in a managerial way. I'm not

22  working individual cases with special agents in the field, but

23  in a managerial kind of way.

24  Q.   So what was the intake process at the Justice

25  Department?  What was the main method or mechanism by which

1    the Department received allegations?  Did it start from the

2    FBI field offices?  Did it come from

3    Main Justice?

4         A.    All the above.

5         Q.    Okay.

6         A.  There's multiple ways.  There's 55 FBI field

7    offices, and an American citizen who knows of wrongdoing can

8    certainly report it to the FBI at either a field office or

9    headquarters.  Sometimes wrongdoing is learned by state

10   authorities who decide that there's Fed issues at stake.  They

11   report it to the FBI, to the local police.  It could be

12   election officials.

13                    There's not a single formula that says "This

14   is the only way that information about potential wrongdoing is

15   addressed."  There's multiple ways.

16        Q.  During the 2020 election, do you recall whether most

17   of the allegations came through the FBI first or whether they

18   went through the DOJ proper?

19        A.  I think that we're getting into a quantitative area

20   that, you know, something that would require more consultation

21   with staff and others to be able to answer your question in an

22   accurate manner.

23        Q.  So with respect to the Justice Department, and

24   specifically the Justice Department proper, how many personnel

25   were responsible for vetting voter fraud and election crime-

1    related allegations?

2         A.   Well, "potentially" responsible makes it a pretty

3    sizeable number across the FBI investigator offices and the

4    Criminal Division.  And, of course, if it is someone else that

5    gets a report,they will work with the FBI and channel it to

6    the appropriate location.

7              So if you're in the Drug Enforcement

8    Administration, you would still have responsibility to pass on

9    information.  But I don't have an exact number, but it's a

10   considerable number of people that potentially are able to

11   address those issues.

12        Q.     Thanks, sir.

13               So the general process, though, with respect

14   to the FBI, an allegation is vetted at the Field Office level

15   and eventually, if it's good enough, for lack of a better

16   phrase, it moves up the leadership chain.  Then, the Justice

17   Department becomes involved at that point?

18        A.   I apologize, but I missed the beginning of the

19   question.

20        Q.   So the general process is the FBI does the intake

21   first.  They vet it and they investigate it, and then they

22   move it up the chain.  And eventually the Justice Department

23   is supposed to receive some sort of notification about the

24   allegation.

25               Is that the general process?

1       A.   It's one of the potential processes.   I do think, to

2   the extent you really want to understand those processes, I

3   would like to suggest that the FBI and the Criminal Division

4   could provide greater detail.   For me, I rely on them to brief

5   me as needed, and follow up if I need to ask.

6            But as I said, I'm not responsible for

7   individual cases, if I understand the big picture of the

8   process.   And the Department of Justice has 115,000 people.

9   I'm just the Acting Attorney General.   So it's a big

10  organization.

11           Mr. Flynn-Brown.   So let's turn to Bates

12  stamp -714.   I believe this is going to be Exhibit 8.

13                          (Exhibit 8, notes, was

14           marked.) Mr. Rosen.   Okay.

15           BY MR. FLYNN-BROWN.

16       Q.        The top says "Meeting with DAG + Jeff Clark -

17  6th floor."

18           "DAG" refers to you, sir; is that correct?

19       A.   That would be my interpretation.   These are not my

20  notes.   I think from the handwriting it's maybe Rich

21  Donoghue's notes.   I don't think I took notes of this meeting

22  or the other meeting.

23       Q.   So in the middle of the page, I believe it says,

24  "Thinks he saw trucks move ballots to shredding location."

25           It's not clear based on the notes who "he"

1    is, per se.

2              Next, the notes say, "Cobb County - woman who

3    worked at facility testified at the Georgia Senate Hearing

4    that she saw shred trucks at election location."

5              Are you aware of whether or not these

6    allegations were investigated by the Justice Department or

7    FBI?

8         A.       So my understanding is these are things

9    that's been previously investigated by both the Georgia

10   authorities and DOJ authorities.  I think this needs a half

11   step back.

12             So this is a Saturday, January 2, meeting

13   with Jeff Clark.  I don't think that the notes are

14   comprehensive.  I'm not saying they're inaccurate as to what

15   they say.  Again, they're not my notes, but I remember this

16   meeting.  And so we should take a half step back as to where

17   did this meeting come from.  We haven't talked about that.

18             But my recollection is that either Thursday

19   night, New Year's Eve, December 31, or Friday morning, New

20   Year's Day, I had either a meeting or a conversation with Jeff

21   Clark.  And at that time, he shared with me that he had had

22   another meeting with the President, and that -- which was

23   contrary to this assurance to me that that wouldn't happen

24   again.  And he had not told me in advance that he was going to

25   a meeting with him.

1    And he said at that time that the President

2  wanted him to consider whether he would be willing to take

3  over my job if the President wanted him to.  It wasn't to say

4  that it would happen, but if the President wanted -- according

5  to Jeff Clark -- and I did not hear that from the President.

6  But according to Jeff Clark, the President was targeting

7  Monday for Jeff Clark to let him know whether he would be

8  willing to entertain the possibility of replacing me and

9  implementing a different approach.

10    So to say that I was disappointed to hear

11  that he had another meeting with the President, without

12  telling me, was a significant understatement.  Guessing you

13  can probably gather how I felt about it and it wasn't

14  positive.

15    So at that point, he renewed his request to

16  have a DNI briefing.  And I had to consider, he says he is

17  meeting with the President, but he's telling me that he just

18  wants to do some due diligence because, if he agrees with me

19  and Donoghue that there isn't corruption, malfeasance, he may

20  just tell the President no.

21    So this is a challenging assessment.  He does

22  have the clearance.  And my thought is he's going to advise

23  the President, whether I like it or not.  I don't think that's

24  appropriate.  But maybe the best thing is for him to know

25  something, because maybe he'll come to his senses and join

1  what I believe is the overall department position -- that

2  there's no facts that create a proper foundation for saying

3  the election results should not be certified.

4          So I contacted the DNI Director and asked him

5  if he would be amenable to give Mr. Clark the briefing that I

6  had previously had.  He agreed.  And I'm not going to talk

7  about the substance of it for obvious reasons, but Clark had

8  that --

9      Q.  Are those reasons because they are classified?

10     A.   Yes.  Yes.

11         And so Clark had the briefing on New Year's Day,

12 and then in the meeting that Saturday, to get an understanding

13 of whether he would now say "I'm done with this."

14         So it was a second step.  I thought maybe he

15 just needs an illustration of why Donoghue and I and others

16 think that these stories that they told are debunked.  Maybe

17 that would help.

18         So I knew of one where there had been a

19 suggestion raised the ballots were being destroyed in Atlanta.

20 And it was being attributed to a State Senator, but it was

21 debunked.  And the U.S. Attorney in Atlanta knew of this, this

22 story.

23         So I told Jeff Clark, "You can call the U.S.

24 Attorney and ask about the ballots."

25         To my surprise, as I heard at this meeting,

1   he never called the U.S. Attorney.  He did his own inquiry

2   where he called someone who had testified at a Georgia

3   legislature hearing the week before and was telling these

4   tales, but they -- at least, as it was reported to me, they

5   were tales that didn't add up.

6            So he had this meeting.  It was Rich Donoghue

7   and I and Jeff Clark on that Saturday morning.  The real

8   purpose -- it was really twofold.  One is to see if having

9   done a little bit, you know, "Knock yourself out, see a little

10  bit of the facts."

11           To see if he now says, "I see where you guys are

12  coming from.  I'll get with the program," or what is his

13  posture.

14           And either way it was harkening back to, again,

15  say "this is not okay to be going behind my back and talking

16  to my boss."

17           So we had a session -- and by the way, I will

18  give this quick digression.  Because he was a Presidential

19  appointee with Senate confirmation, I could not fire him.

20  Only the President could fire him.

21           So sometimes I think the issue, why didn't I

22  just tell him, "You said you're not going to do this again.

23  You did it again.  You're fired," because that's what I might

24  do in the past with people.  But a

25  Presidential appointee with a Senate confirmation, even as

1    Attorney General, I don't have that authority.

2            So we had this Saturday morning discussion,

3    and I think Rich's notes partly captured the concept that --

4    yeah.  The notes indicate that he did not, let's say, come

5    around to the position that I had.

6            And he wanted -- I think he used the word "due

7    diligence" or some such.  So it was a very difficult,

8    challenging meeting.  I see the notes say a rather difficult

9    meeting.  Well, that was accurate, consistent with what I am

10   saying.  But it would have been understated.

11           And so I think at this point, we shift from,

12   as I was alluding to earlier in the week, this was somebody I

13   had known for a long time.  He says he won't do it again.  He

14   did it again.  And he seems to be on a very different course.

15           So that sets up what happens at another

16   meeting with him on Sunday.  And then that sets up the Sunday

17   night where you know the final piece of that.

18           But these notes relate to that Saturday

19   morning meeting.  And so when you asked me -- this is really -

20   - sorry.  Just trying to give your sense of how it developed.

21           I don't think you can just circle, like, a

22   section and say "What about these allegations or whatever?"

23   Because this was some rogue activity.

24       Q  I appreciate your explanation.  I appreciate the

25   detail.

1           I can certainly understand that with

2    complicated records like this, but we have to ask questions

3    that drill down to see exactly what happened and what did not

4    happen.

5           Mr. Flynn-Brown.  So let's move on to Bates

6    No. -598 to -601.  This will be Exhibit 9. (Exhibit

7                  9, email, was marked.)

8           Mr. Rosen.  Which one is this?

9           Mr. Flynn-Brown.  -598 to -601.

10          Mr. Rosen.  I have it. BY

11            MR. FLYNN-BROWN.

12     Q.  Okay.  So this is a December 30, 2020, email. It

13   includes an email from Cleta Mitchell to Mark Meadows in which

14   she sent the petition filed in Georgia and a press release.

15   And then Meadows then forwards the email to you.  And in that

16   email, Mark Meadows says, "Can you have your team look into

17   these allegations of wrongdoing.  Only the alleged fraudulent

18   activity.

19   Thanks, Mark."

20          So are you aware of whether or not the Justice

21   Department and the FBI reviewed and investigated these

22   allegations?

23     A.  My recollection on this was this had two

24   difficulties.  One was that it involved allegations that had

25   already been the subject of some review; and the other was it

Trustpoint.One | Alderson.          www.trustpoint.one
                                        www.aldersonreporting.com          800.FOR.DEPO
                                                                           (800.367.3376)

1    was a campaign piece.

2            So I think the general way we approached

3    suggestions of "Here is the problem," or "Here are some

4    facts," is to assess if we already know enough to know that

5    it's inaccurate.  If we don't know, can we keep it internal.

6    In other words, in government.  Sometimes it's a State

7    government and we can figure out what the situation is so we

8    can address the concept.

9            And, in part, I alluded to this earlier,

10   because I do want to be in the position to make sure the

11   President of the United States -- and I would say this about

12   any President of the United States -- is provided with

13   information to know that something that he's being told by

14   others is not accurate.  And I think any President should know

15   that his cabinet officials, including Justice, will tell him

16   something that he might repeat isn't true.

17           So that's the process that -- so this

18   particular one, I think didn't actually involve anything new

19   or useful.  And so my best recollection is it was kind of a --

20   we pushed it aside, we'll say.  Not because we didn't care

21   about allegations of election fraud, but because these

22   situations were -- had already been, in some manner,

23   addressed.

24       Q.    Thank you, sir.

25            Mr. Flynn-Brown.  So let's turn to Bates

1    -675, Exhibit 10 at this point.

2                         (Exhibit 10, email, was marked.)

3              BY MR. FLYNN-BROWN.

4         Q.  So here we have Mark Meadows' email of January 1,

5    2021.  He says, in part, "Can you forward this list to your

6    team to review the allegations contained herein."

7              These allegations related to New Mexico

8    ballot security issues, according to the email subject line.

9              Are you aware of whether or not these

10   allegations were reviewed and investigated by the

11   Justice Department or FBI?

12        A.  I think somewhat analogously.  There's a mix in

13   there of things that are being litigated by the campaign and

14   those are not appropriate for the Justice Department.  We're

15   -- at that point, we weren't involved in election disputes

16   between parties, campaigns, whatever.  They do their things in

17   the court, but the Justice Department is staying out of that.

18             So for some of this, I think it was, "It's not

19   our issue."

20             Other parts, again, had been considered,

21   assessed, addressed previously.  And I think that, again, it

22   was not one that raised new information that needed to be

23   processed in a substantive way.

24             Mr. Flynn-Brown.  So, for now, my questioning

25   is done, and we can talk with my colleague on this, about how

1    much more time they will use.  We do have some time left.  I

2    think about 15 minutes for this hour, and we reserve that time

3    in case we have to step back in and ask you additional

4    questions.

5              For the time being, we can go off the record.

6    And it is 3:14.

7                           (Discussion held off the record.

8                      Chair Durbin enters.)

9              Ms. Zdeb.  It is 3:24, and we can go back on

10   the record.

11             BY MS. ZDEB.

12        Q.  So I think as we were concluding my last round, we

13   talked a bit about the meeting on December 27th, and then --

14   I'm sorry, a call on December 27th.  And then we talked about

15   the meeting at the White House with the Chief of Staff and the

16   White House Counsel on December 29th.  That was the one where

17   you primarily recall the discussion about oversight, maybe a

18   little bit about the election, and I think you subsequently

19   explained to my colleague on Senator Grassley's staff that

20   there was this swirl of activity involving Kurt Olsen that

21   day.

22                      I want to jump ahead maybe two days in time

23   to December 31st and ask about a White House meeting that I

24   understand took place on that date.  But before I do, I just

25   want to ask, the intervening day, December 30, were there any

1    meetings or phone calls with the President or the White House

2    on the topic of the election?

3         A.   So as I think I alluded to earlier, I think on the

4    30th is when I had the call with the President to tell him

5    that we were not going to do this, the court case.

6         Q.    That's right, okay.

7         A. So I don't recall another call that day.

8         Q.   So then fast-forward again to the 31st.  I know that

9    there was a meeting in the Oval Office that afternoon.

10        Was there a meeting, an internal meeting,

11   with you and Mr. Donoghue and Mr. Clark at some point earlier

12   in the day?

13        A.   No.  I think it was later.  I'm not totally sure if

14   it was a meeting or a call.  My recollection is that that

15   evening, Thursday the 31st, so New Year's Eve, or the next

16   morning -- the best I can do is approximate that it's in that

17   window -- I had a conversation with Mr. Clark.  But whether it

18   was a call or a meeting, unfortunately, after seven months, I

19   have displaced it in my memory.  But I think the

20   communications occurred either that Thursday night or Friday

21   morning.

22        Q.   So I want to talk about the White House meeting

23   first.

24        A.    Okay.

25        Q.  We have seen the official White House photograph of

1    that meeting.  We understand from one of your emails, that

2    you requested it.  So we know from that photo, that you, Mr.

3    Donoghue, Mr. Meadows, Mr. Philbin and Mr. Cipollone attended

4    and were present.

5              Was there anyone else?

6         A.      I think the photo accurately captures this.

7    Rich Donoghue and me for DOJ.  It's Pat Cipollone,

8    White House counsel.  Mark Meadows, Chief of Staff. And I

9    don't think he's in the picture, Chad Mizelle, who was the

10   general counsel of DHS, was there as well.

11                 As an aside, if you will bear with me, I have

12   just a standard practice if I know I'm photographed at events

13   at DOJ or at the White House, if they're going to be in the

14   Archives, I ask can you send me a copy of the picture?  So

15   that's a standard practice.

16            But that, I did receive those pictures.

17        Q.    Why was Chad Mizelle there?

18        A.  Well, of course, I didn't organize the meeting so I

19   can't say definitively, but I think it's somewhat similar with

20   the earlier meetings where Ken Cuccinelli had been there.  The

21   President wanted to talk about election machines and DHS had

22   some responsibility.

23        Q.  So you said a second ago that you didn't organize

24   the meeting.  Does that mean that somebody at the White House

25   called the meeting?

Trustpoint.One | Alderson    www.trustpoint.one
www.aldersonreporting.com          800.FOR.DEPO
                                   (800.367.3376)

1      A.   Yes.   My recollection is that the President had been

2  at Mar-a-Lago, but he had come back on the afternoon of what

3  would be New Year's Eve, and that I received some kind of

4  notification from the White House that the President had

5  returned and he wanted a meeting.   And so Rich Donoghue and I,

6  we went over.

7            I don't think we had necessarily received a

8  clear notice of what it was about, but we had enough of a

9  track record that I knew -- that I could approximate what it

10  was going to be about.

11      Q.   Did -- well, if you wouldn't mind, maybe just giving

12  us a sense of the overall tenor of the meeting.

13      A.   I think the President seemed unhappy that it was now

14  late December 31st.   And I'm going to put this not as how I

15  would see it, but in some sense, it was described as "you

16  still haven't found the fraud," that "Here we are.   You're

17  saying -- you, DOJ -- that there's still not significant or

18  substantial evidence of widespread fraud."

19      Q.   You said "he seemed unhappy."   What gave you that

20  impression?   Did he say, "I'm unhappy with the Department"?

21      A.   Not in those exact words, but more, "You guys have

22  said that there wasn't any, but that you remained open that

23  the facts had changed."

24            And I think he -- his comments were that

25  people continue to tell him that there is fraud, so how can it

1  be that, if the Justice Department is "doing its job," you

2  haven't find this widespread fraud.  And it was somewhat

3  repetitive of our earlier discussions.

4           And as I alluded to earlier in our

5  conversation today, I think the President's observations were

6  somewhat similar to what he was -- they were very similar to

7  the things he was saying publicly or the media were

8  attributing to him as to his dissatisfaction about the

9  assessment of the validity of the election.

10     Q.  Did he raise the idea of the Department making a

11  public statement again?

12     A.  One of the challenges is trying to parse what was

13  said when exactly.  That was something that he was interested

14  in as in you should -- you should find the fraud that people

15  are telling him was there, and that he knew you should say so.

16  Whether that was specifically discussed at that meeting, that

17  meeting, in some ways, doesn't register as fully on me as this

18  Sunday night one.

19           So I'm not aware of it at the meeting, but if

20  there's some other record, that might help me sort it out.

21  But, conceptually, I think there's some continuity of what his

22  concerns were.

23     Q.     Did he raise the Jeff Clark letter?

24     A.     I don't think so.  Not that I recall.

25     Q.     Did anyone at the meeting raise the Jeff

1    Clark letter?

2         A.  I don't think so.  Because, at that juncture, Rich

3    Donoghue and I had told Jeff Clark, "We're not interested in

4    this."

5       I don't think that to my awareness at that time, it had gone

6    outside the Department.  I think Jeff Clark had presented to

7    me and Rich Donoghue, and we said, "No thank you," or

8    something like that (that's more polite than the actual

9    language).  I don't recall the actual words.

10              And so I think at that juncture, I thought

11   that probably might have the entirety of my awareness of the

12   letter going outside the Department and being proposed

13   elsewhere.  I think that came later.

14        Q.  Putting the letter aside, was there any discussion

15   at the meeting about the prospect of replacing you with Jeff

16   Clark, or did that come later?

17        A.  As I was alluding to previously, I remember some

18   conversation with Jeff Clark that I think it was that evening.

19   It might be Friday morning.  But it was right after -- close

20   in time after that meeting at the White House.  But I can't

21   rule out some allusion to it, but I don't think so.

22        Q.  Did the idea of filing that Supreme Court action

23   come up again during this meeting, or had that essentially

24   been put to rest in your call the day before?

25        A.  So my best recollection is it had been put to rest

1  on the call, but -- that's to my best recollection.  I can't

2  say definitively that it didn't come up on that Thursday White

3  House meeting, but I don't think so.

4      Q.  How did you end the meeting?  Did you have a

5  particular impression about how things stood?  What the

6  President expected of you?

7      A.  Because that meeting turned out to be less

8  significant than the Sunday one, when I look back at that

9  Thursday meeting, my recollection of it is not quite as good.

10 I remember generally that it was what I regarded as more of

11 the same.

12          But my reaction to it was more, generally, "We've

13 been trying.  We've been trying to say the Department will

14 look at real evidence.  The Department is going to do its job

15 down the middle, straight up. But we don't see evidence.  We

16 don't see it.  And our obligation is to say, 'This is the

17 law.'"

18              So by this point, as I've alluded to, we had

19 a number of these small episodes of "Here's one we're not

20 doing.  Here is one we're not doing.  Here's one we're not

21 doing," but we are doing our job.  This is not like an

22 ideological thing that "We're just not interested in the

23 evidence."  It's "Our position is driven by the evidence."

24              And so I think, by that Thursday, I'm

25 developing a little bit of a frustration of how do we get

1    through that our actions are premised on the evidence that the

2    Department develops.

3            And I guess the one other thing is, because I

4    don't remember well in sequence of where the Jeff Clark

5    conversation comes in, at another meeting, the Thursday

6    meeting, I asked Rich Donoghue and Pat Hovakimian, who was one

7    of my senior advisers.  He had been my chief of staff, but he

8    was getting ready to leave the Department shortly.

9            So I had asked the two of them, "Let's get

10   together and kind of figure out where we go from here."

11           But it's in that same time frame that I

12   learned from Jeff Clark that there's, at least to me, new

13   developments, which is the President wants an answer by noon

14   Monday as to whether he's going to be considering him as a

15   replacement.

16           I think I've said this before, but I want to

17   make sure that I'm clear because I'm talking about what's my

18   reaction on that Thursday evening.  I'm not the issue -- the

19   Department's position and its integrity is what matters.  And

20   if the President wants to make a change, have Rich Donoghue or

21   Steve Engel replace me, that would be fine with me.  But I

22   certainly would have felt comfortable that either of them, or

23   someone like them, just maintain the same course, fine.  But I

24   am concerned that we are functioning on the basis of the facts

25   and the law.

Trustpoint.One    Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

1        Q.    So the conversation that you had with Jeff

2    Clark around this same period of time, how did that go?

3        A.    Well, that's what I referenced earlier.  He said

4    that he had had another either meeting or conversation with

5    the President.  Notwithstanding his assurances that he made

6    over the weekend that, A, that it wouldn't happen again; and

7    B, if he got a request, he would notify me or Rich Donoghue.

8    Neither of those happened.

9                But he said that he had had a discussion with

10   the President and that the President wants him to let him know

11   on Monday if he's willing to be considered. At that point, it

12   wasn't framed as the President is going to be making a change,

13   but it is framed as he, Jeff, is now -- Jeff Clark is going to

14   think about it, whether he would be willing to do it.  And he

15   wants to do some due diligence to see if maybe he would see

16   things the same as Rich Donoghue and me.

17       Q.    So I think I may just be getting confused by the

18   sheer number of the different communications involving Jeff

19   Clark.  I know from the calendars and that you have alluded

20   to, I think on January 2nd, there is -- there's another

21   meeting with you and Mr. Clark and Mr. Donoghue.

22               But just so I'm clear, the conversation

23   you're talking about right now in which he reveals to you

24   that, notwithstanding your prior discussion, he did have a

25   conversation with the President.  That is separate from the

1    January 2nd?

2         A.   Yes.   The January 2 is the follow-up to that, where

3    he has been permitted to get that and to talk to the U.S.

4    Attorney in Atlanta, which he didn't actually do.   And so the

5    January 2nd is the follow-up from the earlier request of he

6    has to get an answer by Monday so he would like to have access

7    to some information.

8         Q.   I see.

9         A.   And that Saturday, he tells us he's had that access,

10   and here is where he stands.   It's really -- he tells us where

11   he stands, but he doesn't say "I'm going to tell the President

12   I'm available.   I'm still sorting this out."

13                   I think one of the things he raised is now,

14   at this juncture, he would be willing to sign a letter instead

15   of me, and he can answer no "if you'll do the things that I'm

16   suggesting."

17                   And I said "No, I'm not sending that letter

18   to the Georgia legislature."

19              I knew that wasn't likely to result in his

20   standing down, but that's when I say, we were not releasing

21   that letter.

22        Q.   So Jeff Clark framed it as a choice he was

23   giving you, to essentially either go along with the letter

24   that you had previously rejected and sign it under your own

25   name, or he will presumably take the President up on his offer

1   to be installed in your place.  Is that how you understood it?

2       A.  Close to that.  That he was saying that having done

3   some due diligence as he requested, that he wasn't satisfied

4   where Rich Donoghue and I were on this, but that he still

5   wasn't sure what his answer would be on it.  And he raised

6   another thing that he might point to, that he might be able to

7   say no, is if -- that letter, if I reversed my position on the

8   letter, which

9   I was unwilling to do.

10      Q.  I'd like to jump to the January 2nd conversation in

11  just a minute.  But before we do, I wanted to just briefly ask

12  you about two emails that you received on January 1st from Mr.

13  Meadows.  And I think -- my apologies.  We passed them out

14  already.

15          So the first one is the document that is Bates

16  numbered -678 at the bottom.  And that would be

17  Exhibit No. 11.

18                         (Exhibit 11, email, was marked.)

19          BY MS. ZDEB.

20      Q.  So this is an email on January 1st.  It's an email

21  chain from January 1.  It starts off at 3:00 in the afternoon

22  with Mark Meadows and you, and you then forward that to Mr.

23  Donoghue.  He responds "Pure insanity."

24          And then you respond to him with some

25  additional color around this issue.

1          Can you just give me a sense of how this Italygate

2   issue was presented to you?  What you took this email from Mr.

3   Meadows with the YouTube link to mean?

4       A.   Yeah.  So I think he had sent us an affidavit of

5   somebody that has been described as being in protective

6   custody in Italy who was a witness.  And I didn't know what

7   that was.

8               But then he provided this Internet link, sort

9   of out of the blue.  He wasn't saying, "I'm going to send you

10  other things," but this email came across. And sort of the

11  curiosity got the better of me (given my general thoughts on

12  the reliability of the Internet).  But I clicked on it and it

13  didn't work.  So I asked him to send the right link or

14  something to that effect.

15              He sent it.  And I started to watch it, and I said,

16  "You have got to be kidding me."

17              So this was I think on a Friday night.  Yeah,

18  Friday, January 1.  It's been a long day at the end of a long

19  week.  And my normal practice would have been to forward

20  something and then talk about it.  But a little bit of fatigue

21  set in, and we had this email exchange of "Can you believe

22  this?"

23              His response was "Pure insanity."

24              And I thought that would be the end of it, as I

25  alluded to.  Some of these we would just push aside and so

1  forth.  But then I actually got a call on this one saying,

2  "Are you doing any follow-up?"

3          And I said, "I think somebody had run down

4  that this individual" -- and, again, keeping it within the

5  government, nothing overt that might appear to give it

6  credence.  Someone figured out that "protective custody" was

7  that the person was in prison after a conviction.

8          So I think when I got a call, I said, "This

9  one is another one that's debunked."

10          And I was asked, "Well" -- I don't think I

11  realized that this was coming from Mr. Giuliani and the

12  campaign, but on this call, I did find out -- "There's more to

13  it.  Would you meet with Mr. Rudy Giuliani?"

14          I had refused to meet with Rudy Giuliani

15  multiple times over, during the month of December, so I said

16  no.  I said, "If he has evidence, he can do what any American

17  can do.  He can walk into an FBI field office and present his

18  evidence, but I'm not meeting with him, no."

19              And Mr. Meadows seemed to accept that.  But

20  then he called me back and he said Mr. Giuliani is insulted

21  that you think he should have to walk into a FBI office.  And

22  so the email reflects I declined to do it.

23              I can't remember if I headed home or if there

24  was some reason there was an email.  But in frustration, I

25  sent this note to share with Rich.  As the email reflects, I

1   got a little more animated than usual, at the end of the week.

2       Q.  I think I just heard you indicate this, but just for

3   the record, it was Mark Meadows who made this call to you?

4       A.      That's my recollection.

5       Q.  And on the previous occasions when you had been

6   asked to speak with Mr. Giuliani, was that also by Mark

7   Meadows?

8       A.  These things started to blur.  I know I received

9   requests to meet with Mr. Giuliani.  I declined.  They

10  accepted it, as they didn't say, "You must do this," or

11  "You're expected to do it."  But the request came back, and I

12  said I'm not going to do that.

13  And so I never did meet with Mr. Giuliani.

14              So I remember the request.  This particular

15  one, I think, was Mr. Meadows, but he did accept my position.

16  I said I'm just not doing it.

17      Q.  And the earlier requests may have been Mr.

18  Meadows, but you're not 100 percent certain, at this

19  point?

20      A.  I'm confident I got the request.  Whether it was the

21  President, Mr. Meadows, or both is where I'm a little hazy.

22      Q.  Tell me -- about how many times were you asked to

23  meet with Rudy Giuliani?

24      A.  I don't think I can quantify it.  I'm just telling

25  you what I remember is I got that request -- it was more than

1   once.  I can't quantify it.  And it was not -- I don't want to

2   overstate it.  It was not every 10 minutes or something

3   ridiculous.

4        Q.  And it's possible they were from Mr. Meadows. It's

5   possible they were from the President.  But sitting here

6   today, you're not certain which of those two?

7        A.     As I said previously.

8             Ms. Zdeb.  Let's turn to the second exhibit,

9   I believe you have it over there.  It starts with Bates -673

10  at the bottom, and this will be Exhibit 12.

11                          (Exhibit 12, email, was marked.)

12            Mr. Rosen.  I have it.

13            BY MS. ZDEB.

14       Q.     So this seems to -- sorry.

15            This seems to be a follow-up to his outreach

16  with the Italygate YouTube link.  He then sends this

17  additional note at 4:13 p.m. on January 1st, Mr. Meadows

18  does.  And he writes, "There have been allegations of

19  signature match anomalies in Fulton County, Georgia.  Can

20  you get Jeff Clark to engage on this issue immediately to

21  determine if there is any truth to this allegation."

22            And then you and Mr. Donoghue have an

23  exchange in response to that.

24            I think it is somewhat implicit in the

25  exchange that you and Mr. Donoghue have, but can you give me a

1    sense of how you reacted to this particular request?

2        A.  Well, the -- I had two reactions.  One is the

3    signature match anomalies, I think is something that we spoke

4    about earlier today, that their colleague raised in one of the

5    calls.  So I think I had an impression that, perhaps, this was

6    just the Chief of Staff responding to his boss having said

7    something about it and he sent it over.

8            And so my reaction to it, what got my

9    attention more was having Jeff Clark engage on this issue.

10   Jeff Clark, of course, was in the Civil Division, and

11   signature match anomalies would not be his responsibility.  So

12   common sense would tell you this, at this juncture, that that

13   looked a little bit corroborative of Jeff Clark having just

14   told me earlier that day or the night before that the

15   President wants to know if he's willing to replace me.  So it

16   seemed, in some way, corroborative.  It doesn't actually say

17   that.

18           So Rich and I had this exchange.  I think

19   that's sort of indicative of what I was saying earlier. By

20   this point in the week, there was some fatigue and being ready

21   to have everything be over with has set in.

22           I think we were attuned to this thing was

23   supposed to be some kind of focal point that we better be

24   ready and be considering how we persuade the President that

25   some of the things other people are telling him aren't right,

1   that he's not listening to the right people.  And that's when

2   I started to continue to try to think through what's the best

3   way to get this to an appropriate outcome.

4           Ms. Zdeb.  We're going to tag-team on our side,

5   Mr. Rosen, so my colleague Ms. Walton is going to ask you

6   some questions.

7           BY MS. McCLAIN-WALTON.

8       Q.  Mr. Rosen, I'll just give you a brief road map here.

9   I'm going to direct the questions now to January 2nd --

10  Saturday, January 2nd, and then what you've described as the

11  culmination of events on Sunday, January 3rd.

12      A.    Okay.

13      Q.  You've already spoken a little bit about the lead-up

14  to January 2nd and this meeting that you and Mr. Donoghue and

15  Mr. Clark are having on Saturday, the 2nd.  And you've

16  described, I think it's fair to say, at this point, tensions

17  are rising with respect to these issues; is that fair?

18      A.  Yes.  Because we started to hear things that, from

19  my vantage point, they are unfounded.  And I just don't think

20  it's appropriate for an Assistant Attorney General to meet

21  with the President alone.

22      Q.  And so at this point on January 2nd, I think you

23  described that the purpose of the meeting with Mr. Clark was

24  twofold.  It was, one, to say "Stop meeting with the President

25  behind my back"; correct?

1          A.          That's the short form of what I alluded to

2    earlier.

3          Q.    And, two, to see if Mr. Clark was going to get on

4    the same page, essentially, as everyone else in the Justice

5    Department; is that correct?

6          A.    Yes.   What I said is -- yours is the summary, but I

7    provided a little bit more push and pull of the conversation

8    as I said earlier.

9          Q.     Absolutely.

10         A.      You heard that.

11         Q.     Absolutely.

12               And so at the meeting on January 2nd, Mr. Clark

13   had said that he had been briefed by ODNI at that point;

14   correct?

15         A.      On Saturday the 2nd, I believe so.

16         Q.   And what was Mr. Clark's reaction to the briefing

17   from ODNI?

18         A.   Well, what I remember is that he was just

19   dissatisfied in some way.

20         Q.   And at that point as well, you had provided Mr.

21   Clark the phone number for the U.S. Attorney in

22   Georgia, U.S. Attorney Pak; is that correct?

23         A.     Yes.

24         Q.   Did you ask Mr. Clark if he reached out to U.S.

25   Attorney Pak to get more information about what was going on

1   in Georgia?

2        A   Yes.

3        Q.      And had Mr. Clark reached out to U.S.

4   Attorney Pak?

5        A.     No.

6        Q.   Okay.  And what was your reaction to him not

7   reaching out to U.S. Attorney Pak, as you had instructed him

8   to do?

9        A.      I was disturbed.  And I told him.

10       Q.   And during the course of this conversation, Mr.

11  Clark indicated, essentially, that he was still thinking about

12  the President's offer to assume the role of Acting Attorney

13  General; is that correct?

14       A.   With a small correction.  The way I remember it is

15  he was considering the President's offer, whether he would be

16  willing to consider.  It's perhaps a small difference, but

17  meaning he had not actually been offered "Here is the job.

18  Will you take it?"  But more "I wanted to know if I decide to

19  make a change, are you willing to be considered as the

20  recipient of the change?"  Slightly softer, to say.

21       Q.   Understood.

22           And so -- and during this conversation, in

23  mulling this over, he asked, "Would you be willing to now sign

24  that proof of concept letter?"  And you said you were still

25  unwilling to do that.

1          That's right.

2      Q.  And I assume at that point, things kind of came to a

3  head and the meeting was over, or did you have further

4  discussions?

5      A.  No.  The meeting took a while.  I don't remember

6  exactly how long.  My sense of it would have been 45 minutes.

7  And so there's obviously more discussion than just the things

8  we could do in 45 seconds, but I think they're just more

9  specifics of those topics.

10          I think the meeting ended with a little bit

11  of conflict.  Nobody being really satisfied, but "let's talk

12  about this later or tomorrow, or you know, let's figure out

13  where this goes."

14          And so it all came to a kind of closure.

15          I certainly do remember Rich Donoghue

16  reinforcing where I was coming from in a very aggressive way

17  that you went behind your boss's back, and you're proposing

18  things that are outside your domain and you don't know what

19  you're talking about, basically.

20      Q.  And so when the meeting ended and Mr. Clark left --

21  I would say, the room, wherever you are -- what is the

22  conversation that you have with Mr. Donoghue at that point?

23  Did you discuss next steps, what your strategy is?

24          Yes.  One of the things, to take a half step

25  to give you a context.  Obviously, this is not the only thing

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com

800.FOR.DEPO
(800.367.3376)

1   going on.  It's an important thing, but there is departmental

2   business to deal with.  And there's what I'll call regular

3   department business, as in just the press of work.  And, you

4   know, I can remember, just as an example, there was a -- I

5   think a status conference coming up in the Google antitrust

6   litigation.  And so it was regular and important department

7   business that we still had to attend to, and it was an

8   important part of our business.

9                   And it was the transition.  And so it was the

10  transition-related work.  Much of that, in terms of what I'll

11  call a formal transition, is on a staff level.  There are

12  people who are retiring.  There are people who want to get 15

13  minutes to talk to you before their last day.  And so there

14  are some things that don't happen -- that happened more than

15  they would regularly happen.

16                  So there's both work to do, and, of course,

17  the transition was to culminate on January 20th.  So there's

18  preparations for that.  That's itself a big and important

19  process.

20        So Rich Donoghue and I were first things

21  first:  The Department's business has to get done.  But we

22  were also then talking with ourselves and figuring out who

23  else might have some insight.

24        Mr. Steve Engel of OLC was someone that I

25  thought very highly of.  And in his OLC role, he was a very

1   important counselor.

2          So I think the way you characterized it is right, we

3   tried to strategize as to where do we go with this.  We want

4   to ensure that the right things are done for the right

5   reasons.

6      Q.  And so at that point, that's going to the next

7   morning, the morning of Sunday, January 3rd, or that day.  I

8   understand you continued to have these conversations about the

9   business of the Department with Mr. Donoghue.

10          But at some point, do you and Mr. Donoghue

11  decide that Mr. Clark should come back in and discuss more

12  things?  Do you speak with Mr. Clark again, you and Mr.

13  Donoghue, before that Oval Office meeting later on Sunday

14  night?

15     A.  What happens is late that morning, maybe around noon

16  -- I don't know if it's a little before or a little after --

17  but in that time frame, I get a call from Jeff Clark saying he

18  wants to talk further and it's important.

19          And I said, "Okay.  You know, I actually have

20  some things I have to do.  So let me address the things I have

21      to do, and we'll get together in the afternoon."

22          He was telling me it was time urgent.  I said,

23  "I'll do the best I can do."

24          It turned out to be around 3:00.  He was in

25  the building.  I was at my office that day.  And he came down

1   to my office.  My recollection is that, at that point, he

2   wanted to talk to me alone.  He didn't want Mr. Donoghue

3   there.

4           That was something I needed to think about. But I

5   decided having known him for a long time, I would do that.  I

6   would see if I could -- my hope was that I would persuade him,

7   that he should stand down basically from the path that he was

8   advocating.  And so I took the meeting with him.

9           We met that afternoon.  And he told me, at

10  that point, the reason it was time-sensitive when he called me

11  earlier was that he had talked earlier with the President, and

12  the schedule -- the schedule had moved up and that the

13  President had decided to offer him the position, and he had

14  decided to take it. So that I would be replaced that Sunday,

15  and the Department would chart a different path.

16          And somewhat remarkably in this conversation, he told

17  me that part of why he wanted to talk alone was he wanted me

18  to stay on as the deputy, but Rich Donoghue would be replaced

19  by me, which I told him made no sense, and there was no

20  universe I could imagine in which that would ever happen.

21          And he said he just thought that it was the

22  right thing to offer.  And --

23      Q.  During this conversation, did Mr. Clark mention at

24  all about what the New York Times had reported that President

25  Trump had reached out to the Secretary of State in Georgia,

1    Secretary Raffensperger, the day before, to talk about getting

2    a certain number of votes?

3        A.   I don't have any recollection of that.  I remember

4    this was a very unhappy conversation.  I told him that from

5    my vantage point this wasn't about me. It was about what was

6    the right thing for the country, that I thought he was making

7    a colossal error in judgment, and that I really encouraged

8    him that he should rethink this while there was still time.

9            And we talked a little bit --  in both directions.

10   Me telling him that I've known him a long time, and I couldn't

11   understand how he was pursuing this path, and him saying it

12   was because we knew each other that he had hoped that I would

13   understand what he was doing, which I did not.

14           So after some of that conversation, I told

15   him, "Well, here's the thing, Jeff Clark, my subordinates

16   don't get to fire me.  So I'm not accepting what you're

17   telling me, that you're going to replace me.  I'm going to

18   contact the President and tell him I need to talk with him."

19           And he didn't object to that.

20           And I said, "So I will let you know what the

21   next steps are, but for now, we're done."

22           And after he left my office, which was in the

23   neighborhood of 4:00, give or take, I called over to the White

24   House and asked Mr. Meadows that I need to see the President

25   and it needs to be today.  He said he would arrange it, and he

1    called me back very quickly and said "You're on for 6:15

2    tonight."

3           And I also called Pat Cipollone, who was out

4    of the office.  I left him a message.  And he said he would

5    plan to be at the meeting, and figure out who else should be

6    there.  I think he was going to address that.  And he did

7    highlight -- I think it was Mr. Cipollone -- that it would be

8    helpful to know that this is not just two people at the

9    Justice Department who do things differently, but that this is

10   the whole Department is with you, Rosen.  So I believed the

11   answer to that is yes, but we needed to figure out a way to

12   confirm that.

13          So after that I spoke with Rich Donoghue and

14   Patrick Hovakimian, who was, as I said, was my previous chief

15   of staff.  He was serving as a senior counselor.

16   That's his function.

17          And said, "Can you guys" -- we talked and

18   collectively came up with a concept that they would organize a

19   call with the group of senior leaders of the Department, which

20   they did.  I was not on it.  The concept was people should be

21   able to communicate freely and honestly.

22          So while they did that, I worked with -- I

23   contacted Steve Engel and told him what was going on and that

24   I would appreciate it if he could come in on this.  And he and

25   I and Rich Donoghue would ride together to the White House.

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1              An aside right there, when we were getting

2    ready to leave, Jeff Clark came by and asked if he could ride

3    with us.  And maybe this was ungracious of me, but I declined.

4         Q.    I understand.

5              Two just quick follow-up questions about

6    that.  Notwithstanding the fact that you told Mr. Clark "I do

7    not accept my subordinate telling me that I'm fired," was it -

8    - did Mr. Clark communicate to you that the President had made

9    his decision, the decision was done, and that he would be

10   installed as the Acting Attorney General at that point?  Is

11   that why you followed up with the President directly?

12        A.    Yes.

13        Q.  And as part of that decision that he would be the

14   Acting Attorney General that he communicated to you, did he

15   also communicate to you that that the proof of concept letter

16   would, therefore, be sent as that was what his plan was for

17   the next steps of the Department?

18        A.  I think that was implicit.  And at the meeting we

19   subsequently had, he did advocate that he wanted to send it.

20        Q.  With respect to Mr. Donoghue, and I believe you said

21   perhaps Mr. Engel following up with the rest of DOJ leadership

22   to kind of clue them in on what was going on, I assume you're

23   referring to the other Assistant Attorney Generals; correct?

24        A.  The Assistant Attorney Generals and the Principal

25   Deputy who is running the Associate AG's office --  Claire

1    Murray, I didn't actually compile the list to know exactly who

2    was on the call, that would be Mr. Hovakimian.  But the

3    concept was the Assistant Attorney Generals of the Litigating

4    Divisions and the Solicitor General.  Jeff Wall was the

5    Solicitor

6    General that was on that.

7                 So it was what I would call senior

8    leadership.  I don't mean any disrespect to anybody who wasn't

9    on the call, some folks were unavailable, some were career

10   people.  Included was the senior non-career DOJ leadership.

11       Q.  And before walking into the Oval Office, driving

12   over, did you get feedback, I guess, from Mr. Donoghue as

13   to what senior leadership's position was in all of this?

14                 For example, did Mr. Donoghue communicate to

15   you that senior leadership was going to essentially walk with

16   you at that point?

17       A.    Yes.

18       Q.  And so you knew that going into the meeting with the

19   President, that senior leadership had all expressed that?

20   Essentially, if you go, they go?

21       A.      Yes.  Mr. Donoghue was very clear on that.

22       Q.  So when you get to the Oval Office, is it fair to

23   say that tensions -- you have uninvited Mr. Clark from your

24   ride over -- they are pretty high at this point.

25       A.  Well, it's -- the lines have been drawn. He's made

1    his choice that he was willing to accept the appointment to

2    be the Acting Attorney General and pursue what he thinks was

3    -- or, at least, he's asserted was his preferred course.  And

4    I've been clear that if it means -- if that course is going

5    to happen, I can be fired or resign, it doesn't really

6    matter, because I'm not going to do that.

7        Q.  And I think you mentioned when our colleagues on

8    Senator Grassley's side were asking questions, the meeting,

9    ultimately, in the Oval Office, lasted for some time, about

10   two hours or longer?

11       A.    Yes.

12       Q.  And so -- and, essentially, in that meeting, it was

13   the seven lawyers, I believe?

14       A.    That's correct.

15       Q.          And it was six against one; that "one" being

16   Mr. Clark?

17       A.    That's true.

18       Q.  And you mentioned also that you were concerned

19   because one of the first things that were said when you walked

20   into the meeting was that President Trump said to you, "Well,

21   we know as long as you're running the Department, nothing is

22   going to happen here."

23       A.    That's right.

24       Q.  So would you characterize, then, the next two hours,

25   or however long it was, that the six of you, who are on your

Trustpoint.One | Alderson    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

1  side of things, were trying to convince President Trump not to

2  go with the course of action that Jeffrey Clark had stated,

3  which was installing him as the AG?

4       A I'm sorry, I missed the beginning.  Could you repeat

5  that?

6       Q.  So for about that two-hour time, what were you and

7  the other six members, who are on your side of things, doing,

8  we'll say?

9       A.  This is a wide-ranging discussion of both the letter

10  and course of action.  The -- well, just generally, the path

11  that Jeff Clark was advocating.  His view was that that letter

12  itself, actually, that if he sent it to multiple places, it

13  would set off multiple steps of action.  At least, that's what

14  he said.  I don't know for sure what he was thinking, but

15  that's what he said.

16              And each of the others of us were opposed to

17  that, but, as I said, other people also wanted to address the

18  qualifications.  In addition to that's a bad course, I think -

19  - Mr. Herschmann, I can recall in great detail, was highly

20  critical of Mr. Clark's qualifications and capabilities.  And,

21  again, I'm putting that in a relatively polite manner.  He was

22  aggressive.

23              So there was some extensive discussion on

24  those lines.  I -- to some extent, those things I let others

25  do the talking.  I didn't think I needed to address what my

1    qualifications are, something like that.

2            So I saw, at some point -- I've seen some

3    press-reporting on this.  It was pretty accurate.  But the one

4    thing I differed was I saw the characterization that said it

5    was "Celebrity Apprentice."

6            As if Jeff Clark and I each have to bid on it and

7    advocate our credentials.  It wasn't that.  There was no

8    effort on my part to try to compare the capabilities of either

9    of us to run the Department.  Even if he didn't do that.  But

10   other people did want to speak to that.  Not in the way that

11   I'm pejoratively addressing it, but people just saying "The

12   Department is well led.  This is not -- if you make a change,

13   this is not the way you should do it or who you should do it

14   with," and some of that was to say quite aggressive.

15           But I think more of the conversation was

16   about the imprudence of going down the path Jeff Clark was

17   advocating.  And it was lots of discussion on why that was

18   bad, legally, why it was bad for the country, why it was

19   inconsistent with the Justice Department's role.

20               And I heard -- not just for me, but from the

21   other five people that were there, some very persuasive and

22   articulate discussion of that.  And I think other folks also

23   made the point that the Department is unified on Rosen's

24   position.  So this is not a, you know, "He said this.  He said

25   this.  He said that."

1                              (Discussion off the record.)

2              BY MS. McCLAIN WALTON.

3        Q So just to put a finer point on it, I want to be true

4   to my word about five minutes here.  I know lawyers always say

5   five minutes, and they don't mean that.

6        A.     No judge will ever believe that.

7        Q.   The discussion in your mind, while some are focused

8   on the qualifications of who is better qualified to be Acting

9   Attorney General, the discussion for you and for much of this

10  is just what is the path that the Department of Justice is

11  taking from here; right?  The path of Jeffrey Clark, or the

12  path of Jeffrey Rosen; correct?

13       A.     I think that's a good way to put it.

14       Q.   And because this conversation went on for two hours

15  and you had six legal minds discussing this issue, seven

16  including Mr. Clark, it's fair to say that you were receiving

17  some pushback from the President as to which path he should be

18  taking as you were assessing it?

19       A.   Well, as I alluded to earlier, the meeting proceeded

20  in different ways at different points.  The President at some

21  points was just listening, he was just sitting back and

22  inviting people to debate and say what they wanted to say.

23  There were other parts where he engaged or asked questions.

24                    I can remember several places where he asked

25  questions.  I was just thinking about this.  He did ask Mr.

1    Engel to weigh in.  Steve Engel had been in the OLC for most

2    of the administration, so I think the President was familiar

3    with Steve from past instances of seeking his advice.

4         Q.  At some point in this conversation, did the

5    President -- I think you did allude to this earlier with my

6    colleagues -- mention that he wanted to fire the U.S. Attorney

7    in Georgia --

8         A.    Yes.

9         Q.         -- the Eastern District of Georgia, U.S.

10   Attorney Pak?

11        A.  So as I referenced before, I would say during the

12   meeting, that wasn't an issue.  I think after the meeting had

13   been -- had resolved the questions that the President was not

14   going to make the change to Jeff

15   Clark, there was this sort of tail end of the meeting

16   in which -- as you might expect, it was a pretty significant

17   couple of hours.  When the President said he's not going to

18   make the change, that was an important moment in terms of what

19   I needed to do.

20             So it was some time after that, we were

21   thinking it's time to get out of here, that that came up.

22   And as I alluded to before, my recollection is I know that

23   Rich Donoghue and I were defending that Mr. Pak not be

24   fired.  And my recollection is there wasn't a single person

25   in the room recommending that he should be fired.  I think

1    everybody who spoke was against it.

2        Q.  And do you recall if, during this meeting, everyone

3    told the President that U.S. Attorney Pak is resigning anyway,

4    making the point kind of moot; correct?

5                Ms. McClain Walton.  And just for the record,

6    Mr. Rosen nodded his head to that question.

7        Mr. Rosen.  Well, yeah.  I should just say

8    what I said before, which is, this part of the meeting, I

9    don't have as clear a recollection of each step of the way.  I

10   think I was thinking at that point it's time to go.

11           So I somewhat need to defer to others'

12   recollections.  But, in general, I refer back to what I said

13   earlier.

14           BY MS. McCLAIN WALTON.

15       Q.  And then my very last question:  Do you recall

16   President Trump stating that he wanted to go outside of the

17   normal line of succession for who would replace U.S. Attorney

18   Pak and have U.S. Attorney Bobby Christine moved over to that

19   office and take over?

20       A As I stated, I think that that did come up, which I

21   think that is what happened.  Although, it didn't change

22   anything substantively.  I think Mr. Pak did resign and U.S.

23   Attorney Christine became the acting head of that office, but

24   my recollection is the assessment remained the same.

25           Ms. Zdeb.  Josh, excuse me, but before you

1   enter your exhibits, I have one follow-up to that question.

2          BY MS. ZDEB.

3      Q.  Do you recall the President indicating, as part of

4   his discussion about whether he would go outside the line of

5   succession, that he liked Bobby Christine and thought that if

6   he installed him, instead of the First Assistant U.S.

7   Attorney, that maybe Bobby Christine would do something about

8   the election fraud allegations?

9      A.       I think that's more -- more detailed than

10  the way I remember this breaking up.  I do remember Bobby

11  Christine came up, but I don't -- I think I need some

12  documents or things to sort this one out.

13          Ms. McClain Walton.  Thank you.

14          Mr. Flynn-Brown.  Mr. Rosen, thank you for

15  your time today.  I'm going to introduce two exhibits into the

16  record.

17          You do not need to comment on these at all. They

18  are one -- two press releases, both on January 6, 2021, from

19  Senator Grassley.

20          So Exhibit 13 will be -- this one is titled

21  "America Must Be Better Than This."

22                      (Exhibit 13, press release, was

23                      marked.)

24          Mr. Flynn-Brown.  The second one is titled

25  "Grassley's Statement on Electoral College

1    Certification," and that will be Exhibit 14. (Exhibit 14,

2                          press release, was marked.)

3              Mr. Flynn-Brown.  So that's it for me today. And I

4    want to thank you again for your time.  You've been here a

5    long time today to talk with us, and we really do appreciate

6    it.  So thank you very much.

7              Mr. Rosen.  Anything further from the

8    Majority?

9              Ms. Zdeb.  Just to add my thanks to my

10   colleagues.  We sincerely appreciate your making yourself

11   available voluntarily.  We appreciate your doing so on

12   Saturday.

13             The same goes for your counsel and Department

14   counsel.

15             I also want to extend my sincere thanks to my

16   colleagues on Senator Grassley's staff for making themselves

17   available on a Saturday, and also being very accommodating

18   with respect to some last-minute logistical changes.

19             Mr. Blumenthal.  I would add my thanks as

20   well having been here for just about all day and you made a

21   real effort to be forthcoming.  Thank you.

22             Mr. Rosen.  Thank you, Senator.

23             Thank you.

24             The only other thing I would like to say is

25   it's the nature of these things to be focused on the person

1   who, in essence, assumed the role of AG.  But as I maintained,

2   and still do, that the Department of Justice acted with

3   integrity and sought to do the right things.

4            I really want to underscore the people that

5   worked on the leadership team and many others throughout the

6   Department.  Some of them I've identified here today, but I

7   considered myself, then and now, very fortunate to have been

8   able to work with them in that time frame on their behalf and

9   with appreciation of their public service.

10           Ms. McClain Walton.  Thank you.

11           Ms. Zdeb.  Thank you, Mr. Rosen.  We can go

12   off the record.

13                        (Discussion off the record.)

14

15

16

17

18

19

20

21

22

23

24

25

1          Certificate of Deponent/Interviewee

2   I have read the foregoing ___ pages, which contain the

3   correct transcript of the answers made by me to the questions

4   therein recorded.

5

6

7

8

9

10                          _____

11                               Witness Name

12

13

14

15                          _____

16                               Date

17

18

19

20

21

22

23

24

25

**WORD INDEX**

**< 1 >**
**1**  11:22  13:*19*, *21*
135:*4*  146:*21*
147:*18*
**1:13**  77:25
**10**  83:25  84:2
135:*1*, *2*  150:2
**10:00**  1:*17*  65:*3*
**10:04**  2:*1*, *3*
**10:16**  11:*1*
**100**  149:*18*
**1001**  5:25
**11**  146:*17*, *18*
**11:14**  42:20
**11:27**  42:23
**115,000**  127:8
**11th**  13:25
**12**  150:*10*, *11*
**13**  169:*20*, *22*
**14**  23:*23*  170:*1*
**14th**  11:*23*  12:6, *19*
24:*16*
**15**  81:*14*  83:25
84:2  136:2  156:*12*
**15th**  24:*25*  28:*3*
32:*23*  40:*18*, *23*
41:5  78:8  82:*1*
**16**  11:*11*
**18**  5:25
**1st**  146:*12*, 20
150:*17*

**< 2 >**
**2**  7:6  19:20, *23*
128:*12*  145:2
**2:28**  110:7
**2019**  8:25  11:*11*
20:*20*
**2020**  2:*12*  8:9
13:25  18:2  19:*21*
20:*19*  29:5  43:*13*
44:6  56:5  57:8
62:*1*  73:*17*  74:25
98:*13*  120:7  121:5
123:7  124:*20*
125:*16*  133:*12*
**2021**  1:*13*  7:*3*, 4, 6
9:25  44:*15*  45:7
110:*12*  135:5
169:*18*
**20th**  79:*17*  114:*13*
156:*17*
**21st**  39:*15*  80:2, *11*
**23**  86:*18*
**23rd**  11:*13*, *15*, *23*
42:*3*, 4, 6  80:*18*
**24**  8:*4*  86:*18*
**24th**  11:*14*  41:6
42:*3*, *16*  57:*15*

**80:22  81:*1*  83:20**
84:*13*  89:5
**26**  7:*3*
**26th**  84:*16*  86:*12*
87:*13*  88:*10*  89:7
**27**  57:8
**27th**  39:22  40:2*1*,
22  88:*12*, *21*  89:7
136:*13*, *14*
**28**  44:6  86:*13*
98:*13*  101:8
**28th**  39:22  43:*13*
106:*3*
**29th**  106:*13*  136:*16*
**2nd**  144:20  145:*1*,
5  146:*10*  152:9, *10*,
*14*, *15*, 22  153:*12*, *15*

**< 3 >**
**3**  23:*13*, *14*, *21*
44:*14*  45:6  110:*12*
119:7
**3:00**  117:*14*  146:2*1*
157:*24*
**3:14**  136:6
**3:24**  136:9
**30**  133:*12*  136:25
**30th**  117:8  137:*4*
**31**  118:*3*  128:*19*
**31st**  136:23  137:8,
*15*  139:*14*
**3rd**  9:25  45:*10*, *12*,
20  46:2*1*  61:22
77:*10*  87:6  110:*10*,
*12*  152:*11*  157:7

**< 4 >**
**4**  43:5, 8
**4:00**  46:7  159:*23*
**4:13**  150:*17*
**4:40**  99:*10*
**425**  23:22
**45**  155:6, 8

**< 5 >**
**5**  56:2*1*, 22, *23*
88:*17*, 20, 22
**50**  65:*16*, *18*
**55**  125:6
**598**  133:6, 9

**< 6 >**
**6**  86:*13*  98:5, 6, 8
169:*18*
**6:00**  99:9
**6:15**  46:*12*  48:*1*
160:*1*
**6:30**  48:*4*
**601**  133:6, 9
**6697**  98:6

**673**  150:9
**675**  135:*1*
**678**  146:*16*
**68**  26:7
**680**  13:20
**697**  98:9, *11*
**6th**  127:*17*

**< 7 >**
**7**  1:*13*  119:*18*, *19*
120:7  121:*23*
**714**  127:*12*
**735**  56:*16*, *19*  57:*11*
**736**  56:*15*  57:*10*,
*11*  58:*16*
**737**  60:5  63:8
92:*24*
**738**  64:*15*  94:*24*
**739**  94:*24*
**741**  68:*23*
**742**  56:*16*, *19*
**744**  43:5  44:*4*
**745**  43:*14*, *17*
**750**  43:5
**751**  119:*13*
**754**  119:*13*

**< 8 >**
**8**  127:*12*, *13*
**8:30**  48:5

**< 9 >**
**9**  7:*4*  133:6, 7
**90**  65:*12*, *13*
**94**  73:*10*  74:*18*
**9th**  19:2*1*  20:2
21:*18*  75:*11*

**< A >**
**a.m**  1:*18*  2:*1*
**A/AG**  44:*14*, *21*
**AAG**  44:*15*
**ability**  15:*18*  16:22
**able**  66:2  86:25
115:*16*  125:2*1*
126:*10*  146:6
160:2*1*  171:8
**Absolutely**  153:9, *11*
**abstraction**  90:7
**accept**  9:8  61:20
148:*19*  149:*15*
161:7  163:*1*
**acceptable**  89:*18*
**accepted**  53:*15*, 24
55:*17*  86:5  103:*18*
117:25  118:9, *17*
149:*10*
**accepting**  103:2*1*
104:*3*  159:*16*

**access**  10:*10*  77:4
85:*12*  100:*16*
145:6, 9
**accessed**  100:*4*
**accommodating**
170:*17*
**accommodation**
107:*19*
**accompanied**  4:9
**accomplished**  31:*11*
**accuracy**  63:*17*
66:*24*  75:6
**accurate**  20:*12*
24:*24*  26:*14*  30:20
39:*1*  44:*17*  52:7
59:*3*  61:*1*, *19*
66:*13*  94:*16*
125:22  132:9
134:*14*  165:*3*
**accurately**  138:6
**accused**  91:*12*
**acknowledged**
84:*23*  112:7
**acknowledging**
118:25
**acquiesced**  9:*15*
**acquitted**  28:*15*
**acronym**  26:*18*
**acted**  9:*21*  100:*23*
171:2
**Acting**  7:*19*  8:*3*
9:6  10:*13*  11:*12*
12:*16*, *23*  24:*17*
29:*3*  41:6  44:2*1*
45:*3*  49:7  50:*11*,
*14*  53:9  100:25
104:*19*  110:20
127:9  154:*12*
161:*10*, *14*  163:2
166:8  168:2*3*
**action**  34:5  38:*17*
56:*4*  98:*19*, 20
141:22  164:2, *10*, *13*
**actions**  8:*18*  9:5,
*14*  10:6, *19*  32:*14*,
*16*  49:*12*, *21*  62:*19*
97:*3*  143:*1*
**activities**  3:5  13:*17*
**activity**  79:5
120:*23*  121:5
132:*23*  133:*18*
136:20
**actual**  9:20  12:*3*
60:*17*  75:7, *10*
94:8  141:8, 9
**add**  6:*12*, *18*  131:5
170:9, *19*
**addition**  164:*18*
**additional**  5:*3*
10:*10*  88:*14*  136:*3*
146:25  150:*17*

**address**  10:22
107:22  120:*1*
126:*11*  134:8
157:20  160:6
164:*17*, 25
**addressed**  18:7
24:*4*  70:*10*  125:*15*
134:23  135:2*1*
**addressing**  27:*17*
90:9  165:*11*
**adjourns**  110:22
**administration**  22:*3*
60:22  86:2  101:9
126:8  167:2
**advance**  23:*18*
85:5  128:*24*
**advice**  51:25  52:5,
*24*  53:2  55:*4*
118:8  167:*3*
**advise**  15:20
129:22
**advised**  27:8
**Adviser**  47:*12*
**advisers**  53:8  143:7
**advocate**  161:*19*
165:7
**advocated**  50:*17*
**advocating**  158:8
164:*11*  165:*17*
**affidavit**  147:*4*
**affirm**  7:20
**aftermath**  77:*11*
**afternoon**  28:8
42:*4*, 9  45:*15*  58:7,
*11*  80:*10*  84:*13*
107:*15*  114:*12*
117:8, *17*  137:9
139:2  146:2*1*
157:2*1*  158:9
**AG**  11:*12*  19:*12*
21:25  22:*17*  24:*16*
28:8  29:2, *11*, *16*
32:*3*  37:*24*  39:*16*
41:*10*, *14*  42:2, 8
76:*3*  92:*13*  107:*18*
121:*17*, *19*, *23*
164:*3*  171:*1*
**agencies**  63:*1*
**Agency**  26:*17*
**agents**  124:22
**aggravated**  116:*11*
**aggressive**  116:*1*
155:*16*  164:22
165:*14*
**ago**  10:9  88:7
89:22  90:*19*  138:*23*
**agree**  17:6  48:*16*
63:*3*  71:24  92:9
93:*12*  98:*15*
**agreed**  24:*18*  51:2*1*

130:6
**agreement** 53:8
**agrees** 129:18
**AG's** 26:18 77:4
78:21 161:25
**ahead** 65:3, 13, 15
101:25 102:2
136:22
**albeit** 22:22
**alike** 74:17
**allegation** 61:3
126:14, 24 150:21
**allegations** 24:8, 11
26:3 34:5 36:12
38:5 48:10 56:13
59:14, 15 60:10
62:1 64:10 70:23
71:5, 9 73:4, 11
75:12 110:15
120:11, 16 121:11
123:4, 23 124:18
125:1, 17 126:1
128:6 132:22
133:17, 22, 24
134:21 135:6, 7, 10
150:18 169:8
**alleged** 66:14
133:17
**allegedly** 64:17
**allow** 48:21
**allowable** 27:10
**allowed** 50:20
**allude** 167:5
**alluded** 11:4, 16
71:12 72:16 76:2
80:20 83:14 92:18
97:24 105:22
113:15 122:9, 20
134:9 137:3 140:4
142:18 144:19
147:25 153:1
166:19 167:22
**alluding** 20:5
100:3 132:12
141:17
**allusion** 141:21
**alongside** 7:25
**altered** 122:16
**alternative** 10:5
**amenable** 67:19, 20
130:5
**America** 112:23
113:1 169:21
**American** 7:17
59:12 60:3 62:25
72:12, 21 95:22
125:7 148:16
**amount** 3:11 63:15
103:15
**Amundson** 73:18

120:19 122:12
**analogously** 135:12
**analyses** 26:23
**analysis** 64:23
**and-a-half** 40:25
**angry** 35:5
**animated** 149:1
**announce** 12:6
**announced** 8:6
11:23 12:20 20:1
21:24 23:12 28:15,
23 92:13 121:24
**announcement** 80:4
**annoyed** 114:21
**anomalies** 150:19
151:3, 11
**answer** 5:14, 18
9:2 10:7 21:15
28:17 68:18 69:14
80:7 86:8 87:9, 17
98:16 125:21
143:13 145:6, 15
146:5 160:11
**answered** 67:6
114:22
**answers** 172:3
**Antell** 5:11
**anticipate** 3:21
**anticipated** 53:23
**antitrust** 156:5
**Antrim** 24:8 38:14
**anybody** 60:24
114:3 162:8
**anyway** 168:3
**apologetic** 85:4, 8
**apologies** 146:13
**apologize** 19:17
23:18 80:14 126:18
**apparent** 60:8
**apparently** 106:24
**appear** 2:18 4:3
113:19 148:5
**appearance** 123:9
**appeared** 8:25
26:15, 20 104:3
**appearing** 2:17 4:5
**appears** 92:25
**application** 21:23
23:4
**applies** 6:1
**apply** 3:5
**appoint** 32:21 34:3
**appointed** 8:15
**appointee** 131:19, 25
**appointees** 55:25
56:2
**appointing** 32:23
**appointment** 44:2
163:1
**appreciate** 2:17
20:14 40:16

132:24 160:24
170:5, 10, 11
**appreciation** 171:9
**Apprentice** 165:5
**approach** 22:7
33:19 46:16 49:15,
24 50:25 129:9
**approached** 134:2
**appropriate** 9:2
14:23 15:23 37:14
40:4 51:23 92:5,
21 99:23 126:6
129:24 135:14
152:3, 20
**appropriately** 95:22
**approval** 56:1
74:24
**approve** 74:11
**approximate**
137:16 139:9
**approximately** 48:6
**April** 8:25
**Archives** 138:14
**area** 70:17, 18 81:5
125:19
**Arena** 120:11, 15
121:11 123:4
**argument** 95:13
**arguments** 51:5
102:24
**Arizona** 81:18
102:22 105:4
112:24
**arrange** 159:25
**arrived** 5:2
**articulate** 165:22
**aside** 11:25 34:19
79:7 90:2 91:9
123:4 134:20
138:11 141:14
147:25 161:1
**asked** 23:2 24:17
25:1 27:11 28:4,
22 34:2 36:9
40:11 52:24 57:14
75:22 78:11 85:16
90:19 94:23 97:1,
2, 13 107:3 113:22
114:7 115:13, 17,
19 130:4 132:19
143:6, 9 147:13
148:10 149:6, 22
154:23 159:24
161:2 166:23, 24
**asking** 12:22 21:4,
5, 12 36:8 49:23
61:10 70:21 83:12
84:19 87:24 88:11
99:25 107:17
112:18 163:8

**aspect** 15:13 40:15
101:24
**aspects** 26:15, 21
**assemble** 44:2
**assembling** 109:4
**assert** 97:8
**asserted** 25:6 72:3,
4 163:3
**asserting** 35:14
**assertions** 26:5
72:5
**assess** 134:4
**assessed** 135:21
**assessing** 166:18
**assessment** 25:12
32:17 37:25
129:21 140:9
168:24
**Assistant** 9:6 40:3
83:4, 6 99:4
152:20 161:23, 24
162:3 169:6
**Associate** 15:3
161:25
**assume** 66:6
154:12 155:2
161:22
**assumed** 171:1
**assuming** 3:15
**assumption** 121:22
**assurance** 128:23
**assurances** 144:5
**assured** 85:22
**Atlanta** 130:19, 21
145:4
**attached** 14:14
121:8
**attachments** 14:4
23:25 24:7
**attack** 35:16
**attempts** 2:12
**attend** 5:1 28:21
78:9 156:7
**attendance** 5:4
42:25
**attended** 28:2
86:15 138:3
**attending** 4:23
**attention** 15:14
37:18 72:13 151:9
**Attorney** 7:19 8:3,
6 9:6 10:14 11:15,
16, 24 12:16, 17, 20,
23, 25 14:12, 13
15:2, 3 16:10
17:11 18:1, 9, 18,
25 19:20 20:1, 18,
22, 25 21:10, 18
22:8 23:11 24:17
27:11 28:22 29:3
41:6 44:22 45:4

49:7 50:11, 15
51:8 53:10 54:2,
11, 14 55:23 70:16,
20 76:19 77:15
78:6, 9, 12, 17 79:3,
4 80:19 83:5, 6
101:2 110:20
115:20 121:17
122:3, 16, 22 127:9
130:21, 24 131:1
132:1 145:4
152:20 153:21, 22,
25 154:4, 7, 12
161:10, 14, 23, 24
162:3 163:2 166:9
167:6, 10 168:3, 17,
18, 23 169:7
**Attorneys** 27:18
55:5, 25 70:2
**Attorney's** 73:9, 11
74:18 95:23
**attributed** 87:18
130:20
**attributing** 140:8
**attuned** 151:22
**AUGUST** 1:13 7:6
**authorities** 70:8
116:5 125:10
128:10
**authority** 54:4
55:24 62:14 95:2
132:1
**authorization** 7:2, 3
85:6 123:9, 19, 24
**authorize** 7:6 75:12
**authorized** 3:18
15:12 86:9 123:25
**available** 145:12
170:11, 17
**avoid** 18:19 19:5, 6
**awards** 78:22
**aware** 5:3 6:6
12:1, 19, 25 15:4
27:3 57:4 81:15
107:4 112:22
121:3 122:18
123:5 124:19
128:5 133:20
135:9 140:19
**awareness** 21:12
75:23 76:12
106:10 122:10
141:5, 11

**< B >**
**back** 3:11 8:25
31:16 40:17 42:22
44:4 46:11 57:24
58:12 77:17 78:1,
17, 21, 25 80:14
81:14 87:15 100:5

102:*10*  104:*4*
110:*6, 9*  118:5
121:*8*  128:*11, 16*
131:*14, 15*  136:*3, 9*
139:*2*  142:*8*
148:*20*  149:*11*
152:*25*  155:*17*
157:*11*  160:*1*
166:*21*  168:*12*
**back-and-forth**
84:*22*
**bad**  30:*14*  51:*18*
61:*4*  117:*18*
164:*18*  165:*18*
**balance**  16:*13*  17:*4*
**balances**  17:*13*
**ballot**  135:*8*
**ballots**  18:*21*  19:2
30:*23, 25*  65:*11*
66:*1*  67:*24*  68:*1*
127:*24*  130:*19, 24*
**Barr**  8:*6*  11:*15, 25*
12:*20*  13:*1*  18:*1, 9*
21:*1, 25*  23:*12*
24:*16*  27:*11*  28:*8,*
*22*  29:*2, 6, 16*  32:*3*
37:*24*  39:*16*  41:*10,*
*14*  42:*2, 8*  74:*25*
75:*11*  76:*3, 25*
78:*6, 10, 17*  80:*19*
92:*13*  107:*18*
121:*19, 23*  122:*16*
**Barr's**  11:*16*  18:*18*
19:*1, 12, 21*  20:*1*
26:*18*
**based**  36:*24*  37:*6*
49:*10*  61:*5, 6*
66:*21*  75:*7, 18*
92:*25*  96:*10*
112:*11*  123:*15*
127:*25*
**basic**  11:*7*  50:*19*
**basically**  42:*13*
79:*11*  83:*14*  103:*5,*
*18*  114:*11*  155:*19*
158:*7*
**basis**  7:*22*  17:*18*
62:*7*  143:*24*
**Bates**  13:*20*  43:*14*
56:*15, 18*  57:*11*
98:*6*  119:*13*
127:*11*  133:*5*
134:*25*  146:*15*
150:*9*
**Bates-numbered**
23:*22*
**Bates-stamped**  43:*5*
**bear**  138:*11*
**began**  8:*4*  19:2
**beginning**  40:*15*

48:*15*  126:*18*  164:*4*
**begins**  13:*19*  56:*19*
**behalf**  2:*16*  7:5
62:*25*  171:*8*
**belief**  71:*9*
**believable**  113:*20*
**believe**  11:*21*
12:*18*  26:*24*  29:*22*
43:*1*  57:*8*  63:*20*
64:*7*  75:*11*  94:*1*
109:*18*  121:*19*
124:*2*  127:*12, 23*
130:*1*  147:*21*
150:*9*  153:*15*
161:*20*  163:*13*
166:*6*
**believed**  92:*22*
160:*10*
**bell**  18:*22*  59:*9*
106:*8*
**belligerent**  35:*9, 22,*
*25*  36:*3, 7, 13, 17, 23*
**benign**  31:*1*  89:*18,*
*19*
**best**  8:*1*  10:*7*  28:*9*
41:*4*  46:*10*  48:*2*
54:*17*  57:*4*  58:*25*
74:*2*  75:*20*  76:*16,*
*21*  86:*12*  99:*2*
111:*8*  112:*11, 12*
116:*22*  118:*21, 24*
120:*1*  129:*24*
134:*19*  137:*16*
141:*25*  142:*1*
152:*2*  157:*23*
**better**  15:*6*  28:*14*
31:*9*  48:*18*  115:*16*
121:*9*  124:*16*
126:*15*  147:*11*
151:*23*  166:*8*
169:*21*
**beyond**  79:*13*
**bid**  165:*6*
**big**  75:*8*  80:*4*
92:*12*  124:*21*
127:*7, 9*  156:*18*
**big-picture**  92:*17*
**bike**  57:*23*
**bin**  30:*25*
**bit**  22:*7, 9*  33:*18*
40:*17*  57:*22*  72:*19*
75:*4, 23*  80:*14, 23*
84:*22*  88:*11*  90:*17*
94:*10*  102:*12*
103:*7, 8, 9*  104:*20*
109:*14*  110:*21*
120:*25*  131:*9, 10*
136:*13, 18*  142:*25*
147:*20*  151:*13*
152:*13*  153:*7*
155:*10*  159:*9*

**BJay**  54:*6, 19*  55:*5,*
*9, 10, 16, 17, 21*
70:*18*
**Blackburn**  119:*3, 4*
**blue**  82:*23*  99:*3*
147:*9*
**Blumenthal**  2:*25*
56:*20*  170:*19*
**blunt**  80:*7*
**blur**  149:*8*
**Bobby**  70:*19*
168:*18*  169:*5, 7, 10*
**boots**  71:*4*
**boss**  131:*16*  151:*6*
155:*17*
**bottom**  13:*20*
15:*15*  23:*22*  40:*6,*
*7*  43:*6*  58:*16*  63:*8,*
*12*  64:*16*  94:*24*
98:*7*  146:*16*  150:*10*
**bound**  49:*19*
**Bowdich**  120:*8*
122:*12*
**Brad**  5:*9*
**brain**  96:*19*
**Branch**  22:*21*
62:*24*  73:*14, 16*
74:*10*  75:*18*
119:*13*  121:*16*
123:*6*
**Branch's**  17:*24*
**break**  3:*13, 14, 16*
87:*7*  88:*12*  92:*1*
109:*16*  113:*4*
**breaking**  169:*10*
**brief**  8:*22*  27:*12*
40:*4*  104:*18, 20*
106:*1*  108:*18*
114:*19, 25*  115:*22*
116:*2*  118:*4*  127:*4*
152:*8*
**briefed**  26:*19*
101:*16*  153:*13*
**briefing**  24:*22*  26:2
98:*22*  102:*16*
104:*8*  129:*16*
130:*5, 11*  153:*16*
**briefly**  17:*21*  78:*4*
94:*10*  111:*11*
118:*23*  146:*11*
**broad**  34:*8*
**brought**  48:*20*
54:*10*  81:*13, 14*
106:*4*  122:*23*
**Brown**  4:*8*  6:*24*
**brushoff**  115:*10*
**Building**  1:*19*
157:*25*
**bullet**  115:*14*
**business**  156:*2, 3, 7,*

*8, 21*  157:*9*
**busy**  69:*23*  99:*9*
**bypassing**  12:*21*
**Byrnes**  4:*10*


< C >
**cabinet**  134:*15*
**calendar**  81:*7*
**calendars**  144:*19*
**call**  16:*12*  32:*1*
37:*20*  38:*20*  39:*20*
40:*19*  41:*10, 12, 13,*
*20*  42:*5, 10, 15*
53:*15, 19*  57:*7, 12,*
*18, 21*  58:*21, 24*
63:*18*  80:*17, 21, 24*
81:*8*  82:*8*  83:*13,*
*20, 24*  87:*12*  88:*11,*
*15, 21*  89:*3, 4, 7, 9*
92:*10, 23*  114:*16*
115:*10*  116:*12*
117:*4, 12, 16*  118:*6*
124:*13*  130:*23*
136:*14*  137:*4, 7, 14,*
*18*  141:*24*  142:*1*
148:*1, 8, 12*  149:*3*
156:*2, 11*  157:*17*
160:*19*  162:*2, 7, 9*
**called**  33:*7*  39:*3*
41:*1, 2*  42:*2*  46:*5,*
*8, 11*  57:*19*  58:*12*
81:*6*  84:*16, 19*
111:*14*  116:*20*
117:*4, 5*  124:*9*
131:*1, 2*  138:*25*
148:*20*  158:*10*
159:*23*  160:*1, 3*
**calling**  8:*19*  16:*12*
114:*17*
**calls**  16:*11*  110:*11*
115:*24*  117:*10*
137:*1*  151:*5*
**campaign**  8:*10*
71:*15*  114:*4*  134:*1*
135:*13*  148:*12*
**campaigns**  135:*16*
**capabilities**  101:*6*
164:*20*  165:*8*
**capacity**  86:*1*
**captured**  132:*3*
**captures**  138:*6*
**care**  15:*18*  134:*20*
**career**  22:*20*  162:*9*
**carries**  94:*24*
**case**  17:*17*  39:*25*
46:*3*  79:*25*  80:*5*
88:*25*  92:*16*  108:*7*
115:*4, 6*  117:*18*
123:*21*  136:*3*  137:*5*
**cases**  15:*8, 21*
74:*17*  75:*15*  123:*6,*

*11, 20, 22*  124:*22*
127:*7*
**cast**  19:*2*
**casting**  18:*21*
**category**  109:*3*
**caught**  85:*9*
**causality**  105:*24*
**cause**  79:*24*
**caveat**  62:*5*
**Celebrity**  165:*5*
**cell**  114:*13*
**ceremonial**  79:*2*
**ceremony**  79:*2*
**certain**  14:*22*  30:*3*
31:*19*  33:*11*  63:*15*
69:*9*  75:*14*  149:*18*
150:*6*  159:*2*
**certainly**  37:*3*  54:*4,*
*18*  89:*17*  97:*11*
125:*8*  133:*1*
143:*22*  155:*15*
**Certificate**  172:*1*
**certification**  8:*11*
19:*14*  75:*2, 14*
121:*6*  122:*18*  170:*1*
**certified**  18:*21*
19:*3*  67:*3*  92:*20*
123:*7*  130:*3*
**cetera**  27:*19*  66:*12*
**Chad**  29:*24*  138:*9,*
*17*
**chain**  120:*18*
126:*16, 22*  146:*21*
**Chair**  2:*9, 16*  4:*18*
47:*2, 3*  136:*8*
**challenge**  66:*23*
95:*11*  118:*16*
**challenged**  116:*15*
**challenges**  8:*11*
48:*22*  140:*12*
**challenging**  65:*1*
129:*21*  132:*8*
**chance**  103:*4*
**change**  8:*8*  10:*18*
11:*19*  32:*19*  59:*7*
66:*4, 21*  76:*12*
91:*19*  93:*14*  95:*2*
101:*9, 16*  104:*1*
143:*20*  144:*12*
154:*19, 20*  165:*12*
167:*14, 18*  168:*21*
**changed**  20:*1*
21:*10*  65:*18*  99:*23*
100:*19*  139:*23*
**changes**  20:*23*  21:*6*
170:*18*
**changing**  19:*13*
21:*16*
**channel**  14:*21*
15:*10*  126:*5*
**chapter**  113:*6*

characterization
165:4
characterize 75:7
163:24
characterized 157:2
charge 28:16 29:14
41:15 73:16
chart 158:15
chastised 85:4
chat 42:14 81:10
check 86:3 86:6
119:16
checking 41:17
Chief 2:19 4:20
29:23 41:2 46:5
71:3 106:9 107:13,
15 108:11 109:23
113:17 114:9
120:19 136:15
138:8 143:7 151:6
160:14
China 100:5
choice 145:22
163:1
choose 4:5
chosen 9:18
Christine 70:19
168:18, 23 169:5, 7,
11
Christmas 39:22
57:15 81:1 82:11,
12 84:14 86:17
106:25
Cipollone 29:22
47:9 50:13, 16, 22
52:10 106:18
107:4, 8, 12 110:24
111:5, 17 138:3, 7
160:3, 7
circle 132:21
circulated 14:19
circumstances
60:12 80:24
CISA 26:16, 25
27:12
citizen 125:7
city 69:17 70:7
Civil 3:4 9:7 15:8,
21 83:1 99:17
100:23, 24 101:1
104:18, 19 106:10
107:4 151:10
claim 96:23
claimed 114:24
claims 26:14 27:22
92:3, 6, 9 93:8
Claire 161:25
clarify 24:12 25:17
35:2 69:22
Clark 9:7 10:1
11:4, 5 43:14, 22

45:24 46:1, 3, 6, 15
47:17 48:12 49:5,
14, 23 50:10, 14, 16,
22, 25 51:4, 7
52:14 53:5, 8, 13,
17, 22 54:17 61:21
77:13 82:22, 25
83:11, 21 84:4, 16
86:11 87:10, 12, 17,
23 88:1 89:2, 6, 10,
15, 17 90:4, 15, 23
91:1, 3 98:14 99:4,
17 100:10 101:17
102:4, 12 103:13
105:19, 25 106:2,
11, 12, 16, 22, 24
110:19 111:7
112:21 119:8
127:16 128:13, 21
129:5, 6, 7 130:5, 7,
11, 23 131:7
137:11, 17 140:23
141:1, 3, 6, 16, 18
143:4, 12 144:2, 13,
19, 21 145:22
150:20 151:9, 10,
13 152:15, 23
153:3, 12, 21, 24
154:3, 11 155:20
157:11, 12, 17
158:23 159:15
161:2, 6, 8 162:23
163:16 164:2, 11
165:6, 16 166:11,
16 167:15
Clark's 10:6 13:17
44:9, 15 48:25
91:10 106:9
153:16 164:20
classified 98:22
130:9
clear 20:7 29:15
30:3 35:13 38:9
48:19 51:7 67:25
91:7 107:7 127:25
139:8 143:17
144:22 162:21
163:4 168:9
clearance 129:22
clearances 99:18
clearer 96:6
clearly 10:12
Cleta 133:13
clicked 147:12
close 42:18 141:19
146:2
closely 115:3
closest 47:18
closure 76:19
155:14

clue 90:17 161:22
Cobb 128:2
coinciding 80:18
colleague 13:18
36:9 88:10 92:1
94:23 96:17
106:19 118:2
135:25 136:19
151:4 152:5
colleagues 4:9 6:11,
17 163:7 167:6
170:10, 16
collectively 160:18
College 8:12 28:13
169:25
Collins 7:5
colloquial 62:9
color 40:13 146:25
colossal 159:7
combining 51:2
come 26:18 27:12
28:7 33:1, 12
38:18 40:17 75:22
85:17 105:15
106:11 108:1, 10,
18 124:12 125:2
128:17 129:25
132:4 139:2
141:16, 23 142:2
157:11 160:24
168:20
comes 22:15 61:22
90:17 99:11 143:5
comfortable 143:22
comfortably 90:12
coming 57:16
72:25 131:12
148:11 155:16
156:5
command 104:1
comment 9:4
59:23 61:16 92:15
122:8 123:14
169:17
commentary 54:21
commented 123:18
commenting 62:18
comments 8:17
50:24 71:2 101:23
139:24
committed 37:5
COMMITTEE 1:2
2:20 3:5 4:4, 14
9:1
committees 44:1
Committee's 2:10
3:21
common 16:18
151:12
Commonwealth
113:2

clue 90:17 161:22
communicate 15:7
160:21 161:8, 15
162:14
communicated
13:12 96:22
107:18 161:14
communication
23:11
communications
14:22, 24 15:4, 11
17:10 22:14 97:1
110:14 137:20
144:18
companion 14:5
compare 165:8
compile 162:1
complaint 112:22
113:1 118:13, 20
119:8
complaints 27:17
60:14 63:22
complaints/reports
60:7
complete 3:22 5:15
completely 37:13
complicated 133:2
comply 76:25
122:19
component 98:25
components 69:13
comprehensive 70:6
128:14
concept 104:24
132:3 134:8
154:24 160:18, 20
161:15 162:3
Conceptually 19:12
140:21
concern 37:21 39:4
59:12 63:21
concerned 27:2
37:21 59:17 60:2
72:13 96:11
143:24 163:18
concerning 15:20
24:8 87:21
concerns 48:17
60:13 61:7 140:22
concluding 136:12
conclusion 53:12
concur 120:22
conduct 122:6
conducted 1:18
conference 39:16
78:22 79:3, 8 80:1
96:1, 3, 4, 7 97:19
102:5, 8 156:5
conferences 49:12
confidence 58:17
59:13, 17, 21 60:3

confident 149:20
confines 123:12
confirm 160:12
confirmation
131:19, 25
confirmed 7:15
11:10 32:8
conflict 155:11
confused 100:9
144:17
Congress 5:19
107:17, 19 109:19
Congressional 5:24
8:23
Congressman 85:14,
15 86:20, 23
Congressmen 66:16
95:6 104:14
connected 86:23
Connecticut 3:1
conned 102:14
consequential 80:20
103:17
consider 129:2, 16
154:16
considerable 51:22
52:21 126:10
consideration 20:22
21:13, 16 76:20
considerations
17:19 70:13
considered 21:6
135:20 144:11
154:19 171:7
considering 12:2,
21 21:19 143:14
151:24 154:15
consist 108:13
consistency 74:17
consistent 15:9
16:6 18:16 29:17
30:13 33:2 38:11
60:17 61:15 63:18
93:5 96:8, 15 97:7
112:12 132:9
consistently 9:21
72:3
constantly 72:20, 23
Constitution 7:23
8:13 36:25 63:7
constitutional 15:18
16:22 62:22
construe 44:24
65:22
construing 69:17
consult 4:4 77:1
88:25
consultation 74:23
125:20
contact 14:11
159:18

contacted 85:23
130:4 160:23
contacting 107:20
contacts 14:7
contain 172:2
contained 135:6
contains 73:13
contemplated 15:21
content 25:25 82:2
99:3, 6
contentious 103:8
contents 75:10
context 24:6 57:12
58:11 72:21 98:24
120:4 155:25
contextualize 11:7
contextualizing
13:16
continuation 121:15
122:1, 5
continue 4:16 24:6
34:15 50:20
139:25 152:2
continued 87:6
92:14 157:8
continuing 60:24
continuity 140:21
contradict 32:17
contrary 8:21
128:23
contributed 63:21
control 36:20
61:11, 13 63:1
94:17
controlling 100:13
convened 1:17
conventions 17:12,
14
conversation 7:12
13:4 35:14, 15
40:9 41:9 46:6
52:17, 19 58:20
78:5 82:21 84:23
93:6 95:10 99:6
105:6 107:8
116:10, 14 118:2
128:20 137:17
140:5 141:18
143:5 144:1, 4, 22,
25 146:10 153:7
154:10, 22 155:22
158:16, 23 159:4,
14 165:15 166:14
167:4
conversations 16:3
45:17 59:12, 16
64:4 76:17 93:7
110:11 157:8
convey 35:22 36:3
conveying 38:4

conviction 148:7
convince 164:1
coordinating 74:14
coordination 74:21
copies 19:18
copy 19:16 23:18,
19 56:20 98:4
138:14
copying 13:24
Corey 73:18
120:19 122:12
corner 44:13 57:6
correct 27:16 42:2
43:20 44:22 45:1
46:22 47:23, 24
50:4 53:4, 6, 11, 25
55:24 64:7 68:14
73:14 75:3 77:17
110:16 111:25
113:10 127:18
152:25 153:5, 14,
22 154:13 161:23
163:14 166:12
168:4 172:3
correction 154:14
correctly 28:5, 12
105:5
correspondence
121:7
corroborated 92:14
corroborative
151:13, 16
corrupt 8:17 31:13
66:15 95:5, 8
corruption 25:7
83:18 102:8 129:19
Counsel 2:20, 22
4:4, 5, 6, 8, 14, 15,
18, 20 10:3 15:1
19:17 29:22 33:8
34:3, 18 45:1, 4, 16
47:9, 10 50:5, 9
86:8 92:18 97:3
106:18 111:12, 16
124:7 136:16
138:8, 10 170:13, 14
counselor 157:1
160:15
counsels 5:6 32:22,
24 38:14
count 65:13
counted 65:17
counterpart 124:9
counting 30:25
country 8:2 10:10
51:18 112:13
159:6 165:18
County 24:8 26:6
27:4 38:14 69:3, 7,
13, 16, 17, 18, 23

70:2, 3 128:2
150:19
couple 11:7 23:25
28:24 76:7 79:16
80:13 86:7 88:14
101:19 104:13
105:25 108:4
111:6 167:17
course 5:1, 24
33:16 49:21 52:17
58:3 64:4 78:15
79:16 92:10
101:19 112:6, 11,
19 126:4 132:14
138:18 143:23
151:10 154:10
156:16 163:3, 4
164:2, 10, 18
Court 8:18, 22
38:17, 24 39:19
40:1 97:2 108:7
115:5 117:18
118:4 135:17
137:5 141:22
courtesy 4:24 5:3
courts 43:25
covered 25:2 42:11
123:10
crash 80:2
create 123:3 130:2
credence 148:6
credentials 165:7
credible 27:23
71:10
crime 60:10 73:4
123:6 125:25
crime-related 59:14
Crimes 17:23, 24
22:21 60:7, 15
63:22 73:14 74:10
75:2, 17 119:13
121:16 123:6 124:6
crimes-related 64:5
criminal 5:25 15:8,
21 73:5, 6, 7, 8
126:4 127:3
criteria 39:9, 10
critical 52:14
54:13 164:20
criticize 62:20
67:21
CTY 69:17
Cuccinelli 26:24
27:1 29:18 31:19
138:20
culminate 156:17
culmination 110:13
152:11
curiosity 147:11

curious 20:21 21:8
40:24 83:3 84:5
89:5 100:6
curiousness 84:6, 9
current 7:15
currently 29:13
custody 147:6
148:6
Cybersecurity 26:17

< D >
D.C 1:3, 19 81:5
DAG 12:15 65:21
127:16, 18
Daniel 42:25
data 52:15 61:6
date 19:14 21:7
39:21 117:7
121:23 136:24
172:16
dated 7:3, 6 44:6
Dave 120:8 122:12
day 10:6 12:4
19:14 23:11 24:16,
19, 20, 25 25:15
26:13 28:12, 15, 23
32:12 41:10, 25
42:2, 8 45:11, 13
65:12 74:6 80:21
81:1 84:14, 15
86:16 88:12 98:1
99:9 106:13, 15
107:15 110:25
113:12, 22 115:11,
20 118:5, 23
128:20 130:11
136:21, 25 137:7,
12 141:24 147:18
151:14 156:13
157:7, 25 159:1
170:20
day-long 114:2
days 27:7 32:7
39:15 55:11 79:16
80:13 82:12, 15
86:7, 17 89:22
90:19 104:13
111:15 113:11
136:22
day-to-day 76:17
de 57:23, 25
deal 77:16 115:23
156:2
debate 48:21
166:22
debunked 130:16,
21 148:9
December 8:4
11:13, 22 23:23
32:23 40:18, 21
41:5 43:13 44:6

57:8 78:8 79:17
80:12, 18, 22 81:2,
14 84:13 86:12, 18
88:10 98:13 101:8
106:3, 20 117:9
118:3 120:7
121:23 128:19
133:12 136:13, 14,
16, 23, 25 139:14
148:15
decide 33:16 53:21
125:10 154:18
157:11
decided 10:4 13:1
33:16 77:15 102:1
110:18, 20 111:20,
23 158:5, 13, 14
decision 12:3, 5
44:2 53:10, 13, 24
54:1 77:12, 16, 18
111:2, 25 161:9, 13
decisions 53:25
110:22 123:20
declined 114:6
115:5 148:22
149:9 161:3
defend 62:19
defending 167:23
defensive 85:3
defer 57:16 168:11
definitely 40:13
52:13
definitively 118:5
138:19 142:2
degree 122:13
deliberations 44:3
deliver 118:10
delivering 30:12, 22
Democratic 4:22
denying 25:21
departed 11:15
13:8 42:8
Department 2:11
3:18 4:15 5:7, 10,
11 7:2, 21, 22 8:5,
7, 10, 21 9:11, 20
10:14 11:9, 17
14:5, 7 15:1, 7, 20
16:2, 15, 25 17:5,
13, 17 18:17 19:4,
7 20:20, 23 22:10,
22 23:4 27:12, 23
28:3 29:19 32:13,
14, 21 33:16, 21
34:9, 12, 14 35:1, 3,
7, 19, 23 36:4, 10,
21, 23 37:10, 24
38:7, 9, 16 39:5, 8
40:5, 8 46:18
50:19 51:17 56:12
60:22, 24 61:25

62:15  63:23  66:21
68:7, 20  69:12
70:1  73:3, 8, 25
76:18  78:14, 21
79:19  80:8  81:3,
15  82:5, 9  86:4
90:8, 9, 10, 13, 21,
22  91:2, 13, 16, 19,
25  93:19  94:20
95:24  96:11  97:13,
19  100:24  105:16
108:15  110:15
112:2  113:5
114:17  117:19
122:18  123:2, 16
124:25  125:1, 23,
24  126:17, 22
127:8  128:6  130:1
133:21  135:11, 14,
17  139:20  140:1,
10  141:6, 12
142:13, 14  143:2, 8
153:5  156:3, 6
157:9  158:15
160:9, 10, 19
161:17  163:21
165:9, 12, 23
166:10  170:13
171:2, 6
departmental  156:1
departments  13:9
63:1
Department's  9:15
12:14  13:24  17:22
21:21, 22  25:12
29:8  49:10  75:1
91:9  94:2, 13
102:19  118:9
124:16  143:19
156:21  165:19
departure  80:18
depending  47:8
Deponent/Interviewe
e  172:1
deputize  15:3
Deputy  4:20  12:22
13:4, 23  15:2  23:7
47:5, 10  76:19
107:13  120:8
122:3, 22  158:18
161:25
describe  64:1  75:25
described  25:25
52:20  78:15  80:17
100:6  139:15
147:5  152:10, 16, 23
describing  42:6
description  93:6
96:10
descriptions  20:6

designed  17:12, 14
desire  22:6, 9  27:24
desk  46:22  47:6,
18  114:16
destroyed  130:19
detail  89:24  108:24
127:4  132:25
164:19
detailed  169:9
details  22:4  23:9
33:7  55:21
determine  150:21
develop  21:20
developed  87:21
132:20
developing  142:25
development  4:25
developments
143:13
develops  143:2
DHS  24:22  26:2,
17  27:11, 20  31:24
138:10, 21
dialogue  93:9
didn  29:1  90:16
165:9
differed  165:4
difference  154:16
different  9:19, 25
17:21  20:6  27:17
39:10, 11  46:16
48:18  49:15, 18, 22
51:3, 5  62:7  74:18,
20  90:24  96:25
97:25  98:4  110:13
117:22  129:9
132:14  144:18
158:15  166:20
differential  27:9
differently  160:9
difficult  132:7, 8
difficulties  133:24
digits  43:7
digression  131:18
diligence  129:18
132:7  144:15  146:3
direct  58:19  93:1
152:9
direction  16:16
17:11  36:19  65:6
87:4  104:11  105:23
directions  159:9
directive  122:19
directly  161:11
Director  98:22
99:16  120:8  130:4
Dirksen  1:18
disagree  20:9
disagreed  9:10
disagreeing  75:9

disagreement  21:20
121:16
disappointed  129:10
discern  58:25
discredit  9:14
discrepancy  67:3
discuss  28:19
33:15  46:4  47:21
48:25  54:6  115:12
116:9  155:23
157:11
discussed  6:8  14:3
21:5  25:15  33:23
42:14  44:14  46:14
48:12  68:21  92:10
101:25  104:22
105:7  110:10
118:19  121:20
140:16
discussing  64:23
116:7  166:15
discussion  7:12
11:7  12:8  13:16
16:17  23:20  30:6
31:16  32:22  38:15
42:21  48:9  49:5
52:6, 25  53:12, 18
69:20  75:4, 21
77:24  78:19  79:9
86:11  88:2, 6  89:2
91:25  92:4  99:12
102:25  107:21
109:7  110:5
116:22  118:3
132:2  136:7, 17
141:14  144:9, 24
155:7  164:9, 23
165:17, 22  166:1, 7,
9  169:4  171:13
discussions  12:24
14:23  22:12, 18
78:15  140:3  155:4
dismiss  104:17
dismissed  8:24
displaced  137:19
displeasure  94:20
dispute  70:25  91:5
disputes  23:3
122:21  135:15
disputing  8:16
disrespect  109:20
162:8
dissatisfaction
103:9  140:8
dissatisfied  153:19
distinction  37:10
District  167:9
distrust  63:15
disturbed  154:9
Division  9:7  73:7,
8  83:1  99:17

100:23, 24  101:1
104:18, 19  106:10
107:5  126:4  127:3
151:10
Divisions  162:4
DNI  101:16  102:16
129:16  130:4
Dnoghue  47:15
document  13:15, 19
14:1  17:3  19:8, 15,
16, 19  20:15  23:14,
21  24:15  26:3, 4,
14, 15  43:5, 8, 11
44:7, 13  56:18
57:3  75:5  98:2
121:14  146:15
documents  10:10
39:20  75:10  85:12
123:15  169:12
doing  21:13  29:11
33:6  34:10, 14
35:1, 3  38:7, 9
49:2  50:21, 23, 24
62:10, 16  63:1
64:9  67:20  68:5
90:10, 13  91:16, 25
93:21  97:9, 23, 24
102:21  107:22
108:20  113:18
118:7  140:1
142:20, 21  148:2
149:16  159:13
164:7  170:11
DOJ  9:20  31:24
34:3, 4  39:15  42:8
60:6, 19  62:10
64:8  66:3  75:24
76:1  95:1  114:13
117:2  119:12
123:8, 14  124:7
125:18  128:10
138:7, 13  139:17
161:21  162:10
DOJ's  10:2  62:4
domain  30:14  33:4
100:3, 14  155:18
dominated  109:8
Dominion  27:22
100:4
don  43:1  48:16
77:8  137:7  141:5
159:16
Donohue  12:22
13:23  14:19  24:25
25:10  28:6, 20
29:20  35:11  40:19
43:19  44:5  47:5, 7,
14, 17  52:8  54:13
55:11  56:9  57:8
69:3, 6, 22  70:14,
22  78:9, 12, 20

79:1, 6  89:8  90:11
91:15, 22  93:18
98:14  99:12
101:25  102:9, 12
103:12  107:9
108:9  111:5, 12
120:8, 10  121:7, 9
122:2, 5  129:19
130:15  131:6
137:11  138:3, 7
139:5  141:3, 7
143:6, 20  144:7, 16,
21  146:4, 23
150:22, 25  152:14
155:15, 22  156:20
157:9, 10, 13  158:2,
18  160:13, 25
161:20  162:12, 14,
21  167:23
Donoghue's  44:18
59:1  82:18  88:18,
20  93:1  127:21
door  45:22
doubt  59:2, 24
63:17
doubting  60:20
Doug  7:5  106:12
Douglas  106:7
draft  40:4  43:22
44:10  45:5  48:12
49:5  51:9  53:5, 8
54:1  77:13  108:18
110:19  112:22
113:1, 4, 10  114:19
118:19  119:8
draw  15:14  103:1
drawn  162:25
drill  133:3
driven  142:23
driving  162:11
dropped  31:23
Drug  126:7
due  129:18  132:6
144:15  146:3
Durbin  2:9  4:18
136:8
duties  15:23  16:5

< E >
earlier  3:17  11:12
20:20  21:6, 19
51:3  64:7  72:16
75:4, 5, 19  76:3
83:20  94:23  95:9
97:25  100:6
105:22  112:15
118:2  122:9, 20
132:12  134:9
137:3, 11  138:20
140:3, 4  144:3
145:5  149:17

151:*4*, *14*, *19*   153:*2*,
*8*   158:*11*   166:*19*
167:*5*   168:*13*
**early** 22:*2*   51:*14*
80:*10*   87:*21*   112:*7*
**easier** 45:*19*
**Eastern** 167:*9*
**ECB** 76:*23*
**effect** 7:*4*   11:*17*
12:*25*   29:*10*   36:*11*
47:*12*   50:*24*   67:*12*
69:*2*   79:*19*, *24*
84:*20*   90:*4*   95:*4*
147:*14*
**effective** 93:*24*
**effort** 20:*11*   165:*8*
170:*21*
**efforts** 2:*10*   114:*2*
**either** 26:*11*   31:*24*
69:*22*   70:*7*   79:*6*
86:*16*, *17*   107:*12*
125:*8*   128:*18*, *20*
131:*14*   137:*20*
143:*22*   144:*4*
145:*23*   165:*8*
**elaborated** 39:*16*
**election** 2:*12*   8:*9*,
*16*, *17*, *20*, *22*, *24*
9:*9*, *12*, *15*   10:*18*,
*20*   11:*18*, *19*   17:*23*,
*24*   18:*10*, *11*, *19*
19:*14*   20:*19*, *24*
21:*5*, *9*, *14*   22:*21*
25:*7*   27:*18*   28:*19*
29:*5*   30:*4*, *14*
31:*13*   32:*19*   33:*8*
35:*15*   38:*24*, *25*
41:*9*, *21*   43:*25*
48:*10*   56:*5*   59:*7*
60:*10*   61:*7*   62:*1*
64:*5*   65:*2*, *4*, *10*
66:*4*, *15*, *21*   67:*14*,
*21*   72:*6*, *10*   73:*4*, *6*,
*14*, *17*, *22*   74:*1*, *5*, *9*,
*10*, *15*   75:*17*   78:*16*
79:*20*   80:*6*, *10*
81:*16*, *22*   83:*16*
88:*2*   92:*3*, *23*
93:*14*   95:*2*, *5*, *8*
96:*8*, *12*   99:*19*
102:*19*   104:*16*
108:*1*, *4*   110:*15*
112:*4*, *9*   117:*11*
119:*12*   121:*5*, *6*, *16*
123:*6*, *7*   124:*6*, *17*,
*20*   125:*12*, *16*, *25*
128:*4*   130:*3*
134:*21*   135:*15*
136:*18*   137:*2*
138:*21*   140:*9*   169:*8*

**election-related**
56:*13*   74:*11*   75:*2*
99:*20*   107:*23*
**elections** 10:*16*
17:*25*   59:*15*, *21*
75:*14*
**elector** 44:*2*
**Electoral** 8:*12*
28:*12*   60:*3*   169:*25*
**elevated** 76:*19*
122:*22*
**else's** 61:*10*
**email** 13:*21*, *23*
14:*4*   23:*23*   24:*2*, *3*,
*7*, *8*, *14*   25:*18*, *22*
43:*14*, *19*, *21*   44:*5*,
*8*, *9*   46:*15*   98:*8*, *13*,
*18*   99:*1*, *2*, *10*, *11*
100:*2*, *19*   101:*20*
102:*7*, *10*   119:*19*
120:*10*, *18*, *21*
121:*14*   122:*15*
133:*7*, *12*, *13*, *15*, *16*
135:*2*, *4*, *8*   146:*18*,
*20*   147:*2*, *10*, *21*
148:*22*, *24*, *25*
150:*11*
**emails** 110:*11*
138:*1*   146:*12*
**emphasizing** 16:*25*
97:*21*
**empowered** 101:*2*
**enables** 16:*14*
**enabling** 17:*4*
**encourage** 4:*3*
**encouraged** 159:*7*
**encouraging** 112:*15*
**ended** 10:*1*   46:*7*
80:*17*   111:*4*
115:*10*   155:*10*, *20*
**endorsed** 10:*1*
**energetic** 95:*16*
**enforce** 7:*23*
**enforcement** 15:*23*
71:*3*   126:*7*
**enforcing** 74:*16*
**engage** 116:*25*
150:*20*   151:*9*
**engaged** 166:*23*
**Engel** 47:*18*   51:*22*
52:*10*   101:*3*   107:*9*
108:*8*   115:*19*
117:*20*   143:*21*
156:*24*   160:*23*
161:*21*   167:*1*
**Engel's** 101:*5*
**English** 115:*18*, *21*
**ensuing** 86:*24*
**ensure** 7:*22*   15:*17*
17:*14*   62:*15*, *25*

72:*7*   157:*4*
**ensuring** 16:*21*
**enter** 6:*25*   169:*1*
**entered** 7:*9*   110:*4*
**enters** 136:*8*
**entertain** 129:*8*
**entire** 10:*2*   19:*3*
43:*6*
**entirely** 53:*25*   54:*3*
**entirety** 141:*11*
**entreaties** 10:*18*
**Environment** 100:*22*
**episode** 116:*23*
**episodes** 142:*19*
**equal** 3:*10*
**equation** 123:*1*
**Eric** 47:*11*
**error** 26:*8*   159:*7*
**essence** 171:*1*
**essentially** 18:*18*
19:*2*   23:*3*   79:*18*
105:*12*   141:*23*
145:*23*   153:*4*
154:*11*   162:*15*, *20*
163:*12*
**estimate** 48:*2*, *5*
**et** 27:*19*   66:*12*
**evaluate** 61:*9*   75:*22*
**Eve** 82:*12*   128:*19*
137:*15*   139:*3*
**evening** 9:*24*   45:*20*
137:*15*   141:*18*
143:*18*
**even-keeled** 35:*15*
**event** 78:*21*   79:*2*, *6*
**events** 7:*18*   10:*8*
32:*12*   40:*3*   41:*23*
84:*7*   87:*6*, *21*
138:*12*   152:*11*
**eventually** 126:*15*,
*22*
**everybody** 39:*14*
48:*20*   50:*7*   51:*4*, *5*
62:*10*   77:*18*
110:*22*   168:*1*
**evidence** 8:*7*   11:*18*
31:*5*   32:*4*   43:*25*
79:*19*   80:*8*   92:*17*
93:*19*   94:*8*   95:*22*
100:*14*   139:*18*
142:*14*, *15*, *23*
143:*1*   148:*16*, *18*
**evident** 101:*14*
**exact** 17:*22*   30:*10*
59:*24*   117:*7*   126:*9*
139:*21*
**exactly** 9:*3*   18:*11*
27:*6*   28:*10*   35:*2*
70:*11*   84:*17*   91:*5*
95:*17*   113:*24*

133:*3*   140:*13*
155:*6*   162:*1*
**example** 59:*5*
66:*10*   156:*4*   162:*14*
**exchange** 89:*5*
95:*1*   120:*7*   122:*15*
147:*21*   150:*23*, *25*
151:*18*
**excluded** 29:*6*
**exclusive** 81:*21*
**Excuse** 78:*23*   85:*1*
88:*19*   121:*14*
168:*25*
**execute** 16:*9*
**executed** 15:*19*
**Executive** 23:*24*
62:*23*
**Exhibit** 13:*19*, *21*
19:*20*, *23*   23:*13*, *14*,
*21*   43:*4*, *8*   56:*21*,
*22*, *23*   77:*8*   86:*13*
88:*17*, *19*, *22*   98:*5*,
*6*, *8*   119:*10*, *14*, *17*,
*18*, *19*   120:*4*
127:*12*, *13*   133:*6*
135:*1*, *2*   146:*17*, *18*
150:*8*, *10*, *11*
169:*20*, *22*   170:*1*
**exhibits** 98:*3*
119:*16*   169:*1*, *15*
**existed** 123:*12*
**expansive** 80:*7*
**expect** 66:*14*, *20*
83:*6*   95:*4*   167:*16*
**expected** 142:*6*
149:*11*
**expert** 27:*19*   101:*4*
**explain** 33:*23*
76:*10*   96:*19*   115:*16*
**explained** 40:*11*
120:*21*   136:*19*
**explanation** 51:*22*
65:*8*   89:*19*   132:*24*
**explicit** 123:*10*
**explicitly** 49:*6*
52:*24*
**express** 38:*6*
**expressed** 76:*24*
162:*19*
**expressing** 94:*20*
**extend** 170:*15*
**extensive** 164:*23*
**extent** 84:*1*   87:*10*
121:*1*   123:*23*
127:*2*   164:*24*
**extra** 19:*18*
**extradited** 80:*3*
**extraneous** 17:*19*
**extraordinary** 7:*25*
10:*9*

**extremely** 114:*19*

**< F >**
**facilitate** 7:*12*
**facility** 128:*3*
**facing** 47:*6*
**fact** 21:*9*   29:*17*
37:*17*   65:*18*   85:*7*
92:*24*   93:*25*   94:*12*
103:*10*   161:*6*
**facts** 7:*23*   17:*18*
36:*24*   37:*6*, *23*
46:*17*   49:*10*   51:*16*
61:*14*   67:*9*, *10*
82:*4*, *5*   93:*20*   96:*9*
112:*11*   130:*2*
131:*10*   134:*4*
139:*23*   143:*24*
**factual** 32:*17*
39:*12*   64:*3*   67:*8*,
*22*   68:*17*   96:*5*
**failing** 60:*6*
**Fair** 13:*14*   38:*10*
51:*25*   88:*9*   97:*10*
103:*15*   120:*2*
152:*16*, *17*   162:*22*
166:*16*
**fairly** 16:*18*   31:*4*
**faithful** 36:*25*
**faithfully** 15:*19*
16:*9*
**false** 5:*23*   94:*6*
**familiar** 167:*2*
**familiarity** 69:*16*
**Farm** 120:*11*, *15*
121:*11*   123:*4*
**fast** 9:*22*
**fast-forward** 137:*8*
**fatigue** 147:*20*
151:*20*
**favorite** 109:*9*
**FBI** 27:*19*   56:*12*
62:*16*   63:*10*, *15*, *19*,
*23*   70:*3*   73:*6*
95:*23*   120:*5*, *9*
124:*5*, *9*, *12*, *14*
125:*2*, *6*, *8*, *11*, *17*
126:*3*, *5*, *14*, *20*
127:*3*   128:*7*
133:*21*   135:*11*
148:*17*, *21*
**Fed** 125:*10*
**Federal** 3:*4*
**feedback** 162:*12*
**feeling** 115:*9*
**felt** 38:*1*   50:*22*
61:*4*   79:*22*   83:*22*
113:*15*   129:*13*
143:*22*
**FEMALE** 71:*17*

**field** 70:3  95:23
124:12, 22  125:2, 6,
8  126:14  148:17
**figure** 33:21  44:18
67:9  92:21  102:3
134:7  143:10
155:12  160:5, 11
**figured** 116:20
148:6
**figuring** 67:19
156:22
**file** 40:5  84:10
104:18  108:7
116:2  118:17
**filed** 8:19, 22
104:15, 16  115:4
133:14
**filing** 38:16  39:25
97:2  117:18
118:13  141:22
**fill** 106:21
**final** 132:17
**Finally** 6:7  111:20,
23
**find** 10:6  69:4
78:11  140:2, 14
148:12
**finding** 67:17
95:15, 18, 19
**fine** 143:21, 23
**finer** 92:7  166:3
**fingers** 66:4
**fire** 55:5, 8, 15, 23
56:7, 9, 11  57:13
131:19, 20  159:16
167:6
**fired** 46:2  54:20
131:23  161:7
163:5  167:24, 25
**firm** 8:9  86:2
**firmly** 37:5  71:9
**first** 8:2  11:1, 24
14:16  15:15  16:3,
24  26:11  39:18, 23
41:13  42:18  43:4
44:4  77:21  89:22
98:20  104:10
115:10  119:11
120:12, 25  124:3
125:17  126:21
137:23  146:15
156:20, 21  163:19
169:6
**firsthand** 22:14
**fit** 39:10
**fits** 39:9
**five** 105:2  117:22
118:12, 16  124:2
165:21  166:4, 5
**flabbergasted** 84:25

**flavor** 30:6  72:19
**flaws** 118:25
**flip** 59:6  93:14
95:2
**flood** 65:5
**floor** 127:17
**flow** 93:6
**Flynn-Brown** 4:19,
20  6:20  42:22
43:10  56:15, 18, 21,
24  70:15  72:2
77:7, 20  110:6, 8
119:2, 6, 15, 20
124:2, 4, 15  127:11,
15  133:5, 9, 11
134:25  135:3, 24
169:14, 24  170:3
**focal** 151:23
**focus** 9:19  31:10
61:14  84:9, 11
**focused** 87:16
166:7  170:25
**focusing** 26:12
**folks** 22:16  26:16
48:25  49:3  56:1
73:19  77:3  103:5
123:9  162:9  165:22
**follow** 3:6  78:4
83:14  113:19  127:5
**followed** 161:11
**following** 20:19
32:12  71:11  78:14
93:2, 16  94:25
109:4  161:21
**follow-up** 23:1
84:14  145:2, 5
148:2  150:15
161:5  169:1
**force** 116:12
**foregoing** 172:2
**forensic** 26:5
**forget** 17:22
**form** 72:18  153:1
**formal** 156:11
**former** 2:11  7:5,
15  8:6  9:6
**formula** 125:13
**formulation** 81:20
**forth** 3:11  31:17
80:15  81:4  148:1
**forthcoming** 170:21
**fortunate** 171:7
**forward** 80:13
135:5  146:22
147:19
**forward-leaning**
22:9
**forwards** 133:15
**found** 11:18  80:8
97:9, 16  139:16

**foundation** 67:22
96:5  130:2
**founded** 40:7
**four** 21:11  31:11
82:14  111:22  124:3
**frame** 7:11  19:13
33:5  143:11
157:17  171:8
**framed** 144:12, 13
145:22
**France** 57:25
**fraud** 8:8  10:17
11:18  18:19  25:7
27:18  30:14  32:4,
18  34:8, 11  35:15
39:5  48:9  49:11
59:14, 20  60:9
61:25  64:5  67:17
71:4  72:14  73:5,
12  79:20  80:7, 9
81:16, 22  90:8
92:4, 23  95:14, 18
96:8, 12  97:8, 16,
22, 23  124:17
125:25  134:21
139:16, 18, 25
140:2, 14  169:8
**fraud-related** 48:10
**fraudulent** 133:17
**freely** 4:4  160:21
**friction** 22:2, 5, 23
75:24, 25  76:9
77:3  122:10
**Friday** 128:19
137:20  141:19
147:17, 18
**friend** 106:19
**front** 20:15
**frustration** 38:7
56:12  94:20
142:25  148:24
**frustrations** 110:14
**full** 94:5
**fully** 74:10  140:17
**Fulton** 69:3, 7, 13,
16, 18, 23  70:1, 3, 7
150:19
**function** 82:4
160:16
**functioning** 143:24
**functions** 16:15
74:16
**further** 10:21  35:2
57:16  100:17
116:22  155:3
157:18  170:7
**fuzzy** 34:18

**< G >**
**Gallagher** 4:11

**game** 58:14
**garbage** 94:6
**gather** 129:13
**General** 7:19  8:4,
6  9:6  10:14  11:15,
16, 24  12:16, 17, 20,
23, 25  14:12, 13, 21
15:2, 3  16:10
17:11  18:1, 3, 5, 9,
18  19:1, 20  20:1,
18, 22, 25  21:10, 18
23:12  24:10, 17
27:11, 15  28:22
29:3  30:10  39:7
41:6  44:22  45:4
49:7  50:11, 15
51:8  53:10  54:3
68:4  75:23  76:20
77:16  78:6, 9, 13,
17  79:4  80:19
83:5  85:15, 16
95:12  101:2
110:20  113:13
114:2, 9  115:20
121:18  122:3, 16,
22  126:13, 20, 25
127:9  132:1  134:2
138:10  147:11
152:20  154:13
161:10, 14  162:4, 6
163:2  166:9  168:12
**generality** 59:22
**generally** 19:5
50:5  60:16  63:17
64:8  102:1  115:19
124:19  142:10, 12
164:10
**Generals** 83:7
161:23, 24  162:3
**General's** 22:9
79:3  115:13
**gentleman** 120:18
**Georgia** 30:16
34:11  38:13  58:17
59:13, 17  69:19, 23
70:2, 17, 19, 20
97:23  101:21
102:21  105:1, 3
112:23  113:2
128:3, 9  131:2
133:14  145:18
150:19  153:22
154:1  158:25
167:7, 9
**getting** 36:8  42:17
54:9  65:5  66:10
75:24  81:3  101:12
102:2  122:11, 25
125:19  143:8
144:17  159:1  161:1
**gist** 25:4  99:12

**Giuliani** 114:7
148:11, 13, 14, 20
149:6, 9, 13, 23
**give** 4:13  6:22  7:7
30:6, 10  40:5  48:4
57:12  72:18  78:18
84:2  85:23  86:22
87:13  98:3  105:6
130:5  131:18
132:20  147:1
148:5  150:25
152:8  155:25
159:23
**given** 20:22  21:13
99:5  103:9  117:21
147:11
**gives** 6:24  68:8
**giving** 61:4  62:5
139:11  145:23
**glad** 10:24
**global** 102:20
**go** 2:3, 5  3:7, 11
13:2, 7  19:22  25:1
28:4  31:12  42:19,
22  44:4  48:19
56:15  57:11  58:16
59:6  60:5  64:15
65:20  69:3  70:23
77:10, 23, 25  94:10
102:2  109:15
110:1, 6, 9  119:13
121:12  124:3
136:5, 9  143:10
144:2  145:23
157:3  162:20
164:2  168:10, 16
169:4  171:11
**goes** 56:16  155:13
170:13
**Gohmert** 104:15
**going** 3:16  11:8
12:2  13:17  16:10
27:3  28:10, 11, 18
29:2  30:10  31:24
34:12  35:7  36:21,
23, 25  39:6  40:11
43:4  44:7  45:22,
25  46:13  48:5, 15,
19  49:11  53:23
55:13  66:23  67:14
77:9, 17, 20  81:4
82:17  84:18, 20
90:22  91:19  95:25
100:9  101:17
102:3, 4, 11  106:22
110:9  112:3, 8, 16
113:16  114:3, 11
115:12  116:12
118:10, 17  119:11
121:10  127:12
128:24  129:22

130:6  131:*15, 22*
137:5  138:*13*
139:*10, 14*  141:*12*
142:*14*  143:*14*
144:*12, 13*  145:*11*
147:9  149:*12*
152:*4, 5, 9*  153:*3,*
*25*  156:*1*  157:6
159:*17*  160:*6, 23*
161:22  162:*15, 18*
163:*4, 6, 22*  165:*16*
167:*14, 17*  169:*15*
**gold**  31:*21*
**golf**  57:*20, 21*  58:*3,*
*14*
**golfing**  58:*12*
**Good**  4:*17, 19*
12:*12*  25:8  42:*11,*
*19*  51:*15*  52:*14*
54:*11, 14*  55:7
65:*4, 14*  103:*2, 6,*
*22*  115:*18*  126:*15*
142:9  166:*13*
**Google**  156:5
**gotten**  58:*13*
**govern**  14:6  17:9
**government**  37:*1*
109:*18*  134:*6, 7*
148:5
**government-to-**
**government**  67:5
**Governor**  43:*23*
**granularity**  70:*10*
122:*13*
**Grassley**  4:*21*
12:*10, 12*  43:*1*
93:*11*  169:*19*
**Grassley's**  88:*11*
92:*1, 18*  136:*19*
163:8  169:*25*
170:*16*
**great**  72:*12*  90:*4,*
*16*  108:*24*  164:*19*
**greater**  90:6  127:*4*
**Greg**  57:*24*
**ground**  71:*4*
**group**  46:*23*  50:*17*
51:8  53:*3*  89:*23*
160:*19*
**guess**  37:9  40:*23*
45:9, *18*  84:*1*
85:*20*  93:*5*  103:*23*
113:*4*  119:*1, 25*
143:*3*  162:*12*
**Guessing**  129:*12*
**guestimating**  27:6
**guidance**  123:*13*
**guidelines**  3:7  17:9,
*14*

**guy**  48:*17*  71:*16*
82:*24*  90:*19*  100:7
112:*16*
**guys**  29:*11, 13*
34:9  52:*23*  93:2,
*16*  97:9  107:*22*
108:*20*  109:*4*
113:*18*  131:*11*
139:*21*  160:*17*

**< H >**
**hackers**  100:*3, 13,*
*14*
**hairs**  118:*22*
**half**  128:*10, 16*
155:*24*
**hand**  16:*23*  22:8
27:*4, 8*  31:*20, 23*
32:8  34:*22*
**handed**  19:*19*
86:*13*
**handing**  13:*18*
**handle**  73:*4*
**handled**  63:*23*
**handling**  50:*20*
110:*15*
**hands**  76:*3*
**handwriting**  127:*20*
**handwritten**  44:*16*
56:*19*
**happen**  16:*17*  85:2,
*7, 22*  102:*11*
128:*23*  129:*4*
133:*4*  144:6
156:*14, 15*  158:*20*
163:*5, 22*
**happened**  26:6
27:*1*  30:*15*  45:*19*
54:8  62:*21*  68:*11*
85:*21*  86:9  99:*3*
107:*11*  108:*19*
133:*3*  144:8
156:*14*  168:*21*
**happening**  31:*15*
76:*22*
**happens**  22:*1*  65:*3*
114:*15*  132:*15*
157:*15*
**happy**  10:*22*  19:*16*
23:*17*  25:*3*  36:*22*
40:*14*  74:*3*  99:*14*
113:*7*
**hard**  102:*12*
**harkening**  131:*14*
**harmful**  51:*1*
**hash**  52:*18*
**hat**  100:*13, 14*
**hazy**  149:*21*
**head**  17:*25*  22:*20*
61:*10, 17*  62:*23*
64:*1*  73:*18*  83:*1*

99:*17*  100:*22, 24*
101:*3*  104:*19*
107:*4*  115:*19*
155:*3*  168:*6, 23*
**headed**  30:2  111:9
148:*23*
**heading**  111:*4*
**headquarters**  125:9
**hear**  28:5  41:5
117:*12*  129:*5, 10*
152:*18*
**heard**  6:*17*  26:*16*
46:*17*  52:*23*  58:*13*
71:*23*  81:*16, 18, 22,*
*24*  84:*12*  87:*24*
93:8  97:*21*  104:*11*
130:*25*  149:2
153:*10*  165:*20*
**hearing**  9:*1*  37:*25*
38:5  61:*12*  72:*14*
128:*3*  131:*3*
**held**  8:9  9:*21*
12:*15*  71:9  136:7
**he'll**  129:*25*
**help**  7:*11*  19:*8, 22*
39:*20*  109:6
115:*21*  130:*17*
140:*20*
**helpful**  121:*12*
160:8
**Herschmann**  47:*11,*
*14*  52:*12*  164:*19*
**hesitated**  82:*14*
**hew**  22:7
**high**  101:5  162:*24*
**high-level**  31:*4*
**highlight**  160:7
**highlights**  33:*18*
**highly**  156:*25*
164:*19*
**hindsight**  82:8
83:8  89:*16*  90:*16*
91:6  101:*14*
**hit**  25:*14*  109:*15*
**Holder**  14:*13, 16*
15:*15*  17:*11*
**holiday**  57:*15*  81:*3,*
*5*
**holidays**  106:*20*
**home**  148:*23*
**Homeland**  29:*19*
**honestly**  30:*12*
160:*21*
**honored**  7:*24*
**hope**  35:*24*  109:*21*
158:6
**hoped**  97:*18*  159:*12*
**horseshoe**  47:*19*
**hour**  3:9, *14*  4:*23*
42:*18*  72:*25*  73:2
77:*9, 21*  78:6

80:*17*  109:*14*
110:*21*  119:*11*
121:*1*  136:2
**hours**  48:6  111:*1*
163:*10, 24*  166:*14*
167:*17*
**House**  10:*3*  14:5, *7,*
*25*  15:*1, 7, 20*  25:2
27:*1*  28:*4, 7*  29:*22,*
*23*  40:*18*  41:*3*
45:*16*  47:9, *10*
50:5, *8*  58:7  71:*16*
78:8  81:8  86:7
106:*14, 17, 18*
109:*23*  111:*12, 16*
123:*25*  136:*15, 16,*
*23*  137:*1, 22, 25*
138:8, *13, 24*  139:*4*
141:*20*  142:*3*
159:*24*  160:*25*
**Hovakimian**  143:6
160:*14*  162:2
**Hovakimian's**  44:*19*
**human**  118:*25*
**humorous**  53:*16*

**< I >**
**idea**  14:*21*  44:*15*
50:*14*  52:*14*  101:*4*
103:2  108:6
117:*18*  140:*10*
141:22
**ideas**  103:6, *21, 22*
**identified**  79:*19*
171:6
**ideological**  142:*22*
**ignored**  70:*13*
**illegal**  69:*4*  92:*16*
**illegality**  73:5
**illustration**  130:*15*
**imagine**  10:*25*  11:*4*
16:*21*  158:*20*
**immediate**  84:*14*
**immediately**  21:*14*
110:*25*  150:*20*
**impartial**  17:*1*
**implement**  76:*13*
**implementation**
22:*16*
**implementing**  129:9
**implicit**  101:*22*
150:*24*  161:*18*
**imply**  122:6
**important**  15:*22*
16:*4*  17:5  83:5
109:*11*  114:*20*
156:*1, 6, 8, 18*
157:*1, 18*  167:*18*
**impose**  16:*1*
**imposed**  14:*20*

**impossible**  64:*17*
65:*19*
**impression**  13:6
139:*20*  142:5  151:5
**improper**  17:6
**imprudence**  165:*16*
**inaccurate**  128:*14*
134:5
**inadvertently**
102:*14*
**inappropriate**  49:2
92:5
**inbox**  25:*14, 18*
**incident**  121:*11*
**include**  44:8  49:6
**included**  43:2
71:*10*  107:9  162:*10*
**includes**  133:*13*
**including**  3:6  37:2
120:*23*  134:*15*
166:*16*
**inconsistency**  27:2
**inconsistent**  24:*23*
25:9, *11*  26:*16, 21,*
*22*  67:*20*  100:*10*
165:*19*
**incorrect**  31:6
**independent**  37:*1*
90:*3*  102:*23*
**indicate**  35:2  43:*24*
63:*14*  104:*23*
132:*4*  149:2
**indicated**  31:*19*
78:*10*  95:*1*  123:*18*
154:*11*
**indicating**  96:*14*
169:*3*
**indication**  105:6
**indicative**  151:*19*
**indicia**  60:*25*  92:*22*
**individual**  92:*14, 16*
123:*11*  124:*22*
127:7  148:*4*
**individuals**  47:*4*
**inefficient**  19:*25*
**inexplicable**  10:*7*
**influence**  17:2, *6*
**information**  7:*18*
26:*19*  39:8  61:*4*
68:*14*  70:8  71:*10*
100:*3*  124:*11*
125:*14*  126:9
134:*13*  135:*22*
145:7  153:*25*
**informed**  79:*23*
**Infrastructure**  26:*17*
**inherently**  62:6
**initial**  42:5  43:2
78:6  81:*19*  87:*12,*
*20*

**initially** 28:17 86:5
112:14 114:21, 23
**initiate** 117:10
**initiated** 8:18
**initiation** 87:5
**innocent** 87:19
**inquired** 84:16
**inquiries** 9:17
**inquiry** 19:10
39:11 108:10, 13
113:16 131:1
**insanity** 146:23
147:23
**insight** 156:23
**installed** 146:1
161:10 169:6
**installing** 164:3
**instance** 26:7 94:9
100:2
**instances** 40:25
167:3
**institutions** 8:20
**instructed** 154:7
**insulated** 17:1
**insulating** 17:5
**insulted** 148:20
**intake** 124:24
126:20
**integrity** 6:9 9:21
10:15 21:21 22:6,
13, 19, 21 23:3
67:21 73:8, 13, 19
74:9, 15, 22 75:17
76:6 119:12 120:5,
20, 22 121:4, 17
122:6, 16 123:5
124:5, 10, 14
143:19 171:3
**Intelligence** 98:23
**interactions** 64:22
**interest** 112:12
**interested** 9:5
121:25 140:13
141:3 142:22
**interesting** 83:20
**interests** 8:1
**interface** 124:6
**interjecting** 19:6
52:16
**Internal** 124:7
134:5 137:10
**Internet** 93:2, 16,
23 94:1, 4, 8, 11, 12,
15, 21 100:4, 15, 16
147:8, 12
**interpret** 36:18
**interpretation**
127:19
**interrupt** 25:16
**intervening** 136:25

**INTERVIEW** 1:8,
17 2:8, 9 4:24 5:1,
17 6:1, 8 7:14
12:11 33:6 124:3
**interviews** 3:6
120:24
**introduce** 2:21 4:6,
15 5:7 43:4 120:4
169:15
**introductions** 43:2
**investigate** 56:13
73:11 126:21
**investigated** 128:6,
9 133:21 135:10
**investigating** 27:16
75:2
**investigation** 2:10
3:21 5:24 6:10
19:11 68:21 92:14
**investigations** 15:8,
21 17:17 74:12
**investigative** 3:5
4:20 18:19 19:5
22:10 74:11
120:23 121:5
122:17
**investigator** 43:1
126:3
**investigators** 62:7
**invite** 111:9
**invited** 78:13 111:5
**inviting** 166:22
**involve** 2:11 134:18
**involved** 22:17
24:8 49:5 76:1
78:19 105:24
126:17 133:24
135:15
**involving** 136:20
144:18
**irregularities** 43:25
75:13
**irrespective** 3:19
97:11
**Island** 3:3
**issue** 27:13 31:17
37:21 38:14 40:16
46:14 54:7 66:25
68:16 80:7 107:24
109:8 122:23
123:15 131:21
135:19 143:18
146:25 147:2
150:20 151:9
166:15 167:12
**issued** 20:18
**issues** 9:20 22:16
24:23 41:3 48:21
64:5 69:25 70:9
75:22 76:15, 18
81:14 99:19 108:3

125:10 126:11
135:8 152:17
**Italy** 147:6
**Italygate** 94:9
147:1 150:16
**item** 32:7 37:20
98:20
**items** 6:25 98:19
108:4, 5
**it'll** 45:18
**its** 10:14 34:13, 15
35:1 36:5, 22 38:9
39:8 66:4 69:12
90:10, 13, 22 91:16,
25 95:2 99:3
140:1 142:14
143:19

**< J >**
**January** 9:24
44:14 45:6, 10, 12,
20 46:21 61:22
77:10 86:13 87:6
110:10, 12 119:7
128:12 135:4
144:20 145:1, 2, 5
146:10, 12, 20, 21
147:18 150:17
152:9, 10, 11, 14, 22
153:12 156:17
157:7 169:18
**Jeff** 4:8 44:9
45:24 46:1, 6, 14
47:17 48:12 49:14,
23 50:10, 14, 22, 24
51:4 53:13 54:17
61:21 82:22, 25
83:11, 21 84:4, 16
86:11 87:17, 23
89:17 90:4, 15, 23
91:1, 3 98:14 99:4,
17 100:9 101:17
102:4, 10 103:12
105:25 106:2, 9, 11,
12, 16, 22, 23 111:7
112:2 113:13
127:16 128:13, 20
129:5, 6, 7 130:23
131:7 140:23, 25
141:3, 6, 15, 18
143:4, 12 144:1, 13,
18 145:22 150:20
151:9, 10, 13
157:17 159:15
161:2 162:4
164:11 165:6, 16
167:14
**JEFFREY** 1:8 2:9,
15 9:7 10:1 11:4
43:14 51:7 89:2, 6,
10 164:2 166:11, 12

**job** 17:4 34:13, 15
35:1, 8 36:5, 22
38:9 39:8 50:25
62:4, 10, 16, 24
90:10, 13 91:14, 16,
25 97:9 104:3
129:3 140:1
142:14, 21 154:17
**jobs** 83:5 95:21
**jog** 10:11
**John** 4:10
**join** 111:8, 9
129:25
**joined** 8:19 78:2
110:2
**Josh** 4:20 168:25
**judge** 166:6
**judgment** 16:13, 19
159:7
**judgments** 16:25
**JUDICIARY** 1:2
2:10, 20 9:1
**July** 7:3
**jump** 2:6 136:22
146:10
**jumping** 80:13, 14
**juncture** 97:2
99:22 103:24
105:9 108:17
141:2, 10 145:14
151:12
**junctures** 50:18
96:25 97:25
**jurisdictions** 75:14
**Justice** 2:11 3:19
5:7, 10, 12 7:3, 21
8:5, 22 9:11, 20
10:14 15:1, 19
17:1, 17 25:11
33:16, 21 36:21, 23
37:24 50:19 51:17
56:11 61:25 62:15
63:23 66:20 68:7,
20 69:12 73:3, 8
74:13, 22 75:1
80:8 81:3, 15 86:4
90:7, 8, 9, 13, 21
93:19 95:24
102:18 105:16
110:15 112:2
113:6 117:19
120:6 122:18
124:24 125:3, 23,
24 126:16, 22
127:8 128:6
133:20 134:15
135:11, 14, 17
140:1 153:4 160:9
165:19 166:10
171:2

**justified** 51:16
**justify** 96:5 99:21

**< K >**
**keep** 97:15 110:20
119:15 134:5
**keeping** 148:4
**Ken** 29:18 138:20
**Kenneth** 105:13
**kept** 67:4 114:8
**key** 10:12
**kickoff** 30:10
**kidding** 147:16
**kind** 24:21 33:18
40:5, 15 42:7 54:9
62:7 67:4 70:9
76:7 79:2 82:21
83:13 85:3, 9
89:23 90:14 98:15
104:10, 13 106:24
108:25 115:14, 25
118:1 122:23
124:23 134:19
139:3 143:10
151:23 155:2, 14
161:22 168:4
**kinds** 30:13 59:10
74:14 81:13
**Kira** 5:11
**Klobuchar** 18:13
**Klukowski** 105:13
**knew** 26:10, 13
28:10 39:23 45:21
46:13 50:5, 7
54:22 89:19
107:13 115:15
130:18, 21 139:9
140:15 145:19
159:12 162:18
**Knock** 131:9
**know** 3:15 4:24
5:16 16:11 21:1,
15 22:3 24:21
25:3, 7 27:11, 15
28:15, 17 29:1, 2
30:1 31:2, 4 34:7,
10, 22 35:6, 7, 9, 11
39:23 41:14, 18
43:11 44:19 45:18
48:15, 18 49:17
50:6, 10, 13 54:21
56:25 57:2 58:19
59:9 60:18, 19, 20
61:8, 23 63:9, 18
64:3, 25 65:2, 3, 5
66:11 67:8 68:23
69:6, 14, 15 72:13,
23 74:6 76:6, 8
79:11, 25 81:14
82:4, 5, 6, 18, 24
83:4, 6, 11 84:19,

*21* 86:8, *9, 18* 87:*9,
*10, 16, 17, 22, 23*
89:*18* 90:*23* 91:*1,
4, 12* 93:*21* 94:*4*
104:*8, 11* 105:*13,
14, 21, 25* 106:*5*
107:*2* 112:*2, 8, 16*
113:*24* 115:*1, 6*
116:*16* 117:*10, 13*
119:*21* 123:*21*
125:*20* 129:*7, 24*
131:*9* 132:*17*
134:*4, 5, 13, 14*
137:*8* 138:*2, 12*
144:*10, 19* 147:*6*
149:*8* 151:*15*
154:*18* 155:*12, 18*
156:*4* 157:*16, 19*
159:*20* 160:*8*
162:*1* 163:*21*
164:*14* 165:*24*
166:*4* 167:*22*
**knowing** 115:*11*
**knowingly** 5:*23*
**knowledge** 20:*21*
70:*6* 103:*11*
**knowledgeable** 21:*1*
**known** 9:*9* 85:*25*
100:*7* 132:*13*
158:*5* 159:*10*
**knows** 39:*14* 95:*22*
110:*23* 125:*7*
**Kurt** 114:*1, 18*
115:*24* 136:*20*

**< L >**
**lack** 15:*6* 126:*15*
**laid** 117:*22*
**language** 16:*21, 23*
141:*9*
**large** 72:*6*
**lasted** 163:*9*
**last-minute** 170:*18*
**late** 58:*3, 6* 81:*2*
139:*14* 157:*15*
**laughed** 58:*5*
**law** 5:*18* 7:*24*
9:*21* 10:*15* 15:*23*
17:*18* 36:*24, 25*
37:*7* 49:*10* 51:*16*
61:*15* 67:*10* 71:*3*
74:*16, 19* 82:*4*
86:*2* 93:*20* 101:*5*
112:*11* 142:*17*
143:*25*
**laws** 15:*19* 16:*9*
**lawsuit** 8:*23* 38:*23*
39:*19, 25* 104:*15*
**lawsuits** 8:*19*
**lawyer** 47:*11* 49:*20*
114:*1, 8*

**lawyers** 46:*24*
115:*18* 163:*13*
166:*4*
**laying** 81:*20*
**lays** 101:*20*
**lead** 68:*21*
**Leaders** 63:*11*
160:*19*
**leadership** 10:*3*
13:*24* 15:*10* 21:*22*
22:*13* 91:*2, 9, 18*
126:*16* 161:*21*
162:*8, 10, 15, 19*
171:*5*
**leadership's** 162:*13*
**leading** 100:*5*
110:*11* 112:*2*
**lead-up** 152:*13*
**learn** 11:*24* 105:*15*
**learned** 12:*3* 27:*5*
125:*9* 143:*12*
**leave** 33:*15* 66:*15*
95:*5, 8* 116:*1*
143:*8* 161:*2*
**leaving** 28:*23* 29:*7*
111:*7* 114:*8*
**led** 7:*25* 165:*12*
**Lee** 78:*1*
**left** 28:*24* 32:*6*
41:*10* 42:*3, 9* 47:*3,
7, 8, 14, 16, 17* 55:*1*
77:*7* 79:*8* 80:*22*
108:*3* 136:*1*
155:*20* 159:*22*
160:*4*
**legal** 7:*23* 8:*11*
16:*25* 38:*16* 39:*13*
44:*25* 45:*4* 53:*25*
54:*3* 102:*23* 166:*15*
**legally** 40:*8* 165:*18*
**legislation** 14:*23*
**legislative** 44:*1*
**legislators** 8:*16*
**legislature** 131:*3*
145:*18*
**legislatures** 44:*1*
51:*17*
**legitimacy** 8:*20*
**legitimate** 60:*7, 9,
13* 63:*22* 92:*3, 6,
10* 94:*2, 3, 14, 22*
**LeMond** 57:*24*
**length** 81:*25*
**letter** 7:*2, 4* 12:*7*
43:*22* 44:*10, 13*
45:*5* 48:*12* 49:*5,
16* 51:*9* 52:*14*
53:*5, 8* 54:*1* 77:*14*
98:*21* 101:*20*
102:*17* 104:*22, 24*
106:*15* 110:*19*

140:*23* 141:*1, 12,
14* 145:*14, 17, 21,
23* 146:*7, 8* 154:*24*
161:*15* 164:*9, 11*
**letters** 8:*15* 49:*13*
**letting** 41:*17* 52:*17*
**level** 14:*25* 59:*22,
25* 62:*22* 67:*5*
70:*10* 90:*6* 126:*14*
156:*11*
**levels** 39:*10*
**light** 4:*25* 41:*23*
43:*24* 44:*3*
**liked** 169:*5*
**limitations** 16:*1*
**limited** 87:*10*
123:*19*
**limits** 15:*6* 16:*2*
**Lindell** 71:*17*
**line** 12:*14, 16* 13:*3,
7* 25:*19* 40:*6, 7*
50:*22* 58:*8* 81:*9*
98:*19* 100:*2* 135:*8*
168:*17* 169:*4*
**lines** 91:*23* 94:*19*
162:*25* 164:*24*
**link** 147:*3, 8, 13*
150:*16*
**list** 115:*14, 17, 18*
118:*12* 135:*5* 162:*1*
**listed** 32:*14* 35:*20*
**listen** 38:*22*
**listened** 55:*4* 82:*1*
**listening** 52:*16, 22*
152:*1* 166:*21*
**literal** 118:*15*
**literally** 111:*1*
127:*21*
**litigated** 135:*13*
**Litigating** 162:*3*
**litigation** 49:*12*
99:*20* 156:*6*
**little** 15:*14* 21:*2*
22:*9* 33:*18* 40:*17*
48:*5, 7* 65:*15*
72:*19* 75:*4, 23*
79:*7* 80:*14* 84:*22*
90:*17* 94:*10*
100:*18* 103:*7, 8, 9*
104:*20* 109:*14*
110:*21* 120:*25*
131:*9* 136:*18*
142:*25* 147:*20*
149:*1, 21* 151:*13*
152:*13* 153:*7*
155:*10* 157:*16*
159:*9*
**local** 125:*11*
**location** 126:*6*
127:*24* 128:*4*

**Lockerbie** 80:*2, 5*
**logistical** 170:*18*
**long** 17:*23* 47:*25*
48:*1, 8* 49:*4* 82:*1*
83:*24* 85:*25*
107:*14* 132:*13*
147:*18* 155:*6*
158:*5* 159:*10*
163:*21, 25* 170:*5*
**longer** 48:*7* 58:*24*
95:*10* 109:*17*
116:*10* 163:*10*
**long-standing** 18:*6,
17*
**long-time** 106:*19*
**look** 19:*24* 34:*10*
39:*6, 9* 47:*8* 53:*20*
57:*2, 10* 66:*1* 67:*3,
25* 74:*4, 22* 75:*7,
24* 87:*15* 133:*16*
142:*8, 14*
**looked** 24:*21* 53:*20*
57:*1* 60:*23* 74:*20*
81:*23* 92:*6* 104:*20*
119:*23* 151:*13*
**looking** 68:*7* 82:*10*
92:*3* 94:*21* 96:*14*
97:*23*
**looks** 64:*16* 65:*23*
**loose** 32:*1*
**lose** 64:*18*
**lot** 18:*6* 33:*2*
41:*19* 65:*17*
110:*11, 13*
**lots** 69:*24* 81:*15*
165:*17*
**lunch** 3:*16* 106:*18*
107:*12*

**< M >**
**machine** 26:*2*
27:*12* 100:*4*
**machines** 24:*23*
25:*8* 26:*8, 20*
27:*20, 21, 23*
100:*13* 138:*21*
**mad** 90:*17*
**Main** 120:*6* 124:*25*
125:*3*
**maintain** 14:*6*
90:*22* 143:*23*
**maintained** 8:*5*
10:*14, 15* 14:*6*
63:*15* 171:*1*
**maintaining** 29:*9*
102:*14*
**major** 47:*20*
**Majority** 2:*19* 3:*9*
71:*17* 170:*8*
**making** 20:*23* 67:*7*
92:*2* 95:*13* 107:*1*

140:*10* 144:*12*
159:*6* 168:*4*
170:*10, 16*
**MALE** 88:*19* 110:*1*
**malfeasance** 129:*19*
**managerial** 124:*21,
23*
**manner** 3:*11* 5:*15*
108:*3* 125:*22*
134:*22* 164:*21*
**manual** 17:*24*
74:*13, 22*
**map** 152:*8*
**Mar-a-Lago** 57:*19*
117:*13* 139:*2*
**mark** 19:*20* 23:*13*
107:*9* 133:*13, 16,
19* 135:*4* 138:*8*
146:*22* 149:*3, 6*
**marked** 13:*19, 22*
19:*23* 23:*15* 43:*9*
56:*23* 98:*8* 119:*19*
127:*14* 133:*7*
135:*2* 146:*18*
150:*11* 169:*23*
170:*2*
**match** 92:*21*
150:*19* 151:*3, 11*
**material** 117:*15*
**materially** 5:*23*
**matter** 47:*21* 52:*6,
24* 53:*11* 83:*22*
163:*6*
**matters** 18:*20*
119:*9* 143:*19*
**McClain** 4:*17, 18*
23:*16* 33:*25*
119:*17* 166:*2*
168:*5, 14* 169:*13*
171:*10*
**McCLAIN-
WALTON** 152:*7*
**Meadows** 29:*23*
41:*8* 46:*5, 8, 23*
107:*10, 15, 16, 18,
20* 108:*4* 113:*18,
23* 133:*13, 15, 16*
135:*4* 138:*3, 8*
146:*13, 22* 147:*3*
148:*19* 149:*3, 7, 15,
18, 21* 150:*4, 17*
159:*24*
**mean** 25:*10, 22*
34:*21, 22* 35:*7*
39:*10* 48:*13, 23*
53:*14* 63:*24* 72:*16,
22, 24* 76:*9* 94:*2*
95:*7* 109:*20, 21*
110:*25* 111:*16, 24*
138:*24* 147:*3*
162:*8* 166:*5*

**meaning** 28:*3*
154:*17*
**means** 163:*4*
**meant** 94:*13*
**measured** 36:22
**measures** 46:*18*
**mechanism** 124:*25*
**media** 83:*15* 140:*7*
**mediate** 23:*3*
**meet** 46:*8* 104:*4*
148:*13, 14* 149:*9,
13, 23* 152:*20*
**meeting** 9:*24* 25:*1*
26:*13* 27:*1, 15*
28:2, *18* 29:*4, 19,
20, 25* 30:*2* 32:*10,
23* 33:*1, 2, 10, 11,
12, 14* 34:2, *19, 24*
36:*10* 38:*12, 15, 18,
20* 40:*18, 23* 41:*2,
5* 45:*7, 10, 12, 16,
20, 23* 46:6 47:*25*
48:*13* 53:*23* 54:*6,
8* 55:*12* 61:22
75:*20* 77:*11* 78:*7,
12, 14* 79:*1, 23*
84:*24* 85:*4, 17*
86:*8, 14* 87:*14, 18*
88:2, *3* 89:*23* 91:*8*
99:*5, 6, 8, 13, 16, 23*
100:*17* 101:*15, 18*
102:2, *13* 103:*7*
104:*7, 23* 106:*3, 4,
14, 17, 24* 107:*9, 14,
25* 108:2, *16, 25*
110:*10, 12, 22*
111:*4* 112:*1, 8*
113:*17* 114:*2, 3*
118:*3* 119:*7*
127:*16, 21, 22*
128:*12, 16, 17, 20,
22, 25* 129:*11, 17*
130:*12, 25* 131:*6*
132:*8, 9, 16, 19*
136:*13, 15, 23*
137:*9, 10, 14, 18, 22*
138:*1, 18, 24, 25*
139:*5, 12* 140:*16,
17, 19, 25* 141:*15,
20, 23* 142:*3, 4, 7, 9*
143:*5, 6* 144:*4, 21*
148:*18* 152:*14, 23,
24* 153:*12* 155:*3, 5,
10, 20* 157:*13*
158:*8* 160:*5*
161:*18* 162:*18*
163:*8, 12, 20*
166:*19* 167:*12, 15*
168:2, *8*
**meetings** 106:*11*

137:*1* 138:*20*
**Member** 12:*10*
**members** 4:22, 25
5:*4* 107:*19* 164:*7*
**member's** 8:*23*
**memo** 15:*15* 16:*24*
19:*1, 13, 21, 23*
20:*18, 24* 21:*4, 17,
22, 23* 74:*25* 75:*11,
16* 76:*4, 25* 121:*20*
**memorandum**
14:*13* 17:*9*
**memory** 10:*8, 11*
27:*6* 33:*9* 55:*6*
59:*5* 74:*3* 87:*8*
119:*1* 137:*19*
**memos** 14:*16*
**mental** 61:*10*
**mention** 60:*1*
89:*10* 158:*23* 167:*6*
**mentioned** 3:*17*
25:*3* 26:*1* 29:*18*
32:*11, 20* 41:*21*
64:*6* 78:*13, 16*
89:*6* 93:*10* 101:*19*
105:*10* 163:*7, 18*
**mere** 94:*12*
**merits** 7:*23* 17:*15*
39:*12, 13*
**message** 117:*6*
160:*4*
**messages** 114:*9*
116:*1*
**met** 28:*13* 45:*15*
57:*24* 76:*5* 87:*24*
89:22 90:*18* 102:*5*
103:*10* 106:*2, 20*
107:*5* 158:*9*
**method** 124:*25*
**Mexico** 135:*7*
**Michael** 23:*23*
**Michigan** 24:*9*
26:*6* 31:*18* 105:*4*
112:*24*
**microphone** 78:*23,
24*
**mid** 58:*6*
**middle** 47:*6*
127:*23* 142:*15*
**Mike** 71:*16, 17*
**mind** 17:*11* 32:*25*
49:*18* 72:*9* 81:*11,
12* 96:*23* 97:*12*
103:*17* 139:*11*
166:*7*
**minds** 166:*15*
**mine** 19:*25* 66:*24*
**minimized** 87:*15*
**ministerial** 15:*5*
16:*1*

**Minority** 3:*9* 4:22
6:*12* 98:*3*
**minuscule** 27:*9*
**minute** 14:*9* 19:*21*
24:*7* 77:*7* 146:*11*
**minutes** 2:*23* 79:*8*
81:*10* 83:*25* 111:*6*
136:*2* 150:*2* 155:*6*
156:*13* 166:*4, 5*
**misconstrued** 68:*6*
**misguided** 9:*10*
**misinformed** 9:*13*
**missed** 18:*24* 82:*10*
126:*18* 164:*4*
**misspeak** 35:*24*
**mistrust** 63:*20*
**Mitchell** 133:*13*
**mix** 97:*3* 135:*12*
**Mizelle** 29:*24*
138:*9, 17*
**Molly** 23:*23*
**moment** 112:*15*
167:*18*
**moments** 53:*16*
**Monday** 39:*21*
57:*16* 80:*11* 82:*13,
17, 19* 86:*13* 106:*3*
129:*7* 143:*14*
144:*11* 145:*6*
**month** 9:*19* 31:*10*
101:*9* 148:*15*
**months** 10:*9* 88:*7*
137:*18*
**moot** 168:*4*
**morning** 4:*17, 19,
23* 12:*12* 57:*19*
65:*4* 128:*19* 131:*7*
132:*2, 19* 137:*16,
21* 141:*19* 157:*7, 15*
**motion** 104:*16*
**move** 20:*16* 21:*7*
38:*12* 54:*10* 68:*23*
98:*1* 106:*13*
121:*13* 126:*22*
127:*24* 133:*5*
**moved** 83:*2* 158:*12*
168:*18*
**moves** 126:*16*
**Mukasey** 14:*12*
**mulling** 154:*23*
**multiple** 71:*12*
100:*20* 101:*10*
125:*6, 15* 148:*15*
164:*12, 13*
**Murray** 162:*1*

**< N >**
**name** 2:*13, 15, 19*
4:*19* 47:*3* 54:*10*
71:*19* 87:*24*
105:*16* 106:*7*

114:*1* 120:*19*
145:*25* 172:*11*
**named** 82:*24*
**national** 72:*18*
92:*23* 98:22 100:*22*
**nature** 49:*20* 80:*15*
170:*25*
**near** 48:*14*
**necessarily** 41:*7*
76:*24* 93:*21*
112:*15* 139:*7*
**necessary** 36:*2, 7, 17*
**need** 3:*14* 14:*9*
19:*15* 27:*20* 35:*21*
46:*8* 51:*19* 56:*25*
57:*2, 17* 63:*2*
74:*10, 23* 76:*18*
79:*22* 81:*15* 98:*16*
119:*21* 123:*8*
124:*13* 127:*5*
159:*18, 24* 168:*11*
169:*11, 17*
**needed** 47:*21*
71:*11* 79:*2* 109:*25*
127:*5* 135:*22*
158:*4* 160:*11*
164:*25* 167:*19*
**needs** 60:*19* 93:*19,
20* 110:*23* 116:*20*
124:*12* 128:*10*
130:*15* 159:*25*
**negate** 10:*20*
**neglected** 4:*13*
**neighborhood** 46:*7*
48:*4* 159:*23*
**neither** 103:*13*
144:*8*
**net-connecting**
100:*5*
**Nevada** 105:*5*
112:*24*
**never** 50:*6* 96:*6*
106:*4* 131:*1* 149:*13*
**new** 22:*1, 15* 57:*23*
82:*3* 108:*19*
128:*19* 130:*11*
134:*18* 135:*7, 22*
137:*15* 139:*3*
143:*12* 158:*24*
**news** 80:*1*
**nice** 119:*4*
**Nicholas** 4:*11*
**Nicole** 4:*17* 13:*18*
**night** 45:*7* 61:22
65:*3* 87:*6* 128:*19*
132:*17* 137:*20*
140:*18* 147:*17*
151:*14* 157:*14*
**nodded** 168:*6*
**nodding** 17:*24*

**nomination** 9:*1*
**non-career** 162:*10*
**non-concurrence**
121:*4*
**non-governmental**
68:*6*
**noninterference**
17:*25* 18:*6*
**nonobjection** 7:*5*
**noon** 116:*3* 143:*13*
157:*15*
**normal** 13:*2* 85:*21*
147:*19* 168:*17*
**notation** 44:*6* 92:*2,
25* 94:22, *25*
**note** 12:*10* 60:*8*
148:*25* 150:*17*
**noted** 63:*21*
**notes** 44:*12, 16*
56:*19, 23* 57:*7*
58:*17* 59:*1, 4, 9, 24*
60:*6* 63:*10, 17*
65:*1, 23, 25* 66:*10,
13, 20, 22, 24* 69:*1,
18* 71:*1* 72:*1*
82:*18* 88:*18, 20*
89:*1, 11, 12, 24*
90:*1, 2* 91:*4, 17*
92:2, *25* 93:*1, 11*
94:*23* 95:*10, 11*
127:*13, 20, 21, 25*
128:2, *13, 15* 132:*3,
4, 8, 18*
**notice** 1:*17* 25:*23*
85:*23* 139:*8*
**noticed** 25:22
**noticing** 25:*18*
**notification** 126:*23*
139:*4*
**notify** 144:*7*
**notion** 77:*12*
**Notwithstanding**
144:*5, 24* 161:*6*
**November** 13:*24*
18:*1, 18* 19:*21*
20:*1, 19* 21:*18*
73:*23* 74:*25* 75:*11*
121:*20*
**nuances** 18:*7*
**number** 11:*5* 13:*19*
19:*20* 23:*13, 21*
26:*5* 32:*14* 43:*6*
46:*15* 51:*2* 53:*7*
65:*11* 67:*15* 68:*12*
88:*17* 98:*5, 6*
114:*14* 117:*14*
119:*16, 18* 124:*13*
126:*3, 9, 10* 142:*19*
144:*18* 153:*21*
159:*2*

numbered  146:*16*
numbers  68:*16*

**< O >**
oath  5:*18*  62:*24*
object  7:*16*  159:*19*
objections  124:*2*
objective  68:*5*
obligation  15:*18*
  16:*9*  37:*5*  142:*16*
obligations  16:*22*
observations  7:*11,
  13*  140:*5*
obvious  13:*2*  130:*7*
obviously  38:*13*
  83:*9*  85:*12*  155:*7,
  25*
occasion  59:*19*
occasions  60:*2*
  149:*5*
occur  16:*19*  114:*15*
occurred  10:*9*  27:*4*
  113:*11*  137:*20*
odd  40:*2*  82:*21*
  83:*7*  106:*22*  107:*2*
  111:*7*  113:*25*
Oddly  100:*19*
ODNI  99:*16*
  153:*13, 17*
offer  7:*11*  123:*14*
  145:*25*  154:*12, 15*
  158:*13, 22*
offered  123:*17*
  154:*17*
Office  1:*19*  23:*24*
  44:*25*  45:*4*  70:*4*
  73:*11*  85:*19*  86:*15*
  87:*14*  95:*23*  111:*6*
  114:*16*  115:*14*
  124:*12*  125:*8*
  126:*14*  137:*9*
  148:*17, 21*  157:*13,
  25*  158:*1*  159:*22*
  160:*4*  161:*25*
  162:*11, 22*  163:*9*
  168:*19, 23*
officers  71:*3*
Offices  73:*9*  74:*19*
  125:*2, 7*  126:*3*
official  80:*18*
  109:*17, 18*  137:*25*
officially  11:*13*
officials  102:*19*
  125:*12*  134:*15*
off-kilter  100:*18*
  101:*13*
Oh  31:*14*  36:*16*
  37:*16*  68:*6*  103:*21*
  115:*3*  116:*4*
Okay  7:*10*  20:*17*
  23:*10*  29:*2*  37:*16*

39:*1, 2*  40:*12*  42:*1*
  43:*13*  45:*3*  46:*11*
  50:*3*  57:*6, 17*  58:*4,
  8*  63:*8*  68:*23*
  81:*12*  103:*22*
  104:*7, 9*  110:*18*
  117:*24*  118:*15*
  119:*7*  121:*13*
  124:*9*  125:*5*
  127:*14*  131:*15*
  133:*12*  137:*6, 24*
  152:*12*  154:*6*
  157:*19*
OLC  44:*14, 25*
  101:*2, 3*  115:*19*
  156:*24, 25*  167:*1*
old  19:*4*  101:*2*
Olsen  114:*1, 18*
  115:*24*  136:*20*
once  64:*14*  65:*3*
  71:*25*  72:*4, 24*
  77:*12, 16*  150:*1*
one-on-one  107:*7*
ones  65:*11*  86:*19*
one-time  106:*19*
open  31:*17*  32:*7*
  87:*2, 8*  139:*22*
opened  112:*1*  123:*6*
opening  10:*24*
  32:*11*  49:*17*
operating  14:*10*
Operation  31:*12*
  72:*7*
operator  58:*7*  81:*8*
  105:*12*
opinion  101:*2*
opportunity  3:*10*
  4:*14*  7:*13*  10:*24*
  32:*2, 3*
oppose  63:*11*
opposed  21:*14*
  44:*14*  50:*14*  101:*4*
  104:*16*  164:*16*
opposite  47:*6*
order  3:*24*  6:*9*
  15:*17*  19:*6*  27:*5, 7*
  35:*22*  36:*3, 18*  84:*2*
orderly  8:*12*
ordinarily  124:*10*
ordinary  13:*7*
organization  124:*8*
  127:*10*
organize  138:*18, 23*
  160:*18*
originally  14:*11*
  39:*24*
originated  120:*18*
outcome  8:*8, 16*
  11:*19*  66:*4, 21*
  83:*16*  112:*19*  152:*3*

outline  117:*20*
out-of-date  68:*13*
outrageous  94:*7*
outreach  150:*15*
outset  7:*20*  9:*4*
  87:*5*
outside  6:*8*  24:*6*
  33:*10*  79:*8*  105:*1*
  113:*5*  114:*1*
  116:*24*  141:*6, 12*
  155:*18*  168:*16*
  169:*4*
outsiders  116:*21*
Oval  45:*21*  46:*20*
  85:*18*  86:*15*  87:*14*
  137:*9*  157:*13*
  162:*11, 22*  163:*9*
overall  16:*9*  93:*6*
  130:*1*  139:*12*
overly  24:*13*
overrule  118:*11*
overseeing  21:*25*
Oversight  2:*20*
  4:*18*  107:*16, 24*
  108:*3, 17*  109:*8*
  136:*17*
overstate  150:*2*
overt  18:*19*  19:*6*
  120:*23*  148:*5*
overtime  84:*7*
overturn  2:*12*  8:*23*
  56:*4*  67:*14*  80:*9*
  104:*16*  112:*3, 9*
overturned  8:*18*
overview  24:*21*
owned  57:*23*

**< P >**
p.m  77:*25*  99:*10*
  150:*17*
PA  66:*1*
page  13:*20*  15:*15*
  23:*22*  43:*6*  44:*4*
  56:*17*  64:*16*  65:*20*
  92:*24*  127:*23*  153:*4*
pages  44:*8*  172:*2*
Pak  54:*6, 10, 19, 22*
  55:*3, 5, 9, 10, 16, 17,
  22*  70:*18*  153:*22,
  25*  154:*4, 7*  167:*10,
  23*  168:*3, 18, 22*
Pak's  54:*10*
paragraph  16:*24*
  17:*8*  100:*11*  120:*12*
paraphrasing  64:*9*
Parker  42:*25*
parochial  37:*20*
parse  140:*12*
part  2:*9*  28:*6*
  32:*15*  43:*21*  70:*19*
  82:*20*  87:*21*  102:*2,

18*  107:*8, 11*
  120:*21*  123:*1*
  134:*9*  135:*5*  156:*8*
  158:*17*  161:*13*
  165:*8*  168:*8*  169:*3*
partake  77:*6*
participants  112:*20*
participate  8:*10*
participated  29:*21*
particular  8:*14*
  13:*4*  24:*7*  42:*10*
  49:*24*  59:*23*  60:*22*
  68:*21*  72:*1*  123:*20,
  21*  134:*18*  142:*5*
  149:*14*  151:*1*
particularly  78:*11*
  80:*19*
parties  8:*11*  135:*16*
partly  132:*3*
parts  12:*1*  51:*3*
  52:*21*  83:*19*  88:*7*
  97:*20*  103:*8*
  135:*20*  166:*23*
pass  126:*8*
passed  146:*13*
passing  78:*5*
  113:*17*  118:*24*
Pat  29:*22*  44:*19*
  47:*9, 10*  50:*13*
  106:*18*  107:*3, 8, 11,
  13*  111:*4, 5*  138:*7*
  143:*6*  160:*3*
patched  89:*8*
patently  94:*6*
path  10:*1, 5*  49:*18*
  158:*7, 15*  159:*11*
  164:*10*  165:*16*
  166:*10, 11, 17, 22*
pathway  49:*22*
Patrick  160:*14*
pause  109:*15*
pausing  45:*13*  61:*8*
pay  37:*18*
paying  72:*12*
peaceful  8:*13*
peculiar  83:*19*
pejoratively  165:*11*
pending  15:*8, 20*
  123:*12*
Pennsylvania  30:*16*
  34:*11*  38:*13*  59:*6*
  66:*2*  67:*1, 24*  68:*1,
  12*  72:*15*  81:*17*
  85:*14*  92:*20*  97:*22*
  105:*3*  108:*6*
  112:*23*  113:*2*
  114:*19*
people  9:*5*  18:*20*
  25:*6*  30:*18, 19*
  31:*2, 14*  34:*8, 10*
  35:*6, 10*  36:*3, 12*

38:*6*  39:*4, 9*  48:*17,
  24*  52:*21*  54:*9*
  58:*17*  59:*17, 20*
  60:*20*  61:*3, 4, 12,
  18*  62:*25*  64:*6*
  67:*16*  71:*13, 14, 15,
  20, 21, 22*  72:*12, 13,
  21*  73:*11*  76:*1*
  81:*2, 16, 21*  83:*16*
  90:*4, 7*  91:*13*
  94:*17*  95:*13, 14*
  97:*5*  106:*4*  122:*25*
  126:*10*  127:*8*
  131:*24*  139:*25*
  140:*14*  151:*25*
  152:*1*  156:*12*
  160:*8, 20*  162:*10*
  164:*17*  165:*10, 11,
  21*  166:*22*  171:*4*
people's  59:*13*  60:*3*
perceive  37:*4*
perceived  77:*19*
  100:*10*
percent  26:*7*  65:*12,
  13, 16, 18*  149:*18*
perfect  10:*8*
perform  15:*18*
  16:*15, 22*
performance  15:*22*
  16:*4*
period  7:*18*  18:*20*
  19:*1, 3*  21:*23*
  40:*25*  41:*1*  144:*2*
permitted  145:*3*
perpetrators  80:*3*
Perry  85:*14, 15, 16*
  86:*20, 23*
persistent  9:*17*
person  49:*23*  65:*12,
  13, 17*  76:*16*  148:*7*
  167:*24*  170:*25*
personally  23:*2*
  69:*22*  70:*23*  71:*5*
personnel  70:*1*
  122:*19*  125:*24*
person's  61:*10*
perspective  15:*24*
persuade  9:*25*
  93:*23*  151:*24*  158:*6*
persuasive  165:*21*
petition  133:*14*
phase  104:*10*
Philbin  47:*10*
  50:*13, 16*  52:*10*
  107:*13*  111:*5, 17*
  138:*3*
phone  16:*11*  38:*20*
  39:*20*  58:*7*  80:*21*
  110:*11*  114:*13, 22*
  118:*6*  137:*1*  153:*21*

photo 138:2, *6*
photograph 137:*25*
photographed
138:*12*
phrase 126:*16*
picked 26:22
114:*18*
picture 75:*8* 92:*12*
124:*21* 127:7
138:9, *14*
pictures 138:*16*
piece 31:5 113:*25*
132:*17* 134:*1*
pieces 46:*16*
Pilger 22:24 73:*21*,
*22, 24*
pillow 71:*16*
PIN 21:*21* 40:*16*
76:23 120:22
121:*16*
place 14:*11* 16:*3*
40:20 45:20 51:*4*
59:15 89:*3* 90:25
136:24 146:*1*
placed 117:*16*
places 15:2, *5*
52:22 67:*16* 81:*4*
93:*11* 164:*12*
166:24
plain 115:*18*, *21*
plan 45:25 48:*18*
109:5 160:5 161:*16*
plane 80:2
planned 85:*10*
plans 81:*4*
plausibility 68:*8*
play 55:*19* 124:20
players 47:20
playing 57:20
please 2:*13* 3:*15*
4:6 5:*8*, *16* 109:22
113:*8* 119:*13*
pleased 111:24
112:*6*, *18*
plus 101:*16*
point 3:*14*, *16* 6:*19*
12:*19* 20:24 21:20
24:20 25:*12* 26:*1*
29:5 30:*3* 31:*7*
39:*3*, *14* 42:*19*
53:*17* 54:22 67:*8*
68:*17* 69:*21* 73:*23*
74:6 75:*21* 78:*17*
84:*23* 86:*3* 87:2
89:*9* 90:24 91:*21*
92:7 95:*21* 99:*19*
101:*12* 104:*5*
105:*23* 111:*2*
112:*17* 113:*21*
114:*12* 115:*13*
117:*3* 118:24

121:24 122:*3*
126:*17* 129:*15*
132:*11* 135:*1*, *15*
137:*11* 142:*18*
144:*11* 146:*6*
149:*19* 151:20, *23*
152:*16*, *19*, *22*
153:*13*, *20* 155:2,
*22* 157:6, *10* 158:*1*,
*10* 159:5 161:*10*
162:*16*, *24* 165:2,
*23* 166:*3* 167:*4*
168:*4*, *10*
points 52:*15*, *22*
97:*1* 115:*14*, *22*
166:20, *21*
police 125:*11*
policies 14:5 17:20
18:*15* 20:*10*
policy 14:*11* 15:*13*,
*25* 17:*21*, *22*, *25*
18:5, *7*, *17*, *25* 19:*4*
20:*1*, *5*, *23* 21:*10*,
*20* 22:*2*, *15* 23:5
75:*1*, *5* 76:*12*
121:*15* 122:*16*
polite 115:*10* 141:*8*
164:*21*
political 8:*11* 17:*1*,
*6*
popped 87:*1*
popping 24:*14*
portion 98:*2*
position 8:5, *9* 9:*16*
12:*15*, *17* 22:22
36:*21* 39:7 46:*18*
49:*10* 50:*17*, *19*
73:*24*, *25* 76:*24*
77:5 90:22 92:*13*
95:*25* 112:7 117:*2*
118:*9* 122:*11*
123:*3* 130:*1* 132:5
134:*10* 142:*23*
143:*19* 146:7
149:*15* 158:*13*
162:*13* 165:*24*
positions 48:*22*
positive 129:*14*
possibility 129:*8*
possible 41:*9*, *18*, *24*
117:*11* 118:*23*
120:*16* 150:*4*, *5*
possibly 107:*12*
post 94:*18*
post-election 19:*1*
21:*23*
posture 29:*8* 96:*18*,
*23* 112:*21* 131:*13*
potential 3:20 5:*4*
121:*4* 125:*14* 127:*1*

potentially 49:*6*
55:*3* 60:*13* 71:*10*
101:*21* 126:2, *10*
POTUS 25:20, *23*
44:*14* 81:*9*
practice 114:*3*
138:*12*, *15* 147:*19*
preamble 2:5 6:*14*
precise 21:*3* 24:*13*
precisely 24:*21*
pre-election 21:7
preexisting 22:7
prefer 61:*18*, *20*
preferred 9:*18*
109:*24* 163:*3*
preliminary 7:*11*,
*13* 17:*16* 19:9
45:*8* 104:*17*
pre-meetings 45:*11*,
*14*, *17*
premised 143:*1*
preparations 156:*18*
prepare 115:*14*
prepared 6:22
21:5 113:*4*, *5*
115:22
preparing 105:*15*
present 12:*10* 47:*4*,
*20* 86:*9* 109:*9*
138:*4* 148:*17*
presented 8:7 39:*8*
43:*25* 141:6 147:2
presenting 37:*19*
presents 60:*24*
preserve 6:*9* 7:*24*
presidency 9:*19*
President 2:*11* 7:5,
*15* 9:6, *8*, *10*, *13*, *17*,
*24*, *25* 10:*4* 12:*21*
13:2, *6* 14:25 16:*8*,
*14*, *16* 17:*4* 23:*24*
25:5 28:*15*, *19*
29:*10*, *16* 30:*4*, *11*
31:*8* 33:*3*, *4* 34:2,
*4* 35:*1*, *21* 36:2, *9*,
*14*, *22* 37:2, *17*, *18*,
*25* 39:*3* 40:*3*, *10*,
*20* 41:*1*, *5*, *11* 42:5,
*10*, *13*, *16* 43:*23*
45:*3*, *8*, *24* 46:*4*, *9*,
*19*, *21*, *25* 47:*12*, *15*
48:*14*, *20* 49:*6*
50:*17* 51:*7* 52:*1*, *6*,
*15* 53:*15*, *17*, *20*, *24*
54:*6*, *10*, *12*, *15*, *19*,
*20*, *24* 55:*4*, *8*, *15*
56:*2*, *7*, *9*, *11* 57:*7*,
*15* 58:*4*, *9*, *12*, *23*
59:*11* 60:*1*, *10*, *12*
61:*2*, *11*, *20* 62:*14*,
*23* 63:*4*, *15*, *19*

64:5, *8*, *11*, *17*, *22*
66:*7*, *20*, *25* 67:*15*
69:*1* 70:*21* 71:*3*, *8*
72:*3*, *20* 77:*13*
78:*15* 79:*1*, *9*
80:*17*, *21* 81:*9*
83:*4*, *6*, *11*, *16*
84:25 85:5, *19*
87:*3*, *4*, *11*, *17*, *22*
89:*4*, *7*, *10*, *19*, *20*,
*22* 90:*3*, *12*, *18*, *20*
91:*4*, *24* 92:*2*, *6*, *19*
93:*2*, *8*, *21* 94:*1*, *19*
95:*3*, *12* 101:*15*
102:*13* 103:*10*
104:*5*, *15* 105:*8*
106:*1*, *25* 107:*5*
110:*13*, *18* 111:*2*,
*15*, *25* 113:*9*, *21*
114:*7*, *25* 115:*1*, *13*,
*24* 116:2, *8*, *12*, *17*,
*21* 117:*2*, *4*, *10*
118:*8*, *20* 128:22
129:*1*, *3*, *4*, *5*, *6*, *11*,
*17*, *20*, *23* 131:20
134:*11*, *12*, *14*
137:*1*, *4* 138:*21*
139:*1*, *4*, *13* 142:*6*
143:*13*, *20* 144:*5*,
*10*, *12*, *25* 145:*11*,
*25* 149:*21* 150:5
151:*15*, *24* 152:*21*,
*24* 158:*11*, *13*, *24*
159:*18*, *24* 161:*8*,
*11* 162:*19* 163:20
164:*1* 166:*17*, *20*
167:*2*, *5*, *13*, *17*
168:*3*, *16* 169:*3*
presidential 2:*12*
55:*25* 56:2 131:*18*,
*25*
Presidents 63:*6*
President's 15:*17*,
*23* 16:5, *11*, *21*
47:*2*, *8* 54:*4* 60:*8*
61:*17* 62:*19* 63:*21*
64:*1* 66:*14* 96:*19*
140:5 154:*12*, *15*
press 39:*16* 49:*12*
96:*1*, *3*, *4*, *7* 97:*19*
102:*8* 133:*14*
156:*3* 169:*18*, *22*
170:2
press-reporting
165:*3*
presumably 145:25
pretty 30:*12* 42:*17*
65:*14* 69:23 76:*3*
84:*15* 126:*2*
162:24 165:*3*
167:*16*

previous 76:*18*
110:*21* 149:5
160:*14*
previously 21:*13*
24:*23* 39:*17* 114:*6*
115:*4* 121:*21*
128:*9* 130:*6*
135:*21* 141:*17*
145:*24* 150:7
primarily 108:*2*
136:*17*
Principal 161:*24*
principals 48:*21*
52:*18*
prior 7:*3* 18:25
20:5 74:25 75:*13*
79:*18* 86:*1* 121:5
122:*17* 144:*24*
prioritized 97:*12*
prioritizing 97:*6*
priority 7:*21* 58:5
prison 148:7
privately 64:*12*
privilege 3:20
pro 43:*23*
probably 23:7
24:20 25:*23* 42:*19*
45:*19* 48:*3* 55:*13*
67:*16* 72:*19* 76:*15*
84:*1* 87:*18*, *23*
115:*12* 121:*8*
129:*13* 141:*11*
problem 124:*8*
134:*3*
problems 102:*18*
Procedure 3:*4*
proceed 3:*8* 7:22
17:*18* 47:*3* 67:*9*
proceeded 77:*18*
166:*19*
process 19:*7*, *9*
55:*19* 60:*3* 61:*11*
68:*14* 74:*8*, *13*
87:*5* 124:*17*, *24*
126:*13*, *20*, *25*
127:*8* 134:*17*
156:*19*
processed 135:*23*
processes 122:*21*
124:*19* 127:*1*, *2*
professional 86:*1*
program 131:*12*
prompted 12:5
proof 39:*11* 104:*24*
154:*24* 161:*15*
proper 72:7 104:*3*
117:*1* 125:*18*, *24*
130:2
properly 50:*20*
proposal 99:*16*
101:20, *24* 105:7

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

**proposals** 49:*1*
106:*25*
**proposed** 104:*23*
120:*23* 141:*12*
**proposing** 49:*16*
155:*17*
**prosecution** 5:*25*
**prosecutorial** 123:*20*
**prosecutors** 8:*15*
62:*8*
**prospect** 32:*23*
38:*16* 141:*15*
**protective** 147:*5*
148:*6*
**provide** 3:*19* 5:*23*
6:*5* 52:*5* 127:*4*
**provided** 51:*25*
121:*4* 123:*16*
134:*12* 147:*8*
153:*7, 20*
**public** 7:*17* 8:*1, 17*
9:*9* 10:*19* 21:*21*
22:*6, 13, 18, 21*
23:*3* 30:*14* 32:*16*
33:*4* 37:*21, 23*
49:*12, 16* 67:*5*
73:*8, 13, 18* 74:*9,
14, 21* 75:*17* 76:*5*
79:*17* 96:*7, 13*
97:*1, 14* 100:*3, 14*
109:*17* 119:*12*
120:*5, 19, 22* 121:*3,
17* 122:*6, 15* 123:*5*
124:*5, 9, 14* 140:*11*
171:*9*
**publically** 35:*17*
**publicly** 8:*5* 29:*8,
16* 33:*3, 5* 39:*15*
60:*11* 64:*11* 72:*18*
92:*13* 140:*7*
**pull** 43:*11* 153:*7*
**pulled** 79:*7*
**Pure** 146:*23* 147:*23*
**purporting** 66:*11*
**purpose** 17:*5* 30:*1*
131:*8* 152:*23*
**pursuant** 1:*17* 19:*4*
123:*24*
**pursue** 9:*25* 10:*4*
45:*25* 75:*12* 163:*2*
**pursued** 51:*1*
**pursuing** 159:*11*
**push** 147:*25* 153:*7*
**pushback** 166:*17*
**pushed** 134:*20*
**pushing** 104:*4*
114:*24*
**put** 8:*1* 9:*20*
14:*11* 34:*19* 40:*16*
59:*2* 61:*18* 65:*1*
76:*4, 14* 90:*5* 92:*7*

115:*21* 139:*14*
141:*24, 25* 166:*3, 13*
**putting** 30:*13* 90:*2*
91:*9* 141:*14* 164:*21*

**< Q >**
**Q.And** 48:*12* 55:*23*
**Q.What** 72:*10*
**qualifications** 48:*25*
164:*18, 20* 165:*1*
166:*8*
**qualified** 166:*8*
**qualify** 75:*9*
**quality** 94:*17*
**quantify** 149:*24*
150:*1*
**quantitative** 125:*19*
**question** 3:*25* 8:*19*
13:*2* 34:*25* 36:*1, 6,
14* 38:*12* 53:*19*
61:*5* 67:*8, 24*
80:*15* 87:*3, 9*
89:*12* 91:*10* 92:*23*
99:*15* 119:*25*
125:*21* 126:*19*
168:*6, 15* 169:*1*
**questioning** 2:*6*
3:*8* 11:*2* 42:*24*
87:*22* 135:*24*
**questions** 3:*9, 10,
12, 22* 5:*15, 16, 18*
6:*15* 7:*16* 10:*7, 21*
11:*1, 5, 7* 25:*4*
76:*13* 77:*9* 80:*5, 6*
83:*23* 88:*14* 92:*8*
123:*15* 133:*2*
136:*4* 152:*6, 9*
161:*5* 163:*8*
166:*23, 25* 167:*13*
172:*3*
**quibbling** 63:*24*
**quick** 131:*18* 161:*5*
**quickly** 66:*3* 77:*10*
110:*9* 160:*1*
**quite** 39:*23* 100:*7*
142:*9* 165:*14*
**quizzical** 83:*10*
**quote** 58:*19, 20*
60:*18* 66:*11* 91:*20*
93:*1*

**< R >**
**race** 57:*23* 58:*18*
**races** 59:*13, 18*
**Raffensperger** 159:*1*
**raise** 93:*8* 140:*10,
23, 25*
**raised** 54:*13, 15*
59:*19* 61:*7* 66:*25*
92:*19* 108:*4*

130:*19* 135:*22*
145:*13* 146:*5* 151:*4*
**raising** 35:*5* 36:*12*
37:*17*
**rang** 58:*7*
**Ranking** 12:*10*
**rate** 26:*8* 27:*10*
**rational** 65:*7*
**rationale** 71:*7*
**reached** 109:*13*
153:*24* 154:*3*
158:*25*
**reaching** 154:*7*
**reacted** 151:*1*
**reaction** 79:*13, 14*
98:*25* 100:*1*
101:*24* 142:*12*
143:*18* 151:*8*
153:*16* 154:*6*
**reactions** 151:*2*
**read** 15:*25* 17:*3*
66:*8* 71:*23* 96:*23*
172:*2*
**reading** 65:*25* 66:*9*
**ready** 54:*9* 81:*3*
119:*22, 23* 143:*8*
151:*20, 24* 161:*2*
**real** 16:*17* 94:*16*
131:*7* 142:*14*
170:*21*
**reality** 64:*2* 94:*4*
**realized** 4:*13* 29:*4*
148:*11*
**realizing** 101:*13*
**really** 16:*12* 20:*7*
27:*19* 29:*1* 31:*8*
41:*16* 46:*14* 50:*23*
61:*9, 10* 62:*17*
63:*24* 75:*8* 76:*2*
82:*10* 86:*24* 87:*9*
89:*16* 90:*7* 94:*17*
101:*6* 104:*8*
105:*25* 107:*23*
109:*9* 123:*3* 127:*2*
131:*8* 132:*19*
145:*10* 155:*11*
159:*7* 163:*5* 170:*5*
171:*4*
**reason** 6:*4* 16:*17*
50:*4* 56:*2, 3* 59:*2,
24* 63:*16* 65:*14*
66:*12* 89:*12* 95:*11*
148:*24* 158:*10*
**reasonable** 61:*5*
62:*4, 13, 14* 121:*22*
**reasonableness**
62:*18*
**reasons** 14:*14*
117:*22* 118:*12*
120:*3* 130:*7, 9*

157:*5*
**recalcitrant** 116:*13*
**recall** 14:*1* 22:*20*
23:*6* 24:*2* 25:*17*
28:*9* 31:*7* 38:*19*
40:*1* 41:*21* 46:*10*
55:*12* 56:*14* 57:*4,
20* 58:*22* 59:*11*
68:*20* 70:*11, 21, 24*
76:*23* 78:*25* 84:*15*
86:*12* 88:*5, 7* 91:*8,
10* 99:*2* 105:*5*
106:*14, 17* 108:*5*
115:*9* 120:*14*
121:*11* 125:*16*
136:*17* 137:*7*
140:*24* 141:*9*
164:*19* 168:*2, 15*
169:*3*
**receive** 3:*22* 42:*15*
82:*5* 124:*17*
126:*23* 138:*16*
**received** 23:*11*
24:*22* 26:*1, 11*
28:*7* 37:*11, 12, 15*
60:*10* 71:*10* 75:*17*
98:*14* 125:*1* 139:*3,
7* 146:*12* 149:*8*
**receiving** 14:*1* 24:*2*
61:*6* 104:*12* 166:*16*
**reception-like** 79:*5*
**recipient** 154:*20*
**recognize** 105:*14*
114:*14*
**recognizing** 10:*8*
35:*19* 37:*12* 89:*1*
104:*1*
**recollect** 70:*25*
71:*18*
**recollection** 18:*15*
24:*10* 30:*11* 33:*5*
41:*4* 42:*9, 11* 48:*3*
55:*14, 15, 19* 66:*19*
71:*8* 74:*2* 75:*18,
20* 76:*21* 90:*3*
95:*12* 96:*16*
104:*19* 108:*2, 24*
109:*7* 116:*22*
118:*21, 24* 122:*23,
24* 128:*18* 133:*23*
134:*19* 137:*14*
139:*1* 141:*25*
142:*1, 9* 149:*4*
158:*1* 159:*3*
167:*22, 24* 168:*9, 24*
**recollections** 168:*12*
**recommendations**
52:*1, 5* 53:*3* 55:*4*
**recommended** 54:*19*
**recommending**

167:*25*
**reconciled** 68:*16*
**reconciliation** 67:*6*
**record** 2:*4, 14, 22*
3:*24* 4:*7* 7:*1, 9*
12:*9* 18:*12* 23:*13,
16, 20* 26:*4* 42:*20,
21, 23, 25* 44:*7, 11*
67:*25* 69:*20* 77:*23,
24* 78:*1* 109:*15, 17*
110:*3, 5, 6* 117:*7*
119:*2* 123:*3* 136:*5,
7, 10* 139:*9* 140:*20*
149:*3* 166:*1* 168:*5*
169:*16* 171:*12, 13*
**recorded** 172:*4*
**records** 77:*2* 109:*5*
133:*2*
**recount** 27:*4, 8*
31:*20, 23* 32:*8*
34:*22* 85:*11*
**refer** 64:*23* 123:*8*
168:*12*
**referee** 101:*6*
**reference** 43:*13*
44:*5* 45:*6* 65:*20,
21* 67:*23* 82:*21, 22*
83:*20* 84:*4, 6*
88:*25* 89:*15, 21*
90:*14* 91:*8, 10*
92:*3* 100:*11* 105:*1*
106:*12* 113:*17*
121:*19*
**referenced** 78:*5*
85:*14* 97:*4* 104:*17*
106:*4* 144:*3* 167:*11*
**references** 106:*1*
120:*11*
**referencing** 59:*12*
**referred** 72:*20*
83:*15*
**referring** 18:*4*
34:*24* 161:*23*
**refers** 43:*21* 44:*21,
25* 127:*18*
**reflected** 17:*23*
20:*24* 26:*3*
**reflects** 16:*2* 42:*25*
148:*22, 25*
**reform** 31:*11*
**refresh** 73:*19* 74:*3,
23* 120:*16*
**refused** 148:*14*
**refuting** 27:*10*
**regard** 9:*11* 10:*15*
13:*3* 19:*13* 29:*8*
59:*23* 72:*10* 73:*5*
101:*5* 107:*22*
**regarded** 111:*25*
142:*10*

**regarding** 8:22
16:*19* 47:*23* 52:6
60:2, *13* 99:*16*
124:6
**regardless** 71:*25*
**regards** 26:*19* 76:*4*
**Reginald** 4:*8*
**register** 25:*24*
89:*16, 23* 91:*3*
140:*17*
**registered** 66:2
67:2 68:*1, 12*
93:*17* 105:*17*
**registrations** 92:*20*
**regular** 156:2, 6
**regularity** 71:22
**regularly** 156:*15*
**reinforced** 93:*17*
103:*12*
**reinforcing** 155:*16*
**reiterate** 32:*3*
79:22
**reiterating** 79:*18*
**reject** 54:*1* 77:*13,
14* 110:*19*
**rejected** 40:*1*
44:*10, 15* 45:4
53:4, 7, 9 102:*15*
104:2 116:2*1*
145:*24*
**relate** 132:*18*
**related** 29:5 41:2
48:9 56:*12* 119:9
121:5 124:*18*
126:*1* 135:7
**relating** 61:7
**relation** 91:*11*
124:*10*
**relatively** 164:2*1*
**release** 133:*14*
169:22 170:2
**releases** 169:*18*
**releasing** 145:*20*
**relevant** 43:*23*
**reliability** 60:*25*
147:*12*
**relied** 117:2*1*
**relief** 111:*19, 22*
**rely** 93:*20* 127:4
**remain** 65:*17*
**remained** 139:22
168:*24*
**remains** 7:4
**remarkable** 98:*15*
**remarkably** 158:*14*
**remarks** 17:*16*
30:*12* 45:8 49:*17*
79:5 104:*17*
**remember** 10:*12*
14:*10* 18:5, 9, 11
19:9 21:24 22:*12,*

24, 25 23:*1, 9* 24:4,
14, 15, 20 25:*13, 24,
25* 27:*14* 28:*12*
30:9 32:9 33:7, *13*
34:*18, 20* 39:*22, 18,*
21 41:7, *16, 19, 24,
25* 42:*15* 45:*13*
54:7, *17* 55:*10, 21*
57:*14, 20* 58:*10, 12,
13* 59:22 60:*17, 18*
64:*20, 25* 65:*1, 2*
66:25 68:*3, 10*
69:*14* 70:*11* 71:6
74:*4, 24* 76:5, 21*
77:2 78:*20* 79:*15,*
25 80:4 82:*2, 7, 23*
84:*1, 17* 86:*19*
89:*14, 25* 90:6
91:5, *17, 20* 93:*12,
15* 95:*17* 96:*19*
97:6, *20* 99:4
102:*12, 25* 104:*14*
108:*16, 22, 23*
109:2 111:6
115:25 120:*15, 17*
128:*15* 141:*17*
142:*10* 143:4
148:23 149:*14, 25*
153:*18* 154:*14*
155:5, *15* 156:4
159:3 166:*24*
169:*10*
**remote** 65:*18*
**remove** 56:2
**removed** 76:7
**renewed** 129:*15*
**repeat** 134:*16*
164:4
**repeated** 51:*15*
102:6 122:6
**repeating** 95:9
**repetitive** 140:*3*
**replace** 45:*25*
54:*16* 90:2*1*
143:2*1* 151:*15*
159:*17* 168:*17*
**replaced** 158:*14, 18*
**replacement** 143:*15*
**replacing** 91:9
129:8 141:*15*
**replicating** 105:*1*
**report** 25:*3, 13*
26:5 27:*10* 31:*18*
125:8, *11*
**report,they** 126:5
**reported** 32:8 33:4
60:*11* 64:6 131:4
158:24
**reporting** 19:9 61:2
**reports** 27:*17*

60:*15* 63:22
**represent** 116:*19*
**representative** 49:9,
14
**representatives**
107:*20*
**represented** 49:22
**Republican** 4:*25*
95:6
**request** 26:*19* 28:7
34:23 48:*14* 98:2*1,*
25 102:*15* 107:24
129:*15* 144:7
145:5 149:*11, 14,
20, 25* 151:*1*
**requested** 2:9
28:2*1* 45:7 78:9,
10 138:2 146:*3*
**requests** 107:*17*
149:9, *17*
**require** 125:*20*
**required** 5:*18*
46:*17*
**reservation** 123:*11*
**reserve** 136:2
**resign** 11:22 12:6
55:22 73:24 163:5
168:22
**resignation** 11:*17*
12:6 121:24
**resigned** 12:4
24:*16* 73:24, 25
74:*1*
**resigning** 11:2*4*
12:2*1* 23:*12* 54:2*3,*
25 55:2, *11, 17, 18*
168:*3*
**resist** 118:*10*
**resisted** 10:*18*
**Resolute** 46:22
**resolution** 61:*23*
76:*20* 122:*24*
**resolved** 32:7
107:2*1* 111:*14*
118:4, 6 167:*13*
**Resource** 100:*23*
**respect** 44:9, *12, 21*
53:*11* 55:*3, 14*
59:*13* 60:2 64:*10*
67:23 72:5 74:9
109:9 110:*14*
120:4 122:6, *17*
123:*19* 125:2*3*
126:*13* 152:*17*
161:20 170:*18*
**respectfully** 31:9
**respond** 37:*14*
51:*11, 12* 60:6, *19*
146:24
**responded** 37:*10,
13* 38:8 66:6 67:4

**responding** 7:*16*
151:6
**responds** 146:2*3*
**response** 22:22
33:*14, 19* 34:5, *14*
36:*11* 44:8, 9 53:2
60:2*1* 66:*14* 92:8
95:*3* 118:*15*
147:23 150:2*3*
**responses** 3:22, *25*
**responsibilities** 63:6
69:*24*
**responsibility** 62:*15*
70:*17* 73:7 74:*15*
99:*18* 102:*19*
109:*19* 126:8
138:22 151:*11*
**responsible** 23:*8*
70:*3* 125:25 126:2
127:6
**responsive** 109:*19,*
22
**rest** 66:*16* 90:*12*
95:5, *8* 141:24, 25
161:2*1*
**restrictions** 14:2*0*
**result** 10:*18* 26:8
32:8 145:*19*
**results** 9:9 10:2*0*
64:24 80:9 130:*3*
**retain** 54:2
**rethink** 159:8
**retiring** 156:*12*
**return** 73:*1*
**returned** 139:5
**returning** 78:*13*
**reveals** 144:2*3*
**reversed** 146:7
**review** 14:9, *18*
56:25 61:*25*
119:2*1* 133:25
135:6
**reviewed** 133:2*1*
135:*10*
**reviewing** 62:*3, 6*
**revised** 14:*12*
**Rhode** 3:2
**Rich** 35:*11* 44:*18*
47:5, *14, 17* 55:*11*
56:9 57:8 59:*1, 2*
69:2, 22 70:*14*
90:*11* 93:*17* 95:*11*
99:*11* 101:25
102:8, 9, *10* 103:*12*
107:9 108:8 111:5,
12 120:8 121:7
127:20 131:6
138:7 139:5 141:2,
7 143:6, *20* 144:7,
16 146:4 148:25
151:*18* 155:*15*

156:20 158:*18*
160:*13, 25* 167:*23*
**Richard** 2:25
12:22 24:25 25:*10*
28:6 54:*13* 73:2*1,
22* 82:*18*
**Rich's** 59:*24* 63:*17*
65:*1* 66:*12* 71:*1*
132:*3*
**ride** 160:*25* 161:2
162:24
**ridiculous** 54:*24*
103:*14* 150:*3*
**right** 11:*13,* 20
12:*17* 14:8, *15*
15:*16* 19:*15* 25:*20*
30:5, *20* 32:9, *16*
36:*1,* 24 37:6
44:*13* 45:6 47:*3, 7,
9, 15* 48:*16* 49:25
54:*14* 57:6, 9
61:*14* 62:4, 5
70:24 72:20 79:6
80:*16* 92:*11* 97:*15*
104:4 105:2*1*
110:2, *17* 111:*17*
119:*14* 113:*3*
119:*14* 120:*17*
122:4 137:6
141:*19* 144:2*3*
147:*13* 151:25
152:*1* 155:*1* 157:2,
4 158:22 159:6
161:*1* 163:2*3*
166:*11* 171:*3*
**ring** 18:22 59:9
**ringing** 114:*14*
**rings** 106:7
**rising** 152:*17*
**risk** 95:9
**road** 152:8
**rogue** 132:2*3*
**role** 11:9 51:*16*
63:25 64:*3* 67:*13*
92:4 99:2*1* 102:24
114:5 154:*12*
156:25 165:*19*
171:*1*
**room** 2:2*1* 6:9
23:*17* 46:24 49:4
50:7 51:4 78:22
79:3, 8 102:6
110:4 155:2*1*
167:25
**ROSEN** 1:*8* 2:4, 7,
9, 15, 16* 4:2, 9, *19*
5:5, *14, 21* 6:3, 6,
16, 21* 7:7, *10*
10:23 12:*14* 19:24
34:*1* 48:*15* 56:4,
17* 69:2*1* 71:*18*

72:25  77:19, 22
78:4, 23  88:22
98:9  109:16  110:9
112:2, 8  119:4
124:7  127:14
133:8, 10  150:12
152:5, 8  160:10
166:12  168:6, 7
169:14  170:7, 22
171:11
**Rosen's**  2:22
165:23
**roughly**  80:18
**round**  11:1  136:12
**rounds**  3:8  80:15
**row**  114:15
**Rudy**  148:13, 14
149:23
**rule**  7:24  9:21
10:15  36:25  61:15
141:21
**Rules**  3:4
**run**  58:2  148:3
165:9
**running**  58:2
161:25  163:21

< S >
**sad**  94:4
**Sara**  2:19
**SAs**  63:11
**Sasse**  110:4
**satisfied**  96:21, 22
146:3  155:11
**SATURDAY**  1:13
84:16  86:12
128:12  130:12
131:7  132:2, 18
145:9  152:10, 15
153:15  170:12, 17
**saw**  12:7  29:17
30:21  89:24  91:17
127:24  128:4
165:2, 4
**saying**  8:17  25:23
31:6  33:3  34:9, 12
35:6, 10, 16  36:3,
11, 12, 13, 18  37:11,
20  39:4, 5  42:8, 13,
14  47:7  58:21
60:17  61:11, 12
62:17  65:24  70:13,
25  76:11  81:16, 21,
23  82:9  84:5  85:9
90:3, 12  91:15, 18
93:2, 13, 18  95:20
96:7, 20  104:4
107:20  108:20, 22
112:1, 6  114:18
116:17  128:14
130:2  132:10

**semantic**  34:21
45:15  72:22
**semicircle**  47:19
**SENATE**  1:1, 19
2:10  9:1  56:1
58:18  59:13, 18
128:3  131:19, 25
**Senate-confirmed**
100:22
**Senator**  3:1  4:21
5:2  12:12  18:13
43:1  78:1  88:10
92:1, 18  93:10
109:12  110:2, 4
119:2, 4  130:20
136:19  163:8
169:19  170:16, 22
**Senators**  2:24
23:17  109:9
**send**  29:11  40:3
44:15  51:8  101:20
138:14  147:9, 13
161:19
**sending**  44:10  45:5
49:15  53:5, 7  54:1
104:24  110:19
145:17
**sends**  98:18  150:16
**senior**  10:2  47:11
143:7  160:15, 19
162:7, 10, 13, 15, 19
**sense**  13:10  14:18
22:5  27:15  34:7
37:19  53:4, 7  62:9
78:18  79:21  86:22
87:13  92:12  93:7
95:18  98:24
105:10, 18  111:19,
22  132:20  139:12,
15  147:1  151:1, 12
155:6  158:19
**senses**  129:25
**sensitive**  14:21, 24
16:18
**sensitivity**  16:13
**sent**  8:15  13:24
43:19, 22  102:10
113:12  116:5
133:14  147:4, 15
148:25  151:7
161:16  164:12
**separate**  144:25
**separating**  103:24
**sequence**  55:12
143:4
**servants**  8:1
**served**  7:18, 25
**service**  171:9
**serving**  160:15
**session**  131:17

**semantic**  139:17  140:7
146:2  147:9  148:1
151:19  157:17
159:11  165:11
**says**  15:17  17:8
25:23  36:20  43:21
44:13  52:22  63:9
75:12  91:4  99:10
100:13, 15  120:21
122:2, 5  125:13
127:16, 23  129:16
131:11  132:13
133:16  135:5
**scale**  8:8  32:5, 19
**schedule**  158:12
**scheduled**  48:1
81:7  107:14
**scope**  3:20
**se**  84:10  128:1
**season**  81:5
**seated**  47:15
**second**  17:8  73:2
77:9  103:13
130:14  138:23
150:8  169:24
**seconds**  155:8
**secret**  83:15
**Secretary**  102:20
158:25  159:1
**Section**  21:21
22:13, 19  73:1, 9,
13, 19  74:9, 15, 22
76:6  120:20, 22
121:4  123:5
124:14  132:22
**Security**  26:17
29:19  99:18  135:8
**see**  3:23  17:24
42:17  43:14  49:11
58:10  59:4, 8
63:12  64:19  66:8,
9, 17, 18  69:4
75:22  84:17  87:3
89:25  94:8  95:24
109:13  119:4, 25
120:10, 11  131:8, 9,
10, 11  132:8  133:3
139:15  142:15, 16
144:15  145:8
153:3  158:6  159:24
**seeing**  25:11, 18
26:20  111:6
**seek**  9:24  69:13
87:3, 4
**seeking**  167:3
**seen**  10:17  26:21
39:14  57:3, 5  82:6
93:8  113:22
114:19  137:25
165:2

**set**  27:14  40:2
46:15, 20  51:14, 22
99:8  101:18
147:21  151:21
164:13
**sets**  17:9  75:5
132:15, 16
**seven**  46:24  49:3
54:16  88:7  137:18
163:13  166:15
**shape**  65:4, 14
**share**  7:17  12:5
19:16  22:14  148:25
**shared**  25:5  37:24
128:21
**sharing**  34:5  70:9
**sheer**  144:18
**Sheldon**  3:2
**shift**  132:11
**short**  2:5  3:13
27:5, 7  28:17
41:20  153:1
**shorter**  84:2
**shortly**  11:6  45:16
68:15  106:25  143:8
**show**  13:15  67:18
82:18  115:8  116:6
**showed**  27:8
**showing**  24:4
**shows**  24:3  99:10
**shred**  128:4
**shredding**  127:24
**Shrugged**  90:20
**side**  14:25  15:1
115:20  152:4
163:8  164:1, 7
**sign**  145:14, 24
154:23
**signature**  69:3, 13
150:19  151:3, 11
**significance**  89:25
90:16
**significant**  83:9
84:6  109:19
129:12  139:17
142:8  167:16
**similar**  91:23  93:7
115:4  138:19  140:6
**simplify**  65:10
**simply**  111:1
**sincere**  170:15
**sincerely**  170:10
**single**  125:13
167:24
**sir**  31:8  43:3
56:25  63:12  64:19
65:21  66:17  67:25
68:24  77:21  82:11
113:3  119:21
126:12  127:18
134:24

**sit**  18:11  23:6
25:24  32:9  70:6,
11, 24  74:2, 24
76:21  122:24
**sitting**  28:9  46:21
47:2, 13  150:5
166:21
**situation**  16:10
47:23  74:19  134:7
**situational**  76:11
77:2  122:10
**situations**  76:8
134:22
**six**  51:6, 23  104:6
112:20  163:15, 25
164:7  166:15
**size**  45:18
**sizeable**  126:3
**skepticism**  63:19, 20
**Slightly**  84:2, 3
90:6  154:20
**small**  41:13  42:12
114:23  142:19
154:14, 16
**smart**  100:4, 12
**smarter**  49:20
**Smith**  106:7, 12
**snap**  66:4
**so-called**  26:5
**social**  106:19
**softer**  154:20
**Solicitor**  113:13
114:9, 22  115:13
162:4, 5
**solo**  105:12
**solved**  68:16
**somebody**  9:3
30:22  54:23  75:22
105:14  132:12
138:24  147:5  148:3
**somewhat**  53:16
58:24  85:8  89:18,
19  99:2  103:3
115:4  135:12
138:19  140:2, 6
150:24  158:16
168:11
**soon**  29:11, 13
**sorry**  21:2  25:16
38:22  50:12  71:18
78:24  110:3
111:21  112:5
132:20  136:14
150:14  164:4
**sort**  15:5  24:12
30:18  32:25  33:9
34:16  38:10, 16
49:17  58:11  79:4
82:14, 23  84:9, 10
86:25  87:1, 4
96:13  97:14  100:7

102:*14*   113:*17*
115:*21*   116:*17*
117:*3, 22*   126:*23*
140:*20*   147:*8, 10*
151:*19*   167:*15*
169:*12*

**sorted**   68:*9*
**sorting**   145:*12*
**sorts**   16:*3*
**sought**   171:*3*
**sounds**   26:*10*   30:*1*
37:*13*   38:*4*   84:*5*
91:*24*   96:*10*   100:*15*
**source**   10:*19*
**speak**   6:*7*   10:*25*
17:*10*   20:*10*   27:*25*
52:*16*   71:*4, 6*
149:*6*   157:*12*
165:*10*
**Speaker**   43:*23*
71:*17*   88:*19*   110:*1*
**speaking**   5:*2*   64:*9*
78:*16*
**special**   8:*15*   32:*22,*
*23*   33:*7*   34:*3, 18*
37:*18*   38:*14*   97:*2*
124:*22*
**specific**   12:*24*
34:*17, 20, 23*   36:*10*
57:*2*   91:*10*   97:*18*
99:*15*   107:*23*
123:*22*
**Specifically**   5:*22*
22:*25*   24:*4*   25:*18,*
*21*   28:*21*   38:*20*
121:*10*   122:*13*
125:*24*   140:*16*
**specificity**   59:*25*
**specifics**   40:*6*
41:*19*   68:*4*   70:*12*
108:*16*   155:*9*
**Speed**   31:*12*
**spend**   109:*10, 23*
**spent**   103:*15*
119:*24*
**split**   118:*22*
**spoke**   50:*18*   52:*13*
54:*18*   87:*7*   89:*6*
111:*11*   116:*23*
117:*17*   151:*3*
160:*13*   168:*1*
**spoken**   116:*16*
152:*13*
**sports**   57:*22*   80:*20*
**square**   59:*5*   68:*16*
**staff**   3:*9, 10*   14:*23*
22:*13, 17*   23:*7*
29:*23*   41:*2*   45:*15*
46:*5*   68:*22*   77:*4*
88:*11*   92:*1*   106:*9*
107:*16*   108:*11*

109:*22, 23*   113:*18*
114:*9*   125:*21*
136:*15, 19*   138:*8*
143:*7*   151:*6*
156:*11*   160:*15*
170:*16*
**staffers**   52:*18*
**stage**   35:*4*   87:*20*
101:*18*
**stages**   20:*6*   39:*11*
**stake**   125:*10*
**stamp**   43:*14*   127:*12*
**stand**   158:*7*
**standard**   31:*22*
138:*12, 15*
**standing**   115:*7*
116:*6*   145:*20*
**stands**   145:*10, 11*
**start**   2:*24*   6:*15*
11:*1, 6*   35:*20*
42:*24*   43:*4*   48:*1, 2*
57:*11*   82:*16*
122:*11*   125:*1*
**started**   18:*20*
26:*11*   30:*11*   57:*21*
73:*1*   88:*11*   114:*14*
119:*11*   147:*15*
149:*8*   152:*2, 18*
**starting**   19:*2*   23:*22*
**starts**   56:*16*   94:*23*
98:*6*   146:*21*   150:*9*
**state**   2:*13*   8:*16*
17:*11*   39:*25*   43:*24*
44:*7*   51:*17*   70:*8, 9*
74:*20*   102:*21*
113:*2*   120:*11, 15*
121:*11*   123:*4*
125:*9*   130:*20*
134:*6*   158:*25*
**stated**   44:*11*   80:*1*
164:*2*   168:*20*
**statement**   6:*1, 22,*
*25*   10:*24*   35:*20*
63:*14*   79:*18, 22*
96:*14*   97:*14*   100:*8*
140:*11*   169:*25*
**statements**   5:*23*
10:*19*   11:*16, 21*
32:*17*   49:*16*   96:*7*
**STATES**   1:*1*   3:*1*
8:*16*   35:*21*   36:*2,*
*15*   37:*2*   47:*1*   55:*8*
59:*20*   62:*23*   72:*6,*
*11*   73:*10*   74:*21*
83:*4*   101:*21*
104:*23*   105:*2*
107:*5*   108:*7*
112:*23*   113:*1*
115:*4*   121:*15*
134:*11, 12*

**stating**   43:*6, 7*
168:*16*
**statistical**   64:*23*
**statistically**   64:*17*
**statistics**   67:*18*
**status**   108:*14*   156:*5*
**statute**   5:*25*
**statutes**   73:*6*
**stay**   12:*2*   13:*1*
46:*24*   123:*12*
158:*18*
**stayed**   101:*11*
**staying**   81:*4*   135:*17*
**stenographer**   3:*1*
**step**   12:*22*   23:*2*
62:*4*   128:*11, 16*
130:*14*   136:*3*
155:*24*   168:*9*
**stepped**   28:*24*
**stepping**   11:*25*
22:*21, 24*   23:*1*
**steps**   18:*19*   19:*6,*
*11*   22:*10*   49:*12*
62:*13*   68:*4, 11*
74:*11, 12*   76:*7*
96:*12*   122:*17*
155:*23*   159:*21*
161:*17*   164:*13*
**Steve**   47:*18*   51:*21*
101:*3, 5*   108:*8*
115:*19, 20*   117:*20*
143:*21*   156:*24*
160:*23*   167:*1, 3*
**Steven**   107:*9*
**stolen**   88:*3*
**stood**   142:*5*
**Stop**   152:*24*
**stopping**   42:*19*
**stories**   130:*16*
**story**   130:*22*
**straight**   142:*15*
**strange**   28:*21, 25*
29:*6*   99:*11*
**strategize**   157:*3*
**strategy**   155:*23*
**street**   15:*11*
**strike**   17:*12*   100:*8*
**striking**   17:*3*
**strong**   115:*15*
**strongly**   9:*18*
50:*14, 22*   103:*12*
**struck**   16:*14*   83:*3,*
*7*   84:*4*
**stuck**   58:*11*   82:*20*
**stuff**   55:*7*   61:*23*
83:*15*   117:*11*
**styled**   104:*24*
**subject**   5:*24*   25:*19*
29:*1, 5*   98:*19*
107:*23*   133:*25*

135:*8*
**subordinate**   161:*7*
**subordinates**   159:*15*
**subsequent**   29:*25*
34:*2*   41:*23*   106:*3*
**subsequently**   38:*18*
99:*24*   107:*14*
136:*18*   161:*19*
**substance**   41:*16*
45:*21*   82:*2*   97:*16*
116:*8*   130:*7*
**substantial**   32:*5*
75:*12*   80:*9*   139:*18*
**substantive**   135:*23*
**Substantively**   48:*23*
168:*22*
**succession**   12:*15*
13:*3, 7*   168:*17*
169:*5*
**sufficient**   8:*8*
10:*17*   11:*18*   80:*9*
**suggest**   31:*8*   37:*4*
89:*11*   127:*3*
**suggested**   9:*11*
91:*13*   96:*25*   97:*4*
**suggesting**   104:*11,*
*15*   108:*14*   145:*16*
**suggestion**   91:*24*
130:*19*
**suggestions**   104:*2*
134:*3*
**suitcase**   30:*22, 24*
**suited**   50:*25*
**summarize**   20:*11*
**summary**   66:*11*
72:*19*   153:*6*
**summation**   38:*10*
**Sunday**   39:*21*   45:*7*
57:*19*   58:*10*   61:*21*
87:*6*   132:*16*
140:*18*   142:*8*
152:*11*   157:*7, 13*
158:*14*
**support**   10:*2*   63:*11*
**supportive**   50:*5*
**suppose**   21:*2*   34:*23*
61:*21*   111:*24*
**supposed**   126:*23*
151:*23*
**Supreme**   8:*18*
38:*17, 23*   39:*19*
40:*1*   97:*2*   108:*7*
115:*5*   117:*18*
118:*4*   141:*22*
**Sure**   2:*7*   5:*3*   6:*16,*
*25*   19:*15, 16*   20:*8,*
*12*   34:*1*   38:*23*
42:*1, 24*   44:*11*
63:*5*   67:*25*   68:*5*
82:*9*   84:*15*   86:*21*
88:*16*   119:*16*

121:*12*   134:*10*
137:*13*   143:*17*
146:*5*   164:*14*
**surprise**   99:*5, 7*
116:*1*   130:*25*
**surprising**   78:*11*
**suspect**   120:*1*
**swept**   88:*1, 3*
**swirl**   136:*20*
**switch**   59:*6*   93:*14*
95:*2*
**sworn**   43:*24*
**system**   37:*1*   72:*6,*
*10*

**< T >**
**tabulation**   75:*13*
**tag-team**   152:*4*
**tail**   167:*15*
**tailed**   54:*9*
**take**   3:*13, 14, 16*
6:*13*   9:*14*   10:*19*
14:*17*   15:*18*   16:*11*
19:*21*   22:*11*   24:*6*
25:*17*   32:*15*   34:*4*
46:*18*   48:*4*   49:*11,*
*15, 24*   53:*13*   56:*4*
62:*13*   77:*5*   82:*12*
84:*2*   93:*5*   95:*7*
115:*5*   128:*16*
129:*2*   145:*25*
154:*18*   155:*24*
158:*14*   159:*23*
168:*19*
**taken**   40:*20*   59:*15*
74:*12*   100:*25*
117:*20*
**takes**   39:*11*   52:*15*
62:*24*
**tales**   131:*4, 5*
**talk**   16:*1*   28:*2*
30:*4*   32:*13*   33:*20*
39:*4*   41:*13, 18*
42:*12*   58:*9*   71:*14*
82:*12*   107:*16*
110:*24*   111:*3*
114:*7, 23*   117:*6, 11*
119:*11*   123:*19, 21,*
*25*   130:*6*   135:*25*
137:*22*   138:*21*
145:*3*   147:*20*
155:*11*   156:*13*
157:*18*   158:*2, 17*
159:*1, 18*   170:*5*
**talked**   32:*12*   38:*13,*
*14*   45:*16*   58:*1*
59:*10*   61:*21*   78:*7*
80:*20*   102:*9*
106:*23*   113:*9*
119:*7, 8*   128:*17*

136:*13, 14*  158:*11*
159:*9*  160:*17*
**talking**  30:*17*  38:*6*
39:*15, 24*  40:*18, 24*
52:*21*  57:*16, 21, 22*
70:*10*  71:*14*  81:*19*
85:*13, 19*  88:*6*
100:*12*  116:*21*
123:*11*  131:*15*
143:*17*  144:*23*
155:*19*  156:*22*
164:*25*
**talks**  100:*12*
**target**  92:*15*
**targeting**  129:*6*
**tax**  31:*11*
**taxpayers**  62:*25*
63:*2*
**team**  7:*25*  10:*3*
106:*5*  133:*16*
135:*6*  171:*5*
**technical**  20:*8*
**technically**  11:*14*
**tell**  6:*3*  34:*8*  45:*19*
46:*19*  48:*18*  61:*19*
62:*20*  72:*8*  74:*5*
79:*24*  80:*23*  83:*22*
84:*10, 18*  85:*5, 6,
24*  86:*14*  90:*4, 8*
94:*7, 15*  96:*23*
99:*14*  103:*5*  104:*6*
109:*12, 21*  113:*7*
116:*4, 12*  117:*1, 2*
129:*20*  131:*22*
134:*15*  137:*4*
139:*25*  145:*11*
149:*22*  151:*12*
159:*18*
**telling**  25:*6, 9*
30:*18, 19, 20*  31:*6,
14*  34:*11*  48:*17*
51:*17*  64:*8*  67:*16*
71:*13, 21, 22*  81:*22*
83:*17*  87:*23*  88:*8*
93:*22*  95:*13*
115:*23*  122:*25*
129:*12, 17*  131:*3*
140:*15*  149:*24*
151:*25*  157:*22*
159:*10, 17*  161:*7*
**tells**  145:*9, 10*
**temp**  43:*23*
**ten**  79:*7*
**tenor**  139:*12*
**tens**  69:*5*
**tension**  120:*5*
**tensions**  152:*16*
162:*23*
**tenure**  7:*21*  8:*3, 14*
10:*2*
**terminated**  77:*15*

**terminating**  49:*7*
53:*9*  55:*3*
**terminology**  19:*10*
**terms**  11:*9*  12:*3*
22:*10*  37:*14*  53:*22*
84:*4*  92:*17*  94:*19*
96:*21*  156:*10*
167:*18*
**testified**  9:*2*  113:*3*
128:*3*  131:*2*
**testify**  122:*13*
**testimony**  3:*19*  6:*5*
7:*6*
**Texas**  39:*25*
**thank**  2:*17*  4:*12*
5:*5, 13*  6:*20*  7:*8,
10, 12*  10:*23*  43:*3*
56:*22*  58:*15*  68:*19*
77:*21, 22*  134:*24*
141:*7*  169:*13, 14*
170:*4, 6, 21, 22, 23*
171:*10, 11*
**Thanks**  79:*11*
126:*12*  133:*19*
170:*9, 15, 19*
**theme**  97:*7*
**theories**  100:*15*
**theory**  94:*9*  101:*1*
**thereof**  44:*1*
**thermostat**  100:*5, 12*
**thermostats**  100:*16*
101:*1*
**thing**  10:*12*  17:*10*
31:*3, 9*  37:*6*  39:*19*
42:*7*  48:*15*  51:*23*
58:*24*  92:*19, 21*
94:*10*  97:*7*  101:*19*
103:*17*  108:*19, 22*
109:*10*  112:*2, 8, 16*
115:*15, 25*  117:*1*
129:*24*  142:*22*
143:*3*  146:*6*
151:*22*  155:*25*
156:*1*  158:*22*
159:*6, 15*  165:*4*
170:*24*
**things**  9:*10*  10:*10*
14:*22*  16:*14, 16*
17:*15*  18:*7*  20:*7*
22:*8*  24:*19*  25:*2*
26:*22*  29:*16*  30:*13,
15, 20*  31:*6, 10*
32:*21*  33:*19, 22, 23*
35:*16*  36:*4*  37:*17*
39:*6*  45:*24*  46:*15*
48:*24*  49:*19*  54:*5*
57:*2*  59:*4, 8, 10*
60:*16, 17, 23*  61:*19*
64:*2*  67:*21*  68:*5*
69:*16*  72:*17*  74:*14*
76:*6*  82:*3, 7, 10*

94:*5, 6, 21*  97:*11,
13*  99:*13*  100:*17*
102:*6*  103:*16*
106:*23*  108:*17*
109:*22*  116:*24*
118:*6*  122:*25*
123:*2, 18, 25*  128:*8*
135:*13, 16*  140:*7*
142:*5*  144:*16*
145:*13, 15*  147:*10*
149:*8*  151:*25*
152:*18*  155:*2, 7, 18,
24*  156:*14, 20*
157:*4, 12, 20*  160:*9*
163:*19*  164:*1, 7, 24*
169:*12*  170:*25*
171:*3*
**think**  11:*12, 14*
12:*8, 24, 25*  13:*1, 4*
14:*3*  16:*18*  17:*13,
17*  18:*24*  19:*12, 14*
21:*2, 15, 17, 25*
22:*1, 13, 16, 18*
23:*7*  24:*22*  25:*13*
26:*18*  27:*5, 20, 25*
28:*6, 9, 11, 12*
29:*25*  30:*9*  31:*18,
21*  32:*1, 20*  33:*1, 6,
7, 11*  34:*23*  36:*6, 8,
19, 24*  37:*19, 22*
39:*7, 19*  40:*4*  41:*8,
17*  42:*7, 18*  44:*17,
19, 23*  46:*6*  47:*6*
48:*2*  49:*3*  50:*10,
19, 21, 24*  51:*3, 14,
21, 23*  52:*7, 13*
53:*14, 19, 23, 24*
54:*7, 9, 21, 22*  55:*1,
16, 20, 22*  55:*1*
57:*1, 3*  58:*5*  59:*1,
5, 20*  61:*2, 3, 13, 14,
16, 17, 19*  62:*5, 8,
20*  63:*9, 25*  64:*11*
65:*7, 14*  66:*12, 23,
24*  67:*1, 7, 11, 15*
68:*3, 8, 11*  69:*8, 9,
15, 18, 22*  70:*5, 8, 9,
12, 14, 18*  71:*2*
73:*23*  74:*14, 18*
75:*9, 23*  76:*5, 6*
77:*3, 5*  78:*10, 13,
16, 21*  79:*1, 6, 14,
17*  80:*10, 16*  81:*1,
6, 7, 8, 20*  82:*3, 22*
84:*12, 13*  85:*14*
86:*6, 16, 20*  88:*6, 8*
89:*14, 21*  90:*11, 14,
15*  91:*15, 19, 20*
92:*18, 22, 24*  93:*10*
96:*2, 6, 22, 25*  97:*3,
15*  98:*2*  99:*3, 8, 25*

101:*12, 15, 22*
102:*7, 9, 17*  103:*2,
3, 6, 11, 12, 22*
104:*8*  105:*2, 16*
107:*3, 11, 23*  108:*6,
7, 12, 17, 19*  109:*2,
25*  110:*1, 17*
111:*14*  112:*18, 20*
113:*12, 18, 21*
114:*4, 6, 12*  116:*15,
25*  117:*4, 15*  118:*1,
3, 5, 6, 24*  121:*8*
122:*9, 12, 13, 20*
123:*1, 2, 8*  125:*19*
127:*1, 20, 21*
128:*10, 13*  129:*23*
130:*16*  131:*21*
132:*3, 6, 11, 21*
134:*2, 14, 18*
135:*12, 18, 21*
136:*2, 12, 18*  137:*3,
13, 19*  138:*6, 9, 19*
139:*7, 13, 24*  140:*5,
21, 24*  141:*2, 5, 6,
10, 13, 18, 21*  142:*3,
24*  143:*16*  144:*14,
17, 20*  145:*13*
146:*13*  147:*4, 17*
148:*3, 8, 10, 21*
149:*2, 15, 24*
150:*24*  151:*3, 5, 18,
22*  152:*2, 16, 19, 22*
155:*8, 10*  156:*5*
157:*2*  158:*4*  160:*6,
7*  161:*18*  163:*7*
164:*18, 25*  165:*15,
22*  166:*13*  167:*2, 5,
12, 25*  168:*10, 20,
21, 22*  169:*9, 11*
**thinking**  96:*24*
154:*11*  164:*14*
166:*25*  167:*21*
168:*10*
**Thinks**  127:*24*
163:*2*
**third**  70:*20*
**thought**  7:*10*  9:*9*
20:*6*  28:*13*  35:*2*
39:*24*  40:*7*  51:*15*
54:*19*  65:*7*  86:*24*
92:*13*  97:*21*  99:*22*
103:*4*  111:*13*
112:*19*  113:*14*
129:*22*  130:*14*
141:*10*  147:*24*
156:*25*  158:*21*
159:*6*  169:*5*
**thoughts**  147:*11*
**thousands**  69:*5*
**three**  27:*7*  43:*7*

89:*22*  90:*19*  114:*15*
**thrown**  109:*1*
**Thursday**  81:*2*
86:*18*  128:*18*
137:*15, 20*  142:*2, 9,
24*  143:*5, 18*
**tied**  49:*8*
**till**  48:*4*
**Tillis**  5:*2*
**time**  3:*11*  6:*23*
8:*21*  10:*9, 13*
12:*16*  14:*2, 6, 10,
17, 19*  16:*7*  18:*8,
20*  19:*4, 13, 25*
20:*12*  26:*10, 13*
32:*6, 18*  33:*5*  34:*2*
39:*18*  43:*3, 24*
48:*2*  49:*3*  52:*1*
53:*18, 19*  56:*25*
57:*4*  58:*2*  60:*11,
16*  63:*19*  67:*7*
69:*23*  70:*16*  77:*8,
10, 21*  79:*21*  80:*15*
82:*8*  83:*8, 9*  84:*5,
11*  85:*25*  86:*25*
87:*16*  88:*24*  89:*15,
17, 22, 25*  90:*16, 18,
23*  91:*3, 6*  92:*9*
100:*7, 23*  101:*3, 13,
14*  102:*1, 13, 15*
103:*13, 15, 19, 25*
105:*16*  106:*11, 21*
107:*14*  109:*10, 23,
24*  116:*23*  118:*19,
25*  119:*24*  120:*9*
122:*2*  128:*21*
129:*1*  132:*13*
136:*1, 2, 5, 22*
141:*5, 20*  143:*11*
144:*2*  157:*17, 22*
158:*5*  159:*8, 10*
163:*9*  164:*6*
167:*20, 21*  168:*10*
169:*15*  170:*4, 5*
171:*8*
**timeline**  42:*1*
**times**  70:*22*  71:*12*
100:*20*  101:*10, 19*
104:*6*  114:*15*
121:*3*  148:*15*
149:*22*  158:*24*
**time-sensitive**
158:*10*
**tipoff**  91:*6*
**title**  17:*22*  47:*11*
100:*19, 25*  101:*10,
16*
**titled**  169:*20, 24*
**today**  2:*17*  4:*5, 24*
5:*1*  6:*5*  7:*7, 17*
10:*7, 13*  11:*8*  23:*6,*

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

*17* 25:24, *25* 28:10
35:20 43:3 58:5
64:3 74:2 75:19
76:3, *21* 77:6
82:11 105:15
116:3, *25* 123:10
124:3 140:5 150:6
151:4 159:25
169:15 170:3, 5
171:6
**told** 9:13 26:25
27:14 28:8 29:2
31:2 40:10 45:24
54:23 55:10 61:3
64:6 70:12 79:9
81:24 82:6 85:11,
*21* 87:10, 11, 25
88:5, 6, 7 97:8, 21
99:4 103:11, 16, 17
106:22 112:20
116:15, 18 117:1,
*17* 128:24 130:16,
*23* 134:13 141:3
151:14 154:9
158:9, 16, 19 159:4,
*14* 160:23 161:6
168:3
**tomorrow** 155:12
**tone** 35:5 37:4
**tonight** 160:2
**top** 14:24 44:6, 12
57:6 69:1 94:24
127:16
**topic** 17:20 91:23
108:1 137:2
**topics** 3:20 123:10
155:9
**total** 99:5
**totally** 26:9 33:11
89:18 94:5 137:13
**Tour** 57:23, 25
**track** 119:15 139:9
**tracking** 38:19
**trail** 100:5
**transcribed** 2:8
3:6 7:14
**transcript** 58:25
172:3
**transfer** 8:13
**transition** 156:9, 11,
*17*
**transition-related**
156:10
**transpired** 87:13
**trash** 94:17
**tried** 86:6 116:24
157:3
**trucks** 127:24
128:4
**true** 61:3 91:1
94:5 112:10

134:16 163:17
166:3
**Trump** 7:6 9:6, 11
12:21 34:2, 4 35:1
45:3 46:21 49:6
52:15 53:19 55:23
56:7, 9, 11 57:8
77:13, 18 84:25
158:25 163:20
164:1 168:16
**Trump's** 2:11 9:8
**truth** 6:3 37:22
150:21
**truthful** 5:15 6:5
94:16
**truthfully** 5:19
**try** 61:14 63:25
67:9 72:22 89:21
102:3 118:11
121:1 123:12
152:2 165:8
**trying** 15:10 20:8,
*9, 11* 21:2, 24
32:25 33:9 35:13
37:9, 12 38:22
39:18 44:18 45:14
54:7 64:1 69:21
70:5 84:17 93:23
96:18 102:25
105:10 109:2
112:3 117:3
118:22 132:20
140:12 142:13
164:1
**Tuesday** 114:13
**turn** 21:18 77:8
78:24 119:10, 11
127:11 134:25
150:8
**turned** 28:18 32:2
50:2, 3 85:18 99:7
142:7 157:24
**TV** 72:18
**tweeting** 33:6
**two** 4:9 5:6 9:5
12:1 14:4 21:8
24:19 26:15 27:6
40:22 48:6 53:9,
*10* 60:16 70:2
74:17 82:7 86:17
98:19 110:25
111:12 113:11, 12
133:23 136:22
143:9 146:12
150:6 151:2 153:3
160:8 161:5
163:10, 24 166:14
169:15, 18
**twofold** 131:8
152:24

**two-hour** 164:6
**two-week** 40:25
**type** 64:2
**types** 22:10 27:18
**typically** 3:13 15:4

**< U >**
**U.S.** 27:18 54:11,
*14* 55:23, 25 70:2,
*16, 20* 73:9 74:18
95:23 130:21, 23
131:1 145:3
153:21, 22, 24
154:3, 7 167:6, 9
168:3, 17, 18, 22
169:6
**ultimate** 53:10
**ultimately** 9:23
53:4, 6 91:1
110:19 163:9
**ultimatum** 118:11
**unable** 6:5
**unavailable** 162:9
**unaware** 4:22
99:19
**uncommon** 72:17
**uncover** 96:12
**underlying** 101:5
**undermines** 59:21
**underscore** 10:13
171:4
**understand** 4:1
5:16, 17, 20 6:2, 21
15:25 16:20 18:25
20:9 26:12 27:21,
*24* 36:6 37:12
40:20 41:14 66:3
85:17 89:2 124:16
127:2, 7 133:1
136:24 138:1
157:8 159:11, 13
161:4
**understanding**
14:20 15:9 18:3,
*16, 23* 128:8 130:12
**understated** 132:10
**understatement**
129:12
**understood** 16:6
18:16 37:8 38:23
68:19 74:7 92:8
111:1 146:1 154:21
**unfair** 30:14 50:8
54:24
**unfolded** 30:7
45:14 84:7
**unfortunate** 9:23
**Unfortunately**
121:15 137:18
**unfounded** 152:19
**ungracious** 161:3

**unhappy** 13:10
35:23 36:22 83:16
139:13, 19, 20 159:4
**unified** 165:23
**uninvited** 162:23
**Unit** 75:17 119:12
120:5 121:17
122:7, 16 124:5, 10
**UNITED** 1:1 2:25
35:21 36:2, 15
37:2 46:25 55:8
59:20 62:23 72:6,
*11* 73:10 83:4
107:5 108:7
112:22 113:1
134:11, 12
**units** 73:3 76:23
122:19
**universe** 158:20
**unknowns** 105:23
**unproductive** 103:3
**unreasonable** 60:12
**unreasonableness**
62:18
**unrelated** 46:16
**unrestricted** 3:19
**unusual** 29:10
**unwilling** 146:9
154:25
**unwillingness** 9:8
**update** 18:10, 18
79:12 108:14
**updated** 18:1 26:2
68:13
**updating** 68:14
**uphold** 63:6
**urgency** 43:24
**Urgent** 98:19
114:10 157:22
**USC** 5:25
**use** 3:25 20:12
22:5 30:25 31:10
35:22 36:4 60:8
62:8, 14 95:1
109:24 117:21
136:1
**useful** 10:11 104:8
134:19
**usual** 149:1
**usually** 81:21

**< V >**
**vaccine** 31:12
**valid** 94:16
**validating** 62:6
**validity** 9:15 140:9
**vantage** 87:2
105:23 152:19
159:5
**variants** 124:11

**variation** 16:8
97:22
**varied** 97:25
**various** 9:14
115:14
**vein** 13:16
**verbal** 3:25
**verification** 69:4
**verifications** 69:13
**verify** 71:4
**versa** 124:13
**version** 14:12, 17
**versus** 16:16 19:14
68:1 103:25
112:23 113:2
**vet** 70:23 124:17
126:21
**vetted** 126:14
**vetting** 125:25
**viable** 108:9, 23
**Vice** 104:15 124:13
**videotape** 30:22
**view** 46:17 47:15
62:11 90:24 94:2,
*13, 21* 164:11
**viewed** 94:22
**viewing** 66:19
**vigorous** 95:18
**visitors** 71:15
**voice** 35:5
**volume** 60:9
**voluntarily** 2:18
3:18 7:14 170:11
**vote** 18:21 19:3
64:23 67:3 75:13
**voter** 8:8 48:9
59:14 60:9 61:25
92:16 124:17
125:25
**voters** 19:2 66:2
67:2 68:2, 12
**votes** 8:12 65:5, 12
92:20 159:2
**voting** 24:23 25:7
26:2, 8, 20 27:12,
*19* 65:12 75:13
100:13

**< W >**
**wait** 75:1 77:9
**waiting** 115:23
**walk** 40:14 46:20
95:23 111:6
148:17, 21 162:15
**walked** 18:13
30:18 45:22 46:23
163:19
**walking** 31:5
162:11
**Wall** 113:13 162:4

**Walton** 4:*17, 18*
23:*16*  33:25
119:*17*  152:5
166:2  168:5, *14*
169:*13*  171:*10*
**want** 4:24  5:14
6:*16, 25*  7:20  9:4
13:*15*  14:*18*  17:20
18:*10*  19:*12*  20:*13,*
*14*  23:*10*  24:*13*
31:8  33:*15*  34:*21*
39:*21*  40:6, *19*
41:*18*  42:24  44:*11*
50:8  55:20  57:*12*
62:*17*  67:24  74:*19*
75:*9*  76:24  77:*10*
83:25  89:*1*  91:*18*
92:6  96:*17*  97:7
98:*20*  101:6, *9*
102:*1*  103:*1, 18*
104:6, *7*  106:*13*
120:*3*  121:*1*
123:*14*  127:2
134:*10*  136:22, *25*
137:22  143:*16*
150:*1*  156:*12*
157:*3*  158:2
165:*10*  166:*3*
170:4, *15*  171:*4*
**wanted** 5:*3*  11:6
12:9  15:*14*  25:*16*
28:*19*  30:4  37:*18*
39:*4*  40:*14*  46:*3*
48:25  54:*16*  55:*23*
71:*3*  72:6  78:4
88:25  92:7  96:*13*
99:*4*  100:*20, 25*
102:7  103:*16*
107:*16, 21*  114:*25*
117:6  129:2, *3, 4*
132:6  138:*21*
139:*5*  146:*11*
154:*18*  158:2, *17*
161:*19*  164:*17*
166:22  167:6
168:*16*
**wanting** 46:*19*  97:*4*
**wants** 58:*9*  90:*20,*
*22*  100:*19*  101:*15*
115:*1*  116:2, *9*
117:*12*  129:*18*
143:*13, 20*  144:*10,*
*15*  151:*15*  157:*18*
**Warp** 31:*12*
**WASHINGTON**
1:*3, 19*
**wasn** 99:*5*  129:*13*
**watch** 147:*15*
**way** 24:22  31:4, *5*
34:8  37:*13, 14, 16*
44:24  45:23  47:6

48:*19*  53:*16*  54:*13*
55:*10*  57:*14*  61:*18,*
*23*  65:2, *22*  66:5, *8*
68:6  74:20  76:*14,*
*18*  77:2  80:4
82:22  91:*5*  93:*3,*
*16*  99:*3*  104:*3*
105:*18*  109:20
124:*12, 21, 23*
125:*14*  131:*14, 17*
134:2  135:23
151:*16*  152:*3*
153:*19*  154:*14*
155:*16*  157:2
160:*11*  165:*10, 13*
166:*13*  168:*9*
169:*10*
**ways** 125:6, *15*
140:*17*  166:20
**website** 67:*1, 2*
68:*12*  92:*19*
**websites** 67:20
**Wednesday** 86:*18*
117:8
**week** 20:*19*  21:9
39:22  104:*14*
131:*3*  132:*12*
147:*19*  149:*1*
151:20
**weekend** 57:*15*
99:6  144:6
**weeks** 28:24  40:23
**weigh** 167:*1*
**Weinsheimer** 5:9
123:*17*
**Welcome** 2:4  14:*17*
**well** 4:*15*  5:8  7:*10*
9:9  10:*3*  12:*1, 7*
14:*21*  16:20  17:8
20:25  24:*3, 12, 19*
27:*14, 25*  28:6
29:*1, 17*  30:*19, 21*
31:2  40:7  46:2
49:20  50:*18*  55:*1,*
*6, 20, 21*  57:*17*
63:*16*  65:*10*  67:*13*
71:*12*  72:4  73:*18*
75:*19*  76:*14*  78:2
82:*11, 14, 16*  84:*10,*
*12*  85:20  89:*11*
90:*17*  92:4  94:*15*
95:*21*  96:*17*
103:*13*  106:*19*
108:20  111:*13*
112:*18*  115:6, *8*
116:7  118:9
119:23  121:*13*
126:2  132:9
138:*10, 18*  139:*11*
143:4  144:*3*
148:*10*  151:2

153:*18, 20*  159:*15*
162:25  163:20
164:*10*  165:*12*
166:*19*  168:7
170:20
**went** 45:8  48:4
49:4  55:7  69:6, *23*
70:*14*  78:20  79:*3*
85:*18*  108:*23*
110:20  117:24
125:*18*  139:6
155:*17*  166:*14*
**we're** 3:*15*  10:24
11:8  13:*16*  17:20
36:24  40:*10*  49:*11*
60:24  67:*14*  70:*10*
88:6  90:25  95:25
101:8, *12, 13*
102:*19, 20*  113:*16*
115:*3*  118:7
125:*19*  135:*14*
141:*3*  142:*19, 20,*
*22*  152:*4*  159:*21*
**we've** 32:*12*  39:*14*
80:*14*  82:*3*  123:*10*
142:*12, 13*
**White** 10:*3*  14:*5, 7,*
*25*  15:*7, 20*  25:*1*
27:*1*  28:4, *7*  29:22,
*23*  40:*18*  41:*3*
45:*16*  47:*9, 10*
50:5, *8*  58:7  71:*16*
78:8  81:8  86:7
100:*13, 14*  106:*14,*
*17, 18*  109:*23*
111:*12, 16*  123:*24*
136:*15, 16, 23*
137:*1, 22, 25*  138:*8,*
*13, 24*  139:*4*
141:20  142:2
159:*23*  160:*25*
**Whitehouse** 3:2
109:*12*
**wide-ranging** 164:*9*
**widespread** 8:7
10:*17*  11:*18*  32:*4,*
*18*  49:*11*  79:20
92:22  139:*18*  140:2
**William** 8:*6*
**willing** 129:*2, 8*
144:*11, 14*  145:*14*
151:*15*  154:*16, 19,*
*23*  163:*1*
**willingness** 2:*18*
**window** 137:*17*
**winner** 57:*25*
**Wisconsin** 105:*4*
112:24
**wish** 6:22  55:7
**wishes** 35:23  36:4
111:*8*

**witness** 2:*13*  64:*3*
98:*17*  123:*18*
147:6  172:*11*
**witnesses** 4:*3*  5:22
**woman** 128:2
**wonder** 87:24
**wondered** 82:*17*
**word** 15:6  18:24
22:6  27:*16*  35:22
58:*21*  60:9  65:25
117:*12*  121:25
132:6  166:4
**words** 14:22  15:5
16:4  36:5  59:25
77:*15*  93:25  134:6
139:*21*  141:9
**work** 29:*13*  62:25
66:5  74:8  77:5
115:7  117:*19*
126:5  147:*13*
156:*3, 10, 16*  171:8
**worked** 86:*3*  91:2
107:*19*  128:*3*
160:22  171:5
**working** 103:*5*
105:*11, 19*  106:5
115:*3*  124:22
**works** 27:5  46:*3*
76:*18*  123:2
**wouldn** 115:*15*
**wound** 40:9
**wrap** 77:20
**writ** 72:6
**write** 113:*14*
**writes** 150:*18*
**writing** 113:22
**written** 3:24
**wrong** 9:*14*  26:9
35:*12*  64:7
**wrongdoing** 125:7,
*9, 14*  133:*17*
**wrote** 12:7  44:*23*
95:*11*

**< Y >**
**yeah** 25:*21*  48:7
62:*12*  71:*18*  72:22
80:25  83:*1*  88:*13*
112:*19*  113:6
116:*4*  123:*17*
132:4  147:*4, 17*
168:7
**year** 8:*4*  21:16
**years** 21:*11*  31:*11*
57:*24*  80:*3*
**year's** 10:*16*
128:*19, 20*  130:*11*
137:*15*  139:*3*
**York** 57:*23, 24*
158:24

**YouTube** 147:*3*
150:*16*

**< Z >**
**Zdeb** 2:*3, 8, 16, 19*
3:*4*  4:*3, 12*  5:*6, 13,*
*22*  6:*4, 7, 18, 21*
7:*8*  10:*23*  11:*3*
12:*9, 13*  13:22
18:*12, 14*  20:*3*
23:*10, 21*  24:*1*
35:*18*  42:*17*  77:*23,*
*25*  78:*3*  88:*20, 23*
98:*10*  109:*13*
110:*3*  136:*9, 11*
146:*19*  150:*8, 13*
152:*4*  168:25
169:*2*  170:*9*  171:*11*