1

2

3

4

5    SELECT COMMITTEE TO INVESTIGATE THE

6    JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

7    U.S. HOUSE OF REPRESENTATIVES,

8    WASHINGTON, D.C.

9

10

11

12    DEPOSITION OF:   KENNETH KLUKOWSKI

13

14

15

16                              Wednesday, December 15, 2021

17

18                              Washington, D.C.

19

20

21        The interview in the above matter was held in Room 4480, O'Neill House Office

22    Building, commencing at 10:30 a.m.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

1      Appearances:

2

3

4

5      For the SELECT COMMITTEE TO INVESTIGATE

6

7      THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

8

9      ███████████, SENIOR INVESTIGATIVE COUNSEL

10     ███████████, CHIEF INVESTIGATIVE COUNSEL

11     ███████████, PROFESSIONAL STAFF

12     ███████████, DETAILEE

13     ███████████, CHIEF CLERK

14     ███████████, STAFF ASSOCIATE

15     ███████████, CHIEF ADMINISTRATIVE OFFICER

16

17

18

19     For THE WITNESS:

20

21     EDDIE GREIM

22     PAUL BROTHERS

1

2          Mr. ███████    Then we will go on the record, and it is 10:30 in the morning.    This

3     is a deposition of Kenneth Klukowski conducted by the House Select Committee to

4     Investigate the January 6th Attack on the United States Capitol pursuant to House

5     Resolution 503.

6          At this time, I'd ask the witness to please state your name and spell your last name

7     for the record.

8          The ████████    My name is Kenneth Alan Klukowski, last name spelled

9     K-l-u-k-o-w-s-k-i.

10          Mr. ██████.    Okay.    Thank you, Mr. Klukowski.

11          And this will be a staff-led deposition, but members of the select committee are

12     entitled to join and may ask questions if they come.    I expect that if they do participate,

13     it will be via Zoom, which we have here active in the room.    And I just note for the

14     record that we do have other select committee staff on the Zoom right now as well, who

15     are listed there, that being ████████████████████████████

16          If a member does join, we'll try to announce it as soon as we note their presence

17     so that you're aware of it as well.

18          The Witness.    Okay.

19          Mr.██████    In the room today, me, I'm ████████████    I'm senior investigative

20     counsel to the select committee.    ██████████ to my right, he's chief investigative

21     counsel to the select committee.    To my left is ██████████, who is senior counsel to the

22     vice chair of the select committee, and ████████████, who is also staff here at the select

23     committee.    Again, if anybody joins, we'll announce their presence so you're aware of

24     who they are.

25          Just a few things about the deposition itself.    Under the House deposition rules,

1       neither the committee members, nor staff can discuss the substance of the testimony

2       that you provide today unless the committee approves its release.

3               You and your attorneys will have the opportunity to review the transcript after

4       we're complete, and that will include the record of the exhibits.

5               And just a few more ground rules.    We are going to follow the deposition rules

6       that were provided to you and your attorneys in the subpoena.

7               Other government agency counsel, mainly in this case, being the Department, are

8       not allowed to attend pursuant to the House deposition rules.    But, if an issue comes up,

9       we can step out.    We can recess the deposition and make a call if we need to.

10              So, at this point, I'd ask that your counsel, Mr. Greim and Mr. Brothers, introduce

11      themselves for the record.

12              Mr. Greim.    Sure.    Eddie Greim and Paul Brothers from Graves Garrett, LLC,

13      appearing to represent the deponent here.

14              We have a couple of objections.    We did this in our last deposition as well, and I'll

15      just state them once for the record now.    We won't return to them.

16              Mr. ▉▉▉▉    Let me finish going over the ground rules, and --

17              Mr. Greim.    Sure.

18              Mr. ▉▉▉▉    -- then I'll return back to you --

19              Mr. Greim.    Sure.

20              Mr. ▉▉▉▉    -- to for you to do that.

21              So and I just note that there is an official reporter transcribing the record of this

22      deposition.    He's seated to your right.    So, along those lines, please wait until each

23      question is completely asked and finished before you begin your response, and we'll try

24      to wait until your response is complete before we ask our next question.    It just makes it

25      a lot easier for the record.

1          We do ask that you provide complete answers based on your best recollection.

2     If my question is not clear, which it may be, please ask me to clarify, and I will.    And, if

3     you don't know the answer, please just say so.

4          You may only refuse to answer a question to preserve a privilege recognized by

5     the select committee.    If you refuse to answer a question based on privilege, the

6     staff -- we can either proceed with the deposition or seek a ruling from the chairman on

7     the objection.    And if the chairman overrules such an objection, you will be required to

8     answer the question.

9          I do want to remind you that it's unlawful to deliberately provide false information

10    to Congress.    And, since this deposition is under oath, providing false information could

11    result in criminal penalties for perjury and/or providing false information.

12          Do you understand everything that I just mentioned to you?

13          The <u>Witness.</u>    I think so, yes.

14          Mr. ████    Okay.    Do you understand that there could be criminal penalties

15    for deliberately providing false information?

16          The <u>Witness.</u>    Yes.

17          Mr. ████    All right.    So, at this time, I'd ask you to stand and raise your right

18    hand to be sworn.

19          [Witness sworn.]

20          Mr. ████    Final thing before I turn it to you, Mr. Greim, just logistics.    If you

21    need a break at any time, please let us know.    We can break for lunch.    And, if there is

22    ever anything you need to speak with your attorneys about, let us know that as well.

23          Like I said before we went on the record, there is a video camera that's recording

24    this room, and it's not going to stop for the length of the deposition.    So just be aware of

25    that if you need to have private conversations.

1      All right.   So, with that, Mr. Greim, I understand you want to make a statement?

2      Mr. Greim.   Yes.   Thank you.

3      The witness preserves the objections that are set forth in the letter that we made

4   responding to the subpoena.   Those objections were pertinence, legislative purpose,

5   First Amendment privilege, and Fourth Amendment.   We are standing by those.   We're

6   not waiving them here, other than to the extent we see that you have materials that had

7   been covered that we didn't know you had.   In some cases, others may have removed

8   an element of one of the privileges, and we'll deal with that as it happens during the

9   deposition.

10      We do object to the committee as not being properly composed.   The resolution

11   authorizing the select committee provides for the Speaker to appoint 13 members of the

12   committee, but requires the Speaker to appoint five of those 13 members after

13   consultation with the minority leader.

14      The Speaker failed to comply with this requirement in our view.   None of the

15   members of the committee were appointed in consultation with the minority leader.

16   The Speaker rejected the minority leader's requested appointees and appointed all 13

17   members on her own.   Our position is that the Speaker's failure to properly compose

18   the committee invalidates all the committee's activities, including the issuance of this

19   subpoena for deposition and for records.

20      We preserve that objection, but we are trying to work with you to avoid conflict in

21   court proceedings that aren't necessary.

22      For similar reasons, we believe the subpoena was not properly issued.   Under

23   the committee's resolution, a deposition subpoena can only be issued after consultation

24   with the ranking member.   Here, there is no ranking member.   This is denoted by

25   Representative Cheney holding the title of vice chair rather than as ranking member.   So

1    there was no consultation with the ranking member.    Therefore, the deposition

2    subpoena is improper.

3        But, again, to avoid -- if we are wrong on this, the House's view may be that it's a

4    crime, and so, because of the severe penalties associated with being wrong as a matter of

5    law, we are here to do our best to answer your questions, and we're ready to do that

6    now.

7        Mr.█████    Great.    Thank you.    Your objections are noted, and we will

8    proceed.

9                            EXAMINATION

10            BY MR.█████

11    Q    So, in front of you, you have a binder of exhibits, and I understand you had a

12    few minutes with them before this deposition started.    I'm going to be referring to these

13    exhibits throughout.    Each one is numbered according to the tab on the right, and we'll

14    just start with exhibit No. 1.

15        So exhibit No. 1 is a subpoena dated November 5th, 2021, to Kenneth Klukowski.

16    So you do understand -- objection is noted, but you understand that you're hearing -- you

17    are here pursuant to that subpoena, correct?

18    A    Yes.

19    Q    And thus far, you have produced to the committee four emails and three

20    Word documents, and I also received from your attorneys a privilege log listing emails

21    between roughly November 1st and December 12th, 2020, as well as, it appears, a few

22    documents in there as well.

23        I do understand that your attorneys are working to provide additional documents,

24    and can you just confirm that there are additional documents you plan to provide to the

25    select committee?

1         A    Yes, I believe so.

2         Q    Okay.    And in your review of documents and information that's responsive

3    to the subpoena, had you reviewed text messages that you may have sent or received

4    during the period April 1st of 2020 through the end date of the subpoena?

5         A    Yes, I believe so.

6         Q    Okay.    And have you provided those to your attorney to turn over to us as

7    appropriate?

8         A    I -- I believe -- I think that process is still ongoing.

9         Q    Okay.    Very good.

10        As far as emails, we know that you used an email address with some variation of

11   your name [redacted] and we have information related to that.    Do you have any

12   other email addresses in which responsive material might be found?

13        A    I'm unaware of respond -- I do not recall any responsive emails sent to a

14   different email address.

15        Q    Have you looked at other personal email addresses that you have used for

16   responsive matters?

17        A    Yes.

18        Q    Okay.    And would you provide a list of those email addresses to the

19   committee as part of this process?

20        Mr. Greim.    We'll take that request under advisement.    We have concerns

21   about providing information that then gets publicized, but we'll take it under advisement.

22   And we may be able to give you an answer after our next break.

23        Mr. [redacted]    Okay.    Well, we can revisit that, then, after the break.

24        BY MR. [redacted]

25        Q    And how many cell phones did you use between April 1st and

1    January 20th -- excuse me -- April 1st, 2020, and end of January 2021?

2        A    To the best of my recollection, three.

3        Q    And what were those cell phones?

4        A    One is my personal cell phone, which was used throughout that period.

5        Q    Okay.

6        A    Second would be my DOJ-issued cell phone used during the dates of my

7    employment at DOJ.    And third would be my -- because this is the time period from

8    when to when?

9        Q    April 1st, 2020, to end of January 2021.

10       A    And then the third would be my other government-issued cell phone for the

11   dates before I -- for the dates within that window before I was employed at DOJ.

12       Q    And was that with the Office of Management and Budget?

13       A    Yes.

14       Q    Okay.    Did you return that cell phone before joining DOJ?

15       A    Yes.

16       Q    And did you return your DOJ cell phone once your time there was complete?

17       A    Yes.    Yes.

18       Q    Okay.    Is there a caveat there that --

19       A    No.    It's -- it's in -- in the final days of the administration, there was

20   restricted access at the end of the administration, so it was a courier who came to the

21   house to pick up DOJ electronic assets that we had to return them.

22       Q    Understood.    Okay.    But you don't have custody or control over those

23   phones, OMB --

24       A    Correct.

25       Q    -- or DOJ?

1       A       Correct, I do not.

2       Q       Okay.

3       A       In each case, it was returned in the manner that I was instructed to return it.

4       Q       Understood.

5               And, your personal phone, is it the same phone that you have now that you used

6       throughout that period?

7       A       I don't recall the latest time -- the most recent time that I upgraded to a

8       newer model of cell phone.    I don't know what that date was.    But there is -- as best I

9       know, to the best of my knowledge, there is continuity if -- from whenever I purchased

10      this phone to whatever version I had prior.

11      Q       Okay.    And did any of those phones back up to the cloud, like an Apple

12      cloud or a Google cloud, where some of the information on any of those phones might

13      still be stored, to your knowledge?

14      A       I don't have knowledge as to how that sort of thing works.

15      Q       Okay.    Do you have a personal iCloud account associated with your gmail,

16      for example, that you're aware of?

17      A       Not that I can think of.    I don't know what features I may have.    I'm -- I'm

18      tech illiterate, so I don't know what features or -- I don't know some of the features and

19      options that I have.

20      Q       Okay.    And, to the extent that there is such information, I'll work with your

21      attorneys in making sure all of that is captured as appropriate.

22              Mr. Greim.    It is our goal to make sure that you have that data, and I think we

23      can probably answer some of these questions.    If we need to do it on the record later

24      today, we will have it for you.

25              Mr          Very good.    Thank you, Mr. Greim.

1          Mr. Greim.    Yeah.

2                    BY MR. ▓▓▓▓▓

3          Q     Okay.    The final question is I understand that you volunteered with the

4    Trump campaign, and we're going to get into that.    Did you have a separate cell phone

5    that you used for that?

6          A     No, I did not.

7          Q     Was that -- did you do Trump campaign-related stuff on your personal

8    phone?

9          A     I did not use any other cell phone during -- during the time I was -- no one

10   issued me any type of alternative cell phone that I recall for -- for use during that time.

11         Q     Okay.    And did you have a separate Trump campaign email account?

12         A     Not that I know of.

13         Q     Okay.    So, if you received emails, for example, related to the campaign in

14   your time with the campaign, would those have gone to your personal email account, the

15   ▓▓▓▓▓▓▓▓ we talked about?

16         A     Yes.

17         Q     Okay.    Anywhere else that you're aware of?

18         A     Not that I recall.

19         Q     Okay.    All right.    I appreciate that.    Thank you, Mr. Klukowski.

20         So I want to talk a little bit about your background.    I understand that you went

21   to Notre Dame for undergrad.    Is that right?

22         A     Yes.

23         Q     Okay.    And you also went to George Mason, where you got your J.D.?

24         A     Yes.

25         Q     All right.    And that was in 2008?

1          A     Yes.

2          Q     Okay.   What's your current job?

3          A     Currently, I am a practicing attorney, and I'm also a consultant with a media

4   company.

5          Q     Where are you a practicing attorney?

6          A     I'm senior counsel at Schaerr Jaffe, LLP.

7          Q     All right.   Now, going back before your current job, I understand you

8   worked on the Trump transition team in 2016 as policy staff on constitutional rights.   Do

9   I have that roughly correct?

10          A     The substance of that, what -- the words you used sound like an accurate

11   description of the substance of it.   I don't know what the official title was, but yes, that's

12   the substance of it.

13          Q     Okay.   And how long were you on the transition team, to the best of your

14   recollection?

15          A     To the best of my recollection, the -- I believe that the first times I was in, it

16   was on or around August of 2016 through the beginning of the administration.

17          Q     Did you have an official title in the White House immediately after the

18   transition period?

19          A     Not that I know of.

20          Q     Okay.   Who did you report to when you worked on the transition team?

21          A     I reported to Mr. Ado Machida, who was the head of the policy team for the

22   2016 Trump transition.

23          Q     Okay.   Did you stay in -- were you -- did you work with anybody who then

24   moved to the White House?   And I'm thinking of a few names in particular,

25   Mr. Meadows being one of them.

1          A       I do not recall.    I do not recall working with Mr. Meadows during that time.

2     I would not include with that whether I passed someone in the hall that I knew and said

3     pleasantries, but I -- I do not recall any substantive work with Mr. Meadows during that

4     time.

5          Q       Okay.    And did you go right from the transition team to OMB?

6          A       No.    After -- after my time with the transition was concluded, I resumed

7     work with -- with the nonprofit law firm that I was at at the time and the other

8     organizations that I was working with on a contractual basis at the time.    And I -- to the

9     best of my recollection, I did not discontinue any of that work during my time with the

10    transition.    My time with the transition was part-time.

11         Q       Okay.    When did you go to Office of Management and Budget?

12         A       I believe it was August of 2019.

13         Q       What took you there?    Why did you go there?

14         A       Forgive me.    Could you elaborate on the --

15         Q       Sure.    Why did you make the jump into government in your career?

16         A       It's -- I wanted to move forward in my career.    I wanted to upgrade my

17    career, and I had -- and there were -- there were various agencies and departments that I

18    had -- that I had interviewed with and expressed interest in.    One of them was that I

19    interviewed with the general counsel of OMB in the spring of 2019.    And, at some point

20    subsequent to that interview, he called and said that they wanted to explore bringing me

21    on board at OMB.

22         Q       And I understand from your current law firm profile that you were

23    White -- you worked at the White House as special counsel in the Office of Management

24    and Budget.    Is that your official title?

25         A       My title was special counsel --

1     Q     Okay.

2     A     -- at the Office of Management and Budget.   The employer is technically

3     the Executive Office of the President, the EOP.   It's colloquially referred to as the White

4     House, but it's not the White House Office.   That is a subset of the EOP.   OMB is

5     actually -- has attributes of an agency as a separate component of the EOP, but housed in

6     the White House complex.

7     Q     Okay.   And, when you say White House complex, you're talking about the

8     Executive Office Building as opposed to the West Wing?   Is that fair?

9     A     Talk -- it's -- yes.   The OMB is housed, to the best of my knowledge, in two

10    buildings, the executive -- the Eisenhower Executive Office Building, EEOB, and also the

11    New Executive Office Building, NEOB, or NEOB, which is adjacent to it on the northern

12    side of Pennsylvania Avenue.

13    Q     Where were you?

14    A     I was in EEOB.

15    Q     Got it.

16    A     The Eisenhower Building.

17    Q     And who did you report to at OMB?

18    A     I reported to the general counsel of OMB.

19    Q     Who is that?

20    A     Mark Paoletta.

21    Q     What were your responsibilities there?   What type of issues did you work

22    on?

23    A     It's -- I had -- I dealt with constitutional issues for matters that came across

24    OMB.   And then I had -- I dealt with a clearance for communications items insofar as

25    OMB would be consulted, or at least some of them, like -- OGC, the Office of General

1    Counsel at OMB.   It's -- whenever things come into OMB where it just requires legal

2    sign-off or, rather, that it goes to various components for anyone who does think they

3    have an equity in it, to be able to assert an objection or make a comment.

4         It's -- so I would see stuff pertaining to legislation, either proposed legislation or

5    legislation that was under review.   I would see some -- sometimes draft executive

6    orders, draft op-eds going out by senior administration officials when they would be

7    checking it with the White House.   I would see budget documents, and -- and would

8    provide regulatory review.

9         The regulatory review that the Office of Information and Regulatory Affairs, OIRA,

10   provides.   It's -- OIRA does policy coordination there, and certainly the persons who

11   work there can also weigh in legally.   The head of OIRA is a very distinguished lawyer,

12   but the Office of General Counsel would often -- and I believe generally -- provide the

13   legal clearance for matters that were coming to OIRA for OIRA review and clearance.

14        And so, I would see proposed rules, interim final rules, final rules, where it's a

15   matter of all the research on that to make sure that it's legally sufficient.   And, after

16   COVID became a dominant activity for the -- well, for the entire country, but including the

17   U.S. Government, I was one of several lawyers for whom COVID was part of my portfolio.

18        So, for months -- for the bulk of -- for all of the time from April 1st to the end of

19   my time in the White House -- I'm sorry -- at -- to the end of my time at OMB, the

20   majority of my time -- the majority of my hours was spent working on COVID-related

21   measures.

22        Q    Okay.

23        A    Legal review for measures that were coming in from agencies for OIRA

24   clearance to be sent to the Federal Register.

25        Q    Okay.   And, while you were at OMB, did you have any election

1   litigation-related responsibilities?

2          A    Not that I recall.

3          Q    Okay.   And you stayed there until roughly December.   We're about to get

4   into it, but December of 2020?

5          A    That's correct.

6          Q    Did you work closely with any White House staff -- and, when I say White

7   House, I now mean West Wing staff -- while you were at OMB?

8          A    No, I did not work closely with any White House staff.   I would -- I would of

9   course see people, but it's -- I reported up my chain of command, and it's above my pay

10  grade to -- to be dealing with the West Wing.

11         Q    Okay.   So you didn't work closely, for example, with Pat Cipollone or

12  Pat Philbin in the White House Counsel's Office?

13         A    I don't recall ever having a substantive conversation with Mr. Cipollone.

14         Q    Okay.

15         A    And I do not recall ever having met Mr. Philbin during my time at the White

16  House.

17         Q    Okay.   How about Mr. Meadows?   Did you work closely with him officially

18  on -- while you were at OMB?

19         A    No.   It's -- if at any point I saw him at an event, the limits of the

20  communication would have been waving and an exchange of pleasantries.   I do not

21  recall a single substantive conversation with Mr. Meadows during -- during the time that

22  he was at the White House --

23         Q    Okay.

24         A    -- as Chief of Staff to the President.

25         Q    Okay.   Now, earlier, you mentioned that you worked for a media

1    organization as well, or did some work for a media organization, or -- let me rephrase

2    that -- that you do some work for a media organization.    Did you do that while you were

3    working at the Justice Department as well?

4          A    No.

5          Q    Okay.    Now, ultimately you moved to DOJ as senior counsel in the Civil

6    Division.    Is that right?

7          A    Yes.    Yes.    That is -- that is correct.

8          Q    Okay.    And official start date, am I right, December 14th?

9          A    I believe that's correct.

10         Q    Okay.    Around the 14th, 15th?

11         A    It's -- it's -- I -- I -- on boarding took place on December 14, but it was done

12   virtually.    I was at home.    The first time I reported for duty physically, I believe, was

13   December 15.

14         Q    And this was a -- what, a schedule C appointment to DOJ?

15         A    That is correct.    That is my understanding.

16         Q    Okay.    Why did you make the move towards the end of the

17   administration --

18         A    Sure.

19         Q    -- about a month left, to the Department of Justice?

20         A    It's -- it's -- when I was -- ever since 2018, I was actively exploring options to

21   join the administration, wanted to upgrade my career to develop a lucrative, for-profit

22   conventional legal practice, and so, I looked at different options with the -- to join the

23   administration.

24         I -- I sought a position as deputy general counsel at the Department of Energy.    I

25   had interviewed twice for different offices and divisions at DOJ.    It's -- I wanted to get

1   into a litigation experience position.

2          Once I joined -- once I joined OMB, I -- I didn't think it would look good for a

3   career, or be doing right by my employer to just hopscotch somewhere else, so I wanted

4   to stay a solid year at least at OMB.    So, as -- so, when August -- when August of 2020

5   came around, and I was, at the time, hoping that there would be a second term, I wanted

6   to try -- after I had been there a year, wanted to try to get placed in what would be the

7   next step in my career.    I thought I had maximized the resume value of what I would

8   have out of OMB.

9          And so, in my -- my biggest focus -- the biggest area that I thought I needed for

10  career development was litigation experience.    And so, I -- there was an email exchange

11  on September 10 of 2020 with the White House liaison at DOJ with me asking about

12  joining DOJ in a litigation capacity.    And, of the various divisions at DOJ, my background

13  in nonprofit was civil rights, so I was not interested in going to the Civil Rights Division.    I

14  was open to exploring all of the others.

15         I expressed that my top choice, if I could have a choice, would be the Civil Division

16  as having the broadest portfolio of general civil litigation that I thought could be

17  translated into a post-service private law practice.

18         Q    Okay.   Now, you mentioned reaching out, I believe you said in September,

19  to the White House liaison for DOJ?

20         A    In -- I think she emailed me on September 10, that I had just socialized to the

21  right people.   You know, I would love to -- you know, it's -- during the periodic review

22  that political staff could have with political appointees about, you know, where would you

23  want to be later perhaps in a second term?   You know, I had said DOJ, in a -- in the

24  litigation division.

25         And you occasionally hear of other job offers as well, where people will ask you if

1    you're interested in this or that, and I -- and, again, up through August of 2020, I didn't

2    seriously entertain anything.   And then, after August of 2020, I only wanted to make a

3    move that seemed to make sense as a next step in my career, not moving for the sake of

4    moving.   And DOJ litigation, especially in Civil Division, I felt was going to be -- would

5    be -- would be the best.

6         Q    Okay.

7         A    So --

8         Q    And the White House liaison, was that Heidi Stirrup?

9         A    She was not the liaison at the time, and that actually, I believe, is a factor for

10   how long it took me to get to DOJ.   There was -- it started with a D, I believe.

11        Q    Okay.

12        A    I want to say Delaplane.

13        Q    Okay.

14        A    Camellia Delaplane might be the name.

15             Someone with a name similar to that was the White House liaison in September

16   of 2020.   We had interviewed at the time.   I heard that a DAAG position, a deputy

17   assistant attorney general position in the Civil Division, the one for the Federal Programs

18   Branch, either had or was soon to be coming vacant, and I said I would specifically like to

19   be considered for that position, or for any other DAAG position.

20             And so, we had had a conversation about that.   She -- I don't recall exactly what

21   she said next steps would be, but we had run the traps on that.

22             I was subsequently told that a lawyer working in the White House Counsel's Office

23   by the name of John Coghlan, that White House counsel had expressed to PPO and DOJ,

24   as I guess there is a very -- there is an ongoing working relationship between

25   those -- those offices, that they had recommended him for that position, and that at the

1     end of whatever the decisionmaking process was, the decision was made that

2     John Coghlan would receive that position, but that I was told that I was on everyone's

3     radar, and that they would keep their eyes open for other opportunities coming up in the

4     Civil Division.

5             So that was -- that was September.    It was sometime subsequent --

6         Q     Let me stop you really quick.

7         A     Yes.

8         Q     When you say you were on everybody's radar, are you talking in the

9     Presidential Personnel Office, PPO, or at DOJ?

10        A     I'm not sure -- I'm not sure I know --

11        Q     Okay.

12        A     -- because I don't remember the exact conversation.   It was -- it was just

13    along the lines of the people who were involved in making these decisions were aware of

14    your interest, and they know that you'd like to come over.   So -- so I think -- I'm

15    wondering if it was a conversation with Ms. Delaplane.

16        Q     Okay.   That's fine.

17        A     I can't -- yeah.   It was -- I was just told that the right people -- the people

18    who would be involved in future decisions knew that I was interested, knew after this

19    that I was interested in going over to civil when there would be an appropriate opening.

20        Q     Okay.   So I understand that you met with Clare Morell and Heidi Stirrup in

21    late October, either in person or on the phone.

22        A     It was -- yes.   It was on the phone.   I believe it was sometime during -- it

23    was sometime between that September 10th communication with Ms. Delaplane, if I'm

24    recalling her conversation -- her name correctly.    And we had had subsequent phone

25    conversations.   It was sometime between that and the date that you're referencing that

1    Heidi Stirrup became the White House liaison.    And I believe that Ms. Morell was some

2    sort of a deputy or assistant to her in that position.

3          Q      Okay.    Now, Ms. Stirrup, we understand, said that you were recommended

4    by the White House Presidential Personnel Office and a friend of hers at the Vice

5    President's Office.    Do you know who those people are?

6          I'll start first with Presidential Personnel.    Was it John McEntee?

7          A      I -- I've met Mr. McEntee.    It's -- an appointment at my level is dealt with

8    with subordinate staff, like special assistant to the President staff.    I spoke with

9    several -- we use the acronym SAPs -- several special assistants to the President.    It's -- I

10   don't recall a meeting with a DAP, a deputy assistant to the President, and I don't recall a

11   meeting with Mr. McEntee himself, who was the director of that office.

12         It's -- the only conversation -- substantive conversations I recall were to various

13   special assistants to the President that I knew in PPO, just saying that, Hey, guys, I would

14   love to be considered for DOJ when there is a -- when there is a relevant opening.

15         Q      Did you have --

16         A      They have several that I spoke to in that regard knowing that they talk to

17   each other, so --

18         Q      Okay.    You said substantive conversation.    Did you have nonsubstantive

19   conversations with Mr. McEntee about the job?

20         A      Not -- not that I recall.

21         Q      Okay.

22         A      My only -- all I recall with Mr. McEntee during this time was, Good morning,

23   sir.    Just pleasantries.

24         Q      Okay.    And what about the friend in the VP's Office?    Do you know who

25   that would be, who recommended you?

1       A       I believe that would be -- that would -- that would probably be

2       Dr. Paul Teller, who was -- who was a longtime friend of mine that -- whom I would speak

3       to about career interests.    Like, when I went to join OMB, I mentioned it to Mr. Teller.

4               And, when I mentioned DOJ, he told me that -- and I said something along the

5       lines of, Unfortunately it looks like there is going to be a new White House liaison, so I

6       don't know if I'm back to square one, or words to that effect.

7               And he had said, Oh, I actually know the person who will be taking that position.

8       She's someone I know, and -- and I'm paraphrasing here, but would you like me to put in

9       a good word with her?

10      Q       Okay.    Now, I understand that, as this process was going on, internally, the

11      White House liaison to DOJ, Ms. Stirrup, or her deputy was eager to get you in quickly and

12      said something to the effect of, I think PPO would work to expedite him, meaning you,

13      Mr. Klukowski, through since they want him in soon.

14              Do you know why the White House wanted you to join DOJ soon, quickly?

15      A       I -- I had urged people who were friends of mine in PPO to say, Guys, I've -- I

16      love my work at OMB.    Of course I'm paraphrasing here, but I love my work at OMB, and

17      especially with what we're doing regarding COVID, I mean, there were -- there were such

18      long days on such big issues that I actually had a great deal of job satisfaction in terms of

19      the substance of the service that we were providing.    But, having been there a year, I

20      said, But all that said -- I said, Look, if I have to -- if I have to keep going at OMB, you

21      know, I'm honored to have the opportunity to keep working here.    Now that I've been

22      here a year, I'd really love to start getting some litigation experience.    You know, if

23      anyone owes me a favor, I'm calling in those favors.    I would really love to -- you know,

24      to get to DOJ in a litigation capacity.

25              So I -- I would frequently bring that up over cups of coffee, over cups of water

1    when I'd be having lunch with people.    So it was -- but I think my enthusiasm was the

2    driver on that, and I had mentioned it to multiple friends at PPO.

3          Q      Okay.    And, in the process of moving to DOJ, did you have discussions with

4    people about working on election-related litigation?

5          A      Not that I recall.    In fact, election matters is part of the Civil Rights Division.

6    And, with my background in civil rights, that was the only litigation division that I was not

7    interested in being considered for.    So I -- I was unaware of any election-related

8    litigation that was not part of the -- of the civil rights portfolio.    So I was most certainly

9    never -- not only was I not seeking it.    That's part of what I was trying to stay away from

10   in terms of the substantive work I would be doing at DOJ.

11         Q      Okay.    Now, you also worked for a volunteer or -- excuse me -- as a

12   volunteer for President Trump's 2020 reelection --

13         A      Yes.

14         Q      -- campaign, I understand.

15         A      Yes.

16         Q      And was that roughly November 3rd to the 10th of 2020?

17         A      It was a few days before the 3rd.    It was a few days prior to Election Day,

18   and then a business week after.    So I -- I took -- I took a number of days of leave, of

19   vacation time on both sides of November 3rd.

20         Q      Okay.    And you stopped on November 10th?    Is that accurate?

21         A      I'm not sure of the exact date, but it was -- that week is when I -- is when I

22   returned to duty at the White House.

23         Q      Okay.    And what was your role on the campaign?

24         A      It's -- my role on the -- I was just one of, like, floating staff attorneys.    There

25   were a number of political appointees who were -- some were attorneys.    Many were

1    nonattorneys, but just political appointees who were taking leave time to go volunteer for

2    the campaign.

3         So it's -- a lot of -- many people did not have, like, a fixed portfolio.    You would

4    just be given assignments, things to work on for -- sometimes they fit your experience.

5    Sometimes you just happened to be the warm body in the room when -- when something

6    had to be assigned to someone.

7         Q    Did you work on litigation-related matters?

8         A    I'm trying to think of -- I'm trying to think of -- of what I -- what I can say in --

9         Mr. Greim.    Yeah.    I mean, I think we're not to the attorney-client privilege issue

10   yet.

11        The Witness.    Okay.    Gotcha.

12        Mr. Greim.    I think you can answer whether you did or didn't.

13        The Witness.    Oh, sure.    Could you then repeat the question?

14        Mr. ███████.    Yeah, sure.

15             BY MR. ███████

16        Q    So, while you were working for the Trump campaign, or volunteering, to be

17   clear --

18        A    Yes.

19        Q    -- in November of 2020, did you work on litigation matters related to the

20   election?

21        A    After Election Day.    Before election day, it was activities that generally are

22   referred to by the term EDO, Election Day Operations.    So brushing up and checking

23   ahead of time, studying the -- for the State I was in, Pennsylvania, studying the

24   Pennsylvania election code, studying common issues that arise on or around Election Day,

25   requirements for canvassing, requirements for in-person voting, requirements -- so -- so it

1    was -- so nothing litigation related prior to Election Day.

2            After Election Day, it's -- if the election isn't over, that's -- that's a general part of

3    the conversation then.

4            Q    Did you work on litigation that was ultimately filed in court, either while you

5    were a volunteer or after?

6            Mr. Greim.    I think you can answer this, too --

7            The Witness.    Okay.

8            Mr. Greim.    -- yes or no.

9            The Witness.    Yes.

10                BY MR. ████████:

11            Q    Okay.    And, after you left the campaign on or about November the 10th,

12    did you stay in touch with people on the campaign?

13            A    I had a lot of friends on the campaign and people I had talked with

14    beforehand and continued talking with.

15            Q    Did you talk to any of them about campaign work?    So, for example, the

16    litigation that was ultimately filed and that you played some role in, did you continue

17    talking to the campaign about that after November the 10th?

18            Mr. Greim.    You can answer that question.

19            The Witness.    I -- I did not -- I don't recall discussing anything that would have

20    been covered by attorney-client privilege, but the subject matter of ongoing challenges

21    and -- and that things are in the courts and -- for example, things that would be in the

22    news, those would continue to be a topic of conversation.

23                BY MR ████████

24            Q    Okay.    And so you said nothing that you thought would be covered by

25    attorney-client privilege, so the follow-up question to that is:    Did you provide legal

1    advice after you left the campaign on or about November 10th to the campaign?

2            Mr. Greim.    Because we're into the area of privilege here, I mean, this is a

3    question the witness can answer, but the question for somebody who is not a litigator

4    very much is going to cover giving advice to the campaign itself to somebody who is still a

5    lawyer for the campaign.    But it could be marking things up.    You give advice in other

6    ways than simply get -- receiving a legal question and providing a legal response.    It can

7    also include marking up and editing work product.

8            And maybe the question could be split up.    I think it's -- I don't think we're

9    intruding -- to break down the question of giving legal advice.

10           Mr. █████████    That's perfectly fair.

11           Mr. Greim.    Okay.

12                   BY MR. ████████

13    Q       So I'll do that in two parts.    First is:    Did you continue to provide legal

14    advice to the campaign or campaign people in the period after you left officially on or

15    about November the 10th?

16    A       And the reason I'm pausing is, in every instance, it's -- or at least in these

17    instances, is I'm not aware that there has been any waiver of attorney-client privilege

18    with the campaign, and so, I'm just -- I'm in unusual territory for myself here, and I'm just

19    trying to be as responsive as I can without -- without violating any privilege.

20    Q       Very fair point, and I'm not asking you at this point for the communications.

21    A       Okay.

22    Q       The privileged communications.

23    A       Gotcha.

24    Q       Just whether or not they happened.

25    A       It's -- it's -- I -- I recall conversations with people who are supporters of the

1    President.   I'm -- and including people who had -- had volunteered with the campaign.

2    Some of those individuals, I wouldn't be aware -- I would not presently be aware and was

3    not at the time whether, for certain individuals who I know were supporting the

4    campaign, whether they would be considered part of the campaign since so much

5    campaign labor is volunteer labor.

6         Q    Let me ask you this:    Did you provide legal advice related to the election to

7    those people you just identified or you just mentioned?

8         A    I'm not recalling giving legal advice.    It was a common topic of conversation

9    if there was a news story about a court ruling on something to have a conversation about,

10   you know --

11        Q    I'll just stop you there.   I'm not that interested in that right now.    More so,

12   did you give them recommendations on litigation, for example?

13        A    Not that I recall.

14        Q    Okay.   Did you mark up -- as Mr. Greim referenced, mark up or draft any

15   pleadings?

16        A    I do not recall drafting any pleadings.    I don't recall marking up any -- any

17   pleadings.

18        Q    Or commenting on pleadings?

19        A    When I would see things that were filed, I think, in conversation, things that

20   would show up in news stories, I think I would have social conversations about -- about

21   things that would be linked into news stories and whatnot.

22        Q    Social conversations, but not, Ken, what are your thoughts on this pleading,

23   or, Ken, we want you to see this pleading.

24        A    From the campaign?

25        Q    Correct.

1          A     Yeah.    Yeah.    Not that I recall.

2          Q     Or people associated with the campaign.

3          A     People who -- who were supporting the campaign, or -- when you -- could

4    you -- because I want to --

5          Q     This is --

6          A     When you say associated with, I'm not trying to be difficult.    I'm

7    trying -- when you say associated with the campaign --

8          Q     Sure.    So there was a lot of election-related litigation going on.

9          A     Right.

10         Q     After you left the campaign on or about November the 10th, did people

11   contact you for your thoughts, advice, editing, whatever it might be, in a legal capacity for

12   any of that litigation, either filed or proposed?

13         A     There were -- there were individuals I had spoken with during my time

14   volunteering with the campaign where -- where those conversations were ongoing, but

15   my participation is what changed.    So I -- so, you know, I -- I might be copied on a list of

16   something, but I was not a participant as I had been on the time I was at -- on leave --

17         Q     Okay.

18         A     -- doing the same sorts of things that I would be -- that I would be doing.

19         Some of these are matters where, you know, several attorneys could have been

20   copied, and -- and my name could still be on a list, even if I had not asked for it to be on a

21   list.

22         Q     Okay.    And we may flesh this out a little bit more in a bit, but, when you

23   were with the campaign, who did you work with?    Who did you work for?    Excuse me.

24   Who did you report to, for instance?

25         A     There -- there wasn't -- it was a very fluid configuration.    There -- it was not

1    clear lines of authority and chain of command such as I had at OMB.

2         Q    Okay.   Let me ask you this:   Did you work for Justin Clark?

3         A    I do not recall having any communication with Mr. Clark.   I'm -- I do not

4    recall having met Mr. Clark.

5         Q    Okay.   And, when you say don't have communications, was that both

6    during your time in the campaign and after?

7         A    Correct.   I do not recall ever having met Mr. Clark.

8         Q    Okay.

9         A    The -- if -- if I had met him, I -- could have been at some social event that

10   I -- that I don't recall.

11        Q    Okay.   How about Jason Miller?   That's another name in the campaign.

12   Did you ever work closely with him?

13        A    I -- I do not recall ever having worked with Mr. Miller.

14        Q    Okay.   Do you know Mr. Miller?

15        A    I've -- I have met Mr. Miller.   I met him at the -- in the media area of the

16   Vice President's debate in the 2016 election.

17        Q    Okay.   So that's kind of beyond what we're looking at.

18        A    Right.   Right.   Right.   But I wanted to -- but you asked if I had ever met

19   him, so I wanted to -- I don't recall ever having have a conversation with him since that

20   time.

21        Q    Fair enough.   Okay.   All right.   So --

22        A    And that was 2016, not 2020.

23        Q    Okay.   So, when you get to DOJ, you're a senior counsel in the Civil Division.

24        A    Yes.

25        Q    Is that right?   And I understand that you worked closely with somebody

1   named Jeff Clark?

2      A    Yes.

3      Q    I believe you were recommended, actually, specifically to work for Jeff Clark.

4   Is that right?

5      A    I was recommended to work in the Civil Division regardless of who the head

6   of the Civil Division was.

7      Q    But that was Jeff Clark, correct?

8      A    He was the acting head, so he was the temporary interim head.   He was the

9   Senate-confirmed head of the Environment and Natural Resources Division, and was also

10   during a brief -- during that period of time, was also the acting assistant attorney general

11   of the Civil Division.

12      Q    But he was your boss when you got to DOJ?

13      A    Yes, correct.

14      Q    And you also worked -- I guess closely may not be the right word, but with

15   Doug Smith, his chief of staff.   Is that right?

16      A    I worked on occasion with Mr. Smith.   It's -- I was told that, since he was

17   chief of staff, that any matters that I would have that were not important enough to

18   bother the head of the division, see if Mr. Smith can handle it.

19      Q    Okay.   And I understand you wanted to go to DOJ, in part, because of

20   litigation.   Did you get to do litigation?

21      A    I did.   And -- and quite a bit, actually.   It was -- when -- on my first day

22   there in person, on December 15, I had -- I -- I'm not sure whether I offered it, or whether

23   it was Mr. Clark who brought it up in terms of, Well, I -- I'm sure you want to get a lot of

24   litigation done.   He said, It looks like we have a little bit more than a month in the

25   administration.   I believe, at the time, it was something like 36 or 37 days,

1    though -- though I don't recall him giving a specific.

2         He said, We have a little bit of time in the administration.   He said, Let's try to get

3    you at least one oral argument, and see if we can get you a deposition.   He said, And

4    then there is a lot of daily assignments that don't involve courtroom appearances, but

5    that are important and substantive litigation work.

6         And he said, That will be -- that will be the mainstay of your daily requirements.

7    He said, But let's try and make sure we get you an oral argument and a deposition.

8         And then he told me subsequent to that the -- the various DAAGs to approach

9    about, you know, so and so usually has, you know, a lot of cases going.   Make sure you

10   check here.   And then I followed up on that.

11        Q    Did you have a specific -- issues that you were -- that were going to be in

12   your portfolio?

13        A    Everything that was in civil was -- I -- I wanted to get as broad of experience

14   as I could throughout the civil portfolio.   And I don't recall having any sort of a

15   preference.   And of course, beggars can't be choosers.   You'll do whatever you're

16   assigned to do.

17        I did -- I did like the idea -- I don't know if I verbalized this or not, but -- but really

18   wanted to work on matters that would sound good talking about in job interviews down

19   the -- in the pretty distant -- I'm sorry -- in the pretty near future.

20        Q    Fair enough.   Did you talk to Mr. Clark about working on election-related

21   issues?

22        A    I had told him of my volunteer time on the campaign.   I did -- I did not

23   express anything about wanting to work on election-related issues as part of my civil job.

24   And I had the expectation -- since election-related matters is not part of the civil portfolio,

25   I had the expectation that I would have no election-related matters during -- during my

1    tenure at DOJ.

2        Q    And, when you told Mr. Clark about your experience with the campaign, did

3    he kind of see a lane for you because of that?    Is that unique experience that he

4    wanted?

5        Mr. Greim.    Objection.    Calls for speculation, lack of personal knowledge.

6            BY MR.█████████

7    Q    Just based on your conversation with Mr. Clark.

8        Mr. Greim.    Same objection.

9        Mr.█████████    Are you instructing Mr. Klukowski not to answer?

10       Mr. Greim.    Just an objection.

11       Mr.████████    Okay.

12       The Witness.    It's -- I do not recall him saying anything along the lines of, Oh,

13   well, you know, we'll -- we'll do some work in this division on that, and you can work on

14   that.    I don't recall any substance along those lines.

15           BY MR.█████████

16   Q    Okay.    So, just very quickly, I want to run through a couple people.

17       But what was your relationship, if any, with Acting Attorney General Rosen while

18   you were there?

19   A    I do not recall ever having had the pleasure of meeting Mr. Rosen.

20   Q    Okay.    How about acting or the person who assumed the acting DAAG

21   responsibilities, Richard Donoghue?

22   A    I do not recall ever having met Mr. Donoghue.

23   Q    All right.    Have you met former President Trump in person aside from just

24   like a photo op?

25   A    Aside from a photo op, no.

1        Q      Ever had substantive conversations with former President Trump?

2        A      When he -- not as -- not as President.    When he was a candidate, I was at

3    one event that -- that several candidates were speaking at.

4        Q      Was this unrelated to the November 2020 election?

5        A      Oh, this was in 2015, I believe.

6        Q      Okay.    Very good.

7        Do you know whether Mr. Clark ever met former President Trump?

8        A      I have -- I have read accounts that Mr. Clark has met Mr. Trump, and -- and

9    so, I don't have firsthand knowledge of it, but I have received information that -- that

10   Mr. Clark has met with Mr. -- met with Mr. Trump.

11       Q      Have you talked to Mr. Clark about his interactions with former

12   President Trump?

13       A      Mr. Clark raised with me at some point -- not in the initial meeting, when I

14   first talked with Mr. Clark on December 15.    I don't know what date it was.

15   Subsequent to that, it was after -- well after that, but before the January 3rd Oval Office

16   meeting that people have read a lot about.

17       Q      And we'll talk about that.

18       A      Right.    Right.    Absolutely.    I just want to set the bookends, but I'm not

19   sure when in it, it was that he had said that he had spoken with -- that he had spoken

20   with the President.

21       Q      Okay.    So you have talked to Mr. Clark about his interactions, or at least

22   some of them, with former President Trump.    Do you know how he was introduced to

23   the former President?

24       A      I do -- I do not recall being told how he was introduced.

25       Q      Okay.    And I'll ask more specifically.    Do you know whether

1    Representative Perry had anything to do with Mr. Clark's introduction to the former

2    President?

3        A    I do not know what role Mr. Perry had in that regard.   Mr. Clark did

4    mention Mr. Perry in the context of those conversations, but I don't know how that

5    pertains to introductions or what exactly the dynamics of those communications were.

6        Q    Fair point.   And my question was very specific, so point taken.

7        What did -- what do you recall Mr. Clark saying about Mr. Perry or -- excuse

8    me -- Representative Perry's role in his relationship with the President?

9        A    I don't recall -- I don't recall if Mr. Clark characterized Congressman Perry's

10    role.

11        Q    Okay.   What did Mr. Clark say about Mr. Perry?

12        A    I don't recall the specifics.   I just recall the Congressman's name being

13    mentioned in that conversation, but I -- it's -- I -- as I think about it, I cannot recall exactly

14    what was said in terms of how that -- how he fit into that situation.

15        Q    Okay.   And, to be clear, I'm not asking necessarily for the exact words that

16    Mr. Clark used, but just what's the idea?   How did his name come up?   What was it

17    about?   What were you talking to Mr. Clark about?

18        A    It was -- the topic of the conversation was -- though I don't recall if this was

19    the same conversation.   It's -- it's -- I think -- I believe there was more than one

20    comment made in more than one conversation.

21        Q    Okay.

22        A    And -- and -- and it didn't seem like things that involved me directly, and I

23    was -- I was -- at this time, we were pursuing my arguing three appeals and a district court

24    hearing and doing the deposition all in less than 37 days.   And so -- and one of those

25    appeals was a very complex -- was -- at least to me, a very complex appeal that resulted in

1    a published decision, which we won.    So I -- it's -- my -- my focus was on these monster

2    briefs in statute books.

3           When comments like this would be made, I saw no role for myself in them, so I

4    didn't focus on them beyond thinking, wow, that's -- that sounds like -- it sounds above

5    my pay grade, and -- and just -- so --

6           Q    So, Mr. Klukowski --

7           A    Yes.

8           Q    -- let me just stop you.    And you clearly remember that you had

9    conversations --

10          A    Yes.

11          Q    -- with Mr. Clark --

12          A    Right.

13          Q    -- about Mr. Perry?

14          A    Right.

15          Q    Okay.   I'm not asking for a specific one.

16          A    Okay.

17          Q    I just want to know what -- generally, what Mr. Clark -- what the information

18   that he conveyed to you related to Mr. Perry was?

19          A    Related to Mr. Perry, I don't know if -- the subject of the -- of the -- of the

20   part of the conversation where the name would come up was Mr. Clark saying that the

21   President would like the Department to be doing more with regards to the 2020 election,

22   and that Mr. Clark thought that there were additional things that the Department could

23   do.

24          He made -- the comment he made to me -- he made a couple -- is -- and one of

25   them was that he thought a lawyer for a client, or for a boss -- that a lawyer should go as

1   far as the law justifies on the facts as they're known or believed to be, and that he

2   thought that the efforts that were being done thus far were -- were -- were not to

3   that -- to that extent.

4       And so I don't know who communicated that to who, but -- but you'd seemed to

5   think that somehow that sentiment of Mr. Clark's was communicated to Congressman

6   Perry.   And so, it's -- that's -- that's -- I -- I didn't -- I don't recall asking follow-up

7   questions, because this seemed to be both out of my lane and above my pay grade.

8       Q   Sure.

9       A   And I just wanted to focus on these cases that -- I wanted to win these cases

10   and be able to talk in job interviews about how I won those cases.   So there were

11   comments where -- where dots were not connected for me, and I don't recall asking

12   follow-up questions to ask him for those dots to be connected.

1    [11:30 a.m.]

2              BY MR. ▓▓▓▓▓

3    Q    Fair enough.    And just to define the "he" that you mentioned, you said he

4    thought the Department wasn't going far enough.

5    A    Mr. Clark.

6    Q    So Mr. Clark thought the Department wasn't doing enough?

7    A    Mr. Clark thought that the Department could be doing more.

8    Q    In the election-related space?

9    A    Yes.

10    Q    Okay.    Did you find that odd?    Because you have mentioned now a couple

11    of times that election wasn't really in the Civil portfolio.

12    A    I was surprised, but this was a brand-new boss.    Some bosses welcome you

13    asking a bunch of questions.    Other bosses prefer that you not express an opinion or ask

14    questions unless they open the door for it.

15        I had been on the job -- I mean, my first day in the office was December 15th.

16    And in the interim there, I can't remember if this was before or after Christmas, but you

17    had Christmas Eve, you had Christmas Day.    I didn't have much face time with this

18    person at all.    I would see him for short periods.

19    Q    Okay.

20    A    I would mainly have my assignments, but I would work mainly at my desk

21    through the day and give, like, a daily reporting out or asking questions that needed to be

22    asked.

23        So I didn't -- I was curious at the time, but I don't recall asking follow-up questions,

24    not knowing how questions would be received.    It didn't have anything to with my job

25    responsibilities.

1       Q    Okay.

2       A    So, you know, it's -- so that I stayed focused on my job.

3       Q    Okay.   So that message gets relayed to Mr. Perry, the sentiment that you

4   explained that Mr. Clark thought that DOJ wasn't doing enough.

5       What is your understanding of what happened after that gets relayed to

6   Representative Perry?

7       A    I -- nothing was -- I don't recall being told anything about -- I don't know who

8   Mr. Clark communicated those things to.

9       Q    You just mentioned --

10      A    The fact that Congressman Perry's name was raised at some point by

11   Mr. Clark, it's -- I'm trying not to speculate.

12      Q    Of course.

13      A    In terms of it's -- I don't know who communicates -- who information would

14   go to and where it would go from there.   But Congressman Perry's name was raised in

15   those -- in at least one of those, you know, short conversations that just came out of

16   nowhere and then abruptly ended in the middle of me, you know, just talking through my

17   official duties and assignments for the day.   As to how exactly that worked in, I don't

18   recall if I was -- what I was told.

19      Q    Let me ask it this way.   Is it your understanding that Representative Perry

20   had a role of introducing Mr. Clark to the President based on either Mr. Clark's

21   sentiments or something else?

22      A    It's certainly possible from what I remember of the conversation.

23      Q    And about that specifically, what do you remember?

24      A    I don't recall specifics.   It's --

25      Q    So you remember enough --

1       A     I know it.   And I'm trying --

2       The Reporter.   Excuse me.   One at a time, please.

3             BY MR. █████

4       Q     So you remember enough to say that Representative Perry may have had a

5       role in introducing Mr. Clark --

6       A     Right.

7       Q     -- to the President?

8       A     Yes.

9       Q     But you didn't remember anything about that.   Do I have it right?

10      A     It's -- I'm making inferences in terms of -- and I'm trying to draw the line for

11      myself between inferences and just speculating.

12            From the flow of the conversation, I don't recall if Mr. Clark said, "Congressman

13      Perry introduced me to the President," but I am certainly not saying that he did not say it.

14            If it was said, I don't recall it.   But in the conversation of the President becoming

15      aware that Mr. Clark thought that the Department should be doing more, Mr. Perry's

16      name, Congressman Perry's name did come up in that conversation.

17            Mr. █████   Okay.

18            Mr █████, do you have any follow-up.

19            Mr. █████   Yeah.

20            Let me go back, Mr. Klukowski.   And I appreciate that you're trying to be careful.

21      We appreciate that.   We certainly want you to be careful with all the answers.

22            The Witness.   One second before you do.

23            Mr. █████   Sure.

24            The Witness.   Is there anything more I can say on that?   Because I'm trying to

25      answer fully.   I'm trying not to speak beyond the limits of what I recall.

1          Mr. Greim.    And I'm just going to tell the witness, this is -- they are here to get

2     facts that you have.

3          The Witness.    Okay.

4          Mr. Greim.    And understand the basis for those facts.    The best way for this to

5     work is just to sit back, listen to their questions carefully, And then do your best to

6     answer the information you have.

7          The Witness.    Okay.

8          Mr. Greim.    And don't speculate.    But, you know, you have to just do the best

9     to answer what they give you.

10         So now a different lawyer will ask.    We object to the idea of the two different

11    lawyers, but that's okay.    But let's go ahead and get it done.

12         Mr. ▮▮▮▮▮    I appreciate that.

13              BY MR. ▮▮▮▮▮ :

14    Q      So, Mr. Klukowski, let me go back to the time on which you started at the

15    DOJ.   You said that your first day physically in the office was December 15th?

16    A      I believe so.    Yes.

17    Q      What was your view at the time as to how long you were going to be there?

18    A      I thought I was going to be there until the morning of January 20th.

19    Q      Okay.   So you were not expecting that there was some chance that there

20    would be a second Trump term at that point?    At that point you had already -- your

21    understanding was that the Trump administration was ending and that President Biden

22    would soon assume control, on January 20th?

23    A      Given that the electoral college had voted the previous day, December 14th.

24    Q      Yes.

25    A      Prior to that moment, I thought we were -- I thought that the election was in

1    Bush v. Gore territory where there's legal challenges going up, and who knows how those

2    are going to pan out.

3             When the electoral college met on December 14th and voted for Vice President

4    Biden as President-elect, I thought that was the ballgame.

5        Q    I see.

6        A    I knew that there were ongoing litigation items, but it's -- I thought I would

7    be out of a job on January 20th.

8        Q    Okay.   Despite the fact that it was a relatively short horizon, it sounds like it

9    was still attractive enough for you to give up the OMB job to take what sounded like a

10   temporary position?

11       A    Absolutely, and for two reasons.

12       Q    Uh-huh.

13       A    First of all, I had been trying to get over there sense September.

14       Q    Yeah.

15       A    And so part of my persistence was, having had a goal, I didn't want to give up

16   on that goal, even if I wasn't going to be there long.

17            Second, given that it was going to cross the New Year's dateline, I figured my

18   resume would say Department of Justice 2020 and 2021 and that it wouldn't be maybe

19   until the sit-down interview stage that they would find out how few of days in each of

20   those calendar years we were actually talking about.

21            And that third, I was hopeful that I could get as many medals on my chest as

22   possible during that short period of time.

23       Q    Uh-huh.

24       A    That if I could get two appeals under my belt, that that would be -- that

25   there are nonpartners who go years without ever getting that.

1     And so, I had -- I just wanted to get everything that I could and express that I'd be

2     especially interested in appeals.    Ended up getting scheduled for three.    One of them

3     was pulled; reassigned to the career person.    But I did end up arguing and winning two

4     appeals during my short time there.

5          Q     And when you started, was it your impression that there were a lot of things

6     that needed to be finished before January 20th, which would somehow increase the pace

7     or the volume and you were there to provide support?

8          A     No, I had no impression along those lines.    I just know that the -- or it was

9     my impression that the U.S. Government has an enormous litigation load and that the

10    Civil Division had, at least by my assessment, the broadest portfolio.    So my thought was

11    there's got to be a ton of ongoing cases.

12         Q     I see.

13         A     I'm just going to grab every one that I can up to the limits, without

14    overcommitting myself for legal ethics reasons in terms of, you know, a lawyer can't take

15    on too much and do it competently.

16         Q     Okay.    So it sounds like your expectation was it would be business as usual

17    in the Civil Division, but that creates a sufficient volume that you could get some real

18    experience even in a little over a month?

19         A     Yes, that's correct.    And I would be telling people, you know, I'm going to

20    be putting out my resume here soon.    I'd like to put -- in fact, before I left the White

21    House, there were people were already collecting resumes.    And various people would

22    say, "Ken, if you want to send me your resume I am happy to send it along."

23         And my response would be, "Wait until I start at the Justice Department so that I

24    can add that line to my resume, and then I'll send it along to you to be circulated."

25         And then when I found out -- and then when I started doing that, a couple people I

1    think circulated it.    Others said, "It would be real helpful if you could put what you did at

2    DOJ there."

3          I said, "Well, I just started in the past few days, I haven't done anything yet."

4    And so I had said, "Let me get this to you on January 20th, after I see what I can add in

5    that space."

6          Q    Okay.

7          A    So I was in resume-building mode.    That was my focus.

8          Q    Got it.    You were not there -- you didn't understand that you were going

9    there for any specific purpose, a surge, an attempt to --

10         A    That's correct.    That's correct.

11         Q    You have got to let me finish --

12         A    Please.

13         Q    -- before you answer the question.

14         A    Apologies.

15         Q    You were not going there anticipated to do anything specific that needed to

16   be done before the end of the administration.    You were rather just going to do the

17   regular work of the Civil Division for as long as possible until January 20th.

18         A    That is precisely correct.    Nothing changed after my September -- from the

19   trajectory I tried to be on after that September 10th email exchange with the White

20   House liaison at DOJ that I just want to get there as soon as possible and just do the work.

21         Q    Okay.    During your first meeting with Mr. Clark, it that sounds like that was

22   on December 15th, did he give you the same impression, that his view was we're going to

23   run through the tape on January 20th and we'll get you as much experience as we can

24   until that date?

25         A    Yes.    That is the impression.

1        Q    Did anybody give you a different impression that --

2        A    No.

3        Q    -- there would be a potential second term, that this job could continue?

4    Did you hear that from any source when you started on are December 15th?

5        A    No, I did not.

6        Q    Was it your impression from Mr. Clark and others --

7        A    Not that I recall.   Not that I recall.

8        Q    Okay.   Appreciate your precision.

9    Was it your impression on December 15th that everyone understood that the

10   clock was going to run out on January 20th?

11       A    Yes.

12       Q    Okay.   Did that ever change?

13       A    Not that I recall.

14       Q    All the way through January 20th was it your ongoing expectation that your

15   time at the Department would end on that date?

16       A    Yes.

17       Q    And no one had ever expressed, "Hey, there's a chance that the election

18   could be overturned or we could have a second term," anything along those lines?

19       A    I would see things in the Twittersphere with people saying --

20       Q    I'm not talking about Twitter.

21       A    Talking about DOJ?

22       Q    Yes.

23       A    No one at DOJ ever said anything to me that I recall in that vein, anything

24   similar.

25       Q    Including Mr. Clark?

1          A        Correct.     My conversations with Mr. Clark were about job searches and,

2     you know, where do you plan on going after January 20th?     Yeah, correct.     Yeah, those

3     decisions.

4               My decisions with Mr. Clark in that channel were no different than with the other

5     people at DOJ that I would speak to about that, that I can recall.

6          Q        Yeah, I understand.     And I was going to develop more about the

7     conversations with Clark about the election, but I'll assume you'll get to that.

8               Mr. <u>Greim.</u>     I wonder if we could take our first break now?

9               Mr. ██████     Sure.

10              Mr. ████     And just a reminder, the camera is still going, but we are going to

11    go off the record.

12              [Recess.]

13              Mr. ████     Go back on the record.     It's 12:04, and the select committee is

14    resuming the deposition of Kenneth Klukowski.

15              Did you have any further follow-ups at this moment?

16              Mr. ████     No, I don't.     Thank you.

17              Mr. ████     Okay.     I know ██████ wanted to --

18              Mr. ███     Yes.     I just wanted to follow up.

19                  BY MR ████:

20         Q        Going back to the conversation Mr. ████ was asking you about with

21    Mr. Clark when he mentioned Mr. Perry in the conversation.

22              One of the things you mentioned was that he thought that DOJ wasn't doing quite

23    enough and that he explained the sentiment of the attorney-client relationship and the

24    idea of going as far as the law would allow to achieve the client's goals.     Is that right?

25         A        Everything you've described, yes.

1    Q    And what did you understand the goals to be in that conversation?

2    A    I don't know.    I don't recall anything being said about what the goals were.

3    It was a matter of effort.    And he said that if he were in -- if I should just keep going?

4    Q    Sure.

5    A    He said that he had during his time at DOJ that had spanned multiple

6    administrations, he said that he had served under four DAAGS, Deputy Attorney General,

7    the same acronym as DAAG, and he said that he liked and respected all four of the DAAGs

8    he had worked under.    He thought the finest of the four was Jeff Rosen, that he had

9    known Mr. Rosen for 20 years, they were at Kirkland Ellis together, that he regarded him

10   as a friend and as a mentor.

11         He said that totally apart from this context, he said that at my -- December 15th,

12   when I started.    We were just talking about the Department.    And then he repeated

13   that in the context of these conversations.

14         And there was more than one conversation.    I don't even know, for example, if

15   Mr. Perry's name showed up in the same conversation where he said the Department

16   could be doing more.    But that he had said that in a different position in the Department

17   that he could do the more that could be done.

18         And he mentioned Deputy.    He said, for example, he said, "I'm a

19   Senate-confirmed official.    There aren't many of us PAS officials left here."    He says,

20   "Many of the people in those senior positions are Schedule C's who succeeded to it on an

21   acting basis."    And he said, "I'm a Senate-confirmed AAG.    If I were the Acting Deputy, I

22   would have jurisdiction over the entire Department under General Rosen's supervision

23   and I would be in a position to do everything that needed to be done."

24         So it was more about the means than the goals.

25    Q    And did you, in the subsequent work you did over the next month or so, did

1    you come to understand what the goals were as you kind of did more work with

2    Mr. Clark?

3        A    I don't believe -- I never knew where this was heading.    There were only a

4    few days left until the end of the administration, so, and with each day that passed, you

5    were one day closer to the end of the administration.

6        Q    Sure.

7        A    I mean, you had Christmas in there, you had New Years in there.    Yeah.    I

8    was confused as to what do people hope to -- what do people think they can achieve and

9    is that realistic.

10        Q    Okay.    And the client in the attorney-client discussion was Donald Trump.

11    Is that right?

12        A    It's -- I'm trying to remember if it was client or the boss.    I mean, they were

13    like put together in one conversation.    It was a lawyer should do the best he can for his

14    client and a worker should do the best he can for the boss.    And a lawyer should go as

15    far as the law is justified applying to specific facts.

16        So, I mean, kind of which a statement that I don't think that -- I don't know of any

17    lawyer who would disagree with that statement.    As to exactly how that connects to

18    specific facts, I don't recall those specific facts being laid out.

19        Q    Okay.    So the facts aside, the overall objective, though, the client in the

20    attorney-client sentiment he was discussing is Donald Trump.    Is that right?

21        A    Whether he was being referred to as the client or the boss was unclear.    He

22    was certainly the boss.    Whether he was being referred to as the client on top of the

23    boss, that wasn't precisely clear from any wording that I recall.    But like you said, it was

24    all kind of put into one run-on sentence.

25        Mr. ████    Okay.    Okay.    Thanks.

1                    BY MR. █████████

2          Q     Just to follow up on that conversation, when do you remember that

3     conversation happening?    Was that your first day on the job?

4          A     No, it was not the first day.    It was several days in.    It was prior to

5     December 28th.

6          Q     Okay.

7          A     So between the 16th and the 28th.    And we were not there on the 25th.    I

8     don't even recall if we were there for a part day on the 24th.    But, I mean, but it was

9     face to face.

10         Q     What prompted it, that meeting?

11         A     I would typically go into Mr. Clark's office typically twice, at least twice a day.

12    This guy was a partner at Kirkland Ellis.    I figure he's going to be on the job market in a

13    month and he doesn't really know me.    So even things I could send by email or on the

14    phone, I would try to get into the -- without being a pest, without being in the office too

15    much, I was trying to get as much face time as I could with the boss, who I thought had a

16    really impressive resume, so that he could decide that he liked me as -- so that I could

17    give him reason to say, "I like working with this guy."

18              So it's -- so I would be in -- his office was just a few doors down from mine.    So I

19    was frequently just back and forth.

20         Q     This was just one of those face time meetings?

21         A     Yes.    Yes.

22         Q     What else did you guys talk about during that meeting?

23         A     I don't recall.    We would jump back and forth between whatever package I

24    was working on at the time.    Most of my conversations with him had nothing to do with

25    this subject matter.    And, I mean, I don't know if there might have been instances where

1   it could have been four or five times that we had, like, short, I don't know, perhaps 5- or

2   10-minute meetings, where it's -- so I don't know where this fit into the context of it.

3          I do not recall it being anything like I was called into a meeting and then this is

4   what was discussed, this subject matter.   It came up in the context of what I would call

5   just a standard, you know, all right, this is the package, this is the ongoing litigation on

6   this thing, we're considering settlement, here's the package and the staff

7   recommendation, research it, come back to me with whether you think I should sign off

8   on this and be ready to report out today on it.   And so it would be in the context of

9   meetings like that that these comments would come up.

10          Q     And did those comments, the ones you just referred to, about going as far as

11   the law allows, was that a result of the conversation about one of these packages or just

12   generally?

13          A     Definitely not a result of the packages.   It's like we would be sitting in the

14   room -- and on a couple of days we would have brought lunch in.   And on a couple days

15   he would be like, "Oh, why don't you come on down to the conference room as you're

16   eating -- as I'm eating my salad, go ahead and bring whatever you have," and where it

17   would be most of the conversation would then be social, you know, talking

18   about   [inaudible.]   "Tell me about your kids," you know.

19          And so it was really wandering conversations.   They didn't follow a

20   linear progression or these sorts of things.   I don't recall being in something where I got

21   the feeling that I was being called in to focus specifically on that.

22          Now, the fact that he brought something up means he definitely planned on, you

23   know, saying -- I mean, there was nothing spontaneous about it.   But aside from a

24   couple instances that I'm sure we're going to be talking to, aside from those instances, I

25   don't recall that being a pattern of these.

1  Q Was anybody else there for this conversation?

2  A No. No.

3  Q Just the two of you?

4  A Correct.

5  Q Now, one of things you said is that -- or you relayed -- is that Mr. Clark said,

6 "If I were Deputy, do everything that needed to be done." What did you understand the

7 "needed to be done"?

8  A It's -- and I'm paraphrasing -- it's -- perhaps that wasn't the best wording.

9 The gist of "I could do more" or that there was nothing that he thought the Department

10 should be doing that he could not do if he were the DAAG, if he were the DAAG he could

11 be doing whatever it is he was talking about.

12  Q Did you understand that to be election-related issues?

13  A Well, that was definitely -- that was only in the context of election issues.

14 He had made that comment in the course of the conversation of saying, you know -- I

15 don't know if it was that conversation or not, but it was on one of these exchanges where

16 he was saying, you know, "The President thinks the Department should be doing more.

17 I think there's more that we can be doing."

18  And so but not saying whether it was the very next sentence or even if it was

19 perhaps the next meeting. But it was, like, for example, "If I were the Deputy, if I were

20 the Acting Deputy, I could do that stuff."

21  Q Did he offer thoughts on what they could do, even if hypothetically?

22  A Not that I recall. I recall being curious and I do not recall asking questions.

23 I mean, all I could just necessarily infer from that is it was things not within the general

24 purview of what the Assistant Attorney General in charge of the Civil Division can do. So

25 I don't know what other components or divisions of DOJ that would be referring to. I

1    don't know.

2            I had no knowledge about anything the Department was doing in this space.   I

3    didn't know anything that wasn't being reported in the news.   I had no conversations

4    with anyone at DOJ about activities or investigations or anything of that sort.

5        Q    Okay.

6        Mr. █████████   Do you have anything further on this?

7        Mr. ███████   Yes.

8            BY MR. ████████:

9        Q    It sounds like at this time -- do you know who was Attorney General at this

10    time?   Had Attorney General Barr left yet or was he still Attorney General?

11       A    General Barr announced his resignation the day before I showed up for duty

12    on the 15th.

13       Q    Okay.

14       A    I believe the General's last date was the 23rd.

15       Q    That's right.

16       A    The only conversations I recall referenced General Rosen as the ultimate

17    decisionmaker.   I don't recall any conversation where it was referring to something that

18    General Barr was not doing.

19       Q    Uh-huh.

20       A    And also, the conversation about the idea of Mr. Clark becoming the Acting

21    Deputy had to have taken place after Mr. Rosen had succeeded to be the Acting AG,

22    because until that moment you have a Senate-confirmed Deputy AG, so it had to have

23    been after that moment.

24       Q    Okay.   So the chances are that this conversation you are describing with

25    Mr. Clark in which do all you can for your client related to the elections was after General

1    Barr's resignation?

2          A    And to even put dates on it.

3          Q    Yeah.

4          A    It would have had to have been.   It would have had to have been.   I don't

5    even know if I was in the office on the 24th, but I know I was not on the 25th.   It would

6    have had to have been either the 23rd, 24th, 26th, or 27th, because I know it was before

7    the 28th.

8          Q    Got you.

9          Now, when Attorney General Barr several times very publicly stated that the

10   Department had looked and had found insufficient evidence of voter fraud sufficient to

11   undermine the confidence in the outcome, he said it on December 2nd and he said it

12   again at a press conference, I think it was the 21st, a few days before he left.

13         So the position of the Department, as articulated by the Attorney General, was,

14   hey, we looked and we haven't found it.   Do you remember that coming up in the

15   conversation with Mr. Clark?

16         A    I do not.   My only knowledge on that, that I recall, is from just news stories

17   that I would see or later when I read of the Senate Judiciary Committee report from this

18   past October.

19         Q    Okay.

20         A    I don't recall being told anything within the scope of my DOJ employment.

21         Q    So when Mr. Clark says more could be done, was there any reference to

22   Barr's conclusion that we didn't find -- we looked but didn't find sufficient evidence to

23   undermine confidence in the election?

24         A    I don't recall any comments that specified whether these were things that he

25   thought that General Barr should have done or things that Mr. Rosen should have done.

1    This would have been so soon after Mr. Rosen had taken over as Acting Attorney General

2    that, I mean, how can you comment on the past 6 hours of what, you know, of what a

3    department of over 100,000 people are doing.

4            So the sense that I had from it is that it would have referred to the Department's

5    activities, you know, more than -- going back more than a couple days.    So I think it

6    would have spanned both.

7        Q    I see.

8        Mr.␀␀␀␀␀␀  Okay.   Thanks, ␀␀␀␀␀

9            BY MR.␀␀␀␀␀

10       Q    Moving on a little bit, there have been reports of a meeting at the White

11   House on December 21st, so shortly after you started at the Department, and the reports

12   are that it was with Members of Congress, the President, Representative Perry, including

13   Jim Jordan, Representative Biggs, Brooks, and a few others.

14           Do you know whether -- do you know anything about that meeting?

15       A    I knew nothing about it at the time.    If it is mentioned in the Senate

16   Judiciary Committee report, I would have read about it there.

17       Q    Okay.   So --

18       A    I don't know if there was any prior news story where I would have seen a

19   reference to it.    But I don't recall knowing anything about any such meeting during the

20   timeframe that we're discussing.

21       Q    You didn't go to a meeting like that at the White House?

22       A    Most certainly not.

23       Q    Okay.   Did Jeff Clark say anything about going to a meeting at the White

24   House with Members of Congress?

25       A    I don't recall a meeting with Members of Congress.   He did reference that

1      he had been -- I think he said that Congressman Perry was present at a meeting at the

2      White House.    That was said.

3            Q      Okay.

4            A      But I don't recall a reference to whether there were other Members of

5      Congress present.

6            Q      Fair enough.    What do you remember about that conversation?

7            A      It was just that Mr. Clark was talking about what more the Department could

8      be doing.

9            Q      And how did that relate to the White House?    What did he -- how are the

10     two linked?

11           A      He didn't connect the dots.    So I don't know if it was a briefing or a debrief

12     or -- I don't know what the substance of the conversation is.    It's when he would say

13     that, and with me not having, with this not part of my job and this isn't anything I'm

14     working on, this felt so far above my pay grade that I don't recall asking any follow-up

15     questions.

16           I may have expressed, I don't know if I gave voice to any of the thoughts that I had

17     in terms of, wow, that sounds extraordinary, or something like that, or that sounds big, or

18     if I just kept my mouth shut entirely.    I know I was certainly thinking it.

19           But, again, brand-new boss.    And I'm like and this has nothing to do with

20     anything I'm doing, so it's just wow.    And that was that.    I did not probe or anything.

21           Q      You seem pretty good with dates.    Do you know roughly when this

22     conversation with Jeff Clark took place?

23           A      Whew.    I don't.    And I do try to be good with dates.    And I'm trying to tell

24     you every fact I can recall into making this as precise as I can.    I don't.    It had to have

25     been one of those four dates, though, for certain.    I mean, it's --

1      Q    Those dates being the 23rd, 24th, 26th, or 27th?

2      A    Yes.

3      Q    Okay.

4      A    Yes.   Mr. Rosen was running the Department when we had these

5 conversations, it was not when General Barr was still there, to the best of my recollection.

6      Q    What else do you remember him saying about that meeting at the White

7 House?

8      A    Whether it was that meeting or another meeting, I don't know if he was

9 asked or if he had offered it.   But whoever raised it and whatever the back and forth

10 was, it was making the President aware that if he were to change the leadership structure

11 of the Department, then the Department might be able to do more in this space.

12      Q    And in this space, just to be clear --

13      A    In the topic we're discussing about what the Department is doing vis-à-vis

14 the aftermath of the 2020 election.

15      Q    Okay.

16      A    What the Department is investigating or doing.

17      Q    Do you remember if Jeff Clark said anything else about that meeting?

18      A    Not that I recall beyond -- and I don't know if there was more than one

19 meeting, I don't know if these were references to one or more than one.   He did say that

20 it was in the residence.

21      Q    The meeting --

22      A    Because I recall responding I have never been in the residence of the White

23 House.   I imagine it's pretty nice.   So I recall responding to that effect.

24      Q    Okay.   And is that the meeting -- and I'm just making sure I have it right in

25 my mind --

1       A    Sure.

2       Q    -- that Representative Perry came up, or was he there as well?

3       A    I'm not sure.    My -- I'm not sure.

4       Q    Okay.

5       A    I don't recall whether it was said that Congressman Perry was in that

6    meeting.

7       Q    Okay.    So this happened in the residence, talking about potential change of

8    leadership at the Department and how it could affect election-related issues

9    post-election.

10      A    Yes.

11      Q    Anything else?

12      A    I'm racking my brain to see whether he said that Congressman Perry was

13   there for that particular exchange, and I don't recall whether that was the case.

14          I do recall him mentioning that the Congressman being there for a meeting with

15   the President.    I don't recall if it was this meeting or if there was more than one, and if

16   that one was in the residence.

17          And in terms of the substance of what was conveyed, I can't recall anything more

18   at this moment.

19      Q    Okay.    And you're having this conversation with Mr. Clark.    Was that at

20   the Department, one of these face-to-face --

21      A    Yes.

22      Q    -- check-ins?

23      A    Yes, sir.

24      Q    Okay.    Was there any ask or expectation or even just setting of goals that

25   resulted from this or in this meeting?

1    A    Involving me?

2    Q    Yes.

3    A    No.

4    Q    How about involving him?    Did he say, "I'm now going to do something"?

5    A    No.    Not that I recall.

6    Q    Okay.

7    A    I know I wasn't asked to do anything.

8    Q    Okay.

9    A    And I don't recall him saying anything that he was going to do in pursuit of

10   what was -- of what had been discussed.

11   Q    Okay.    Did he offer any ideas about what the Department could do other

12   than just, "I would do more if I was Deputy"?

13   A    He did mention -- I can't remember if this was in the same conversation or

14   not -- he did mention we could have agents seize certain machines and examine those

15   machines.

16   Now, I'm not sure what machines were being referenced and I'm not sure what

17   the examination would be.    I can't remember whether he specified the component,

18   whether it would be FBI.    That's the only specific that I can recall.

19   Q    And did that comment seem related to the meeting that Mr. Clark had in the

20   residence?

21   A    I'm not sure that he said that there was any -- I don't recall him saying that

22   he had provided any specifics to the President about what he thought the Department

23   could do but was not yet doing.

24   Q    Okay.    And the reason I ask is there's a December 18th or 19th meeting

25   that's been reported about the White House and Sidney Powell and Michael Flynn, Patrick



1    Byrne, and a few others being present where a topic like this came up as well.    Do you

2    remember Mr. Clark saying that any of those people were at a meeting as well with him?

3         A    Not that I recall.

4         Q    Okay.

5         A    I don't recall him ever meeting.    And can you list those names again so that

6    I can go one at a time?

7         Q    Of course.    So Sidney Powell?

8         A    I do not recall him saying that he was ever in a meeting with Sidney Powell.

9         Q    General Michael Flynn?

10        A    I don't recall him ever saying he was in a meeting with General Flynn.

11        Q    Patrick Byrne, who is the former Overstock CEO?

12        A    I'm not even sure I know who that is.    I don't recall him ever saying that he

13    was in a meeting with that gentleman either.

14        Q    Mike Lindell?

15        A    I do not recall him ever saying he was in a meeting with Mr. Lindell.

16        Q    Okay.

17        Mr.            And do you have anything further on this?    Okay.

1

2          BY MR. ██████

3          Q    So during your time at DOJ it sounds like Mr. Clark had contact with the

4    White House and the President.    Did you have any contact with the White House?    And

5    let me define that as West Wing, the President, or OVP, the Vice President?

6          A    I have friends in OVP, people that I have worked with at other organizations

7    previously, social friends.    And so whenever -- I went back to the White House several

8    times for Christmas parties, for going away parties, for happy hours.

9          Frankly, there were very few people at DOJ.    There wasn't much of a social

10   dynamic.    Now, I was working long hours anyway so there wasn't much time for

11   socializing.    But I figure we're all out of a job in a few weeks and I miss my friends there.

12          So I would typically go back for OMB-related social events, and the OVP offices are

13   immediately adjacent to OMB on the same floor, on the second floor.    So when I would

14   be in the hall, I would typically walk down to see whether Dr. Teller or any of the other

15   several people that I knew, and I knew several.    I'm from Indiana, so it's -- so I've known

16   some of Vice President Pence's people going back years.

17          Q    Okay.

18          A    And so but only that social dynamic.

19          Q    Okay.    No official dynamic?

20          A    Correct.    Correct.

21          Q    No campaign-related dynamic?

22          A    We could just as easily have gotten together at a bar.

23          Q    Okay.

24          A    Now, in the course of all that, I mean, everyone is talking about the fact that

25   it looks like a job is gone.    I mean, it's -- there would typically be -- the idea of ongoing

1    lawsuits and efforts would be -- were typical social topics of conversation, but not -- but

2    it's -- it's -- but, I mean, it's people talked about things over snack food or a water.

3         Q     Okay.   So Mr. Clark is having these meetings, communications.   Did he

4    ever raise the issue of the White House contacts policy, where DOJ really isn't supposed

5    to overlap too much with the White House, and to the extent there is overlap it's at the

6    very highest level?

7         A     It only came up once --

8         Q     How?

9         A     -- though not in the -- not with the kind of formal -- not put in the context of

10   a structure as you just laid it out, which I have subsequently read about in the Senate

11   Judiciary Committee report.

12        The way it came up was this.   He had mentioned that Mr. Rosen had called him

13   and said, "Have you spoken to the President?" and that he said, "I told him yes."   And he

14   had said, "You're not supposed to do this.   You know, that's not for you to be doing."

15        And the word "policy" may have been said in that context, I don't know.   It was

16   either policy or some synonym of policy, like that's not the rules, or that's not the

17   process, or that's not the policy, or whatever.

18        And Mr. Clark said that he responded, "Well, I didn't initiate the phone call.   And

19   if the boss calls" -- now, I don't know, what I'm about to say, I don't know if he was saying

20   this to me or if he is repeating something he said to Mr. Rosen, he didn't make clear.   He

21   said, "Look, DOJ" -- and I don't know if he said policy, or procedures, or rules, I don't know

22   what, I will use policy as a default, because I don't know if that was the precise word.

23        Q     Okay.

24        A     He said, "DOJ policy is set by the Attorney General.   The Attorney General is

25   subordinate to the President.   If the President chooses to call one of his political

1   appointees, I don't think that the Attorney General or any Cabinet officer has the

2   authority to tell a fellow appointee not to answer the boss' phone call."

3          So I'm paraphrasing, but that was the substance of what he said.   So there was

4   not a formal policy described, as I later read about in the Judiciary Committee, about

5   these are the people who can talk, this is how it goes.   None of that was explained.   It

6   was just that one instance.   So it was a fact-driven thing he was responding to when he

7   said that to me.

8          Q      Okay.

9          A      Does that fully answer your question?

10         Q      Yes, it does.   I'm going to drill down a little bit on it.

11         Do you remember when that happened?   The reason I'm asking for context --

12         A      Yes.

13         Q      -- is that there are reports, information about a meeting on Saturday or a

14   phone call on Saturday the 26th or thereabouts.

15         A      Well, Mr. Rosen was definitely in charge at that moment.   The conversation

16   would have been nonsensical otherwise.   So this is definitely 23rd or after.   And I was

17   not there on the 25th.   And the 26th was a Saturday?

18         Q      That's right.

19         A      I was not there on the 26th either or the 27th.   I actually never looked at

20   my calendar as to where the weekend was there.

21         So if this was not -- it couldn't have been the 28th -- -- or could it have been the

22   28th?   I mean, it had to have either been the 24th, if I was in the building.   And I think I

23   was.   I think it was like a half day or so.   No, no.   President Trump issued an executive

24   order saying that the Christmas holiday would be extended to the 24th.

25         DOJ will have records of what days I was there.   I don't know if I was in the

1    building on the 24th, or if I was just working remotely, or, frankly, just literally taking the

2    day off, maybe just studying my -- I didn't take a single day off.   I was getting ready for

3    these oral arguments.

4          So then this could have been -- this could have been the 28th.   23rd or the 28th

5    are the only days I can -- I'm curious if I was there the 24th even if it was a holiday.   I just

6    don't know.

7          Q    Did Mr. Clark tell you this in person or over the phone?

8          A    Definitely in person.

9          Q    Okay.

10         A    Yes.   I remember the face-to-face exchange.

11         Q    And it was about a meeting that he had had or a call he had had with Acting

12   Attorney General Rosen?

13         A    Yes.

14         Q    Okay.

15         A    And I don't know if it was a meeting or a call.   I don't recall if he specified

16   that.

17         Q    But it was Rosen as opposed to Donoghue?

18         A    It was Rosen.   It was Rosen.   Yes, it was Rosen, I'm certain of that.   Or I'm

19   certain that that's what he told me.   I have no firsthand knowledge of the exchange, but

20   that is certainly what he told me.

21         Q    Did he seem frustrated when this issue about the White House contacts

22   policy or this policy came up?

23         A    He expressed that Mr. Rosen was frustrated.

24         Mr. Clark has a very low key personality.   So I'm not sure how often I saw him

25   frustrated.   He's a very mellow individual, almost professorial.   So I would say he

1    didn't give -- I didn't pick up on any indication of frustration, but he was a low key enough

2    personality that he could have been frustrated and just wasn't showing it.

3           Q      What else did he say about that meeting that he had -- or call had he had

4    with Mr. Rosen?

5           A      He said that Mr. Rosen had told him don't do that again.

6           Q      And his response was that, "If the President calls me, I'm going to answer it,"

7    more or less?

8           A      More or less.   I don't know if the exact word choice was like you have to

9    answer, if the President calls you have to answer.   So I don't know his exact word choice,

10   but more or less, yes.

11          Q      Okay.   Anything else from that that you recall about that call or meeting

12   with Mr. Rosen?

13          A      Not that -- not that I recall.

14          Q      Okay.   All right.

15          So I'm going to move on to December 28th.   I think we finally reached

16   there.   Actually, you know what, I'm doing to back up for one moment.   We just talked

17   about a series of dates, that you weren't in the office on the 24th because of the

18   Christmas holiday, you think.

19          A      Right.   I'm not sure.   I know it was declared to be a holiday.

20          Q      Okay.

21          A      I don't recall whether -- if I was there, I left early, but I don't recall if I was

22   there.

23          Q      Okay.   And then the 26th and 27th were the weekend.   Do you remember

24   working at DOJ over the weekend?

25          A      I was definitely not at DOJ on either of those days.

1     Q     Okay.   So that leaves the 23rd as the possible face-to-face with Mr. Clark

2     about the residence remaining?

3     A     23rd or early on the 24th, if I was there.   Again, I don't know, but DOJ will

4     have those records.

5     Q     Okay.

6     A     Or -- and then the next date is the 28th.   It was definitely not 25th, 26th, or

7     27th.

8     Q     Okay.   All right.

9     So let's go to the 28th.   And I'm going to have you turn to exhibit No. 2 in the

10    binder.

11    A     Just one moment.

12    Q     Sure.

13    This is an email.

14    A     Yes, sir.

15    Q     From Kenneth A. Klukowski (CIV).   I assume that's you.

16    A     Yes.

17    Q     To Jeff -- Jeffrey Clark (ENRD).

18    A     Yes.

19    Q     I assume that's the Clark we've been talking about.

20    A     Yes.

21    Q     The subject:   "email to you."

22    A     Yes.

23    Q     Attachment:   "Draft letter JBC 12 28 2020."   And then just in the body a

24    single word, "Attached."

25    A     Yes.

1        Q    All right.   Why did you send this email?

2        A    The -- this is the letter -- I'm sure we're about to talk about the letter -- this is

3    the day that I was drafting the parts of the letter that I drafted.   And for several hours

4    during that time there were problems with the Civil Division's email system.

5            Evidently, Civil Division has actually a separate email system.   I don't know if

6    other components also have their own separate thing.   But it is not like one DOJ system

7    that's either up or down.

8            And so, it's -- so I was -- had been unable for several hours to communicate by

9    email.   And so, I sent it, but Mr. Clark's ENRD address -- because he was still the head of

10   that division simultaneously -- that was working fine.

11           And so I was trying to send a test email to see if I could now send the letter I

12   currently had, to say whether I -- to see whether I could successfully send it to him by

13   email.   So that was me emailing it to his non-Civil, but still official DOJ address to see

14   if -- to see if it would -- if it would go through.

15       Q    Did he ask you to send this draft letter to him?

16       A    We had -- there had been a couple times -- so yes, yes, it was -- I was

17   working on this, and then I was to send it -- send it to him.

18       Q    Did he say he needed it for a specific purpose?

19       A    Yes.   He said that -- he had referenced -- he had referenced in these various

20   meetings, but including when I -- when I -- my standard -- the standard format for my

21   work at DOJ was each morning I would go down to Mr. Clark's office to get what my

22   assignments were for the day.   And, again, this is a little out of sequence.   But at

23   the -- this was my work assignment for the day.

24           And so, he had said -- he had referenced previous to that day that I knew there

25   were ongoing conversations between him, Mr. Rosen, and Mr. Donoghue regarding the

1    whole topic of the 2020 election.    And he said that I would assist in drafting this letter.

2    It was going to be a letter that Mr. Rosen, Mr. Donoghue, and he were going to sign and

3    that the meeting would be that evening.

4         So it was -- my task for the day was to work with him to prepare this letter for

5    their joint signatures, their three signatures.

6         Q    Okay.    So when you're sending this at 4:20 p.m. to Mr. Clark, is that you just

7    finishing the task for the day and sending it off?

8         A    Yes.

9         Q    Okay.

10        A    Yes.    I don't know, unless there was a later email between that and the end

11   of the day.    This is the time of day, between 4 and 5, is typically when I would report out

12   my work product.

13        The work product would normally be a recommendation on a package where I

14   would go down, brief him in person, he would make a decision off that.    But in this case

15   it was a document.    It was something he needed the file to.    And so I emailed it.    This

16   would be the time of day when I did that.

17        So if the email log does not show any subsequent email, then, yes, that would

18   have been sending that.

19        Q    When was the first time you found out that you'd be writing a -- or drafting a

20   letter like this?

21        A    That morning, when he --

22        Q    So the 28th?

23        A    Correct.    The morning of the 28th.

24        Q    And did he give you any context other than, "I'm having these conversations

25   with Mr. Rosen and Mr. Donoghue"?

1          A      No, out of the blue.

2          Q      Did this surprise you given the fact that election-related stuff is not in the

3     Civil Department -- Civil Division wheelhouse?

4          A      I was -- I was --

5          Mr. Greim.    You can answer.

6          The Witness.    I was shocked for two reasons.

7                 BY MR. ██████:

8          Q      Okay.

9          A      First of all, because election-related matters are not part of the Civil

10    portfolio.    The second is it's December 28.    You've got New Year's Eve coming, you've

11    got New Year's Day coming.    We're talking about Georgia?    Georgia has a special

12    election on January 5.    And then Congress meets on January 6.    What could you

13    possibly hope to accomplish at this late hour?

14            Now, I don't know if I -- I wouldn't have known how to communicate that in a way

15    that doesn't sound insulting, maybe even insubordinate.    So I don't know if I verbalized

16    anything about how surprised I was.    But I was stunned.

17         Q      So you said you don't know.    Do you think you said something, even if not

18    in the words you just used?

19         A      I'm trying to constrain -- to control myself as much as possible.    I don't

20    know.    If I did, it would have been very short and with as calm of -- something like,

21    "Well, that sounds extraordinary," or something like that, but nothing to convey what

22    could possibly -- I used to work at a State legislature.    And I had never heard, when

23    Mr. Clark would talk about his background, I never heard that he had.

24            I used to work at the Arizona State Senate.    I know how the State legislative

25    process works.    This legislature is not even in session.    And this is during the holiday

1    season when I know from my own personal experience legislators are typically on travel

2    with their family at the time.    What could you possibly hope?    What's the end game?

3           Q      Let me ask you, did Mr. Clark say --

4           A      He --

5           Q      -- what he hoped to accomplish?

6           A      He -- sorry, ma'am.    I get animated about this revisiting it.

7           He did not.    And as I was working on this through the day, I kept wondering,

8    what in the world?    Because among other things, given the current electoral college

9    count, even if something could happen with Georgia, it's still the same outcome for the

10   election, you're just changing the number.

11          So I -- so, no, it was not explained to me.    And it's -- at some point during the

12   day, I don't recall if it was this initial meeting, at some point in the day he had said, you

13   know, "And a similar letter could be sent to other States as well."

14          Q      Did he say what those other States would be?

15          A      I don't recall if he did.    I don't recall if he did.    Of course I had worked on

16   the campaign.    And even though I didn't have much time, I did consider to see the -- I

17   did continue to see the news.    And, you know, and I would -- and I -- I was aware of

18   other lawsuits in other States.

19          And so it's -- he wouldn't have had to tell me what States.    If you were sending a

20   letter like this, and if you were to ask what States are similarly situated to Georgia, I could

21   have a guess as to what those States were.    I don't recall if he had said that.    But in my

22   mind, it was adding one level of impossibility after another, because I wasn't drafting

23   anything for any other State.

24          So it was, okay, this is the 28th, you've -- you can already almost --- you can count

25   on your hands the number of days between this and January 6th.    You're talking about

1    drafting.    I don't know if he was talking about drafting a similar letter on future days

2    when you would even have fewer days.    So I just -- he didn't.

3          Mr. Greim.    I just want to tell the witness, you know, in a deposition they'll ask a

4    question, you should fully answer it, but, you know, only ask the question -- answer the

5    question asked.

6          The Witness.    Understood.

7          Mr. Greim.    Because when you add in all these other comments, I mean, they

8    decline probably in usefulness to the committee and then you won't get done today.

9    I'm sure they appreciate it, but just try to answer that.    And if they have a follow-up,

10    they'll ask you that.

11          The Witness.    I will focus on that.    I'm trying to answer fully, but I certainly don't

12    mean to drag things on.

13          Mr. ███████    And we appreciate that.

14              BY MR. ███████

15          Q    So when Mr. Clark gives you this assignment, what does he tell you?    What

16    are his expectations?

17          A    Okay.    Could we turn to the letter?

18          Q    Sure.    And that's exhibit 3.

19          A    Right.

20    Okay, he said --

21          Q    Or, I'm sorry, it's the continuation of 2.

22          A    Okay.    He said we're going to be drafting a letter.    So I don't know if he

23    used the word memo, but it would essentially be a legal memo in letter form, though I

24    don't know if he formulated it that way or if that's just what I said to myself.

25          He said it would be addressed to the Governor, the Speaker of the House, and the

1    head of the Senate, that I was to research who those individuals were and get their -- and

2    look up what would be appropriate contact information.

3         And then he ran through the points that he wanted made -- the points that he

4    wanted made.    He said that the first paragraph was going to say that the Department is

5    investigating various irregularities in the 2020 election, that the Department -- I mean,

6    like the first -- the first sentence there, I mean, I just wrote on to a note pad and typed up

7    exactly what he said.

8         Q    Okay.

9         A    The second sentence, same thing, though he edited the document

10   afterwards.    I -- this -- I wrote something similar here.    I don't know if he modified the

11   wording, but the substance is the same, just the Department will -- will advise you or

12   update you or report to you regarding what we find here.

13        Now, the word like -- third sentence -- "no doubt," I didn't write that.    That was

14   inserted after the fact.

1

2          [12:49 p.m.]

3                    BY MR. ███████

4     Q     And --

5     A     Yes.

6     Q     -- we'll get into the very specifics.

7     A     Okay.   Yes, sir.   You want me to go more general?

8     Q     Yeah.   Like what he told you --

9     A     Gotcha.

10    Q     -- before you started drafting?

11    A     Gotcha.   He told me the contents of the beginning.   And then he said, Pull

12    up the statutes and relevant cases for the casting of ballots for the electoral college, the

13    authority and prerogatives of State legislatures, what power they have under the electors

14    clause of Article II.   And he said, Mention what happened in Hawaii in 1960, which I had

15    to look up after the fact.   I did not know when I was given the instruction what had

16    happened in Hawaii in 1960.

17         And -- and then he said -- he said -- he said, Reference what's going on with the

18    election litigation in Georgia.   He said, Get the docket number, confirm the procedural

19    posture of the case.   The -- get the relevant dates, find out what's going on with that

20    case.

21         He said, Then -- then unpack the authorities under Article II.   He said, You know,

22    go to Bush v. Gore, look at the cases cited there.

23         And then -- and then he virtually -- he essentially dictated the next paragraph

24    saying what the purpose of the special session would be, though it -- though I think that

25    wording has been modified, but the substance is there.

1          And then he said, And -- and then add that, if the Governor does not call them into

2     special session, lay out an argument as to how they have the authority to call themselves

3     into session if the Governor won't do it.    And I think -- and we talked about that for a

4     moment then.

5          And, see, what I wrote was much shorter than this.    He added a lot of stuff.

6     The -- let me see.    One moment.

7          And -- and that was it.    He said, And then -- and then he says, Write three

8     signature blocks for that, General Rosen, Mr. Donoghue, and me.

9          And he said, And let's have it ready before close of business, because I'm going to

10    have a meeting with Rosen and Donoghue.    It's at close of business, and I want the letter

11    ready for signature by that time.

12        Q    Okay.    So, to unpack some of that, it sounds like --

13        A    Yes.

14        Q    -- Mr. Clark laid out an outline --

15        A    Yes.

16        Q    -- of what actually became this letter?

17        A    Correct.

18        Q    Was there anything that he told you to do that didn't end up in this letter?

19        A    No, not that I recall.    Nothing.

20        Q    Did you add any other sections or arguments that he didn't recommend to

21    you?

22        A    No.

23        Q    Okay.

24        A    He told me what the arguments were.    The -- the bottom line -- the black

25    law argument.    I was to go find the case law authorities to substantiate and flesh out

1    that argument.

2         Q    So he gave you structure.   You filled it in?

3         A    Correct.

4         Q    Okay.   All right.   And, with respect to the people who would be signing

5    this, was it your understanding when you got this assignment that General Rosen, Deputy

6    Donoghue, and Mr. Clark had all agreed to this conceptually, and this was just putting pen

7    to paper, or did you understand this to be, I'm going to present this to them for their

8    consideration?

9         A    A version of the second, but -- but I didn't know until I read the Senate

10   Judiciary Committee report that there had been no groundwork laid for this.   So I didn't

11   know -- my guess coming off it was, okay, they were -- they were -- they were shooting

12   back and forth ideas, and now -- and now Mr. Clark was going to actually come up with

13   what he was proposing to say, okay, now here's -- to -- I mean, to characterize it, like,

14   okay, that I said we should do a letter.   Here.   This is what I've talked about.   We

15   should send this out.

16        I didn't know until I read the Senate Judiciary Committee report that -- that, when

17   they first saw this, that evidently there had been no previous conversation about even

18   contemplating something of this nature.

19        Q    Okay.   And I think one of the things that you said was that Mr. Clark went in

20   and filled in additional information --

21        A    Yes.

22        Q    -- that you didn't originally write.

23        Quickly, I'd like you to turn to exhibit 15.

24        A    1-5?

25        Q    Correct.   This is a document that you produced to the --

1     A    Yes.

2     Q    -- select committee.

3     A    Yes.

4     Q    Is this the version that you wrote?

5     A    No.

6     Q    No?

7     A    I know this is further modified from the one in version 2.

8     Q    Okay.    And we'll get back to that, then --

9     A    Yeah.

10    Q    -- in a little bit.

11    A    Shall I go back to 2?

12    Q    Yes, please.

13         Mr. ████    Before we get off the general idea of the letter, because that was

14    assigned to you, Mr. █████?

15         Mr. █████    No.    I'm all right.    Thank you.

16         Mr. █████    Okay.

17    Mr. █████    No.

18         BY MR. █████

19    Q    All right.    So, looking at the letter, did Mr. Clark, in assigning it to you, say

20    that anybody else had requested this, like this is a request from the boss, meaning the

21    White House?

22    A    No, he did not.    Not that I recall.

23    Q    None at all?

24    A    Correct.

25    Q    Okay.

1          A      It sounded like an idea that he had.    The only question I had is what -- is

2     how it -- whether it had came up, and, in fact, I thought -- I was assuming it had come up

3     in a previous conversation with Mr. Rosen and Mr. Donoghue, that he was proposing

4     something -- putting flesh on something that had just been perhaps a passing idea or

5     whatnot.

6          Q      And did you have any assistance writing this?

7          A      No.

8          Q      Okay.    Other than Mr. Clark, who knew that you were drafting this?

9          A      No one that I know of.

10         Mr. Greim.    Counsel, before we go further, I'll ask it now so we don't screw up

11    your next line, but -- so we've got exhibit 2 as a cover -- a covering email, and then

12    some -- it sounds like now some version of the letter.    Is the exhibit that's -- is the letter

13    that's attached to this the draft letter attached to the email?

14         Mr. ███████    As relayed to the committee, this is the attachment to the email.

15    The Witness.    This is my recollection.

16         Mr. █████    Okay.

17                BY MR. ██████

18         Q      So this is the version that you sent to Mr. Clark, just to put a finer point on

19    that, of exhibit 20?

20         A      It is.    He had added stuff in during the day.    He had gotten an earlier

21    version, added stuff in, because, in -- and I'm happy to point out the items that I know I

22    did not write and didn't even know about.    And then -- and then I continued adding to

23    it --

24         Q      Okay.

25         A      -- and then sent it back.    So it was a work in process.    We met multiple

1    times through the day on it --

2        Q    All right.

3        A    -- between my morning meeting and the end-of-day report.

4        Q    Okay.    So, actually, you know, before we get to the substance, then, in

5    these multiple times you met with him -- maybe we can start with the first time you met

6    with him after the assignment comes in.

7        A    Sure.

8        Q    What were his comments?    What did he say?

9        A    Just along the lines of -- I don't recall specific.    It was, Good start, and

10   then -- and then just had a number of nits, with part of it being -- I don't even recall -- I

11   don't even recall if he had me make additional changes before -- before he made his

12   changes, or if it was -- or if he took it and then made the changes himself, and then -- and

13   then everything I did was on -- when I had -- when I had it back from him, and then a list

14   of additional things to flesh out.

15       Like I recall one of them was cite checking, but that being like towards -- towards

16   the end.

17       Q    Normal editing type stuff?

18       A    Correct.

19       Q    Okay.

20       A    Yes.    Yes.

21       Q    But he was very involved in how this letter was shaping?

22       A    Oh, very much so.

23       Q    Okay.    All right.    So, at the beginning -- and you already referenced this,

24   but you wrote -- and Mr. Clark may have edited it, but that DOJ is investigating

25   very -- various irregularities in the 2020 election for President of the United States.

1        Now, generally, DOJ doesn't talk about ongoing investigations.   Why start a letter

2    like this?

3        A     First of all, I didn't even know -- even though I could not recall DOJ saying

4    things like that, I didn't even know that that wasn't something that would normally be

5    said.   That's something I didn't even know.

6        Second, I had no knowledge of any investigation that was going on.   I was

7    surprised by it.

8        Q     So this was strictly something he, Mr. Clark, told you to include?

9        A     Yes.   He told me that that was going to be the first sentence.

10        Q     And you were not aware of any investigations at that point about election

11    irregularities?

12        A     I thought there were no investigations going on.

13        Q     Okay.

14        A     To the best of my -- I did not know of any.

15        Q     Okay.   And then the next couple lines down, it says, We have identified

16    significant concerns that may have impacted the outcome of the election in multiple

17    States, including the State of Georgia.

18        As you're drafting this letter, do you know what those concerns were in Georgia?

19        A     I did not.   I just kept telling myself, this -- I guess this shows that this is not

20    part of the Civil Division.   These investigations must be someone else, because I have

21    never heard anything about any of this.

22        Q     And you hadn't seen any actual evidence to that point about

23    these -- whatever these irregularities or issues are in Georgia when you were drafting

24    this?

25        A     I had seen no evidence.

1          Q     Did Jeff Clark ever show you any evidence, or discuss specifically evidence

2 about the irregularities that are referenced here, or concerns?

3          A     Not that I recall.   I mean, it's -- not that I recall.

4          Q     Okay.   And then, later in that paragraph, it says, No doubt, many of

5 Georgia's State legislators are aware of irregularities sworn to by various witnesses, and

6 we've taken notice of their complaints.   See, e.g., a standing -- a subcommittee of the

7 standing Senate Judiciary Committee of testimony from a State senate hearing, and then

8 a reference to the tennesseestar.com.

9       Did you find those references?

10         A     Starting with the words no doubt, I didn't write any of that.

11         Q     Okay.

12         A     Now, I -- I don't know if I had any version of that first sentence, but I never

13 looked up any -- any hearings.   I didn't put any URLs, any web addresses in there.   But

14 the rest of that paragraph is -- that's not me.

15         Q     Okay.   And are you aware if Jeff Clark had any other evidence aside from

16 these two things that are referenced about irregularities in Georgia?

17         A     I am not aware.

18         Q     Okay.   And you did not have any evidence --

19         A     No.

20         Q     -- beyond that?

21         A     No.

22         Q     Okay.

23         A     It's -- and, to be clear, I'm talking about, like, within my context of my DOJ

24 employment.   I mean, I would see news reports of people, you know, alleging things in

25 lawsuits and whatnot.   But, no, within the scope of DOJ employment, I had no

1    knowledge of any investigation.    I had no evidence within -- within the scope of that,

2    et cetera.

3         Q     Okay.    Now, this is identified as a proof of concept letter at the -- or just

4    says Georgia proof of concept, and you had mentioned potentially sending this or that

5    Mr. Clark indicated he wanted to send this to other States as well.

6              Did you ever learn what those other States might be?

7         A     First, I did not type the words, Georgia proof of concept, so those words had

8    to be inserted by Mr. Rosen.    I -- I did type the rest of the header.    I typed the

9    predecisional, deliberative, attorney-client or work product, or legal work product.

10   That's what I wrote.    He inserted the line under that.

11             Could you repeat the question?

12        Q     Yeah.    Did you ever learn what the other States might be where a letter like

13   this would be directed?    And that was a bad asking of a question, but let me -- let me

14   start over.

15             This is -- this is a proof-of-concept letter that seems to suggest it might go to other

16   States as well.

17             Did you ever learn what those other States might be?

18        A     I don't recall if he told me or if it was just my background knowledge with

19   ongoing election challenges that I -- that -- it would be speculation.    I don't recall him

20   providing the list.    I had the sense of -- I had my own sense of what those other States

21   would be, but I don't recall whether he said them, or whether I asked about it, because I

22   kept thinking about what are you going to do with this?

23        Q     Okay.

24             BY MR. ███████

25        Q     Just ask a clarifying question.    You mentioned you thought Mr. Rosen had

1        inserted Georgia proof of concept.    Did you mean, Mr. Clark?

2              A     Oh, I'm sorry.    Did I say Mr. Rosen?

3              Q     I think you said Rosen.

4              A     I misspoke.    I meant Mr. Clark.    I apologize.    Yeah.    I want to be very

5        clear on that.

6              Mr. ███████.    Thanks.

7              The Witness.    I don't even know what that phrase means, necessarily.

8              Mr.███████.    Okay.

9                    BY MR.███████

10             Q     Okay.    And were you aware at this point -- and this may go back to a

11       question that Mr. ███████ asked you -- that, you know, by this point, Attorney

12       General -- then-Attorney General Barr had said they looked into election issues and found

13       no evidence of widespread fraud that would affect the election, and that the U.S.

14       attorney in Georgia, B.J. Pak at the time, had looked into election issues and had nothing

15       to report.

16             Mr. Greim.    Objection.    Compound question.

17             Mr.███████.    Okay.

18                   BY MR.███████

19             Q     Were you aware --

20             Mr. ███████    Are you directing him not to answer that question?

21             Mr. Greim.    No, no, no.    I mean, at a deposition, if there are -- I mean, we're

22       trying to kind of keep it free-flowing here, but, if there are problems with the form of the

23       question, he's providing evidence, you know, sworn testimony.    I'm going to raise those,

24       and it's up to you to either decide to change the form of the question or to stand on it.

25       But I'll -- I'll say if I tell him not to answer.

1          Mr. ████      Okay.    Thank you for clarifying that.

2          The <u>Witness.</u>   Could you?

3          Mr. ████      Yeah.    So let's go back.

4          The <u>Witness.</u>   Can you repeat the question?

5          Mr. ████      Let's do it one by one.

6                 BY MR. ████:

7          Q     At the time you drafted this, were you aware that the Attorney

8     General -- former Attorney General, had come out and said there is no evidence of

9     widespread fraud in the election that would change the outcome?

10         A     Yes, only from the news stories that -- that were publicly available that I had

11    seen, just as a consumer of the news.

12         Q     Okay.    And were you --

13         A     Nothing through official channels.

14         Q     Okay.    Were you aware that the U.S. attorney in Georgia had looked into

15    issues related to election irregularities and found nothing of significance?

16         A     I cannot recall whether I had seen a news story about that, so I -- so I -- I

17    don't recall whether I saw something specifically about the U.S. attorney for the Northern

18    District of Georgia.

19         Q     Okay.    All right.    So one of the things you also say is, the top of page 2, the

20    Department recommends that the Georgia General Assembly should convene in special

21    session so that its legislators are in a position to take additional testimony, receive new

22    evidence, and deliberate on the matter consistent with its duties under the U.S.

23    Constitution.

24               Who, to your knowledge, in the Department recommended that?

25         A     I had no idea.    I was -- I -- this was essentially -- I was just writing, I believe,

1    what I was told word for word to write.

2         Q    Okay.

3         A    So, once we got to the signature block portion, I'm like, well, I think it

4    is -- you know, it's -- it's -- I'm inferring from that that it's the acting AG, the acting deputy,

5    and Mr. Clark, as the leaders of the Department, the first two speaking for the

6    Department.

7         Q    Okay.    Are you, Mr. Klukowski, aware of any other time that the

8    Department of Justice recommended that a State legislature call itself into session?

9         A    No.

10        Q    And, with your background working in the Arizona Legislature, was that

11   unusual as you were drafting this?

12        A    I had never seen anything like it.    I -- I was -- that -- that's the third -- that is

13   a third thing about the first paragraph that I found very surprising.

14        Q    Okay.    Now, you also say time is of the essence because of the joint session

15   on January 6th when the Vice President would preside, consider objections, and then

16   decide between any competing slates of elector certificates.

17        Was it your understanding that timing is of the essence for that reason; it had to

18   be before January 6th?

19        A    Yes.

20        Q    Did Mr. Clark say anything specifically about January 6th?

21        A    I can't recall if he said anything specific about January 6, or if it was just -- for

22   that matter, I don't know if that would be January 6th or January 20th when you say that

23   time is of the essence, because it's all post December 14.

24        Q    Okay.    So, whether it's January 6 or January 20th, though, it had to do with

25   the likely end of the former President's administration?

1        A       Yes.

2        Q       And this —

3        A       That was my impression.

4        Q       Okay.    And this needed to be before then?

5        A       Yes.

6        Q       Okay.    Was it Mr. Clark's idea to say time is of the essence?

7        A       I think so.    It's -- it's -- I don't recall anything that I came up with in this

8    paragraph.

9        Q       Okay.

10       A       It was -- it was -- I don't know if everything was given to me word for word,

11   and then he just modified it from there.    But I -- I don't remember any of this being

12   original content from me.

13       Q       Fair enough.

14       A       I was merely just transcribing --

15       Q       Okay.

16       A       -- the content I was told to write.

17       Q       Okay.    And, in this paragraph, it also talks about the -- effectively the joint

18   session considering any objections to any electoral certificates on January 6th.

19       A       Are we on the second paragraph now, page 2, first paragraph?

20       Q       Page 2, first paragraph still.

21       A       Okay.

22       Q       So, as you're writing this, were you aware of any planned objections to

23   electoral votes during the joint session?

24       A       I can't remember the first time I saw a news story or otherwise heard that

25   there was -- that there were Members who were going to voice objections.

1        Q        But you only learned about that through the news, not through Mr. Clark or

2    somebody else at the Department?

3        A        Definitely not through Mr. Clark or through the -- the Department, yes.

4        Q        Okay.

5        A        Yes.    I'm just trying to separate out both my background knowledge and

6    the fact that, in many previous elections, I knew objections had been raised.    I mean, I

7    had worked on previous campaigns.    It's -- so I'm trying to separate that out.    But, no, it

8    definitely did not come from Mr. Clark.

9        Q        Okay.    I appreciate that distinction.

10        Had you discussed with any Members of Congress objections to the electoral

11    count?

12        A        Had I discussed with any Members of Congress objections they could make

13    on January 6?

14        Q        Correct.

15        A        Not that I recall.

16        Q        Or that they would be making objections on January 6th?

17        A        Not that I recall.

18        Q        You're hesitating.    Is there something --

19        A        Well, it's just I'm -- I'm trying to think through events I would go to, you

20    know, like -- like group events, like social events, Republican Party events,

21    conservative -- and then some of them speaking on air during interviews on cable news

22    networks.    You know, it's -- it's -- I was trying -- I was trying to sort through all the

23    remarks I had heard from any number of Members of Congress discussing the election,

24    and whether any of them said that specifically.

25        At some point, I just don't know if it was before the 28th, you started seeing

1    Members saying, I'm going to raise this in our joint -- but I don't know the first time I

2    heard that, so I don't know if I had heard one of those when I was drafting this.   So I'm

3    trying to be precise --

4         Q    Understood.

5         A    -- in my answer to you.

6         Q    Okay.   So, in that same paragraph -- I'm going to go into the next one as

7    well -- it says -- it talks about the need to decide between competing slates of elector

8    certificates.

9         And then the next paragraph on page 2, it says, "The Department believes that, in

10   Georgia and several other States, both the slate of electors supporting Joseph R. Biden,

11   Jr., and a separate slate of electors supporting Donald J. Trump gathered at the proper

12   location to cast their ballots and that both sets of those ballots had been transmitted to

13   Washington, D.C. to be opened by Vice President Trump" -- excuse me -- "Vice President

14   Pence."

15        So this, in particular, do you know whether that was true as of the date of this

16   letter, December 28th, that alternate slates of elector certificates had been sent to

17   Washington?   Or, actually, let me back up.

18        Do you know whether they had actually been cast?

19        A    I'm not sure I recall -- and let me explain.   That reference is the Hawaii

20   thing.   Until I looked at the Hawaii thing, the Hawaii anomaly, if I could call it that -- until

21   I actually looked that up after he had instructed me to talk about Hawaii, I'm like, okay,

22   what is Hawaii from 1960?

23        Until I -- I checked out that Law Review article, and then I did internet searches

24   looking for more information on that.   Until then, I was unaware that there had ever

25   been a historical instance where the proposed electors for the person who was not

1   thought to be the winner of the State had actually showed up on the electoral college

2   State and actually cast ballots that, at that moment, had no recognized force of law.   I

3   didn't even know that had ever been done.

4          So, at the time I was writing this, I didn't know that this was -- I didn't know what

5   this was.   I had thought that this was -- that what was being talked about here

6   was -- was historically unprecedented and was anything other than just pieces of paper

7   that people were signing.

8          Q      Okay.   So, just to be precise, did you know that Republican electors had

9   gathered on December 14th and voted an alternate set of electoral votes?

10         A      At some point, outside the scope of DOJ, just as I read the news and, you

11  know, get information that sort of way each day, I had seen references to Trump electors

12  casting alternative ballots.   But my thinking at the time was anyone can take a piece of

13  paper, sign their name on it, and say, This is my elector certificate for President of

14  the -- it's just a piece of paper.   It has no legal -- so -- so I had seen news accounts and

15  whatnot, but I didn't know that anyone had ever tried anything of this sort or that there

16  was -- it's -- so I'm trying --

17         Q      Sure.

18         A      Am I answering the question?   It's --

19         Q      Let me ask this, too.   So this is a statement of fact.   The Department

20  believes -- it's the Department's belief, that in these States, two sets of electors cast

21  electoral votes.

22         Did Mr. Clark tell you to include this?

23         A      It -- he told me to include -- I'm trying to remember what the exact word

24  choice was.   He told me to cite it, and then one of my internet searches when I got back

25  to my computer was doing searches with keywords to actually pull this up and see if this

1    was, in fact, the case, because there were things I hadn't even given much thought to

2    previously, because there was a lot of people saying a lot of stuff, it seems, you know, in

3    public, and I had a job, and it wasn't this.

4         Q    Okay.

5         A    And so it wasn't until I got to my computer and looked up that I found out

6    that, indeed, there -- in each -- in several contested States, that this had, in fact,

7    happened.

8         Q    Okay.   So you learned that as you're writing and --

9         A    Yes.

10       Q    -- drafting the letter?

11       A    Yes.

12       Q    Okay.

13       A    Yes, yes, yes.

14       Q    I think I know the answer to this, but I have to ask anyway.   So were you

15    involved in an effort to appoint alternate electors or have alternate electors vote?

16       A    No.   Not -- not that I -- not that I -- no.

17       Q    Did you discuss this strategy about having alternate electors vote with

18    anybody at the Department of Justice?

19       A    No.

20       Q    Did you discuss it with anybody in the White House?

21       A    Alternate electors?   No.   There was -- there was at some sort of

22    going-away party a reference to, you know, some people are like -- and my reaction at

23    the time was trying to -- I can't remember the words that I used, but it was the substance

24    of what I had just conveyed in terms of, what, some people just signed papers saying

25    I'm -- I'm an elector for President?

1          I'm like, that -- there is no legal force behind that.    That's absurd.    So it wasn't

2     like a serious substantive conversation.    It was just another idea that I saw no

3     foundation in in law, because, I mean, at the time, I didn't even know about Hawaii.

4          So, I mean -- so it had come up -- the fact that -- one of these news stories or

5     something of that sort had come up at, like, a happy hour or something.    I don't even

6     remember who I was talking with, but where I had brushed off the idea as, you know,

7     some people will try anything.

8          Q     Okay.

9          A     It's -- so I --

10         Q     Did you -- did you discuss with anybody in the campaign kind of

11    implementing this strategy of having alternate electors vote?

12         A     No.

13         Q     Okay.    Did you know that people working for the campaign, when you

14    wrote this or later, had been calling State legislators about this very issue, about having

15    alternate electors vote?

16         A     About alternate electors?    Not that I recall.    I know that there were -- I

17    know that there were efforts, which I would -- which I would characterize differently.    I

18    know that there were efforts about having State legislatures weigh in and take direct

19    legislative action under the electors' clause.

20         But I had -- but, with the information that I had, it would have been similar to

21    what -- it would have been identical to what was going on, what I read -- what Bush v.

22    Gore talks about in terms of what was happening in Florida, where they were talking

23    about legislative action, like a joint resolution or whatever the vehicle would be, declaring

24    that, in that -- in that election, that George W. Bush had won the State of Florida and was

25    entitled to the State's electors -- electoral votes.

1          Q     So I'm going to have you flip to exhibit No. 4 very quickly, and then we'll get

2     back to this letter.

3          Mr. Greim.    I wonder.    We've been going for, like, about an hour and

4     20 minutes now.    I know you don't want to split in the middle of the letter.    Are we

5     getting close to the end of the letter, or --

6          Mr. ███████    We still have a bit to cover with the letter.

7          Mr. Greim.    Okay.

8          Mr. ███████    I mean, do you want to push on until 1:30?

9          Mr. Greim.    Yeah.

10         Mr.██████.    Okay.

11              BY MR. ██████:

12         Q     So exhibit No. 4, these are alternate elector certificates.    Have you ever

13    seen anything like this, either completed or blank before?

14         The Witness.    So we're on -- remind me where we're at, please.

15         Mr. Greim.    Four.

16         Mr. ███████.    Exhibit No. 4.

17         The Witness.    Oh, exhibit 4.

18         Have I ever seen something like this before?

19         Mr.██████    Correct.

20         The Witness.    Not that I am aware of.    Not that I recall.

21              BY MR. ██████

22         Q     Did you or anybody at the Department have any role in drafting alternate

23    elector certificates like this?

24         A     I most certainly did not.    I have no knowledge about whether anyone else

25    was.

1          Q     Okay.    All right.    So, if we go back to the middle of page 2, and you've

2    referenced this now, the example of Hawaii.    So it sounds like you first learned about

3    this when you were asked to draft this letter?

4          The Witness.    I'm sorry.    Which one are we on now?

5          Mr. Greim.    He's back on 2.

6          Mr. ██████    Back on no. 2, yeah.    And this is the Hawaii example.

7          The Witness.    Okay.    I'm back.    What's the question?

8                BY MR. ██████

9          Q     We're talking about the Hawaii example.

10         A     Yes.

11         Q     It sounds like you had never heard of this incident involving Hawaii.

12         A     I had never -- I had never heard of it.    I -- I think I had seen news accounts

13   that said -- that just mentioned Hawaii, but I -- I didn't know what that was a reference to.

14   I didn't know what we've described -- I didn't know about that until this day when I'm like,

15   okay, what exactly was Hawaii?    What happened in Hawaii in 1960?

16         Q     Is this your summary of what happened in Hawaii, or is this Jeff Clark's?

17         A     What -- I found a -- a cert petition that had been filed several days previous.

18   I'm like, I bet this stuff shows up in this -- the litigation that's ongoing, and so, I pulled up

19   a cert petition that had been filed several days ago at SCOTUS, and just did a keyword

20   search for Hawaii, and there I saw the Balkin Yale Law Journal reference in that cert

21   petition.

22              And then I pulled up -- because the cert petition, it was like a sentence.    It didn't

23   say much.    So then I pulled up the Law Review article, and then I also took some words

24   from that to do a couple supplemental just internet -- just search engine-type searches to

25   get -- to get more a sense of it.

1          Yes, that was the first I learn of this -- of this concept of -- of the idea that, on the

2    day designated by 3 U.S.C. 7 that there could be more -- that there -- it had ever been the

3    case, that there had been more than one set of electors.

4          Q     Were you directed to that cert petition, or you just found it on your own?

5          A     No.   It's -- it's -- I was -- you know, I would see lots of news on this topic, so

6    I knew cert petitions had been filed, and so it's -- and so I -- I -- it didn't take me long to

7    find.

8          Q     Okay.   So, in this, it talks about having separate slates of electors that were

9    sent by Hawaii in 1960.

10         A     Right.

11         Q     Both of which were certified by the Governor of Hawaii.

12         A     Right.

13         Q     And Hawaii is, my understanding -- the reason they had this is because there

14   was a court-ordered recount of the vote because it was a margin of less than 200.   Is

15   that consistent with what you remember of this?

16         A     Well, it's -- this came in two parts, because, before I was at DOJ, of course, I

17   was volunteer attorney with the campaign.   And then, once I was back at OMB, when I

18   was not in hours or on property -- when I was not under Hatch Act restrictions, not using

19   government assets or during government time, it's -- you know, I would -- people would

20   continue -- some of the people I had dealt with on the campaign would continue sending

21   me things.

22         Like I told you earlier, pleadings, you know, I never saw any pleadings.   I never

23   saw any -- or I don't recall seeing any complaints, any motions to dismiss, any answers.

24   So I didn't see any pleadings.   But I did see other documents related to ongoing

25   litigation, like proposed statistical reports and things of that nature.

1          It's -- then I would generally be copied on it.    I don't have a background in

2     statistics.    I don't know what these -- you know, what they purport to mean or whether

3     they're accurate.    So that was -- then we get to this stage.    This was, on this day,

4     looking up these things, was the first time I actually saw anything more than just a bare

5     unadorned reference to Hawaii, and actually saw the specifics that you're referring to

6     now.

7          Q    Okay.    So your understanding is what I relayed to you earlier, then,

8     generally?

9          A    Yes.

10         Q    Okay.

11         A    Yes.    Yes.

12         Q    All right.    So --

13         A    And that's an understanding I came to that -- that day.

14         Q    And then, ultimately, in this incident, the Vice President, then Nixon,

15    accepted the slate that both -- the slate that was certified by the Governor and that was

16    the result of the court-ordered recount?

17         A    I don't recall the precise procedural posture, but I do recall reading that on

18    the January 6th, 1961 session, that it was the Kennedy slate that was accepted and that

19    Vice President Nixon did not contest --

20         Q    Okay.

21         A    -- that.

22         Q    And what this letter is asking for, though, is for the State legislature to call

23    itself into session and maybe pick a set of electors that even the Governor doesn't

24    approve of?    That's part of this, right?    It can go around the Governor's authority?

25         A    Not quite, because -- because another section of Federal law

1   specifies -- yeah, it's 3 U.S.C. 7.   Any vote -- any ballots that were not cast on

2   December 14 are not elector certificates.   Now, this letter is going out 2 weeks later.

3   So it would be more like a retroactive empowerment of electors as opposed to them

4   picking --

5        Q     Different than Hawaii -- the Hawaii situation?

6        A     And different -- I don't know enough about Hawaii to know how different it

7   is.   It's definitely different from Florida, where in Florida they were doing it ahead of

8   December 14.   Because I went to Bush v. Gore to try and understand this as I was doing

9   it, and that litigation was all before December 14, and it was about the legislature directly

10  appointing electors who would then cast their ballot on the -- on the day specified by 3

11  U.S.C. 7.   So this was an after the fact, whereas Florida was before.

12       As to whether what's being described here is precisely what happened in Hawaii, I

13  didn't get into enough granular detail to know whether it was precisely the same.   It was

14  certainly similar.

15       Q     Okay.   I'm going to move on from that.

16       In the last paragraph on page 3, you wrote, "We share with you our view that the

17  Georgia General Assembly has implied authority under the Constitution of the United

18  States to call itself into special session for the limited purpose of considering issues

19  pertaining to the appointment of Presidential electors."

20       Is that a statement that you wrote?

21       A     It's -- Mr. Clark had asked me in the -- when he was laying out the outline, he

22  had asked something along -- I don't know if he said or if he asked.   How it came up,

23  whether -- how can a legislature do this if they're not in session, or I can't remember how

24  the question was framed up.   I do remember the substance -- the verbal substance of

25  my response.

1            And that was that, in previous legal work, before the election -- nothing to do in

2    the context of elections, it -- on a previous matter before I was in DOJ and before I

3    volunteered with the campaign, on a totally unrelated issue, I had done research on the

4    doctrine of necessary implication.

5            And so I said, Well, you know, there is a doctrine out there, and that would seem

6    to apply -- that would seem to apply here.    I say, if -- because, if it's the legislature that's

7    appointing -- but I said, I'd have to look and see.    My impression is that historically, State

8    legislatures were not in session during this time of the year.

9            So, if they're being told they have the power to appoint electors but they might

10   not be in session, the Constitution doesn't say anything about a role that a Governor has.

11   They would have to get into session in order to appoint electors.    So it was a purely

12   historical-based argument.

13           But the idea of necessary implication is research I did when I was not DOJ, nothing

14   to do with elections.    It was just a doctrine I was familiar with.

15       Q    Okay.    And earlier, though, you said, I think -- and I don't want to put words

16   in your mouth, but you said something to the effect of this idea of this legislature calling

17   itself back into special session was crazy.

18       A    The idea of a legislature calling itself into session, I wasn't commenting on

19   whether that was crazy.    I don't know that it's ever been done.

20       Q    Yeah.

21       A    I was talking about the idea that a legislature, on December 28, for a letter

22   that wouldn't even go out December 29, the idea from my own personal experience that

23   a State legislature could possibly physically assemble and actually take any sort of action

24   that would achieve any sort of result over -- what would that be, like an eight-day period

25   when there is a holiday in the middle, I just thought it was -- it was physically, logistically,

1    and politically infeasible.

2         Q    Okay.    And I know we're at 1:30, and we're going to break in just a second,

3    but this letter generally, was there any talk about getting the Office of Legal Counsel

4    involved in reviewing it?

5         A    No, there was not.

6         Q    Did Mr. Clark say that that was going to happen, or just said nothing about it

7    at all?

8         A    He said nothing about it at all.

9         Q    Did you suggest that OLC be involved?

10        A    I was not familiar enough with Department operations.    I had been there,

11   you know, essentially 2 weeks at this point.    I didn't know at what point OLC becomes

12   involved in things like this.

13            It wasn't until I later read -- and it might have -- in the -- when I later read about a

14   response that either Mr. Rosen or Mr. Donoghue had had in this space, where they had

15   said, even if we could do this, we -- this would have to go to OLC first.

16            The first -- when I first saw that written account after the fact, that was the first I

17   became aware that certainly standard operating procedure would have been to involve

18   OLC at that point.    I didn't know it at that moment.

19        Q    All right.

20        A    At this moment.

21            BY MR. ██████

22        Q    Did you express any of these reservations about the letter at all directly to

23   Clark, the reservations that you expressed to us?

24        A    I did not -- well, it's -- regarding -- regarding the facts, I didn't express any

25   reservations about the facts, because I had no knowledge about this.    I was -- I didn't

1   think any of this was happening.   I was stunned.   I was like, wow, this must -- this

2   evidently is a very siloed Department if all of this can be going on and I just don't know

3   anything about it.

4      Then again, it's not part of Civil's portfolio, so they must keep things -- you know,

5   they must keep things in their proper silo.   And if you're not part of it, you just don't

6   know about it.

7      So I had no reason to disbelieve the factual assertions, because I saw that the facts

8   I was supposed to be writing up -- these aren't facts I would be asserting.   These would

9   be things that Mr. Rosen was going to sign.   And I'm like, well, if -- if guys like Rosen and

10  Donoghue are going to sign it, it must be true, as astounding as I thought it was.

11     So I had the thought that this was so far above my pay grade, that if I were asked

12  for my views, I would express, but that if I were not being asked for what I thought of this

13  that my boss and his boss and his boss were going to be doing and that all these people

14  had been my boss for less than 2 weeks, and I should just be lucky to be here, that -- that

15  it's -- it's -- on the facts, I had no basis to know whether they were true.   I had no reason

16  to believe that Mr. Rosen would sign something that would be factually false.

17     Regarding the -- regarding the political reality of it, whether this was feasible, I

18  don't recall whether I said -- and I think I might have said this earlier.   I don't recall

19  whether I said -- whether I put any voice to what could be done in such a short

20  timeframe.   So, if I said anything, it was in a muted and neutral tone.   I don't recall if I

21  verbalized -- it's -- just logistically, politically, how does this work in just -- in days that you

22  can count on your hands --

23     Q   Yeah.   So --

24     A   -- to do something that's never been done.

25     Q   Bottom line, you don't recall pushing back at all with Mr. Clark, saying

1    anything either about the facts or about the practical possibility that this would work or

2    anything else about that?

3          A      Well, I couldn't push back on the facts, because I had no --

4          Q      Right.   I understand.

5          A      -- knowledge of -- I was confident that Mr. Rosen would not sign his name to

6    something that was making false factual claims.   And, again, at the moment, I had

7    thought I didn't know that this was a pitch out of the blue from Mr. Clark.   It wasn't until

8    I read that later.   I had thought that this was the next step of what had been a

9    preexisting conversation.

10         So, from that, I was thinking, okay, maybe -- they must have some sort of facts if

11   they're looking at -- if they're talking about whether they're going to send a letter talking

12   about, We've got facts, you know.   So it's -- so regarding the factual matter.

13         Then, regarding the specific legal issues, there are -- the legal -- the precise

14   propositions of law in these paragraphs are either -- are either true, or are plausible.

15   Like, for example, that Congress sets the day in 3 U.S.C. 7 for the electoral college to meet

16   and cast their votes.   Well, that's a correct proposition of law.

17         The -- is there a -- I might be speaking too much generality.   Is there a specific

18   proposition of law that you have a question about?

19         Q      No.   I'm really not interested in the specifics.

20         A      Okay.

21         Q      You got asked to do something that had no basis in fact or law and was

22   wildly out of the lane of the Civil Division.   I'm asking you whether or not you voiced any

23   of those concerns to your supervisor, Mr. Clark.

24         Mr. Greim.   Object to assuming facts not in evidence, and a compound question,

25   and also asked and answered.

1          BY MR. ▐

2          Q      Did you ever at any point with Mr. Clark question this, question the

3     assignment in any way?

4          Mr. Greim.    Same objection.    Asked and answered.

5          The Witness.    I did not know that this was necessarily out of the lane of the Civil

6     Division.    I knew that election- related investigations were not, or at least that I had

7     never been exposed to them and that it was my background understanding when I was

8     looking at where I wanted to work at DOJ that that was part of the Civil Rights Division.

9          But, if it has Mr. Rosen's and Mr. Donoghue's signature on it, then it's

10    department-wide in terms of what lane it is.    They cover all lanes, and I had no

11    knowledge about whether you could have a letter with the two officers who have

12    department-wide jurisdiction plus a third signature from an individual who has a

13    narrower jurisdiction.

14         So, first of all -- so I didn't know how that kind of hybrid thing worked out in terms

15    of whether something was in the lane, and whether this was in the lane, therefore, of the

16    whole Department of Justice.

17         Regarding having no basis of fact, I didn't know what the facts were, so I would -- I

18    am not asserting any facts here.    I'm being instructed by my superior to draft a

19    document where he and his superiors are going to assert these facts, and they're

20    regarding matters that I -- that, first of all, I had no firsthand knowledge of.    But second,

21    from General Barr's previous statements, I know that there had been investigations at

22    some point.    I don't know what they uncovered, what was considered their impact.

23         So I didn't know anything about the truthfulness of those factual assertions,

24    because I was not the one who would be making the representation.

25         BY MR. ▐

1        Q       So the answer is no, you didn't express any concern, reservations to

2    Mr. Clark directly?

3            Mr. Greim.    Objection.    Asked and answered.

4            Mr.███████.    I'm just trying to get that simple answer.

5            Mr. Greim.    Well, the problem is it's not a simple answer, but he's doing his best

6    here to --

7                    BY MR. ██████

8        Q      I'm just asking --

9            Mr. Greim.    He's answering three different lawyers asking questions here.

10                   BY MR. ██████

11       Q      -- if you ever expressed any reservations about this letter directly to

12   Mr. Clark?

13       A      To restate what I said earlier, if I said anything, it was in neutral terms of this

14   is -- this is astounding, or this is -- or, wow, or something -- I do not think I was utterly

15   silent.    I think there are words that I said.    I don't -- but I don't recall what exactly I said.

16           I mean, obviously it was not -- I was not silent during my whole time there, so I

17   gave a verbal response at some points during the meeting.    As to what my verbal

18   responses were, or at what point I said them, that, I don't know.

19       Q      Did any of those verbal responses, in any way, express concern, reservation,

20   or pushback against what you were being asked to do?

21       A      I don't recall.

22       Q      Okay.

23           Mr.███████.    Can I ask one more question, and I think we'll be wrapped up on

24   the letter?

25           Mr. Greim.    Okay.

1          Mr. ▮▮▮▮   Okay.

2                    BY MR. ▮▮▮▮

3          Q     So, on the top of page 3, it says -- it's written:   "Many State legislatures

4    originally chose electors by direct appointment, but over time, each State legislature had

5    chosen to do so by popular vote."

6          And it goes on:    "However, Congress also explicitly recognizes the power that

7    State legislatures have to appoint electors."   That seems to suggest that the States could

8    decide after an election, after votes had been certified, that they could change the results

9    of the election with different electors.

10         Was that concerning when that -- when this argument came up in the letter?

11         Mr. Greim.    I'm going to object to a compound question, but if you can -- think

12   you can understand it, do your best.

13         The Witness.    Okay.   I think there is two possible -- plausible meanings to 3

14   U.S.C. 2, and that's -- and that's the section we're looking at.

15                    BY MR. ▮▮▮▮

16         Q    Can I just stop you?

17         A    Yes.

18         Q    I don't want to get into kind of the legal component.    This just says that,

19   originally State legislatures chose electors by direct appointment.

20         You'd agree with that?

21         A    Well, yeah.    Let's -- right.    Let's take those one at a time.    And my --

22         Q    And then it says --

23         A    It is my --

24         Q    Can I just stop you.    But, over time, each State legislature has chosen to do

25   so by popular vote.

1          So, in Georgia, is it your understanding that State law appoints electors based on

2    the popular vote?

3          A     Yes.

4          Q     Okay.    This also goes on to say:    "However, Congress also explicitly

5    recognizes the power that State legislatures have to appoint electors."    So that seems to

6    suggest we can look past the popular vote.

7          Is that accurate?

8          A     That is what -- that is what 3 U.S.C., section 2 says, and it is what my

9    understanding of what Chief Justice Rehnquist said in his concurrence in Bush v. Gore.

10         Q     And this is the independent legislature doctrine.    I don't know if you've

11   heard of that specifically, but --

12         A     I don't recall ever having heard that term before --

13         Q     Okay.

14         A     -- so I don't know what that means.    I -- I can talk substance, but I can't put

15   labels on something that I don't know.

16         Q     But this suggests that the State legislature, even after the people vote, and

17   after that vote is certified -- in this case, December 14th -- the State legislature can decide

18   to appoint a separate slate of electors.

19         A     It doesn't necessarily mean that, because the way I read what was going on

20   here is to say, if a State chose, pursuant to 3 U.S.C. 1, to participate in the national

21   congressional election, but, in the phraseology of section 2, failed to make a selection on

22   that day, whether it's a mechanical breakdown, or there is just a dispute about who had

23   enough votes, or if there were ongoing challenges regarding batches of votes in a close

24   enough election where people were still wrangling in court about who actually won,

25   at -- there are calendar dates that are set by the Constitution.    A Presidential term will

1    end.    Someone will be sworn in.

2        I have not seen where the term "failed election" or "fail to appoint," to use, you

3    know, the language in section 2, as to precisely where that is determined.    But the issue

4    is that, as Chief Justice Rehnquist says, they're not operating under State law when

5    they're appointing Presidential electors.    They're operating under direct grant of

6    authority from Article II of the Federal Constitution.    They try to participate in the

7    election.    The issue is how you're resolving not making up a new result; trying to

8    determine who won in the national election on 3 U.S.C. 1.

9        Q    So, of the concerns that you've had about this letter, the assignment that

10   you got from Mr. Clark, was this one of them, this language that we just talked about?

11       A    Well, there are several propositions of law here.    Congress does not confer

12   power by 3 U.S.C. 2 --

13       Q    I just --

14       A    -- because it's not their authority to confer.    They are recognizing the direct

15   grant of Federal Constitution empowered to State legislatures, which I think Chief

16   Justice Rehnquist accurately described in his Bush v. Gore concurrence.

17       Q    And you said that.    All my question is:    Of this language and the multiple

18   propositions of law that you just said, was this part of the concern you had about the

19   letter?

20       A    I have no concerns about the wording that Congress codified in section 2,

21   because I don't see what I'm saying outside just quoting a constitutional provision and a

22   statute, and then a couple, you know, to my knowledge, uncontested factual assertions,

23   in the meantime, that States increasingly participated in the national election.

24       Q    Okay.    All right.

25            Mr. ▉▉▉▉    Well, I think we're done with that.    So I think now would be a good

1   time to take a break unless you have --

2           Mr. ▇▇▇▇    Procedural question.

3               BY MR. ▇▇▇▇

4       Q    So, as you guys were drafting this letter, did you ever consult with anybody

5   outside the Department, any --

6       A    No, I did not.

7       Q    So --

8       A    Not that I -- not that I recall.    Not that I'm aware of.

9       Q    No State legislators or --

10      A    No.    I did not communicate with any State legislator in doing this.

11      Q    Okay.    Thank you.

12          Mr. ▇▇▇▇.    All right.    Then why don't we go off the record.    It's 1:45.

13          [Recess.]

1      [2:44 p.m.]

2          Mr. ███████ We are back on the record.    It is 2:44, and we're Zooming the

3    deposition of Ken Klukowski.

4              BY MR. ███████

5      Q    So we left off talking about the December 28th draft letter.    And I just want

6    to draw your attention to exhibit No. 5, which is metadata related to that letter.

7          And in this metadata and in similar metadata that you have provided separately, it

8    shows the White House Communications Agency here as the company.    So do you know

9    why the White House Communications Agency would be referenced in the metadata to

10   this document?

11     A    I believe so.

12     Q    Can you explain that, please?

13     A    Yes.

14         As we were writing -- as we were writing this letter, I was involved in another

15   agency writing a letter memorandum regarding the U.S. Agency for Global Media,

16   USAGM, which was sort of a component of the State Department, does Voice of America

17   and other public communications.    In that legal memorandum, I had written a -- the

18   doctrine of necessary implication came up.

19         And the USAGM got involved in a lawsuit -- that's what my memorandum had

20   been developed in the context of -- and that USAGM lawsuit was then currently on

21   appeal, being handled by the DOJ Civil Division.    So, when I saw on the lineup of action

22   items for the appellate team at DOJ Civil that they were doing the USAGM case, I didn't

23   know if there was anything in the memorandum that I had dealt with on the same topic

24   that would be useful for them.

25         So I didn't still have access to my previous email accounts, but I called someone

1    who had the memorandum and had them email it from their official account to my

2    official DOJ email account so that I could print off a hard copy of it and walk it down the

3    hall and to hand the copy to Sopan Joshi, who was the name of the head of the appellate

4    team at DOJ Civil.

5            Now, that happened shortly, just a few days, before this thing came up with

6    Mr. Clark regarding this letter.    So, when the conversation was turning in the direction

7    of the doctrine of necessary implication, I was thinking as I was sitting there, I'm like, oh, I

8    already have a memo, I don't need to reinvent the wheel, I already have a memo that

9    actually discusses this point.

10           And so I pulled up the memo just to see exactly what I had said in that regard.

11   And then, since I already had the document open, I just selected and deleted all the text

12   in the memo that didn't have to do with that doctrine.    And that's why -- and that was

13   the shell in which I started writing the draft of the December 28 memo.

14           So the Word file itself originated when I was at OMB.    So it originated in the

15   White House, even though none of the content that we're discussing here now, aside

16   from the necessary implication material, that none of it -- that none of it -- of the rest of it

17   originated in the White House.

18           Q    Okay.

19           So did you share the December 28th draft letter with anybody at the White

20   House?

21           A    No.

22           Q    Did anybody at the White House review the draft letter of December 28th?

23           A    Not to my knowledge.

24           Q    Do you know if Mr. Clark sent that letter to anybody at the White House?

25           A    I have no knowledge of that one way or the other.

1      Q     Okay.

2      A     I reported it up to Mr. Clark, and that was -- that was it.

3            BY MR. ▮▮▮▮▮

4      Q     So did you do that at the beginning of your work drafting the letter?   That

5      was sort of the first step you took?   Or was that -- it must have been at the beginning.

6      A     Yes.   Yes.   Because it's -- that was the -- as I was sitting down, thinking

7      through the points I had just been given that I was going to type up, I'm like, oh, I have

8      something right here on necessary implication, I should see what that is.   So I opened up

9      that document, so I already had Word now open in front of me.

10     Q     Uh-huh.

11     A     And, once I saw that paragraph, I'm like, okay, might as well start drafting

12     the letter.   So just deleted everything else and started --

13     Q     I see.   So, instead of clipping that paragraph about necessary implication

14     and dumping it into a draft letter, you used the shell from the previous memo as --

15     A     Correct.

16     Q     -- the actual document in which you drafted the --

17     A     That's correct.   Because I started -- I'm still only a few days in at the

18     Department.   I didn't have, like, preset templates and whatnot.   One document was as

19     good as another.   So just hit "delete" and then start typing.

20     Q     Okay.

21           BY MR. ▮▮▮▮▮

22     Q     Do you recall ever using a thumb drive to move this document back and

23     forth between anywhere?

24     A     Yes.   During the time that the email address was not working.

25     Q     Can you explain that a little bit more?

1      A      Yeah, I just -- I looked -- I don't remember if someone handed me one or if I

2      got it out of the supply closet.   I just looked around the supplies; I'm like, I need to have

3      a -- have a document here, found a thumb drive, and just stuck it into my DOJ computer.

4      And that's what I saved the draft to, since the email wasn't working.

5             And I knew this was a time-sensitive matter.   I knew that the boss, you know,

6      Mr. Clark, wanted to see a draft as soon as it was ready.   So I saved it to that, and then I

7      walked it down to him.

8             When he was done with whatever, I walked it back and stuck it back in the -- that's

9      how we circulated brass back and forth.   It may have just been one round; can't

10     remember.   But that's how we circulated it back and forth until the email server was

11     back up and running again.

12     Q      So that's how you circulated the draft letter on December the 28th while the

13     email server was down.

14     A      Yeah.   "Circulated" I guess isn't the right word.   That is how I got the Word

15     document from my computer to Mr. Clark's computer and back so that he could edit

16     directly into a document instead of having to mark something up in red ink and for me to

17     do it.

18     Q      Was this ever saved on a DOJ server?

19     A      I don't know.   To repeat something I've said earlier, I'm tech-illiterate, so I

20     don't know how those things work.   But the -- so I don't know how that works.

21     Q      Did Mr. Clark ever ask you to not save it on a DOJ server?

22     A      Not that I recall.

23     Q      Did he ever ask you not to save it on your DOJ computer?

24     A      Not that I recall.

25     Q      Okay.   So this was merely just a way to transfer it --

1        A       It was a way to keep working while the email server was down.    And as

2   soon as it was right up, as soon as it was up, you see I immediately just emailed it, you

3   know, using normal channels as soon as I knew I was able to do so.

4        Q       And then did you take that document and ever save it on your home

5   computer?

6        A       No.

7        Q       Okay.    And we'll get to that in a little bit, but it ended up either in your

8   personal email or your personal computer, right, is how you produced it to us today.

9        A       You're talking about the one -- the later version, yes.    We'll get to that.

10  And that was not me saving anything -- I never took DOJ files and put them on my

11  personal computer.

12       Q       Okay.    All right.    So it sounds like we'll get to that.

13       A       Yes.

14       Q       All right.

15       So, if you go to exhibit 3 -- and I know it's going backwards just a little bit, but this

16  is a -- excuse me -- an email from Jeff Clark, ENRD, Monday the 28th, about 20 minutes

17  after the email you sent to him.    This is at 4:40.    And it's sent from him to Acting

18  Attorney General Rosen and Acting Deputy Attorney General Donoghue.

19       It has "Two Action Items" -- or "Two Urgent Action Items" is the subject.    And it

20  attaches a letter with the same file that you had forwarded to Mr. Clark -- or with the

21  same file name, I should say.

22       Have you ever seen this email before?

23       A       I'm not sure if it is in the Senate Judiciary Committee report.    I didn't look

24  through all the exhibits of it.    So, if I have I ever seen it before, it would've been in that

25  report.    But, looking at this, I do not recall at this moment ever having seen this before.

1          Q      Do you remember being blind-copied on it, for example?

2          A      No, I most certainly was not, or at least I have no recollection of that

3     whatsoever.

4          Q      Do you remember if Mr. Clark forwarded it to you?

5          A      I have no recollection of that.

6          Q      Okay.

7                 So two things primarily that come up in this.   One of the requests that Mr. Clark

8     makes is to get an ODNI briefing from DNI Ratcliffe.

9                 Do you know anything about Mr. Clark's desire to get such a briefing?

10         A      I -- not that I recall.

11         Q      Did he ever talk to you about getting a briefing from ODNI?

12         A      He made a reference at some point that -- I'm trying to remember if he said,

13    like, he'd like to know if there's any classified information that we have on this or

14    something.   So there was a reference to wondering if there was classified information.

15    I do not recall him specifically saying that he wanted the DNI himself to give some sort of

16    briefing.

17         Q      Okay.   Did he ever tell that you he got a classified briefing from anybody?

18         A      Not that I recall.

19         Q      Okay.   Did he ever tell you that there is classified information about issues

20    with the election?

21         A      Not that I recall.

22         Q      Okay.   And, of course, if you do recall something, I don't want to get into

23    the actual --

24         A      Of course.

25         Q      -- information in this setting.

1       A    I get that.   And I will abide by, of course, all legal requirements in that

2   regard.

3       Q    Okay.

4       Did Mr. Clark ever talk to you about white hat hackers and evidence in the public

5   domain that a Dominion machine accessed the internet through a thermostat?

6       A    Not that I recall.   The first I recall ever reading about that -- ever learning

7   anything about that was when I read the Senate Judiciary Committee report.

8       Q    Okay.   And so is it fair to say that, in this first request about classified

9   information that ODNI or others might have, you don't know anything about that, from

10  Mr. Clark or otherwise?

11      A    Correct.   I had no idea what that stuff was about.

12      Q    Okay.

13      All right.   So the second request is that -- is related to the draft letter.   And it

14  says, "Attached is a draft letter.   This a concept that would go potentially to each

15  relevant state."   And he specifies a little bit that it talks about the legislatures

16  assembling and making a decision about elector appointment.   And then he says,

17  "Personally, I see no valid downsides to sending out the letter."

18      A    And could I have a moment to read this?

19      Q    Of course.

20      A    Because I'm not sure I've ever seen this before.

21      Thank you.

22      Q    Sure.

23      All right.   So it says in there, in that second paragraph, it says, "Personally, I see

24  no valid downsides to sending out the letter."

25      We have talked about reservations that you may have had about this letter, but

1   do you agree with the assessment that "I see no valid downsides to sending out this

2   letter"?

3       A   No.

4       Q   Would you have said that to Mr. Rosen and Mr. Donoghue?

5       A   If they had asked me for my opinion?

6       Q   Yes.

7       A   If they had asked me if I saw a downside to it, I would've said yes.

8       Q   Now, at the very -- almost at the very end, in the third paragraph there,

9   Mr. Clark kind of reiterates, but he says, "I continue to think there's no downside" -- and

10  here's the part I'm interested in -- "with as few as 23 days left in the President's term."

11      And he's talking about removing his "Acting" title, which is not really that

12  important for our purposes right now.   But he seems to leave open the possibility by

13  saying "as few as 23 days," leave open the possibility that the President could remain

14  beyond those 23 days.

15      Did he express that to you?

16      A   No.   Did he -- sorry, did he express what?   I want to make sure.

17      Q   Did Mr. Clark express that the President's term could extend beyond the

18  remaining 23 days at that point?

19      A   I don't recall him saying anything like that to me.

20      Q   Did Mr. Clark say anything that would lead you to believe that the

21  President's term could be extended?

22      A   He knew that there were ongoing legal challenge efforts.   I mean,

23  for that -- like, I had just seen several days before a cert petition that was filed, so, I

24  mean, it was there.   So there were challenges ongoing.   He never expressed any

25  optimism to me that any of those challenges were going to bear fruit.

1       Q      And I may have -- or we may have asked you this earlier, but did he explain

2   that that -- ever, either expressly or by implication, that extending the President's term in

3   office was a purpose of this letter, this December 28th letter?

4       A      For the President to -- no, he didn't -- he didn't tell me -- he didn't tell me

5   what the end game was, that -- just what the meaning of the text of the letter was.    He

6   didn't game out for me what he thought the cascading sequence of events that

7   would come from that.

8       Q      Okay.

9       So, very quickly, I'm going to have you turn to exhibit No. 6.    And this is a memo

10  issued on November 9th, so before you're at the Department, by then-Attorney General

11  Barr, discussing, kind of, post-election involvement of DOJ in certain things.

12      And one of the quotes here is that the reason for this policy is so that all of the

13  American people, regardless of their preferred candidate or party, can have full

14  confidence in the results of our election.

15      So my question is, did this memo or Attorney General Barr's guidance ever affect

16  what you and Mr. Clark were doing with respect to this draft letter?

17      A      I don't recall ever seeing this memorandum during my time at DOJ.    So I

18  have no -- with this and with the previous answer, I should've said I have no recollection

19  of seeing this memo during my time at DOJ.

20      Q      Do you remember if Mr. Clark or yourself ever had a conversation saying, we

21  need to be careful of what we're doing because of DOJ's unique role in the government?

22      A      I don't recall any conversation along those lines.

23      Q      Okay.

24      Was Mr. Clark, based on what you saw or heard, aware of the need to have the

25  Department take a measured approach to election-related issues?

1          A     I have no recollection of him saying anything in that vein.

2          Q     Okay.

3          All right.    So I'm going to move on to exhibit No. 7, and this is an email from

4    Acting Deputy Attorney General Donoghue in response to Jeff Clark and his email from

5    earlier.

6          Have you ever seen this email before, aside from the Senate Judiciary report?

7          A     Prior to the Senate Judiciary report?    Not that I recall.

8          Q     Okay.    You weren't copied on this?

9          A     Most certainly not.

10         Q     Mr. Clark didn't forward it to you?

11         A     I -- no.

12         Q     Okay.

13         Now, in this email -- and we don't need to get into all of it, but the top-line

14   takeaway is that Mr. Donoghue said, "There's no chance I would sign this letter or

15   anything remotely like this."

16         Did you ever learn from Mr. Clark that Mr. Donoghue had outright rejected this

17   letter?

18         A     I asked Mr. Clark on the morning of the 29th when I was getting my daily

19   assignments, so what happened with last night's meeting?    And he said, we're not going

20   to send the letter.    He said, they didn't like it.    So he kept it short and -- yeah.

21         Q     Okay.

22         What else -- you said it's -- this is on the 29th, the next day.

23         A     Yes.

24         Q     What else did he say happened in that meeting?

25         A     I can't remember what he said.    His body language as he said we're not

1    sending the letter, he seemed crestfallen.    And it didn't seem -- he was obviously was

2    not upbeat about it, and so I was not getting the vibe that the boss wanted to discuss this

3    further.

4         So I don't remember what else he -- what else, if anything, that he said, but his

5    answer was pretty short and with body language that, you know -- I just moved right on

6    to my assignments for the day.

7         Q    Okay.    So that was the extent of the discussion about the meeting that took

8    place on the 28th that you recall.

9         A    I don't recall any additional substantive content.    Right.

10        Q    You said he seemed crestfallen.    Was he angry?

11        A    As I mentioned before, he has a low-key personality.    I'm not sure I ever

12   saw him angry in the 36 or 37 days I was at DOJ.    So I didn't detect any anger, but, again,

13   he doesn't have a very expressive personality.

14        Q    Okay.    And, in that moment, did it seem like it was the end of the road for

15   this letter?

16        A    Yeah, that was my impression.    Yes.    I thought it was a -- my impression

17   coming off was, that was, you know, spitballing an idea, brainstorming; nope, not gonna

18   do that; and moving on.    I thought it was a done issue after that.

19        Q    Did that change at some point?    Was it no longer a done issue ever?

20        A    When I read the October Senate Judiciary Committee report and realized

21   that he had brought it up at the January 3rd Oval Office meeting --

22        Q    Okay.    And we'll get to that.

23        A    -- that is the first indication I had that anything -- that's the first indication I

24   remember that anything came of that letter after the events of the 28th.

25        Q    Did you stop working on the letter on the 28th?

1     A    Yes.

2     Q    Okay.

3           BY MR. █████████

4     Q    And he never mentioned it to you again after that meeting on the 29th when

5     he said, they didn't like it, it's not going?

6     A    Not that I recall, though there is an email that we're going to talk about --

7     Q    Yes.

8     A    -- later.    But not that I recall.

9     Q    Okay.    So, when you read about it in the Senate Judiciary report, because it

10    does come up purportedly in the January 3rd meeting, you were surprised because you

11    had never had any substantive --

12    A    I was shocked.

13    Q    -- discussions with --

14    A    Yes.    I was stunned that that was -- an idea that I thought -- set aside

15    whatever the legal arguments are, set aside everything else.    If something was just

16    politically and logistically not feasible when you had 8 days or whatever, I was stunned

17    that someone would bring it up 3 days, 72 hours --

18    Q    Yeah.

19    A    -- ahead of time.    I was astounded.

20    Q    I assume also, Mr. Klukowski, that on the 29th, when he said they didn't like

21    it, you didn't pile on or weigh in or say, I get it because there are some real issues --

22    A    You're correct, yes.    To reference my earlier remark, he seemed to be sad,

23    so --

24    Q    Right.

25    A    You know, it's something that I had thought was not a good idea.    Evidently

1   everyone else thought it was a good idea.   I saw nothing to be gained by rubbing the

2   boss's nose --

3   Q   Everyone else thought it was not a good idea.

4   A   Yes, if I misspoke, yeah, that evidently everyone who had seen this thought

5   this was a bad idea.   And there's no -- I saw nothing to be gained by --

6   Q   I see.

7   A   -- rubbing my boss's nose in that.

8   Q   Got it.

9        BY MR. ▮▮▮▮▮

10   Q   So, quick followup.   When you spoke to Mr. Clark about the December 28th

11   meeting that he had, did he tell you that Mr. Donoghue specifically told him to stay out of

12   election-related issues?   Maybe not in those words but something like that?

13   A   Not that I recall.

14   Q   Do you know whether Mr. Clark ever suggested that DOJ have a press

15   conference to announce that there was corruption in the 2020 election?

16   A   I don't recall him mentioning that.

17   Q   Let me ask you more generally, do you ever recall discussing a potential

18   press conference related to the election with Mr. Clark?

19   A   I do not recall that.

20   Q   Okay.   Do you remember anybody talking about that at the Department?

21   A   No.   And I'll reiterate that I don't recall ever talking with anyone, other than

22   Mr. Clark, having a conversation pertaining to the 2020 election.

23   Q   Okay.

24        All right.   So a lot happened on the 28th, but I understand that he participated in

25   a 6:30 meeting that day in the Gohmert v. Pence lawsuit.

1      A    Where are we, sir?

2      Q    I'm just speaking generally.

3      A    Oh, yeah.   Go ahead.   Say again, please.

4      Q    So I understand that, after the meeting with Mr. Rosen and Mr. Donoghue

5  about the letter, there was a separate meeting about the Gohmert v. Pence lawsuit that

6  had been filed the day before.

7      Are you familiar with the Gohmert v. Pence lawsuit?

8      A    That Mr. Clark was in a meeting?

9      Q    Correct.

10     A    On the 28th?

11     Q    Correct.

12     A    About the Gohmert lawsuit?

13     Q    That's right.   Are you aware of that?

14     A    I did not know about that meeting.

15     Q    Based on your reaction, it seems like you didn't.   So you were not at a

16  meeting on the 28th about the Gohmert v. Pence lawsuit.

17     A    Most certainly not.

18     Q    All right.

19     On the 28th -- and I go to exhibit No. 8 now.   This is a document that you

20  provided.

21     A    Yes.

22     Q    It's an email from Connie Hair to Ken Klukowski at 6:10, looks like, central

23  time.

24     A    Yes.

25     Q    And the subject is "Law Suit in Eastern District of Texas," with an attachment

1    named "1 Complaint-Expedited Declaratory&Injunction12-28-2020."

2        A    Yes.

3        Q    Okay.    You provided this document to us?

4        A    Yes, I did.

5        Q    All right.    Who is Connie Hair?

6        A    Connie Hair, to the best of my knowledge, is chief of staff to Congressman

7    Gohmert.

8        Q    Why do you say "to the best of your knowledge"?

9        A    Well, it's -- the last time I heard anything about Connie -- about Ms. Hair, she

10   was the Congressman's chief of staff.    I have no reason to believe that's changed.

11       Q    Okay.

12       A    I'm just answering to the best of my knowledge.

13       Q    Do you know her personally?

14       A    Yes, I do.

15       Q    How do you know her?

16       A    It's -- Ms. Hair is active in conservative political circles, and so she and I have

17   seen each other in various conservative movement, conservative Republican-type events

18   going back, I would -- I'm not sure, but I would guess more than a decade?

19       Q    Okay.    Do you have a regular relationship with her?    And I say that as in

20   friendly, not implying anything else.

21       A    No.    I would say we are acquaintances on friendly terms.

22       Q    All right.

23       A    When we do see each other, it's, "Hi, how's it going?" and it's genuine, but

24   we are not, like, in regular communication or work together on things.

25       Q    Okay.

1          And if you flip one page, this is the attachment that you provided to us.   It's a

2    complaint --

3          A     Yes.

4          Q     -- for expedited and declaratory relief in Gohmert v. Pence.

5          A     Yes.

6          Q     So the email she sends to you is just "FYI."   Why did she send this to you?

7          A     Ms. Hair had called me during the day that day.   I didn't answer because

8    it's -- I'm doing my DOJ duties, and so I assumed this was some sort of a personal call, and

9    I'm not -- you know, I try to maintain a barrier and focus on my work.

10          Then I returned her call after I was done for the day and had left the building, was

11    going to be driving home.   I don't remember the specifics of the conversation, but she

12    said that she -- but the substance was that she wanted to tell me about this lawsuit that

13    the Congressman and others had brought that would prevent Mr. Pence from -- that

14    could, not that it necessarily would -- but that it would -- that it could have an

15    impact -- and I'm putting my own words on it here, because I don't remember her word

16    choice at all -- regarding what would be done on January 6th during the joint session.

17          And I think I expressed -- I'm like, what possible lawsuit could -- and so I expressed

18    my non-support for this idea.   And I said, I would have to see the lawsuit to have a take,

19    but I can't imagine -- and, again, I'm paraphrasing here -- I can't imagine that there's any

20    angle in there where there is any chance that anything could possibly happen.

21          And she's like, well, I'll email it to you.   And then, later on, she emailed it to me.

22          Q     Okay.   And this came from her personal --

23          A     Correct.

24          Q     -- email address.

25          A     To my personal email address.

1        Q       And that's the ▮▮▮▮▮▮ we've discussed?

2        A       Yes.

3        Q       Okay.    And when she called you, did she call you on her personal cell -- on

4    your personal cell phone?     Excuse me.

5        A       Yes.

6        Q       Okay.    All right.    So that happens that evening.

7                Had you been aware of this lawsuit before Ms. Hair told you about it?

8        A       I don't know.    There were so many lawsuits going that I didn't keep track of

9    which was which.    It was the feeling of people throwing spaghetti against a wall.    And I

10   had several real cases and meritorious cases that were occupying my bandwidth, and so I

11   was just keeping my head down, doing my work.

12               I can't remember when I first heard about this.    I do believe this is the first time I

13   saw it.    Like, I saw some news stories on it, but I can't remember if it was before or after

14   this moment.

15       Q       Okay.    And when you talked to Ms. Hair that evening -- let me think about

16   the best way to say this -- was she reaching out to you because of your new role in DOJ?

17       A       She gave no indication of that.

18       Q       Was she reaching out to you because you had volunteered in a legal capacity

19   with the Trump campaign?

20       A       In the circles where we would see each other, general area subject-matter

21   experts would typically just speak up on matters that they know about.    At these sorts

22   of informal get-togethers and whatnot, I was one of the -- I was one of the lawyers, I was

23   one of the legal guys.    So people would frequently float legal ideas; I would commonly

24   opine on those things.

25               So that would've been familiar in -- that would've been the dynamic between us.

1   She didn't say anything that I recall that would've made it specific to the time I had spent

2   with the Trump campaign, though I believe -- I believe that she was aware that I had.

3        Q        Did she say anything that suggested to you she was reaching out because

4   you could do something about this lawsuit?

5        A        Much to the contrary.    First of all, no.    But then when I finally did open

6   this thing up and I saw that this thing was so badly engineered that, instead of suing Mike

7   Pence as President of the Senate, they actually were suing him as Vice President of the

8   United States, and thus the executive branch, and therefore DOJ would be opposing

9   counsel in this, I'm like, I can't -- I can't touch this, I can't discuss this.

10       Q        Okay.

11          So, along those lines, did you ever talk to Ms. Hair about this lawsuit or a lawsuit

12   like this before --

13       A        Before --

14       Q        -- it was filed?

15       A        No.    To my knowledge, no.    It's -- I'm trying to remember if there were

16   times, I don't recall with Ms. Hair, but when people -- as people would spitball things,

17   they're like, "Maybe there could be a lawsuit about January 6th."

18          I never weighed in on anything like that that I recall.    I was uniformly -- for me, it

19   was all political question doctrine.    There's just no way a Federal court is going to invade

20   a joint session of Congress.    You know, that's a crazy idea.

21          I don't recall ever a conversation with Ms. Hair on that, aside from whether I

22   might have said anything in that phone call we're referencing when she called me.

23          I did contact her -- it took me a while to figure out how exactly do I do this.    I

24   didn't want to get anything more from her.    I did contact her after -- I believe 2 days

25   after, because I really wanted to think about, what can I even say here?    But I don't want

1   this person -- I was trying to figure out how silence would be construed -- and called her

2   to say, "I'm opposing counsel in this lawsuit, don't be sending me anything, I cannot

3   discuss this with you," so words to that effect, just to make it clear that I -- that I was not

4   in -- that I could not be discussing this matter with her and that I was not neutral either,

5   that I was opposing counsel on this matter, or at least that the Department was, and I'm

6   part of the Department, so, you know, regard me as opposing counsel.

7        Q      How'd she take that?

8        A      I mean, I didn't -- I didn't say it in an unfriendly manner.   And, you know, I

9   don't know whether I used words to the effect of, you know, nothing personal here, I

10  mean, this is, you know -- we're friendly, but this is, you know -- I have ethical obliga- -- I

11  have obligations here, I have legal obligations here.

12        She didn't -- she did not press the matter.

13        Q      Okay.

14        A      So it was a fairly -- it was a short conversation.   I don't remember the exact

15  word choice, but I made it clear that I cannot engage on this because I'm actually a lawyer

16  on this case and I'm on the other side of this case.   And she did not protest any of that

17  and didn't seem to take it personally.   She seemed to get it right away.

18        Q      Okay.

19        And it seems like you quickly came to the conclusion when you read the lawsuit

20  that maybe the wrong person -- or the right person but in the wrong capacity was sued.

21  Did you ever communicate that to Ms. Hair?

22        A      I'm not sure how I characterized it.   When I did have a chance to read and

23  study and think about the lawsuit, it wasn't even the right person in the wrong capacity; it

24  was the wrong person.

25        So, I mean, there were so many things wrong with that lawsuit.   I mean, this was

1      an epicly horrible lawsuit.

2            Q      And did you say any of those things that were wrong about it to Ms. Hair?

3            A      I do not -- I don't recall doing that.

4            Q      Okay.

5            A      It's -- the only thing even close to it would be conveying to her that, because

6      of how the lawsuit was set up, that is why I am opposing counsel; it's why we can't talk

7      about it.

8            Q      Okay.

9            A      So it was -- so I don't know what words I used to that effect, but it was to

10     explain that -- to just state the fact:     The way this has been done, I'm opposing counsel,

11     so we can't talk about this.

12           Q      Okay.     Did that conversation happen on your personal phone as well?

13           A      Yes.

14           Q      All right.

15           So is it fair to say that you had nothing to do with the Gohmert v. Pence lawsuit

16     before it was filed?

17           A      Yes.    Yes, that is correct.

18           Q      Okay.

19           Did you ever talk to any of their representatives, not in your role with DOJ but just

20     as a lawyer involved in the election law space, about this lawsuit?

21           A      Not to my knowledge.    And if it was anything -- in anything that was framed

22     as suing a member of the executive branch, I wouldn't have even discussed.

23           So I'm saying that even fits into two categories.    I don't recall any such

24     conversation, and I sure as heck don't recall any conversation about, well, if someone

25     were to sue the executive branch, what do you think -- it's -- I'm part of DOJ.    It's my job

1    to fight those lawsuits.

2         Q    Okay.

3         Did you discuss this lawsuit with anybody in the White House?

4         A    Not that I -- not that I recall.

5         Q    Okay.

6         A    I don't -- not that -- not that -- not that I recall.   I don't know if I

7    made -- yeah.

8         Q    Okay.

9         A    Yeah.   Yeah.

10        Mr. ███████   Any followup on this?

11        Mr.███████   No.

12             BY MR.███████

13        Q    All right.   So, in the lawsuit itself -- and we're not going to go through all of

14   it, particularly understanding that you're saying you didn't have anything do with it.   But

15   in paragraphs 1 and 2, this lawsuit -- and the nature of the action is for a declaratory

16   judgment that certain sections of the Electoral Count Act are unconstitutional.

17        And then paragraph 2 says the violation here is based on direction in the Electoral

18   Count Act to the Vice President to count electoral votes for a State where electors are

19   appointed in violation of the Constitution.   And it's also based on purported limitations

20   to the Vice President's alleged constitutional power to determine which slates of electors

21   can be counted.

22        And so did you know at any time before this was filed that these allegations would

23   be included in a lawsuit by any of these plaintiffs?

24        A    No.   And, at the time that I saw this, I -- the concept of exclusive authority

25   and sole discretion.   At the time I saw this, I completely rejected that argument --

1        Q     Okay.

2        A     -- that that is -- that that is flatly wrong.

3        Q     So, in paragraph 4 of this -- and, again, I'm not going through for any

4    particular purpose except the ones I'm stating here.

5            And, in footnote 2, it says that this is not a hypothetical harm, because the State

6    of Arizona and several others have appointed two competing slates of electors.

7            And then, in paragraph 5, it talks about those States that put forward competing

8    slates of electors, being Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin.   And

9    this appears later.

10           So this is somewhat similar to the December 28th letter that talks about

11   competing slates of electors that had been appointed and that sent their votes up on

12   December 14th.

13       A     With a critical difference.

14       Q     Go ahead.

15       A     The legislature did not appoint the alternative slate.   And that -- in my

16   assessment at the time, that was instantly fatal.

17       Q     So I understand why you're saying that from a legal perspective, but the

18   earlier letter just talks about alternative slates of electors having met and sent up votes.

19   And that's what this talks about as well.

20           To your knowledge, is there any correlation between that letter and what went

21   into that letter and this lawsuit?

22       A     To my knowledge, no, because I see the December 28th letter as having

23   asserted a different position, that the legislature might be able to take action itself.   But

24   this, these are just pieces of paper, that there's no legislative action; this has no warrant

25   whatsoever.

1   Q I hear what you're saying, and I appreciate that.

2    Do you know if Mr. Clark had any role in this lawsuit, Gohmert v. Pence?

3   A I do not know of any.

4   Q Other than defending on behalf --

5   A Right, right, right.   I was about to figure out how to phrase that to say, we

6 had -- there were plenty -- there were discussions, but they were all about filing a motion

7 to dismiss, to beat the lawsuit.   I'm unaware of anything aside from that.

8   Q Okay.

9    And I do want to go to paragraph 32, which is on page 11 of this lawsuit.

10   A Complaint paragraph 32 --

11   Q That's correct.

12   A -- of the pleading?

13   Q That's right. So it has a pretty similar paragraph to what appears in the draft

14 December 28th letter.   And it talks about the power of legislatures.   And, in fact, it

15 cites some of the same cases, this McPherson v. --

16   A Blacker.

17   Q -- Blacker and Bush v. Gore.

18    Earlier, you talked about a pleading that may have influenced or you'd been able

19 to take from to help with the December 28th letter.

20   A Yes.

21   Q Is this that pleading?

22   A No.   It was a cert petition that was filed in a Pennsylvania election decision.

23 And the cert petition references both Bush v. Gore and McPherson v. Blacker.   But when

24 you read Bush v. Gore, Bush v. Gore quotes McPherson v. Blacker.   So, if you're reading

25 Bush v. Gore, that's all those authorities.

1      Q      And did you share any of the language that you had drafted for the

2      December 28th letter or similar language with any of these plaintiffs?

3      A      No.

4      Q      Okay.

5             Mr.████████      Anything further on this?

6             Mr.████████      No.

7                    BY MR.████████

8      Q      All right.    So exhibit 9 is the filed copy of Vice President's motion -- I think

9      it's a motion to dismiss --

10     A      Yes, it is.

11     Q      -- technically.    Yeah, it doesn't say so, but that's what it is.    And this is in

12     Gohmert v. Pence.

13     A      Yep.

14     Q      So you recognize this.

15     A      Yes, I do.

16     Q      Okay.    And the Department gets this because it was the Vice President who

17     was sued, correct?

18     A      Yes.

19     Q      Even though he's sued, in theory he's acting as a legislator -- or in a

20     legislative capacity.

21     A      There was a lot of confusion in that lawsuit, and that's part of it.

22     Q      Okay.

23            Now, did you assist in this litigation in your role at the Department?

24     A      Yes, I did.

25     Q      How did you assist?

1        A    There was a meeting called -- I don't know what morning it is, but you have

2    these records.   It was a conference call meeting in Mr. Clark's office, people both

3    present physically and on the phone.

4        Physically, it was Mr. Clark; his PDAAG, Principal Deputy Assistant Attorney

5    General, Jennifer Dickey; John Coghlan, the DAG of the Federal Programs Branch; and me.

6    I don't know if there was anyone else from the division there.   There may have been,

7    but I don't recall.

8        And then on the phone you had the Acting Associate Attorney General, Claire

9    Murray; you had, I believe his name was Greg Jacobs -- I'm not sure I've ever met

10    him -- counsel to the Vice President; and you had one or more people from the White

11    House Counsel's Office on the phone, I believe Pat Philbin, but I'm not sure on that.   And

12    I do not know who else was on the phone.

13        And it was to discuss the response to this lawsuit.

14        Q    Okay.   And what happened on that call?

15        A    It was, let's file a motion to dismiss and get this thing knocked out as quickly

16    as possible.   All sorts of criticisms about the numerous deep, deep flaws and problems

17    with this lawsuit.   And just a -- you know, it's, what exactly are we going to -- what can

18    we file quickly and just have done with this.

19        Q    Okay.   So --

20        A    I mean, it was a target-rich environment.

21        Q    One of the things you mentioned is all sorts of criticisms about the, I think

22    you said, deep, deep flaws with the lawsuit.

23        A    Yes.

24        Q    What were those?

25        A    Some of them are, as I flip through the brief here -- and I remember it a little

1    bit.   Some of it's actually covered here.   Lack of adverseness.   It's hard to know which

2    one is the most glaring, but lack of adverseness.   You're suing a guy to help him and

3    empower him.

4          The second was lack of standing.

5          Third, I'm trying to remember if they raised the Speech or Debate Clause here, but

6    they call it the "Speech and Debate Clause."

7          And one argument that -- I can't remember if it came up -- if I had been drafting it,

8    it would've been political question doctrine as well.   I'm trying to remember.   For me,

9    that was the most glaring thing.   But, again, what's most glaring in this kind of a -- in this

10   document?   But that was not -- for whatever reason -- I don't know if it was space

11   constraints.

12         I know that there was, "We need to file quickly," so it was an issue of, you know,

13   "This thing is dead.   We just have to get it filed so that it dies.   Let's not let this thing

14   linger.   Let's file quickly."

15         So I don't know why -- so they took those issues, they drafted up those issues.

16   There were a couple emails back and forth.   So I was involved in the early hours on that,

17   but then, by the time you got to the drafting stage, my name wasn't on the pleading.   So

18   I don't recall seeing a draft late in the afternoon or later in the day or when it was

19   actually -- or when it was actually filed.

20         Q     Okay.

21         Was there any discussion during that call critical of the relief requested other than

22   the adverseness issue you mentioned?   So the relief request being that a declaration

23   that the Vice President has the authority to essentially count whatever votes he deems

24   fit.

25         A     So the whole exclusive authority/sole discretion, I don't recall whether there

1    was discussion on the underlying merits.   This was not a justiciable case, and the

2    conversation just seemed to focus on, "This is an absurd lawsuit.   We have to deal with

3    it.   Let's just deal with it as quickly as possible and get rid of it."

4         Q    Okay.

5              And do you remember the Vice President's Office, Greg Jacob most likely,

6    expressing an opinion on how to do that?

7         A    No, I do not recall specifically what he said or what issues he raised.

8         Q    Okay.

9              And did this call occur before the drafting process really started?

10        A    Yes.

11        Q    All right.

12             I don't want to get into necessarily the --

13        A    Or, to my knowledge.   I had not seen any drafting work.

14             I think there was an email exchange -- let me -- let me expand on it.   I think there

15   was an email exchange, I'm not sure between who, in the run-up to the call to say, "Huge

16   problems with this lawsuit," and ticked off a couple items, you know.   I can't remember

17   what they were.   "We need to convene a call and discuss this."

18             So I'm not counting that as part of the drafting, but it was definitely like a

19   precursor to drafting.

20        Q    Okay.

21             All right.   So, on the very last page of the pleading, before the certificate of

22   service, Jeffrey Bossard Clark is listed as the first --

23        A    Yes.

24        Q    -- signer, so to speak.

25        A    Are we on page 8 on the bottom?

1          Q      Yes, we are.

2          A      Okay.    Yes, I see it.

3          Q      Okay.    Was he actively involved in the response to this litigation, to your

4    knowledge?

5          A      I believe so.    I mean, he convened that call.    Now, there was a

6    higher-ranking person present telephonically.    But, yeah, I mean, he was --- in terms of

7    the mechanics of what happened in the division, he was running that.

8          Q      Okay.    So he, at that point, is Acting Assistant Attorney General.    He's the

9    head of the Civil Division.

10         A      Correct.    Correct.

11         Q      Oftentimes, my understanding is that, kind of, the first person listed there is,

12   not a figurehead, I don't want to use that term, but somebody who is not actively

13   involved in the litigation itself.    Do you know why he was actively involved in this

14   litigation?

15         A      Two things.    First of all, Mr. Clark's reputation -- and I've seen this in media

16   accounts -- is that he's -- some people regard him as uncommonly hands-on in terms of

17   litigation that his -- if his name goes on it, he -- career staff, at times -- media reports said

18   career staff would complain about the fact that it wasn't just his name on the top, that he

19   wanted to see drafts and was weighing in on substance throughout his tenure.

20                So I take your point regarding the typical figurehead role.    I always got the

21   impression that he was more hands-on than that.

22         Q      Okay.    And I don't mean to use that term -- I'm sitting next to a former U.S.

23   attorney, so I don't mean to suggest that --

24                Mr. ▓▓▓▓▓▓      Nothing wrong with hands-on supervision.

25                The <u>Witness.</u>    Does that answer your question?

1                    BY MR. ███████

2        Q    It does, yes.

3        A    Okay.

4        Q    It's helpful.

5             And so, I guess, just as some context, the House responded to this.    I believe they

6    intervened.    I'm not sure if you're aware of that.    Or they filed some pleading.

7        A    Did they?    They filed something.    I don't know if it was a plea deal, and I

8    don't know the nature of the filing.    I don't know if it -- it might've been an amicus brief.

9    Or I don't know if they attempted to intervene or -- I do recall that they were -- there was

10   action.

11       Q    Okay.    So, yeah, the House did something --

12       A    Yes.

13       Q    -- filed something.

14       A    Yes.    Yes.

15       Q    And in it they said -- and I have a quote here, but I don't have the document

16   in front of me.    But the House said, "In a radical departure from our constitutional

17   procedures and consistent legislative practices, this lawsuit would authorize the Vice

18   President to ignore the will of the Nation's voters and choose the winner.    And to

19   achieve this extraordinary result, plaintiffs filed suit to ask this court to strike down an act

20   of Congress, the 'gravest and most delicate' duty that this court is called upon to

21   perform."

22            So, very -- very clear that they viewed this lawsuit as something highly unusual, I

23   think is a fair assessment.

24       A    It'd be difficult to take those words differently.

25       Q    Okay.

1          And so, on DOJ's response, though -- and this is on page 1 of the pleading at

2     exhibit 9 -- DOJ was a little bit more subdued and said that this, quote, "emergency

3     motion raises a host of weighty legal issues about the manner in which" --

4          A     Forgive me, sir.   Where are we on page --

5          Q     At the very top.

6          A     Oh.   Oh.   Thank you.   Thank you.

7          Q     Yep.

8          So it "raises a host of weighty legal issues about the manner in which electoral

9     votes for President are to be counted."

10         And then it went on to argue some standing issues and suggest that maybe the

11    House and Senate are the proper defendants, not the Vice President.

12         Is this an approach that Mr. Clark wanted specifically, to your knowledge?

13         A     I don't recall who -- I mean, he was not the highest-ranking person from DOJ

14    there.   His boss was on the phone.

15         I don't recall whose ideas were what, but the frame of what was going to be

16    addressed -- I mean, the strategic-level stuff was set on that call.   And then when the

17    call was convened, Mr. Clark was issuing his specific assignments.   So you were going,

18    like, from the strategic to the tactical.   I don't remember where that comes in.

19         Q     Okay.

20         Well, the reason I'm asking is because the letter that you helped to draft and that

21    he sent to Mr. Rosen and Mr. Donoghue on the 28th, it could be read to be in line with

22    what the Gohmert plaintiffs are asking for in this case, namely that the Vice President has

23    the authority to choose among competing sets of electoral votes.

24         And so I guess what I'm asking is whether -- if you know -- whether Mr. Clark's

25    view expressed in that letter that you guys drafted influenced DOJ's response in this

1    lawsuit.

2          Mr. Greim.    Objection to the question within the question there and the

3    characterization of the things.

4          With that objection, you can answer the question.

5          The Witness.    I do -- I do not -- I do not know.

6             BY MR. ███████

7     Q    Okay.

8          Do you know whether Mr. Clark ever discussed DOJ's response to this lawsuit with

9    anybody outside of the Department?

10    A    I do not know that either.

11    Q    Okay.    And when I say that, other than the Vice President's Office, as well,

12    as the person --

13    A    It's -- I don't recall or don't know.    It's -- I don't recall ever -- I don't recall

14    him telling me about that.    And I -- I don't recall.

15    Q    Okay.

16         Did you ever discuss the response to this lawsuit with anybody outside of the

17    Department or the Vice President's Office?

18    A    I'm not sure.    Not that I recall.

19         I was very critical of the whole idea behind this, even before I saw the lawsuit and

20    saw that, you know, it's -- the idea that the Vice President wielded dictatorial power to

21    choose the President and somehow the country hadn't noticed for two centuries seemed

22    astounding enough on its face that, when people would say that anyone was talking

23    about it, I can't say that I never said something along the lines of, "That's crazy."

24         But that's the concept.    I don't know in terms of the timeline of this lawsuit.

25    Q    Okay.

1        So, to your knowledge, did the White House, outside of the Vice President's

2    Office, have any influence over the way DOJ responded here?

3        A    Not to my knowledge.

4        Q    To your knowledge, did the Trump reelection campaign have any influence

5    in the way DOJ responded here?

6        A    Not to my knowledge.

7        BY MR. ███████

8        Q    Can I just follow up?    I want to go back to your call that you described with

9    Pat Philbin and Greg Jacob.    Who is the decisionmaker -- or who was your perception at

10   the time as the decisionmaker in that group conversation about the lawsuit?

11       A    When everyone was on the phone call together?

12       Q    Yes.

13       A    I hadn't thought through it.    The only thing I was cognizant of is that I was

14   the lowest-ranking person in the conversation and I was brand-new.    So I wasn't going

15   to say anything unless someone asked me a question, you know?    I wasn't going to try

16   and take any sort of role in the conversation, didn't see that as my place.    And I don't

17   recall anyone asking for my views --

18       Q    Yeah.

19       A    -- on anything through the meeting.

20       So I had no thought at the time about it.    If I had to make an assessment, it

21   would be the Acting Associate Attorney General, because it's DOJ who determines how to

22   litigate these things, and this was the senior-most DOJ official who was present.

23       Q    I see.    Okay.    And you're anticipating my question.

24       The Department represents the cause of justice, right?    I mean, the client of the

25   Department of Justice, through its lawyers, is not any one person or any one agency but,

1    rather, the people.

2         A    Yes.

3         Q    So, if the Department of Justice believes that it should take a particular

4    position based on the facts and the law and somebody else in another agency disagrees,

5    how does that -- what was your impression as to how that gets resolved?

6         A    When an agency would want to do one thing and DOJ would want to do

7    another --

8         Q    Yes.

9         A    -- regarding litigation?

1    [3:42 p.m.]

2                    BY MR. ██████

3        Q     Yes.

4        A     Unless there was some sort of independent statutory grant of litigation

5    authority -- even if there were -- I would -- my reading of the statutes -- if I'm being asked

6    for my legal opinion?

7        Mr. Greim.    Well, no.    He's asking for your view at the time.

8        The Witness.    Oh.

9        Mr. Greim.    You're not here to give a legal opinion.

10       The Witness.    Oh, oh, gotcha.    Gotcha.    Yeah.

11       Mr. ████████    I'm asking -- right -- for your view.

12       The Witness.    Right.    Okay.    My view at the time --

13       Mr. ████████    Yeah.

14       The Witness.    -- is that DOJ prevails.

15                    BY MR. ████████

16       Q     Okay.    So the conversations with the Vice President's Office, the White

17   House Counsel, are not, "They're our clients and we have to defer to them," but, rather,

18   "They have an interest here, and we want to make sure that we get their views."

19       A     That sounds correct to me.

20       Q     Okay.    And it sounds like, on this particular call, there really wasn't any

21   dissension.    Everyone agreed that the case was meritless and should be dismissed.

22       A     Yeah.    I don't recall anyone making any comment suggesting that anyone

23   thought that there was any merit --

24       Q     Got it.

25       A     -- to this lawsuit.

1          Mr. ▇▇▇▇  Okay.    Thank you.

2                   BY MR. ▇▇▇▇

3          Q    Just to follow up on that.    Greg Jacob was there as representative of the

4    Vice President, I am assuming?

5          A    Yes, on the phone, yes.

6          Q    Do you remember him saying anything about how to respond?

7          A    He spoke.    I do not recall -- I do not recall what he said.

8          Q    Okay.    And I'm going to say this, and if it joggles something loose in your

9    memory --

10         A    Sure.    Please, please.

11         Q    Did he say anything that suggested the Vice President wanted to make sure

12   he kept some amount of discretion for his role as President of the Senate?

13         A    I don't recall him saying anything of the sort.

14         Q    Meaning -- and, just to put a finer point on it, that -- was there any concern

15   that DOJ would take a position that would harm his role as President of the Senate during

16   the joint session?

17         A    Not that I recall.    Could you flesh out what kind of harms to see if I can

18   recall any specific words or --

19         Q    I think -- yes.    We can revisit that, because we're about to get into a part of

20   it.

21              Do you remember Pat Philbin or Pat Cipollone saying anything during the call?

22         A    As I mentioned before, I think -- I think Pat Philbin was on the call.    I do not

23   recall whether Mr. Cipollone was on the call.

24         Q    Okay.

25         A    I'm not saying he wasn't.    I just -- I just don't recall.    And someone from

1    White House Counsel's Office spoke, but I can't remember who said what.

2        Q    Okay.   Do you remember what the person said from the White House

3    Counsel's Office, even if you don't know exactly who it was?

4        A    No.   It's like people went around the horn.   But I don't recall who

5    said -- no one said anything that I took -- that really stuck out at me that I

6    remembered afterwards --

7        Q    Okay.

8        A    -- in terms of, oh, so and so said this.

9        Q    Fair enough.

10       All right.   So, if you can turn all the way to the end, exhibit No. 20.

11       A    2-0?

12       Q    Yes.   So this is a document provided by the Department of Justice, and it

13   includes, we understand, Mr. Clark's comments to DOJ's draft response in the Gohmert v.

14   Pence lawsuit.

15       So were you involved -- it sounds like you weren't, but, just to be clear -- were you

16   involved in the review and editing process of the response?

17       A    To the best of my recollection, the first time I saw this was when I arrived

18   this morning and was looking through the exhibits that we would see today.

19       Q    Okay.   Fair enough.

20       Just some specific questions, and I think these are going to flesh out my earlier

21   one about what was said on this call.

22       If you turn to the page with Bates ending in 162 at the bottom, towards the back.

23       A    Yes, I have it.

24       Q    Okay.   So at the very last sentence there that's not redacted, the original

25   version of this sentence read:   "It would ensure only that the Vice President is able to

1    exercise any discretion he possessed under the Constitution with respect to the counting

2    of votes."   And this is kind of talking about the lawsuit generally.

3            So Mr. Clark --

4        A    Forgive me.   I want to make sure I'm following.

5        Q    Yes.

6        A    Are we in the mainline text or in the footnote portion?

7        Q    No.   There is a blacked-out footnote, but it's the last sentence that you can

8    see --

9        A    Yes.

10       Q    -- starting:   "It would ensure."

11       A    "It would ensure."   Okay.

12       Q    Okay.   So there is a comment there that says:   "The phrase, 'Any

13   discretion he possesses under the Constitution as to the counting of votes' would be, I

14   predict, a red flag to the Vice President, opening him and DOJ up to attacks, suggesting

15   that the Vice President, together with DOJ, may believe that the Vice President may well

16   have no discretion in the counting process.   This is precisely the issue that the Vice

17   President wishes to avoid until that question comes into focus on January 6th."

18           So he then suggested some edits.

19       A    Okay.

20       Q    So it looks like he suggested some edits to kind of clarify that the

21   Department wasn't going to take the view that the Vice President didn't have any

22   discretion.

23           Is that how you read this, he's preserving any discretion that's available to the Vice

24   President?

25       A    As I -- as I read it -- and these are referring to things that I don't know

1       about --

2              Q       Yeah.

3              A       -- like I don't recall -- seeing it, I infer from this that there were offline

4       conversations where the VP, Vice President Pence, didn't want to get boxed in ahead of

5       January 6th into exactly what -- what tools, what options, what discretion the presiding

6       officer has.

7              Mr. Greim.    I'll tell the witness that counsel is trying to refresh your recollection.

8              The Witness.    Yes.

9              Mr. Greim.    He's not asking you to read this and --

10             The Witness.    Oh.

11             Mr. Greim.    -- infer things back --

12             The Witness.    Oh, oh, okay, all right.

13                    BY MR. █████████

14             Q      But I'm glad you raise that, because I think that's not an unfair inference,

15      that there may have been offline conversations.

16                    But do you remember in the phone call whether Greg Jacob, for the Vice

17      President, carved out and said, "Hey, guys, I'm really worried, we need to preserve

18      discretion here"?

19             A      Apologies for not having focused on that question.

20             Q      That's fine.

21             A      No, I do not recall this dynamic, this point being raised.

22             Q      Okay.    And do you recall any other conversations or phone calls where this

23      issue was raised with the Vice President's Office?

24             A      I do -- I do not recall any conversations where this was raised with the Vice

25      President's Office.

1      Q      And, understanding that you're not Mr. Clark's minder, but are you aware of

2   any other conversations he had with the Vice President's Office about this lawsuit?

3      A      I am not aware of any such conversations.

4      Q      Okay.

5             BY MR. ███████

6      Q      Did that -- I'm just wondering, beyond conversations with the Vice

7   President's Office, did that issue, the need and the position taken in the motion to dismiss

8   in the Gohmert v. Pence case to preserve the Vice President's future position, did that

9   issue ever get raised at any time?

10     A      In --

11     Q      In any of your -- I'm sorry -- in any of your discussions in your work at the

12  Department about --

13     A      No.     Not that I recall, no.

14     Q      Did anybody at any point ever raise, "Hey, we've got to be careful that the

15  position we take here doesn't foreclose or bind the Vice President to do or not do

16  something in the future"?

17     A      I do not recall anyone raising that -- that point.

18     Q      Okay.

19     A      I don't recall any discussion about that.

20     Q      With anyone?

21     A      With any -- yeah.     Certainly no -- no conversation in the Department that I

22  was part of.

23     Q      Yeah.     Okay.     Because ████ was asking you about a

24  conversation -- questions about whether the Vice President's Office said that.     I just

25  wanted to broaden that timing.

1        A     I gotcha.   Yes.   I'm unaware of any conversations at the Department on

2     that.

3              Mr. ██████        Okay.    Thanks.

4              Mr. ██████       So I'll have you go to 166 as well, or the page ending in Bates 166.

5              Mr. Greim.    And I wonder, before we go much longer, could we take another

6     break here pretty soon?

7              Mr. ██████      Yeah, sure.

8              Mr. Greim.    We've been going for an hour.

9              Mr. ██████       If we can get through -- do you want to say 4?

10             Mr. Greim.    Yeah, if that's okay.

11             Mr. ██████       Okay.

12             Mr. Greim.    Maybe when we're done with this.

13             Mr. ██████      Sure.

14             Mr. Greim.    Okay.

15             Mr. ██████      Okay.

16                 BY MR. ██████

17        Q     So, on this, there is a lot blacked out.    All we see is a section heading.

18        A     Yes.

19        Q     This was provided by DOJ, so I can't unblack that out.    But there is a

20     comment to the section heading about apparently an argument that plaintiff's allegations

21     of election administration harm presents only a nonjusticiable generalized grievance.

22     And then there is a comment from Mr. Clark saying, "I don't agree with this argument and

23     wouldn't make it at all."

24              And it talks a little bit about a Federal versus State law issues and appears to leave

25     open an avenue for some plaintiffs at some point to sue the right defendant.

1          A      If you could give me just a moment just to read through it.

2          Q      Yeah, take your time.

3          A      It's a long -- it's a long note.

4          Mr. <u>Greim.</u>   While the witness is reading this, could I ask, make sure I understand

5     that --

6          Mr. █████      Yeah.

7          Mr. <u>Greim.</u>   -- Department of Justice gave this with the actual text redacted but

8     the comments unredacted?

9          Mr. █████      So the Department provided this with some of the text redacted,

10    some of it not redacted.

11         Mr. <u>Greim.</u>   Right.   I've seen some text, but this entire section --

12         Mr. █████      Is redacted from the Department.    This is not something that the

13    select committee did.

14         Mr. <u>Greim.</u>   Okay.   I mean, I think it's -- all right.    And it looks like, then,

15    the -- and there is more comments, I guess, on the same section, although it seems odd,

16    because the very top is not -- there is some stuff that's not redacted, and so --

17         Mr. █████      That's right.    And I'm only going to ask about this comment and

18    then one more.

19         Mr. <u>Greim.</u>   Okay.    Well, I guess -- well, I'll let you -- I'll let you make your -- I

20    may have an objection to it, but go ahead.

21         Mr. █████      Fair enough.

22         Mr. <u>Greim.</u>   It's not going to be an authorization problem, but I might object.

23    I'll hear it first.

24         Mr. █████      Yep.

25         The <u>Witness.</u>   I'm reading the other comments.    I was directed by what you

1   said, and I flipped the page and saw that there's another comment here.

2          Mr. ███████   Okay.   So you can stop there, Mr. Klukowski.

3          The Witness.   Okay.

4                BY MR. ████████

5          Q      My first question is going to be about the -- actually, those first two

6   comments.

7          A      Yes.

8          Q      So in those two comments on Bates 166 and 167, the way I read it is that

9   Mr. Clark makes it clear that he sees this not just as a State law issue, but a Federal one,

10  too, leaving an avenue to file a Federal suit by alternate elector plaintiffs against the right

11  defendant and at the right time, but not necessarily here.

12         Is that generally what you understand as well?

13         A      I'm wondering what the blacked-out text is.   I've already said that I haven't

14  seen this document before.   So I didn't see the document --

15         Q      Sure.

16         A      -- at this stage.

17         Q      And just based on the comment here, what I summarized.

18         Mr. Greim.   I just -- I guess I'm going to go ahead and object to the form, because

19  it's asking the witness to comment on someone else's comment on blacked-out text.

20         The Witness.   He's responding to something.

21         Mr. ███████   Okay.

22         The Witness.   I don't know what he's responding to.

23         Mr. ██████   Fair enough.

24         The Witness.   And so I don't know -- I don't know if a meaning that might make

25  sense without reference to text would read very differently if I knew what that text was.

1          BY MR. ███████

2          Q     And I'm not asking you to see whether it makes sense vis-à-vis what was

3     blacked out.    Just, you know, Mr. Clark's comments seem to suggest that there needs to

4     be a Federal avenue open for the right plaintiffs, alternate electors, at the right time.

5     And I guess what I'm wondering is, did you ever talk to Mr. Clark about the need to keep

6     an avenue for a Federal lawsuit open?

7          A     Definitely not.    Not that I recall.

8          Q     Okay.    And then, in the -- second to last page of this is Bates starting 169.

9     The very last sentence that carries over to the next one says:    "If plaintiffs were

10    permitted to maintain their suit at this late date, generations of established practice

11    would be upended and replaced with an unfettered system of counting electoral votes by

12    fiat."

13         To which Mr. Clark says:    "This is way over the top and prejudges the very issue

14    of discretion that our client, the Vice President, wishes to keep open."

15         But, to be clear, do you remember the Vice President or his representatives ever

16    saying that they needed to keep this issue open?

17         A     I do not recall one way or the other anything said on that topic.

18         Q     Okay.

19         Mr. ████████    I think this would be a good time for a break unless you have

20    anything --

21         Mr. ████████    I don't.    Not on that.

22         Mr. ████████    Okay.    Great.    Two minutes before 4, we'll go off the record.

23         [Recess.]

24         Mr. ████████    All right.    So we're going to go back on the record.    It's 4:15, and

25    we're resuming the deposition of Kenneth Klukowski.

1          Is now a good time to discuss the --

2          Mr. Greim.   Yeah.

3          Mr. ██████   -- email issue?

4          Mr. Greim.   Yeah, except we still didn't call Sprint or your carrier, right?

5          Mr. ██████   Let's reserve that for the end.

6          Mr. Greim.   Okay.   Sorry.

7          Mr. ██████   We'll take a brief recess to address that.

8          Mr. Greim.   Do the other thing now.

9          Mr. ██████   Yeah.   Okay.

10              BY MR. ██████

11          Q     So, moving on, I want to speak briefly with you about a case that was filed as

12   original jurisdiction in the Supreme Court called United States v. Pennsylvania.

13          On December 29th, the White House emailed DOJ folks a draft brief in an original

14   jurisdiction case.

15          Are you familiar at all with that case and DOJ's role, if any, in it?

16          A     I am not at all aware.

17          Q     Okay.

18          A     Not to my recollection.

19          Q     Okay.   And some of the lawyers on that case were Kurt Olson, Bill Olson.

20   Do you know either of them?

21          A     I don't believe I've ever met either of them.   Do you have -- is there an

22   exhibit here --

23          Q     There is not.

24          A     -- on this?   Oh.   It's -- I do not recall ever having met individuals by that

25   name.

1    Q    Okay.

2    A    By those names.

3    Q    All right.    So December 31st, 2020, it's New Year's Eve, Mr. Clark emailed

4    somebody at the White House looking for Pat Cipollone's phone number and saying, "He

5    wants me to call him."

6        Do you remember Mr. Clark ever talking about a conversation he had with

7    Pat Cipollone on New Year's Eve?

8    A    I do not recall --

9    Q    Okay.

10    A    -- any such -- a reference to any such conversation.

11    Q    Do you remember a -- Mr. Clark ever talking about any conversations he had

12    with Pat Cipollone around that time?

13    A    I do not recall Mr. Clark ever telling me that he had a conversation with

14    Mr. Cipollone in the timeframe that we're discussing -- or elsewhere.    I don't think he's

15    ever -- I don't recall any conversation he ever said he had with Mr. Cipollone.

16    Q    Okay.    Do you remember Mr. Clark ever talking about any conversations he

17    had with Mr. Cipollone, Mr. Philbin, or anybody else in the White House Counsel's Office

18    about him potentially taking over as Attorney General?

19    A    I do not recall any reference to that topic aside from the January 3rd

20    meeting that I'm sure we're going to discuss.    But aside from that, I don't recall any

21    reference --

22    Q    Okay.

23    A    -- to anything.

24    Q    Very good.    And we're about to get to that.

25        Just marching through chronologically.    So there is reports that on January 2nd

1    there was a conference call where the President, a number of Members of Congress,

2    John Eastman, Phill Kline, and a lot of State legislators all convened and discussed

3    ways -- potential ways to affect the election.    Are you aware of this phone call?

4          A     Not to my knowledge.

5          Q     Are you aware of any phone call like that with those people or those

6    participants?

7          A     Not that I recall.

8          Q     Okay.    Were you ever asked to join a phone call with State legislators, for

9    example?

10         A     Not that I recall.

11         Q     Okay.    Do you know if Mr. Clark was ever asked to join a phone call with

12   State legislators?

13         A     I don't recall him ever referencing such -- such a thing.

14         Q     Okay.    Very good.

15         So, moving -- did you have any --

16         Mr. ███████    Nope.

17         Mr. ███████    Okay.

18               BY MR. ███████

19         Q     On January 3rd -- and now we're going to go to exhibit No. 12.    This is a

20   document that you produced to the committee, and it's an email from ███████ on

21   January 3rd to Ken Klukowski, to you, in your ███████, subject line, "Forward:

22   Letter Draft," and then attachment, "Draft Letter 1 3 21."

23         Who is ███████?

24         A     I do not know for sure.

25         Q     Who do you believe it to be?

1       A       I believe it to be Jeff Clark.

2       Q       Why do you believe it to be him?

3       A       Because of what was attached to it.

4       Q       Were you not expecting this email?

5       A       In fact -- it's not what you're asking, but you'll want to know this -- I do not

6   recall ever seeing this email until I was going through my email records to be responsive

7   to the subpoena.    That's the first time I saw this.    It's -- when I see something like

8   ████████████    that looks like spam to me.

9           But I was going line by line through my emails during this period, and so I opened

10  it, saw what it was.    So in the time that I've been responding to the subpoena, that is the

11  first time I ever recall seeing this.

12      Q       Okay.    So this is on the morning -- just for context -- it's on the morning of a

13  later White House meeting --

14      A       Yes.

15      Q       -- with Jeff Clark.

16      A       Yes.    And the first time I recall seeing this is in the past few days.

17      Q       Okay.

18      A       So I was right.    Within the past 30 days of today.

19      Q       Understanding that you're saying this is the first time you're seeing this

20  recently, do you remember Jeff Clark, on January 3rd, January 2nd, saying, "I'm going to

21  send you the letter"?

22      A       I do not.

23      Q       Okay.    This is totally unexpected?

24      A       And it was sent at a time when I would have been going to church -- I've

25  looked at the time stamp -- or would have been getting my -- my four young

1    children -- right.    It's -- I'm not doing email on Sunday mornings.    And so, yes,

2    it's -- yeah.    I don't recall ever seeing this.

3         Q    Okay.    And, just to be clear, my question was, you were not expecting

4    Mr. Clark to email you a draft -- this draft letter on the 3rd?

5         A    I was most certainly not expecting this.

6         Q    Okay.    And I assume that, based on the fact that you say you just found

7    this, you never asked Mr. Clark about this?

8         A    That is -- I certainly do not recall ever asking about this.

9         Q    Okay.    Did you communicate with Mr. Clark in a private-to-private email

10    capacity otherwise, other than this?

11         A    The only emails that I recall are the ones that I produced to the committee.

12         Q    Okay.    Now, you said --

13         A    As I -- as I searched.    The only -- the only emails that would fit that

14    description are the ones that we've -- that we've turned over.

15         Q    Okay.    Did you ever communicate with Mr. Clark on your ▮▮▮▮▮▮

16    account that you recall?

17         A    No.

18         Q    All right.    Okay.    So this comes in -- and I'll have you flip to the next page,

19    which is the letter itself that you produced as the attachments to this email.    Is that

20    right?

21         A    Say that again, please.    I'm sorry.

22         Q    The next pages of exhibit 12 --

23         A    Yes.

24         Q    -- are the attachment to this email.    Is that correct?

25         A    Yes.

1     Q     Okay.   Now, this, to me, looks similar to but not the same as the draft

2     December 28th letter.

3            Can you explain what happened here?

4     A     It's -- Mr. Clark clearly made certain changes.   One of the signature blocks

5     has been removed, the Donoghue signature block.   The --

6     Q     Did you make any of the changes in the different version?

7     A     No.   No, I did not.

8     Q     Okay.   So you --

9     A     I do not recall ever seeing the letter after the version that we've already

10    discussed once that was sent out of my hands.   For all I knew, that thing just

11    disappeared into a black hole later that day when Mr. -- when Messrs. Rosen and

12    Donoghue were like:   We're not going here.   I thought the issue was done at that point.

13    Q     Okay.   So you didn't work on editing the version that ended up on this

14    email?

15    A     Correct.

16    Q     Okay.   Did you talk to Mr. Clark about the different version that ended up

17    on this, ever?

18    A     I did not, because I was not aware until the past number of days that we've

19    discussed that this even existed.

20    Q     Okay.

21    A     That a separate version existed.

22    Q     Okay.   Do you know if Mr. Clark was working with anybody else on this

23    letter, at this time now?

24    A     I have no knowledge of that.

25    Q     All right.   So you mentioned that Mr. Donoghue, his signature line has been

1    removed.

2        A    Yes.

3        Q    Do you have any idea why?

4        A    Of course I read this only after I had read the Senate Judiciary Committee

5    report and saw the emphasis with which Mr. Donoghue was opposing this idea.    So I do

6    not know, but it's --

7        Mr. Greim.    Yeah.    Don't speculate.

8        The Witness.    Okay.    I --

9        Mr. Greim.    The question is whether you know.

10       The Witness.    I do not know.

11       Mr. ██████    Okay.    Fair enough.

12           BY MR. ██████

13       Q    I'm going to draw your attention to exhibit 15 now, which is a different

14   version of this letter, and the file name on this is still the same, draft letter 13, according

15   to the metadata, but this one shows it was last printed in the metadata on January the

16   5th.

17           Did you ever receive this letter again from Mr. Clark?

18       A    Not that I know of.    And, again, I didn't know I had received the other

19   version either.

20           Was this --

21       Q    Why --

22       A    I don't recognize this, or I don't -- sorry.    Go ahead.

23       Q    So do you know why you'd have two different versions of this letter, one

24   printed or modified after the other in January?

25       A    I have both of these?

1      Q      You produced both of these letters.

2      Mr. Greim.   I'll tell you.   Yeah, we produced each letter.   Both came from

3   email.   I just can't -- I can't tell you anything other than that.

4      Mr. ▮▮▮▮▮.   What I'll do -- and exhibit 19 is the metadata you provided for this

5   as well.   It's kind of hard to see.

6      The Witness.   The metadata for this exhibit 15?

7      Mr. ▮▮▮▮   Yeah.   It's the metadata for all the documents you produced.

8      The Witness.   Wow.

9      Mr. ▮▮▮▮   And the bottom line is this exhibit, exhibit No. 15, it says it was

10   created on 1/3 at 12:47 p.m., so after you would have received it according to the email,

11   and it was last modified on January the 5th at 10:32 a.m.   And, again, this is draft letter,

12   the file name is in the middle there, draft letter 1 3 21, and then in brackets there it's also

13   1.

14      The Witness.   That I opened it?   Is that what that means?

15      Mr. ▮▮▮▮   I don't know.   That's why I'm asking you why you'd have two

16   different versions, one which was modified later on the 5th.

17      The Witness.   I guess I don't know what "modified" means.   I don't recall seeing

18   it at all.   If I had clicked on an attachment, I don't know if that makes it marked modified

19   or something.   It's -- I don't know anything about this.

20      BY MR. ▮▮▮▮▮▮

21      Q      Do you remember saving the attachment that you got from the ▮▮▮▮▮▮▮

22   account to your own computer?

23      A      I don't know that I had anything on the ▮▮▮▮▮▮ account.   Is that what

24   this says here?

25      Q      You provided the ▮▮▮▮▮▮ email and the attachment.

1       A       Okay.

2       Q       Okay?   And then --

3       Mr. <u>Greim.</u>   No.

4       The <u>Witness.</u>   Did we?

5       Mr. <u>Greim.</u>   I don't think it is a ▮▮▮▮▮.

6       The <u>Witness.</u>   I didn't think I had any responsive --

7       Mr. <u>Brothers.</u>   For clarification, I think where we're getting confused is, Mr.

8       ▮▮▮▮ you're referring to the ▮▮▮▮▮ being ▮▮▮▮▮ --

9       Mr. ▮▮▮▮   That's right.

10      Mr. <u>Brothers.</u>   -- and Mr. Klukowski's email --

11      The <u>Witness.</u>   Oh, okay.   Yeah.

12      Mr. <u>Brothers.</u>   -- under Klukowski's --

13      The <u>Witness.</u>   Because --

14      Mr. <u>Brothers.</u>   -- ▮▮▮▮.

15      The <u>Witness.</u>   Right, because I found no responsive -- okay.   So can we --

16              BY MR. ▮▮▮▮

17      Q       So just to back up --

18      A       On your point -- yes, please.

19      Q       -- on the 3rd, you got an email from Jeff Clark, or presumably Jeff Clark, the

20      ▮▮▮▮▮▮▮▮ account.

21      A       Okay.

22      Q       To your ▮▮▮▮

23      A       Yes.

24      Q       Then that has this letter attached, which is this January 3rd letter.

25      A       Yes.

1          Q      You also provided to us a letter, different version, that looks like it was last

2    modified on the 5th and created on -- after you received it from Mr. Clark's ▓▓▓▓▓

3    account.

4                 Do you remember any of this?

5          A      No.

6          Q      Do you remember working on this letter at all after you received it from

7    Mr. Clark's ▓▓▓▓▓ account?

8          A      I don't remember working on this letter in any form after the afternoon of

9    December 28.

10         Q      Do you remember ever printing it again?

11         A      No.

12         Q      Okay.   And you don't remember changing it at all?

13         A      No.

14         Q      Because there are some differences between these two letters.

15         A      No.

16         Q      Okay.

17         A      So is this metadata saying that I changed it?

18         Q      The metadata just says that it was created on one date, last modified on

19   another date.   And we're asking those questions to try to figure that out, to figure out

20   the meaning of the metadata.

21         A      I have no recollection about having seen this until we were responding to

22   the email.   If I had clicked on something and hit, like, return and created a space and

23   said, "What is this?" and closed it, would that -- would that list as a modification?   Or

24   can we -- can we go through the -- do you have --

25         Q      I think, for these purposes, I would just prefer to move on --

1          A      Okay.

2          Q      -- at this point.    I mean, you've said what, you know, you've said, and that's

3     fine.

4                 So on the 3rd, though, we do know, which is the same day that Mr. Clark, via this

5     ████████      account, sends you a draft of this letter, we know that he had a meeting at

6     the White House.

7                 So when did you find out that he was going to be meeting at the White House on

8     Sunday, the 3rd?

9          A      After -- after church, I had -- I had a message to call -- to call the boss.    And

10    so, after church, I gave him a call.    So this is on Sunday, the -- so this is Sunday, the 3rd, I

11    believe early afternoon.

12         Q      Okay.   And what did he tell you?

13         A      He had said, "Remember how we had previously discussed how there might

14    be some changes" -- and I'm paraphrasing here, but this is the substance -- "how

15    the" -- "how there might be changes to the leadership structure of the Department?"

16                He says, "There might be something that might be happening."   He said, "I'm

17    going to have to ask you and Doug Smith to come meet me at Main Justice later this

18    afternoon."   I believe he said 4 p.m., but I don't recall.

19         Q      Okay.

20         A      And he said he was going to a meeting at the White House and for me

21    to -- for me and Mr. Smith to meet him at -- at Main Justice after that.

22         Q      Okay.   Did you do that?   Did you go to Main Justice that day?

23         A      There were a couple more phone calls then --

24         Q      Okay.

25         A      -- that the time was sliding, and then including a phone call later on saying,

1    "This is going to go much later than I thought, and Jeff Rosen is going to be with me when

2    I'm meeting at the White House.    Let's push back this meeting."

3         I don't know if it was pushed back more than once, but the final time was 8 p.m.

4    Q    Okay.  So --

5    A    And then, yes, I did go in for that 8 p.m.

6    Q    Let's walk through some of those phone calls first.

7         Were you asked to do anything to prepare before this meeting?

8    A    Not that I recall.    Just to be there.

9    Q    Did Mr. Clark ask you for anything in advance of the meeting,

10   document-wise or anything else?

11   A    Not that I recall.

12   Q    Did he say anything else about what he expected to happen at this meeting

13   at the White House?

14   A    Not that I -- not that I recall at the -- not that I recall.

15   Q    Did he seem excited, like "It's happening"?

16   A    He has a low-key personality.    It's even harder to read over the phone.    So

17   it was stated matter of factly, but it wasn't -- I mean, there was nothing depressed about

18   it.    But I didn't detect any elevated emotions.

19   Q    Did he ever express to you what your role would be if he took over as Acting

20   Attorney General or Deputy?

21   A    No, he did not.

22   Q    Okay.    No indication that you would have a more pronounced role or

23   specific role if he were to take on another position?

24   A    Not that I recall.

25   Q    Okay.    And why did he want -- I mean, I don't mean to suggest you're not

1    important to Mr. Clark, but you've only been there for a couple weeks.   Why did he

2    want you and Mr. Smith to be the people who were there helping him, waiting for him in

3    this meeting at the White House?

4        A    Well, Mr. Smith is his Chief of Staff, he among the DAAGs was Chief of Staff,

5    so that made a lot of sense.

6        For me, it's -- he didn't say, so I can only speculate.

7        Q    All right.   Well, what did you think?   You must have thought something

8    when you received this call.

9        A    What were my thoughts at the time?   I didn't have any thoughts about why

10   me and not someone else.   It's half-formed thoughts at the time, just my impression

11   during that time at DOJ.

12       These -- the other political appointees came in under prior management.   I was

13   someone who had come in under -- under him.   And I was -- I mean -- and I was already

14   in the conversation in this -- in this -- I had already been involved in a sensitive matter

15   that seems to be like in that column, talked about the December 28th matter.

16       Q    The letter?

17       A    That's correct.

18       Q    Okay.

19       A    But that made sense for December 28th because I had a background in

20   election law.   And since election law isn't part of the Civil portfolio, I might have been

21   the only political appointee at Civil who had a background in election law.

22       As to how that translates to January 3rd --

23       Q    Let me ask you this.

24       A    -- that, I don't know.

25       Q    Let me ask you this.   So there has been reports that the Presidential

1    Personnel Office, and Johnny McEntee in particular, who we've talked about in the past,

2    was kind of keyed in and focused on ensuring that political appointees were loyal.

3    These are not your words.    This is just reports.

4             I know that in your onboarding process to DOJ you had to complete a

5    questionnaire about the White House and your priorities and what you thought were

6    important, right?

7             A    I recall that.

8             Q    So do you think that this had anything to do with kind of this loyalty issue?

9    You could be trusted, somebody coming from the White House, as opposed to, like you

10   said, previous political appointees or people who had been at the Department for longer?

11            Mr. Greim.    Objection.    Calls for speculation, lack of foundation.

12                 BY MR.

13            Q    Just go through your thoughts, Mr. Klukowski.

14            A    I did not have any thoughts at the time.    I was thinking through the reality.

15   In my mind, it's -- I was -- I was thinking that -- that Mr. Clark was going to end up as the

16   Acting Deputy.    I didn't think he was going to be the Acting Attorney General.

17            And so I was just thinking through.    And I don't know, being brand-new, being so

18   new to the Department, there is so much about the Department structure I didn't know.

19   I didn't even know if I would have like a role in that -- I mean, the way it was set up, I

20   mean, Mr. Clark had said something -- something along the lines of, you know, "And I'd

21   want help from you and Doug."

22            So it sounded like there would be something with that additional office.    I didn't

23   know what it was.    Again, I was -- it's -- we only had a few days left, and I had to get

24   ready for two oral arguments.

25            Q    Okay.

1   A So I, in the jumble of all that, I didn't give any thought at the time about, why

2 is he asking me?

3   Q And you didn't know what he meant when he said he'd want some help from

4 you and Doug?

5   A Oh, it's -- and, again, because I'm paraphrasing, where he said, you know, "If

6 we make this move, you know, I'll want you and Doug to help," words to that effect.

7 So --

8   Q Help how?   In like a policy or more of a just strategic or --

9   A Nothing -- nothing --

10   Q Okay.

11   A I don't -- I don't recall anything.   Nor did I -- nor did I -- nor do I recall

12 asking, or, I mean, I was -- I was still -- I was just trying to process all this.

13   So I -- I don't think I had any thoughts as to what exactly that meant, and I don't

14 recall asking anything, and I don't recall him getting any -- any -- giving any details.

15   Q Okay.   All right.   So you were at home, or at church, I guess, in the

16 morning --

17   A Yes.

18   Q -- and then at home before you came to the Department, and you

19 mentioned a few calls.

20   What happened in those other calls?

21   A It was mainly -- all I recall from the calls was telling me that the time was

22 shifting, to contact Mr. Smith to let him know.   He said -- I recall, you know, he said,

23 "He's on a plane right now, so send -- send an email telling him about the -- about the

24 new time."   I think there was a call saying, "Maybe we should bring in dinner," or

25 something.   So it was logistical type stuff.

1        Q      Nothing substantive about expectations or --

2        A      Not that -- no, not that I recall.    No.    It was logistical.

3        Q      Okay.

4        A      And I don't know if the schedule slid more than once.    I don't recall if it

5    went right from 4 p.m. to 8 p.m.    I'm wondering if there was -- I think that -- I don't

6    know if it was original like 6:30 or something, and then calling back to say, "No, actually,

7    let's say 8 o'clock."

8            And so, I mean, it was something like that.    It was -- it was very -- it was just

9    quick.

10       Q      Okay.    At one point in the day, Mr. Clark texted the Attorney General and

11   said that he had just gotten off the phone with Pat Philbin and asked for a call from the

12   Attorney General.

13           Do you remember Mr. Clark talking anything about his conversation with

14   Pat Philbin or Mr. Rosen?

15       A      That it was Mr. Clark who texted and said?

16       Q      That's correct.

17       A      No.    I do not.

18       Q      Okay.    Do you remember Mr. Clark saying anything about a meeting that he

19   had had before this White House meeting with Attorney General Rosen?

20       A      Yes.    I'm trying to remember if he said on that day or if it was the next day

21   when he was given a very abbreviated version as compared to what I later read in the

22   Senate Judiciary Committee report, an abbreviated version of what had happened.

23       Q      What was the version he gave you?

24       A      That he had met with Mr. Rosen -- and, again, this is after the fact -- that he

25   had met with Mr. Rosen and said that the President was thinking of making a change, and

1   that -- I'm trying to remember if he said anything about how it might work with Rosen

2   staying as AG and Mr. Clark becoming the Acting DAAG.   I'm not recalling anything on

3   that right now.

4       What I do recall is he had said, "If the President were to name me as Acting AG,

5   would you be willing to continue staying on in your Senate-confirmed role as Deputy?"

6       Q    To be clear, Deputy Attorney General?

7       A    Deputy Attorney General, yes.

8       Q    Okay.

9       A    So the position to which Mr. Rosen had been confirmed.   And that he said

10   that Mr. Rosen had said -- and I'm paraphrasing here -- but, "I would have a hard time

11   seeing how that could work.   Can I -- can I think about it?"

12       And he said, "Can I come to this meeting later on today?"   So, obviously,

13   Mr. Clark had told him, you know, that there would be this follow-up meeting.   He said,

14   "Could I come to the White House and be in that meeting with the President?"

15       Q    And this is --

16       A    And Mr. Clark said yes.

17       Q    -- Mr. Donoghue saying this, or -- excuse me -- Mr. Rosen?

18       A    Mr. Rosen, yes.

19       Q    Yes.

20       A    Mr. Rosen.

21       Q    Okay.   And so it was Mr. Rosen who Jeff Clark referenced staying on as

22   Deputy?

23       A    Yes.

24       Q    Got it.   Okay.

25       Before the meeting at the White House, did Mr. Clark ever say that, "If this

1    happens" -- or something along the lines of, "Hey, if this happens, we're going to send out

2    this December 28th letter"?

3        A    Not that I recall.

4        Q    Okay.    Did he say anything about what he would do if he took over as some

5    higher-up at the Department?

6        A    Not that I recall.

7        Q    No policy actions or litigation actions?

8        A    Not that I can -- not that I can remember.

9        Q    Okay.

10       Mr. ███████    Before we get to the meeting?

11       Mr. ███████    Yeah.

12            BY MR. ███████

13       Q    And it sounds like you're saying, Mr. Klukowski, that before 8 o'clock that

14   Sunday night Mr. Clark didn't specify to you which particular position he might assume.

15   You had said earlier he mentioned the Acting DAAG; in a conversation with Rosen, he

16   mentions Acting AG.

17            What had he said to you up to that point?    I'm not talking about the next day.

18       A    Right.    Right.    Yeah.

19       Q    I'm talking about --

20       A    Those -- he had mentioned that the President was considering making a

21   change.

22       Q    Uh-huh.

23       A    And he had said, you know, I -- I mean, "I could be Acting Attorney General,"

24   he said, but, he said -- and then he said, "But, Jeff," as he would call him, he said, "Jeff and

25   I have been friends for 20 years, and Jeff has always been the senior man in the

1    relationship."

2         Q    Uh-huh.

3         A    He said, "Both in the -- both in government service and in the private

4    sector."    That was the time he had waxed eloquent about the four DAAGs he had served

5    under.    And he said -- and he said, I -- he said, you know, "Everything" -- and I'm

6    paraphrasing here -- "But everything that the Department could be doing, if I were the

7    Acting Deputy," he said, because -- he said, "Donoghue, he's not Senate confirmed to

8    anything.    He's Schedule C.    I'm a Senate-confirmed official.    There is only a few of us

9    left here.    I could be elevated to Deputy and do everything that should be done" -- or

10   could be done, or whatever the exact word choice was.

11        So it's -- now, when he mentioned that -- so that's what he had said --

12        Q    Sure.

13        A    -- at some point prior --

14        Q    Okay.

15        A    -- and I don't know which day.

16        Q    So he had mentioned the possibility of becoming Acting Attorney General or

17   Acting Deputy Attorney General --

18        A    Yes.

19        Q    -- because he had been Senate confirmed, and Richard Donoghue was not?

20        A    Yes.

21        Q    Richard Donoghue was Senate confirmed, though, wasn't he?    Wasn't he

22   the U.S. attorney in the Eastern District of New York?

23        A    I think the context where -- that is my understanding, that he had been a

24   U.S. attorney previously.    I think the context Mr. Clark was speaking in was in the

25   current leadership structure --

1        Q        I see.

2        A        -- of the -- of the -- that he was not the Senate-confirmed Deputy AG.

3        Q        Okay.

4        A        That he had been -- when Jeff Rosen was in position as Deputy AG,

5    Mr. Donoghue was his Schedule C Chief of Staff.

6        Q        Right.

7        A        So I think that's what he was referring to.

8        Q        Tell -- describe, if you can for us, the difference between Mr. Clark's

9    relationship with Mr. Rosen, which you described as long-lasting and fond, and his

10    relationship with Mr. Donoghue.

11        A        He didn't have much to say about Mr. Donoghue.    He spoke in warm and

12    glowing terms about Mr. Rosen.    His commentary on Mr. Donoghue was neutral.    He

13    had a couple comments I'm trying to remember that were I don't want to say critical, but

14    it was -- he says, "He has a New York approach about him," or something.

15        It was some reference that, you know, he's -- he's hard -- I don't want to -- it

16    wasn't the word hard-bitten, but it was -- it was some sort of reference that he was a

17    tough guy and just not as -- not easy -- not easy for Mr. Clark -- not as easy for Mr. Clark

18    to get along with, in contrast to Rosen, who he held in very high regard --

19        Q        I see.

20        A        -- and that he regarded as a friend.

21        Q        All right.    So was it your perception that there was some conflict or tension

22    between Donoghue and Clark?

23        A        Yes, that was my impression.

24        Q        And did that stem from Donoghue's inflexibility on the letter or any other

25    election-related issues, or was it, in your sense from Clark, more of a personality thing?

1        A      I don't recall Mr. Clark elaborating on that.   And, again, I'm still -- at this

2    point I had only been at the Department for a few days.

3        Q      Yeah.

4        A      And so I -- getting one boss to talk about another boss, I just -- I didn't see

5    any upside to trying to explore conversations like that.

6        Q      Yeah.   Well, you know now from the Senate Judiciary report that

7    Mr. Donoghue directly chastised Mr. Clark repeatedly and told him he was way out of line

8    and that he violated the White House contacts policy.

9        A      I read that in the report once it was issued.

10        Q      Does that then give you any further insight into Clark's comments about

11    Donoghue that you personally heard?

12        A      I -- it's --

13        Mr. Greim.   Go ahead.

14        The Witness.   It did not appear to me that they got along.

15        Mr.          Okay.

16        The Witness.   I mean.   And that there appeared to be multiple conversations

17    where those must have been tough conversations.

18        Mr.          Yeah.   Okay.   Fair enough.   Thank you.

19            BY MR.

20        Q      All right.   So you don't have any other substantive phone calls about what

21    the expectations would be or any need to prepare for anything at this White House

22    meeting, correct?   They're just all scheduling?

23        A      And whether I should stop someplace to pick up dinner or bring something.

24    I mean, things of a nonsubstantive nature.

25        Q      Okay.   So you got to the Department.   What time did you get there,

1    roughly?

2         A    I don't think I was late.    So right about 8 p.m.

3         Never having gone in on a Sunday, and also being new to the Department, so not

4    knowing how common it was for political appointees to have to come in on a Sunday,

5    evidently not all the entrances are open.    And so I ended up going almost a full block

6    before I found a place where I can get in.

7         So, if I was late, I was late circumventing a rather large building trying to find a

8    way to get in.

9         Q    Did you meet with Mr. Clark before he went to the White House?

10        A    No, I did not.

11        Q    Was Doug Smith there when you got to the Department?

12        A    Yes.    He was waiting at the table in the conference room that's adjacent to

13   Mr. Clark's office.

14        Q    Do you know if he had met with Mr. Clark before Mr. Clark went to the

15   White House?

16        A    He did not express anything to me that would give me that impression.

17        Q    Okay.    Were you supposed to meet with Mr. Clark beforehand, or he just

18   wanted you there for after the meeting?

19        A    To the best of my recollection, it was after the meeting.    He said nothing

20   that I -- he said nothing about us getting together beforehand.

21        Q    Okay.    So you stayed there.    Presumably Mr. Clark showed up at some

22   point?

23        A    No, he did not.    We were sitting at the table, and --

24        Q    You and Mr. Smith?

25        A    That's right.    That's right.

1      Q      Anybody else?

2      A      Mr. Smith and no one else.

3      Q      All right.

4      A      And just, "How was your vacation?   How was your Christmas?"   -- I mean,

5      "How was your New Year?"   So, I mean, it's -- so largely small talk.

6      And, you know, it's Mr. Smith asking, "Do you know what we're doing here?"

7      And I was surprised that he evidently didn't know.   It's -- I said, it's -- well, it's -- "Jeff," as

8      I called him -- I said, "Jeff" -- "I think Jeff is at the White House with Rosen with the

9      President."

10      And then, you know -- and it's -- and I just recounted as best I could at the time,

11      not knowing the words that I used at the time, what Mr. Clark had conveyed to me

12      earlier.

13      Q      Which is that he might become either Acting or Deputy Attorney General?

14      A      Well, I didn't want to say Acting Deputy to Mr. Smith, because, again, I'm

15      sitting here thinking, if there was a change made -- I just didn't see Acting Attorney

16      General happening, but I wasn't about to say that to my boss or to my boss' Chief of Staff.

17      So I just mentioned -- I mentioned acting -- I don't know if I said acting

18      leadership -- I don't know if I said leadership change or Acting Attorney General, but I

19      don't think I would have mentioned Acting Deputy.

20      But the idea of elevation and that Mr. Clark wanted to speak with us afterwards.

21      And, aside from that, I mean, most of the conversation as we're sitting there is, again, just

22      small talk and talking about the holidays and stuff, just waiting for Mr. Clark to show up.

23      Q      Did you have any sense that Mr. Clark would have to go there to kind of fight

24      for this new job, or convince the President that he should put Mr. Clark into a new job?

25      A      I didn't have a sense of what it -- what it was.

1       Q    Mr. Clark never said anything like that, "I'm going to go convince him to put

2    me in"?

3       A    No.   No.   It's -- it's -- my sense -- and I'm trying to remember, because of

4    course he explained later that he had said he had raised the idea with Mr. Rosen about

5    staying on as an Acting Deputy, so I'm trying not to reconstruct thinking on January 3rd

6    based on what I found out on January 4th.

7       So, no, I don't know what -- what was going to come of that meeting or how it

8    was -- how that was going to work out.

9       Q    Did you ever find out how the meeting went?

10       A    I -- well, the next day.   So it's -- to finish -- to finish my answer regarding the

11    night of the 3rd, after we were there for a length of time -- I'm guessing maybe

12    40 minutes -- I got a phone call from Mr. Clark saying that the meeting at the White

13    House was over, that no changes were going to be made in the leadership structure of

14    the Department, that -- that he just -- it had been a long day, and he was going home, he

15    would not be coming to the Department after all, that Mr. Smith and I could just go

16    home, to just report back to duty, you know, the following morning, Monday morning,

17    and something to the effect of, "At some point I'll explain what happened tonight, but

18    right now I just want to go home."

19       Q    Okay.

20       A    And so that -- that's the end of the 3rd.

21       Now you're asking about the 4th?

22       Q    Well, yeah.   I was asking, actually, if you figured out what had happened in

23    that meeting.

24       Earlier you used the word "crestfallen" to describe a meeting that Mr. Clark had

25    and the result of it.   How did he sound after this meeting?

1      A    When I saw him the next day, on January 4th?

2      Q    Or just -- even in this phone call.

3      A    Oh, it's -- it's -- I know I've said this a number of times before, he's not very

4  expressive.   If I detected anything in the voice, it sounded disappointed, sounded -- a

5  muted voice.   Certainly not excited.

6      Q    Okay.

7      A    But, again, such a low-key personality that it's really -- it was always hard for

8  me to read much into his tone of voice, especially on something like a phone call.

9      Q    Okay.   Did he say anything else?   Did he say anything about what had

10  happened other than --

11      A    The -- as I -- again, as I -- as I just said, he -- what he explicitly said is that he

12  didn't -- you know, he just didn't or couldn't, whatever word he used, just, "I don't want

13  to go into it right now, I just want to go home."

14      Q    Okay.   So did you meet with him the next day, which would have been

15  Monday, the 4th?

16      A    Yes.   Yes.

17      Q    And what did you guys talk about?

18      A    It was either the 4th or the 5th.   I believe it was 4th.   I have no reason to

19  believe it was the 5th.   It's just I don't know, because I don't know.

20      And then what did we talk about?

21      Q    Yeah.

22      A    He gave me my assignments for the day.   Again, that was the normal -- that

23  was the normal thing.   And then -- and he said -- and he said, "About Sunday night," and

24  then he -- he recounted -- do you want me to unpack -- he said, "When I showed up," he

25  said, "first of all, I had to wait to get in.   I was waiting outside for a while."

1    He said, "As I'm waiting, Steven Engel arrived."   And he said, "And then, when I

2    finally got in, I go to the West Wing."   He said, "It's not just Jeff Rosen, but Rich

3    Donoghue is waiting outside the Oval, and Steve Engel is there."   And he said, "And then

4    Pat Cipollone is there, and Pat Philbin is there."

5    And he said, "And then there was another gentleman as well."   He couldn't

6    remember the guy's name.   I subsequently learned in this Senate Judiciary Committee

7    report it was a man by the name of Eric Herschmann.   I don't think I've ever met him.   I

8    still don't know who that is, I think.

9    But it's -- and he said, "And it was a long," he says, "It was a long debate.   The

10   President chaired the meeting."   He said, "It was just a long back and forth."   And he

11   said, "And, at the end of it, the President decided, 'Okay, Rosen's going to stay.   You

12   know, we're -- we're not changing anything here.'"   And -- and -- let's see, what else?

13   And he said at the end, he said, as they were filing out, he said Cipollone was

14   going to meet with some of them, I presume up in his office.   He said, "And the

15   President motioned to me and said, 'What's going to happen to this guy?'"   or, "What's

16   going to happen to Jeff?" or whatever.   I don't know precisely what words the President

17   used or how Mr. Clark characterized them, to indicate him.

18   And one of them, I can't remember which, said, "Well, Mr. President, he's a

19   Senate-confirmed Presidential appointee, so what happens to him is up to you."   And

20   then he said that the President responded, "Well, try and take it easy on him," or words

21   to that effect.

22   He said, "And then the rest of them exited the room."   And he said, "And I left

23   the White House and gave you guys a call, and then I went home."

24   Q    Okay.

25   A    And he sounded like a beaten man, and he was that way to the end of the

1    time in the -- to my last day at DOJ.

2         Q    Okay.

3         A    Trying to find something stronger than crestfallen.    He was crestfallen on

4    the 29th.    He was -- he was -- seemed like a deeply, deeply saddened man who had said,

5    "So all I'm going to do now," he says, "I'm going to just keep my head down, just do my

6    work.    There is a lot of work with this division."

7         And he said -- now, I can't remember if he told me this or -- or -- I think it was a

8    subsequent conversation where he said, "I've decided to leave before the 20th to allow

9    my PDAAG at ENRD to become the Acting AAG and to have that on his resume."    He

10   said, "So I'm going to depart a little early to allow for that elevation and for the PDAAG at

11   Civil to become the acting head of Civil."

12        And he said, "Aside from that, I'm just -- I'm just going to do my work quietly and

13   finish."    And then he -- and then he said, "And I'm," he said, "I'm deeply saddened."    He

14   said, "I've always counted Jeff Rosen as a friend, and I know that that relationship is -- I've

15   burned that bridge forever."    And he says, "I think I've lost some -- I know I've lost some

16   friends off this and probably made some enemies off this, and so I -- I'm just going to, as

17   quietly as possible, just get my job done and go."

1      [5:00 p.m.]

2                    BY MR. ▮▮▮▮▮▮

3      Q      Okay.    There is a lot to unpack there.    As far as the tone of the meeting,

4      did he explain what that was like?    Hostile, friendly?

5      A      He certainly didn't -- nothing about it sounded friendly, but he didn't

6      describe it hostile.    It's -- it's -- I think you've noticed the pattern today, Mr. Clark often

7      didn't unpack a lot of details with me.    And you've said that I'm not in the habit of asking

8      questions beyond what the boss is willing to say.    It's -- it's -- so I don't recall him

9      characterizing that at all.    I took the time I did to recount every substantive detail I could

10     recall.    I don't recall anything else he said aside from everything I've just unpacked.

11     Q      Okay.    And some of my questions are going to be designed to see if we can

12     jostle anything --

13     A      Sure.

14     Q      -- loose in there.

15     A      Yes, sir, yes, sir.

16     Q      But were there any comments that Mr. Donoghue, Mr. Philbin,

17     Mr. Cipollone, anybody in that meeting made that stood out to him, that affected him,

18     and that he recounted to you?

19     A      Someone, and I'm not sure who, said that if Mr. Rosen were to be replaced,

20     that a number of political appointees would be resigning.    That there would be a

21     number of resignations from Department leadership.

22     Q      Okay.    Did he say anything about that?

23     A      At some point, I can't remember if it was January 4 or if it was a subsequent

24     conversation, he had said that he had found out that a cell phone -- that a conference call

25     had been convened between the political appointees where someone, I can't remember

1    who, had said, please let so-and-so know -- I don't remember the name -- let so-and-so

2    know if -- if Clark were to replace Rosen as acting AG, which -- who among you would

3    resign as a result?    And text your answer to so-and-so.

4        Q    He found out about that later?

5        A    It -- he did.    I'm trying to -- I don't recall how he found out or that he -- I

6    don't recall him telling me how he found out.

7        Q    Okay.

8        A    Maybe he was even recounting, I don't know how many details.    I found

9    out from the committee that the meeting went on for more than 2 hours.    So I don't

10   even know what the details actually were said by whoever spoke in the meeting on that.

11       Q    One of the things that you said Mr. Clark told you after was that he thought

12   he may have burned some bridges and made some enemies.    What was it that burned

13   the bridges and made some enemies?    Did Mr. Clark tell you?

14       A    The sense that -- he mentioned a comment in the conversation that he had

15   with Mr. Rosen before, earlier that day on Sunday, where Mr. Rosen said something along

16   the lines of, I can't believe you would do this to me, or I can't believe this would be

17   you -- something -- something like that.    And to which Mr. Clark responded, look, it's the

18   President who makes these decisions, you know.    We all serve at the pleasure of the

19   President.    And so, we all just operate under the appointments that he chooses to make,

20   something -- something to that effect.

21       Q    Uh-huh.

22       A    And that Mr. Rosen said something to the effect of you could have told him

23   no, or you could have told him you're not interested, or you could have told him you

24   won't do it.    Something like that.

25       Q    Uh-huh.

1       A       So it's -- ask your question again, if that didn't fully answer it.

2       Q       No.    That's fine.

3               And the President, we talked about this much earlier in the day, but the President

4       was interested in Mr. Clark because of, I don't know, his willingness to go to bat on

5       election-related issues?    Is that a fair summary of what you understood?

6       A       That -- that certain -- yeah, that certainly -- there seemed to be such a focus

7       on that at the time that I did not hear any indication of any other reason for that.

8       Q       Okay.

9               BY MR. ▮▮▮▮

10      Q       Did Mr. Clark say what ultimately was the basis of President's decision?

11      A       I don't recall, the -- I did read in the Senate Judiciary Committee report

12      where the President said he wasn't going do anything that was called mass resignations.

13      I don't recall Mr. Clark having said that to me.

14      Q       Okay.

15      A       All I recall the Mr. Clark saying was the President decided I'm not going to do

16      that.   Yeah, we're not going to make him change.    I'm not going to do this.

17      Q       But he didn't say because of the mass resignations or any other specific

18      factor?

19      A       Correct.    I don't recall Mr. Clark saying -- this was -- this gave me -- he gave

20      me the appearance of this being a very painful, embarrassing conversation for him to be

21      having.

22      Q       Right.    So you didn't ask a lot of questions?

23      A       It's -- he -- he acted like he felt compelled that he had to say something, but

24      he wanted this conversation to be over as soon as possible.

25      Q       Yeah.

1       A       So it was -- it was -- it was quick, and tight, and done.

2       Q       Did he say anything about who in the meeting was on his side, if anyone?

3       A       He did not say anything about anyone being on his side.

4       Q       Did he say that no one was on his side?

5       A       I don't recall him saying anything about it.    It wasn't until I read the Senate

6       report that it appeared that it was unanimous.

7       Q       Okay.    And did he say anything about people directly criticizing him, and his

8       legal skills, and his experience in front of the President in that meeting?

9       A       I do not recall him saying anything.    I did of course, you know, look at -- you

10      know I read the committee --

11      Q       Okay.

12      A       Reading the committee report made clear to me just how little, just how few

13      details I had been given.

14      Q       I understand it is hard to disentangle what you've read in the report --

15      A       Right.

16      Q       -- from what Mr. Clark told you directly.

17      A       Right.

18      Q       So I appreciate it.    I always appreciate your precision about that.

19              That's all I have.

20              Mr.▮▮▮▮▮        Okay.

21                      BY MR▮▮▮▮▮

22      Q       After that meeting, go back, how long did you stay at the Department?

23      A       I was there -- I -- I submitted a letter of resignation effective at 11:59 a.m. on

24      January 20th.

25      Q       And you said Mr. Clark left earlier.    Do you remember when he left?

1          A      Um, I -- I -- I do not.    Of course those -- I mean those are easily discoverable

2     records for you.

3          Q      Sure.

4          A      I -- I'm guessing -- I -- I don't know.    It's several days prior, but I don't know

5     if that was the 18th or 14th, or somewhere in that range.

6          Q      Okay.

7          A      It was after, if I may, it was after my oral arguments and the last one I

8     believe was January 13, so it was subsequent to that date.

9          Q      After that meeting, and things kind of settle from that meeting at the White

10    House, did you have any election-related responsibilities again?

11         A      None whatsoever.    And I was cramming for what I saw as huge things that I

12    needed to do well.    And so, I just -- I had my conventional portfolio and no one did

13    anything to distract me from that.

14         Q      Did you have anything that you needed to do before January 6th, that was

15    only 3 days later?

16         A      No.    Not just beyond continuing to prepare for my oral arguments that

17    would be the following week.

18         Q      Okay.    Did Mr. Clark do anything related to the election after that meeting

19    at the White House on the 3rd?

20         A      No.    I had -- I had no involvement.    And he said nothing to me about him

21    having any involvement in anything.    And that would have been contrary to the verbal

22    representations he had made to me about what his plan was for his few remaining days.

23         Q      Okay.    Do you know if he or anyone else actually sent off the draft letter

24    after this meeting?

25         A      I -- I have no -- I have no knowledge of it.    In fact, again, it wasn't until the

1    Judiciary Committee report that I was even aware that the letter came up in the Oval

2    Office meeting.   He never mentioned.    I do not recall him saying anything to me on the

3    4th about the letter having come up previously.

4         Q    Is there anything else about your time at the Department that we should

5    know related to election-related issues or January 6th?

6         A    No.    It's -- not that I can think of.

7         Q    Okay.

8         A    It seems you have been quite thorough.

9         Q    I'm not quite done yet.    But very briefly we are reaching the end here.

10        A    Yes.

11        Q    So exhibit 16 and 17 are memos that all just refer to as the John Eastman

12   memos.   Do you know John Eastman?

13        A    Yes, I do.

14        Q    Okay.    Have you worked with John Eastman on any election-related issues?

15        A    When I was in the private sector, so this is before my government service.

16        Q    So 2016?

17        A    And -- and there could have been something in '17.    There could have

18   been -- remember, I joined in 2019, so prior to 2019.    I had on the --

19        Q    Let me stop you, because we're really just focused on the 2020 election?

20        A    Oh.

21        Q    I appreciate, like Mr. ███████ your precision.

22        A    Gotcha.    Gotcha.

23        Q    But have you seen previous versions -- before these were publicly released,

24   had you ever seen any versions of Mr. Eastman's memos?

25        A    Mr. Eastman emailed me a version of this memo shortly after January 1.    I

1    think it was January 2.

2           Q      For what purpose?

3           A      It is -- I had -- and I don't remember the specifics of the conversation, I

4    thought I had had a conversation.    I can't remember if it was -- I honestly can't

5    remember if it was with Dr. Eastman himself.    I think it would have been.    But I truly

6    don't remember the conversation.    I'm trying to build back from what I'm about to say.

7    He emailed me, with no comment, a copy of -- of I believe this -- this memorandum.

8           Q      The shorter one?

9           A      Yes, I believe -- I believe so.

10          Q      Will you provide those to the committee.

11          Mr. <u>Greim.</u>    Those -- so we have a First Amendment log that we have not

12   produced yet.    That was going to be on there.    I see you've got this memo here.    And

13   so, I'll tell you that we're willing to provide that email that he sent, the witness is

14   currently testifying about, so we will provide that to the committee.

15          Mr. ██████    And our position would be his communications with John Eastman

16   about this election in particular would be responsive to the committee's subpoena.

17          Mr. <u>Greim.</u>    And that's why they are going to be on the log.    But at any rate,

18   we'll let you go ahead, question by question.    I don't know that we're going to have

19   objections as it turns out to this stuff.    And had I foreseen this, we probably would have

20   produced this so you could at least just have had those today.

21          We will let the witness go ahead with his answer.

22          Mr. ██████    Okay.

23                 BY MR ██████

24          Q      So did he -- did you expect him to send any version of this memo to you?

25          A      No, no.

1        Q      He -- out of the blue, he just sends you an email like this?

2        A      I'm trying to remember if I had heard -- well, you now know Eastman has a

3   memo, you know, like a game.   I -- I'm trying to remember who I was talking with, or

4   whether it was John himself.   I truly don't remember.   I'm like, do what?   What

5   memo?   I mean, it's -- do what?   And I got this email.   I opened it up, I saw this memo.

6   As soon as I saw it, and I realized that this was the same subject matter that I had just

7   been involved in a motion to dismiss on.   I didn't think -- it's whether it was obligatory or

8   not, I just didn't think I should be involved in any conversation on this.

9        I'm starting to think am I conflicted out on -- it's just so -- I didn't forward it to

10  anyone.   I didn't respond.   I didn't reply in any way.   And I was not happy to have it.

11  I'm, like, what is this?   And I just wanted to have nothing to do with it.

12       Q      Did you call John Eastman about this?

13       A      No.

14       Q      Okay.

15       A      I -- I didn't want to -- I wasn't even sure if it would be -- I wasn't even sure if

16  it would be proper for me to call at that point.   Again, it's just -- I -- I was -- I was

17  involved in -- I was just involved in filing a motion to dismiss to shut down something in

18  this lane.   So I'm trying to think back through professional responsibility obligations.

19  There's a common nucleus of facts.   I was trying to think through all this.   I'm like, you

20  know what, I should just -- I don't want to touch this with a 10-foot pole and just stepped

21  away.

22       Q      I want to kind of broaden the aperture here.   Did you talk to John Eastman

23  whether on the phone, in person, email, or otherwise about the November 2020 election

24  or its aftermath?

25       A      About --

1          Mr. <u>Greim.</u>    Now, here's -- when we get into specific discussions that go beyond

2     this memo, we will be objecting.    But this is a broad -- he's doing the entire subject

3     matter, it's a yes-or-no question.

4          The <u>Witness.</u>    Okay.

5          Mr. <u>Greim.</u>    You can answer that question.

6          The <u>Witness.</u>    Okay.    And forgive me, can you please ask the question again?

7               BY MR █████:

8          Q     Yeah.    Did you communicate with John Eastman at all about the November

9     2020 election or its aftermath?

10         A     Yes.

11         Q     When?    Was it before the election?

12         A     The -- no, shortly after the election.    When I was on leave as a volunteer

13     attorney.

14         Q     For the Trump campaign?

15         A     Correct.

16         Q     And did you talk to him in your capacity as an attorney for the campaign, or

17     just as two interested people?

18         A     As -- as -- as an attorney -- as an attorney for the campaign, trying to assess

19     the universe of what's what -- what's the situation.

20         Q     Okay.    And in trying to assess the universe of the situation, are you also

21     trying to assess the universe of challenges to the election?

22         A     This was all in the context of trying to assess post-election litigation options.

23         Q     Okay.    And did you talk to him about subject matter that's also in his memo

24     that he sent to you?

25         A     Things related to a joint session of Congress -- no, no, no, no.    This was all

1     just, you know, there are -- there are -- there are -- it's --

2          Q      Let me ask you, and I'm --

3          A      I can --

4          The Reporter.    One at a time.    You have to go one at a time.

5          The Witness.    No.    To answer clearly and directly, not at all.

6                 BY MR.▮▮▮▮▮▮

7          Q      Okay.    Did you talk to Mr. Eastman about alternate electors?

8          A      I'm trying to think through the early conversation and --

9          Mr. Greim.    If the conversation was when you were serving as volunteer counsel

10    for the campaign -- it took me a second to think this through -- I think -- I think you have

11    to assert the attorney-client and First Amendment privilege to that, but the -- I mean, I

12    think that's what you have to do.

13         The Witness.    Yeah.

14         I -- it's -- I don't it think I'm at liberty to discuss the substance of those

15    conversations.

16                 BY MR.▮▮▮▮▮▮

17         Q      Okay.    So I just want to be very clear for the record, are you asserting

18    attorney-client privilege to not answer the question of did you talk to Mr. Eastman about

19    alternate electors?

20         Mr. Greim.    Well, and I'll step in here.    The privilege is being asserted for talking

21    to Eastman about alternate electors during the timeframe when he was serving as a

22    volunteer attorney for the Trump campaign.    He's -- he'll answer any of your questions --

23         The Witness.    That's correct.

24         Mr. Greim.    -- about talking to Eastman when he is at the Department of Justice.

25         The Witness.    Yes.

1          BY MR ▮▮▮▮▮▮

2          Q      Okay.    So again, I want to be very clear for the record.    The question I

3   asked was, did you talk to Mr. Eastman about alternate electors, and you are asserting

4   attorney-client privilege?

5          A      For the time that I was a volunteer attorney for the campaign.    When I was

6   acting in that capacity, yes, and yes.

7          Q      Okay.    Outside of that timeframe, did you talk to Mr. Eastman about

8   alternate electors?

9          A      We -- we talked socially about ongoing litigation.    He filed one of the cert

10  petitions at the Supreme Court.    So there were -- there were brief exchanges along

11  those lines.    That was more of a broad-scope conversation about challenges, and not

12  about what I consider the prospects of success on those challenges.    But I don't recall -- I

13  don't recall whether there was a specific topic on -- on where exactly those challenges

14  would -- would go.

15         Q      Okay.    So you said you talked to him about the cert petition that he filed.

16  So he filed a cert petition in Texas v. Pennsylvania on behalf of the President.    Is that the

17  one you're talking about?

18         A      I'm referring to the Pennsylvania cert petition, the challenge from -- the legal

19  challenge in Pennsylvania.

20         Q      And that was in early December, correct?

21         A      I believe that the cert petition was filed sometime in mid-December.

22         Q      Okay.    What did he say about that?

23         A      Just that it was -- I think it was as short as congrats on the cert petition.    So

24  I mean, it was -- it was a -- it was a -- a short -- it was -- to the -- to the best of what I

25  remember right -- at the moment, it was -- it was just a short, you know, Hey congrats.

1   It's -- I don't recall a detailed conversation.   I don't recall a detailed conversation

2   about -- about any theory for how you could do anything after December 14.   So

3   it's -- it's -- it's -- I -- I was avoiding getting into the substance of conversations after

4   December 14 where I would be unpacking what I thought the odds were of any sort of

5   legal action that could produce any sort of outcome after the electoral college had voted

6   in December 14.   And to use the phrase I've used before, that we were no longer in Bush

7   v. Gore territory.   No election is perfect.   There's problems with -- you know, no

8   election is perfect and on December 14, the electors cast their ballot.   Because

9   remember it wasn't I research the Hawaii thing on December 28th.   Until then, I didn't

10  know that anyone had every tried anything after that point or without -- yes.

11        Q     Okay.   So just to clarify one thing, you were congratulating Mr. Eastman on

12  the cert petition?

13        A     Words to that effect.

14        Q     Okay.

15        A     Congrats on the cert petition.

16        Q     Okay.   Mr. Eastman writes these memos.   Did you ever brainstorm with

17  him about what ultimately became these memos?

18        A     Oh, regarding the January 6th memos?

19        Q     That's right.

20        A     He -- no, not that I recall.

21        Q     Okay.   Did you talk to him about the Vice President's power as the

22  President of the Senate on January 6th?

23        A     Not that I recall.   And I was unaware of his view until I read it.

24        Q     Did you talk to Mr. Eastman about legislatures appointing or certifying their

25  own electors after December 14th?

1       A       After December 14?

2       Q       That's not when the conversation happened?

3       A       Right, right.    Just whether -- whether a legislature could do something after

4    December 14?

5       Q       Correct.

6       A       I have no recollection --

7       Mr. Greim.    I was going to -- go ahead and finish your answer.    Go ahead.

8       To the extent this question could have covered back -- we may be -- on all these

9    questions, I think we are past your time as a volunteer attorney on the campaign.

10       The Witness.    Right.    Yes.    We're talking beyond the period where we've

11    already asserted privilege.    It's -- it's -- it's -- I thought that was -- if I need to make that

12    explicit, I'm not making any comment on conversations beforehand during that time

13    period.    The idea of later conversations post that time period about what legislatures

14    could do after December 14, I -- I have no recollection of any such conversation.

15                BY MR. ██████

16       Q       Okay.    And, of course, the reason I'm asking is because some of this

17    overlaps in subject matter with the letter that you drafted in December with Mr. Clark --

18       A       Yes.

19       Q       -- about State legislatures' powers and alternate electors?

20       A       Right.

21       Q       Did John Eastman, or your discussions with John Eastman, at all impact the

22    letter that you drafted on December 28th?

23       A       The -- the reason I believe you're seeing the overlap is because I referenced

24    that I was looking at a cert petition as I was writing the December 28 letter, I was reading

25    the John Eastman cert petition from Pennsylvania.

1          Q      And was that because you thought that petition and John Eastman's position

2     was a good one?

3          A      That was because of the cert petitions that I knew about.    Dr. Eastman was

4     the most accomplished constitutional lawyer.    Many of the filings that I had seen at

5     different points subsequent to Election Day were -- were not of the highest quality.    I

6     thought that the cert petition was -- I mean, some of these things had typos in it or

7     incorrect citations.    The Eastman cert petition cited to various historical sources, cited to

8     various cases.    And I'm like, okay, I have a limited time period on December 28, I need to

9     come up with a draft right away.    I can't think of anything I would be looking for that

10    wouldn't already be in this document that who knows how many man-hours had been

11    spent on.    And so, that's where I was pulling case law citations.    That was where I saw

12    Hawaii.    That was where I got the citation, that's where I was pointed in the direction of

13    Balkin Yale Law Journal article that I looked up to say what is, what happened in Hawaii in

14    1960.

15         Q      And did Mr. Clark suggest that you look at this cert petition for your

16    research?

17         A      No, he did not.

18         Q      This is on your own?

19         A      Yes.

20         Q      And did you remember this cert petition because it's something that you had

21    discussed with Mr. Eastman before?

22         A      I had seen -- I had heard or read a news story about -- about Eastman having

23    filed a cert petition.    And so, I had pulled it up at some point just to see what is the cert

24    petition, this is prior to that.    And so, I had -- I had read through it, and -- or I -- at

25    least -- I hadn't read through it, I had skimmed it just to get a gist of what was being

1   argued.   And so, it was fresh in my mind just -- just a couple or several days later.   I

2   don't remember which day I read it, but it was within 5 days prior to -- to December 28.

3   So when I was actually in December 28 and had to find authorities quickly, I recalled the

4   cert petition and just looked it up.

5       Q    Okay.   So moving kind of away from that, but you said you received from

6   Dr. Eastman a draft version of this memo sometime in early January.   Is that right?

7       A    Yes.

8       Q    Okay.   And you said that because of your responsibilities at the Department

9   at the time you didn't feel like you could respond?

10      A    It's -- it's -- that and I -- I didn't feel I should.   And I did not agree with the

11  legal theory.   So I'm just not touching this.

12      Q    Did you push back at on it at all?

13      A    I -- I didn't think it was advisable that I should have any communication on

14  this.   I couldn't control the fact that something was sent to me that actually overlapped

15  a case that I had worked on.   That I couldn't have known about ahead of time.   So I

16  didn't regard myself responsible for that, but that I had to be careful in what I would do

17  subsequent to becoming aware of it.   And so, seeing something that -- that I disagreed

18  with at the moment, but even if I had agreed, either way, the fact that I had been

19  involved in litigation about this, I -- I thought I shouldn't -- I didn't want to have it.   I

20  wasn't happy about the fact that I had it.   And I didn't think I should -- I -- that I should

21  say -- I should do nothing.   I should hands off.

22      Q    And at the time did you know Mr. Eastman was meeting with the President,

23  the President's staff, the Vice President, and the Vice President's staff about this memo?

24      A    No, I did not.

25      Q    None of them?

1       A       It's -- it's -- I knew that there were these legal matters still ongoing, despite

2       the fact that, you know, as I've already expressed, I thought that this was in a date range

3       where, you know.   I mean, prior to December 14 is one thing, this is not that.   I knew

4       that there were different lawyers and different people doing -- I was staying steer clear of

5       that.   I had two oral arguments coming up the following week.   And I was just -- I

6       wasn't touching any of it.   I wasn't spending time on that.   I was doing my job.

7       Q       Did you tell Mr. Clark that you had received this from John Eastman?

8       A       No, I did not.

9       Q       Did you tell Mr. Clark that you had used John Eastman's cert petition as a

10      basis for the letter, the draft letter?

11      A       No, I do -- I do not believe so.

12      Q       Okay.   So you had no involvement in crafting, thinking through, or making

13      suggestions about these Eastman memos that are at exhibit 16 and 17?

14      A       I would not -- I would not be involved drafting a legal memorandum

15      regarding a -- I would not be voluntarily working on any sort of legal effort on a legal

16      position I did not agree with.

17      Q       Okay.   So that was going to be my next question.   If you were involved,

18      would you have told Mr. Eastman you can't do this, this is not right?

19              Mr. Greim.   You know, I just -- sort of -- the question has sort of been answered,

20      but I'm just going to object to asking an improper hypothetical.   And he said he wasn't

21      involved in it, asking for speculation.

22              Mr. ███████   Are you comfortable answering the question?

23              The Witness.   It wasn't the facts of it's -- it's not what happened.

24                      BY MR ███████

25      Q       When you say it's not what happened?

1          A      No, I -- I -- I'm saying it's -- it's -- I -- I'm disinclined to get into hypothetical

2      what ifs, when, it's -- it's --

3          Q      Okay.

4          A      I --

5          Q      I just want to flesh out one thing on the attorney-client assertion that you've

6      made.    You're saying that you are an attorney working for the campaign as your client,

7      correct?

8          A      We're talking about earlier?

9          Q      In the November 3rd to 10th roughly timeframe?

10         A      Yes, and for several days prior to November 3rd in the run-up.    But in the

11     days surrounding the election.

12         Q      Okay.    And did Mr. Eastman have a role on the campaign at that time?

13             Mr. Greim.    You can answer yes or no.

14             The Witness.    It's -- he -- at some -- at some point, yes.    I don't know what day

15     that started?

16                       BY MR. ███████

17         Q      In that time period, when you were --

18         A      In that time period.    Yes.

19         Q      And just let me make sure I get my question out.    In that time period where

20     you're November 3rd-ish to 10th-ish, where you're talking to Mr. Eastman, and for what

21     you've now asserted a privilege, Mr. Eastman was also working for the campaign is what

22     you're saying?

23         A      Subsequent to November 3rd, at some point in the following days,

24     Mr. Eastman was advising people -- other lawyers on the campaign.

25         Q      Okay.    Is there anything else about Mr. Eastman that you think we should

1    know as far as your involvement in discussions with him?

2           Mr. Greim.   He is asking for your opinion.

3           The Witness.   It's -- no.

4                    BY MR██████

5    Q    Okay.    Very quickly, do you know John Lott, Jr.?

6    A    Yes.

7    Q    He joined the Department around the same time you did.    It was November

8    or December I believe of 2020?

9    A    Oh.    We might be talking about someone different.    I'm sorry, who?

10   Q    John Lott, Jr.?

11   A    Are we talking about an elderly gentleman or an younger gentleman?

12   Q    I will have you turn to exhibit 18, the person listed there, John R. Lott, Jr.,

13   Ph.D.

14   A    If this is the gentlemen I'm thinking of, yes, I do know him.    I've not had

15   contact in years.

16   Q    Do you know that he was working at the Department around the same time

17   you were, late November, December 2020?

18   A    No.    So much so that I wonder if this is even the same individual that I'm

19   thinking of, but certainly not anything I knew about, no.

20   Q    Okay.    Fair enough.

21          The Willard Hotel has been a hot topic in the news as far as war rooms and

22   reported war rooms.    Not my terms.    Do you know anything about that?    Were you

23   ever there?

24   A    No, I was never there.

25   Q    Did you ever talk to people, or talk with people who were there?    So you

1    knew, for example, you're getting on a conference call with people at the Willard?

2         A    No.   I -- I had no knowledge of any event at the Willard that I was in any

3    way plugged into.

4         Q    So people there were Mr. Giuliani, Sidney Powell, Jenna Ellis, I believe Roger

5    Stone may have been there at some point, Bernie Kerik.   Did you talk to any of those

6    people in early January?

7         A    No.

8         Q    How about in December?

9         A    And run through that list again.

10         Q    Rudy Giuliani?

11         A    No.

12         Q    Sidney Powell?

13         A    No.

14         Q    Jenna Ellis?

15         A    No.

16         Q    Roger Stone?

17         A    No.

18         Q    Bernie Kerik?

19         A    No.

20         Q    Okay.   Do you know Ms. Ellis?

21         A    Yes.

22         Q    How do you know her?

23         A    I met her when she was working for Dr. James Dobson years ago.

24         Q    Did you have any interactions with her between the election in November

25    and January 6th?

1          A      No, not that I can think of.   I -- I don't remember the last time I've

2     communicated with her.   I believe it was a long time prior to that.

3          Q      Okay.   Now, you sent us a privilege log -- and this really is rapping up -- but

4     it looks like on December the 4th you had a series of discussions.

5          Do you have the privilege log with you, counsel?

6          Mr. Greim.   Yeah.

7          Mr. Brothers.   Hold up.

8          Mr. Greim.   Yeah, we have it.   Sorry, it went to sleep.

9          Mr.█████   All right.

10         On this one what I will do is I will just chat with counsel and we can work out some

11    of these issues.

12         The Witness.   Okay.

13              BY MR█████

14         Q      So one of the things that we're doing here is, as you know, trying to figure

15    out if there's anything that the Congress can do, legislatively or otherwise, to prevent

16    something like the attack on the Capitol from happening again.   I did neglect to ask you,

17    were you anywhere near the Capitol on January 6th?

18         A      I was working from home on January 6th.   I was not anywhere in D.C. -- in

19    the District.

20         Q      And did you have any communications with the White House or anybody in

21    the West Wing about what was happening at the Capitol on January 6th?

22         A      No.

23         Q      Did you have any conversations with the Vice President or his office about

24    anything that was happening on January 6th?

25         A      No.

1       Q      All right.   So to get back to my earlier point, Congress is charged with

2    figuring out whether there's any legislation that can prevent something like the attack on

3    the Capitol from happening again.    Is there anything that you've thought of going

4    through this process, after having received a subpoena, and thinking about various

5    legislative issues, that you could recommend to the committee?

6            Mr. <u>Greim.</u>    I mean, we -- rather than testifying under oath, I think we'd be happy

7    to give you something in writing -- what we can -- this is probably not the most creative

8    and thoughtful time of day after a long day of stressful questioning, but I think the

9    witness would -- would happily consider it.

10           Mr. █████     Okay.    Let me just say for the record, that's something we would

11   be interested in.    And you seemed like an accomplished attorney who's thought about

12   issues and some of the issues that, like the Electoral Count Act came up in some of the

13   things that you've talked about here today.    And so, your views on them as with respect

14   to how they could prevent something like this would be welcome.    I think the

15   committee would appreciate it.

16           The <u>Witness.</u>    It's -- it's -- that's -- when I'm not under oath as a fact witness and

17   being sought for, like, legal opinions and it's -- it's -- it would certainly be natural for

18   someone in this process to have had thoughts about things that could be done

19   differently.

20           Mr. █████     Okay.

21           Mr. █████     Yeah.    And we'll happily take that in the form of letter from your

22   counsel.    That's no problem.    Give every witness an opportunity to help us with the

23   prospective part of this so we can consider changes.

24               BY MR. █████

25       Q      When is the last time you spoke to Jeffrey Clark?

1   A As responsive to the subpoena or just volunteering information?

2   Q Whatever you think is potentially --

3   A I cut you off.

4   Q When was the last time you spoke to Jeff Clark?

5   A It was -- it was after we were in the private sector.   I was in a job search

6 and he was in the job search.   And so, I want to say roughly once a month, we'd touch

7 base for a couple months just in terms of Hey, have you landed anywhere?   That sort of

8 thing.

9   Q Uh-huh.

10   A And then -- and then I reached out to him several months ago because the

11 nonprofit law firm he was at was engaged in litigation on a subject matter, totally

12 unrelated to elections, that my law firm also had a case on.   And I had seen an expert

13 report in the lawsuit of that organization.   And again, this has nothing to do with

14 elections, it is a scientific matter.

15   Q Then it really doesn't matter, if it doesn't have to do with the subject matter.

16   A Oh, if we're talking about the subject matter of this, yes.   I'm sorry.

17   Q I appreciate that you had ongoing personal or other professional

18 conversations with him.   I'm wondering whether you've had any conversations with

19 Mr. Clark about anything related to your joint service at the Department of Justice?

20   A Nothing -- nothing beyond when we would have, you know, months ago,

21 months ago, just touching base in terms of Hey, have you found a job yet?   In a brief

22 conversation, just along the lines of, Boy, it's a real shame things ended on the note they

23 did.   So nothing substantive, just a, you know -- it's -- you know.

24   Q Have you talked to him about the select committee?

25   A I can't remember whether the committee was formed yet at that point.   So

1    I -- it's -- I seem to recall he made a comment, so they maybe this -- maybe this would be

2    along the lines of Well, you know, I may have -- I may have a -- a tough road to hoe or

3    something like that, just in terms of, you know, I would gather from that knowing from

4    the media stories that he was in.    The New York Times had run stories on this, which I'm

5    sure you're aware, just knowing that if anyone was going to end -- that among the list of

6    people that such a committee was likely to talk to, that as soon as that New York Times

7    story had come out saying, you know, like suggesting the tie between the January 3rd

8    meeting and January 6th, that something along the lines of, you know, I may end up

9    getting interviewed or something, or, Oh no, or Oh, golly, look at this.

10          So nothing substantive, just a, you know -- to paraphrase, I'm sad that there are

11   now news stories suggesting a tie there of people investigating the one will want to talk

12   to people involved with the other.

13          Q       Did he ever mention anything about getting subpoenaed or about the

14   committee's interaction with him?

15          A       I don't think I've -- I don't recall having communicated with Mr. Clark on any

16   matter that's responsive subsequent to his being subpoenaed.

17          Q       Okay.    Has he ever mentioned anything to you about a Fifth Amendment

18   privilege that he may assert or may have?

19          A       So we're talking now before a subpoena was issued?    Because I haven't had

20   conversations with him after.

21          Q       And --

22          A       Yeah.    I never recalled him saying anything to me about -- all of that would

23   have been so premature because we're talking pre subpoena.    Just a, Oh, no, look at this

24   committee that's been formed.    And now they are saying that the January 3rd thing may

25   have been tied in, and oh, golly.    I mean, that's kind -- that was -- that was the end.

1          Q     Okay.    And other than your attorneys, and I don't want to hear about any

2     conversations with them, did you reach out to anyone when you were subpoenaed or to

3     sort of prepare for your testimony?

4          A     I --

5          Mr. Greim.    I would just say and searches for other attorneys.

6          Mr. ██████     I'm not interested in any of that.

7          The Witness.   Yes.   I was -- I did not want to engage in any nonprivileged

8     conversations regarding it.    So it -- it -- it took a while to find counsel.   I kept you

9     advised of those ongoing efforts.    So --

10                    BY MR. ██████

11         Q     A different issue.   I mean, sort of on the merits of what happened, trying to

12     refresh your memory by talking to others who were involved in those events, anything

13     like that?

14         A     Not -- not -- not that -- not that I recall.   I --

15         Q     Okay.   Is there anything that we have not asked you, any fact you want to

16     make sure we're aware of before we stop, anything at all on your mind that you think

17     might be relevant or bear upon the issues that we're evaluating?

18         A     That once I was back from the campaign, but before I was at DOJ, when I

19     was at OMB, when I was outside of what I would call Hatch Act territory in the evenings,

20     at home or on private property on my own time, I did continue in conversations, you

21     know.   I would occasionally be sent -- not pleadings, but like, here is a draft to -- drafts

22     of -- of items that might be raised in litigation asking for review for comment.    So

23     communications of -- of that sort.   When I was on my own time and in a volunteer

24     capacity.

25         Q     I appreciate that.

1          And did any of that volunteer capacity work, legal work, bear upon anything that

2    you handled, managed at the Department of Justice?

3          A    No, not that I know of.

4          Q    Okay.

5          Mr          Okay.

6               BY MR

7          Q    Including the December 28th draft letter?

8          A    None of the -- there were legal -- there was some public discussions,

9    well-known public discussions about various legal concepts that started being discussed

10   publicly and widely, very shortly after the election.    Understanding -- I mean, some of

11   those I see as kind of tied in.    It's hard for me to separate everything in December, in the

12   December 28th letter from those conversations that everyone was having, you know.

13   Shortly after November 3rd when things were moving into a litigation mode.    So you've

14   got that overlap.

15         Q    Let me just --

16         A    So you've got that overlap.    I think those -- they are inextricable.

17         Q    Let me just specify, did any of that motivate any actions you took at the

18   Department, including the December 28th letter?

19         A    No, it did not.

20         Q    Okay.    So just for kind of housekeeping purposes at one of the breaks, we

21   talked about a          account that you had.    You said that you reviewed the

22   contents of that in order to determine what was responsive to the committee's

23   subpoenas?

24         A    Yes.

25         Q    You have done that?

1          A     Yes.

2          Q     Okay.    And then I will talk with your counsel, but I understand that you're

3    still running down maybe an issue or two about cell phones that you had or didn't have in

4    the time period that's responsive to this subpoena?

5          A     Yes, and --

6          Q     Okay.

7          A     And regarding the ███████████ account --

8          Mr. Greim.    Yeah.    Yeah.

9          The Witness.    We found no responsive items.

10         Mr. ███████    Okay.

11         The Witness.    So I scanned, I scanned the full account.

12         Mr. ███████    Okay.

13               And then so in light of the fact that we are expecting additional documents

14   and that there is an outstanding objection to one of questions that's relevant to the

15   committee, what we're going to is what we will recess the deposition subject to the call of the

16   chair.    And I will be in touch with your counsel about that moving forward.    But I think

17   at this point we are prepared to recess subject to the call of the chair.

18         Mr. ███████    With no current intention to reconvene.    Only sort of keeping that

19   option open if something in your further production or other documents make that

20   necessary.

21         Mr. ███████.    We will go off the record.

22         [Whereupon, at 5:47 p.m., the deposition was recessed, subject to the call of the

23   chair.]

1                          Certificate of Deponent/Interviewee

2

3

4          I have read the foregoing _____ pages, which contain the correct transcript of the

5      answers made by me to the questions therein recorded.

6

7

8

9                                    _____

10                                          Witness Name

11

12

13                                   _____

14                                              Date

15

16