# EXHIBIT 7

January 6, 2021

United States Senate
Select Committee on Intelligence
Washington, DC 20510-6475

RE: SSCI #2020-3029

Dear Acting Chairman Rubio and Vice Chairman Warner,

(U) This letter responds to your letter to me of October 29, 2020, asking for an independent review of possible instances of politicization of intelligence. The letter transmits my findings, which are laid out more fully in the attached report. I am prepared to provide a classified briefing to discuss the findings in more detail.

(U) The United States is in a hyperpartisan state, unlike any in recent memory. The country is divided along political, ideological, and racial lines to the point where civil discourse has become difficult if not impossible. The polarized atmosphere has threatened to undermine the foundations of our Republic, penetrating even into the Intelligence Community. Though, as intelligence professionals, we have the ethical responsibility to remain unbiased and objective in our work, we are human beings and can still feel the pressures from society and our political leaders. Pressures from our political leaders have sometimes placed demands on us that have translated into what might seem like bias or a loss of objectivity. In most cases, what we see is the entire system responding to and resisting pressures from outside, rather than attempts to politicize intelligence by our leaders or analysts.

(U) In this environment, characterized by unintentional loss of objectivity, there have been a few incidents where we documented where individuals, or groups of individuals, taking willful actions that – whatever their motivations – had the effect of politicizing intelligence, hindering objective analysis, or injecting bias into the intelligence process. This report lays out the evidence for these instances.

(U) The bottom-line-up-front answers to your questions are:

(U) **Have ODNI-published products adhered to Analytic Standards?** YES, within the scope of the tradecraft review explained below.

(U) **Have ODNI officials politicized or attempted to politicize intelligence, exercised or attempted to exercise undue influence on the analysis, production, or dissemination process of ODNI-published intelligence products related to election security**? YES, in some cases as documented below.

(U) **Have definitions or analytic tradecraft been altered, misapplied, or applied inconsistently on these products?** YES, in some cases as documented below.

(U) **Has ODNI followed standard procedure for the drafting, editing, approval, and dissemination of analytic products related to election interference?** NO, not in all cases, as documented below.

(U) By taking on board this report, the Intelligence Community recognizes where we have not met our responsibilities for objective intelligence. By taking up the recommendations detailed in Appendix I, the Intelligence Community shows that it is already taking steps to correct where we lost our focus on objectivity in the past and will work to ensure that it does not happen again.

Sincerely,

*[signature: Barry Zulauf]*

Dr. Barry A. Zulauf,

IC Analytic Ombudsman,

Office of the Director of National Intelligence

UNCLASSIFIED

## (U) Independent IC Analytic Ombudsman's on Politicization of Intelligence

### (U) Authorities

(U) As the Intelligence Community (IC) Analytic Ombudsman, IRTPA Section 1020 grants me the authority to counsel, conduct arbitration, offer recommendations, and, as appropriate, initiate inquiries into real or perceived problems of analytic tradecraft or politicization, biased reporting, or lack of objectivity in intelligence analysis. For definitions of these standards, see Annex II. In his appointment letter to me, DNI Ratcliffe conveyed his personal commitment to the Ombudsman's obligation to provide an independent avenue for analysts to pursue unbiased analysis. Even the perception that intelligence is being politicized can undermine the trust that the American people have placed in the work of the Intelligence Community. Accordingly, what follows is my independent review and recommendations as the IC Analytic Ombudsman.

### (U) Altered, Misapplied or Inconsistent Analytic Tradecraft or Definitions

(U) My review, conducted in response to IC complaints regarding the election threat issue, surfaced a number of examples of altered tradecraft and misapplied or inconsistent definitions. Due to varying collection and insight into hostile state actors' leadership intentions and domestic election influence campaigns, the definitional use of the terms "influence" and "interference" and associated confidence levels are applied differently by the China and Russia analytic communities. A formal definition document, *Lexicon for Russian Influence Efforts (U//FOUO)*, was published by the NIC in June 2017, however there is no parallel document for China, and it seems that the Russia document is not widely known across IC agencies, at least not outside the election threat community. The terms were applied inconsistently across the analytic community. Failing to explain properly these definitions is inconsistent with Tradecraft Standards 1, 2, and 6.

(U) Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tended to disagree with the Administration's policies, saying in effect, I don't want our intelligence used to support those policies. This behavior would constitute a violation of Analytic Standard B: Independent of Political Considerations (IRTPA Section 1019). On the other hand, Russia analysts assessed that there was clear and credible evidence of Russian election influence activities. They said IC management slowing down or not wanting to take their analysis to customers, claiming that it was not well received, frustrated them. Analysts saw this as suppression of intelligence, bordering on politicization of intelligence from above. At a minimum, it is a violation of the Analytic Standard for Timeliness. ODNI leaders were focusing on presenting intelligence as part of a story arc, highlighting significant trends in a way the customers could consume, rather than reporting each individual item. The incongruity between leaders' and analysts' perceptions might not have occurred if there had been more consistent and transparent communication about analytic differences.

(U) ODNI officials engaging with policymakers said that these customers did notice the result, particularly differences in the volume, frequency, and confidence levels of the intelligence coming from the China and Russia analytic communities on activities that, from their perspective, were very similar in their potential effects. These differences were not intentional, but a result of different collection and analysis rhythms and interpretations by analysts that do not cross-pollinate between regional issues. Subtle differences in analytic concepts, and their inconsistent application did, therefore, make a difference in how customers consumed the intelligence. Some customers were able to perceive differences in tradecraft and definitions: they asked hard questions, leading to greater scrutiny within the IC as leaders suggested changes in an attempt to make the intelligence more consistent and, in some cases, more palatable to customers. IC leaders were not consistently transparent with the workforce about some of these probably justified changes.

(U) According to interviews with NIC officials, policymakers were probably not aware of the behind-the-scenes machinations of the production and dissemination processes. These foundational analytic shortcomings contributed to instances of, and led to other instances of, at least the perceived politicization of intelligence, needlessly long review times, and differences between analytic conclusions in public statements on the one hand and established IC positions on the other. None of this happened in a vacuum, but the dispute appears to have largely begun with misapplied or inconsistent analytic definitions.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

## (U) Dissonance between Public Statements and IC Coordinated Assessments

(U) After conducting a thorough review I found several incidents where there were attempts to politicize intelligence. The most egregious example is the talking points provided alongside the written introductory statement delivered by, but not written by, National Counterintelligence and Security Center (NCSC) Director Bill Evanina on 10 March 2020. Evanina also issued a 24 July ODNI public statement on foreign election interference/influence, and a 7 August press release [for both of which, the intelligence information came from the NIC]. Analysts also referred to statements by the DNI in an 8 October article published in The Hill. These statements left the impression that "the IC thinks…" when, in fact what was stated was actually, according to analysts, a "gross misrepresentation" of established IC views. According to the Director of NCSC, when asked about the IC assessments shared in his March statement and August press release, he said that he assumed they represented coordinated IC views, because NIC and other ODNI officials gave them to him and portrayed them as such. They in fact did not represent fully coordinated IC views, as discussed below.

(U) The March 10 Talking Points were drafted presumably by ODNI staff, however I was not able to find one individual who admitted to writing them. Most officials say (in the passive voice) "they were drawn from" existing reporting, albeit selectively, and were "shaped by other ODNI officials and the Ambassador [meaning A/DNI Grenell]." The main drafters were not analysts, which was probably a major contributing factor to the perceived difference between the

talking points and the established IC view. Analysts point out that there were substantive differences between the Talking Points and what the IC actually thought. Emails show that those who drew up the talking points did partially coordinate them and were informed of analysts' concerns with them, but did not completely consider the concerns in the final version. There was widespread reluctance among intelligence professionals to deliver them. This reluctance on the part of seasoned IC officers should have been a red flag, but did not stop the statement from being issued.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

**(U) Not Following Standard Procedure for Drafting, Editing, Approval, and Dissemination**

(U) Following the March Talking Points, I have identified a long story arc of – at the very least – perceived politicization of intelligence. Guidelines on special review procedures relating to election security products were promulgated by ODNI and CIA leadership, but according to interviews it appears not all analysts and managers were aware of them. Interviewees commented, if there are such guidelines they are not well promulgated. They may be known to other analysts.  Three different NIC products demonstrate the overall pattern of perceived politicization stemming from the inconsistent application of definitions as outlined above. There was a neglect or refusal to re-coordinate changes, adopt alternative analyses, and include dissent language, as well as leadership's failure to communicate clearly and directly to analysts the reasoning for those changes on a consistent basis.

(U) A NIC Memo (NICM) published in May 2020 suffered from a severe slowdown and major changes to coordinated assessments in the drafting, review, and approval process. CIA analysts noted that they and a wide range of IC analysts participated fully in the early analytic work leading up to this NICM, including in the analytic line review. They feel that the first drafts of the NICM followed the general agreement of the community. Then a revised draft came back from NIC review as substantially changed, leading with intelligence gaps that seemed to undermine the threat assessment. The draft led with intelligence gaps and "buried the lead" regarding what the IC does know about election security threats. The then-NIC Chair, immediately before becoming the Principal Executive, crafted this language.  In a follow-up interview, the PE stated that he did this because it was good tradecraft to lay out the analytic environment, including what is not known.

(U) Subsequently, the draft was held up by A/DNI Grenell for weeks before publication, and underwent what appears to be politically motivated editing. Analysts recounted that the NIC and DNI's changes were not fully re-coordinated with the community. The result was a final product whose delayed publication meant it diverged sharply from the up-to-date IC view communicated in other product lines. I have e-mail exchanges to document this delay, allusions to political repercussions, and frustration from intelligence professionals with the delay. These actions constitute a violation of the Analytic Standard for Timeliness, and Tradecraft Standard 7.

(U) According to interviews, the established practice does not include the DNI actively participating in the review chain for NIC Memos or Assessments. As a political appointee, there

is a potential conflict of interest. As DNI Ratcliffe has stated, on the other hand, just because it is unusual to have DNI involvement in the review of these products does not mean it is necessarily wrong to do so. According to tradecraft standards, the DNI like any IC employee, has the right to an analytic conclusion, and provided it is supported by the intelligence. The DNI should also, when speaking publicly, adhere to good tradecraft and clearly delineate when they are sharing their own personal views versus when they are communicating a coordinated intelligence community assessment. To do otherwise would be a violation of Tradecraft Standard 3.

(U) [*Ombudsman Comment: I have not interviewed A/DNI Grenell or his staff who have departed ODNI. They are no longer under my purview as Analytic Ombudsman.*]

(U) In the August NICA, there were analytic lines from the Annual Threat Assessment (ATA – originally drafted in early 2020) which were technically accurate but not as current as what the IC had published over the previous six months in other product lines. Instead of allowing the most current IC-coordinated NICA language to drive this alignment, previously IC-coordinated ATA language was used without a re-coordination, at the instruction of the A/NIC Chair. Analysts claim that NIC leadership consistently watered down conclusions during a drawn-out review process, boosting the threat from China and making the threat from Russia sound "not too controversial."

(U) NIC officials pointed to ODNI senior officials as intervening in the changes to conclusions, saying that they were overly sensitive to political customers who saw the dissonance between China and Russia reporting and the inconsistent application of definitions. DNI Ratcliffe just disagreed with the established analytic line on China, insisting 'we are missing China's influence in the US and that Chinese actions ARE intended to affect the election. DNI Ratcliffe wrote as much in his Wall Street Journal op-ed. Ultimately the DNI insisted in putting material on China in, and was aware analysts disagreed and probably still disagree. As a result, the final published NICA, analysts felt, was an outrageous misrepresentation of their analysis. DNI Ratcliffe states, "I know my conclusions are right, based on the intelligence that I see." As the DNI states, "Many analysts think I am going off the script. They don't realize that I did it based on the intelligence."

(U) Two NIOs wrote a NIC Alternative Analysis Memo (NIC AOA Memo) in October 2020, which expressed alternative views on potential Chinese election influence activities. These alternative views met with considerable organizational counter pressure, which we will address later in this report. ODNI has to ensure that alternative views are expressed, even when they differ from the majority. A healthy challenge culture in the IC can foster differences of analytic views and ensure that they are shared in intelligence products, consistent with IRTPA Section 1017. In my discussions with him, DNI Ratcliffe agreed with the concerns expressed in the Alternative Analysis Memo, and was aware that most analysts did not hold that view. Not to include all intelligence would also be a violation of the IRTPA Analytic Standard D, to be "Based on All Available Sources of Intelligence."

(U) Ombudsmen from CIA, NSA, and ODNI report the widely shared perspective among IC analysts that analysis on foreign election interference was delayed, distorted, or obstructed out of concern over policymaker reactions or for political reasons, which in their view constitutes

politicization. These Ombudsmen agree, whether through application of highly stringent coordination and review practices or deliberate temporizing, there is a discernible pattern of delay on IC analytic production on election threat reporting. There is an inherent danger in even the perception that intelligence products were changed for political purposes. The perception of politicization undermined analysts' willingness to come forward with alternatives. This is a violation of Tradecraft Standard 4 and IRTPA Section 1017.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

### (U) Undue Influence on Analysis, Production, and Dissemination

(U) There were strong efforts to suppress analysis of alternatives (AOA) in the August NICA, and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017. NIC officials reported that CIA officials rejected NIC coordination comments and tried to downplay analysis of alternatives in their own production during the drafting of the NICA. According to NIOs and Directors, CIA management contacted the A/NIC Chair and NIOs to suppress the NIC from caveating analytic judgments that were downplayed due to concerns about policy. As a result, these NIC officials felt the only avenue to express alternative views was via the NIC AOA Memo they authored in October 2020. During the drafting of the NIC AOA Memo, CIA management again contacted the A/NIC Chair and other NIOs on joint duty assignment from CIA (who would eventually have to return to their home agency), pressuring them to withdraw their support of the NIC AOA Memo in an attempt to suppress it. This was seen by NIOs as politicization from below, just as the A/DNI's push to bring forward evidence of what the Chinese are or were doing without apparently being supported by intelligence available to all analysts "must be politicization from above," according to an ODNI official. Politicization may be in the eye of the beholder, but my objective and independent view is that there was politicization from above and below.

(U) The NIOs and Directors faced opposition getting their views on election interference across. It is difficult to have a healthy analytic conversation in a confrontational environment. ODNI and the IC agencies involved in analysis of election interference at first failed in allowing for a challenge culture where analysis of alternatives is required and dissents are encouraged as healthy analytic tradecraft. Such actions amount to exercise, or at least the attempt to exercise, undue influence on intelligence, which is a violation of Tradecraft Standard 4. ODNI and the NIC did, to their credit, ensure that the analysis of alternatives piece and other related intelligence was published.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

### (U) Tradecraft Review

(U) Pursuant to your letter, I asked for products produced between January and October 2020 to be evaluated for compliance with Analytic Tradecraft Standards by the ODNI's Analytic Integrity and Standards Division (AIS) in exactly the same manner as any other product would

be evaluated pursuant to IRTPA Section 1019. We found no evidence of lack of objectivity or politicization of intelligence. Indications of politicization would come out in the inquiry focused on the editing, review, and coordination behind the scenes of the final products.

### (U) Historical Context

(U) Recent history gives an example of how politicization of intelligence can undermine the intelligence analysis process. Politicization of election security intelligence this year echoes the events surrounding the writing of Secretary of State Colin Powell's UN Speech to make the case to go to war with Iraq in 2003. In this historic example, politicians and political appointees had also made up their mind about an issue and spent considerable time pressuring analysts and managers to prove their thesis to the American public, with little regard for analytic tradecraft.

(U) The difference this time – with the accusations of politicization of intelligence in 2020 -- is that analysts remember what happened in 2003. Intelligence based on bias and subjected to undue influence led to a war. In this case, analysts have reacted strongly to what they see as history repeating itself. Analysts may have lost their own objectivity because they felt they had to fight to ensure the intelligence information they provided was not misconstrued, misused, or ignored. Analysts should not be put in this position. The DNI and other ODNI senior officials must stay above the fray and protect the integrity, timeliness and objectivity of intelligence by fostering a challenge culture in which differences of analytic opinion are shared without organizational suppression or fear of retribution. The IC must produce objective intelligence and communicate it clearly to customers; however customers might use or mis-use it for policy purposes with which analysts or IC leaders may or may not agree.

### (U) Conclusion

(U) Looking back over the past year, it is evident that what began as mischaracterization of IC analytic assessments by ODNI officials escalated into an ongoing widespread perception in the workforce about politicization and loss of analytic objectivity throughout the community on the topics of Russian and Chinese election influence and interference. Politicization need not be overt to be felt. This report documents the reality of both attempts to politicize and perception of politicization of intelligence.

(U) No ODNI official has stated that reviews or edits of election threat intelligence were phrased in a way that was explicitly political in nature. Rather, from the ODNI leadership perspective, officials were seeking a way to deliver intelligence in a way that the Trump Administration would consume it. Top ODNI officials faced enormous pressure to balance between IC assessments and customers' demands. This pressure filtered back down the chain and analysts perceived their work as being politicized, in contravention to the Analytic Standards for Objectivity and avoiding political considerations, in order to make intelligence more palatable to senior customers. Their response to the perceived – and sometimes real – attempts at politicization reflected a loss of analytic objectivity. When analysts face perceived politicization, they have recourse to report their concerns to the Ombudsman just as they have the obligation to continue to produce timely, accurate, objective intelligence with no regard for political considerations.

(U) If our political leaders in the White House and Congress believe we are withholding intelligence because of organizational turf wars or political considerations, the legitimacy of the Intelligence Community's work is lost. Intelligence officers, even those at the highest levels, cannot allow political considerations to influence analysis, and must stand as a bulwark against all political pressures, even if the cost is that senior customers do not like what the intelligence community assesses. As PE Neil Wiley has stated (and I paraphrase), *intelligence is the only great function of state that does not come to top decision makers with an agenda, wanting something. The purpose of intelligence is to provide objective, unbiased, and policy-neutral assessments. We are, perhaps, most important to decision makers when we bring to them the bad news, or what they don't want to hear. This is an ethical challenge to intelligence professionals, and sometimes demands moral courage to carry out. Other institutions are inherently political and are much less likely to bring bad news. If we lose that objectivity, or even are perceived to have lost it, we have endangered the entire reason for us to exist.*

(U) Finally, IC officials, whether politically appointed or not, must not make statements that, implied or directly attributed, communicate the IC's analytic views when they are in fact not representative of the IC's analytic line of argument. There must be a clear distinction between the actual intelligence, the IC's analytic assessments and judgments, and personal or political opinions. DNI Ratcliffe pointed out that "objectivity needs to be on both sides of the debate. When senior leaders ask questions about analytic products that does not mean that is politicization." The IC needs to foster a stronger challenge culture to allow for alternative views and "make the IC better at what it does."

(U) This report has presented the findings of my independent Ombudsman review, in response to your letter. I have appended a set of recommendations at Annex I, based on those findings, pursuant to my authority under IRTPA Section 1020, which I have given to ODNI management to take for action. I have provided definitions in Annex II and a scope note in Annex III.

## ANNEX I

### (U) Recommendations

(U) ODNI recognizes the analytic tradecraft deficiencies related to intelligence products on election interference. These recommendations have been accepted by the DNI, and ODNI is already taking steps and is prepared to take further steps to remedy the process, communication, and education failures that led to this ombudsman complaint.

- (U) Reinforce through direct leadership communications from ODNI to the workforce as a whole, and from agency heads to all IC agencie,s the importance of protecting analytic integrity and a renewed commitment to analytic objectivity and avoiding politicization in both policy and practice. Reinforce adherence to analytic tradecraft as spelled out in IRTPA Section 1019.
- (U) This issue has created across the workforce, in several agencies, skepticism and mistrust among analysts and line managers directed at agency and IC leaders. Take steps to rebuild trust through more direct leadership communication and transparency. When departing from established practices, ensure consistency in decision making that adheres to established analytic tradecraft standards, best practices, and guidelines for production and dissemination on this topic. Avoid verbal instructions, such as, "ODNI says to do it this way." Adhere to clear and defensible written instructions, and provide timely, direct, and specific feedback. Help the analytic workforce understand the balance between discretion required for this topic and the need to warn. Ensure that these guidelines and practices are written, widely disseminated, and understood. Analysts may assume that changes must be politically motivated. Better leadership communications will clarify when changes are being made NOT for political or policy reasons.
- (U) Foster a collaboration culture across the IC analytic community that expressly supports analyses of alternatives and encourages dissent when appropriate as required in IRTPA, Section 1017. Publish a memo to IC and ODNI senior leaders, managers, and analysts reminding them that when fundamental disagreements to analytic judgments exist across agencies or analytic units, the solution is to write a product that clearly articulates those disagreements, to include dissenting language and analysis of alternatives. Backchannel intimidation tactics between analysts, managers, and/or senior leadership to suppress dissenting views must be expressly forbidden.
- (U) Use the Analytic Ombudsman to sponsor dialogues between analytic elements and leadership where needed to facilitate direct communication and transparency. The Ombudsman's statutory role in IRTPA Section 1020 is to help resolve differences before they become problems.
- (U) Mandate analyst exchanges between regional election security units within agencies (e.g., Russian election security analysts spend time working with China election security analysts and vice versa) in order to facilitate the exchange of methodologies and analytic practice with the aim of providing more consistent analytic definitions across topics at the strategic level. These analytic exchanges can clarify what has been seen as inconsistent application of definitions and analytic models.

- (U) Redouble analytic objectivity and tradecraft standards training efforts for three customer categories: new analyst training, refresher training for managers and analysts, and executive-level training. 1) Analysis 101 was once mandatory, but agencies resisted in favor of their own training. Clearly, the training going on now has been insufficient to inculcate good tradecraft – leading to this issue. This course already exists, and is overseen by the Analytic Ombudsman; 2) require an analytic standards and objectivity course prerequisite as part of completing the IC Advanced Analyst Program (ICAAP). Such a requirement will provide in-service training on analytic standards for senior analyst and managers of analysts, to better enable them to recognize and mitigate problems with objectivity and politicization. Courses already exist, that just have to be recognized within and overseen by ICAAP; 3) Provide for one expert on analytic tradecraft and objectivity to create and oversee an executive training course on analytic objectivity and tradecraft standards.
- (U) Hold IC agencies to account for improving tradecraft issues found by ODNI's assessments of analytic tradecraft conducted by AIS – and where possible by agencies own tradecraft evaluation efforts. ODNI will work through the National Intelligence Analysis Board (NIAB) to improve analytic tradecraft across the IC.

UNCLASSIFIED

## ANNEX II:

### (U) Definitions:  What we mean when we say

(U) Mandated by Section 1019 of the Intelligence Reform and Terrorism Prevention Act (IRTPA), the IC Analytic Standards guide analytic production, speak directly to the integrity of the analytic *process* that lies behind the disseminated analytic product, and to the *value* of that product to the consumer. Below are Intelligence Community Directive 203 definitions of these terms; my comments add context for this case.

a) **(U) Objective**: Analysts must perform their functions with objectivity and with awareness of their own assumptions and reasoning. They must employ reasoning techniques and practical mechanisms that reveal and mitigate bias. Analysts should be alert to influence by existing analytic positions or judgments and must consider alternative perspectives and contrary information. Analysis should not be unduly constrained by previous judgments when new developments indicate a modification is necessary. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of analytic objectivity and bias.*

- **(U) Bias:** According to the late Dick Heuer in <u>Psychology of Intelligence Analysis</u>, bias in intelligence is a fundamental limitation of human mental processes. These limitations cause people to employ various simplifying strategies and rules of thumb to ease the burden of mentally processing information to make judgments and decisions. In ordinary life, these simple rules of thumb are often useful in helping us deal with complexity and ambiguity. In intelligence analysis, however, bias lead to predictably faulty analytic judgments and the inability to provide objective analysis to consumers of intelligence.

b) **(U) Independent of political consideration**: Analytic assessments must not be distorted by, nor shaped for, advocacy of a particular audience, agenda, or policy viewpoint. Analytic judgments must not be influenced by the force of preference for a particular policy. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of politicization and distortion.*

c) **(U) Timely**: Analysis must be disseminated in time for it to be actionable by customers. Analytic elements have the responsibility to be continually aware of events of intelligence interest, of customer activities and schedules, and of intelligence requirements and priorities, in order to provide useful analysis at the right time. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of excessively delayed review times.*

d) **(U) Based on all available sources of intelligence information**: Analysis should be informed by all relevant information available. Analytic elements should identify and address critical information gaps and work with collection activities and data providers to develop access and collection strategies. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of analytic tradecraft.*

e) **(U) Implements and Exhibits Analytic Tradecraft Standards**: The nine standards as further spelled out in ICD 203, are -

UNCLASSIFIED

1. Properly Describes the Quality and Credibility of Underlying Sources, Data, and Methodologies
2. Properly Expresses and Explains Uncertainties Associated With Major Analytic Judgments
3. Properly Distinguishes Between Underlying Intelligence Information and Analysts' Assumptions and Judgments
4. Incorporates Analysis of Alternatives
5. Demonstrates Customer Relevance and Addresses Implications
6. Uses Clear and Logical Argumentation
7. Explains Change to or Consistency of Analytic Judgments
8. Makes Accurate Judgments and Assessments
9. Incorporates Effective Visual Information Where Appropriate

UNCLASSIFIED

## ANNEX III

### (U) Scope Note

(U) I completed a comprehensive review and ascertained accusations and documentation of attempts to alter a range of analytic products for reasons that do not follow good tradecraft. Prior to receipt of the letter, I already had begun a review based on perceived problems with politicization and violations of analytic tradecraft that were brought to my attention by Ombudsmen in three IC agencies.

(U) While Ombudsmen from other agencies do not report to me in my statutory role as ODNI Ombudsman, several of us met and conferred on these complaints and agree that aspects of these concerns fall within the IC definition of politicization. The concerns conveyed to us represent widely held views among IC officers engaged on the election threat issue and point to broadly perceived, and probably some actual instances of, politicized intelligence relating to foreign interference in US elections.

(U) I conducted listening sessions with the analysts and managers from CIA, NSA, other agencies, NIC, PDB, and ODNI leadership to obtain information surrounding the complaints filed. Some interview subjects requested anonymity, which I granted, as a condition for their sharing documentation or comments. Others asked to be identified. I also conducted confidential interviews with a number of senior IC leaders connected with this issue. I have not interviewed individuals outside the IC.