**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

STATE OF GEORGIA,

v.

JEFFREY BOSSERT CLARK,

DEFENDANT.

Case No. 1:23-cv-3721

(Related to:

Case Nos.  1:23-cv-03621-SCJ
1:23-cv-03720-SCJ
1:23-cv-03792-SCJ
1:23-cv-03803-
SCJ)

Judge Steve C. Jones

On removal from the Fulton
County Superior Court

## DECLARATION OF EDWIN MEESE, III

My name is Edwin Meese, III. I am 91 years old, and of sound mind. I give

this Declaration based on my personal and professional experience and specialized

knowledge of the topics discussed below.

1.

I graduated from the University of California at Berkeley law school in 1958

and joined the District Attorney's Office in Alameda County, California. In 1967, I

joined the staff of then-Governor of California, Ronald Reagan, eventually

becoming his Chief of Staff. After the end of Governor Reagan's last term as

California's Chief Executive, I held various positions in industry, private practice, and academia, and maintained a strong focus and interest in public policy and especially in constitutional law and legal policy. When Ronald Reagan ran for President in 1980, I served in his campaign as Chief of Staff. When he took office as President, I became Counselor to the President with cabinet rank and served on the National Security Council from 1981 to 1985.

2.

President Reagan nominated me to be the 75th Attorney General of the United States in 1984.  I was confirmed by the Senate and took office in February 1985. I resigned as Attorney General in August 1988.

3.

After my service as Attorney General, I have remained active in legal and public policy matters. In 1988, I was appointed as the Ronald Reagan Chair in Public Policy at the Heritage Foundation. I am now the Ronald Reagan Distinguished Fellow, emeritus.  The Heritage Foundation is a formally organized body of experts providing advice, ideas, and written publications in Washington, D.C.  I now serve as a consultant to Heritage's Meese Center for Legal and Judicial Studies.  Founded in 2001, the Center offers advice, conducts research, and engages in study of the Constitution, and of relevant legal principles and their impact on public policy. I have also served in many other advisory, adjunct, and



2

board roles at a variety of organizations.  Among these are the Landmark Legal Foundation, the Discovery Institute, the Capital Research Center, the Mercatus Center at George Mason University, acting as a Board Member of the Federalist Society, acting as Co-Chair of the Board of Governors of the Ronald Reagan Ranch Project and similar organizations. I have also served as a member and Rector of the Board of Visitors of George Mason University and the Board of Visitors of the U.S. Military Academy at West Point.

4.

In my affiliation with the Heritage Foundation, I served as Chairman of the Editorial Advisory Board for *The Heritage Guide to the Constitution*, *available at* https://www.heritage.org/constitution/#understanding-the-guide (last visited Sept. 16, 2023). Based on all of the experiences in my long career and in the writing and provisions of the U.S. Constitution I reference below. Each of the entries in the *Guide* are written by one or more eminent Judges, scholars, or practitioners and were then reviewed by the well-qualified Editorial Advisory Board. For instance, University of Virginia Law Professor Saikrishna Prakash wrote the *Guide*'s entry on the Take Care Clause, recently deceased Judge and former Senator James  Buckley wrote the entry on the Speech and Debate Clause, and Notre Dame Law Professor G. Robert Blakey wrote the entry on the Double Jeopardy Clause.

5.

By virtue of my long career experience in legal and public policy circles, including my service to President Reagan as Counselor, Member of the National Security Council, and later as Attorney General, dealing with matters of federal law, policy, and the interaction between the two, I have a strong understanding of the constitutional, statutory, and functional relationship between the President and the Department of Justice under current and past law, and constitutional history. Based on personal experience at the highest levels of federal and state government as well as continued study, I have a thorough understanding of the duties, authorities, and responsibilities of Senate-confirmed Assistant Attorneys General.

6.

Based on this experience, I have considered the actions of Jeffrey B. Clark as alleged in the August 14, 2023 Indictment handed down against him and other defendants. Mr. Clark was an Assistant Attorney General ("AAG") in the Trump Administration. He was confirmed by the Senate with votes coming from both parties in October 2018. Sworn into office on November 1, 2018, he then served as the AAG for the Environment and Natural Resources Division and, beginning in September of 2020, simultaneously served as the Acting AAG for the Civil Division. This put a total of approximately 1,400 Department lawyers under his supervision. Mr. Clark resigned from his position running two of the Department's



seven litigating Divisions near the end of the Trump Administration on January 14, 2021.

7.

The Office of Legal Counsel ("OLC") in the Department of Justice, among other duties, prepares formal opinions that are treated as binding legal policy determinations within the Department of Justice and the Executive Branch more broadly. The Attorney General himself once prepared these opinions, but the duty was delegated, as the Department grew in size, to the AAG for OLC, subject, of course, to the Attorney General's approval of those opinions.

8.

In considering Mr. Clark's actions as alleged in the Indictment, I have also considered that in 1983, OLC issued an opinion called *Historical Use of Assistant Attorneys General*, 7 Op. OLC 165 (Oct. 27, 1983) ("Opinion"). The AAG who authored this OLC Opinion was Ted Olson, an eminent legal practitioner who would go on to become the Solicitor General. The Solicitor General is the officer entrusted with the authority to oversee and direct, subject to supervision by the Attorney General, all U.S. Supreme Court litigation for the United States and its agencies. A copy of this Opinion is attached hereto as Exhibit 1. The Opinion  discusses the historical practice and legal provisions relating to the authorities of AAGs. In short, the Opinion concludes that AAGs are generally not limited to any

5

one Division of the Department of Justice or any specific set of duties. They can,
instead, be moved from heading most Divisions to instead heading most other
Divisions at the discretion of the Attorney General. And, of course, the Attorney
General reports to the President, which means the President has discretion to assign
duties to the AAGs as the President sees fit. This is only natural, as the AAGs are
direct appointees of the President. In a word, as a matter of both constitutional and
statutory law, the work of the Department of Justice's AAGs, with limited
exceptions, is "fungible." As the OLC opinion explains:

> We believe that the Attorney General is authorized to make such
> shifts as internal Department transfers because, except for the
> Assistant for Administration, 28 U.S.C. § 507, ***the Assistants are not
> limited to any statutory functions***. 28 U.S.C. § 506.1 *See also id.* §§
> 509, 510.

*Id.* at 165 (emphasis added).

9.

The text of 28 U.S.C. § 506 provides that "[t]he President shall appoint, by
and with the advice and consent of the Senate, 11 Assistant Attorneys General,
who shall assist the Attorney General in the performance of his duties." Thus, by
statute, this body of AAGs are generally not locked in by law, post-Senate
confirmation, as heading particular divisions only, or having a stove-piped set of
specific responsibilities. The existence of the Assistant Attorney General for
Administration, which is a career position (*see* 28 U.S.C. § 507(b)) and serves as



6

of the Attorney General. *See* U.S. Const., art. II, § 1. Hence, all functions of the

Department of Justice are available to the President both for him to choose which

delegates at the Department to use to accomplish all Section 506 purposes and to

direct them in the discharge of their duties.

10.

In my opinion, the conclusion of the 1983 Opinion flows logically from the

authorities cited:

> The Attorney General is authorized under 28 U.S.C. § 506 to have ten
> Assistants [the number of Assistants then established in 1983, prior to
> the 2006 creation of the AAG for National Security]. He may assign
> them any duties he chooses, 28 U.S.C. §§ 509, 510, including the
> supervision of a division other than that for which they were
> nominated and confirmed.

*Id.*

11.

I agree with the 1983 Opinion discussed above regarding the duties and

authorities of most AAGs — their authorities are not fixed by statute, and the

Attorney General or the President can assign them one Division or another at their

discretion. I have reviewed Mr. Clark's signed commission to serve in the Justice

Department from 2018-2021. *See* Exhibit 2. Consistent with the Opinion and my

views as expressed above, the reason his commission does not mention the

Environment & Natural Resources Division (or the Civil Division) is that he was

one of the fungible nine AAGs in the Department. AAGs can be tasked to perform

7

any duties and responsibilities under the Attorney General by the Attorney General or the President, with only limited exceptions not applicable to Mr. Clark's situation in the Trump Administration. When I became Attorney General in 1985, I took no steps to withdraw or reformulate the Opinion because I agreed with it. The Opinion reflected my understanding of my authority and that of the President when I served as the Attorney General of the United States and it also reflects my current understanding.

12.

The Attorney General acts as the President's agent to carry out the law enforcement authorities vested in the President pursuant to the Take Care Clause. From this it is implicit and logically necessary that the President can also assign tasks to an AAG at his discretion.

13.

An AAG is a "principal officer of the United States," as that term is used in reference to the Constitution's Appointments Clause, because 28 U.S.C. § 506 requires the eleven (11) AAGs to be confirmed by the Senate, just as the officers at the apex of any department are required to be Senate-confirmed. The President is  surely entitled to solicit the views of anyone working in the Executive Branch, especially those he has appointed to wield a such supervisory power and discretion that Congress deemed it necessary in law to require Senate advice and consent.

14.

The Opinion Clause of the Constitution, art. II, § 2, cl. 1, provides that "[t]he President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." Thus, the President may ask for the advice or opinion of any Senate-confirmed officer of the United States, and they, if asked, are obliged to respond. Indeed, it is difficult to imagine why the President could not, in his capacity, as the head of the Executive Branch, require the opinion in writing of any officer in the Executive Branch. And I affirm it is my studied view—and my experience in practice—that the President has that power.

15.

Any such consultations under the Opinion Clause, or by an AAG with the President or consultations with the Acting Attorney General or the Principal Associate Deputy Attorney General preliminary to or related to presidential consultations, are, by definition and by their very nature, within the scope of their discretionary authorities. Thus, they are protected by executive and deliberative process privileges. Where the opinion rendered is a legal opinion or the subject of  advice, it is also protected by attorney-client privilege. Where the opinion in question relates to whether, how, and to what extent to exercise the President's or

the Department's law enforcement authorities under the President's supervision, it is also subject to the law enforcement privilege.

16.

The purpose of these privileges is to protect the President's exercise of his Article II powers from encroachment or diminution by other branches of government and to preserve and protect the supremacy of the federal government over the States. The privileges promote the confidential and vigorous exchange of ideas among the President's advisors that has long been seen as essential to the functioning of the Presidency and hence to the national government. As was recognized in *Nixon v. Administrator of General Services Administration*, 433 U.S. 425, 448-49 (1977):

> [W]e think that the Solicitor General states the sounder view, and we adopt it:
>
>> 'This Court held in *United States v. Nixon* . . . that the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure.'



17.

10

I have read the Indictment in *State of Georgia v. Donald J. Trump, et al.*, and focused on the allegations therein that reference Jeffrey B. Clark, who is one of the co-defendants in the case. The Indictment alleges that Mr. Clark drafted a letter and, on December 28, 2020, sent it to his superiors at the Department of Justice (the Acting Attorney General Jeff Rosen and the Principal Associate Deputy Attorney General Richard Donoghue), seeking their approval and co-signature, and again sought their approval and co-signature on January 2, 2021. The letter is alleged in the Indictment to be a criminal attempted false writing the alleged falsity of which lies in the difference between 1) the position the draft letter proposed that the Department of Justice take and 2) the position regarding the election in Georgia that was adhered to by the then-Acting Attorney General Jeffrey Rosen and Principal Associate Deputy Attorney General Richard Donoghue.

18.

Read in light of the law and longstanding practice inside the DOJ, however, the draft letter was a proposed view of facts as brought out by Georgia Senator Ligon in hearings he conducted about the 2020 election. The letter then coupled that with a proposed recommendation by the Department that the conclusions Senator Ligon reached be investigated further by the Georgia Legislature, which the letter legally opined the Georgia Legislature could do consistent with the



Electors Clause of the Constitution and related case law. *See* Exhibit 3 (draft Clark letter in the files of the Senate Judiciary Committee) (citing the Ligon Report) & Exhibit 4 (*The Chairman's Report of The Election Law Study Subcommittee of the Standing Senate Judiciary Committee* (hereafter "Ligon Report")). The draft letter was thus quite modest in suggesting only that further investigation was warranted.

19.

Then-Acting Attorney General Jeffrey Rosen and Principal Associate Deputy Attorney General Richard Donoghue or others may have disagreed with Mr. Clark's view of the facts but that does not establish that Mr. Clark's legal and factual opinions and his proposals to his superiors soliciting broader Department agreement were intended to be or were actually false. Moreover, I am not aware that the Department of Justice serving under Acting Attorney General Rosen and Principal Associate Deputy Attorney General Donoghue ever produced an official counter-report or set of objections to the Ligon Report. Finally, the idea that proposing a change of position could be a criminal attempted false statement because it is not the same as the position it proposes be changed is a far-fetched legal *non sequitur*. The losing side of privileged and confidential internal DOJ factual and legal disagreements cannot be subject to state law criminal prosecution on the grounds of attempted false writings without destroying the supremacy of the federal government.



20.

Disagreement on legal, factual, and policy matters in the halls of the Justice Department is commonplace, just as disagreements among lawyers in private practice, in state government, and in local government are common. I should know. I have participated as a lawyer in a wide variety of levels of governments in each office where I took an oath to support and defend the U.S. Constitution. I have never in all my years encountered a situation where a legal, factual, or legal policy dispute inside of some law-firm like entity—whether the U.S. Justice Department, state or local government law enforcement agencies, or private law firms—based on differing views of the facts—was treated as if the losing side had prepared a false writing, let alone a criminal false writing or an attempted criminal false writing. Indeed, I encouraged my counsels and my AAGs to speak up when they disagreed with me or with each other, so that we could pressure-test new legal and other ideas and make the positions we ultimately adopted as an entire Department stronger.

21.

Additionally, the Indictment does not allege that the draft letter was ever sent. Though it is not mentioned in the Indictment, I am aware from news reports that the President, after consulting with his most senior legal advisors, including Mr. Clark, decided against sending the draft letter. And if that is true, that was 

entirely a presidential prerogative. The President is the ultimate and final Executive Branch decisionmaker. And in my experience, Presidents, like Attorneys General, want and need their subordinates to present different options. Senior officials preside over such debates in order to foster better decision-making.

22.

Mr. Clark's alleged preparation of the draft letter and the discussions concerning the draft he is alleged to have had with Acting Attorney General Jeff Rosen and the Principal Associate Deputy Attorney General Richard Donoghue fit squarely within the privileges discussed above as recognized by Presidents, the Congress, and various courts throughout our history. It also fits squarely within the protections of the Opinion Clause of the Constitution. Draft letters like the one involved here are proposals for consideration and further decision only. If the draft letter was offered in response to a request by the President, Mr. Clark was, as a Senate-confirmed Officer of the United States and subordinate of the President's, required to provide it. That others at the Department of Justice did not agree with the content of the draft letter, or that they argued vehemently against sending it, or that it differed from some real or imagined "consensus" among the other AAGs or attorneys at DOJ is, in my opinion, irrelevant. The decision to send, or not to send, the draft letter was for the President alone. *See* U.S. Const., art. II, §§ 1 cl. 1 & 8 (Vesting and Take Care Clauses, respectively); art. II, § 2, cl. 1 (Opinion Clause).

14

That the President ultimately decided not to send it does not in any way deprive Mr. Clark or the President of the protections of these privileges or any others that inhere in their respective constitutional/statutory authorities and responsibilities. To the contrary, "the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Administrator of GSA*, 433 U.S. at 448-49.

23.

Nor do such circumstances mean that, in preparing and seeking approval of the draft, Mr. Clark was somehow acting outside the boundaries of his responsibilities as an AAG. Any such claim necessarily and incorrectly presumes, contrary to the clear law discussed above, that the authorities of all AAGs are strictly defined or limited to particular subject matters. In short, taking positions on legal issues relating to the conduct of the 2020 election and consideration of whether to pursue the policy option inherent in the alleged draft letter were not strictly off limits or out of bounds for Mr. Clark, nor were they off limits for any  other of the nine fungible AAGs for that matter, including any of those who may have argued against sending the letter.

24.

Further, I am aware that Mr. Clark directly supervised 2020 election-related controversies in his capacity as Acting AAG of the Civil Division concerning (1) a suit against Vice President Pence by Representative Gohmert and alternate presidential electors in Arizona, *see* Exhibit 5; and (2) suits against the United States Postal Service concerning mail-in balloting, *see, e.g.,* Exhibits 6 and 7. Note that Mr. Clark, while running the Civil Division opposed the Gohmert and Arizona alternate electors suit. That is a key fact inconsistent with the general tenor of the allegations against Mr. Clark in the Indictment and the mainstream press that he was only acting for President Trump's personal benefit.

25.

The January 6th House Select Committee reached the conclusion that for a brief time Mr. Clark was appointed by the President as the Acting Attorney General.[1] *See also* https://rumble.com/v3g2jjs-committee-mentions-jeff-clark.html (last visited Sept. 16, 2023). Assuming that conclusion to be true, any argument fails if it asserts that Mr. Clark, in expressing views about the factual or legal issues pertaining to the 2020 presidential election and any steps he recommended be taken by the Justice Department were outside of his role.

---

[1] The January 6th Committee hearing on June 5, 2022 contains the following passage from Rep. Kinzinger: "White House call logs obtained by the committee show that by 4:19 PM on January 3rd, the White House had already begun referring to Mr. Clark as the acting attorney general. As far as the White House was concerned, Mr. Clark was already at the top of the Justice Department." *See* https://www.npr.org/2022/06/23/1106700800/jan-6-committee-hearing-transcript.



26.

I have reviewed the State of Georgia's Reply to Mr. Clark's Notice of Removal [Document 28] and its assertion that Mr. Clark "violat[ed] established DOJ policy by speaking with the President directly". [Doc. 28 at 6 & fn. 3] I have also reviewed the policy memorandum referenced in the footnote and attached as Exhibit E [Doc. 28-5]. By its own terms, the "memorandum sets out guidelines" that "are intended to … route communications to the proper officials so they can be adequately reviewed and considered, free from either the reality or the appearance of improper influence." [Doc. 28-5 at 1, 4] It also states that "these guidelines and procedures are not intended to wall off the Department from legitimate communication." [Doc. 28-5 at 4] In my judgment, Mr. Clark's actions were perfectly consistent with this "guidance". His communications with the President were commenced by the President himself, and any response he gave was, by definition, a "Subject relating to the Duties of [his] … Office[]" as an Assistant Attorney General. Note as well that the policy is a guidance document. It is not statutory law or law established by regulation. Finally, if the policy were interpreted to restrict the actions of the President in reaching out to consult with his  subordinates, that would be an unconstitutional violation of Article II of the Constitution giving the power to direct the entire Executive Branch to the President alone.

27.

I am not aware of any state criminal prosecution ever being brought against a President and a senior Justice Department official like Mr. Clark for their privileged and confidential discussions of whether and how to assert federal law enforcement authority other than this new *State of Georgia v. Trump, et al.* Indictment. The prosecution of the President and an AAG is a major affront to federal supremacy never before seen in the history of our country. If the premise of this prosecution were to be accepted, then state law enforcement officials could arrest local U.S. Attorneys and their Assistants while they were deliberating over whether and/or how to approach a possible prosecution of state or local officials. Similarly, under Fulton County's interpretation of federal supremacy, state or local officials could enter the Oval Office and arrest the President and his Attorney General during their deliberations over whether and to what extent to assert federal law enforcement powers against state or local officials. Not even George Wallace or Orval Faubus, during the heights of the heated civil rights-era disputes, were willing to go that far against President Kennedy and his Attorney General Robert F. Kennedy.

28.

In short, in my opinion, any consideration of the above matters squarely involves Mr. Clark's actions as a federal officer concerning the exercise of his

federal authority under the Constitution and federal law and were within the scope of his authorities as an AAG under federal law.

* * *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on 16th day of September, 2023.

Edwin Meese, III

19

☐☐☐☐

## CERTIFICATE OF COMPLIANCE WITH L.R. 5.1

The undersigned hereby certifies that this filing was prepared in the Times New Roman size 14 font in compliance with L.R. 5.1.

This this 16th day of September, 2023.

>/s/ Harry W. MacDougald
>Georgia Bar No. 463076
>*Attorney for Defendant*

CALDWELL, CARLSON, ELLIOTT & DELOACH LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

# Historical Use of Assistant Attorneys General

The Attorney General may reassign Assistant Attorneys General from one unit to another within the Department of Justice. This has been done on at least ten occasions and does not require that the Assistant Attorney General be reconfirmed by the Senate.

October 27, 1983

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

This responds to your request for information on whether the Attorney General may reassign Assistant Attorneys General (Assistants) from one unit to another without resubmitting their names to Congress, and whether the Attorney General has ever done so. We believe that the Attorney General is authorized to make such shifts as internal Department transfers because, except for the Assistant for Administration, 28 U.S.C. § 507, the Assistants are not limited to any statutory functions. 28 U.S.C. § 506.[1] *See also id.* §§ 509, 510. We have identified at least ten occasions on which an Attorney General has made such transfers. In one other instance, discussed below, political considerations persuaded the Attorney General to make the shift by having the Assistant resign from his first position and be nominated and confirmed again as an Assistant for the second position.

## I. Historical Examples

*The Register of the United States Department of Justice and the Federal Courts* (1983) does not list Assistants by division until 1925, shortly after appointment by division apparently began. *Id.* at 140. By comparing names of Assistants heading the divisions since then, we have identified the following individuals who served consecutively as the head of two different units in the Department and who were transferred to their second position without a new confirmation hearing.

1. *Robert H. Jackson:* Mr. Jackson became head of the Tax Division in March 1936. In January 1937 he was designated head of the Antitrust Division to fill a vacancy caused by a resignation.[2]

---

[1] Section 506 states that "[t]he President shall appoint, by and with the advice and consent of the Senate, ten Assistant Attorneys General, who shall assist the Attorney General in the performance of his duties." Prior to 1950, this language was codified at 5 U.S.C. § 295.

[2] N.Y. Times, Jan. 19, 1937, at 7, col. 7.

165

2. *James W. Morris:* Mr. Morris was appointed to head the Claims (now Civil) Division in November 1935. In January 1937, he was transferred to the Tax Division to fill the vacancy left by Mr. Jackson's transfer, described above.[3]

3. *Tom C. Clark/Wendell Berge:* Mr. Clark was placed in charge of the Antitrust Division in early 1943, and Mr. Berge was placed in charge of the Criminal Division in 1941. As part of a Department reorganization aimed at increasing efficiency in response to the demands of World War II, the Attorney General had Mr. Clark and Mr. Berge exchange positions in August 1943.[4]

4. *David L. Bazelon:* Mr. Bazelon was the Assistant in charge of the Land and Natural Resources Division from 1946 until he was transferred in the Spring of 1947 to head the newly created Office of Alien Property.[5]

5. *John F. Sonnett:* Mr. Sonnett served as Assistant in charge of the Claims Division from 1945 until May 1947, when Attorney General Clark shifted him to the Antitrust Division to fill a vacancy caused by the resignation of Wendell Berge.[6]

6. *Theron Lamar Caudle:* Mr. Caudle headed the Criminal Division from 1945 until July 1947, when he was moved to the Tax Division.[7]

7. *James M. McInerney:* As the result of a Department-wide reshuffling in the early 1950s, Mr. McInerney was transferred from the Criminal Division to the Land and Natural Resources Division in August 1952.[8]

8. *Malcolm R. Wilkey:* Mr. Wilkey headed the Office of Legal Counsel for a year until he was shifted in 1959 by Attorney General Rogers to the Criminal Division. Att'y Gen. Order No. 177–59 (Mar. 26, 1959).[9]

9. *Edwin L. Weisl, Jr.:* Mr. Weisl was moved by Attorney General Clark in 1967 from the Land and Natural Resources Division to the Civil Division. Att'y Gen. Order No. 384–67 (Oct. 9, 1967).[10]

There was one transfer that deviated from this pattern. After passage of the Civil Rights Act of 1957, Attorney General Rogers chose W. Wilson White, then Assistant Attorney General for this Office, to head the newly created Civil Rights Division.[11] One reported reason for the choice of Mr. White was to avoid debate in Congress over the new division by eliminating the need for a confirmation hearing.[12] However, unfavorable reaction from Congress, which wanted to scrutinize the first head of the Civil Rights Division, persuaded the

---

[3] *Id.*

[4] N.Y. Times, Aug. 29, 1943, at 27, col. 1.

[5] N.Y. Times, Apr. 25, 1947, at 18, col. 7. Prior to that, there had been an Office of Alien Property headed by a director and a separate alien property litigation unit. *Id. See also Register, supra,* at 13 (41st ed. 1947).

[6] N.Y. Times, May 2, 1947, at 28, col. 2. *See also Register, supra,* at 3 (41st ed. 1947).

[7] *See Register, supra,* at 4 (41st ed. 1947); H.R. Rep. No. 1079, 83rd Cong., 1st Sess. 90, 91, 95 (1953).

[8] N.Y. Times, Aug. 9, 1952, at 1, col. 6; *id.,* Aug. 6, 1952, at 12, col. 6.

[9] N.Y. Times, Mar. 24, 1959, at 27, col. 2. The *Times* noted that "[t]he move to the Criminal Division does not require Senate confirmation."

[10] N.Y. Times, Oct. 1, 1967, at 1, col. 2.

[11] *See* Att'y Gen. Order No. 155–57 (Dec. 9, 1957).

[12] N.Y. Times, Nov. 22, 1957, at 1, col. 2 ("The expected struggle over confirmation, with all its likely personal attacks, would doubtless have discouraged any judges or leading lawyers in private practice from accepting the civil rights position.").

Attorney General and the White House to change their plans. Mr. White resigned his position with this Office, received a recess appointment as Assistant Attorney General for the Civil Rights Division, and was nominated for the permanent position. After a six-month delay, the Senate confirmed him.

## II. Prior Memoranda

This Office has written at least three times with reference to the fungibility of Assistants. In 1953 we responded to inquiries from the Deputy Attorney General by stating flatly that "[t]he several Assistant Attorneys General are not required to be assigned to any particular divisions." Memorandum for Russell L. Malone, Jr., Deputy Attorney General from Ellis Lyons, Acting Assistant Attorney General, Executive Adjudications Division (Jan. 15, 1953). In 1957, we examined the issue again in a memorandum prepared for use by the Attorney General. Noting the lack of any statutory requirement that any Assistant perform specific duties and the statutory vesting of all functions of the Department, with limited exceptions, in the Attorney General, 28 U.S.C. § 509, we concluded that there were no statutory limits on the duties of any Assistant Attorney General. Memorandum on Statutory Specification of Duties of Assistant Attorneys General (Feb. 18, 1957). Finally, earlier this year we wrote an opinion explaining why there were no constraints on the use of the tenth Assistant slot created by Pub. L. No. 95–598, § 218, 92 Stat. 2549, 2662 (1978). We concluded that, "[a]s with the other nine Assistant Attorney General slots we believe that the Attorney General may exercise unfettered discretion in deciding how this new Assistant Attorney General can best assist him." Memorandum for Edward C. Schmults, Deputy Attorney General from Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel (Feb. 8, 1983).

## Conclusion

The Attorney General is authorized under 28 U.S.C. § 506 to have ten Assistants. He may assign them any duties he chooses, 28 U.S.C. §§ 509, 510, including the supervision of a division other than that for which they were nominated and confirmed. This has in fact that been done at least ten times and there is no reason to believe it cannot be done in the future.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

167



Donald J. Trump

President of the United States of America.

To all who shall see these Presents, Greeting:

Know Ye: That reposing special trust and confidence in the Wisdom, Uprightness, and Learning of Jeffrey Bossert Clark, of Virginia; I have nominated, and, by and with the advice and consent of the Senate, do appoint him an Assistant Attorney General and do authorize and empower him to execute and fulfil the duties of that Office according to the Constitution and Laws of the said United States, and to Have and to Hold the said Office, with all the powers, privileges and emoluments to the same of right appertaining, unto Him, the said Jeffrey Bossert Clark during the pleasure of the President.

In testimony whereof, I have caused these Letters to be made patent and the seal of the Department of Justice to be hereunto affixed. Done at the City of Washington this twelfth day of October in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-third.

By the President

Attorney General.

**Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product**
**Georgia Proof of Concept**

[LETTERHEAD]

The Honorable Brian P. Kemp
Governor
111 State Capitol
Atlanta, Georgia 30334

*Draft letter from Jeff Clark. Rejected by OAG ODAG, + OLC.*

The Honorable David Ralston
Speaker of the House
332 State Capitol
Atlanta, Georgia 30334

The Honorable Butch Miller
President *Pro Tempore* of the Senate
321 State Capitol
Atlanta, Georgia 30334

December 28, 2020

Dear Governor Kemp, Mr. Speaker, and Mr. President *Pro Tempore*:

The Department of Justice is investigating various irregularities in the 2020 election for President of the United States. The Department will update you as we are able on investigatory progress, but at this time we have identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia. No doubt, many of Georgia's state legislators are aware of irregularities, sworn to by a variety of witnesses, and we have taken notice of their complaints. *See, e.g.,* The Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee Summary of Testimony from December 3, 2020 Hearing, http://www.senatorligon.com/THE_FINAL%20REPORT.PDF (Dec. 17, 2020) (last visited Dec. 28, 2020); Debra, Heine, *Georgia State Senate Report: Election Results Are 'Untrustworthy;' Certification Should Be Rescinded*, THE TENNESSEE STAR (Dec. 22, 2020), *available at* https://tennesseestar.com/2020/12/22/georgia-state-senate-report-election-results-are-untrustworthy-certification-should-be-rescinded/ (last visited Dec. 28, 2020).

Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product

In light of these developments, the Department recommends that the Georgia General Assembly should convene in special session so that its legislators are in a position to take additional testimony, receive new evidence, and deliberate on the matter consistent with its duties under the U.S. Constitution.  Time is of the essence, as the U.S. Constitution tasks Congress with convening in joint session to count Electoral College certificates, *see* U.S. Const., art. II, § 1, cl. 3, consider objections to any of those certificates, and decide between any competing slates of elector certificates, and 3 U.S.C. § 15 provides that this session shall begin on January 6, 2021, with the Vice President presiding over the session as President of the Senate.

The Constitution mandates that Congress must set the day for Electors to meet to cast their ballots, which Congress did in 3 U.S.C. § 7, and which for this election occurred on December 14, 2020.  The Department believes that in Georgia and several other States, both a slate of electors supporting Joseph R. Biden, Jr., and a separate slate of electors supporting Donald J. Trump, gathered on that day at the proper location to cast their ballots, and that both sets of those ballots have been transmitted to Washington, D.C., to be opened by Vice President Pence.  The Department is aware that a similar situation occurred in the 1960 election.  There, Vice President Richard Nixon appeared to win the State of Hawaii on Election Day and Electors supporting Vice President Nixon cast their ballots on the day specified in 3 U.S.C. § 7, which were duly certified by the Governor of Hawaii.  But Senator John F. Kennedy also claimed to win Hawaii, with his Electors likewise casting their ballots on the prescribed day, and that by January 6, 1961, it had been determined that Senator Kennedy was indeed the winner of Hawaii, so Congress accordingly accepted only the ballots cast for Senator Kennedy.  *See* Jack M. Balkin, *Bush v. Gore and the Boundary Between Law and Politics*, 110 YALE L.J. 1407, 1421 n.55 (2001).

The Department also finds troubling the current posture of a pending lawsuit in Fulton County, Georgia, raising several of the voting irregularities pertaining to which candidate for President of the United States received the most lawfully cast votes in Georgia.  *See Trump v. Raffensperger*, 2020cv343255 (Fulton Cty. Super. Ct.).  Despite the action having been filed on December 4, 2020, the trial court there has not even scheduled a hearing on matter, making it difficult for the judicial process to consider this evidence and resolve these matters on appeal prior to January 6.  Given the urgency of this serious matter, including the Fulton County litigation's sluggish pace, the Department believes that a special session of the Georgia General Assembly is warranted and is in the national interest.

2

Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product

The Electors Clause of the U.S. Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct," electors to cast ballots for President and Vice President. *See* U.S. Const., art. II, § 1, cl. 2. Many State Legislatures originally chose electors by direct appointment, but over time each State Legislature has chosen to do so by popular vote on the day appointed by Congress in 3 U.S.C. § 1 to be the Election Day for Members of Congress, which this year was November 3, 2020. However, Congress also explicitly recognizes the power that State Legislatures have to appoint electors, providing in 3 U.S.C. § 2 that "[w]henever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by [3 U.S.C. § 1], the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct."

The purpose of the special session the Department recommends would be for the General Assembly to (1) evaluate the irregularities in the 2020 election, including violations of Georgia election law judged against that body of law as it has been enacted by your State's Legislature, (2) determine whether those violations show which candidate for President won the most legal votes in the November 3 election, and (3) whether the election failed to make a proper and valid choice between the candidates, such that the General Assembly could take whatever action is necessary to ensure that one of the slates of Electors cast on December 14 will be accepted by Congress on January 6.

While the Department of Justice believes the Governor of Georgia should immediately call a special session to consider this important and urgent matter, if he declines to do so, we share with you our view that the Georgia General Assembly has implied authority under the Constitution of the United States to *call itself into special session* for the limited purpose of considering issues pertaining to the appointment of Presidential Electors. The Constitution specifies that Presidential Electors shall be appointed by the *Legislature* of each State. And the Framers clearly knew how to distinguish between a state legislature and a state executive, so their disparate choices to refer to one (legislatures), the other (executive), or both, must be respected.[1] Additionally,

---

[1] *See, e.g.,* U.S.C., art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of *the Legislature, or of the Executive (when the Legislature cannot be convened)* against domestic Violence.") (emphases added); *id.* art. VI ("The Senators and Representatives before mentioned, and the Members of the *several State Legislatures, and all executive and judicial Officers,* both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution ….") (emphasis added); *id.* XVII amend. ("When vacancies happen in the representation of any State in the Senate, *the executive authority of such State* shall issue writs of election to fill such vacancies: Provided, That *the legislature of any State* may empower

3

SJC-Pre-CertificationEvents-07292021-000748

Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product

when the Constitution intends to refer to laws enacted by the Legislature and signed by the Governor, the Constitution refers to it simply as the "State." *See, e.g.,* U.S. Const., art. I, § 8 ("[Congress may] exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, *by Cession of particular States,* and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of *the Legislature of the State* in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings") (emphasis added) (distinguishing between the "State," writ large, and the "Legislature of the State"). The Constitution also makes clear when powers are forbidden to any type of state actor. *See, e.g.,* U.S. Const., art. I, § 10, cl. 1 ("No State shall enter into any Treaty, Alliance, or Confederation …."). Surely, this cannot mean that a State Governor could enter into such a Treaty but a State Legislature could not, or *vice versa.*

Clearly, however, some provisions refer explicitly to state legislatures — and there the Framers must be taken at their word. One such example is in Article V, which provides that a proposed Amendment to the Constitution is adopted "when ratified by the Legislatures of three fourths of the several States," which is done by joint resolution or concurrent resolution. Supreme Court precedent makes clear that the Governor has no role in that process, and that his signature or approval is not necessary for ratification. *See, e.g., Coleman v. Miller,* 307 U.S. 433 (1939). So too, Article II requires action only by the Legislature in appointing Electors, and Congress in 3 U.S.C. § 2 likewise recognizes this Constitutional principle.

The Supreme Court has explained that the Electors Clause "leaves it to the legislature exclusively to define the method" of appointing Electors, vesting the Legislature with "the broadest possible power of determination." *McPherson v. Blecker,* 146 U.S. 1, 27 (1892). This power is "placed absolutely and *wholly* with legislatures." *Id.* at 34-35 (emphasis added). In the most recent disputed Presidential election to reach the Supreme Court, the 2000 election, the Supreme Court went on to hold that when a State Legislature appoints Presidential Electors—which it can do either through statute or through direct action—the Legislature is not acting "solely under the authority given by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush v. Palm Beach Cty. Canvassing Bd.,* 531 U.S.

_____

*the executive thereof* to make temporary appointments until the people fill the vacancies by election *as the legislature may direct.*") (emphases added).

SJC-Pre-CertificationEvents-07292021-000749

Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product

70, 76 (2000).  The State Legislature's authority to appoint Electors is "plenary."  *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam).  And a State Legislature cannot lose that authority on account of enacting statutes to join the National Election.  "Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power an any time, for it can neither be taken away nor abdicated."  *McPherson*, 146 U.S. at 125.

The Georgia General Assembly accordingly must have inherent authority granted by the U.S. Constitution to come into session to appoint Electors, regardless of any purported limit imposed by the state constitution or state statute requiring the Governor's approval.  The "powers actually granted [by the U.S. Constitution] must be such as are expressly given, or given by necessary implication."  *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 326 (1816).  And the principle of necessary implication arises because our Constitution is not prolix and thus does not "provide for minute specification of its powers, or to declare the means by which those powers should be carried into execution."  *Id.*  Otherwise, in a situation like this one, if a Governor were aware that the Legislature of his State was inclined to appoint Electors supporting a candidate for President that the Governor opposed, the Governor could thwart that appointment by refusing to call the Legislature into session before the next President had been duly elected.  The Constitution does not empower other officials to supersede the state legislature in this fashion.

Therefore whether called into session by the Governor or by its own inherent authority, the Department of Justice urges the Georgia General Assembly to convene in special session to address this pressing matter of overriding national importance.

Sincerely,

| | | |
|---|---|---|
| Jeffrey A. Rosen | Richard Donoghue | Jeffrey Bossert Clark |
| Acting Attorney General | Acting Deputy Attorney General | (Acting) Assistant Attorney General |
| | | Civil Division |

5

# THE CHAIRMAN'S REPORT OF THE ELECTION LAW STUDY SUBCOMMITTEE OF THE STANDING SENATE JUDICIARY COMMITTEE

## SUMMARY OF TESTIMONY FROM DECEMBER 3, 2020 HEARING

Honorable William T. Ligon, Chairman
Senator, District 3

Honorable John Kennedy
Senator, District 18

Honorable Bill Heath
Senator, District 31

Honorable Blake Tillery
Senator, District 19

Honorable Michael Rhett
Senator, District 33

Honorable Elena Parent
Senator, District 42

I.   INTRODUCTION

II.  EXECUTIVE SUMMARY

III. ORAL TESTIMONY

IV.  FINDINGS

V.   RECOMMENDATIONS

## I.        INTRODUCTION

The charge assigned to the Election Law Study Subcommittee of the Standing Senate Judiciary Committee was to examine the recent election cycle, the recount process, the audit process, the current investigations taking place, the litigation that is moving forward, as well as address issues relating to the upcoming runoffs. In the matter of the law itself, we were to also consider Georgia's election laws as they have impacted and are impacting the current election cycle. This Report may be further amended prior to the 2021 Georgia Legislative Session.

This Subcommittee met once at the Georgia State Capitol on Thursday, December 3, 2020. The hearing was open to the public, and there was an open invitation for citizens to speak before the committee. Subcommittee members also expressed stories they had heard from their constituents. Other committee meetings have also been hearing testimony which should be considered to present an even broader understanding. At this time, the additional committees which have met and received testimony are the Senate Governmental Affairs Committee and the House Governmental Oversight Committee. Many who could not testify due to lack of time have recorded their own testimonies online and shared their written speeches with this committee; the Subcommittee received many affidavits under oath.

<u>This Report by the Subcommittee Chair has not been formally approved by the Subcommittee or the standing Judiciary Committee.  It is submitted for informational purposes to be a part of the record at the request of the Judiciary Chair.  It is a summary of testimony given in person and by affidavit.  For more information, please refer to the video record of the hearing and the affidavits submitted.</u>

## II.       EXECUTIVE SUMMARY

The November 3, 2020 General Election (the "Election") was chaotic and any reported results must be viewed as untrustworthy.  The Subcommittee took evidence from witnesses and received affidavits sworn under oath.  The Subcommittee heard evidence that proper protocols were not used to ensure chain of custody of the ballots throughout the Election, after the opening of ballots prior to the Election, and during the recounts. The Subcommittee heard testimony that it was possible or even likely that large numbers of fraudulent ballots were introduced into the pool of ballots that were counted as voted; there is no way of tracing the ballots after they have been separated from the point of origin. The Subcommittee heard testimony of pristine ballots whose origin looked suspicious or which could not be verified and the inability of poll workers to distinguish between test ballots and absentee ballots. Signatures were not consistently verified according to law in the absentee balloting process.

Poll watchers on Election Night testified that they had noted that ballots were not secured, that seals and security tags were not used, and the chain of custody was often lax or non-existent. During the recount process, the monitors observed similar patterns of unsecured ballots that had broken seals and open cases of ballots laying around for hours or overnight in unsecured

locations. There was a lack of enforcement of the law, sloppy handling of the ballots by those counting, deliberate covering-up of voting numbers by workers, lack of following the process during the recount, unsafe handling of military ballots, and insecure data such as on laptops and flash drives. According to submitted testimony, there were also many equipment failures when ballots would not go through the machines and other times when ballots were counted more than once.

A great deal of testimony supported evidence of a coordinated effort to prevent a transparent process of observing the counting of ballots during the absentee ballot opening period and on Election Night. Witnesses testified to hostility to Republican poll workers during the recount – directional signage was unavailable, doors were locked, and Republican poll watchers were sent home early or given menial assignments.

Monitors throughout the state were often kept at an unreasonably long distance – some social distancing was understandable, but monitors were blocked from having the visual ability to see what was written on the ballots or to have any meaningful way to check the counting or to double-check that what was counted was actually assigned to the right candidate. They also could not observe what was entered into the ARLO system, nor could they be told the count that was being entered into ARLO. Instead, they were told that those numbers would be totaled and come back from the Secretary of State's Office. They were also told not to take pictures, film, or have other means of acquiring proof of the process that they were experiencing based on a rule from the State Elections Board.  That rule contravenes the spirit and purpose of the election law.

The Secretary of State's Office was unresponsive to its hotline. It has been unresponsive to many who wonder if their vote ever really counted. The office has turned a blind eye to fraud to the point that it ought to be considered gross negligence.

The Subcommittee did not have time to investigate the numerous publicly reported issues with the Dominion voting machines. The Subcommittee takes notice of the various publicly reported functions of the machines and heard evidence that the machines can duplicate fraudulent ballots to the point that not even trained personnel can tell the difference between a test ballot and a real ballot. Testimony also suggested that the system responds wirelessly to being reset from an unknown location as happened with the poll books. The Subcommittee also heard that Dominion machines can be programmed with algorithms that reallocate votes between candidates. In addition, the Dominion machines are programmed to count votes using percentages of whole numbers rather than actual votes, which is a feature incompatible with the actual voting process.  The Subcommittee learned that the history and control of the company that owns the Dominion voting system is unclear and provides serious implications of foreign interference in the U.S. election.

## III.    ORAL TESTIMONY

**Violation of Ballot/Computer Security Procedures During Early Voting and on Election Day**

- ■ Bridget Thorne, who has nine years' experience as a poll worker/precinct manager in Fulton County, worked for five and a half days during early voting as a technician in the temporary warehouse in the Georgia World Congress Center. Because of positive COVID tests among Fulton County elections employees, Dominion Software was selected to run the warehouse. Thorne was disturbed at the lack of ballot security. Test ballots were printed on the same type of paper (official Rolland Voting paper) as real ballots, but test ballots were not routinely marked as such or destroyed. Thorne testified she saw a stack of these ballots almost eight inches tall.

On October 30, when early voting finished at State Farm Arena in Fulton County (the "State Farm Arena"), Thorne observed 40-50 scanners being brought into the arena and tens of thousands of ballots being scanned in by random people pulling ballots from random places – no formal procedure, no oaths, no chain of custody. When Thorne objected to this haphazard process, a Dominion employee replied, "It's fine, we have been doing this all week." When Thorne left that night, she observed unsecured suitcases of ballots next to the scanners.

Upon arriving at the State Farm Arena the following morning, Thorne saw that suitcases of ballots had been piled in a corner and sealed. But there was no restricted access, so anyone could have removed one or more suitcases. In addition, anyone could have opened them and resealed them" because "seals were easily accessible." During the day, employees brought Thorne other ballots that were found in the warehouse, asking if they were real or test. She had no way of knowing.

The following night, when Thorne was again working at the warehouse, she observed a Dominion employee and an Election Group Consultant printing "test ballots" but doing so incorrectly. She realized then that "<u>anyone </u>in the warehouse had access to printing real ballots."

Before Election Day, Thorne attempted to report her concerns about these insecure ballot operations to the Secretary of State (SOS) office and to the State Board of Elections; she received no response.

Since giving her testimony to the Senate Subcommittee, Bridget Thorne has been fired by a consultant working for Fulton County.

**Recount: Counting Votes Without Monitoring, or Without Meaningful Monitoring**

- Election Day – Video from State Farm Arena in Fulton County showed a Fulton County Election worker approaching the media and poll monitors. After a brief exchange, the media and monitors packed up and left. This coincided with media reports that everyone was told to leave State Farm Arena around 10 p.m. on Election Night; workers testified they were told that tabulation was stopping for the night and would resume the next morning. Instead, video from State Farm Arena revealed that about six workers stayed behind. What happened next revealed a coordinated effort by election workers to deliberately conceal their continued counting of ballots out of public view, in direct violation of the law. This incident was premeditated. Those workers pulled out four concealed cases of ballots from under a table and continued counting for another two hours. During those two hours there were multiple machines running, each of which could process up to 3000 ballots per hour.  A "representative" of The Secretary of State's office claimed that it had a representative present during that period, and the media reported that statement widely; it was not true.  The representative admitted he was not present during that time period and is not evident on the video.

- David Cross, though unable to speak at the hearing due to time constraints, submitted written testimony with graphs, one of which appears to enhance the significance of what took place with the change in vote totals just after the late-night activities took place at State Farm Arena. Due to its significance to the State Farm Arena video seen by the committee, his graph is included with this Report. It shows that 136,155 votes suddenly appeared in Biden's vote column at 1:59 a.m., November 4, 2020.

- Scott Hall of Fulton County is an experienced poll watcher who testified that there was a secured "lunch area" but when he bought lunch for workers, they were not permitted to use that area.  There were no cameras in that area, yet tables were set up for counting, and poll watchers were excluded.  He has photographs of the area.  He also testified that there were stacks and stacks of unsecured blank ballots ("checks," as he called them) that were in the open.

- Mr. Hall noted a limitation of one monitor per 10 recounting tables as being an inadequate ratio to be truly effective.  He was constantly engaged in the recount, even being called to go to the World Congress Center at ridiculous hours, such as 10 p.m., for more counting.  He was adamant that something was seriously wrong with how Fulton County was handling the ballots.

- Mark Amick reported that in DeKalb County, only one monitor was allowed per 10 tables of 16 recounters.  He testified that monitors were kept six feet away and could not see the totals entered on the computer screens.

- At State Farm Arena at the end of the recount day on November 14, Susan Voyles of Sandy Springs observed pallets of ballots remaining to be counted beginning the following day. When she arrived the next morning, November 15, those pallets were gone.

- On November 15, Voyles and her partner with whom she had traveled to State Farm Arena (also identified as a Republican), were given only 60 ballots to review, even though other tables had thousands. Voyles and her partner, as well as other Republican monitors, were told at 10 a.m. there was nothing else for them to do, so they should leave. Since giving her testimony to the Senate Subcommittee, Susan Voyles has been fired by a consultant working for Fulton County.

- Tony Burrison of Savannah and a military veteran served as one of very few recount observers during the recount in Chatham County. He described the process as "disgusting" – stacks of ballots were being counted with no oversight or accountability. Based on what he observed, he believed there is a major problem with voting integrity due to tampering with the vote.

- Nancy Kain of DeKalb reported that she was kept too far from the counting to verify any votes.

- Hal Soucie of Smyrna, a poll watcher at State Farm Arena, testified that he was told that he was not supposed to be close enough to see batch numbers.

**No Chain of Custody**

- Annette Davis Jackson, a Gwinnett monitor, saw broken locks on the bins containing paper backup ballots.

- Scott Hall of Fulton County was told to leave the World Congress Center after he tried to document and photograph nine unsecured bags of ballots.  He testified he "cried" over the incidents he saw.

- Dana Smith, a Republican poll watcher in Hart County, testified that she observed the paper backup ballots being placed in unlocked canvas bags for transport to the county office of the Elections Supervisor. The precinct manager finally (at Smith's insistence) obtained locks before transporting the bags in her car, but she refused to complete chain-of-custody forms.  Smith also testified that there was open access to the special paper used to print the paper backup ballots.

- Hal Soucie observed the recount process in two counties, Cobb and Fulton. At State Farm Arena in Fulton County, he reported "suitcases" full of ballots "all over the place," with no chain-of-custody procedures, no time and no date information. He observed people taking ballots out of the cases, counting, and putting them right back into the cases. No one checked him in as a credentialed observer, and one man handed him a stack of ballots without knowing who he was or where the ballots came from.

**Suspicious "Pristine" Absentee Ballots**

- At the State Farm Arena recount on November 14, Susan Voyles – who has 20 years' experience managing election precincts in Fulton County – reviewed a stack of 110 absentee ballots [ballots are normally placed in stacks of 100] and noticed they were "pristine." They had not been folded, and they did not appear worn as though voters and election workers had handled them. Each ballot was "bubbled in" with exactly the same marking, which showed a small crescent of white in the bubble. It appeared as though one ballot had been marked and then reproduced over 100 times. In addition, one of these ballots bore the distinctive ink markings of having been pulled from a printer too soon. Almost all of these ballots were votes for Vice President Biden; only two were for President Trump. In her 20 years of election experience, Voyles had never seen any ballots like these. As noted above, Ms. Voyles has been fired from her position as a poll manager with Fulton County, presumably for her honest testimony.

- Hal Soucie, who was also at the State Farm Arena, verified that he saw the pristine ballots mentioned by Ms. Voyles.

- During the recount, Scott Hall of Fulton County saw large quantities of ballots at the World Congress Center that appeared to have been machine-produced. He stated that he saw this "over and over." The Subcommittee received evidence that other poll workers throughout the State reported similar instances of "pristine" ballots with no explicable origin.

**Duplication of Ballots Without Oversight**

- Nancy Kain, a naturalized citizen in DeKalb County, volunteered as a poll watcher for Advance Voting at lower Roswell Road, served as a poll monitor during processing of absentee ballots and as a poll watcher on Election Day. At 10 a.m. on November 5, at the State Farm Arena, she was not asked for credentials and noticed that many people did not even have credentials. She observed a young man with paper ballots putting in selections on a ballot on a voting machine and wondered why it was not going through the scanner. The supervisor explained that the military ballots are transcribed in proper format and ballots come in that they were trying to salvage because of damage, thus they were just transferring them to a new ballot, and that was the process. Yet, no one was there to verify what the young man was doing. He was the brother of the

supervisor. Technically, he was voting for someone else on a voting machine. She took video and photographs and recorded her conversation with the supervisor.

- Mark Amick observed the processing of Provisional, Military and UOCAVA ballots in Fulton County on November 6 from early morning until 10:15 p.m. The only "oversight" provided was from a Secretary of State (SOS) employee who was not seen in the area before mid-morning, and who spent much of day not observing the duplication and tabulation process but rather sitting in the back of the room and leaving the room while on his phone. The first time Amick saw the SOS employee on the counting/sorting floor was 5:53 p.m. By 6:02 p.m. he had returned to his chair at the back of the room, and he did not go back onto the counting/sorting floor by the time Amick left at 10:15 p.m.

**Denial of Entry to Election Day Poll Watchers and During Recount**

- Mark Amick, a credentialed Statewide Poll Watcher in Milton (Fulton County), was denied entry into the Birmingham Falls Elementary School precinct despite his statewide credentials. The Subcommittee has also received evidence from monitors that some of them were denied entrance during the recount.

**Hostility**

- Hale Soucie of Symrna testified that Cobb County was using an electronic counting machine on the first day to count ballots, which was not the approved way to do the recount. The next day, it was the hand count process. He stated that on his second day he immediately observed that the first auditor made three mistakes in two minutes calling three ballots marked for Trump as Biden votes, but the second auditor caught those mistakes. He noticed another table that was not even doing a double-check at all. When he sought to observe, he was met with great hostility and vulgar name calling directed at him. The Subcommittee received other evidence of hostility against the monitors.

**Wildly Disparate Vote Totals from the Recount**

- While observing the recount at the DeKalb County Board of Elections on November 15, Mark Amick saw that a box of ballots was recorded as 10,707 votes for Biden and 13 votes for President Trump. He flagged this obvious disparity to the election workers, who discussed among themselves how it came to be. Two election officials with whom he engaged about this issue became agitated with Amick for his continued monitoring of the situation. They finally agreed to recount the box, resulting in a revised total of 1,081 votes for Vice President Biden and 13 for President Trump – still statistically disparate, but 9,626 votes less so.  Amick was not certain if the corrected count was actually entered into the final recount totals.

- At State Farm Arena during the recount, Susan Voyles also noted a stack of absentee ballots with only two votes for President Trump.

- Hal Soucie of Smyrna, while monitoring in State Farm Arena, noticed stacks of ballots quite high, such as eight inches high for Biden, yet not a single Trump vote. He stated that he works with data and marketing, and anytime figures start reaching the 90th percentile, that type of consumer data is suspect, and when it gets to 100 percent that is passing the level of improbable to impossible.

**Ballots Counted from Ineligible Voters**

- Mark Davis analyzed data from U.S. Postal Service change-of-address (COA) forms and compared it to voters who voted in their former precincts. For example, he discovered that 14,980 out-of-state movers still voted in the Georgia General Election. Another 40,279 moved across county lines more than 30 days prior to the election, yet still voted in their former county precincts, a violation of Georgia law. He also noted that about 1,000 voters had voted twice in the Primary, inferring that the same pattern could have existed in the General Election.

**Constitutional Violations of Duly Passed Law**

- Dr. John C. Eastman, former Professor of Law and former Dean of the Chapman University Fowler School of Law and current Fellow at the Claremont Institute, testified regarding the plenary authority of the legislative body of the States to set the "Times, Places and Manner" of elections involving Federal officials, including with respect to the selection of Electors for the Electoral College in the presidential election, citing Article I, Section 4 and Article II, Section 1 of the U.S. Constitution. He noted that when States have vested that authority in the people of their States that they are bound to follow the people's choice in a free and fair election, but where fraud and failure to follow the law as passed by the legislative body is evident, that authority can be withdrawn. The legislature then can exercise its plenary authority to choose the electors in a presidential contest. He referenced both *Bush v. Gore* and *McPherson v. Blacker* as authoritative.

  Professor Eastman further explained that the failure of State election officials to follow the manner of conducting the election according to the statutes duly passed by the legislative body can annul an election. The U.S. Constitution clearly gives State legislatures under Article I, Section 4 the duty to determine the "manner" of federal elections, and that power rests solely with the State legislatures unless Congress passes its own laws that preempt State election laws. There is no provision which allows any Executive branch member to modify, set aside, enhance, or otherwise create policies or procedures which undermine or contravene those laws.

He noted various ways State election officials had failed to follow the statutes in conducting the election. He reiterated failures such as counting the votes of approximately 66,000 underage individuals, the 2,500 felons whose votes were unlawfully counted, the votes of those who had no verifiable residences within the State, and the "biggest" of all he believed was the March 2020 settlement agreement that was entered into with Georgia's Secretary of State and "certain democrat committee challengers that effectively altered the signature verification process" with regard to Absentee Ballots, an agreement that was contrary to State law.  He further noted that the "intermingling of legal and illegal ballots" also meant that the election cannot legally be certified. "The State has failed to make a choice on Election Day in accordance with the manner" the legislature prescribed. In light of the failures, the fraud, and the unconstitutional agreement, Dr. Eastman opined that it was the duty of the legislative body to choose the State's Electors for the presidential election.

**Data Analysis in General and Dominion Issues**

- Russell J. Ramsland, Jr., a cybersecurity expert from Texas, testified that his team had compared data from Dominion voting machines in those places where they were used around the nation. They discovered that with Dominion machines, Vice President Biden outperformed what he was statistically expected to receive by an "amazing" 5%. He also outperformed statistical expectations when the analysis was run by county, with Vice President Biden picking up 78% of Dominion counties but only 46% of counties using machines from other manufacturers. Depending on the type of analysis performed, Ramsland estimated that these anomalies translated to between 123,000 and 136,000 extra votes for Vice President Biden in Georgia.

  Ramsland also found that the rejection rate for absentee ballots in Georgia was much lower in 2020 (0.2%) than in 2016 (6.4%). He also identified over 96,000 phantom votes, meaning that they had been counted, but there was no record of the counties recording those ballots as "received."

- Phil Waldron**,** a former U.S. Army information officer with expertise in electronic warfare, identified a "pretty significant information warfare campaign" conducted across the country during the Election. He described the history of the Dominion and other voting machines, with the operating software sharing the same "DNA" going back to Smartmatic, which was created to help steal elections in Venezuela.

  Waldron analyzed these machines in Michigan and found them extremely insecure. He said a good hacker could get into them within two minutes, while an elementary-school student could probably do it in twelve. There are 12 avenues of attack. Dominion also sends voter data outside the United States.

Waldron discussed fractional voting. Waldron testified that the Dominion software used in the Georgia machines assigns a fractional value to each vote; there is no legitimate purpose in assigning an elector's vote as a fractional vote.  That feature can allow the manipulation of election results.

Waldron said federal law (USC Title 46) requires that the ballot images within the machine are required to be preserved for 22 months, but only a forensic analysis would show if this was done. Each machine can record 2,000-3,000 ballots per hour.  His Michigan analysis showed "huge breaches in chain of custody" with respect to the machines and to absentee ballots. In Georgia, there was an unexplained upload of ballots at 3:36 a.m. on November 4.

Waldron urged a full forensic audit of the machines and of absentee ballots (for example, ink analysis would show if ballots were mass-produced).

- Scott Hall of Fulton County stated that when he worked at the English Street facility that he had concerns about the contractors hired there. He noted that every vote in Fulton County ends up on thumb drives that eventually find their way to the English Street location. He said, "I have photographs of pallet loads of basically signed checks." "So you've got every single vote, you've got currency, and now you just need someone to do it." He said he hired one of his own guys to determine if a fraudulent vote could be recorded on the Dominion machines at that point in the process.  "Now, I've got all these votes that have not been uploaded anywhere. And he actually wrote me a paper, and he said that it was the 'stupidest, simplest thing I've ever seen.' He said, 'Dominion's own documentation shows how you take an entire batch, swipe it off, and then swipe on a new batch, before you put it into the real-time reader that uploads." He summed up the voter fraud by using the analogy that the referee got paid off to call the game and something is very wrong.

## Outside Influence Over Governmental Election Functions

- Scott Walter from the Capitol Research Group testified about Mark Zuckerberg's Center for Technology and Civic Life (CTCL), a progressive advocacy group that seeks to influence elections via voter "education" and get-out-the-vote efforts. In the 2020 election, CTCL made grants to individual counties, in Georgia and elsewhere, ostensibly to help run safe elections during COVID. But county boards could use the money for whatever they wanted, and the bulk of the grants (95% of total funding) went to counties that voted for Clinton in 2016 and for Biden in 2020. In fact, nine of the 10 Georgia counties that experienced the largest shifts toward Democrats in 2020 received CTCL grants -- $4.38-$10.47 spent per each man, woman, and child in those counties. Georgia should not allow "privatized" elections via the organization that the Washington Post has called the "Democratic Party's Hogwarts for digital wizardry."

**Voters Unable to Verify Votes Counted**

- Grace Lennon, a student at Georgia Tech, hoped to early vote on October 23. When she arrived, she was told that she had been sent an absentee ballot.  She never received an absentee ballot. She had to sign an affidavit saying that she had not requested nor had she received an absentee ballot. She was then given a voter card to vote on the machine. However, the next day, she learned that someone had voted absentee in her name on October 7th.  She was not able to verify that her vote actually counted for the one she chose to select in the election or whether the absentee ballot counted instead. Senator Greg Dolezal confirmed that most all the Senators had heard many similar stories.

## V.   FINDINGS

1- The November 3, 2020 election was chaotic and the results cannot be trusted.
2- The Secretary of State and the State Elections Board failed to enforce the law as written in the Georgia Code, and furthermore, created policies that contravened State law. As Senator Matt Brass concluded at the December 3 hearing, "We have heard evidence that State law was not followed, time after time after time."
3- The Secretary of State failed to have a transparent process for the verification of signatures for absentee ballots, for the counting of votes during the subsequent recount and audit, and for providing the type of guidance and enforcement necessary to ensure that monitors and other observers had meaningful access to the process.
4- The Secretary of State instituted an unconstitutional gag order so that monitors were told not to use photography or video recording devices during the recount.
5- Election officials at all levels failed to secure test ballots and actual ballots. Many reports indicate that proper procedures were not followed, and there was systematic failure to maintain appropriate records of the chain of custody for these ballots, both prior to and after voting and throughout the recount.
6- The Secretary of State and Election Supervisors failed to stop hostile behavior of workers toward citizen volunteer monitors during the recount process.
7- The events at the State Farm Arena are particularly disturbing because they demonstrated intent on the part of election workers to exclude the public from viewing the counting of ballots, an intentional disregard for the law. The number of votes that could have been counted in that length of time was sufficient to change the results of the presidential election and the senatorial contests. Furthermore, there appears to be coordinated illegal activities by election workers themselves who purposely placed fraudulent ballots into the final election totals.
8- Grants from private sources provided financial incentives to county officials and exerted influence over the election process.
9- The oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified.

## VI.   RECOMMENDATIONS

### A.   Absentee Ballots

In addition to following the law as already written by the legislature, such as not opening absentee ballots until Election Day, additional steps should be taken to ensure that only legal absentee votes are counted.

At a minimum, these recommendations include requiring photo identification, following signature match procedures faithfully, allowing absentee ballots to be used only upon demonstration of need, mailing absentee ballots out only upon the request of the registered voter, and although already illegal, expressly prohibiting drop boxes.

### B.   Secure Chain of Custody and Additional Security Measures

Procedures should be established to ensure proper chain of custody for all ballots, whether they are test ballots, new unused ballots, spoiled ballots, cast BMD-generated ballots, absentee ballots, and even the specialty paper that is used to print the ballots.

Penalties should be clearly known and enforced for any violations.

There should be complete security when workers go on the job, with sign-in of their names and a time stamp, when they go in and when they go out.

Cameras should also be on-site to monitor the process at all times, as well as all the entrances to the buildings where ballots and the ballot paper are stored.

### C.   Meaningful Access for Poll Watchers and Monitors

Citizens who are seeking to ensure the integrity of the vote need to be able to truly see the process. They should be able to ensure that people are reading their ballots before they are cast. They should be able to inspect the signature match process when ballots are opened. They should be able to write down seal information so they can ensure proper custody is in place. They should be close enough to see the names on the ballots during any recounts, the counts written on recount report sheets, the counts going into the ARLO system, the counts written on ballot containers, the process of the seals being broken as the ballots are entering the process, and so forth.

More poll watchers and monitors should be allowed to participate since the ratio needs to be improved. Objections by monitors should be addressed immediately on-site to ensure access and transparency.

Hostile actions by election workers toward volunteers should be immediately addressed and should be cause for dismissal.

### D. No Unconstitutional Gag Orders

There is no reason to ban cameras when tabulation is taking place or when recounts and audits are taking place.

Furthermore, there is no reason to ban cameras at the polling booth as long as voters have privacy while voting.

The State Board of Elections should not ban cameras and recording equipment. They must fulfill their duty to ensure a transparent election process. Furthermore, citizens have a right to share those photos, recordings, and thoughts about what they observe.

### E. Unqualified Voters Should Be Purged from the System

No underage voters should be in the system to allow their votes. No felons should be in the system to allow their votes.

Other categories of voters, such as the deceased and those who have moved out of state, should also be examined as to their continued presence on the voter rolls.

### F. Violations of State Election Laws Must Be Prosecuted

The Georgia Bureau of Investigation ("GBI") and the Attorney General should aggressively investigate and prosecute those who violate election laws, including those conspiring to place fraudulent ballots into the system and the 1,000 persons identified by the Secretary of State who voted twice in the 2020 primaries. If prosecutions do not happen, violations will recur.

The GBI should establish an independent office for the investigation of all claims of voter fraud. That office should report regularly to the Judiciary Committee and, except in the case of investigations involving the Secretary of State or its personnel, the office of the Secretary of State.

The GBI should investigate the cases where many affidavits already exist regarding election fraud in the 2020 General Election.

**G.  Forensic Audits of Ballots and Machines**

The Legislature must determine if ballot marking devices (BMDs) have been manipulated to provide a fraudulent result and without regard to whether the forensic audits can actually identify the manipulation of votes and the authenticity of the ballots that are in the ballot boxes, either generated by the BMDs or those that are absentee ballots.

Independent third-party auditors should review the fiducials on all ballots types (absentee, military, machine generated), audit the absentee ballot results from the last election, confirm the number of external envelopes in each county, and the number of ballots for each county.

Such audits should help ensure that phantom ballots and other fraudulent ballots are not counted in election results, and that legal votes are the only votes counted.

**H.  For Rectifying the 2020 General Election Results**

The Legislature should carefully consider its obligations under the U.S. Constitution.  If a majority of the General Assembly concurs with the findings of this report, the certification of the Election should be rescinded and the General Assembly should act to determine the proper Electors to be certified to the Electoral College in the 2020 presidential race.  Since time is of the essence, the Chairman and Senators who concur with this report recommend that the leadership of the General Assembly and the Governor immediately convene to allow further consideration by the entire General Assembly.

Respectfully submitted this the <u>17th</u> day of December 2020.

_____

Honorable William T. Ligon, Chairman
Senator, District 3

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

LOUIE GOHMERT, *et al.*,

Plaintiffs,

v.

Case No. 6:20-cv-00660

THE HONORABLE MICHAEL R. PENCE, VICE PRESIDENT OF THE UNITED STATES, in his official capacity,

Defendant

.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S EMERGENCY MOTION FOR EXPEDITED DECLARATORY JUDGMENT AND EMERGENCY INJUNCTIVE RELIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

CONCLUSION ....................................................................................................................... 7

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ................................... 7

*Castanon v. United States*, 444 F. Supp. 3d 118 (D.D.C. 2020) ..................................... 4

*Common Cause v. Biden*, 748 F.3d 1280 (D.C. Cir. 2014) ............................................ 4

*Donelon v. Louisiana Div. of Admin. Law ex rel. Wise*, 522 F.3d 564 (5th Cir. 2008) ................... 3

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ............................................ 5

*Escambia Cty., Fla. v. McMillan*, 466 U.S. 48 (1984) ................................................. 7

*Ex Parte Young*, 209 U.S. 123 (1908) ................................................................. 6

*Franklin v. Massachusetts*, 505 U.S. 788 (1992).  .................................................... 5

*Frye v. Anadarko Petroleum Corp.*, 9553 F.3d 285 (5th Cir. 2019) ................................... 3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................. 5, 6

*MedImmunte, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ........................................... 3

*Muskrat v. United States*, 219 U.S. 346 (1911) ....................................................... 3

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) .................................................... 3

*Poe v. Gerstein*, 417 U.S. 281 (1974) ................................................................ 5

*Robinson v. Hunt County, Texas*, 921 F.3d 440 (5th Cir. 2019) ...................................... 5

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) ....................................... 7

*United States v. Brewster*, 408 U.S. 501 (1972) ..................................................... 6

**Constitution and Statutes**

3 U.S.C. § 15. ......................................................................................... 2

3 U.S.C. § 5. .......................................................................................... 2

U.S. Const. art. I, § 6, cl. 1 ......................................................................... 4

U.S. Const., amend. XII. ......................................................................................... 2

U.S. Const., Art. II, § 2, cl. 2 ................................................................................ 1

**Other Authorities**

Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*,

   56 Fla. L. Rev. 541 (2004). ............................................................................... 2

## INTRODUCTION

Plaintiffs have presented this Court with an emergency motion raising a host of weighty legal issues about the manner in which the electoral votes for President are to be counted. But these plaintiffs' suit is not a proper vehicle for addressing those issues because plaintiffs have sued the wrong defendant. The Vice President—the only defendant in this case—is ironically the very person whose power they seek to promote. The Senate and the House, not the Vice President, have legal interests that are sufficiently adverse to plaintiffs to ground a case or controversy under Article III. Defendant respectfully request denial of plaintiffs' emergency motion because the relief that plaintiffs request does not properly lie against the Vice President.

## BACKGROUND

The Constitution of the United States establishes the process for the election of a President and Vice President of the United States. The Electors Clause of Article II provides, "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress; but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector." U.S. Const., Art. II, § 2, cl. 2. The Twelfth Amendment then describes the process by which these Electors cast their ballots for President and those ballots are counted:

> The Electors shall meet in their respective states and vote by ballot for President and Vice-President, . . . they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President . . . ; The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall

be taken by states, the representation from each state having one vote. . . .

U.S. Const., amend. XII.

Following a century of debate over the appropriate process under the Constitution for counting electoral votes and resolving any objections thereto, Congress enacted the Electoral Control Act of 1887.  *See* Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 541, 551-56 (2004).  That Act sets forth a procedure by which the Senate and the House of Representatives can, jointly, decide upon objections to votes or papers purporting to certify electoral votes submitted by the States.  3 U.S.C. § 15.  It further sets forth a procedure for determining a controversy as to the appointment of electors.  3 U.S.C. § 5.

Plaintiffs, who are the U.S. Representative for Texas' First Congressional District, together with the slate of Republican Presidential Electors for the State of Arizona, filed this lawsuit and emergency motion on Sunday, December 27, 2020, challenging the constitutionality of these provisions of the Electoral Count Act.  Plaintiffs allege that the procedures violate the Electors Clause of Article II and the Twelfth Amendment because they "take[] away the authority given to the Vice-President under the Twelfth Amendment" Mot. at 19, and "exceeded the power of Congress to enact," Mot. 22.  They seek, *inter alia*, a declaratory judgment that "Sections 5 and 15 of the Electoral Count Act, 3 U.S.C. §§ 5 and 15, are unconstitutional insofar as they conflict with and violate the Electors Clause and the Twelfth Amendment" and that Vice President Pence "may exercise the exclusive authority and sole discretion in determining which electoral votes to count for a given State," along with related injunctive relief.

## ARGUMENT

The Vice President is not the proper defendant to this lawsuit.  "When considering a

2

declaratory judgment action, a district court must engage in a three-step inquiry. The court must ask (1) whether an actual controversy [of legal interests] exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Frye v. Anadarko Petroleum Corp.*, 9553 F.3d 285, 293-94 (5th Cir. 2019) (internal citations and quotation marks omitted). With respect to the first inquiry, the Supreme Court has required that a dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks and alteration omitted). Plaintiffs' lawsuit against the Vice President does not meet that standard.

Plaintiffs' suit seeks to empower the Vice President to unilaterally and unreviewably decide objections to the validity of electoral votes, notwithstanding the Electoral Count Act. Plaintiffs are thus not sufficiently adverse to the legal interests of the Vice President to ground a case or controversy under Article III. *Cf. Muskrat v. United States*, 219 U.S. 346, 361 (1911) (no case or controversy where "the United States is made a defendant to this action, but it has no interest adverse to the claimants" who are simply seeking "to determine the constitutional validity of this class of legislation"); *Donelon v. Louisiana Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 568 (5th Cir. 2008) (no case or controversy where the plaintiff head of a state agency created a situation "where the state is essentially suing itself"); *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc) ("Although, in this facial attack on the constitutionality of the statute, consideration of the merits may have strong appeal to some, we are powerless to act except to say that we cannot act: these plaintiffs have no case or controversy with these defendants, the Governor and Attorney General of

3

Louisiana, and consequently we lack Article III jurisdiction to decide this case."). Indeed, if plaintiffs' suit were to succeed, the result would be to *remove* any constraint the Electoral Count Act places on the Vice President.

To the extent any of these particular plaintiffs have a judicially cognizable claim, it would be against the Senate and the House of Representatives. After all, it is the role prescribed for the Senate and the House of Representatives in the Electoral Count Act to which plaintiffs object, not any actions that Vice President Pence has taken. Specifically, plaintiffs object to the Senate and the House of Representatives asserting a role for themselves in determining which electoral votes may be counted—a role that these plaintiffs assert is constitutionally vested in the Vice President. *Cf. Common Cause v. Biden*, 748 F.3d 1280, 1285 (D.C. Cir. 2014) ("In short, Common Cause's alleged injury was caused not by any of the defendants, but by an 'absent third party'—the Senate itself."); *Castanon v. United States*, 444 F. Supp. 3d 118, 133 (D.D.C. 2020) (three-judge court) (citing *Common Cause* and noting that plaintiffs' injuries were not caused by defendants (including the Vice President) but by "the House and the Senate."). And it would be the Senate and the House of Representatives that are best positioned to defend the Act.[1] Indeed, as a matter of logic, it is those bodies against whom plaintiffs' requested relief must run. The House of Representatives has already expressly recognized those interests by informing the Defendant that it intends to present the Court numerous arguments in response to plaintiffs' motion. By contrast, a suit to establish that the Vice President has discretion over the count, *filed against the Vice President*, is a walking legal contradiction.

---

[1] The United States disagrees with plaintiffs' unsupported assertion that the Constitution's Speech or Debate Clause does not apply to the Vice President in his official capacity as the President of the Senate. *See* U.S. Const. art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."); Mot. 12.

Plaintiffs also have not established that they are entitled to the extraordinary relief of an injunction against the Vice President. "According to well-established principles of equity, a plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A district court properly refuses to issue an injunction when it is anticipated that a defendant will "respect [a] declaratory judgment." *See Robinson v. Hunt County, Texas*, 921 F.3d 440, 450 (5th Cir. 2019) (quoting *Poe v. Gerstein*, 417 U.S. 281, 281 (1974)). Plaintiffs have made no allegation that the Vice President would refuse to respect a declaratory judgment issued against him. The extraordinary remedy of an injunction is accordingly unnecessary and inappropriate in this case. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992).

It is the responsibility of the Department of Justice, on behalf of the United States, to also raise to the Court's attention a number of threshold issues, which plaintiffs themselves anticipate at pp. 4-15 of their opening brief. First, it is well established that Article III standing requires a plaintiff to "have suffered an 'injury in fact' . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical'"; the injury must be "fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court"; and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). Here, Representative Gohmert identifies as his injury the mere possibility that "he will not be able to vote as a Congressional Representative in accordance with the

Twelfth Amendment, and instead, his vote in the House, if there is disagreement, will be eliminated by the current statutory construct under the Electoral Count Act, or diluted by votes of the Senate and ultimately by passing the final determination to the state Executives."[2]  Mot. at 4-5.  Plaintiff Arizona Electors claim a theoretical injury in the "debasement of their votes."  Mot. at 6.  But the declaration and injunction these plaintiffs seek would not ensure any particular outcome that favors plaintiffs.  They do not seek an order requiring that the presidential election be resolved by the House of Representatives, or that the Republican Electors' votes from Arizona be counted, and even if plaintiffs were granted the relief that they do request, any possibility that those events might occur depends on speculation concerning objections that may or may not be raised in the future, and exercises of discretion concerning those as-yet-unraised objections.  Thus, these plaintiffs have not adequately alleged redress for their specifically-asserted conjectural injuries.  *See Lujan*, 504 U.S. at 568-69 (finding no standing where plaintiffs had not sued all of the relevant parties needed to provide redress).  The Senate and the House of Representatives, by contrast, could take action to redress such injury by amending the Electoral Control Act.

These plaintiffs' claims against the Vice President in his capacity as President of the Senate also fail to address the Constitution's Speech and Debate Clause, which prevents the other Branches of Government from questioning Congress in connection with "legislative acts," which have "consistently been defined as an act generally done in Congress in relation to the business before it."  *United States v. Brewster*, 408 U.S. 501, 512 (1972).  *See also supra* n.1.  Moreover, nothing in *Ex Parte Young*, 209 U.S. 123 (1908), or its progeny supports these particular plaintiffs' novel suit to enjoin the Vice President in the exercise of his constitutional authority as President

---

[2] Ironically, Representative Gohmert's position, if adopted by the Court, would actually deprive him of his opportunity as a Member of the House under the Electoral Count Act to raise objections to the counting of electoral votes, and then to debate and vote on them.

of the Senate. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) (looking to history to understand the scope of equitable suits to enjoin executive action). To the extent the Court is inclined to address these and other issues, the House of Representatives has informed the Defendant that it intends to present this Court with a number of arguments in response to plaintiffs' motion. In light of Congress's comparative legal interests in the Electoral Count Act, Defendant respectfully defers to the Senate and the House of Representatives, as those bodies see fit, to present those arguments.

Finally "[i]t is a well established principle . . . that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cty., Fla. v. McMillan*, 466 U.S. 48, 51 (1984); *see also Texas v. United States*, 328 F. Supp. 3d 662, 710 (S.D. Tex. 2018) ("There is no need to rule on the Take Care Clause issue because the Court has reached a conclusion on a non-constitutional basis."). Plaintiffs' motion presents several novel constitutional issues with respect to the Act. But this Court can and should resolve this motion under the well settled requirement of true and not artificial adversity or the other threshold issues outlined above, particularly given the time constraints and expedited briefing necessitated by Plaintiffs' recent filings.

## CONCLUSION

The relief requested by plaintiffs does not properly lie against the Vice President, and plaintiffs' suit can be resolved on a number of threshold issues. For the foregoing reasons, the Court should deny plaintiffs' request for expedited declaratory judgment and emergency injunctive relief against the Vice President.

Dated: December 31, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JENNIFER B. DICKEY
Principal Deputy Assistant Attorney General

*/s/ John V. Coghlan*
JOHN V. COGHLAN
Deputy Assistant Attorney General
Federal Programs Branch
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue N.W.
Washington, DC 20530
Tel: (202) 353-2793
Email: john.coghlan2@usdoj.gov

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I certify that on December 31, 2020, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ John V. Coghlan*
JOHN V. COGHLAN
Deputy Assistant Attorney General
Federal Programs Branch
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue N.W.
Washington, DC 20530
Tel: (202) 353-2793
Email: john.coghlan2@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| LOUIE GOHMERT, *et al.*,<br><br>Plaintiffs,<br><br> v.<br><br>THE HONORABLE MICHAEL R. PENCE, VICE PRESIDENT OF THE UNITED STATES, in his official capacity,<br><br>Defendant. | Case No. 6:20-cv-00660 |

### [PROPOSED] ORDER DENYING EMERGENCY INJUNCTIVE RELIEF

Plaintiffs' Emergency Motion for Expedited Declaratory Judgment and Emergency Motion for Injunctive Relief filed December 28, 2020 is hereby DENIED.

_____
Judge Jeremy D. Kernodle

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

**Commonwealth of Pennsylvania, State of California, State of Delaware, District of Columbia, State of Maine, Commonwealth of Massachussetts, and State of North Carolina**,

Plaintiffs,

v.

**Louis DeJoy, in his official capacity as United States Postmaster General, Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors, and the United States Postal Service**,

Defendants.

Case No. 20-cv-4096

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction ..................................................................................................................... 1

Background ..................................................................................................................... 3

I.     The United States Postal Service ..................................................................... 3

II.    USPS's Handling of Election Mail ................................................................. 4

      A.     State, Local, and Individual Responsibilities for Election Mail ............................ 6

      B.     USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail ....................... 8

            1.     USPS Outreach and Recommendations to Election Officials ................... 8

            2.     USPS's Longstanding Special Measures for Election Mail ................... 11

            3.     USPS's Increased Efforts in Support of the Election .............................. 13

III.   USPS's Years-Long Mandate to Improve Efficiency and Control Expenses .................. 14

      A.     Periodic, Data-Based Reduction in Redundant Processing Equipment and Collection Boxes ................................................................................. 15

      B.     USPS's Continued Focus on Adherence to Existing Transportation Schedules ...................................................................................... 17

      C.     USPS Personnel Practices Related to Overtime Usage and Staffing Shortages Caused by the Covid-19 Pandemic ....................................... 19

            1.     Overtime ................................................................................. 19

            2.     The Impact of the COVID-19 Pandemic ................................... 20

      D.     Other Efforts Aimed at Improving Efficiency ..................................... 21

IV.   Procedural History ....................................................................................... 21

Standard of Review ...................................................................................................... 22

Argument ...................................................................................................................... 23

I.     Plaintiffs are unlikely to prevail on the merits of their claims .......................... 23

      A.     Plaintiffs' alleged injuries rely on a speculative chain of possibilities, and are thus insufficient to establish standing. ............................................ 23

      B.     Plaintiffs are unlikely to succeed on their section 3661 claim ............................ 25

i

      1.      District Courts lack subject-matter jurisdiction over complaints regarding 39 U.S.C. § 3661, which are channeled to the Postal Regulatory Commission and then the D.C. Circuit. ............................... 25

      2.      The ultra vires doctrine does not provide an avenue for judicial review here. ................................................................................................. 29

   C.     Plaintiffs are unlikely to establish that the alleged USPS policy changes violates the rights of State legislatures under the Elections Clause. ..................... 35

II.    Plaintiffs fail to establish irreparable harm. ........................................................ 42

III.   The balance of equities counsel against Plaintiffs' requested relief. ............................... 43

IV.   Plaintiffs' proposed injunction does not comport with Rule 65 ....................................... 45

Conclusion ............................................................................................................. 47

# TABLE OF AUTHORITIES

## CASES

*Acierno v. New Castle County,*
40 F.3d 645 (3d Cir.1994)....................................................................... 42

*Aid Ass'n for Lutherans v. USPS,*
321 F.3d 1166 (D.C. Cir. 2003) .............................................................. 30

*Am. Fed'n of Gov't Employees, AFL-CIO v. Trump,*
929 F.3d 748 (D.D.C. 2019) .................................................................... 29

*Bank of Louisiana v. FDIC,*
919 F.3d 916 (5th Cir. 2019) .................................................................. 28

*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.,*
502 U.S. 32 (1991).................................................................................. 30

*Bovard v. U.S. Post Office,*
47 F.3d 1178 (10th Cir. 1995) ................................................................ 26

*Buchanan v. U.S. Postal Serv.,*
508 F.2d 259 (5th Cir. 1975) ........................................................... 31, 35

*Cheney v. U.S. Dist. Court for D.C.,*
542 U.S. 367 (2004)................................................................................ 38

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).......................................................................... 23, 24

*Cook v. Gralike,*
531 U.S. 510 (2001)................................................................................ 36

*Ctr. for Biological Diversity v. EPA,*
861 F.3d 174 (D.C. Cir. 2017) ................................................................ 28

*Foster v. Pitney Bowes Corp.,*
549 F. App'x 982 (Fed. Cir. 2013) ......................................................... 26

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
561 U.S. 477 (2010).......................................................................... 28, 29

*Gelman v. FEC,*
631 F.2d 939 (D.C. Cir. 1980) ................................................................ 33

*I.M. Wilson, Inc. v. Otvetstvennostyou,*
No. 18-5194, 20129 U.S. Dist. LEXIS 182350 (E.D. Pa. Oct. 18, 2019)     43

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
   548 F.3d 110 (D.C. Cir. 2008) ................................................................ 28

*Jarkesy v. SEC*,
   803 F.3d 9 (D.C. Cir. 2015) ..................................................................... 29

*Leedom v. Kyne*,
   358 U.S. 184 (1958)................................................................................... 30

*LeMay v. U.S. Postal Serv.*,
   450 F.3d 797 (8th Cir. 2006) ............................................................ 25, 26

*McDermott v. Potter*,
   No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom.*
   *McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011) ......................... 27

*Media Access Project v. FCC*,
   884 F.2d 1063 (D.C. Cir. 1989)................................................................ 28

*Mittleman v. Postal Regulatory Comm'n*,
   757 F.3d 300 (D.C. Cir. 2014) .......................................................... 29, 30

*Murphy v. United States Postal Serv.*,
   No. C 14-02156 SI, 2014 WL 4437731 (N.D. Cal. Sept. 9, 2014)........... 27

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Service Impasses Panel*,
   437 F.3d 1256 (D.C. Cir. 2006) ............................................................... 30

*Nat'l Ass'n of Postal Supervisors v. USPS*,
   No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020) ........... 30

*Nken v. Holder*,
   556 U.S. 418 (2009).................................................................................. 22

*Norton v. S. Utah Wilderness,All.*,
   542 U.S. 55 (2004).................................................................................... 44

*Nyunt v. Broadcasting Bd. of Govs.*,
   589 F.3d 445 (D.C. Cir. 2009) ................................................................. 30

*Pep-Wku, LLC v. USPS*,
   No. 20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020) ....... 27

*Pierre & Carlo, Inc. v. Premier Salons, Inc.*,
   713 F. Supp. 2d 471 (E.D. Pa. 2010) ...................................................... 42

*Powell v. United States Postal Serv.*,
   No. CV 15-12913-FDS, 2016 WL 409672 (D. Mass. Feb. 2, 2016)......... 27

iv

*Public Util. Comm'r of Or. v. Bonneville Power Admin,*
  767 F.2d 622 (9th Cir. 1985) ........................................................................................... 28

*Rodriguez v. Hemit,*
  No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018) ................................... 27

*Sears, Roebuck & Co. v. U.S. Postal Serv.,*
  134 F. Supp. 3d 365 (D.D.C. 2015), *aff'd in part on other grounds, vacated in part on*
  *other grounds, rev'd in part sub nom.,* 844 F.3d 260 (D.C. Cir. 2016) .................................... 27

*Smiley v. Holm,*
  285 U.S. 355 (1932) ........................................................................................... 36, 37, 39

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ........................................................................................... 23

*Striley v. United States Postal Serv.,*
  No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) ................................... 27

*Summers v. Earth Island Institute,*
  555 U.S. 488 (2009) ........................................................................................... 43

*Telecomms Res. & Action Ctr. v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984) ........................................................................................... 28

*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.,*
  735 F.3d 131 (3d Cir. 2013) ........................................................................................... 23

*U.S. Term Limits, Inc. v. Thornton,*
  514 U.S. 779 (1995) ........................................................................................... 36, 38

*United Farm Workers of Am., AFL-CIO v. Chao,*
  227 F. Supp. 2d 102 (D.D.C. 2002) ................................................................................... 33

*Wilson v. USPS,*
  441 F. Supp. 803 (C.D. Cal. 1977) ................................................................................... 32

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................... 22

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.,*
  379 U.S. 411 (1995)   28

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) ........................................................................................... 41, 42

*Zschernig v. Miller,*
  389 U.S. 429 (1968) ........................................................................................... 39, 40

## STATUTES

39 U.S.C. § 401 ................................................................................................ 29

39 U.S.C. § 409 ................................................................................................ 25

39 U.S.C. § 410 ................................................................................................ 30

39 U.S.C. § 3661 .......................................................................... 2, 25, 26, 29

39 U.S.C. § 3662 ............................................................................... 25, 26, 27

39 U.S.C. § 3663 ............................................................................................ 27

39 U.S.C. § 3664 ............................................................................................ 27

## OTHER AUTHORITIES

Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. 2006-1 (Dec. 12, 2006) .......................................................... 34

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf ..................................... 34

Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf ..................................... 34

Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf .......... 34

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf ..................................... 34

Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf ..................................... 34

Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf ............................................. 34

Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20 Opinion.pdf ................................................................................................. 34

Congressional Briefing (Aug. 31, 220),
https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf .......... 19

*Number of Voters and Voter Registration as a Share of the Voter Population*,
https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?currentTimeframe=0&sortModel=%7B%22colld%22:%22Location%22,%22sort%22:%22asc%22%7D ................................................................................................... 4

Service Performance Rebounds at Postal Service (Aug. 31, 2020),
https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm ................................................................................................ 19

## INTRODUCTION

This case is not about whether the United States Postal Service ("USPS") will be able to meet the burdens imposed by individuals who intend to vote by mail in the November 2020 election (the "Election"). Just as it has in past elections, USPS has taken, and will continue to take, a number of efforts to ensure that ballots move quickly and efficiently through the mail. Such efforts include encouraging state officials to appropriately identify and mark ballots to facilitate proper treatment of Election Mail; asking voters to mail their ballots as soon as they are able; and then tracking (where possible), monitoring, and moving the ballots as expeditiously as possible. Nothing has changed in USPS's approach to Election Mail from past years, except that USPS has put in place *even more* processes to monitor and move these ballots in response to the major increase in Election Mail volume caused by the COVID pandemic. Indeed, to avoid any doubt about USPS's ability to meet its responsibilities, it has suspended a number of routine, long-standing operational activities—implemented *before* Postmaster General DeJoy's tenure—until after the November Election.

In light of these publicly expressed commitments, this case is now about Plaintiffs' attempts to have this court oversee the day-to-day operations of USPS, based on statutory claims that the D.C. Circuit has analogized to a "Hail Mary," to right wrongs that do not exist. Plaintiffs' legally deficient claims, arising from unsupported fears about the potential actions of USPS, do not warrant the extraordinary relief it seeks.

First, Plaintiffs cannot show a likelihood of success because they lack Article III standing. All of their alleged injuries hinge on their theory that certain USPS policies will create future delays. However, the vast majority of policies identified by Plaintiffs either do not exist, or have been in place for years, and thus cannot be responsible for any recent delays. In any event, even if

1

Plaintiffs establish that there may be delays, any injury flowing to Plaintiffs would be based on a speculative chain of possibilities. It is unclear whether these delays would occur in the Plaintiff States in particular, and would be of a sufficient length and affect a sufficient number of persons. Plaintiffs thus cannot establish standing.

And even if Plaintiffs had standing, the Court still lacks jurisdiction over their statutory claims. Plaintiffs claim that USPS failed to comply with 39 U.S.C. § 3661's requirement that certain major changes first receive an advisory opinion by the Postal Regulatory Commission. But Congress has explicitly channeled those claims away from the district court, and towards the Postal Regulatory Commission, an independent executive branch establishment responsible for regulating the Postal Service, with review in the D.C. Circuit. Decades of precedent thus confirm that district courts have no jurisdiction over these claims.

Plaintiffs turn to the last resort of *ultra vires* jurisdiction to overcome this clear statutory bar, but such jurisdiction is unavailable here for two reasons. First, *ultra vires* review is unavailable where there is a path for judicial review, and because here there clearly is, Plaintiffs cannot invoke this doctrine. Second, relief under the *ultra vires* doctrine requires a clear error, implicating the agency's jurisdiction to take such action.  But the statute Plaintiffs rely upon applies only to certain major changes, and here Plaintiffs' challenge largely centers around alleged policy changes that never occurred. The only national policy Plaintiff challenges is guidance on when extra truck trips are appropriate, which likewise does not constitute a "major change" requiring an advisory opinion by the Postal Regulatory Commission.

Nor can Plaintiffs prevail on their claim that any alleged USPS policy changes interfered with Plaintiffs' authority under the Elections Clause to enact laws concerning the "times, places, and manner" of their elections. USPS has not prevented Plaintiffs from determining how their

2

citizens may legally vote; indeed, those allowed to vote by mail under Plaintiffs' laws still possess that right today. Plaintiffs' claim thus relies on the remarkable and unprecedented theory that the Elections Clause protects plaintiffs from any federal policy that may indirectly affect the electoral process. Unsurprisingly, Plaintiffs cite to no case where a court has adopted this theory—which could potentially jeopardize a number of federal policies—and Defendants are aware of none.

Furthermore, Plaintiff cannot establish the other prerequisites for a preliminary injunction, including that any irreparable injury must be "certain and great." Plaintiff's injuries consist of speculative and unjustified concerns over future mail deliveries. And the balance of the equities and the public interest support allowing the Postal Service to manage its operations as efficiently and effectively as possible, so it can meet the many burdens placed upon it in advance of the upcoming election. Plaintiffs' request for a broad, ambiguous injunction requiring USPS to employ a number of policy changes does not comport with Rule 65, nor do the equities support placing the Postal Service under judicial receivership with that election only weeks away.

## BACKGROUND

### I.     The United States Postal Service.

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States. USPS has the authority to, among other things, designate mail routes and construct or designate post offices with the authority to carry, deliver, and regulate mail for the entire country. It is one of the nation's largest and most complex business operations. The USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a *single* day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

The Board of Governors of USPS, which is comparable to the board of directors for a publicly held corporation, directs the exercise of powers of the Postal Service, including, among other things, long-range planning, oversight of service standards, management of expenditures, and review of policy and practices. The PRC, an independent agency, has regulatory oversight over USPS.

Louis DeJoy is the 75th Postmaster General and Chief Executive Officer of USPS. The Board appointed Postmaster General DeJoy on May 6, 2020. He assumed office on June 16, 2020.

## II.    USPS's Handling of Election Mail.

"Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3. This includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications).[1] *Id.* USPS regards Election Mail as having special importance.

The USPS has determined that it is fully capable—both financially and operationally—of handling a surge of Election Mail in connection with the November Election. By its analysis, even if every registered voter in the United States[2] used a mail-in ballot to cast a vote in the Election, the associated mail volume would represent only a small fraction of the total mailpieces that the USPS processes each week, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail

---

[1] Election Mail is distinct from "Political Mail" sent by political candidates, political action committees, and similar organizations in order to engage in advocacy. Glass Dec. ¶ 3.

[2] Publicly available data generally indicate that there are approximately 150 million registered voters in the United States. *See, e.g.*, *Number of Voters and Voter Registration as a Share of the Voter Population*, https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?currentTimeframe=0&sortModel=%7B%22colld%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Sept. 10, 2020).

volume that the USPS handles every winter holiday season. *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23. Indeed, USPS projects (even accounting for an increased use of mail-in ballots to compensate for COVID-19-related mitigation efforts) that only two to five percent of the total mail volume in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. As detailed below and in USPS's declarations and public statements, USPS has been planning for the Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered. Glass Dec. ¶¶ 42-44.[3]

Beyond these financial and operational resources, USPS will continue to employ longstanding practices to facilitate the timely delivery of Election Mail and provide proper handling of Election Mail and work with external stakeholders to educate them on how to effectively use the mail as part of the electoral process (should they so choose). These include extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots; publishing and distributing the official Election Mail kit (which provides a comprehensive guide to services, resources, and recommendations for Election Mail) to approximately 11,400 state and local election officials; offering special Election Mail markings to improve the visibility and ensure proper handling of Election Mail; and, as the attached declarations further detail, taking extraordinary steps to ensure the timely delivery of Election Mail for the upcoming election. *See* Glass Dec. ¶¶ 3-41. Further, due to the unprecedented

---

[3] *See also* Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Meeting (Aug. 7, 2020) (Ex. 3) at 4 ("[T]he Postal Service has ample capacity to deliver all election mail securely and on-time in accordance with our delivery standards, and we will do so."); Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections (Ex. 5) at 54 ("[W]e have plenty of cash to operate for the election.").

demands of the election, the Board of Governors has established a bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the Election. *Id.* at ¶ 10. USPS has demonstrated, both in its public representations and in practice, its commitment to continuing its longstanding practice to facilitate and expeditiously deliver Election Mail this year.

### A.      State, Local, and Individual Responsibilities for Election Mail.

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters bear significant responsibility in the successful utilization of postal services for the Election. USPS lacks authority over the critical decisions committed by law to states and local election officials regarding their Election Mail policies and procedures. *Id.* ¶ 4. Generally, each state determines whether, and to what extent, mail-in voting of any kind is allowed. If mail-in voting is allowed, either the legislature or state and local election officials, if so authorized, and must choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. *Id.* ¶ 4; *see also* Ex. 4 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections*"* (Aug. 31, 2020)). Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a Priority Mail class with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 4 at 1; Glass Dec. ¶ 4. USPS has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. *See, e.g.*, Ex. 5 (Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections (Aug. 21, 2020)) at 18 ("[W]e are not going to change any rates."); Ex. 3 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and

Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 4 ("We have delivery standards that have been in place for many years. These standards have not changed").

State legislatures, or election officials, if delegated such authority, also have the responsibility for making key decisions that directly impact mail-in voting. Within the constraints of state and federal law, state and local election officials determine, among other things: (1) the design of Election Mail (its dimensions and the graphic and textual elements that will be displayed); (2) whether they will sufficiently mark Election Mail to enable USPS to identify and expeditiously process Election Mail for handling and delivery; (3) deadlines for voters to request and return mail-in ballots (4) when Election Mail will be sent to voters; (5) whether Election Mail will be trackable (for example, using USPS's Intelligent Mail barcode system); and (6) whether to pre-pay postage for returned ballots (versus requiring voters to affix their own postage). Glass Dec. ¶ 4. Individual voters are responsible for, among other things, providing current addresses to election officials; understanding mail-in voting procedures in their state and locality; and timely requesting ballots from, and returning those ballots to, election officials.

USPS's most significant operational concerns with respect to the Election are those elements controlled by the states themselves, either through legislation or state and local election officials and voters, not USPS. *Id.* ¶ 45. Indeed, when reviewing an audit of the special and primary elections in May and June 2020, the USPS Office of Inspector General ("OIG") concluded that USPS had improved several of its practices and procedures since prior OIG audits and had appropriately adjusted its processes to accommodate for the timely processing of Election Mail to meet the needs of the elections. Ex. 4 at 3, 12. OIG identified, however, several "potential concerns" that may affect the USPS servicing capacity for the Election (*i.e.* ballots mailed without tracking technology, ballot mailpiece design, Election Mail sent to voters too close to the election,

7

varying state postmark requirements for ballots, and out-of-date voter addresses)—none of which are controlled by USPS.

**B.      *USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail.***

In preparation for the Election, USPS has undertaken extensive, expanded efforts to help election officials and voters in the planning and preparation of Election Mail, strongly encourage election officials, voters, and Postal Service employees to implement best practices, reinforce existing policies and procedures for handling Election Mail with Postal Service employees, and prepare to process and deliver a high volume of Election Mail.

**1.      *USPS Outreach and Recommendations to Election Officials.***

USPS has demonstrated its commitment to provide election officials with the tools necessary to use the U.S. Mail as a secure, efficient, and effective way to facilitate the election process. In support of the Election, USPS has already had approximately 42,000 contacts to confer and advise state and local election officials regarding Election Mail best practices and recommendations, and this outreach is ongoing. Glass Dec. ¶¶ 5-9. Additionally, since February 2020, the outreach strategy has included distributing approximately 11,500 copies of "Kit 600," an official Election Mail guide; offering mailpiece design services; designating Election Mail Coordinators to serve each locality; and publishing extensive election-related information and guidance online. *Id.* ¶ 6; *see also* Ex. 6 (USPS 2020 Election Mail – Kit 600). This outreach strategy in the run-up to the 2020 Election is consistent with USPS's outreach efforts in past election years. The principal distinction between this year's effort and those of previous election years is that the volume and frequency of USPS's communications have *increased* to address challenges stemming from the COVID-19 pandemic. Glass Dec. ¶ 32.

In May and July 2020, following dissemination of Kit 600, the USPS General Counsel's office sent letters to election officials to follow up and emphasize key aspects of the USPS's

processes and recommendations so that they may be taken into account when educating the public on voting by mail. Glass Dec. ¶ 7 & Glass Dec. Ex. 1. USPS tailored the July 2020 letters to each state, identifying key provisions of each state's election laws and procedures and relevant considerations for the timely, effective use of U.S. Mail to facilitate the voting process. *See generally* Ex. 15 (July 29, 2020 USPS Letter). For example, in its letter to Arkansas election officials, USPS cited provisions of state election law that "are incongruous with [USPS] delivery standards" and "create[] a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted." *Id.* at 1. USPS implored Arkansas election officials, as it did all other state and local election officials, to "keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election" by mail. *Id.* at 2.

None of the letters sent to state and local election officials by the Postal Service stated that the Postal Service intended to slow or delay delivery of Election Mail, or that USPS was otherwise altering its service standards for Election Mail. Rather, these letters aimed to ensure that election officials are fully informed, well in advance of the Election, of USPS's delivery standards, the extensive resources that USPS offers to assist election officials, and the potential risks that local ballot request deadlines may pose to voters' full participation by mail in the Election. *See* Ex. 1; *see generally* Ex. 15. Moreover, these letters were consistent with USPS's outreach to election officials during past election cycles. *See, e.g.*, Glass Dec. ¶ 8 & Glass Dec. Ex. Ex. 2 (Sept. 23, 2016 letter to state election officials advising them, for example, to consult with USPS Election Mail Coordinators, urge voters to return ballots one week early in order to ensure timely delivery, use the official USPS Election Mail markings, and send Election Mail by First-Class Mail).

In all of its communications regarding 2020 Election Mail, USPS has strongly, and repeatedly, recommended that election officials adopt USPS best practices, including the following[4]:

- Consult with USPS Election Mail Coordinators to better understand the Postal Service's services, resources, recommendations and to help resolve issues should they arise, as well as mailpiece design analysts on how to ensure quality mailpiece design for Election Mail envelopes, including ballot envelopes. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 2; Ex. 6 at 5; *see also* Glass Dec. ¶ 6.

- Identify Election Mail using USPS's official Election Mail logo, Green Tag 191 (which can be applied only to containers of mail enclosing ballots being sent out to voters), or by other means. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 4, 5, 13, 23; Ex. 8 (USPS Election Mail – Graphic Guidelines and Logos (Pub. 631)); *see also* Glass Dec. ¶¶ 11-14.



Official USPS Election Mail Logo



Green Tag 191

- Use tracking technology, for example USPS's Intelligent Mail Barcode, for Election Mail. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 7.

- Use First-Class Mail to transmit Election Mail (including blank ballots) to voters, and allow sufficient time for delivery to and from voters. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1; Ex. 7 at 10 (USPS Publication 632, explaining the USPS's different delivery standards and

---

[4] *See* Glass Dec. ¶ 32; *see also* Ex. 4 at 2 ("[t]he Postal Service has frequently communicated to state election officials the importance of" following best practices).

"recommend[ing] the use of First-Class Mail service to obtain timely delivery"); *see also* Glass Dec. ¶ 18.

- Keep USPS delivery standards in mind when informing voters how to vote by mail. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1.

Lastly, the USPS has consistently urged voters to return their completed ballots early. *See, e.g.*, Ex. 1 at 2; Glass Dec. ¶ 42 ("[T]o mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively encouraging voters and election officials to act early"); Ex. 9 at 1 (Statement of Postmaster General Louis DeJoy Before the House Committee on Oversight and Reform (Aug. 24, 2020) "encourag[ing] all Americans who choose to vote by mail to request their ballots early and to vote early, as a common sense best practice.").

### 2. *USPS's Longstanding Special Measures for Election Mail.*

For many years, USPS has taken special measures for handling Election Mail. In anticipation of the Election's increased reliance upon USPS, USPS has ramped up its efforts to ensure Election Mail is timely delivered.

First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. This effort is significantly aided when election officials use the official USPS Election Mail logo for all Election Mail mailpieces, affix Green Tag 191 to mail bins containing ballots being sent to voters, and check the "Election Mail" box on the postage statement form that is filled out when bulk Election Mail is entered into the USPS system. *See* Glass. Dec. ¶¶ 11-14. When a mail bin identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary. *Id.* ¶ 19. USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper

11

location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.*

USPS also has several longstanding practices to expeditiously process and deliver Election Mail, particularly ballots (whether election officials have chosen to send ballots to voters using Marketing Mail or First-Class Mail). *Id.* ¶ 20. USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. *Id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *Id.* And, when identifiable, USPS prioritizes placing ballots on outgoing truck, whether sent using First-Class Mail or Marketing Mails. *Id.* ¶ 22.

Furthermore, USPS has a longstanding practice of postmarking (also referred to as "cancelling") all completed ballots returned by mail that are readily identifiable as ballots. *Id.* ¶ 34. A postmark is a USPS imprint applied to a mailpiece, usually by an Advanced Facer Cancellation System (AFCS) machine at a processing plant, indicating the location and date that the USPS accepted custody of the mailpiece, and the location the cancellation mark was applied, in order to cancel affixed postage so that it may not be reused. *Id.* ¶ 33, 35. Many mailpieces do not need to be cancelled, because they bear indicia of postage that is not at risk of being reused (*e.g.*, metered or permitted mail, or mail bearing a pre-cancelled stamp). *Id.* USPS, however, still takes measures to strive to postmark all returned ballots given the emphasis placed on postmarks by some state laws in validating the timely return of ballots. *Id.* USPS even goes so far as to cancel return ballot envelops by hand, if necessary, to facilitate postmarking. *Id.* ¶ 34.

Based upon USPS's analysis of contemporaneous data regarding current AFCS machine capacity throughout the country, USPS has ample capacity to postmark all mailpieces readily

identifiable ballots. *Id.* USPS also plans to take extra steps for this election to identify and hand-cancel ballots that are rejected by an AFCS machine. *Id.* ¶¶ 39, 41. Further, and for the first time, USPS will use Ballot Monitors during the week preceding and through Election Day to ensure that all USPS personnel follow proper protocol for identifying and postmarking ballots. *Id.* ¶ 39.

USPS will continue these longstanding practices in support of mail-in voting for the Election. Glass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. Glass Dec. ¶¶ 1, 27.

### 3.    *USPS's Increased Efforts in Support of the Election.*

In anticipation of the additional mail volume associated with the Election, USPS remains committed to and has increased its efforts to process and deliver Election Mail. For example, Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 10 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1-2. These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows). Glass Dec. ¶ 29. USPS has also expanded its Election Mail Task Force this year to include leaders of the postal unions and management associations, to ensure strong coordination throughout USPS and with state and local election officials, and to make sure any concerns can be raised and timely resolved at the highest levels of the organization. *Id.* ¶ 10. As discussed above, USPS has also increased the volume and frequency of its communications with election officials and will, for the first time, utilize Ballot Monitors. *Id.* ¶¶ 32, 39.

### III.    USPS's Years-Long Mandate to Improve Efficiency and Control Expenses.

USPS's systematic efforts to facilitate the use of U.S Mail for elections, particularly the 2020 Election, have not been diminished by USPS's mandate to improve performance, adhere to service standards, and help address the Postal Service's precarious financial condition—a mandate that long predates Postmaster General DeJoy's tenure. Per USPS's Fiscal Year 2019 Annual Report to Congress, the USPS's financial condition results, in part, from the steady declines in First-Class and Marketing Mail volumes. *See* Ex. 1 at 28-29; *see also, e.g.*, Ex. 11 (First-Class Mail Volume Since 1926 Report, showing that the volume of First-Class Mail in 2019 was at its lowest point since 1977); Ex. 12 (Statement of Postmaster General and Chief Executive Officer Megan J. Brennan Before the House Committee on Oversight and Reform (Apr. 30, 2019)) at 1 (2019 statement of the former Postmaster noting the steep decline in First-Class Mail, the USPS's "most profitable product"). Pursuant to this mandate, the Postal Service routinely analyzes operations and performance metrics to determine whether and where improvements can be made to further efficient service. To that end, USPS regularly reviews, among other things, collection box and equipment utilization, overtime usage, retail and facility operations, and transportation and delivery initiatives. As a part of that process, the USPS makes determinations as to collection box and equipment removal, implementation of programs to improve efficiency, changing retail hours, consolidation or closing of facilities, and amendments to policies and practices.

In light of the increased scrutiny of these activities recently, and in an effort to bolster public confidence in the Postal Service's ability to handle Election Mail, Postmaster General DeJoy has publicly committed to suspending the aforementioned activities, including equipment and collection box removal, changes to retail hours, plans to consolidate or close any facilities, and implementation of a limited pilot program for mail carriers. *See, e.g.*, Ex. 10. He also clarified that overtime was never banned and that it would continue to be permitted. *Id.* The only exception

14

to Postmaster General's DeJoy's directive to maintain the status quo through Election Day pertains to the ongoing effort to improve compliance with existing schedules throughout USPS's transportation and processing networks—which, as discussed below, has not had any lasting negative impact on USPS's service performance.

### A. Periodic, Data-Based Reduction in Redundant Processing Equipment and Collection Boxes

For years, and largely the result of changing operational needs due to the decline in letter and flat mail[5] volume, USPS has periodically gathered and analyzed data relating to the utilization of blue collection boxes and mail processing machines. Based upon these analyses, USPS makes determinations regarding the reduction or reallocation of redundant collection boxes and processing equipment based upon its analyses.

USPS has over 140,000 collection boxes. *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. USPS regularly reviews the need for and location of collection boxes in accordance with procedures set out in the Postal Operations Manual ("POM"). *Id.* ¶ 5. Generally, a collection box is targeted for removal if it averages fewer than 25 mailpieces daily during a two week observation period. With some exceptions, USPS posts a 30-day public notice on collection boxes identified for relocation or removal before final action. *Id.* ¶¶ 5, 8. For the last seven years, USPS has removed an average of 3,100 collection boxes each year, many of which were relocated to more heavily trafficked areas. *Id.* ¶¶ 8, 10. Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal. *Id.* ¶ 6. USPS has removed approximately 1,500 boxes in 2020 pursuant to this routine process, consistent with removal rates of previous years. Postmaster General DeJoy was not involved in any decisions relating to the removal of these

---

[5] "Flat mail" refers to periodicals and larger envelopes (for example, newsletters and advertising material). *See, e.g.*, DeChambeau Dec. ¶ 5.

boxes. *Id.* ¶¶ 10, 19. Rather, the removal and relocation of collection boxes (other than damaged boxes or unsecured boxes) has been suspended at least through the Election at Postmaster General DeJoy's direction. *Id.* ¶¶ 18-19.

Similarly, USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement. *See* DeChambeau Dec. ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Declaration of Robert Cintron ("Cintron Dec.") ¶ 5. Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for several years, to align with volume reductions in those types of mail. DeChambeau Dec. ¶ 13. The number of machines reduced varies from year to year, based on utilization data. *Id.* For example, in Fiscal Year 2016, the USPS reduced 1,120 letter and flat sorting machines, while the following year it reduced only 197 machines. *Id.* In 2017, the USPS began a more structured, phased equipment reduction initiative. *Id.* ¶ 14. The first phase focused on reducing unnecessary Delivery Barcode Sorters (DCBS) and Automated Flat Sorting Machines (AFSM), which process letter and flat mail, respectively. *Id.* Later phases included reducing unnecessary AFCS equipment. *Id.* ¶¶ 6, 16. In 2020, the USPS reduced approximately 700 letter and flat sorting machines. *Id.* ¶¶ 19-21. These reductions were planned and scheduled before Postmaster General DeJoy took office, and he had no role in their implementation, *id.* ¶ 22, Couch Dec. ¶¶ 5, 9, Declaration of Michael L. Barber ("Barber Dec.") ¶ 5. Regarding the timing of the removals, as in prior years, the removals were scheduled for summer, when mail volumes are historically lower. DeChambeau Dec. ¶ 19; Couch Dec. ¶ 4.

Mail processing machines that are taken out of service are generally removed from a facility floor and disassembled for their usable parts. Couch Dec. ¶¶ 10-11. Other machines may be offered for sale to the general public through the USPS's Corporate Asset Accountability

Office. *Id.* ¶¶ 10, 12. Indeed, factoring in the mail processing machines that were removed or disconnected this year, USPS's mail processing utilization at the national level ranges from 35 percent (when mail is low) to 65 percent (when mail is high); which means that machines have ample extra capacity. Barber Dec. ¶ 6.

USPS is confident that its processing facilities have ample capacity to process all anticipated Election Mail based on its ongoing monitoring of processing capacity data, taking into account machines that have been removed from service. DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6. USPS tracks mail processing data for machines nationwide in order to evaluate whether machine utilization comports with the volume and types of mail handled in each facility, removing and/or replacing machines accordingly. DeChambeau Dec. ¶ 8; Couch Dec. ¶ 4; Barber Dec. ¶ 4. USPS may also remove machines because they are obsolete, to free up floor space for other use (*e.g.*, sorting operations or package handling equipment), or as a result of facility consolidations, though no mail processing facility closings or consolidations are scheduled for Fiscal Year 2020 or the first quarter of Fiscal Year 2021. DeChambeau Dec. ¶¶ 7-12, 18; Couch Dec. ¶ 3; *see* Barber Dec. ¶ 11; *see also* Ex. 10 at 1 ("No mail processing facilities will be closed.").

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 10 at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15.

### B. USPS's Continued Focus on Adherence to Existing Transportation Schedules

Approximately two years ago, Robert Cintron, Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules. Cintron Dec. ¶¶ 1, 11-13, 21. When Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed the initiative with the Postmaster General and other Postal executives. *Id.* ¶¶ 22-23. Concurrent with these discussions, the OIG published a report addressing "late deliveries

17

. . . late dispatch, extra trips, and all the time and costs" that those issues caused. Ex. 5 at 10. In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Ex. 13 (USPS OIG Audit Report No. 19XG013NO00O-R20, "US. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.*

Soon after joining the Postal Service, Postmaster General DeJoy reemphasized the need to adhere to USPS's operational plans, including transportation schedules. Cintron Dec. ¶ 23. Mr. Cintron and his team then developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. Cintron Dec. ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives, advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. *Id.* ¶ 25.[6]

During the following week, compliance with transportation schedules improved, but USPS experienced a temporary decline in its service performance. *Id.* ¶ 26. However, after USPS

---

[6] USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. *See* Cintron Dec. ¶ 24 n.1. USPS, upon investigation, learned that this memo was locally prepared; it was not created, reviewed, or approved by USPS Headquarters. *Id.* The memo does not represent official USPS policy, either in July or now; in fact, it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules. *Id.* It has never been USPS policy or guidance to "ban" extra trips, nor was it ever USPS's goal or desire to leave mail behind in processing facilities. *Id.* ¶¶ 24 n.1 & 28; Curtis Dec. ¶ 24 n.1.

addressed the decline, it observed steady improvements in service performance. *Id.* ¶ 27; *See* Declaration of Angela Curtis ("Curtis Dec.") ¶ 30. On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules. In other words, we are improving service performance while more consistently running our trucks on time." *See* Service Performance Rebounds at Postal Service (Aug. 31, 2020) at 1, https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm; *id.* Congressional Briefing (Aug. 31, 220) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels), https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf ("Congressional Briefing"); Cintron Dec. ¶ 27. Furthermore, in the last two months, there has been a sharp decrease in late and extra trips. *See* Congressional Briefing at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27. USPS's performance continues to improve. *See* USPS Service Performance Continues Upward Trend (Sept. 10, 2020), https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-continues-upward-trend.htm.

### C.  *USPS Personnel Practices Related to Overtime Usage and Staffing Shortages Caused by the Covid-19 Pandemic*

#### 1.  *Overtime*

Defendants have not attempted to curtail USPS's ability to handle Election Mail by banning or unreasonably restricting employee overtime. The Postal Service's customary overtime practices, pursuant to which overtime is generally evaluated and approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took

office, and the rate at which USPS has incurred overtime has remained constant. *See* Curtis Dec. ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4. To the extent USPS has made past efforts to monitor or address certain issues regarding overtime usage, such efforts are unrelated to the Election. Instead, these efforts consist of ongoing, routine measures to improve efficiency and reduce unnecessary costs. *See* Curtis Dec. ¶¶ 12-13; Colin Dec. ¶¶ 3-6.

In maintaining the status quo leading up to the Election, Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use. *See, e.g.*, Ex. 14 14 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)) 14 ("I did not direct the elimination or any cutback in overtime."); Ex. 10 at 1 ("[W]e reassert that overtime has, and will continue to be, approved as needed").

### 2. *The Impact of the COVID-19 Pandemic*

Since March 2020, USPS has faced significant staffing issues caused by the COVID-19 pandemic. *See* Declaration of John Prokity ("Prokity Dec.") ¶ 4; Curtis Dec. ¶ 18. Prior to the pandemic, USPS experienced, on average, a weekly equivalent of 55,000 employees using full-day leave. Prokity Dec. ¶ 5. In early March, this figure began to increase until it peaked in mid-April at 81,000, or the equivalent of nearly 26,000 additional employees using full-day leave in a week. *Id.* Thereafter, the situation improved somewhat until July, when personnel availability again began to decrease (hitting its lowest levels in the week of July 11, 2020). *Id.*

To mitigate these staffing shortages, which negatively impacted USPS's ability to timely deliver mail, *see id.* ¶¶ 20-21, Prokity Dec. ¶¶ 6, 10, USPS has taken extraordinary steps to hire additional employees.[7] *See* Prokity Dec. ¶ 6. For instance, USPS has implemented a number of

---

[7] On August 7, 2020, in connection with a high-level organizational restructuring, USPS implemented a hiring freeze for managerial positions. Prokity Dec. ¶ 6 n.1. This action has had no

changes to its normal hiring processes to be able to hire employees more quickly, and has negotiated agreements with the postal workers' unions to allow the hiring of non-career employees above the historical contractual limits. *See id.* ¶¶ 7-8. As a result of these and other efforts, USPS has hired an average of 2,000 to 3,000 employees per week, with a total of 88,627 new employees hired between March 1 and August 27, 2020. *Id.* ¶ 9.

### D. Other Efforts Aimed at Improving Efficiency

There are two other practices that have prompted election-related criticism of USPS: setting park points (*i.e.*, locations where a driver parks and exits a postal vehicle to deliver mail on foot) and "Expedited to Street/Afternoon Sortation" ("ESAS"), a limited pilot program aimed at reducing morning activities to allow carriers to begin their routes earlier. There is no nationwide USPS policy setting a fixed cap on the number of park points that may be used on a route, nor has Postmaster General DeJoy made any changes to USPS practices regarding park points. Colin Dec. ¶¶ 12-14. Furthermore, the ESAS was planned before Postmaster General DeJoy took office, and it was suspended at the Postmaster General's direction. Colin Dec. ¶ 11.

## IV. Procedural History

Plaintiff filed this Complaint on August 20, 2020, Compl, ECF No.1, and its motion for Preliminary Injunction, ECF No. 8, on September 1, 2020. It complains about two sets of alleged changes, which are purportedly identified in two informal documents. The first purported set of changes are summarized in a document entitled "New PMG's expectations and plan," which purportedly identifies "significant nationwide changes Postmaster DeJoy was implementing," including "that overtime would be eliminated, that letter carriers would have to make changes limiting the timeline and affecting the scope of their delivery routes, and that certain customer

---

effect on the hiring of non-management employees, including mail carriers, mail handlers, and clerks. *Id.*; *see also* Curtis Dec. ¶ 25.

service windows would be closed during lunchtime . . . .[while] direct[ing] employees to leave mail behind at distribution centers if it delayed letter carriers from their routes." PI Mem. at 11 (hereinafter "PMG Plan"). The second set of changes is detailed in a document entitled "Pivoting for our Future," which describes certain "transportation changes being implemented (today)." *Id.* at 12 (hereinafter "Pivot"). As will be discussed later, neither of these documents describes actual changes on behalf of the organization; rather, each was prepared by a mid-level manager, and distributed locally. The documents do not accurately represent USPS policy. *See* Curtis Decl. ¶ 24 n.1. Plaintiff seeks to enjoin the "PMG Plan" and "Pivot." *See* Proposed Order, ECF No. 8-4.

Eleven lawsuits, including this one, have been filed recently across the country concerning purported changes made by USPS. Generally, the plaintiffs in these cases allege that the purported changes were intended to obstruct voting by mail for the Election, asserting overlapping constitutional and statutory claims. Despite the fact that the USPS suspended almost all of the activities at issue until after Election, these plaintiffs continue to pursue litigation.[8]

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Id.* at 20. When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, "when mandatory injunctive relief is sought," seeking to

---

[8] Because the issues here are largely the same, and in the interest of efficiency, Defendants also rely here on the declarations filed in support of Defendants' preliminary injunction briefing in *Jones, et al. v. United States Postal Service, et al.*, No. 1:20-cv-06516 (S.D.N.Y.).

compel affirmative conduct rather than simply preserve the status quo, "the burden on the moving party is particularly heavy" and the "right to relief must be indisputably clear." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

ARGUMENT

## I. Plaintiffs are unlikely to prevail on the merits of their claims.

### A. Plaintiffs' alleged injuries rely on a speculative chain of possibilities, and are thus insufficient to establish standing.

To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). When a plaintiff seeks prospective relief, the "threatened injury must be certainly impending to constitute injury in fact;" "[a]llegations of possible future injury are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). A "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy" this requirement. *Id.* at 410. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547.

Here, Plaintiffs rely on alleged injuries stemming from their assertion that USPS's purported policy changes will result in material delays of sufficient degree to harm Plaintiffs in particular (*e.g.*, by delaying the delivery of payments and goods to Plaintiffs). But this theory suffers from at least two problems. To start, as noted *supra*, the vast majority of the purported changes pre-date PMG DeJoy's tenure, or simply never existed, which creates an independent redressability problem: Plaintiffs cannot benefit if the Court orders Defendants to suspend policies that do not exist, or are unrelated to recent delays. And although the agency *did* renew its focus on mitigating unnecessary extra or late trips, and there "was a temporary decline in meeting service

23

standards" in mid-July, USPS "began efforts to correct the decline through focusing on meeting mail processing and delivery schedules, conducting a root cause analysis of why some mail was not timely being load on trucks, and identifying corrective measures to improve these issues, Cintron Decl. ¶¶ 25-26. As a result, "service performance is rapidly returning to early July levels." *Id.* ¶ 27. Moreover, any alleged injury based on a delay in the delivery of election mail is entirely speculative, particularly considering the enormous efforts that USPS has put into place in order to ensure that ballots are timely delivered. *See*, *e.g.*, DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6.

In any event, even assuming USPS instituted the policies alleged by Plaintiffs, any alleged injury to Plaintiffs still relies on a "highly attenuated chain of possibilities." First, the purported USPS policy changes must cause *material* delays in the future. Plaintiffs refer to prior delays as proof, but there is no indication that those delays were primarily caused by the USPS policy changes, rather than COVID-related circumstances (*e.g.*, staffing shortages). Second, these material delays must affect Plaintiffs in particular. Plaintiffs do not claim that the alleged policy changes will cause delays across-the-board. And even if Plaintiffs have witnessed delays in the past, that alone is insufficient to establish that they will continue to suffer delays in the future. *See City of L.A. v. Lyons*, 461 U.S. 95, 107-08 (1983). Third, these delays must be of sufficient length and magnitude to actually cause the harms about which Plaintiffs complain. For example, Plaintiffs allege that delays may interfere with the efficient operation of their legal systems, since legal documents are often sent by mail. *See* Compl. ¶ 219. But Plaintiffs must show that the delays will be of sufficient length, and affect the delivery of legal documents to or from a sufficient number of persons, to create any meaningful interference with the legal system. This "speculative chain of possibilities does not establish that injury based on" the purported USPS policy changes "is certainly pending." *Clapper*, 568 U.S. at 414.

**B.** **Plaintiffs are unlikely to succeed on their section 3661 claim.**

Plaintiffs' central claim in this lawsuit is that the Postal Service has failed to comply with the requirement to seek an advisory opinion from the PRC pursuant to 39 U.S.C. § 3661(b) before enacting certain purported operational "changes," *i.e.*, changes to policies concerning mail truck schedules and election mail. Section 3661(b) requires that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must first submit a proposal to the PRC requesting an advisory opinion. 39 U.S.C. § 3661(b). The PRC shall issue its written opinion only after an opportunity for a hearing on the record. 39 U.S.C. § 3661(c).

As a threshold matter, clear statutory text and decades of precedent make clear that it is the *PRC* that has exclusive jurisdiction over complaints relating to service issues, including the failure of the Postal Service to first seek an advisory opinion from that body for a nationwide change in service, with the right to appeal to the D.C. Circuit if the complainant is dissatisfied. District courts play no role in adjudicating such disputes. But even if Plaintiffs could somehow overcome this hurdle, the Postal Service was not required to seek an advisory opinion relating to any of the purported actions challenged in this suit.

> 1. *District Courts lack subject-matter jurisdiction over complaints regarding 39 U.S.C. § 3661, which are channeled to the Postal Regulatory Commission and then the D.C. Circuit.*

Congress has expressly precluded district court jurisdiction over Plaintiff's section 3661 claim. Title 39 of the U.S. Code provides that the district courts have jurisdiction over cases against the Postal Service, "*except* as otherwise provided in this title." 39 U.S.C. § 409(a) (emphasis added); *see also LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (district court jurisdiction over Postal Service can be preempted by other provisions, including section 3662). This case involves one of those exceptions: 39 U.S.C. § 3662, which vests exclusive jurisdiction

over complaints regarding the Postal Service's compliance with certain statutory requirements –
including section 3661 – in the PRC.

In section 3662, Congress specified that any person "who believes the Postal Service is not
operating in conformance with the requirements of various provisions, including "*this chapter* [i.e.,
Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under
any of those provisions) may lodge a complaint with the Postal Regulatory Commission." 39
U.S.C. § 3662(a) (emphasis added). "If the Postal Regulatory Commission finds the complaint to
be justified, it shall order that the Postal Service take such action as the Commission considers
appropriate in order to achieve compliance with the applicable requirements and to remedy the
effects of any noncompliance." *Id.* § 3662(c). If that person is dissatisfied with the PRC's ruling,
she may petition for review in the D.C. Circuit. *Id.* § 3663. If she is satisfied with the PRC's order,
the district courts have jurisdiction to enforce any PRC orders against the Postal Service. *Id.* §
3664.

Courts have repeatedly held that 39 U.S.C. §§ 3662 and 3663 constitute the exclusive
jurisdictional remedy for complaints about postal services that fall within the statutory provisions
specifically identified in section 3662—and as discussed above, that includes a claim that the
Postal Service is not complying with section 3661. Numerous courts of appeals have so held. *See,
e.g.*, *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has "exclusive
jurisdiction . . . over claims enumerated in § 3662"); *LeMay*, 450 F.3d at 799-800 ("In this case,
Congress removed the district courts' jurisdiction over claims regarding postal rates and services.
It did so by enacting 39 U.S.C. § 3662."); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir.
1995) (earlier version of 39 U.S.C. § 3662 "makes clear that a postal customer's remedy for

26

unsatisfactory service [which was identified in section 3662] lies with the Postal Rate Commission. . . . Accordingly, the district court was without jurisdiction to review this claim.").

And these courts of appeals have been joined by the "countless decisions" of lower courts. *Pep-Wku, LLC v. USPS*, No. 20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020); *see, e.g.*, *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom. McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011) ("Read together, [39 U.S.C. §§ 3662, 3663, and 3664] demonstrate that this Court lacks jurisdiction to consider service-related complaints in the first instance" and holding that "the PRC has exclusive jurisdiction" over such claims); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018) (same); *Striley v. United States Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017) ("Under 39 U.S.C. Section 3662, the Postal Regulatory Commission has exclusive jurisdiction over such complaints"); *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 134 F. Supp. 3d 365, 382 (D.D.C. 2015), *aff'd in part on other grounds, vacated in part on other grounds, rev'd in part sub nom. Sears, Roebuck & Co. v. United States Postal Serv.*, 844 F.3d 260 (D.C. Cir. 2016) ("Particularly exempted [from district court jurisdiction] are claims concerning postal rates and service standards; such claims must first be presented to the Postal Regulatory Commission"); *Murphy v. United States Postal Serv.*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014) ("The PRC has exclusive jurisdiction over service-related complaints with the Postal Service covered by section 3662."); *Powell v. United States Postal Serv.*, No. CV 15-12913-FDS, 2016 WL 409672, at *1 –2 (D. Mass. Feb. 2, 2016) (district courts lack jurisdiction regarding claims brought pursuant to 39 U.S.C. § 3661(a)).

This overwhelming line of precedent has developed for good reason. "Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems' those procedures 'are to be exclusive.'" *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 589 (2010) (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S.411, 420 (1995)). "It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomms Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 186 (D.C. Cir. 2017) ("[W]here 'a special statutory review procedure [exists], it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies.'") (quoting *Media Access Project v. FCC*, 884 F.2d 1063, 1077 (D.C. Cir. 1989)); *Public Util. Comm'r of Or. v. Bonneville Power Admin*, 767 F.2d 622, 627 (9th Cir. 1985) ("[J]urisdiction over a specific class of claims which Congress has committed to the court of appeals generally is exclusive, even in the absence of an express statutory command of exclusiveness."). This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first to an agency, and then to the federal courts of appeals. *See, In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) ("The multiple layers of review evince Congress's intent to direct challenges . . . to the avenues Congress created."); *see also Bank of Louisiana v. FDIC*, 919 F.3d 916, 922 (5th Cir. 2019) ("[S]ometimes Congress leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts"). Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 (including complaints that the Postal Service has not complied with section 3661)

go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C. Circuit. *See* 39 U.S.C. §§ 3661, 3662. Under such circumstances, this court lacks subject matter jurisdiction over this claim[9]

    2.    *The ultra vires doctrine does not provide an avenue for judicial review here.*

Plaintiffs fail to acknowledge section 3662's channeling of review to the PRC and then to the D.C. Circuit. Instead, Plaintiffs seek review under this Court's very limited *ultra vires* review doctrine. But Plaintiffs cannot satisfy *ultra vires* review, for two reasons: first, *ultra vires* review is *only* available where there is no other potential remedy, and here the statute provides for the filing of a complaint to the PRC and then the D.C. Circuit. And second, *ultra vires* review is only available if the agency has failed to comply with such a clear and unequivocal statutory command that the agency has acted without any authority. There is no such error here; indeed, the vast majority of the "changes" of which Plaintiffs complains are not changes at all, but routine, long-standing operational practices.

"[T]he Postal Service is exempt from review under the [APA]." *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (internal quotation marks and citations omitted); 39 U.S.C. § 401(a). For claims—unlike here—where there is no other remedy, some

---

[9] The Supreme Court has recognized that district court jurisdiction may not be implicitly precluded if three factors are met: (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) if the suit is "wholly collateral to a statute's review provisions," and (3) "if the claims are 'outside the agency's expertise." *Jarkesy v. SEC*, 803 F.3d 9, 17 (D.C. Cir. 2015) (quoting *Free Enterprise*, 561 U.S. at 489-90. None of these factors is met here.

There is meaningful judicial review of a final PRC order in the D.C. Circuit. Nor does it matter that the PRC cannot provide "immediate relief," as the fact that there may *eventually* be relief is sufficient as a matter of law. *See Am. Fed'n of Gov't Employees*, 929 F.3d at 755-56 ("Here, [the Supreme Court] instructs that the [plaintiffs] are not necessarily entitled to raise a pre-implementation challenge in the district court, and that Congress may require them to litigate their claims solely through the statutory scheme, so long as they can *eventually* obtain review and relief.") (emphasis added) Moreover, the suit is not collateral to the statute's review provisions, but falls within their explicit text, and involves a function committed to the agency's expertise.

29

courts have, however, found "non-statutory review' available for certain Postal Service decisions, notwithstanding the preclusion of APA review under 39 U.S.C. § 39 U.S.C. § 410(a)." *Mittleman*, 757 F.3d. at 307; *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (Postal Service can be reviewed under *ultra vires* doctrine pursuant to "the leading case, *Leedom v. Kyne*, 358 U.S. 184 (1958)"). Such review, however, "is quite narrow," *id.*, and "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt v. Broadcasting Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). In order to justify relief under the *ultra vires* doctrine "a plaintiff must show, *first* that the agency has acted 'in excess of its delegated powers and contrary to a specific prohibition,' and, *second*, that barring review by the district court 'would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Service Impasses Panel*, 437 F.3d 1256, 1258 (D.C. Cir. 2006) (quoting, first, *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), and, second, *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). With respect to the first prong, "[a]n agency acts *ultra vires* when it violates a 'clear and mandatory' statutory provision. A statutory provision is 'clear and mandatory' when it has only one unambiguous interpretation." *Nat'l Ass'n of Postal Supervisors v. USPS*, No. 18-cv-2236-RCL, 2020 WL 4039177, at 3 (D.D.C. July 17, 2020).

Plaintiffs' claim fails each requirement. Most obviously, Plaintiffs fail at the second condition: they have a "meaningful and adequate means of vindicating [their] statutory rights." *MCorp*, 502 U.S. at 43. Plaintiffs can file a complaint to the Postal Regulatory Commission, with judicial review if they remain unsatisfied in the D.C. Circuit. Their failure to even attempt to do so is fatal to their claim. *See id.* (appeal to agency, followed by review in the courts of appeals, constitutes a meaningful and adequate means of vindicating statutory rights).

Although this Court need not reach it in light of the express channeling of judicial review to the D.C. Circuit, Plaintiffs' claim also fails under the first prong of the *ultra vires* analysis, because they cannot show that the Postal Service has violated section 3661(b). That provision requires the Postal Service to request an advisory opinion whenever it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis. 39 U.S.C. § 3661(b). The leading case interpreting this statute is *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975). There, the Fifth Circuit recognized that "Congress intended 3661 to apply to only a specified class of decisions," and that "Postal management was left with broad decision-making power, subject to 3661's requirements for specified decisions." *Id.* at 262; *see also id.* ("The language of 3661 indicates the limited scope of application."); *see also id.* at 263-64 (recognizing "a policy of broad management power and an unexpansive interpretation of 3661"). Accordingly, three factors that must be satisfied before section 3661(b) comes into play.

"First, there must be a 'change.' This implies that a quantitative determination is necessary." *Id.* at 262. In other words, "[t]here must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661." *Id.* "Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered." *Id.* at 262-63. "Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved." *Id.* at 263. In drawing these lines, courts have made a "distinction between Postal Service managerial decisions and Postal Service decisions which affect the public and give rise to an opportunity to be heard," with decisions like

transferring mail processing facilities and maintaining mail trucks falling into the former category. *See, e.g.*, *Wilson v. USPS*, 441 F. Supp. 803, 806 (C.D. Cal. 1977).

Plaintiffs identify two such purported "changes": (1) certain operational changes to mail transportation, PI Mem. at 30-33; and (2) a future "plan" to no longer "prioritize Election Mail" and to "not process Election Mail without adequate postage." *Id.* at 33-34. Neither meets these demanding standards. First, contrary to Plaintiffs' contention, *id.* at 1, USPS has not prohibited extra or late trips. *See* Cintron Dec. ¶¶ 23-24. The only notable change USPS has made has been to develop written guidance clarifying the circumstances under which extra truck trips were acceptable, in order to mitigate the number of unplanned and unnecessary trips, *see* Cintron Dec. ¶¶ 23-24, and that is not a "change" as that term is used in section 3661. It is not a new policy but rather a renewed focus on ensuring the Postal Service complies with its *existing policies*, and that it operates as efficiently as possible. This is precisely the type of management direction to which section 3661 does not apply. In their brief, Plaintiffs focus on the fact that there was a delay in the mail, *see* PI Mot at 31-33, a delay which has now largely been corrected. But that, by itself, cannot be enough to trigger section 3661 because *any* managerial change can be said to have the effect of changing the Postal Service's operations (i.e., changing how the mail is delivered). If that is true, then nearly any managerial initiative, be that one which would make the Service either more efficient or less efficient, would first need to go through an on-the-record, trial-type proceeding. It cannot be true, for example, that the Postal Service would be required to seek an advisory opinion from a separate agency if it wanted to upgrade its IT or truck routing systems, even if those upgrades might have a temporary effect on its services. Indeed, Plaintiffs never claim that the Postal Service's operational plan needed to undergo PRC review; if so, a decision to enforce *compliance* with that plan could not trigger review.

Second, Plaintiffs allege that USPS has stated that it will no longer "prioritize Election Mail," and that "the Postal Service will not process Election Mail without adequate postage." PI Mot. at 33-4. But neither of these changes has even happened. USPS has numerous practices to prioritize Election Mail generally, and ballots in particular, regardless of the class in service. *See* Glass Dec. ¶ 21-23. As a result of these practices "the delivery timeframes for Election Mail entered as Marketing Mail [a cheaper, slower class of service] often are comparable to those of Election Mail entered as First-Class Mail." *Id.* ¶ 21. More to the point, this is not a *change*: it has been USPS practice for a number of years. *Id.* ¶ 18-23. And those practices are in place for the Election in November as well. *Id.* ¶ 29. And with respect to the claim that USPS will not process Election Mail without postage, this is wrong. USPS processes *all* returned ballots, regardless of postage, *see* POM § 171.3; Publication 632, *State and Local Election Mail User's Guide* (Jan. 2020), https://about.usps.com/publications/pub632.pdf, at 7, and USPS has always required state and local election officials to pay for the mail services they use, just like any other mail user. *See*, *e.g.*, Glass Dec. Ex. 2 (2016 letter from USPS to states recommending that election officials "should use First-Class Mail postage . . . when paying for delivery of outbound absentee or vote by mail ballots."). And given that USPS's efforts to expeditiously deliver Election Mail in the upcoming election actually exceeds what the agency has done in the past, there is simply no basis to suggest that the agency could have violated section 3661.

Moreover, both the Postal Service and the Commission's past practices confirm that any change that USPS has implemented does not fall within section 3661's ambit. "[P]ast practice . . . should be given the deference ordinarily accorded any interpretation of a statute by the agency charged with its enforcement." *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102,107 n.11 (D.D.C. 2002) (quoting *Gelman v. FEC*, 631 F.2d 939, 943 (D.C. Cir. 1980)). The

Commission has noted that a "change in the nature of postal services broadly can be defined as changes to a customer's ability to access essential postal services that require a visit to a postal retail facility."[10] Its past practice illustrates that changes that trigger 3661's review are general changes to postal facility hours or service standards for mail delivery. The Postal Service requires an advisory opinion before, for example, formally changing the service standards (i.e., optimal transit times) for certain pieces of mail (i.e., eliminating overnight delivery for single-piece First-Class Mail or adding an extra day to Standard Mail),[11] changing the hours of operations at

---

[10] Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), at 1, https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.

[11] Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), at 1, 10, https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20Opinion.pdf ("This proposal entails a change to the delivery expectation or delivery service standard for . . . [certain] Standard Mail. . . . Under the Postal Service's proposal, the service standard would change [from 3 days] to 4 days"); Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), at 1 https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf ("The [Postal Service's proposed] changes to service standards would ultimately eliminate all overnight delivery service for single-piece First-Class Mail, and delay much of current First-Class Mail 2-day delivery to 3-day delivery. Presorted First-Class Mail and Periodicals would have to meet new mailing requirements, including new accelerated entry times, to maintain eligibility for overnight service. Standard Mail and Package Services would be affected to a lesser extent."); Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, , at 7 Docket No. 2006-1 (Dec. 12, 2006) (proposing "changes in the application of current service standards to numerous 3-digit ZIP Code service area origin-destination pairs for different classes of mail.").

thousands of post offices or retail operations,[12] or eliminating an entire day of mail delivery.[13] All of these proposals constitute substantial, formal changes in how mail is classified or which customer-facing operations are open. None of them concern basic, managerial operational changes of the type at issue here.

If there were any doubt as to whether these "changes" are covered by section 3661, that doubt would be an insufficient basis for Plaintiffs' *ultra vires* claim. Plaintiffs' claim emerges at the intersection of two lines of doctrine: the requirement that section 3661 be narrowly interpreted, in order to preserve USPS's "broad management power," *see Buchanan*, 508 F.2d at 263-64, and the *ultra vires* doctrine, which requires that any error be clear and unambiguous. The basic, operational activities that Plaintiffs seek to challenge here cannot meet this set of unequivocal requirements. Indeed, were it otherwise, the *ultra vires* doctrine would swallow Congress's express preclusion of judicial review of these types of claims in district court. Almost any sort of operational or management initiatives that could have an impact on Postal Service operations would fall within the ambit of section 3661 – and require extensive hearings---exactly the sort of ossification Congress intended to avoid. *See id.*

---

[12] Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), at 1, 3, https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf (proposing to reduce the hours of operations "at more than 13,0000 post offices nationwide); Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf (proposing to identify "more than 3,650 post offices, retail annexes, stations and branches for possible closing").; Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf (proposing a broad station and branch discontinuation plan).

[13] Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), at 1, available at https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf (The Postal Service requests a Commission advisory opinion on a plan to end Saturday delivery, Saturday outgoing mail processing, and other related service changes.").

### C.  Plaintiffs are unlikely to establish that the alleged USPS policy changes violates the rights of State legislatures under the Elections Clause.

Plaintiffs next claim that the Elections Clause grants them a constitutional right to a certain level of mail service from USPS to support their own laws regarding elections. In support, Plaintiffs argue that they relied upon USPS policies and performance when crafting their relevant election laws, and thus the alleged USPS alleged policy changes at issue violate the right of their legislatures to enact laws concerning the "times, places, and manner" of elections. This theory—that the Elections Clause creates ancillary rights against actions by the federal government that may have indirect effects on State elections—is unprecedented and without merit.

The Elections Clause states that "[t]he times, places and manner of holding elections for" congresspersons "shall be prescribed in each state by the legislature thereof," but Congress may generally "make or alter such regulations" by law. *Smiley v. Holm*, 285 U.S. 355, 363 (1932). The Elections Clause thus allows State legislatures "to prescribe the procedural mechanisms for holding congressional elections." *Cook v. Gralike*, 531 U.S. 510, 523 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995) ("The Framers intended the Elections Clause to grant States authority to create procedural regulations."). The "function contemplated by [the Elections Clause] is that of making laws." *Smiley*, 285 U.S. at 366.

Here, USPS has not violated the right of Plaintiffs' legislatures under the Elections Clause. First and foremost, there is no support whatsoever for Plaintiffs' novel theory that the Elections Clause not only confers upon State legislatures the authority to pass laws governing how their citizens may vote, but also restricts federal activity which may have an incidental impact on the effects of these State regulations. The Elections Clause, by its terms, empowers Plaintiffs' legislatures to enact laws governing "the times, places, and manner" in which their citizens may vote, and USPS has done nothing to limit that authority. Plaintiffs have all enacted laws allowing

some or all of their citizens to cast their ballots by mail, and those laws remain operative today. Even if Plaintiffs purportedly based these laws on an expectation of a certain level of performance by USPS in delivering the mail, that subjective expectation does not mean the Elections Clause now grants Plaintiffs a concomitant Constitutional right to have this Court oversee USPS operations to ensure that their expectations are met.

Unsurprisingly, Plaintiffs do not cite to a single Elections Clause case that has recognized the validity of such a theory, and Defendants are aware of none. The overwhelming majority of Elections Clause cases concern whether State legislatures have enacted elections laws permissible under the Elections Clause, not whether other actors have interfered with powers granted to the States therein.[14] And to the limited extent there is case law concerning whether third parties (other than the federal government) have violated the right of State legislatures under this provision, that case law undermines Plaintiffs' theory. In *Smiley v. Holm*, for example, the Supreme Court found that the Elections Clause does not protect State legislatures from the inherent limitations of legislative activity, including circumstances external to a legislature which may affect the consequences of (or even undo) relevant election laws. 285 U.S. 355 (1932). There, the Minnesota legislature enacted an election law, which the governor vetoed. The State nevertheless sought to implement the law, arguing that the governor could not constitutionally veto a law passed pursuant to the Elections Clause, because that provision confers the relevant authority upon the "legislature"

---

[14] *See*, *e.g.*, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 831-35 (1995) (an Arkansas law that functionally created congressional term limits could not be justified under the Elections Clause); *Roudebush v. Hartke*, 405 U.S. 15, 26 (1972) (Indiana Senate election vote recount was consistent with the Elections Clause); *Cook v. Gralike*, 531 U.S. 510, 525 (2001) (Missouri law which required that ballots must identify a candidate's position on term limits could be justified under the Elections Clause); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 459 (2008) (Washington State blanket primary was permissible exercise of Elections Clause power).

alone. *Id.* at 362-63. The Supreme Court rejected this argument, noting that the "subject-matter" of the Elections Clause "involves lawmaking in its essential features," and that "limitation[s]" to lawmaking—including the prospect of a veto—are not "incongruous with the grant of legislative authority to regulate congressional elections." *Id.* at 366, 368. If the Elections Clause does not shield a State legislature from an event which entirely negates an election law, it certainly does not give States a constitutional right against any external event which may incidentally impact an election.

Furthermore, Plaintiffs' theory, if accepted, would effectively allow States to wield the Elections Clause as a means to control the actions of federal agencies. Here, Plaintiffs claim the right to force USPS to operate in a manner Plaintiffs prefer—prioritizing certain considerations over others, regardless of the effect on the overall Postal Service—all because Plaintiffs chose to use USPS for mail-in voting. If Plaintiffs' theory were accepted, then in future elections, States could challenge *any* USPS delays—even those caused by events beyond USPS's control—and secure a federal judgment directing the content of USPS's business operations or forcing USPS to incur additional costs. And these claims would not be limited to USPS. For example, a State could challenge the decisions of federal agencies not to allow their employees the day off to vote on election days, or the decision of a federal health and safety agency to condemn a building (or otherwise ensure safe conditions) in a facility that has been selected as a polling place. States, and by necessary implication the judiciary, would become overseers of federal agencies to the extent their actions could impact state election laws—a result that would present significant separation of powers concerns, risking a "confrontation between the two branches" that "should be avoided whenever possible." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389–90 (2004).

This result is, of course, not the one that the Framers intended in crafting the narrow scope of the Elections Clause. Indeed, far from establishing the primacy of State interests, the Elections Clause, if anything, reflects a principle of "federal supremacy over the procedural aspects of determining the times, places, and manner of elections." *U.S. Term Limits, Inc.* 514 U.S. at 810 (describing Congress's authority to preempt State election laws). The Court should therefore conclude that the Elections Clause means what it says: States can issue procedural laws concerning the times, places, and manner of their elections, but the federal government need not contort its programs and policies to best accommodate any given State's election law.

Plaintiffs' arguments in support of creating this new cause of action lack merit. To start, Plaintiffs assert that the Elections Clause expressly grants Congress the authority to generally pass laws which "make or alter" State "regulations" enacted under the Elections Clause, and thus, by inference, this authority is withheld from the Executive Branch. But USPS has not engaged in any conduct reserved for Congress under this provision. Congress can expressly "supplement" or "substitute" relevant State laws; it can dictate when, where, and how States' citizens are allowed to vote in Congressional elections. *Smiley*, 285 U.S. at 366-67. Congress thus "has a general supervisory power over the whole subject." *Id.* at 367. USPS has not acted under, let alone usurp, this legislative authority. It has not even attempted to prescribe how a State's citizens are allowed to vote, nor has it overridden a State law on the subject.[15]

Plaintiffs then argue that under *Zschernig v. Miller*, 389 U.S. 429 (1968), any "interference" with a right vested with another governing body is unconstitutional. In *Zschernig*,

---

[15] As a separate matter, Plaintiffs fail to explain why USPS could not "supplement" or "substitute" relevant State laws when acting pursuant to an express statutory grant of power from Congress. However, because USPS is neither "supplementing" nor "substituting" Plaintiffs' election laws, the Court need not resolve this question.

the Supreme Court struck down an Oregon inheritance statute under which, before an heir located

abroad could receive her or his inheritance, Oregon Courts would have to first inquire into (and

render a judgment on) the adequacy of certain legal protections of the country in which the heir

resided—the kind of "involvement in foreign affairs and international relations . . . which the

Constitution entrusts solely to the Federal Government." *Id.* at 432, 436. Obviously, *Zschernig* has

no relevance here. First, it dealt with the unique area of "foreign policy" and "foreign relations,"

where "[e]xperience [had] shown that international controversies of the gravest moment,

sometimes even leading to war, may arise from" actions taken "by a government." *Id.* at 440–41.

Even assuming *Zschernig* held that any "interference" with the federal government's foreign

policy authority is unconstitutional, there is no indication that this standard applies to any other

Constitutional provision, much less the Elections Clause in particular.

Regardless, *Zschernig* did *not* find the Oregon law at issue unconstitutional simply because

it "interfered" with the federal government's foreign policy authority. Rather, the issue was that

Oregon was directly engaging in conduct reserved for the federal government. "The Oregon

statute" led to "minute inquiries concerning the actual administration of foreign law" and "into the

credibility of foreign diplomatic statements." *Id.* at 435. The Oregon law thus called for activities

reserved "for the Federal Government, not for local probate courts," and had "a direct impact upon

foreign relations." *Id.* at 437–38, 441. Importantly, the Supreme Court clarified that a state law

would not be unconstitutional simply because it had "only some incidental or indirect effect" on

foreign policy. *Id.* at 433. Here, USPS did not engage in any activities reserved for State

legislatures. It did not select or foreclose the means by which the citizens in any particular state

may vote. States that allowed mail-in voting before the alleged USPS policy changes may continue

to allow mail-in voting *after* those alleged changes.

Plaintiffs finally argue that USPS violated the Elections Clause because the "purpose" of the alleged USPS policy changes is to interfere with mail-in voting. But there is no evidence, or even well-pled allegation, to support this assertion. Most of the alleged "policy changes" Plaintiffs refer to are actually long-established policies that predate PMG DeJoy's tenure, and in any event, the PMG suspended those changes pending the November 2020 election to assuage public concern. Critically, USPS has made no change to the election mail policies it has followed since before the PMG took office. It has not changed the prices charged for or the services available to those who choose to use the mail to participate in the electoral process. If anything, USPS has now committed *even more* resources towards the processing and delivery of election mail. *See supra* at 10-11.

To establish improper motive, Plaintiffs refer to the timing of the alleged policy changes, the procedure followed for their implementation, and certain extraneous activities of PMG DeJoy and a member of the USPS Board of Governors. But none of these allegations provides any direct support for Plaintiffs' suspicion, and they certainly do not justify any inference of improper motive in light of the measures taken by PMG DeJoy (*e.g.*, suspending certain policies at issue in this litigation). In any event, the alleged policy changes that did occur involved other persons at USPS, and thus the motivation for these policy changes cannot be driven by only the two people emphasized by Plaintiffs. *See, e.g.*, Cintron Decl. (describing transportation imitative which Plaintiffs now challenge as having been started in 2017).

Furthermore, it is unclear how abstract "purpose" has any bearing on the relevant Elections Clause analysis. As explained earlier, USPS has not inhibited States from issuing laws governing how their citizens are allowed to vote in Congressional elections, and so USPS has not violated the right of State legislatures under the Elections Clause. And the States remain free to alter their

policies to account for any fears over the performance of USPS. It is unclear how subjective "motivation" could change this conclusion.

To argue otherwise, Plaintiffs cite to no authority specific to the Elections Clause. Instead, they rely upon *Zivotofsky ex rel. Zivotofsky v. Kerry*, which dealt with whether a statute requiring the State Department to list "Israel" as the birthplace on passports for U.S. citizens born in Jerusalem infringed upon "[t]he President's exclusive recognition power" which "encompasses the authority to acknowledge [a foreign nation's] territorial bounds." 576 U.S. 1, 17 (2015). As is readily apparent, this case is inapplicable. First, the court did not find that an allegation of improper "purpose" could establish a "Presidential recognition power" claim, much less an Elections Clause claim. The Court there held that because the President had claimed that he would not formally recognize Jerusalem as within Israel's sovereignty, Congress could not "require him to contradict [that] statement" by requiring the Executive Branch to proclaim that Jerusalem is part of Israel in U.S. passports. *Id.* at 21; *see also id.* at 29 (the statute at issue "require[d] the President, through the Secretary [of State], to identify citizens born in Jerusalem who so request as being born in Israel. But according to the President, those citizens were not born in Israel," and so the statute "directly contradicts the . . . Executive branch policy of neutrality toward Jerusalem"). Although towards the end of its opinion the Court noted, in passing, that "the purpose of the statute was to infringe on the recognition power," *id.* at 31, this was in no way necessary to its holding. The Court found the statute at issue unconstitutional because "Congress in effect [was] exercis[ing] the recognition power," and "overrid[ing] the President's recognition determination." *Id.* at 29.

If anything, *Zivotofsky* supports USPS's position. There, the Supreme Court held only that Congress could not "directly contradict[]" the President's recognition determinations, but the Court clarified that Congress *could* take other measures which would indirectly impact those

recognition determinations. *Id.* at 30; *see also id.* at 16 ("Although the President alone effects the formal act of recognition," Congress has "substantial authority regarding many of the policy determinations that precede and follow the act of recognition itself. If Congress disagrees with the President's recognition policy, there may be consequences. Formal recognition may seem a hollow act if it is not accompanied by the dispatch of an ambassador, the easing of trade restrictions, and the conclusion of treaties. And those decisions require action by the Senate or the whole Congress."). Here, similarly, USPS is not proclaiming that Plaintiffs' citizens cannot legally vote by mail. Plaintiffs allege only that the purported policy changes, *at most*, may have an indirect impact on citizens who opt to use this voting method. Accordingly, Plaintiffs cannot establish that any alleged USPS policy changes at issue violated the rights of their legislatures under the Elections Clause.

## II. Plaintiffs fail to establish irreparable harm.

Plaintiffs also have failed to meet their burden to show that they will suffer irreparable harm in the absence of a preliminary injunction. *See Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471, 481 (E.D. Pa. 2010) ("An irreparable harm is a harm which cannot be redressed by a legal or an equitable remedy following a trial.") (quoting *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994). Preliminary injunctive relief "inherently requires a causal connection between the injunction and harm." *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, No. 18-5194, 2019 U.S. Dist. LEXIS 182350, at *9 (E.D. Pa. Oct. 18, 2019).

Plaintiffs claim that they have suffered various harms to the administration of their benefits and other programs as the result of mail delays. But Plaintiffs have not established—as is their burden—a "causal connection" between the mail delays and the challenged policies, or that any future delays, if there are any, would be the result of Postal Service operational changes. As set

forth *supra*, USPS has taken a number of steps that have resulted in service performance improving.

Nor can Plaintiffs' election mail related harms support a finding of irreparable injury. Indeed, in light of the service improvements and ongoing efforts to timely deliver election mail described *supra*, Plaintiffs have failed to show that, if residents mail their ballots a reasonable time before the election (which is approximately two months away), they would not be received in time to be counted. To argue otherwise is pure speculation, which is an insufficient basis for the extraordinary relief Plaintiffs seek.

Finally, for the reasons explained *supra*, there is no procedural injury. PI Mot. at 49-50. As discussed *supra*, Plaintiffs cannot state a claim under section 3661, and thus cannot have suffered any procedural injury as a result of any violation of that statute. And even if there was a technical violation, the mere failure to comply with a procedural rule, absent any independent harm, is insufficient to show Article III injury (and thus is not, by definition, sufficient to show "certain and great" injury). *See Summers*, 555 U.S. at 496.

### III.    The balance of equities counsel against Plaintiffs' requested relief.

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor. As explained *supra*, USPS is currently undertaking extensive efforts to facilitate the timely delivery of election mail. There is no dispute that USPS has the capacity, including in terms of financing and machinery, to handle the anticipated surge in election mail. And Plaintiffs and voters have an opportunity to avoid any harm by mailing in their ballots without delay. These considerations demonstrate that the equities weigh against an injunction here.

Moreover, an injunction in this context would be particularly inappropriate. Plaintiffs seek to inject the court in overseeing the entirety of the Postal Service's operations. They demand this Court oversee the Postal Services' postmarking, overtime, transportation, and operational practices—something that is inappropriate even in APA cases, and for good reason. *See, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (noting the importance of "protect[ing] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."). In effect, then, they would designate this Court as the acting Postmaster General. And they would do this even though they have not actually challenged many of these policies (such as USPS's postmarking policy, where, as discussed, the Postal Service goes above and beyond to ensure that ballots are postmarked. *See* Glass Dec. ¶¶ 33-41. The public interest is not served by such actions, particularly when there is no guarantee that the vague and overarching mandatory injunction sought by Plaintiffs would have any noticeable effect, let alone actually redress any of their purported injuries. *See Norton*, 542 U.S. at 66-67.

## IV.    Plaintiffs' proposed injunction does not comport with Rule 65.

The Court should not enter the relief requested by Plaintiffs, even if they somehow overcome each factual and legal hurdle identified above. Plaintiffs' request does not comply with Rule 65's specificity requirement.  Rule 65 requires that "[e]very order granting its injunction . . . must state its terms specifically; and describe in reasonable detail – and not by referring to the complaint or other document – the acts or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "As the Supreme Court has explained, the policy behind this principle is 'to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *Leonard v. Mackerth*, No. 11-

7418, 2014 WL 512456, at *10 (E.D. Pa. Feb. 10, 2014) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). "Broad, non-specific language . . . does not give the restrained party fair notice of what conduct will risk contempt." *NAACP v. City of Philadelphia*, 2014 WL 727410, at *3 (E.D. Pa. Dec. 19, 2014) (quoting *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994)). This also includes framing an injunction that uses "vague terms" such as "required" or "necessary," as such an order is "very likely to be overbroad, difficult for [defendant] to comply with, and difficult for this Court to enforce." *INDECS Corp. v. Claim Doc, LLC*, No. 16-4421 (JBC), 2017 WL 186178, at *4 (D.N.J. Mar. 21, 2017).

Here, Plaintiffs' proposed order seeks to enjoin "the operational changes adopted by Defendants in July 2020," Proposed Order, ECF No. 18-2, without defining what those changes specifically are (and again, the changes of which Plaintiffs complain largely did not occur). Indeed, the order compounds this problem, seeking to "prohibit[] overtime, late trips, or extra trips, in a manner inconsistent with the Postal Service's policies and practice prior to the implementation of the operational policy changes adopted in July 2020." *Id.* But Plaintiffs do not define "inconsistent," nor do they define the Postal Service's policies and practices (something that could be open for debate, given USPS's sheer scope and decentralized nature regarding overtime, *see* Curtis Dec. ¶ 13 ("overtime work is evaluated and approved by field managers, not managers at postal Headquarters")), and, of course, they do not define the specific changes of which they complain. Additionally, they seek to require to enjoin the Postal Service from "[f]ailing to take *reasonable steps* to ensure that every piece of Election Mail receives a postmark the day it is received by the Postal Service," Proposed Order (emphasis added), a command that obviously lacks the requisite specificity. The remainder of their Proposed Order suffers from similar infirmities.

**CONCLUSION**

The Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: September 11, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

WILLIAM M. McSWAIN
U.S. Attorney for the
Eastern District of Pennsylvania

ERIC WOMACK
Assistant Branch Director, Federal Programs Branch

*/s/* Kuntal Cholera
ALEXIS ECHOLS
DENA ROTH
JOSEPH E. BORSON
KUNTAL V. CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
kuntal.cholera@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all users receiving ECF notices for this case.

/s/ Kuntal Cholera

Kuntal V. Cholera
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

Attorney for Defendants

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

**National Association for the Advancement of
Colored People,**

Plaintiff,

**v.**

**United States Postal Service, *et al.*,**

Defendants

Case No. 20-cv-2295

### DEFENDANTS' FURTHER RESPONSE TO
### THIS COURT'S NOVEMBER 3, 2020 ORDER

Defendants respectfully provide the following further response to this Court's November 3, 2020 Order. At the outset, Defendants reiterate that they take their compliance with the orders of this Court extremely seriously. As this Court is aware, throughout this case and the related cases, Defendants have undertaken significant efforts to comply with this Court's orders. As explained below, after this Court issued its November 3, 2020 Order, Defendants undertook further efforts to comply with the Court's Order to the best of their ability.

On November 3, 2020, the Postal Inspection Service conducted inspections in the 220 mail processing facilities across the country that handle Election Mail, including the relevant processing facilities in the specific postal districts identified in this Court's November 3, 202 order. Among other things, they searched holding and non-holding areas for Election Mail, scanned for delayed mail, and ensured that Election Mail was processed expeditiously. Any deficiencies were identified and reported to management for resolution. Throughout the day and into the evening, processing plants, including those in the postal districts required by this Court's order, were also

1

conducting regular "sweeps" for any remaining ballots, so that they could be expeditiously processed and directed to their final destination. Indeed, after a conversation with counsel for the Plaintiffs, Defendants sent a further email to all processing plants yesterday evening reminding them of this responsibility.

Defendants therefore conducted inspections by Postal Inspectors and sweeps at the relevant plants yesterday, pursuant to this Court's order, but it was not possible for the Postal Inspectors to conduct sweeps of all relevant facilities by this Court's 3pm deadline. Inspectors were not physically on site at the time of the Court's order, because they had been scheduled to arrive later in the day, to conduct inspections at the most critical time when the vast majority of any ballots processed on Election Day would be on site, and even if they were, Inspectors are not equipped to do full operational sweeps in the time allotted, although they do and did conduct their own sweeps as part of their reviews. We explain why below and further demonstrate how Defendants effectively accomplished the goal underlying the Court's order.

I. **The Postal Inspection Service conducted daily reviews of mail processing facilities handling Election Mail, but it was not possible to change the nature or timing of this review in the limited time available.**

The Postal Inspection Service has conducted daily reviews, called Observation of Mail Conditions ("OMCs") of 220 mail-processing facilities handling Election Mail for the past several days, including yesterday. Brubaker Dec. ¶ 6. Typically, one (and sometimes two) Inspectors are assigned to each facility. *Id.* These facilities are very large, and Inspectors are instructed to walk throughout the facility and observe the conditions of Election Mail, chiefly ballots, processed and handled by employees. *Id.* They are directed to consider specific things, including reviewing staging areas and areas outside the staging area for Election Mail, scanning for delayed mail, ensuring Election Mail is processed expeditiously, and ensuring no ballots are held for postage

due.  *Id.*  The purpose of the review is to do everything possible to ensure that ballots are delivered timely; and any deficiencies are identified and reported to management for prompt resolution.  *Id.*

That process occurred yesterday.  For the twelve districts identified in this Court's order, the following matters were discovered related to ballots: (a) in Johnstown, PA, three delayed ballots were discovered and were being expedited by management for delivery, and (b) in Lancaster, PA, ten ballots were discovered from collectors and referred to management for delivery. *Id.* ¶ 10.

It was not, however, possible, to have Inspectors on site in the specific districts identified in the Court's order to conduct and complete sweeps between 12:30 and 3pm.  There are two main reasons why this was so.  *First*, the schedule for Postal Inspection Service's daily reviews is set in advance, and Inspectors were scheduled to be at their processing plant from 4pm to 8pm on Election Day, because the bulk of the mail from delivery units arrived at or after that time, and processing begins thereafter.  *See id.* ¶ 7; *see also* Bray Dec. ¶ 8.  In other words, the vast majority of ballots processed in plants on Election Day would be processed between 4pm and close of polls, and the management suggested that time for the Inspection Service so that they would be present to observe compliance with postal operational efforts to postmark and deliver ballots to the Boards of Election by the respective deadlines.  Bray Dec. ¶ 8.  Accordingly, Inspectors were instructed to pay attention to specific postmarking or ballot-in-hand deadlines for each state, which impact the processing of Election Mail on Election Day.  Brubaker Dec. ¶ 7,

At the time the Court's order was issued at 12:30pm, it was not practicable to move OMCs earlier in the day due to logistical considerations.  Brubaker Dec. ¶ 8.  The Inspectors were not in the facilities; as Election Mail reviews are not a normal duty, and Inspectors were assigned to conduct them for a particular period of time.  *Id.*  Before the OMC was to begin at 4pm, they were

3

conducting their normal duties related to their assigned team (e.g., mail theft, mail fraud, dangerous mail responses, etc.). *Id.* When the Court order was issued, there was not enough time to contact them, to have them travel to the processing facilities, and to assign new duties to them at the facilities. *Id.* Notably, some of the duties they were undertaking elsewhere included election matters unrelated to OMCs. *Id.*

*Second*, the term "sweep" is used in multiple contexts by the Postal Service. *Id.* ¶ 9. As has generally been discussed in this litigation, it is an operational term that means that employees examine every place in the plant to make sure no ballots have been left behind pursuant to a specific plan. These sweeps involve approximately one to five employees, depending on the size of the facility. It is not possible for Inspectors to conduct this type of sweep in the time allotted, however, Inspectors did observe these sweeps in addition to their own efforts, and reported any deficiencies to facility management. *Id.* Inspectors also conducted their own "sweeps" of facilities as part of the OMC, where they search equipment, trailers, recyclable dumpsters, staging areas, empty equipment areas, bathrooms, breakrooms, locker rooms, stock rooms, offices, closets, etc. *Id.*

## II. The Postal Service conducted regular sweeps at all plants on Election Day.

The Postal Service did, however, conduct regular sweeps at all its plants on Election Day, as part of a longstanding review process in place to ensure that no ballots are left behind. "Sweep" is the term used when Postal Employees search plants to be sure that all ballots are accounted for and being processed correctly. Brady Dec. ¶ 3. "This includes searching the facility to be sure no ballots are in any unexpected locations . . . as well as identifying ballots in the mailstream that are not moving with sufficient speed." *Id.* The search is not limited to the interior of the plant and encompasses the surrounding area, including the docks and any trailers that might contain mail. *Id.* During the last days of the election, when all ballots must be dispatched from plants under the

4

extraordinary measures undertaken by the Postal Service, all ballots retrieved during sweeps are expedited through whatever means are necessary to ensure they are delivered in time to be counted, assuming that it is physically possible. *Id.* ¶ 4. While some states allow ballots to be counted after Election Day, the Postal Service, through Election Day, treats all ballots as if they must be delivered by the close of polls. *Id.* ¶ 4.

Sweeps have generally been taking place daily since January. *Id.* ¶ 6. Plants are required to submit an "all clear" report, indicating that it has searched for ballots and either none were identified, or that any identified were moved expeditiously when found. *Id.* This report is submitted at 10am each day. *Id.* For November 3rd, in addition to the 10am "all clear," all plants were also instructed to continuously sweep the plants for ballots starting at 7am (when the new shift starts) and continuing as long as the state Boards of Elections (BOEs) continue to accept mail. *Id.* ¶ 7. All plant staff are on high alert to find any ballots that may not be in the proper place. Any ballots identified in these sweeps were to be moved to the BOEs as quickly as necessary to be counted outside of the Postal Service's usual transportation network. *Id.* This includes arrangements with some BOEs who make plans to come to the plants to pick up ballots themselves. *Id.; see also* Hr'g Tr. of Michael Barber, Oct. 31, 2020, at 15:13-19 ("Tuesday, we will have hourly sweeps then from most mails coming in all the way up until – each individual state's Board of Election have a slightly different receipt times. So we provided all of that information to every postal facility across the country and they will make continuous sweeps up until those times of the Board of Elections still continue to accept."). On Election Day, this plan was executed, and the sweeps were carried out. Bray Dec. ¶ 7. At the request of Plaintiffs' counsel, and consistent with these processes, the Postal Service sent the attached email to all Plant Managers last night emphasizing that plants must "continu[e] to do regular sweeps to ensure that all ballots can be

timely delivered in accordance with the state's Election Day ballot deadline **today**" and that "[a]ll plants must ensure that we provide a final clean sweep for all Election Mail Ballots for deliveries **today** in all states for which you provide service." (emphasis original). *See id.* ¶ 9.

The Postal Service has confirmed with the plant maangers that sweeps were carried out as instructed yesterday in plants located in the Central Pennsylvania, Philadelphia, Detroit, Colorado/Wyoming, Atlanta, Houston, Alabama, Northern New England, Greater South Carolina, South Florida, Lakeland, and Arizona districts. Bray Dec. ¶¶ 10-22.

## CONCLUSION:

As discussed above, the Inspection Service was not able to conduct specific sweeps at specific times of the day, as this was not operationally possible to implement in the limited time available for the reasons stated above. Our understanding at the hearing was that the Court did not intend for the Postal Service to make operational changes on Election Day, but rather to confirm that the existing processes were functioning as anticipated. Defendants conducted ongoing sweeps of the plants in the relevant districts throughout the day to identify any ballots and expedite them to BOEs, and the Inspection Service conducted its thorough observational process during Election Day, at which point it identified only a handful of ballots. Defendants therefore respectfully indicate that they have provided assurance that the relevant plants had sufficient oversight on Election Day to ensure that ballots were expedited as quickly as possible.

Dated:  November 4, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

*/s/ Joseph E. Borson*
JOSEPH BORSON (VA Bar No. 85519)
KUNTAL V. CHOLERA
ALEXIS ECHOLS
DENA ROTH
JOHN J. ROBINSON
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 514-1944
E-mail: Joseph.Borson@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Vote Forward, *et al*,

Plaintiffs,

v.

Case No. 20-cv-2405

DeJoy, *et al.*,

Defendants.

## DECLARATION OF DANIEL B. BRUBAKER

I, Daniel B. Brubaker, of the United States Postal Inspection Service ("Postal Inspection Service") hereby make the following declaration in lieu of an affidavit as permitted by 20 U.S.C. § 1746.

1. The Postal Inspection Service is the law enforcement and security arm of the U.S. Postal Service. To carry out its mission, it employs Postal Inspectors, Postal Police Officers, and support staff.

2. I am the Inspector in Charge (INC) of the Security Group which is primarily located at United States Postal Service's National Headquarters in Washington, D.C. and have been in this role since September 28, 2019.

3. Prior to being the INC of the Security Group, I was the INC of the Inspection Service's Philadelphia Division from March 2017 to September 2019. I have been employed by the Inspection Service since September 1999 and have held roles as Assistant Postal Inspector in Charge, Team Leader, and Postal Inspector during that time.

4. As the INC of the Security Group I oversee the Inspection Service's role in the Postal Service's Election Mail efforts.

5. The Inspection Service consists of 17 different divisions covering all 50 states as well as Guam, Puerto Rico, and the Virgin Islands. Each division has domiciles where personnel are physically located. The Inspection Service employs approximately 1,280 Postal Inspectors at approximately 190 work sites.

6. The Inspection Service has conducted daily reviews, called Observation of Mail Conditions ("OMCs"), of 220 mail-processing facilities handling Election Mail for the past several days according to schedules set several days before election day. On November 3, 2020, Inspectors were scheduled to be at their assigned facility from 4 p.m. to 8 p.m. Typically, one (and sometimes two) Inspector was assigned to each facility. The facilities are very large – in many of them, the processing machines are almost as large as a football field. Inspectors are instructed to walk throughout the facility and observe the conditions of Election Mail, chiefly ballots, processed and handled by employees. The Inspectors consider a specific list of items (attached as Exhibit 1). These include reviewing Election and Political Mail logs for accuracy and completeness, reviewing staging areas for Election and Political Mail and areas outside the staging area for Election and Political Mail, scanning for delayed mail, ensuring Election Mail is processed expeditiously, and ensuring no ballots can be held for postage due. The overall purpose of the reviews is to do everything possible make sure ballots are delivered timely. Deficiencies are identified and reported to management for prompt resolution.

7. In consultation with the Postal Service management, it was determined Inspectors were scheduled, in advance, to be at their processing plants from 4 p.m. to 8 p.m. on election day, because the bulk of the mail arrives from

delivery units that carriers collected throughout the day after approximately 4 p.m., and processing begins then. Inspectors had been instructed to pay attention to specific postmarking or ballot-in-hand rules for each state, which impact the processing of Election Mail on November 3, 2020. In addition to this role, the Inspection Service was also an overt security presence at the facilities.

8. When the Court issued its Order at approximately 12:30 p.m., it was not practicable to move OMCs earlier in the day due to logistical considerations. At the time the Order was issued, the Inspectors were not at the facilities. The OMCs are not a normal duty and Inspectors had been assigned to conduct them for a particular period of time. In the time prior to the OMC they were conducting their normal duties related to their assigned team (e.g., mail theft, mail fraud, dangerous mail responses, etc.). When the Court order was issued, there was not enough time to contact them, to have them travel to the processing facilities, and to assign new duties to them at the facilities. Notably, some of these duties they were undertaking elsewhere included election matters unrelated to OMCs.

9. The term "sweep" is used in multiple contexts in the Postal Service. It is used by employees in operations – it means that employees examine every place in a plant to make sure no ballots have not been left behind pursuant to a specific plan. These sweeps involve approximately one to five employees, depending on the size of the facility, and Inspectors did observe these sweeps in addition to their own efforts, and reported any deficiencies to facility management. In addition to this, Inspectors conducted their own "sweeps" of facilities as part of the OMC, where they search equipment, trailers, recyclable dumpsters, staging areas, empty equipment areas, bathrooms, breakrooms, locker rooms,

stock rooms, offices, closets, etc.  It is not possible for them to conduct the same type of sweep as operations employees in the time allotted.

10. For the locations set forth in the Order (Central Pennsylvania, Philadelphia, Detroit, Colorado/Wyoming, Atlanta, Houston, Alabama, Northern New England, Greater South Carolina, South Florida, Lakeland, and Arizona) the following matters were discovered related to ballots:

      a.In Johnstown, PA three delayed ballots were discovered and were being expedited by management for delivery.

      b.In Lancaster, PA ten ballots were discovered from collectors and referred to management for delivery.

Executed at Washington, D.C., on this 4th day of November 2020.

Daniel B. Brubaker

UNITED STATES POSTAL INSPECTION SERVICE

# Security Group

| OMC - Section B. Processing and Distribution (P&DC/NDC/Other Processing Facilities) | | |
|---|---|---|
| *Walk the facility and observe the conditions of mail and consideration items listed below. As appropriate, locate a manager and work with them to identify your answers to the questions below. Include comments for **all** answers of **NO** or **NA**.* | | |
| Inspector: | Date: | Division: |
| **ITEM** | **MAIL CONDITION OBSERVED** | **Y/N/NA** | **ITEMS FOR CONSIDERATION** |

| ITEM | MAIL CONDITION OBSERVED | Y/N/NA | ITEMS FOR CONSIDERATION |
|---|---|---|---|
| B1 | EM/PM "ALL CLEAR" certification done on previous day? | | Ask to see the previous day's ALL CLEAR; or check for ALL CLEAR in USPS BLUE. https://facilitycerts.usps.gov/. |
| B2 | EM/PM log is present and properly completed? | | Ask to see the "Plant Political/Election Mail Log" at the dock. Verify it is current, complete and accurate. All Acceptance Employees are required to record every qualified EM/PM mailing accepted in the log. |
| B3 | EM/PM samples, copies, or descriptions are kept/recorded? | | The expeditor receives the paperwork from the driver. He validates the count and keeps a copy and gives a copy to the driver. |
| B4 | EM/PM is moved to staging area or positioned for processing? | | EM/PM can only move from docks to the EM/PM staging area or positioned by machines for processing. Plants should have staging areas clearly marked for EM/PM. |
| B5 | EM/PM is found outside the staging or processing area? | | Observe: docks, opening unit, 010, manual flat/letter sorting, pouching/sack operations, other staging areas, express, registry, all non-floor areas, storage, offices, break rooms, etc. |
| B6 | EM/PM is found delayed? Verify with "Mail History" app scans | | Scan a sampling of barcode labels on placards/trays. If DELAYED EM/PM is found, annotate pieces/volumes in the comments section and the narrative. |
| B7 | EM/PM is found unworked in Nixie/ Hazmat unit? | | Verify EM/PM in NIXIE is being worked expeditiously. |
| B8 | EM/PM is being handled expeditiously? | | Ensure every effort is made to process EM expeditiously. Confirm it is processed in order of arrival. EM staging areas are expected. If First In/First Out is applies, clearance tags should be used. |
| B9 | EM with postage due is handled properly? | | **No** Election Mail (ballots) can be held for postage due. |
| B10 | Tag 191 (EM/GREEN) and Tag 57 (PM/RED) are being used? | | Use of Tags 191 and 57 is OPTIONAL. Tags identify trays and sacks as containing ballots (only), or PM, and increase visibility in the network. Once EM/PM is co-mingled in processing, tags are generally not expected. |

| ITEM | MAIL CONDITION OBSERVED | Y/N/NA | ITEMS FOR CONSIDERATION |
|---|---|---|---|
| B11 | Postal manager was briefed? | | A manager for the facility should be briefed of the observations and any issues that need addressed. |
| | | | |

| OMC - Section B. Processing and Distribution (P&DC/NDC/Other Processing Facilities) | | |
|---|---|---|
| *After observing all conditions, completing the questions, and briefing the manager of your findings, write your narrative summary below. Describe any observations of note, approximate volumes of delayed or curtailed EM/PM, or issues needing addressed. This portion and your report narrative is required and included in the OMC Executive Summary Report.* | | |
| **Facility:** | | **Manager Briefed:** |
| **Facility Address:** | | |
| **Date:** | | **Time:** |
| OMC REPORT NARRATIVE | | |

*(Insert narrative here)*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Vote Forward, et al.,

        Plaintiffs,

v.

Louis DeJoy, in his official capacity, et al.,

        Defendants.

No. 20-cv-2405 (EGS)

## DECLARATION OF KEVIN BRAY

I, Kevin Bray, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, hereby declare as follows:

1.     I have been with the Postal Service for 26 years. In that time, I have served as an operations specialist, manager of in-plant support, and executive manager, area, in-plant support. Currently I am the executive lead for mail processing, in the 2020 elections. In that role, I am responsible for all mail processing during the 2020 election.

2.     I am filing this declaration to explain the Postal Service's process of sweeping its plants to ensure that all ballots are dispatched expeditiously, and to ensure that the maximum number of ballots are delivered to Boards of Elections in time to be counted.

3.     "Sweep" is the term used when Postal Service employees search plants to be sure that all ballots are accounted for and being processed correctly.[1] This includes searching the

---

[1] While not relevant to this litigation, sweeps are also intended to identify other election mail and political mail and ensure that it does not get lost.

facility to be sure no ballots are in any unexpected locations, such as in manual operations (around 5 percent of mailpieces are rejected by automated machines and sorted by hand), as well as identifying ballots in the mailstream that are not moving with sufficient speed. The search is not limited to the interior of the plant and encompasses the surrounding area, including the docks and any trailers that might contain mail.

4.      During the last days of the election, when all ballots must be dispatched from plants under the extraordinary measures undertaken by the Postal Service, all ballots retrieved during sweeps are expedited through whatever means are necessary to ensure they are delivered in time to be counted, assuming that is physically possible. While some states allow ballots to be counted after election day, the Postal Service, through election day, treats all ballots as if they must be delivered by the close of polls.

5.      Due to the large size of postal plants and their surroundings, a sweep takes a considerable amount of time. Depending on the size of the plant, it could take a single employee several hours to complete. Some smaller plants only require 1-2 employees to sweep, while larger plants, such as Los Angeles, require 4-5. The size of the team is designed to make sure it can be completed within an hour. It is not something that a single employee could do on an hourly basis, and it would prevent them from doing any other duties in that time. It would not be possible for a Postal Inspector or manager to sweep a plant while simultaneously observing it to ensure that all election procedures are followed. It would also take a Postal Inspector longer to sweep a plant, because they have less familiarity with the facility.

6.      Sweeps have been taking place daily, followed by an "all clear" report, where the facility certifies that it has been searched for ballots and either none were identified, or any that were identified were moved expeditiously when found. This "all clear" certification has been a

requirement since January and is due at 10:00 am local time. It certifies that the plant has been swept and that all mail that was processed the previous night has been dispatched. If a facility fails to clear it must explain why. In addition, Headquarters alerts the relevant Division Director or Regional Vice-President to follow up. All plants have been performing these throughout the year and are experienced with the process.

7.      For November 3rd, in addition to the 10:00 am "all clear," all plants were also instructed to continuously sweep the plants for ballots starting at 7:00 am (when the new shift starts) and continuing as long as Boards of Elections (BoEs) continued to accept mail. All plant staff are on high alert to find any ballots that may not be in the proper place. Any ballots identified in these sweeps were to be moved to the BoEs as quickly as necessary to be counted, outside of the Postal Service's usual transportation network. This includes arrangements with some BoEs who make plans to come to plants to pick up ballots themselves. Similar hourly sweeps are done for other date-critical events, such as IRS Tax day, and the facilities are experienced with this process. On Election Day, this plan was executed, and the sweeps were carried out.

8.      While plants are staffed throughout the day, the vast bulk of mail is processed at the plants starting at 4:00 pm, when some retail facilities close and begin bringing mail to the plant. The busiest hours at a plant are between 4:00 pm and 11:00 pm. Because of this, the vast majority of ballots processed in plants on Election Day would be processed between 4:00 pm and the close of polls. This is why we suggested that time for the Inspection Service, so they would be present to observe compliance with postal operational efforts to postmark and deliver ballots to the Boards of Election by the respective deadlines.

3

9.     At the request of Plaintiffs' counsel, and consistent with our practices described above, the Postal Service sent the attached email to all Plant Managers last night emphasizing that plants must "continu[e] to do regular sweeps to ensure that all ballots can be timely delivered in accordance with the state's Election Day ballot deadline today" and that "[a]ll plants must ensure that we provide a final clean sweep for all Election Mail Ballots for deliveries today in all states for which you provide service." This process is distinct from, but complementary to, the review process conducted by the U.S. Postal Inspection Service.

10.     Today, I confirmed that the sweeps were carried out as instructed in plants located in the Central Pennsylvania, Philadelphia, Detroit, Colorado/Wyoming, Atlanta, Houston, Alabama, Northern New England, Greater South Carolina, South Florida, Lakeland, and Arizona districts. I confirmed this by calling and speaking to the relevant plant managers directly.

11.     Central Pennsylvania confirmed that it began sweeping the facility at 10:00 am, and continued during the day through the last dispatch.

12.     Philadelphia confirmed that it began sweeps at 8:00 am and continued through the last dispatch and pickup.

13.     Detroit confirmed that sweeps began at 11:00 am and continued throughout the day through the last dispatch.

14.     Colorado/Wyoming confirmed that sweeps began at 10:00 am an continued until all ballots were dispatched or handed off to BoEs.

15.     Atlanta confirmed that sweeps began at 10:00 and ran throughout the day until the last dispatch of ballots.

16.  I was not able to confirm the Houston start time by the time this declaration was drafted but confirmed that sweeps were ongoing at 12:00 pm through when the last ballots were dispatched.

17.  Alabama confirmed that sweeps began at 7:00 am and continued until the 12:00 pm Alabama cutoff time.

18.  Northern New England confirmed at it began sweeps at 7:00 am and continued through the last dispatch.

19.  Greater South Carolina confirmed that sweeps began at 7:00 am and continued through the last dispatch.

20.  South Florida confirmed that sweeps began at 7:00 am and continued through the last dispatch and pickups of ballots.

21.  Lakeland confirmed that it began sweeping at 3:00 am and continued through the last dispatch of ballots.

22.  Arizona confirmed that it began sweeping at 8:00 am and continued until the last dispatch of ballots to the BoEs.

23.  I also understand that questions have been raised about data that identifies ballots that have received an initial or first processing scan within the Postal Service's processing network, but have not received a destination or finalization scan. The lack of a destination or finalization scan does not mean that the ballots were not delivered.

24.  There are many reasons that a ballot may not receive a finalization scan. Most significantly, as part of the extraordinary efforts used by the Postal Service to expedite the delivery of ballots, we instructed plants to take ballots out of our normal processing (to "hold them out") for expedited delivery to the BoEs (or organize for pickup by the BoEs). This

5

process involves an expedited approach to sorting ballots by BoE on our processing equipment, and thus the ballots receive a first scan and are then removed, or "held out" from further processing. This means they would not receive a finalization scan.

25.     For example, in North Texas, the processing plant has agreements with most of the state's Boards of Election to hold out identified ballots for direct delivery to the BOE. In that circumstance, the ballots would show a first processing scan, but would not have a destination scan. Thus, many delivered ballots do not have final or destination scans.

26.     Additionally, as a normal part of mail processing, mailpieces sometimes will be rejected through automation. Mailpieces may land in a "reject" bin on a machine during processing, meaning that the machine was unable to sort it. For example, two mailpieces may stick together and the machine cannot independently read their addresses. There are also circumstances where a barcode will be unreadable because of a smudge. These mailpieces can be manually sorted and would not necessarily receive a finalization scan prior to being sent to a delivery unit. As such, the most reliable way to tell that a facility is clear of ballots is the all clear process, rather than by comparing entry and exit scans.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

6

Executed this 4th day of November, 2020.

Kevin Bray

| From: | Barber, Mike L - Plano, TX |
|---|---|
| To: | Plant Mgr - Chesapeake;  Plant Mgr - Coastal Southest;  Plant Mgr - Lakeshores;  Plant Mgr - Mid-Atlantic;  Plant Mgr - Mid-South;  Plant Mgr - Midwest;  Plant Mgr - New England;  Plant Mgr - New York Metro;  Plant Mgr - Pacific Northwest;  Plant Mgr - Southern California;  Plant Mgr - Southwest;  Plant Mgr - Westshore;  Proc Division Directors - East;  Proc Division Directors - West;  Munoz, Larry P - San Diego, CA;  Coleman, Dane A - Windsor, CT;  MIPS |
| Cc: | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;  Williams Jr, David E - Washington, DC |
| Subject: | Reminder: Sweeps |
| Date: | Tuesday, November 03, 2020 7:37:47 PM |

Managers

We're in the final stretch - as we've discussed, please make sure you are continuing to do regular sweeps to ensure all ballots can be timely delivered in accordance with the state's Election Day ballot deadline **today**.

If there are any questions on a state's deadlines or other requirements, contact the Law Department for clarification: ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮ @usps.gov, and ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮ @usps.gov.

All plants must ensure that we provide a final clean sweep for all Election Mail Ballots for deliveries **today** in all states for which you provide service.

Consistent with that mandate, mail-in ballots must be swept throughout the night until the final dispatch to your local BOE.  Ensure ballots are pulled from all mail processing and manual operations, to include pieces provided directly by Retail offices, for all Board of Elections within your service area.